Casey R. Fronk (Illinois Bar No. 6296535)
Cheryl M. Mori (Utah Bar No. 8887)
Attorneys for Plaintiff
Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, UT  84101
Tel: (801) 524-5796
fronkc@sec.gov
moric@sec.gov

# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | **COMPLAINT** |
| Plaintiff, | Case No.: |
| v. | Judge: |
| THE ESTATE OF STEPHEN ROMNEY SWENSEN, and CREW CAPITAL GROUP, LLC, a Nevada limited liability company, | Magistrate Judge: |
| Defendants, | |
| WENDY SWENSEN, an individual, SARIA C. RODRIGUEZ, an individual, WS FAMILY IP, LLC, a Utah limited liability company, WINGMAN, LLC, a Utah limited liability company, and SWENSEN CAPITAL, LLC, a Utah limited liability company, | |
| Relief Defendants. | |

1

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges as follows:

## SUMMARY

1. This case involves the late Stephen Romney Swensen's ("Swensen's") multi-year fraudulent securities offering, through which he defrauded over 50 investors of at least $29.3 million.

2. Since at least July 2011 until his death on June 6, 2022, Swensen made false statements to investors to induce them to invest in Crew Capital Group, LLC ("Crew Capital"). Among other things, Swensen told investors that Crew Capital was a safe investment fund paying a guaranteed minimum of 5% annually, and up to 10% annually depending on the performance of the S&P 500 index; that Crew Capital invested in various securities, including in bank loans and options on the S&P 500 index; and that Crew Capital was one of the safest places to invest their money.

3. In fact, Crew Capital, a limited liability company Swensen created and operated, invested no money in securities. Rather, once investors solicited by Swensen sent their investment funds to Crew Capital, Swensen pooled the funds in an account in Crew Capital's name at Wells Fargo Bank, N.A., on which Swensen was the sole signatory. Swensen then used a portion of the money to make periodic payments of fictitious earnings to certain investors in a Ponzi-like fashion, and used the bulk of the money for personal expenses, including the living expenses of his family and his mistresses, and luxuries such as private airplanes. Swensen also diverted investor funds from Crew Capital to other businesses that Swensen owned (including Relief Defendants Swensen Capital, LLC and Wingman, LLC).

4. Although Swensen is now deceased, Crew Capital continues to violate the federal securities laws by disseminating false and misleading statements to investors. Swensen created a website for Crew Capital that is still operating and displaying fictitious information to investors about the investors' purported "accounts" with Crew Capital. In fact, no such accounts exist, and

the remaining investor money sent to Crew Capital is now being spent and otherwise dissipated by Defendants and Relief Defendants.

5. The Commission brings this action against Swensen's estate and Crew Capital to halt Crew Capital's ongoing violations of the federal securities laws, prevent further harm to investors through the dissipation of assets, seek disgorgement stemming from Swensen's and Crew Capital's wrongdoing, and recover investor money from the Relief Defendants so that funds can be returned to investors who were victims of the fraud.

## JURISDICTION AND VENUE

6. The Commission brings this action pursuant to Sections 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)], and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d) and (e)].

7. This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

8. Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Defendants and Relief Defendants are found, inhabit, and/or transacted business in the District of Utah, Northern Division, and one or more acts or transactions constituting the violations alleged herein occurred in the District of Utah.

9. Swensen and Crew Capital were, individually and collectively, involved in the offer and sale of securities, as that term is defined under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)], issued by Defendant Crew Capital Group, LLC.

10. Defendants, directly or indirectly, made use of the mails or the means or instrumentalities of interstate commerce in connection with the conduct alleged in this Complaint.

## DEFENDANTS

11. **The Estate of Stephen Romney Swensen** (the "Swensen Estate") is the successor in interest to Swensen, who is deceased. Swensen's widow, Wendy Swensen, is the Executor of the Swensen Estate. The Swensen Estate comprises the property in which Swensen had an interest at the time of his death, including real, personal, or other property he owned, possessed, or controlled, whether directly or indirectly.

12. Prior to his death, Swensen exercised undisclosed *de facto* control over Crew Capital Group, LLC, through nominee/figurehead entities and individuals. Swensen controlled Crew Capital's bank account at Wells Fargo Bank, N.A. at all relevant times.

13. **Crew Capital Group, LLC, f/k/a Capital Cooperative Group, LLC** ("Crew Capital") is a Nevada limited liability company formed in March 2010 On information and belief, Swensen is the only individual to have management control over, or ownership interest in, Crew Capital. Crew Capital has no actual business operations other than Swensen's efforts to raise investments for Crew Capital. Swensen operated Crew Capital from Utah.

## RELIEF DEFENDANTS

14. **Wendy Swensen** ("Wendy"), age 51, is a resident of Utah. Wendy had been married to Swensen for 29 years at the time of Swensen's death. Wendy has received proceeds from Swensen's fraud to which she has no legitimate claim. Among other things, Swensen gave Wendy at least $356,000 in investor funds directly from Crew Capital, and also provided Wendy with real property and other assets Swensen purchased at least in part using investor funds.

15. **Saria C. Rodriguez** ("Rodriguez"), age 30, is last known to be a resident of Utah. Rodriguez received at least $40,136 in proceeds from Swensen's fraud, to which she has no legitimate claim. On information and belief, Swensen also used proceeds of the fraud to pay for Rodriguez's living expenses, and Rodriguez is in possession of property that Swensen purchased with proceeds from the fraud.

16. **WS Family IP, LLC** ("WS Family IP") is a Utah limited liability company formed in July 2022 with a principal place of business in Kaysville, Utah. Wendy is the sole manager of WS Family IP. WS Family IP holds title to at least a home in Kaysville, Utah that was purchased, at least in part, using proceeds of the fraud to which WS Family IP has no legitimate claim.

17. **Swensen Capital, LLC, f/k/a Last Advisor, LLC, f/k/a Four Buckets, LLC** ("Swensen Capital") is a Utah limited liability company formed in January 2014, and does business under the name Bucket Bliss. Its principal place of business is in Layton, Utah. Prior to his death, Swensen was the sole manager of Swensen Capital and the sole signatory on its bank account. In July 2022, Ronald S. Gibb became Swensen Capital's sole manager and became a signatory to its bank account. Swensen Capital received at least $978,429 in proceeds from Swensen's fraud to which it has no legitimate claim.

18. **Wingman, LLC** ("Wingman") is a Utah limited liability company formed in August 2020 with a principal place of business in Kaysville, Utah. Swensen was Wingman's sole manager. Wingman's business involved the creation of a messaging app called "Wingman" that is available on the Apple app store. Swensen funded Wingman's operations using proceeds from the fraud, to which Wingman has no legitimate claim.

## FACTS

19. Stephen Romney Swensen ("Swensen"), age 50 at the time of his death, was a resident of Kaysville, Utah. During the period in which Swensen operated the Crew Capital fraud, he was a registered representative of broker-dealers Summit Brokerage Services, Inc. (March 2020 to June 2014), Allegis Investment Services, LLC (July 2014 to May 2018), and J.W. Cole Financial, Inc. (May 2018 to June 2018), and an investment adviser representative of Allegis Investment Advisors, LLC (February 2017 to May 2018), J.W. Cole Advisors, Inc. (May 2018 to June 2018), and Wealth Navigation Advisors (June 2018 to June 2022).

20.     Swensen initially worked with his father, Philip Swensen, who was a registered representative of several broker-dealers during his career. Philip Swensen developed an investment approach that involved four "buckets." The safest investments were put into "Bucket 1," and were for short-term cash flow needs. The remaining three buckets were for progressively riskier investments, with the potential for higher returns. After Philip Swensen retired in July 2014, Swensen retained many of Philip's customers and continued using the "four bucket" approach.

21.     From approximately September 2013 to approximately May 2018, Swensen worked with Jason Kimber, who was a registered representative of broker-dealers Summit Brokerage Services, Inc. and Allegis Investment Services, LLC. From approximately May 2018 to approximately May 2022, Swensen worked with Jacob Cazier, an investment adviser representative of Wealth Navigation Advisors.

### Swensen's Fraudulent Scheme

22.     Beginning in at least July 2011, Swensen started offering and selling investment interests in Crew Capital. Swensen solicited his customers and clients during meetings at which Swensen advised them on their investment portfolios and retirement plans. Swensen recommended that his customers and clients invest in Crew Capital as part of their investment and retirement strategy.

23.     Swensen told investors, among other things, that Crew Capital was a safe investment fund that paid guaranteed minimum returns of 5% annually, with possible annual returns as high as 10% depending on how well the S&P 500 performed that year. He said that Crew Capital could provide their retirement income. He further said that Crew Capital was a "Bucket 1" investment, the safest investment in their portfolios.

24.     Swensen also told certain investors that they would be investing in a fund at the Bank of Utah, with the same guaranteed minimum returns of 5% to 10%. Swensen represented

this Bank of Utah fund was a "Bucket 1 investment," meaning that it was the safest of their investments. There was no fund at Bank of Utah, however, and after investors funded their accounts at Bank of Utah, Swensen immediately transferred those investor funds from the Bank of Utah to Crew Capital's bank account at Wells Fargo Bank.

25. Swensen also provided written documentation about the fictitious Crew Capital investment to some investors. Those documents falsely described Crew Capital as an "actively managed portfolio" that invested both in senior secured floating rate loans and options on the S&P 500 index. Some of the documents also falsely stated that Pacific Investment Management Company, LLC ("PIMCO") was the subadvisor to Crew Capital and that Crew Capital had been in existence since 1997. Other documents falsely stated that Crew Capital's "share class inception" date was April 29, 2011. Swensen also hired a graphic design company to create an official-looking logo, which he used on Crew Capital documentation.

26. Swensen also provided some investors with falsified PIMCO documents to make it appear that PIMCO and Crew Capital together managed a "Senior Floating Rate Fund." Swensen doctored actual PIMCO documentation for PIMCO's Senior Floating Rate Fund by adding his Crew Capital logo and the words "Crew" and "Crew Capital Group" in various places. One of the doctored documents represented that there was a "Crew / PIMCO Senior Floating Rate Fund" that invested in "floating or variable senior secured loans and short dated high yield bonds." Another of the doctored documents purported to be an annual report of the "Crew Capital Group / PIMCO Funds" and represented that a joint Crew/PIMCO fund existed with $318,897,000 in total assets. In fact, PIMCO never had any relationship with either Swensen or Crew Capital.

27. Swensen also developed and maintained a website for Crew Capital with the assistance of a web developer and a graphic designer. When Crew Capital was named Capital Cooperative, the website was available at www.capitalcoop.com. Once the name changed to

Crew Capital in 2015, the website was available at www.crewfunds.com. These websites represented, among other things, that Crew Capital could eliminate market risk, saying: "Do you want to eliminate market turbulence? Talk to your financial advisor about how." Swensen provided login credentials for the websites to Crew Capital investors. Investors were able to log in and view their account balances, including the fictitious returns. Investor accounts at the websites purported to show daily accrual of the guaranteed 5% annual returns, with an additional annual lump sum payment of up to another 5% annual return on the anniversary of the date of their investment. In fact, the representations regarding the accrual of funds in investor accounts were entirely fictitious.

28. Swensen maintained a bank account at Wells Fargo Bank in Crew Capital's name. Swensen alone controlled the account. He pooled Crew Capital investor money in this account.

29. Swensen obtained investor money in several ways. For example, he instructed investors at various times to write personal checks to Crew Capital, to obtain cashier's checks payable to Crew Capital, to wire funds directly to Crew Capital's accounts at Wells Fargo Bank, and/or to sign documentation authorizing the transfer of funds into Crew Capital's account directly from the investor's other investment or retirement accounts.

30. Swensen also instructed several investors to open self-directed IRA accounts at the Bank of Utah. Swensen further instructed these investors to sign a "Letter of Authorization" authorizing Swensen to direct the disposition of the funds in those self-directed Bank of Utah IRA accounts. Once the investors deposited money into their new Bank of Utah accounts (or, in some instances, transferred the money into the Bank of Utah from other investment or retirement accounts), Swensen instructed the Bank of Utah to wire the funds to Crew Capital's account at Wells Fargo Bank.

31.     By the time of Swensen's death, Swensen had raised at least $29.3 million in investor funds through these fraudulent schemes. Crew Capital's bank account received additional transfers of putative investor funds from the Bank of Utah of at least $7.1 million.

### Swensen's Statements About Crew Capital Were False

32.     Swensen's oral and written representations about Crew Capital were false. In reality, neither Swensen nor Crew Capital actually invested the money that investors put into Crew Capital. Neither Swensen nor Crew Capital had any affiliation with PIMCO. Once Swensen pooled investor funds in the Crew Capital account at Wells Fargo Bank, he used that account as though it were his personal account. He made Ponzi-type payments of returns to investors, which were funded from their own capital investment and from the capital investments of other victims. Swensen also used Crew Capital's money to pay for his family's living expenses. He used Crew Capital's money to buy and maintain several airplanes. He used Crew Capital's money to purchase homes and vehicles, and to fund his and his family's lifestyle. He spent Crew Capital's money on the living expenses of at least two mistresses. He also used Crew Capital's money to pay the operating expenses of Relief Defendants Swensen Capital, LLC and Wingman, LLC.

33.     Swensen continued to make false and misleading statements to investors even after he had obtained their money. For example, he provided false Crew Capital account statements to some investors purporting to show their Crew Capital account number, account balance, and accrued interest. Swensen also controlled the websites for Crew Capital, which displayed false account balances and earnings information to investors who logged in. Swensen controlled and updated the fake account balances and earnings information on the website.

34.     Swensen provided false Crew Capital account information to the Bank of Utah for the victims whose investments were done through the Bank of Utah. The Bank of Utah used that false information to create account statements issued by the Bank of Utah. These statements

from the Bank of Utah gave further assurance to investors that their money was safe and accounted for by the Bank of Utah.

35. Swensen also caused Crew Capital to issue false IRS Forms 1099 to investors. The Forms 1099 showed the amount of any withdrawals taken by investors during the year, including required minimum distributions for IRAs. The Forms 1099 showed the withdrawals as interest income, such that investors paid taxes on their fictitious investment returns.

36. By convincing investors that their Crew Capital investments were doing well and growing, Swensen persuaded several investors to invest additional funds in Crew Capital.

## Swensen Acted With Intent To Deceive

37. Swensen took several steps to hide the truth about Crew Capital from investors and create the appearance that Crew Capital was a legitimate company.

38. Swensen used a Nevada business entity creation service called Nevada Corporate Headquarters, Inc. ("NCH") to create and maintain Crew Capital's legal status as a Nevada limited liability company. He paid extra fees to NCH for their "privacy package," which meant that NCH and its affiliates placed their names (rather than Swensen's) on the documents filed with the Nevada Secretary of State for Crew Capital. This kept Swensen's name from appearing on documents for Crew Capital that were publicly available from the Nevada Secretary of State, thus maintaining the fiction that Crew Capital was not directly owned and operated by Swenson.

39. Swensen also used mail forwarding services for Crew Capital to create the appearance that Crew Capital was a legitimate company with offices in various states around the country. Initially, Swensen used the mail forwarding service offered by NCH, which allowed Crew Capital to have mailing addresses in Las Vegas, Nevada. Later, Swensen hired a virtual office/mail forwarding company that provided mailing addresses in large office buildings in Boston, New York City, and San Francisco. Swensen used these mailing addresses on the fictitious Crew Capital documents and account statements that he provided to investors. This

lent credibility to Swensen's false statements that Crew Capital was an independent, legitimate company operating an investment fund.

40. Swensen also obtained a toll-free number for Crew Capital and paid a virtual receptionist service to staff the number. Nonetheless, the phone calls for Crew Capital, and messages left by investors who called, were forwarded to Swensen. Crew Capital had no known employees other than Swensen, and no business operations other than the fraudulent efforts to induce victims to invest money. Swensen is the only person known to have ownership interest in or management control over Crew Capital. He signed its tax returns as its President.

41. Swensen hired a web designer and a graphic designer to make the Crew Capital paperwork and website appear more legitimate to investors. Through the web designer and hosting service, Swensen controlled Crew Capital's website and updated his victims' fictitious account balances that were shown on the website.

42. On information and belief, Swensen had actual knowledge of the falsity of his statements to investors and acted with intent to defraud investors.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)(1)]

### (Against Crew Capital and Swensen Estate)

43. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–42, inclusive, as if they were fully set forth herein.

44. By engaging in the conduct described above, Swensen and Crew Capital, and each of them, directly or indirectly, individually or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce or by use of the mails,

   a. employed devices, schemes, or artifices to defraud;

    b. obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c. engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit.

45. With respect to violations of Section 17(a)(1) of the Securities Act, each of Swensen and Crew Capital engaged in the above-referenced conduct knowingly or with severe recklessness.

46. With respect to violations of Sections 17(a)(2) and (a)(3) of the Securities Act, each of Swensen and Crew Capital engaged in the above-referenced conduct was at least negligent in its/his conduct and in making the untrue and misleading statements alleged herein.

47. By reason of the foregoing, Swensen and Crew Capital violated and, with respect to Crew Capital, unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]**

**(Against Crew Capital and Swensen Estate)**

48. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–47 inclusive, as if they were fully set forth herein.

49. By engaging in the conduct described above, Swensen and Crew Capital, directly or indirectly, individually or in concert with others, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails,

      a. employed devices, schemes, and artifices to defraud;

      b. made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      c. engaged in acts, practices, and course of business which operated as a fraud and deceit upon purchasers, prospective purchasers, and other persons.

50. Each of Swensen and Crew Capital engaged in the above-referenced conduct and made the above-referenced untrue and misleading statements knowingly or with severe recklessness.

51. By reason of the foregoing, each of Swensen and Crew Capital have violated and, with respect to Crew Capital, unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

### Equitable Disgorgement

### (Against All Relief Defendants)

52. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1–51, inclusive, as if they were fully set forth herein.

53. Each of the Relief Defendants named in paragraphs 14-18 above obtained money, property, and assets as a result of the violations of the securities laws by Swensen and Crew Capital, to which they have no legitimate claim.

54. Each of the Relief Defendants should be required to disgorge all ill-gotten gains which inured to their benefit under the equitable doctrines of disgorgement, unjust enrichment and constructive trust.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

**I.**

Permanently restraining and enjoining Crew Capital from, directly or indirectly, engaging in conduct in violation of Section 17 of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b–5 thereunder [17 C.F.R. § 240.10b–5];

**II.**

Permanently restraining and enjoining Crew Capital from soliciting any person or entity to purchase or sell any security;

**III.**

Permanently restraining and enjoining Crew Capital from, directly or indirectly, participating in the issuance, purchase, offer, or sale of any security;

**IV.**

Ordering Defendants and Relief Defendants to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

**V.**

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and,

## VI.

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

Dated: October 14, 2022

/s/     *Casey R. Fronk*
Casey R. Fronk
Cheryl M. Mori
*Attorneys for Plaintiff*
*Securities and Exchange Commission*