Casey R. Fronk (Illinois Bar No. 6296535)
Cheryl M. Mori (Utah Bar No. 8887)
Attorneys for Plaintiff
Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, UT  84101
Tel: (801) 524-5796
fronkc@sec.gov
moric@sec.gov

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>      Plaintiff,<br><br>v.<br><br>THE ESTATE OF STEPHEN ROMNEY SWENSEN, and CREW CAPITAL GROUP, LLC, a Nevada limited liability company,<br><br>      Defendants,<br><br>WENDY SWENSEN, an individual, SARIA C. RODRIGUEZ, an individual, WS FAMILY IP, LLC, a Utah limited liability company, WINGMAN, LLC, a Utah limited liability company, and SWENSEN CAPITAL, LLC, a Utah limited liability company,<br><br>      Relief Defendants. | **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION, ASSET FREEZE, AND OTHER PRELIMINARY RELIEF, AND MEMORANDUM IN SUPPORT THEREOF**<br><br>Case No.:  1:22-cv-00135-DBP<br><br>Magistrate Judge Dustin B. Pead |

Plaintiff Securities and Exchange Commission (the "Commission") respectfully seeks a preliminary injunction to stop the ongoing fraudulent conduct of Defendant Crew Capital Group, LLC ("Crew Capital"), and an order freezing the assets of the Defendants and Relief Defendants to protect the Commission's ability to recover investor monies fraudulent obtained by Crew Capital and the now-deceased Stephen Romney Swensen ("Swensen"). The Commission further requests that Defendants be ordered to preserve documents and provide an accounting. In support of this motion, the Commission states as follows:

## **INTRODUCTION**

This action concerns a nearly $30 million securities offering fraud perpetrated by Swensen and Crew Capital. Beginning as early as July 2011, and continuing until June 2022, Swensen solicited investors to purchase securities in Crew Capital (an entity he secretly created and operated), which he represented was a managed fund paying investors a guaranteed minimum of 5% annual returns. To induce their initial and continuing investments, Swenson provided investors with documentation representing that Crew Capital was an independent investment fund with substantial assets. Swenson also created and distributed to investors, including through websites operated by Crew Capital, account statements displaying account balances and returns on investors' investments in Crew Capital securities.

In reality, Crew Capital was a wholesale fraud. Instead of investing Crew Capital's assets as he represented, Swensen deposited investor funds into an account at Wells Fargo Bank in Crew Capital's name that he alone controlled. Swensen used the account to make Ponzi-type payments to investors—and to buy (among other things) homes, private aircraft, and vehicles in support of his family's and his mistresses' luxurious lifestyles. What's more, Swenson, who went to great lengths to hide his ownership and control of Crew Capital, falsified documentation for a separate investment fund, and distributed those falsified documents to investors, as part of a concerted effort to deceive investors into believing Crew Capital was legitimate.

Although Swensen is now deceased, his scheme continues through Defendant Crew Capital, whose website continues to operate and display false and misleading information to investors about their purported "returns" and "account balances." Furthermore, the millions of investor dollars Swenson obtained through his scheme are now controlled by Defendant Swenson Estate, as successor in interest to Swenson, and by the Defendants and Relief Defendants who ultimately received those ill-gotten gains. The Commission thus seeks a preliminary injunction against Crew Capital to put an end to its ongoing violations, and an asset freeze against all Defendants and Relief Defendants to prevent the further dissipation of assets that should rightfully be returned to the harmed investors. The Commission also seeks an order prohibiting Defendants and Relief Defendants from destroying documents and requiring each to provide an accounting.

## STATEMENT OF FACTS

1.      Swensen, formerly a resident of Utah, died on June 6, 2022 at the age of 50. From at least July 2011 to June 6, 2022, he was a financial advisor who solicited numerous investors to invest in the securities of Defendant Crew Capital. During this time, Swenson was a registered representative of broker-dealers Summit Brokerage Services, Inc. (from March 2010 to June 2014), Allegis Investment Services, LLC (from July 2014 to May 2018), and J.W. Cole Financial, Inc. (from May 2018 to June 2018), and an investment adviser representative of Allegis Investment Advisors, LLC (from February 2017 to May 2018), J.W. Cole Advisors, Inc. (from May 2018 to June 2018), and Wealth Navigation Advisors (from June 2018 to June 2022).

2.      Defendant the Estate of Stephen Romney Swensen (the "Swensen Estate") is the successor in interest to Swensen. Swensen's widow, Wendy Swensen, is its Executor.

3.      Defendant Crew Capital is a Nevada limited liability company formed in March 2010. Its original name was Capital Cooperative Group, LLC, which Swensen changed to Crew Capital Group, LLC in May 2015. Swensen is the only individual known to have management

control over, or ownership interest in, Crew Capital. He was the sole signatory on Crew Capital's bank account at Wells Fargo Bank, N.A.

4.        Relief Defendant Wendy Swensen ("Wendy") is Swensen's widow. She received proceeds from Swensen's fraud to which she has no legitimate claim. In particular, Swensen transferred to Wendy at least $356,000.00 in funds that Swenson received from investors in Crew Capital. (Ex. A, Declaration of Amir Salimi ("Salimi Decl.") filed herewith, ¶ 14.c.)

5.        Relief Defendant Saria C. Rodriguez ("Rodriguez") was one of Swensen's mistresses. She received at least $40,136.00 from the Crew Capital account to which she has no legitimate claim. (Salimi Decl. ¶ 14.f.) On information and belief, Swensen paid for Rodriguez's living expenses using proceeds of the fraud for approximately two years, and Rodriguez has property that was purchased with proceeds from the fraud. (Ex. B, Declaration of Joni Ostler ("Ostler Decl.") filed herewith, ¶¶ 28–32.) Rodriguez also currently holds Swensen's laptop computer, to which she has no legitimate claim. (*Id.* ¶ 32.)

6.        Relief Defendant WS Family IP, LLC ("WS Family IP") is a Utah limited liability company formed in July 2022 with a principal place of business in Kaysville, Utah. Wendy is its sole manager. (Ostler Decl. ¶ 44 & Ex. 28.) WS Family IP holds title to, at least, a home in Kaysville, Utah that was purchased using proceeds of the fraud to which WS Family IP has no legitimate claim. (*Id.* ¶¶ 38–43 & Exs. 25–26; *see also* Salimi Decl. ¶ 14.e.)

7.        Relief Defendant Swensen Capital, LLC ("Swensen Capital") is a Utah limited liability company, formerly known as Last Advisor, LLC and Four Buckets, LLC. (Ostler Decl. ¶ 45 & Ex. 27.) It does business under the name Bucket Bliss. (*Id.*) Prior to his death, Swensen was the sole manager of Swensen Capital, LLC and the sole signatory on its bank account. (*Id.* ¶¶ 45–46.) Swensen Capital received at least $1 million in proceeds from Swensen's fraud, to which it has no legitimate claim. (Salimi Decl. ¶ 14.b.)

8.      Relief Defendant Wingman, LLC ("Wingman") is a Utah limited liability company whose business involved creating a messaging app available in the Apple app store. Swensen was Wingman's sole manager and funded Wingman's operations using proceeds from the fraud.  (Ostler Decl. ¶ 48 & Ex. 29.)  Wingman received at least $120,000.00 in proceeds from Swensen's fraud, to which Wingman has no legitimate claim.  (Salimi Decl. ¶ 14.d.)

### The Crew Capital Scheme

9.      Swensen worked as a financial advisor assisting customers and clients with their retirement planning and investments.  (Thurman Decl. ¶ 3; Forsyth Decl. ¶¶ 3–4; Hartman Tr. 12:2–18.)[1]  Beginning as early as July 2011, Swensen began offering and selling investments in Crew Capital to clients of his investment advisory business.  During meetings in which Swensen and his colleagues reviewed clients' investment portfolios and retirement strategies, Swensen would recommend that the clients invest in Crew Capital.  (Thurman Decl. ¶ 3; Forsyth Decl. ¶ 5; Hartman Tr. 12:19–25.)

10.     Swensen represented to those clients, and other prospective investors, that Crew Capital was a safe investment fund that paid a guaranteed minimum of 5% annually and up to 10% annually depending on the performance of the S&P 500 index each year.  (Transcript of Mark Lee Fox ("Fox Tr.", attached to Ostler Decl. as Exhibit 35) at 12:6–13:17, 18:22–19:4, 22:21–23:12 & Ex. 15 thereto; Hartman Tr. 13:1–14:4; *see* Declaration of David Luthy ("Luthy Decl.", attached to Ostler Decl. as Exhibit 32) at ¶ 4; Thurman Decl. ¶¶ 18–20.)  Swensen also represented to investors that Crew Capital invested in various securities, including in bank loans and options on the S&P 500 index.  (Forsyth Decl. ¶¶ 5, 9.)  He further represented to investors that Crew Capital was co-managed by Pacific Investment Management Company, LLC

---

[1] The Declaration of Bret Thurman ("Thurman Decl.") is attached as Exhibit 30 to the Ostler Declaration.  The Declaration of Alfred Forsyth ("Forsyth Decl.") is attached as Exhibit 31 to the Ostler Declaration.  The transcript of the testimony of Cathy L. Hartman ("Hartman Tr.") is attached as Exhibit 34 to the Ostler Declaration.

("PIMCO").  (*Id.* ¶ 12.)  To at least one investor, Swensen represented that Crew Capital paid 7% annually, and that Swensen kept a portion for his "fee" and passed through 4%–4.5% to the investor.  (Thurman Decl. ¶ 3.)

11.     Swensen represented to some investors that they would be investing in a fund at the Bank of Utah, with the same guaranteed minimum returns of 5% to 10%.  (Declaration of John Keith ("Keith Decl.", attached to the Ostler Decl. as Exhibit 33), ¶¶ 8, 11.)

12.     Swensen also represented to investors that Crew Capital was one of the safest places to invest their money.  (Thurman Decl. ¶ 13; Forsyth Decl. ¶¶ 3, 5; Luthy Decl. ¶ 4; Fox Tr. 11:18–24, 15:1–5.)

13.     Swensen gave documents about the fictitious Crew Capital investment to some investors.  The documents falsely described Crew Capital as an "actively managed portfolio" that invested both in senior secured floating rate loans and options on the S&P 500 index.  Some of the documents also falsely stated that PIMCO was the subadvisor to Crew Capital and that Crew Capital had been in existence since 1997.  Other documents falsely stated that Crew Capital's "share class inception" date was April 29, 2011.  (Hartman Tr. 23:17–24:5 & Ex. 9; Fox Tr. 35:25–36:25, 38:1–12 & Ex. 21.)

14.     Swensen also provided some investors with falsified PIMCO documents to make it appear that PIMCO and Crew Capital together managed a "Senior Floating Rate Fund."  (*See* Forsyth Decl. ¶ 13.)  Swensen doctored actual PIMCO documentation for PIMCO's Senior Floating Rate Fund by adding his Crew Capital logo and the words "Crew" and "Crew Capital Group" in various places.  One of the doctored documents represented that there was a "Crew / PIMCO Senior Floating Rate Fund" that invested in "floating or variable senior secured loans and short dated high yield bonds."  Another of the doctored documents purported to be an annual report of the "Crew Capital Group / PIMCO Funds" and represented that a joint Crew/PIMCO fund existed with $318,897,000 in total assets.  (Forsyth Decl. ¶ 13 & Exs. 4–5; Ostler Decl. ¶ 19

& Exs. 16–17.)  In fact, PIMCO never had any relationship with either Swensen or Crew Capital.  (*Id* ¶ 20 & Exs. 10–20.)

15.  Swensen hired a graphic design firm to create a logo, which he used on Crew Capital documentation to make it look more legitimate.  (*Id.* ¶¶ 23–24.)

16.  Swensen maintained a bank account at Wells Fargo Bank in Crew Capital's name.  (Salimi Decl. ¶¶ 8–9.)  Swensen was the sole signatory on the account.  (*Id.* ¶ 9.)

17.  Swensen obtained investor funds in several ways:  he told investors to write personal checks to Crew Capital, to obtain cashier's checks payable to Crew Capital, to wire funds directly to Crew Capital's account, and/or to sign documentation authorizing the transfer of funds into Crew Capital's account directly from the investor's other investment or retirement accounts.  (*See* Thurman Decl. ¶¶ 5–6; Forsyth Decl. ¶ 7; Hartman Tr. 15:1–17; Luthy Decl. ¶ 5; Fox Tr. 20:9–14.)

18.  Swensen also instructed several investors to open self-directed IRA accounts at the Bank of Utah.  (*See, e.g.,* Hartman Tr. 16:16–17:23; Keith Decl. ¶ 9.)  Swensen instructed these investors to sign a "Letter of Authorization" authorizing Swensen to direct the disposition of their funds.  (*See, e.g.,* Hartman Tr. 20:22–21:25 & Ex. 8.)  Once the investors deposited money into their new Bank of Utah accounts (or, in some instances, transferred the money into the Bank of Utah from other investment or retirement accounts), Swensen then instructed the Bank of Utah to wire the funds directly to Crew Capital's account at Wells Fargo Bank.  (Ostler Decl. ¶¶ 26-27 & Ex. 24.)

19.  Swensen developed and maintained a website for Crew Capital with the assistance of a web developer and a graphic designer.  When Crew Capital was named Capital Cooperative, the website was www.capitalcoop.com.  Once the name changed to Crew Capital, the website was www.crewfunds.com.  (Ostler Decl. ¶¶ 21–23 & Exs. 21–23.)  Swensen provided investors with login credentials for these websites.  Investors were able to log in and

view their account balances, including the fictitious returns. Investor accounts falsely showed returns on the guaranteed 5%, with an additional lump payment of up to another 5% paid on the anniversary of the date of their investment. (Thurman Decl. ¶ 8; Forsyth Decl. ¶¶ 8, 10; Hartman Tr. 27:18–28:6; Fox Tr. 18:16–19:7.)

20.     Swensen also provided periodic statements to some investors of their Crew Capital "accounts" showing the investors' purported earnings. (Thurman Decl. ¶¶ 7, 10 & Exs. 1, 5.)

21.     As of the date of this motion, the crewfunds.com website is still operational and investors are still able to log in to view their false "account" balances showing their fictitious investment returns. (Ostler Decl. ¶ 21. *See also* Forsyth Decl. ¶ 15, Fox Tr. 33:13–15; Thurman Decl. ¶ 10 & Exs. 6–7.)

<u>**Material Misrepresentations and Omissions**</u>

22.     Swensen's representations about Crew Capital were false. Swensen concealed from investors that Crew Capital was a limited liability company that Swensen himself created, owned, and operated. (Ostler Decl. ¶¶ 6–10 & Exs. 1–5.) Neither Swensen nor Crew Capital invested money, nor had any relationship with PIMCO. (Ostler Decl. ¶ 20; Salimi Decl. ¶¶ 13–14, 17.)

23.     There were no individual "accounts" for investors at Crew Capital. Swensen simply pooled all investor funds in the Crew Capital account at Wells Fargo Bank that Swensen alone controlled. (Salimi Decl. ¶ 9–12.) Swensen then used a portion of the money to make periodic payments of fictitious earnings to certain investors in a Ponzi-like fashion, but used the bulk of the money for personal expenses. (*Id.* ¶¶ 13–18.) Among other things, Swensen used investor funds to pay for private aircraft and real estate. (*Id.* ¶ 18.)

24.     Swensen died by suicide on June 6, 2022.

25.     From at least July 2011 to the date of Swensen's death, over 50 investors invested in the scheme.  (Salimi Decl. ¶ 12.)  By the time of Swensen's death, Swensen had raised at least $29.3 million in investor funds for his fraud.  Crew Capital's bank account received additional transfers from the Bank of Utah of at least $7.1 million, all of which likely also comprise investor funds.  (*Id.*)

## Swensen and Crew Capital Acted With Scienter

26.     Swensen knew he was operating a fraudulent scheme.  He knew that he did not invest the funds provided by investors into Crew Capital as he had represented.  Swensen also knew that he used a portion of the money to make Ponzi payments of fictitious returns to some investors, while spending the majority on his and his family's personal expenses, on his mistresses, and on operating costs for his other businesses.

27.     Swensen also took multiple steps to create the appearance that Crew Capital was a legitimate company while concealing his ownership of Crew Capital from investors.  In addition to creating and maintaining the Crew Capital website, and creating false Crew Capital documentation (*supra* at 6–8, ¶¶ 14–15, 19), Swensen paid for mail forwarding services so he could use street addresses of large office buildings in cities around the country for Crew Capital, including San Francisco, Boston, and New York City.   (Ostler Decl. ¶¶ 11–17 & Exs. 2, 4, 6–14. Swensen used these street addresses on Crew Capital documentation that he gave to clients. (*See, e.g.*, Hartman Tr. 32:18–33:1 & Ex. 10; Ostler Decl. ¶¶ 11–13 & Exs. 6–11.)  Some of Crew Capital's documents represented that the San Francisco address was the "West Service Center" and the New York City address was the "East Service Center."  (*Id.* ¶ 13 & Ex. 11.)  In fact, Crew Capital had no business operations or employees at any of these addresses.

28.     In addition, Swenson hired a virtual receptionist service to answer Crew Capital's telephone number, creating the appearance that Crew Capital had other employees in other offices apart from Swensen himself.  (Ostler Decl. ¶ 18 & Ex. 15.)

29.     Swensen also hired a business entity creation service called Nevada Corporate Headquarters, Inc. ("NCH") to create and maintain Crew Capital's legal status as a Nevada limited liability company.  (Ostler Decl. ¶¶ 6–9.)  Swensen paid extra for the "privacy package," in exchange for which NCH listed its own affiliate as the "manager" of Crew Capital on all the Crew Capital documents that are available to the public from the Nevada Secretary of State.  (*Id.* ¶ 9.)  This allowed Swensen to hide his ownership and management of Crew Capital from the public and from investors.

30.     Swensen is the only person known to have ownership interest in or management control over Crew Capital.  He signed its tax returns as its President.  (Ostler Decl. ¶ 10 & Ex. 5.)

### The Relief Defendants Received Proceeds of the Fraud

31.     The Relief Defendants received proceeds of the fraud to which they have no legitimate claim.

32.     Swensen used proceeds of the fraud to pay business expenses for Relief Defendants Swensen Capital and Wingman.  Swensen Capital received at least $1 million in investor funds (when its bank account was held under its prior name, Last Advisor, LLC). (Salimi Decl. ¶ 14.b; Ostler Decl. ¶¶ 45–46.)  Wingman received at least $120,000.00 in investor funds.  (Salimi Decl. ¶ 14.d.)

33.     Swensen used proceeds of the fraud to pay a portion of the purchase price of a home in Kaysville, Utah, that is owned by WS Family IP.  (Ostler Decl. ¶¶ 38–40; Salimi Decl. ¶ 14.e.)

34.     Swensen gave to his wife, Relief Defendant Wendy Swenson, at least $356,000.00 in proceeds of the fraud.  (Salimi Decl. ¶ 14.c.)

35.     On information and belief, Swensen used investors' money to pay living expenses for Relief Defendant Saria Rodriguez.  (Ostler Decl. ¶¶ 28–32.)  Rodriguez had two credit cards from Swensen that Swensen paid for.  (*Id.* ¶¶ 30, 32.)  Rodriguez spent tens of thousands of

dollars on merchandise from luxury retailers such as Tiffany & Co. and Louis Vuitton. (*Id.* ¶¶ 33–35.) Also, Rodriguez received a cashier's check purchased with funds in the Crew Capital account in the amount of $40,126.21. (*Id.* ¶ 37; Salimi Decl. ¶ 14.f.) Rodriguez also has Swensen's laptop in her possession. (Ostler Decl. ¶ 32.)

## ARGUMENT

## I. A PRELIMINARY INJUNCTION IS NECESSARY TO HALT CREW CAPITAL'S ONGOING VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Section 20(b) of the Securities Act of 1933 ("Securities Act") and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") empower the Court to grant injunctive relief where it appears that a person is engaged in or about to engage in violations of the federal securities laws. 15 U.S.C. §§ 78(b) and 78u(d). Under these sections, the Commission must make a "proper showing" of violative activity in order to obtain injunctive relief. The Commission "must show a likelihood of prevailing on the merits and a reasonable likelihood that the wrong will be repeated." *SEC v. Traffic Monsoon, LLC*, 245 F. Supp. 3d 1275, 1296 (D. Utah 2017), *aff'd sub nom. SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019); *see also SEC v. Unifund SAL*, 910 F.2d 1028, 1035–40 (2d Cir. 1990). Here, the evidence presented shows that Defendant Crew Capital is violating the federal securities laws, and will continue to do so absent this Court's order.

### A. Crew Capital Has Violated the Federal Securities Laws

As the Commission's evidence shows, Crew Capital has violated (and continues to violate) the anti-fraud provisions of the federal securities laws, including by making false statements to investors and engaging in a fraudulent scheme.

#### 1. Crew Capital Has Made False Statements To Investors

Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. §240.10b-5] make it unlawful, in connection with the purchase or sale of a security, to make any untrue statement of a material fact or omit to state a material fact necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading. Similarly, Section 17(a)(2) of the Securities Act [15 U.S.C. §77q(a)] prohibits any person from, directly or indirectly, "obtain[ing] money or property by means of any untrue statement of a material fact" or omitting to disclose material facts in the offer or sale of securities.

"To establish a § 10(b) or Rule 10b-5 violation, the SEC must prove that [a defendant] made: (1) 'a misrepresentation or omission (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, and (5) by [means of interstate commerce].' *SEC v. Smart*, 678 F.3d 850, 856 (10th Cir. 2012), quoting *SEC v. Wolfson*, 539 F.3d 1249, 1256 (10th Cir. 2008). A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). Scienter is "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Recklessness is sufficient to establish scienter. *Smart*, 678 F.3d at 857.

The elements of a Section 17(a)(2) claim are similar, except that violations of this provision require only negligence as opposed to scienter. *Aaron v. SEC*, 446 U.S. 680, 701–02 (1980). To show negligence, the Commission must show a defendant failed to conform to the standard of care that would be exercised by a reasonable person. *See SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856–57 (9th Cir. 2001); *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453–54 (3d Cir.1997).

The evidence attached to and submitted in support of this motion, and summarized above, establishes a *prima facie* case that Crew Capital violated Exchange Act Section 10(b) and Rule 10b-5(b) as well as Securities Act Section 17(a)(2). Crew Capital, through Swensen, obtained investor funds by making materially false oral and written representations to investors and by

omitting material facts that rendered its affirmative statements misleading.[2]  For example, the Crew Capital written documentation that Swensen gave to investors falsely stated that Crew Capital was a fund that invested in bank loans and options on the S&P 500 with PIMCO as a subadvisor.  Crew Capital, through Swensen, also told investors, falsely, that Crew Capital was a risk-free investment fund that paid guaranteed 5% annual returns, and as much as 10% annual returns if the S&P 500 performed well.  Crew Capital's website, which is still operational, displays false "account" balance information to investors and falsely shows investors that their money is earning a return.  Crew Capital further failed to disclose the material facts that Swensen himself operated Crew Capital; that Crew Capital did not actually invest the money it received from investors; and that Crew Capital's assets were used to pay fictitious earnings to other investors, Swensen's personal expenses, and expenses associated with other businesses owned and controlled by Swenson.[3]

Swensen made these false statements and omissions with scienter, and his scienter—as the controlling officer of the company—is imputed to Crew Capital.  *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003) ("The scienter of the senior controlling officers of a

---

[2] The investments in Crew Capital were securities.  Securities Act §2(a)(1) and Exchange Act §3(a)(10) define "security" to include "investment contracts," which involve (1) an investment of money, (2) in a common enterprise, (3) with an expectation of profit from the efforts of others. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946).  The investments that Crew Capital sold satisfy all three elements.  First, investors paid money for their interests in Crew Capital. Second, a common enterprise existed because Crew Capital commingled all investor money into a single account for the purported purpose of investing the funds in other securities to generate a profit, and investors were purportedly paid returns proportionate to the amount of money each invested.  *See SEC v. Merrill Scott & Assocs., Ltd.*, 505 F. Supp. 2d 1193, 1213 (D. Utah 2007) (finding a common enterprise where the promoter commingled investor funds, held assets in accounts in the name of the promoter's entity, and controlled the accounts).  Third, investors expected to profit from the efforts of others – namely, the efforts of Crew Capital (and its purported subadvisor PIMCO) to invest the capital in securities to generate a return.
[3] Crew Capital's activities also occurred in interstate commerce.  Crew Capital, through Swensen, solicited investors through e-mail and telephone conversations, and operated the false and misleading website.  *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004).

corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority.").  Swensen knew all along that Crew Capital did not invest in any securities, but rather, that Swensen was using the assets of Crew Capital to cover his personal expenses and to pay fictitious returns to investors.  Swensen knowingly and intentionally created false documents touting Crew Capital as an investment fund, and created the Crew Capital website to lend an appearance of legitimacy and give investors a false sense of security about their invested funds.  Swensen also went to great lengths to hide from investors that Crew Capital was Swensen's own company.  These circumstances go beyond mere recklessness and indicate that Swensen knowingly and deliberately intended to defraud investors.  These facts also establish that Crew Capital's actions, through Swensen, fall far below the standard of care of any reasonable person—thus establishing negligence for purposes of Section 17(a)(2) liability.

## 2.    Crew Capital Engaged in a Fraudulent Scheme

In addition to liability for false or misleading statements under Securities Act Section 17(a)(2), and Exchange Act Section 10(b) and Rule 10b-5(b), the evidence submitted here establishes a *prima facie* case that Crew Capital engaged in a fraudulent scheme in violation of Securities Act Sections 17(a)(1) and 17(a)(3) and Exchange Act Rules 10b-5(a) and (c).  These provisions make it unlawful for any person to employ any device or scheme to defraud, or engage in any transaction, practice or course of business which operates as a fraud in the offer or sale of securities.  15 U.S.C. §77q(a)(1), (3); 17 C.F.R. § 240.10b-5(a), (c).  A "scheme" is "'a project, plan, or program of something to be done.'"  *Malouf v. SEC*, 933 F.3d 1248, 1260 (10th Cir. 2019), quoting *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019).  Proof of scienter is required for Rules 10b-5(a) and (c) and Section 17(a)(1), whereas negligence is sufficient for Section 17(a)(3).  *Aaron*, 446 U.S. at 691 & 697.

The evidence submitted shows that Crew Capital, through Swensen, engaged in a course of conducted that constituted a scheme to defraud. For example, Swensen went to great lengths to create the appearance that Crew Capital was a legitimate investment fund independent of Swensen himself, with offices and business operations in large cities across the country. Among other things, Swensen obtained fake but legitimate-looking street addresses for Crew Capital in Las Vegas, Boston, San Francisco, and New York City from mail forwarding services, and used those street addresses on Crew Capital documentation. Swensen also set up a phone number for Crew Capital and hired a virtual receptionist service to answer phone calls, making it seem to investors that Crew Capital was a legitimate operation with employees other than Swensen. Swensen hired a graphic design service and web hosting service to create and host the Crew Capital website and make it look professional. And Swensen concealed his ownership of Crew Capital by forming the limited liability company through Nevada Corporate Headquarters, Inc., a Nevada business entity formation company, and paying for their "privacy package," which allowed Swensen to keep his name off of all publicly-filed documents regarding Crew Capital. Swensen also created false Crew Capital account statements and other Crew Capital documentation to lend a veneer of credence to the scheme. All these actions gave investors the false impression that Crew Capital was a real investment fund while concealing the fact that Swensen was operating Crew Capital and taking the invested money.

Further, Crew Capital was a Ponzi scheme. Crew Capital, through Swensen, paid investors fictitious returns using money from new investors. Investors' capital contributions were never invested to generate any real returns. The Tenth Circuit has explained that scheme liability under Section 10(b) and Rules 10b-5(a) and (c) of the Exchange Act and Sections 17(a)(1) and (3) of the Securities Act applies to Ponzi schemes, which are "'inherently deceptive because [they] generate[] a false appearance of profitability by using money from new investors to generate returns for earlier investors.'" *SEC v. Scoville,* 913 F.3d 1204, 1223 & n. 8, 1224

(10th Cir. 2019) (internal citation omitted).  As with the other violations of the securities laws,

Swenson's scienter in this regard is imputed to Crew Capital.  *See supra* at 13.

### B.  Crew Capital's Violations Are Likely to Be Repeated

To obtain a preliminary injunction, the Commission must also show "a reasonable

likelihood that the wrong will be repeated."  *Traffic Monsoon*, 245 F. Supp. 3d at 1296.  The

evidence submitted shows that Crew Capital's violations are ongoing.

Part of Crew Capital's ongoing scheme is its website at crewfunds.com.  Through

Swensen, Crew Capital provided login credentials to investors.  Once an investor is logged in,

the website displays false information to the investors about their supposed "accounts."  For

example, the website represents, falsely, that each investor has an "account" at Crew Capital.  In

fact, there is only a single Crew Capital account at Wells Fargo Bank and all investor funds were

pooled together in that account.  The crewfunds.com website also displays fictitious "account

balance" information and fictitious information about "returns" paid on each investor's capital

deposit.  In actuality, the money that investors placed in Crew Capital was never invested

anywhere, never earned any returns, and has been spent on Ponzi-style payments to other

investors and on Swensen's (and his associates') personal expenses.

To the SEC's knowledge, some of Crew Capital's investors are still unaware that the

information displayed on the crewfunds.com website is materially false.  Thus, Crew Capital

continues to disseminate false and misleading information to investors and continues to withhold

material information from investors.  A preliminary injunction is necessary to halt Crew

Capital's ongoing violations.[4]

---

[4] A preliminary injunction would also prevent any third-party from continuing operations in
Crew Capital's name.  While Swensen is the only person known to have acted on Crew Capital's
behalf or conducted its business operations, The Nevada Business Consortium, Inc., an affiliate
of Nevada Corporate Headquarters, is currently listed as Crew Capital's manager and legally has
the ability to assert control over Crew Capital's operations and its name.  (*See* Ostler Decl. ¶ 6 &
Ex 1.)  An injunction would prevent the Consortium or any other third-party who may currently

## II.    AN ASSET FREEZE IS NECESSARY TO MAINTAIN THE *STATUS QUO* AND GUARANTEE FUNDS WILL BE AVAILABLE FOR DISGORGEMENT

Moreover, an order freezing the assets of each of the Defendants and Relief Defendants is necessary to preserve the *status quo* and ensure that funds remain available for disgorgement to harmed investors.  Section 21(d)(5) of the Exchange Act authorizes the Court to grant equitable relief "that may be appropriate or necessary for the benefit of investors."  15 U.S.C. §78u(d)(5). Section 27 of the Exchange Act likewise provides the Court general equitable powers in Commission actions.  15 U.S.C. §78aa.  Such equitable powers include the authority to freeze assets of parties and nonparties to prevent the dissipation of assets so they will be available for the benefit of investors.  *SEC v. Hickey*, 322 F.3d 1123, 1131 (9th Cir. 2003) (affirming asset freeze over nonparty brokerage firm controlled by defendant to effectuate disgorgement order against defendant); *SEC v. Young*, Nos. 21-1061, 21-1075, 21-1322, 2022 U.S. App. LEXIS 20822 (10th Cir. July 28, 2022) (affirming asset freeze over defendants and relief defendants); *SEC v. Marquis Props., LLC*, No. 2:16-cv-00040-JNP, 2016 U.S. Dist. LEXIS 195950, at *3 (D. Utah Jan. 20, 2016) (ordering asset freeze of defendants and relief defendants' to maintain status quo after Commission established *prima facie* case that defendants violated federal securities laws); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103–04 (2d Cir. 1972).

The showing required to obtain an asset freeze is lower than that required for a preliminary injunction.  *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990); *Traffic Monsoon*, 245 F. Supp. 3d at 1296 & n.14.  To obtain an asset freeze "to guarantee money will be available to remedy a violation," the Commission need only show a reasonable probability of success on the merits.  *Id.*  The Commission has made that showing here.

As discussed above, the evidence here demonstrates that Swensen and Crew Capital engaged in a fraudulent scheme in violation of the federal securities laws for over ten years.

---

have control of the website from continuing to make false representations on Crew Capital's behalf.

Through the fraudulent scheme, Swensen and Crew Capital obtained at least $29.3 million, and likely an additional $7.1 million, from over 50 investors.

Swensen transferred proceeds of the fraud to the Relief Defendants. (Salimi Decl. ¶ 14.) Wendy Swensen received at least $356,000.00 in proceeds of the fraud. Wingman received at least $120,000.00 in proceeds of the fraud. Last Advisor received at least $1 million in proceeds of the fraud. WS Family IP received at least $65,000.00 in proceeds of the fraud, which was used as a payment on a home that WS Family IP holds. (*Id.*) Ms. Rodriguez received at least $40,126.00 in proceeds of the fraud in the form of a cashier's check purchased in January 2022 with investor funds. (*Id.*; *see also* Ostler Decl. ¶ 37.) In addition, Swensen supported Ms. Rodriguez financially and gave her two credit cards, which she used to make purchases of an unknown total amount, but totaling at least tens of thousands of dollars. (Ostler Decl. ¶¶ 32–36.)

An asset freeze over the remaining assets of the Defendants and the Relief Defendants is necessary and appropriate to protect investors and ensure that the proceeds of the fraud are not dissipated and are available for disgorgement to investors.

## III. THE COURT SHOULD ORDER ACCOUNTINGS AND PRESERVATION OF DOCUMENTS

Finally, the Court should order that each of the Defendants and Relief Defendants preserve relevant documents and provide an accounting. Courts frequently require defendants to provide an accounting of all the monies and properties they obtained as a result of fraudulent activity, as well as their current financial assets or resources. *See, e.g., U.S. v. Badger*, 818 F.3d 563, 566 (10th Cir. 2016) (disgorgement "'consists of factfinding by a district court to determine the amount of money acquired through wrongdoing—a process sometimes called 'accounting''") (citation omitted); *SEC v. Int'l Swiss Inv. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990). Here, an accounting is necessary from each of the Defendants and Relief Defendants to determine the Defendants' assets available for disgorgement and the total amount of proceeds from the fraud the Relief Defendants received. As such, the Court should require each Relief Defendant to

provide an accounting detailing the receipt, use, and location of funds and property the Relief Defendant from Swensen during the time frame of the fraud, which will allow the Commission and the Court to determine the full amount of the proceeds of the fraud that each Relief Defendant obtained, ensure that all proceeds of the fraud are frozen, and assess what is available for investor recovery. With respect to the Defendants, the Court should require the Swensen Estate and Crew Capital to provide an accounting of all assets so that the Court and the Commission can ensure that all assets are frozen and protected for investors.

An order requiring that all Defendants and Relief Defendants preserve documents is also appropriate. The Court has the power to grant such an order to protect evidence for the litigation. *See Unifund SAL*, 910 F.2d at 1040 n.11 (upholding order prohibiting destruction or alteration of documents); *Marquis Props.*, 2016 U.S. Dist. LEXIS 195950, at *3 (ordering preservation of documents in the custody or control of defendants and relief defendants). Such an order is appropriate here, particularly where Ms. Rodriguez is in possession of Swensen's laptop, which likely contains critical information regarding, among other things, Swenson's use of investor assets, the identity of the investors and prospective investors Swenson solicited, details regarding Swenson's and Crew Capital's fraudulent scheme, the identity of third-parties not currently named in this action who may have received investor funds, and the total amount of investor funds Swenson received as part of this fraudulent scheme.

## **CONCLUSION**

For the foregoing reasons, the Commission respectfully requests that the Court grant its Motion and enter the preliminary injunction, asset freeze, and other requested relief.

Respectfully submitted this 14th day of October, 2022.

/s/ *Casey R. Fronk*
Casey R. Fronk
Cheryl M. Mori
Attorneys for Plaintiff
U.S. Securities & Exchange Commission

## CERTIFICATE OF SERVICE

I am over the age of 18 years and not a party to this action. My business address is:

> U.S. SECURITIES AND EXCHANGE COMMISSION
> 351 South West Temple, Suite 6.100
> Salt Lake City, UT 84101-1950
> Tel.: (801) 524-5796; Fax: (801) 524-3558

On October 17, 2022, I will cause to be served the document entitled PLAINTIFF'S MOTION FOR PRLIMINARY INJUNCTION, ASSET FREEZE, AND OTHER PRELIMINARY RELIEF, AND MEMORANDUM IN SUPPORT THEREOF and supporting papers the DECLARATION OF AMIR SALIMI IN SUPPORT OF PLAINTIFF'S MOTION FOR PRLIMINARY INJUNCTION, ASSET FREEZE, AND OTHER PRELIMINARY RELIEF, the DECLARATION OF JONI OSTLER IN SUPPORT OF PLAINTIFF'S MOTION FOR PRLIMINARY INJUNCTION, ASSET FREEZE, AND OTHER PRELIMINARY RELIEF, and the PROPOSED ORDER, on all the parties by mailing copies of the papers via U.S. Mail, first class postage prepaid, to the addresses listed below:

Estate of Stephen Romney Swensen
c/o Wendy Swensen, Executor

Crew Capital Group, LLC
4730 S. Fort Apache Road, Suite 300
Las Vegas, NV 89147-7947

Wendy Swensen

Wingman, LLC
1142 Foxtrotter Court
Kaysville, UT 84037

WS Family IP, LLC

Swensen Capital Group, LLC
c/o Ronald Gibb
██████████████████

Saria Rodriguez
████████████████████

I declare under penalty of perjury that the foregoing is true and correct.

Date:  October 14, 2022          */s/  Casey R. Fronk*