# EXHIBIT B

*Declaration of Joni Ostler*

Casey R. Fronk (Illinois Bar No. 6296535)
Cheryl M. Mori (Utah Bar No. 8887)
Attorneys for Plaintiff
Securities and Exchange Commission
351 South West Temple, Suite 6.100
Salt Lake City, UT  84101
Tel: (801) 524-5796
fronkc@sec.gov
moric@sec.gov

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>THE ESTATE OF STEPHEN ROMNEY SWENSEN, and CREW CAPITAL GROUP, LLC, a Nevada limited liability company,<br><br>    Defendants,<br><br>WENDY SWENSEN, an individual, SARIA C. RODRIGUEZ, an individual, WS FAMILY IP, LLC, a Utah limited liability company, WINGMAN, LLC, a Utah limited liability company, and SWENSEN CAPITAL, LLC, a Utah limited liability company,<br><br>    Relief Defendants. | **DECLARATION OF JONI OSTLER IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION, ASSET FREEZE, AND OTHER PRELIMINARY RELIEF**<br><br>Case No.: 1:22-cv-00135-DBP<br><br>Magistrate Judge: Dustin B. Pead |

1

I, Joni Ostler, do hereby declare, under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the following is true and correct to the best of my belief and, further, that this declaration is made on my personal knowledge, and that I am competent to testify as to the matters herein stated.

1.  I am over the age of 21 and a resident of the State of Utah.

2.  I make this declaration in support of the United States Securities and Exchange Commission's Motion for Preliminary Injunction, Asset Freeze, and Other Preliminary Relief.

3.  I am presently employed as a staff attorney in the Division of Enforcement by the United States Securities and Exchange Commission (the "Commission" or "SEC") working from the Commission's Salt Lake Regional Office located at 351 South West Temple, Suite 6.100, Salt Lake City, Utah, 84101. I have been employed as an attorney with the Commission since December 2021. My official duties as an attorney in the Commission's Division of Enforcement include participating in fact-finding inquiries and investigations to determine whether the federal securities laws have been, are presently being, or are about to be violated, and assisting, as requested, in the Commission's litigation of securities laws violations.

4.  As part of my duties, I was assigned to the Commission's investigation entitled *In the Matter of Stephen Romney Swensen*, matter number SL-02881 ("Investigation"). I learned the information set forth in this declaration from my personal knowledge and experience; documents I reviewed in the course of the Investigation, including bank records I or other members of the investigative team reviewed and analyzed; witness interviews and testimony that I or other members of the investigative team conducted; witness and investor declarations that I or other members of the investigative team obtained; and other information provided to me by other Commission staff.

5.  All documents attached to this declaration have been redacted where necessary to protect the privacy of investors and confidential sources.

### Crew Capital's Ownership

6. As part of the Investigation, SEC staff endeavored to identify the owner of the business entity Crew Capital Group, LLC ("Crew Capital"). I conducted a business entity search on the State of Nevada Secretary of State's website at https://www.nvsos.gov/sos/ and retrieved information concerning Crew Capital, a true and correct copy of which is attached hereto as **Exhibit 1**. The entity information shows that Crew Capital was formed in March 2010, that its sole manager is The Nevada Business Consortium, Inc., and its registered agent is Nevada Corporate Headquarters, Inc. ("NCH").

7. In response to a subpoena, NCH produced Articles of Organization for Crew Capital (then named Capital Cooperative Group, LLC), a true and correct copy of which are attached as **Exhibit 2.** The Articles of Organization show Lance Kerness of NCH as the sole manager or managing member. NCH also produced an Amendment to Articles of Organization changing the name from Capital Cooperative Group, LLC to Crew Capital Group, LLC in May 2015, a true and correct copy of which is attached as **Exhibit 3.** This document bears Stephen Swensen's signature.

8. As part of the investigation, I spoke to Lance Kerness of NCH. Kerness told me that NCH and Nevada Business Consortium, Inc. are affiliated, and are in the business of creating business entities in Nevada for customers, but have nothing to do with the management or operation of the business entities they create. Kerness told me that Stephen Swensen was the owner of Crew Capital, and that neither NCH nor Nevada Business Consortium, Inc. had anything to do with Crew Capital other than creating and maintaining Crew Capital's legal existence in Nevada and forwarding to Swensen any mail received for Crew Capital.

9. In response to a subpoena, NCH produced copies of Swensen's invoices for the creation and maintenance of Crew Capital's legal existence in Nevada. True and correct copies of these invoices, dating from February 2010 through March 2022, are attached as **Exhibit 4.**

The invoices show that Swensen paid extra for NCH's "privacy package."  When I spoke to Kerness, he said that if a customer buys the "privacy package," The Nevada Business Consortium, Inc. is listed as the manager of the customer's entity on the Nevada Secretary of State's website (as opposed to the customer, who is the real owner of the company).

10. In response to a subpoena, Integrated Tax Accounting, Inc. ("Integrated Tax") produced tax preparation documents and tax returns for Crew Capital.  I spoke to Jake Johnsun, a tax preparer at Integrated Tax, in August 2022.  He said that Swensen hired Integrated Tax to prepare the tax returns for Crew Capital starting in 2014.  The Crew Capital tax returns that Integrated Tax produced show that Swensen signed the tax returns for Crew Capital as its President.  Attached as **Exhibit 5** is an example of an e-file signature authorization form for Crew Capital showing that Swensen signed on behalf of Crew Capital as its President.

## Crew Capital's Fictitious Office Locations

11. During our investigation, the SEC staff has obtained various Crew Capital investor account statements, account applications, and Forms 1099 from Crew Capital.  The various documents show five different street addresses for Crew Capital:

   a. 177 Huntington Ave., Suite 1703, Boston, MA 02115;

   b. 548 Market Street, San Francisco, CA 94104;

   c. 228 Park Avenue S, New York, NY 10003;

   d. 4730 S. Fort Apache Road, Suite 300, Las Vegas, NV 89147; and

   e. 101 Convention Center Drive, 7th Floor, Las Vegas, NV 89109.

12. Examples of Crew Capital investor account statements with these street addresses, which the SEC obtained from investor victims, are attached as **Exhibits 6 - 10.**

13. Some of Crew Capital's documents state that the New York and San Francisco addresses above were the "East Service Center" and "West Service Center" respectively.  A true and correct copy of a document that staff received from an investor is attached as **Exhibit 11**,

which shows the representation that the New York and San Francisco addresses were "service centers."

14. In the course of the investigation, I learned that a mail forwarding company called Earth Class Mail, Inc. (part of LegalZoom) offers customers the ability to use the above street addresses in Boston, San Francisco, and New York (and the post office boxes in San Francisco and New York that Crew Capital used), for a fee. Attached as **Exhibit 12** are screen shots of Earth Class Mail's website showing that they offer these addresses as part of their virtual mailbox service.

15. In response to a subpoena, Earth Class Mail, Inc. produced documents showing that Stephen Swensen used their services so that Crew Capital could receive mail at 177 Huntington Avenue, Suite 1703, Boston, MA; 548 Market Street, San Francisco, CA; and 228 Park Avenue S., New York, NY. The documents are attached as **Exhibit 13**. Earth Class Mail also produced a text file showing that Swensen's account with them was created on January 25, 2015.

16. Staff was able to retrieve the document attached as **Exhibit 14** from one of Swensen's iPhones. The document appears to be a screenshot showing Swensen signing up to use the street addresses in New York and San Francisco (as well as the post office boxes in New York and San Francisco) that were offered by Earth Class Mail.

17. The two addresses in Las Vegas, Nevada that appeared on Crew Capital documents are addresses for NCH, the Nevada business entity creation service that Swensen hired (*see supra* ¶ 9) and Nevada Business Consortium, Inc. The address on Fort Apache Road is shown on the invoices from NCH to Swensen for their services (**Exhibit 4**). The address on Convention Center Drive also belongs to NCH, as shown on **Exhibit 2.**

### Crew Capital's Answering Service

18. In response to a subpoena, ReceptionHQ, also known as VirtualHQ, produced the document attached as **Exhibit 15,** showing that Stephen Swensen signed up for a virtual receptionist service for Crew Capital Group.

### Crew Capital Documents and Website

19. Attached as **Exhibit 16**, **Exhibit 17**, and **Exhibit 18** are documents that investors provided to staff that Swensen gave to them.

20. Pursuant to subpoena, Pacific Investment Management Company, LLC ("PIMCO") produced the real copies of the altered documents at **Exhibit 16** and **Exhibit 17.** Relevant portions of the real PIMCO documents are attached as **Exhibit 19** and **Exhibit 20** respectively. PIMCO also stated in response to the SEC's subpoena that it was not in possession of any documents concerning Stephen Romney Swensen, Crew Funds, Crew Capital Group, LLC, or Capital Cooperative Group.

21. Attached as **Exhibit 21** is a true and correct copy of a screenshot I created of the website www.crewfunds.com on September 26, 2022. I have spoken with several investors since June 2022 who have told me that they are still able to log in to the crewfunds.com website, and that it still displays their Crew Capital account balance and investment "earnings."

22. Attached as **Exhibit 22** is a true and correct copy of a portion of an email, and the attachment to that email, sent to SEC staff by Bart Hubbard from a company called Objective.

23. Attached as **Exhibit 23** is a true and correct copy of an email that Objective produced to the SEC in response to a subpoena.

24. As part of the Investigation, I spoke with Matt Garner of Mattco Design in August 2022. He said that he is a graphic designer. He said that he previously worked with a partner at another graphic design company from about 2003 to about 2016, and that he and his prior partner created the Crew Funds logo for Stephen Swensen. Gardner said that they originally created that

logo for a different purpose for Swensen, but Swensen decided to use it for Crew Funds. (Gardner said that Swensen called the company "Crew Funds.")

25.  Gardner also told me that Swensen hired him to do design work for the crewfunds.com website and to do work on forms for Crew Funds. Gardner said that he designed what the website would look like, and Objective (another company in Salt Lake City) did the coding for the website. Gardner also said that shortly before Swensen's death, asked him to place the Crew Funds logo onto forms that came from American Funds.

26.  As part of the Investigation, I spoke to Randy Hahn at the Bank of Utah. Mr. Hahn told me that the Bank of Utah had approximately three dozen customers who invested in Crew Capital through their Bank of Utah accounts. Mr. Hahn said that all of the money invested in Crew Capital from the various accounts was all sent to one account at Wells Fargo Bank.

27.  The staff obtained the document attached as **Exhibit 24** from Wealth Navigation. Representatives of Wealth Navigation told the SEC staff that this document was given to Wealth Navigation from an employee at the Bank of Utah, and that it shows an example of the wire instructions that Swensen gave to the Bank of Utah to wire money from customer accounts into an account at Wells Fargo in the name of Crew Capital.

### Relief Defendant Saria Rodriguez

28.  As part of the Investigation, I spoke with Lance Tempest. Mr. Tempest said he was a friend of Wendy and Stephen Swensen. He said that after Swensen died, he and Bryn Marley (another friend of the Swensens) met in person with Saria Rodriguez to retrieve some of Swensen's personal items that Ms. Rodriguez had in her possession because she had been living in a townhome with Swensen at the time of his death. They did this at the request of Swensen's widow Wendy. When they met Ms. Rodriguez, Ms. Rodriguez told Mr. Tempest that she had Swensen's laptop in her possession, but Ms. Rodriguez's male relatives refused to give the laptop to Mr. Tempest at that time.

29. As part of the Investigation, I spoke with Bryn Marley. Ms. Marley said that he and his wife were friends of Wendy and Stephen Swensen. Mr. Marley said that after Swensen's death, he went with Mr. Tempest to meet Saria Rodriguez in person to retrieve some of Swensen's personal items, including Swensen's laptop, at Wendy's request. He, like Mr. Tempest, said that Ms. Rodriguez told him that she had Swensen's laptop, but Ms. Rodriguez's male relatives, who were also present, refused to give the laptop to Messrs. Tempest and Marley at that time.

30. Mr. Marley said Ms. Rodriguez had two credit cards that Swensen was paying for her. Mr. Marley said that Ms. Rodriguez told him that Swensen had been paying her living expenses – a car, credit card, and apartment – for the last year and a half.

31. As part of the Investigation, I spoke with Kevin Day. Mr. Day said he had been Swensen's friend for many years, and in particular, that he spoke to Swensen almost daily from the end of January 2022 until Swensen's death. Mr. Day said that Saria Rodriguez was one of Swensen's mistresses. Mr. Day said that Swensen asked Mr. Day to deliver a credit card to Ms. Rodriguez for him, and he did so. Mr. Day also said that Swensen told him that Ms. Rodriguez spent $20,000 - $30,000 a month, which Swensen was paying. Mr. Day said that Swensen also provided Ms. Rodriguez with a Tesla vehicle.

32. I spoke with Saria Rodriguez and her counsel on October 11, 2022. Ms. Rodriguez said that she was "with" Swensen for two years prior to his death. She said that Swensen was taking care of her and her child financially. She said she had two credit cards from Swensen on which she was an authorized user: a Marriott card and a Lexus card. Ms. Rodriguez said that Swensen provided her a Tesla vehicle but that she returned it to the Tesla dealership after Swensen died. Ms. Rodriguez's counsel said that she had Swensen's laptop and was willing to give the SEC access to it.

33. Pursuant to subpoena, SEC Staff obtained the records for a Marriott Bonvoy credit card on which Swensen was the account holder. I have reviewed the records. The expenditures on the card totaled $381,950 in just the time frame from September 27, 2021 to July 24, 2022. The expenditures included $8,850 at Marion Plastic Surgery, over $16,000 at Tiffany & Co., over $14,500 at Louis Vuitton, and $4,991 at Gucci.

34. Without assistance from Ms. Rodriguez, it is not possible to tell which charges were made by Ms. Rodriguez and which charges were made by Swensen, with a couple exceptions. One exception is that the Marriott credit card records show purchases totaling thousands of dollars in San Juan, Puerto Rico on June 3-5, 2022, a time during which Swensen was in Utah according to statements from Mr. Tempest, Mr. Marley, and Wendy Swensen. The purchases in San Juan on the days when Swensen was in Utah included $3,307 at Jimmy Choo San Juan, $306.63 at Tiffany & Co. San Juan, and $3,255 at Louis Vuitton San Juan.

35. Another exception is that the Marriot credit card records also show that purchases continued after Swensen's death, including $1,051 in charges for airfare between Salt Lake City and New York City, over $1,100 spent at Wal-Mart, $354 at Best Buy, $279 at Bob's Lock Safe & Key, and $221 at Home Depot.

36. The Staff obtained records of Swensen's accounts at JP Morgan Chase Bank. I have reviewed those records. The records show that Saria Rodriguez received multiple Zelle payments from one of Swensen's accounts to Rodriguez's account at Key Bank between August 2021 and May 2022, totaling $51,500. The records of another of Swensen's accounts show that Rodriguez received multiple Zelle payments from this additional Swensen account between February 2021 and May 23, 2022, totaling $84,550.

37. I have reviewed the records of the Crew Capital account that Wells Fargo Bank produced. On January 28, 2022, Swensen purchased a cashier's check payable to Saria Rodriguez using funds in the Crew Capital account in the amount of $40,126.21.

9

### Relief Defendant WS Family IP, LLC

38. As part of the Investigation, I spoke to K. Beau Ogzewalla. Mr. Ogzewalla is the manager of 317 Kaysville Ops LLC, a company that builds homes. Mr. Ogzewalla told me that in December 2021 Swensen placed a construction deposit of $65,000 on a new home that was under construction in Kaysville, Utah.

39. Attached as **Exhibit 25** is a true and correct copy of the cashier's check to 317 Kaysville Ops LLC. It is from Wells Fargo Bank, N.A.

40. I have reviewed the records of the Crew Capital account that Wells Fargo Bank produced. The cashier's check that Swensen gave to Mr. Ogzewalla as a construction deposit on the Kaysville home was purchased with money from the Crew Capital account.

41. Mr. Ogzewalla told me that Swensen made two additional deposits on the Kaysville home prior to his death, and that Swensen's daughter and son-in-law completed the purchase of the home in July 2022 with money provided by Swensen's widow, Wendy.

42. Using tools available to SEC staff, I obtained title information for the Kaysville home, a true and correct copy of which is attached as **Exhibit 26.**

43. As part of the Investigation, I spoke with Wendy Swensen. She confirmed that she completed the purchase of the Kaysville home in July 2022. She said she used the proceeds of a life insurance policy on Swensen to complete the purchase of the home. She confirmed that WS Family IP, LLC holds title to the home.

44. I conducted a business entity search on the website of the State of Utah, Division of Corporations and Commercial Code at https://corporationsutah.gov and retrieved information concerning WS Family IP, LLC, a true and correct copy of which is attached hereto as **Exhibit 28**. The record shows that WS Family IP, LLC was created on July 21, 2022 and Wendy Swensen is its sole manager.

### Relief Defendant Swensen Capital, LLC

45.     I conducted a business entity search on the website of the State of Utah, Division of Corporations and Commercial Code at https://corporationsutah.gov and retrieved information concerning Swensen Capital, LLC, true and correct copies of which are attached hereto as **Exhibit 27**.  Swensen Capital, LLC was formerly known as Last Advisor, LLC and Four Buckets, LLC and registered the d/b/a "Bucket Bliss."  Swensen changed the name of the company from Last Advisor, LLC to Swensen Capital, LLC on May 31, 2022.  On July 12, 2022, Ronald S. Gibb became the sole manager of Swensen Capital, LLC.

46.     As part of the Investigation, I spoke with Ronald S. Gibb.  He told me that Swensen hired him in 2014 to work for a company then known as Last Advisor LLC.  Mr. Gibb said the company is known as Bucket Bliss and does business as Bucket Bliss.  Mr. Gibb said that after Swensen died, the company could not pay its operating expenses because Swensen was the sole signatory on the company's bank account.  To remedy this, Wendy Swensen and Mr. Gibb went to the bank together and placed Mr. Gibb on the company's bank account as a signatory.  The name of the company on the bank account was changed at that time from Last Advisor, LLC to Swensen Capital, LLC.  Mr. Gibb explained his understanding that his name was put on the State of Utah's records as the manager of the limited liability company after Swensen died for the purpose of allowing Mr. Gibb to continue to run the ongoing business.

47.     Mr. Gibb also told me that he was in the process of purchasing the Bucket Bliss business from the Swensen Estate, but that counsel for the Swensen Estate put a hold on the sale of the business to Mr. Gibb after learning of the SEC's Investigation.

### Relief Defendant Wingman, LLC

48.      I conducted a business entity search on the website of the State of Utah, Division of Corporations and Commercial Code at https://corporationsutah.gov and retrieved information concerning Wingman, LLC, true and correct copies of which are attached hereto as **Exhibit 29**.  Wingman, LLC was originally created with the name Hatchat, LLC on August 11, 2020 with

Swensen as its sole manager.  Swensen changed the name to Wingman, LLC on December 31, 2020.

## Investor Declarations and Testimony

49. Attached as **Exhibit 30** is a true and correct copy of the Declaration of Bret Thurman and accompanying exhibits.

50. Attached as **Exhibit 31** is a true and correct copy of the Declaration of Alfred Forsyth and accompanying exhibits.

51. Attached as **Exhibit 32** is a true and correct copy of the Declaration of David Luthy and accompanying exhibits.

52. Attached as **Exhibit 33** is a true and correct copy of the Declaration of John Keith and accompanying exhibits.

53. Attached as **Exhibit 34** is a true and correct copy of the transcript of the testimony of Cathy L. Hartman and accompanying Exhibits 8, 9, and 10.

54. Attached as **Exhibit 35** is a true and correct copy of the transcript of the testimony of Mark Lee Fox and accompanying Exhibits 15 and 21.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of October, 2022 in Salt Lake City, Utah.

/s/ Joni Ostler
Joni Ostler