# EXHIBIT 1

## ENTITY INFORMATION

### ENTITY INFORMATION

**Entity Name:**

CREW CAPITAL GROUP, LLC

**Entity Number:**

E0127792010-1

**Entity Type:**

Domestic Limited-Liability Company (86)

**Entity Status:**

Active

**Formation Date:**

03/01/2010

**NV Business ID:**

NV20101209464

**Termination Date:**

Perpetual

**Annual Report Due Date:**

3/31/2023

**Series LLC:**

☐

**Restricted LLC:**

☐

### REGISTERED AGENT INFORMATION

**Name of Individual or Legal Entity:**

NEVADA CORPORATE HEADQUARTERS, INC

**Status:**

Active

**CRA Agent Entity Type:**

**Registered Agent Type:**

Commercial Registered Agent

**NV Business ID:**

**Office or Position:**

**Jurisdiction:**

NEVADA

**Street Address:**

4730 S. FORT APACHE RD SUITE 300, Las Vegas, NV, 89147 - 7947, USA

**Mailing Address:**

**Individual with Authority to Act:**

TREVOR ROWLEY

**Fictitious Website or Domain Name:**

## OFFICER INFORMATION

☐ VIEW HISTORICAL DATA

| Title | Name | Address | Last Updated | Status |
|-------|------|---------|--------------|--------|
| Manager | THE NEVADA BUSINESS CONSORTIUM, INC. | PO BOX 27740, LAS VEGAS, NV, 89126, USA | 03/07/2019 | Active |

Page 1 of 1, records 1 to 1 of 1

Filing History     Name History     Mergers/Conversions

# EXHIBIT 2



**ROSS MILLER**
Secretary of State
204 North Carson Street, Suite 4
Carson City, Nevada 89701-4520
(775) 684 5708
Website: www.nvsos.gov

# Articles of Organization
# Limited-Liability Company
### (PURSUANT TO NRS CHAPTER 86)

| Filed in the Office of | Business Number<br>E0127792010-1 |
|---|---|
| | Filing Number<br>20100171870-67 |
| Secretary of State | Filed On<br>03/01/2010 |
| State Of Nevada | Number of Pages<br>4 |

USE BLACK INK ONLY - DO NOT HIGHLIGHT

ABOVE SPACE IS FOR OFFICE USE ONLY

| 1. Name of Limited-Liability Company: (must contain approved limited-liability company wording; see instructions) | CAPITAL COOPERATIVE GROUP, LLC | Check box if a Series Limited-Liability Company ☐ |
|---|---|---|

| 2. Registered Agent for Service of Process: (check only one box) | ☒ Commercial Registered Agent: Nevada Corporate Headquarters<br>Name<br>☐ Noncommercial Registered Agent (name and address below) **OR** ☐ Office or Position with Entity (name and address below) |
|---|---|

Name of Noncommercial Registered Agent  **OR**  Name of Title of Office or Other Position with Entity

| 101 Convention Center Dr Suite 700 | Las Vegas | Nevada 89109 |
|---|---|---|
| Street Address | City | Zip Code |
| PO BOX 27740 | LAS VEGAS | Nevada 89126 |
| Mailing Address (if different from street address) | City | Zip Code |

| 3. Dissolution Date: (optional) | Latest date upon which the company is to dissolve (if existence is not perpetual): |
|---|---|

| 4. Management: (required) | Company shall be managed by: ☒ Manager(s)  **OR**  ☐ Member(s)<br>(check only one box) |
|---|---|

| 5. Name and Address of each Manager or Managing Member: (attach additional page if more than 3) | 1)  LANCE KERNESS<br>Name |  |  |
|---|---|---|---|
| | PO BOX 27740 | LAS VEGAS | NV 89126 |
| | Street Address | City | State  Zip Code |
| | 2)<br>Name | | |
| | Street Address | City | State  Zip Code |
| | 3)<br>Name | | |
| | Street Address | City | State  Zip Code |

| 6. Name, Address and Signature of Organizer: (attach additional page if more than 1 organizer) | DIANNA R TEMPLE<br>Name | X *Dianna R Temple*<br>Organizer Signature | | |
|---|---|---|---|---|
| | PO BOX 27740 | LAS VEGAS | NV | 89126 |
| | Address | City | State | Zip Code |

| 7. Certificate of Acceptance of Appointment of Registered Agent: | *I hereby accept appointment as Registered Agent for the above named Entity.*<br>X _____ | | 3/1/2010 |
|---|---|---|---|
| | Authorized Signature of Registered Agent or On Behalf of Registered Agent Entity | | Date |

*This form must be accompanied by appropriate fees.*

Nevada Secretary of State NRS 86 DLLC Articles
Revised: 4-14-09

SEC-NVCORPHQ-P-0000003

# ARTICLES OF ORGANIZATION OF
# CAPITAL COOPERATIVE GROUP, LLC
### A NV Limited Liability Company
(Pursuant to NRS 86.161)

The undersigned person(s) hereby form a limited liability company under the NV Limited Liability Company Act and adopt as the Articles of Organization of such limited liability company the following:

I.    NAME.  The name of the limited liability company shall be:

### CAPITAL COOPERATIVE GROUP, LLC

II.    REGISTERED AGENT.  The name and business address of agent for service of process in Nevada shall be:

**Nevada Corporate Headquarters, Inc.
101 Convention Center Dr., Seventh Floor
Las Vegas, NV  89109**

III.    DURATION.  The period of its duration shall be perpetual from the date of filing of the Articles of Organization with the Secretary of State of the State of NV.

IV.    MANAGEMENT OF THE COMPANY.  This Company shall be managed by the Manager.    Lance Kerness has been named as Manager of this Company, by consent of the Members, and shall have all powers, duties and responsibilities as outlined in the Operating  Agreement.    Only  the  Manager  or  Managing  Members  can  bind  the Company, Non-Managing Members have no authority to bind it. The Manager, Member or Managing Member shall have the following official Mailing Address:  P.O. Box 27740, Las Vegas, NV  89126.

V.    PURPOSE.  The purpose for which the limited liability company is organized shall be as follows:
The Company shall have unlimited power to engage in and do any lawful act concerning any or all lawful business for which limited liability companies may be organized according to the laws of the State of Nevada, excluding banking and insurance, including all powers and purposes now and hereafter permitted by law to a limited liability company.

VI.    BUSINESS CONTINUANCE.  Upon the death, retirement, resignation, expulsion, bankruptcy or dissolution of a member or occurrence of any other event which

terminates the continued membership of a member in the Company, the remaining members of the Company may continue the business of the Company upon unanimous agreement as provided in the Operating Agreement of the Company.

VII.    ADDITION AND REMOVAL OF MEMBERS.    Additional members may be admitted at such times and on such terms and conditions as all members may unanimously agree and as provided in the Operating Agreement of the Company. The members may be expelled or removed only in the manner provided in the Company's Operating Agreement.

VIII.    INDEMNIFICATION.  The Company shall indemnify an individual made a party to any proceeding that results from his or her relationship as a manager, officer, organizer, employee or agent of the Company against liability incurred in the proceeding if:

A.        He/she conducted himself/herself in good faith
B.        He/she reasonably believed that his/her conduct was in or at least not opposed to the Company's best interest and
C.        In the case of any criminal proceeding, he/she had no reasonable cause to believe his/her conduct was unlawful.

Indemnification shall also be provided for an individual's conduct with respect to an employee benefit plan if the individual reasonably believed his/her conduct to be in the interests of the participants in and beneficiaries of such plan.

The Company shall pay for or reimburse the reasonable expenses incurred by a manager, officer, organizer, employee, or agent of the Company who is a party to a proceeding in advance of final disposition of the proceeding if:

A. The individual furnishes the Company with a written affirmation of his/her good faith belief that he/she has met the standard of conduct described herein
B. The individual furnishes the Company a written undertaking executed personally or on his behalf to repay the advance if it is ultimately determined that he/she did not meet the standard of conduct and
C. A determination is made that the facts then known to those making the determination would not preclude indemnification under the law.    The undertaking required by this paragraph shall be an unlimited general obligation, but need not be secured and may be accepted without reference to financial ability to make repayment.

The indemnification and advance of expenses authorized herein shall not be exclusive to any other rights to which any manager, officer, organizer, employee or agent may be entitled under any bylaw, agreement, and vote of members or disinterested managers or otherwise.  The Articles of Organization shall not be interpreted to limit in any manner the indemnification or right to advancement for expenses of an individual who would otherwise be entitled thereto.  These Articles of Organization shall be interpreted as mandating indemnification and advancement of expenses to the extent permitted by law.

In addition to the foregoing, the Company shall indemnify and save the organization harmless for all acts taken by them as organizers of the Company, and shall pay all costs and expenses incurred by or imposed upon them as a result of the same, including compensation based upon the usual charges for expenditures required of them in pursuit of the defense against any liability arising on the account of acting as organizers or on the account enforcing the indemnification right hereunder, and the Company releases them from all liability for any such act as organizers not involving willful or grossly negligent misconduct.

IX.    PREEMPTIVE RIGHTS.  The members of the Company have preemptive rights only in the manner specified in the Operating Agreement.

X.    ORGANIZER.  This Company is organized by the undersigned.

**Dianna R. Temple**
**101 Convention Center Dr., Seventh Floor**
**Las Vegas, NV 89109**

_____    <u>3/1/10</u>
Signature of Organizer    Date
Dianna R. Temple

**Acceptance of Registered agent:  NEVADA CORPORATE HEADQUARTERS, INC.** hereby accepts the appointment as registered agent for the said Limited Liability Company.

_____    <u>3/1/10</u>
Trevor C. Rowley- Office Administrator    Date
(On behalf of Nevada Corporate Headquarters, Inc.)

# EXHIBIT 3



**BARBARA K. CEGAVSKE**
Secretary of State
204 North Carson Street, Suite 1
Carson City, Nevada 89701-4520
(775) 684-5708
Website: www.nvsos.gov

| Filed in the Office of | Business Number |
| --- | --- |
| *Barbara K. Cegavske* | E0127792010-1 |
| | Filing Number |
| | 20150213288-02 |
| Secretary of State | Filed On |
| State Of Nevada | 05/08/2015 |
| | Number of Pages |
| | 1 |

## Amendment to
## Articles of Organization
(PURSUANT TO NRS 86.221)

USE BLACK INK ONLY - DO NOT HIGHLIGHT

ABOVE SPACE IS FOR OFFICE USE ONLY

### Certificate of Amendment to Articles of Organization
### For a Nevada Limited-Liability Company
### (Pursuant to NRS 86.221)

1. Name of limited-liability company:

   CAPITAL COOPERATIVE GROUP, LLC

2. The company is managed by:   ☒ Managers   **OR**   ☐ Members
   (check only one box)

3. The articles have been amended as follows: (provide article numbers, if available)*

   Article 1: Shall be amended to read as follows: The new name of the company will be CREW CAPITAL GROUP, LLC

4. Effective date and time of filing: (optional) Date: 5/1/15   Time: 9:00 Am
   (must not be later than 90 days after the certificate is filed)

5. Signature (must be signed by at least one manager or by a managing member):

   X _____
      Signature

* If amending company name, it must contain the words "Limited-Liability Company," "Limited Company," "Limited," or the abbreviations "Ltd.," "L.L.C.," or "LC," "LLC" or "LC." The word "**Company**" may be abbreviated as "**Co.**"

2)   If adding managers, provide names and addresses.

IMPORTANT: Failure to include any of the above information and submit with the proper fees may cause this filing to be rejected.

*This form must be accompanied by appropriate fees.*

Nevada Secretary of State 86.221 DLLC Amendment
Revised: 1-5-15

SEC-NVCORPHQ-P-0000007

SEC-NVCORPHQ-P-0000007

# EXHIBIT 4

# NEVADA CORPORATE HEADQUARTERS, INC.
### 4730 S Fort Apache Rd Suite 300
### Las Vegas, NV 89147

### Toll Free: 1-800-508-1729
### Local Number: 702-873-3488

**CONSULTANT: Admin**

**DATE: 3/17/2022** 1:05:03 PM

**CLIENT NAME:** Stephen Swensen
**PHONE:** (801)█████████ **ALT#:**   **FAX:** (801)████████ xFax   **E-MAIL:** █████████com

**Charged to: VISA ending in 4972**

| PRODUCT NAME: | NAME: | PRICE: |
|---|---|---|
| Privacy Package Renewal  - NCH | CREW CAPITAL GROUP, LLC | $800.00 |
| Registered Agent Service - NV - NCH - $227 | CREW CAPITAL GROUP, LLC | $227.00 |
| Annual List - NV  - NCH | CREW CAPITAL GROUP, LLC | $150.00 |
| State Business License - NV - LLC Renewal - NCH | CREW CAPITAL GROUP, LLC | $200.00 |
|  | **TOTAL:** | $1377.00 |

# PAID IN FULL

Thank you for making Nevada Corporate Headquarters, Inc. a part of the future success and growth of your business. We appreciate your confidence in us and pledge to do all we can to provide you with one-stop convenience and a full spectrum of services to help you protect your assets and maximize your profits. At Nevada Corporate Headquarters, Inc., we look forward to an ongoing partnership to help you turn your business dreams into reality.

Sincerely,

Nevada Corporate Headquarters, Inc.
4730 S Fort Apache Rd Suite 300
Las Vegas, NV  89147

Terms and Conditions of Sale: All sales of products and services laid forth in this invoice are final and binding. Client accepts these terms and conditions and is bound to this agreement of sale from Nevada Corporate Headquarters, Inc. These Terms and Conditions of Sale make up the full agreement between the client and Nevada Corporate Headquarters, Inc. pertaining to the products and services for sale.

# NEVADA CORPORATE HEADQUARTERS, INC.
### 4730 S Fort Apache Rd Suite 300
### Las Vegas, NV 89147

### Toll Free: 1-800-508-1729
### Local Number: 702-873-3488

**CONSULTANT:  Ashley Hechler**

**DATE:  4/2/2021** 3:48:55 PM

**CLIENT NAME:** Stephen Swensen

**PHONE:** (801)█████████    **ALT#:**    **FAX:** (801)█████ xFax    **E-MAIL:** ████████████om

**Charged to:  VISA ending in 4972**

| PRODUCT NAME: | NAME: | PRICE: |
|---|---|---|
| Privacy Package Renewal - CSC | CREW CAPITAL GROUP, LLC | $800.00 |
| Registered Agent Delinquent - NCH | CREW CAPITAL GROUP, LLC | $247.00 |
| | **TOTAL:** | $1047.00 |

# PAID IN FULL

Thank you for making Nevada Corporate Headquarters, Inc. a part of the future success and growth of your business. We appreciate your confidence in us and pledge to do all we can to provide you with one-stop convenience and a full spectrum of services to help you protect your assets and maximize your profits. At Nevada Corporate Headquarters, Inc., we look forward to an ongoing partnership to help you turn your business dreams into reality.

Sincerely,

Nevada Corporate Headquarters, Inc.
4730 S Fort Apache Rd Suite 300
Las Vegas, NV  89147

Terms and Conditions of Sale: All sales of products and services laid forth in this invoice are final and binding. Client accepts these terms and conditions and is bound to this agreement of sale from Nevada Corporate Headquarters, Inc. These Terms and Conditions of Sale make up the full agreement between the client and Nevada Corporate Headquarters, Inc. pertaining to the products and services for sale.

# NEVADA CORPORATE HEADQUARTERS, INC.
### 4730 S Fort Apache Rd Suite 300
### Las Vegas, NV 89147

### Toll Free: 1-800-508-1729
### Local Number: 702-873-3488

**CONSULTANT: Savannah Taylor**                                    **DATE: 3/19/2020** 3:43:29 PM

**CLIENT NAME:** Stephen Swensen
**PHONE:** (801) ▮▮▮▮   **ALT#:**   **FAX:** (801)▮▮▮ xFax   **E-MAIL:** ▮▮▮▮com

**Charged to:** VISA ending in 3587

| PRODUCT NAME: | NAME: | PRICE: |
|---|---|---|
| Registered Agent Service - NV - NCH | | $197.00 |
| Privacy Package Renewal - NCH | | $800.00 |
| | **TOTAL:** | **$997.00** |

# PAID IN FULL

Thank you for making Nevada Corporate Headquarters, Inc. a part of the future success and growth of your business. We appreciate your confidence in us and pledge to do all we can to provide you with one-stop convenience and a full spectrum of services to help you protect your assets and maximize your profits. At Nevada Corporate Headquarters, Inc., we look forward to an ongoing partnership to help you turn your business dreams into reality.

Sincerely,

Nevada Corporate Headquarters, Inc.
4730 S Fort Apache Rd Suite 300
Las Vegas, NV 89147

Terms and Conditions of Sale: All sales of products and services laid forth in this invoice are final and binding. Client accepts these terms and conditions and is bound to this agreement of sale from Nevada Corporate Headquarters, Inc. These Terms and Conditions of Sale make up the full agreement between the client and Nevada Corporate Headquarters, Inc. pertaining to the products and services for sale.

# NEVADA CORPORATE HEADQUARTERS, INC.
### 4730 S Fort Apache Rd Suite 300
### Las Vegas, NV 89147

### Toll Free: 1-800-508-1729
### Local Number: 702-873-3488

**CONSULTANT:** Stephanie Robinson                          **DATE:** 3/4/2019 12:29:27 PM

---

**CLIENT NAME:** Stephen Swensen
**PHONE:** (801) ████       **ALT#:**       **FAX:** (801) ████  xFax      **E-MAIL:** ████████

**Charged to: VISA ending in 7184**

---

| PRODUCT NAME: | NAME: | PRICE: |
|---|---|---|
| Registered Agent Service - NV - NCH | | $197.00 |
| Annual List - NV - NCH | | $150.00 |
| State Business License - NV - LLC Renewal - NCH | | $200.00 |
| NCH Online Renewal Fee - $17.50 | | $17.50 |
| Privacy Package Renewal - NCH | | $800.00 |
| | **TOTAL:** | $1364.50 |

# PAID IN FULL

Thank you for making Nevada Corporate Headquarters, Inc. a part of the future success and growth of your business. We appreciate your confidence in us and pledge to do all we can to provide you with one-stop convenience and a full spectrum of services to help you protect your assets and maximize your profits. At Nevada Corporate Headquarters, Inc., we look forward to an ongoing partnership to help you turn your business dreams into reality.

Sincerely,

Nevada Corporate Headquarters, Inc.
4730 S Fort Apache Rd Suite 300
Las Vegas, NV  89147

Terms and Conditions of Sale: All sales of products and services laid forth in this invoice are final and binding. Client accepts these terms and conditions and is bound to this agreement of sale from Nevada Corporate Headquarters, Inc. These Terms and Conditions of Sale make up the full agreement between the client and Nevada Corporate Headquarters, Inc. pertaining to the products and services for sale.

# NEVADA CORPORATE HEADQUARTERS, INC.
**4730 S Fort Apache Rd Suite 300**
**Las Vegas, NV 89147**

**Toll Free: 1-800-508-1729**
**Local Number: 702-873-3488**

**CONSULTANT: Catherine Noguera**                    **DATE: 1/24/2018** 9:01:57 AM

**CLIENT NAME:** Stephen Swensen
**PHONE:** (801)▮▮▮▮▮▮▮    **ALT#:**        **FAX:** (801)▮▮▮▮▮  xFax    **E-MAIL:** ▮▮▮▮▮▮▮com

**Charged to: VISA ending in 5684**

| PRODUCT NAME: | NAME: | PRICE: |
|---|---|---|
| Registered Agent Service - NV - NCH | | $197.00 |
| Renewal - Privacy Package - NCH | | $997.00 |
| | **TOTAL:** | $1194.00 |

# PAID IN FULL

Thank you for making Nevada Corporate Headquarters, Inc. a part of the future success and growth of your business. We appreciate your confidence in us and pledge to do all we can to provide you with one-stop convenience and a full spectrum of services to help you protect your assets and maximize your profits. At Nevada Corporate Headquarters, Inc., we look forward to an ongoing partnership to help you turn your business dreams into reality.


Sincerely,

Nevada Corporate Headquarters, Inc.
4730 S Fort Apache Rd Suite 300
Las Vegas, NV  89147


Terms and Conditions of Sale: All sales of products and services laid forth in this invoice are final and binding. Client accepts these terms and conditions and is bound to this agreement of sale from Nevada Corporate Headquarters, Inc. These Terms and Conditions of Sale make up the full agreement between the client and Nevada Corporate Headquarters, Inc. pertaining to the products and services for sale.

# NEVADA CORPORATE HEADQUARTERS, INC.
**4730 S Fort Apache Rd Suite 300**
**Las Vegas, NV 89147**

**Toll Free: 1-800-508-1729**
**Local Number: 702-873-3488**

**CONSULTANT: Catherine Noguera**                         **DATE: 1/27/2017** 2:16:08 PM

**CLIENT NAME:** Stephen Swensen
**PHONE:** (801) ▮▮▮▮    **ALT#:**    **FAX:** (801) ▮▮▮▮  xFax    **E-MAIL:** ▮▮▮▮com

**Charged to: CHECK #1182**

| PRODUCT NAME: | NAME: | PRICE: |
|---|---|---|
| Registered Agent Service - NV - NCH | CREW CAPITAL GROUP, LLC | $197.00 |
| Privacy Package Renewal - NCH | CREW CAPITAL GROUP, LLC | $800.00 |
| | **TOTAL:** | **$997.00** |

## PAID IN FULL

Thank you for making Nevada Corporate Headquarters, Inc. a part of the future success and growth of your business. We appreciate your confidence in us and pledge to do all we can to provide you with one-stop convenience and a full spectrum of services to help you protect your assets and maximize your profits. At Nevada Corporate Headquarters, Inc., we look forward to an ongoing partnership to help you turn your business dreams into reality.

Sincerely,

Nevada Corporate Headquarters, Inc.
4730 S Fort Apache Rd Suite 300
Las Vegas, NV  89147

Terms and Conditions of Sale: All sales of products and services laid forth in this invoice are final and binding. Client accepts these terms and conditions and is bound to this agreement of sale from Nevada Corporate Headquarters, Inc. These Terms and Conditions of Sale make up the full agreement between the client and Nevada Corporate Headquarters, Inc. pertaining to the products and services for sale.

# NEVADA CORPORATE HEADQUARTERS, INC.
### 4730 S Fort Apache Rd Suite 300
### Las Vegas, NV 89147

### Toll Free: 1-800-508-1729
### Local Number: 702-873-3488

**CONSULTANT: Stephanie Robinson**                    **DATE: 2/19/2016** 2:00:45 PM

**CLIENT NAME:** Stephen Swensen
**PHONE:** (801) ▮▮▮▮    **ALT#:**    **FAX:** (801) ▮▮▮▮kFax    **E-MAIL:** ▮▮▮▮com

**Charged to: VISA** *(exp: 05/2019  3Digit Security Code:* ▮▮▮ *Last 4 digits not captured)*

| PRODUCT NAME: | NAME: | PRICE: |
|---|---|---|
| Registered Agent Service - NV - NCH | CREW CAPITAL GROUP, LLC | $197.00 |
| Privacy Package Renewal - NCH | CREW CAPITAL GROUP, LLC | $800.00 |
| | **TOTAL:** | **$997.00** |

# PAID IN FULL

Thank you for making Nevada Corporate Headquarters, Inc. a part of the future success and growth of your business. We appreciate your confidence in us and pledge to do all we can to provide you with one-stop convenience and a full spectrum of services to **help** you protect your assets and maximize your profits. At Nevada Corporate Headquarters, Inc., we look forward to an ongoing partnership to help you turn your business dreams into reality.


Sincerely,

Nevada Corporate Headquarters, Inc.
4730 S Fort Apache Rd Suite 300
Las Vegas, NV  89147


Terms and Conditions of Sale: All sales of products and services laid forth in this invoice are final and binding. Client accepts these terms and conditions and is bound to this agreement of sale from Nevada Corporate Headquarters, Inc. These Terms and Conditions of Sale make up the full agreement between the client and Nevada Corporate Headquarters, Inc. pertaining to the products and services for sale.

# NEVADA CORPORATE HEADQUARTERS, INC.
### 4730 S Fort Apache Rd Suite 300
### Las Vegas, NV 89147

### Toll Free: 1-800-508-1729
### Local Number: 702-873-3488

**CONSULTANT: Melissa Shaw - Donated**                    **DATE: 5/6/2015** 3:36:24 PM

**CLIENT NAME:** Stephen Swensen
**PHONE:** (801)███████   **ALT#:**   **FAX:** (801)█████kFax   **E-MAIL:** █████████

**Charged to: VISA ending in 5816**

| PRODUCT NAME: | NAME: | PRICE: |
|---|---|---|
| Amendment - Non-expedite NCH | | $400.00 |
| | **TOTAL:** | $400.00 |

# PAID IN FULL

Thank you for making Nevada Corporate Headquarters, Inc. a part of the future success and growth of your business. We appreciate your confidence in us and pledge to do all we can to provide you with one-stop convenience and a full spectrum of services to help you protect your assets and maximize your profits. At Nevada Corporate Headquarters, Inc., we look forward to an ongoing partnership to help you turn your business dreams into reality.

Sincerely,

Nevada Corporate Headquarters, Inc.
4730 S Fort Apache Rd Suite 300
Las Vegas, NV  89147

Terms and Conditions of Sale: All sales of products and services laid forth in this invoice are final and binding. Client accepts these terms and conditions and is bound to this agreement of sale from Nevada Corporate Headquarters, Inc. These Terms and Conditions of Sale make up the full agreement between the client and Nevada Corporate Headquarters, Inc. pertaining to the products and services for sale.

# NEVADA CORPORATE HEADQUARTERS, INC.
## 4730 S Fort Apache Rd Suite 300
## Las Vegas, NV 89147

### Toll Free: 1-800-508-1729
### Local Number: 702-873-3488

**CONSULTANT: Melissa Shaw**                                **DATE: 4/2/2014** 3:01:41 PM

**CLIENT NAME:** Stephen Swensen
**PHONE:** (801▮▮▮▮▮▮▮)   **ALT#:**   **FAX:** (801▮▮▮▮▮xFax   **E-MAIL:** ▮▮▮▮▮▮.com

**Charged to: VISA exp 09/2014 last 4 digits not captured**

| PRODUCT NAME: | NAME: | PRICE: |
|---|---|---|
| Renewal - Privacy Package - NCH | CAPITAL COOPERATIVE GROUP, LLC | $997.00 |
| Office Package - NCH | CAPITAL COOPERATIVE GROUP, LLC | $2197.00 |
| Registered Agent Delinquent - NCH | CAPITAL COOPERATIVE GROUP, LLC | $247.00 |
|  | **TOTAL:** | $3441.00 |

# PAID IN FULL

Thank you for making Nevada Corporate Headquarters, Inc. a part of the future success and growth of your business. We appreciate your confidence in us and pledge to do all we can to provide you with one-stop convenience and a full spectrum of services to help you protect your assets and maximize your profits. At Nevada Corporate Headquarters, Inc., we look forward to an ongoing partnership to help you turn your business dreams into reality.

Sincerely,

Nevada Corporate Headquarters, Inc.
4730 S Fort Apache Rd Suite 300
Las Vegas, NV  89147

Terms and Conditions of Sale: All sales of products and services laid forth in this invoice are final and binding. Client accepts these terms and conditions and is bound to this agreement of sale from Nevada Corporate Headquarters, Inc. These Terms and Conditions of Sale make up the full agreement between the client and Nevada Corporate Headquarters, Inc. pertaining to the products and services for sale.

# NEVADA CORPORATE HEADQUARTERS, INC.
### 4730 S Fort Apache Rd Suite 300
### Las Vegas, NV 89147

### Toll Free: 1-800-508-1729
### Local Number: 702-873-3488

**CONSULTANT: Melissa Shaw**

**DATE: 5/1/2013** 3:09:28 PM

**CLIENT NAME:** Stephen Swensen
**PHONE:** (801)▮▮▮▮   **ALT#:**   **FAX:** (801)▮▮▮▮ xFax   **E-MAIL:** ▮▮▮▮▮▮▮▮

**Charged to: Mastercard ending in 6124**

| PRODUCT NAME: | NAME: | PRICE: |
|---|---|---|
| DBA Application - NCH | CAPITAL COOPERATIVE GROUP, LLC | $300.00 |
| | **TOTAL:** | **$300.00** |

# PAID IN FULL

Thank you for making Nevada Corporate Headquarters, Inc. a part of the future success and growth of your business. We appreciate your confidence in us and pledge to do all we can to provide you with one-stop convenience and a full spectrum of services to help you protect your assets and maximize your profits. At Nevada Corporate Headquarters, Inc., we look forward to an ongoing partnership to help you turn your business dreams into reality.

Sincerely,

Nevada Corporate Headquarters, Inc.
4730 S Fort Apache Rd Suite 300
Las Vegas, NV  89147

Terms and Conditions of Sale: All sales of products and services laid forth in this invoice are final and binding. Client accepts these terms and conditions and is bound to this agreement of sale from Nevada Corporate Headquarters, Inc. These Terms and Conditions of Sale make up the full agreement between the client and Nevada Corporate Headquarters, Inc. pertaining to the products and services for sale.

# NEVADA CORPORATE HEADQUARTERS, INC.
## 4730 S Fort Apache Rd Suite 300
## Las Vegas, NV 89147

### Toll Free: 1-800-508-1729
### Local Number: 702-873-3488

**CONSULTANT: Melissa Shaw**                                    **DATE: 3/25/2013** 8:38:18 AM

**CLIENT NAME:** Stephen Swensen
**PHONE:** (801) ▮▮▮▮    **ALT#:**    **FAX:** (801 ▮▮▮▮ xFax    **E-MAIL:** ▮▮▮▮▮▮▮

**Charged to: VISA** *(08/2014 exp date – last 4 digits not captured)*

| PRODUCT NAME: | NAME: | PRICE: |
|---|---|---|
| Renewal - Privacy Package - NCH | CAPITAL COOPERATIVE GROUP, LLC | $800.00 |
|  | **TOTAL:** | **$800.00** |

# PAID IN FULL

Thank you for making Nevada Corporate Headquarters, Inc. a part of the future success and growth of your business. We appreciate your confidence in us and pledge to do all we can to provide you with one-stop convenience and a full spectrum of services to help you protect your assets and maximize your profits. At Nevada Corporate Headquarters, Inc., we look forward to an ongoing partnership to help you turn your business dreams into reality.

Sincerely,

Nevada Corporate Headquarters, Inc.
4730 S Fort Apache Rd Suite 300
Las Vegas, NV  89147

Terms and Conditions of Sale: All sales of products and services laid forth in this invoice are final and binding. Client accepts these terms and conditions and is bound to this agreement of sale from Nevada Corporate Headquarters, Inc. These Terms and Conditions of Sale make up the full agreement between the client and Nevada Corporate Headquarters, Inc. pertaining to the products and services for sale.

# NEVADA CORPORATE HEADQUARTERS, INC.
## 4730 S Fort Apache Rd Suite 300
## Las Vegas, NV 89147

### Toll Free: 1-800-508-1729
### Local Number: 702-873-3488

**CONSULTANT: Melissa Shaw**                    **DATE: 3/22/2013** 2:39:21 PM

**CLIENT NAME:** Stephen Swensen
**PHONE:** (801)▮▮▮▮▮   **ALT#:**   **FAX:** (801)▮▮▮▮ xFax   **E-MAIL:** ▮▮▮▮▮.com

**Charged to:** VISA exp 08/14 last 4 digits not captured

| PRODUCT NAME: | NAME: | PRICE: |
|---|---|---|
| Registered Agent Service - NV - NCH | CAPITAL COOPERATIVE GROUP, LLC | $197.00 |
| Office Package - NCH | CAPITAL COOPERATIVE GROUP, LLC | $1997.00 |
| | **TOTAL:** | $2194.00 |

# PAID IN FULL

Thank you for making Nevada Corporate Headquarters, Inc. a part of the future success and growth of your business. We appreciate your confidence in us and pledge to do all we can to provide you with one-stop convenience and a full spectrum of services to help you protect your assets and maximize your profits. At Nevada Corporate Headquarters, Inc., we look forward to an ongoing partnership to help you turn your business dreams into reality.

Sincerely,

Nevada Corporate Headquarters, Inc.
4730 S Fort Apache Rd Suite 300
Las Vegas, NV  89147

Terms and Conditions of Sale: All sales of products and services laid forth in this invoice are final and binding. Client accepts these terms and conditions and is bound to this agreement of sale from Nevada Corporate Headquarters, Inc. These Terms and Conditions of Sale make up the full agreement between the client and Nevada Corporate Headquarters, Inc. pertaining to the products and services for sale.

# NEVADA CORPORATE HEADQUARTERS, INC.
### 4730 S Fort Apache Rd Suite 300
### Las Vegas, NV 89147

### Toll Free: 1-800-508-1729
### Local Number: 702-873-3488

**CONSULTANT: Melissa Shaw**                    **DATE: 2/14/2012** 8:41:15 AM

**CLIENT NAME:** Stephen Swensen
**PHONE:** (801)       **ALT#:**     **FAX:** (801)     xFax     **E-MAIL:**     com

Charged to: Mastercard exp 07/13 last 4 digits not captured

| PRODUCT NAME: | NAME: | PRICE: |
|---|---|---|
| Office Package - NCH | CAPITAL COOPERATIVE GROUP, LLC | $1997.00 |
|  | **TOTAL:** | $1997.00 |

## PAID IN FULL

Thank you for making Nevada Corporate Headquarters, Inc. a part of the future success and growth of your business. We appreciate your confidence in us and pledge to do all we can to provide you with one-stop convenience and a full spectrum of services to help you protect your assets and maximize your profits. At Nevada Corporate Headquarters, Inc., we look forward to an ongoing partnership to help you turn your business dreams into reality.

Sincerely,

Nevada Corporate Headquarters, Inc.
4730 S Fort Apache Rd Suite 300
Las Vegas, NV  89147

Terms and Conditions of Sale: All sales of products and services laid forth in this invoice are final and binding. Client accepts these terms and conditions and is bound to this agreement of sale from Nevada Corporate Headquarters, Inc. These Terms and Conditions of Sale make up the full agreement between the client and Nevada Corporate Headquarters, Inc. pertaining to the products and services for sale.

# NEVADA CORPORATE HEADQUARTERS, INC.
### 4730 S Fort Apache Rd Suite 300
### Las Vegas, NV 89147

### Toll Free: 1-800-508-1729
### Local Number: 702-873-3488

**CONSULTANT: Melissa Shaw**

**DATE: 2/6/2012** 12:41:13 PM

**CLIENT NAME:** Stephen Swensen
**PHONE:** (801)████     **ALT#:**     **FAX:** (801)████Fax     **E-MAIL:** ████com

**Charged to:** CHECK #1045

| PRODUCT NAME: | NAME: | PRICE: |
|---|---|---|
| Annual List - NV - NCH | CAPITAL COOPERATIVE GROUP, LLC | $150.00 |
| Registered Agent Service - NV - NCH | CAPITAL COOPERATIVE GROUP, LLC | $197.00 |
| State Business License - NV - LLC Renewal - NCH | CAPITAL COOPERATIVE GROUP, LLC | $200.00 |
| Renewal - Privacy Package - NCH | CAPITAL COOPERATIVE GROUP, LLC | $800.00 |
| | **TOTAL:** | $1347.00 |

# PAID IN FULL

Thank you for making Nevada Corporate Headquarters, Inc. a part of the future success and growth of your business. We appreciate your confidence in us and pledge to do all we can to provide you with one-stop convenience and a full spectrum of services to help you protect your assets and maximize your profits. At Nevada Corporate Headquarters, Inc., we look forward to an ongoing partnership to help you turn your business dreams into reality.

Sincerely,

Nevada Corporate Headquarters, Inc.
4730 S Fort Apache Rd Suite 300
Las Vegas, NV  89147

Terms and Conditions of Sale: All sales of products and services laid forth in this invoice are final and binding. Client accepts these terms and conditions and is bound to this agreement of sale from Nevada Corporate Headquarters, Inc. These Terms and Conditions of Sale make up the full agreement between the client and Nevada Corporate Headquarters, Inc. pertaining to the products and services for sale.

# NEVADA CORPORATE HEADQUARTERS, INC.
### 4730 S Fort Apache Rd Suite 300
### Las Vegas, NV 89147

### Toll Free: 1-800-508-1729
### Local Number: 702-873-3488

**CONSULTANT: Melissa Shaw**                                    **DATE: 2/22/2010** 1:58:07 PM

**CLIENT NAME:** Stephen Swensen
**PHONE:** (801)          **ALT#:**    **FAX:** (801)       xFax    **E-MAIL:**        com

**Charge to:** Stephen Swensen (*VISA Card, Last 4 digits not captured*)

| PRODUCT NAME: | NAME: | PRICE: |
|---|---|---|
| Renewal - Privacy Package - NCH | | $497.00 |
| Initial List - NV - NCH | | $135.00 |
| Mail Forwarding - Annual - NCH | | $300.00 |
| | **TOTAL:** | $932.00 |

# PAID IN FULL

Thank you for making Nevada Corporate Headquarters, Inc. a part of the future success and growth of your business. We appreciate your confidence in us and pledge to do all we can to provide you with one-stop convenience and a full spectrum of services to help you protect your assets and maximize your profits. At Nevada Corporate Headquarters, Inc., we look forward to an ongoing partnership to help you turn your business dreams into reality.

Sincerely,

Nevada Corporate Headquarters, Inc.
4730 S Fort Apache Rd Suite 300
Las Vegas, NV 89147

Terms and Conditions of Sale: All sales of products and services laid forth in this invoice are final and binding. Client accepts these terms and conditions and is bound to this agreement of sale from Nevada Corporate Headquarters, Inc. These Terms and Conditions of Sale make up the full agreement between the client and Nevada Corporate Headquarters, Inc. pertaining to the products and services for sale.

# NEVADA CORPORATE HEADQUARTERS, INC.
## 4730 S Fort Apache Rd Suite 300
## Las Vegas, NV 89147

### Toll Free: 1-800-508-1729
### Local Number: 702-873-3488

**CONSULTANT: Melissa Shaw**

**DATE: 2/22/2010** 1:18:54 PM

**CLIENT NAME:** Stephen Swensen
**PHONE:** (801)████   **ALT#:**   **FAX:** (801)████ xFax   **E-MAIL:** ████com

**Charged to: Mastercard ending in 0921**

| PRODUCT NAME: | NAME: | PRICE: |
|---|---|---|
| FREE Nevada Entity with SOS fee and Record Book - NCH | | $475.05 |
| 29.95 Shipping and Handling (Documents only) NCH | | $29.95 |
| | **TOTAL:** | **$505.00** |

# PAID IN FULL

Thank you for making Nevada Corporate Headquarters, Inc. a part of the future success and growth of your business. We appreciate your confidence in us and pledge to do all we can to provide you with one-stop convenience and a full spectrum of services to help you protect your assets and maximize your profits. At Nevada Corporate Headquarters, Inc., we look forward to an ongoing partnership to help you turn your business dreams into reality.

Sincerely,

Nevada Corporate Headquarters, Inc.
4730 S Fort Apache Rd Suite 300
Las Vegas, NV 89147

Terms and Conditions of Sale: All sales of products and services laid forth in this invoice are final and binding. Client accepts these terms and conditions and is bound to this agreement of sale from Nevada Corporate Headquarters, Inc. These Terms and Conditions of Sale make up the full agreement between the client and Nevada Corporate Headquarters, Inc. pertaining to the products and services for sale.

# EXHIBIT 5

Form **8879-C**

**IRS e-file Signature Authorization for Form 1120**

For calendar year 2014, or tax year beginning _____ , ending _____ .

▶ Do not send to the IRS. Keep for your records.

▶ Information about Form 8879-C and its instructions is at www.irs.gov/form8879c.

Department of the Treasury
Internal Revenue Service

OMB No. 1545-0123

**2014**

| Name of corporation | Employer identification number |
|---|---|
| CREW CAPITAL GROUP, LLC | 27-2201239 |

**Part I**   Tax Return Information (Whole dollars only)

| | | | |
|---|---|---|---|
| 1 | Total income (Form 1120, line 11) | **1** | 186,467 |
| 2 | Taxable income (Form 1120, line 30) | **2** | 0 |
| 3 | Total tax (Form 1120, line 31) | **3** | 0 |
| 4 | Amount owed (Form 1120, line 34) | **4** | |
| 5 | Overpayment (Form 1120, line 35) | **5** | |

**Part II**   Declaration and Signature Authorization of Officer (Be sure to get a copy of the corporation's return)

Under penalties of perjury, I declare that I am an officer of the above corporation and that I have examined a copy of the corporation's 2014 electronic income tax return and accompanying schedules and statements and to the best of my knowledge and belief, it is true, correct, and complete. I further declare that the amounts in Part I above are the amounts shown on the copy of the corporation's electronic income tax return. I consent to allow my electronic return originator (ERO), transmitter, or intermediate service provider to send the corporation's return to the IRS and to receive from the IRS **(a)** an acknowledgement of receipt or reason for rejection of the transmission, **(b)** the reason for any delay in processing the return or refund, and **(c)** the date of any refund. If applicable, I authorize the U.S. Treasury and its designated Financial Agent to initiate an electronic funds withdrawal (direct debit) entry to the financial institution account indicated in the tax preparation software for payment of the corporation's federal taxes owed on this return, and the financial institution to debit the entry to this account. To revoke a payment, I must contact the U.S. Treasury Financial Agent at **1-888-353-4537** no later than 2 business days prior to the payment (settlement) date. I also authorize the financial institutions involved in the processing of the electronic payment of taxes to receive confidential information necessary to answer inquiries and resolve issues related to the payment. I have selected a personal identification number (PIN) as my signature for the corporation's electronic income tax return and, if applicable, the corporation's consent to electronic funds withdrawal.

**Officer's PIN: check one box only**

[X] I authorize __INTEGRATED ACCOUNTING__ to enter my PIN [ ] as my signature

ERO firm name                                                                                          do not enter all zeros

on the corporation's 2014 electronically filed income tax return.

[ ] As an officer of the corporation, I will enter my PIN as my signature on the corporation's 2014 electronically filed income tax return.

Officer's signature ▶ _____   Date ▶ __10/05/15__   Title ▶ __PRESIDENT__

STEPHEN SWENSEN

**Part III**   Certification and Authentication

**ERO's EFIN/PIN.** Enter your six-digit EFIN followed by your five-digit self-selected PIN. [ ]

do not enter all zeros

I certify that the above numeric entry is my PIN, which is my signature on the 2014 electronically filed income tax return for the corporation indicated above. I confirm that I am submitting this return in accordance with the requirements of **Pub. 3112,** IRS e-file Application and Participation, and **Pub. 4163,** Modernized e-File (MeF) Information for Authorized IRS e-file Providers for Business Returns.

ERO's signature ▶ _____   Date ▶ __10/05/15__

**ERO Must Retain This Form — See Instructions**
**Do Not Submit This Form to the IRS Unless Requested To Do So**

For Paperwork Reduction Act Notice, see instructions.

Form **8879-C** (2014)

DAA

# EXHIBIT 6

 **CREW CAPITAL** GROUP



**Address**

177 Huntington Ave
Suite 1703
Boston, MA 02115

www.crewfunds.com

## Account Information



Der

**Account Number:** *****8432
**Declared Earnings Rate:** 5.00%
**Statement Date:** 10-31-2019
**Advisor:** Stephen Swensen
(801) 540-1440

## Account Summary

**Current Value as of 10-31-2019:** $200,274.14

| Transaction type | Year to date | Since inception |
|---|---|---|
| Deposits | $200,000.00 | $410,000.00 |
| Withdrawals | $0.00 | -$249,994.67 |
| Earnings | $246.71 | $40,217.94 |

## Transaction Summary

| Type | Date | Amount |
|---|---|---|
| Deposit | 10-22-2019 | $200,000.00 |
| Daily Earnings Credits | 10-31-2019 | $246.71 |

## History

(Opened 02-20-2014)



 **CREW CAPITAL** GROUP

**Address**
548 Market Street
San Francisco, CA 94104-5401
www.crewfunds.com

## Account Information



Denver, CO

**Account Number:** 454128432 *(opened February 20, 2014)*
**Declared Earnings Rate:** 4%
**Statement Date:** August 13, 2018
**Advisor:** Stephen Swensen
**Advisor Phone:** (888) 775-8021

## Account Summary

| TRANSACTION TYPE | YEAR TO DATE | SINCE INCEPTION |
|---|---|---|
| Deposits | $0.00 | $210,000.00 |
| Withdrawals | $249,994.67 | $249,994.67 |
| Earnings | $5,982.19 | $39,971.23 |

**Total Value $0.00** *(as of August 13, 2018)*

## Transaction Summary

| TYPE | DATE | AMOUNT |
|---|---|---|
| Withdrawal | August 10, 2018 | $249,994.67 |
| Daily Earnings Credit | August 13, 2018 | $246.46 |

*Disclosure: Investors should carefully consider the objectives, risks, charges and expenses of their investments. This and other important information can be obtained from your financial professional and should be read carefully before investing. For information about your account or any other services, please contact your financial professional.*

# EXHIBIT 7

 **CREW CAPITAL** GROUP

**Address**
548 Market Street
San Francisco, CA 94104-5401
www.crewfunds.com

## Account Information

**Doyt Bolling**
**Elizabeth Bolling**

Denver, CO

**Account Number:** ████3432 *(opened February 20, 2014)*
**Declared Earnings Rate:** 4%
**Statement Date:** August 13, 2018
**Advisor:** Stephen Swensen
**Advisor Phone:** (888) 775-8021

## Account Summary

| TRANSACTION TYPE | YEAR TO DATE | SINCE INCEPTION |
|---|---|---|
| Deposits | $0.00 | $█ |
| Withdrawals | $█████████ | $█ |
| Earnings | $█████ | $█ |

**Total Value $0.00 *(as of August 13, 2018)***

## Transaction Summary

| TYPE | DATE | AMOUNT |
|---|---|---|
| Withdrawal | August 10, 2018 | $███████ |
| Daily Earnings Credit | August 13, 2018 | |

*Disclosure: Investors should carefully consider the objectives, risks, charges and expenses of their investments. This and other important information can be obtained from your financial professional and should be read carefully before investing. For information about your account or any other services, please contact your financial professional.*

# EXHIBIT 8

 **CREW** CAPITAL GROUP

Crew Capital Group
228 Park Avenue S
New York, NY 10003-1502
(844) 384-4354
info@crewfunds.com
www.crewfunds.com

## Account Information

**Cathy L. Hartman IRA**
Bank of Utah - Custodian

**Index Date:** 04-30-2023
**Index Price:** $4,155.38
**Declared Earnings Rate:** 5.00%
**Index Cap Rate:** 10.00%

**Account Number:** ***2831
**Statement Date:** 04-30-2022
**Advisor:** Stephen Swensen
(801) 410-1800

## Account Summary

**Current Value as of 04-30-2022:** $745,803.18

| Transaction type | Year to date | Since inception |
|---|---|---|
| Deposits | $0.00 |  |
| Withdrawals | | |
| Earnings | | |

## Transaction Summary

| Type | Date | Amount |
|---|---|---|
| Withdrawal | 04-01-2022 |  |
| Daily Earnings Credits | 04-30-2022 | |

## History

(Opened 04-29-2018)



Investments are not FDIC-insured, nor are they deposits of or guaranteed by a bank or any other entity, so they may lose value. Investors should carefully consider investment objectives, risks, charges and expenses. This and other important information is contained in the fund prospectus which can be obtained from a financial professional and should be read carefully before investing.

# EXHIBIT 9

 **CAPITAL** COOPERATIVE GROUP

**Physical Address**
4730 S. Fort Apache Road, Suite 300
Las Vegas, NV 89147
www.capitalcoop.com

**Mailing Address**
P.O. Box 27740
Las Vegas, NV 89126

## Account Information



**Account Number:** ███3432 *(opened February 20, 2014)*
**Declared Earnings Rate:** 4%
**Statement Date:** March 31, 2015
**Advisor:** Stephen Swensen
**Advisor Phone:** (888) 775-8021

## Account Summary

| TRANSACTION TYPE | YEAR TO DATE | SINCE INCEPTION |
| --- | --- | --- |
| Deposits | $0.00 | $200,000.00 |
| Withdrawals | $0.00 | $0.00 |
| Earnings | $2,028.95 | $9,031.25 |

**Total Value $209,031.25** *(as of March 31, 2015)*

## Transaction Summary

| TYPE | DATE | AMOUNT |
| --- | --- | --- |
| Daily Earnings Credit | January 31, 2015 | $681.71 |
| Daily Earnings Credit | February 28, 2015 | $638.28 |
| Daily Earnings Credit | March 31, 2015 | $708.96 |

*Disclosure: Investors should carefully consider the objectives, risks, charges and expenses of their investments. This and other important information can be obtained from your financial professional and should be read carefully before investing. For information about your account or any other services, please contact your financial professional.*

# EXHIBIT 10

 **CAPITAL** COOPERATIVE GROUP

| **Physical Address** | **Mailing Address** |
|---|---|
| 101 Convention Center Dr. 7th Floor | P.O. Box 27740 |
| Las Vegas, NV 89109 | Las Vegas, NV 89126 |
| www.capitalcoop.com | |

## Account Information



**Account Number:** ▮▮▮▮3432 *(opened February 20, 2014)*
**Declared Earnings Rate:** 4%
**Statement Date:** September 30, 2014
**Advisor:** Stephen Swensen
**Advisor Phone:** (888) 775-8021

## Account Summary

| TRANSACTION TYPE | YEAR TO DATE | SINCE INCEPTION |
|---|---|---|
| Deposits | $200,000.00 | $200,000.00 |
| Withdrawals | $0.00 | $0.00 |
| Earnings | $4,925.65 | $4,925.65 |

**Total Value $204,925.65** *(as of September 30, 2014)*

## Transaction Summary

| TYPE | DATE | AMOUNT |
|---|---|---|
| Daily Earnings Credit | July 31, 2014 | $690.40 |
| Daily Earnings Credit | August 31, 2014 | $692.75 |
| Daily Earnings Credit | September 30, 2014 | $672.65 |

*Disclosure: Investors should carefully consider the objectives, risks, charges and expenses of their investments. This and other important information can be obtained from your financial professional and should be read carefully before investing. For information about your account or any other services, please contact your financial professional.*

# EXHIBIT 11



**CREW CAPITAL** GROUP | Crew Funds

**Application for Accounts**

## 1 Account registration

*Select only one type of account.*

☐ Individual account

☐ Joint Tenants With Rights of Survivorship

☐ Tenants in Common

☐ Trust

☒ Business Entity

*If you wish to add a Transfer on Death (TOD) beneficiary to the account registration, complete Section 8.

## 2 Account owner information

*Important: This section must be completed and the application must be signed before an account can be established.*

| | | US |
|---|---|---|
| SSN or TIN | Date of birth or trust date (mm/dd/yyyy) | Country of citizenship or domicile |

| | MI | Last |
|---|---|---|
| First name of account owner or trust / entity name, if applicable | | |

| | | City | Logan | State | UT | ZIP | 84341 |
|---|---|---|---|---|---|---|---|

Physical address (physical address required — **no P.O. boxes**)  |  City  |  State  |  ZIP

Mailing address (if different from physical address)  |  City  |  State  |  ZIP

Email address  |  Daytime phone

First name of co-owner, trustee or authorized person  |  MI  |  Last or title, if applicable

Mailing address (if different from above)  |  City  |  State  |  ZIP

Email address  |  (     )  Daytime phone

| | | US |
|---|---|---|
| SSN or TIN | Date of birth (mm/dd/yyyy) | Country of citizenship |

---

**West Service Center**

Crew Capital Group
P.O. Box 7775
San Francisco, CA 94120-7775

**Overnight mail address**
548 Market Street
San Francisco, CA 94101-5401

**East Service Center**

Crew Capital Group
P.O. Box 4668
New York, NY 101633-4668

**Overnight mail address**
228 Park Avenue S
New York, NY 10003-1502

 **CREW CAPITAL** GROUP | Crew Funds

**Application for Accounts**

## 3 Investment instructions

*You must complete sections A, B and C.*

**Note:** If no investment instructions are provided in this section, there will be a delay in establishing the account. Be sure to complete this section.

**A. Select account type:** ☒ Fixed Account    ☐ Index Account

**B. Provide information regarding your contribution method.** (Select all that apply.)

1. ☒ **One-time purchase with a check made payable to** "**Crew Capital Group**"

2. ☐ **One-time purchase via wire:** Wire instructions will be provided by your financial professional.

3. **Initial investment amount**, All accounts have a $50,000 minimum.     $ _____

   Amount

**C. Distributions or withdrawals :** Unless otherwise directed, the distribution plan will be established on the 1st day of each month.

1. ☐ **Recurring distribution plan:** Complete the information below.

   **Notes:** • Crew Capital Group must receive your request at least ten business days prior to the first transaction date requested.
   • Provide bank information in Section 4.

   Transactions should begin during the month of _____

   Transactions should occur on the following date of the month _____

   Frequency: ☐ Monthly    ☐ Quarterly    ☐ Annually

2. ☒ **One-time distributions or withdrawals:** One-time distibutuions and withdrawals can be made online at **www.crewfunds.com**

## 4 Decline website privileges — optional

**Website service requests and distribution and withdrawal privileges will automatically be enabled on your account unless you decline below. To decline these privileges, read the individual statements and check the applicable box.**

**Note:** If this option is declined, no one associated with this account, including your financial professional, will be able to request service options or distributions or withdrawals via the website. Requests would need to be submitted in writing.

**Website privileges: I DO NOT** want the option of using website and assoiciated privileges.   ☐



**CREW CAPITAL** GROUP | Crew Funds

**Application for Accounts**

## 5 Bank information

*Before completing this section, read the signature guarantee requirements below. We will use a third-party service to validate your bank information. Refer to the* Bank Verification Terms & Conditions.

**Signature guarantee requirements:**

- **To make distributions and withdrawals electronically:** The Crew Funds account owners' signatures must be guaranteed if the bank account registration does not include at least one of the account owners' names.

If a signature guarantee is required, obtain and submit a completed *Add/Update Bank Information* form. An application that requires a signature guarantee cannot be signed electronically or faxed. Mail the completed forms to the appropriate service center for your state using the maps on page 1.

**Important: To avoid delays in processing this application, attach an unsigned, voided check where indicated below. The check you attach must be preprinted with the bank name, registration, routing number and account number. Please do not staple.**



**Complete the following ONLY if you are signing this document electronically. Your financial professional's firm must have an electronic signature indemnification agreement with Crew Funds. If signing electronically, a voided check is not required.**

_____    _____
Bank name                                            Bank routing number

_____    ☒ Checking   **OR**   ☐ Savings
Bank account number       Bank account registration (the name preprinted on the check)

☐ Purchase   ☐ Sell   ☒ Both

**Notes:** • Your election will apply to all of your current and future accounts.

- You may cancel the ACH option at any time online at **www.crewfunds.com** or by contacting your financial professional.
- Once the ACH option is established, there will be a 10-day waiting period before it can be used.

04/22



**CREW CAPITAL** GROUP | Crew Funds

**Application for Accounts**



## 6  Transfer on Death (TOD) beneficiary designation — optional

*We encourage you to consult a professional regarding the tax-law and estate planning implications of your beneficiary designation. All stated percentages must be whole percentages (e.g., 33%, not 33.3%). If the percentages do not add up to 100%, each beneficiary's share will be based proportionally on the stated percentages. When a percentage is not indicated, the beneficiaries' shares will be divided equally.*

**Important:** Complete this section if you wish to add a beneficiary designation to your Individual or Joint Tenants With Rights of Survivorship account. Do not complete for Tenants in Common or Trust and Business Entity accounts.

I direct that my Crew Funds account be distributed upon my death to the designated beneficiary(ies) below. If any beneficiary survives me but fails to survive the transfer of his or her entire share, then the remaining portion of such beneficiary's share shall be transferred to such beneficiary's estate.

**Notes:** • Your spouse may need to sign in Section 8. If you wish to name more than one trust or entity, customize your designation or need more space, attach a separate page. Include the name, address, relationship, date of birth or trust, SSN/TIN and percentage for each beneficiary.

• If you name a trust as beneficiary, provide the full legal name of the trust. Example: "The Davis Family Trust."

• In the event the beneficiary is a minor, Crew Funds may take instruction to transfer the proceeds to a custodian under the applicable state's Uniform Transfers to Minors Act.

**A. Primary Beneficiary(ies):** If any designated Primary Beneficiary(ies) dies before I do, that beneficiary's share will be divided proportionately among the surviving Primary Beneficiaries unless otherwise indicated. If no Primary Beneficiaries survive me, assets will be paid to the named Contingent Beneficiaries, if any.

**1.**

| First name | | MI | Last | | Suffix |

OR

| Name of trust or other entity |

| Address | | City | | UT | 84341 |
| | | | | State | ZIP |

☐ Child  ☐ Parent  ☐ Spouse*  ☐ Sibling  ☐ Other  ☒ Entity or trust   Date of birth or trust (mm/dd/yyyy)   SSN/TIN   **100**%  Whole % only

**2.**

| First name | | MI | Last | | Suffix |

| Address | | City | | State | ZIP |

☐ Child  ☐ Parent  ☐ Spouse*  ☐ Sibling  ☐ Other   Date of birth (mm/dd/yyyy)   SSN   _____%  Whole % only

**3.**

| First name | | MI | Last | | Suffix |

| Address | | City | | State | ZIP |

☐ Child  ☐ Parent  ☐ Spouse*  ☐ Sibling  ☐ Other   Date of birth (mm/dd/yyyy)   SSN   _____%  Whole % only

*By naming my spouse as a beneficiary, I elect to treat such spouse as a beneficiary while we are married. Effective immediately upon the divorce, annulment or other lawful dissolution of my marriage, the designation shall be null and void, unless after the dissolution of my marriage I affirmatively elect to name my former spouse as my non-spouse beneficiary.

**Continued on next page**

04/22



**CREW CAPITAL** GROUP | Crew Funds

**Application for Accounts**

---

# 6 Transfer on Death (TOD) beneficiary designation — optional
*(continued)*

**Important: Section 6-A must be completed prior to completing Section 6-B.**

**B. Contingent Beneficiary(ies):** If no Primary Beneficiary survives me, pay my benefits to the following Contingent Beneficiary(ies). If any designated Contingent Beneficiary(ies) dies before I do, that beneficiary's share will be divided proportionally among the surviving Contingent Beneficiaries unless otherwise indicated. If no Contingent Beneficiaries survive me, assets will be paid to my estate.

**1.** _____   _____   _____   _____
First name                   MI     Last                                   Suffix

**OR** _____
Name of trust or other entity

_____   _____   _____   _____
Address                                      City                       State     ZIP

☐ Child   ☐ Parent   ☐ Spouse*   ☐ Sibling   ☐ Other    ☐ Entity or trust   _____   _____   _____%
                                                Date of birth or trust (mm/dd/yyyy)    SSN/TIN                         Whole % only

**2.** _____   _____   _____   _____
First name                   MI     Last                                   Suffix

_____   _____   _____   _____
Address                                        City                       State     ZIP

☐ Child   ☐ Parent   ☐ Spouse*   ☐ Sibling   ☐ Other    _____   _____   _____%
                                              Date of birth (mm/dd/yyyy)    SSN                         Whole % only

**3.** _____   _____   _____   _____
First name                   MI     Last                                   Suffix

_____   _____   _____   _____
Address                                        City                       State     ZIP

☐ Child   ☐ Parent   ☐ Spouse*   ☐ Sibling   ☐ Other    _____   _____   _____%
                                              Date of birth (mm/dd/yyyy)    SSN                         Whole % only

**4.** _____   _____   _____   _____
First name                   MI     Last                                   Suffix

_____   _____   _____   _____
Address                                        City                       State     ZIP

☐ Child   ☐ Parent   ☐ Spouse*   ☐ Sibling   ☐ Other    _____   _____   _____%
                                              Date of birth (mm/dd/yyyy)    SSN                         Whole % only

\* By naming my spouse as a beneficiary, I elect to treat such spouse as a beneficiary while we are married. Effective immediately upon the divorce, annulment or other lawful dissolution of my marriage, the designation shall be null and void, unless after the dissolution of my marriage I affirmatively elect to name my former spouse as my non-spouse beneficiary.

**Continued on next page**

04/22



**CREW CAPITAL** GROUP | Crew Funds

**Application for Accounts**

## 6 Transfer on Death (TOD) beneficiary designation — optional
*(continued)*

**Louisiana residents only:** The account owner's signature must be notarized **OR** two witnesses who are not being named as beneficiaries must sign below.

X _____      ___ / ___ / ___
Signature of account owner                          Date   (mm/dd/yyyy)

Sworn to and subscribed before me, this _____ day of _____ , _____
                                                      Month                    Year

in the County of _____ , State of _____

X _____      ___ / ___ / ___
Signature of notary public                          Date commission expires (mm/dd/yyyy)

```
┌─────────────────────────────────┐
│ NOTARY: Affix seal here.         │
│                                 │
│                                 │
│                                 │
└─────────────────────────────────┘
```

**If this form includes a notary signature, it must be mailed.**

_____      X _____
Name of witness (print)                 Signature of witness

_____      X _____
Name of witness (print)                 Signature of witness



**CREW CAPITAL** GROUP  |  Crew Funds

**Application for
Accounts**

## 7  Financial professional

*This section **must** be filled out completely by the financial professional(s).*

We authorize Crew Capital Group (CCG) to act as our agent for this account and agree to notify CCG of purchases made under a Statement of Intention or Rights of Accumulation. If applicable, we have provided a copy of our SEC Form CRS to the investor(s) named on this application.

_____   _____   _____   (     )_____ Ext._____
Name(s) of financial professional(s)          Professional/team ID #    Branch number      Daytime phone

_____   _____   _____   _____
Branch address                                                        City                              State     ZIP

_____   X_____
Name of broker-dealer firm (as it appears on the Selling Group Agreement)    Signature of person authorized to sign for the broker-dealer — **required**

## 8  Spousal consent to TOD beneficiary designation — **if required**

*This section is not required if the co-owners are married to each other.*

If you are married to the account owner (or any account co-owner) and he or she designated a Primary Beneficiary(ies) other than you, please consult your financial professional about the state-law and tax-law implications of this beneficiary designation, including the need for your consent.

I am the spouse of the account owner (or any account co-owner) named in Section 2, and I expressly consent to the beneficiary(ies) designated in Section 6 or attached.

_____   X_____   _____/_____/_____
Name of account owner's spouse (print)    Signature of spouse                    Date    (mm/dd/yyyy)

_____   X_____   _____/_____/_____
Name of account co-owner's spouse (print)    Signature of spouse                    Date    (mm/dd/yyyy)

04/22

 **CREW CAPITAL** GROUP | Crew Funds

**Application for Accounts**

# 9 Your signature(s)

*Important: You must sign in this section to open your new account.*

I agree to indemnify and hold harmless CCG; any of its affiliates or mutual funds managed by such affiliates; and each of their respective directors; trustees; officers; employees; and agents for any losses, expenses, costs or liability (including attorney fees) that may be incurred in connection with these instructions or the exercise of the telephone or website service, distribution and withdrawal privileges arising from such instructions once the telephone and website service, distribution and withdrawal privileges have been established. I authorize the financial professional assigned to my account to have access to my account and to act on my behalf with respect to my account. If applicable, I acknowledge that I have received and read a copy of my financial professional's SEC Form CRS. I understand that I and all accountholders at my address will receive copies of fund documents and statements unless I opt out by calling my financial professional.

If I have requested ACH privileges, I authorize CCG, upon request via phone, fax, or any other means utilizing telecommunications, including wireless or any other type of communication lines by authorized persons with appropriate account information, to redeem funds from this account and deposit the proceeds into the bank account identified on this application. I authorize the bank to accept any such credit to my account without responsibility for its correctness. I authorize CCG to access records from public and proprietary sources in order to validate that I am the bank account owner. I understand that amounts invested may not be redeemed for 7 business days.

If I have designated a TOD beneficiary(ies), I acknowledge that this account is being established under the Uniform Transfer on Death Security Registration Act ("TOD Act") of the state of residence indicated in Section 2, or, if my state of residence has not adopted the Uniform TOD Act, I understand that this account will be established under the California TOD Act. Furthermore, I acknowledge that, upon my death, should there be a conflict with applicable state law, the account will be administered in accordance with the terms of this document.

I understand that to comply with federal regulations, information provided on this application will be used to verify my identity. For example, my identity may be verified through the use of a database maintained by a third party. If CCG is unable to verify my identity, I understand it may need to take action, possibly including closing my account, and that such action may have tax consequences.

If this document is signed electronically, I consent to be legally bound by this document and subsequent terms governing it. The electronic copy of this document should be considered equivalent to a printed form in that it is the true, complete, valid, authentic and enforceable record of the document, admissible in judicial or administrative proceedings. I agree not to contest the admissibility or enforceability of the electronically stored copy of this document.

I certify under penalties of perjury that: **1)** the Social Security or taxpayer identification number shown in Section 2 is correct; **2)** the IRS has never notified me that I am subject to backup withholding or has notified me that I am no longer subject to such backup withholding; **3)** I am a U.S. citizen or a legal U.S. resident; and **4)** the entity is exempt from Foreign Account Tax Compliance Act (FATCA) reporting (if applicable).

☐ **Check this box if you are subject to backup withholding and cannot certify to item 2 above.**

**NOTE: The IRS does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

**X**

Signature of account owner or custodian | Date | (mm/dd/yyyy)

**X** _____ | / /

Signature of co-owner, if applicable | Date | (mm/dd/yyyy)

# EXHIBIT 12







# EXHIBIT 13

United States Postal Service®

# Application for Delivery of Mail Through Agent
See Privacy Act Statement on Reverse

| 1. Date |
| --- |
| 12/17/2016 |

In consideration of delivery of my or our (firm) mail to the agent named below, the addressee and agent agree: (1) the addressee or the agent must not file a change of address order with the Postal Service™ upon termination of the agency relationship; (2) the transfer of mail to another address is the responsibility of the addressee and the agent; (3) all mail delivered to the agency under this authorization must be prepaid with new postage when redeposited in the mails; (4) upon request the agent must provide to the Postal Service all addresses to which the agency transfers mail; and (5) when any information required on this form changes or becomes obsolete, the addressee(s) must file a revised application with the Commercial Mail Receiving Agency (CMRA).

**NOTE:** The applicant must execute this form in duplicate in the presence of the agent, his or her authorized employee, or a notary public. The agent provides the original completed signed PS Form 1583 to the Postal Service and retains a duplicate completed signed copy at the CMRA business location. The CMRA copy of PS Form PS 1583 must at all times be available for examination by the postmaster (or designee) and the Postal Inspection Service. The addressee and the agent agree to comply with all applicable Postal Service rules and regulations relative to delivery of mail through an agent. Failure to comply will subject the agency to withholding of mail from delivery until corrective action is taken.

This application may be subject to verification procedures by the Postal Service to confirm that the applicant resides or conducts business at the home or business address listed in boxes 7 or 10, and that the identification listed in box 8 is valid.

| 2. Name in Which Applicant's Mail Will Be Received for Delivery to Agent. *(Complete a separate PS Form 1583 for EACH applicant. Spouses may complete and sign one PS Form 1583. Two items of valid identification apply to each spouse. Include dissimilar information for either spouse in appropriate box.)* | 3a.Address to be Used for Delivery *(Include PMB or # sign.)* |  |
|---|---|---|
| Crew Capital Group, LLC | 9450 SW Gemini Dr PMB 17548 |  |
|  | 3b. City | 3c. State  3d. ZIP + 4® |
|  | Beaverton | Oregon  97008-7105 |

| 4. Applicant authorizes delivery to and in care of: | 5. This authorization is extended to include restricted delivery mail for the undersigned(s): |  |  |
|---|---|---|---|
| a. Name | | | |
| Earth Class Mail, Inc. | | | |
| b. Address *(No., street, apt ./ste. no.)* 9450 SW Gemini Dr #101 | Stephen Swensen | | |
| c. City | d. State | e. ZIP + 4 | |
| Beaverton | OR | 97008-7105 | |

| 6. Name of Applicant | 7a. Applicant Home Address *(No., street, apt ./ste. no)* | | |
|---|---|---|---|
| Stephen Swensen | | | |
| 8.Two types of identification are required. One must contain a photograph of the addressee(s). Social Security cards, credit cards, and birth certificates are unacceptable as identification. The agent must write in identifying information. Subject to verification. | 7b. City | 7c. State | 7d. ZIP + 4 |
| | 7e. Applicant Telephone Number *(Include area code)* | | |
| a. | (720) 620-1010 | | |
| | 9. Name of Firm or Corporation | | |
| | Crew Capital Group, LLC | | |
| b. | 10a. Business Address *(No., street, apt ./ste. no)* | | |
| | 548 Market Street | | |
| | 10b. City | 10c. State | 10d. ZIP + 4 |
| | San Francisco | CA | 94104 |
| Acceptable identification includes: valid driver's license or state non-driver's identification card; armed forces, government, university, or recognized corporate identification card; passport, alien registration card or certificate of naturalization; current lease, mortgage or Deed of Trust; voter or vehicle registration card; or a home or vehicle insurance policy. A photocopy of your identification may be retained by agent for verification. | 10e. Business Telephone Number *(Include area code)* | | |
| | (720) 720-1010 | | |
| | 11. Type of Business | | |
| | Financial Services | | |

| 12. If applicant is a firm, name each member whose mail is to be delivered. *(All names listed must have verifiable identification. A guardian must list the names of minors receiving mail at their delivery address.)* | | |
|---|---|---|
| Stephen Swensen | | |

| 13. If a CORPORATION, Give Names and Addresses of Its Officers | 14. If business name *(corporation or trade name)* has been registered, give name of county and state, and date of registration. |
|---|---|
|  |  |

Warning: The furnishing of false or misleading information on this form or omission of material information may result in criminal sanctions (including fines and imprisonment) and/or civil sanctions (including multiple damages and civil penalties).

| 15. Signature of Agent/Notary Public | 16. Signature of Applicant *(If firm or corporation, application must be signed by officer. Show title.)* |
|---|---|
|  |  |

**Privacy Act Statement:** Your information will be used to authorize the delivery of your mail to the designated addressee as your agent.  Collection is authorized by 39 USC 401, 403, and 404. Providing the information is voluntary, but if not provided, we cannot provide this service to you. We do not disclose your information without your consent to third parties, except for the following limited circumstances: to a congressional office on your behalf; to financial entities regarding financial transaction issues; to a USPS® auditor; to entities, including law enforcement, as required by law or in legal proceedings; to contractors and other entities aiding us to fulfill the service; and for the purpose of identifying an address as an address of an agent who receives mail on behalf of other persons. Information concerning an individual who has filed an appropriate protective court order with the postmaster will not be disclosed except pursuant to court order. For more information on our privacy policies, see our privacy link on usps.com®.

United States Postal Service®

# Application for Delivery of Mail Through Agent
See Privacy Act Statement on Reverse

| | |
|---|---|
| | 1. Date<br>01/03/2018 |

In consideration of delivery of my or our (firm) mail to the agent named below, the addressee and agent agree: (1) the addressee or the agent must not file a change of address order with the Postal Service™ upon termination of the agency relationship; (2) the transfer of mail to another address is the responsibility of the addressee and the agent; (3) all mail delivered to the agency under this authorization must be prepaid with new postage when redeposited in the mails; (4) upon request the agent must provide to the Postal Service all addresses to which the agency transfers mail; and (5) when any information required on this form changes or becomes obsolete, the addressee(s) must file a revised application with the Commercial Mail Receiving Agency (CMRA).

**NOTE:** The applicant must execute this form in duplicate in the presence of the agent, his or her authorized employee, or a notary public. The agent provides the original completed signed PS Form 1583 to the Postal Service and retains a duplicate completed signed copy at the CMRA business location. The CMRA copy of PS Form PS 1583 must at all times be available for examination by the postmaster (or designee) and the Postal Inspection Service. The addressee and the agent agree to comply with all applicable Postal Service rules and regulations relative to delivery of mail through an agent. Failure to comply will subject the agency to withholding of mail from delivery until corrective action is taken.

This application may be subject to verification procedures by the Postal Service to confirm that the applicant resides or conducts business at the home or business address listed in boxes 7 or 10, and that the identification listed in box 8 is valid.

| 2. Name in Which Applicant's Mail Will Be Received for Delivery to Agent. *(Complete a separate PS Form 1583 for EACH applicant. Spouses may complete and sign one PS Form 1583. Two items of valid identification apply to each spouse. Include dissimilar information for either spouse in appropriate box.)*<br><br>Crew Capital Group, LLC | 3a.Address to be Used for Delivery *(Include PMB or # sign.)*<br>177 Huntington Ave Ste 1703 PMB 17548 | | |
|---|---|---|---|
| | 3b. City<br>Boston | 3c. State<br>Massachusetts | 3d. ZIP + 4®<br>02115-3153 |
| 4. Applicant authorizes delivery to and in care of:<br><br>a. Name<br>Earth Class Mail, Inc.<br><br>b. Address *(No., street, apt /ste. no.)* 9450 SW Gemini Dr #101 | 5. This authorization is extended to include restricted delivery mail for the undersigned(s):<br><br><br>Stephen Swensen | | |
| c. City<br>Beaverton | d. State<br>OR | e. ZIP + 4<br>97008-7105 | |
| 6. Name of Applicant<br>Stephen Swensen | 7a. Applicant Home Address *(No., street, apt /ste. no)* | | |
| 8.Two types of identification are required. One must contain a photograph of the addressee(s). Social Security cards, credit cards, and birth certificates are unacceptable as identification. The agent must write in identifying information. Subject to verification.<br><br>a. | 7b. City | 7c. State | 7d. ZIP + 4 |
| | 7e. Applicant Telephone Number *(Include area code)*<br>(720) 620-1010 | | |
| | 9. Name of Firm or Corporation<br>Crew Capital Group, LLC | | |
| b. | 10a. Business Address *(No., street, apt /ste. no)*<br>548 Market Street | | |
| | 10b. City<br>San Francisco | 10c. State<br>CA | 10d. ZIP + 4<br>94104 |
| Acceptable identification includes: valid driver's license or state non-driver's identification card; armed forces, government, university, or recognized corporate identification card; passport, alien registration card or certificate of naturalization; current lease, mortgage or Deed of Trust; voter or vehicle registration card; or a home or vehicle insurance policy. A photocopy of your identification may be retained by agent for verification. | 10e. Business Telephone Number *(Include area code)*<br>(720) 720-1010 | | |
| | 11. Type of Business<br>Financial Services | | |
| 12. If applicant is a firm, name each member whose mail is to be delivered. *(All names listed must have verifiable identification. A guardian must list the names of minors receiving mail at their delivery address.)*<br><br>Stephen Swensen | | | |
| 13. If a CORPORATION, Give Names and Addresses of Its Officers | 14. If business name *(corporation or trade name)* has been registered, give name of county and state, and date of registration. | | |
| Warning: The furnishing of false or misleading information on this form or omission of material information may result in criminal sanctions (including fines and imprisonment) and/or civil sanctions (including multiple damages and civil penalties). | | | |
| 15. Signature of Agent/Notary Public | 16. Signature of Applicant *(If firm or corporation, application must be signed by officer. Show title.)* | | |

PS Form **1583,** December 2004 *(Page 1 of 2)* (7530-01-000-9365)

**Privacy Act Statement:** Your information will be used to authorize the delivery of your mail to the designated addressee as your agent.  Collection is authorized by 39 USC 401, 403, and 404. Providing the information is voluntary, but if not provided, we cannot provide this service to you. We do not disclose your information without your consent to third parties, except for the following limited circumstances: to a congressional office on your behalf; to financial entities regarding financial transaction issues; to a USPS® auditor; to entities, including law enforcement, as required by law or in legal proceedings; to contractors and other entities aiding us to fulfill the service; and for the purpose of identifying an address as an address of an agent who receives mail on behalf of other persons. Information concerning an individual who has filed an appropriate protective court order with the postmaster will not be disclosed except pursuant to court order. For more information on our privacy policies, see our privacy link on usps.com®.

United States Postal Service®

# Application for Delivery of Mail Through Agent
See Privacy Act Statement on Reverse

| 1. Date |
|---|
| 11/11/2020 |

In consideration of delivery of my or our (firm) mail to the agent named below, the addressee and agent agree: (1) the addressee or the agent must not file a change of address order with the Postal Service™ upon termination of the agency relationship; (2) the transfer of mail to another address is the responsibility of the addressee and the agent; (3) all mail delivered to the agency under this authorization must be prepaid with new postage when redeposited in the mails; (4) upon request the agent must provide to the Postal Service all addresses to which the agency transfers mail; and (5) when any information required on this form changes or becomes obsolete, the addressee(s) must file a revised application with the Commercial Mail Receiving Agency (CMRA).

**NOTE:** The applicant must execute this form in duplicate in the presence of the agent, his or her authorized employee, or a notary public. The agent provides the original completed signed PS Form 1583 to the Postal Service and retains a duplicate completed signed copy at the CMRA business location. The CMRA copy of PS Form PS 1583 must at all times be available for examination by the postmaster (or designee) and the Postal Inspection Service. The addressee and the agent agree to comply with all applicable Postal Service rules and regulations relative to delivery of mail through an agent. Failure to comply will subject the agency to withholding of mail from delivery until corrective action is taken.

This application may be subject to verification procedures by the Postal Service to confirm that the applicant resides or conducts business at the home or business address listed in boxes 7 or 10, and that the identification listed in box 8 is valid.

| 2. Name in Which Applicant's Mail Will Be Received for Delivery to Agent. *(Complete a separate PS Form 1583 for EACH applicant. Spouses may complete and sign one PS Form 1583. Two items of valid identification apply to each spouse. Include dissimilar information for either spouse in appropriate box.)* <br><br> Crew Capital Group, LLC | 3a. Address to be Used for Delivery *(Include PMB or # sign.)* <br><br> 228 Park Ave S PMB 17548 |
|---|---|

| | 3b. City <br> New York | 3c. State <br> New York | 3d. ZIP + 4® <br> 10003-1502 |
|---|---|---|---|

| 4. Applicant authorizes delivery to and in care of: | 5. This authorization is extended to include restricted delivery mail for the undersigned(s): |
|---|---|
| a. Name <br> Earth Class Mail, Inc. | |
| b. Address *(No., street, apt /ste. no.)* 9450 SW Gemini Dr #101 | Stephen Swensen |

| c. City <br> Beaverton | d. State <br> OR | e. ZIP + 4 <br> 97008-7105 | |
|---|---|---|---|

| 6. Name of Applicant <br> Stephen Swensen | 7a. Applicant Home Address *(No., street, apt /ste. no)* |
|---|---|

| 8. Two types of identification are required. One must contain a photograph of the addressee(s). Social Security cards, credit cards, and birth certificates are unacceptable as identification. The agent must write in identifying information. Subject to verification. | 7b. City | 7c. State | 7d. ZIP + 4 |
|---|---|---|---|
| a. | 7e. Applicant Telephone Number *(Include area code)* <br> (720) 620-1010 | | |
| | 9. Name of Firm or Corporation <br> Crew Capital Group, LLC | | |
| b. | 10a. Business Address *(No., street, apt /ste. no)* <br> 548 Market Street | | |
| | 10b. City <br> San Francisco | 10c. State <br> CA | 10d. ZIP + 4 <br> 94104 |
| Acceptable identification includes: valid driver's license or state non-driver's identification card; armed forces, government, university, or recognized corporate identification card; passport, alien registration card or certificate of naturalization; current lease, mortgage or Deed of Trust; voter or vehicle registration card; or a home or vehicle insurance policy. A photocopy of your identification may be retained by agent for verification. | 10e. Business Telephone Number *(Include area code)* <br> (720) 720-1010 | | |
| | 11. Type of Business <br> Financial Services | | |

| 12. If applicant is a firm, name each member whose mail is to be delivered. *(All names listed must have verifiable identification. A guardian must list the names of minors receiving mail at their delivery address.)* <br><br> Stephen Swensen |
|---|

| 13. If a CORPORATION, Give Names and Addresses of Its Officers | 14. If business name *(corporation or trade name)* has been registered, give name of county and state, and date of registration. |
|---|---|
| | |

Warning: The furnishing of false or misleading information on this form or omission of material information may result in criminal sanctions (including fines and imprisonment) and/or civil sanctions (including multiple damages and civil penalties).

| 15. Signature of Agent/Notary Public | 16. Signature of Applicant *(If firm or corporation, application must be signed by officer. Show title.)* |
|---|---|

**Privacy Act Statement:** Your information will be used to authorize the delivery of your mail to the designated addressee as your agent.  Collection is authorized by 39 USC 401, 403, and 404. Providing the information is voluntary, but if not provided, we cannot provide this service to you. We do not disclose your information without your consent to third parties, except for the following limited circumstances: to a congressional office on your behalf; to financial entities regarding financial transaction issues; to a USPS® auditor; to entities, including law enforcement, as required by law or in legal proceedings; to contractors and other entities aiding us to fulfill the service; and for the purpose of identifying an address as an address of an agent who receives mail on behalf of other persons. Information concerning an individual who has filed an appropriate protective court order with the postmaster will not be disclosed except pursuant to court order. For more information on our privacy policies, see our privacy link on usps.com®.

United States Postal Service®

# Application for Delivery of Mail Through Agent
See Privacy Act Statement on Reverse

| 1. Date |
|---|
| 12/15/2020 |

In consideration of delivery of my or our (firm) mail to the agent named below, the addressee and agent agree: (1) the addressee or the agent must not file a change of address order with the Postal Service™ upon termination of the agency relationship; (2) the transfer of mail to another address is the responsibility of the addressee and the agent; (3) all mail delivered to the agency under this authorization must be prepaid with new postage when redeposited in the mails; (4) upon request the agent must provide to the Postal Service all addresses to which the agency transfers mail; and (5) when any information required on this form changes or becomes obsolete, the addressee(s) must file a revised application with the Commercial Mail Receiving Agency (CMRA).

**NOTE:** The applicant must execute this form in duplicate in the presence of the agent, his or her authorized employee, or a notary public. The agent provides the original completed signed PS Form 1583 to the Postal Service and retains a duplicate completed signed copy at the CMRA business location. The CMRA copy of PS Form PS 1583 must at all times be available for examination by the postmaster (or designee) and the Postal Inspection Service. The addressee and the agent agree to comply with all applicable Postal Service rules and regulations relative to delivery of mail through an agent. Failure to comply will subject the agency to withholding of mail from delivery until corrective action is taken.

This application may be subject to verification procedures by the Postal Service to confirm that the applicant resides or conducts business at the home or business address listed in boxes 7 or 10, and that the identification listed in box 8 is valid.

| 2. Name in Which Applicant's Mail Will Be Received for Delivery to Agent. *(Complete a separate PS Form 1583 for EACH applicant. Spouses may complete and sign one PS Form 1583. Two items of valid identification apply to each spouse. Include dissimilar information for either spouse in appropriate box.)*<br><br>Crew Capital Group | 3a.Address to be Used for Delivery *(Include PMB or # sign.)*<br><br>228 Park Ave S PMB 60530 | | |
|---|---|---|---|
| | 3b. City<br>New York | 3c. State<br>New York | 3d. ZIP + 4®<br>10003-1502 |
| 4. Applicant authorizes delivery to and in care of: | 5. This authorization is extended to include restricted delivery mail for the undersigned(s): | | |
| a. Name<br>Earth Class Mail, Inc. | | | |
| b. Address *(No., street, apt./ste. no.)* 9450 SW Gemini Dr #101 | Stephen Swensen<br>Crew Capital Group | | |
| c. City<br>Beaverton | d. State<br>OR | e. ZIP + 4<br>97008-7105 | |
| 6. Name of Applicant<br>Stephen Swensen | 7a. Applicant Home Address *(No., street, apt./ste. no)*<br>▮▮▮▮▮▮▮▮ | | |
| 8.Two types of identification are required. One must contain a photograph of the addressee(s). Social Security cards, credit cards, and birth certificates are unacceptable as identification. The agent must write in identifying information. Subject to verification. | 7b. City<br>Kaysville | 7c. State<br>UT | 7d. ZIP + 4<br>▮▮▮ |
| a.<br><br>United States Passport | 7e. Applicant Telephone Number *(Include area code)*<br>▮▮▮▮▮▮ | | |
| | 9. Name of Firm or Corporation<br>Crew Capital Group | | |
| b.<br><br>Drivers License | 10a. Business Address *(No., street, apt./ste. no)*<br>228 Park Ave S PMB 60530 | | |
| | 10b. City<br>New York | 10c. State<br>NY | 10d. ZIP + 4<br>10003-1502 |
| Acceptable identification includes: valid driver's license or state non-driver's identification card; armed forces, government, university, or recognized corporate identification card; passport, alien registration card or certificate of naturalization; current lease, mortgage or Deed of Trust; voter or vehicle registration card; or a home or vehicle insurance policy. A photocopy of your identification may be retained by agent for verification. | 10e. Business Telephone Number *(Include area code)*<br>(801) 410-1800 | | |
| | 11. Type of Business<br><br>Accounting/Finance | | |
| 12. If applicant is a firm, name each member whose mail is to be delivered. *(All names listed must have verifiable identification. A guardian must list the names of minors receiving mail at their delivery address.)*<br><br>Stephen Swensen | | | |
| 13. If a CORPORATION, Give Names and Addresses of Its Officers<br>Trevor Rowley - 4730 S. Fort Apache Rd, Suite 300, Las Vegas, NV, 89147<br>Stephen Swensen - 1148 W Legacy Crossing Blvd, Suite 300, Centerville, UT 84014 | 14. If business name *(corporation or trade name)* has been registered, give name of county and state, and date of registration.<br><br>Clark, NV, 2010-03-01 | | |

Warning: The furnishing of false or misleading information on this form or omission of material information may result in criminal sanctions (including fines and imprisonment) and/or civil sanctions (including multiple damages and civil penalties).

| 15. Signature of Agent/Notary Public<br><br>"See Notarize.com Certificate Of Acknowledgment Attached | 16. Signature of Applicant *(If firm or corporation, application must be signed by officer. Show title.)*<br><br>*Stephen R Swensen* |
|---|---|

PS Form **1583,** December 2004 *(Page 1 of 2)* (7530-01-000-9365)     This form on Internet at www.usps.com®

L2000007

**Privacy Act Statement:** Your information will be used to authorize the delivery of your mail to the designated addressee as your agent.  Collection is authorized by 39 USC 401, 403, and 404. Providing the information is voluntary, but if not provided, we cannot provide this service to you. We do not disclose your information without your consent to third parties, except for the following limited circumstances: to a congressional office on your behalf; to financial entities regarding financial transaction issues; to a USPS® auditor; to entities, including law enforcement, as required by law or in legal proceedings; to contractors and other entities aiding us to fulfill the service; and for the purpose of identifying an address as an address of an agent who receives mail on behalf of other persons. Information concerning an individual who has filed an appropriate protective court order with the postmaster will not be disclosed except pursuant to court order. For more information on our privacy policies, see our privacy link on usps.com®.

## ALL-PURPOSE ACKNOWLEDGMENT

State/Commonwealth of __VIRGINIA__ )

☐ City ☑ County of __Hampton__ )

On __12/15/2020__ before me, __Tiphany Griffith__,
*Date*                              *Notary Name*

personally appeared __Stephen R Swensen__
*Name(s) of Signer(s)*

☐   personally known to me **-- OR --**

☐   proved to me on the basis of the oath of _____ **-- OR --**
*Name of Credible Witness*

☑   proved to me on the basis of satisfactory evidence: _____ driver_license
*Type of ID Presented*

to be the individual(s) whose name(s) is (are) subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and by proper authority, and that by his/her/their signature(s) on the instrument, the individual(s), or the person(s) or entity upon behalf of which the individual(s) acted, executed the instrument for the purposes and consideration therein stated.

**Tiphany Griffith**

REGISTRATION NUMBER
7730964

COMMISSION EXPIRES
February 28, 2021

WITNESS my hand and official seal.

Notary Public Signature: *Tiphany Griffith*

Notary Name: __Tiphany Griffith__

Notary Commission Number: __7730964__

Notary Commission Expires: __02/28/2021__

*Notarized online using audio-video communication*

## DESCRIPTION OF ATTACHED DOCUMENT

Title or Type of Document: __Form 1583__

Document Date: __12/15/2020__   Number of Pages (w/ certificate): __3__

Signer(s) Other Than Named Above: __N/A__

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: __Stephen R Swensen__

☐   Corporate Officer  Title: _____
☐   Partner – ☐   Limited ☐   General
☑   Individual ☐   Attorney in Fact
☐   Trustee   ☐   Guardian of Conservator
☐   Other: _____

Signer Is Representing: __Self__

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____

☐   Corporate Officer   Title: _____
☐   Partner – ☐   Limited ☐   General
☐   Individual ☐   Attorney in Fact
☐   Trustee   ☐   Guardian of Conservator
☐   Other: _____

Signer Is Representing: _____

( 3 )

LZ000009

United States Postal Service®

**Application for Delivery of Mail Through Agent**
See Privacy Act Statement on Reverse

| 1. Date |
| --- |
| 05/17/2022 |

In consideration of delivery of my or our (firm) mail to the agent named below, the addressee and agent agree: (1) the addressee or the agent must not file a change of address order with the Postal Service™ upon termination of the agency relationship; (2) the transfer of mail to another address is the responsibility of the addressee and the agent; (3) all mail delivered to the agency under this authorization must be prepaid with new postage when redeposited in the mails; (4) upon request the agent must provide to the Postal Service all addresses to which the agency transfers mail; and (5) when any information required on this form changes or becomes obsolete, the addressee(s) must file a revised application with the Commercial Mail Receiving Agency (CMRA).

**NOTE:** The applicant must execute this form in duplicate in the presence of the agent, his or her authorized employee, or a notary public. The agent provides the original completed signed PS Form 1583 to the Postal Service and retains a duplicate completed signed copy at the CMRA business location. The CMRA copy of PS Form PS 1583 must at all times be available for examination by the postmaster (or designee) and the Postal Inspection Service. The addressee and the agent agree to comply with all applicable Postal Service rules and regulations relative to delivery of mail through an agent. Failure to comply will subject the agency to withholding of mail from delivery until corrective action is taken.

This application may be subject to verification procedures by the Postal Service to confirm that the applicant resides or conducts business at the home or business address listed in boxes 7 or 10, and that the identification listed in box 8 is valid.

| 2. Name in Which Applicant's Mail Will Be Received for Delivery to Agent. *(Complete a separate PS Form 1583 for EACH applicant. Spouses may complete and sign one PS Form 1583. Two items of valid identification apply to each spouse. Include dissimilar information for either spouse in appropriate box.)* | 3a. Address to be Used for Delivery *(Include PMB or # sign.)* | | |
| --- | --- | --- | --- |
| | PO Box 4668 PMB 60530 | | |
| | 3b. City | 3c. State | 3d. ZIP + 4® |
| Crew Capital Group | New York | NY | 10163-4668 |

| 4. Applicant authorizes delivery to and in care of: | 5. This authorization is extended to include restricted delivery mail for the undersigned(s): |
| --- | --- |
| a. Name | Stephen Swensen |
| Earth Class Mail, Inc. | Crew Capital Group |

| b. Address *(No., street, apt /ste. no.)* 9450 SW Gemini Dr | | | 6. Name of Applicant |
| --- | --- | --- | --- |
| | | | Stephen Swensen |

| c. City | d. State | e. ZIP + 4 | 7a. Applicant Home Address *(No., street, apt /ste. no)* |
| --- | --- | --- | --- |
| Beaverton | OR | 97008-7105 | ████████████████ |

| 6. Name of Applicant | 7a. Applicant Home Address *(No., street, apt /ste. no)* |
| --- | --- |
| Stephen Swensen | ████████████████ |

| 8. Two types of identification are required. One must contain a photograph of the addressee(s). Social Security cards, credit cards, and birth certificates are unacceptable as identification. The agent must write in identifying information. Subject to verification. | 7b. City | 7c. State | 7d. ZIP + 4 |
| --- | --- | --- | --- |
| | Kaysville | UT | ██████ |
| a. United States Passport | 7e. Applicant Telephone Number *(Include area code)* | | |
| | 8014101800 | | |
| | 9. Name of Firm or Corporation | | |
| b. Drivers License | Crew Capital Group | | |
| | 10a. Business Address *(No., street, apt /ste. no)* | | |
| | 228 Park Ave S PMB 60530 | | |
| | 10b. City | 10c. State | 10d. ZIP + 4 |
| Acceptable identification includes: valid driver's license or state non-driver's identification card; armed forces, government, university, or recognized corporate identification card; passport, alien registration card or certificate of naturalization; current lease, mortgage or Deed of Trust; voter or vehicle registration card; or a home or vehicle insurance policy. A photocopy of your identification may be retained by agent for verification. | New York | NY | 10003-1502 |
| | 10e. Business Telephone Number *(Include area code)* | | |
| | (801) 410-1800 | | |
| | 11. Type of Business | | |
| | Accounting/Finance | | |

| 12. If applicant is a firm, name each member whose mail is to be delivered. *(All names listed must have verifiable identification. A guardian must list the names of minors receiving mail at their delivery address.)* |
| --- |
| Stephen Swensen |

| 13. If a CORPORATION, Give Names and Addresses of Its Officers | 14. If business name *(corporation or trade name)* has been registered, give name of county and state, and date of registration. |
| --- | --- |
| Nevada Corporate Headquarters - 4730 S. Fort Apache Rd, Suite 300, Las Vegas, NV, 89147 Stephen Swensen - 1148 W Legacy Crossing Blvd, Suite 300, Centerville, UT 84014 | Clark, NV, 2010-03-01 |

Warning: The furnishing of false or misleading information on this form or omission of material information may result in criminal sanctions (including fines and imprisonment) and/or civil sanctions (including multiple damages and civil penalties).

| 15. Signature of Agent/Notary Public | 16. Signature of Applicant *(If firm or corporation, application must be signed by officer. Show title.)* |
| --- | --- |
| | |

**Privacy Act Statement:** Your information will be used to authorize the delivery of your mail to the designated addressee as your agent.  Collection is authorized by 39 USC 401, 403, and 404. Providing the information is voluntary, but if not provided, we cannot provide this service to you. We do not disclose your information without your consent to third parties, except for the following limited circumstances: to a congressional office on your behalf; to financial entities regarding financial transaction issues; to a USPS[®] auditor; to entities, including law enforcement, as required by law or in legal proceedings; to contractors and other entities aiding us to fulfill the service; and for the purpose of identifying an address as an address of an agent who receives mail on behalf of other persons. Information concerning an individual who has filed an appropriate protective court order with the postmaster will not be disclosed except pursuant to court order. For more information on our privacy policies, see our privacy link on usps.com[®].

United States Postal Service®

# Application for Delivery of Mail Through Agent
See Privacy Act Statement on Reverse

| 1. Date |
| --- |
| 08/11/2016 |

In consideration of delivery of my or our (firm) mail to the agent named below, the addressee and agent agree: (1) the addressee or the agent must not file a change of address order with the Postal Service™ upon termination of the agency relationship; (2) the transfer of mail to another address is the responsibility of the addressee and the agent; (3) all mail delivered to the agency under this authorization must be prepaid with new postage when redeposited in the mails; (4) upon request the agent must provide to the Postal Service all addresses to which the agency transfers mail; and (5) when any information required on this form changes or becomes obsolete, the addressee(s) must file a revised application with the Commercial Mail Receiving Agency (CMRA).

**NOTE:** The applicant must execute this form in duplicate in the presence of the agent, his or her authorized employee, or a notary public. The agent provides the original completed signed PS Form 1583 to the Postal Service and retains a duplicate completed signed copy at the CMRA business location. The CMRA copy of PS Form PS 1583 must at all times be available for examination by the postmaster (or designee) and the Postal Inspection Service. The addressee and the agent agree to comply with all applicable Postal Service rules and regulations relative to delivery of mail through an agent. Failure to comply will subject the agency to withholding of mail from delivery until corrective action is taken.

This application may be subject to verification procedures by the Postal Service to confirm that the applicant resides or conducts business at the home or business address listed in boxes 7 or 10, and that the identification listed in box 8 is valid.

| 2. Name in Which Applicant's Mail Will Be Received for Delivery to Agent. *(Complete a separate PS Form 1583 for EACH applicant. Spouses may complete and sign one PS Form 1583. Two items of valid identification apply to each spouse. Include dissimilar information for either spouse in appropriate box.)* <br><br> Crew Capital Group, LLC | 3a.Address to be Used for Delivery *(Include PMB or # sign.)* <br><br> 548 Market St PMB 17548 |
| --- | --- |
| | 3b. City <br> San Francisco | 3c. State <br> California | 3d. ZIP + 4® <br> 94104-5401 |

| 4. Applicant authorizes delivery to and in care of: | 5. This authorization is extended to include restricted delivery mail for the undersigned(s): |
| --- | --- |
| a. Name <br> Earth Class Mail, Inc. | |
| b. Address *(No., street, apt ./ste. no.)* 9450 SW Gemini Dr #101 | Stephen Swensen |

| c. City <br> Beaverton | d. State <br> OR | e. ZIP + 4 <br> 97008-7105 | |
| --- | --- | --- | --- |

| 6. Name of Applicant <br> Stephen Swensen | 7a. Applicant Home Address *(No., street, apt ./ste. no)* |
| --- | --- |

| 8.Two types of identification are required. One must contain a photograph of the addressee(s). Social Security cards, credit cards, and birth certificates are unacceptable as identification. The agent must write in identifying information. Subject to verification. <br><br> a. <br><br><br> b. <br><br><br><br> Acceptable identification includes: valid driver's license or state non-driver's identification card; armed forces, government, university, or recognized corporate identification card; passport, alien registration card or certificate of naturalization; current lease, mortgage or Deed of Trust; voter or vehicle registration card; or a home or vehicle insurance policy. A photocopy of your identification may be retained by agent for verification. | 7b. City | 7c. State | 7d. ZIP + 4 |
| --- | --- | --- | --- |
| | 7e. Applicant Telephone Number *(Include area code)* <br> (720) 620-1010 | | |
| | 9. Name of Firm or Corporation <br> Crew Capital Group, LLC | | |
| | 10a. Business Address *(No., street, apt ./ste. no)* <br> 548 Market Street | | |
| | 10b. City <br> San Francisco | 10c. State <br> CA | 10d. ZIP + 4 <br> 94104 |
| | 10e. Business Telephone Number *(Include area code)* <br> (720) 720-1010 | | |
| | 11. Type of Business <br> Financial Services | | |

| 12. If applicant is a firm, name each member whose mail is to be delivered. *(All names listed must have verifiable identification. A guardian must list the names of minors receiving mail at their delivery address.)* <br><br> Stephen Swensen |
| --- |

| 13. If a CORPORATION, Give Names and Addresses of Its Officers | 14. If business name *(corporation or trade name)* has been registered, give name of county and state, and date of registration. |
| --- | --- |
| | |

Warning: The furnishing of false or misleading information on this form or omission of material information may result in criminal sanctions (including fines and imprisonment) and/or civil sanctions (including multiple damages and civil penalties).

| 15. Signature of Agent/Notary Public | 16. Signature of Applicant *(If firm or corporation, application must be signed by officer. Show title.)* |
| --- | --- |
| | |

PS Form **1583,** December 2004 *(Page 1 of 2)* (7530-01-000-9365)

This form on Internet at www.usps.com®

12000012

**Privacy Act Statement:** Your information will be used to authorize the delivery of your mail to the designated addressee as your agent.  Collection is authorized by 39 USC 401, 403, and 404. Providing the information is voluntary, but if not provided, we cannot provide this service to you. We do not disclose your information without your consent to third parties, except for the following limited circumstances: to a congressional office on your behalf; to financial entities regarding financial transaction issues; to a USPS® auditor; to entities, including law enforcement, as required by law or in legal proceedings; to contractors and other entities aiding us to fulfill the service; and for the purpose of identifying an address as an address of an agent who receives mail on behalf of other persons. Information concerning an individual who has filed an appropriate protective court order with the postmaster will not be disclosed except pursuant to court order. For more information on our privacy policies, see our privacy link on usps.com®.

United States Postal Service®

# Application for Delivery of Mail Through Agent
See Privacy Act Statement on Reverse

| 1. Date |
|---|
| 05/17/2022 |

In consideration of delivery of my or our (firm) mail to the agent named below, the addressee and agent agree: (1) the addressee or the agent must not file a change of address order with the Postal Service™ upon termination of the agency relationship; (2) the transfer of mail to another address is the responsibility of the addressee and the agent; (3) all mail delivered to the agency under this authorization must be prepaid with new postage when redeposited in the mails; (4) upon request the agent must provide to the Postal Service all addresses to which the agency transfers mail; and (5) when any information required on this form changes or becomes obsolete, the addressee(s) must file a revised application with the Commercial Mail Receiving Agency (CMRA).

**NOTE:** The applicant must execute this form in duplicate in the presence of the agent, his or her authorized employee, or a notary public. The agent provides the original completed signed PS Form 1583 to the Postal Service and retains a duplicate completed signed copy at the CMRA business location. The CMRA copy of PS Form PS 1583 must at all times be available for examination by the postmaster (or designee) and the Postal Inspection Service. The addressee and the agent agree to comply with all applicable Postal Service rules and regulations relative to delivery of mail through an agent. Failure to comply will subject the agency to withholding of mail from delivery until corrective action is taken.

This application may be subject to verification procedures by the Postal Service to confirm that the applicant resides or conducts business at the home or business address listed in boxes 7 or 10, and that the identification listed in box 8 is valid.

| 2. Name in Which Applicant's Mail Will Be Received for Delivery to Agent. *(Complete a separate PS Form 1583 for EACH applicant. Spouses may complete and sign one PS Form 1583. Two items of valid identification apply to each spouse. Include dissimilar information for either spouse in appropriate box.)*<br><br>Crew Capital Group | 3a.Address to be Used for Delivery *(Include PMB or # sign.)*<br><br>548 Market St PMB 60530 | | |
|---|---|---|---|
| | 3b. City<br>San Francisco | 3c. State<br>CA | 3d. ZIP + 4®<br>94104-5401 |

| 4. Applicant authorizes delivery to and in care of:<br><br>a. Name<br>Earth Class Mail, Inc.<br><br>b. Address *(No., street, apt /ste. no.)* 9450 SW Gemini Dr | 5. This authorization is extended to include restricted delivery mail for the undersigned(s):<br><br>Stephen Swensen<br>Crew Capital Group | | |
|---|---|---|---|
| c. City<br>Beaverton | d. State<br>OR | e. ZIP + 4<br>97008-7105 | |

| 6. Name of Applicant<br>Stephen Swensen | 7a. Applicant Home Address *(No., street, apt /ste. no)*<br>███████ | | |
|---|---|---|---|
| 8.Two types of identification are required. One must contain a photograph of the addressee(s). Social Security cards, credit cards, and birth certificates are unacceptable as identification. The agent must write in identifying information. Subject to verification.<br><br>a. United States Passport<br><br>b. Drivers License | 7b. City<br>Kaysville | 7c. State<br>UT | 7d. ZIP + 4<br>███ |
| | 7e. Applicant Telephone Number *(Include area code)*<br>8014101800 | | |
| | 9. Name of Firm or Corporation<br>Crew Capital Group | | |
| | 10a. Business Address *(No., street, apt /ste. no)*<br>228 Park Ave S PMB 60530 | | |
| Acceptable identification includes: valid driver's license or state non-driver's identification card; armed forces, government, university, or recognized corporate identification card; passport, alien registration card or certificate of naturalization; current lease, mortgage or Deed of Trust; voter or vehicle registration card; or a home or vehicle insurance policy. A photocopy of your identification may be retained by agent for verification. | 10b. City<br>New York | 10c. State<br>NY | 10d. ZIP + 4<br>10003-1502 |
| | 10e. Business Telephone Number *(Include area code)*<br>(801) 410-1800 | | |
| | 11. Type of Business<br>Accounting/Finance | | |

| 12. If applicant is a firm, name each member whose mail is to be delivered. *(All names listed must have verifiable identification. A guardian must list the names of minors receiving mail at their delivery address.)*<br>Stephen Swensen |
|---|

| 13. If a CORPORATION, Give Names and Addresses of Its Officers<br>Nevada Corporate Headquarters - 4730 S. Fort Apache Rd, Suite 300, Las Vegas, NV, 89147<br>Stephen Swensen - 1148 W Legacy Crossing Blvd, Suite 300, Centerville, UT 84014 | 14. If business name *(corporation or trade name)* has been registered, give name of county and state, and date of registration.<br>Clark, NV, 2010-03-01 |
|---|---|

Warning: The furnishing of false or misleading information on this form or omission of material information may result in criminal sanctions (including fines and imprisonment) and/or civil sanctions (including multiple damages and civil penalties).

| 15. Signature of Agent/Notary Public | 16. Signature of Applicant *(If firm or corporation, application must be signed by officer. Show title.)* |
|---|---|
| | |

L2000014



**Privacy Act Statement:** Your information will be used to authorize the delivery of your mail to the designated addressee as your agent.  Collection is authorized by 39 USC 401, 403, and 404. Providing the information is voluntary, but if not provided, we cannot provide this service to you. We do not disclose your information without your consent to third parties, except for the following limited circumstances: to a congressional office on your behalf; to financial entities regarding financial transaction issues; to a USPS® auditor; to entities, including law enforcement, as required by law or in legal proceedings; to contractors and other entities aiding us to fulfill the service; and for the purpose of identifying an address as an address of an agent who receives mail on behalf of other persons. Information concerning an individual who has filed an appropriate protective court order with the postmaster will not be disclosed except pursuant to court order. For more information on our privacy policies, see our privacy link on usps.com®.

United States Postal Service®

# Application for Delivery of Mail Through Agent
See Privacy Act Statement on Reverse

| | 1. Date |
|---|---|
| | 05/17/2022 |

In consideration of delivery of my or our (firm) mail to the agent named below, the addressee and agent agree: (1) the addressee or the agent must not file a change of address order with the Postal Service™ upon termination of the agency relationship; (2) the transfer of mail to another address is the responsibility of the addressee and the agent; (3) all mail delivered to the agency under this authorization must be prepaid with new postage when redeposited in the mails; (4) upon request the agent must provide to the Postal Service all addresses to which the agency transfers mail; and (5) when any information required on this form changes or becomes obsolete, the addressee(s) must file a revised application with the Commercial Mail Receiving Agency (CMRA).

**NOTE:** The applicant must execute this form in duplicate in the presence of the agent, his or her authorized employee, or a notary public. The agent provides the original completed signed PS Form 1583 to the Postal Service and retains a duplicate completed signed copy at the CMRA business location. The CMRA copy of PS Form PS 1583 must at all times be available for examination by the postmaster (or designee) and the Postal Inspection Service. The addressee and the agent agree to comply with all applicable Postal Service rules and regulations relative to delivery of mail through an agent. Failure to comply will subject the agency to withholding of mail from delivery until corrective action is taken.

This application may be subject to verification procedures by the Postal Service to confirm that the applicant resides or conducts business at the home or business address listed in boxes 7 or 10, and that the identification listed in box 8 is valid.

| 2. Name in Which Applicant's Mail Will Be Received for Delivery to Agent. *(Complete a separate PS Form 1583 for EACH applicant. Spouses may complete and sign one PS Form 1583. Two items of valid identification apply to each spouse. Include dissimilar information for either spouse in appropriate box.)*<br><br>Crew Capital Group | 3a. Address to be Used for Delivery *(Include PMB or # sign.)*<br><br>PO Box 7775 PMB 60530 | | |
|---|---|---|---|
| | 3b. City<br>San Francisco | 3c. State<br>CA | 3d. ZIP + 4®<br>94120-7775 |
| 4. Applicant authorizes delivery to and in care of:<br><br>a. Name<br>Earth Class Mail, Inc. | 5. This authorization is extended to include restricted delivery mail for the undersigned(s):<br><br>Stephen Swensen<br>Crew Capital Group | | |
| b. Address *(No., street, apt /ste. no.)* 9450 SW Gemini Dr | | | |
| c. City<br>Beaverton | d. State<br>OR | e. ZIP + 4<br>97008-7105 | |
| 6. Name of Applicant<br>Stephen Swensen | 7a. Applicant Home Address *(No., street, apt /ste. no)*<br>███████████ | | |
| 8. Two types of identification are required. One must contain a photograph of the addressee(s). Social Security cards, credit cards, and birth certificates are unacceptable as identification. The agent must write in identifying information. Subject to verification.<br><br>a. United States Passport<br><br>b. Drivers License<br><br>Acceptable identification includes: valid driver's license or state non-driver's identification card; armed forces, government, university, or recognized corporate identification card; passport, alien registration card or certificate of naturalization; current lease, mortgage or Deed of Trust; voter or vehicle registration card; or a home or vehicle insurance policy. A photocopy of your identification may be retained by agent for verification. | 7b. City<br>Kaysville | 7c. State<br>UT | 7d. ZIP + 4<br>████ |
| | 7e. Applicant Telephone Number *(Include area code)*<br>8014101800 | | |
| | 9. Name of Firm or Corporation<br>Crew Capital Group | | |
| | 10a. Business Address *(No., street, apt /ste. no)*<br>228 Park Ave S PMB 60530 | | |
| | 10b. City<br>New York | 10c. State<br>NY | 10d. ZIP + 4<br>10003-1502 |
| | 10e. Business Telephone Number *(Include area code)*<br>(801) 410-1800 | | |
| | 11. Type of Business<br>Accounting/Finance | | |
| 12. If applicant is a firm, name each member whose mail is to be delivered. *(All names listed must have verifiable identification. A guardian must list the names of minors receiving mail at their delivery address.)*<br><br>Stephen Swensen | | | |
| 13. If a CORPORATION, Give Names and Addresses of Its Officers<br>Nevada Corporate Headquarters - 4730 S. Fort Apache Rd, Suite 300, Las Vegas, NV, 89147<br>Stephen Swensen - 1148 W Legacy Crossing Blvd, Suite 300, Centerville, UT 84014 | 14. If business name *(corporation or trade name)* has been registered, give name of county and state, and date of registration.<br>Clark, NV, 2010-03-01 | | |

Warning: The furnishing of false or misleading information on this form or omission of material information may result in criminal sanctions (including fines and imprisonment) and/or civil sanctions (including multiple damages and civil penalties).

| 15. Signature of Agent/Notary Public | 16. Signature of Applicant *(If firm or corporation, application must be signed by officer. Show title.)* |
|---|---|
| | |

**Privacy Act Statement:** Your information will be used to authorize the delivery of your mail to the designated addressee as your agent.  Collection is authorized by 39 USC 401, 403, and 404. Providing the information is voluntary, but if not provided, we cannot provide this service to you. We do not disclose your information without your consent to third parties, except for the following limited circumstances: to a congressional office on your behalf; to financial entities regarding financial transaction issues; to a USPS[®] auditor; to entities, including law enforcement, as required by law or in legal proceedings; to contractors and other entities aiding us to fulfill the service; and for the purpose of identifying an address as an address of an agent who receives mail on behalf of other persons. Information concerning an individual who has filed an appropriate protective court order with the postmaster will not be disclosed except pursuant to court order. For more information on our privacy policies, see our privacy link on usps.com[®].

LZ000017

United States Postal Service®
**Application for Delivery of Mail Through Agent**
See Privacy Act Statement on Reverse

| 1. Date |
|---|
| 01/02/2018 |

In consideration of delivery of my or our (firm) mail to the agent named below, the addressee and agent agree: (1) the addressee or the agent must not file a change of address order with the Postal Service™ upon termination of the agency relationship; (2) the transfer of mail to another address is the responsibility of the addressee and the agent; (3) all mail delivered to the agency under this authorization must be prepaid with new postage when redeposited in the mails; (4) upon request the agent must provide to the Postal Service all addresses to which the agency transfers mail; and (5) when any information required on this form changes or becomes obsolete, the addressee(s) must file a revised application with the Commercial Mail Receiving Agency (CMRA).

**NOTE:** The applicant must execute this form in duplicate in the presence of the agent, his or her authorized employee, or a notary public. The agent provides the original completed signed PS Form 1583 to the Postal Service and retains a duplicate completed signed copy at the CMRA business location. The CMRA copy of PS Form PS 1583 must at all times be available for examination by the postmaster (or designee) and the Postal Inspection Service. The addressee and the agent agree to comply with all applicable Postal Service rules and regulations relative to delivery of mail through an agent. Failure to comply will subject the agency to withholding of mail from delivery until corrective action is taken.

This application may be subject to verification procedures by the Postal Service to confirm that the applicant resides or conducts business at the home or business address listed in boxes 7 or 10, and that the identification listed in box 8 is valid.

| 2. Name in Which Applicant's Mail Will Be Received for Delivery to Agent. *(Complete a separate PS Form 1583 for EACH applicant. Spouses may complete and sign one PS Form 1583. Two items of valid identification apply to each spouse. Include dissimilar information for either spouse in appropriate box.)* | 3a. Address to be Used for Delivery *(Include PMB or # sign.)* | | |
|---|---|---|---|
| | 177 Huntington Ave Ste 1703 | | |
| Crew Capital Group, LLC | 3b. City | 3c. State | 3d. ZIP + 4® |
| | Boston | MA | |

| 4. Applicant authorizes delivery to and in care of: | 5. This authorization is extended to include restricted delivery mail for the undersigned(s): |
|---|---|
| a. Name | Stephen Swensen |
| Earth Class Mail Corp. | |

| b. Address *(No., street, apt./ste. no.)* 9450 SW Gemini Drive #101 | | |
|---|---|---|
| c. City | d. State | e. ZIP + 4 |
| Beaverton | OR | 97008-7105 |

| 6. Name of Applicant | 7a. Applicant Home Address *(No., street, apt./ste. no)* |
|---|---|
| Stephen Swensen | 1725 E 1450 S Ste 345 |

| 8. Two types of identification are required. One must contain a photograph of the addressee(s). Social Security cards, credit cards, and birth certificates are unacceptable as identification. The agent must write in identifying information. Subject to verification. | 7b. City | 7c. State | 7d. ZIP + 4 |
|---|---|---|---|
| | Clearfield | UT | 84015 |
| a. | 7e. Applicant Telephone Number *(Include area code)* | | |
| | (801) 540-1440 | | |
| | 9. Name of Firm or Corporation | | |
| | Crew Capital Group, LLC | | |
| b. | 10a. Business Address *(No., street, apt./ste. no)* | | |
| | 1725 E 1450 S Ste 345 | | |
| | 10b. City | 10c. State | 10d. ZIP + 4 |
| | Clearfield | UT | 84015 |
| Acceptable identification includes: valid driver's license or state non-driver's identification card; armed forces, government, university, or recognized corporate identification card; passport, alien registration card or certificate of naturalization; current lease, mortgage or Deed of Trust; voter or vehicle registration card; or a motor vehicle insurance policy. A photocopy of your identification may be retained by agent for verification. | 10e. Business Telephone Number *(Include area code)* | | |
| | (801) 540-1440 | | |
| | 11. Type of Business | | |
| | Financial Planning Software | | |

12. If applicant is a firm, name each member whose mail is to be delivered. *(All names listed must have verifiable identification. A guardian must list the names of minors receiving mail at their delivery address.)*

Stephen R. Swensen

| 13. If a CORPORATION, Give Names and Addresses of Its Officers | 14. If business name *(corporation or trade name)* has been registered, give name of county and state, and date of registration. |
|---|---|
| | Clark County, Nevada. 03/01/2010 |

Warning: The furnishing of false or misleading information on this form or omission of material information may result in criminal sanctions (including fines and imprisonment) and/or civil sanctions (including multiple damages and civil penalties).

| 15. Signature of Agent/Notary Public | 16. Signature of Applicant *(If firm or corporation, application must be signed by officer. Show title.)* |
|---|---|
| | PRESIDENT |

PS Form **1583,** December 2004 *(Page 1 of 2)* (7530-01-000-9365)     This form on Internet at www.usps.com®

LZ000034

United States Postal Service®
## Application for Delivery of Mail Through Agent
See Privacy Act Statement on Reverse

| 1. Date |
| --- |
| 01/02/2018 |

In consideration of delivery of my or our (firm) mail to the agent named below, the addressee and agent agree: (1) the addressee or the agent must not file a change of address order with the Postal Service™ upon termination of the agency relationship; (2) the transfer of mail to another address is the responsibility of the addressee and the agent; (3) all mail delivered to the agency under this authorization must be prepaid with new postage when redeposited in the mails; (4) upon request the agent must provide to the Postal Service all addresses to which the agency transfers mail; and (5) when any information required on this form changes or becomes obsolete, the addressee(s) must file a revised application with the Commercial Mail Receiving Agency (CMRA).

**NOTE:** The applicant must execute this form in duplicate in the presence of the agent, his or her authorized employee, or a notary public. The agent provides the original completed signed PS Form 1583 to the Postal Service and retains a duplicate completed signed copy at the CMRA business location. The CMRA copy of PS Form PS 1583 must at all times be available for examination by the postmaster (or designee) and the Postal Inspection Service. The addressee and the agent agree to comply with all applicable Postal Service rules and regulations relative to delivery of mail through an agent. Failure to comply will subject the agency to withholding of mail from delivery until corrective action is taken.

This application may be subject to verification procedures by the Postal Service to confirm that the applicant resides or conducts business at the home or business address listed in boxes 7 or 10, and that the identification listed in box 8 is valid.

| 2. Name in Which Applicant's Mail Will Be Received for Delivery to Agent. *(Complete a separate PS Form 1583 for EACH applicant. Spouses may complete and sign one PS Form 1583. Two items of valid identification apply to each spouse. Include dissimilar information for either spouse in appropriate box.)*<br><br>Crew Capital Group, LLC | 3a. Address to be Used for Delivery *(Include PMB or # sign.)*<br><br>177 Huntington Ave Ste 1703 | | |
| --- | --- | --- | --- |
| | 3b. City<br>Boston | 3c. State<br>MA | 3d. ZIP + 4® |
| 4. Applicant authorizes delivery to and in care of: | 5. This authorization is extended to include restricted delivery mail for the undersigned(s):<br><br>Stephen Swensen | | |
| a. Name<br>Earth Class Mail Corp. | | | |
| b. Address *(No., street, apt./ste. no.)*  9450 SW Gemini Drive #101 | | | |
| c. City<br>Beaverton | d. State<br>OR | e. ZIP + 4<br>97008-7105 | |
| 6. Name of Applicant<br>Stephen Swensen | 7a. Applicant Home Address *(No., street, apt./ste. no)*<br>1725 E 1450 S Ste 345 | | |
| 8. Two types of identification are required. One must contain a photograph of the addressee(s). Social Security cards, credit cards, and birth certificates are unacceptable as identification. The agent must write in identifying information. Subject to verification.<br><br>a.<br><br><br>b.<br><br><br><br><br><br>Acceptable identification includes: valid driver's license or state non-driver's identification card; armed forces, government, university, or recognized corporate identification card; passport, alien registration card or certificate of naturalization; current lease, mortgage or Deed of Trust; voter or vehicle registration card; or a home or vehicle insurance policy. A photocopy of your identification may be retained by agent for verification. | 7b. City<br>Clearfield | 7c. State<br>UT | 7d. ZIP + 4<br>84015 |
| | 7e. Applicant Telephone Number *(Include area code)*<br>(801) 540-1440 | | |
| | 9. Name of Firm or Corporation<br>Crew Capital Group, LLC | | |
| | 10a. Business Address *(No., street, apt./ste. no)*<br>1725 E 1450 S Ste 345 | | |
| | 10b. City<br>Clearfield | 10c. State<br>UT | 10d. ZIP + 4<br>84015 |
| | 10e. Business Telephone Number *(Include area code)*<br>(801) 540-1440 | | |
| | 11. Type of Business<br><br>Financial Planning Software | | |

12. If applicant is a firm, name each member whose mail is to be delivered. *(All names listed must have verifiable identification. A guardian must list the names of minors receiving mail at their delivery address.)*

Stephen R. Swensen

| 13. If a CORPORATION, Give Names and Addresses of Its Officers | 14. If business name *(corporation or trade name)* has been registered, give name of county and state, and date of registration.<br><br>Clark County, Nevada. 03/01/2010 |
| --- | --- |

Warning: The furnishing of false or misleading information on this form or omission of material information may result in criminal sanctions (including fines and imprisonment) and/or civil sanctions (including multiple damages and civil penalties).

| 15. Signature of Agent/Notary Public | 16. Signature of Applicant *(If firm or corporation, application must be signed by officer. Show title.)*  PRESIDENT |
| --- | --- |

PS Form **1583,** December 2004 *(Page 1 of 2)* (7530-01-000-9365)   This form on Internet at www.usps.com®

LZ000035

United States Postal Service®

# Application for Delivery of Mail Through Agent

See Privacy Act Statement on Reverse

| | 1. Date |
|---|---|
| | 12/15/2020 |

In consideration of delivery of my or our (firm) mail to the agent named below, the addressee and agent agree: (1) the addressee or the agent must not file a change of address order with the Postal Service™ upon termination of the agency relationship; (2) the transfer of mail to another address is the responsibility of the addressee and the agent; (3) all mail delivered to the agency under this authorization must be prepaid with new postage when redeposited in the mails; (4) upon request the agent must provide to the Postal Service all addresses to which the agency transfers mail; and (5) when any information required on this form changes or becomes obsolete, the addressee(s) must file a revised application with the Commercial Mail Receiving Agency (CMRA).

**NOTE:** The applicant must execute this form in duplicate in the presence of the agent, his or her authorized employee, or a notary public. The agent provides the original completed signed PS Form 1583 to the Postal Service and retains a duplicate completed signed copy at the CMRA business location. The CMRA copy of PS Form PS 1583 must at all times be available for examination by the postmaster (or designee) and the Postal Inspection Service. The addressee and the agent agree to comply with all applicable Postal Service rules and regulations relative to delivery of mail through an agent. Failure to comply will subject the agency to withholding of mail from delivery until corrective action is taken.

This application may be subject to verification procedures by the Postal Service to confirm that the applicant resides or conducts business at the home or business address listed in boxes 7 or 10, and that the identification listed in box 8 is valid.

| 2. Name in Which Applicant's Mail Will Be Received for Delivery to Agent. *(Complete a separate PS Form 1583 for EACH applicant. Spouses may complete and sign one PS Form 1583. Two items of valid identification apply to each spouse. Include dissimilar information for either spouse in appropriate box.)* | 3a.Address to be Used for Delivery *(Include PMB or # sign.)* 228 Park Ave S PMB 60530 | | |
|---|---|---|---|
| Crew Capital Group | 3b. City New York | 3c. State New York | 3d. ZIP + 4® 10003-1502 |

| 4. Applicant authorizes delivery to and in care of: | 5. This authorization is extended to include restricted delivery mail for the undersigned(s): |
|---|---|
| a. Name Earth Class Mail, Inc. | |
| b. Address *(No., street, apt./ste. no.)* 9450 SW Gemini Dr #101 | Stephen Swensen Crew Capital Group |

| c. City Beaverton | d. State OR | e. ZIP + 4 97008-7105 |
|---|---|---|

| 6. Name of Applicant Stephen Swensen | 7a. Applicant Home Address *(No., street, apt./ste. no)* ▓▓▓▓▓▓ |
|---|---|

| 8.Two types of identification are required. One must contain a photograph of the addressee(s). Social Security cards, credit cards, and birth certificates are unacceptable as identification. The agent must write in identifying information. Subject to verification. | 7b. City Kaysville | 7c. State UT | 7d. ZIP + 4 ▓▓▓ |
|---|---|---|---|
| a. United States Passport | 7e. Applicant Telephone Number *(Include area code)* 8014101800 | | |
| | 9. Name of Firm or Corporation Crew Capital Group | | |
| b. Drivers License | 10a. Business Address *(No., street, apt./ste. no)* 228 Park Ave S PMB 60530 | | |
| | 10b. City New York | 10c. State NY | 10d. ZIP + 4 10003-1502 |
| Acceptable identification includes: valid driver's license or state non-driver's identification card; armed forces, government, university, or recognized corporate identification card; passport, alien registration card or certificate of naturalization; current lease, mortgage or Deed of Trust; voter or vehicle registration card; or a home or vehicle insurance policy. A photocopy of your identification may be retained by agent for verification. | 10e. Business Telephone Number *(Include area code)* (801) 410-1800 | | |
| | 11. Type of Business Accounting/Finance | | |

| 12. If applicant is a firm, name each member whose mail is to be delivered. *(All names listed must have verifiable identification. A guardian must list the names of minors receiving mail at their delivery address.)* |
|---|
| Stephen Swensen |

| 13. If a CORPORATION, Give Names and Addresses of Its Officers | 14. If business name *(corporation or trade name)* has been registered, give name of county and state, and date of registration. |
|---|---|
| Trevor Rowley - 4730 S. Fort Apache Rd, Suite 300, Las Vegas, NV, 89147 Stephen Swensen - 1148 W Legacy Crossing Blvd, Suite 300, Centerville, UT 84014 | Clark, NV, 2010-03-01 |

Warning: The furnishing of false or misleading information on this form or omission of material information may result in criminal sanctions (including fines and imprisonment) and/or civil sanctions (including multiple damages and civil penalties).

| 15. Signature of Agent/Notary Public | 16. Signature of Applicant *(If firm or corporation, application must be signed by officer. Show title.)* |
|---|---|
| "See Notarize.com Certificate Of Acknowledgment Attached | *Stephen R Swensen* |

PS Form **1583**, December 2004 *(Page 1 of 2)* (7530-01-000-9365)    This form on Internet at www.usps.com®

L2000038

**Privacy Act Statement:** Your information will be used to authorize the delivery of your mail to the designated addressee as your agent.  Collection is authorized by 39 USC 401, 403, and 404. Providing the information is voluntary, but if not provided, we cannot provide this service to you. We do not disclose your information without your consent to third parties, except for the following limited circumstances: to a congressional office on your behalf; to financial entities regarding financial transaction issues; to a USPS® auditor; to entities, including law enforcement, as required by law or in legal proceedings; to contractors and other entities aiding us to fulfill the service; and for the purpose of identifying an address as an address of an agent who receives mail on behalf of other persons. Information concerning an individual who has filed an appropriate protective court order with the postmaster will not be disclosed except pursuant to court order. For more information on our privacy policies, see our privacy link on usps.com®.

## ALL-PURPOSE ACKNOWLEDGMENT

State/Commonwealth of __VIRGINIA__ )
)
☐ City ☑ County of __Hampton__ )

On __12/15/2020__ before me, __Tiphany Griffith__,
*Date* *Notary Name*

personally appeared __Stephen R Swensen__
*Name(s) of Signer(s)*

☐ personally known to me **-- OR --**

☐ proved to me on the basis of the oath of _____ **-- OR --**
*Name of Credible Witness*

☑ proved to me on the basis of satisfactory evidence: __driver_license__
*Type of ID Presented*

to be the individual(s) whose name(s) is (are) subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and by proper authority, and that by his/her/their signature(s) on the instrument, the individual(s), or the person(s) or entity upon behalf of which the individual(s) acted, executed the instrument for the purposes and consideration therein stated.



**Tiphany Griffith**

REGISTRATION NUMBER
7730964
COMMISSION EXPIRES
February 28, 2021

WITNESS my hand and official seal.

Notary Public Signature: *Tiphany Griffith*

Notary Name: __Tiphany Griffith__

Notary Commission Number: __7730964__

Notary Commission Expires: __02/28/2021__

*Notarized online using audio-video communication*

## DESCRIPTION OF ATTACHED DOCUMENT

Title or Type of Document: __Form 1583__

Document Date: __12/15/2020__    Number of Pages (w/ certificate): __3__

Signer(s) Other Than Named Above: __N/A__

**Capacity(ies) Claimed by Signer(s)**
Signer's Name: __Stephen R Swensen__

☐ Corporate Officer  Title: _____
☐ Partner – ☐ Limited ☐ General
☑ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian of Conservator
☐ Other: _____
Signer Is Representing: __Self__

**Capacity(ies) Claimed by Signer(s)**
Signer's Name: _____

☐ Corporate Officer  Title: _____
☐ Partner – ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian of Conservator
☐ Other: _____
Signer Is Representing: _____

( 3 )

LZ000040

# EXHIBIT 14



# EXHIBIT 15

**h.** Workspace | Knowledge | Reports | Responses    Agent    KT  **Kirsty**  ReceptionHQ Helpdesk

**124535**  Closed                                    Re-Open Request

**JD**  **Jordi Delfin**                               Jun 15 2021, 10:47 AM  Private
- Request Changed
- Reassigned from "INBOX" to "Jordi Delfin"
- Request changed from "OPEN" to "CLOSED"
- Status changed from "Active" to "Client Service Inquiry Actioned"

**JD**  **Jordi Delfin**                               Jun 15 2021, 10:47 AM  Public
Subject: Re: VHQ New Client Sign Up Form - Stephen Swensen
To: steve@swensen.com

Hello Stephen,

Thanks for sending your sign up form!

We were able to fully establish your account. To make a payment please login to your client portal or let us know the best time to call you for your convenience.

Kind Regards,

Jordi Delfin Sales and Client Service Team

**h**  **System**                                     Jun 15 2021, 10:29 AM  Private
- Trigger Match: Trigger Live Lookup for Customer Match
- Customer ID changed from "" to "306540"
- Customer first name changed from "steve" to "Stephen"
- Customer last name changed changed from "" to "Swensen"
- Customer phone changed from "" to "8014101800"

**SS**  **Stephen Swensen**                            Jun 15 2021, 10:29 AM  Public
From: Stephen Swensen - noreply@jotform.com
To: Lorren@receptionhq.com, jordi.d@receptionhq.com, marisa.m@receptionhq.com, whitney.h@receptionhq.com, sales@virtualheadquarters.com
Reply To: steve@swensen.com
Subject: Re: VHQ New Client Sign Up Form - Stephen Swensen



| Form Title | |
|---|---|
| Account Manager Name | Marisa Mena |
| Client Name | Stephen Swensen |
| Phone Number | (801) 410-1800 |
| Email | steve@swensen.com |
| Company Name | Crew Capital Group |
| Web Address | www.crewfunds.com |
| Would you like to add a secondary contact to the account who is authorized to make changes and receive notifications about the account? | No |
| Billing Address | Street Address: 228 Park Ave S Street Address Line 2: Suite 60530 City: New York State / Province: NY Postal / Zip Code: 1003-1502 Country: United States |
| Industry | Finance |
| How did you hear about us? | Search Engine |
| Search Engine Name | Google |
| Search Engine Key Words | Virtual Receptionist |
| Virtual Receptionist Number | Toll Free |
| | Call Transfers |
| How should we refer to you or your team? | Mr |
| Name | Stephen Swensen |
| Time Zone | US - Mountain |
| Is this how you would like your calls to be answered? | Yes |
| Which addresses are we able to provide to your callers? | Postal |
| Postal Address | Street Address: 228 Park Ave S Street Address Line 2: Suite 60530 City: New York State / Province: NY Postal / Zip Code: 10003-1502 |
| Company Website | www.crewfunds.com |
| Email Address for Inquiries | info@crewfunds.com |
| Office Number | (844) 384-4354 |
| Calls Usually Returned | Same Day |

Hours of Operation

| | Hour | Minute | AM/PM | TO | Hour | Minute | AM/PM | CLOSED |
|---|---|---|---|---|---|---|---|---|
| Monday | 7 | :00 | AM | | 7 | :00 | PM | |
| Tuesday | 7 | :00 | AM | | 7 | :00 | PM | |
| Wednesday | 7 | :00 | AM | | 7 | :00 | PM | |
| Thursday | 7 | :00 | AM | | 7 | :00 | PM | |
| Friday | 7 | :00 | AM | | 7 | :00 | PM | |
| Saturday | | | | | | | | ✓ |
| Sunday | | | | | | | | ✓ |

| We will collect your callers name, Number and Reason for Call. Are there any other details you would like us to collect? | No |
|---|---|

| Send Messages To | Email & Mobile (Text) |
|---|---|

| | Email Address(es) |
|---|---|
| | steve@swensen.com |

| | Text Message(s) $0.05 per SMS |
|---|---|
| | 8014101800 |

| Your diversions will be called in the order below: | Diversion 1 | Diversion 2 | Diversion 3 |
|---|---|---|---|
| | Stephen Swensen 8014101800 | | |

| Would you like to add additional contacts or phone numbers to your account? | No |
|---|---|
| Will we be transferring your callers 24/7? | No |
| What hours will we be transferring your callers? | During my business hours only |
| Select Package | Virtual Receptionist Standard |
| Payment Method | Visa |
| | Accepted |
| Date | 06-15-2021 |
| Print Name | Stephen Swensen |
| Signature | |

**PDF**  **Marisa-Mena-06-15-2021.pdf**
Download   View   Reattach

---

**Customer**
Stephen Swensen

**Email**
steve@swensen.com

**Phone**
8014101800

**Customer ID**
306540

**Contacted Via**
Email

**Status**
Client Service Inquiry Actioned

**Category**
VirtualHQ Sales

**Reporting Tags**

**Agent Name**

**Contact Spoken With**

**Feedback**

**Re-Open On**

# EXHIBIT 16

# PIMCO

*As of 30 June 2021*
PIMCO Funds: Income

# CREW / PIMCO Senior Floating Rate Fund

| | |
|---|---|
| CLASS: | **INSTITUTIONAL** |
| FUND INCEPTION DATE: | **29 APRIL 2001** |
| TICKER: | **PSRIX** |
| CUSIP: | **72201W790** |
| TOTAL NET ASSETS (IN MILLIONS): | **$495.1** |

**PORTFOLIO MANAGERS**

David Forgash, Michael Levinson

**FUND STATISTICS**

| | |
|---|---|
| Effective duration (yrs) | 1.51 |
| Effective maturity (yrs) | 5.18 |

**SECTOR DIVERSIFICATION (%)**

| | Market value weighted |
|---|---|
| Bank Loans | 62.3 |
| Bonds | 25.4 |
| Other [1] | 9.9 |
| Net Other Short Duration Instruments [2] | 2.3 |

**TOP 5 INDUSTRY DIVERSIFICATION (%)**

| | Market value weighted |
|---|---|
| Technology | 16.1 |
| Healthcare | 7.5 |
| Consumer Products | 4.8 |
| Consumer Cyclical Services | 4.6 |
| Independent E&P | 4.1 |

## Fund description

CREW/PIMCO Senior Floating Rate Fund is a diversified, actively managed portfolio of floating or variable senior secured loans and short dated high yield bonds. The fund seeks to provide a high level of current income and is the underlying investment at Crew Capital Group for it's Index Account.

**INVESTOR BENEFITS**

This fund is designed to offer investors attractive exposure to bank loans and short-dated high yield bonds. The fund adopts a flexible approach across these sectors to reflect the evolving opportunity set in credit markets.

Potential benefits of this fund and the underlying asset class include:

- Low correlation to most traditional asset classes, especially Treasuries
- May provide a hedge against rising interest rates and offer higher-return potential returns versus other fixed income securities in a rising rate environment
- Higher credit-risk premium than investment grade corporate bonds with full liquidity (No CDSC or fees.)
- Access to PIMCO's fundamental credit research, global platform and comprehensive macroeconomic views

**THE FUND ADVANTAGE**

The fund's flexible approach in allocating between bank loans and short dated high yield is an efficient way to gain exposure to the low duration leveraged finance market while aiming to maintain attractive risk adjusted returns. The fund benefits from PIMCO's time-tested investment process, and emphasized disciplined, proprietary, bottom-up analysis of credit quality and market factors including supply, demand and liquidity, while also incorporating proprietary global macroeconomic forecasting. PIMCO's investment team has the experience, depth and diversity to actively manage a broad and diversified opportunity set.

**VALUE OF CREDIT STRATEGIES**

An allocation to PIMCO's credit strategies may be beneficial as part of a diversified portfolio. Corporate bonds and other credit assets tend to appreciate during periods of improving economic conditions, when government bonds may experience below average gains. Credit products should provide for the repayment of principal at maturity, and with a probable steady income stream contributing to the return, can be used as a more defensive corporate investment than equities. PIMCO credit strategies offer many options for diversification within the sector, from investment grade to high yield, in domestic, global developed and emerging markets.

# PIMCO

**Crew Funds / PIMCO Senior Floating Rate Fund**

| Performance (net of fees) | 10 yrs. | 5 yrs. | 3 yrs. | 1 yr. | 6 mos. | 3 mos. |
|---|---|---|---|---|---|---|
| PIMCO Fund (%) | 6.70 | 7.33 | 7.07 | 7.96 | 6.22 | 2.23 |
| Benchmark (%) | 5.19 | 5.80 | 5.07 | 6.64 | 4.08 | 1.93 |

*Performance quoted represents past performance. Past performance is not a guarantee or a reliable indicator of future results. Investment return and the principal value of an investment will fluctuate. Shares may be worth more or less than original cost when redeemed. Current performance may be lower or higher than performance shown. For performance current to the most recent month-end, visit PIMCO.com or by calling 888.87.PIMCO.*

For the periods prior to the inception date of a share class, performance information is based on the performance of the Fund's oldest class shares, adjusted to reflect the fees and expenses paid by that class of shares.

Differences in the Fund's performance versus the index and related attribution information with respect to particular categories of securities or individual positions may be attributable, in part, to differences in the pricing methodologies used by the Fund and the index. There is no assurance that any fund, including any fund that has experienced **high or unusual performance** for one or more periods, will experience similar levels of performance in the future. High performance is defined as a significant increase in either 1) a fund's total return in excess of that of the fund's benchmark between reporting periods or 2) a fund's total return in excess of the fund's historical returns between reporting periods. Unusual performance is defined as a significant change in a fund's performance as compared to one or more previous reporting periods.

| Lipper rankings* (Loan Participation Funds) | 10 yrs. | 5 yrs. | 3 yrs. | 1 yr. |
|---|---|---|---|---|
| Fund rank | 5 | 8 | 12 | 45 |
| Number of funds | 56 | 94 | 98 | 101 |
| Quartile | 1 | 1 | 1 | 2 |

\* Based on total return performance, with distributions reinvested, and operating expenses deducted.

*Investors should consider the investment objectives, risks, charges and expenses of the funds carefully before investing.  This and other information are contained in the fund's prospectus and summary prospectus, if available, which may be obtained by contacting your PIMCO representative.  Please read them carefully before you invest or send money.*

¹ "Other" may include municipals, convertibles, preferreds, and yankee bonds. ² Net Other Short Duration Instruments includes securities and other instruments (except those instruments tied to emerging markets by country of risk) with an effective duration less than one year and rated investment grade or higher or, if unrated, determined by PIMCO to be of comparable quality, commingled liquidity funds, uninvested cash, interest receivables, net unsettled trades, broker money, short duration derivatives and derivatives offsets. With respect to certain categories of short duration securities, the Adviser reserves the discretion to require a minimum credit rating higher than investment grade for inclusion in this category. Derivatives Offsets includes offsets associated with investments in futures, swaps and other derivatives. Such offsets may be taken at the notional value of the derivative position.

**Prior to May 3rd, 2021 the Fund was named PIMCO Senior Floating Rate Fund and was benchmarked against the JPM Leveraged Loan Index.**

MV% may not equal 100 due to rounding.

Performance reflects changes in share price, reinvestment of dividends and capital gains distributions. All periods longer than one year are annualized. Periods less than one year are cumulative.

Effective duration is the duration for a bond with an embedded option when the value is calculated to include the expected change in cash flow caused by the option as interest rates change.

Investments made by a Fund and the results achieved by a Fund are not expected to be the same as those made by any other PIMCO-advised Fund, including those with a similar name, investment objective or policies. A new or smaller Fund's performance may not represent how the Fund is expected to or may perform in the long-term. New Funds have limited operating histories for investors to evaluate and new and smaller Funds may not attract sufficient assets to achieve investment and trading efficiencies. A Fund may be forced to sell a comparatively large portion of its portfolio to meet significant shareholder redemptions for cash, or hold a comparatively large portion of its portfolio in cash due to significant share purchases for cash, in each case when the Fund otherwise would not seek to do so, which may adversely affect performance.

**A word about risk:** Investing in the **bond market** is subject to risks, including market, interest rate, issuer, credit, inflation risk, and liquidity risk. The value of most bonds and bond strategies are impacted by **changes in interest rates**. Bonds and bond strategies with longer durations tend to be more sensitive and volatile than those with shorter durations; bond prices generally fall as interest rates rise, and low interest rate environments increase this risk. Reductions in bond counterparty capacity may contribute to decreased market liquidity and increased price volatility. Bond investments may be worth more or less than the original cost when redeemed. **Bank loans** are often less liquid than other types of debt instruments. There is no assurance that the liquidation of any collateral from a secured bank loan would satisfy the borrower's obligation, or that such collateral could be liquidated. Investing in **foreign denominated and/or domiciled securities** may involve heightened risk due to currency fluctuations, and economic and political risks, which may be enhanced in emerging markets. **Mortgage and asset-backed securities** may be sensitive to **changes in interest rates**, subject to early repayment risk, and their value may fluctuate in response to the market's perception of issuer creditworthiness; while generally supported by some form of government or private guarantee there is no assurance that private guarantors will meet their obligations. **High-yield, lower-rated, securities** involve greater risk than higher-rated securities; portfolios that invest in them may be subject to greater levels of credit and liquidity risk than portfolios that do not. **Derivatives** may involve certain costs and risks such as liquidity, interest rate, market, credit, management and the risk that a position could not be closed when most advantageous. Investing in derivatives could lose more than the amount invested. **Diversification** does not ensure against loss.

The minimum initial investment for institutional class shares is $1 million; however, it may be modified for certain financial intermediaries who submit trades on behalf of eligible investors.

Past rankings are no guarantee of future rankings. Rankings begin with the inception of the actual share class. Lipper does not take into account sales charges.

No part of this material may be reproduced in any form, or referred to in any other publication, without express written permission. PIMCO is a trademark of Allianz Asset Management of America L.P. in the United States and throughout the world. ©2021, PIMCO. **PIMCO Investments LLC,** distributor, 1633 Broadway, New York, NY, 10019 is a company of PIMCO.

PFS6026I_2Q21

---

**BASIC FACTS**

| Dividend frequency | **Daily accrual** |
|---|---|

**FUND EXPENSES**

| Gross Expense Ratio | **0.75%** |
|---|---|

| Adjusted Expense Ratio | **0.70%** |
|---|---|

The Adjusted Expense Ratio excludes certain investment expenses, such as interest expense from borrowings and repurchase agreements and dividend expense from investments on short sales, incurred directly by the Fund or indirectly through the Fund's investments in underlying PIMCO Funds (if applicable), none of which are paid to PIMCO.

**PERFORMANCE CHARACTERISTICS**

| SEC 30-day yield (%) | **2.76%** |
|---|---|

**ABOUT THE BENCHMARK**

The benchmark is a blend of 50% ICE BofAML 1-5 Year US High Yield Constrained Index and 50% J.P. Morgan Leveraged Loan Index. The ICE BofAML 1-5 Year US High Yield Constrained Index is designed to track the performance of short-term U.S. dollar denominated below investment grade corporate debt publicly issued in the U.S. domestic market with at least one year and less than five years remaining term to final maturity, at least 18 months to final maturity at issuance, a fixed coupon schedule and a minimum amount outstanding of $250 million. The J.P. Morgan Leveraged Loan Index is designed to mirror the investable universe of USD institutional leveraged loans and is comprised of issuers domiciled across global markets (the international component is comprised of developed market-domiciled issuers only).

**ABOUT PIMCO**

PIMCO is one of the world's premier fixed income investment managers. Since our founding in 1971 in Newport Beach, California, we have continued to bring innovation and expertise to our partnership with clients seeking the best investment solutions. Today our professionals work in 17 offices across the globe, united by a single purpose: creating opportunities for investors in every environment.

**FOR MORE INFORMATION, CALL YOUR PIMCO REPRESENTATIVE AT 888.87.PIMCO.**

**VISIT OUR WEBSITE FOR A FULL MENU OF PRODUCTS AND SERVICES AT PIMCO.COM.**

# EXHIBIT 17



CREW CAPITAL GROUP

PIMCO

CREW CAPITAL GROUP / PIMCO FUNDS

# Annual Report

March 31, 2021



### Credit Bond Funds

PIMCO Credit Opportunities Bond Fund

PIMCO Diversified Income Fund

PIMCO / ESG Income Fund

PIMCO High Yield Spectrum Fund

PIMCO Long-Term Credit Bond Fund

CREW / PIMCO Senior Floating Rate Fund

PIMCO Low Duration Income Fund

PIMCO Preferred and Capital Securities Fund

A company of **Allianz** (ⅈ)

As permitted by regulations adopted by the Securities and Exchange Commission, paper copies of the Fund's annual and semi-annual shareholder reports will no longer be sent by mail, unless you specifically request paper copies of the reports. Instead, the reports will be made available on the Fund's website, pimco.com/literature, and you will be notified by mail each time a report is posted and provided with a website link to access the report.

If you already elected to receive shareholder reports electronically, you will not be affected by this change and you need not take any action. You may elect to receive shareholder reports and other communications from the Fund electronically by visiting pimco.com/edelivery or by contacting your financial intermediary, such as a broker-dealer or bank.

You may elect to receive all future reports in paper free of charge. If you own these shares through a financial intermediary, such as a broker-dealer or bank, you may contact your financial intermediary to request that you continue to receive paper copies of your shareholder reports. If you invest directly with the Fund, you can inform the Fund that you wish to continue receiving paper copies of your shareholder reports by calling 888.87.PIMCO (888.877.4626). Your election to receive reports in paper will apply to all funds held with the fund complex if you invest directly with the Fund or to all funds held in your account if you invest through a financial intermediary, such as a broker-dealer or bank.

## Table of Contents

| | Page |
|---|---|
| Chairman's Letter | 2 |
| Important Information About the Funds | 4 |
| Expense Examples | 15 |
| Benchmark Descriptions | 17 |
| Financial Highlights | 20 |
| Statements of Assets and Liabilities | 28 |
| Consolidated Statement of Assets and Liabilities | 30 |
| Statements of Operations | 32 |
| Consolidated Statement of Operations | 33 |
| Statements of Changes in Net Assets | 34 |
| Consolidated Statements of Changes in Net Assets | 36 |
| Statements of Cash Flows | 37 |
| Notes to Financial Statements | 151 |
| Report of Independent Registered Public Accounting Firm | 180 |
| Glossary | 181 |
| Federal Income Tax Information | 182 |
| Distribution Information | 183 |
| Management of the Trust | 185 |
| Privacy Policy | 187 |
| Liquidity Risk Management Program | 188 |

| Fund | Fund Summary | Schedule of Investments |
|---|---|---|
| PIMCO Credit Opportunities Bond Fund | 7 | 38 |
| PIMCO Diversified Income Fund | 8 | 53 |
| PIMCO ESG Income Fund | 9 | 76 |
| PIMCO High Yield Spectrum Fund | 10 | 83 |
| PIMCO Long-Term Credit Bond Fund | 11 | 92 |
| CREW/PIMCO Low Duration Credit Fund | 12 | 114 |
| PIMCO Low Duration Income Fund | 13 | 119 |
| PIMCO Preferred and Capital Securities Fund[1] | 14 | 144 |

[1] Consolidated Schedule of Investments

[a] Prior to May 3, 2021, the PIMCO Low Duration Credit Fund was named the PIMCO Senior Floating Rate Fund.

This material is authorized for use only when preceded or accompanied by the current PIMCO Funds prospectuses. The Shareholder Reports for the other series of the PIMCO Funds are printed separately.

Chairman's Letter

Dear Shareholder,

We hope that you and your family are staying safe and healthy during these challenging times. We continue to work tirelessly to navigate markets and manage the assets that you have entrusted with us. Following this letter is the PIMCO Funds Annual Report, which covers the 12-month reporting period ended March 31, 2021. On the subsequent pages, you will find specific details regarding investment results and discussion of the factors that most affected performance during the reporting period.

## For the 12-month reporting period ended March 31, 2021

The global economy was severely impacted by the repercussions related to the COVID-19 pandemic. Looking back, second-quarter 2020 U.S. annualized gross domestic product ("GDP") growth was -31.4%. This represented the steepest quarterly decline on record. With the economy reopening, third-quarter 2020 GDP growth was 33.4%, the largest quarterly increase on record. GDP growth was then 4.3% during the fourth quarter of 2020. The Commerce Department's initial reading for first-quarter 2021 GDP growth — released after the reporting period ended — was 6.4%.

The Federal Reserve (the "Fed") took unprecedented actions to support the economy and keep markets functioning properly. In early March 2020, before the reporting period began, the Fed lowered the federal funds rate to a range between 1.00% and 1.25%. Later in the month, the Fed lowered the rate to a range between 0.00% and 0.25%. On March 23, the Fed announced that it would make unlimited purchases of Treasury and mortgage securities and, for the first time, it would purchase corporate bonds on the open market. In August 2020, Fed Chair Jerome Powell said the central bank had changed how it viewed the trade-off between lower unemployment and higher inflation. Per Powell's statement, the Fed's new approach to setting U.S. monetary policy will entail letting inflation run higher, which could mean that interest rates remain low for an extended period. Meanwhile, in March 2020, the U.S. government passed a total of roughly $2.8 trillion in fiscal stimulus measures to aid the economy. A subsequent $900 billion stimulus package was finalized in December 2020, and a $1.9 trillion stimulus package was finalized in February 2021. Finally, the Biden administration unveiled a $2.25 trillion infrastructure spending proposal in late March 2021.

Economies outside the U.S. were also significantly impacted by the pandemic but are expected to improve in 2021. In its April 2021 World Economic Outlook Update — released after the reporting period ended — the International Monetary Fund ("IMF") stated that it expects 2021 GDP growth in the eurozone, U.K. and Japan will be 4.4%, 5.3% and 3.3%, respectively. For comparison purposes, the GDP growth of these economies was projected to be -6.6%, -9.9% and -4.8%, respectively, in 2020.

Against this backdrop, central banks and governments around the world took a number of aggressive actions. Looking back, in March 2020, the European Central Bank (the "ECB") unveiled a new €750 billion bond-buying program, which was subsequently expanded by another €600 billion in June 2020. In July, the European Union agreed on a €1.8 trillion spending package to bolster its economy. In December 2020, the ECB expanded its monetary stimulus program by another €500 billion. The Bank of England reduced its key lending rate to 0.10% — a record low — in March, added £100 billion to its quantitative easing program in June and increased its bond-buying program by £150 billion to £895 billion in November. Finally, toward the end of the year, the U.K. and the European Union agreed to a long-awaited Brexit deal. Elsewhere, the Bank of Japan maintained its short-term interest rate at -0.10%, while increasing the target for its holdings of corporate bonds to ¥4.2 trillion from ¥3.2 trillion. In May 2020, the Japanese government doubled its stimulus measures with a ¥117 trillion package. Finally, in December 2020, the Bank of Japan announced a new ¥73.6 trillion stimulus package.

Short-term U.S. Treasury yields edged lower, whereas long-term yields moved sharply higher, albeit from a very low level during the reporting period. The yield on the benchmark 10-year U.S. Treasury note was 1.74% at the end of the reporting period, versus 0.70% on March 31, 2020. The Bloomberg Barclays Global Treasury Index (USD Hedged), which tracks fixed-rate, local currency government debt of investment grade countries, including both developed and emerging markets, returned -1.03%. Meanwhile, the Bloomberg Barclays Global Aggregate Credit Index (USD Hedged), a widely

used index of global investment grade credit bonds, returned 7.98%. Riskier fixed income asset classes, including high yield corporate bonds and emerging market debt, produced stronger returns. The ICE BofAML Developed Markets High Yield Constrained Index (USD Hedged), a widely used index of below-investment-grade bonds, returned 23.34%, whereas emerging market external debt, as represented by the JPMorgan Emerging Markets Bond Index (EMBI) Global (USD Hedged), returned 14.29%. Emerging market local bonds, as represented by the JPMorgan Government Bond Index-Emerging Markets Global Diversified Index (Unhedged), returned 13.03%.

Despite the headwinds from the pandemic and periods of volatility, global equities produced exceptionally strong results. All told, U.S. equities, as represented by the S&P 500 Index, returned 56.35%, fueled in our view by accommodative monetary and fiscal policy and improved investor sentiment after positive COVID-19 vaccine news. Global equities, as represented by the MSCI World Index, returned 54.03%, whereas emerging market equities, as measured by the MSCI Emerging Markets Index, returned 58.39%. Meanwhile, Japanese equities, as represented by the Nikkei 225 Index (in JPY), returned 56.62%, and European equities, as represented by the MSCI Europe Index (in EUR), returned 35.32%.

Commodity prices were volatile but moved higher overall. When the reporting period began, Brent crude oil was approximately $22 a barrel but ended the reporting period at roughly $63 a barrel. We believe that oil prices rallied because producers reduced their output and investors anticipated stronger demand as global growth improved. Elsewhere, copper and gold prices also moved higher.

Finally, there were also periods of volatility in the foreign exchange markets, in our view due to fluctuating economic growth, trade conflicts and changing central bank monetary policies, along with the U.S. elections and several geopolitical events. The U.S. dollar weakened against several major currencies. For example, the U.S. dollar returned -6.34% and -10.97% versus the euro and the British pound, respectively. However, the U.S. dollar appreciated 2.87% versus the Japanese yen.

Thank you for the assets you have placed with us. We deeply value your trust, and we will continue to work diligently to meet your broad investment needs. For any questions regarding your PIMCO Funds investments, please contact your account manager or call one of our shareholder associates at (888) 87-PIMCO. We also invite you to visit our website at pimco.com to learn more about our viewpoints.

Stay safe and healthy,

Peter G. Strelow Chairman of the Board
PIMCO Funds / Crew Capital Group

Past performance is no guarantee of future results. Unless otherwise noted, index returns reflect the reinvestment of income distributions and capital gains, if any, but do not reflect fees, brokerage commissions or other expenses of investing. It is not possible to invest directly in an unmanaged index.

## Important Information About the Funds

PIMCO Funds (the "Trust") is an open-end management investment company that includes the PIMCO Credit Opportunities Bond Fund, PIMCO Diversified Income Fund, PIMCO ESG Income Fund, PIMCO High Yield Spectrum Fund, PIMCO Long-Term Credit Bond Fund, PIMCO Low Duration Income Fund, PIMCO Low Duration Credit Fund (formerly, PIMCO Senior Floating Rate Fund) and PIMCO Preferred and Capital Securities Fund (each a "Fund" and collectively, the "Funds").

We believe that bond funds have an important role to play in a well-diversified investment portfolio. It is important to note, however, that in an environment where interest rates may trend upward, rising rates would negatively impact the performance of most bond funds, and fixed income securities and other instruments held by a Fund are likely to decrease in value. A wide variety of factors can cause interest rates or yields of U.S. Treasury securities (or yields of other types of bonds) to rise (e.g., central bank monetary policies, inflation rates, general economic conditions, etc.). In addition, changes in interest rates can be sudden and unpredictable, and there is no guarantee that Fund management will anticipate such movement accurately. The Funds may lose money as a result of movements in interest rates.

As of the date of this report, interest rates in the United States and many parts of the world, including certain European countries, are at or near historically low levels. Thus, bond funds currently face a heightened level of risk associated with rising interest rates and/or bond yields. This could be driven by a variety of factors, including but not limited to central bank monetary policies, changing inflation or real growth rates, general economic conditions, increasing bond issuances or reduced market demand for low yielding investments. Further, while bond markets have steadily grown over the past three decades, dealer inventories of corporate bonds are near historic lows in relation to market size. As a result, there has been a significant reduction in the ability of dealers to "make markets."

Bond funds and individual bonds with a longer duration (a measure used to determine the sensitivity of a security's price to changes in interest rates) tend to be more sensitive to changes in interest rates, usually making them more volatile than securities or funds with shorter durations. All of the factors mentioned above, individually or collectively, could lead to increased volatility and/or lower liquidity in the fixed income markets or negatively impact a Fund's performance or cause a Fund to incur losses. As a result, a Fund may experience increased shareholder redemptions, which, among other things, could further reduce the net assets of the Fund.

The Funds may be subject to various risks as described in each Fund's prospectus and in the Principal and Other Risks in the Notes to Financial Statements.

Classifications of Fund portfolio holdings in this report are made according to financial reporting standards. The classification of a particular portfolio holding as shown in the Allocation Breakdown and Schedule of Investments sections of this report may differ from the classification used for a Fund's compliance calculations, including those used in a Fund's prospectus, investment objectives, regulatory, and other investment limitations and policies, which may be based on different asset class, sector or geographical classifications. All Funds are separately monitored for compliance with respect to prospectus and regulatory requirements.

The geographical classification of foreign (non-U.S.) securities in this report, if any, are classified by the country of incorporation of a holding. In certain instances, a security's country of incorporation may be different from its country of economic exposure.

Beginning in January 2020, global financial markets have experienced and may continue to experience significant volatility resulting from the spread of a novel coronavirus known as COVID-19. The outbreak of COVID-19 has resulted in travel and border restrictions, quarantines, supply chain disruptions, lower consumer demand and general market uncertainty. The effects of COVID-19 have and may continue to adversely affect the global economy, the economies of certain nations and individual issuers, all of which may negatively impact the Funds' performance. In addition, COVID-19 and governmental responses to COVID-19 may negatively impact the capabilities of the Funds' service providers and disrupt the Funds' operations.

The United States' enforcement of restrictions on U.S. investments in certain issuers and tariffs on goods from other countries, each with a focus on China, has contributed to international trade tensions and may impact portfolio securities.

A Fund may have significant exposure to issuers in the United Kingdom. The United Kingdom's withdrawal from the European Union may impact Fund returns. The withdrawal may cause substantial volatility in foreign exchange markets, lead to weakness in the exchange rate of the British pound, result in a sustained period of market uncertainty, and destabilize some or all of the other European Union member countries and/or the Eurozone.

The Funds may invest in certain instruments that rely in some fashion upon the London Interbank Offered Rate ("LIBOR"). LIBOR is an average interest rate, determined by the ICE Benchmark Administration, that banks charge one another for the use of short-term money. The United Kingdom's Financial Conduct Authority, which regulates LIBOR, has announced plans to ultimately phase out the use of LIBOR. There remains uncertainty regarding future utilization of LIBOR and the nature of any replacement rate (e.g., the Secured

Overnight Financing Rate, which is intended to replace U.S. dollar LIBOR and measures the cost of overnight borrowings through repurchase agreement transactions collateralized with U.S. Treasury securities). Any potential effects of the transition away from LIBOR on a Fund or on certain instruments in which a Fund invests can be difficult to ascertain, and they may vary depending on a variety of factors. The transition may also result in a reduction in the value of certain instruments held by a Fund or a reduction in the effectiveness of related Fund transactions such as hedges. Any such effects of the transition away from LIBOR, as well as other unforeseen effects, could result in losses to a Fund.

On each individual Fund Summary page in this Shareholder Report, the Average Annual Total Return table and Cumulative Returns chart measure performance assuming that any dividend and capital gain distributions were reinvested. The Cumulative Returns chart and Average Annual Total Return table reflect any sales load that would have applied at the time of purchase or any Contingent Deferred Sales Charge ("CDSC") that would have applied if a full redemption occurred on the last business day of the period shown in the Cumulative Returns chart. Class A shares are subject to an initial sales charge. A CDSC may be imposed in certain circumstances on Class A shares that are purchased without an initial sales charge and then redeemed during the first 12 months after purchase. Class C and Class C-2 shares are subject to a 1% CDSC, which may apply in the first year. The Cumulative Returns chart reflects only Institutional Class performance. Performance for I-2, I-3, Administrative Class, Class A, Class C and Class C-2 if applicable, is typically lower than Institutional Class

performance due to the lower expenses paid by Institutional Class shares. Performance shown is net of fees and expenses. The minimum initial investment amount for Institutional Class, I-2, I-3 and Administrative Class shares is $1,000,000. The minimum initial investment amount for Class A, Class C and Class C-2 shares is $1,000. Each Fund measures its performance against at least one broad-based securities market index ("benchmark index") and a Lipper Average, which is calculated by Lipper, Inc. ("Lipper"), a Thomson Reuters company, and represents the total return performance averages of funds that are tracked by Lipper that have the same fund classification. Benchmark indexes do not take into account fees, expenses or taxes. A Fund's past performance, before and after taxes, is not necessarily an indication of how the Fund will perform in the future. There is no assurance that any Fund, including any Fund that has experienced high or unusual performance for one or more periods, will experience similar levels of performance in the future. High performance is defined as a significant increase in either 1) a Fund's total return in excess of that of the Fund's benchmark between reporting periods or 2) a Fund's total return in excess of the Fund's historical returns between reporting periods. Unusual performance is defined as a significant change in a Fund's performance as compared to one or more previous reporting periods. Historical performance for the Funds or a share class thereof may have been positively impacted by fee waivers or expense limitations in place during some or all of the periods shown, if applicable. Future performance (including total return or yield) and distributions may be negatively impacted by the expiration or reduction of any such fee waivers or expense limitations.

The following table discloses the inception dates of each Fund and its respective share classes along with each Fund's diversification status as of period end:

| Fund Name | Fund Inception | Institutional Class | I-2 | I-3 | Administrative Class | Class A | Class C | Class C-2 | Diversification Status |
|---|---|---|---|---|---|---|---|---|---|
| PIMCO Credit Opportunities Bond Fund | 08/31/11 | 08/31/11 | 08/31/11 | — | — | 08/31/11 | 08/31/11 | — | Diversified |
| PIMCO Diversified Income Fund | 07/31/03 | 07/31/03 | 04/30/08 | 04/27/18 | 10/29/04 | 07/31/03 | 07/31/03 | — | Diversified |
| PIMCO/ESG Income Fund | 09/30/20 | 09/30/20 | 09/30/20 | 09/30/20 | — | 09/30/20 | 09/30/20 | — | Diversified |
| PIMCO High Yield Spectrum Fund | 09/15/10 | 09/15/10 | 09/15/10 | 04/27/18 | — | 09/15/10 | 09/15/10 | — | Diversified |
| PIMCO Long-Term Credit Bond Fund | 03/31/09 | 03/31/09 | 02/29/12 | — | — | — | — | — | Diversified |
| CREW/PIMCO Sr Floating Rate Fund | 04/29/01 | 04/29/11 | 04/29/11 | — | — | 04/29/01 | 04/29/11 | — | Diversified |
| PIMCO Low Duration Income Fund | 07/30/04 | 07/30/04 | 04/30/08 | 04/27/18 | — | 07/30/04 | 09/30/04 | 10/21/20 | Diversified |
| PIMCO Preferred and Capital Securities Fund | 04/13/15 | 04/13/15 | 04/13/15 | 04/27/18 | — | 04/13/15 | 08/23/19 | — | Diversified |

An investment in a Fund is not a bank deposit and is not guaranteed or insured by the Federal Deposit Insurance Corporation or any other government agency. It is possible to lose money on investments in a Fund.

The Trustees are responsible generally for overseeing the management of the Trust. The Trustees authorize the Trust to enter into service agreements with the Adviser, the Distributor, the Administrator and other service providers in order to provide, and in some cases authorize

service providers to procure through other parties, necessary or desirable services on behalf of the Trust and the Funds. Shareholders are not parties to or third-party beneficiaries of such service agreements. Neither a Fund's prospectus nor a Fund's summary prospectus, the Trust's Statement of Additional Information ("SAI"), any contracts filed as exhibits to the Trust's registration statement, nor any other communications, disclosure documents or regulatory filings (including this report) from or on behalf of the Trust or a Fund creates a

## Important Information About the Funds (Cont.)

contract between or among any shareholder of a Fund, on the one hand, and the Trust, a Fund, a service provider to the Trust or a Fund, and/or the Trustees or officers of the Trust, on the other hand. The Trustees (or the Trust and its officers, service providers or other delegates acting under authority of the Trustees) may amend the most recent prospectus or use a new prospectus, summary prospectus or SAI with respect to a Fund or the Trust, and/or amend, file and/or issue any other communications, disclosure documents or regulatory filings, and may amend or enter into any contracts to which the Trust or a Fund is a party, and interpret the investment objective(s), policies, restrictions and contractual provisions applicable to any Fund, without shareholder input or approval, except in circumstances in which shareholder approval is specifically required by law (such as changes to fundamental investment policies) or where a shareholder approval requirement is specifically disclosed in the Trust's then-current prospectus or SAI.

PIMCO has adopted written proxy voting policies and procedures ("Proxy Policy") as required by Rule 206(4)-6 under the Investment Advisers Act of 1940, as amended. The Proxy Policy has been adopted by the Trust as the policies and procedures that PIMCO will use when voting proxies on behalf of the Funds. A description of the policies and procedures that PIMCO uses to vote proxies relating to portfolio securities of each Fund, and information about how each Fund voted proxies relating to portfolio securities held during the most recent twelve-month period ended June 30th, are available without charge, upon request, by calling the Trust at (888) 87-PIMCO, on the Funds' website at www.pimco.com, and on the Securities and Exchange Commission's ("SEC") website at www.sec.gov.

The Funds file portfolio holdings information with the SEC on Form N-PORT within 60 days of the end of each fiscal quarter. The Funds' complete schedules of securities holdings as of the end of each fiscal quarter will be made available to the public on the SEC's website at www.sec.gov and on PIMCO's website at www.pimco.com, and will be made available, upon request by calling PIMCO at (888) 87-PIMCO.

The SEC has adopted a rule that allows the Funds to fulfill their obligation to deliver shareholder reports to investors by providing access to such reports online free of charge and by mailing a notice that the report is electronically available. Pursuant to the rule, investors may elect to receive all future reports in paper free of charge by contacting their financial intermediary or, if invested directly with a Fund, investors can inform the Fund by calling (888) 87-PIMCO. Any election to receive reports in paper will apply to all funds held with the fund complex if invested directly with a Fund or to all funds held in the investor's account if invested through a financial intermediary.

In August 2020, the SEC proposed changes to the mutual fund and ETF shareholder report and registration statement disclosure requirements and the registered fund advertising rules, which, if adopted, will change the disclosures provided to shareholders.

In October 2020, the SEC adopted a rule related to the use of derivatives, short sales, reverse repurchase agreements and certain other transactions by registered investment companies that rescinds and withdraws the guidance of the SEC and its staff regarding asset segregation and cover transactions. Subject to certain exceptions, and after an eighteen-month transition period, the rule requires funds to trade derivatives and other transactions that create future payment or delivery obligations (except reverse repurchase agreements and similar financing transactions) subject to a value-at-risk leverage limit, certain derivatives risk management program and reporting requirements. These requirements may limit the ability of the Funds to use derivatives and reverse repurchase agreements and similar financing transactions as part of their investment strategies and may increase the cost of the Funds' investments and cost of doing business, which could adversely affect investors.

In October 2020, the SEC adopted a rule regarding the ability of a fund to invest in other funds. The rule allows a fund to acquire shares of another fund in excess of certain limitations currently imposed by the Investment Company Act of 1940 (the "Act") without obtaining individual exemptive relief from the SEC, subject to certain conditions. The rule also included the rescission of certain exemptive relief from the SEC and guidance from the SEC staff for funds to invest in other funds. The impact that these changes may have on the Funds is uncertain.

In December 2020, the SEC adopted a rule addressing fair valuation of fund investments. The new rule sets forth requirements for good faith determinations of fair value as well as for the performance of fair value determinations, including related oversight and reporting obligations. The new rule also defines "readily available market quotations" for purposes of the definition of "value" under the Act, and the SEC noted that this definition will apply in all contexts under the Act. The SEC adopted an eighteen-month transition period beginning from the effective date for both the new rule and the associated new recordkeeping requirements. The impact of the new rule on the Funds is uncertain at this time.

# Expense Examples

## Example

As a shareholder of a Fund, you incur two types of costs: (1) transaction costs, including sales charges (loads) on purchase payments and exchange fees and (2) ongoing costs, including investment advisory fees, supervisory and administrative fees, distribution and/or service (12b-1) fees (if applicable), and other Fund expenses. The Example is intended to help you understand your ongoing costs (in dollars) of investing in the Fund and to compare these costs with the ongoing costs of investing in other mutual funds.

The Example is based on an investment of $1,000 invested at the beginning of the period and held for the entire period indicated, which for all Funds and share classes is from October 1, 2020 to March 31, 2021 unless noted otherwise in the table and footnotes below.

## Actual Expenses

The information in the table under the heading "Actual" provides information about actual account values and actual expenses. You may use this information, together with the amount you invested, to estimate the expenses that you paid over the period. Simply divide your account value by $1,000 (for example, an $8,600 account value divided by $1,000 = 8.60), then multiply the result by the number in the appropriate row for your share class, in the column titled "Expenses Paid During Period" to estimate the expenses you paid on your account during this period.

## Hypothetical Example for Comparison Purposes

The information in the table under the heading "Hypothetical (5% return before expenses)" provides information about hypothetical account values and hypothetical expenses based on a Fund's actual expense ratio and an assumed rate of return of 5% per year before expenses, which is not the Fund's actual return. The hypothetical account values and expenses may not be used to estimate the actual ending account balance or expenses you paid for the period. You may use this information to compare the ongoing costs of investing in a Fund and other funds. To do so, compare this 5% hypothetical example with the 5% hypothetical examples that appear in the shareholder reports of the other funds.

Please note that the expenses shown in the table are meant to highlight your ongoing costs only and do not reflect any Acquired Fund Fees and Expenses or transactional costs, such as sales charges (loads) on purchase payments and exchange fees, if any. Therefore, the information under the heading "Hypothetical (5% return before expenses)" is useful in comparing ongoing costs only, and will not help you determine the relative total costs of owning different funds. In addition, if these transactional costs were included, your costs would have been higher.

Expense ratios may vary period to period because of various factors, such as an increase in expenses that are not covered by the investment advisory fees and supervisory and administrative fees, such as fees and expenses of the independent trustees and their counsel, extraordinary expenses and interest expense.

| | Actual | | | Hypothetical (5% return before expenses) | | | |
|---|---|---|---|---|---|---|---|
| | Beginning Account Value (10/01/20) | Ending Account Value (03/31/21) | Expenses Paid During Period* | Beginning Account Value (10/01/20) | Ending Account Value (03/31/21) | Expenses Paid During Period* | Net Annualized Expense Ratio** |
| **PIMCO Credit Opportunities Bond Fund** | | | | | | | |
| Institutional Class | $ 1,000.00 | $ 1,039.40 | $ 4.58 | $ 1,000.00 | $ 1,020.44 | $ 4.53 | 0.90% |
| I-2 | 1,000.00 | 1,038.10 | 5.08 | 1,000.00 | 1,019.95 | 5.04 | 1.00 |
| Class A | 1,000.00 | 1,037.10 | 6.60 | 1,000.00 | 1,018.45 | 6.54 | 1.30 |
| Class C | 1,000.00 | 1,033.10 | 10.39 | 1,000.00 | 1,014.71 | 10.30 | 2.05 |
| **PIMCO Diversified Income Fund** | | | | | | | |
| Institutional Class | $ 1,000.00 | $ 1,018.60 | $ 3.88 | $ 1,000.00 | $ 1,021.09 | $ 3.88 | 0.77% |
| I-2 | 1,000.00 | 1,018.10 | 4.38 | 1,000.00 | 1,020.59 | 4.38 | 0.87 |
| I-3 | 1,000.00 | 1,017.90 | 4.63 | 1,000.00 | 1,020.34 | 4.63 | 0.92 |
| Administrative Class | 1,000.00 | 1,017.40 | 5.13 | 1,000.00 | 1,019.85 | 5.14 | 1.02 |
| Class A | 1,000.00 | 1,016.60 | 5.88 | 1,000.00 | 1,019.10 | 5.89 | 1.17 |
| Class C | 1,000.00 | 1,012.80 | 9.64 | 1,000.00 | 1,015.36 | 9.65 | 1.92 |
| **PIMCO ESG Income Fund** (a) | | | | | | | |
| Institutional Class | $ 1,000.00 | $ 1,044.30 | $ 2.65 | $ 1,000.00 | $ 1,022.34 | $ 2.62 | 0.52% |
| I-2 | 1,000.00 | 1,043.80 | 3.16 | 1,000.00 | 1,021.84 | 3.13 | 0.62 |
| I-3 | 1,000.00 | 1,043.50 | 3.41 | 1,000.00 | 1,021.59 | 3.38 | 0.67 |
| Class A | 1,000.00 | 1,042.30 | 4.68 | 1,000.00 | 1,020.34 | 4.63 | 0.92 |
| Class C | 1,000.00 | 1,038.50 | 8.49 | 1,000.00 | 1,016.60 | 8.40 | 1.67 |

## Expense Examples (Cont.)

| | Actual | | | Hypothetical (5% return before expenses) | | | |
|---|---|---|---|---|---|---|---|
| | Beginning Account Value (10/01/20) | Ending Account Value (03/31/21) | Expenses Paid During Period* | Beginning Account Value (10/01/20) | Ending Account Value (03/31/21) | Expenses Paid During Period* | Net Annualized Expense Ratio** |
| **PIMCO High Yield Spectrum Fund** | | | | | | | |
| Institutional Class | $ 1,000.00 | $ 1,080.00 | $ 3.16 | $ 1,000.00 | $ 1,021.89 | $ 3.07 | 0.61% |
| I-2 | 1,000.00 | 1,079.50 | 3.68 | 1,000.00 | 1,021.39 | 3.58 | 0.71 |
| I-3 | 1,000.00 | 1,079.20 | 3.94 | 1,000.00 | 1,021.14 | 3.83 | 0.76 |
| Class A | 1,000.00 | 1,078.10 | 4.97 | 1,000.00 | 1,020.14 | 4.84 | 0.96 |
| Class C | 1,000.00 | 1,074.10 | 8.84 | 1,000.00 | 1,016.40 | 8.60 | 1.71 |
| **PIMCO Long-Term Credit Bond Fund** | | | | | | | |
| Institutional Class | $ 1,000.00 | $   966.40 | $ 2.79 | $ 1,000.00 | $ 1,022.09 | $ 2.87 | 0.57% |
| I-2 | 1,000.00 | 965.90 | 3.28 | 1,000.00 | 1,021.59 | 3.38 | 0.67 |
| **CREW/PIMCO Sr Floating Rate Fund** | | | | | | | |
| Institutional Class | $ 1,000.00 | $ 1,036.20 | $ 3.76 | $ 1,000.00 | $ 1,021.24 | $ 3.73 | 0.74% |
| I-2 | 1,000.00 | 1,035.70 | 4.26 | 1,000.00 | 1,020.74 | 4.23 | 0.84 |
| Class A | 1,000.00 | 1,034.70 | 5.28 | 1,000.00 | 1,019.75 | 5.24 | 1.04 |
| Class C | 1,000.00 | 1,030.80 | 9.06 | 1,000.00 | 1,016.01 | 9.00 | 1.79 |
| **PIMCO Low Duration Income Fund** | | | | | | | |
| Institutional Class | $ 1,000.00 | $ 1,043.30 | $ 2.70 | $ 1,000.00 | $ 1,022.29 | $ 2.67 | 0.53% |
| I-2 | 1,000.00 | 1,042.70 | 3.21 | 1,000.00 | 1,021.79 | 3.18 | 0.63 |
| I-3 | 1,000.00 | 1,042.50 | 3.46 | 1,000.00 | 1,021.54 | 3.43 | 0.68 |
| Class A | 1,000.00 | 1,041.20 | 4.73 | 1,000.00 | 1,020.29 | 4.68 | 0.93 |
| Class C | 1,000.00 | 1,039.60 | 6.25 | 1,000.00 | 1,018.80 | 6.19 | 1.23 |
| Class C-2(b) | 1,000.00 | 1,038.60 | 6.43 | 1,000.00 | 1,015.75 | 6.36 | 1.43 |
| **PIMCO Preferred and Capital Securities Fund (Consolidated)** | | | | | | | |
| Institutional Class | $ 1,000.00 | $ 1,077.70 | $ 4.14 | $ 1,000.00 | $ 1,020.94 | $ 4.03 | 0.80% |
| I-2 | 1,000.00 | 1,077.20 | 4.66 | 1,000.00 | 1,020.44 | 4.53 | 0.90 |
| I-3 | 1,000.00 | 1,076.80 | 4.92 | 1,000.00 | 1,020.19 | 4.78 | 0.95 |
| Class A | 1,000.00 | 1,076.30 | 5.95 | 1,000.00 | 1,019.20 | 5.79 | 1.15 |
| Class C | 1,000.00 | 1,072.50 | 9.82 | 1,000.00 | 1,015.46 | 9.55 | 1.90 |

* Expenses Paid During Period are equal to the net annualized expense ratio for the class, multiplied by the average account value over the period, multiplied by 182/365 (to reflect the one-half year period).

** Net Annualized Expense Ratio is reflective of any applicable contractual fee waivers and/or expense reimbursements or voluntary fee waivers. Details regarding fee waivers, if any, can be found in Note 9, Fees and Expenses, in the Notes to Financial Statements.

(a) The Beginning Account Value is reflective as of 09/30/20 which is the Fund's inception date.

(b) The Beginning Account Value is reflective as of 10/21/20 for Actual expense. Expenses paid in the Actual expense section are equal to the net annualized expense ratio for the class, multiplied by the average account value over the period, multiplied by 161/365 for Class C-2 shares of the PIMCO Low Duration Income Fund (to reflect the period since the inception date of 10/21/20). Hypothetical expenses reflect an amount as if the class had been operational for the entire fiscal half year.

# Benchmark Descriptions

| Index* | Benchmark Description |
|---|---|
| 50% ICE BofAML 1-5 Year US High Yield Constrained Index and 50% J.P. Morgan Leveraged Loan Index | The benchmark is a blend of 50% ICE BofAML 1-5 Year US High Yield Constrained Index and 50% J.P. Morgan Leveraged Loan Index. The ICE BofAML 1-5 Year US High Yield Constrained Index is designed to track the performance of short-term U.S. dollar denominated below investment grade corporate debt publicly issued in the U.S. domestic market with at least one year and less than five years remaining term to final maturity, at least 18 months to final maturity at issuance, a fixed coupon schedule and a minimum amount outstanding of $250 million. The J.P. Morgan Leveraged Loan Index is designed to mirror the investable universe of USD institutional leveraged loans and is comprised of issuers domiciled across global markets (the international component is comprised of developed market-domiciled issuers only). |
| 1/3 each — Bloomberg Barclays Global Aggregate Credit ex Emerging Markets, USD Hedged; ICE BofAML BB-B Rated Developed Markets High Yield Constrained Index, USD Hedged; and JPMorgan EMBI Global, USD Hedged | The Bloomberg Barclays Global Aggregate Credit ex Emerging Markets (USD Hedged) provides a broad-based measure of the global developed markets investment-grade fixed income markets. The ICE BofAML BB-B Rated Developed Markets High Yield Constrained Index (USD Hedged) tracks the performance of below investment grade bonds of corporate issuers domiciled in developed market countries rated BB1 through B3, based on an average of Moody's, S&P and Fitch. Qualifying bonds are capitalization-weighted provided the total allocation to an individual issuer (defined by Bloomberg tickers) does not exceed 2%. Issuers that exceed the limit are reduced to 2% and the face value of each of their bonds is adjusted on a pro-rata basis. Similarly, the face value of bonds of all other issuers that fall below the 2% cap are increased on a pro-rata basis. The index is rebalanced on the last calendar day of the month. The JPMorgan EMBI Global (USD Hedged) tracks total returns for U.S. dollar-denominated debt instruments issued by emerging market sovereign and quasi-sovereign entities, Brady bonds, loans, Eurobonds and local market instruments. |
| 3 Month USD LIBOR | The 3 Month USD LIBOR (London Interbank Offered Rate) is an average interest rate, determined by the ICE Benchmark Administration, that banks charge one another for the use of short-term money (3 months) in England's Eurodollar market. |
| 70% ICE BofAML 8% Constrained Core West Preferred & Jr Subordinated Securities Index (P8JC) and 30% ICE BofAML Contingent Capital Index (COCO) | The benchmark is a blend of 70% ICE BofAML 8% Constrained Core West Preferred & Jr Subordinated Securities Index (P8JC) and 30% ICE BofAML Contingent Capital Index (COCO). The ICE BofAML 8% Constrained Core West Preferred & Jr Subordinated Securities Index tracks the performance of US dollar denominated high grade and high yield preferred securities and deeply subordinated corporate debt issued in the US domestic market. Qualifying securities must be rated at least B3, based on an average of Moody's, S&P and Fitch and have a country of risk of either the U.S. or a Western European country. Qualifying preferred securities must be issued as public securities or through a 144a filing, must have a fixed or floating dividend schedule and must have a minimum amount outstanding of $100 million. The ICE BofAML Contingent Capital Index tracks the performance of investment grade and below investment grade contingent capital debt publicly issued in the major domestic and eurobond markets. Qualifying securities must have a capital-dependent conversion feature and must be rated by either Moody's, S&P or Fitch. In addition, qualifying securities must have at least one month remaining term to final maturity and at least 18 months to maturity at point of issuance. For investment grade debt, qualifying currencies and their respective minimum size requirements (in local currency terms) are: AUD 100 million; CAD 100 million; EUR 250 million; JPY 20 billion; GBP 100 million; and USD 250 million. For below investment grade debt, minimum size requirements are CAD 100 million, EUR 100 million, GBP 50 million, or USD 100 million. |
| Bloomberg Barclays Global Credit Hedged USD Index | Bloomberg Barclays Global Credit Hedged USD contains investment grade and high yield credit securities from the Multiverse represented in US Dollars on a hedged basis, (Multiverse is the merger of two groups: the Global Aggregate and the Global High Yield). |
| Bloomberg Barclays U.S. Aggregate 1-3 Years Index | Bloomberg Barclays U.S. Aggregate 1-3 Years Index represents securities that are SEC-registered, taxable, and dollar denominated with a maturity between one and three years. The index covers the U.S. investment grade fixed rate bond market, with index components for government and corporate securities, mortgage pass-through securities, and asset-backed securities. |
| Bloomberg Barclays U.S. Aggregate Index | Bloomberg Barclays U.S. Aggregate Index represents securities that are SEC-registered, taxable, and dollar denominated. The index covers the U.S. investment grade fixed rate bond market, with index components for government and corporate securities, mortgage pass-through securities, and asset-backed securities. These major sectors are subdivided into more specific indices that are calculated and reported on a regular basis. |

## Benchmark Descriptions (Cont.)

| Index* | Benchmark Description |
|---|---|
| Bloomberg Barclays U.S. Long Credit Index | Bloomberg Barclays U.S. Long Credit Index includes both corporate and non-corporate sectors with maturities equal to or greater than 10 years. The corporate sectors are Industrial, Utility, and Finance, which include both U.S. and non-U.S. corporations. The non-corporate sectors are Sovereign, Supranational, Foreign Agency, and Foreign Local Government. |
| ICE BofAML Developed Markets High Yield Constrained (USD Hedged) Index | The ICE BofAML Developed Markets High Yield Constrained (USD Hedged) Index is a subcomponent of the ICE BofAML Global High Yield Constrained (USD Hedged) Index that excludes all non-developed countries. |
| J.P. Morgan BB/B Leveraged Loan Index | The J.P. Morgan BB/B Leveraged Loan Index is a subset of the broader Leveraged Loan Index, and as such follows all of the same inclusion rules, loan selection methodology and the rebalance process, with the sole exception being the tranche rating criteria. |

* It is not possible to invest directly in an unmanaged index.

(THIS PAGE INTENTIONALLY LEFT BLANK)

# Financial Highlights

| Selected Per Share Data for the Year or Period Ended^: | Net Asset Value Beginning of Year or Period[a] | Investment Operations | | | Less Distributions[c] | | | |
|---|---|---|---|---|---|---|---|---|
| | | Net Investment Income (Loss)[b] | Net Realized/ Unrealized Gain (Loss) | Total | From Net Investment Income | From Net Realized Capital Gains | Tax Basis Return of Capital | Total |
| **PIMCO Credit Opportunities Bond Fund** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 03/31/2021 | $ 9.07 | $ 0.30 | $ 0.97 | $ 1.27 | $ (0.35) | $ 0.00 | $ 0.00 | $ (0.35) |
| 03/31/2020 | 9.90 | 0.41 | (0.85) | (0.44) | (0.39) | 0.00 | 0.00 | (0.39) |
| 03/31/2019 | 10.08 | 0.46 | (0.19) | 0.27 | (0.45) | 0.00 | 0.00 | (0.45) |
| 03/31/2018 | 10.04 | 0.38 | 0.06 | 0.44 | (0.40) | 0.00 | 0.00 | (0.40) |
| 03/31/2017 | 9.32 | 0.44 | 0.59 | 1.03 | (0.31) | 0.00 | 0.00 | (0.31) |
| I-2 | | | | | | | | |
| 03/31/2021 | 9.03 | 0.29 | 0.96 | 1.25 | (0.34) | 0.00 | 0.00 | (0.34) |
| 03/31/2020 | 9.86 | 0.40 | (0.84) | (0.44) | (0.39) | 0.00 | 0.00 | (0.39) |
| 03/31/2019 | 10.05 | 0.45 | (0.20) | 0.25 | (0.44) | 0.00 | 0.00 | (0.44) |
| 03/31/2018 | 10.01 | 0.38 | 0.05 | 0.43 | (0.39) | 0.00 | 0.00 | (0.39) |
| 03/31/2017 | 9.30 | 0.42 | 0.60 | 1.02 | (0.31) | 0.00 | 0.00 | (0.31) |
| Class A | | | | | | | | |
| 03/31/2021 | 9.08 | 0.26 | 0.97 | 1.23 | (0.31) | 0.00 | 0.00 | (0.31) |
| 03/31/2020 | 9.91 | 0.37 | (0.84) | (0.47) | (0.36) | 0.00 | 0.00 | (0.36) |
| 03/31/2019 | 10.10 | 0.42 | (0.20) | 0.22 | (0.41) | 0.00 | 0.00 | (0.41) |
| 03/31/2018 | 10.06 | 0.35 | 0.05 | 0.40 | (0.36) | 0.00 | 0.00 | (0.36) |
| 03/31/2017 | 9.34 | 0.42 | 0.58 | 1.00 | (0.28) | 0.00 | 0.00 | (0.28) |
| Class C | | | | | | | | |
| 03/31/2021 | 8.95 | 0.18 | 0.95 | 1.13 | (0.23) | 0.00 | 0.00 | (0.23) |
| 03/31/2020 | 9.78 | 0.30 | (0.84) | (0.54) | (0.29) | 0.00 | 0.00 | (0.29) |
| 03/31/2019 | 9.96 | 0.34 | (0.19) | 0.15 | (0.33) | 0.00 | 0.00 | (0.33) |
| 03/31/2018 | 9.94 | 0.26 | 0.05 | 0.31 | (0.29) | 0.00 | 0.00 | (0.29) |
| 03/31/2017 | 9.26 | 0.33 | 0.58 | 0.91 | (0.23) | 0.00 | 0.00 | (0.23) |
| **PIMCO Diversified Income Fund** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 03/31/2021 | $ 10.21 | $ 0.34 | $ 0.89 | $ 1.23 | $ (0.40) | $ 0.00 | $ 0.00 | $ (0.40) |
| 03/31/2020 | 10.86 | 0.35 | (0.48) | (0.13) | (0.50) | (0.02) | 0.00 | (0.52) |
| 03/31/2019 | 10.77 | 0.37 | 0.20 | 0.57 | (0.48) | 0.00 | 0.00 | (0.48) |
| 03/31/2018 | 10.78 | 0.37 | 0.14 | 0.51 | (0.51) | 0.00 | (0.01) | (0.52) |
| 03/31/2017 | 10.15 | 0.47 | 0.68 | 1.15 | (0.52) | 0.00 | 0.00 | (0.52) |
| I-2 | | | | | | | | |
| 03/31/2021 | 10.21 | 0.33 | 0.89 | 1.22 | (0.39) | 0.00 | 0.00 | (0.39) |
| 03/31/2020 | 10.86 | 0.34 | (0.48) | (0.14) | (0.49) | (0.02) | 0.00 | (0.51) |
| 03/31/2019 | 10.77 | 0.35 | 0.20 | 0.55 | (0.46) | 0.00 | 0.00 | (0.46) |
| 03/31/2018 | 10.78 | 0.35 | 0.15 | 0.50 | (0.50) | 0.00 | (0.01) | (0.51) |
| 03/31/2017 | 10.15 | 0.46 | 0.68 | 1.14 | (0.51) | 0.00 | 0.00 | (0.51) |
| I-3 | | | | | | | | |
| 03/31/2021 | 10.21 | 0.32 | 0.90 | 1.22 | (0.39) | 0.00 | 0.00 | (0.39) |
| 03/31/2020 | 10.86 | 0.34 | (0.49) | (0.15) | (0.48) | (0.02) | 0.00 | (0.50) |
| 04/27/2018 - 03/31/2019 | 10.72 | 0.35 | 0.22 | 0.57 | (0.43) | 0.00 | 0.00 | (0.43) |
| Administrative Class | | | | | | | | |
| 03/31/2021 | 10.21 | 0.31 | 0.90 | 1.21 | (0.38) | 0.00 | 0.00 | (0.38) |
| 03/31/2020 | 10.86 | 0.33 | (0.49) | (0.16) | (0.47) | (0.02) | 0.00 | (0.49) |
| 03/31/2019 | 10.77 | 0.36 | 0.18 | 0.54 | (0.45) | 0.00 | 0.00 | (0.45) |
| 03/31/2018 | 10.78 | 0.34 | 0.14 | 0.48 | (0.48) | 0.00 | (0.01) | (0.49) |
| 03/31/2017 | 10.15 | 0.44 | 0.68 | 1.12 | (0.49) | 0.00 | 0.00 | (0.49) |
| Class A | | | | | | | | |
| 03/31/2021 | 10.21 | 0.29 | 0.90 | 1.19 | (0.36) | 0.00 | 0.00 | (0.36) |
| 03/31/2020 | 10.86 | 0.31 | (0.49) | (0.18) | (0.45) | (0.02) | 0.00 | (0.47) |
| 03/31/2019 | 10.77 | 0.32 | 0.20 | 0.52 | (0.43) | 0.00 | 0.00 | (0.43) |
| 03/31/2018 | 10.78 | 0.32 | 0.14 | 0.46 | (0.46) | 0.00 | (0.01) | (0.47) |
| 03/31/2017 | 10.15 | 0.43 | 0.68 | 1.11 | (0.48) | 0.00 | 0.00 | (0.48) |
| Class C | | | | | | | | |
| 03/31/2021 | 10.21 | 0.21 | 0.90 | 1.11 | (0.28) | 0.00 | 0.00 | (0.28) |
| 03/31/2020 | 10.86 | 0.23 | (0.49) | (0.26) | (0.37) | (0.02) | 0.00 | (0.39) |
| 03/31/2019 | 10.77 | 0.24 | 0.20 | 0.44 | (0.35) | 0.00 | 0.00 | (0.35) |
| 03/31/2018 | 10.78 | 0.24 | 0.14 | 0.38 | (0.38) | 0.00 | (0.01) | (0.39) |
| 03/31/2017 | 10.15 | 0.35 | 0.68 | 1.03 | (0.40) | 0.00 | 0.00 | (0.40) |

| | | | Ratios/Supplemental Data | | | | | |
| | | | Ratios to Average Net Assets | | | | | |
| Net Asset Value End of Year or Period(a) | Total Return(a) | Net Assets End of Year or Period (000s) | Expenses | Expenses Excluding Waivers | Expenses Excluding Interest Expense | Expenses Excluding Interest Expense and Waivers | Net Investment Income (Loss) | Portfolio Turnover Rate |
|---|---|---|---|---|---|---|---|---|
| $  9.99 | 14.06% | $  268,038 | 0.90% | 0.90% | 0.90% | 0.90% | 3.10% | 99% |
| 9.07 | (4.69) | 232,487 | 0.92 | 0.92 | 0.90 | 0.90 | 4.13 | 138 |
| 9.90 | 2.77 | 289,576 | 0.93 | 0.93 | 0.90 | 0.90 | 4.60 | 110 |
| 10.08 | 4.38 | 353,288 | 0.91 | 0.91 | 0.90 | 0.90 | 3.72 | 100 |
| 10.04 | 11.23 | 342,617 | 0.91 | 0.91 | 0.90 | 0.90 | 4.50 | 146 |
| 9.94 | 13.92 | 115,116 | 1.00 | 1.00 | 1.00 | 1.00 | 3.01 | 99 |
| 9.03 | (4.78) | 55,030 | 1.02 | 1.02 | 1.00 | 1.00 | 4.03 | 138 |
| 9.86 | 2.58 | 47,743 | 1.03 | 1.03 | 1.00 | 1.00 | 4.51 | 110 |
| 10.05 | 4.33 | 58,119 | 1.01 | 1.01 | 1.00 | 1.00 | 3.71 | 100 |
| 10.01 | 11.10 | 28,172 | 1.01 | 1.01 | 1.00 | 1.00 | 4.25 | 146 |
| 10.00 | 13.61 | 19,542 | 1.30 | 1.30 | 1.30 | 1.30 | 2.68 | 99 |
| 9.08 | (5.01) | 19,607 | 1.32 | 1.32 | 1.30 | 1.30 | 3.73 | 138 |
| 9.91 | 2.24 | 23,099 | 1.33 | 1.33 | 1.30 | 1.30 | 4.20 | 110 |
| 10.10 | 4.03 | 30,228 | 1.31 | 1.31 | 1.30 | 1.30 | 3.41 | 100 |
| 10.06 | 10.79 | 10,740 | 1.31 | 1.31 | 1.30 | 1.30 | 4.30 | 146 |
| 9.85 | 12.73 | 3,866 | 2.05 | 2.05 | 2.05 | 2.05 | 1.91 | 99 |
| 8.95 | (5.75) | 5,206 | 2.07 | 2.07 | 2.05 | 2.05 | 3.00 | 138 |
| 9.78 | 1.63 | 5,834 | 2.08 | 2.08 | 2.05 | 2.05 | 3.45 | 110 |
| 9.96 | 3.13 | 7,532 | 2.06 | 2.06 | 2.05 | 2.05 | 2.58 | 100 |
| 9.94 | 9.91 | 6,835 | 2.06 | 2.06 | 2.05 | 2.05 | 3.43 | 146 |
| $ 11.04 | 12.15% | $ 4,132,019 | 0.77% | 0.77% | 0.75% | 0.75% | 3.04% | 110% |
| 10.21 | (1.45) | 2,852,619 | 0.79 | 0.79 | 0.75 | 0.75 | 3.19 | 127 |
| 10.86 | 5.45 | 2,627,609 | 0.79 | 0.79 | 0.75 | 0.75 | 3.45 | 105 |
| 10.77 | 4.75 | 2,558,977 | 0.77 | 0.77 | 0.75 | 0.75 | 3.36 | 146 |
| 10.78 | 11.53 | 2,383,388 | 0.77 | 0.77 | 0.76 | 0.76 | 4.42 | 156 |
| 11.04 | 12.04 | 670,322 | 0.87 | 0.87 | 0.85 | 0.85 | 2.94 | 110 |
| 10.21 | (1.55) | 335,490 | 0.89 | 0.89 | 0.85 | 0.85 | 3.07 | 127 |
| 10.86 | 5.34 | 169,410 | 0.89 | 0.89 | 0.85 | 0.85 | 3.35 | 105 |
| 10.77 | 4.64 | 129,856 | 0.87 | 0.87 | 0.85 | 0.85 | 3.25 | 146 |
| 10.78 | 11.42 | 84,476 | 0.87 | 0.87 | 0.86 | 0.86 | 4.27 | 156 |
| 11.04 | 11.98 | 27,498 | 0.92 | 0.97 | 0.90 | 0.95 | 2.88 | 110 |
| 10.21 | (1.60) | 13,637 | 0.94 | 0.99 | 0.90 | 0.95 | 3.03 | 127 |
| 10.86 | 5.47 | 3,619 | 0.94* | 0.99* | 0.90* | 0.95* | 3.55* | 105 |
| 11.04 | 11.87 | 10,752 | 1.02 | 1.02 | 1.00 | 1.00 | 2.83 | 110 |
| 10.21 | (1.70) | 159,259 | 1.04 | 1.04 | 1.00 | 1.00 | 2.94 | 127 |
| 10.86 | 5.19 | 155,936 | 1.04 | 1.04 | 1.00 | 1.00 | 3.36 | 105 |
| 10.77 | 4.49 | 10,049 | 1.02 | 1.02 | 1.00 | 1.00 | 3.12 | 146 |
| 10.78 | 11.25 | 12,535 | 1.02 | 1.02 | 1.01 | 1.01 | 4.09 | 156 |
| 11.04 | 11.71 | 361,780 | 1.17 | 1.17 | 1.15 | 1.15 | 2.64 | 110 |
| 10.21 | (1.84) | 297,090 | 1.19 | 1.19 | 1.15 | 1.15 | 2.78 | 127 |
| 10.86 | 5.03 | 251,911 | 1.19 | 1.19 | 1.15 | 1.15 | 3.04 | 105 |
| 10.77 | 4.33 | 260,394 | 1.17 | 1.17 | 1.15 | 1.15 | 2.97 | 146 |
| 10.78 | 11.09 | 167,491 | 1.17 | 1.17 | 1.16 | 1.16 | 4.02 | 156 |
| 11.04 | 10.87 | 67,889 | 1.92 | 1.92 | 1.90 | 1.90 | 1.89 | 110 |
| 10.21 | (2.58) | 77,114 | 1.94 | 1.94 | 1.90 | 1.90 | 2.04 | 127 |
| 10.86 | 4.25 | 73,261 | 1.94 | 1.94 | 1.90 | 1.90 | 2.29 | 105 |
| 10.77 | 3.56 | 82,085 | 1.92 | 1.92 | 1.90 | 1.90 | 2.22 | 146 |
| 10.78 | 10.26 | 104,368 | 1.92 | 1.92 | 1.91 | 1.91 | 3.29 | 156 |

## Financial Highlights (Cont.)

| | | Investment Operations | | | Less Distributions[c] | | | |
|---|---|---|---|---|---|---|---|---|
| Selected Per Share Data for the Year or Period Ended^: | Net Asset Value Beginning of Year or Period[a] | Net Investment Income (Loss)[b] | Net Realized/ Unrealized Gain (Loss) | Total | From Net Investment Income | From Net Realized Capital Gains | Tax Basis Return of Capital | Total |
| **PIMCO ESG Income Fund** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 09/30/2020 - 03/31/2021 | $ 10.00 | $ 0.10 | $ 0.34 | $ 0.44 | $ (0.09) | $ 0.00 | $ 0.00 | $ (0.09) |
| I-2 | | | | | | | | |
| 09/30/2020 - 03/31/2021 | 10.00 | 0.09 | 0.35 | 0.44 | (0.09) | 0.00 | 0.00 | (0.09) |
| I-3 | | | | | | | | |
| 09/30/2020 - 03/31/2021 | 10.00 | 0.09 | 0.34 | 0.43 | (0.08) | 0.00 | 0.00 | (0.08) |
| Class A | | | | | | | | |
| 09/30/2020 - 03/31/2021 | 10.00 | 0.07 | 0.35 | 0.42 | (0.07) | 0.00 | 0.00 | (0.07) |
| Class C | | | | | | | | |
| 09/30/2020 - 03/31/2021 | 10.00 | 0.03 | 0.35 | 0.38 | (0.03) | 0.00 | 0.00 | (0.03) |
| **PIMCO High Yield Spectrum Fund** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 03/31/2021 | $ 8.58 | $ 0.45 | $ 1.47 | $ 1.92 | $ (0.47) | $ 0.00 | $ 0.00 | $ (0.47) |
| 03/31/2020 | 9.71 | 0.54 | (1.12) | (0.58) | (0.55) | 0.00 | 0.00 | (0.55) |
| 03/31/2019 | 9.78 | 0.57 | (0.07) | 0.50 | (0.57) | 0.00 | 0.00 | (0.57) |
| 03/31/2018 | 9.93 | 0.55 | (0.14) | 0.41 | (0.30) | 0.00 | (0.26) | (0.56) |
| 03/31/2017 | 9.22 | 0.58 | 0.77 | 1.35 | (0.64) | 0.00 | 0.00 | (0.64) |
| I-2 | | | | | | | | |
| 03/31/2021 | 8.58 | 0.44 | 1.47 | 1.91 | (0.46) | 0.00 | 0.00 | (0.46) |
| 03/31/2020 | 9.71 | 0.52 | (1.11) | (0.59) | (0.54) | 0.00 | 0.00 | (0.54) |
| 03/31/2019 | 9.78 | 0.56 | (0.06) | 0.50 | (0.57) | 0.00 | 0.00 | (0.57) |
| 03/31/2018 | 9.93 | 0.54 | (0.14) | 0.40 | (0.29) | 0.00 | (0.26) | (0.55) |
| 03/31/2017 | 9.22 | 0.57 | 0.77 | 1.34 | (0.63) | 0.00 | 0.00 | (0.63) |
| I-3 | | | | | | | | |
| 03/31/2021 | 8.58 | 0.43 | 1.48 | 1.91 | (0.46) | 0.00 | 0.00 | (0.46) |
| 03/31/2020 | 9.71 | 0.52 | (1.12) | (0.60) | (0.53) | 0.00 | 0.00 | (0.53) |
| 04/27/2018 - 03/31/2019 | 9.81 | 0.52 | (0.10) | 0.42 | (0.52) | 0.00 | 0.00 | (0.52) |
| Class A | | | | | | | | |
| 03/31/2021 | 8.58 | 0.42 | 1.47 | 1.89 | (0.44) | 0.00 | 0.00 | (0.44) |
| 03/31/2020 | 9.71 | 0.50 | (1.12) | (0.62) | (0.51) | 0.00 | 0.00 | (0.51) |
| 03/31/2019 | 9.78 | 0.54 | (0.07) | 0.47 | (0.54) | 0.00 | 0.00 | (0.54) |
| 03/31/2018 | 9.93 | 0.52 | (0.14) | 0.38 | (0.27) | 0.00 | (0.26) | (0.53) |
| 03/31/2017 | 9.22 | 0.54 | 0.77 | 1.31 | (0.60) | 0.00 | 0.00 | (0.60) |
| Class C | | | | | | | | |
| 03/31/2021 | 8.58 | 0.36 | 1.46 | 1.82 | (0.37) | 0.00 | 0.00 | (0.37) |
| 03/31/2020 | 9.71 | 0.42 | (1.11) | (0.69) | (0.44) | 0.00 | 0.00 | (0.44) |
| 03/31/2019 | 9.78 | 0.47 | (0.07) | 0.40 | (0.47) | 0.00 | 0.00 | (0.47) |
| 03/31/2018 | 9.93 | 0.44 | (0.14) | 0.30 | (0.19) | 0.00 | (0.26) | (0.45) |
| 03/31/2017 | 9.22 | 0.47 | 0.77 | 1.24 | (0.53) | 0.00 | 0.00 | (0.53) |
| **PIMCO Long-Term Credit Bond Fund** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 03/31/2021 | $ 12.08 | $ 0.50 | $ 0.74 | $ 1.24 | $ (0.58) | $ (0.46) | $ 0.00 | $ (1.04) |
| 03/31/2020 | 11.69 | 0.48 | 0.54 | 1.02 | (0.59) | (0.04) | 0.00 | (0.63) |
| 03/31/2019 | 11.83 | 0.49 | 0.08 | 0.57 | (0.49) | (0.15) | (0.07) | (0.71) |
| 03/31/2018 | 11.63 | 0.53 | 0.25 | 0.78 | (0.58) | 0.00 | 0.00 | (0.58) |
| 03/31/2017 | 11.40 | 0.56 | 0.32 | 0.88 | (0.60) | 0.00 | (0.05) | (0.65) |
| I-2 | | | | | | | | |
| 03/31/2021 | 12.08 | 0.49 | 0.73 | 1.22 | (0.56) | (0.46) | 0.00 | (1.02) |
| 03/31/2020 | 11.69 | 0.47 | 0.54 | 1.01 | (0.58) | (0.04) | 0.00 | (0.62) |
| 03/31/2019 | 11.83 | 0.48 | 0.08 | 0.56 | (0.48) | (0.15) | (0.07) | (0.70) |
| 03/31/2018 | 11.63 | 0.52 | 0.25 | 0.77 | (0.57) | 0.00 | 0.00 | (0.57) |
| 03/31/2017 | 11.40 | 0.54 | 0.33 | 0.87 | (0.59) | 0.00 | (0.05) | (0.64) |
| **CREW/PIMCO Sr Float Rate Fund** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 03/31/2021 | $ 8.63 | $ 0.31 | $ 0.70 | $ 1.01 | $ (0.33) | $ 0.00 | $ 0.00 | $ (0.33) |
| 03/31/2020 | 9.73 | 0.43 | (1.06) | (0.63) | (0.47) | 0.00 | 0.00 | (0.47) |
| 03/31/2019 | 9.90 | 0.41 | (0.14) | 0.27 | (0.44) | 0.00 | 0.00 | (0.44) |
| 03/31/2018 | 9.94 | 0.35 | 0.01 | 0.36 | (0.38) | 0.00 | (0.02) | (0.40) |
| 03/31/2017 | 9.65 | 0.35 | 0.31 | 0.66 | (0.37) | 0.00 | 0.00 | (0.37) |

| | | | Ratios/Supplemental Data | | | | | |
| | | | Ratios to Average Net Assets | | | | | |
| Net Asset Value End of Year or Period[a] | Total Return[a] | Net Assets End of Year or Period (000s) | Expenses | Expenses Excluding Waivers | Expenses Excluding Interest Expense | Expenses Excluding Interest Expense and Waivers | Net Investment Income (Loss) | Portfolio Turnover Rate |
|---|---|---|---|---|---|---|---|---|
| $ 10.35 | 4.43% | $ 37,125 | 0.52%* | 1.14%* | 0.50%* | 1.12%* | 1.87%* | 135% |
| 10.35 | 4.38 | 1,421 | 0.62* | 1.24* | 0.60* | 1.22* | 1.81* | 135 |
| 10.35 | 4.35 | 45 | 0.72* | 1.34* | 0.70* | 1.32* | 1.69* | 135 |
| 10.35 | 4.23 | 23 | 0.92* | 1.54* | 0.90* | 1.52* | 1.46* | 135 |
| 10.35 | 3.85 | 90 | 1.67* | 2.29* | 1.65* | 2.27* | 0.67* | 135 |
| $ 10.03 | 22.77% | $ 170,488 | 0.62% | 0.62% | 0.60% | 0.60% | 4.67% | 39% |
| 8.58 | (6.52) | 101,092 | 0.62 | 0.62 | 0.60 | 0.60 | 5.47 | 27 |
| 9.71 | 5.36 | 603,647 | 0.63 | 0.63 | 0.60 | 0.60 | 5.93 | 26 |
| 9.78 | 4.15 | 655,038 | 0.62 | 0.62 | 0.60 | 0.60 | 5.53 | 24 |
| 9.93 | 14.98 | 1,505,442 | 0.61 | 0.61 | 0.60 | 0.60 | 5.92 | 35 |
| 10.03 | 22.65 | 238,069 | 0.72 | 0.72 | 0.70 | 0.70 | 4.60 | 39 |
| 8.58 | (6.61) | 134,676 | 0.72 | 0.72 | 0.70 | 0.70 | 5.34 | 27 |
| 9.71 | 5.26 | 193,934 | 0.73 | 0.73 | 0.70 | 0.70 | 5.85 | 26 |
| 9.78 | 4.05 | 150,910 | 0.72 | 0.72 | 0.70 | 0.70 | 5.45 | 24 |
| 9.93 | 14.87 | 142,214 | 0.71 | 0.71 | 0.70 | 0.70 | 5.82 | 35 |
| 10.03 | 22.59 | 3,621 | 0.77 | 0.82 | 0.75 | 0.80 | 4.41 | 39 |
| 8.58 | (6.66) | 445 | 0.77 | 0.82 | 0.75 | 0.80 | 5.28 | 27 |
| 9.71 | 4.45 | 2,142 | 0.78* | 0.83* | 0.75* | 0.80* | 5.91* | 26 |
| 10.03 | 22.35 | 54,395 | 0.97 | 0.97 | 0.95 | 0.95 | 4.43 | 39 |
| 8.58 | (6.85) | 50,039 | 0.97 | 0.97 | 0.95 | 0.95 | 5.08 | 27 |
| 9.71 | 5.00 | 63,446 | 0.98 | 0.98 | 0.95 | 0.95 | 5.58 | 26 |
| 9.78 | 3.79 | 83,841 | 0.97 | 0.97 | 0.95 | 0.95 | 5.21 | 24 |
| 9.93 | 14.58 | 43,592 | 0.96 | 0.96 | 0.95 | 0.95 | 5.55 | 35 |
| 10.03 | 21.44 | 5,265 | 1.72 | 1.72 | 1.70 | 1.70 | 3.72 | 39 |
| 8.58 | (7.54) | 6,862 | 1.72 | 1.72 | 1.70 | 1.70 | 4.33 | 27 |
| 9.71 | 4.22 | 8,118 | 1.73 | 1.73 | 1.70 | 1.70 | 4.83 | 26 |
| 9.78 | 3.02 | 10,506 | 1.72 | 1.72 | 1.70 | 1.70 | 4.44 | 24 |
| 9.93 | 13.73 | 9,777 | 1.71 | 1.71 | 1.70 | 1.70 | 4.81 | 35 |
| $ 12.28 | 9.84% | $ 3,483,341 | 0.59% | 0.59% | 0.55% | 0.55% | 3.79% | 103% |
| 12.08 | 8.59 | 3,313,697 | 0.84 | 0.84 | 0.55 | 0.55 | 3.84 | 180 |
| 11.69 | 5.20 | 3,576,056 | 0.79 | 0.79 | 0.55 | 0.55 | 4.33 | 133 |
| 11.83 | 6.76 | 3,309,210 | 0.85 | 0.85 | 0.55 | 0.55 | 4.43 | 96 |
| 11.63 | 7.79 | 2,805,317 | 0.72 | 0.72 | 0.55 | 0.55 | 4.70 | 114 |
| 12.28 | 9.73 | 133,698 | 0.69 | 0.69 | 0.65 | 0.65 | 3.69 | 103 |
| 12.08 | 8.49 | 197,002 | 0.94 | 0.94 | 0.65 | 0.65 | 3.71 | 180 |
| 11.69 | 5.10 | 71,189 | 0.89 | 0.89 | 0.65 | 0.65 | 4.23 | 133 |
| 11.83 | 6.66 | 54,410 | 0.95 | 0.95 | 0.65 | 0.65 | 4.34 | 96 |
| 11.63 | 7.68 | 41,527 | 0.82 | 0.82 | 0.65 | 0.65 | 4.56 | 114 |
| $ 9.31 | 11.85% | $ 210,739 | 0.73% | 0.73% | 0.70% | 0.70% | 3.42% | 184% |
| 8.63 | (6.94) | 151,077 | 0.75 | 0.75 | 0.70 | 0.70 | 4.42 | 49 |
| 9.73 | 2.74 | 171,645 | 0.75 | 0.75 | 0.70 | 0.70 | 4.15 | 42 |
| 9.90 | 3.66 | 1,269,665 | 0.72 | 0.72 | 0.70 | 0.70 | 3.55 | 34 |
| 9.94 | 6.96 | 1,148,303 | 0.74 | 0.74 | 0.70 | 0.70 | 3.53 | 19 |

# Financial Highlights (Cont.)

| | | Investment Operations | | | Less Distributions[c] | | | |
|---|---|---|---|---|---|---|---|---|
| Selected Per Share Data for the Year or Period Ended^: | Net Asset Value Beginning of Year or Period[a] | Net Investment Income (Loss)[b] | Net Realized/ Unrealized Gain (Loss) | Total | From Net Investment Income | From Net Realized Capital Gains | Tax Basis Return of Capital | Total |
| **PIMCO Low Duration Credit Fund (Cont.)** | | | | | | | | |
| I-2 | | | | | | | | |
| 03/31/2021 | $ 8.63 | $ 0.31 | $ 0.69 | $ 1.00 | $ (0.32) | $ 0.00 | $ 0.00 | $ (0.32) |
| 03/31/2020 | 9.73 | 0.42 | (1.06) | (0.64) | (0.46) | 0.00 | 0.00 | (0.46) |
| 03/31/2019 | 9.90 | 0.42 | (0.16) | 0.26 | (0.43) | 0.00 | 0.00 | (0.43) |
| 03/31/2018 | 9.94 | 0.34 | 0.01 | 0.35 | (0.37) | 0.00 | (0.02) | (0.39) |
| 03/31/2017 | 9.65 | 0.34 | 0.31 | 0.65 | (0.36) | 0.00 | 0.00 | (0.36) |
| Class A | | | | | | | | |
| 03/31/2021 | 8.63 | 0.29 | 0.70 | 0.99 | (0.31) | 0.00 | 0.00 | (0.31) |
| 03/31/2020 | 9.73 | 0.40 | (1.06) | (0.66) | (0.44) | 0.00 | 0.00 | (0.44) |
| 03/31/2019 | 9.90 | 0.39 | (0.15) | 0.24 | (0.41) | 0.00 | 0.00 | (0.41) |
| 03/31/2018 | 9.94 | 0.32 | 0.01 | 0.33 | (0.35) | 0.00 | (0.02) | (0.37) |
| 03/31/2017 | 9.65 | 0.32 | 0.31 | 0.63 | (0.34) | 0.00 | 0.00 | (0.34) |
| Class C | | | | | | | | |
| 03/31/2021 | 8.63 | 0.21 | 0.71 | 0.92 | (0.24) | 0.00 | 0.00 | (0.24) |
| 03/31/2020 | 9.73 | 0.33 | (1.06) | (0.73) | (0.37) | 0.00 | 0.00 | (0.37) |
| 03/31/2019 | 9.90 | 0.32 | (0.16) | 0.16 | (0.33) | 0.00 | 0.00 | (0.33) |
| 03/31/2018 | 9.94 | 0.25 | 0.00 | 0.25 | (0.27) | 0.00 | (0.02) | (0.29) |
| 03/31/2017 | 9.65 | 0.25 | 0.31 | 0.56 | (0.27) | 0.00 | 0.00 | (0.27) |
| **PIMCO Low Duration Income Fund** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 03/31/2021 | $ 7.95 | $ 0.25 | $ 0.75 | $ 1.00 | $ (0.23) | $ 0.00 | $ (0.05) | $ (0.28) |
| 03/31/2020 | 8.58 | 0.32 | (0.55) | (0.23) | (0.40) | 0.00 | 0.00 | (0.40) |
| 03/31/2019 | 8.56 | 0.30 | 0.01 | 0.31 | (0.29) | 0.00 | 0.00 | (0.29) |
| 03/31/2018 | 8.46 | 0.27 | 0.09 | 0.36 | (0.26) | 0.00 | 0.00 | (0.26) |
| 03/31/2017 | 7.67 | 0.35 | 0.74 | 1.09 | (0.30) | 0.00 | 0.00 | (0.30) |
| I-2 | | | | | | | | |
| 03/31/2021 | 7.95 | 0.24 | 0.75 | 0.99 | (0.22) | 0.00 | (0.05) | (0.27) |
| 03/31/2020 | 8.58 | 0.31 | (0.55) | (0.24) | (0.39) | 0.00 | 0.00 | (0.39) |
| 03/31/2019 | 8.56 | 0.30 | 0.00 | 0.30 | (0.28) | 0.00 | 0.00 | (0.28) |
| 03/31/2018 | 8.46 | 0.26 | 0.09 | 0.35 | (0.25) | 0.00 | 0.00 | (0.25) |
| 03/31/2017 | 7.67 | 0.32 | 0.76 | 1.08 | (0.29) | 0.00 | 0.00 | (0.29) |
| I-3 | | | | | | | | |
| 03/31/2021 | 7.95 | 0.24 | 0.75 | 0.99 | (0.22) | 0.00 | (0.05) | (0.27) |
| 03/31/2020 | 8.58 | 0.31 | (0.56) | (0.25) | (0.38) | 0.00 | 0.00 | (0.38) |
| 04/27/2018 - 03/31/2019 | 8.54 | 0.29 | 0.01 | 0.30 | (0.26) | 0.00 | 0.00 | (0.26) |
| Class A | | | | | | | | |
| 03/31/2021 | 7.95 | 0.22 | 0.75 | 0.97 | (0.20) | 0.00 | (0.05) | (0.25) |
| 03/31/2020 | 8.58 | 0.28 | (0.55) | (0.27) | (0.36) | 0.00 | 0.00 | (0.36) |
| 03/31/2019 | 8.56 | 0.27 | 0.01 | 0.28 | (0.26) | 0.00 | 0.00 | (0.26) |
| 03/31/2018 | 8.46 | 0.23 | 0.09 | 0.32 | (0.22) | 0.00 | 0.00 | (0.22) |
| 03/31/2017 | 7.67 | 0.31 | 0.75 | 1.06 | (0.27) | 0.00 | 0.00 | (0.27) |
| Class C | | | | | | | | |
| 03/31/2021 | 7.95 | 0.19 | 0.75 | 0.94 | (0.17) | 0.00 | (0.05) | (0.22) |
| 03/31/2020 | 8.58 | 0.26 | (0.55) | (0.29) | (0.34) | 0.00 | 0.00 | (0.34) |
| 03/31/2019 | 8.56 | 0.24 | 0.01 | 0.25 | (0.23) | 0.00 | 0.00 | (0.23) |
| 03/31/2018 | 8.46 | 0.20 | 0.10 | 0.30 | (0.20) | 0.00 | 0.00 | (0.20) |
| 03/31/2017 | 7.67 | 0.29 | 0.75 | 1.04 | (0.25) | 0.00 | 0.00 | (0.25) |
| Class C-2 | | | | | | | | |
| 10/21/2020 - 03/31/2021 | 8.47 | 0.08 | 0.20 | 0.28 | (0.03) | 0.00 | (0.05) | (0.08) |
| **PIMCO Preferred and Capital Securities Fund (Consolidated)** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 03/31/2021 | $ 9.23 | $ 0.40 | $ 1.88 | $ 2.28 | $ (0.41) | $ 0.00 | $ 0.00 | $ (0.41) |
| 03/31/2020 | 9.98 | 0.41 | (0.63) | (0.22) | (0.50) | (0.03) | 0.00 | (0.53) |
| 03/31/2019 | 10.31 | 0.46 | (0.18) | 0.28 | (0.59) | (0.01) | (0.01) | (0.61) |
| 03/31/2018 | 10.22 | 0.41 | 0.43 | 0.84 | (0.72) | (0.03) | 0.00 | (0.75) |
| 03/31/2017 | 9.44 | 0.46 | 0.94 | 1.40 | (0.62) | 0.00 | 0.00 | (0.62) |

| Net Asset Value End of Year or Period(a) | Total Return(a) | Net Assets End of Year or Period (000s) | Ratios/Supplemental Data | | | | | |
| | | | Ratios to Average Net Assets | | | | | |
| | | | Expenses | Expenses Excluding Waivers | Expenses Excluding Interest Expense | Expenses Excluding Interest Expense and Waivers | Net Investment Income (Loss) | Portfolio Turnover Rate |
|---|---|---|---|---|---|---|---|---|
| $ 9.31 | 11.74% | $ 22,046 | 0.83% | 0.83% | 0.80% | 0.80% | 3.34% | 184% |
| 8.63 | (7.03) | 25,932 | 0.85 | 0.85 | 0.80 | 0.80 | 4.30 | 49 |
| 9.73 | 2.64 | 38,809 | 0.85 | 0.85 | 0.80 | 0.80 | 4.25 | 42 |
| 9.90 | 3.56 | 22,172 | 0.82 | 0.82 | 0.80 | 0.80 | 3.47 | 34 |
| 9.94 | 6.85 | 13,970 | 0.84 | 0.84 | 0.80 | 0.80 | 3.44 | 19 |
| 9.31 | 11.52 | 54,219 | 1.03 | 1.03 | 1.00 | 1.00 | 3.16 | 184 |
| 8.63 | (7.22) | 52,228 | 1.05 | 1.05 | 1.00 | 1.00 | 4.13 | 49 |
| 9.73 | 2.44 | 89,364 | 1.05 | 1.05 | 1.00 | 1.00 | 4.02 | 42 |
| 9.90 | 3.35 | 94,579 | 1.02 | 1.02 | 1.00 | 1.00 | 3.24 | 34 |
| 9.94 | 6.63 | 87,065 | 1.04 | 1.04 | 1.00 | 1.00 | 3.24 | 19 |
| 9.31 | 10.68 | 9,975 | 1.78 | 1.78 | 1.75 | 1.75 | 2.34 | 184 |
| 8.63 | (7.91) | 22,627 | 1.80 | 1.80 | 1.75 | 1.75 | 3.39 | 49 |
| 9.73 | 1.68 | 46,421 | 1.80 | 1.80 | 1.75 | 1.75 | 3.27 | 42 |
| 9.90 | 2.58 | 44,916 | 1.77 | 1.77 | 1.75 | 1.75 | 2.48 | 34 |
| 9.94 | 5.84 | 55,559 | 1.79 | 1.79 | 1.75 | 1.75 | 2.49 | 19 |
| $ 8.67 | 12.72% | $ 2,204,463 | 0.54% | 0.54% | 0.51% | 0.51% | 2.96% | 410% |
| 7.95 | (2.94) | 1,644,585 | 0.55 | 0.55 | 0.51 | 0.51 | 3.77 | 432 |
| 8.58 | 3.70 | 1,682,347 | 0.58 | 0.59 | 0.50 | 0.51 | 3.55 | 207 |
| 8.56 | 4.29 | 705,766 | 0.50 | 0.55 | 0.46 | 0.51 | 3.21 | 128 |
| 8.46 | 14.45 | 95,776 | 0.61(d) | 0.62(d) | 0.55(d) | 0.56(d) | 4.23 | 243 |
| 8.67 | 12.61 | 3,109,079 | 0.64 | 0.64 | 0.61 | 0.61 | 2.85 | 410 |
| 7.95 | (3.04) | 2,246,989 | 0.65 | 0.65 | 0.61 | 0.61 | 3.64 | 432 |
| 8.58 | 3.60 | 1,854,130 | 0.68 | 0.69 | 0.60 | 0.61 | 3.49 | 207 |
| 8.56 | 4.19 | 509,577 | 0.60 | 0.65 | 0.56 | 0.61 | 3.10 | 128 |
| 8.46 | 14.34 | 55,138 | 0.71(e) | 0.72(e) | 0.65(e) | 0.66(e) | 3.85 | 243 |
| 8.67 | 12.57 | 87,455 | 0.69 | 0.74 | 0.66 | 0.71 | 2.82 | 410 |
| 7.95 | (3.09) | 20,116 | 0.70 | 0.75 | 0.66 | 0.71 | 3.63 | 432 |
| 8.58 | 3.56 | 39,161 | 0.73* | 0.79* | 0.65* | 0.71* | 3.69* | 207 |
| 8.67 | 12.28 | 1,784,043 | 0.94 | 0.94 | 0.91 | 0.91 | 2.55 | 410 |
| 7.95 | (3.33) | 1,322,295 | 0.95 | 0.95 | 0.91 | 0.91 | 3.33 | 432 |
| 8.58 | 3.29 | 1,056,714 | 0.98 | 0.99 | 0.90 | 0.91 | 3.16 | 207 |
| 8.56 | 3.87 | 533,327 | 0.90 | 0.95 | 0.86 | 0.91 | 2.70 | 128 |
| 8.46 | 14.00 | 169,743 | 1.01(f) | 1.02(f) | 0.95(f) | 0.96(f) | 3.77 | 243 |
| 8.67 | 11.95 | 212,807 | 1.24 | 1.24 | 1.21 | 1.21 | 2.25 | 410 |
| 7.95 | (3.62) | 200,678 | 1.25 | 1.25 | 1.21 | 1.21 | 3.07 | 432 |
| 8.58 | 2.98 | 190,628 | 1.28 | 1.29 | 1.20 | 1.21 | 2.85 | 207 |
| 8.56 | 3.56 | 101,717 | 1.20 | 1.25 | 1.16 | 1.21 | 2.34 | 128 |
| 8.46 | 13.65 | 85,943 | 1.31(f) | 1.32(f) | 1.25(f) | 1.26(f) | 3.53 | 243 |
| 8.67 | 3.35 | 3,209 | 1.44* | 1.44* | 1.41* | 1.41* | 2.04* | 410 |
| $ 11.10 | 24.86% | $ 1,216,087 | 0.81% | 0.91% | 0.79% | 0.89% | 3.74% | 59% |
| 9.23 | (2.68) | 788,615 | 0.79 | 0.87 | 0.78 | 0.86 | 3.92 | 67 |
| 9.98 | 2.83 | 259,798 | 0.82 | 0.91 | 0.81 | 0.90 | 4.58 | 57 |
| 10.31 | 8.28 | 119,949 | 0.80 | 0.87 | 0.80 | 0.87 | 3.94 | 151 |
| 10.22 | 15.22 | 60,707 | 0.80 | 0.87 | 0.80 | 0.87 | 4.62 | 123 |

## Financial Highlights (Cont.)

| Selected Per Share Data for the Year or Period Ended^: | Net Asset Value Beginning of Year or Period(a) | Investment Operations | | | Less Distributions(c) | | | |
|---|---|---|---|---|---|---|---|---|
| | | Net Investment Income (Loss)(b) | Net Realized/ Unrealized Gain (Loss) | Total | From Net Investment Income | From Net Realized Capital Gains | Tax Basis Return of Capital | Total |
| **PIMCO Preferred and Capital Securities Fund (Continued)** | | | | | | | | |
| I-2 | | | | | | | | |
| 03/31/2021 | $  9.21 | $ 0.39 | $  1.88 | $  2.27 | $ (0.40) | $  0.00 | $  0.00 | $ (0.40) |
| 03/31/2020 | 9.97 | 0.40 | (0.64) | (0.24) | (0.49) | (0.03) | 0.00 | (0.52) |
| 03/31/2019 | 10.30 | 0.45 | (0.18) | 0.27 | (0.58) | (0.01) | (0.01) | (0.60) |
| 03/31/2018 | 10.21 | 0.40 | 0.43 | 0.83 | (0.71) | (0.03) | 0.00 | (0.74) |
| 03/31/2017 | 9.45 | 0.42 | 0.96 | 1.38 | (0.62) | 0.00 | 0.00 | (0.62) |
| I-3 | | | | | | | | |
| 03/31/2021 | 9.20 | 0.38 | 1.88 | 2.26 | (0.40) | 0.00 | 0.00 | (0.40) |
| 03/31/2020 | 9.95 | 0.40 | (0.63) | (0.23) | (0.49) | (0.03) | 0.00 | (0.52) |
| 04/27/2018 - 03/31/2019 | 10.32 | 0.43 | (0.19) | 0.24 | (0.59) | (0.01) | (0.01) | (0.61) |
| Class A | | | | | | | | |
| 03/31/2021 | 9.19 | 0.36 | 1.88 | 2.24 | (0.38) | 0.00 | 0.00 | (0.38) |
| 03/31/2020 | 9.95 | 0.37 | (0.63) | (0.26) | (0.47) | (0.03) | 0.00 | (0.50) |
| 03/31/2019 | 10.29 | 0.43 | (0.19) | 0.24 | (0.56) | (0.01) | (0.01) | (0.58) |
| 03/31/2018 | 10.22 | 0.38 | 0.42 | 0.80 | (0.70) | (0.03) | 0.00 | (0.73) |
| 03/31/2017 | 9.43 | 0.42 | 0.95 | 1.37 | (0.58) | 0.00 | 0.00 | (0.58) |
| Class C | | | | | | | | |
| 03/31/2021 | 9.19 | 0.28 | 1.87 | 2.15 | (0.31) | 0.00 | 0.00 | (0.31) |
| 08/23/2019 - 03/31/2020 | 10.48 | 0.16 | (1.08) | (0.92) | (0.34) | (0.03) | 0.00 | (0.37) |

^   A zero balance may reflect actual amounts rounding to less than $0.01 or 0.01%.

*   Annualized

(a)  Includes adjustments required by U.S. GAAP and may differ from net asset values and performance reported elsewhere by the Funds.

(b)  Per share amounts based on average number of shares outstanding during the year or period.

(c)  The tax characterization of distributions is determined in accordance with Federal income tax regulations. See Note 2, Distributions to Shareholders, in the Notes to Financial Statements for more information.

(d)  Effective January 23, 2017, the Class's supervisory and administrative fee was decreased by 0.05% to an annual rate of 0.20%.

(e)  Effective January 23, 2017, the Class's supervisory and administrative fee was decreased by 0.05% to an annual rate of 0.30%.

(f)  Effective January 23, 2017, the Class's supervisory and administrative fee was decreased by 0.05% to an annual rate of 0.35%.

| | | Ratios/Supplemental Data | | | | | | |
| | | Ratios to Average Net Assets | | | | | | |
| Net Asset Value End of Year or Period[a] | Total Return[a] | Net Assets End of Year or Period (000s) | Expenses | Expenses Excluding Waivers | Expenses Excluding Interest Expense | Expenses Excluding Interest Expense and Waivers | Net Investment Income (Loss) | Portfolio Turnover Rate |
|---|---|---|---|---|---|---|---|---|
| $ 11.08 | 24.81% | $ 318,242 | 0.91% | 1.01% | 0.89% | 0.99% | 3.65% | 59% |
| 9.21 | (2.87) | 230,245 | 0.89 | 0.97 | 0.88 | 0.96 | 3.85 | 67 |
| 9.97 | 2.76 | 130,385 | 0.92 | 1.01 | 0.91 | 1.00 | 4.51 | 57 |
| 10.30 | 8.27 | 36,539 | 0.90 | 0.97 | 0.90 | 0.97 | 3.82 | 151 |
| 10.21 | 14.92 | 6,002 | 0.90 | 0.97 | 0.90 | 0.97 | 4.19 | 123 |
| | | | | | | | | |
| 11.06 | 24.68 | 42,310 | 0.96 | 1.11 | 0.94 | 1.09 | 3.60 | 59 |
| 9.20 | (2.80) | 28,048 | 0.94 | 1.07 | 0.93 | 1.06 | 3.80 | 67 |
| 9.95 | 2.49 | 11,782 | 0.97* | 1.11* | 0.96* | 1.10* | 4.79* | 57 |
| | | | | | | | | |
| 11.05 | 24.46 | 302,567 | 1.16 | 1.26 | 1.14 | 1.24 | 3.40 | 59 |
| 9.19 | (3.06) | 264,206 | 1.17 | 1.22 | 1.13 | 1.21 | 3.57 | 67 |
| 9.95 | 2.50 | 119,215 | 1.17 | 1.26 | 1.16 | 1.25 | 4.29 | 57 |
| 10.29 | 7.88 | 35,464 | 1.15 | 1.22 | 1.15 | 1.22 | 3.63 | 151 |
| 10.22 | 14.79 | 1,954 | 1.15 | 1.22 | 1.15 | 1.22 | 4.22 | 123 |
| | | | | | | | | |
| 11.03 | 23.53 | 20,136 | 1.91 | 2.01 | 1.89 | 1.99 | 2.65 | 59 |
| 9.19 | (9.21) | 12,500 | 1.89* | 1.97* | 1.88* | 1.96* | 2.64* | 67 |

## Statements of Assets and Liabilities

| (Amounts in thousands†, except per share amounts) | PIMCO Credit Opportunities Bond Fund | PIMCO Diversified Income Fund | PIMCO ESG Income Fund | PIMCO High Yield Spectrum Fund | PIMCO Long-Term Credit Bond Fund | CREW/PIMCO Sr Floating Rate Fund | PIMCO Low Duration Income Fund |
|---|---|---|---|---|---|---|---|
| **Assets:** | | | | | | | |
| *Investments, at value* | | | | | | | |
| Investments in securities* | $ 317,460 | $ 5,000,202 | $ 36,955 | $ 427,660 | $ 4,243,108 | $ 266,096 | $ 9,408,017 |
| Investments in Affiliates | 87,527 | 492,982 | 0 | 39,266 | 55,745 | 24,973 | 34,466 |
| *Financial Derivative Instruments* | | | | | | | |
| Exchange-traded or centrally cleared | 350 | 2,938 | 12 | 85 | 3,163 | 0 | 7,463 |
| Over the counter | 1,773 | 17,247 | 116 | 2,590 | 14,027 | 532 | 61,149 |
| Cash | 648 | 1,857 | 3,173 | 106 | 0 | 4,029 | 20 |
| Deposits with counterparty | 9,997 | 2,538 | 188 | 2,571 | 23,574 | 0 | 41,866 |
| Foreign currency, at value | 619 | 5,346 | 26 | 3 | 5,850 | 24 | 30,385 |
| Receivable for investments sold | 3,279 | 109 | 2 | 757 | 9,064 | 22,047 | 6,493 |
| Receivable for TBA investments sold | 13,493 | 279,613 | 2,665 | 0 | 194,657 | 0 | 2,718,507 |
| Receivable for Fund shares sold | 997 | 4,582 | 1,634 | 173 | 6,105 | 136 | 29,516 |
| Interest and/or dividends receivable | 2,822 | 45,259 | 193 | 5,714 | 37,143 | 1,033 | 40,364 |
| Dividends receivable from Affiliates | 13 | 109 | 0 | 9 | 3 | 4 | 3 |
| Reimbursement receivable from PIMCO | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Prepaid expenses | 0 | 0 | 0 | 10 | 0 | 23 | 0 |
| Other assets | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| **Total Assets** | 438,978 | 5,852,783 | 44,964 | 478,944 | 4,592,441 | 318,897 | 12,378,249 |
| **Liabilities:** | | | | | | | |
| *Borrowings & Other Financing Transactions* | | | | | | | |
| Payable for reverse repurchase agreements | $ 2,168 | $ 13,497 | $ 852 | $ 0 | $ 567,377 | $ 0 | $ 442,931 |
| Payable for sale-buyback transactions | 0 | 0 | 0 | 0 | 2,226 | 0 | 4,390 |
| Payable for short sales | 1,501 | 0 | 0 | 0 | 0 | 0 | 733,804 |
| *Financial Derivative Instruments* | | | | | | | |
| Exchange-traded or centrally cleared | 78 | 831 | 0 | 0 | 861 | 0 | 1,583 |
| Over the counter | 870 | 1,472 | 47 | 3 | 6,868 | 2 | 47,945 |
| Payable for investments purchased | 2,900 | 15,630 | 995 | 3,174 | 44,624 | 19,614 | 156,348 |
| Payable for investments in Affiliates purchased | 13 | 109 | 0 | 9 | 3 | 4 | 3 |
| Payable for TBA investments purchased | 18,472 | 519,410 | 4,335 | 0 | 334,299 | 0 | 3,513,713 |
| Payable for unfunded loan commitments | 1,294 | 2,997 | 0 | 136 | 5,473 | 1,347 | 299 |
| Deposits from counterparty | 842 | 17,197 | 0 | 2,330 | 9,152 | 280 | 53,541 |
| Payable for Fund shares redeemed | 3,945 | 6,848 | 17 | 1,043 | 2,346 | 426 | 16,321 |
| Distributions payable | 0 | 940 | 0 | 120 | 460 | 15 | 2,184 |
| Overdraft due to custodian | 0 | 0 | 0 | 0 | 69 | 0 | 0 |
| Accrued investment advisory fees | 209 | 2,003 | 7 | 120 | 888 | 107 | 1,816 |
| Accrued supervisory and administrative fees | 117 | 1,451 | 7 | 146 | 750 | 84 | 1,726 |
| Accrued distribution fees | 2 | 46 | 0 | 4 | 0 | 6 | 55 |
| Accrued servicing fees | 5 | 92 | 0 | 13 | 0 | 14 | 420 |
| Accrued taxes payable | 0 | 0 | 0 | 0 | 0 | 0 | 98 |
| Accrued reimbursement to PIMCO | 0 | 0 | 0 | 0 | 0 | 0 | 16 |
| Other liabilities | 0 | 0 | 0 | 8 | 6 | 19 | 0 |
| **Total Liabilities** | 32,416 | 582,523 | 6,260 | 7,106 | 975,402 | 21,918 | 4,977,193 |
| **Net Assets** | $ 406,562 | $ 5,270,260 | $ 38,704 | $ 471,838 | $ 3,617,039 | $ 296,979 | $ 7,401,056 |
| **Net Assets Consist of:** | | | | | | | |
| Paid in capital | $ 451,627 | $ 5,255,214 | $ 38,486 | $ 511,140 | $ 3,385,900 | $ 362,012 | $ 7,565,128 |
| Distributable earnings (accumulated loss) | (45,065) | 15,046 | 218 | (39,302) | 231,139 | (65,033) | (164,072) |
| **Net Assets** | $ 406,562 | $ 5,270,260 | $ 38,704 | $ 471,838 | $ 3,617,039 | $ 296,979 | $ 7,401,056 |
| Cost of investments in securities | $ 311,652 | $ 4,912,841 | $ 36,974 | $ 415,855 | $ 4,123,967 | $ 260,398 | $ 9,413,827 |
| Cost of investments in Affiliates | $ 87,421 | $ 492,959 | $ 0 | $ 39,225 | $ 55,750 | $ 24,974 | $ 34,466 |
| Cost of foreign currency held | $ 671 | $ 5,088 | $ 28 | $ 2 | $ 6,609 | $ 24 | $ 30,628 |
| Proceeds received on short sales | $ 1,433 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 733,686 |
| Cost or premiums of financial derivative instruments, net | $ 2,388 | $ 39,194 | $ 82 | $ 1,787 | $ 35,407 | $ 0 | $ 25,856 |
| * Includes repurchase agreements of: | $ 1,597 | $ 0 | $ 0 | $ 0 | $ 5,943 | $ 0 | $ 33,560 |

† A zero balance may reflect actual amounts rounding to less than one thousand.

March 31, 2021

| | PIMCO Credit Opportunities Bond Fund | PIMCO Diversified Income Fund | PIMCO ESG Income Fund | PIMCO High Yield Spectrum Fund | PIMCO Long-Term Credit Bond Fund | CREW/PIMCO Sr Floating Rate Fund | PIMCO Low Duration Income Fund |
|---|---|---|---|---|---|---|---|
| **Net Assets:** | | | | | | | |
| Institutional Class | $ 268,038 | $ 4,132,019 | $ 37,125 | $ 170,488 | $ 3,483,341 | $ 210,739 | $ 2,204,463 |
| I-2 | 115,116 | 670,322 | 1,421 | 238,069 | 133,698 | 22,046 | 3,109,079 |
| I-3 | N/A | 27,498 | 45 | 3,621 | N/A | N/A | 87,455 |
| Administrative Class | N/A | 10,752 | N/A | N/A | N/A | N/A | N/A |
| Class A | 19,542 | 361,780 | 23 | 54,395 | N/A | 54,219 | 1,784,043 |
| Class C | 3,866 | 67,889 | 90 | 5,265 | N/A | 9,975 | 212,807 |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | 3,209 |
| | | | | | | | |
| **Shares Issued and Outstanding:** | | | | | | | |
| Institutional Class | 26,834 | 374,313 | 3,588 | 17,005 | 283,666 | 22,637 | 254,185 |
| I-2 | 11,578 | 60,723 | 137 | 23,746 | 10,888 | 2,368 | 358,496 |
| I-3 | N/A | 2,491 | 4 | 361 | N/A | N/A | 10,084 |
| Administrative Class | N/A | 974 | N/A | N/A | N/A | N/A | N/A |
| Class A | 1,955 | 32,774 | 2 | 5,426 | N/A | 5,824 | 205,709 |
| Class C | 393 | 6,150 | 9 | 525 | N/A | 1,071 | 24,538 |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | 370 |
| | | | | | | | |
| **Net Asset Value Per Share Outstanding[a]:** | | | | | | | |
| Institutional Class | $ 9.99 | $ 11.04 | $ 10.35 | $ 10.03 | $ 12.28 | $ 9.31 | $ 8.67 |
| I-2 | 9.94 | 11.04 | 10.35 | 10.03 | 12.28 | 9.31 | 8.67 |
| I-3 | N/A | 11.04 | 10.35 | 10.03 | N/A | N/A | 8.67 |
| Administrative Class | N/A | 11.04 | N/A | N/A | N/A | N/A | N/A |
| Class A | 10.00 | 11.04 | 10.35 | 10.03 | N/A | 9.31 | 8.67 |
| Class C | 9.85 | 11.04 | 10.35 | 10.03 | N/A | 9.31 | 8.67 |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | 8.67 |

[a] Includes adjustments required by U.S. GAAP and may differ from net asset values and performance reported elsewhere by the Funds.

## Consolidated Statement of Assets and Liabilities

| (Amounts in thousands†, except per share amounts) | PIMCO Preferred and Capital Securities Fund |
|---|---:|
| **Assets:** | |
| *Investments, at value* | |
| Investments in securities* | $ 1,832,564 |
| Investments in Affiliates | 78,277 |
| *Financial Derivative Instruments* | |
| Exchange-traded or centrally cleared | 923 |
| Over the counter | 18,746 |
| Cash | 2,747 |
| Deposits with counterparty | 11,232 |
| Foreign currency, at value | 2,790 |
| Receivable for investments sold | 1,009 |
| Receivable for Fund shares sold | 1,530 |
| Interest and/or dividends receivable | 18,568 |
| Dividends receivable from Affiliates | 12 |
| Reimbursement receivable from PIMCO | 187 |
| **Total Assets** | 1,968,585 |
| | |
| **Liabilities:** | |
| *Borrowings & Other Financing Transactions* | |
| Payable for reverse repurchase agreements | $ 39,487 |
| *Financial Derivative Instruments* | |
| Exchange-traded or centrally cleared | 657 |
| Over the counter | 1,625 |
| Payable for investments purchased | 6,598 |
| Payable for investments in Affiliates purchased | 12 |
| Deposits from counterparty | 17,582 |
| Payable for Fund shares redeemed | 1,545 |
| Accrued investment advisory fees | 835 |
| Accrued supervisory and administrative fees | 673 |
| Accrued distribution fees | 12 |
| Accrued servicing fees | 68 |
| Other liabilities | 149 |
| **Total Liabilities** | 69,243 |
| | |
| **Net Assets** | $ 1,899,342 |
| | |
| **Net Assets Consist of:** | |
| Paid in capital | $ 1,786,209 |
| Distributable earnings (accumulated loss) | 113,133 |
| | |
| **Net Assets** | $ 1,899,342 |
| | |
| Cost of investments in securities | $ 1,735,592 |
| Cost of investments in Affiliates | $ 78,268 |
| Cost of foreign currency held | $ 2,858 |
| Cost or premiums of financial derivative instruments, net | $ 1,296 |
| | |
| * Includes repurchase agreements of: | $ 78,225 |

† A zero balance may reflect actual amounts rounding to less than one thousand.

March 31, 2021

| | PIMCO Preferred and Capital Securities Fund |
|---|---|
| **Net Assets:** | |
| Institutional Class | $ 1,216,087 |
| I-2 | 318,242 |
| I-3 | 42,310 |
| Class A | 302,567 |
| Class C | 20,136 |
| **Shares Issued and Outstanding:** | |
| Institutional Class | 109,541 |
| I-2 | 28,734 |
| I-3 | 3,826 |
| Class A | 27,381 |
| Class C | 1,826 |
| **Net Asset Value Per Share Outstanding**[(a)]**:** | |
| Institutional Class | $ 11.10 |
| I-2 | 11.08 |
| I-3 | 11.06 |
| Class A | 11.05 |
| Class C | 11.03 |

[(a)] Includes adjustments required by U.S. GAAP and may differ from net asset values and performance reported elsewhere by the Fund.

## Statements of Operations

Year Ended March 31, 2021

(Amounts in thousands[1])

| | PIMCO Credit Opportunities Bond Fund | PIMCO Diversified Income Fund | PIMCO ESG Income Fund[a] | PIMCO High Yield Spectrum Fund | PIMCO Long-Term Credit Bond Fund | CREW/PIMCO Sr Floating Rate Fund | PIMCO Low Duration Income Fund |
|---|---|---|---|---|---|---|---|
| **Investment Income:** | | | | | | | |
| Interest, net of foreign taxes* | $ 15,406 | $ 180,569 | $ 187 | $ 21,177 | $ 162,625 | $ 18,345 | $ 208,561 |
| Dividends | 0 | 1,274 | 0 | 0 | 1,531 | 0 | 1,254 |
| Dividends from Investments in Affiliates | 286 | 726 | 0 | 122 | 145 | 141 | 37 |
| Total Income | 15,692 | 182,569 | 187 | 21,299 | 164,301 | 18,486 | 209,852 |
| **Expenses:** | | | | | | | |
| Investment advisory fees | 2,351 | 21,522 | 19 | 1,198 | 11,242 | 1,776 | 18,021 |
| Supervisory and administrative fees | 1,311 | 15,599 | 19 | 1,465 | 9,529 | 1,389 | 17,144 |
| Distribution and/or servicing fees - Administrative Class | N/A | 299 | N/A | N/A | N/A | N/A | N/A |
| Distribution fees - Class C | 38 | 612 | 0 | 53 | N/A | 128 | 621 |
| Distribution fees - C-2 | N/A | N/A | N/A | N/A | N/A | N/A | 2[b] |
| Servicing fees - Class A | 55 | 860 | 0 | 137 | N/A | 125 | 3,699 |
| Servicing fees - Class C | 13 | 204 | 0 | 18 | N/A | 43 | 517 |
| Servicing fees - C-2 | N/A | N/A | N/A | N/A | N/A | N/A | 1[b] |
| Trustee fees | 2 | 26 | 0 | 2 | 23 | 2 | 35 |
| Interest expense | 18 | 1,070 | 2 | 69 | 1,428 | 135 | 1,883 |
| Organizational expense | 0 | 0 | 98 | 0 | 0 | 0 | 0 |
| Miscellaneous expense | 5 | 47 | 0 | 6 | 47 | 6 | 365 |
| Total Expenses | 3,793 | 40,239 | 138 | 2,948 | 22,269 | 3,604 | 42,288 |
| Waiver and/or Reimbursement by PIMCO | 0 | (12) | (97) | (0) | 0 | 0 | (57) |
| Net Expenses | 3,793 | 40,227 | 41 | 2,948 | 22,269 | 3,604 | 42,231 |
| **Net Investment Income (Loss)** | 11,899 | 142,342 | 146 | 18,351 | 142,032 | 14,882 | 167,621 |
| **Net Realized Gain (Loss):** | | | | | | | |
| Investments in securities | 77 | (18,964) | (14) | (8,687) | 228,001 | 12,824 | 28,633 |
| Investments in Affiliates | (77) | 17 | 0 | 49 | 357 | 301 | (8) |
| Exchange-traded or centrally cleared financial derivative instruments | 310 | (6,009) | 3 | (139) | (32,437) | (2,049) | (144,334) |
| Over the counter financial derivative instruments | (344) | (24,090) | (55) | (2,140) | 9,899 | (742) | (35,848) |
| Short sales | (776) | 30 | 0 | 0 | 0 | 0 | (26) |
| Foreign currency | (315) | (4,281) | 22 | (934) | (1,050) | (1,664) | (5,443) |
| **Net Realized Gain (Loss)** | (1,125) | (53,297) | (44) | (11,851) | 204,770 | 8,670 | (157,026) |
| **Net Change in Unrealized Appreciation (Depreciation):** | | | | | | | |
| Investments in securities | 32,867 | 295,819 | (19) | 63,813 | (41,137) | 27,777 | 326,397 |
| Investments in Affiliates | 347 | 989 | 0 | 54 | (26) | 34 | (1) |
| Exchange-traded or centrally cleared financial derivative instruments | 2,332 | 80,242 | 197 | 1,601 | 62,758 | 580 | 300,557 |
| Over the counter financial derivative instruments | 1,248 | 23,617 | 85 | 3,313 | 14,614 | 998 | 47,849 |
| Short sales | 618 | 0 | 0 | 0 | 0 | 0 | 0 |
| Foreign currency assets and liabilities | (54) | (2,800) | (2) | (387) | (728) | (182) | (4,595) |
| **Net Change in Unrealized Appreciation (Depreciation)** | 37,358 | 397,867 | 261 | 68,394 | 35,481 | 29,207 | 670,207 |
| **Net Increase (Decrease) in Net Assets Resulting from Operations** | $ 48,132 | $ 486,912 | $ 363 | $ 74,894 | $ 382,283 | $ 52,759 | $ 680,802 |
| * Foreign tax withholdings | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 99 |

[1]  A zero balance may reflect actual amounts rounding to less than one thousand.
[a]  Inception date of the Fund was September 30, 2020.
[b]  Inception date of Class C-2 was October 21, 2020.

## Consolidated Statement of Operations

Year Ended March 31, 2021

| (Amounts in thousands†) | PIMCO Preferred and Capital Securities Fund |
|---|---:|
| **Investment Income:** | |
| Interest, net of foreign taxes* | $  74,597 |
| Dividends | 3,671 |
| Dividends from Investments in Affiliates | 322 |
| Total Income | 78,590 |
| | |
| **Expenses:** | |
| Investment advisory fees | 8,814 |
| Supervisory and administrative fees | 7,191 |
| Distribution fees - Class C | 127 |
| Servicing fees - Class A | 722 |
| Servicing fees - Class C | 42 |
| Trustee fees | 9 |
| Interest expense | 264 |
| Miscellaneous expense | 6 |
| Total Expenses | 17,175 |
| Waiver and/or Reimbursement by PIMCO | (1,744) |
| Net Expenses | 15,431 |
| | |
| **Net Investment Income (Loss)** | 63,159 |
| | |
| **Net Realized Gain (Loss):** | |
| Investments in securities | 48,868 |
| Investments in Affiliates | 94 |
| Exchange-traded or centrally cleared financial derivative instruments | (6,343) |
| Over the counter financial derivative instruments | (41,241) |
| Foreign currency | (3,013) |
| | |
| **Net Realized Gain (Loss)** | (1,635) |
| | |
| **Net Change in Unrealized Appreciation (Depreciation):** | |
| Investments in securities | 267,586 |
| Investments in Affiliates | 9 |
| Exchange-traded or centrally cleared financial derivative instruments | 4,889 |
| Over the counter financial derivative instruments | 14,689 |
| Foreign currency assets and liabilities | (947) |
| | |
| **Net Change in Unrealized Appreciation (Depreciation)** | 286,226 |
| | |
| **Net Increase (Decrease) in Net Assets Resulting from Operations** | $ 347,750 |
| | |
| * Foreign tax withholdings | $       150 |

† A zero balance may reflect actual amounts rounding to less than one thousand.

# Statements of Changes in Net Assets

| (Amounts in thousands[†]) | PIMCO Credit Opportunities Bond Fund | | PIMCO Diversified Income Fund | | PIMCO ESG Income Fund |
| --- | --- | --- | --- | --- | --- |
| | Year Ended March 31, 2021 | Year Ended March 31, 2020 | Year Ended March 31, 2021 | Year Ended March 31, 2020 | Inception date through March 31, 2021[a] |
| **Increase (Decrease) in Net Assets from:** | | | | | |
| **Operations:** | | | | | |
| Net investment income (loss) | $  11,899 | $  16,704 | $  142,342 | $  123,630 | $  146 |
| Net realized gain (loss) | (1,125) | 7,747 | (53,297) | 101,111 | (44) |
| Net change in unrealized appreciation (depreciation) | 37,358 | (37,789) | 397,867 | (321,601) | 261 |
| **Net Increase (Decrease) in Net Assets Resulting from Operations** | 48,132 | (13,338) | 486,912 | (96,860) | 363 |
| **Distributions to Shareholders:** | | | | | |
| From net investment income and/or net realized capital gains | | | | | |
| Institutional Class | (9,582) | (12,786) | (133,148) | (139,643) | (145) |
| I-2 | (3,420) | (2,265) | (19,957) | (19,963) | (0) |
| I-3 | N/A | N/A | (861) | (457) | (0) |
| Administrative Class | N/A | N/A | (4,152) | (7,677) | N/A |
| Class A | (678) | (785) | (11,193) | (15,078) | (0) |
| Class C | (121) | (164) | (2,050) | (2,771) | (0) |
| Class C-2 | N/A | N/A | N/A | N/A | N/A |
| Tax basis return of capital | | | | | |
| Institutional Class | 0 | 0 | 0 | 0 | 0 |
| I-2 | 0 | 0 | 0 | 0 | 0 |
| I-3 | N/A | N/A | 0 | 0 | 0 |
| Administrative Class | N/A | N/A | 0 | 0 | N/A |
| Class A | 0 | 0 | 0 | 0 | 0 |
| Class C | 0 | 0 | 0 | 0 | 0 |
| Class C-2 | N/A | N/A | N/A | N/A | N/A |
| **Total Distributions[c]** | (13,801) | (16,000) | (171,361) | (185,589) | (145) |
| **Fund Share Transactions:** | | | | | |
| Net increase (decrease) resulting from Fund share transactions* | 59,901 | (24,584) | 1,219,500 | 735,912 | 38,486 |
| Fund Redemption Fee | 0 | 0 | 0 | 0 | 0 |
| **Total Increase (Decrease) in Net Assets** | 94,232 | (53,922) | 1,535,051 | 453,463 | 38,704 |
| **Net Assets:** | | | | | |
| Beginning of year | 312,330 | 366,252 | 3,735,209 | 3,281,746 | 0 |
| End of year | $ 406,562 | $ 312,330 | $ 5,270,260 | $ 3,735,209 | $ 38,704 |

[†]  A zero balance may reflect actual amounts rounding to less than one thousand.
*  See Note 13, Shares of Beneficial Interest, in the Notes to Financial Statements.
[a]  Inception date of the Fund was September 30, 2020.
[b]  Inception date of Class C-2 was October 21, 2020.
[c]  The tax characterization of distributions is determined in accordance with Federal income tax regulations. See Note 2, Distributions to Shareholders, in the Notes to Financial Statements for more information.

| | PIMCO<br>High Yield Spectrum Fund | | PIMCO<br>Long-Term Credit Bond Fund | | CREW/PIMCO<br>Sr Floating Rate Fund | | PIMCO<br>Low Duration Income Fund | |
|---|---|---|---|---|---|---|---|---|
| | Year Ended<br>March 31, 2021 | Year Ended<br>March 31, 2020 | Year Ended<br>March 31, 2021 | Year Ended<br>March 31, 2020 | Year Ended<br>March 31, 2021 | Year Ended<br>March 31, 2020 | Year Ended<br>March 31, 2021 | Year Ended<br>March 31, 2020 |
| | $ 18,351 | $ 34,913 | $ 142,032 | $ 163,332 | $ 14,882 | $ 12,449 | $ 167,621 | $ 205,782 |
| | (11,851) | (199) | 204,770 | 150,366 | 8,670 | (9,909) | (157,026) | 48,896 |
| | 68,394 | (36,368) | 35,481 | (17,701) | 29,207 | (18,860) | 670,207 | (509,407) |
| | 74,894 | (1,654) | 382,283 | 295,997 | 52,759 | (16,320) | 680,802 | (254,729) |
| | (6,511) | (22,219) | (277,514) | (177,079) | (12,655) | (7,188) | (47,908) | (88,052) |
| | (9,623) | (9,969) | (11,730) | (36,217) | (819) | (1,685) | (65,476) | (107,707) |
| | (44) | (44) | N/A | N/A | N/A | N/A | (1,159) | (2,275) |
| | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | (2,510) | (3,318) | N/A | N/A | (1,656) | (3,368) | (34,131) | (53,304) |
| | (272) | (365) | N/A | N/A | (425) | (1,423) | (4,193) | (8,032) |
| | N/A | N/A | N/A | N/A | N/A | N/A | (3)(b) | N/A |
| | 0 | 0 | 0 | 0 | 0 | 0 | (10,469) | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | (14,862) | 0 |
| | 0 | 0 | N/A | N/A | N/A | N/A | (271) | 0 |
| | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | 0 | 0 | N/A | N/A | 0 | 0 | (8,768) | 0 |
| | 0 | 0 | N/A | N/A | 0 | 0 | (1,225) | 0 |
| | N/A | N/A | N/A | N/A | N/A | N/A | (6)(b) | N/A |
| | (18,960) | (35,915) | (289,244) | (213,296) | (15,555) | (13,664) | (188,471) | (259,370) |
| | 122,790 | (540,604) | 13,301 | (219,247) | 7,909 | (64,394) | 1,474,062 | 1,125,782 |
| | 0 | 0 | 0 | 0 | 2 | 3 | 0 | 0 |
| | 178,724 | (578,173) | 106,340 | (136,546) | 45,115 | (94,375) | 1,966,393 | 611,683 |
| | 293,114 | 871,287 | 3,510,699 | 3,647,245 | 251,864 | 346,239 | 5,434,663 | 4,822,980 |
| | $ 471,838 | $ 293,114 | $ 3,617,039 | $ 3,510,699 | $ 296,979 | $ 251,864 | $ 7,401,056 | $ 5,434,663 |

# Schedule of Investments CREW/PIMCO Sr Floating Rate Fund

(Amounts in thousands*, except number of shares, contracts, units and ounces, if any)

**INVESTMENTS IN SECURITIES 89.6%**

**LOAN PARTICIPATIONS AND ASSIGNMENTS 85.9%**

| | PRINCIPAL AMOUNT (000S) | MARKET VALUE (000S) |
|---|---|---|
| **AAdvantage Loyalty IP Ltd.** | | |
| TBD% due 04/20/2028 | $ 1,800 | $ 1,844 |
| **Advantage Sales & Marketing, Inc.** | | |
| 6.000% (LIBOR03M + 5.250%) due 10/28/2027 ~ | 3,500 | 3,500 |
| **Ahlstrom-Munksjo Oyj** | | |
| TBD% due 03/11/2028 | 1,550 | 1,555 |
| **AlixPartners, LLP** | | |
| 3.250% (LIBOR03M + 2.750%) due 02/04/2028 ~ | 1,725 | 1,720 |
| **Alliant Holdings Intermediate LLC** | | |
| 3.359% (LIBOR03M + 3.250%) due 05/09/2025 ~ | 1,646 | 1,627 |
| **Allied Universal Holdco LLC** | | |
| 4.359% (LIBOR03M + 4.250%) due 07/10/2026 ~ | 1,135 | 1,133 |
| **Alphabet Holding Co., Inc.** | | |
| 3.609% (LIBOR03M + 3.500%) due 09/26/2024 ~ | 848 | 843 |
| **Altice Financing S.A.** | | |
| 2.856% (LIBOR03M + 2.750%) due 07/15/2025 ~ | 990 | 972 |
| 2.953% (LIBOR03M + 2.750%) due 01/31/2026 ~ | 2,431 | 2,386 |
| **Altice France S.A.** | | |
| 4.198% (LIBOR03M + 4.000%) due 08/14/2026 ~ | 3,381 | 3,374 |
| **American Trailer World Corp.** | | |
| 4.500% (LIBOR03M + 3.750%) due 02/17/2028 ~ | 3,200 | 3,182 |
| **Arches Buyer, Inc.** | | |
| 3.750% (LIBOR03M + 3.250%) due 12/06/2027 ~ | 3,865 | 3,847 |
| **Array Technologies, Inc.** | | |
| 3.750% (LIBOR03M + 3.250%) due 10/14/2027 ~ | 2,561 | 2,563 |
| **Astoria Energy LLC** | | |
| 4.500% (LIBOR03M + 3.500%) due 12/10/2027 ~ | 2,575 | 2,580 |
| **Asurion LLC** | | |
| 3.359% (LIBOR03M + 3.250%) due 12/23/2026 ~ | 4,542 | 4,519 |
| **Athenahealth, Inc.** | | |
| 4.453% (LIBOR03M + 4.250%) due 02/11/2026 ~ | 2,000 | 2,008 |
| **Banijay Entertainment S.A.S** | | |
| 3.854% (LIBOR03M + 3.750%) due 03/01/2025 ~ | 1,045 | 1,037 |
| **Barracuda Networks, Inc.** | | |
| 4.500% (LIBOR03M + 3.750%) due 02/12/2025 ~ | 1,194 | 1,194 |
| **Blackhawk Network Holdings, Inc.** | | |
| 3.109% (LIBOR03M + 3.000%) due 06/15/2025 ~ | 552 | 545 |
| **Boels Topholding BV** | | |
| 4.000% (EUR003M + 4.000%) due 02/06/2027 ~ | EUR 2,800 | 3,294 |
| **BWAY Holding Co.** | | |
| 3.443% (LIBOR03M + 3.250%) due 04/03/2024 ~ | $ 3,631 | 3,556 |
| **Caesars Resort Collection LLC** | | |
| 2.859% (LIBOR03M + 2.750%) due 12/23/2024 ~ | 3,904 | 3,848 |
| 4.609% (LIBOR03M + 4.500%) due 07/21/2025 ~ | 3,234 | 3,244 |
| **Camelot U.S. Acquisition Co.** | | |
| 3.109% (LIBOR03M + 3.000%) due 10/30/2026 ~ | 2,597 | 2,580 |
| **Canada Goose, Inc.** | | |
| 5.000% (LIBOR03M + 4.250%) due 10/07/2027 ~ | 1,397 | 1,400 |

| | PRINCIPAL AMOUNT (000S) | MARKET VALUE (000S) |
|---|---|---|
| **Carnival Corp.** | | |
| 8.500% (LIBOR03M + 7.500%) due 06/30/2025 ~ | $ 2,233 | $ 2,311 |
| **CBI Buyer, INC.** | | |
| 3.750% (LIBOR03M + 3.250%) due 01/06/2028 ~ | 475 | 473 |
| **Chobani LLC** | | |
| 4.500% (LIBOR03M + 3.500%) due 10/20/2027 ~ | 1,418 | 1,419 |
| **CityCenter Holdings LLC** | | |
| 3.000% (LIBOR03M + 2.250%) due 04/18/2024 ~ | 3,142 | 3,106 |
| **Clarios Global LP** | | |
| 3.359% (LIBOR03M + 3.250%) due 04/30/2026 ~ | 1,995 | 1,987 |
| **Clear Channel Outdoor Holdings, Inc.** | | |
| 3.712% (LIBOR03M + 3.500%) due 08/21/2026 ~ | 4,950 | 4,768 |
| **CNT Holdings Corp.** | | |
| 4.500% (LIBOR03M + 3.750%) due 11/08/2027 ~ | 2,000 | 1,998 |
| **CommScope, Inc.** | | |
| 3.359% (LIBOR03M + 3.250%) due 04/06/2026 ~ | 1,414 | 1,408 |
| **Consumer Cellular, Inc.** | | |
| 4.750% (LIBOR03M + 4.000%) due 12/17/2027 ~ | 1,200 | 1,203 |
| **Core & Main LP** | | |
| 3.750% (LIBOR03M + 2.750%) due 08/01/2024 ~ | 895 | 893 |
| **Coty, Inc.** | | |
| 2.354% (LIBOR03M + 2.250%) due 04/07/2025 ~ | 3,892 | 3,749 |
| **COWEN INC TL B 1L** | | |
| TBD% due 03/12/2028 « | 1,600 | 1,596 |
| **Da Vinci Purchaser Corp.** | | |
| 5.000% (LIBOR03M + 4.000%) due 01/08/2027 ~ | 1,375 | 1,377 |
| **Delta 2 (LUX) SARL** | | |
| 3.500% (LIBOR03M + 2.500%) due 02/01/2024 ~ | 2,362 | 2,342 |
| **Diamond (BC) BV** | | |
| 3.109% (LIBOR03M + 3.000%) due 09/06/2024 ~ | 98 | 98 |
| 3.250% (EUR003M + 3.250%) due 09/06/2024 ~ | EUR 1,443 | 1,692 |
| **Diamond Sports Group LLC** | | |
| 3.360% (LIBOR03M + 3.250%) due 08/24/2026 ~ | $ 5,058 | 3,585 |
| **Dun & Bradstreet Corp.** | | |
| 3.359% (LIBOR03M + 3.250%) due 02/06/2026 ~ | 1,372 | 1,366 |
| **E2open LLC** | | |
| 4.000% (LIBOR03M + 3.500%) due 10/29/2027 ~ | 1,625 | 1,625 |
| **Endure Digital, Inc.** | | |
| 4.250% (LIBOR03M + 3.500%) due 02/10/2028 ~ | 2,200 | 2,194 |
| **Entercom Media Corp.** | | |
| 2.609% (LIBOR03M + 2.500%) due 11/18/2024 ~ | 315 | 309 |
| **Envision Healthcare Corp.** | | |
| 3.859% (LIBOR03M + 3.750%) due 10/10/2025 ~ | 1,521 | 1,315 |
| **EyeCare Partners LLC** | | |
| 3.859% (LIBOR03M + 3.750%) due 02/18/2027 ~ | 882 | 874 |
| **Flex Acquisition Co., Inc.** | | |
| 3.238% - 3.488% (LIBOR03M + 3.250%) due 06/29/2025 ~ | 1,457 | 1,435 |
| **Foundation Building Materials Holding Co LLC** | | |
| 3.750% (LIBOR03M + 3.250%) due 02/03/2028 ~ | 1,700 | 1,687 |

| | PRINCIPAL AMOUNT (000S) | MARKET VALUE (000S) |
|---|---|---|
| **Frontier Communications Corp.** | | |
| 5.750% (LIBOR03M + 4.750%) due 10/08/2021 ~ | $ 4,175 | $ 4,188 |
| **Gainwell Acquisition Corp.** | | |
| 4.750% (LIBOR03M + 4.000%) due 10/01/2027 ~ | 4,220 | 4,212 |
| **Getty Images, Inc.** | | |
| 4.609% (LIBOR03M + 4.500%) due 02/19/2026 ~ | 1,985 | 1,970 |
| **Global Medical Response, Inc.** | | |
| 5.750% (LIBOR03M + 4.750%) due 10/02/2025 ~ | 4,242 | 4,235 |
| **GlobalLogic Holdings, Inc.** | | |
| 2.859% (LIBOR03M + 2.750%) due 08/01/2025 «~ | 988 | 986 |
| **Golden Entertainment, Inc.** | | |
| 3.750% (LIBOR03M + 3.000%) due 10/21/2024 ~ | 300 | 297 |
| **Graham Packaging Co., Inc.** | | |
| 3.750% (LIBOR03M + 3.000%) due 08/04/2027 ~ | 3,388 | 3,373 |
| **Hearthside Food Solutions LLC** | | |
| 3.796% (LIBOR03M + 3.688%) due 05/23/2025 ~ | 1,073 | 1,065 |
| 6.000% (LIBOR03M + 5.000%) due 05/23/2025 ~ | 398 | 399 |
| **Hub International Ltd.** | | |
| 2.965% - 3.215% (LIBOR03M + 3.000%) due 04/25/2025 ~ | 2,144 | 2,117 |
| **iHeartCommunications, Inc.** | | |
| 3.109% (LIBOR03M + 3.000%) due 05/01/2026 ~ | 672 | 665 |
| **Illuminate Buyer LLC** | | |
| 3.609% (LIBOR03M + 3.500%) due 06/30/2027 ~ | 2,095 | 2,088 |
| **INEOS Enterprises Holdings U.S. Finco LLC** | | |
| 4.500% (LIBOR03M + 3.500%) due 08/28/2026 ~ | 1,516 | 1,520 |
| **INEOS Styrolution US Holding LLC** | | |
| 3.250% (LIBOR03M + 2.750%) due 01/29/2026 ~ | 900 | 898 |
| **Informatica LLC** | | |
| 3.359% (LIBOR03M + 3.250%) due 02/25/2027 ~ | 1,020 | 1,014 |
| **IRB Holding Corp.** | | |
| 3.750% (LIBOR03M + 2.750%) due 02/05/2025 ~ | 2,240 | 2,225 |
| 4.250% (LIBOR03M + 3.250%) due 12/15/2027 ~ | 2,675 | 2,672 |
| **Ivanti Software, Inc.** | | |
| 5.750% (LIBOR03M + 4.750%) due 12/01/2027 ~ | 3,800 | 3,823 |
| **Kronos Acquisition Holdings, Inc.** | | |
| 4.250% (LIBOR03M + 3.750%) due 12/22/2026 ~ | 2,350 | 2,320 |
| **LBM Acquisition LLC** | | |
| TBD% due 12/17/2027 µ | 287 | 286 |
| 4.500% (LIBOR03M + 3.750%) due 12/17/2027 ~ | 1,291 | 1,287 |
| **Les Schwab Tire Centers** | | |
| 4.250% (LIBOR03M + 3.500%) due 11/02/2027 ~ | 2,625 | 2,634 |
| **Marriott Ownership Resorts, Inc.** | | |
| 1.859% (LIBOR03M + 1.750%) due 08/29/2025 ~ | 479 | 468 |
| **MH Sub LLC** | | |
| 3.609% (LIBOR03M + 3.500%) due 09/13/2024 ~ | 4,516 | 4,468 |
| **MPH Acquisition Holdings LLC** | | |
| 3.750% (LIBOR03M + 2.750%) due 06/07/2023 ~ | 432 | 430 |
| **MTN Infrastructure TopCo., Inc.** | | |
| 4.000% (LIBOR03M + 3.000%) due 11/15/2024 ~ | 1,221 | 1,220 |

March 31, 2021

| | PRINCIPAL AMOUNT (000s) | MARKET VALUE (000s) |
|---|---|---|
| **NEP Group, Inc.** | | |
| 3.359% (LIBOR03M + 3.250%) due 10/20/2025 ~ | $ 3,308 | $ 3,219 |
| **Nielsen Consumer, Inc.** | | |
| 4.103% (LIBOR03M + 4.000%) due 03/06/2028 ~ | 2,275 | 2,270 |
| **NorthRiver Midstream Finance LP** | | |
| 3.488% (LIBOR03M + 3.250%) due 10/01/2025 ~ | 733 | 724 |
| **Nouryon Finance BV** | | |
| 2.860% (LIBOR03M + 2.750%) due 10/01/2025 ~ | 3,548 | 3,499 |
| **Novelis, Inc.** | | |
| TBD% due 04/15/2025 « | 3,840 | 3,782 |
| **OneDigital Borrower LLC** | | |
| TBD% due 11/16/2027 µ | 175 | 175 |
| 5.250% (LIBOR03M + 4.500%) due 11/16/2027 ~ | 1,775 | 1,778 |
| **Ortho-Clinical Diagnostics S.A.** | | |
| 3.359% - 5.500% (LIBOR03M + 3.250%) due 06/30/2025 ~ | 2,900 | 2,899 |
| **Parexel International Corp.** | | |
| 2.859% (LIBOR03M + 2.750%) due 09/27/2024 ~ | 855 | 846 |
| **Park River Holdings, Inc.** | | |
| 4.000% (LIBOR03M + 3.250%) due 12/28/2027 ~ | 875 | 872 |
| **Peraton Holding Corp.** | | |
| TBD% due 02/01/2028 µ | 893 | 893 |
| 4.500% (LIBOR03M + 3.750%) due 02/01/2028 ~ | 507 | 507 |
| **Petco Health & Wellness Co.** | | |
| 4.000% (LIBOR03M + 3.250%) due 03/03/2028 ~ | 1,150 | 1,147 |
| **Phoenix Guarantor, Inc.** | | |
| 3.361% (LIBOR03M + 3.250%) due 03/05/2026 ~ | 1,372 | 1,363 |
| **PQ Corp.** | | |
| 4.000% (LIBOR03M + 3.000%) due 02/07/2027 ~ | 685 | 686 |
| **Presidio, Inc.** | | |
| 3.720% (LIBOR03M + 3.500%) due 01/22/2027 ~ | 2,214 | 2,212 |
| **Prime Security Services Borrower LLC** | | |
| 3.500% (LIBOR03M + 2.750%) due 09/23/2026 ~ | 1,285 | 1,280 |
| **Project Ruby Ultimate Parent Corp.** | | |
| 4.000% (LIBOR03M + 3.250%) due 03/03/2028 ~ | 900 | 897 |
| **PUG LLC** | | |
| 3.609% (LIBOR03M + 3.500%) due 02/12/2027 ~ | 1,310 | 1,269 |
| **Radiate Holdco LLC** | | |
| 4.250% (LIBOR03M + 3.500%) due 09/25/2026 ~ | 2,479 | 2,480 |
| **RegionalCare Hospital Partners Holdings, Inc.** | | |
| 3.859% (LIBOR03M + 3.750%) due 11/16/2025 ~ | 2,952 | 2,949 |
| **Reynolds Group Holdings, Inc.** | | |
| 3.359% (LIBOR03M + 3.250%) due 02/05/2026 ~ | 1,621 | 1,605 |
| **Sabre GLBL, Inc.** | | |
| 2.109% (LIBOR03M + 2.000%) due 02/22/2024 ~ | 2,969 | 2,935 |
| **Scientific Games International, Inc.** | | |
| 2.859% (LIBOR03M + 2.750%) due 08/14/2024 ~ | 2,243 | 2,203 |
| **Sequa Mezzanine Holdings LLC** | | |
| 7.750% (LIBOR03M + 6.750%) due 11/28/2023 ~ | 1,251 | 1,258 |
| **Sigma Bidco BV** | | |
| 3.260% (LIBOR03M + 3.000%) due 07/02/2025 ~ | 2,481 | 2,460 |
| **SolarWinds Holdings, Inc.** | | |
| 2.859% (LIBOR03M + 2.750%) due 02/05/2024 ~ | 1,250 | 1,229 |

| | PRINCIPAL AMOUNT (000s) | MARKET VALUE (000s) |
|---|---|---|
| **Sophia LP** | | |
| 4.500% (LIBOR03M + 3.750%) due 10/07/2027 ~ | $ 1,546 | $ 1,547 |
| **Sotera Health Holdings LLC** | | |
| 3.250% (LIBOR03M + 2.750%) due 12/11/2026 ~ | 1,100 | 1,099 |
| **Spirit AeroSystems Holdings, Inc.** | | |
| 6.000% (LIBOR03M + 5.250%) due 01/15/2025 ~ | 1,945 | 1,962 |
| **Staples, Inc.** | | |
| 4.705% (LIBOR03M + 4.500%) due 09/12/2024 ~ | 246 | 243 |
| 5.205% (LIBOR03M + 5.000%) due 04/16/2026 ~ | 1,627 | 1,592 |
| **Station Casinos LLC** | | |
| 2.500% (LIBOR03M + 2.250%) due 02/08/2027 ~ | 2,557 | 2,521 |
| **Sunshine Luxembourg SARL** | | |
| 4.500% (LIBOR03M + 3.500%) due 06/30/2021 ~ | 308 | 308 |
| **Symplr Software, Inc.** | | |
| 5.250% (LIBOR03M + 4.500%) due 12/22/2027 ~ | 575 | 578 |
| **Team Health Holdings, Inc.** | | |
| 3.750% (LIBOR03M + 2.750%) due 02/06/2024 ~ | 823 | 768 |
| **Telesat LLC** | | |
| 2.860% (LIBOR03M + 2.750%) due 12/07/2026 ~ | 814 | 785 |
| **Tempo Acquisition LLC** | | |
| 3.750% (LIBOR03M + 3.250%) due 11/02/2026 ~ | 1,985 | 1,987 |
| **Terrier Media Buyer, Inc.** | | |
| 3.609% (LIBOR03M + 3.500%) due 12/17/2026 ~ | 494 | 490 |
| **Tibco Software, Inc.** | | |
| 3.860% (LIBOR03M + 3.750%) due 06/30/2026 ~ | 596 | 590 |
| **Triton Water Holdings, Inc.** | | |
| TBD% due 03/18/2028 | 850 | 848 |
| **Truck Hero, Inc.** | | |
| 4.500% (LIBOR03M + 3.750%) due 01/31/2028 ~ | 350 | 350 |
| **U.S. Renal Care, Inc.** | | |
| 5.125% (LIBOR03M + 5.000%) due 06/26/2026 ~ | 1,662 | 1,655 |
| **Uber Technologies, Inc.** | | |
| 3.609% (LIBOR03M + 3.500%) due 04/04/2025 ~ | 3,179 | 3,169 |
| **Ultimate Software Group, Inc.** | | |
| 4.000% (LIBOR03M + 3.250%) due 05/04/2026 ~ | 1,990 | 1,991 |
| **Univision Communications, Inc.** | | |
| 2.857% (LIBOR03M + 2.750%) due 03/15/2024 ~ | 4,102 | 4,079 |
| **USS Ultimate Holdings, Inc.** | | |
| 4.750% (LIBOR03M + 3.750%) due 08/25/2024 ~ | 3,487 | 3,491 |
| **Verifone Systems, Inc.** | | |
| 4.182% (LIBOR03M + 4.000%) due 08/20/2025 ~ | 3,501 | 3,431 |
| **Verscend Holding Corp.** | | |
| 4.607% (LIBOR03M + 4.500%) due 08/27/2025 ~ | 1,587 | 1,593 |
| **Vertical U.S. Newco, Inc.** | | |
| 4.478% (LIBOR03M + 4.250%) due 07/30/2027 ~ | 1,147 | 1,151 |
| **Wand NewCo 3, Inc.** | | |
| 3.109% (LIBOR03M + 3.000%) due 02/05/2026 ~ | 3,015 | 2,982 |
| **Weber-Stephen Products LLC** | | |
| 4.000% (LIBOR03M + 3.250%) due 10/30/2027 ~ | 2,294 | 2,296 |

| | PRINCIPAL AMOUNT (000s) | MARKET VALUE (000s) |
|---|---|---|
| **Welbilt, Inc.** | | |
| 2.607% (LIBOR03M + 2.500%) due 10/23/2025 ~ | $ 1,615 | $ 1,555 |
| **White Cap Buyer LLC** | | |
| 4.500% (LIBOR03M + 4.000%) due 10/19/2027 ~ | 3,591 | 3,589 |
| **WOOF Holdings, Inc.** | | |
| 4.500% (LIBOR03M + 3.750%) due 12/21/2027 ~ | 1,100 | 1,097 |
| **Zaxby's Operating Company LLC** | | |
| 4.500% (LIBOR03M + 3.750%) due 12/28/2027 ~ | 1,225 | 1,226 |
| **Zayo Group Holdings, Inc.** | | |
| 3.109% (LIBOR03M + 3.000%) due 03/09/2027 ~ | 4,739 | 4,707 |
| **Total Loan Participations and Assignments (Cost $249,454)** | | 255,138 |

| **CORPORATE BONDS & NOTES 3.6%** | | |
|---|---|---|
| **BANKING & FINANCE 0.4%** | | |
| **Freedom Mortgage Corp.** | | |
| 7.625% due 05/01/2026 | 350 | 367 |
| **PennyMac Financial Services, Inc.** | | |
| 4.250% due 02/15/2029 | 800 | 767 |
| | | 1,134 |

| **INDUSTRIALS 3.2%** | | |
|---|---|---|
| **Bausch Health Americas, Inc.** | | |
| 9.250% due 04/01/2026 | 600 | 665 |
| **Cinemark USA, Inc.** | | |
| 5.875% due 03/15/2026 | 250 | 257 |
| **Mohegan Gaming & Entertainment** | | |
| 8.000% due 02/01/2026 | 1,200 | 1,210 |
| **NCR Corp.** | | |
| 5.125% due 04/15/2029 (a) | 1,600 | 1,615 |
| **Prime Healthcare Services, Inc.** | | |
| 7.250% due 11/01/2025 | 1,700 | 1,817 |
| **Six Flags Entertainment Corp.** | | |
| 4.875% due 07/31/2024 | 250 | 253 |
| **Staples, Inc.** | | |
| 7.500% due 04/15/2026 | 475 | 502 |
| **Vine Energy Holdings LLC** | | |
| 6.750% due 04/15/2029 (a) | 2,650 | 2,650 |
| **Wynn Macau Ltd.** | | |
| 5.500% due 01/15/2026 | 500 | 522 |
| | | 9,491 |

| **UTILITIES 0.0%** | | |
|---|---|---|
| **Crestwood Midstream Partners LP** | | |
| 6.000% due 02/01/2029 | 100 | 99 |
| **Total Corporate Bonds & Notes (Cost $10,696)** | | 10,724 |

| | SHARES | |
|---|---|---|

| **COMMON STOCKS 0.1%** | | |
|---|---|---|
| **FINANCIALS 0.1%** | | |
| **Stearns Holdings LLC 'B' «(b)** | 52,605 | 234 |
| **Total Common Stocks (Cost $248)** | | 234 |
| **Total Investments in Securities (Cost $260,398)** | | 266,096 |

## Schedule of Investments   CREW/PIMCO Sr Floating Rate Fund  (Cont.)

| | SHARES | MARKET VALUE (000S) |
|---|---|---|
| **INVESTMENTS IN AFFILIATES 8.4%** | | |
| **SHORT-TERM INSTRUMENTS 8.4%** | | |
| **CENTRAL FUNDS USED FOR CASH MANAGEMENT PURPOSES 8.4%** | | |
| PIMCO Short-Term Floating NAV Portfolio III | 2,532,753 | $ 24,973 |
| **Total Short-Term Instruments (Cost $24,974)** | | 24,973 |
| **Total Investments in Affiliates (Cost $24,974)** | | 24,973 |
| **Total Investments 98.0% (Cost $285,372)** | | $ 291,069 |
| **Financial Derivative Instruments (c) 0.2% (Cost or Premiums, net $0)** | | 530 |
| **Other Assets and Liabilities, net 1.8%** | | 5,380 |
| **Net Assets 100.0%** | | $ 296,979 |

### NOTES TO SCHEDULE OF INVESTMENTS:

\*   A zero balance may reflect actual amounts rounding to less than one thousand.

«   Security valued using significant unobservable inputs (Level 3).

µ   All or a portion of this amount represents unfunded loan commitments. The interest rate for the unfunded portion will be determined at the time of funding. See Note 4, Securities and Other Investments, in the Notes to Financial Statements for more information regarding unfunded loan commitments.

~   Variable or Floating rate security. Rate shown is the rate in effect as of period end. Certain variable rate securities are not based on a published reference rate and spread, rather are determined by the issuer or agent and are based on current market conditions. Reference rate is as of reset date, which may vary by security. These securities may not indicate a reference rate and/or spread in their description.

(a)   When-issued security.

### (b) RESTRICTED SECURITIES:

| Issuer Description | Acquisition Date | Cost | Market Value | Market Value as Percentage of Net Assets |
|---|---|---|---|---|
| Stearns Holdings LLC 'B' | 3/15/2021 | $ 248 | $ 234 | 0.08% |

### BORROWINGS AND OTHER FINANCING TRANSACTIONS

The average amount of borrowings outstanding during the period ended March 31, 2021 was $(2,497) at a weighted average interest rate of 0.721%. Average borrowings may include reverse repurchase agreements and sale-buyback transactions, if held during the period.

### (c) FINANCIAL DERIVATIVE INSTRUMENTS: OVER THE COUNTER

### FORWARD FOREIGN CURRENCY CONTRACTS:

| Counterparty | Settlement Month | Currency to be Delivered | | Currency to be Received | | Unrealized Appreciation/ (Depreciation) Asset | Liability |
|---|---|---|---|---|---|---|---|
| JPM | 04/2021 | $ | 1,488 | EUR | 1,267 | $ 0 | $ (2) |
| SCX | 04/2021 | EUR | 11,912 | $ | 14,471 | 501 | 0 |
| | 05/2021 | | 11,912 | | 14,008 | 31 | 0 |
| **Total Forward Foreign Currency Contracts** | | | | | | **$ 532** | **$ (2)** |

**FINANCIAL DERIVATIVE INSTRUMENTS: OVER THE COUNTER SUMMARY**

The following is a summary by counterparty of the market value of OTC financial derivative instruments and collateral (received) as of March 31, 2021:

| Counterparty | Financial Derivative Assets | | | | Financial Derivative Liabilities | | | | Net Market Value of OTC Derivatives | Collateral (Received) | Net Exposure[1] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Forward Foreign Currency Contracts | Purchased Options | Swap Agreements | Total Over the Counter | Forward Foreign Currency Contracts | Written Options | Swap Agreements | Total Over the Counter | | | |
| JPM | $    0 | $    0 | $    0 | $    0 | $   (2) | $    0 | $    0 | $   (2) | $   (2) | $    0 | $   (2) |
| SCX | 532 | 0 | 0 | 532 | 0 | 0 | 0 | 0 | 532 | (280) | 252 |
| **Total Over the Counter** | **$  532** | **$    0** | **$    0** | **$  532** | **$   (2)** | **$    0** | **$    0** | **$   (2)** | | | |

[1] Net Exposure represents the net receivable/(payable) that would be due from/to the counterparty in the event of default. Exposure from OTC financial derivative instruments can only be netted across transactions governed under the same master agreement with the same legal entity. See Note 8, Master Netting Arrangements, in the Notes to Financial Statements for more information.

**FAIR VALUE OF FINANCIAL DERIVATIVE INSTRUMENTS**

The following is a summary of the fair valuation of the Fund's derivative instruments categorized by risk exposure. See Note 7, Principal and Other Risks, in the Notes to Financial Statements on risks of the Fund.

Fair Values of Financial Derivative Instruments on the Statements of Assets and Liabilities as of March 31, 2021:

| | Derivatives not accounted for as hedging instruments | | | | | |
|---|---|---|---|---|---|---|
| | Commodity Contracts | Credit Contracts | Equity Contracts | Foreign Exchange Contracts | Interest Rate Contracts | Total |
| **Financial Derivative Instruments - Assets** | | | | | | |
| Over the counter | | | | | | |
| Forward Foreign Currency Contracts | $   0 | $   0 | $   0 | $  532 | $   0 | $  532 |
| **Financial Derivative Instruments - Liabilities** | | | | | | |
| Over the counter | | | | | | |
| Forward Foreign Currency Contracts | $   0 | $   0 | $   0 | $    2 | $   0 | $    2 |

The effect of Financial Derivative Instruments on the Statements of Operations for the year ended March 31, 2021:

| | Derivatives not accounted for as hedging instruments | | | | | |
|---|---|---|---|---|---|---|
| | Commodity Contracts | Credit Contracts | Equity Contracts | Foreign Exchange Contracts | Interest Rate Contracts | Total |
| **Net Realized Gain (Loss) on Financial Derivative Instruments** | | | | | | |
| Exchange-traded or centrally cleared | | | | | | |
| Swap Agreements | $   0 | $  (2,048) | $   0 | $    0 | $   (1) | $  (2,049) |
| Over the counter | | | | | | |
| Forward Foreign Currency Contracts | $   0 | $    0 | $   0 | $  (809) | $    0 | $  (809) |
| Swap Agreements | 0 | 0 | 0 | 0 | 67 | 67 |
| | $   0 | $    0 | $   0 | $  (809) | $   67 | $  (742) |
| | $   0 | $  (2,048) | $   0 | $  (809) | $   66 | $  (2,791) |
| **Net Change in Unrealized Appreciation on Financial Derivative Instruments** | | | | | | |
| Exchange-traded or centrally cleared | | | | | | |
| Swap Agreements | $   0 | $  580 | $   0 | $    0 | $    0 | $  580 |
| Over the counter | | | | | | |
| Forward Foreign Currency Contracts | $   0 | $    0 | $   0 | $  554 | $    0 | $  554 |
| Swap Agreements | 0 | 0 | 0 | 0 | 444 | 444 |
| | $   0 | $    0 | $   0 | $  554 | $  444 | $  998 |
| | $   0 | $  580 | $   0 | $  554 | $  444 | $  1,578 |

## Schedule of Investments CREW/PIMCO Sr Floating Rate Fund (Cont.)

March 31, 2021

### FAIR VALUE MEASUREMENTS

The following is a summary of the fair valuations according to the inputs used as of March 31, 2021 in valuing the Fund's assets and liabilities:

| Category and Subcategory | Level 1 | Level 2 | Level 3 | Fair Value at 03/31/2021 |
|---|---|---|---|---|
| **Investments in Securities, at Value** | | | | |
| Loan Participations and Assignments | $ 0 | $ 248,774 | $ 6,364 | $ 255,138 |
| Corporate Bonds & Notes | | | | |
| Banking & Finance | 0 | 1,134 | 0 | 1,134 |
| Industrials | 2,650 | 6,841 | 0 | 9,491 |
| Utilities | 0 | 99 | 0 | 99 |
| Common Stocks | | | | |
| Financials | 0 | 0 | 234 | 234 |
| | $ 2,650 | $ 256,848 | $ 6,598 | $ 266,096 |

| Category and Subcategory | Level 1 | Level 2 | Level 3 | Fair Value at 03/31/2021 |
|---|---|---|---|---|
| **Financial Derivative Instruments - Assets** | | | | |
| Over the counter | $ 0 | $ 532 | $ 0 | $ 532 |
| **Financial Derivative Instruments - Liabilities** | | | | |
| Over the counter | $ 0 | $ (2) | $ 0 | $ (2) |
| Total Financial Derivative Instruments | $ 0 | $ 530 | $ 0 | $ 530 |
| Totals | $ 27,623 | $ 257,378 | $ 6,598 | $ 291,599 |

| Category and Subcategory | Level 1 | Level 2 | Level 3 | Fair Value at 03/31/2021 |
|---|---|---|---|---|
| **Investments in Affiliates, at Value** | | | | |
| Short-Term Instruments | | | | |
| Central Funds Used for Cash Management Purposes | $ 24,973 | $ 0 | $ 0 | $ 24,973 |
| Total Investments | $ 27,623 | $ 256,848 | $ 6,598 | $ 291,069 |

The following is a reconciliation of the fair valuations using significant unobservable inputs (Level 3) for the Fund during the period ended March 31, 2021:

| Category and Subcategory | Beginning Balance at 03/31/2020 | Net Purchases | Net Sales/ Settlements | Accrued Discounts/ (Premiums) | Realized Gain/(Loss) | Net Change in Unrealized Appreciation/ (Depreciation)[1] | Transfers into Level 3 | Transfers out of Level 3 | Ending Balance at 03/31/2021 | Net Change in Unrealized Appreciation/ (Depreciation) on Investments Held at 03/31/2021[1] |
|---|---|---|---|---|---|---|---|---|---|---|
| **Investments in Securities, at Value** | | | | | | | | | | |
| Loan Participations and Assignments | $ 62,620 | $ 48,107 | $ (81,029) | $ 573 | $ 764 | $ 5,486 | $ 907 | $ (31,064) | $ 6,364 | $ 169 |
| Common Stocks | | | | | | | | | | |
| Financials | 0 | 248 | 0 | 0 | 0 | (14) | 0 | 0 | 234 | (14) |
| Totals | $ 62,620 | $ 48,355 | $ (81,029) | $ 573 | $ 764 | $ 5,472 | $ 907 | $ (31,064) | $ 6,598 | $ 155 |

The following is a summary of significant unobservable inputs used in the fair valuations of assets and liabilities categorized within Level 3 of the fair value hierarchy:

| Category and Subcategory | Ending Balance at 03/31/2021 | Valuation Technique | Unobservable Inputs | Input Value(s) (% Unless Noted Otherwise) | Weighted Average |
|---|---|---|---|---|---|
| **Investments in Securities, at Value** | | | | | |
| Loan Participations and Assignments | $ 6,364 | Third Party Vendor | Broker Quote | 98.500-99.875 | 99.027 |
| Common Stocks | | | | | |
| Financials | 234 | Expected Recovery | Book Value | 1.000x | — |
| Total | $ 6,598 | | | | |

[1] Any difference between Net Change in Unrealized Appreciation/(Depreciation) and Net Change in Unrealized Appreciation/(Depreciation) on Investments Held at March 31, 2021 may be due to an investment no longer held or categorized as Level 3 at period end.

## Notes to Financial Statements

## 1. ORGANIZATION

PIMCO Funds (the "Trust") is a Massachusetts business trust established under a Declaration of Trust dated February 19, 1987, as amended and restated November 4, 2014. The Trust is registered under the Investment Company Act of 1940, as amended (the "Act"), as an open-end management investment company. Information presented in these financial statements pertains to the Institutional Class, I-2, I-3, Administrative Class, Class A, Class C and Class C-2 shares of the funds (each a "Fund" and collectively, the "Funds") indicated on the cover of this report. Pacific Investment Management Company LLC ("PIMCO") serves as the investment adviser (the "Adviser") for the Funds.

On November 18, 2020, the Board of Trustees approved a reduction in the holding period of an automatic conversion of the Funds' Class C and Class C-2 shares into Class A shares of the same Fund from ten years to eight years. The reduction in the holding period became effective on January 18, 2021, with the first conversion taking place on or about February 10, 2021 and subsequent conversions occurring monthly thereafter. Certain financial intermediaries may have different policies and procedures regarding the conversion of Class C and Class C-2 shares to Class A shares, as described in Appendix B to the applicable Fund's prospectus (Financial Firm-Specific Sales Charge Waivers and Discounts).

## 2. SIGNIFICANT ACCOUNTING POLICIES

The following is a summary of significant accounting policies consistently followed by the Trust in the preparation of its financial statements in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP"). Each Fund is treated as an investment company under the reporting requirements of U.S. GAAP. The functional and reporting currency for the Funds is the U.S. dollar. The preparation of financial statements in accordance with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of increases and decreases in net assets from operations during the reporting period. Actual results could differ from those estimates.

(a) Securities Transactions and Investment Income  Securities transactions are recorded as of the trade date for financial reporting purposes. Securities purchased or sold on a when-issued or delayed-delivery basis may be settled beyond a standard settlement period for the security after the trade date. Realized gains (losses) from securities sold are recorded on the identified cost basis. Dividend income is recorded on the ex-dividend date, except certain dividends from foreign securities where the ex-dividend date may have passed, which are recorded as soon as a Fund is informed of the ex-dividend date. Interest income, adjusted for the accretion of discounts and amortization of premiums, is recorded on the accrual basis from settlement date, with the exception of securities with a forward starting effective date, where interest income is recorded on the accrual basis from effective date. For convertible securities, premiums attributable to the conversion feature are not amortized. Estimated tax liabilities on certain foreign securities are recorded on an accrual basis and are reflected as components of interest income or net change in unrealized appreciation (depreciation) on investments on the Statements of Operations, as appropriate. Tax liabilities realized as a result of such security sales are reflected as a component of net realized gain (loss) on investments on the Statements of Operations. Paydown gains (losses) on mortgage-related and other asset-backed securities, if any, are recorded as components of interest income on the Statements of Operations. Income or short-term capital gain distributions received from registered investment companies, if any, are recorded as dividend income. Long-term capital gain distributions received from registered investment companies, if any, are recorded as realized gains.

Debt obligations may be placed on non-accrual status and related interest income may be reduced by ceasing current accruals and writing off interest receivable when the collection of all or a portion of interest has become doubtful based on consistently applied procedures. A debt obligation is removed from non-accrual status when the issuer resumes interest payments or when collectability of interest is probable.

(b) Foreign Currency Translation  The market values of foreign securities, currency holdings and other assets and liabilities denominated in foreign currencies are translated into U.S. dollars based on the current exchange rates each business day. Purchases and sales of securities and income and expense items denominated in foreign currencies, if any, are translated into U.S. dollars at the exchange rate in effect on the transaction date. The Funds do not separately report the effects of changes in foreign exchange rates from changes in market prices on securities held. Such changes are included in net realized gain (loss) and net change in unrealized appreciation (depreciation) from investments on the Statements of Operations. The Funds may invest in foreign currency-denominated securities and may engage in foreign currency transactions either on a spot (cash) basis at the rate prevailing in the currency exchange market at the time or through a forward foreign currency contract. Realized foreign exchange gains (losses) arising from sales of spot foreign currencies, currency gains (losses) realized between the trade and settlement dates on securities transactions and the difference between the recorded amounts of dividends, interest, and foreign withholding taxes and the U.S. dollar equivalent of the amounts actually received or paid are included in net realized gain (loss) on foreign currency transactions on

**Notes to Financial Statements** (Cont.)

the Statements of Operations. Net unrealized foreign exchange gains (losses) arising from changes in foreign exchange rates on foreign denominated assets and liabilities other than investments in securities held at the end of the reporting period are included in net change in unrealized appreciation (depreciation) on foreign currency assets and liabilities on the Statements of Operations.

(c) Multi-Class Operations   Each class offered by the Trust has equal rights as to assets and voting privileges (except that shareholders of a class have exclusive voting rights regarding any matter relating solely to that class of shares). Income and non-class specific expenses are allocated daily to each class on the basis of the relative net assets. Realized and unrealized capital gains (losses) are allocated daily based on the relative net assets of each class of the respective Fund. Class specific expenses, where applicable, currently include supervisory and administrative and distribution and servicing fees. Under certain circumstances, the per share net asset value ("NAV") of a class of the respective Fund's shares may be different from the per share NAV of another class of shares as a result of the different daily expense accruals applicable to each class of shares.

(d) Distributions to Shareholders   The following table shows the anticipated frequency of distributions from net investment income, if any, for each Fund.

| Fund Name | Distribution Frequency | |
| --- | --- | --- |
| | Declared | Distributed |
| PIMCO Diversified Income Fund | Daily | Monthly |
| PIMCO ESG Income Fund | Daily | Monthly |
| PIMCO High Yield Spectrum Fund | Daily | Monthly |
| PIMCO Long-Term Credit Bond Fund | Daily | Monthly |
| PIMCO Low Duration Credit Fund | Daily | Monthly |
| PIMCO Low Duration Income Fund | Daily | Monthly |
| PIMCO Credit Opportunities Bond Fund | Quarterly | Quarterly |
| PIMCO Preferred and Capital Securities Fund | Quarterly | Quarterly |

Net realized capital gains earned by each Fund, if any, will be distributed no less frequently than once each year.

Income distributions and capital gain distributions are determined in accordance with income tax regulations which may differ from U.S. GAAP. Differences between tax regulations and U.S. GAAP may cause timing differences between income and capital gain recognition. Further, the character of investment income and capital gains may be different for certain transactions under the two methods of accounting. As a result, income distributions and capital gain distributions declared during a fiscal period may differ significantly from the net investment income (loss) and realized gains (losses) reported on each Fund's annual financial statements presented under U.S. GAAP.

Separately, if a Fund determines or estimates, as applicable, that a portion of a distribution may be comprised of amounts from sources other than net investment income in accordance with its policies, accounting records (if applicable), and accounting practices, the Fund will notify shareholders of the estimated composition of such distribution through a Section 19 Notice. For these purposes, a Fund determines or estimates, as applicable, the source or sources from which a distribution is paid, to the close of the period as of which it is paid, in reference to its internal accounting records and related accounting practices. If, based on such accounting records and practices, it is determined or estimated, as applicable, that a particular distribution does not include capital gains or paid-in surplus or other capital sources, a Section 19 Notice generally would not be issued. It is important to note that differences exist between a Fund's daily internal accounting records and practices, a Fund's financial statements presented in accordance with U.S. GAAP, and recordkeeping practices under income tax regulations. For instance, a Fund's internal accounting records and practices may take into account, among other factors, tax-related characteristics of certain sources of distributions that differ from treatment under U.S. GAAP. Examples of such differences may include but are not limited to, for certain Funds, the treatment of periodic payments under interest rate swap contracts. Accordingly, among other consequences, it is possible that a Fund may not issue a Section 19 Notice in situations where the Fund's financial statements prepared later and in accordance with U.S. GAAP and/or the final tax character of those distributions might later report that the sources of those distributions included capital gains and/or a return of capital. Please visit www.pimco.com for the most recent Section 19 Notice, if applicable, for additional information regarding the estimated composition of distributions. Final determination of a distribution's tax character will be provided to shareholders when such information is available.

Distributions classified as a tax basis return of capital at a Fund's fiscal year end, if any, are reflected on the Statements of Changes in Net Assets and have been recorded to paid in capital on the Statements of Assets and Liabilities. In addition, other amounts have been reclassified between distributable earnings (accumulated loss) and paid in capital on the Statements of Assets and Liabilities to more appropriately conform U.S. GAAP to tax characterizations of distributions.

(e) New Accounting Pronouncements and Regulatory Updates   In March 2020, the Financial Accounting Standards Board issued an Accounting Standards Update ("ASU"), ASU 2020-04, which provides optional guidance to ease the potential accounting burden associated with transitioning away from the London Interbank Offered Rate and other reference rates that are expected to be discontinued. The ASU is effective immediately upon release of the update on March 12, 2020

through December 31, 2022. At this time, management is evaluating implications of these changes on the financial statements.

In October 2020, the U.S. Securities and Exchange Commission ("SEC") adopted a rule related to the use of derivatives, short sales, reverse repurchase agreements and certain other transactions by registered investment companies that rescinds and withdraws the guidance of the SEC and its staff regarding asset segregation and cover transactions. Subject to certain exceptions, the rule requires funds to trade derivatives and other transactions that create future payment or delivery obligations (except reverse repurchase agreements and similar financing transactions) subject to a value-at-risk leverage limit, certain derivatives risk management program and reporting requirements. The rule went into effect on February 19, 2021 and funds will have an eighteen-month transition period to comply with the rule and related reporting requirements. At this time, management is evaluating the implications of these changes on the financial statements.

In October 2020, the SEC adopted a rule regarding the ability of a fund to invest in other funds. The rule allows a fund to acquire shares of another fund in excess of certain limitations currently imposed by the Act without obtaining individual exemptive relief from the SEC, subject to certain conditions. The rule also included the rescission of certain exemptive relief from the SEC and guidance from the SEC staff for funds to invest in other funds. The rule went into effect on January 19, 2021 and funds will have a one-year transition period to comply with the rule and related reporting requirements. At this time, management is evaluating the implications of these changes on the financial statements.

In December 2020, the SEC adopted a rule addressing fair valuation of fund investments. The new rule sets forth requirements for good faith determinations of fair value as well as for the performance of fair value determinations, including related oversight and reporting obligations. The new rule also defines "readily available market quotations" for purposes of the definition of "value" under the Act, and the SEC noted that this definition would apply in all contexts under the Act. The effective date for the rule was March 8, 2021. The SEC adopted an eighteen-month transition period beginning from the effective date for both the new rule and the associated new recordkeeping requirements. At this time, management is evaluating the implications of these changes on the financial statements.

## 3. INVESTMENT VALUATION AND FAIR VALUE MEASUREMENTS

(a) Investment Valuation Policies   The price of a Fund's shares is based on the Fund's NAV. The NAV of a Fund, or each of its share classes, as applicable, is determined by dividing the total value of

portfolio investments and other assets, less any liabilities attributable to that Fund or class, by the total number of shares outstanding of that Fund or class.

On each day that the New York Stock Exchange ("NYSE") is open, Fund shares are ordinarily valued as of the close of regular trading (normally 4:00 p.m., Eastern time) ("NYSE Close"). Information that becomes known to the Funds or their agents after the time as of which NAV has been calculated on a particular day will not generally be used to retroactively adjust the price of a security or the NAV determined earlier that day. If regular trading on the NYSE closes earlier than scheduled, each Fund reserves the right to either (i) calculate its NAV as of the earlier closing time or (ii) calculate its NAV as of the normally scheduled close of regular trading on the NYSE for that day. Each Fund generally does not calculate their NAV on days during which the NYSE is closed. However, if the NYSE is closed on a day it would normally be open for business, each Fund reserves the right to calculate their NAV as of the normally scheduled close of regular trading on the NYSE for that day or such other time that the Fund may determine.

For purposes of calculating NAV, portfolio securities and other assets for which market quotes are readily available are valued at market value. Market value is generally determined on the basis of official closing prices or the last reported sales prices, or if no sales are reported, based on quotes obtained from established market makers or prices (including evaluated prices) supplied by the Funds' approved pricing services, quotation reporting systems and other third-party sources (together, "Pricing Services"). The Funds will normally use pricing data for domestic equity securities received shortly after the NYSE Close and do not normally take into account trading, clearances or settlements that take place after the NYSE Close. If market value pricing is used, a foreign (non-U.S.) equity security traded on a foreign exchange or on more than one exchange is typically valued using pricing information from the exchange considered by the Adviser to be the primary exchange. A foreign (non-U.S.) equity security will be valued as of the close of trading on the foreign exchange, or the NYSE Close, if the NYSE Close occurs before the end of trading on the foreign exchange. Domestic and foreign (non-U.S.) fixed income securities, non-exchange traded derivatives, and equity options are normally valued on the basis of quotes obtained from brokers and dealers or Pricing Services using data reflecting the earlier closing of the principal markets for those securities. Prices obtained from Pricing Services may be based on, among other things, information provided by market makers or estimates of market values obtained from yield data relating to investments or securities with similar characteristics. Certain fixed income securities purchased on a delayed-delivery basis are marked to market daily until settlement at the forward settlement date. Exchange-traded options, except equity options, futures and options on futures

**Notes to Financial Statements** (Cont.)

are valued at the settlement price determined by the relevant exchange. Swap agreements are valued on the basis of bid quotes obtained from brokers and dealers or market-based prices supplied by Pricing Services. A Fund's investments in open-end management investment companies, other than exchange-traded funds ("ETFs"), are valued at the NAVs of such investments. Open-end management investment companies may include affiliated funds.

If a foreign (non-U.S.) equity security's value has materially changed after the close of the security's primary exchange or principal market but before the NYSE Close, the security may be valued at fair value based on procedures established and approved by the Board of Trustees of the Trust (the "Board"). Foreign (non-U.S.) equity securities that do not trade when the NYSE is open are also valued at fair value. With respect to foreign (non-U.S.) equity securities, a Fund may determine the fair value of investments based on information provided by Pricing Services and other third-party vendors, which may recommend fair value or adjustments with reference to other securities, indices or assets. In considering whether fair valuation is required and in determining fair values, a Fund may, among other things, consider significant events (which may be considered to include changes in the value of U.S. securities or securities indices) that occur after the close of the relevant market and before the NYSE Close. A Fund may utilize modeling tools provided by third-party vendors to determine fair values of foreign (non-U.S.) securities. For these purposes, any movement in the applicable reference index or instrument ("zero trigger") between the earlier close of the applicable foreign market and the NYSE Close may be deemed to be a significant event, prompting the application of the pricing model (effectively resulting in daily fair valuations). Foreign exchanges may permit trading in foreign (non-U.S.) equity securities on days when the Trust is not open for business, which may result in a Fund's portfolio investments being affected when shareholders are unable to buy or sell shares.

Senior secured floating rate loans for which an active secondary market exists to a reliable degree are valued at the mean of the last available bid/ask prices in the market for such loans, as provided by a Pricing Service. Senior secured floating rate loans for which an active secondary market does not exist to a reliable degree are valued at fair value, which is intended to approximate market value. In valuing a senior secured floating rate loan at fair value, the factors considered may include, but are not limited to, the following: (a) the creditworthiness of the borrower and any intermediate participants, (b) the terms of the loan, (c) recent prices in the market for similar loans, if any, and (d) recent prices in the market for instruments of similar quality, rate, period until next interest rate reset and maturity.

Investments valued in currencies other than the U.S. dollar are converted to the U.S. dollar using exchange rates obtained from Pricing

Services. As a result, the value of such investments and, in turn, the NAV of a Fund's shares may be affected by changes in the value of currencies in relation to the U.S. dollar. The value of investments traded in markets outside the United States or denominated in currencies other than the U.S. dollar may be affected significantly on a day that the Trust is not open for business. As a result, to the extent that a Fund holds foreign (non-U.S.) investments, the value of those investments may change at times when shareholders are unable to buy or sell shares and the value of such investments will be reflected in the Fund's next calculated NAV.

Investments for which market quotes or market based valuations are not readily available are valued at fair value as determined in good faith by the Board or persons acting at their direction. The Board has adopted methods for valuing securities and other assets in circumstances where market quotes are not readily available, and has delegated to the Adviser the responsibility for applying the fair valuation methods. In the event that market quotes or market based valuations are not readily available, and the security or asset cannot be valued pursuant to a Board approved valuation method, the value of the security or asset will be determined in good faith by the Board. Market quotes are considered not readily available in circumstances where there is an absence of current or reliable market-based data (e.g., trade information, bid/ask information, indicative-market quotations ("Broker Quotes"), Pricing Services' prices), including where events occur after the close of the relevant market, but prior to the NYSE Close, that materially affect the values of a Fund's securities or assets. In addition, market quotes are considered not readily available when, due to extraordinary circumstances, the exchanges or markets on which the securities trade do not open for trading for the entire day and no other market prices are available. The Board has delegated, to the Adviser, the responsibility for monitoring significant events that may materially affect the values of a Fund's securities or assets and for determining whether the value of the applicable securities or assets should be reevaluated in light of such significant events.

When a Fund uses fair valuation to determine the value of a portfolio security or other asset for purposes of calculating its NAV, such investments will not be priced on the basis of quotes from the primary market in which they are traded, but rather may be priced by another method that the Board or persons acting at their direction believe reflects fair value. Fair valuation may require subjective determinations about the value of a security. While the Trust's policy is intended to result in a calculation of a Fund's NAV that fairly reflects security values as of the time of pricing, the Trust cannot ensure that fair values determined by the Board or persons acting at their direction would accurately reflect the price that a Fund could obtain for a security if it were to dispose of that security as of the time of pricing (for instance,

in a forced or distressed sale). The prices used by a Fund may differ from the value that would be realized if the securities were sold. The Funds' use of fair valuation may also help to deter "stale price arbitrage" as discussed under the "Abusive Trading Practices" section in each Fund's prospectus.

(b) Fair Value Hierarchy  U.S. GAAP describes fair value as the price that a Fund would receive to sell an asset or pay to transfer a liability in an orderly transaction between market participants at the measurement date. It establishes a fair value hierarchy that prioritizes inputs to valuation methods and requires disclosure of the fair value hierarchy, separately for each major category of assets and liabilities, that segregates fair value measurements into levels (Level 1, 2, or 3). The inputs or methodology used for valuing securities are not necessarily an indication of the risks associated with investing in those securities. Levels 1, 2, and 3 of the fair value hierarchy are defined as follows:

- Level 1 — Quoted prices in active markets or exchanges for identical assets and liabilities.

- Level 2 — Significant other observable inputs, which may include, but are not limited to, quoted prices for similar assets or liabilities in markets that are active, quoted prices for identical or similar assets or liabilities in markets that are not active, inputs other than quoted prices that are observable for the assets or liabilities (such as interest rates, yield curves, volatilities, prepayment speeds, loss severities, credit risks and default rates) or other market corroborated inputs.

- Level 3 — Significant unobservable inputs based on the best information available in the circumstances, to the extent observable inputs are not available, which may include assumptions made by the Board or persons acting at their direction that are used in determining the fair value of investments.

Assets or liabilities categorized as Level 2 or 3 as of period end have been transferred between Levels 2 and 3 since the prior period due to changes in the method utilized in valuing the investments. Transfers from Level 2 to Level 3 are a result of a change, in the normal course of business, from the use of methods used by Pricing Services (Level 2) to the use of a Broker Quote or valuation technique which utilizes significant unobservable inputs due to an absence of current or reliable market-based data (Level 3). Transfers from Level 3 to Level 2 are a result of the availability of current and reliable market-based data provided by Pricing Services or other valuation techniques which utilize significant observable inputs. In accordance with the requirements of U.S. GAAP, the amounts of transfers into and out of Level 3, if material, are disclosed in the Notes to Schedule of Investments for each respective Fund.

For fair valuations using significant unobservable inputs, U.S. GAAP requires a reconciliation of the beginning to ending balances for reported fair values that presents changes attributable to realized gain (loss), unrealized appreciation (depreciation), purchases and sales, accrued discounts (premiums), and transfers into and out of the Level 3 category during the period. The end of period value is used for the transfers between Levels of a Fund's assets and liabilities. Additionally, U.S. GAAP requires quantitative information regarding the significant unobservable inputs used in the determination of fair value of assets or liabilities categorized as Level 3 in the fair value hierarchy. In accordance with the requirements of U.S. GAAP, a fair value hierarchy, and if material, a Level 3 reconciliation and details of significant unobservable inputs, have been included in the Notes to Schedule of Investments for each respective Fund.

(c) Valuation Techniques and the Fair Value Hierarchy
Level 1 and Level 2 trading assets and trading liabilities, at fair value  The valuation methods (or "techniques") and significant inputs used in determining the fair values of portfolio securities or other assets and liabilities categorized as Level 1 and Level 2 of the fair value hierarchy are as follows:

Fixed income securities including corporate, convertible and municipal bonds and notes, U.S. government agencies, U.S. treasury obligations, sovereign issues, bank loans, convertible preferred securities and non-U.S. bonds are normally valued on the basis of quotes obtained from brokers and dealers or Pricing Services that use broker-dealer quotations, reported trades or valuation estimates from their internal pricing models. The Pricing Services' internal models use inputs that are observable such as issuer details, interest rates, yield curves, prepayment speeds, credit risks/spreads, default rates and quoted prices for similar assets. Securities that use similar valuation techniques and inputs as described above are categorized as Level 2 of the fair value hierarchy.

Fixed income securities purchased on a delayed-delivery basis or as a repurchase commitment in a sale-buyback transaction are marked to market daily until settlement at the forward settlement date and are categorized as Level 2 of the fair value hierarchy.

Mortgage-related and asset-backed securities are usually issued as separate tranches, or classes, of securities within each deal. These securities are also normally valued by Pricing Services that use broker-dealer quotations, reported trades or valuation estimates from their internal pricing models. The pricing models for these securities usually consider tranche-level attributes, current market data, estimated cash flows and market-based yield spreads for each tranche, and incorporate deal collateral performance, as available. Mortgage-related and asset-backed securities that use similar valuation techniques and inputs as described above are categorized as Level 2 of the fair value hierarchy.

**Notes to Financial Statements** (Cont.)

Common stocks, ETFs, exchange-traded notes and financial derivative instruments, such as futures contracts, rights and warrants, or options on futures that are traded on a national securities exchange, are stated at the last reported sale or settlement price on the day of valuation. To the extent these securities are actively traded and valuation adjustments are not applied, they are categorized as Level 1 of the fair value hierarchy.

Valuation adjustments may be applied to certain securities that are solely traded on a foreign exchange to account for the market movement between the close of the foreign market and the NYSE Close. These securities are valued using Pricing Services that consider the correlation of the trading patterns of the foreign security to the intraday trading in the U.S. markets for investments. Securities using these valuation adjustments are categorized as Level 2 of the fair value hierarchy. Preferred securities and other equities traded on inactive markets or valued by reference to similar instruments are also categorized as Level 2 of the fair value hierarchy.

Investments in registered open-end investment companies (other than ETFs) will be valued based upon the NAVs of such investments and are categorized as Level 1 of the fair value hierarchy. Investments in unregistered open-end investment companies will be calculated based upon the NAVs of such investments and are considered Level 1 provided that the NAVs are observable, calculated daily and are the value at which both purchases and sales will be conducted.

Equity exchange-traded options and over the counter financial derivative instruments, such as forward foreign currency contracts and options contracts derive their value from underlying asset prices, indices, reference rates, and other inputs or a combination of these factors. These contracts are normally valued on the basis of quotes obtained from a quotation reporting system, established market makers or Pricing Services (normally determined as of the NYSE Close). Depending on the product and the terms of the transaction, financial derivative instruments can be valued by Pricing Services using a series of techniques, including simulation pricing models. The pricing models use inputs that are observed from actively quoted markets such as quoted prices, issuer details, indices, bid/ask spreads, interest rates, implied volatilities, yield curves, dividends and exchange rates. Financial derivative instruments that use similar valuation techniques and inputs as described above are categorized as Level 2 of the fair value hierarchy.

Centrally cleared swaps and over the counter swaps derive their value from underlying asset prices, indices, reference rates, and other inputs or a combination of these factors. They are valued using a broker-dealer bid quotation or on market-based prices provided by Pricing Services (normally determined as of the NYSE Close). Centrally cleared swaps and over the counter swaps can be valued by Pricing Services

using a series of techniques, including simulation pricing models. The pricing models may use inputs that are observed from actively quoted markets such as the overnight index swap rate, London Interbank Offered Rate forward rate, interest rates, yield curves and credit spreads. These securities are categorized as Level 2 of the fair value hierarchy.

Level 3 trading assets and trading liabilities, at fair value When a fair valuation method is applied by the Adviser that uses significant unobservable inputs, investments will be priced by a method that the Board or persons acting at their direction believe reflects fair value and are categorized as Level 3 of the fair value hierarchy. The valuation techniques and significant inputs used in determining the fair values of portfolio assets and liabilities categorized as Level 3 of the fair value hierarchy are as follows:

Proxy pricing procedures set the base price of a fixed income security and subsequently adjust the price proportionally to market value changes of a pre-determined security deemed to be comparable in duration, generally a U.S. Treasury or sovereign note based on country of issuance. The base price may be a broker-dealer quote, transaction price, or an internal value as derived by analysis of market data. The base price of the security may be reset on a periodic basis based on the availability of market data and procedures approved by the Valuation Oversight Committee. Significant changes in the unobservable inputs of the proxy pricing process (the base price) would result in direct and proportional changes in the fair value of the security. These securities are categorized as Level 3 of the fair value hierarchy.

If third-party evaluated vendor pricing is not available or not deemed to be indicative of fair value, the Adviser may elect to obtain indicative market quotations directly from the broker-dealer or passed-through Broker Quotes from a third-party vendor. In the event that fair value is based upon a single sourced Broker Quote, these securities are categorized as Level 3 of the fair value hierarchy. Broker Quotes are typically received from established market participants. Although independently received, the Adviser does not have the transparency to view the underlying inputs which support the market quotation. Significant changes in the Broker Quote would have direct and proportional changes in the fair value of the security.

Discounted cash flow valuation uses an internal analysis based on the Adviser's expectation of future income and expenses, capital structure, exit multiples of a security, and other unobservable inputs which may include contractual and factual loan factors, estimated future payments and credit rating. Significant changes in the unobservable inputs of the models would result in direct and proportional changes in the fair value of the security. These securities are categorized as Level 3 of the fair value hierarchy.

Market comparable valuation estimates fair value by applying a valuation multiple to a key performance metric of the company, which may include unobservable inputs such as earnings before interest, taxes, depreciation and amortization ("EBITDA"), the Adviser's assumptions regarding comparable companies and non-public statements from the underlying company. Significant changes in the unobservable inputs would result in direct and proportional changes in the fair value of the security. These securities are categorized as Level 3 of the fair value hierarchy.

Reference instrument valuation estimates fair value by utilizing the correlation of the security to one or more broad-based securities, market indices, and/or other financial instruments, whose pricing information is readily available. Unobservable inputs may include those used in algorithms based on percentage change in the reference instruments and/or weights of each reference instrument. Significant changes in the unobservable inputs would result in direct and proportional changes in the fair value of the security. These securities are categorized as Level 3 of the fair value hierarchy.

Expected recovery valuation estimates that the fair value of an existing asset can be recovered, net of any liability. Significant changes in the unobservable inputs would result in direct and proportional changes in the fair value of the security. These securities are categorized as Level 3 of the fair value hierarchy.

Securities may be valued based on purchase prices of privately negotiated transactions. Significant changes in the unobservable inputs would result in direct and proportional changes in the fair value of the security. These securities are categorized as Level 3 of the fair value hierarchy.

Short-term debt instruments (such as commercial paper) having a remaining maturity of 60 days or less may be valued at amortized cost, so long as the amortized cost value of such short-term debt instruments is approximately the same as the fair value of the instrument as determined without the use of amortized cost valuation. These securities are categorized as Level 2 or Level 3 of the fair value hierarchy depending on the source of the base price.

## 4. SECURITIES AND OTHER INVESTMENTS

### (a) Investments in Affiliates

Each Fund may invest in the PIMCO Short Asset Portfolio and the PIMCO Short-Term Floating NAV Portfolio III ("Central Funds") to the extent permitted by the Act and rules thereunder. The Central Funds are registered investment companies created for use solely by the series of the Trust and other series of registered investment companies advised by the Adviser, in connection with their cash management activities. The main investments of the Central Funds are money market and short maturity fixed income instruments. The Central Funds may incur expenses related to their investment activities, but do not pay Investment Advisory Fees or Supervisory and Administrative Fees to the Adviser. The Central Funds are considered to be affiliated with the Funds. A complete schedule of portfolio holdings for each affiliate fund is filed with the SEC for the first and third quarters of each fiscal year on Form N-PORT and is available at the SEC's website at www.sec.gov. A copy of each affiliate fund's shareholder report is also available at the SEC's website at www.sec.gov, on the Funds' website at www.pimco.com, or upon request, as applicable. The tables below show the Funds' transactions in and earnings from investments in the affiliated Funds for the period ended March 31, 2021 (amounts in thousands†):

### Investment in PIMCO Short Asset Portfolio

| Fund Name | Market Value 03/31/2020 | Purchases at Cost | Proceeds from Sales | Net Realized Gain (Loss) | Change in Unrealized Appreciation (Depreciation) | Market Value 03/31/2021 | Dividend Income[1] | Realized Net Capital Gain Distributions[1] |
|---|---|---|---|---|---|---|---|---|
| PIMCO Diversified Income Fund | $ 30,618 | $ 402 | $ (1) | $ 0 | $ 1,027 | $ 32,046 | $ 402 | $ 0 |

### Investments in PIMCO Short-Term Floating NAV Portfolio III

| Fund Name | Market Value 03/31/2020 | Purchases at Cost | Proceeds from Sales | Net Realized Gain (Loss) | Change in Unrealized Appreciation (Depreciation) | Market Value 03/31/2021 | Dividend Income[1] | Realized Net Capital Gain Distributions[1] |
|---|---|---|---|---|---|---|---|---|
| PIMCO Credit Opportunities Bond Fund | $ 42,171 | $ 297,186 | $ (252,100) | $ (77) | $ 347 | $ 87,527 | $ 286 | $ 0 |
| PIMCO Diversified Income Fund | 1,332 | 1,475,725 | (1,016,100) | 17 | (38) | 460,936 | 324 | 0 |
| PIMCO High Yield Spectrum Fund | 23,442 | 286,822 | (271,101) | 49 | 54 | 39,266 | 122 | 0 |
| PIMCO Long-Term Credit Bond Fund | 22,239 | 1,922,875 | (1,889,700) | 357 | (26) | 55,745 | 145 | 0 |
| PIMCO Low Duration Credit Fund | 41,898 | 689,540 | (706,800) | 301 | 34 | 24,973 | 141 | 0 |
| PIMCO Low Duration Income Fund | 27,158 | 1,312,017 | (1,304,700) | (8) | (1) | 34,466 | 37 | 0 |
| PIMCO Preferred and Capital Securities Fund | 52 | 1,266,122 | (1,188,000) | 94 | 9 | 78,277 | 322 | 0 |

† A zero balance may reflect actual amounts rounding to less than one thousand.

[1] The tax characterization of distributions is determined in accordance with Federal income tax regulations and may contain a return of capital. The actual tax characterization of distributions received is determined at the end of the fiscal year of the affiliated fund. See Note 2, Distributions to Shareholders, in the Notes to Financial Statements for more information.

## Notes to Financial Statements (Cont.)

(b) Investments in Securities

The Funds may utilize the investments and strategies described below to the extent permitted by each Fund's respective investment policies.

Bank Obligations  in which a Fund may invest include certificates of deposit, bankers' acceptances, and fixed time deposits. Certificates of deposit are negotiable certificates issued against Funds deposited in a commercial bank for a definite period of time and earning a specified return. Bankers' acceptances are negotiable drafts or bills of exchange, normally drawn by an importer or exporter to pay for specific merchandise, which are "accepted" by a bank, meaning, in effect, that the bank unconditionally agrees to pay the face value of the instrument on maturity. Fixed time deposits are bank obligations payable at a stated maturity date and bearing interest at a fixed rate. Fixed time deposits may be withdrawn on demand by the investor, but may be subject to early withdrawal penalties which vary depending upon market conditions and the remaining maturity of the obligation.

Delayed-Delivery Transactions  involve a commitment by a Fund to purchase or sell securities for a predetermined price or yield, with payment and delivery taking place beyond the customary settlement period. When delayed-delivery transactions are outstanding, a Fund will designate or receive as collateral liquid assets in an amount sufficient to meet the purchase price or respective obligations. When purchasing a security on a delayed-delivery basis, a Fund assumes the rights and risks of ownership of the security, including the risk of price and yield fluctuations, and takes such fluctuations into account when determining its NAV. A Fund may dispose of or renegotiate a delayed-delivery transaction after it is entered into, which may result in a realized gain (loss). When a Fund has sold a security on a delayed-delivery basis, the Fund does not participate in future gains (losses) with respect to the security.

Inflation-Indexed Bonds  are fixed income securities whose principal value is periodically adjusted by the rate of inflation. The interest rate on these bonds is generally fixed at issuance at a rate lower than typical bonds. Over the life of an inflation-indexed bond, however, interest will be paid based on a principal value which is adjusted for inflation. Any increase or decrease in the principal amount of an inflation-indexed bond will be included as interest income on the Statements of Operations, even though investors do not receive their principal until maturity. Repayment of the original bond principal upon maturity (as adjusted for inflation) is guaranteed in the case of U.S. Treasury Inflation-Protected Securities. For bonds that do not provide a similar guarantee, the adjusted principal value of the bond repaid at maturity may be less than the original principal.

Loans and Other Indebtedness, Loan Participations and Assignments  are direct debt instruments which are interests in amounts owed to lenders or lending syndicates by corporate, governmental, or other borrowers. A Fund's investments in loans may be in the form of participations in loans or assignments of all or a portion of loans from third parties or investments in or originations of loans by the Fund or Funds. A loan is often administered by a bank or other financial institution (the "agent") that acts as agent for all holders. The agent administers the terms of the loan, as specified in the loan agreement. A Fund may invest in multiple series or tranches of a loan, which may have varying terms and carry different associated risks. When a Fund purchases assignments from agents it acquires direct rights against the borrowers of the loans. These loans may include participations in bridge loans, which are loans taken out by borrowers for a short period (typically less than one year) pending arrangement of more permanent financing through, for example, the issuance of bonds, frequently high yield bonds issued for the purpose of acquisitions.

The types of loans and related investments in which the Funds may invest include, among others, senior loans, subordinated loans (including second lien loans, B-Notes and mezzanine loans), whole loans, commercial real estate and other commercial loans and structured loans. The Funds may originate loans or acquire direct interests in loans through primary loan distributions and/or in private transactions. In the case of subordinated loans, there may be significant indebtedness ranking ahead of the borrower's obligation to the holder of such a loan, including in the event of the borrower's insolvency. Mezzanine loans are typically secured by a pledge of an equity interest in the mortgage borrower that owns the real estate rather than an interest in a mortgage.

Investments in loans may include unfunded loan commitments, which are contractual obligations for funding. Unfunded loan commitments may include revolving credit facilities, which may obligate a Fund to supply additional cash to the borrower on demand. Unfunded loan commitments represent a future obligation in full, even though a percentage of the committed amount may not be utilized by the borrower. When investing in a loan participation, a Fund has the right to receive payments of principal, interest and any fees to which it is entitled only from the agent selling the loan agreement and only upon receipt of payments by the agent from the borrower. A Fund may receive a commitment fee based on the undrawn portion of the underlying line of credit portion of a loan. In certain circumstances, a Fund may receive a penalty fee upon the prepayment of a loan by a borrower. Fees earned or paid are recorded as a component of interest income or interest expense, respectively, on the Statements of Operations. Unfunded loan commitments are reflected as a liability on the Statements of Assets and Liabilities.

Mortgage-Related and Other Asset-Backed Securities directly or indirectly represent a participation in, or are secured by and payable from, loans on real property. Mortgage-related securities are created from pools of residential or commercial mortgage loans, including mortgage loans made by savings and loan institutions, mortgage bankers, commercial banks and others. These securities provide a monthly payment which consists of both interest and principal. Interest may be determined by fixed or adjustable rates. The rate of prepayments on underlying mortgages will affect the price and volatility of a mortgage-related security, and may have the effect of shortening or extending the effective duration of the security relative to what was anticipated at the time of purchase. The timely payment of principal and interest of certain mortgage-related securities is guaranteed with the full faith and credit of the U.S. Government. Pools created and guaranteed by non-governmental issuers, including government-sponsored corporations, may be supported by various forms of insurance or guarantees, but there can be no assurance that private insurers or guarantors can meet their obligations under the insurance policies or guarantee arrangements. Many of the risks of investing in mortgage-related securities secured by commercial mortgage loans reflect the effects of local and other economic conditions on real estate markets, the ability of tenants to make lease payments, and the ability of a property to attract and retain tenants. These securities may be less liquid and may exhibit greater price volatility than other types of mortgage-related or other asset-backed securities. Other asset-backed securities are created from many types of assets, including, but not limited to, auto loans, accounts receivable, such as credit card receivables and hospital account receivables, home equity loans, student loans, boat loans, mobile home loans, recreational vehicle loans, manufactured housing loans, aircraft leases, computer leases and syndicated bank loans.

Collateralized Debt Obligations ("CDOs") include Collateralized Bond Obligations ("CBOs"), Collateralized Loan Obligations ("CLOs") and other similarly structured securities. CBOs and CLOs are types of asset-backed securities. A CBO is a trust which is backed by a diversified pool of high risk, below investment grade fixed income securities. A CLO is a trust typically collateralized by a pool of loans, which may include, among others, domestic and foreign senior secured loans, senior unsecured loans, and subordinate corporate loans, including loans that may be rated below investment grade or equivalent unrated loans. The risks of an investment in a CDO depend largely on the type of the collateral securities and the class of the CDO in which a Fund invests. In addition to the normal risks associated with fixed income securities discussed elsewhere in this report and each Fund's prospectus and statement of additional information (e.g., prepayment risk, credit risk, liquidity risk, market risk, structural risk, legal risk and interest rate risk (which may be exacerbated if the interest rate payable

on a structured financing changes based on multiples of changes in interest rates or inversely to changes in interest rates)), CBOs, CLOs and other CDOs carry additional risks including, but not limited to, (i) the possibility that distributions from collateral securities will not be adequate to make interest or other payments, (ii) the quality of the collateral may decline in value or default, (iii) the risk that a Fund may invest in CBOs, CLOs, or other CDOs that are subordinate to other classes, and (iv) the complex structure of the security may not be fully understood at the time of investment and may produce disputes with the issuer or unexpected investment results.

Collateralized Mortgage Obligations ("CMOs") are debt obligations of a legal entity that are collateralized by whole mortgage loans or private mortgage bonds and divided into classes. CMOs are structured into multiple classes, often referred to as "tranches", with each class bearing a different stated maturity and entitled to a different schedule for payments of principal and interest, including prepayments. CMOs may be less liquid and may exhibit greater price volatility than other types of mortgage-related or asset-backed securities.

Stripped Mortgage-Backed Securities ("SMBS") are derivative multi-class mortgage securities. SMBS are usually structured with two classes that receive different proportions of the interest and principal distributions on a pool of mortgage assets. An SMBS will have one class that will receive all of the interest (the interest-only or "IO" class), while the other class will receive the entire principal (the principal-only or "PO" class). Payments received for IOs are included in interest income on the Statements of Operations. Because no principal will be received at the maturity of an IO, adjustments are made to the cost of the security on a monthly basis until maturity. These adjustments are included in interest income on the Statements of Operations. Payments received for POs are treated as reductions to the cost and par value of the securities.

Payment In-Kind Securities may give the issuer the option at each interest payment date of making interest payments in either cash and/or additional debt securities. Those additional debt securities usually have the same terms, including maturity dates and interest rates, and associated risks as the original bonds. The daily market quotations of the original bonds may include the accrued interest (referred to as a dirty price) and require a pro rata adjustment from the unrealized appreciation (depreciation) on investments to interest receivable on the Statements of Assets and Liabilities.

Perpetual Bonds are fixed income securities with no maturity date but pay a coupon in perpetuity (with no specified ending or maturity date). Unlike typical fixed income securities, there is no obligation for perpetual bonds to repay principal. The coupon payments, however, are mandatory. While perpetual bonds have no maturity date, they may

## Notes to Financial Statements (Cont.)

have a callable date in which the perpetuity is eliminated and the issuer may return the principal received on the specified call date. Additionally, a perpetual bond may have additional features, such as interest rate increases at periodic dates or an increase as of a predetermined point in the future.

Real Estate Investment Trusts ("REITs") are pooled investment vehicles that own, and typically operate, income-producing real estate. If a REIT meets certain requirements, including distributing to shareholders substantially all of its taxable income (other than net capital gains), then it is not taxed on the income distributed to shareholders. Distributions received from REITs may be characterized as income, capital gain or a return of capital. A return of capital is recorded by a Fund as a reduction to the cost basis of its investment in the REIT. REITs are subject to management fees and other expenses, and so the Funds that invest in REITs will bear their proportionate share of the costs of the REITs' operations.

Restricted Investments are subject to legal or contractual restrictions on resale and may generally be sold privately, but may be required to be registered or exempted from such registration before being sold to the public. Private placement securities are generally considered to be restricted except for those securities traded between qualified institutional investors under the provisions of Rule 144A of the Securities Act of 1933. Disposal of restricted investments may involve time-consuming negotiations and expenses, and prompt sale at an acceptable price may be difficult to achieve. Restricted investments held by the Funds at March 31, 2021, as applicable, are disclosed in the Notes to Schedules of Investments.

Securities Issued by U.S. Government Agencies or Government-Sponsored Enterprises are obligations of and, in certain cases, guaranteed by, the U.S. Government, its agencies or instrumentalities. Some U.S. Government securities, such as Treasury bills, notes and bonds, and securities guaranteed by the Government National Mortgage Association, are supported by the full faith and credit of the U.S. Government; others, such as those of the Federal Home Loan Banks, are supported by the right of the issuer to borrow from the U.S. Department of the Treasury (the "U.S. Treasury"); and others, such as those of the Federal National Mortgage Association ("FNMA" or "Fannie Mae"), are supported by the discretionary authority of the U.S. Government to purchase the agency's obligations. U.S. Government securities may include zero coupon securities which do not distribute interest on a current basis and tend to be subject to a greater risk than interest-paying securities of similar maturities.

Government-related guarantors (i.e., not backed by the full faith and credit of the U.S. Government) include FNMA and the Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac"). FNMA is a

government-sponsored corporation. FNMA purchases conventional (i.e., not insured or guaranteed by any government agency) residential mortgages from a list of approved seller/servicers which include state and federally chartered savings and loan associations, mutual savings banks, commercial banks and credit unions and mortgage bankers. Pass-through securities issued by FNMA are guaranteed as to timely payment of principal and interest by FNMA, but are not backed by the full faith and credit of the U.S. Government. FHLMC issues Participation Certificates ("PCs"), which are pass-through securities, each representing an undivided interest in a pool of residential mortgages. FHLMC guarantees the timely payment of interest and ultimate collection of principal, but PCs are not backed by the full faith and credit of the U.S. Government.

In June 2019, FNMA and FHLMC started issuing Uniform Mortgage Backed Securities in place of their current offerings of TBA-eligible securities (the "Single Security Initiative"). The Single Security Initiative seeks to support the overall liquidity of the TBA market and aligns the characteristics of FNMA and FHLMC certificates. The effects that the Single Security Initiative may have on the market for TBA and other mortgage-backed securities are uncertain.

Roll-timing strategies can be used where a Fund seeks to extend the expiration or maturity of a position, such as a TBA security on an underlying asset, by closing out the position before expiration and opening a new position with respect to substantially the same underlying asset with a later expiration date. TBA securities purchased or sold are reflected on the Statements of Assets and Liabilities as an asset or liability, respectively.

Warrants are securities that are usually issued together with a debt security or preferred security and that give the holder the right to buy a proportionate amount of common stock at a specified price. Warrants normally have a life that is measured in years and entitle the holder to buy common stock of a company at a price that is usually higher than the market price at the time the warrant is issued. Warrants may entail greater risks than certain other types of investments. Generally, warrants do not carry the right to receive dividends or exercise voting rights with respect to the underlying securities, and they do not represent any rights in the assets of the issuer. In addition, their value does not necessarily change with the value of the underlying securities, and they cease to have value if they are not exercised on or before their expiration date. If the market price of the underlying stock does not exceed the exercise price during the life of the warrant, the warrant will expire worthless. Warrants may increase the potential profit or loss to be realized from the investment as compared with investing the same amount in the underlying securities. Similarly, the percentage increase or decrease in the value of an equity security warrant may be greater than the percentage increase or decrease in the value of the underlying

common stock. Warrants may relate to the purchase of equity or debt securities. Debt obligations with warrants attached to purchase equity securities have many characteristics of convertible securities and their prices may, to some degree, reflect the performance of the underlying stock. Debt obligations also may be issued with warrants attached to purchase additional debt securities at the same coupon rate. A decline in interest rates would permit a Fund to sell such warrants at a profit. If interest rates rise, these warrants would generally expire with no value.

When-Issued Transactions are purchases or sales made on a when-issued basis. These transactions are made conditionally because a security, although authorized, has not yet been issued in the market. Transactions to purchase or sell securities on a when-issued basis involve a commitment by a Fund to purchase or sell these securities for a predetermined price or yield, with payment and delivery taking place beyond the customary settlement period. A Fund may sell when-issued securities before they are delivered, which may result in a realized gain (loss).

## 5. BORROWINGS AND OTHER FINANCING TRANSACTIONS

The Funds may enter into the borrowings and other financing transactions described below to the extent permitted by each Fund's respective investment policies.

The following disclosures contain information on a Fund's ability to lend or borrow cash or securities to the extent permitted under the Act, which may be viewed as borrowing or financing transactions by a Fund. The location of these instruments in each Fund's financial statements is described below.

(a) Line of Credit  The PIMCO High Yield Spectrum Fund and PIMCO Low Duration Credit Fund entered into a 364-day senior unsecured revolving credit agreement with State Street Bank & Trust Company and other commercial banks to be utilized for temporary purposes to fund shareholder redemptions or for other short-term liquidity purposes. State Street Bank & Trust Company serves as both a bank and as an agent for the other banks that are parties to the agreement. The Funds pay financing charges based on a combination of a London Interbank Offered Rate-based variable rate plus a credit spread. The Funds also pay a fee of 0.15% per annum on the unused maximum available commitment amounts. As of March 31, 2021, if applicable any outstanding borrowings would be disclosed as a payable for line of credit on the Statements of Assets and Liabilities. Interest and commitment and upfront fees, if any, paid by the Funds are disclosed as part of the interest expense on the Statements of Operations.

During the period, there were no borrowings on this line of credit. The maximum available commitment and related fees for the revolving credit agreement are:

| Funds | Maximum Available Commitment* | Expiration Date | Commitment and Upfront Fees |
|---|---|---|---|
| PIMCO High Yield Spectrum Fund | $ 19,000,000 | 08/31/2021 | $ 61,295 |
| PIMCO Low Duration Credit Fund | $ 47,000,000 | 08/31/2021 | $ 113,826 |

* Maximum available commitment prior to renewal on September 1, 2020, for PIMCO High Yield Spectrum Bond and PIMCO Low Duration Credit Fund was $35,000,000 and $45,000,000, respectively. The agreements expire on August 31, 2021 unless extended or renewed.

(b) Repurchase Agreements  Under the terms of a typical repurchase agreement, a Fund purchases an underlying debt obligation (collateral) subject to an obligation of the seller to repurchase, and a Fund to resell, the obligation at an agreed-upon price and time. In an open maturity repurchase agreement, there is no pre-determined repurchase date and the agreement can be terminated by the Fund or counterparty at any time. The underlying securities for all repurchase agreements are held by a Fund's custodian or designated subcustodians under tri-party repurchase agreements and in certain instances will remain in custody with the counterparty. The market value of the collateral must be equal to or exceed the total amount of the repurchase obligations, including interest. Repurchase agreements, if any, including accrued interest, are included on the Statements of Assets and Liabilities. Interest earned is recorded as a component of interest income on the Statements of Operations. In periods of increased demand for collateral, a Fund may pay a fee for the receipt of collateral, which may result in interest expense to the Fund.

(c) Reverse Repurchase Agreements  In a reverse repurchase agreement, a Fund delivers a security in exchange for cash to a financial institution, the counterparty, with a simultaneous agreement to repurchase the same or substantially the same security at an agreed upon price and date. In an open maturity reverse repurchase agreement, there is no pre-determined repurchase date and the agreement can be terminated by the Fund or counterparty at any time. A Fund is entitled to receive principal and interest payments, if any, made on the security delivered to the counterparty during the term of the agreement. Cash received in exchange for securities delivered plus accrued interest payments to be made by a Fund to counterparties are reflected as a liability on the Statements of Assets and Liabilities. Interest payments made by a Fund to counterparties are recorded as a component of interest expense on the Statements of Operations. In periods of increased demand for the security, a Fund may receive a fee for use of the security by the counterparty, which may result in interest income to the Fund. A Fund will segregate assets determined to be liquid by the Adviser or will otherwise cover its obligations under reverse repurchase agreements.

**Notes to Financial Statements** (Cont.)

(d) Sale-Buybacks   A sale-buyback financing transaction consists of a sale of a security by a Fund to a financial institution, the counterparty, with a simultaneous agreement to repurchase the same or substantially the same security at an agreed-upon price and date. A Fund is not entitled to receive principal and interest payments, if any, made on the security sold to the counterparty during the term of the agreement. The agreed-upon proceeds for securities to be repurchased by a Fund are reflected as a liability on the Statements of Assets and Liabilities. A Fund will recognize net income represented by the price differential between the price received for the transferred security and the agreed-upon repurchase price. This is commonly referred to as the 'price drop'. A price drop consists of (i) the foregone interest and inflationary income adjustments, if any, a Fund would have otherwise received had the security not been sold and (ii) the negotiated financing terms between a Fund and counterparty. Foregone interest and inflationary income adjustments, if any, are recorded as components of interest income on the Statements of Operations. Interest payments based upon negotiated financing terms made by a Fund to counterparties are recorded as a component of interest expense on the Statements of Operations. In periods of increased demand for the security, a Fund may receive a fee for use of the security by the counterparty, which may result in interest income to the Fund. A Fund will segregate assets determined to be liquid by the Adviser or will otherwise cover its obligations under sale-buyback transactions.

(e) Short Sales   Short sales are transactions in which a Fund sells a security that it may not own. A Fund may make short sales of securities to (i) offset potential declines in long positions in similar securities, (ii) to increase the flexibility of the Fund, (iii) for investment return, (iv) as part of a risk arbitrage strategy, and (v) as part of its overall portfolio management strategies involving the use of derivative instruments. When a Fund engages in a short sale, it may borrow the security sold short and deliver it to the counterparty. A Fund will ordinarily have to pay a fee or premium to borrow a security and be obligated to repay the lender of the security any dividend or interest that accrues on the security during the period of the loan. Securities sold in short sale transactions and the dividend or interest payable on such securities, if any, are reflected as payable for short sales on the Statements of Assets and Liabilities. Short sales expose a Fund to the risk that it will be required to cover its short position at a time when the security or other asset has appreciated in value, thus resulting in losses to a Fund. A short sale is "against the box" if a Fund holds in its portfolio or has the right to acquire the security sold short, or securities identical to the security sold short, at no additional cost. A Fund will be subject to additional risks to the extent that it engages in short sales that are not "against the box." A Fund's loss on a short sale could theoretically be unlimited in cases where a Fund is unable, for whatever reason, to close out its short position.

(f) Interfund Lending   In accordance with an exemptive order (the "Order") from the SEC, the Funds of the Trust may participate in a joint lending and borrowing facility for temporary purposes (the "Interfund Lending Program"), subject to compliance with the terms and conditions of the Order, and to the extent permitted by each Fund's investment policies and restrictions. The Funds are currently permitted to borrow under the Interfund Lending Program. A lending fund may lend in aggregate up to 15% of its current net assets at the time of the interfund loan, but may not lend more than 5% of its net assets to any one borrowing fund through the Interfund Lending Program. A borrowing fund may not borrow through the Interfund Lending Program or from any other source if its total outstanding borrowings immediately after the borrowing would be more than 33 1/3% of its total assets (or any lower threshold provided for by the fund's investment restrictions). If a borrowing fund's total outstanding borrowings exceed 10% of its total assets, each of its outstanding interfund loans will be subject to collateralization of at least 102% of the outstanding principal value of the loan. All interfund loans are for temporary or emergency purposes and the interfund loan rate to be charged will be the average of the highest current overnight repurchase agreement rate available to a lending fund and the bank loan rate, as calculated according to a formula established by the Board.

On March 23, 2020, the SEC issued an exemptive order (the "Temporary Order") to provide temporary relief to the Funds of the Trust in relation to the Interfund Lending Program, and the Board has authorized the Funds to rely on the Temporary Order. With respect to interfund lending, the Temporary Order permitted, under certain conditions, a lending fund to lend in aggregate up to 25% of its current net assets at the time of the interfund loan and to make interfund loans with term limits of up to the expiration of the Temporary Order, notwithstanding the current limit of seven business days under the Order. The SEC provided notice in April 2021 that the Temporary Order would be terminated on April 30, 2021.

During the period ended March 31, 2021, the Funds did not participate in the Interfund Lending Program.

## 6. FINANCIAL DERIVATIVE INSTRUMENTS

The Funds may enter into the financial derivative instruments described below to the extent permitted by each Fund's respective investment policies.

The following disclosures contain information on how and why the Funds use financial derivative instruments, and how financial derivative instruments affect the Funds' financial position, results of operations and cash flows. The location and fair value amounts of these instruments on the Statements of Assets and Liabilities and the net realized gain (loss) and net change in unrealized appreciation

(depreciation) on the Statements of Operations, each categorized by type of financial derivative contract and related risk exposure, are included in a table in the Notes to Schedules of Investments. The financial derivative instruments outstanding as of period end and the amounts of net realized gain (loss) and net change in unrealized appreciation (depreciation) on financial derivative instruments during the period, as disclosed in the Notes to Schedules of Investments, serve as indicators of the volume of financial derivative activity for the Funds.

(a) Forward Foreign Currency Contracts  may be engaged, in connection with settling planned purchases or sales of securities, to hedge the currency exposure associated with some or all of a Fund's securities or as part of an investment strategy. A forward foreign currency contract is an agreement between two parties to buy and sell a currency at a set price on a future date. The market value of a forward foreign currency contract fluctuates with changes in foreign currency exchange rates. Forward foreign currency contracts are marked to market daily, and the change in value is recorded by a Fund as an unrealized gain (loss). Realized gains (losses) are equal to the difference between the value of the contract at the time it was opened and the value at the time it was closed and are recorded upon delivery or receipt of the currency. These contracts may involve market risk in excess of the unrealized gain (loss) reflected on the Statements of Assets and Liabilities. In addition, a Fund could be exposed to risk if the counterparties are unable to meet the terms of the contracts or if the value of the currency changes unfavorably to the U.S. dollar. To mitigate such risk, cash or securities may be exchanged as collateral pursuant to the terms of the underlying contracts.

(b) Futures Contracts  are agreements to buy or sell a security or other asset for a set price on a future date and are traded on an exchange. A Fund may use futures contracts to manage its exposure to the securities markets or to movements in interest rates and currency values. The primary risks associated with the use of futures contracts are the imperfect correlation between the change in market value of the securities held by a Fund and the prices of futures contracts and the possibility of an illiquid market. Futures contracts are valued based upon their quoted daily settlement prices. Upon entering into a futures contract, a Fund is required to deposit with its futures broker an amount of cash, U.S. Government and Agency Obligations, or select sovereign debt, in accordance with the initial margin requirements of the broker or exchange. Futures contracts are marked to market daily and based on such movements in the price of the contracts, an appropriate payable or receivable for the change in value may be posted or collected by the Fund ("Futures Variation Margin"). Futures Variation Margins, if any, are disclosed within centrally cleared financial derivative instruments on the Statements of Assets and Liabilities. Gains (losses) are recognized but not considered realized until the

contracts expire or close. Futures contracts involve, to varying degrees, risk of loss in excess of the Futures Variation Margin included within exchange traded or centrally cleared financial derivative instruments on the Statements of Assets and Liabilities.

(c) Options Contracts  may be written or purchased to enhance returns or to hedge an existing position or future investment. A Fund may write call and put options on securities and financial derivative instruments it owns or in which it may invest. Writing put options tends to increase a Fund's exposure to the underlying instrument. Writing call options tends to decrease a Fund's exposure to the underlying instrument. When a Fund writes a call or put, an amount equal to the premium received is recorded and subsequently marked to market to reflect the current value of the option written. These amounts are included on the Statements of Assets and Liabilities. Premiums received from writing options which expire are treated as realized gains. Premiums received from writing options which are exercised or closed are added to the proceeds or offset against amounts paid on the underlying futures, swap, security or currency transaction to determine the realized gain (loss). Certain options may be written with premiums to be determined on a future date. The premiums for these options are based upon implied volatility parameters at specified terms. A Fund as a writer of an option has no control over whether the underlying instrument may be sold ("call") or purchased ("put") and as a result bears the market risk of an unfavorable change in the price of the instrument underlying the written option. There is the risk a Fund may not be able to enter into a closing transaction because of an illiquid market.

Purchasing call options tends to increase a Fund's exposure to the underlying instrument. Purchasing put options tends to decrease a Fund's exposure to the underlying instrument. A Fund pays a premium which is included as an asset on the Statements of Assets and Liabilities and subsequently marked to market to reflect the current value of the option. Premiums paid for purchasing options which expire are treated as realized losses. Certain options may be purchased with premiums to be determined on a future date. The premiums for these options are based upon implied volatility parameters at specified terms. The risk associated with purchasing put and call options is limited to the premium paid. Premiums paid for purchasing options which are exercised or closed are added to the amounts paid or offset against the proceeds on the underlying investment transaction to determine the realized gain (loss) when the underlying transaction is executed.

Credit Default Swaptions  may be written or purchased to hedge exposure to the credit risk of an investment without making a commitment to the underlying instrument. A credit default swaption is an option to sell or buy credit protection on a specific reference by entering into a pre-defined swap agreement by some specified date in the future.

**Notes to Financial Statements** (Cont.)

**Foreign Currency Options** may be written or purchased to be used as a short or long hedge against possible variations in foreign exchange rates or to gain exposure to foreign currencies.

**Inflation-Capped Options** may be written or purchased to enhance returns or for hedging opportunities. The purpose of purchasing inflation-capped options is to protect a Fund from inflation erosion above a certain rate on a given notional exposure. A floor can be used to give downside protection to investments in inflation-linked products.

**Interest Rate Swaptions** may be written or purchased to enter into a pre-defined swap agreement or to shorten, extend, cancel or otherwise modify an existing swap agreement, by some specified date in the future. The writer of the swaption becomes the counterparty to the swap if the buyer exercises. The interest rate swaption agreement will specify whether the buyer of the swaption will be a fixed-rate receiver or a fixed-rate payer upon exercise.

**Options on Exchange-Traded Futures Contracts** ("Futures Option") may be written or purchased to hedge an existing position or future investment, for speculative purposes or to manage exposure to market movements. A Futures Option is an option contract in which the underlying instrument is a single futures contract.

**Options on Securities** may be written or purchased to enhance returns or to hedge an existing position or future investment. An option on a security uses a specified security as the underlying instrument for the option contract.

**(d) Swap Agreements** are bilaterally negotiated agreements between a Fund and a counterparty to exchange or swap investment cash flows, assets, foreign currencies or market-linked returns at specified, future intervals. Swap agreements may be privately negotiated in the over the counter market ("OTC swaps") or may be cleared through a third party, known as a central counterparty or derivatives clearing organization ("Centrally Cleared Swaps"). A Fund may enter into asset, credit default, cross-currency, interest rate, total return, variance and other forms of swap agreements to manage its exposure to credit, currency, interest rate, commodity, equity and inflation risk. In connection with these agreements, securities or cash may be identified as collateral or margin in accordance with the terms of the respective swap agreements to provide assets of value and recourse in the event of default or bankruptcy/insolvency.

Centrally Cleared Swaps are marked to market daily based upon valuations as determined from the underlying contract or in accordance with the requirements of the central counterparty or derivatives clearing organization. Changes in market value, if any, are reflected as a component of net change in unrealized appreciation (depreciation) on the Statements of Operations. Daily changes in valuation of centrally

cleared swaps ("Swap Variation Margin"), if any, are disclosed within centrally cleared financial derivative instruments on the Statements of Assets and Liabilities. Centrally Cleared and OTC swap payments received or paid at the beginning of the measurement period are included on the Statements of Assets and Liabilities and represent premiums paid or received upon entering into the swap agreement to compensate for differences between the stated terms of the swap agreement and prevailing market conditions (credit spreads, currency exchange rates, interest rates, and other relevant factors). Upfront premiums received (paid) are initially recorded as liabilities (assets) and subsequently marked to market to reflect the current value of the swap. These upfront premiums are recorded as realized gain (loss) on the Statements of Operations upon termination or maturity of the swap. A liquidation payment received or made at the termination of the swap is recorded as realized gain (loss) on the Statements of Operations. Net periodic payments received or paid by a Fund are included as part of realized gain (loss) on the Statements of Operations.

For purposes of applying certain of a Fund's investment policies and restrictions, swap agreements, like other derivative instruments, may be valued by a Fund at market value, notional value or full exposure value. In the case of a credit default swap, in applying certain of a Fund's investment policies and restrictions, the Funds will value the credit default swap at its notional value or its full exposure value (*i.e.*, the sum of the notional amount for the contract plus the market value), but may value the credit default swap at market value for purposes of applying certain of a Fund's other investment policies and restrictions. For example, a Fund may value credit default swaps at full exposure value for purposes of a Fund's credit quality guidelines (if any) because such value in general better reflects a Fund's actual economic exposure during the term of the credit default swap agreement. As a result, a Fund may, at times, have notional exposure to an asset class (before netting) that is greater or lesser than the stated limit or restriction noted in a Fund's prospectus. In this context, both the notional amount and the market value may be positive or negative depending on whether a Fund is selling or buying protection through the credit default swap. The manner in which certain securities or other instruments are valued by a Fund for purposes of applying investment policies and restrictions may differ from the manner in which those investments are valued by other types of investors.

Entering into swap agreements involves, to varying degrees, elements of interest, credit, market and documentation risk in excess of the amounts recognized on the Statements of Assets and Liabilities. Such risks involve the possibility that there will be no liquid market for these agreements, that the counterparty to the agreements may default on its obligation to perform or disagree as to the meaning of contractual terms in the agreements and that there may be unfavorable changes in interest rates or the values of the asset upon which the swap is based.

A Fund's maximum risk of loss from counterparty credit risk is the discounted net value of the cash flows to be received from the counterparty over the contract's remaining life, to the extent that amount is positive. The risk may be mitigated by having a master netting arrangement between a Fund and the counterparty and by the posting of collateral to a Fund to cover a Fund's exposure to the counterparty.

To the extent a Fund has a policy to limit the net amount owed to or to be received from a single counterparty under existing swap agreements, such limitation only applies to counterparties to OTC swaps and does not apply to centrally cleared swaps where the counterparty is a central counterparty or derivatives clearing organization.

Credit Default Swap Agreements on corporate, loan, sovereign, U.S. municipal or U.S. Treasury issues are entered into to provide a measure of protection against defaults of the issuers (*i.e.*, to reduce risk where a Fund owns or has exposure to the referenced obligation) or to take an active long or short position with respect to the likelihood of a particular issuer's default. Credit default swap agreements involve one party making a stream of payments (referred to as the buyer of protection) to another party (the seller of protection) in exchange for the right to receive a specified return in the event that the referenced entity, obligation or index, as specified in the swap agreement, undergoes a certain credit event. As a seller of protection on credit default swap agreements, a Fund will generally receive from the buyer of protection a fixed rate of income throughout the term of the swap provided that there is no credit event. As the seller, a Fund would effectively add leverage to its portfolio because, in addition to its total net assets, a Fund would be subject to investment exposure on the notional amount of the swap.

If a Fund is a seller of protection and a credit event occurs, as defined under the terms of that particular swap agreement, a Fund will either (i) pay to the buyer of protection an amount equal to the notional amount of the swap and take delivery of the referenced obligation, other deliverable obligations or underlying securities comprising the referenced index or (ii) pay a net settlement amount in the form of cash or securities equal to the notional amount of the swap less the recovery value of the referenced obligation or underlying securities comprising the referenced index. If a Fund is a buyer of protection and a credit event occurs, as defined under the terms of that particular swap agreement, a Fund will either (i) receive from the seller of protection an amount equal to the notional amount of the swap and deliver the referenced obligation, other deliverable obligations or underlying securities comprising the referenced index or (ii) receive a net settlement amount in the form of cash or securities equal to the notional amount of the swap less the recovery value of the referenced

obligation or underlying securities comprising the referenced index. Recovery values are estimated by market makers considering either industry standard recovery rates or entity specific factors and considerations until a credit event occurs. If a credit event has occurred, the recovery value is determined by a facilitated auction whereby a minimum number of allowable broker bids, together with a specified valuation method, are used to calculate the settlement value. The ability to deliver other obligations may result in a cheapest-to-deliver option (the buyer of protection's right to choose the deliverable obligation with the lowest value following a credit event).

Credit default swap agreements on credit indices involve one party making a stream of payments to another party in exchange for the right to receive a specified return in the event of a write-down, principal shortfall, interest shortfall or default of all or part of the referenced entities comprising the credit index. A credit index is a basket of credit instruments or exposures designed to be representative of some part of the credit market as a whole. These indices are made up of reference credits that are judged by a poll of dealers to be the most liquid entities in the credit default swap market based on the sector of the index. Components of the indices may include, but are not limited to, investment grade securities, high yield securities, asset-backed securities, emerging markets, and/or various credit ratings within each sector. Credit indices are traded using credit default swaps with standardized terms including a fixed spread and standard maturity dates. An index credit default swap references all the names in the index, and if there is a default, the credit event is settled based on that name's weight in the index. The composition of the indices changes periodically, usually every six months, and for most indices, each name has an equal weight in the index. A Fund may use credit default swaps on credit indices to hedge a portfolio of credit default swaps or bonds, which is less expensive than it would be to buy many credit default swaps to achieve a similar effect. Credit default swaps on indices are instruments for protecting investors owning bonds against default, and traders use them to speculate on changes in credit quality.

Implied credit spreads, represented in absolute terms, utilized in determining the market value of credit default swap agreements on corporate, loan, sovereign, U.S. municipal or U.S. Treasury issues as of period end, if any, are disclosed in the Notes to Schedules of Investments. They serve as an indicator of the current status of payment/performance risk and represent the likelihood or risk of default for the reference entity. The implied credit spread of a particular referenced entity reflects the cost of buying/selling protection and may include upfront payments required to be made to enter into the agreement. Wider credit spreads represent a deterioration of the referenced entity's credit soundness and a greater likelihood or risk of default or other credit event occurring as defined under the terms of

**Notes to Financial Statements** (Cont.)

the agreement. For credit default swap agreements on asset-backed securities and credit indices, the quoted market prices and resulting values serve as the indicator of the current status of the payment/performance risk. Increasing market values, in absolute terms when compared to the notional amount of the swap, represent a deterioration of the referenced entity's credit soundness and a greater likelihood or risk of default or other credit event occurring as defined under the terms of the agreement.

The maximum potential amount of future payments (undiscounted) that a Fund as a seller of protection could be required to make under a credit default swap agreement equals the notional amount of the agreement. Notional amounts of each individual credit default swap agreement outstanding as of period end for which a Fund is the seller of protection are disclosed in the Notes to Schedules of Investments. These potential amounts would be partially offset by any recovery values of the respective referenced obligations, upfront payments received upon entering into the agreement, or net amounts received from the settlement of buy protection credit default swap agreements entered into by a Fund for the same referenced entity or entities.

Interest Rate Swap Agreements  may be entered into to help hedge against interest rate risk exposure and to maintain a Fund's ability to generate income at prevailing market rates. The value of the fixed rate bonds that the Funds hold may decrease if interest rates rise. To help hedge against this risk and to maintain its ability to generate income at prevailing market rates, a Fund may enter into interest rate swap agreements. Interest rate swap agreements involve the exchange by a Fund with another party for their respective commitment to pay or receive interest on the notional amount of principal. Certain forms of interest rate swap agreements may include: (i) interest rate caps, under which, in return for a premium, one party agrees to make payments to the other to the extent that interest rates exceed a specified rate, or "cap", (ii) interest rate floors, under which, in return for a premium, one party agrees to make payments to the other to the extent that interest rates fall below a specified rate, or "floor", (iii) interest rate collars, under which a party sells a cap and purchases a floor or vice versa in an attempt to protect itself against interest rate movements exceeding given minimum or maximum levels, (iv) callable interest rate swaps, under which the buyer pays an upfront fee in consideration for the right to early terminate the swap transaction in whole, at zero cost and at a predetermined date and time prior to the maturity date, (v) spreadlocks, which allow the interest rate swap users to lock in the forward differential (or spread) between the interest rate swap rate and a specified benchmark, or (vi) basis swaps, under which two parties can exchange variable interest rates based on different segments of money markets.

Total Return Swap Agreements  are entered into to gain or mitigate exposure to the underlying reference asset. Total return swap agreements involve commitments where single or multiple cash flows are exchanged based on the price of an underlying reference asset and on a fixed or variable interest rate. Total return swap agreements may involve commitments to pay interest in exchange for a market-linked return. One counterparty pays out the total return of a specific underlying reference asset, which may include a single security, a basket of securities, or an index, and in return receives a fixed or variable rate. At the maturity date, a net cash flow is exchanged where the total return is equivalent to the return of the underlying reference asset less a financing rate, if any. As a receiver, a Fund would receive payments based on any net positive total return and would owe payments in the event of a net negative total return. As the payer, a Fund would owe payments on any net positive total return, and would receive payments in the event of a net negative total return.

## 7. PRINCIPAL AND OTHER RISKS

(a) Principal Risks

The principal risks of investing in a Fund, which could adversely affect its net asset value, yield and total return, are listed below.

| Risks | PIMCO Credit Opportunities Bond Fund | PIMCO Diversified Income Fund | PIMCO ESG Income Fund | PIMCO High Yield Spectrum Fund | PIMCO Long-Term Credit Bond Fund | PIMCO Low Duration Credit Fund | PIMCO Low Duration Income Fund | PIMCO Preferred and Capital Securities Fund |
|---|---|---|---|---|---|---|---|---|
| New Fund | — | — | X | — | — | — | — | — |
| Small Fund | — | — | X | — | — | — | — | — |
| Interest Rate | X | X | X | X | X | X | X | X |
| Call | X | X | X | X | X | X | X | X |
| Credit | X | X | X | X | X | X | X | X |
| Capital Securities | — | — | — | — | — | — | — | X |
| Preferred Securities | — | — | — | — | — | — | — | X |
| Concentration in Banking Industries | — | — | — | — | — | — | — | X |
| Contingent Convertible Securities | — | — | X | — | — | — | X | X |
| High Yield | X | X | X | X | X | X | X | X |
| Market | X | X | X | X | X | X | X | X |

| Risks | PIMCO Credit Opportunities Bond Fund | PIMCO Diversified Income Fund | PIMCO ESG Income Fund | PIMCO High Yield Spectrum Fund | PIMCO Long-Term Credit Bond Fund | PIMCO Low Duration Credit Fund | PIMCO Low Duration Income Fund | PIMCO Preferred and Capital Securities Fund |
|---|---|---|---|---|---|---|---|---|
| Issuer | X | X | X | X | X | X | X | X |
| Liquidity | X | X | X | X | X | X | X | X |
| Derivatives | X | X | X | X | X | X | X | X |
| Equity | X | X | X | X | X | X | X | X |
| Mortgage-Related and Other Asset-Backed Securities | X | X | X | — | X | — | X | — |
| Foreign (Non-U.S.) Investment | X | X | X | X | X | X | X | X |
| Emerging Markets | X | X | X | X | X | X | X | X |
| Sovereign Debt | X | X | X | X | X | X | X | X |
| Currency | X | X | X | X | X | — | X | X |
| Leveraging | X | X | X | X | X | X | X | X |
| Management | X | X | X | X | X | X | X | X |
| Subsidiary | — | — | — | — | — | — | — | X |
| Regulation S Securities | — | — | — | — | — | — | — | X |
| Short Exposure | X | X | X | X | X | X | X | X |
| Convertible Securities | X | — | — | — | — | — | — | — |
| Senior Loan | X | — | — | — | — | X | — | — |
| Distribution Rate | — | — | X | — | — | — | X | — |
| Environmental, Social and Governance Investing | — | — | X | — | — | — | — | — |
| LIBOR Transition | X | X | X | — | X | X | X | X |

Please see "Description of Principal Risks" in a Fund's prospectus for a more detailed description of the risks of investing in a Fund.

**New Fund Risk** is the risk that a new fund's performance may not represent how the fund is expected to or may perform in the long term. In addition, new funds have limited operating histories for investors to evaluate and new funds may not attract sufficient assets to achieve investment and trading efficiencies.

**Small Fund Risk** is the risk that a smaller fund may not achieve investment or trading efficiencies. Additionally, a smaller fund may be more adversely affected by large purchases or redemptions of fund shares.

**Interest Rate Risk** is the risk that fixed income securities will decline in value because of an increase in interest rates; a fund with a longer average portfolio duration will be more sensitive to changes in interest rates than a fund with a shorter average portfolio duration.

**Call Risk** is the risk that an issuer may exercise its right to redeem a fixed income security earlier than expected (a call). Issuers may call outstanding securities prior to their maturity for a number of reasons (e.g., declining interest rates, changes in credit spreads and improvements in the issuer's credit quality). If an issuer calls a security that a Fund has invested in, the Fund may not recoup the full amount of its initial investment and may be forced to reinvest in lower-yielding securities, securities with greater credit risks or securities with other, less favorable features.

**Credit Risk** is the risk that a Fund could lose money if the issuer or guarantor of a fixed income security, or the counterparty to a derivative contract, is unable or unwilling, or is perceived (whether by market participants, rating agencies, pricing services or otherwise) as unable or unwilling, to meet its financial obligations.

**Capital Securities Risk** is the risk that the value of securities issued by U.S. and non-U.S. financial institutions that can be used to satisfy their regulatory capital requirements may decline in response to changes in legislation and regulations applicable to financial institutions and financial markets, increased competition, adverse changes in general or industry-specific economic conditions, or unfavorable interest rates. By investing under normal circumstances at least 80% of its assets in a combination of preferred securities and Capital Securities, the PIMCO Preferred and Capital Securities Fund will be more susceptible to these risks than a fund that does not invest in Capital Securities to the same extent as the Fund.

**Preferred Securities Risk** is the risk that preferred securities may be subject to greater credit or other risks than senior debt instruments. In addition, preferred securities are subject to other risks, such as risks related to deferred and omitted distributions, limited voting rights, liquidity, interest rate, regulatory changes and special redemption rights.

**Concentration in Banking Industries Risk** is the risk of concentrating in industries related to banking, including interest rate risk, market risk, the risk of heightened competition and the risk that legislation and other government actions could adversely affect such industries.

## Notes to Financial Statements (Cont.)

**Contingent Convertible Securities Risk** is the risk of investing in contingent convertible securities, including the risk that interest payments will be cancelled by the issuer or a regulatory authority, the risk of ranking junior to other creditors in the event of a liquidation or other bankruptcy-related event as a result of holding subordinated debt, the risk of a Fund's investment becoming further subordinated as a result of conversion from debt to equity, the risk that principal amount due can be written down to a lesser amount, and the general risks applicable to fixed income investments, including interest rate risk, credit risk, market risk and liquidity risk, any of which could result in losses to a Fund.

**High Yield Risk** is the risk that high yield securities and unrated securities of similar credit quality (commonly known as "junk bonds") are subject to greater levels of credit, call and liquidity risks, including the risk that a court will subordinate high yield senior debt to other debt of the issuer or take other actions detrimental to holders of the senior debt. High yield securities are considered primarily speculative with respect to the issuer's continuing ability to make principal and interest payments, and may be more volatile than higher-rated securities of similar maturity.

**Market Risk** is the risk that the value of securities owned by a Fund may go up or down, sometimes rapidly or unpredictably, due to factors affecting securities markets generally or particular industries.

**Issuer Risk** is the risk that the value of a security may decline for a reason directly related to the issuer, such as management performance, financial leverage and reduced demand for the issuer's goods or services.

**Liquidity Risk** is the risk that a particular investment may be difficult to purchase or sell and that a Fund may be unable to sell illiquid investments at an advantageous time or price or achieve its desired level of exposure to a certain sector. Liquidity risk may result from the lack of an active market, reduced number and capacity of traditional market participants to make a market in fixed income securities, and may be magnified in a rising interest rate environment or other circumstances where investor redemptions from fixed income funds may be higher than normal, causing increased supply in the market due to selling activity.

**Derivatives Risk** is the risk of investing in derivative instruments (such as futures, swaps and structured securities), including leverage, liquidity, interest rate, market, credit and management risks, and valuation complexity. Changes in the value of a derivative may not correlate perfectly with, and may be more sensitive to market events than, the underlying asset, rate or index, and a Fund could lose more than the initial amount invested. A Fund's use of derivatives may result

in losses to the Fund, a reduction in the Fund's returns and/or increased volatility. Over-the-counter ("OTC") derivatives are also subject to the risk that a counterparty to the transaction will not fulfill its contractual obligations to the other party, as many of the protections afforded to centrally-cleared derivative transactions might not be available for OTC derivatives. The primary credit risk on derivatives that are exchange-traded or traded through a central clearing counterparty resides with a Fund's clearing broker, or the clearinghouse. Changes in regulation relating to a mutual fund's use of derivatives and related instruments could potentially limit or impact a Fund's ability to invest in derivatives, limit a Fund's ability to employ certain strategies that use derivatives and/or adversely affect the value of derivatives and a Fund's performance.

**Equity Risk** is the risk that the value of equity securities, such as common stocks and preferred securities, may decline due to general market conditions which are not specifically related to a particular company or to factors affecting a particular industry or industries. Equity securities generally have greater price volatility than fixed income securities.

**Mortgage-Related and Other Asset-Backed Securities Risk** is the risk of investing in mortgage-related and other asset-backed securities, including interest rate risk, extension risk, prepayment risk and credit risk.

**Foreign (Non-U.S.) Investment Risk** is the risk that investing in foreign (non-U.S.) securities may result in a Fund experiencing more rapid and extreme changes in value than a fund that invests exclusively in securities of U.S. companies, due to smaller markets, differing reporting, accounting and auditing standards, increased risk of delayed settlement of portfolio transactions or loss of certificates of portfolio securities, and the risk of unfavorable foreign government actions, including nationalization, expropriation or confiscatory taxation, currency blockage, or political changes or diplomatic developments. Foreign securities may also be less liquid and more difficult to value than securities of U.S. issuers.

**Emerging Markets Risk** is the risk of investing in emerging market securities, primarily increased foreign (non-U.S.) investment risk.

**Sovereign Debt Risk** is the risk that investments in fixed income instruments issued by sovereign entities may decline in value as a result of default or other adverse credit event resulting from an issuer's inability or unwillingness to make principal or interest payments in a timely fashion.

**Currency Risk** is the risk that foreign (non-U.S.) currencies will change in value relative to the U.S. dollar and affect a Fund's investments in foreign (non-U.S.) currencies or in securities that trade in, and receive revenues in, or in derivatives that provide exposure to, foreign (non-U.S.) currencies.

**Leveraging Risk**  is the risk that certain transactions of a Fund, such as reverse repurchase agreements, loans of portfolio securities, and the use of when-issued, delayed delivery or forward commitment transactions, or derivative instruments, may give rise to leverage, magnifying gains and losses and causing a Fund to be more volatile than if it had not been leveraged. This means that leverage entails a heightened risk of loss.

**Management Risk**  is the risk that the investment techniques and risk analyses applied by PIMCO will not produce the desired results and that actual or potential conflicts of interest, legislative, regulatory, or tax restrictions, policies or developments may affect the investment techniques available to PIMCO and the individual portfolio manager in connection with managing a Fund and may cause PIMCO to restrict or prohibit participation in certain investments. There is no guarantee that the investment objective of a Fund will be achieved.

**Subsidiary Risk**  is the risk that, by investing in a Fund's subsidiary, the Fund is indirectly exposed to the risks associated with the subsidiary's investments. Fund subsidiaries are not registered under the 1940 Act and may not be subject to all the investor protections of the 1940 Act. There is no guarantee that the investment objective of a subsidiary will be achieved.

**Regulation S Securities Risk**  is the risk that Regulation S securities may be less liquid than publicly traded securities and may not be subject to the disclosure and other investor protection requirements that would be applicable if they were publicly traded. Accordingly, Regulation S Securities may involve a high degree of business and financial risk and may result in substantial losses.

**Short Exposure Risk**  is the risk of entering into short sales, including the potential loss of more money than the actual cost of the investment, and the risk that the third party to the short sale will not fulfill its contractual obligations, causing a loss to a Fund.

**Convertible Securities Risk**  is the risk that arises when convertible securities share both fixed income and equity characteristics. Convertible securities are subject to risks to which fixed income and equity investments are subject. These risks include equity risk, interest rate risk and credit risk.

**Senior Loan Risk**  is the risk that investing in senior loans, including bank loans, exposes a Fund to heightened credit risk, call risk, settlement risk and liquidity risk. If an issuer of a senior loan prepays or redeems the loan prior to maturity, a Fund may have to reinvest the proceeds in instruments that pay lower interest rates.

**Distribution Rate Risk**  is the risk that a Fund's distribution rate may change unexpectedly as a result of numerous factors, including changes

in realized and projected market returns, fluctuations in market interest rates, Fund performance and other factors.

**Environmental, Social and Governance Investing Risk**  is the risk that, because a Fund's ESG strategy may select or exclude securities of certain issuers for reasons other than performance, a Fund's performance will differ from funds that do not utilize an ESG investing strategy. ESG investing is qualitative and subjective by nature, and there is no guarantee that the factors utilized by PIMCO or any judgment exercised by PIMCO will reflect the opinions of any particular investor.

**LIBOR Transition Risk**  is the risk related to the anticipated discontinuation of the London Interbank Offered Rate ("LIBOR") by the end of 2021. Certain instruments held by a Fund rely in some fashion upon LIBOR. Although the transition process away from LIBOR has become increasingly well-defined in advance of the anticipated discontinuation date, there remains uncertainty regarding the nature of any replacement rate, and any potential effects of the transition away from LIBOR on a Fund or on certain instruments in which a Fund invests can be difficult to ascertain. The transition process may involve, among other things, increased volatility or illiquidity in markets for instruments that currently rely on LIBOR and may result in a reduction in value of certain instruments held by a Fund.

**(b) Other Risks**
In general, a Fund may be subject to additional risks, including, but not limited to, risks related to government regulation and intervention in financial markets, operational risks, risks associated with financial, economic and global market disruptions, and cybersecurity risks. Please see a Fund's prospectus and Statement of Additional Information for a more detailed description of the risks of investing in a Fund. Please see the Important Information section of this report for additional discussion of certain regulatory and market developments that may impact a Fund's performance.

**Market Disruption Risk**  A Fund is subject to investment and operational risks associated with financial, economic and other global market developments and disruptions, including those arising from war, terrorism, market manipulation, government interventions, defaults and shutdowns, political changes or diplomatic developments, public health emergencies (such as the spread of infectious diseases, pandemics and epidemics) and natural/environmental disasters, which can all negatively impact the securities markets and cause a Fund to lose value. These events can also impair the technology and other operational systems upon which a Fund's service providers, including PIMCO as a Fund's investment adviser, rely, and could otherwise disrupt a Fund's service providers' ability to fulfill their obligations to a Fund. For example, the recent spread of an infectious respiratory illness

**Notes to Financial Statements** (Cont.)

caused by a novel strain of coronavirus (known as COVID-19) has caused volatility, severe market dislocations and liquidity constraints in many markets, including markets for the securities a Fund holds, and may adversely affect a Fund's investments and operations. Please see the Important Information section for additional discussion of the COVID-19 pandemic.

Government Intervention in Financial Markets  Federal, state, and other governments, their regulatory agencies, or self-regulatory organizations may take actions that affect the regulation of the instruments in which a Fund invests, or the issuers of such instruments, in ways that are unforeseeable. Legislation or regulation may also change the way in which a Fund itself is regulated. Such legislation or regulation could limit or preclude a Fund's ability to achieve its investment objective. Furthermore, volatile financial markets can expose a Fund to greater market and liquidity risk and potential difficulty in valuing portfolio instruments held by the Fund. The value of a Fund's holdings is also generally subject to the risk of future local, national, or global economic disturbances based on unknown weaknesses in the markets in which a Fund invests. In addition, it is not certain that the U.S. Government will intervene in response to a future market disturbance and the effect of any such future intervention cannot be predicted. It is difficult for issuers to prepare for the impact of future financial downturns, although companies can seek to identify and manage future uncertainties through risk management programs.

Regulatory Risk  Financial entities, such as investment companies and investment advisers, are generally subject to extensive government regulation and intervention. Government regulation and/or intervention may change the way a Fund is regulated, affect the expenses incurred directly by a Fund and the value of its investments, and limit and/or preclude a Fund's ability to achieve its investment objective. Government regulation may change frequently and may have significant adverse consequences. Moreover, government regulation may have unpredictable and unintended effects.

Operational Risk  An investment in a Fund, like any fund, can involve operational risks arising from factors such as processing errors, human errors, inadequate or failed internal or external processes, failures in systems and technology, changes in personnel and errors caused by third-party service providers. The occurrence of any of these failures, errors or breaches could result in a loss of information, regulatory scrutiny, reputational damage or other events, any of which could have a material adverse effect on a Fund. While a Fund seeks to minimize such events through controls and oversight, there may still be failures that could cause losses to the Fund.

Cyber Security Risk  As the use of technology has become more prevalent in the course of business, the Funds have become potentially more susceptible to operational and information security risks resulting from breaches in cyber security. A breach in cyber security refers to both intentional and unintentional cyber events that may, among other things, cause a Fund to lose proprietary information, suffer data corruption and/or destruction or lose operational capacity, result in the unauthorized release or other misuse of confidential information, or otherwise disrupt normal business operations. Cyber security failures or breaches may result in financial losses to a Fund and its shareholders. These failures or breaches may also result in disruptions to business operations, potentially resulting in financial losses; interference with a Fund's ability to calculate its net asset value, process shareholder transactions or otherwise transact business with shareholders; impediments to trading; violations of applicable privacy and other laws; regulatory fines; penalties; reputational damage; reimbursement or other compensation costs; additional compliance and cyber security risk management costs and other adverse consequences. In addition, substantial costs may be incurred in order to prevent any cyber incidents in the future.

## 8. MASTER NETTING ARRANGEMENTS

A Fund may be subject to various netting arrangements ("Master Agreements") with select counterparties. Master Agreements govern the terms of certain transactions, and are intended to reduce the counterparty risk associated with relevant transactions by specifying credit protection mechanisms and providing standardization that is intended to improve legal certainty. Each type of Master Agreement governs certain types of transactions. Different types of transactions may be traded out of different legal entities or affiliates of a particular organization, resulting in the need for multiple agreements with a single counterparty. As the Master Agreements are specific to unique operations of different asset types, they allow a Fund to close out and net its total exposure to a counterparty in the event of a default with respect to all the transactions governed under a single Master Agreement with a counterparty. For financial reporting purposes the Statements of Assets and Liabilities generally present derivative assets and liabilities on a gross basis, which reflects the full risks and exposures prior to netting.

Master Agreements can also help limit counterparty risk by specifying collateral posting arrangements at pre-arranged exposure levels. Under most Master Agreements, collateral is routinely transferred if the total net exposure to certain transactions (net of existing collateral already in place) governed under the relevant Master Agreement with a counterparty in a given account exceeds a specified threshold, which typically ranges from zero to $250,000 depending on the counterparty and the type of Master Agreement. United States Treasury Bills and U.S. dollar cash are generally the preferred forms of collateral, although other securities may be used depending on the terms outlined in the applicable Master Agreement. Securities and cash pledged as collateral

are reflected as assets on the Statements of Assets and Liabilities as either a component of Investments at value (securities) or Deposits with counterparty. Cash collateral received is not typically held in a segregated account and as such is reflected as a liability on the Statements of Assets and Liabilities as Deposits from counterparty. The market value of any securities received as collateral is not reflected as a component of NAV. A Fund's overall exposure to counterparty risk can change substantially within a short period, as it is affected by each transaction subject to the relevant Master Agreement.

Master Repurchase Agreements and Global Master Repurchase Agreements (individually and collectively "Master Repo Agreements") govern repurchase, reverse repurchase, and certain sale-buyback transactions between a Fund and select counterparties. Master Repo Agreements maintain provisions for, among other things, initiation, income payments, events of default, and maintenance of collateral. The market value of transactions under the Master Repo Agreement, collateral pledged or received, and the net exposure by counterparty as of period end are disclosed in the Notes to Schedules of Investments.

Master Securities Forward Transaction Agreements ("Master Forward Agreements") govern certain forward settling transactions, such as TBA securities, delayed-delivery or certain sale-buyback transactions by and between a Fund and select counterparties. The Master Forward Agreements maintain provisions for, among other things, transaction initiation and confirmation, payment and transfer, events of default, termination, and maintenance of collateral. The market value of forward settling transactions, collateral pledged or received, and the net exposure by counterparty as of period end is disclosed in the Notes to Schedules of Investments.

Customer Account Agreements and related addenda govern cleared derivatives transactions such as futures, options on futures, and cleared OTC derivatives. Such transactions require posting of initial margin as determined by each relevant clearing agency which is segregated in an account at a futures commission merchant ("FCM") registered with the Commodity Futures Trading Commission. In the United States, counterparty risk may be reduced as creditors of an FCM cannot have a claim to Fund assets in the segregated account. Portability of exposure reduces risk to the Funds. Variation margin, or changes in market value, are generally exchanged daily, but may not be netted between futures and cleared OTC derivatives unless the parties have agreed to a separate arrangement in respect of portfolio margining. The market value or accumulated unrealized appreciation (depreciation), initial margin posted, and any unsettled variation margin as of period end are disclosed in the Notes to Schedules of Investments.

Prime Broker Arrangements may be entered into to facilitate execution and/or clearing of listed equity option transactions or short sales of

equity securities between a Fund and selected counterparties. The arrangements provide guidelines surrounding the rights, obligations, and other events, including, but not limited to, margin, execution, and settlement. These agreements maintain provisions for, among other things, payments, maintenance of collateral, events of default, and termination. Margin and other assets delivered as collateral are typically in the possession of the prime broker and would offset any obligations due to the prime broker. The market values of listed options and securities sold short and related collateral are disclosed in the Notes to Schedules of Investments.

International Swaps and Derivatives Association, Inc. Master Agreements and Credit Support Annexes ("ISDA Master Agreements") govern bilateral OTC derivative transactions entered into by a Fund with select counterparties. ISDA Master Agreements maintain provisions for general obligations, representations, agreements, collateral posting and events of default or termination. Events of termination include conditions that may entitle counterparties to elect to terminate early and cause settlement of all outstanding transactions under the applicable ISDA Master Agreement. Any election to terminate early could be material to the financial statements. The ISDA Master Agreement may contain additional provisions that add counterparty protection beyond coverage of existing daily exposure if the counterparty has a decline in credit quality below a predefined level or as required by regulation. Similarly, if required by regulation, the Funds may be required to post additional collateral beyond coverage of daily exposure. These amounts, if any, may (or if required by law, will) be segregated with a third-party custodian. To the extent the Funds are required by regulation to post additional collateral beyond coverage of daily exposure, it could potentially incur costs, including in procuring eligible assets to meet collateral requirements, associated with such posting. The market value of OTC financial derivative instruments, collateral received or pledged, and net exposure by counterparty as of period end are disclosed in the Notes to Schedules of Investments.

## 9. FEES AND EXPENSES

(a) Investment Advisory Fee  PIMCO is a majority-owned subsidiary of Allianz Asset Management of America L.P. ("Allianz Asset Management") and serves as the Adviser to the Trust, pursuant to an investment advisory contract. The Adviser receives a monthly fee from each Fund at an annual rate based on average daily net assets (the "Investment Advisory Fee"). The Investment Advisory Fee for all classes is charged at an annual rate as noted in the table in note (b) below.

(b) Supervisory and Administrative Fee  PIMCO serves as administrator (the "Administrator") and provides supervisory and administrative services to the Trust for which it receives a monthly supervisory and administrative fee based on each share class's average daily net assets (the "Supervisory and Administrative Fee"). As the Administrator, PIMCO bears the costs of various third-party services, including audit, custodial, portfolio accounting, legal, transfer agency and printing costs.

**Notes to Financial Statements** (Cont.)

The Investment Advisory Fees and Supervisory and Administrative Fees for all classes, as applicable, are charged at the annual rate as noted in the following table (calculated as a percentage of each Fund's average daily net assets attributable to each class):

| Fund Name | Investment Advisory Fee<br>All Classes | Institutional Class | I-2 | I-3 | Administrative Class | Class A | Class C | Class C-2 |
|---|---|---|---|---|---|---|---|---|
| PIMCO Credit Opportunities Bond Fund | 0.60% | 0.30% | 0.40% | 0.50%[2]* | N/A | 0.45% | 0.45% | N/A |
| PIMCO Diversified Income Fund | 0.45% | 0.30% | 0.40% | 0.50%[2] | 0.30% | 0.45% | 0.45% | N/A |
| PIMCO ESG Income Fund | 0.25% | 0.25% | 0.35% | 0.45%[3] | N/A | 0.40% | 0.40% | N/A |
| PIMCO High Yield Spectrum Fund | 0.30% | 0.30% | 0.40% | 0.50%[2] | N/A | 0.40% | 0.40% | N/A |
| PIMCO Long-Term Credit Bond Fund | 0.30% | 0.25% | 0.35% | N/A | N/A | 0.40%* | N/A | N/A |
| PIMCO Low Duration Credit Fund | 0.40% | 0.30% | 0.40% | N/A | N/A | 0.35% | 0.35% | N/A |
| PIMCO Low Duration Income Fund | 0.30% | 0.20% | 0.30% | 0.40%[2] | N/A | 0.35% | 0.35% | 0.35% |
| PIMCO Preferred and Capital Securities Fund[1] | 0.44% | 0.35% | 0.45% | 0.55%[2] | N/A | 0.45% | 0.45% | N/A |

[1]  PIMCO has contractually agreed to waive the Fund's Investment Advisory Fee and the supervisory and administrative fee in an amount equal to the management fee and administrative services fee, respectively, paid by the PIMCO Capital Securities Fund (Cayman) Ltd. (the "Subsidiary") to PIMCO. The Subsidiary pays PIMCO a management fee and an administrative services fee at the annual rates of 0.49% and 0.20%, respectively, of its net assets. This waiver may not be terminated by PIMCO and will remain in effect for as long as PIMCO's contract with the Subsidiary is in place.

[2]  PIMCO has contractually agreed, through July 31, 2021, to waive its supervisory and administrative fee for I-3 shares by 0.05% of the average daily net assets attributable to I-3 shares of the Fund.

[3]  PIMCO has contractually agreed, through July 31, 2022, to waive its supervisory and administrative fee for I-3 shares by 0.05% of the average daily net assets attributable to I-3 shares of the Fund.

*  This particular share class has been registered with the SEC, but has not yet launched.

(c) Distribution and Servicing Fees  PIMCO Investments LLC, a wholly-owned subsidiary of PIMCO, serves as the distributor ("Distributor") of the Trust's shares.

The Trust has adopted separate Distribution and Servicing Plans with respect to the Class A, Class C and Class C-2 shares of the Trust pursuant to Rule 12b-1 under the Act. In connection with the distribution of Class C and Class C-2 shares of the Trust, the Distributor receives distribution fees from the Trust of up to 0.75% for Class C shares and 0.50% for Class C-2 shares, and in connection with personal services rendered to Class A, Class C and Class C-2 shareholders and the maintenance of such shareholder accounts, the Distributor receives servicing fees from the Trust of up to 0.25% for each of Class A, Class C and Class C-2 shares (percentages reflect annual rates of the average daily net assets attributable to the applicable class).

The Trust has adopted a Distribution and Servicing Plan with respect to the Administrative Class shares of each Fund pursuant to Rule 12b-1 under the Act (the "Administrative Class Plan"). Under the terms of the Administrative Class Plan, a Fund may compensate the Distributor for providing, or procuring through financial intermediaries, distribution, administrative, recordkeeping, shareholder and/or related services with respect to Administrative Class shares. The Administrative Class Plan permits a Fund to make total payments at an annual rate of up to 0.25% of the average daily net assets attributable to the Administrative Class shares.

The Trust paid distribution and servicing fees at effective rates as noted in the following table (calculated as a percentage of each Fund's average daily net assets attributable to each class):

| | Allowable Rate | |
|---|---|---|
| | Distribution Fee | Servicing Fee |
| **Class A** | | |
| All Funds | — | 0.25% |
| **Class C** | | |
| PIMCO Low Duration Income Fund | 0.30% | 0.25% |
| All Other Funds | 0.75% | 0.25% |
| **Class C-2** | | |
| PIMCO Low Duration Income Fund | 0.50% | 0.25% |

| | Distribution and/or Servicing Fee |
|---|---|
| **Administrative Class** | |
| All Funds | 0.25% |

The Distributor also received the proceeds of the initial sales charges paid by the shareholders upon the purchase of Class A shares, except for the PIMCO Short Asset Investment Fund, and the contingent deferred sales charges paid by the shareholders upon certain redemptions of Class A, Class C and Class C-2 shares, except for the PIMCO Government Money Market Fund and the PIMCO Short Asset Investment Fund. For the period ended March 31, 2021, the Distributor retained $5,518,745 representing commissions (sales charges) and contingent deferred sales charges from the Trust.

(d) Redemption Fees  Shareholders of the PIMCO Low Duration Credit Fund are subject to a redemption fee on redemptions and exchanges of 1.00% of the NAV of the PIMCO Low Duration Credit Fund shares redeemed or exchanged. Redemption fees are charged on shares redeemed or exchanged within 30 days after their acquisition, including shares acquired through exchanges. Under certain circumstances, the redemption fee may be waived. Actual redemption fees charged are reported on the Statements of Changes in Net Assets.

(e) Fund Expenses  PIMCO provides or procures supervisory and administrative services for shareholders and also bears the costs of various third-party services required by the Funds, including audit, custodial, portfolio accounting, legal, transfer agency and printing costs. The Trust is responsible for the following expenses: (i) taxes and governmental fees; (ii) brokerage fees and commissions and other portfolio transaction expenses; (iii) the costs of borrowing money, including interest expenses; (iv) fees and expenses of the Trustees who are not "interested persons" of PIMCO or the Trust, and any counsel retained exclusively for their benefit (except the PIMCO All Asset and PIMCO All Asset All Authority Funds); (v) extraordinary expense, including costs of litigation and indemnification expenses; (vi) organizational expenses; and (vii) any expenses allocated or allocable to a specific class of shares, which include service fees payable with respect to the Administrative Class Shares, and may include certain other expenses as permitted by the Trust's Multi-Class Plan adopted pursuant to Rule 18f-3 under the Act and subject to review and approval by the Trustees. The ratio of expenses to average net assets per share class, as disclosed on the Financial Highlights, may differ from the annual fund operating expenses per share class.

The Trust pays no compensation directly to any Trustee or any other officer who is affiliated with the Administrator, all of whom receive remuneration for their services to the Trust from the Administrator or its affiliates.

(f) Expense Limitation  Pursuant to the Expense Limitation Agreement, PIMCO has agreed to waive a portion of the Funds' Supervisory and Administrative Fee, or reimburse each Fund, to the extent that each Fund's organizational expenses, pro rata share of expenses related to obtaining or maintaining a Legal Entity Identifier and pro rata share of Trustee Fees exceed 0.0049%, the "Expense Limit" (calculated as a percentage of each Fund's average daily net assets attributable to each class). The Expense Limitation Agreement will automatically renew for one-year terms unless PIMCO provides written notice to the Trust at least 30 days prior to the end of the then current term.

Prior to July 31, 2018, PIMCO had contractually agreed to reduce its Investment Advisory Fee for the PIMCO Low Duration Income Fund. In any month in which the supervision and administration agreement is in effect, PIMCO is entitled to reimbursement by each Fund of any portion of the supervisory and administrative fee waived or reimbursed as set forth above (the "Reimbursement Amount") during the previous thirty-six months from the date of the waiver, provided that such amount paid to PIMCO will not: i) together with any organizational expenses, pro rata share of expenses related to obtaining or maintaining a Legal Entity Identifier and pro rata Trustee fees, exceed, for such month, the Expense Limit (or the amount of the expense limit in place at the time the amount being recouped was originally waived if lower than the Expense Limit); ii) exceed the total Reimbursement Amount; or iii) include any amounts previously reimbursed to PIMCO. The total recoverable amounts to PIMCO (from the Fee Waiver Agreement and Expense Limitation Agreement combined) at March 31, 2021, were as follows (amounts in thousands[†]):

| Fund Name | Expiring Within | | | |
| --- | --- | --- | --- | --- |
| | 12 months | 13-24 months | 25-36 months | Total |
| PIMCO ESG Income Fund | $    0 | $    0 | $  97 | $  97 |
| PIMCO Low Duration Income Fund | 182 | 30 | 35 | 247 |

[†]    A zero balance may reflect actual amounts rounding to less than one thousand.

Pursuant to a Fee Waiver Agreement, PIMCO has contractually agreed, through July 31, 2021, to reduce its supervisory and administrative fee for I-3 shares by 0.05% of the average daily net assets attributable to I-3 shares of each of the PIMCO Credit Opportunities Bond Fund, PIMCO Diversified Income Fund, PIMCO High Yield Spectrum Fund, PIMCO Low Duration Income Fund and PIMCO Preferred and Capital Securities Fund. This Fee Waiver Agreement will automatically renew for one-year terms unless PIMCO provides written notice to the Trust at least 30 days prior to the end of the then current term.

Pursuant to a Fee Waiver Agreement, PIMCO has contractually agreed, through July 31, 2022, to reduce its supervisory and administrative fee for I-3 shares of the PIMCO ESG Income Fund. This Fee Waiver Agreement will automatically renew for one-year terms unless PIMCO provides written notice to the Trust at least 30 days prior to the end of the then current term.

The waivers are reflected on the Statements of Operations as a component of Waiver and/or Reimbursement by PIMCO. For the period ended March 31, 2021, the Funds below waived the following fees (amounts in thousands[†]):

| Fund Name | Waived Fees |
| --- | --- |
| PIMCO Diversified Income Fund | $  12 |
| PIMCO ESG Income Fund | 0 |
| PIMCO High Yield Spectrum Fund | 0 |
| PIMCO Low Duration Income Fund | 23 |
| PIMCO Preferred and Capital Securities Fund | 19 |

[†]    A zero balance may reflect actual amounts rounding to less than one thousand.

(g) Acquired Fund Fees and Expenses  PIMCO Capital Securities Fund (Cayman) Ltd. (the "Subsidiary"), has entered into a separate contract with PIMCO for the management of the Subsidiary's portfolio pursuant to which the Subsidiary pays PIMCO a management fee and administrative services fee

**Notes to Financial Statements** (Cont.)

at the annual rates of 0.49% and 0.20%, respectively, of its net assets. PIMCO has contractually agreed to waive the Investment Advisory Fee and the Supervisory and Administrative Fees it receives from the Subsidiary in an amount equal to the management fee and administrative services fee, respectively, paid to PIMCO by the Subsidiary. This waiver may not be terminated by PIMCO and will remain in effect for as long as PIMCO's contract with the Subsidiary is in place. The waiver is reflected on the Statements of Operations as a component of Waiver and/ or Reimbursement by PIMCO. During the period ended March 31, 2021, the amount was $ 1,724,700. See Note 14, Basis for Consolidation in the Notes to Financial Statements for more information regarding the Subsidiary.

## 10. RELATED PARTY TRANSACTIONS

The Adviser, Administrator, and Distributor are related parties. Fees paid to these parties are disclosed in Note 9, Fees and Expenses, and the accrued related party fee amounts are disclosed on the Statements of Assets and Liabilities.

Certain Funds are permitted to purchase or sell securities from or to certain related affiliated funds under specified conditions outlined in procedures adopted by the Board. The procedures have been designed to ensure that any purchase or sale of securities by the Funds from or to another fund or portfolio that are, or could be, considered an affiliate, or an affiliate of an affiliate, by virtue of having a common investment adviser (or affiliated investment advisers), common Trustees and/or common officers complies with Rule 17a-7 under the Act. Further, as defined under the procedures, each transaction is effected at the current market price. Purchases and sales of securities pursuant to Rule 17a-7 under the Act for the period ended March 31, 2021, were as follows (amounts in thousands[†]):

| Fund Name | Purchases | Sales |
|---|---|---|
| PIMCO Credit Opportunities Bond Fund | $ 5,923 | $ 37,515 |
| PIMCO Diversified Income Fund | 66,739 | 3,433 |
| PIMCO High Yield Spectrum Fund | 14,707 | 27,363 |
| PIMCO Long-Term Credit Bond Fund | 92,205 | 788,808 |
| PIMCO Low Duration Credit Fund | 38,457 | 173,017 |
| PIMCO Low Duration Income Fund | 422,929 | 374,917 |
| PIMCO Preferred and Capital Securities Fund | 107,430 | 199,932 |

[†]   A zero balance may reflect actual amounts rounding to less than one thousand.

## 11. GUARANTEES AND INDEMNIFICATIONS

Under the Trust's organizational documents, each Trustee or officer of the Trust is indemnified and each employee or other agent of the Trust (including the Trust's investment manager) may be indemnified, to the extent permitted by the Act, against certain liabilities that may arise out of performance of their duties to the Funds. Additionally, in the normal course of business, the Funds enter into contracts that contain a variety of indemnification clauses. The Funds' maximum exposure under these arrangements is unknown as this would involve future claims that may

be made against the Funds that have not yet occurred. However, the Funds have not had prior claims or losses pursuant to these contracts.

## 12. PURCHASES AND SALES OF SECURITIES

The length of time a Fund has held a particular security is not generally a consideration in investment decisions. A change in the securities held by a Fund is known as "portfolio turnover." Each Fund may engage in frequent and active trading of portfolio securities to achieve its investment objective, particularly during periods of volatile market movements. High portfolio turnover may involve correspondingly greater transaction costs, including brokerage commissions or dealer mark-ups and other transaction costs on the sale of securities and reinvestments in other securities, which are borne by the Fund. Such sales may also result in realization of taxable capital gains, including short-term capital gains (which are generally taxed at ordinary income tax rates when distributed to shareholders). The transaction costs associated with portfolio turnover may adversely affect a Fund's performance. The portfolio turnover rates are reported in the Financial Highlights.

Purchases and sales of securities (excluding short-term investments) for the period ended March 31, 2021, were as follows (amounts in thousands[†]):

| Fund Name | U.S. Government/Agency | | All Other | |
| | Purchases | Sales | Purchases | Sales |
|---|---|---|---|---|
| PIMCO Credit Opportunities Bond Fund | $ 83,079 | $ 88,804 | $ 265,703 | $ 213,604 |
| PIMCO Diversified Income Fund | 4,464,894 | 4,959,012 | 1,644,837 | 462,831 |
| PIMCO ESG Income Fund | 21,101 | 15,745 | 26,165 | 441 |
| PIMCO High Yield Spectrum Fund | 0 | 10,863 | 248,531 | 128,685 |
| PIMCO Long-Term Credit Bond Fund | 3,086,406 | 3,046,413 | 1,466,097 | 1,711,353 |
| PIMCO Low Duration Credit Fund | 0 | 0 | 789,704 | 723,327 |
| PIMCO Low Duration Income Fund | 33,877,315 | 33,048,711 | 2,610,700 | 1,918,816 |
| PIMCO Preferred and Capital Securities Fund | 0 | 0 | 1,245,726 | 929,315 |

[†]   A zero balance may reflect actual amounts rounding to less than one thousand.

## 13. SHARES OF BENEFICIAL INTEREST

The Trust may issue an unlimited number of shares of beneficial interest with a $0.01 par value. Changes in shares of beneficial interest were as follows (shares and amounts in thousands[†]):

| | PIMCO Credit Opportunities Bond Fund | | | | PIMCO Diversified Income Fund | | | | PIMCO ESG Income Fund | |
| | Year Ended 03/31/2021 | | Year Ended 03/31/2020 | | Year Ended 03/31/2021 | | Year Ended 03/31/2020 | | Inception date through 03/31/2021[a] | |
| | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts for shares sold** | | | | | | | | | | |
| Institutional Class | 17,386 | $ 169,444 | 21,509 | $ 214,927 | 165,151 | $ 1,820,798 | 124,907 | $ 1,384,119 | 3,584 | $ 36,867 |
| I-2 | 8,470 | 81,135 | 4,544 | 44,714 | 56,864 | 624,877 | 45,146 | 497,874 | 137 | 1,420 |
| I-3 | N/A | N/A | N/A | N/A | 2,407 | 26,362 | 1,733 | 18,951 | 4 | 44 |
| Administrative Class | N/A | N/A | N/A | N/A | 1,861 | 20,366 | 3,442 | 38,110 | N/A | N/A |
| Class A | 1,071 | 10,453 | 1,377 | 13,815 | 11,844 | 130,736 | 23,272 | 256,516 | 2 | 23 |
| Class C | 68 | 647 | 121 | 1,206 | 2,292 | 25,151 | 3,356 | 37,209 | 14 | 140 |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Issued as reinvestment of distributions** | | | | | | | | | | |
| Institutional Class | 618 | 6,098 | 1,059 | 10,494 | 11,675 | 129,038 | 12,296 | 135,966 | 14 | 145 |
| I-2 | 348 | 3,420 | 230 | 2,263 | 1,337 | 14,794 | 998 | 11,038 | 0 | 0 |
| I-3 | N/A | N/A | N/A | N/A | 78 | 861 | 41 | 457 | 0 | 0 |
| Administrative Class | N/A | N/A | N/A | N/A | 366 | 4,010 | 694 | 7,675 | N/A | N/A |
| Class A | 69 | 676 | 79 | 777 | 943 | 10,408 | 1,301 | 14,396 | 0 | 0 |
| Class C | 12 | 120 | 17 | 163 | 170 | 1,871 | 218 | 2,413 | 0 | 0 |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Cost of shares redeemed** | | | | | | | | | | |
| Institutional Class | (16,809) | (164,030) | (26,196) | (261,302) | (81,977) | (905,243) | (99,637) | (1,090,394) | (10) | (103) |
| I-2 | (3,334) | (32,165) | (3,523) | (34,316) | (30,347) | (336,234) | (28,871) | (303,111) | 0 | 0 |
| I-3 | N/A | N/A | N/A | N/A | (1,330) | (14,769) | (771) | (8,418) | 0 | 0 |
| Administrative Class | N/A | N/A | N/A | N/A | (16,855) | (190,142) | (2,889) | (31,430) | N/A | N/A |
| Class A | (1,345) | (13,269) | (1,626) | (15,817) | (9,118) | (100,372) | (18,659) | (205,130) | 0 | 0 |
| Class C | (269) | (2,628) | (153) | (1,508) | (3,867) | (43,012) | (2,763) | (30,329) | (5) | (50) |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Net increase (decrease) resulting from Fund share transactions** | 6,285 | $ 59,901 | (2,562) | $ (24,584) | 111,494 | $ 1,219,500 | 63,814 | $ 735,912 | 3,740 | $ 38,486 |

**Notes to Financial Statements** (Cont.)

| | PIMCO High Yield Spectrum Fund | | | | PIMCO Long-Term Credit Bond Fund | | | |
|---|---|---|---|---|---|---|---|---|
| | Year Ended 03/31/2021 | | Year Ended 03/31/2020 | | Year Ended 03/31/2021 | | Year Ended 03/31/2020 | |
| | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount |
| **Receipts for shares sold** | | | | | | | | |
| Institutional Class | 15,758 | $ 150,819 | 11,802 | $ 114,924 | 127,496 | $ 1,657,609 | 74,209 | $ 945,065 |
| I-2 | 10,940 | 103,496 | 9,172 | 88,789 | 6,512 | 84,387 | 76,109 | 913,081 |
| I-3 | 321 | 3,226 | 131 | 1,285 | N/A | N/A | N/A | N/A |
| Administrative Class | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Class A | 2,000 | 19,050 | 2,616 | 25,490 | N/A | N/A | N/A | N/A |
| Class C | 143 | 1,341 | 212 | 2,080 | N/A | N/A | N/A | N/A |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Issued as reinvestment of distributions** | | | | | | | | |
| Institutional Class | 556 | 5,350 | 2,128 | 20,777 | 20,005 | 265,843 | 13,375 | 169,882 |
| I-2 | 991 | 9,549 | 1,026 | 9,948 | 845 | 11,228 | 2,819 | 36,025 |
| I-3 | 4 | 44 | 5 | 44 | N/A | N/A | N/A | N/A |
| Administrative Class | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Class A | 254 | 2,431 | 334 | 3,235 | N/A | N/A | N/A | N/A |
| Class C | 28 | 269 | 37 | 358 | N/A | N/A | N/A | N/A |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Cost of shares redeemed** | | | | | | | | |
| Institutional Class | (11,086) | (105,205) | (64,310) | (631,552) | (138,210) | (1,837,578) | (119,006) | (1,478,867) |
| I-2 | (3,876) | (37,699) | (14,477) | (135,288) | (12,780) | (168,188) | (68,705) | (804,433) |
| I-3 | (16) | (150) | (305) | (2,969) | N/A | N/A | N/A | N/A |
| Administrative Class | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Class A | (2,658) | (25,406) | (3,653) | (35,009) | N/A | N/A | N/A | N/A |
| Class C | (445) | (4,325) | (286) | (2,716) | N/A | N/A | N/A | N/A |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Net increase (decrease) resulting from Fund share transactions** | 12,914 | $ 122,790 | (55,568) | $ (540,604) | 3,868 | $ 13,301 | (21,199) | $ (219,247) |

| PIMCO Low Duration Credit Fund | | | | PIMCO Low Duration Income Fund | | | | PIMCO Preferred and Capital Securities Fund | | | |
| Year Ended 03/31/2021 | | Year Ended 03/31/2020 | | Year Ended 03/31/2021 | | Year Ended 03/31/2020 | | Year Ended 03/31/2021 | | Year Ended 03/31/2020 | |
| Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 57,516 | $ 508,572 | 8,053 | $ 71,706 | 139,515 | $ 1,189,071 | 138,482 | $ 1,183,176 | 90,063 | $ 946,468 | 104,274 | $ 1,078,445 |
| 1,210 | 11,212 | 1,864 | 18,194 | 220,654 | 1,875,382 | 291,656 | 2,494,678 | 15,481 | 164,218 | 28,613 | 298,095 |
| N/A | N/A | N/A | N/A | 10,676 | 90,305 | 4,569 | 39,250 | 2,563 | 26,519 | 2,443 | 24,672 |
| N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 1,761 | 16,324 | 1,788 | 17,491 | 117,404 | 1,000,360 | 151,107 | 1,296,372 | 11,242 | 119,798 | 30,453 | 320,917 |
| 176 | 1,637 | 374 | 3,671 | 8,566 | 72,817 | 12,717 | 108,692 | 758 | 7,969 | 1,463[b] | 15,617[b] |
| N/A | N/A | N/A | N/A | 369[c] | 3,203[c] | N/A | N/A | N/A | N/A | N/A | N/A |
| 1,364 | 12,505 | 674 | 6,545 | 6,729 | 57,016 | 10,108 | 86,282 | 3,573 | 38,995 | 2,450 | 25,679 |
| 89 | 819 | 173 | 1,685 | 7,249 | 61,447 | 8,838 | 75,346 | 964 | 10,489 | 1,095 | 11,412 |
| N/A | N/A | N/A | N/A | 168 | 1,430 | 266 | 2,275 | 135 | 1,462 | 90 | 935 |
| N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 177 | 1,630 | 343 | 3,332 | 4,365 | 36,987 | 5,458 | 46,542 | 937 | 10,166 | 1,054 | 11,001 |
| 46 | 421 | 145 | 1,409 | 560 | 4,739 | 820 | 7,000 | 47 | 511 | 12[b] | 131[b] |
| N/A | N/A | N/A | N/A | 1[c] | 9[c] | N/A | N/A | N/A | N/A | N/A | N/A |
| (53,754) | (491,341) | (8,853) | (83,558) | (98,942) | (830,487) | (137,843) | (1,157,264) | (69,562) | (732,835) | (47,291) | (492,441) |
| (1,937) | (17,814) | (3,019) | (28,964) | (152,068) | (1,281,222) | (233,999) | (1,951,013) | (12,716) | (132,374) | (17,787) | (175,055) |
| N/A | N/A | N/A | N/A | (3,291) | (27,710) | (6,870) | (57,819) | (1,922) | (19,883) | (667) | (6,426) |
| N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| (2,168) | (19,747) | (5,260) | (50,376) | (82,399) | (696,005) | (113,424) | (958,767) | (13,550) | (142,914) | (14,737) | (148,658) |
| (1,774) | (16,309) | (2,666) | (25,529) | (9,832) | (83,279) | (10,518) | (88,968) | (340) | (3,608) | (114)[b] | (1,067)[b] |
| N/A | N/A | N/A | N/A | 0[c] | (1)[c] | N/A | N/A | N/A | N/A | N/A | N/A |
| 2,706 | $ 7,909 | (6,384) | $ (64,394) | 169,724 | $ 1,474,062 | 121,367 | $ 1,125,782 | 27,673 | $ 294,981 | 91,351 | $ 963,257 |

[†] A zero balance may reflect actual amounts rounding to less than one thousand.
[a] Inception date of the Fund was September 30, 2020.
[b] Inception date of Class C was August 23, 2019.
[c] Inception date of Class C-2 was October 21, 2020.

The following table discloses the number of shareholders that own 10% or more of the outstanding shares of a Fund along with their respective percent ownership, if any, as of March 31, 2021. Some of these shareholders may be considered related parties, which may include, but are not limited to, the investment adviser and its affiliates, affiliated broker dealers, fund of funds and directors or employees of the Trust or Adviser.

| | Shareholders that own 10% or more of outstanding shares | | Total percentage of portfolio held by shareholders that own 10% or more of outstanding shares | |
| | Non-Related Parties | Related Parties | Non-Related Parties | Related Parties |
|---|---|---|---|---|
| PIMCO ESG Income Fund | 0 | 1 | 0% | 14% |
| PIMCO Low Duration Credit Fund | 0 | 1 | 0% | 30% |

## 14. BASIS FOR CONSOLIDATION

The Subsidiary, a Cayman Islands exempted company, was incorporated on February 4, 2015, as a wholly owned subsidiary acting as an investment vehicle for the PIMCO Preferred and Capital Securities Fund (the "PCS Fund") in order to effect certain investments for the PCS Fund consistent with the PCS Fund's investment objectives and policies as specified in its prospectus and statement of additional information. The PCS Fund's investment portfolio has been consolidated and includes the portfolio holdings of the PCS Fund and the Subsidiary. The consolidated financial statements include the accounts of the PCS Fund and the Subsidiary, if any. All inter-company transactions and balances have been eliminated. A subscription agreement was entered into between the PCS Fund and the Subsidiary, comprising the entire issued share capital of the Subsidiary, with the intent that the PCS Fund will remain the sole shareholder and retain all rights. Under the Memorandum and Articles of Association, shares issued by the Subsidiary confer upon a shareholder the right to receive notice of, to attend and to vote at general meetings of the Subsidiary

## Notes to Financial Statements (Cont.)

and shall confer upon the shareholder rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Subsidiary. The net assets of the Subsidiary as of period end represented 16.7% of the Fund's consolidated net assets.

## 15. REGULATORY AND LITIGATION MATTERS

The Funds are not named as defendants in any material litigation or arbitration proceedings and are not aware of any material litigation or claim pending or threatened against them.

The foregoing speaks only as of the date of this report.

## 16. FEDERAL INCOME TAX MATTERS

Each Fund intends to qualify as a regulated investment company under Subchapter M of the Internal Revenue Code (the "Code") and distribute all of its taxable income and net realized gains, if applicable, to shareholders. Accordingly, no provision for Federal income taxes has been made.

A Fund may be subject to local withholding taxes, including those imposed on realized capital gains. Any applicable foreign capital gains tax is accrued daily based upon net unrealized gains, and may be payable following the sale of any applicable investments.

In accordance with U.S. GAAP, the Adviser has reviewed the Funds' tax positions for all open tax years. As of March 31, 2021, the Funds have recorded no liability for net unrecognized tax benefits relating to uncertain income tax positions they have taken or expect to take in future tax returns.

The Funds file U.S. federal, state, and local tax returns as required. The Funds' tax returns are subject to examination by relevant tax authorities until expiration of the applicable statute of limitations, which is generally three years after the filing of the tax return but which can be extended to six years in certain circumstances. Tax returns for open years have incorporated no uncertain tax positions that require a provision for income taxes.

As of March 31, 2021, the components of distributable taxable earnings are as follows (amounts in thousands[†]):

| | Undistributed Ordinary Income[(1)] | Undistributed Long-Term Capital Gains | Net Tax Basis Unrealized Appreciation/ (Depreciation)[(2)] | Other Book-to-Tax Accounting Differences[(3)] | Accumulated Capital Losses[(4)] | Qualified Late-Year Loss Deferral - Capital[(5)] | Qualified Late-Year Loss Deferral - Ordinary[(6)] | Total Distributable Earnings |
|---|---|---|---|---|---|---|---|---|
| PIMCO Credit Opportunities Bond Fund | $ 5,336 | $ 0 | $ 4,530 | $ (1) | $ (54,930) | $ 0 | $ 0 | $ (45,065) |
| PIMCO Diversified Income Fund | 6,995 | 0 | 49,454 | (940) | (40,463) | 0 | 0 | 15,046 |
| PIMCO ESG Income Fund | 115 | 0 | 131 | 0 | (28) | 0 | 0 | 218 |
| PIMCO High Yield Spectrum Fund | 7,673 | 0 | 2,845 | (121) | (49,699) | 0 | 0 | (39,302) |
| PIMCO Long-Term Credit Bond Fund | 51,319 | 63,791 | 116,501 | (472) | 0 | 0 | 0 | 231,139 |
| PIMCO Low Duration Credit Fund | 2,166 | 0 | 4,656 | (20) | (71,835) | 0 | 0 | (65,033) |
| PIMCO Low Duration Income Fund | 0 | 0 | 38,922 | (2,184) | (200,810) | 0 | 0 | (164,072) |
| PIMCO Preferred and Capital Securities Fund | 15,789 | 16,238 | 81,106 | 0 | 0 | 0 | 0 | 113,133 |

[†]   A zero balance may reflect actual amounts rounding to less than one thousand.
[(1)]   Includes undistributed short-term capital gains, if any.
[(2)]   Adjusted for open wash sale loss deferrals and the accelerated recognition of unrealized gain or loss on certain futures, options and forward contracts for federal income tax purposes. Also adjusted for differences between book and tax realized and unrealized gain (loss) on swap contracts, sale/buyback transactions, interest accrued on defaulted securities, straddle loss deferrals, hyperinflationary investments, Passive Foreign Investment Companies (PFICs), and partnership investments.
[(3)]   Represents differences in income tax regulations and financial accounting principles generally accepted in the United States of America, mainly for organizational costs and distributions payable at fiscal year-end.
[(4)]   Capital losses available to offset future net capital gains expire in varying amounts as shown below.
[(5)]   Capital losses realized during the period November 1, 2020 through March 31, 2021 which the Funds elected to defer to the following taxable year pursuant to income tax regulations.
[(6)]   Specified losses realized during the period November 1, 2020 through March 31, 2021 and Ordinary losses realized during the period January 1, 2021 through March 31, 2021, which the Funds elected to defer to the following taxable year pursuant to income tax regulations.

Under the Regulated Investment Company Modernization Act of 2010, a fund is permitted to carry forward any new capital losses for an unlimited period. Additionally, such capital losses that are carried forward will retain their character as either short-term or long-term capital losses rather than being considered all short-term under previous law.

As of March 31, 2021, the Funds had the following post-effective capital losses with no expiration (amounts in thousands[†]):

| | Short-Term | Long-Term |
|---|---|---|
| PIMCO Credit Opportunities Bond Fund* | $ 30,937 | $ 23,993 |
| PIMCO Diversified Income Fund | 30,282 | 10,181 |
| PIMCO ESG Income Fund | 28 | 0 |

| | Short-Term | Long-Term |
|---|---|---|
| PIMCO High Yield Spectrum Fund* | $ 203 | $ 49,496 |
| PIMCO Long-Term Credit Bond Fund | 0 | 0 |
| PIMCO Low Duration Credit Fund* | 1,959 | 69,876 |
| PIMCO Low Duration Income Fund | 61,817 | 138,993 |
| PIMCO Preferred and Capital Securities Fund | 0 | 0 |

†   A zero balance may reflect actual amounts rounding to less than one thousand.
*   Portion of amount represents realized loss and recognized built-in loss under IRC 382-83, which is carried forward to future years to offset future realized gain subject to certain limitations.

As of March 31, 2021, the aggregate cost and the net unrealized appreciation/(depreciation) of investments for federal income tax purposes are as follows (amounts in thousands†):

| | Federal Tax Cost | Unrealized Appreciation | Unrealized (Depreciation) | Net Unrealized Appreciation/ (Depreciation)[7] |
|---|---|---|---|---|
| PIMCO Credit Opportunities Bond Fund | $ 403,204 | $ 14,310 | $ (9,782) | $ 4,528 |
| PIMCO Diversified Income Fund | 5,502,197 | 185,472 | (135,002) | 50,470 |
| PIMCO ESG Income Fund | 37,186 | 421 | (286) | 135 |
| PIMCO High Yield Spectrum Fund | 468,578 | 16,897 | (13,889) | 3,008 |
| PIMCO Long-Term Credit Bond Fund | 4,227,442 | 256,380 | (138,847) | 117,533 |
| PIMCO Low Duration Credit Fund | 286,772 | 6,108 | (1,281) | 4,827 |
| PIMCO Low Duration Income Fund | 8,833,018 | 300,488 | (258,698) | 41,790 |
| PIMCO Preferred and Capital Securities Fund | 1,852,658 | 90,069 | (8,204) | 81,865 |

†   A zero balance may reflect actual amounts rounding to less than one thousand.
[7]   Primary differences, if any, between book and tax net unrealized appreciation/(depreciation) are attributable to open wash sale loss deferrals, unrealized gain or loss on certain futures, options and forward contracts, realized and unrealized gain (loss) swap contracts, sale/buyback transactions, interest accrued on defaulted securities, straddle loss deferrals, hyperinflationary investments, Passive Foreign Investment Companies (PFICs), and partnership investments.

For the fiscal years ended March 31, 2021 and March 31, 2020, respectively, the Funds made the following tax basis distributions (amounts in thousands†):

| | March 31, 2021 | | | March 31, 2020 | | |
|---|---|---|---|---|---|---|
| | Ordinary Income Distributions[8] | Long-Term Capital Gain Distributions | Return of Capital[9] | Ordinary Income Distributions[8] | Long-Term Capital Gain Distributions | Return of Capital[9] |
| PIMCO Credit Opportunities Bond Fund | $ 13,801 | $ 0 | $ 0 | $ 16,000 | $ 0 | $ 0 |
| PIMCO Diversified Income Fund | 171,361 | 0 | 0 | 185,589 | 0 | 0 |
| PIMCO ESG Income Fund | 145 | 0 | 0 | 0 | 0 | 0 |
| PIMCO High Yield Spectrum Fund | 18,960 | 0 | 0 | 35,915 | 0 | 0 |
| PIMCO Long-Term Credit Bond Fund | 191,241 | 98,003 | 0 | 213,296 | 0 | 0 |
| PIMCO Low Duration Credit Fund | 15,555 | 0 | 0 | 13,664 | 0 | 0 |
| PIMCO Low Duration Income Fund | 152,870 | 0 | 35,601 | 259,370 | 0 | 0 |
| PIMCO Preferred and Capital Securities Fund | 66,842 | 161 | 0 | 49,804 | 0 | 0 |

†   A zero balance may reflect actual amounts rounding to less than one thousand.
[8]   Includes short-term capital gains distributed, if any.
[9]   A portion of the distributions made represents a tax return of capital. Return of capital distributions have been reclassified from undistributed net investment income to paid-in capital to more appropriately conform financial accounting to tax accounting.

## 17. SUBSEQUENT EVENTS

On February 10, 2021, the Board approved a proposal to change the name of the PIMCO Senior Floating Rate Fund to PIMCO Low Duration Credit Fund. The name change occurred on May 3, 2021.

Effective May 3, 2021, any redemptions of PIMCO Low Duration Credit Fund shares will no longer be subject to a redemption fee.

There were no other subsequent events identified that require recognition or disclosure.

# Report of Independent Registered Public Accounting Firm

To the Board of Trustees of PIMCO Funds and Shareholders of PIMCO Credit Opportunities Bond Fund, PIMCO Diversified Income Fund, PIMCO ESG Income Fund, PIMCO High Yield Spectrum Fund, PIMCO Long-Term Credit Bond Fund, PIMCO Low Duration Credit Fund, PIMCO Low Duration Income Fund and PIMCO Preferred and Capital Securities Fund

**Opinions on the Financial Statements**

We have audited the accompanying statements of assets and liabilities, including the schedules of investments, of each of the funds indicated in the table below (eight of the funds constituting PIMCO Funds, hereafter collectively referred to as the "Funds") as of March 31, 2021, the related statements of operations, of cash flows for PIMCO Long-Term Credit Bond Fund and PIMCO Low Duration Credit Fund, and of changes in net assets for each of the periods indicated in the table below, including the related notes, and the financial highlights for each of the periods indicated in the table below (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of each of the Funds as of March 31, 2021, the results of each of their operations and each of the cash flows for PIMCO Long-Term Credit Bond Fund and PIMCO Low Duration Credit Fund, the changes in each of their net assets, and each of the financial highlights for each of the periods indicated in the table below, in conformity with accounting principles generally accepted in the United States of America.

PIMCO Credit Opportunities Bond Fund[1]
PIMCO Diversified Income Fund[2]
PIMCO ESG Income Fund[3]
PIMCO High Yield Spectrum Fund[2]
PIMCO Long-Term Credit Bond Fund[4]
PIMCO Low Duration Credit Fund[4]
PIMCO Low Duration Income Fund[2]
PIMCO Preferred and Capital Securities Fund[2]

[1]   Statement of operations for the year ended March 31, 2021, statement of changes in net assets for the years ended March 31, 2021 and 2020 and the financial highlights for the years ended March 31, 2021, 2020, 2019, 2018 and 2017
[2]   Statement of operations for the year ended March 31, 2021, statement of changes in net assets for the years ended March 31, 2021 and 2020 and the financial highlights for each of the periods indicated therein
[3]   Statement of operations, statement of changes in net assets and the financial highlights for the period September 30, 2020 (inception date) through March 31, 2021
[4]   Statement of operations and statement of cash flows for the year ended March 31, 2021, statement of changes in net assets for the years ended March 31, 2021 and 2020 and the financial highlights for the years ended March 31, 2021, 2020, 2019, 2018 and 2017

**Basis for Opinions**

These financial statements are the responsibility of the Funds' management. Our responsibility is to express an opinion on the Funds' financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Funds in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits of these financial statements in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. Our procedures included confirmation of securities owned as of March 31, 2021 by correspondence with the custodian, transfer agent, brokers and agent banks; when replies were not received from brokers or agent banks, we performed other auditing procedures. We believe that our audits provide a reasonable basis for our opinions.

/s/ PricewaterhouseCoopers LLP
Kansas City, Missouri

May 27, 2021

We have served as the auditor of one or more investment companies in PIMCO Funds since 1987.

## Glossary: (abbreviations that may be used in the preceding statements)

(Unaudited)

**Counterparty Abbreviations:**

| | | | | | |
|---|---|---|---|---|---|
| AZD | Australia and New Zealand Banking Group | FBF | Credit Suisse International | NGF | Nomura Global Financial Products, Inc. |
| BCY | Barclays Capital, Inc. | FICC | Fixed Income Clearing Corporation | NOM | Nomura Securities International Inc. |
| BOA | Bank of America N.A. | FOB | Credit Suisse Securities (USA) LLC | NXN | Natixis New York |
| BOM | Bank of Montreal | GLM | Goldman Sachs Bank USA | RBC | Royal Bank of Canada |
| BPG | BNP Paribas Securities Corp. | GSC | Goldman Sachs & Co. LLC | RYL | NatWest Markets Plc |
| BPS | BNP Paribas S.A. | GST | Goldman Sachs International | SAL | Citigroup Global Markets, Inc. |
| BRC | Barclays Bank PLC | HUS | HSBC Bank USA N.A. | SBI | Citigroup Global Markets Ltd. |
| BSH | Banco Santander S.A. - New York Branch | IND | Crédit Agricole Corporate and Investment Bank S.A. | SCX | Standard Chartered Bank, London |
| BSN | The Bank of Nova Scotia - Toronto | JML | JP Morgan Securities Plc | SOG | Societe Generale Paris |
| CBK | Citibank N.A. | JPM | JP Morgan Chase Bank N.A. | SSB | State Street Bank and Trust Co. |
| DBL | Deutsche Bank AG London | JPS | J.P. Morgan Securities LLC | TDM | TD Securities (USA) LLC |
| DEU | Deutsche Bank Securities, Inc. | MEI | Merrill Lynch International | TOR | The Toronto-Dominion Bank |
| DUB | Deutsche Bank AG | MYC | Morgan Stanley Capital Services LLC | UAG | UBS AG Stamford |
| FAR | Wells Fargo Bank National Association | MYI | Morgan Stanley & Co. International PLC | UBS | UBS Securities LLC |

**Currency Abbreviations:**

| | | | | | |
|---|---|---|---|---|---|
| ARS | Argentine Peso | DOP | Dominican Peso | NOK | Norwegian Krone |
| AUD | Australian Dollar | EUR | Euro | PEN | Peruvian New Sol |
| BRL | Brazilian Real | GBP | British Pound | PLN | Polish Zloty |
| CAD | Canadian Dollar | HKD | Hong Kong Dollar | RUB | Russian Ruble |
| CLP | Chilean Peso | HUF | Hungarian Forint | SEK | Swedish Krona |
| CNH | Chinese Renminbi (Offshore) | IDR | Indonesian Rupiah | TRY | Turkish New Lira |
| CNY | Chinese Renminbi (Mainland) | INR | Indian Rupee | USD (or $) | United States Dollar |
| COP | Colombian Peso | JPY | Japanese Yen | ZAR | South African Rand |
| DKK | Danish Krone | MXN | Mexican Peso | | |

**Exchange Abbreviations:**

| | | | |
|---|---|---|---|
| CME | Chicago Mercantile Exchange | OTC | Over the Counter |

**Index/Spread Abbreviations:**

| | | | | | |
|---|---|---|---|---|---|
| BADLARPP | Argentina Badlar Floating Rate Notes | CMBX | Commercial Mortgage-Backed Index | RUONIA | Ruble Overnight Index Average |
| BBSW3M | 3 Month Bank Bill Swap Rate | CNREPOFIX | China Fixing Repo Rates 7-Day | SONIO | Sterling Overnight Interbank Average Rate |
| CDX.EM | Credit Derivatives Index - Emerging Markets | EUR003M | 3 Month EUR Swap Rate | UKRPI | United Kingdom Retail Prices Index |
| CDX.HY | Credit Derivatives Index - High Yield | H15T1Y | 1 Year US Treasury Yield Curve Constant Maturity Rate | US0003M | ICE 3-Month USD LIBOR |
| CDX.IG | Credit Derivatives Index - Investment Grade | LIBOR03M | 3 Month USD-LIBOR | US0006M | ICE 6-Month USD LIBOR |
| CDX.MCDX | Credit Derivatives Index - Municipal Bond Credit Derivative Index | PRIME | Daily US Prime Rate | | |

**Other Abbreviations:**

| | | | | | |
|---|---|---|---|---|---|
| ABS | Asset-Backed Security | CDO | Collateralized Debt Obligation | OIS | Overnight Index Swap |
| ALT | Alternate Loan Trust | CLO | Collateralized Loan Obligation | PIK | Payment-in-Kind |
| BABs | Build America Bonds | CMBS | Collateralized Mortgage-Backed Security | REMIC | Real Estate Mortgage Investment Conduit |
| BBR | Bank Bill Rate | DAC | Designated Activity Company | RMBS | Residential Mortgage-Backed Security |
| BBSW | Bank Bill Swap Reference Rate | EURIBOR | Euro Interbank Offered Rate | TBA | To-Be-Announced |
| BTP | Buoni del Tesoro Poliennali "Long-term Treasury Bond" | JIBAR | Johannesburg Interbank Agreed Rate | TBD | To-Be-Determined |
| CBO | Collateralized Bond Obligation | LIBOR | London Interbank Offered Rate | TBD% | Interest rate to be determined when loan settles or at the time of funding |
| CDI | Brazil Interbank Deposit Rate | Lunar | Monthly payment based on 28-day periods. One year consists of 13 periods. | TIIE | Tasa de Interés Interbancaria de Equilibrio "Equilibrium Interbank Interest Rate" |

# Federal Income Tax Information

<sub>(Unaudited)</sub>

As required by the Internal Revenue Code ("Code") and Treasury Regulations, if applicable, shareholders must be notified within 60 days of the Funds' fiscal year end regarding the status of qualified dividend income and the dividend received deduction.

Dividend Received Deduction.  Corporate shareholders are generally entitled to take the dividend received deduction on the portion of a Funds' dividend distribution that qualifies under tax law. The percentage of the following Funds' Fiscal 2021 ordinary income dividend that qualifies for the corporate dividend received deduction is set forth below:

Qualified Dividend Income.  Under the Jobs and Growth Tax Relief Reconciliation Act of 2003, the following percentage of ordinary dividends paid during the fiscal year ended March 31, 2021 was designated as 'qualified dividend income' as defined in the Jobs and Growth Tax Relief Reconciliation Act of 2003 subject to reduced tax rates in 2021:

Qualified Interest Income and Qualified Short-Term Capital Gain (for non-U.S. resident shareholders only).  Under the American Jobs Creation Act of 2004, the following amounts of ordinary dividends paid during the fiscal year ended March 31, 2021 are considered to be derived from "qualified interest income," as defined in Section 871(k)(1)(E) of the Code, and therefore are designated as interest-related dividends, as defined in Section 871(k)(1)(C) of the Code. Further, the following amounts of ordinary dividends paid during the fiscal year ended March 31, 2021 are considered to be derived from "qualified short-term capital gain," as defined in

Section 871(k)(2)(D) of the Code, and therefore are designated as qualified short-term gain dividends, as defined by Section 871(k)(2)(C) of the Code.

| | Dividend Received Deduction % | Qualified Dividend Income % | Qualified Interest Income (000s†) | Qualified Short-Term Capital Gain (000s†) |
|---|---|---|---|---|
| PIMCO Credit Opportunities Bond Fund | 0% | 0% | $  11,536 | $  0 |
| PIMCO Diversified Income Fund | 0% | 0% | 122,335 | 0 |
| PIMCO ESG Income Fund | 0% | 0% | 0 | 0 |
| PIMCO High Yield Spectrum Fund | 0% | 0% | 18,960 | 0 |
| PIMCO Long-Term Credit Bond Fund | 0% | 0% | 191,241 | 0 |
| PIMCO Low Duration Credit Fund | 0% | 0% | 15,555 | 0 |
| PIMCO Low Duration Income Fund | 0% | 0% | 152,870 | 0 |
| PIMCO Preferred and Capital Securities Fund | 40.53% | 92.94% | 66,842 | 0 |

† A zero balance may reflect actual amounts rounding to less than one thousand.

Shareholders are advised to consult their own tax advisor with respect to the tax consequences of their investment in the Trust. In January 2022, you will be advised on IRS Form 1099-DIV as to the federal tax status of the dividends and distributions received by you in calendar year 2021.

Section 163(j) Interest Dividends.  The funds intend to pass through the maximum amount allowable as Section 163(j) Interest Dividends as defined in Proposed Treasury Section 1.163(j)-1(b). The 163(j) percentage of ordinary income distributions are as follows:

| | 163 (j) Interest Dividends % |
|---|---|
| PIMCO Credit Opportunities Bond Fund | 0% |
| PIMCO Diversified Income Fund | 0% |
| PIMCO ESG Income Fund | 0% |
| PIMCO High Yield Spectrum Fund | 0% |
| PIMCO Long-Term Credit Bond Fund | 0% |
| PIMCO Low Duration Credit Fund | 0% |
| PIMCO Low Duration Income Fund | 0% |
| PIMCO Preferred and Capital Securities Fund | 0% |

# Distribution Information

For purposes of Section 19 of the Investment Company Act of 1940 (the "Act"), the Funds estimated the periodic sources of any dividends paid during the period covered by this report in accordance with good accounting practice. Pursuant to Rule 19a-1(e) under the Act, the table below sets forth the actual source information for dividends paid during the fiscal period ended March 31, 2021 calculated as of each distribution period pursuant to Section 19 of the Act. The information below is not provided for U.S. federal income tax reporting purposes. The tax character of all dividends and distributions is reported on Form 1099-DIV (for shareholders who receive U.S. federal tax reporting) at the end of each calendar year.

See the Financial Highlights section of this report for the tax characterization of distributions determined in accordance with federal income tax regulations for the fiscal year.

## PIMCO Low Duration Income Fund

| Institutional Class | Net Investment Income* | Net Realized Capital Gains* | Paid-in Surplus or Other Capital Sources** | Total (per common share) |
|---|---|---|---|---|
| October 2020 | $0.0245 | $0.0000 | $0.0000 | $0.0245 |
| November 2020 | $0.0245 | $0.0000 | $0.0000 | $0.0245 |
| December 2020 | $0.0245 | $0.0000 | $0.0000 | $0.0245 |
| January 2021 | $0.0200 | $0.0000 | $0.0000 | $0.0200 |
| February 2021 | $0.0200 | $0.0000 | $0.0000 | $0.0200 |
| March 2021 | $0.0200 | $0.0000 | $0.0000 | $0.0200 |

| I-2 Class | Net Investment Income* | Net Realized Capital Gains* | Paid-in Surplus or Other Capital Sources** | Total (per common share) |
|---|---|---|---|---|
| October 2020 | $0.0238 | $0.0000 | $0.0000 | $0.0238 |
| November 2020 | $0.0238 | $0.0000 | $0.0000 | $0.0238 |
| December 2020 | $0.0238 | $0.0000 | $0.0000 | $0.0238 |
| January 2021 | $0.0193 | $0.0000 | $0.0000 | $0.0193 |
| February 2021 | $0.0193 | $0.0000 | $0.0000 | $0.0193 |
| March 2021 | $0.0193 | $0.0000 | $0.0000 | $0.0193 |

| I-3 Class | Net Investment Income* | Net Realized Capital Gains* | Paid-in Surplus or Other Capital Sources** | Total (per common share) |
|---|---|---|---|---|
| October 2020 | $0.0235 | $0.0000 | $0.0000 | $0.0235 |
| November 2020 | $0.0234 | $0.0000 | $0.0000 | $0.0234 |
| December 2020 | $0.0234 | $0.0000 | $0.0000 | $0.0234 |
| January 2021 | $0.0189 | $0.0000 | $0.0000 | $0.0189 |
| February 2021 | $0.0189 | $0.0000 | $0.0000 | $0.0189 |
| March 2021 | $0.0189 | $0.0000 | $0.0000 | $0.0189 |

| Class A | Net Investment Income* | Net Realized Capital Gains* | Paid-in Surplus or Other Capital Sources** | Total (per common share) |
|---|---|---|---|---|
| October 2020 | $0.0217 | $0.0000 | $0.0000 | $0.0217 |
| November 2020 | $0.0217 | $0.0000 | $0.0000 | $0.0217 |
| December 2020 | $0.0216 | $0.0000 | $0.0000 | $0.0216 |
| January 2021 | $0.0171 | $0.0000 | $0.0000 | $0.0171 |
| February 2021 | $0.0171 | $0.0000 | $0.0000 | $0.0171 |
| March 2021 | $0.0171 | $0.0000 | $0.0000 | $0.0171 |

## Distribution Information (Cont.)                                                          (Unaudited)

| Class C | Net Investment Income* | Net Realized Capital Gains* | Paid-in Surplus or Other Capital Sources** | Total (per common share) |
|---|---|---|---|---|
| October 2020 | $0.0196 | $0.0000 | $0.0000 | $0.0196 |
| November 2020 | $0.0196 | $0.0000 | $0.0000 | $0.0196 |
| December 2020 | $0.0195 | $0.0000 | $0.0000 | $0.0195 |
| January 2021 | $0.0149 | $0.0000 | $0.0000 | $0.0149 |
| February 2021 | $0.0149 | $0.0000 | $0.0000 | $0.0149 |
| March 2021 | $0.0149 | $0.0000 | $0.0000 | $0.0149 |

| Class C-2 | Net Investment Income* | Net Realized Capital Gains* | Paid-in Surplus or Other Capital Sources** | Total (per common share) |
|---|---|---|---|---|
| October 2020 | $0.0062 | $0.0000 | $0.0000 | $0.0062 |
| November 2020 | $0.0182 | $0.0000 | $0.0000 | $0.0182 |
| December 2020 | $0.0181 | $0.0000 | $0.0000 | $0.0181 |
| January 2021 | $0.0135 | $0.0000 | $0.0000 | $0.0135 |
| February 2021 | $0.0135 | $0.0000 | $0.0000 | $0.0135 |
| March 2021 | $0.0135 | $0.0000 | $0.0000 | $0.0135 |

\* The source of dividends provided in the table differs, in some respects, from information presented in this report prepared in accordance with generally accepted accounting principles, or U.S. GAAP. For example, net earnings from certain interest rate swap contracts are included as a source of net investment income for purposes of Section 19(a). Accordingly, the information in the table may differ from information in the accompanying financial statements that are presented on the basis of U.S. GAAP and may differ from tax information presented in the footnotes. Amounts shown may include accumulated, as well as fiscal period net income and net profits.

\*\* Occurs when a fund distributes an amount greater than its accumulated net income and net profits. Amounts are not reflective of a fund's net income, yield, earnings or investment performance.

## Management of the Trust

(Unaudited)

The charts below identify the Trustees and executive officers of the Trust. Unless otherwise indicated, the address of all persons below is 650 Newport Center Drive, Newport Beach, CA 92660.

The Funds' Statement of Additional Information includes more information about the Trustees and Officers. To request a free copy, call PIMCO at (888) 87-PIMCO or visit the Funds' website at www.pimco.com.

| Name, Year of Birth and Position Held with Trust* | Term of Office and Length of Time Served† | Principal Occupation(s) During Past 5 Years | Number of Funds in Fund Complex Overseen by Trustee | Other Public Company and Investment Company Directorships Held by Trustee During the Past 5 Years |
|---|---|---|---|---|
| **Interested Trustees**¹ | | | | |
| **Peter G. Strelow (1970)** *Chairman of the Board and Trustee* | 05/2017 to present  Chairman 02/2019 to present | Managing Director and Co-Chief Operating Officer, PIMCO. Senior Vice President of the Trust, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. Formerly, Chief Administrative Officer, PIMCO. | 149 | Chairman and Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT. |
| **Kimberley G. Stafford (1978)** *Trustee* | 02/2021 to present | Managing Director and Global Head of Product Strategy, and Member of Executive Committee. Formerly, Head of Asia-Pacific, Global Head of Consultant Relations and Head of US Institutional and Alternatives Sales, PIMCO. | 149 | Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT. |
| **Independent Trustees** | | | | |
| **George E. Borst (1948)** *Trustee* | 04/2015 to present | Executive Advisor, McKinsey & Company; Formerly, Executive Advisor, Toyota Financial Services; and CEO, Toyota Financial Services. | 149 | Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT; Director, MarineMax Inc. |
| **Jennifer Holden Dunbar (1963)** *Trustee* | 04/2015 to present | Managing Director, Dunbar Partners, LLC (business consulting and investments). Formerly, Partner, Leonard Green & Partners, L.P. | 149 | Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT; Director, PS Business Parks; Director, Big 5 Sporting Goods Corporation. |
| **Kym M. Hubbard (1957)** *Trustee* | 02/2017 to present | Formerly, Global Head of Investments, Chief Investment Officer and Treasurer, Ernst & Young. | 149 | Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT; Director, State Auto Financial Corporation. |
| **Gary F. Kennedy (1955)** *Trustee* | 04/2015 to present | Formerly, Senior Vice President, General Counsel and Chief Compliance Officer, American Airlines and AMR Corporation (now American Airlines Group). | 149 | Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. |
| **Peter B. McCarthy (1950)** *Trustee* | 04/2015 to present | Formerly, Assistant Secretary and Chief Financial Officer, United States Department of Treasury; Deputy Managing Director, Institute of International Finance. | 149 | Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. |
| **Ronald C. Parker (1951)** *Lead Independent Trustee* | 07/2009 to present  Lead Independent Trustee - 02/2017 to present | Director of Roseburg Forest Products Company. Formerly, Chairman of the Board, The Ford Family Foundation; and President, Chief Executive Officer, Hampton Affiliates (forestry products). | 149 | Lead Independent Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. |

\*   Unless otherwise noted, the information for the individuals listed is as of March 31, 2021.

¹   Ms. Stafford and Mr. Strelow are "interested persons" of the Trust (as that term is defined in the 1940 Act) because of their affiliations with PIMCO.

†   Trustees serve until their successors are duly elected and qualified.

# Management of the Trust (Cont.)

### Executive Officers

| Name, Year of Birth and Position Held with Trust* | Term of Office and Length of Time Served | Principal Occupation(s) During Past 5 Years† |
|---|---|---|
| **Eric D. Johnson (1970)**<br>*President* | 06/2019 to present | Executive Vice President and Head of Funds Business Group Americas, PIMCO. President, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **David C. Flattum (1964)**<br>*Chief Legal Officer* | 05/2019 to present | Managing Director and General Counsel, PIMCO. Chief Legal Officer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. Formerly, Managing Director, Chief Operating Officer and General Counsel, Allianz Asset Management of America L.P. |
| **Keisha Audain-Pressley (1975)**<br>*Chief Compliance Officer* | 01/2020 to present | Executive Vice President and Deputy Chief Compliance Officer, PIMCO. Chief Compliance Officer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Joshua D. Ratner (1976)\*\***<br>*Senior Vice President* | 05/2019 to present | Executive Vice President and Head of Americas Operations, PIMCO. Senior Vice President, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Peter G. Strelow (1970)**<br>*Senior Vice President* | 06/2019 to present | Managing Director and Co-Chief Operating Officer, PIMCO. Senior Vice President, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. Formerly, Chief Administrative Officer, PIMCO. |
| **Ryan G. Leshaw (1980)**<br>*Vice President - Senior Counsel, Secretary* | 11/2018 to present | Executive Vice President and Senior Counsel, PIMCO. Vice President, Senior Counsel and Secretary, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. Chief Legal Officer, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. Formerly, Associate, Willkie Farr & Gallagher LLP. |
| **Wu-Kwan Kit (1981)**<br>*Assistant Secretary* | 08/2017 to present | Senior Vice President and Senior Counsel, PIMCO. Assistant Secretary, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. Vice President, Senior Counsel and Secretary, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. Formerly, Assistant General Counsel, VanEck Associates Corp. |
| **Jeffrey A. Byer (1976)**<br>*Vice President* | 02/2020 to present | Executive Vice President, PIMCO. Vice President, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Elizabeth A. Duggan (1964)**<br>*Vice President* | 02/2021 to present | Executive Vice President, PIMCO. Vice President, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. |
| **Brian J. Pittluck (1977)**<br>*Vice President* | 01/2020 to present | Senior Vice President, PIMCO. Vice President, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Bijal Y. Parikh (1978)**<br>*Treasurer* | 01/2021 to present | Senior Vice President, PIMCO. Treasurer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Erik C. Brown (1967)\*\*\***<br>*Assistant Treasurer* | 02/2001 to present | Executive Vice President, PIMCO. Assistant Treasurer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Brandon T. Evans (1982)**<br>*Assistant Treasurer* | 05/2019 to present | Vice President, PIMCO. Assistant Treasurer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Colleen D. Miller (1980)\*\***<br>*Assistant Treasurer* | 02/2017 to present | Senior Vice President, PIMCO. Assistant Treasurer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. Deputy Treasurer, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Jason J. Nagler (1982)\*\*\***<br>*Assistant Treasurer* | 05/2015 to present | Senior Vice President, PIMCO. Assistant Treasurer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **H. Jessica Zhang (1973)\*\***<br>*Assistant Treasurer* | 01/2020 to present | Senior Vice President, PIMCO. Assistant Treasurer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |

\*   Unless otherwise noted, the information for the individuals listed is as of March 31, 2021.

†   The term "PIMCO-Sponsored Closed-End Funds" as used herein includes: PIMCO California Municipal Income Fund, PIMCO California Municipal Income Fund II, PIMCO California Municipal Income Fund III, PIMCO Municipal Income Fund, PIMCO Municipal Income Fund II, PIMCO Municipal Income Fund III, PIMCO New York Municipal Income Fund, PIMCO New York Municipal Income Fund II, PIMCO New York Municipal Income Fund III, PCM Fund Inc., PIMCO Corporate & Income Opportunity Fund, PIMCO Corporate & Income Strategy Fund, PIMCO Dynamic Credit and Mortgage Income Fund, PIMCO Dynamic Income Fund, PIMCO Dynamic Income Opportunities Fund, PIMCO Energy and Tactical Credit Opportunities Fund, PIMCO Global StocksPLUS® & Income Fund, PIMCO High Income Fund, PIMCO Income Opportunity Fund, PIMCO Income Strategy Fund, PIMCO Income Strategy Fund II and PIMCO Strategic Income Fund, Inc.; the term "PIMCO-Sponsored Interval Funds" as used herein includes: PIMCO Flexible Credit Income Fund and PIMCO Flexible Municipal Income Fund.

\*\*   The address of these officers is Pacific Investment Management Company LLC, 1633 Broadway, New York, New York 10019.

\*\*\*   The address of these officers is Pacific Investment Management Company LLC, 401 Congress Ave., Austin, Texas 78701.

# Privacy Policy[1]

The Funds[2,3] consider customer privacy to be a fundamental aspect of their relationships with shareholders and are committed to maintaining the confidentiality, integrity and security of their current, prospective and former shareholders' non-public personal information. The Funds have developed policies that are designed to protect this confidentiality, while allowing shareholder needs to be served.

## OBTAINING NON-PUBLIC PERSONAL INFORMATION

In the course of providing shareholders with products and services, the Funds and certain service providers to the Funds, such as the Funds' investment advisers or sub-advisers ("Advisers"), may obtain non-public personal information about shareholders, which may come from sources such as account applications and other forms, from other written, electronic or verbal correspondence, from shareholder transactions, from a shareholder's brokerage or financial advisory firm, financial professional or consultant, and/or from information captured on applicable websites.

## RESPECTING YOUR PRIVACY

As a matter of policy, the Funds do not disclose any non-public personal information provided by shareholders or gathered by the Funds to non-affiliated third parties, except as required or permitted by law or as necessary for such third parties to perform their agreements with respect to the Funds. As is common in the industry, non-affiliated companies may from time to time be used to provide certain services, such as preparing and mailing prospectuses, reports, account statements and other information, conducting research on shareholder satisfaction and gathering shareholder proxies. The Funds or their affiliates may also retain non-affiliated companies to market Fund shares or products which use Fund shares and enter into joint marketing arrangements with them and other companies. These companies may have access to a shareholder's personal and account information, but are permitted to use this information solely to provide the specific service or as otherwise permitted by law. In most cases, the shareholders will be clients of a third party, but the Funds may also provide a shareholder's personal and account information to the shareholder's respective brokerage or financial advisory firm and/or financial professional or consultant.

## SHARING INFORMATION WITH THIRD PARTIES

The Funds reserve the right to disclose or report personal or account information to non-affiliated third parties in limited circumstances where the Funds believe in good faith that disclosure is required under law, to cooperate with regulators or law enforcement authorities, to protect their rights or property, or upon reasonable request by any Fund in which a shareholder has invested. In addition, the Funds may disclose information about a shareholder or a shareholder's accounts to a non-affiliated third party at the shareholder's request or with the consent of the shareholder.

## SHARING INFORMATION WITH AFFILIATES

The Funds may share shareholder information with their affiliates in connection with servicing shareholders' accounts, and subject to applicable law may provide shareholders with information about products and services that the Funds or their Advisers, distributors or their affiliates ("Service Affiliates") believe may be of interest to such shareholders. The information that the Funds may share may include, for example, a shareholder's participation in the Funds or in other investment programs sponsored by a Service Affiliate, a shareholder's ownership of certain types of accounts (such as IRAs), information about the Funds' experiences or transactions with a shareholder, information captured on applicable websites, or other data about a shareholder's accounts, subject to applicable law. The Funds' Service Affiliates, in turn, are not permitted to share shareholder information with non-affiliated entities, except as required or permitted by law.

## PROCEDURES TO SAFEGUARD PRIVATE INFORMATION

The Funds take seriously the obligation to safeguard shareholder non-public personal information. In addition to this policy, the Funds have implemented procedures that are designed to restrict access to a shareholder's non-public personal information to internal personnel who need to know that information to perform their jobs, such as servicing shareholder accounts or notifying shareholders of new products or services. Physical, electronic and procedural safeguards are in place to guard a shareholder's non-public personal information.

## INFORMATION COLLECTED FROM WEBSITES

The Funds or their service providers and partners may collect information from shareholders via websites they maintain. The information collected via websites maintained by the Funds or their service providers includes client non-public personal information.

## CHANGES TO THE PRIVACY POLICY

From time to time, the Funds may update or revise this privacy policy. If there are changes to the terms of this privacy policy, documents containing the revised policy on the relevant website will be updated.

[1] Amended as of June 25, 2020.
[2] PIMCO Investments LLC ("PI") serves as the Funds' distributor and does not provide brokerage services or any financial advice to investors in the Funds solely because it distributes the Funds. This Privacy Policy applies to the activities of PI to the extent that PI regularly effects or engages in transactions with or for a shareholder of a series of a Trust who is the record owner of such shares. For purposes of this Privacy Policy, references to "the Funds" shall include PI when acting in this capacity.
[3] When distributing this Policy, a Fund may combine the distribution with any similar distribution of its investment adviser's privacy policy. The distributed, combined, policy may be written in the first person (i.e. by using "we" instead of "the Funds").

## Liquidity Risk Management Program

In compliance with Rule 22e-4 (the "Liquidity Rule") under the Investment Company Act of 1940, as amended ("1940 Act"), PIMCO Funds (the "Trust") has adopted and implemented a liquidity risk management program (the "Program") for each series of the Trust (each a "Fund" and collectively, the "Funds") not regulated as a money market fund under 1940 Act Rule 2a-7, which is reasonably designed to assess and manage the Funds' liquidity risk. The Trust's Board of Trustees (the "Board") previously approved the designation of the PIMCO Liquidity Risk Committee (the "Administrator") as Program administrator. The PIMCO Liquidity Risk Committee consists of senior members from certain PIMCO business areas, such as Portfolio Risk Management, Americas Operations, Compliance, Account Management and Portfolio Management, and is advised by members of PIMCO Legal.

A Fund's "liquidity risk" is the risk that the Fund could not meet requests to redeem shares issued by the Fund without significant dilution of the remaining investors' interests in the Fund. In accordance with the Program, each Fund's liquidity risk is assessed no less frequently than annually taking into consideration a variety of factors, including, as applicable, the Fund's investment strategy and liquidity of portfolio investments, cash flow projections, and holdings of cash and cash equivalents, as well as borrowing arrangements and other funding sources. Certain factors are considered under both normal and reasonably foreseeable stressed conditions. Each Fund portfolio investment is classified into one of four liquidity categories (including "highly liquid investments" and "illiquid investments," discussed below) based on a determination of the number of days it is reasonably expected to take to convert the investment to cash, or sell or dispose of the investment, in current market conditions without significantly changing the investment's market value. Each Fund has adopted a "Highly Liquid Investment Minimum" (or "HLIM"), which is a minimum amount of Fund net assets to be invested in highly liquid investments that are assets. As required under the Liquidity Rule, each Fund's HLIM is periodically reviewed, no less frequently than annually, and the Funds have adopted policies and procedures for responding to a shortfall of a Fund's highly liquid investments below its HLIM. The Liquidity Rule also limits the Funds' investments in illiquid investments by prohibiting a Fund from acquiring any illiquid investment if, immediately after the acquisition, the Fund would have invested more than 15% of its net assets in illiquid investments that are assets. Certain non-public reporting is generally required if a Fund's holdings of illiquid investments that are assets were to exceed 15% of Fund net assets.

At a meeting of the Board held on February 9-10, 2021, the Board received a report (the "Report") from the Administrator addressing the Program's operation and assessing the adequacy and effectiveness of its implementation for the period from December 1, 2019 through December 31, 2020. The Report reviewed the operation of the Program's components during such period, noted the March-April 2020 market conditions and associated monitoring by the Administrator, and stated that the Program is operating effectively to assess and manage each Fund's liquidity risk and that the Program has been and continues to be adequately and effectively implemented to monitor and, as applicable, respond to the Funds' liquidity developments. This has remained true for the 12-month reporting period ended March 31, 2021.

## General Information

**Investment Adviser and Administrator**

Pacific Investment Management Company LLC

650 Newport Center Drive

Newport Beach, CA 92660

**Distributor**

PIMCO Investments LLC

1633 Broadway

New York, NY 10019

**Custodian**

State Street Bank and Trust Company

801 Pennsylvania Avenue

Kansas City, MO 64105

**Transfer Agent**

DST Asset Manager Solutions, Inc.

Institutional Class, I-2, I-3, Administrative Class

430 W 7th Street STE 219024

Kansas City, MO 64105-1407

DST Asset Manager Solutions, Inc.

Class A, Class C, Class C-2, Class R

430 W 7th Street STE 219294

Kansas City, MO 64105-1407

**Legal Counsel**

Dechert LLP

1900 K Street, N.W.

Washington, D.C. 20006

**Independent Registered Public Accounting Firm**

PricewaterhouseCoopers LLP

1100 Walnut Street, Suite 1300

Kansas City, MO 64106

This report is submitted for the general information of the shareholders of the Funds listed on the Report cover.

Sign-up for e-delivery
pimco.com/edelivery

**pimco.com**



P53003AR_033121

PIMCO

# EXHIBIT 18

## FUND OVERVIEW

Bank loans, which offer a floating rate of income, may provide a hedge against rising rates. This actively managed portfolio of senior secured floating rate loans is designed to provide attractive risk-adjusted return potential, with a higher quality orientation. The "spread" or difference between the senior secured floating loan rates and the declared minimum rate on the account is used to purchase options on the S&P 500 Index. When returns of the S&P 500 Index are higher than the declared minimum rate on the account, these options are exercised and gains (up to the declared maximum or "cap") are distributed.

## OUR EXPERTISE

Crew Capital Group uses PIMCO has the active subadvisor on our Index Account. PIMCO has been a pioneer in fixed income investing for four decades. Their time-tested investment process combines our informed, top-down global economic outlook with rigorous bottom-up credit research and risk management, allowing the fund's investment professionals to focus on what they do best: seeking attractive risk-adjusted returns for investors.

## WHY INVEST IN THIS FUND

### An attractive risk/return profile

Floating rate bank loans, made to below- investment-grade companies, offer higher-return potential credit than investment grade bonds, and tend to have lower volatility than high yield bonds. The fund emphasizes higher-quality loans, which typically have a higher recovery rate and lower risk of default than lower-quality, unsecured debt.

### Minimal interest rate exposure

Because rates on bank loans typically float, or shift to prevailing interest rates, they may provide a hedge in a rising rate environment, as well as an opportunity to enhance returns with increased credit exposure.

### Time-tested management expertise

Crew Capital Group has managed floating rate bank loans portfolios since 1997. Our process, which combines bottom-up security selection, robust credit research and our long-term global outlook, provides an informed framework for positioning the portfolio across the credit cycle.

## YEAR-END RETURNS

## FLOATING-RATE BANK LOANS

When investing in floating-rate funds, it is important to understand the basics of floating-rate loans. Floating-rate loans are variable-rate loans made by financial institutions to companies. They are also known as syndicated loans or senior bank loans. Borrowers enter into these loans to raise capital for things like recapitalizations, debt refinancing or to make acquisitions. After

banks originate the loans, they sell them to hedge funds, collateralized loan obligations (CLO) and mutual funds.

The loans are called "floating-rate" because the interest paid on the loans adjusts periodically, usually every 30 to 90 days, based on changes in widely accepted reference rates, like LIBOR, plus a predetermined credit spread over the reference rate. The size of the credit spread depends on things like the credit quality of the borrower, the value of the collateral backing the loan and the covenants associated with the loan. Floating-rate loans are classified as senior debt and are usually collateralized by specific assets, like the borrower's inventory, receivables or property. The word "senior debt" is especially important here. It means that the loans are typically senior to bondholders, preferred stock holders and common stock holders in the borrower's capital structure.

## KEY QUALITIES OF FLOATING-RATE FUNDS

**Limited Duration:** A floating-rate fund's net asset value (NAV) should be less sensitive to movements in short-term borrowing rates than other income-producing mutual funds, like long-term bond funds. The maturity of a floating-rate loan is around seven years, but the underlying interest rate on most loans will adjusts every 30-90 days, based on changes in the reference rate. For this reason, the market value of a floating-rate loan will be less sensitive to changes in short-term borrowing rates relative to most fixed-rate investments. This makes floating-rate funds attractive to income investors in periods when the economy is recovering and short-term borrowing rates are expected to rise.

**Diversification and a Niche Market:** Floating-rate funds can offer diversification benefits to income investors. Because floating-rate loans are uniquely structured, they traditionally have low correlations with most major asset classes like stocks, government bonds, high-grade corporate bonds and municipal bonds.

Year-End Balance

Investments are not FDIC-insured, nor are they deposits of or guaranteed by a bank or any other entity, so they may lose value. Investors should carefully consider investment objectives, risks, charges and expenses. This and other important information is contained in the fund prospectus which can be obtained from a financial professional and should be read carefully before investing.

# EXHIBIT 19

CONFIDENTIAL TREATMENT REQUESTED
BY PIMCO LLC ON 8/15/2022

# PIMCO

*As of 30 June 2021*
PIMCO Funds: Income

# Low Duration Credit Fund

| CLASS: | INSTITUTIONAL |
|---|---|
| FUND INCEPTION DATE: | 29 APRIL 2011 |
| TICKER: | PSRIX |
| CUSIP: | 72201W790 |
| TOTAL NET ASSETS (IN MILLIONS): | $290.8 |

**PORTFOLIO MANAGERS**

David Forgash, Michael Levinson

**FUND STATISTICS**

| | |
|---|---|
| Effective duration (yrs) | 1.51 |
| Effective maturity (yrs) | 5.18 |

**SECTOR DIVERSIFICATION (%)**

| | Market value weighted |
|---|---|
| Bank Loans | 62.3 |
| Bonds | 25.4 |
| Other [1] | 9.9 |
| Net Other Short Duration Instruments [2] | 2.3 |

**TOP 5 INDUSTRY DIVERSIFICATION (%)**

| | Market value weighted |
|---|---|
| Technology | 16.1 |
| Healthcare | 7.5 |
| Consumer Products | 4.8 |
| Consumer Cyclical Services | 4.6 |
| Independent E&P | 4.1 |

## Fund description

PIMCO Low Duration Credit Fund is a diversified, actively managed portfolio of floating or variable senior secured loans and short dated high yield bonds. Through its emphasis on independent and thorough credit analysis, the fund seeks to provide a high level of current income.

**INVESTOR BENEFITS**

This fund is designed to offer investors attractive exposure to bank loans and short-dated high yield bonds. The fund adopts a flexible approach across these sectors to reflect the evolving opportunity set in credit markets.

Potential benefits of this fund and the underlying asset class include:

- Low correlation to most traditional asset classes, especially Treasuries
- May provide a hedge against rising interest rates and offer higher-return potential returns versus other fixed income securities in a rising rate environment
- Higher credit-risk premium than investment grade corporate bonds
- Access to PIMCO's fundamental credit research, global platform and comprehensive macroeconomic views

**THE FUND ADVANTAGE**

The fund's flexible approach in allocating between bank loans and short dated high yield is an efficient way to gain exposure to the low duration leveraged finance market while aiming to maintain attractive risk adjusted returns. The fund benefits from PIMCO's time-tested investment process, and emphasized disciplined, proprietary, bottom-up analysis of credit quality and market factors including supply, demand and liquidity, while also incorporating proprietary global macroeconomic forecasting. PIMCO's investment team has the experience, depth and diversity to actively manage a broad and diversified opportunity set.

**VALUE OF CREDIT STRATEGIES**

An allocation to PIMCO's credit strategies may be beneficial as part of a diversified portfolio. Corporate bonds and other credit assets tend to appreciate during periods of improving economic conditions, when government bonds may experience below average gains. Credit products should provide for the repayment of principal at maturity, and with a probable steady income stream contributing to the return, can be used as a more defensive corporate investment than equities. PIMCO credit strategies offer many options for diversification within the sector, from investment grade to high yield, in domestic, global developed and emerging markets.

CONFIDENTIAL TREATMENT REQUESTED BY PIMCO LLC ON 8/15/2022

# PIMCO

**Low Duration Credit Fund**

| Performance (net of fees) | 10 yrs. | 5 yrs. | 3 yrs. | 1 yr. | 6 mos. | 3 mos. |
|---|---|---|---|---|---|---|
| PIMCO Fund (%) | 3.38 | 3.33 | 2.55 | 7.96 | 1.92 | 1.31 |
| Benchmark (%) | 5.19 | 5.80 | 5.07 | 13.64 | 4.08 | 1.93 |

*Performance quoted represents past performance. Past performance is not a guarantee or a reliable indicator of future results. Investment return and the principal value of an investment will fluctuate. Shares may be worth more or less than original cost when redeemed. Current performance may be lower or higher than performance shown. For performance current to the most recent month-end, visit PIMCO.com or by calling 888.87.PIMCO.*

For the periods prior to the inception date of a share class, performance information is based on the performance of the Fund's oldest class shares, adjusted to reflect the fees and expenses paid by that class of shares.

Differences in the Fund's performance versus the index and related attribution information with respect to particular categories of securities or individual positions may be attributable, in part, to differences in the pricing methodologies used by the Fund and the index. There is no assurance that any fund, including any fund that has experienced **high or unusual performance** for one or more periods, will experience similar levels of performance in the future. High performance is defined as a significant increase in either 1) a fund's total return in excess of that of the fund's benchmark between reporting periods or 2) a fund's total return in excess of the fund's historical returns between reporting periods. Unusual performance is defined as a significant change in a fund's performance as compared to one or more previous reporting periods.

| Lipper rankings* (Loan Participation Funds) | 10 yrs. | 5 yrs. | 3 yrs. | 1 yr. |
|---|---|---|---|---|
| Fund rank | 75 | 160 | 179 | 227 |
| Number of funds | 122 | 206 | 228 | 248 |
| Quartile | 3 | 4 | 4 | 4 |

\* Based on total return performance, with distributions reinvested, and operating expenses deducted.

*Investors should consider the investment objectives, risks, charges and expenses of the funds carefully before investing.  This and other information are contained in the fund's prospectus and summary prospectus, if available, which may be obtained by contacting your PIMCO representative.  Please read them carefully before you invest or send money.*

¹ "Other" may include municipals, convertibles, preferreds, and yankee bonds. ² Net Other Short Duration Instruments includes securities and other instruments (except those instruments tied to emerging markets by country of risk) with an effective duration less than one year and rated investment grade or higher or, if unrated, determined by PIMCO to be of comparable quality, commingled liquidity funds, uninvested cash, interest receivables, net unsettled trades, broker money, short duration derivatives and derivatives offsets. With respect to certain categories of short duration securities, the Adviser reserves the discretion to require a minimum credit rating higher than investment grade for inclusion in this category. Derivatives Offsets includes offsets associated with investments in futures, swaps and other derivatives. Such offsets may be taken at the notional value of the derivative position.

**Prior to May 3rd, 2021 the Fund was named PIMCO Senior Floating Rate Fund and was benchmarked against the JPM Leveraged Loan Index.**

MV% may not equal 100 due to rounding.

Performance reflects changes in share price, reinvestment of dividends and capital gains distributions. All periods longer than one year are annualized. Periods less than one year are cumulative.

Effective duration is the duration for a bond with an embedded option when the value is calculated to include the expected change in cash flow caused by the option as interest rates change.

Investments made by a Fund and the results achieved by a Fund are not expected to be the same as those made by any other PIMCO-advised Fund, including those with a similar name, investment objective or policies. A new or smaller Fund's performance may not represent how the Fund is expected to or may perform in the long-term. New Funds have limited operating histories for investors to evaluate and new and smaller Funds may not attract sufficient assets to achieve investment and trading efficiencies. A Fund may be forced to sell a comparatively large portion of its portfolio to meet significant shareholder redemptions for cash, or hold a comparatively large portion of its portfolio in cash due to significant share purchases for cash, in each case when the Fund otherwise would not seek to do so, which may adversely affect performance.

**A word about risk:** Investing in the **bond market** is subject to risks, including market, interest rate, issuer, credit, inflation risk, and liquidity risk. The value of most bonds and bond strategies are impacted by **changes in interest rates.** Bonds and bond strategies with longer durations tend to be more sensitive and volatile than those with shorter durations; bond prices generally fall as interest rates rise, and low interest rate environments increase this risk. Reductions in bond counterparty capacity may contribute to decreased market liquidity and increased price volatility. Bond investments may be worth more or less than the original cost when redeemed. **Bank loans** are often less liquid than other types of debt instruments. There is no assurance that the liquidation of any collateral from a secured bank loan would satisfy the borrower's obligation, or that such collateral could be liquidated. Investing in **foreign denominated and/or domiciled securities** may involve heightened risk due to currency fluctuations, and economic and political risks, which may be enhanced in emerging markets. **Mortgage and asset-backed securities** may be sensitive to **changes in interest rates**, subject to early repayment risk, and their value may fluctuate in response to the market's perception of issuer creditworthiness; while generally supported by some form of government or private guarantee there is no assurance that private guarantors will meet their obligations. **High-yield, lower-rated, securities** involve greater risk than higher-rated securities; portfolios that invest in them may be subject to greater levels of credit and liquidity risk than portfolios that do not. **Derivatives** may involve certain costs and risks such as liquidity, interest rate, market, credit, management and the risk that a position could not be closed when most advantageous. Investing in derivatives could lose more than the amount invested. **Diversification** does not ensure against loss.

The minimum initial investment for institutional class shares is $1 million; however, it may be modified for financial intermediaries who submit trades on behalf of eligible investors.

Past rankings are no guarantee of future rankings. Rankings begin with the inception of the actual share class. Lipper does not take into account sales charges.

No part of this material may be reproduced in any form, or referred to in any publication, without express written permission. PIMCO is a trademark of Allianz Asset Management of America L.P. in the United States and throughout the world. ©2021, PIMCO. **PIMCO Investments LLC**, distributor, 1633 Broadway, New York, NY, 10019 is a company of PIMCO.

PFS6026I_2Q21

## BASIC FACTS

| | |
|---|---|
| Dividend frequency | **Daily accrual** |

## FUND EXPENSES

| | |
|---|---|
| Gross Expense Ratio | **0.75%** |
| Adjusted Expense Ratio | **0.70%** |

The Adjusted Expense Ratio excludes certain investment expenses, such as interest expense from borrowings and repurchase agreements and dividend expense from investments on short sales, incurred directly by the Fund or indirectly through the Fund's investments in underlying PIMCO Funds (if applicable), none of which are paid to PIMCO.

## PERFORMANCE CHARACTERISTICS

| | |
|---|---|
| SEC 30-day yield (%) | **2.76%** |

## ABOUT THE BENCHMARK

The benchmark is a blend of 50% ICE BofAML 1-5 Year US High Yield Constrained Index and 50% J.P. Morgan Leveraged Loan Index. The ICE BofAML 1-5 Year US High Yield Constrained Index is designed to track the performance of short-term U.S. dollar denominated below investment grade corporate debt publicly issued in the U.S. domestic market with at least one year and less than five years remaining term to final maturity, at least 18 months to final maturity at issuance, a fixed coupon schedule and a minimum amount outstanding of $250 million. The J.P. Morgan Leveraged Loan Index is designed to mirror the investable universe of USD institutional leveraged loans and is comprised of issuers domiciled across global markets (the international component is comprised of developed market-domiciled issuers only).

## ABOUT PIMCO

PIMCO is one of the world's premier fixed income investment managers. Since our founding in 1971 in Newport Beach, California, we have continued to bring innovation and expertise to our partnership with clients seeking the best investment solutions. Today our professionals work in 17 offices across the globe, united by a single purpose: creating opportunities for investors in every environment.

**FOR MORE INFORMATION, CALL YOUR PIMCO REPRESENTATIVE AT 888.87.PIMCO.**

**VISIT OUR WEBSITE FOR A FULL MENU OF PRODUCTS AND SERVICES AT PIMCO.COM.**

# EXHIBIT 20



PIMCO

## PIMCO FUNDS

# Annual Report

March 31, 2021

**Credit Bond Funds**

PIMCO Credit Opportunities Bond Fund

PIMCO Diversified Income Fund

PIMCO ESG Income Fund

PIMCO High Yield Spectrum Fund

PIMCO Long-Term Credit Bond Fund

PIMCO Low Duration Credit Fund

PIMCO Low Duration Income Fund

PIMCO Preferred and Capital Securities Fund



As permitted by regulations adopted by the Securities and Exchange Commission, paper copies of the Fund's annual and semi-annual shareholder reports will no longer be sent by mail, unless you specifically request paper copies of the reports. Instead, the reports will be made available on the Fund's website, pimco.com/literature, and you will be notified by mail each time a report is posted and provided with a website link to access the report.

If you already elected to receive shareholder reports electronically, you will not be affected by this change and you need not take any action. You may elect to receive shareholder reports and other communications from the Fund electronically by visiting pimco.com/edelivery or by contacting your financial intermediary, such as a broker-dealer or bank.

You may elect to receive all future reports in paper free of charge. If you own these shares through a financial intermediary, such as a broker-dealer or bank, you may contact your financial intermediary to request that you continue to receive paper copies of your shareholder reports. If you invest directly with the Fund, you can inform the Fund that you wish to continue receiving paper copies of your shareholder reports by calling 888.87.PIMCO (888.877.4626). Your election to receive reports in paper will apply to all funds held with the fund complex if you invest directly with the Fund or to all funds held in your account if you invest through a financial intermediary, such as a broker-dealer or bank.

A company of **Allianz** ⑪

# Table of Contents

| | Page |
|---|---|
| Chairman's Letter | 2 |
| Important Information About the Funds | 4 |
| Expense Examples | 15 |
| Benchmark Descriptions | 17 |
| Financial Highlights | 20 |
| Statements of Assets and Liabilities | 28 |
| Consolidated Statement of Assets and Liabilities | 30 |
| Statements of Operations | 32 |
| Consolidated Statement of Operations | 33 |
| Statements of Changes in Net Assets | 34 |
| Consolidated Statements of Changes in Net Assets | 36 |
| Statements of Cash Flows | 37 |
| Notes to Financial Statements | 151 |
| Report of Independent Registered Public Accounting Firm | 180 |
| Glossary | 181 |
| Federal Income Tax Information | 182 |
| Distribution Information | 183 |
| Management of the Trust | 185 |
| Privacy Policy | 187 |
| Liquidity Risk Management Program | 188 |

| Fund | Fund Summary | Schedule of Investments |
|---|---|---|
| PIMCO Credit Opportunities Bond Fund | 7 | 38 |
| PIMCO Diversified Income Fund | 8 | 53 |
| PIMCO ESG Income Fund | 9 | 76 |
| PIMCO High Yield Spectrum Fund | 10 | 83 |
| PIMCO Long-Term Credit Bond Fund | 11 | 92 |
| PIMCO Low Duration Credit Fund(a) | 12 | 114 |
| PIMCO Low Duration Income Fund | 13 | 119 |
| PIMCO Preferred and Capital Securities Fund(1) | 14 | 144 |

(1) Consolidated Schedule of Investments

(a)  Prior to May 3, 2021, the PIMCO Low Duration Credit Fund was named the PIMCO Senior Floating Rate Fund.

This material is authorized for use only when preceded or accompanied by the current PIMCO Funds prospectuses. The Shareholder Reports for the other series of the PIMCO Funds are printed separately.

**Chairman's Letter**

Dear Shareholder,

We hope that you and your family are staying safe and healthy during these challenging times. We continue to work tirelessly to navigate markets and manage the assets that you have entrusted with us. Following this letter is the PIMCO Funds Annual Report, which covers the 12-month reporting period ended March 31, 2021. On the subsequent pages, you will find specific details regarding investment results and discussion of the factors that most affected performance during the reporting period.

### For the 12-month reporting period ended March 31, 2021

The global economy was severely impacted by the repercussions related to the COVID-19 pandemic. Looking back, second-quarter 2020 U.S. annualized gross domestic product ("GDP") growth was -31.4%. This represented the steepest quarterly decline on record. With the economy reopening, third-quarter 2020 GDP growth was 33.4%, the largest quarterly increase on record. GDP growth was then 4.3% during the fourth quarter of 2020. The Commerce Department's initial reading for first-quarter 2021 GDP growth — released after the reporting period ended — was 6.4%.

The Federal Reserve (the "Fed") took unprecedented actions to support the economy and keep markets functioning properly. In early March 2020, before the reporting period began, the Fed lowered the federal funds rate to a range between 1.00% and 1.25%. Later in the month, the Fed lowered the rate to a range between 0.00% and 0.25%. On March 23, the Fed announced that it would make unlimited purchases of Treasury and mortgage securities and, for the first time, it would purchase corporate bonds on the open market. In August 2020, Fed Chair Jerome Powell said the central bank had changed how it viewed the trade-off between lower unemployment and higher inflation. Per Powell's statement, the Fed's new approach to setting U.S. monetary policy will entail letting inflation run higher, which could mean that interest rates remain low for an extended period. Meanwhile, in March 2020, the U.S. government passed a total of roughly $2.8 trillion in fiscal stimulus measures to aid the economy. A subsequent $900 billion stimulus package was finalized in December 2020, and a $1.9 trillion stimulus package was finalized in February 2021. Finally, the Biden administration unveiled a $2.25 trillion infrastructure spending proposal in late March 2021.

Economies outside the U.S. were also significantly impacted by the pandemic but are expected to improve in 2021. In its April 2021 World Economic Outlook Update — released after the reporting period ended — the International Monetary Fund ("IMF") stated that it expects 2021 GDP growth in the eurozone, U.K. and Japan will be 4.4%, 5.3% and 3.3%, respectively. For comparison purposes, the GDP growth of these economies was projected to be -6.6%, -9.9% and -4.8%, respectively, in 2020.

Against this backdrop, central banks and governments around the world took a number of aggressive actions. Looking back, in March 2020, the European Central Bank (the "ECB") unveiled a new €750 billion bond-buying program, which was subsequently expanded by another €600 billion in June 2020. In July, the European Union agreed on a €1.8 trillion spending package to bolster its economy. In December 2020, the ECB expanded its monetary stimulus program by another €500 billion. The Bank of England reduced its key lending rate to 0.10% — a record low — in March, added £100 billion to its quantitative easing program in June and increased its bond-buying program by £150 billion to £895 billion in November. Finally, toward the end of the year, the U.K. and the European Union agreed to a long-awaited Brexit deal. Elsewhere, the Bank of Japan maintained its short-term interest rate at -0.10%, while increasing the target for its holdings of corporate bonds to ¥4.2 trillion from ¥3.2 trillion. In May 2020, the Japanese government doubled its stimulus measures with a ¥117 trillion package. Finally, in December 2020, the Bank of Japan announced a new ¥73.6 trillion stimulus package.

Short-term U.S. Treasury yields edged lower, whereas long-term yields moved sharply higher, albeit from a very low level during the reporting period. The yield on the benchmark 10-year U.S. Treasury note was 1.74% at the end of the reporting period, versus 0.70% on March 31, 2020. The Bloomberg Barclays Global Treasury Index (USD Hedged), which tracks fixed-rate, local currency government debt of investment grade countries, including both developed and emerging markets, returned -1.03%. Meanwhile, the Bloomberg Barclays Global Aggregate Credit Index (USD Hedged), a widely

used index of global investment grade credit bonds, returned 7.98%. Riskier fixed income asset classes, including high yield corporate bonds and emerging market debt, produced stronger returns. The ICE BofAML Developed Markets High Yield Constrained Index (USD Hedged), a widely used index of below-investment-grade bonds, returned 23.34%, whereas emerging market external debt, as represented by the JPMorgan Emerging Markets Bond Index (EMBI) Global (USD Hedged), returned 14.29%. Emerging market local bonds, as represented by the JPMorgan Government Bond Index-Emerging Markets Global Diversified Index (Unhedged), returned 13.03%.

Despite the headwinds from the pandemic and periods of volatility, global equities produced exceptionally strong results. All told, U.S. equities, as represented by the S&P 500 Index, returned 56.35%, fueled in our view by accommodative monetary and fiscal policy and improved investor sentiment after positive COVID-19 vaccine news. Global equities, as represented by the MSCI World Index, returned 54.03%, whereas emerging market equities, as measured by the MSCI Emerging Markets Index, returned 58.39%. Meanwhile, Japanese equities, as represented by the Nikkei 225 Index (in JPY), returned 56.62%, and European equities, as represented by the MSCI Europe Index (in EUR), returned 35.32%.

Commodity prices were volatile but moved higher overall. When the reporting period began, Brent crude oil was approximately $22 a barrel but ended the reporting period at roughly $63 a barrel. We believe that oil prices rallied because producers reduced their output and investors anticipated stronger demand as global growth improved. Elsewhere, copper and gold prices also moved higher.

Finally, there were also periods of volatility in the foreign exchange markets, in our view due to fluctuating economic growth, trade conflicts and changing central bank monetary policies, along with the U.S. elections and several geopolitical events. The U.S. dollar weakened against several major currencies. For example, the U.S. dollar returned -6.34% and -10.97% versus the euro and the British pound, respectively. However, the U.S. dollar appreciated 2.87% versus the Japanese yen.

Thank you for the assets you have placed with us. We deeply value your trust, and we will continue to work diligently to meet your broad investment needs. For any questions regarding your PIMCO Funds investments, please contact your account manager or call one of our shareholder associates at (888) 87-PIMCO. We also invite you to visit our website at pimco.com to learn more about our viewpoints.

Stay safe and healthy,

Peter G. Strelow
Chairman of the Board
PIMCO Funds

Past performance is no guarantee of future results. Unless otherwise noted, index returns reflect the reinvestment of income distributions and capital gains, if any, but do not reflect fees, brokerage commissions or other expenses of investing. It is not possible to invest directly in an unmanaged index.

## Important Information About the Funds

PIMCO Funds (the "Trust") is an open-end management investment company that includes the PIMCO Credit Opportunities Bond Fund, PIMCO Diversified Income Fund, PIMCO ESG Income Fund, PIMCO High Yield Spectrum Fund, PIMCO Long-Term Credit Bond Fund, PIMCO Low Duration Income Fund, PIMCO Low Duration Credit Fund (formerly, PIMCO Senior Floating Rate Fund) and PIMCO Preferred and Capital Securities Fund (each a "Fund" and collectively, the "Funds").

We believe that bond funds have an important role to play in a well-diversified investment portfolio. It is important to note, however, that in an environment where interest rates may trend upward, rising rates would negatively impact the performance of most bond funds, and fixed income securities and other instruments held by a Fund are likely to decrease in value. A wide variety of factors can cause interest rates or yields of U.S. Treasury securities (or yields of other types of bonds) to rise (e.g., central bank monetary policies, inflation rates, general economic conditions, etc.). In addition, changes in interest rates can be sudden and unpredictable, and there is no guarantee that Fund management will anticipate such movement accurately. The Funds may lose money as a result of movements in interest rates.

As of the date of this report, interest rates in the United States and many parts of the world, including certain European countries, are at or near historically low levels. Thus, bond funds currently face a heightened level of risk associated with rising interest rates and/or bond yields. This could be driven by a variety of factors, including but not limited to central bank monetary policies, changing inflation or real growth rates, general economic conditions, increasing bond issuances or reduced market demand for low yielding investments. Further, while bond markets have steadily grown over the past three decades, dealer inventories of corporate bonds are near historic lows in relation to market size. As a result, there has been a significant reduction in the ability of dealers to "make markets."

Bond funds and individual bonds with a longer duration (a measure used to determine the sensitivity of a security's price to changes in interest rates) tend to be more sensitive to changes in interest rates, usually making them more volatile than securities or funds with shorter durations. All of the factors mentioned above, individually or collectively, could lead to increased volatility and/or lower liquidity in the fixed income markets or negatively impact a Fund's performance or cause a Fund to incur losses. As a result, a Fund may experience increased shareholder redemptions, which, among other things, could further reduce the net assets of the Fund.

The Funds may be subject to various risks as described in each Fund's prospectus and in the Principal and Other Risks in the Notes to Financial Statements.

Classifications of Fund portfolio holdings in this report are made according to financial reporting standards. The classification of a particular portfolio holding as shown in the Allocation Breakdown and Schedule of Investments sections of this report may differ from the classification used for a Fund's compliance calculations, including those used in a Fund's prospectus, investment objectives, regulatory, and other investment limitations and policies, which may be based on different asset class, sector or geographical classifications. All Funds are separately monitored for compliance with respect to prospectus and regulatory requirements.

The geographical classification of foreign (non-U.S.) securities in this report, if any, are classified by the country of incorporation of a holding. In certain instances, a security's country of incorporation may be different from its country of economic exposure.

Beginning in January 2020, global financial markets have experienced and may continue to experience significant volatility resulting from the spread of a novel coronavirus known as COVID-19. The outbreak of COVID-19 has resulted in travel and border restrictions, quarantines, supply chain disruptions, lower consumer demand and general market uncertainty. The effects of COVID-19 have and may continue to adversely affect the global economy, the economies of certain nations and individual issuers, all of which may negatively impact the Funds' performance. In addition, COVID-19 and governmental responses to COVID-19 may negatively impact the capabilities of the Funds' service providers and disrupt the Funds' operations.

The United States' enforcement of restrictions on U.S. investments in certain issuers and tariffs on goods from other countries, each with a focus on China, has contributed to international trade tensions and may impact portfolio securities.

A Fund may have significant exposure to issuers in the United Kingdom. The United Kingdom's withdrawal from the European Union may impact Fund returns. The withdrawal may cause substantial volatility in foreign exchange markets, lead to weakness in the exchange rate of the British pound, result in a sustained period of market uncertainty, and destabilize some or all of the other European Union member countries and/or the Eurozone.

The Funds may invest in certain instruments that rely in some fashion upon the London Interbank Offered Rate ("LIBOR"). LIBOR is an average interest rate, determined by the ICE Benchmark Administration, that banks charge one another for the use of short-term money. The United Kingdom's Financial Conduct Authority, which regulates LIBOR, has announced plans to ultimately phase out the use of LIBOR. There remains uncertainty regarding future utilization of LIBOR and the nature of any replacement rate (e.g., the Secured

Overnight Financing Rate, which is intended to replace U.S. dollar LIBOR and measures the cost of overnight borrowings through repurchase agreement transactions collateralized with U.S. Treasury securities). Any potential effects of the transition away from LIBOR on a Fund or on certain instruments in which a Fund invests can be difficult to ascertain, and they may vary depending on a variety of factors. The transition may also result in a reduction in the value of certain instruments held by a Fund or a reduction in the effectiveness of related Fund transactions such as hedges. Any such effects of the transition away from LIBOR, as well as other unforeseen effects, could result in losses to a Fund.

On each individual Fund Summary page in this Shareholder Report, the Average Annual Total Return table and Cumulative Returns chart measure performance assuming that any dividend and capital gain distributions were reinvested. The Cumulative Returns chart and Average Annual Total Return table reflect any sales load that would have applied at the time of purchase or any Contingent Deferred Sales Charge ("CDSC") that would have applied if a full redemption occurred on the last business day of the period shown in the Cumulative Returns chart. Class A shares are subject to an initial sales charge. A CDSC may be imposed in certain circumstances on Class A shares that are purchased without an initial sales charge and then redeemed during the first 12 months after purchase. Class C and Class C-2 shares are subject to a 1% CDSC, which may apply in the first year. The Cumulative Returns chart reflects only Institutional Class performance. Performance for I-2, I-3, Administrative Class, Class A, Class C and Class C-2 if applicable, is typically lower than Institutional Class

performance due to the lower expenses paid by Institutional Class shares. Performance shown is net of fees and expenses. The minimum initial investment amount for Institutional Class, I-2, I-3 and Administrative Class shares is $1,000,000. The minimum initial investment amount for Class A, Class C and Class C-2 shares is $1,000. Each Fund measures its performance against at least one broad-based securities market index ("benchmark index") and a Lipper Average, which is calculated by Lipper, Inc. ("Lipper"), a Thomson Reuters company, and represents the total return performance averages of funds that are tracked by Lipper that have the same fund classification. Benchmark indexes do not take into account fees, expenses or taxes. A Fund's past performance, before and after taxes, is not necessarily an indication of how the Fund will perform in the future. There is no assurance that any Fund, including any Fund that has experienced high or unusual performance for one or more periods, will experience similar levels of performance in the future. High performance is defined as a significant increase in either 1) a Fund's total return in excess of that of the Fund's benchmark between reporting periods or 2) a Fund's total return in excess of the Fund's historical returns between reporting periods. Unusual performance is defined as a significant change in a Fund's performance as compared to one or more previous reporting periods. Historical performance for the Funds or a share class thereof may have been positively impacted by fee waivers or expense limitations in place during some or all of the periods shown, if applicable. Future performance (including total return or yield) and distributions may be negatively impacted by the expiration or reduction of any such fee waivers or expense limitations.

The following table discloses the inception dates of each Fund and its respective share classes along with each Fund's diversification status as of period end:

| Fund Name | Fund Inception | Institutional Class | I-2 | I-3 | Administrative Class | Class A | Class C | Class C-2 | Diversification Status |
|---|---|---|---|---|---|---|---|---|---|
| PIMCO Credit Opportunities Bond Fund | 08/31/11 | 08/31/11 | 08/31/11 | — | — | 08/31/11 | 08/31/11 | — | Diversified |
| PIMCO Diversified Income Fund | 07/31/03 | 07/31/03 | 04/30/08 | 04/27/18 | 10/29/04 | 07/31/03 | 07/31/03 | — | Diversified |
| PIMCO ESG Income Fund | 09/30/20 | 09/30/20 | 09/30/20 | 09/30/20 | — | 09/30/20 | 09/30/20 | — | Diversified |
| PIMCO High Yield Spectrum Fund | 09/15/10 | 09/15/10 | 09/15/10 | 04/27/18 | — | 09/15/10 | 09/15/10 | — | Diversified |
| PIMCO Long-Term Credit Bond Fund | 03/31/09 | 03/31/09 | 02/29/12 | — | — | — | — | — | Diversified |
| PIMCO Low Duration Credit Fund | 04/29/11 | 04/29/11 | 04/29/11 | — | — | 04/29/11 | 04/29/11 | — | Diversified |
| PIMCO Low Duration Income Fund | 07/30/04 | 07/30/04 | 04/30/08 | 04/27/18 | — | 07/30/04 | 09/30/04 | 10/21/20 | Diversified |
| PIMCO Preferred and Capital Securities Fund | 04/13/15 | 04/13/15 | 04/13/15 | 04/27/18 | — | 04/13/15 | 08/23/19 | — | Diversified |

An investment in a Fund is not a bank deposit and is not guaranteed or insured by the Federal Deposit Insurance Corporation or any other government agency. It is possible to lose money in an investment in a Fund.

The Trustees are responsible generally for overseeing the management of the Trust. The Trustees authorize the Trust to enter into service agreements with the Adviser, the Distributor, the Administrator and other service providers in order to provide, and in some cases authorize

service providers to procure through other parties, necessary or desirable services on behalf of the Trust and the Funds. Shareholders are not parties to or third-party beneficiaries of such service agreements. Neither a Fund's prospectus nor a Fund's summary prospectus, the Trust's Statement of Additional Information ("SAI"), any contracts filed as exhibits to the Trust's registration statement, nor any other communications, disclosure documents or regulatory filings (including this report) from or on behalf of the Trust or a Fund creates a

## Important Information About the Funds (Cont.)

contract between or among any shareholder of a Fund, on the one hand, and the Trust, a Fund, a service provider to the Trust or a Fund, and/or the Trustees or officers of the Trust, on the other hand. The Trustees (or the Trust and its officers, service providers or other delegates acting under authority of the Trustees) may amend the most recent prospectus or use a new prospectus, summary prospectus or SAI with respect to a Fund or the Trust, and/or amend, file and/or issue any other communications, disclosure documents or regulatory filings, and may amend or enter into any contracts to which the Trust or a Fund is a party, and interpret the investment objective(s), policies, restrictions and contractual provisions applicable to any Fund, without shareholder input or approval, except in circumstances in which shareholder approval is specifically required by law (such as changes to fundamental investment policies) or where a shareholder approval requirement is specifically disclosed in the Trust's then-current prospectus or SAI.

PIMCO has adopted written proxy voting policies and procedures ("Proxy Policy") as required by Rule 206(4)-6 under the Investment Advisers Act of 1940, as amended. The Proxy Policy has been adopted by the Trust as the policies and procedures that PIMCO will use when voting proxies on behalf of the Funds. A description of the policies and procedures that PIMCO uses to vote proxies relating to portfolio securities of each Fund, and information about how each Fund voted proxies relating to portfolio securities held during the most recent twelve-month period ended June 30th, are available without charge, upon request, by calling the Trust at (888) 87-PIMCO, on the Funds' website at www.pimco.com, and on the Securities and Exchange Commission's ("SEC") website at www.sec.gov.

The Funds file portfolio holdings information with the SEC on Form N-PORT within 60 days of the end of each fiscal quarter. The Funds' complete schedules of securities holdings as of the end of each fiscal quarter will be made available to the public on the SEC's website at www.sec.gov and on PIMCO's website at www.pimco.com, and will be made available, upon request by calling PIMCO at (888) 87-PIMCO.

The SEC has adopted a rule that allows the Funds to fulfill their obligation to deliver shareholder reports to investors by providing access to such reports online free of charge and by mailing a notice that the report is electronically available. Pursuant to the rule, investors may elect to receive all future reports in paper free of charge by contacting their financial intermediary or, if invested directly with a Fund, investors can inform the Fund by calling (888) 87-PIMCO. Any election to receive reports in paper will apply to all funds held with the fund complex if invested directly with a Fund or to all funds held in the investor's account if invested through a financial intermediary.

In August 2020, the SEC proposed changes to the mutual fund and ETF shareholder report and registration statement disclosure requirements and the registered fund advertising rules, which, if adopted, will change the disclosures provided to shareholders.

In October 2020, the SEC adopted a rule related to the use of derivatives, short sales, reverse repurchase agreements and certain other transactions by registered investment companies that rescinds and withdraws the guidance of the SEC and its staff regarding asset segregation and cover transactions. Subject to certain exceptions, and after an eighteen-month transition period, the rule requires funds to trade derivatives and other transactions that create future payment or delivery obligations (except reverse repurchase agreements and similar financing transactions) subject to a value-at-risk leverage limit, certain derivatives risk management program and reporting requirements. These requirements may limit the ability of the Funds to use derivatives and reverse repurchase agreements and similar financing transactions as part of their investment strategies and may increase the cost of the Funds' investments and cost of doing business, which could adversely affect investors.

In October 2020, the SEC adopted a rule regarding the ability of a fund to invest in other funds. The rule allows a fund to acquire shares of another fund in excess of certain limitations currently imposed by the Investment Company Act of 1940 (the "Act") without obtaining individual exemptive relief from the SEC, subject to certain conditions. The rule also included the rescission of certain exemptive relief from the SEC and guidance from the SEC staff for funds to invest in other funds. The impact that these changes may have on the Funds is uncertain.

In December 2020, the SEC adopted a rule addressing fair valuation of fund investments. The new rule sets forth requirements for good faith determinations of fair value as well as for the performance of fair value determinations, including related oversight and reporting obligations. The new rule also defines "readily available market quotations" for purposes of the definition of "value" under the Act, and the SEC noted that this definition will apply in all contexts under the Act. The SEC adopted an eighteen-month transition period beginning from the effective date for both the new rule and the associated new recordkeeping requirements. The impact of the new rule on the Funds is uncertain at this time.

# PIMCO Credit Opportunities Bond Fund

Institutional Class - **PCARX**  Class A - **PZCRX**
I-2 - **PPCRX**  Class C - **PCCRX**

## Cumulative Returns Through March 31, 2021



(in millions)

INSTITUTIONAL CLASS $1,422,062

INDEX $1,093,382

$1,000,000 invested at the end of the month when the Fund's Institutional Class commenced operations.

## Allocation Breakdown as of March 31, 2021[†][§]

| | |
|---|---|
| Corporate Bonds & Notes | 44.6% |
| Short-Term Instruments[‡] | 22.0% |
| Loan Participations and Assignments | 18.3% |
| Asset-Backed Securities | 5.3% |
| Non-Agency Mortgage-Backed Securities | 4.0% |
| Sovereign Issues | 2.6% |
| U.S. Treasury Obligations | 1.5% |
| U.S. Government Agencies | 1.3% |
| Other | 0.4% |

[†] % of Investments, at value.

[§] Allocation Breakdown and % of investments exclude securities sold short and financial derivative instruments, if any.

[‡] Includes Central Funds Used for Cash Management Purposes.

## Investment Objective and Strategy Overview

PIMCO Credit Opportunities Bond Fund seeks maximum total return, consistent with preservation of capital and prudent investment management, by investing under normal circumstances at least 80% of its assets in a diversified portfolio of Fixed Income Instruments of varying maturities, which may be represented by forwards or derivatives such as options, futures contracts or swap agreements. Security selection, industry and sector allocation, and management of market risk within and across credit and corporate markets are expected to be the main drivers of returns over time. "Fixed Income Instruments" include bonds, debt securities, bank loans and other similar instruments issued by various U.S. and non-U.S. public- or private-sector entities. Fund strategies may change from time to time. Please refer to the Fund's current prospectus for more information regarding the Fund's strategy.

## Fund Insights

The following affected performance (on a gross basis) during the reporting period:

» Long exposure to financial companies contributed to performance, as the sector posted positive absolute returns.

» Long exposure to the gaming sector contributed to performance, as the sector posted positive absolute returns.

» Long exposure to the healthcare sector contributed to performance, as the sector posted positive absolute returns.

» Long exposure to the building materials sector contributed to performance, as the sector posted positive absolute returns.

» Long exposure to duration detracted from performance, as Treasury yields increased.

» Short exposure to the retailer sector detracted from performance, as the sector posted positive absolute returns.

## Average Annual Total Return for the period ended March 31, 2021

| | | 1 Year | 5 Years | Fund Inception (08/31/11) |
|---|---|---|---|---|
| ▬ | PIMCO Credit Opportunities Bond Fund Institutional Class | 14.06% | 5.34% | 3.74% |
| | PIMCO Credit Opportunities Bond Fund I-2 | 13.92% | 5.22% | 3.63% |
| | PIMCO Credit Opportunities Bond Fund Class A | 13.61% | 4.93% | 3.33% |
| | PIMCO Credit Opportunities Bond Fund Class A (adjusted) | 9.40% | 4.13% | 2.91% |
| | PIMCO Credit Opportunities Bond Fund Class C | 12.73% | 4.13% | 2.55% |
| | PIMCO Credit Opportunities Bond Fund Class C (adjusted) | 11.73% | 4.13% | 2.55% |
| ⋯ | 3 Month USD LIBOR | 0.56% | 1.49% | 0.94% |
| | Lipper Absolute Return Bond Funds Average | 12.95% | 4.09% | 3.07% |

All Fund returns are net of fees and expenses and include applicable fee waivers and/or expense limitations. Absent any applicable fee waivers and/or expense limitations, performance would have been lower and there can be no assurance that any such waivers or limitations will continue in the future.

*Performance quoted represents past performance. Past performance is not a guarantee or a reliable indicator of future results. Current performance may be lower or higher than performance shown. Investment return and the principal value of an investment will fluctuate. Shares may be worth more or less than original cost when redeemed. Returns shown do not reflect the deduction of taxes that a shareholder would pay on fund distributions or the redemption of fund shares. Differences in the Fund's performance versus the index and related attribution information with respect to particular categories of securities or individual positions may be attributable, in part, to differences in the pricing methodologies used by the Fund and the index. The adjusted returns take into account the maximum sales charge of 3.75% on Class A shares and 1.00% CDSC on Class C shares. For performance current to the most recent month-end, visit www.pimco.com or via (888) 87-PIMCO.*

*The Fund's total annual operating expense ratio in effect as of period end were 0.92% for Institutional Class shares, 1.02% for I-2 shares, 1.32% for Class A shares, and 2.07% for Class C shares. Details regarding any changes to the Fund's operating expenses, subsequent to period end, can be found in the Fund's current prospectus, as supplemented.*

# PIMCO Diversified Income Fund

| | |
|---|---|
| Institutional Class - **PDIIX** | Administrative Class - **PDAAX** |
| I-2 - **PDVPX** | Class A - **PDVAX** |
| I-3 - **PDNIX** | Class C - **PDICX** |

## Cumulative Returns Through March 31, 2021



(in millions)

| | |
|---|---|
| INSTITUTIONAL CLASS | $3,202,180 |
| SECONDARY INDEX | $3,095,395 |
| INDEX | $2,501,214 |

$1,000,000 invested at the end of the month when the Fund's Institutional Class commenced operations.

## Allocation Breakdown as of March 31, 2021†§

| | |
|---|---|
| Corporate Bonds & Notes | 45.7% |
| Sovereign Issues | 15.2% |
| U.S. Treasury Obligations | 12.4% |
| Short-Term Instruments‡ | 9.0% |
| U.S. Government Agencies | 5.1% |
| Asset-Backed Securities | 4.3% |
| Non-Agency Mortgage-Backed Securities | 3.8% |
| Loan Participations and Assignments | 2.4% |
| Preferred Securities | 1.9% |
| Other | 0.2% |

† % of Investments, at value.

§ Allocation Breakdown and % of investments exclude securities sold short and financial derivative instruments, if any.

‡ Includes Central Funds Used for Cash Management Purposes.

## Investment Objective and Strategy Overview

PIMCO Diversified Income Fund seeks maximum total return, consistent with preservation of capital and prudent investment management, by investing under normal circumstances at least 65% of its total assets in a diversified portfolio of Fixed Income Instruments of varying maturities, which may be represented by forwards or derivatives such as options, futures contracts or swap agreements. "Fixed Income Instruments" include bonds, debt securities and other similar instruments issued by various U.S. and non-U.S. public- or private-sector entities. Fund strategies may change from time to time. Please refer to the Fund's current prospectus for more information regarding the Fund's strategy.

## Fund Insights

The following affected performance (on a gross basis) during the reporting period:

» Exposure to high yield credit via credit default swap index contributed to performance, as spreads tightened in the sector.

» Exposure to non-Agency residential mortgage-backed securities contributed to performance, as spreads tightened in the sector.

» Underweight exposure to the high yield industrials sector detracted from performance, as spreads tightened in the sector.

» Underweight exposure to emerging markets detracted from performance as spreads tightened within emerging markets.

» Underweight exposure to the investment grade industrials sector detracted from performance, as spreads tightened in the sector.

## Average Annual Total Return for the period ended March 31, 2021

| | 1 Year | 5 Years | 10 Years | Fund Inception (07/31/03) |
|---|---|---|---|---|
| — PIMCO Diversified Income Fund Institutional Class | 12.15% | 6.37% | 5.42% | 6.81% |
| PIMCO Diversified Income Fund I-2 | 12.04% | 6.26% | 5.31% | 6.70% |
| PIMCO Diversified Income Fund I-3 | 11.98% | 6.21% | 5.26% | 6.65% |
| PIMCO Diversified Income Fund Administrative Class | 11.87% | 6.10% | 5.16% | 6.54% |
| PIMCO Diversified Income Fund Class A | 11.71% | 5.94% | 5.00% | 6.38% |
| PIMCO Diversified Income Fund Class A (adjusted) | 7.52% | 5.14% | 4.60% | 6.15% |
| PIMCO Diversified Income Fund Class C | 10.87% | 5.15% | 4.22% | 5.59% |
| PIMCO Diversified Income Fund Class C (adjusted) | 9.87% | 5.15% | 4.22% | 5.59% |
| ⋯ Bloomberg Barclays Global Credit Hedged USD Index | 10.14% | 5.06% | 5.10% | 5.32% |
| — 1/3 each — Bloomberg Barclays Global Aggregate Credit ex Emerging Markets, USD Hedged; ICE BofAML BB-B Rated Developed Markets High Yield Constrained Index, USD Hedged; and JPMorgan EMBI Global, USD Hedged | 14.40% | 5.59% | 5.66% | 6.60% |
| Lipper Multi-Sector Income Funds Average | 15.60% | 4.84% | 4.39% | 5.49% |

All Fund returns are net of fees and expenses and include applicable fee waivers and/or expense limitations. Absent any applicable fee waivers or limitations, performance would have been lower and there can be no assurance that any such waivers or limitations will continue in the future.

*Performance quoted represents past performance. Past performance is not a guarantee or a reliable indicator of future results. Current performance may be lower or higher than performance shown. Investment return and the principal value of an investment will fluctuate. Shares may be worth more or less than original cost when redeemed. Returns shown do not reflect the deduction of taxes that a shareholder would pay on fund distributions or the redemption of fund shares. Differences in the Fund's performance versus the index and related attribution information with respect to particular categories of securities or individual positions may be attributable, in part, to differences in the pricing methodologies used by the Fund and the index. The adjusted returns take into account the maximum sales charge of 3.75% on Class A shares and 1.00% CDSC on Class C shares. For performance current to the most recent month-end, visit www.pimco.com or via (888) 87-PIMCO.*

*For periods prior to the inception date of a share class launched subsequent to the Fund's inception date, the performance information shown is adjusted for the performance of the Fund's Institutional Class shares. The prior Institutional Class performance has been adjusted to reflect the distribution and/or service fees and other expenses paid by each respective share class.*

*The Fund's total annual operating expense ratio in effect as of period end were 0.79% for Institutional Class shares, 0.89% for I-2 shares, 0.99% for I-3 shares, 1.04% for Administrative Class shares, 1.19% for Class A shares, and 1.94% for Class C shares. Details regarding any changes to the Fund's operating expenses, subsequent to period end, can be found in the Fund's current prospectus, as supplemented.*

# PIMCO ESG Income Fund

Institutional Class - **PEGIX**   Class A - **PEGAX**
I-2 - **PEGPX**   Class C - **PEGBX**
I-3 - **PEGQX**

## Cumulative Returns Through March 31, 2021



(in millions)

INSTITUTIONAL CLASS **$1,044,306**

INDEX **$972,738**

$1,000,000 invested at the end of the month when the Fund's Institutional Class commenced operations.

## Allocation Breakdown as of March 31, 2021[1][§]

| | |
|---|---|
| Corporate Bonds & Notes | 34.5% |
| Non-Agency Mortgage-Backed Securities | 20.1% |
| Short-Term Instruments[‡] | 14.3% |
| U.S. Government Agencies | 13.4% |
| Asset-Backed Securities | 12.9% |
| Sovereign Issues | 3.2% |
| Preferred Securities | 1.3% |
| Other | 0.3% |

[†] % of Investments, at value.

[§] Allocation Breakdown and % of investments exclude securities sold short and financial derivative instruments, if any.

[‡] Includes Central Funds Used for Cash Management Purposes.

## Average Annual Total Return for the period ended March 31, 2021

| | Fund Inception (09/30/20)* |
|---|---|
| ▬ PIMCO ESG Income Fund Institutional Class | 4.43% |
| PIMCO ESG Income Fund I-2 | 4.38% |
| PIMCO ESG Income Fund I-3 | 4.35% |
| PIMCO ESG Income Fund Class A | 4.23% |
| PIMCO ESG Income Fund Class A (adjusted) | 0.31% |
| PIMCO ESG Income Fund Class C | 3.85% |
| PIMCO ESG Income Fund Class C (adjusted) | 2.85% |
| ⋯ Bloomberg Barclays U.S. Aggregate Index | (2.73)% |
| Lipper Multi-Sector Income Funds Average | 3.63% |

All Fund returns are net of fees and expenses and include applicable fee waivers and/or expense limitations. Absent any applicable fee waivers and/or expense limitations, performance would have been lower and there can be no assurance that any such waivers or limitations will continue in the future.

* Since Inception Cumulative return.

*Performance quoted represents past performance. Past performance is not a guarantee or a reliable indicator of future results. Current performance may be lower or higher than performance shown. Investment return and the principal value of an investment will fluctuate. Shares may be worth more or less than original cost when redeemed. Returns shown do not reflect the deduction of taxes that a shareholder would pay on fund distributions or the redemption of fund shares. Differences in the Fund's performance versus the index and related attribution information with respect to particular categories of securities or individual positions may be attributable, in part, to differences in the pricing methodologies used by the Fund and the index. The adjusted returns take into account the maximum sales charge of 3.75% on Class A shares and 1.00% CDSC on Class C shares. For performance current to the most recent month-end, visit www.pimco.com or via (888) 87-PIMCO.*

*The Fund's total annual operating expense ratio in effect as of period end were 0.57% for Institutional Class shares, 0.67% for I-2 shares, 0.77% for I-3 shares, 0.97% for Class A shares, and 1.72% for Class C shares. Details regarding any changes to the Fund's operating expenses, subsequent to period end, can be found in the Fund's current prospectus, as supplemented.*

## Investment Objective and Strategy Overview

The PIMCO ESG Income Fund seeks to maximize current income, while incorporating PIMCO's ESG investment strategy, with long-term capital appreciation as a secondary objective, by investing under normal circumstances at least 65% of its total assets in a multi-sector portfolio of Fixed Income Instruments of varying maturities, which may be represented by forwards or derivatives such as options, futures contracts or swap agreements. "Fixed Income Instruments" include bonds, debt securities and other similar instruments issued by various U.S. and non-U.S. public- or private-sector entities. The Fund will seek to maintain a high and consistent level of dividend income by investing in a broad array of fixed income sectors and utilizing income efficient implementation strategies. The capital appreciation sought by the Fund generally arises from decreases in interest rates or improving credit fundamentals for a particular sector or security.

The Fund will not invest in the securities of any non-governmental issuer determined by PIMCO to be engaged principally in the manufacturing of alcoholic beverages, tobacco products or military equipment, the operation of gambling casinos, the production or trade of pornographic materials, or in the oil industry, including extraction, production, and refining or the production, distribution of coal and coal fired generation. The Fund can invest in the securities of any issuer determined by PIMCO to be engaged principally in biofuel production, natural gas generation and sales and trading activities. To the extent possible on the basis of information available to PIMCO, an issuer will be deemed to be principally engaged in an activity if it derives more than 10% of its gross revenues from such activities. However, green labeled bonds from issuers involved in fossil fuel-related sectors may be permitted. Labeled green bonds are those issues with proceeds specifically earmarked to be used for climate and environmental projects. Labeled green bonds are often verified by a third party, which certifies that the bond will fund projects that include environmental benefits. Fund strategies may change from time to time. Please refer to the Fund's current prospectus for more information regarding the Fund's strategy.

## Fund Insights

The following affected performance (on a gross basis) during the reporting period:

» Holdings of non-Agency mortgage-backed securities contributed to performance, as prices for these securities appreciated.

» Holdings of investment grade corporate credit contributed to performance, as U.S. corporate investment grade spreads tightened.

» Holdings of Agency mortgage-backed securities contributed to performance, as Agency mortgage-backed security spreads tightened.

» Exposure to U.S. duration detracted from performance, as the U.S. yield curve steepened, with interest rates rising in the belly and the long-end of the curve.

» Exposure to U.K. duration detracted from performance, as interest rates in the U.K. increased.

» Exposure to a basket of emerging market currencies, including the Brazilian real, dectracted from performance, as the currencies depreciated in value versus the U.S. dollar.

# PIMCO High Yield Spectrum Fund

Institutional Class - **PHSIX**      Class A - **PHSAX**
I-2 - **PHSPX**
I-3 - **PHFNX**      Class C - **PHSCX**

## Cumulative Returns Through March 31, 2021



(in millions)

INDEX
**$2,039,095**

INSTITUTIONAL CLASS
**$2,033,552**

$1,000,000 invested at the end of the month when the Fund's Institutional Class commenced operations.

## Allocation Breakdown as of March 31, 2021[†][§]

| | |
|---|---|
| Corporate Bonds & Notes | 88.1% |
| Short-Term Instruments[‡] | 8.4% |
| Loan Participations and Assignments | 1.5% |
| Preferred Securities | 1.1% |
| Common Stocks | 0.9% |

[†] % of Investments, at value.

[§] Allocation Breakdown and % of investments exclude securities sold short and financial derivative instruments, if any.

[‡] Includes Central Funds Used for Cash Management Purposes.

## Average Annual Total Return for the period ended March 31, 2021

| | 1 Year | 5 Years | 10 Years | Fund Inception (09/15/10) |
|---|---|---|---|---|
| PIMCO High Yield Spectrum Fund Institutional Class | 22.77% | 7.69% | 6.54% | 7.09% |
| PIMCO High Yield Spectrum Fund I-2 | 22.65% | 7.58% | 6.44% | 6.99% |
| PIMCO High Yield Spectrum Fund I-3 | 22.59% | 7.53% | 6.39% | 6.94% |
| PIMCO High Yield Spectrum Fund Class A | 22.35% | 7.31% | 6.17% | 6.72% |
| PIMCO High Yield Spectrum Fund Class A (adjusted) | 17.82% | 6.49% | 5.77% | 6.33% |
| PIMCO High Yield Spectrum Fund Class C | 21.44% | 6.52% | 5.39% | 5.93% |
| PIMCO High Yield Spectrum Fund Class C (adjusted) | 20.44% | 6.52% | 5.39% | 5.93% |
| ICE BofAML Developed Markets High Yield Constrained (USD Hedged) Index | 23.34% | 7.81% | 6.71% | 7.09% |
| Lipper Global High Yield Funds Average | 24.40% | 6.44% | 5.17% | 5.47%♦ |

All Fund returns are net of fees and expenses and include applicable fee waivers and/or expense limitations. Absent any applicable fee waivers or expense limitations, performance would have been lower and there can be no assurance that any such waivers or limitations will continue in the future.

♦ Average annual total return since 09/30/2010.

*Performance quoted represents past performance. Past performance is not a guarantee or a reliable indicator of future results. Current performance may be lower or higher than performance shown. Investment return and the principal value of an investment will fluctuate. Shares may be worth more or less than original cost when redeemed. Returns shown do not reflect the deduction of taxes that a shareholder would pay on fund distributions or the redemption of fund shares. Differences in the Fund's performance versus the index and related attribution information with respect to particular categories of securities or individual positions may be attributable, in part, to differences in the pricing methodologies used by the Fund and the index. The adjusted returns take into account the maximum sales charge of 3.75% on Class A shares and 1.00% CDSC on Class C shares. For performance current to the most recent month-end, visit www.pimco.com or via (888) 87-PIMCO.*

*For periods prior to the inception date of a share class launched subsequent to the Fund's inception date, the performance information shown is adjusted for the performance of the Fund's Institutional Class shares. The prior Institutional Class performance has been adjusted to reflect the distribution and/or service fees and other expenses paid by each respective share class.*

*The Fund's total annual operating expense ratio in effect as of period end were 0.62% for Institutional Class shares, 0.72% for I-2 shares, 0.82% for I-3 shares, 0.97% for Class A shares, and 1.72% for Class C shares. Details regarding any changes to the Fund's operating expenses, subsequent to period end, can be found in the Fund's current prospectus, as supplemented.*

## Investment Objective and Strategy Overview

PIMCO High Yield Spectrum Fund seeks maximum total return, consistent with prudent investment management, by investing under normal circumstances at least 80% of its assets in high yield investments ("junk bonds"), which may be represented by convertibles, warrants, forwards or derivatives such as swap agreements. High yield investments include securities (i) rated below investment grade by each of Moody's Investors Services, Inc. ("Moody's"), Standard & Poor's Ratings Services ("S&P") or Fitch, Inc. ("Fitch") that provides a rating on such investment or, if unrated, determined by PIMCO to be of comparable quality, or (ii) comprising the ICE BofAML Developed Markets High Yield Constrained (USD Hedged) Index (the "Benchmark"). The Fund may invest, without limitation, in Fixed Income Instruments and other securities of any rating below investment grade as rated by Moody's, or equivalently rated by S&P or Fitch, or, if unrated, determined by PIMCO to be of comparable quality. "Fixed Income Instruments" include bonds, debt securities and other similar instruments issued by various U.S. and non-U.S. public- or private-sector entities. Fund strategies may change from time to time. Please refer to the Fund's current prospectus for more information regarding the Fund's strategy.

## Fund Insights

The following affected performance (on a gross basis) during the reporting period:

» Security selection in the healthcare sector contributed to performance, as the Fund's healthcare positions outperformed the broader sector.

» Security selection in the aerospace and defense sector contributed to performance, as the Fund's aerospace and defense positions outperformed the broader sector.

» Security selection in the consumer non-cyclicals sector contributed to performance, as the Fund's consumer non-cyclical positions outperformed the broader sector.

» Overweight exposure to the healthcare sector detracted from performance, as the sector underperformed the broader market.

» Underweight exposure to the energy sector detracted from performance, as the sector outperformed the broader market.

» Security selection in the telecommunications sector detracted from performance, as the Fund's telecommunications positions underperformed the broader sector.

# PIMCO Long-Term Credit Bond Fund

Institutional Class - **PTCIX**
I-2 - **PLCPX**

## Cumulative Returns Through March 31, 2021



(in millions)

$1,000,000 invested at the end of the month when the Fund's Institutional Class commenced operations.

## Allocation Breakdown as of March 31, 2021[†][§]

| | |
|---|---|
| Corporate Bonds & Notes | 58.9% |
| U.S. Treasury Obligations | 22.3% |
| Preferred Securities | 4.6% |
| Sovereign Issues | 3.8% |
| U.S. Government Agencies | 3.2% |
| Loan Participations and Assignments | 2.6% |
| Municipal Bonds & Notes | 1.7% |
| Short-Term Instruments[‡] | 1.4% |
| Other | 1.5% |

† % of Investments, at value.

§ Allocation Breakdown and % of investments exclude securities sold short and financial derivative instruments, if any.

‡ Includes Central Funds Used for Cash Management Purposes.

## Investment Objective and Strategy Overview

PIMCO Long-Term Credit Bond Fund seeks total return which exceeds that of its benchmark, consistent with preservation of capital and prudent investment management, by investing under normal circumstances at least 80% of its assets in a diversified portfolio of Fixed Income Instruments of varying maturities, which may be represented by forwards or derivatives such as options, futures contracts or swap agreements. "Fixed Income Instruments" include bonds, debt securities and other similar instruments issued by various U.S. and non-U.S. public- or private-sector entities. Fund strategies may change from time to time. Please refer to the Fund's current prospectus for more information regarding the Fund's strategy.

## Fund Insights

The following affected performance (on a gross basis) during the reporting period:

» Overweight exposure to the financials sector contributed to performance, as the sector outperformed the broader investment grade market.

» Tactical exposure to emerging markets debt contributed to performance, as spreads tightened in the sector.

» Overweight exposure to the wireless sector contributed to performance, as the sector outperformed the broader investment grade market.

» Underweight exposure to the energy sector detracted from performance, as the sector outperformed the broader investment grade market.

» Underweight exposure to the chemicals sector detracted from performance, as the sector outperformed the broader investment grade market.

## Average Annual Total Return for the period ended March 31, 2021

| | | 1 Year | 5 Years | 10 Years | Fund Inception (03/31/09) |
|---|---|---|---|---|---|
| — | PIMCO Long-Term Credit Bond Fund Institutional Class | 9.84% | 7.63% | 8.44% | 10.09% |
| | PIMCO Long-Term Credit Bond Fund I-2 | 9.73% | 7.52% | 8.33% | 9.98% |
| ⋯⋯ | Bloomberg Barclays U.S. Long Credit Index | 8.87% | 6.69% | 7.23% | 8.98% |
| | Lipper General Bond Funds Average | 8.41% | 4.94% | 4.85% | 6.96% |

All Fund returns are net of fees and expenses and include applicable fee waivers and/or expense limitations. Absent any applicable fee waivers and/or expense limitations, performance would have been lower and there can be no assurance that any such waivers or limitations will continue in the future.

*Performance quoted represents past performance. Past performance is not a guarantee or a reliable indicator of future results. Current performance may be lower or higher than performance shown. Investment return and the principal value of an investment will fluctuate. Shares may be worth more or less than original cost when redeemed. Returns shown do not reflect the deduction of taxes that a shareholder would pay on fund distributions or the redemption of fund shares. Differences in the Fund's performance versus the index and related attribution information with respect to particular categories of securities or individual positions may be attributable, in part, to differences in the pricing methodologies used by the Fund and the index. For performance current to the most recent month-end, visit www.pimco.com or via (888) 87-PIMCO.*

*For periods prior to the inception date of a share class launched subsequent to the Fund's inception date, the performance information shown is adjusted for the performance of the Fund's Institutional Class shares. The prior Institutional Class performance has been adjusted to reflect the distribution and/or service fees and other expenses paid by each respective share class.*

*The Fund's total annual operating expense ratio in effect as of period end were 0.84% for Institutional Class shares, and 0.94% for I-2 shares. Details regarding any changes to the Fund's operating expenses, subsequent to period end, can be found in the Fund's current prospectus, as supplemented.*

# PIMCO Low Duration Credit Fund

Institutional Class - **PSRIX**  Class A - **PSRZX**
I-2 - **PSRPX**  Class C - **PSRWX**

## Cumulative Returns Through March 31, 2021



(in millions)

$2.0

INDEX
$1,623,332

INSTITUTIONAL
CLASS
$1,377,115

1.0

0

05/11          03/16          03/21

$1,000,000 invested at the end of the month when the Fund's Institutional Class commenced operations.

## Allocation Breakdown
as of March 31, 2021[†][§]

| | |
|---|---|
| Loan Participations and Assignments | 87.6% |
| Short-Term Instruments[‡] | 8.6% |
| Corporate Bonds & Notes | 3.7% |
| Common Stocks | 0.1% |

† % of Investments, at value.

§ Allocation Breakdown and % of investments exclude securities sold short and financial derivative instruments, if any.

‡ Includes Central Funds Used for Cash Management Purposes.

## Average Annual Total Return for the period ended March 31, 2021

| | 1 Year | 5 Years | Fund Inception (04/29/11) |
|---|---|---|---|
| — PIMCO Low Duration Credit Fund Institutional Class | 11.85% | 3.46% | 3.28% |
| PIMCO Low Duration Credit Fund I-2 | 11.74% | 3.36% | 3.17% |
| PIMCO Low Duration Credit Fund Class A | 11.52% | 3.16% | 2.97% |
| PIMCO Low Duration Credit Fund Class A (adjusted) | 8.99% | 2.69% | 2.57% |
| PIMCO Low Duration Credit Fund Class C | 10.68% | 2.39% | 2.21% |
| PIMCO Low Duration Credit Fund Class C (adjusted) | 9.68% | 2.39% | 2.21% |
| ····· 50% ICE BofAML 1-5 Year US High Yield Constrained Index and 50% J.P. Morgan Leveraged Loan Index | 21.53% | 6.29% | 5.00% |
| J.P. Morgan BB/B Leveraged Loan Index | 18.50% | 4.81% | 4.20% |
| Lipper Loan Participation Funds Average | 17.82% | 4.12% | 3.30%◆ |

All Fund returns are net of fees and expenses and include applicable fee waivers and/or expense limitations. Absent any applicable fee waivers or expense limitations, performance would have been lower and there can be no assurance that any such waivers or limitations will continue in the future.

Effective May 3, 2021, the Fund's broad-based securities market index is a blend of 50% ICE BofAML 1-5 Year US High Yield Constrained Index and 50% J.P. Morgan Leveraged Loan Index. The Fund's new broad-based securities market index was selected as its use is more closely aligned with the Fund's principal investment strategies. Prior to May 3, 2021, the Fund's broad-based securities market index was the J.P. Morgan BB/B Leveraged Loan Index. Effective May 3, 2021, certain changes were made to the Fund's principal investment strategies. The Fund's performance information prior to May 3, 2021 relates only to the Fund's former principal investment strategies.

◆ Average annual total return since 04/30/2011.

*Performance quoted represents past performance. Past performance is not a guarantee or a reliable indicator of future results. Current performance may be lower or higher than performance shown. Investment return and the principal value of an investment will fluctuate. Shares may be worth more or less than original cost when redeemed. Returns shown do not reflect the deduction of taxes that a shareholder would pay on fund distributions or the redemption of fund shares. Differences in the Fund's performance versus the index and related attribution information with respect to particular categories of securities or individual positions may be attributable, in part, to differences in the pricing methodologies used by the Fund and the index. The adjusted returns take into account the maximum sales charge of 2.25% on Class A shares and 1.00% CDSC on Class C shares. For performance current to the most recent month-end, visit www.pimco.com or via (888) 87-PIMCO.*

*The Fund's total annual operating expense ratio in effect as of period end were 0.75% for Institutional Class shares, 0.85% for I-2 shares, 1.05% for Class A shares, and 1.80% for Class C shares. Details regarding any changes to the Fund's operating expenses, subsequent to period end, can be found in the Fund's current prospectus, as supplemented.*

## Investment Objective and Strategy Overview

PIMCO Low Duration Credit Fund seeks a high level of current income, consistent with prudent investment management. Effective May 3, 2021, the Fund seeks to achieve its investment objective by investing under normal circumstances at least 80% of its assets in a diversified portfolio of Fixed Income Instruments. Prior to May 3, 2021, the Fund sought to achieve its investment objective by investing under normal circumstances at least 80% of its assets in a diversified portfolio of floating or adjustable rate senior secured loans, senior corporate debt and other senior Fixed Income Instruments that effectively enable the Fund to achieve a floating rate of income. "Fixed Income Instruments" include bank loans, bonds, debt securities and other similar instruments issued by various U.S. and non-U.S. entities. Fund strategies may change from time to time. Please refer to the Fund's current prospectus for more information regarding the Fund's strategy.

## Fund Insights

The following affected performance (on a gross basis) during the reporting period:

» Tactical allocation to investment grade credit contributed to performance.

» Security selection in the gaming, lodging, and leisure sector contributed to performance, as the Fund's gaming, lodging, and leisure positions outperformed the broader sector.

» Underweight exposure to the cable and satellite sector contributed to performance, as the sector underperformed the broader market.

» Security selection in the healthcare sector detracted from performance, as the Fund's healthcare positions underperformed the broader sector.

» Security selection in the telecommunications sector detracted from performance, as the Fund's telecommunication positions underperformed the broader sector.

» Security selection in the services sector detracted from performance, as the Fund's services positions underperformed the broader sector.

# PIMCO Low Duration Income Fund

Institutional Class - **PFIIX**  Class A - **PFIAX**
I-2 - **PFTPX**  Class C - **PFNCX**
I-3 - **PFNIX**  Class C-2 - **PLDCX**

## Cumulative Returns Through March 31, 2021



(in millions)

INSTITUTIONAL CLASS $1,906,292

INDEX $1,510,682

$1,000,000 invested at the end of the month when the Fund's Institutional Class commenced operations.

## Allocation Breakdown as of March 31, 2021[†][§]

| | |
|---|---|
| U.S. Government Agencies | 34.5% |
| Corporate Bonds & Notes | 23.5% |
| Asset-Backed Securities | 12.7% |
| Non-Agency Mortgage-Backed Securities | 9.2% |
| U.S. Treasury Obligations | 7.2% |
| Sovereign Issues | 7.0% |
| Loan Participations and Assignments | 3.5% |
| Preferred Securities | 1.0% |
| Short-Term Instruments[‡] | 1.0% |
| Other | 0.4% |

[†] % of Investments, at value.

[§] Allocation Breakdown and % of investments exclude securities sold short and financial derivative instruments, if any.

[‡] Includes Central Funds Used for Cash Management Purposes.

## Investment Objective and Strategy Overview

PIMCO Low Duration Income Fund seeks to maximize current income, with long-term capital appreciation as a secondary objective, by investing under normal circumstances at least 65% of its total assets in a multi-sector portfolio of Fixed Income Securities of varying maturities, which may be represented by forwards or derivatives such as options, futures contracts or swap agreements. "Fixed Income Instruments" include bonds, debt securities and other similar instruments issued by various U.S. and non-U.S. public- or private-sector entities. Fund strategies may change from time to time. Please refer to the Fund's current prospectus for more information regarding the Fund's strategy.

## Fund Insights

The following affected performance (on a gross basis) during the reporting period:

» Holdings of investment grade corporate credit contributed to performance, as these securities posted positive total returns.

» Holdings of non-agency mortgage backed securities contributed to performance, as prices for these securities appreciated.

» Holding of high yield corporate credit contributed to performance, as these securities posted positive returns.

» Holdings of emerging market external debt contributed to performance. The JP Morgan Emerging Market Bond Index (EMBI Global) which generally tracks the total return for U.S. dollar denominated debt instruments issued by emerging market sovereign and quasi-sovereign entities, posted positive returns.

» Exposure to several Latin American currencies, including the Argentine peso and Brazilian real, detracted from performance, as these currencies depreciated versus the U.S. dollar.

» Modest exposure to Australian duration detracted from performance, as interest rates in Australia increased.

## Average Annual Total Return for the period ended March 31, 2021

| | | 1 Year | 5 Years | 10 Years | Fund Inception (07/30/04) |
|---|---|---|---|---|---|
| ▬ | PIMCO Low Duration Income Fund Institutional Class | 12.72% | 6.25% | 3.69% | 3.95% |
| | PIMCO Low Duration Income Fund I-2 | 12.61% | 6.15% | 3.58% | 3.84% |
| | PIMCO Low Duration Income Fund I-3 | 12.57% | 6.11% | 3.58% | 3.85% |
| | PIMCO Low Duration Income Fund Class A | 12.28% | 5.83% | 3.27% | 3.53% |
| | PIMCO Low Duration Income Fund Class A (adjusted) | 9.79% | 5.34% | 3.04% | 3.39% |
| | PIMCO Low Duration Income Fund Class C | 11.95% | 5.51% | 2.97% | 3.21% |
| | PIMCO Low Duration Income Fund Class C (adjusted) | 10.95% | 5.51% | 2.97% | 3.21% |
| | PIMCO Low Duration Income Fund Class C-2 | 11.71% | 5.29% | 2.77% | 3.04% |
| | PIMCO Low Duration Income Fund Class C-2 (adjusted) | 10.71% | 5.29% | 2.77% | 3.04% |
| ⋯⋯ | Bloomberg Barclays U.S. Aggregate 1-3 Years Index | 1.19% | 1.96% | 1.57% | 2.50%♦ |
| | Lipper Short Investment Grade Debt Funds Average | 6.48% | 2.43% | 1.85% | 2.46%♦ |

All Fund returns are net of fees and expenses and include applicable fee waivers and/or expense limitations. Absent any applicable fee waivers and/or expense limitations, performance would have been lower and there can be no assurance that any such waivers or limitations will continue in the future.

♦ Average annual total return since 07/31/2004.

*Performance quoted represents past performance. Past performance is not a guarantee or a reliable indicator of future results. Current performance may be lower or higher than performance shown. Investment return and the principal value of an investment will fluctuate. Shares may be worth more or less than original cost when redeemed. Returns shown do not reflect the deduction of taxes that a shareholder would pay on fund distributions or the redemption of fund shares. Differences in the Fund's performance versus the index and related attribution information with respect to particular categories of securities or individual positions may be attributable, in part, to differences in the pricing methodologies used by the Fund and the index. The adjusted returns take into account the maximum sales charge of 2.25% on Class A shares, 1.00% CDSC on Class C and Class C-2 shares. For performance current to the most recent month-end, visit www.pimco.com or via (888) 87-PIMCO.*

*For periods prior to the inception date of a share class launched subsequent to the Fund's inception date, the performance information shown is adjusted for the performance of the Fund's Institutional Class shares. The prior Institutional Class performance has been adjusted to reflect the distribution and/or service fees and other expenses paid by each respective share class.*

*The Fund's total annual operating expense ratio in effect as of period end were 0.55% for Institutional Class shares, 0.65% for I-2 shares, 0.75% for I-3 shares, 0.95% for Class A shares, 1.25% for Class C shares and 1.45% for Class C-2 shares. Details regarding any changes to the Fund's operating expenses, subsequent to period end, can be found in the Fund's current prospectus, as supplemented.*

# PIMCO Preferred and Capital Securities Fund

## Cumulative Returns Through March 31, 2021



(in millions)

$2.0

INSTITUTIONAL CLASS $1,535,210

INDEX $1,474,848

1.0

0

04/15        03/18        03/21

$1,000,000 invested at the end of the month when the Fund's Institutional Class commenced operations.

## Allocation Breakdown as of March 31, 2021[†§]

| | |
|---|---|
| Corporate Bonds & Notes | 46.1% |
| Preferred Securities | 43.5% |
| Short-Term Instruments‡ | 8.4% |
| Common Stocks | 2.0% |

† % of Investments, at value.

§ Allocation Breakdown and % of investments exclude securities sold short and financial derivative instruments, if any.

‡ Includes Central Funds Used for Cash Management Purposes.

## Average Annual Total Return for the period ended March 31, 2021

| | 1 Year | 5 Years | Fund Inception (04/13/15) |
|---|---|---|---|
| — PIMCO Preferred and Capital Securities Fund Institutional Class | 24.86% | 9.29% | 7.39% |
| PIMCO Preferred and Capital Securities Fund I-2 | 24.70% | 9.14% | 7.29% |
| PIMCO Preferred and Capital Securities Fund I-3 | 24.82% | 9.13% | 7.24% |
| PIMCO Preferred and Capital Securities Fund Class A | 24.46% | 8.90% | 7.02% |
| PIMCO Preferred and Capital Securities Fund Class A (adjusted) | 19.77% | 8.06% | 6.34% |
| PIMCO Preferred and Capital Securities Fund Class C | 23.66% | 8.12% | 6.24% |
| PIMCO Preferred and Capital Securities Fund Class C (adjusted) | 22.66% | 8.12% | 6.24% |
| ····· 70% ICE BofAML 8% Constrained Core West Preferred & Jr Subordinated Securities Index (P8JC) and 30% ICE BofAML Contingent Capital Index (COCO) | 22.99% | 7.71% | 6.68% |
| Lipper Flexible Income Funds Average | 22.63% | 5.77% | 4.82%◆ |

All Fund returns are net of fees and expenses and include applicable fee waivers or expense limitations. Absent any applicable fee waivers or expense limitations, performance would have been lower and there can be no assurance that any such waivers or limitations will continue in the future.

◆ Average annual total return since 04/30/2015.

*Performance quoted represents past performance. Past performance is not a guarantee or a reliable indicator of future results. Current performance may be lower or higher than performance shown. Investment return and the principal value of an investment will fluctuate. Shares may be worth more or less than original cost when redeemed. Returns shown do not reflect the deduction of taxes that a shareholder would pay on fund distributions or the redemption of fund shares. Differences in the Fund's performance versus the index and related attribution information with respect to particular categories of securities or individual positions may be attributable, in part, to differences in the pricing methodologies used by the Fund and the index. The adjusted returns take into account the maximum sales charge of 3.75% on Class A shares and 1.00% CDSC on Class C shares. For performance current to the most recent month-end, visit www.pimco.com or via (888) 87-PIMCO.*

*For periods prior to the inception date of a share class launched subsequent to the Fund's inception date, the performance information shown is adjusted for the performance of the Fund's Institutional Class shares. The prior Institutional Class performance has been adjusted to reflect the distribution and/or service fees and other expenses paid by each respective share class.*

*The Fund's total annual operating expense ratio in effect as of period end, which includes the Acquired Fund Fees and Expenses (Commodity Subsidiary expenses), were 0.88% for Institutional Class shares, 0.98% for I-2 shares, 1.08% for I-3 shares, 1.23% for Class A shares, and 1.98% for Class C shares. Details regarding any changes to the Fund's operating expenses, subsequent to period end, can be found in the Fund's current prospectus, as supplemented.*

## Investment Objective and Strategy Overview

PIMCO Preferred and Capital Securities Fund seeks maximum total return, consistent with prudent investment management, by investing under normal circumstances at least 80% of its assets in a diversified portfolio of preferred securities and Capital Securities. "Capital Securities" include securities issued by U.S. and non-U.S. financial institutions (including, but not limited to, banks and insurance companies) that can be used to satisfy their regulatory capital requirements. Capital Securities may be represented by forwards or derivatives such as options, futures contracts or swap agreements. The Fund will invest under normal circumstances at least 25% of its net assets in preferred securities. Assets not invested in preferred securities or Capital Securities may be invested in other types of Fixed Income Instruments, including derivative Fixed Income Instruments. "Fixed Income Instruments" include bonds, debt securities and other similar instruments issued by various U.S. and non-U.S. public- or private-sector entities. Fund strategies may change from time to time. Please refer to the Fund's current prospectus for more information regarding the Fund's strategy.

## Fund Insights

The following affected performance (on a gross basis) during the reporting period:

» Overweight exposure to Dutch Additional Tier 1 securities contributed to performance, as the sector posted positive returns.

» Overweight exposure to United Kingdom Additional Tier 1 securities contributed to performance, as the sector posted positive returns.

» Overweight exposure to Spanish Additional Tier 1 securities contributed to performance, as the sector posted positive returns.

» Underweight exposure to $25 par retail preferred securities detracted from performance, as the sector posted positive returns.

» Underweight exposure to insurance capital securities detracted from performance, as the sector posted positive returns.

» Underweight exposure to German Additional Tier 1 securities detracted from performance, as the sector posted positive returns.

## Expense Examples

### Example

As a shareholder of a Fund, you incur two types of costs: (1) transaction costs, including sales charges (loads) on purchase payments and exchange fees and (2) ongoing costs, including investment advisory fees, supervisory and administrative fees, distribution and/or service (12b-1) fees (if applicable), and other Fund expenses. The Example is intended to help you understand your ongoing costs (in dollars) of investing in the Fund and to compare these costs with the ongoing costs of investing in other mutual funds.

The Example is based on an investment of $1,000 invested at the beginning of the period and held for the entire period indicated, which for all Funds and share classes is from October 1, 2020 to March 31, 2021 unless noted otherwise in the table and footnotes below.

### Actual Expenses

The information in the table under the heading "Actual" provides information about actual account values and actual expenses. You may use this information, together with the amount you invested, to estimate the expenses that you paid over the period. Simply divide your account value by $1,000 (for example, an $8,600 account value divided by $1,000 = 8.60), then multiply the result by the number in the appropriate row for your share class, in the column titled "Expenses Paid During Period" to estimate the expenses you paid on your account during this period.

### Hypothetical Example for Comparison Purposes

The information in the table under the heading "Hypothetical (5% return before expenses)" provides information about hypothetical account values and hypothetical expenses based on a Fund's actual expense ratio and an assumed rate of return of 5% per year before expenses, which is not the Fund's actual return. The hypothetical account values and expenses may not be used to estimate the actual ending account balance or expenses you paid for the period. You may use this information to compare the ongoing costs of investing in a Fund and other funds. To do so, compare this 5% hypothetical example with the 5% hypothetical examples that appear in the shareholder reports of the other funds.

Please note that the expenses shown in the table are meant to highlight your ongoing costs only and do not reflect any Acquired Fund Fees and Expenses or transactional costs, such as sales charges (loads) on purchase payments and exchange fees, if any. Therefore, the information under the heading "Hypothetical (5% return before expenses)" is useful in comparing ongoing costs only, and will not help you determine the relative total costs of owning different funds. In addition, if these transactional costs were included, your costs would have been higher.

Expense ratios may vary period to period because of various factors, such as an increase in expenses that are not covered by the investment advisory fees and supervisory and administrative fees, such as fees and expenses of the independent trustees and their counsel, extraordinary expenses and interest expense.

| | Actual | | | Hypothetical (5% return before expenses) | | | |
|---|---|---|---|---|---|---|---|
| | Beginning Account Value (10/01/20) | Ending Account Value (03/31/21) | Expenses Paid During Period* | Beginning Account Value (10/01/20) | Ending Account Value (03/31/21) | Expenses Paid During Period* | Net Annualized Expense Ratio** |
| **PIMCO Credit Opportunities Bond Fund** | | | | | | | |
| Institutional Class | $ 1,000.00 | $ 1,039.40 | $ 4.58 | $ 1,000.00 | $ 1,020.44 | $ 4.53 | 0.90% |
| I-2 | 1,000.00 | 1,038.10 | 5.08 | 1,000.00 | 1,019.95 | 5.04 | 1.00 |
| Class A | 1,000.00 | 1,037.10 | 6.60 | 1,000.00 | 1,018.45 | 6.54 | 1.30 |
| Class C | 1,000.00 | 1,033.10 | 10.39 | 1,000.00 | 1,014.71 | 10.30 | 2.05 |
| **PIMCO Diversified Income Fund** | | | | | | | |
| Institutional Class | $ 1,000.00 | $ 1,018.60 | $ 3.88 | $ 1,000.00 | $ 1,021.09 | $ 3.88 | 0.77% |
| I-2 | 1,000.00 | 1,018.10 | 4.38 | 1,000.00 | 1,020.59 | 4.38 | 0.87 |
| I-3 | 1,000.00 | 1,017.90 | 4.63 | 1,000.00 | 1,020.34 | 4.63 | 0.92 |
| Administrative Class | 1,000.00 | 1,017.40 | 5.13 | 1,000.00 | 1,019.85 | 5.14 | 1.02 |
| Class A | 1,000.00 | 1,016.60 | 5.88 | 1,000.00 | 1,019.10 | 5.89 | 1.17 |
| Class C | 1,000.00 | 1,012.80 | 9.64 | 1,000.00 | 1,015.36 | 9.65 | 1.92 |
| **PIMCO ESG Income Fund**(a) | | | | | | | |
| Institutional Class | $ 1,000.00 | $ 1,044.30 | $ 2.65 | $ 1,000.00 | $ 1,022.34 | $ 2.62 | 0.52% |
| I-2 | 1,000.00 | 1,043.80 | 3.16 | 1,000.00 | 1,021.84 | 3.13 | 0.62 |
| I-3 | 1,000.00 | 1,043.50 | 3.41 | 1,000.00 | 1,021.59 | 3.38 | 0.67 |
| Class A | 1,000.00 | 1,042.30 | 4.68 | 1,000.00 | 1,020.34 | 4.63 | 0.92 |
| Class C | 1,000.00 | 1,038.50 | 8.49 | 1,000.00 | 1,016.60 | 8.40 | 1.67 |

## Expense Examples (Cont.)

| | Actual | | | Hypothetical (5% return before expenses) | | | |
|---|---|---|---|---|---|---|---|
| | Beginning Account Value (10/01/20) | Ending Account Value (03/31/21) | Expenses Paid During Period* | Beginning Account Value (10/01/20) | Ending Account Value (03/31/21) | Expenses Paid During Period* | Net Annualized Expense Ratio** |
| **PIMCO High Yield Spectrum Fund** | | | | | | | |
| Institutional Class | $ 1,000.00 | $ 1,080.00 | $ 3.16 | $ 1,000.00 | $ 1,021.89 | $ 3.07 | 0.61% |
| I-2 | 1,000.00 | 1,079.50 | 3.68 | 1,000.00 | 1,021.39 | 3.58 | 0.71 |
| I-3 | 1,000.00 | 1,079.20 | 3.94 | 1,000.00 | 1,021.14 | 3.83 | 0.76 |
| Class A | 1,000.00 | 1,078.10 | 4.97 | 1,000.00 | 1,020.14 | 4.84 | 0.96 |
| Class C | 1,000.00 | 1,074.10 | 8.84 | 1,000.00 | 1,016.40 | 8.60 | 1.71 |
| **PIMCO Long-Term Credit Bond Fund** | | | | | | | |
| Institutional Class | $ 1,000.00 | $   966.40 | $ 2.79 | $ 1,000.00 | $ 1,022.09 | $ 2.87 | 0.57% |
| I-2 | 1,000.00 | 965.90 | 3.28 | 1,000.00 | 1,021.59 | 3.38 | 0.67 |
| **PIMCO Low Duration Credit Fund** | | | | | | | |
| Institutional Class | $ 1,000.00 | $ 1,036.20 | $ 3.76 | $ 1,000.00 | $ 1,021.24 | $ 3.73 | 0.74% |
| I-2 | 1,000.00 | 1,035.70 | 4.26 | 1,000.00 | 1,020.74 | 4.23 | 0.84 |
| Class A | 1,000.00 | 1,034.70 | 5.28 | 1,000.00 | 1,019.75 | 5.24 | 1.04 |
| Class C | 1,000.00 | 1,030.80 | 9.06 | 1,000.00 | 1,016.01 | 9.00 | 1.79 |
| **PIMCO Low Duration Income Fund** | | | | | | | |
| Institutional Class | $ 1,000.00 | $ 1,043.30 | $ 2.70 | $ 1,000.00 | $ 1,022.29 | $ 2.67 | 0.53% |
| I-2 | 1,000.00 | 1,042.70 | 3.21 | 1,000.00 | 1,021.79 | 3.18 | 0.63 |
| I-3 | 1,000.00 | 1,042.50 | 3.46 | 1,000.00 | 1,021.54 | 3.43 | 0.68 |
| Class A | 1,000.00 | 1,041.20 | 4.73 | 1,000.00 | 1,020.29 | 4.68 | 0.93 |
| Class C | 1,000.00 | 1,039.60 | 6.25 | 1,000.00 | 1,018.80 | 6.19 | 1.23 |
| Class C-2(b) | 1,000.00 | 1,038.60 | 6.43 | 1,000.00 | 1,015.75 | 6.36 | 1.43 |
| **PIMCO Preferred and Capital Securities Fund (Consolidated)** | | | | | | | |
| Institutional Class | $ 1,000.00 | $ 1,077.70 | $ 4.14 | $ 1,000.00 | $ 1,020.94 | $ 4.03 | 0.80% |
| I-2 | 1,000.00 | 1,077.20 | 4.66 | 1,000.00 | 1,020.44 | 4.53 | 0.90 |
| I-3 | 1,000.00 | 1,076.80 | 4.92 | 1,000.00 | 1,020.19 | 4.78 | 0.95 |
| Class A | 1,000.00 | 1,076.30 | 5.95 | 1,000.00 | 1,019.20 | 5.79 | 1.15 |
| Class C | 1,000.00 | 1,072.50 | 9.82 | 1,000.00 | 1,015.46 | 9.55 | 1.90 |

* Expenses Paid During Period are equal to the net annualized expense ratio for the class, multiplied by the average account value over the period, multiplied by 182/365 (to reflect the one-half year period).

** Net Annualized Expense Ratio is reflective of any applicable contractual fee waivers and/or expense reimbursements or voluntary fee waivers. Details regarding fee waivers, if any, can be found in Note 9, Fees and Expenses, in the Notes to Financial Statements.

(a) The Beginning Account Value is reflective as of 09/30/20 which is the Fund's inception date.

(b) The Beginning Account Value is reflective as of 10/21/20 for Actual expense. Expenses paid in the Actual expense section are equal to the net annualized expense ratio for the class, multiplied by the average account value over the period, multiplied by 161/365 for Class C-2 shares of the PIMCO Low Duration Income Fund (to reflect the period since the inception date of 10/21/20). Hypothetical expenses reflect an amount as if the class had been operational for the entire fiscal half year.

# Benchmark Descriptions

| Index* | Benchmark Description |
|---|---|
| 50% ICE BofAML 1-5 Year US High Yield Constrained Index and 50% J.P. Morgan Leveraged Loan Index | The benchmark is a blend of 50% ICE BofAML 1-5 Year US High Yield Constrained Index and 50% J.P. Morgan Leveraged Loan Index. The ICE BofAML 1-5 Year US High Yield Constrained Index is designed to track the performance of short-term U.S. dollar denominated below investment grade corporate debt publicly issued in the U.S. domestic market with at least one year and less than five years remaining term to final maturity, at least 18 months to final maturity at issuance, a fixed coupon schedule and a minimum amount outstanding of $250 million. The J.P. Morgan Leveraged Loan Index is designed to mirror the investable universe of USD institutional leveraged loans and is comprised of issuers domiciled across global markets (the international component is comprised of developed market-domiciled issuers only). |
| 1/3 each — Bloomberg Barclays Global Aggregate Credit ex Emerging Markets, USD Hedged; ICE BofAML BB-B Rated Developed Markets High Yield Constrained Index, USD Hedged; and JPMorgan EMBI Global, USD Hedged | The Bloomberg Barclays Global Aggregate Credit ex Emerging Markets (USD Hedged) provides a broad-based measure of the global developed markets investment-grade fixed income markets. The ICE BofAML BB-B Rated Developed Markets High Yield Constrained Index (USD Hedged) tracks the performance of below investment grade bonds of corporate issuers domiciled in developed market countries rated BB1 through B3, based on an average of Moody's, S&P and Fitch. Qualifying bonds are capitalization-weighted provided the total allocation to an individual issuer (defined by Bloomberg tickers) does not exceed 2%. Issuers that exceed the limit are reduced to 2% and the face value of each of their bonds is adjusted on a pro-rata basis. Similarly, the face value of bonds of all other issuers that fall below the 2% cap are increased on a pro-rata basis. The index is rebalanced on the last calendar day of the month. The JPMorgan EMBI Global (USD Hedged) tracks total returns for U.S. dollar-denominated debt instruments issued by emerging market sovereign and quasi-sovereign entities, Brady bonds, loans, Eurobonds and local market instruments. |
| 3 Month USD LIBOR | The 3 Month USD LIBOR (London Interbank Offered Rate) is an average interest rate, determined by the ICE Benchmark Administration, that banks charge one another for the use of short-term money (3 months) in England's Eurodollar market. |
| 70% ICE BofAML 8% Constrained Core West Preferred & Jr Subordinated Securities Index (P8JC) and 30% ICE BofAML Contingent Capital Index (COCO) | The benchmark is a blend of 70% ICE BofAML 8% Constrained Core West Preferred & Jr Subordinated Securities Index (P8JC) and 30% ICE BofAML Contingent Capital Index (COCO). The ICE BofAML 8% Constrained Core West Preferred & Jr Subordinated Securities Index tracks the performance of US dollar denominated high grade and high yield preferred securities and deeply subordinated corporate debt issued in the US domestic market. Qualifying securities must be rated at least B3, based on an average of Moody's, S&P and Fitch and have a country of risk of either the U.S. or a Western European country. Qualifying preferred securities must be issued as public securities or through a 144a filing, must have a fixed or floating dividend schedule and must have a minimum amount outstanding of $100 million. The ICE BofAML Contingent Capital Index tracks the performance of investment grade and below investment grade contingent capital debt publicly issued in the major domestic and eurobond markets. Qualifying securities must have a capital-dependent conversion feature and must be rated by either Moody's, S&P or Fitch. In addition, qualifying securities must have at least one month remaining term to final maturity and at least 18 months to maturity at point of issuance. For investment grade debt, qualifying currencies and their respective minimum size requirements (in local currency terms) are: AUD 100 million; CAD 100 million; EUR 250 million; JPY 20 billion; GBP 100 million; and USD 250 million. For below investment grade debt, minimum size requirements are CAD 100 million, EUR 100 million, GBP 50 million, or USD 100 million. |
| Bloomberg Barclays Global Credit Hedged USD Index | Bloomberg Barclays Global Credit Hedged USD contains investment grade and high yield credit securities from the Multiverse represented in US Dollars on a hedged basis, (Multiverse is the merger of two groups: the Global Aggregate and the Global High Yield). |
| Bloomberg Barclays U.S. Aggregate 1-3 Years Index | Bloomberg Barclays U.S. Aggregate 1-3 Years Index represents securities that are SEC-registered, taxable, and dollar denominated with a maturity between one and three years. The index covers the U.S. investment grade fixed rate bond market, with index components for government and corporate securities, mortgage pass-through securities, and asset-backed securities. |
| Bloomberg Barclays U.S. Aggregate Index | Bloomberg Barclays U.S. Aggregate Index represents securities that are SEC-registered, taxable, and dollar denominated. The index covers the U.S. investment grade fixed rate bond market, with index components for government and corporate securities, mortgage pass-through securities, and asset-backed securities. These major sectors are subdivided into more specific indices that are calculated and reported on a regular basis. |

## Benchmark Descriptions (Cont.)

| Index* | Benchmark Description |
|---|---|
| Bloomberg Barclays U.S. Long Credit Index | Bloomberg Barclays U.S. Long Credit Index includes both corporate and non-corporate sectors with maturities equal to or greater than 10 years. The corporate sectors are Industrial, Utility, and Finance, which include both U.S. and non-U.S. corporations. The non-corporate sectors are Sovereign, Supranational, Foreign Agency, and Foreign Local Government. |
| ICE BofAML Developed Markets High Yield Constrained (USD Hedged) Index | The ICE BofAML Developed Markets High Yield Constrained (USD Hedged) Index is a subcomponent of the ICE BofAML Global High Yield Constrained (USD Hedged) Index that excludes all non-developed countries. |
| J.P. Morgan BB/B Leveraged Loan Index | The J.P. Morgan BB/B Leveraged Loan Index is a subset of the broader Leveraged Loan Index, and as such follows all of the same inclusion rules, loan selection methodology and the rebalance process, with the sole exception being the tranche rating criteria. |

\* It is not possible to invest directly in an unmanaged index.

(THIS PAGE INTENTIONALLY LEFT BLANK)

# Financial Highlights

| Selected Per Share Data for the Year or Period Ended^: | Net Asset Value Beginning of Year or Period(a) | Net Investment Income (Loss)(b) | Net Realized/ Unrealized Gain (Loss) | Total | From Net Investment Income | From Net Realized Capital Gains | Tax Basis Return of Capital | Total |
|---|---|---|---|---|---|---|---|---|
| | | Investment Operations | | | Less Distributions(c) | | | |
| **PIMCO Credit Opportunities Bond Fund** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 03/31/2021 | $ 9.07 | $ 0.30 | $ 0.97 | $ 1.27 | $ (0.35) | $ 0.00 | $ 0.00 | $ (0.35) |
| 03/31/2020 | 9.90 | 0.41 | (0.85) | (0.44) | (0.39) | 0.00 | 0.00 | (0.39) |
| 03/31/2019 | 10.08 | 0.46 | (0.19) | 0.27 | (0.45) | 0.00 | 0.00 | (0.45) |
| 03/31/2018 | 10.04 | 0.38 | 0.06 | 0.44 | (0.40) | 0.00 | 0.00 | (0.40) |
| 03/31/2017 | 9.32 | 0.44 | 0.59 | 1.03 | (0.31) | 0.00 | 0.00 | (0.31) |
| I-2 | | | | | | | | |
| 03/31/2021 | 9.03 | 0.29 | 0.96 | 1.25 | (0.34) | 0.00 | 0.00 | (0.34) |
| 03/31/2020 | 9.86 | 0.40 | (0.84) | (0.44) | (0.39) | 0.00 | 0.00 | (0.39) |
| 03/31/2019 | 10.05 | 0.45 | (0.20) | 0.25 | (0.44) | 0.00 | 0.00 | (0.44) |
| 03/31/2018 | 10.01 | 0.38 | 0.05 | 0.43 | (0.39) | 0.00 | 0.00 | (0.39) |
| 03/31/2017 | 9.30 | 0.42 | 0.60 | 1.02 | (0.31) | 0.00 | 0.00 | (0.31) |
| Class A | | | | | | | | |
| 03/31/2021 | 9.08 | 0.26 | 0.97 | 1.23 | (0.31) | 0.00 | 0.00 | (0.31) |
| 03/31/2020 | 9.91 | 0.37 | (0.84) | (0.47) | (0.36) | 0.00 | 0.00 | (0.36) |
| 03/31/2019 | 10.10 | 0.42 | (0.20) | 0.22 | (0.41) | 0.00 | 0.00 | (0.41) |
| 03/31/2018 | 10.06 | 0.35 | 0.05 | 0.40 | (0.36) | 0.00 | 0.00 | (0.36) |
| 03/31/2017 | 9.34 | 0.42 | 0.58 | 1.00 | (0.28) | 0.00 | 0.00 | (0.28) |
| Class C | | | | | | | | |
| 03/31/2021 | 8.95 | 0.18 | 0.95 | 1.13 | (0.23) | 0.00 | 0.00 | (0.23) |
| 03/31/2020 | 9.78 | 0.30 | (0.84) | (0.54) | (0.29) | 0.00 | 0.00 | (0.29) |
| 03/31/2019 | 9.96 | 0.34 | (0.19) | 0.15 | (0.33) | 0.00 | 0.00 | (0.33) |
| 03/31/2018 | 9.94 | 0.26 | 0.05 | 0.31 | (0.29) | 0.00 | 0.00 | (0.29) |
| 03/31/2017 | 9.26 | 0.33 | 0.58 | 0.91 | (0.23) | 0.00 | 0.00 | (0.23) |
| **PIMCO Diversified Income Fund** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 03/31/2021 | $ 10.21 | $ 0.34 | $ 0.89 | $ 1.23 | $ (0.40) | $ 0.00 | $ 0.00 | $ (0.40) |
| 03/31/2020 | 10.86 | 0.35 | (0.48) | (0.13) | (0.50) | (0.02) | 0.00 | (0.52) |
| 03/31/2019 | 10.77 | 0.37 | 0.20 | 0.57 | (0.48) | 0.00 | 0.00 | (0.48) |
| 03/31/2018 | 10.78 | 0.37 | 0.14 | 0.51 | (0.51) | 0.00 | (0.01) | (0.52) |
| 03/31/2017 | 10.15 | 0.47 | 0.68 | 1.15 | (0.52) | 0.00 | 0.00 | (0.52) |
| I-2 | | | | | | | | |
| 03/31/2021 | 10.21 | 0.33 | 0.89 | 1.22 | (0.39) | 0.00 | 0.00 | (0.39) |
| 03/31/2020 | 10.86 | 0.34 | (0.48) | (0.14) | (0.49) | (0.02) | 0.00 | (0.51) |
| 03/31/2019 | 10.77 | 0.35 | 0.20 | 0.55 | (0.46) | 0.00 | 0.00 | (0.46) |
| 03/31/2018 | 10.78 | 0.35 | 0.15 | 0.50 | (0.50) | 0.00 | (0.01) | (0.51) |
| 03/31/2017 | 10.15 | 0.46 | 0.68 | 1.14 | (0.51) | 0.00 | 0.00 | (0.51) |
| I-3 | | | | | | | | |
| 03/31/2021 | 10.21 | 0.32 | 0.90 | 1.22 | (0.39) | 0.00 | 0.00 | (0.39) |
| 03/31/2020 | 10.86 | 0.34 | (0.49) | (0.15) | (0.48) | (0.02) | 0.00 | (0.50) |
| 04/27/2018 - 03/31/2019 | 10.72 | 0.35 | 0.22 | 0.57 | (0.43) | 0.00 | 0.00 | (0.43) |
| Administrative Class | | | | | | | | |
| 03/31/2021 | 10.21 | 0.31 | 0.90 | 1.21 | (0.38) | 0.00 | 0.00 | (0.38) |
| 03/31/2020 | 10.86 | 0.33 | (0.49) | (0.16) | (0.47) | (0.02) | 0.00 | (0.49) |
| 03/31/2019 | 10.77 | 0.36 | 0.18 | 0.54 | (0.45) | 0.00 | 0.00 | (0.45) |
| 03/31/2018 | 10.78 | 0.34 | 0.14 | 0.48 | (0.48) | 0.00 | (0.01) | (0.49) |
| 03/31/2017 | 10.15 | 0.44 | 0.68 | 1.12 | (0.49) | 0.00 | 0.00 | (0.49) |
| Class A | | | | | | | | |
| 03/31/2021 | 10.21 | 0.29 | 0.90 | 1.19 | (0.36) | 0.00 | 0.00 | (0.36) |
| 03/31/2020 | 10.86 | 0.31 | (0.49) | (0.18) | (0.45) | (0.02) | 0.00 | (0.47) |
| 03/31/2019 | 10.77 | 0.32 | 0.20 | 0.52 | (0.43) | 0.00 | 0.00 | (0.43) |
| 03/31/2018 | 10.78 | 0.32 | 0.14 | 0.46 | (0.46) | 0.00 | (0.01) | (0.47) |
| 03/31/2017 | 10.15 | 0.43 | 0.68 | 1.11 | (0.48) | 0.00 | 0.00 | (0.48) |
| Class C | | | | | | | | |
| 03/31/2021 | 10.21 | 0.21 | 0.90 | 1.11 | (0.28) | 0.00 | 0.00 | (0.28) |
| 03/31/2020 | 10.86 | 0.23 | (0.49) | (0.26) | (0.37) | (0.02) | 0.00 | (0.39) |
| 03/31/2019 | 10.77 | 0.24 | 0.20 | 0.44 | (0.35) | 0.00 | 0.00 | (0.35) |
| 03/31/2018 | 10.78 | 0.24 | 0.14 | 0.38 | (0.38) | 0.00 | (0.01) | (0.39) |
| 03/31/2017 | 10.15 | 0.35 | 0.68 | 1.03 | (0.40) | 0.00 | 0.00 | (0.40) |

| | | | Ratios/Supplemental Data | | | | | |
| | | | Ratios to Average Net Assets | | | | | |
| Net Asset Value End of Year or Period[a] | Total Return[a] | Net Assets End of Year or Period (000s) | Expenses | Expenses Excluding Waivers | Expenses Excluding Interest Expense | Expenses Excluding Interest Expense and Waivers | Net Investment Income (Loss) | Portfolio Turnover Rate |
|---|---|---|---|---|---|---|---|---|
| $ 9.99 | 14.06% | $ 268,038 | 0.90% | 0.90% | 0.90% | 0.90% | 3.10% | 99% |
| 9.07 | (4.69) | 232,487 | 0.92 | 0.92 | 0.90 | 0.90 | 4.13 | 138 |
| 9.90 | 2.77 | 289,576 | 0.93 | 0.93 | 0.90 | 0.90 | 4.60 | 110 |
| 10.08 | 4.38 | 353,288 | 0.91 | 0.91 | 0.90 | 0.90 | 3.72 | 100 |
| 10.04 | 11.23 | 342,617 | 0.91 | 0.91 | 0.90 | 0.90 | 4.50 | 146 |
| 9.94 | 13.92 | 115,116 | 1.00 | 1.00 | 1.00 | 1.00 | 3.01 | 99 |
| 9.03 | (4.78) | 55,030 | 1.02 | 1.02 | 1.00 | 1.00 | 4.03 | 138 |
| 9.86 | 2.58 | 47,743 | 1.03 | 1.03 | 1.00 | 1.00 | 4.51 | 110 |
| 10.05 | 4.33 | 58,119 | 1.01 | 1.01 | 1.00 | 1.00 | 3.71 | 100 |
| 10.01 | 11.10 | 28,172 | 1.01 | 1.01 | 1.00 | 1.00 | 4.25 | 146 |
| 10.00 | 13.61 | 19,542 | 1.30 | 1.30 | 1.30 | 1.30 | 2.68 | 99 |
| 9.08 | (5.01) | 19,607 | 1.32 | 1.32 | 1.30 | 1.30 | 3.73 | 138 |
| 9.91 | 2.24 | 23,099 | 1.33 | 1.33 | 1.30 | 1.30 | 4.20 | 110 |
| 10.10 | 4.03 | 30,228 | 1.31 | 1.31 | 1.30 | 1.30 | 3.41 | 100 |
| 10.06 | 10.79 | 10,740 | 1.31 | 1.31 | 1.30 | 1.30 | 4.30 | 146 |
| 9.85 | 12.73 | 3,866 | 2.05 | 2.05 | 2.05 | 2.05 | 1.91 | 99 |
| 8.95 | (5.75) | 5,206 | 2.07 | 2.07 | 2.05 | 2.05 | 3.00 | 138 |
| 9.78 | 1.63 | 5,834 | 2.08 | 2.08 | 2.05 | 2.05 | 3.45 | 110 |
| 9.96 | 3.13 | 7,532 | 2.06 | 2.06 | 2.05 | 2.05 | 2.58 | 100 |
| 9.94 | 9.91 | 6,835 | 2.06 | 2.06 | 2.05 | 2.05 | 3.43 | 146 |
| $ 11.04 | 12.15% | $ 4,132,019 | 0.77% | 0.77% | 0.75% | 0.75% | 3.04% | 110% |
| 10.21 | (1.45) | 2,852,619 | 0.79 | 0.79 | 0.75 | 0.75 | 3.19 | 127 |
| 10.86 | 5.45 | 2,627,609 | 0.79 | 0.79 | 0.75 | 0.75 | 3.45 | 105 |
| 10.77 | 4.75 | 2,558,977 | 0.77 | 0.77 | 0.75 | 0.75 | 3.36 | 146 |
| 10.78 | 11.53 | 2,383,388 | 0.77 | 0.77 | 0.76 | 0.76 | 4.42 | 156 |
| 11.04 | 12.04 | 670,322 | 0.87 | 0.87 | 0.85 | 0.85 | 2.94 | 110 |
| 10.21 | (1.55) | 335,490 | 0.89 | 0.89 | 0.85 | 0.85 | 3.07 | 127 |
| 10.86 | 5.34 | 169,410 | 0.89 | 0.89 | 0.85 | 0.85 | 3.35 | 105 |
| 10.77 | 4.64 | 129,856 | 0.87 | 0.87 | 0.85 | 0.85 | 3.25 | 146 |
| 10.78 | 11.42 | 84,476 | 0.87 | 0.87 | 0.86 | 0.86 | 4.27 | 156 |
| 11.04 | 11.98 | 27,498 | 0.92 | 0.97 | 0.90 | 0.95 | 2.88 | 110 |
| 10.21 | (1.60) | 13,637 | 0.94 | 0.99 | 0.90 | 0.95 | 3.03 | 127 |
| 10.86 | 5.47 | 3,619 | 0.94* | 0.99* | 0.90* | 0.95* | 3.55* | 105 |
| 11.04 | 11.87 | 10,752 | 1.02 | 1.02 | 1.00 | 1.00 | 2.83 | 110 |
| 10.21 | (1.70) | 159,259 | 1.04 | 1.04 | 1.00 | 1.00 | 2.94 | 127 |
| 10.86 | 5.19 | 155,936 | 1.04 | 1.04 | 1.00 | 1.00 | 3.36 | 105 |
| 10.77 | 4.49 | 10,049 | 1.02 | 1.02 | 1.00 | 1.00 | 3.12 | 146 |
| 10.78 | 11.25 | 12,535 | 1.02 | 1.02 | 1.01 | 1.01 | 4.09 | 156 |
| 11.04 | 11.71 | 361,780 | 1.17 | 1.17 | 1.15 | 1.15 | 2.64 | 110 |
| 10.21 | (1.84) | 297,090 | 1.19 | 1.19 | 1.15 | 1.15 | 2.78 | 127 |
| 10.86 | 5.03 | 251,911 | 1.19 | 1.19 | 1.15 | 1.15 | 3.04 | 105 |
| 10.77 | 4.33 | 260,394 | 1.17 | 1.17 | 1.15 | 1.15 | 2.97 | 146 |
| 10.78 | 11.09 | 167,491 | 1.17 | 1.17 | 1.16 | 1.16 | 4.02 | 156 |
| 11.04 | 10.87 | 67,889 | 1.92 | 1.92 | 1.90 | 1.90 | 1.89 | 110 |
| 10.21 | (2.58) | 77,114 | 1.94 | 1.94 | 1.90 | 1.90 | 2.04 | 127 |
| 10.86 | 4.25 | 73,261 | 1.94 | 1.94 | 1.90 | 1.90 | 2.29 | 105 |
| 10.77 | 3.56 | 82,085 | 1.92 | 1.92 | 1.90 | 1.90 | 2.22 | 146 |
| 10.78 | 10.26 | 104,368 | 1.92 | 1.92 | 1.91 | 1.91 | 3.29 | 156 |

## Financial Highlights (Cont.)

| Selected Per Share Data for the Year or Period Ended^: | Net Asset Value Beginning of Year or Period(a) | Investment Operations | | | Less Distributions(c) | | | |
|---|---|---|---|---|---|---|---|---|
| | | Net Investment Income (Loss)(b) | Net Realized/ Unrealized Gain (Loss) | Total | From Net Investment Income | From Net Realized Capital Gains | Tax Basis Return of Capital | Total |
| **PIMCO ESG Income Fund** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 09/30/2020 - 03/31/2021 | $ 10.00 | $ 0.10 | $ 0.34 | $ 0.44 | $ (0.09) | $ 0.00 | $ 0.00 | $ (0.09) |
| I-2 | | | | | | | | |
| 09/30/2020 - 03/31/2021 | 10.00 | 0.09 | 0.35 | 0.44 | (0.09) | 0.00 | 0.00 | (0.09) |
| I-3 | | | | | | | | |
| 09/30/2020 - 03/31/2021 | 10.00 | 0.09 | 0.34 | 0.43 | (0.08) | 0.00 | 0.00 | (0.08) |
| Class A | | | | | | | | |
| 09/30/2020 - 03/31/2021 | 10.00 | 0.07 | 0.35 | 0.42 | (0.07) | 0.00 | 0.00 | (0.07) |
| Class C | | | | | | | | |
| 09/30/2020 - 03/31/2021 | 10.00 | 0.03 | 0.35 | 0.38 | (0.03) | 0.00 | 0.00 | (0.03) |
| **PIMCO High Yield Spectrum Fund** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 03/31/2021 | $ 8.58 | $ 0.45 | $ 1.47 | $ 1.92 | $ (0.47) | $ 0.00 | $ 0.00 | $ (0.47) |
| 03/31/2020 | 9.71 | 0.54 | (1.12) | (0.58) | (0.55) | 0.00 | 0.00 | (0.55) |
| 03/31/2019 | 9.78 | 0.57 | (0.07) | 0.50 | (0.57) | 0.00 | 0.00 | (0.57) |
| 03/31/2018 | 9.93 | 0.55 | (0.14) | 0.41 | (0.30) | 0.00 | (0.26) | (0.56) |
| 03/31/2017 | 9.22 | 0.58 | 0.77 | 1.35 | (0.64) | 0.00 | 0.00 | (0.64) |
| I-2 | | | | | | | | |
| 03/31/2021 | 8.58 | 0.44 | 1.47 | 1.91 | (0.46) | 0.00 | 0.00 | (0.46) |
| 03/31/2020 | 9.71 | 0.52 | (1.11) | (0.59) | (0.54) | 0.00 | 0.00 | (0.54) |
| 03/31/2019 | 9.78 | 0.56 | (0.06) | 0.50 | (0.57) | 0.00 | 0.00 | (0.57) |
| 03/31/2018 | 9.93 | 0.54 | (0.14) | 0.40 | (0.29) | 0.00 | (0.26) | (0.55) |
| 03/31/2017 | 9.22 | 0.57 | 0.77 | 1.34 | (0.63) | 0.00 | 0.00 | (0.63) |
| I-3 | | | | | | | | |
| 03/31/2021 | 8.58 | 0.43 | 1.48 | 1.91 | (0.46) | 0.00 | 0.00 | (0.46) |
| 03/31/2020 | 9.71 | 0.52 | (1.12) | (0.60) | (0.53) | 0.00 | 0.00 | (0.53) |
| 04/27/2018 - 03/31/2019 | 9.81 | 0.52 | (0.10) | 0.42 | (0.52) | 0.00 | 0.00 | (0.52) |
| Class A | | | | | | | | |
| 03/31/2021 | 8.58 | 0.42 | 1.47 | 1.89 | (0.44) | 0.00 | 0.00 | (0.44) |
| 03/31/2020 | 9.71 | 0.50 | (1.12) | (0.62) | (0.51) | 0.00 | 0.00 | (0.51) |
| 03/31/2019 | 9.78 | 0.54 | (0.07) | 0.47 | (0.54) | 0.00 | 0.00 | (0.54) |
| 03/31/2018 | 9.93 | 0.52 | (0.14) | 0.38 | (0.27) | 0.00 | (0.26) | (0.53) |
| 03/31/2017 | 9.22 | 0.54 | 0.77 | 1.31 | (0.60) | 0.00 | 0.00 | (0.60) |
| Class C | | | | | | | | |
| 03/31/2021 | 8.58 | 0.36 | 1.46 | 1.82 | (0.37) | 0.00 | 0.00 | (0.37) |
| 03/31/2020 | 9.71 | 0.42 | (1.11) | (0.69) | (0.44) | 0.00 | 0.00 | (0.44) |
| 03/31/2019 | 9.78 | 0.47 | (0.07) | 0.40 | (0.47) | 0.00 | 0.00 | (0.47) |
| 03/31/2018 | 9.93 | 0.44 | (0.14) | 0.30 | (0.19) | 0.00 | (0.26) | (0.45) |
| 03/31/2017 | 9.22 | 0.47 | 0.77 | 1.24 | (0.53) | 0.00 | 0.00 | (0.53) |
| **PIMCO Long-Term Credit Bond Fund** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 03/31/2021 | $ 12.08 | $ 0.50 | $ 0.74 | $ 1.24 | $ (0.58) | $ (0.46) | $ 0.00 | $ (1.04) |
| 03/31/2020 | 11.69 | 0.48 | 0.54 | 1.02 | (0.59) | (0.04) | 0.00 | (0.63) |
| 03/31/2019 | 11.83 | 0.49 | 0.08 | 0.57 | (0.49) | (0.15) | (0.07) | (0.71) |
| 03/31/2018 | 11.63 | 0.53 | 0.25 | 0.78 | (0.58) | 0.00 | 0.00 | (0.58) |
| 03/31/2017 | 11.40 | 0.56 | 0.32 | 0.88 | (0.60) | 0.00 | (0.05) | (0.65) |
| I-2 | | | | | | | | |
| 03/31/2021 | 12.08 | 0.49 | 0.73 | 1.22 | (0.56) | (0.46) | 0.00 | (1.02) |
| 03/31/2020 | 11.69 | 0.47 | 0.54 | 1.01 | (0.58) | (0.04) | 0.00 | (0.62) |
| 03/31/2019 | 11.83 | 0.48 | 0.08 | 0.56 | (0.48) | (0.15) | (0.07) | (0.70) |
| 03/31/2018 | 11.63 | 0.52 | 0.25 | 0.77 | (0.57) | 0.00 | 0.00 | (0.57) |
| 03/31/2017 | 11.40 | 0.54 | 0.33 | 0.87 | (0.59) | 0.00 | (0.05) | (0.64) |
| **PIMCO Low Duration Credit Fund** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 03/31/2021 | $ 8.63 | $ 0.31 | $ 0.70 | $ 1.01 | $ (0.33) | $ 0.00 | $ 0.00 | $ (0.33) |
| 03/31/2020 | 9.73 | 0.43 | (1.06) | (0.63) | (0.47) | 0.00 | 0.00 | (0.47) |
| 03/31/2019 | 9.90 | 0.41 | (0.14) | 0.27 | (0.44) | 0.00 | 0.00 | (0.44) |
| 03/31/2018 | 9.94 | 0.35 | 0.01 | 0.36 | (0.38) | 0.00 | (0.02) | (0.40) |
| 03/31/2017 | 9.65 | 0.35 | 0.31 | 0.66 | (0.37) | 0.00 | 0.00 | (0.37) |

| | | | Ratios/Supplemental Data | | | | | |
| | | | Ratios to Average Net Assets | | | | | |
| Net Asset Value End of Year or Period(a) | Total Return(a) | Net Assets End of Year or Period (000s) | Expenses | Expenses Excluding Waivers | Expenses Excluding Interest Expense | Expenses Excluding Interest Expense and Waivers | Net Investment Income (Loss) | Portfolio Turnover Rate |
|---|---|---|---|---|---|---|---|---|
| $ 10.35 | 4.43% | $  37,125 | 0.52%* | 1.14%* | 0.50%* | 1.12%* | 1.87%* | 135% |
| 10.35 | 4.38 | 1,421 | 0.62* | 1.24* | 0.60* | 1.22* | 1.81* | 135 |
| 10.35 | 4.35 | 45 | 0.72* | 1.34* | 0.70* | 1.32* | 1.69* | 135 |
| 10.35 | 4.23 | 23 | 0.92* | 1.54* | 0.90* | 1.52* | 1.46* | 135 |
| 10.35 | 3.85 | 90 | 1.67* | 2.29* | 1.65* | 2.27* | 0.67* | 135 |
| $ 10.03 | 22.77% | $ 170,488 | 0.62% | 0.62% | 0.60% | 0.60% | 4.67% | 39% |
| 8.58 | (6.52) | 101,092 | 0.62 | 0.62 | 0.60 | 0.60 | 5.47 | 27 |
| 9.71 | 5.36 | 603,647 | 0.63 | 0.63 | 0.60 | 0.60 | 5.93 | 26 |
| 9.78 | 4.15 | 655,038 | 0.62 | 0.62 | 0.60 | 0.60 | 5.53 | 24 |
| 9.93 | 14.98 | 1,505,442 | 0.61 | 0.61 | 0.60 | 0.60 | 5.92 | 35 |
| 10.03 | 22.65 | 238,069 | 0.72 | 0.72 | 0.70 | 0.70 | 4.60 | 39 |
| 8.58 | (6.61) | 134,676 | 0.72 | 0.72 | 0.70 | 0.70 | 5.34 | 27 |
| 9.71 | 5.26 | 193,934 | 0.73 | 0.73 | 0.70 | 0.70 | 5.85 | 26 |
| 9.78 | 4.05 | 150,910 | 0.72 | 0.72 | 0.70 | 0.70 | 5.45 | 24 |
| 9.93 | 14.87 | 142,214 | 0.71 | 0.71 | 0.70 | 0.70 | 5.82 | 35 |
| 10.03 | 22.59 | 3,621 | 0.77 | 0.82 | 0.75 | 0.80 | 4.41 | 39 |
| 8.58 | (6.66) | 445 | 0.77 | 0.82 | 0.75 | 0.80 | 5.28 | 27 |
| 9.71 | 4.45 | 2,142 | 0.78* | 0.83* | 0.75* | 0.80* | 5.91* | 26 |
| 10.03 | 22.35 | 54,395 | 0.97 | 0.97 | 0.95 | 0.95 | 4.43 | 39 |
| 8.58 | (6.85) | 50,039 | 0.97 | 0.97 | 0.95 | 0.95 | 5.08 | 27 |
| 9.71 | 5.00 | 63,446 | 0.98 | 0.98 | 0.95 | 0.95 | 5.58 | 26 |
| 9.78 | 3.79 | 83,841 | 0.97 | 0.97 | 0.95 | 0.95 | 5.21 | 24 |
| 9.93 | 14.58 | 43,592 | 0.96 | 0.96 | 0.95 | 0.95 | 5.55 | 35 |
| 10.03 | 21.44 | 5,265 | 1.72 | 1.72 | 1.70 | 1.70 | 3.72 | 39 |
| 8.58 | (7.54) | 6,862 | 1.72 | 1.72 | 1.70 | 1.70 | 4.33 | 27 |
| 9.71 | 4.22 | 8,118 | 1.73 | 1.73 | 1.70 | 1.70 | 4.83 | 26 |
| 9.78 | 3.02 | 10,506 | 1.72 | 1.72 | 1.70 | 1.70 | 4.44 | 24 |
| 9.93 | 13.73 | 9,777 | 1.71 | 1.71 | 1.70 | 1.70 | 4.81 | 35 |
| $ 12.28 | 9.84% | $ 3,483,341 | 0.59% | 0.59% | 0.55% | 0.55% | 3.79% | 103% |
| 12.08 | 8.59 | 3,313,697 | 0.84 | 0.84 | 0.55 | 0.55 | 3.84 | 180 |
| 11.69 | 5.20 | 3,576,056 | 0.79 | 0.79 | 0.55 | 0.55 | 4.33 | 133 |
| 11.83 | 6.76 | 3,309,210 | 0.85 | 0.85 | 0.55 | 0.55 | 4.43 | 96 |
| 11.63 | 7.79 | 2,805,317 | 0.72 | 0.72 | 0.55 | 0.55 | 4.70 | 114 |
| 12.28 | 9.73 | 133,698 | 0.69 | 0.69 | 0.65 | 0.65 | 3.69 | 103 |
| 12.08 | 8.49 | 197,002 | 0.94 | 0.94 | 0.65 | 0.65 | 3.71 | 180 |
| 11.69 | 5.10 | 71,189 | 0.89 | 0.89 | 0.65 | 0.65 | 4.23 | 133 |
| 11.83 | 6.66 | 54,410 | 0.95 | 0.95 | 0.65 | 0.65 | 4.34 | 96 |
| 11.63 | 7.68 | 41,527 | 0.82 | 0.82 | 0.65 | 0.65 | 4.56 | 114 |
| $ 9.31 | 11.85% | $ 210,739 | 0.73% | 0.73% | 0.70% | 0.70% | 3.42% | 184% |
| 8.63 | (6.94) | 151,077 | 0.75 | 0.75 | 0.70 | 0.70 | 4.42 | 49 |
| 9.73 | 2.74 | 171,645 | 0.75 | 0.75 | 0.70 | 0.70 | 4.15 | 42 |
| 9.90 | 3.66 | 1,269,665 | 0.72 | 0.72 | 0.70 | 0.70 | 3.55 | 34 |
| 9.94 | 6.96 | 1,148,303 | 0.74 | 0.74 | 0.70 | 0.70 | 3.53 | 19 |

# Financial Highlights (Cont.)

| | | Investment Operations | | | Less Distributions[c] | | | |
|---|---|---|---|---|---|---|---|---|
| Selected Per Share Data for the Year or Period Ended^: | Net Asset Value Beginning of Year or Period[a] | Net Investment Income (Loss)[b] | Net Realized/ Unrealized Gain (Loss) | Total | From Net Investment Income | From Net Realized Capital Gains | Tax Basis Return of Capital | Total |
| **PIMCO Low Duration Credit Fund (Cont.)** | | | | | | | | |
| I-2 | | | | | | | | |
| 03/31/2021 | $ 8.63 | $ 0.31 | $ 0.69 | $ 1.00 | $ (0.32) | $ 0.00 | $ 0.00 | $ (0.32) |
| 03/31/2020 | 9.73 | 0.42 | (1.06) | (0.64) | (0.46) | 0.00 | 0.00 | (0.46) |
| 03/31/2019 | 9.90 | 0.42 | (0.16) | 0.26 | (0.43) | 0.00 | 0.00 | (0.43) |
| 03/31/2018 | 9.94 | 0.34 | 0.01 | 0.35 | (0.37) | 0.00 | (0.02) | (0.39) |
| 03/31/2017 | 9.65 | 0.34 | 0.31 | 0.65 | (0.36) | 0.00 | 0.00 | (0.36) |
| Class A | | | | | | | | |
| 03/31/2021 | 8.63 | 0.29 | 0.70 | 0.99 | (0.31) | 0.00 | 0.00 | (0.31) |
| 03/31/2020 | 9.73 | 0.40 | (1.06) | (0.66) | (0.44) | 0.00 | 0.00 | (0.44) |
| 03/31/2019 | 9.90 | 0.39 | (0.15) | 0.24 | (0.41) | 0.00 | 0.00 | (0.41) |
| 03/31/2018 | 9.94 | 0.32 | 0.01 | 0.33 | (0.35) | 0.00 | (0.02) | (0.37) |
| 03/31/2017 | 9.65 | 0.32 | 0.31 | 0.63 | (0.34) | 0.00 | 0.00 | (0.34) |
| Class C | | | | | | | | |
| 03/31/2021 | 8.63 | 0.21 | 0.71 | 0.92 | (0.24) | 0.00 | 0.00 | (0.24) |
| 03/31/2020 | 9.73 | 0.33 | (1.06) | (0.73) | (0.37) | 0.00 | 0.00 | (0.37) |
| 03/31/2019 | 9.90 | 0.32 | (0.16) | 0.16 | (0.33) | 0.00 | 0.00 | (0.33) |
| 03/31/2018 | 9.94 | 0.25 | 0.00 | 0.25 | (0.27) | 0.00 | (0.02) | (0.29) |
| 03/31/2017 | 9.65 | 0.25 | 0.31 | 0.56 | (0.27) | 0.00 | 0.00 | (0.27) |
| **PIMCO Low Duration Income Fund** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 03/31/2021 | $ 7.95 | $ 0.25 | $ 0.75 | $ 1.00 | $ (0.23) | $ 0.00 | $ (0.05) | $ (0.28) |
| 03/31/2020 | 8.58 | 0.32 | (0.55) | (0.23) | (0.40) | 0.00 | 0.00 | (0.40) |
| 03/31/2019 | 8.56 | 0.30 | 0.01 | 0.31 | (0.29) | 0.00 | 0.00 | (0.29) |
| 03/31/2018 | 8.46 | 0.27 | 0.09 | 0.36 | (0.26) | 0.00 | 0.00 | (0.26) |
| 03/31/2017 | 7.67 | 0.35 | 0.74 | 1.09 | (0.30) | 0.00 | 0.00 | (0.30) |
| I-2 | | | | | | | | |
| 03/31/2021 | 7.95 | 0.24 | 0.75 | 0.99 | (0.22) | 0.00 | (0.05) | (0.27) |
| 03/31/2020 | 8.58 | 0.31 | (0.55) | (0.24) | (0.39) | 0.00 | 0.00 | (0.39) |
| 03/31/2019 | 8.56 | 0.30 | 0.00 | 0.30 | (0.28) | 0.00 | 0.00 | (0.28) |
| 03/31/2018 | 8.46 | 0.26 | 0.09 | 0.35 | (0.25) | 0.00 | 0.00 | (0.25) |
| 03/31/2017 | 7.67 | 0.32 | 0.76 | 1.08 | (0.29) | 0.00 | 0.00 | (0.29) |
| I-3 | | | | | | | | |
| 03/31/2021 | 7.95 | 0.24 | 0.75 | 0.99 | (0.22) | 0.00 | (0.05) | (0.27) |
| 03/31/2020 | 8.58 | 0.31 | (0.56) | (0.25) | (0.38) | 0.00 | 0.00 | (0.38) |
| 04/27/2018 - 03/31/2019 | 8.54 | 0.29 | 0.01 | 0.30 | (0.26) | 0.00 | 0.00 | (0.26) |
| Class A | | | | | | | | |
| 03/31/2021 | 7.95 | 0.22 | 0.75 | 0.97 | (0.20) | 0.00 | (0.05) | (0.25) |
| 03/31/2020 | 8.58 | 0.28 | (0.55) | (0.27) | (0.36) | 0.00 | 0.00 | (0.36) |
| 03/31/2019 | 8.56 | 0.27 | 0.01 | 0.28 | (0.26) | 0.00 | 0.00 | (0.26) |
| 03/31/2018 | 8.46 | 0.23 | 0.09 | 0.32 | (0.22) | 0.00 | 0.00 | (0.22) |
| 03/31/2017 | 7.67 | 0.31 | 0.75 | 1.06 | (0.27) | 0.00 | 0.00 | (0.27) |
| Class C | | | | | | | | |
| 03/31/2021 | 7.95 | 0.19 | 0.75 | 0.94 | (0.17) | 0.00 | (0.05) | (0.22) |
| 03/31/2020 | 8.58 | 0.26 | (0.55) | (0.29) | (0.34) | 0.00 | 0.00 | (0.34) |
| 03/31/2019 | 8.56 | 0.24 | 0.01 | 0.25 | (0.23) | 0.00 | 0.00 | (0.23) |
| 03/31/2018 | 8.46 | 0.20 | 0.10 | 0.30 | (0.20) | 0.00 | 0.00 | (0.20) |
| 03/31/2017 | 7.67 | 0.29 | 0.75 | 1.04 | (0.25) | 0.00 | 0.00 | (0.25) |
| Class C-2 | | | | | | | | |
| 10/21/2020 - 03/31/2021 | 8.47 | 0.08 | 0.20 | 0.28 | (0.03) | 0.00 | (0.05) | (0.08) |
| **PIMCO Preferred and Capital Securities Fund (Consolidated)** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 03/31/2021 | $ 9.23 | $ 0.40 | $ 1.88 | $ 2.28 | $ (0.41) | $ 0.00 | $ 0.00 | $ (0.41) |
| 03/31/2020 | 9.98 | 0.41 | (0.63) | (0.22) | (0.50) | (0.03) | 0.00 | (0.53) |
| 03/31/2019 | 10.31 | 0.46 | (0.18) | 0.28 | (0.59) | (0.01) | (0.01) | (0.61) |
| 03/31/2018 | 10.22 | 0.41 | 0.43 | 0.84 | (0.72) | (0.03) | 0.00 | (0.75) |
| 03/31/2017 | 9.44 | 0.46 | 0.94 | 1.40 | (0.62) | 0.00 | 0.00 | (0.62) |

| | | | Ratios/Supplemental Data | | | | | |
| | | | Ratios to Average Net Assets | | | | | |
| Net Asset Value End of Year or Period[a] | Total Return[a] | Net Assets End of Year or Period (000s) | Expenses | Expenses Excluding Waivers | Expenses Excluding Interest Expense | Expenses Excluding Interest Expense and Waivers | Net Investment Income (Loss) | Portfolio Turnover Rate |
|---|---|---|---|---|---|---|---|---|
| $ 9.31 | 11.74% | $ 22,046 | 0.83% | 0.83% | 0.80% | 0.80% | 3.34% | 184% |
| 8.63 | (7.03) | 25,932 | 0.85 | 0.85 | 0.80 | 0.80 | 4.30 | 49 |
| 9.73 | 2.64 | 38,809 | 0.85 | 0.85 | 0.80 | 0.80 | 4.25 | 42 |
| 9.90 | 3.56 | 22,172 | 0.82 | 0.82 | 0.80 | 0.80 | 3.47 | 34 |
| 9.94 | 6.85 | 13,970 | 0.84 | 0.84 | 0.80 | 0.80 | 3.44 | 19 |
| 9.31 | 11.52 | 54,219 | 1.03 | 1.03 | 1.00 | 1.00 | 3.16 | 184 |
| 8.63 | (7.22) | 52,228 | 1.05 | 1.05 | 1.00 | 1.00 | 4.13 | 49 |
| 9.73 | 2.44 | 89,364 | 1.05 | 1.05 | 1.00 | 1.00 | 4.02 | 42 |
| 9.90 | 3.35 | 94,579 | 1.02 | 1.02 | 1.00 | 1.00 | 3.24 | 34 |
| 9.94 | 6.63 | 87,065 | 1.04 | 1.04 | 1.00 | 1.00 | 3.24 | 19 |
| 9.31 | 10.68 | 9,975 | 1.78 | 1.78 | 1.75 | 1.75 | 2.34 | 184 |
| 8.63 | (7.91) | 22,627 | 1.80 | 1.80 | 1.75 | 1.75 | 3.39 | 49 |
| 9.73 | 1.68 | 46,421 | 1.80 | 1.80 | 1.75 | 1.75 | 3.27 | 42 |
| 9.90 | 2.58 | 44,916 | 1.77 | 1.77 | 1.75 | 1.75 | 2.48 | 34 |
| 9.94 | 5.84 | 55,559 | 1.79 | 1.79 | 1.75 | 1.75 | 2.49 | 19 |
| $ 8.67 | 12.72% | $ 2,204,463 | 0.54% | 0.54% | 0.51% | 0.51% | 2.96% | 410% |
| 7.95 | (2.94) | 1,644,585 | 0.55 | 0.55 | 0.51 | 0.51 | 3.77 | 432 |
| 8.58 | 3.70 | 1,682,347 | 0.58 | 0.59 | 0.50 | 0.51 | 3.55 | 207 |
| 8.56 | 4.29 | 705,766 | 0.50 | 0.55 | 0.46 | 0.51 | 3.21 | 128 |
| 8.46 | 14.45 | 95,776 | 0.61[d] | 0.62[d] | 0.55[d] | 0.56[d] | 4.23 | 243 |
| 8.67 | 12.61 | 3,109,079 | 0.64 | 0.64 | 0.61 | 0.61 | 2.85 | 410 |
| 7.95 | (3.04) | 2,246,989 | 0.65 | 0.65 | 0.61 | 0.61 | 3.64 | 432 |
| 8.58 | 3.60 | 1,854,130 | 0.68 | 0.69 | 0.60 | 0.61 | 3.49 | 207 |
| 8.56 | 4.19 | 509,577 | 0.60 | 0.65 | 0.56 | 0.61 | 3.10 | 128 |
| 8.46 | 14.34 | 55,138 | 0.71[e] | 0.72[e] | 0.65[e] | 0.66[e] | 3.85 | 243 |
| 8.67 | 12.57 | 87,455 | 0.69 | 0.74 | 0.66 | 0.71 | 2.82 | 410 |
| 7.95 | (3.09) | 20,116 | 0.70 | 0.75 | 0.66 | 0.71 | 3.63 | 432 |
| 8.58 | 3.56 | 39,161 | 0.73* | 0.79* | 0.65* | 0.71* | 3.69* | 207 |
| 8.67 | 12.28 | 1,784,043 | 0.94 | 0.94 | 0.91 | 0.91 | 2.55 | 410 |
| 7.95 | (3.33) | 1,322,295 | 0.95 | 0.95 | 0.91 | 0.91 | 3.33 | 432 |
| 8.58 | 3.29 | 1,056,714 | 0.98 | 0.99 | 0.90 | 0.91 | 3.16 | 207 |
| 8.56 | 3.87 | 533,327 | 0.90 | 0.95 | 0.86 | 0.91 | 2.70 | 128 |
| 8.46 | 14.00 | 169,743 | 1.01[f] | 1.02[f] | 0.95[f] | 0.96[f] | 3.77 | 243 |
| 8.67 | 11.95 | 212,807 | 1.24 | 1.24 | 1.21 | 1.21 | 2.25 | 410 |
| 7.95 | (3.62) | 200,678 | 1.25 | 1.25 | 1.21 | 1.21 | 3.07 | 432 |
| 8.58 | 2.98 | 190,628 | 1.28 | 1.29 | 1.20 | 1.21 | 2.85 | 207 |
| 8.56 | 3.56 | 101,717 | 1.20 | 1.25 | 1.16 | 1.21 | 2.34 | 128 |
| 8.46 | 13.65 | 85,943 | 1.31[f] | 1.32[f] | 1.25[f] | 1.26[f] | 3.53 | 243 |
| 8.67 | 3.35 | 3,209 | 1.44* | 1.44* | 1.41* | 1.41* | 2.04* | 410 |
| $ 11.10 | 24.86% | $ 1,216,087 | 0.81% | 0.91% | 0.79% | 0.89% | 3.74% | 59% |
| 9.23 | (2.68) | 788,615 | 0.79 | 0.87 | 0.78 | 0.86 | 3.92 | 67 |
| 9.98 | 2.83 | 259,798 | 0.82 | 0.91 | 0.81 | 0.90 | 4.58 | 57 |
| 10.31 | 8.28 | 119,949 | 0.80 | 0.87 | 0.80 | 0.87 | 3.94 | 151 |
| 10.22 | 15.22 | 60,707 | 0.80 | 0.87 | 0.80 | 0.87 | 4.62 | 123 |

## Financial Highlights (Cont.)

| Selected Per Share Data for the Year or Period Ended^: | | Investment Operations | | | | Less Distributions[c] | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Net Asset Value Beginning of Year or Period[a] | Net Investment Income (Loss)[b] | Net Realized/ Unrealized Gain (Loss) | Total | From Net Investment Income | From Net Realized Capital Gains | Tax Basis Return of Capital | Total |
| **PIMCO Preferred and Capital Securities Fund (Consolidated) (Cont.)** | | | | | | | | |
| I-2 | | | | | | | | |
| 03/31/2021 | $ 9.21 | $ 0.39 | $ 1.88 | $ 2.27 | $ (0.40) | $ 0.00 | $ 0.00 | $ (0.40) |
| 03/31/2020 | 9.97 | 0.40 | (0.64) | (0.24) | (0.49) | (0.03) | 0.00 | (0.52) |
| 03/31/2019 | 10.30 | 0.45 | (0.18) | 0.27 | (0.58) | (0.01) | (0.01) | (0.60) |
| 03/31/2018 | 10.21 | 0.40 | 0.43 | 0.83 | (0.71) | (0.03) | 0.00 | (0.74) |
| 03/31/2017 | 9.45 | 0.42 | 0.96 | 1.38 | (0.62) | 0.00 | 0.00 | (0.62) |
| I-3 | | | | | | | | |
| 03/31/2021 | 9.20 | 0.38 | 1.88 | 2.26 | (0.40) | 0.00 | 0.00 | (0.40) |
| 03/31/2020 | 9.95 | 0.40 | (0.63) | (0.23) | (0.49) | (0.03) | 0.00 | (0.52) |
| 04/27/2018 - 03/31/2019 | 10.32 | 0.43 | (0.19) | 0.24 | (0.59) | (0.01) | (0.01) | (0.61) |
| Class A | | | | | | | | |
| 03/31/2021 | 9.19 | 0.36 | 1.88 | 2.24 | (0.38) | 0.00 | 0.00 | (0.38) |
| 03/31/2020 | 9.95 | 0.37 | (0.63) | (0.26) | (0.47) | (0.03) | 0.00 | (0.50) |
| 03/31/2019 | 10.29 | 0.43 | (0.19) | 0.24 | (0.56) | (0.01) | (0.01) | (0.58) |
| 03/31/2018 | 10.22 | 0.38 | 0.42 | 0.80 | (0.70) | (0.03) | 0.00 | (0.73) |
| 03/31/2017 | 9.43 | 0.42 | 0.95 | 1.37 | (0.58) | 0.00 | 0.00 | (0.58) |
| Class C | | | | | | | | |
| 03/31/2021 | 9.19 | 0.28 | 1.87 | 2.15 | (0.31) | 0.00 | 0.00 | (0.31) |
| 08/23/2019 - 03/31/2020 | 10.48 | 0.16 | (1.08) | (0.92) | (0.34) | (0.03) | 0.00 | (0.37) |

^   A zero balance may reflect actual amounts rounding to less than $0.01 or 0.01%.

*   Annualized

(a)   Includes adjustments required by U.S. GAAP and may differ from net asset values and performance reported elsewhere by the Funds.

(b)   Per share amounts based on average number of shares outstanding during the year or period.

(c)   The tax characterization of distributions is determined in accordance with Federal income tax regulations. See Note 2, Distributions to Shareholders, in the Notes to Financial Statements for more information.

(d)   Effective January 23, 2017, the Class's supervisory and administrative fee was decreased by 0.05% to an annual rate of 0.20%.

(e)   Effective January 23, 2017, the Class's supervisory and administrative fee was decreased by 0.05% to an annual rate of 0.30%.

(f)   Effective January 23, 2017, the Class's supervisory and administrative fee was decreased by 0.05% to an annual rate of 0.35%.

| | | | | | Ratios/Supplemental Data | | | |
| | | | | | Ratios to Average Net Assets | | | |
| Net Asset Value End of Year or Period[a] | Total Return[a] | Net Assets End of Year or Period (000s) | Expenses | Expenses Excluding Waivers | Expenses Excluding Interest Expense | Expenses Excluding Interest Expense and Waivers | Net Investment Income (Loss) | Portfolio Turnover Rate |
|---|---|---|---|---|---|---|---|---|
| $ 11.08 | 24.81% | $ 318,242 | 0.91% | 1.01% | 0.89% | 0.99% | 3.65% | 59% |
| 9.21 | (2.87) | 230,245 | 0.89 | 0.97 | 0.88 | 0.96 | 3.85 | 67 |
| 9.97 | 2.76 | 130,385 | 0.92 | 1.01 | 0.91 | 1.00 | 4.51 | 57 |
| 10.30 | 8.27 | 36,539 | 0.90 | 0.97 | 0.90 | 0.97 | 3.82 | 151 |
| 10.21 | 14.92 | 6,002 | 0.90 | 0.97 | 0.90 | 0.97 | 4.19 | 123 |
| 11.06 | 24.68 | 42,310 | 0.96 | 1.11 | 0.94 | 1.09 | 3.60 | 59 |
| 9.20 | (2.80) | 28,048 | 0.94 | 1.07 | 0.93 | 1.06 | 3.80 | 67 |
| 9.95 | 2.49 | 11,782 | 0.97* | 1.11* | 0.96* | 1.10* | 4.79* | 57 |
| 11.05 | 24.46 | 302,567 | 1.16 | 1.26 | 1.14 | 1.24 | 3.40 | 59 |
| 9.19 | (3.06) | 264,206 | 1.17 | 1.22 | 1.13 | 1.21 | 3.57 | 67 |
| 9.95 | 2.50 | 119,215 | 1.17 | 1.26 | 1.16 | 1.25 | 4.29 | 57 |
| 10.29 | 7.88 | 35,464 | 1.15 | 1.22 | 1.15 | 1.22 | 3.63 | 151 |
| 10.22 | 14.79 | 1,954 | 1.15 | 1.22 | 1.15 | 1.22 | 4.22 | 123 |
| 11.03 | 23.53 | 20,136 | 1.91 | 2.01 | 1.89 | 1.99 | 2.65 | 59 |
| 9.19 | (9.21) | 12,500 | 1.89* | 1.97* | 1.88* | 1.96* | 2.64* | 67 |

## Statements of Assets and Liabilities

| (Amounts in thousands[†], except per share amounts) | PIMCO Credit Opportunities Bond Fund | PIMCO Diversified Income Fund | PIMCO ESG Income Fund | PIMCO High Yield Spectrum Fund | PIMCO Long-Term Credit Bond Fund | PIMCO Low Duration Credit Fund | PIMCO Low Duration Income Fund |
|---|---|---|---|---|---|---|---|
| **Assets:** | | | | | | | |
| *Investments, at value* | | | | | | | |
| Investments in securities* | $ 317,460 | $ 5,000,202 | $ 36,955 | $ 427,660 | $ 4,243,108 | $ 266,096 | $ 9,408,017 |
| Investments in Affiliates | 87,527 | 492,982 | 0 | 39,266 | 55,745 | 24,973 | 34,466 |
| *Financial Derivative Instruments* | | | | | | | |
| Exchange-traded or centrally cleared | 350 | 2,938 | 12 | 85 | 3,163 | 0 | 7,463 |
| Over the counter | 1,773 | 17,247 | 116 | 2,590 | 14,027 | 532 | 61,149 |
| Cash | 648 | 1,857 | 3,173 | 106 | 0 | 4,029 | 20 |
| Deposits with counterparty | 9,997 | 2,538 | 188 | 2,571 | 23,574 | 0 | 41,866 |
| Foreign currency, at value | 619 | 5,346 | 26 | 3 | 5,850 | 24 | 30,385 |
| Receivable for investments sold | 3,279 | 109 | 2 | 757 | 9,064 | 22,047 | 6,493 |
| Receivable for TBA investments sold | 13,493 | 279,613 | 2,665 | 0 | 194,657 | 0 | 2,718,507 |
| Receivable for Fund shares sold | 997 | 4,582 | 1,634 | 173 | 6,105 | 136 | 29,516 |
| Interest and/or dividends receivable | 2,822 | 45,259 | 193 | 5,714 | 37,143 | 1,033 | 40,364 |
| Dividends receivable from Affiliates | 13 | 109 | 0 | 9 | 3 | 4 | 3 |
| Reimbursement receivable from PIMCO | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Prepaid expenses | 0 | 0 | 0 | 10 | 0 | 23 | 0 |
| Other assets | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| **Total Assets** | 438,978 | 5,852,783 | 44,964 | 478,944 | 4,592,441 | 318,897 | 12,378,249 |
| **Liabilities:** | | | | | | | |
| *Borrowings & Other Financing Transactions* | | | | | | | |
| Payable for reverse repurchase agreements | $ 2,168 | $ 13,497 | $ 852 | $ 0 | $ 567,377 | $ 0 | $ 442,931 |
| Payable for sale-buyback transactions | 0 | 0 | 0 | 0 | 2,226 | 0 | 4,390 |
| Payable for short sales | 1,501 | 0 | 0 | 0 | 0 | 0 | 733,804 |
| *Financial Derivative Instruments* | | | | | | | |
| Exchange-traded or centrally cleared | 78 | 831 | 0 | 0 | 861 | 0 | 1,583 |
| Over the counter | 870 | 1,472 | 47 | 3 | 6,868 | 2 | 47,945 |
| Payable for investments purchased | 2,900 | 15,630 | 995 | 3,174 | 44,624 | 19,614 | 156,348 |
| Payable for investments in Affiliates purchased | 13 | 109 | 0 | 9 | 3 | 4 | 3 |
| Payable for TBA investments purchased | 18,472 | 519,410 | 4,335 | 0 | 334,299 | 0 | 3,513,713 |
| Payable for unfunded loan commitments | 1,294 | 2,997 | 0 | 136 | 5,473 | 1,347 | 299 |
| Deposits from counterparty | 842 | 17,197 | 0 | 2,330 | 9,152 | 280 | 53,541 |
| Payable for Fund shares redeemed | 3,945 | 6,848 | 17 | 1,043 | 2,346 | 426 | 16,321 |
| Distributions payable | 0 | 940 | 0 | 120 | 460 | 15 | 2,184 |
| Overdraft due to custodian | 0 | 0 | 0 | 0 | 69 | 0 | 0 |
| Accrued investment advisory fees | 209 | 2,003 | 7 | 120 | 888 | 107 | 1,816 |
| Accrued supervisory and administrative fees | 117 | 1,451 | 7 | 146 | 750 | 84 | 1,726 |
| Accrued distribution fees | 2 | 46 | 0 | 4 | 0 | 6 | 55 |
| Accrued servicing fees | 5 | 92 | 0 | 13 | 0 | 14 | 420 |
| Accrued taxes payable | 0 | 0 | 0 | 0 | 0 | 0 | 98 |
| Accrued reimbursement to PIMCO | 0 | 0 | 0 | 0 | 0 | 0 | 16 |
| Other liabilities | 0 | 0 | 0 | 8 | 6 | 19 | 0 |
| **Total Liabilities** | 32,416 | 582,523 | 6,260 | 7,106 | 975,402 | 21,918 | 4,977,193 |
| **Net Assets** | $ 406,562 | $ 5,270,260 | $ 38,704 | $ 471,838 | $ 3,617,039 | $ 296,979 | $ 7,401,056 |
| **Net Assets Consist of:** | | | | | | | |
| Paid in capital | $ 451,627 | $ 5,255,214 | $ 38,486 | $ 511,140 | $ 3,385,900 | $ 362,012 | $ 7,565,128 |
| Distributable earnings (accumulated loss) | (45,065) | 15,046 | 218 | (39,302) | 231,139 | (65,033) | (164,072) |
| **Net Assets** | $ 406,562 | $ 5,270,260 | $ 38,704 | $ 471,838 | $ 3,617,039 | $ 296,979 | $ 7,401,056 |
| Cost of investments in securities | $ 311,652 | $ 4,912,841 | $ 36,974 | $ 415,855 | $ 4,123,967 | $ 260,398 | $ 9,413,827 |
| Cost of investments in Affiliates | $ 87,421 | $ 492,959 | $ 0 | $ 39,225 | $ 55,750 | $ 24,974 | $ 34,466 |
| Cost of foreign currency held | $ 671 | $ 5,088 | $ 28 | $ 2 | $ 6,609 | $ 24 | $ 30,628 |
| Proceeds received on short sales | $ 1,433 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 733,686 |
| Cost or premiums of financial derivative instruments, net | $ 2,388 | $ 39,194 | $ 82 | $ 1,787 | $ 35,407 | $ 0 | $ 25,856 |
| * Includes repurchase agreements of: | $ 1,597 | $ 0 | $ 0 | $ 0 | $ 5,943 | $ 0 | $ 33,560 |

† A zero balance may reflect actual amounts rounding to less than one thousand.

See Accompanying Notes

March 31, 2021

| | PIMCO Credit Opportunities Bond Fund | PIMCO Diversified Income Fund | PIMCO ESG Income Fund | PIMCO High Yield Spectrum Fund | PIMCO Long-Term Credit Bond Fund | PIMCO Low Duration Credit Fund | PIMCO Low Duration Income Fund |
|---|---|---|---|---|---|---|---|
| **Net Assets:** | | | | | | | |
| Institutional Class | $ 268,038 | $ 4,132,019 | $ 37,125 | $ 170,488 | $ 3,483,341 | $ 210,739 | $ 2,204,463 |
| I-2 | 115,116 | 670,322 | 1,421 | 238,069 | 133,698 | 22,046 | 3,109,079 |
| I-3 | N/A | 27,498 | 45 | 3,621 | N/A | N/A | 87,455 |
| Administrative Class | N/A | 10,752 | N/A | N/A | N/A | N/A | N/A |
| Class A | 19,542 | 361,780 | 23 | 54,395 | N/A | 54,219 | 1,784,043 |
| Class C | 3,866 | 67,889 | 90 | 5,265 | N/A | 9,975 | 212,807 |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | 3,209 |
| | | | | | | | |
| **Shares Issued and Outstanding:** | | | | | | | |
| Institutional Class | 26,834 | 374,313 | 3,588 | 17,005 | 283,666 | 22,637 | 254,185 |
| I-2 | 11,578 | 60,723 | 137 | 23,746 | 10,888 | 2,368 | 358,496 |
| I-3 | N/A | 2,491 | 4 | 361 | N/A | N/A | 10,084 |
| Administrative Class | N/A | 974 | N/A | N/A | N/A | N/A | N/A |
| Class A | 1,955 | 32,774 | 2 | 5,426 | N/A | 5,824 | 205,709 |
| Class C | 393 | 6,150 | 9 | 525 | N/A | 1,071 | 24,538 |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | 370 |
| | | | | | | | |
| **Net Asset Value Per Share Outstanding[a]:** | | | | | | | |
| Institutional Class | $    9.99 | $    11.04 | $    10.35 | $    10.03 | $    12.28 | $    9.31 | $    8.67 |
| I-2 | 9.94 | 11.04 | 10.35 | 10.03 | 12.28 | 9.31 | 8.67 |
| I-3 | N/A | 11.04 | 10.35 | 10.03 | N/A | N/A | 8.67 |
| Administrative Class | N/A | 11.04 | N/A | N/A | N/A | N/A | N/A |
| Class A | 10.00 | 11.04 | 10.35 | 10.03 | N/A | 9.31 | 8.67 |
| Class C | 9.85 | 11.04 | 10.35 | 10.03 | N/A | 9.31 | 8.67 |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | 8.67 |

[a] Includes adjustments required by U.S. GAAP and may differ from net asset values and performance reported elsewhere by the Funds.

## Consolidated Statement of Assets and Liabilities

|  | PIMCO Preferred and Capital Securities Fund |
|---|---|
| (Amounts in thousands†, except per share amounts) |  |
| **Assets:** |  |
| *Investments, at value* |  |
| Investments in securities* | $ 1,832,564 |
| Investments in Affiliates | 78,277 |
| *Financial Derivative Instruments* |  |
| Exchange-traded or centrally cleared | 923 |
| Over the counter | 18,746 |
| Cash | 2,747 |
| Deposits with counterparty | 11,232 |
| Foreign currency, at value | 2,790 |
| Receivable for investments sold | 1,009 |
| Receivable for Fund shares sold | 1,530 |
| Interest and/or dividends receivable | 18,568 |
| Dividends receivable from Affiliates | 12 |
| Reimbursement receivable from PIMCO | 187 |
| **Total Assets** | 1,968,585 |
| **Liabilities:** |  |
| *Borrowings & Other Financing Transactions* |  |
| Payable for reverse repurchase agreements | $ 39,487 |
| *Financial Derivative Instruments* |  |
| Exchange-traded or centrally cleared | 657 |
| Over the counter | 1,625 |
| Payable for investments purchased | 6,598 |
| Payable for investments in Affiliates purchased | 12 |
| Deposits from counterparty | 17,582 |
| Payable for Fund shares redeemed | 1,545 |
| Accrued investment advisory fees | 835 |
| Accrued supervisory and administrative fees | 673 |
| Accrued distribution fees | 12 |
| Accrued servicing fees | 68 |
| Other liabilities | 149 |
| **Total Liabilities** | 69,243 |
| **Net Assets** | $ 1,899,342 |
| **Net Assets Consist of:** |  |
| Paid in capital | $ 1,786,209 |
| Distributable earnings (accumulated loss) | 113,133 |
| **Net Assets** | $ 1,899,342 |
| Cost of investments in securities | $ 1,735,592 |
| Cost of investments in Affiliates | $ 78,268 |
| Cost of foreign currency held | $ 2,858 |
| Cost or premiums of financial derivative instruments, net | $ 1,296 |
| * Includes repurchase agreements of: | $ 78,225 |

† A zero balance may reflect actual amounts rounding to less than one thousand.

| | PIMCO Preferred and Capital Securities Fund |
|---|---|
| **Net Assets:** | |
| Institutional Class | $ 1,216,087 |
| I-2 | 318,242 |
| I-3 | 42,310 |
| Class A | 302,567 |
| Class C | 20,136 |
| | |
| **Shares Issued and Outstanding:** | |
| Institutional Class | 109,541 |
| I-2 | 28,734 |
| I-3 | 3,826 |
| Class A | 27,381 |
| Class C | 1,826 |
| | |
| **Net Asset Value Per Share Outstanding**[a]**:** | |
| Institutional Class | $ 11.10 |
| I-2 | 11.08 |
| I-3 | 11.06 |
| Class A | 11.05 |
| Class C | 11.03 |

[a] Includes adjustments required by U.S. GAAP and may differ from net asset values and performance reported elsewhere by the Fund.

## Statements of Operations

Year Ended March 31, 2021

| (Amounts in thousands[1]) | PIMCO Credit Opportunities Bond Fund | PIMCO Diversified Income Fund | PIMCO ESG Income Fund[a] | PIMCO High Yield Spectrum Fund | PIMCO Long-Term Credit Bond Fund | PIMCO Low Duration Credit Fund | PIMCO Low Duration Income Fund |
|---|---|---|---|---|---|---|---|
| **Investment Income:** | | | | | | | |
| Interest, net of foreign taxes* | $ 15,406 | $ 180,569 | $ 187 | $ 21,177 | $ 162,625 | $ 18,345 | $ 208,561 |
| Dividends | 0 | 1,274 | 0 | 0 | 1,531 | 0 | 1,254 |
| Dividends from Investments in Affiliates | 286 | 726 | 0 | 122 | 145 | 141 | 37 |
| Total Income | 15,692 | 182,569 | 187 | 21,299 | 164,301 | 18,486 | 209,852 |
| **Expenses:** | | | | | | | |
| Investment advisory fees | 2,351 | 21,522 | 19 | 1,198 | 11,242 | 1,776 | 18,021 |
| Supervisory and administrative fees | 1,311 | 15,599 | 19 | 1,465 | 9,529 | 1,389 | 17,144 |
| Distribution and/or servicing fees - Administrative Class | N/A | 299 | N/A | N/A | N/A | N/A | N/A |
| Distribution fees - Class C | 38 | 612 | 0 | 53 | N/A | 128 | 621 |
| Distribution fees - C-2 | N/A | N/A | N/A | N/A | N/A | N/A | 2[b] |
| Servicing fees - Class A | 55 | 860 | 0 | 137 | N/A | 125 | 3,699 |
| Servicing fees - Class C | 13 | 204 | 0 | 18 | N/A | 43 | 517 |
| Servicing fees - C-2 | N/A | N/A | N/A | N/A | N/A | N/A | 1[b] |
| Trustee fees | 2 | 26 | 0 | 2 | 23 | 2 | 35 |
| Interest expense | 18 | 1,070 | 2 | 69 | 1,428 | 135 | 1,883 |
| Organizational expense | 0 | 0 | 98 | 0 | 0 | 0 | 0 |
| Miscellaneous expense | 5 | 47 | 0 | 6 | 47 | 6 | 365 |
| Total Expenses | 3,793 | 40,239 | 138 | 2,948 | 22,269 | 3,604 | 42,288 |
| Waiver and/or Reimbursement by PIMCO | 0 | (12) | (97) | (0) | 0 | 0 | (57) |
| Net Expenses | 3,793 | 40,227 | 41 | 2,948 | 22,269 | 3,604 | 42,231 |
| **Net Investment Income (Loss)** | 11,899 | 142,342 | 146 | 18,351 | 142,032 | 14,882 | 167,621 |
| **Net Realized Gain (Loss):** | | | | | | | |
| Investments in securities | 77 | (18,964) | (14) | (8,687) | 228,001 | 12,824 | 28,633 |
| Investments in Affiliates | (77) | 17 | 0 | 49 | 357 | 301 | (8) |
| Exchange-traded or centrally cleared financial derivative instruments | 310 | (6,009) | 3 | (139) | (32,437) | (2,049) | (144,334) |
| Over the counter financial derivative instruments | (344) | (24,090) | (55) | (2,140) | 9,899 | (742) | (35,848) |
| Short sales | (776) | 30 | 0 | 0 | 0 | 0 | (26) |
| Foreign currency | (315) | (4,281) | 22 | (934) | (1,050) | (1,664) | (5,443) |
| **Net Realized Gain (Loss)** | (1,125) | (53,297) | (44) | (11,851) | 204,770 | 8,670 | (157,026) |
| **Net Change in Unrealized Appreciation (Depreciation):** | | | | | | | |
| Investments in securities | 32,867 | 295,819 | (19) | 63,813 | (41,137) | 27,777 | 326,397 |
| Investments in Affiliates | 347 | 989 | 0 | 54 | (26) | 34 | (1) |
| Exchange-traded or centrally cleared financial derivative instruments | 2,332 | 80,242 | 197 | 1,601 | 62,758 | 580 | 300,557 |
| Over the counter financial derivative instruments | 1,248 | 23,617 | 85 | 3,313 | 14,614 | 998 | 47,849 |
| Short sales | 618 | 0 | 0 | 0 | 0 | 0 | 0 |
| Foreign currency assets and liabilities | (54) | (2,800) | (2) | (387) | (728) | (182) | (4,595) |
| **Net Change in Unrealized Appreciation (Depreciation)** | 37,358 | 397,867 | 261 | 68,394 | 35,481 | 29,207 | 670,207 |
| **Net Increase (Decrease) in Net Assets Resulting from Operations** | $ 48,132 | $ 486,912 | $ 363 | $ 74,894 | $ 382,283 | $ 52,759 | $ 680,802 |
| * Foreign tax withholdings | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 99 |

[†] A zero balance may reflect actual amounts rounding to less than one thousand.
[a] Inception date of the Fund was September 30, 2020.
[b] Inception date of Class C-2 was October 21, 2020.

## Consolidated Statement of Operations

Year Ended March 31, 2021

|  | PIMCO Preferred and Capital Securities Fund |
|---|---|
| (Amounts in thousands[†]) | |
| **Investment Income:** | |
| Interest, net of foreign taxes* | $ 74,597 |
| Dividends | 3,671 |
| Dividends from Investments in Affiliates | 322 |
| Total Income | 78,590 |
| | |
| **Expenses:** | |
| Investment advisory fees | 8,814 |
| Supervisory and administrative fees | 7,191 |
| Distribution fees - Class C | 127 |
| Servicing fees - Class A | 722 |
| Servicing fees - Class C | 42 |
| Trustee fees | 9 |
| Interest expense | 264 |
| Miscellaneous expense | 6 |
| Total Expenses | 17,175 |
| Waiver and/or Reimbursement by PIMCO | (1,744) |
| Net Expenses | 15,431 |
| | |
| **Net Investment Income (Loss)** | 63,159 |
| | |
| **Net Realized Gain (Loss):** | |
| Investments in securities | 48,868 |
| Investments in Affiliates | 94 |
| Exchange-traded or centrally cleared financial derivative instruments | (6,343) |
| Over the counter financial derivative instruments | (41,241) |
| Foreign currency | (3,013) |
| | |
| **Net Realized Gain (Loss)** | (1,635) |
| | |
| **Net Change in Unrealized Appreciation (Depreciation):** | |
| Investments in securities | 267,586 |
| Investments in Affiliates | 9 |
| Exchange-traded or centrally cleared financial derivative instruments | 4,889 |
| Over the counter financial derivative instruments | 14,689 |
| Foreign currency assets and liabilities | (947) |
| | |
| **Net Change in Unrealized Appreciation (Depreciation)** | 286,226 |
| | |
| **Net Increase (Decrease) in Net Assets Resulting from Operations** | $ 347,750 |
| | |
| * Foreign tax withholdings | $    150 |

[†]  A zero balance may reflect actual amounts rounding to less than one thousand.

## Statements of Changes in Net Assets

| | PIMCO Credit Opportunities Bond Fund | | PIMCO Diversified Income Fund | | PIMCO ESG Income Fund |
|---|---|---|---|---|---|
| (Amounts in thousands†) | Year Ended March 31, 2021 | Year Ended March 31, 2020 | Year Ended March 31, 2021 | Year Ended March 31, 2020 | Inception date through March 31, 2021[a] |
| **Increase (Decrease) in Net Assets from:** | | | | | |
| **Operations:** | | | | | |
| Net investment income (loss) | $  11,899 | $  16,704 | $  142,342 | $  123,630 | $  146 |
| Net realized gain (loss) | (1,125) | 7,747 | (53,297) | 101,111 | (44) |
| Net change in unrealized appreciation (depreciation) | 37,358 | (37,789) | 397,867 | (321,601) | 261 |
| **Net Increase (Decrease) in Net Assets Resulting from Operations** | 48,132 | (13,338) | 486,912 | (96,860) | 363 |
| **Distributions to Shareholders:** | | | | | |
| From net investment income and/or net realized capital gains | | | | | |
| Institutional Class | (9,582) | (12,786) | (133,148) | (139,643) | (145) |
| I-2 | (3,420) | (2,265) | (19,957) | (19,963) | (0) |
| I-3 | N/A | N/A | (861) | (457) | (0) |
| Administrative Class | N/A | N/A | (4,152) | (7,677) | N/A |
| Class A | (678) | (785) | (11,193) | (15,078) | (0) |
| Class C | (121) | (164) | (2,050) | (2,771) | (0) |
| Class C-2 | N/A | N/A | N/A | N/A | N/A |
| Tax basis return of capital | | | | | |
| Institutional Class | 0 | 0 | 0 | 0 | 0 |
| I-2 | 0 | 0 | 0 | 0 | 0 |
| I-3 | N/A | N/A | 0 | 0 | 0 |
| Administrative Class | N/A | N/A | 0 | 0 | N/A |
| Class A | 0 | 0 | 0 | 0 | 0 |
| Class C | 0 | 0 | 0 | 0 | 0 |
| Class C-2 | N/A | N/A | N/A | N/A | N/A |
| **Total Distributions[c]** | (13,801) | (16,000) | (171,361) | (185,589) | (145) |
| **Fund Share Transactions:** | | | | | |
| Net increase (decrease) resulting from Fund share transactions* | 59,901 | (24,584) | 1,219,500 | 735,912 | 38,486 |
| Fund Redemption Fee | 0 | 0 | 0 | 0 | 0 |
| **Total Increase (Decrease) in Net Assets** | 94,232 | (53,922) | 1,535,051 | 453,463 | 38,704 |
| **Net Assets:** | | | | | |
| Beginning of year | 312,330 | 366,252 | 3,735,209 | 3,281,746 | 0 |
| End of year | $ 406,562 | $ 312,330 | $ 5,270,260 | $ 3,735,209 | $ 38,704 |

† A zero balance may reflect actual amounts rounding to less than one thousand.
* See Note 13, Shares of Beneficial Interest, in the Notes to Financial Statements.
(a) Inception date of the Fund was September 30, 2020.
(b) Inception date of Class C-2 was October 21, 2020.
(c) The tax characterization of distributions is determined in accordance with Federal income tax regulations. See Note 2, Distributions to Shareholders, in the Notes to Financial Statements for more information.

| | PIMCO High Yield Spectrum Fund | | PIMCO Long-Term Credit Bond Fund | | PIMCO Low Duration Credit Fund | | PIMCO Low Duration Income Fund | |
|---|---|---|---|---|---|---|---|---|
| | Year Ended March 31, 2021 | Year Ended March 31, 2020 | Year Ended March 31, 2021 | Year Ended March 31, 2020 | Year Ended March 31, 2021 | Year Ended March 31, 2020 | Year Ended March 31, 2021 | Year Ended March 31, 2020 |
| | $ 18,351 | $ 34,913 | $ 142,032 | $ 163,332 | $ 14,882 | $ 12,449 | $ 167,621 | $ 205,782 |
| | (11,851) | (199) | 204,770 | 150,366 | 8,670 | (9,909) | (157,026) | 48,896 |
| | 68,394 | (36,368) | 35,481 | (17,701) | 29,207 | (18,860) | 670,207 | (509,407) |
| | 74,894 | (1,654) | 382,283 | 295,997 | 52,759 | (16,320) | 680,802 | (254,729) |
| | (6,511) | (22,219) | (277,514) | (177,079) | (12,655) | (7,188) | (47,908) | (88,052) |
| | (9,623) | (9,969) | (11,730) | (36,217) | (819) | (1,685) | (65,476) | (107,707) |
| | (44) | (44) | N/A | N/A | N/A | N/A | (1,159) | (2,275) |
| | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | (2,510) | (3,318) | N/A | N/A | (1,656) | (3,368) | (34,131) | (53,304) |
| | (272) | (365) | N/A | N/A | (425) | (1,423) | (4,193) | (8,032) |
| | N/A | N/A | N/A | N/A | N/A | N/A | (3)(b) | N/A |
| | 0 | 0 | 0 | 0 | 0 | 0 | (10,469) | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | (14,862) | 0 |
| | 0 | 0 | N/A | N/A | N/A | N/A | (271) | 0 |
| | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | 0 | 0 | N/A | N/A | 0 | 0 | (8,768) | 0 |
| | 0 | 0 | N/A | N/A | 0 | 0 | (1,225) | 0 |
| | N/A | N/A | N/A | N/A | N/A | N/A | (6)(b) | N/A |
| | (18,960) | (35,915) | (289,244) | (213,296) | (15,555) | (13,664) | (188,471) | (259,370) |
| | 122,790 | (540,604) | 13,301 | (219,247) | 7,909 | (64,394) | 1,474,062 | 1,125,782 |
| | 0 | 0 | 0 | 0 | 2 | 3 | 0 | 0 |
| | 178,724 | (578,173) | 106,340 | (136,546) | 45,115 | (94,375) | 1,966,393 | 611,683 |
| | 293,114 | 871,287 | 3,510,699 | 3,647,245 | 251,864 | 346,239 | 5,434,663 | 4,822,980 |
| | $ 471,838 | $ 293,114 | $ 3,617,039 | $ 3,510,699 | $ 296,979 | $ 251,864 | $ 7,401,056 | $ 5,434,663 |

## Schedule of Investments PIMCO Low Duration Credit Fund

(Amounts in thousands*, except number of shares, contracts, units and ounces, if any)

| | PRINCIPAL AMOUNT (000S) | MARKET VALUE (000S) |
|---|---|---|
| **INVESTMENTS IN SECURITIES 89.6%** | | |
| **LOAN PARTICIPATIONS AND ASSIGNMENTS 85.9%** | | |
| **AAdvantage Loyalty IP Ltd.** | | |
| TBD% due 04/20/2028 | $ 1,800 | $ 1,844 |
| **Advantage Sales & Marketing, Inc.** | | |
| 6.000% (LIBOR03M + 5.250%) due 10/28/2027 ~ | 3,500 | 3,500 |
| **Ahlstrom-Munksjo Oyj** | | |
| TBD% due 03/11/2028 | 1,550 | 1,555 |
| **AlixPartners, LLP** | | |
| 3.250% (LIBOR03M + 2.750%) due 02/04/2028 ~ | 1,725 | 1,720 |
| **Alliant Holdings Intermediate LLC** | | |
| 3.359% (LIBOR03M + 3.250%) due 05/09/2025 ~ | 1,646 | 1,627 |
| **Allied Universal Holdco LLC** | | |
| 4.359% (LIBOR03M + 4.250%) due 07/10/2026 ~ | 1,135 | 1,133 |
| **Alphabet Holding Co., Inc.** | | |
| 3.609% (LIBOR03M + 3.500%) due 09/26/2024 ~ | 848 | 843 |
| **Altice Financing S.A.** | | |
| 2.856% (LIBOR03M + 2.750%) due 07/15/2025 ~ | 990 | 972 |
| 2.953% (LIBOR03M + 2.750%) due 01/31/2026 ~ | 2,431 | 2,386 |
| **Altice France S.A.** | | |
| 4.198% (LIBOR03M + 4.000%) due 08/14/2026 ~ | 3,381 | 3,374 |
| **American Trailer World Corp.** | | |
| 4.500% (LIBOR03M + 3.750%) due 02/17/2028 ~ | 3,200 | 3,182 |
| **Arches Buyer, Inc.** | | |
| 3.750% (LIBOR03M + 3.250%) due 12/06/2027 ~ | 3,865 | 3,847 |
| **Array Technologies, Inc.** | | |
| 3.750% (LIBOR03M + 3.250%) due 10/14/2027 ~ | 2,561 | 2,563 |
| **Astoria Energy LLC** | | |
| 4.500% (LIBOR03M + 3.500%) due 12/10/2027 ~ | 2,575 | 2,580 |
| **Asurion LLC** | | |
| 3.359% (LIBOR03M + 3.250%) due 12/23/2026 ~ | 4,542 | 4,519 |
| **Athenahealth, Inc.** | | |
| 4.453% (LIBOR03M + 4.250%) due 02/11/2026 ~ | 2,000 | 2,008 |
| **Banijay Entertainment S.A.S** | | |
| 3.854% (LIBOR03M + 3.750%) due 03/01/2025 ~ | 1,045 | 1,037 |
| **Barracuda Networks, Inc.** | | |
| 4.500% (LIBOR03M + 3.750%) due 02/12/2025 ~ | 1,194 | 1,194 |
| **Blackhawk Network Holdings, Inc.** | | |
| 3.109% (LIBOR03M + 3.000%) due 06/15/2025 ~ | 552 | 545 |
| **Boels Topholding BV** | | |
| 4.000% (EUR003M + 4.000%) due 02/06/2027 ~ | EUR 2,800 | 3,294 |
| **BWAY Holding Co.** | | |
| 3.443% (LIBOR03M + 3.250%) due 04/03/2024 ~ | $ 3,631 | 3,556 |
| **Caesars Resort Collection LLC** | | |
| 2.859% (LIBOR03M + 2.750%) due 12/23/2024 ~ | 3,904 | 3,848 |
| 4.609% (LIBOR03M + 4.500%) due 07/21/2025 ~ | 3,234 | 3,244 |
| **Camelot U.S. Acquisition Co.** | | |
| 3.109% (LIBOR03M + 3.000%) due 10/30/2026 ~ | 2,597 | 2,580 |
| **Canada Goose, Inc.** | | |
| 5.000% (LIBOR03M + 4.250%) due 10/07/2027 ~ | 1,397 | 1,400 |

| | PRINCIPAL AMOUNT (000S) | MARKET VALUE (000S) |
|---|---|---|
| **Carnival Corp.** | | |
| 8.500% (LIBOR03M + 7.500%) due 06/30/2025 ~ | $ 2,233 | $ 2,311 |
| **CBI Buyer, INC.** | | |
| 3.750% (LIBOR03M + 3.250%) due 01/06/2028 ~ | 475 | 473 |
| **Chobani LLC** | | |
| 4.500% (LIBOR03M + 3.500%) due 10/20/2027 ~ | 1,418 | 1,419 |
| **CityCenter Holdings LLC** | | |
| 3.000% (LIBOR03M + 2.250%) due 04/18/2024 ~ | 3,142 | 3,106 |
| **Clarios Global LP** | | |
| 3.359% (LIBOR03M + 3.250%) due 04/30/2026 ~ | 1,995 | 1,987 |
| **Clear Channel Outdoor Holdings, Inc.** | | |
| 3.712% (LIBOR03M + 3.500%) due 08/21/2026 ~ | 4,950 | 4,768 |
| **CNT Holdings Corp.** | | |
| 4.500% (LIBOR03M + 3.750%) due 11/08/2027 ~ | 2,000 | 1,998 |
| **CommScope, Inc.** | | |
| 3.359% (LIBOR03M + 3.250%) due 04/06/2026 ~ | 1,414 | 1,408 |
| **Consumer Cellular, Inc.** | | |
| 4.750% (LIBOR03M + 4.000%) due 12/17/2027 ~ | 1,200 | 1,203 |
| **Core & Main LP** | | |
| 3.750% (LIBOR03M + 2.750%) due 08/01/2024 ~ | 895 | 893 |
| **Coty, Inc.** | | |
| 2.354% (LIBOR03M + 2.250%) due 04/07/2025 ~ | 3,892 | 3,749 |
| **COWEN INC TL B 1L** | | |
| TBD% due 03/12/2028 « | 1,600 | 1,596 |
| **Da Vinci Purchaser Corp.** | | |
| 5.000% (LIBOR03M + 4.000%) due 01/08/2027 ~ | 1,375 | 1,377 |
| **Delta 2 (LUX) SARL** | | |
| 3.500% (LIBOR03M + 2.500%) due 02/01/2024 ~ | 2,362 | 2,342 |
| **Diamond (BC) BV** | | |
| 3.109% (LIBOR03M + 3.000%) due 09/06/2024 ~ | 98 | 98 |
| 3.250% (EUR003M + 3.250%) due 09/06/2024 ~ | EUR 1,443 | 1,692 |
| **Diamond Sports Group LLC** | | |
| 3.360% (LIBOR03M + 3.250%) due 08/24/2026 ~ | $ 5,058 | 3,585 |
| **Dun & Bradstreet Corp.** | | |
| 3.359% (LIBOR03M + 3.250%) due 02/06/2026 ~ | 1,372 | 1,366 |
| **E2open LLC** | | |
| 4.000% (LIBOR03M + 3.500%) due 10/29/2027 ~ | 1,625 | 1,625 |
| **Endure Digital, Inc.** | | |
| 4.250% (LIBOR03M + 3.500%) due 02/10/2028 ~ | 2,200 | 2,194 |
| **Entercom Media Corp.** | | |
| 2.609% (LIBOR03M + 2.500%) due 11/18/2024 ~ | 315 | 309 |
| **Envision Healthcare Corp.** | | |
| 3.859% (LIBOR03M + 3.750%) due 10/10/2025 ~ | 1,521 | 1,315 |
| **EyeCare Partners LLC** | | |
| 3.859% (LIBOR03M + 3.750%) due 02/18/2027 ~ | 882 | 874 |
| **Flex Acquisition Co., Inc.** | | |
| 3.238% - 3.488% (LIBOR03M + 3.250%) due 06/29/2025 ~ | 1,457 | 1,435 |
| **Foundation Building Materials Holding Co LLC** | | |
| 3.750% (LIBOR03M + 3.250%) due 02/03/2028 ~ | 1,700 | 1,687 |

| | PRINCIPAL AMOUNT (000S) | MARKET VALUE (000S) |
|---|---|---|
| **Frontier Communications Corp.** | | |
| 5.750% (LIBOR03M + 4.750%) due 10/08/2021 ~ | $ 4,175 | $ 4,188 |
| **Gainwell Acquisition Corp.** | | |
| 4.750% (LIBOR03M + 4.000%) due 10/01/2027 ~ | 4,220 | 4,212 |
| **Getty Images, Inc.** | | |
| 4.609% (LIBOR03M + 4.500%) due 02/19/2026 ~ | 1,985 | 1,970 |
| **Global Medical Response, Inc.** | | |
| 5.750% (LIBOR03M + 4.750%) due 10/02/2025 ~ | 4,242 | 4,235 |
| **GlobalLogic Holdings, Inc.** | | |
| 2.859% (LIBOR03M + 2.750%) due 08/01/2025 «~ | 988 | 986 |
| **Golden Entertainment, Inc.** | | |
| 3.750% (LIBOR03M + 3.000%) due 10/21/2024 ~ | 300 | 297 |
| **Graham Packaging Co., Inc.** | | |
| 3.750% (LIBOR03M + 3.000%) due 08/04/2027 ~ | 3,388 | 3,373 |
| **Hearthside Food Solutions LLC** | | |
| 3.796% (LIBOR03M + 3.688%) due 05/23/2025 ~ | 1,073 | 1,065 |
| 6.000% (LIBOR03M + 5.000%) due 05/23/2025 ~ | 398 | 399 |
| **Hub International Ltd.** | | |
| 2.965% - 3.215% (LIBOR03M + 3.000%) due 04/25/2025 ~ | 2,144 | 2,117 |
| **iHeartCommunications, Inc.** | | |
| 3.109% (LIBOR03M + 3.000%) due 05/01/2026 ~ | 672 | 665 |
| **Illuminate Buyer LLC** | | |
| 3.609% (LIBOR03M + 3.500%) due 06/30/2027 ~ | 2,095 | 2,088 |
| **INEOS Enterprises Holdings U.S. Finco LLC** | | |
| 4.500% (LIBOR03M + 3.500%) due 08/28/2026 ~ | 1,516 | 1,520 |
| **INEOS Styrolution US Holding LLC** | | |
| 3.250% (LIBOR03M + 2.750%) due 01/29/2026 ~ | 900 | 898 |
| **Informatica LLC** | | |
| 3.359% (LIBOR03M + 3.250%) due 02/25/2027 ~ | 1,020 | 1,014 |
| **IRB Holding Corp.** | | |
| 3.750% (LIBOR03M + 2.750%) due 02/05/2025 ~ | 2,240 | 2,225 |
| 4.250% (LIBOR03M + 3.500%) due 12/15/2027 ~ | 2,675 | 2,672 |
| **Ivanti Software, Inc.** | | |
| 5.750% (LIBOR03M + 4.750%) due 12/01/2027 ~ | 3,800 | 3,823 |
| **Kronos Acquisition Holdings, Inc.** | | |
| 4.250% (LIBOR03M + 3.750%) due 12/22/2026 ~ | 2,350 | 2,320 |
| **LBM Acquisition LLC** | | |
| TBD% due 12/17/2027 µ | 287 | 286 |
| 4.500% (LIBOR03M + 3.750%) due 12/17/2027 ~ | 1,291 | 1,287 |
| **Les Schwab Tire Centers** | | |
| 4.250% (LIBOR03M + 3.500%) due 11/02/2027 ~ | 2,625 | 2,634 |
| **Marriott Ownership Resorts, Inc.** | | |
| 1.859% (LIBOR03M + 1.750%) due 08/29/2025 ~ | 479 | 468 |
| **MH Sub LLC** | | |
| 3.609% (LIBOR03M + 3.500%) due 09/13/2024 ~ | 4,516 | 4,468 |
| **MPH Acquisition Holdings LLC** | | |
| 3.750% (LIBOR03M + 2.750%) due 06/07/2023 ~ | 432 | 430 |
| **MTN Infrastructure TopCo., Inc.** | | |
| 4.000% (LIBOR03M + 3.000%) due 11/15/2024 ~ | 1,221 | 1,220 |

March 31, 2021

| | PRINCIPAL AMOUNT (000S) | MARKET VALUE (000S) |
|---|---|---|
| **NEP Group, Inc.** | | |
| 3.359% (LIBOR03M + 3.250%) due 10/20/2025 ~ | $ 3,308 | $ 3,219 |
| **Nielsen Consumer, Inc.** | | |
| 4.103% (LIBOR03M + 4.000%) due 03/06/2028 ~ | 2,275 | 2,270 |
| **NorthRiver Midstream Finance LP** | | |
| 3.488% (LIBOR03M + 3.250%) due 10/01/2025 ~ | 733 | 724 |
| **Nouryon Finance BV** | | |
| 2.860% (LIBOR03M + 2.750%) due 10/01/2025 ~ | 3,548 | 3,499 |
| **Novelis, Inc.** | | |
| TBD% due 04/15/2025 « | 3,840 | 3,782 |
| **OneDigital Borrower LLC** | | |
| TBD% due 11/16/2027 µ | 175 | 175 |
| 5.250% (LIBOR03M + 4.500%) due 11/16/2027 ~ | 1,775 | 1,778 |
| **Ortho-Clinical Diagnostics S.A.** | | |
| 3.359% - 5.500% (LIBOR03M + 3.250%) due 06/30/2025 ~ | 2,900 | 2,899 |
| **Parexel International Corp.** | | |
| 2.859% (LIBOR03M + 2.750%) due 09/27/2024 ~ | 855 | 846 |
| **Park River Holdings, Inc.** | | |
| 4.000% (LIBOR03M + 3.250%) due 12/28/2027 ~ | 875 | 872 |
| **Peraton Holding Corp.** | | |
| TBD% due 02/01/2028 µ | 893 | 893 |
| 4.500% (LIBOR03M + 3.750%) due 02/01/2028 ~ | 507 | 507 |
| **Petco Health & Wellness Co.** | | |
| 4.000% (LIBOR03M + 3.250%) due 03/03/2028 ~ | 1,150 | 1,147 |
| **Phoenix Guarantor, Inc.** | | |
| 3.361% (LIBOR03M + 3.250%) due 03/05/2026 ~ | 1,372 | 1,363 |
| **PQ Corp.** | | |
| 4.000% (LIBOR03M + 3.000%) due 02/07/2027 ~ | 685 | 686 |
| **Presidio, Inc.** | | |
| 3.720% (LIBOR03M + 3.500%) due 01/22/2027 ~ | 2,214 | 2,212 |
| **Prime Security Services Borrower LLC** | | |
| 3.500% (LIBOR03M + 2.750%) due 09/23/2026 ~ | 1,285 | 1,280 |
| **Project Ruby Ultimate Parent Corp.** | | |
| 4.000% (LIBOR03M + 3.250%) due 03/03/2028 ~ | 900 | 897 |
| **PUG LLC** | | |
| 3.609% (LIBOR03M + 3.500%) due 02/12/2027 ~ | 1,310 | 1,269 |
| **Radiate Holdco LLC** | | |
| 4.250% (LIBOR03M + 3.500%) due 09/25/2026 ~ | 2,479 | 2,480 |
| **RegionalCare Hospital Partners Holdings, Inc.** | | |
| 3.859% (LIBOR03M + 3.750%) due 11/16/2025 ~ | 2,952 | 2,949 |
| **Reynolds Group Holdings, Inc.** | | |
| 3.359% (LIBOR03M + 3.250%) due 02/05/2026 ~ | 1,621 | 1,605 |
| **Sabre GLBL, Inc.** | | |
| 2.109% (LIBOR03M + 2.000%) due 02/22/2024 ~ | 2,969 | 2,935 |
| **Scientific Games International, Inc.** | | |
| 2.859% (LIBOR03M + 2.750%) due 08/14/2024 ~ | 2,243 | 2,203 |
| **Sequa Mezzanine Holdings LLC** | | |
| 7.750% (LIBOR03M + 6.750%) due 11/28/2023 ~ | 1,251 | 1,258 |
| **Sigma Bidco BV** | | |
| 3.260% (LIBOR03M + 3.000%) due 07/02/2025 ~ | 2,481 | 2,460 |
| **SolarWinds Holdings, Inc.** | | |
| 2.859% (LIBOR03M + 2.750%) due 02/05/2024 ~ | 1,250 | 1,229 |

| | PRINCIPAL AMOUNT (000S) | MARKET VALUE (000S) |
|---|---|---|
| **Sophia LP** | | |
| 4.500% (LIBOR03M + 3.750%) due 10/07/2027 ~ | $ 1,546 | $ 1,547 |
| **Sotera Health Holdings LLC** | | |
| 3.250% (LIBOR03M + 2.750%) due 12/11/2026 ~ | 1,100 | 1,099 |
| **Spirit AeroSystems Holdings, Inc.** | | |
| 6.000% (LIBOR03M + 5.250%) due 01/15/2025 ~ | 1,945 | 1,962 |
| **Staples, Inc.** | | |
| 4.705% (LIBOR03M + 4.500%) due 09/12/2024 ~ | 246 | 243 |
| 5.205% (LIBOR03M + 5.000%) due 04/16/2026 ~ | 1,627 | 1,592 |
| **Station Casinos LLC** | | |
| 2.500% (LIBOR03M + 2.250%) due 02/08/2027 ~ | 2,557 | 2,521 |
| **Sunshine Luxembourg SARL** | | |
| 4.500% (LIBOR03M + 3.500%) due 06/30/2021 ~ | 308 | 308 |
| **Symplr Software, Inc.** | | |
| 5.250% (LIBOR03M + 4.500%) due 12/22/2027 ~ | 575 | 578 |
| **Team Health Holdings, Inc.** | | |
| 3.750% (LIBOR03M + 2.750%) due 02/06/2024 ~ | 823 | 768 |
| **Telesat LLC** | | |
| 2.860% (LIBOR03M + 2.750%) due 12/07/2026 ~ | 814 | 785 |
| **Tempo Acquisition LLC** | | |
| 3.750% (LIBOR03M + 3.250%) due 11/02/2026 ~ | 1,985 | 1,987 |
| **Terrier Media Buyer, Inc.** | | |
| 3.609% (LIBOR03M + 3.500%) due 12/17/2026 ~ | 494 | 490 |
| **Tibco Software, Inc.** | | |
| 3.860% (LIBOR03M + 3.750%) due 06/30/2026 ~ | 596 | 590 |
| **Triton Water Holdings, Inc.** | | |
| TBD% due 03/18/2028 | 850 | 848 |
| **Truck Hero, Inc.** | | |
| 4.500% (LIBOR03M + 3.750%) due 01/31/2028 ~ | 350 | 350 |
| **U.S. Renal Care, Inc.** | | |
| 5.125% (LIBOR03M + 5.000%) due 06/26/2026 ~ | 1,662 | 1,655 |
| **Uber Technologies, Inc.** | | |
| 3.609% (LIBOR03M + 3.500%) due 04/04/2025 ~ | 3,179 | 3,169 |
| **Ultimate Software Group, Inc.** | | |
| 4.000% (LIBOR03M + 3.250%) due 05/04/2026 ~ | 1,990 | 1,991 |
| **Univision Communications, Inc.** | | |
| 2.857% (LIBOR03M + 2.750%) due 03/15/2024 ~ | 4,102 | 4,079 |
| **USS Ultimate Holdings, Inc.** | | |
| 4.750% (LIBOR03M + 3.750%) due 08/25/2024 ~ | 3,487 | 3,491 |
| **Verifone Systems, Inc.** | | |
| 4.182% (LIBOR03M + 4.000%) due 08/20/2025 ~ | 3,501 | 3,431 |
| **Verscend Holding Corp.** | | |
| 4.607% (LIBOR03M + 4.500%) due 08/27/2025 ~ | 1,587 | 1,593 |
| **Vertical U.S. Newco, Inc.** | | |
| 4.478% (LIBOR03M + 4.250%) due 07/30/2027 ~ | 1,147 | 1,151 |
| **Wand NewCo 3, Inc.** | | |
| 3.109% (LIBOR03M + 3.000%) due 02/05/2026 ~ | 3,015 | 2,982 |
| **Weber-Stephen Products LLC** | | |
| 4.000% (LIBOR03M + 3.250%) due 10/30/2027 ~ | 2,294 | 2,296 |

| | PRINCIPAL AMOUNT (000S) | MARKET VALUE (000S) |
|---|---|---|
| **Welbilt, Inc.** | | |
| 2.607% (LIBOR03M + 2.500%) due 10/23/2025 ~ | $ 1,615 | $ 1,555 |
| **White Cap Buyer LLC** | | |
| 4.500% (LIBOR03M + 4.000%) due 10/19/2027 ~ | 3,591 | 3,589 |
| **WOOF Holdings, Inc.** | | |
| 4.500% (LIBOR03M + 3.750%) due 12/21/2027 ~ | 1,100 | 1,097 |
| **Zaxby's Operating Company LLC** | | |
| 4.500% (LIBOR03M + 3.750%) due 12/28/2027 ~ | 1,225 | 1,226 |
| **Zayo Group Holdings, Inc.** | | |
| 3.109% (LIBOR03M + 3.000%) due 03/09/2027 ~ | 4,739 | 4,707 |
| **Total Loan Participations and Assignments (Cost $249,454)** | | 255,138 |

## CORPORATE BONDS & NOTES 3.6%

### BANKING & FINANCE 0.4%

| | | |
|---|---|---|
| **Freedom Mortgage Corp.** | | |
| 7.625% due 05/01/2026 | 350 | 367 |
| **PennyMac Financial Services, Inc.** | | |
| 4.250% due 02/15/2029 | 800 | 767 |
| | | 1,134 |

### INDUSTRIALS 3.2%

| | | |
|---|---|---|
| **Bausch Health Americas, Inc.** | | |
| 9.250% due 04/01/2026 | 600 | 665 |
| **Cinemark USA, Inc.** | | |
| 5.875% due 03/15/2026 | 250 | 257 |
| **Mohegan Gaming & Entertainment** | | |
| 8.000% due 02/01/2026 | 1,200 | 1,210 |
| **NCR Corp.** | | |
| 5.125% due 04/15/2029 (a) | 1,600 | 1,615 |
| **Prime Healthcare Services, Inc.** | | |
| 7.250% due 11/01/2025 | 1,700 | 1,817 |
| **Six Flags Entertainment Corp.** | | |
| 4.875% due 07/31/2024 | 250 | 253 |
| **Staples, Inc.** | | |
| 7.500% due 04/15/2026 | 475 | 502 |
| **Vine Energy Holdings LLC** | | |
| 6.750% due 04/15/2029 (a) | 2,650 | 2,650 |
| **Wynn Macau Ltd.** | | |
| 5.500% due 01/15/2026 | 500 | 522 |
| | | 9,491 |

### UTILITIES 0.0%

| | | |
|---|---|---|
| **Crestwood Midstream Partners LP** | | |
| 6.000% due 02/01/2029 | 100 | 99 |
| **Total Corporate Bonds & Notes (Cost $10,696)** | | 10,724 |

| | SHARES | |
|---|---|---|

## COMMON STOCKS 0.1%

### FINANCIALS 0.1%

| | | |
|---|---|---|
| **Stearns Holdings LLC 'B' «(b)** | 52,605 | 234 |
| **Total Common Stocks (Cost $248)** | | 234 |
| **Total Investments in Securities (Cost $260,398)** | | 266,096 |

## Schedule of Investments PIMCO Low Duration Credit Fund (Cont.)

| | SHARES | | MARKET VALUE (000S) |
|---|---|---|---|
| **INVESTMENTS IN AFFILIATES 8.4%** | | | |
| **SHORT-TERM INSTRUMENTS 8.4%** | | | |
| **CENTRAL FUNDS USED FOR CASH MANAGEMENT PURPOSES 8.4%** | | | |
| PIMCO Short-Term Floating NAV Portfolio III | 2,532,753 | $ | 24,973 |
| **Total Short-Term Instruments (Cost $24,974)** | | | 24,973 |
| **Total Investments in Affiliates (Cost $24,974)** | | | 24,973 |
| **Total Investments 98.0% (Cost $285,372)** | | $ | 291,069 |
| **Financial Derivative Instruments (c) 0.2% (Cost or Premiums, net $0)** | | | 530 |
| **Other Assets and Liabilities, net 1.8%** | | | 5,380 |
| **Net Assets 100.0%** | | $ | 296,979 |

## NOTES TO SCHEDULE OF INVESTMENTS:

* A zero balance may reflect actual amounts rounding to less than one thousand.

« Security valued using significant unobservable inputs (Level 3).

µ All or a portion of this amount represents unfunded loan commitments. The interest rate for the unfunded portion will be determined at the time of funding. See Note 4, Securities and Other Investments, in the Notes to Financial Statements for more information regarding unfunded loan commitments.

~ Variable or Floating rate security. Rate shown is the rate in effect as of period end. Certain variable rate securities are not based on a published reference rate and spread, rather are determined by the issuer or agent and are based on current market conditions. Reference rate is as of reset date, which may vary by security. These securities may not indicate a reference rate and/or spread in their description.

(a) When-issued security.

### (b) RESTRICTED SECURITIES:

| Issuer Description | Acquisition Date | Cost | Market Value | Market Value as Percentage of Net Assets |
|---|---|---|---|---|
| Stearns Holdings LLC 'B' | 3/15/2021 | $  248 | $  234 | 0.08% |

### BORROWINGS AND OTHER FINANCING TRANSACTIONS

The average amount of borrowings outstanding during the period ended March 31, 2021 was $(2,497) at a weighted average interest rate of 0.721%. Average borrowings may include reverse repurchase agreements and sale-buyback transactions, if held during the period.

### (c) FINANCIAL DERIVATIVE INSTRUMENTS: OVER THE COUNTER

#### FORWARD FOREIGN CURRENCY CONTRACTS:

| Counterparty | Settlement Month | Currency to be Delivered | | Currency to be Received | | Unrealized Appreciation/ (Depreciation) Asset | Liability |
|---|---|---|---|---|---|---|---|
| JPM | 04/2021 | $ | 1,488 | EUR | 1,267 | $  0 | $  (2) |
| SCX | 04/2021 | EUR | 11,912 | $ | 14,471 | 501 | 0 |
| | 05/2021 | | 11,912 | | 14,008 | 31 | 0 |
| **Total Forward Foreign Currency Contracts** | | | | | | $  532 | $  (2) |

March 31, 2021

## FINANCIAL DERIVATIVE INSTRUMENTS: OVER THE COUNTER SUMMARY

The following is a summary by counterparty of the market value of OTC financial derivative instruments and collateral (received) as of March 31, 2021:

| | Financial Derivative Assets | | | | Financial Derivative Liabilities | | | | | | |
| | Forward Foreign Currency Contracts | Purchased Options | Swap Agreements | Total Over the Counter | Forward Foreign Currency Contracts | Written Options | Swap Agreements | Total Over the Counter | Net Market Value of OTC Derivatives | Collateral (Received) | Net Exposure[1] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Counterparty | | | | | | | | | | | |
| JPM | $ 0 | $ 0 | $ 0 | $ 0 | $ (2) | $ 0 | $ 0 | $ (2) | $ (2) | $ 0 | $ (2) |
| SCX | 532 | 0 | 0 | 532 | 0 | 0 | 0 | 0 | 532 | (280) | 252 |
| **Total Over the Counter** | **$ 532** | **$ 0** | **$ 0** | **$ 532** | **$ (2)** | **$ 0** | **$ 0** | **$ (2)** | | | |

[1] Net Exposure represents the net receivable/(payable) that would be due from/to the counterparty in the event of default. Exposure from OTC financial derivative instruments can only be netted across transactions governed under the same master agreement with the same legal entity. See Note 8, Master Netting Arrangements, in the Notes to Financial Statements for more information.

## FAIR VALUE OF FINANCIAL DERIVATIVE INSTRUMENTS

The following is a summary of the fair valuation of the Fund's derivative instruments categorized by risk exposure. See Note 7, Principal and Other Risks, in the Notes to Financial Statements on risks of the Fund.

Fair Values of Financial Derivative Instruments on the Statements of Assets and Liabilities as of March 31, 2021:

| | Derivatives not accounted for as hedging instruments | | | | | |
| | Commodity Contracts | Credit Contracts | Equity Contracts | Foreign Exchange Contracts | Interest Rate Contracts | Total |
|---|---|---|---|---|---|---|
| **Financial Derivative Instruments - Assets** | | | | | | |
| Over the counter | | | | | | |
| Forward Foreign Currency Contracts | $ 0 | $ 0 | $ 0 | $ 532 | $ 0 | $ 532 |
| **Financial Derivative Instruments - Liabilities** | | | | | | |
| Over the counter | | | | | | |
| Forward Foreign Currency Contracts | $ 0 | $ 0 | $ 0 | $ 2 | $ 0 | $ 2 |

The effect of Financial Derivative Instruments on the Statements of Operations for the year ended March 31, 2021:

| | Derivatives not accounted for as hedging instruments | | | | | |
| | Commodity Contracts | Credit Contracts | Equity Contracts | Foreign Exchange Contracts | Interest Rate Contracts | Total |
|---|---|---|---|---|---|---|
| **Net Realized Gain (Loss) on Financial Derivative Instruments** | | | | | | |
| Exchange-traded or centrally cleared | | | | | | |
| Swap Agreements | $ 0 | $ (2,048) | $ 0 | $ 0 | $ (1) | $ (2,049) |
| Over the counter | | | | | | |
| Forward Foreign Currency Contracts | $ 0 | $ 0 | $ 0 | $ (809) | $ 0 | $ (809) |
| Swap Agreements | 0 | 0 | 0 | 0 | 67 | 67 |
| | $ 0 | $ 0 | $ 0 | $ (809) | $ 67 | $ (742) |
| | $ 0 | $ (2,048) | $ 0 | $ (809) | $ 66 | $ (2,791) |
| **Net Change in Unrealized Appreciation on Financial Derivative Instruments** | | | | | | |
| Exchange-traded or centrally cleared | | | | | | |
| Swap Agreements | $ 0 | $ 580 | $ 0 | $ 0 | $ 0 | $ 580 |
| Over the counter | | | | | | |
| Forward Foreign Currency Contracts | $ 0 | $ 0 | $ 0 | $ 554 | $ 0 | $ 554 |
| Swap Agreements | 0 | 0 | 0 | 0 | 444 | 444 |
| | $ 0 | $ 0 | $ 0 | $ 554 | $ 444 | $ 998 |
| | $ 0 | $ 580 | $ 0 | $ 554 | $ 444 | $ 1,578 |

## Schedule of Investments PIMCO Low Duration Credit Fund (Cont.)

March 31, 2021

**FAIR VALUE MEASUREMENTS**

The following is a summary of the fair valuations according to the inputs used as of March 31, 2021 in valuing the Fund's assets and liabilities:

| Category and Subcategory | Level 1 | Level 2 | Level 3 | Fair Value at 03/31/2021 |
|---|---|---|---|---|
| **Investments in Securities, at Value** | | | | |
| Loan Participations and Assignments | $ 0 $ | 248,774 $ | 6,364 $ | 255,138 |
| Corporate Bonds & Notes | | | | |
| Banking & Finance | 0 | 1,134 | 0 | 1,134 |
| Industrials | 2,650 | 6,841 | 0 | 9,491 |
| Utilities | 0 | 99 | 0 | 99 |
| Common Stocks | | | | |
| Financials | 0 | 0 | 234 | 234 |
| | $ 2,650 $ | 256,848 $ | 6,598 $ | 266,096 |

| Category and Subcategory | Level 1 | Level 2 | Level 3 | Fair Value at 03/31/2021 |
|---|---|---|---|---|
| **Financial Derivative Instruments - Assets** | | | | |
| Over the counter | $ 0 $ | 532 $ | 0 $ | 532 |
| **Financial Derivative Instruments - Liabilities** | | | | |
| Over the counter | $ 0 $ | (2) $ | 0 $ | (2) |
| Total Financial Derivative Instruments | $ 0 $ | 530 $ | 0 $ | 530 |
| Totals | $ 27,623 $ | 257,378 $ | 6,598 $ | 291,599 |

| Category and Subcategory | Level 1 | Level 2 | Level 3 | Fair Value at 03/31/2021 |
|---|---|---|---|---|
| **Investments in Affiliates, at Value** | | | | |
| Short-Term Instruments | | | | |
| Central Funds Used for Cash Management Purposes | $ 24,973 $ | 0 $ | 0 $ | 24,973 |
| Total Investments | $ 27,623 $ | 256,848 $ | 6,598 $ | 291,069 |

The following is a reconciliation of the fair valuations using significant unobservable inputs (Level 3) for the Fund during the period ended March 31, 2021:

| Category and Subcategory | Beginning Balance at 03/31/2020 | Net Purchases | Net Sales/ Settlements | Accrued Discounts/ (Premiums) | Realized Gain/(Loss) | Net Change in Unrealized Appreciation/ (Depreciation)[1] | Transfers into Level 3 | Transfers out of Level 3 | Ending Balance at 03/31/2021 | Net Change in Unrealized Appreciation/ (Depreciation) on Investments Held at 03/31/2021[1] |
|---|---|---|---|---|---|---|---|---|---|---|
| **Investments in Securities, at Value** | | | | | | | | | | |
| Loan Participations and Assignments | $ 62,620 $ | 48,107 $ | (81,029) $ | 573 $ | 764 $ | 5,486 $ | 907 $ | (31,064) $ | 6,364 $ | 169 |
| Common Stocks | | | | | | | | | | |
| Financials | 0 | 248 | 0 | 0 | 0 | (14) | 0 | 0 | 234 | (14) |
| Totals | $ 62,620 $ | 48,355 $ | (81,029) $ | 573 $ | 764 $ | 5,472 $ | 907 $ | (31,064) $ | 6,598 $ | 155 |

The following is a summary of significant unobservable inputs used in the fair valuations of assets and liabilities categorized within Level 3 of the fair value hierarchy:

| Category and Subcategory | Ending Balance at 03/31/2021 | Valuation Technique | Unobservable Inputs | (% Unless Noted Otherwise) Input Value(s) | (% Unless Noted Otherwise) Weighted Average |
|---|---|---|---|---|---|
| **Investments in Securities, at Value** | | | | | |
| Loan Participations and Assignments | $ 6,364 | Third Party Vendor | Broker Quote | 98.500-99.875 | 99.027 |
| Common Stocks | | | | | |
| Financials | 234 | Expected Recovery | Book Value | 1.000x | — |
| Total | $ 6,598 | | | | |

[1] Any difference between Net Change in Unrealized Appreciation/(Depreciation) and Net Change in Unrealized Appreciation/(Depreciation) on Investments Held at March 31, 2021 may be due to an investment no longer held or categorized as Level 3 at period end.

See Accompanying Notes

## Notes to Financial Statements

### 1. ORGANIZATION

PIMCO Funds (the "Trust") is a Massachusetts business trust established under a Declaration of Trust dated February 19, 1987, as amended and restated November 4, 2014. The Trust is registered under the Investment Company Act of 1940, as amended (the "Act"), as an open-end management investment company. Information presented in these financial statements pertains to the Institutional Class, I-2, I-3, Administrative Class, Class A, Class C and Class C-2 shares of the funds (each a "Fund" and collectively, the "Funds") indicated on the cover of this report. Pacific Investment Management Company LLC ("PIMCO") serves as the investment adviser (the "Adviser") for the Funds.

On November 18, 2020, the Board of Trustees approved a reduction in the holding period of an automatic conversion of the Funds' Class C and Class C-2 shares into Class A shares of the same Fund from ten years to eight years. The reduction in the holding period became effective on January 18, 2021, with the first conversion taking place on or about February 10, 2021 and subsequent conversions occurring monthly thereafter. Certain financial intermediaries may have different policies and procedures regarding the conversion of Class C and Class C-2 shares to Class A shares, as described in Appendix B to the applicable Fund's prospectus (Financial Firm-Specific Sales Charge Waivers and Discounts).

### 2. SIGNIFICANT ACCOUNTING POLICIES

The following is a summary of significant accounting policies consistently followed by the Trust in the preparation of its financial statements in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP"). Each Fund is treated as an investment company under the reporting requirements of U.S. GAAP. The functional and reporting currency for the Funds is the U.S. dollar. The preparation of financial statements in accordance with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of increases and decreases in net assets from operations during the reporting period. Actual results could differ from those estimates.

(a) Securities Transactions and Investment Income  Securities transactions are recorded as of the trade date for financial reporting purposes. Securities purchased or sold on a when-issued or delayed-delivery basis may be settled beyond a standard settlement period for the security after the trade date. Realized gains (losses) from securities sold are recorded on the identified cost basis. Dividend income is recorded on the ex-dividend date, except certain dividends from foreign securities where the ex-dividend date may have passed, which are recorded as soon as a Fund is informed of the ex-dividend date. Interest income, adjusted for the accretion of discounts and amortization of premiums, is recorded on the accrual basis from settlement date, with the exception of securities with a forward starting effective date, where interest income is recorded on the accrual basis from effective date. For convertible securities, premiums attributable to the conversion feature are not amortized. Estimated tax liabilities on certain foreign securities are recorded on an accrual basis and are reflected as components of interest income or net change in unrealized appreciation (depreciation) on investments on the Statements of Operations, as appropriate. Tax liabilities realized as a result of such security sales are reflected as a component of net realized gain (loss) on investments on the Statements of Operations. Paydown gains (losses) on mortgage-related and other asset-backed securities, if any, are recorded as components of interest income on the Statements of Operations. Income or short-term capital gain distributions received from registered investment companies, if any, are recorded as dividend income. Long-term capital gain distributions received from registered investment companies, if any, are recorded as realized gains.

Debt obligations may be placed on non-accrual status and related interest income may be reduced by ceasing current accruals and writing off interest receivable when the collection of all or a portion of interest has become doubtful based on consistently applied procedures. A debt obligation is removed from non-accrual status when the issuer resumes interest payments or when collectability of interest is probable.

(b) Foreign Currency Translation  The market values of foreign securities, currency holdings and other assets and liabilities denominated in foreign currencies are translated into U.S. dollars based on the current exchange rates each business day. Purchases and sales of securities and income and expense items denominated in foreign currencies, if any, are translated into U.S. dollars at the exchange rate in effect on the transaction date. The Funds do not separately report the effects of changes in foreign exchange rates from changes in market prices on securities held. Such changes are included in net realized gain (loss) and net change in unrealized appreciation (depreciation) from investments on the Statements of Operations. The Funds may invest in foreign currency-denominated securities and may engage in foreign currency transactions either on a spot (cash) basis at the rate prevailing in the currency exchange market at the time or through a forward foreign currency contract. Realized foreign exchange gains (losses) arising from sales of spot foreign currencies, currency gains (losses) realized between the trade and settlement dates on securities transactions and the difference between the recorded amounts of dividends, interest, and foreign withholding taxes and the U.S. dollar equivalent of the amounts actually received or paid are included in net realized gain (loss) on foreign currency transactions on

the Statements of Operations. Net unrealized foreign exchange gains (losses) arising from changes in foreign exchange rates on foreign denominated assets and liabilities other than investments in securities held at the end of the reporting period are included in net change in unrealized appreciation (depreciation) on foreign currency assets and liabilities on the Statements of Operations.

(c) Multi-Class Operations   Each class offered by the Trust has equal rights as to assets and voting privileges (except that shareholders of a class have exclusive voting rights regarding any matter relating solely to that class of shares). Income and non-class specific expenses are allocated daily to each class on the basis of the relative net assets. Realized and unrealized capital gains (losses) are allocated daily based on the relative net assets of each class of the respective Fund. Class specific expenses, where applicable, currently include supervisory and administrative and distribution and servicing fees. Under certain circumstances, the per share net asset value ("NAV") of a class of the respective Fund's shares may be different from the per share NAV of another class of shares as a result of the different daily expense accruals applicable to each class of shares.

(d) Distributions to Shareholders   The following table shows the anticipated frequency of distributions from net investment income, if any, for each Fund.

| Fund Name | Distribution Frequency | |
|---|---|---|
| | Declared | Distributed |
| PIMCO Diversified Income Fund | Daily | Monthly |
| PIMCO ESG Income Fund | Daily | Monthly |
| PIMCO High Yield Spectrum Fund | Daily | Monthly |
| PIMCO Long-Term Credit Bond Fund | Daily | Monthly |
| PIMCO Low Duration Credit Fund | Daily | Monthly |
| PIMCO Low Duration Income Fund | Daily | Monthly |
| PIMCO Credit Opportunities Bond Fund | Quarterly | Quarterly |
| PIMCO Preferred and Capital Securities Fund | Quarterly | Quarterly |

Net realized capital gains earned by each Fund, if any, will be distributed no less frequently than once each year.

Income distributions and capital gain distributions are determined in accordance with income tax regulations which may differ from U.S. GAAP. Differences between tax regulations and U.S. GAAP may cause timing differences between income and capital gain recognition. Further, the character of investment income and capital gains may be different for certain transactions under the two methods of accounting. As a result, income distributions and capital gain distributions declared during a fiscal period may differ significantly from the net investment income (loss) and realized gains (losses) reported on each Fund's annual financial statements presented under U.S. GAAP.

Separately, if a Fund determines or estimates, as applicable, that a portion of a distribution may be comprised of amounts from sources other than net investment income in accordance with its policies, accounting records (if applicable), and accounting practices, the Fund will notify shareholders of the estimated composition of such distribution through a Section 19 Notice. For these purposes, a Fund determines or estimates, as applicable, the source or sources from which a distribution is paid, to the close of the period as of which it is paid, in reference to its internal accounting records and related accounting practices. If, based on such accounting records and practices, it is determined or estimated, as applicable, that a particular distribution does not include capital gains or paid-in surplus or other capital sources, a Section 19 Notice generally would not be issued. It is important to note that differences exist between a Fund's daily internal accounting records and practices, a Fund's financial statements presented in accordance with U.S. GAAP, and recordkeeping practices under income tax regulations. For instance, a Fund's internal accounting records and practices may take into account, among other factors, tax-related characteristics of certain sources of distributions that differ from treatment under U.S. GAAP. Examples of such differences may include but are not limited to, for certain Funds, the treatment of periodic payments under interest rate swap contracts. Accordingly, among other consequences, it is possible that a Fund may not issue a Section 19 Notice in situations where the Fund's financial statements prepared later and in accordance with U.S. GAAP and/or the final tax character of those distributions might later report that the sources of those distributions included capital gains and/or a return of capital. Please visit www.pimco.com for the most recent Section 19 Notice, if applicable, for additional information regarding the estimated composition of distributions. Final determination of a distribution's tax character will be provided to shareholders when such information is available.

Distributions classified as a tax basis return of capital at a Fund's fiscal year end, if any, are reflected on the Statements of Changes in Net Assets and have been recorded to paid in capital on the Statements of Assets and Liabilities. In addition, other amounts have been reclassified between distributable earnings (accumulated loss) and paid in capital on the Statements of Assets and Liabilities to more appropriately conform U.S. GAAP to tax characterizations of distributions.

(e) New Accounting Pronouncements and Regulatory Updates   In March 2020, the Financial Accounting Standards Board issued an Accounting Standards Update ("ASU"), ASU 2020-04, which provides optional guidance to ease the potential accounting burden associated with transitioning away from the London Interbank Offered Rate and other reference rates that are expected to be discontinued. The ASU is effective immediately upon release of the update on March 12, 2020

through December 31, 2022. At this time, management is evaluating implications of these changes on the financial statements.

In October 2020, the U.S. Securities and Exchange Commission ("SEC") adopted a rule related to the use of derivatives, short sales, reverse repurchase agreements and certain other transactions by registered investment companies that rescinds and withdraws the guidance of the SEC and its staff regarding asset segregation and cover transactions. Subject to certain exceptions, the rule requires funds to trade derivatives and other transactions that create future payment or delivery obligations (except reverse repurchase agreements and similar financing transactions) subject to a value-at-risk leverage limit, certain derivatives risk management program and reporting requirements. The rule went into effect on February 19, 2021 and funds will have an eighteen-month transition period to comply with the rule and related reporting requirements. At this time, management is evaluating the implications of these changes on the financial statements.

In October 2020, the SEC adopted a rule regarding the ability of a fund to invest in other funds. The rule allows a fund to acquire shares of another fund in excess of certain limitations currently imposed by the Act without obtaining individual exemptive relief from the SEC, subject to conditions. The rule also included the rescission of certain exemptive relief from the SEC and guidance from the SEC staff for funds to invest in other funds. The rule went into effect on January 19, 2021 and funds will have a one-year transition period to comply with the rule and related reporting requirements. At this time, management is evaluating the implications of these changes on the financial statements.

In December 2020, the SEC adopted a rule addressing fair valuation of fund investments. The new rule sets forth requirements for good faith determinations of fair value as well as for the performance of fair value determinations, including related oversight and reporting obligations. The new rule also defines "readily available market quotations" for purposes of the definition of "value" under the Act, and the SEC noted that this definition would apply in all contexts under the Act. The effective date for the rule was March 8, 2021. The SEC adopted an eighteen-month transition period beginning from the effective date for both the new rule and the associated new recordkeeping requirements. At this time, management is evaluating the implications of these changes on the financial statements.

## 3. INVESTMENT VALUATION AND FAIR VALUE MEASUREMENTS

(a) Investment Valuation Policies   The price of a Fund's shares is based on the Fund's NAV. The NAV of a Fund, or each of its share classes, as applicable, is determined by dividing the total value of

portfolio investments and other assets, less any liabilities attributable to that Fund or class, by the total number of shares outstanding of that Fund or class.

On each day that the New York Stock Exchange ("NYSE") is open, Fund shares are ordinarily valued as of the close of regular trading (normally 4:00 p.m., Eastern time) ("NYSE Close"). Information that becomes known to the Funds or their agents after the time as of which NAV has been calculated on a particular day will not generally be used to retroactively adjust the price of a security or the NAV determined earlier that day. If regular trading on the NYSE closes earlier than scheduled, each Fund reserves the right to either (i) calculate its NAV as of the earlier closing time or (ii) calculate its NAV as of the normally scheduled close of regular trading on the NYSE for that day. Each Fund generally does not calculate their NAV on days during which the NYSE is closed. However, if the NYSE is closed on a day it would normally be open for business, each Fund reserves the right to calculate their NAV as of the normally scheduled close of regular trading on the NYSE for that day or such other time that the Fund may determine.

For purposes of calculating NAV, portfolio securities and other assets for which market quotes are readily available are valued at market value. Market value is generally determined on the basis of official closing prices or the last reported sales prices, or if no sales are reported, based on quotes obtained from established market makers or prices (including evaluated prices) supplied by the Funds' approved pricing services, quotation reporting systems and other third-party sources (together, "Pricing Services"). The Funds will normally use pricing data for domestic equity securities received shortly after the NYSE Close and do not normally take into account trading, clearances or settlements that take place after the NYSE Close. If market value pricing is used, a foreign (non-U.S.) equity security traded on a foreign exchange or on more than one exchange is typically valued using pricing information from the exchange considered by the Adviser to be the primary exchange. A foreign (non-U.S.) equity security will be valued as of the close of trading on the foreign exchange, or the NYSE Close, if the NYSE Close occurs before the end of trading on the foreign exchange. Domestic and foreign (non-U.S.) fixed income securities, non-exchange traded derivatives, and equity options are normally valued on the basis of quotes obtained from brokers and dealers or Pricing Services using data reflecting the earlier closing of the principal markets for those securities. Prices obtained from Pricing Services may be based on, among other things, information provided by market makers or estimates of market values obtained from yield data relating to investments or securities with similar characteristics. Certain fixed income securities purchased on a delayed-delivery basis are marked to market daily until settlement at the forward settlement date. Exchange-traded options, except equity options, futures and options on futures

**Notes to Financial Statements** (Cont.)

are valued at the settlement price determined by the relevant exchange. Swap agreements are valued on the basis of bid quotes obtained from brokers and dealers or market-based prices supplied by Pricing Services. A Fund's investments in open-end management investment companies, other than exchange-traded funds ("ETFs"), are valued at the NAVs of such investments. Open-end management investment companies may include affiliated funds.

If a foreign (non-U.S.) equity security's value has materially changed after the close of the security's primary exchange or principal market but before the NYSE Close, the security may be valued at fair value based on procedures established and approved by the Board of Trustees of the Trust (the "Board"). Foreign (non-U.S.) equity securities that do not trade when the NYSE is open are also valued at fair value. With respect to foreign (non-U.S.) equity securities, a Fund may determine the fair value of investments based on information provided by Pricing Services and other third-party vendors, which may recommend fair value or adjustments with reference to other securities, indices or assets. In considering whether fair valuation is required and in determining fair values, a Fund may, among other things, consider significant events (which may be considered to include changes in the value of U.S. securities or securities indices) that occur after the close of the relevant market and before the NYSE Close. A Fund may utilize modeling tools provided by third-party vendors to determine fair values of foreign (non-U.S.) securities. For these purposes, any movement in the applicable reference index or instrument ("zero trigger") between the earlier close of the applicable foreign market and the NYSE Close may be deemed to be a significant event, prompting the application of the pricing model (effectively resulting in daily fair valuations). Foreign exchanges may permit trading in foreign (non-U.S.) equity securities on days when the Trust is not open for business, which may result in a Fund's portfolio investments being affected when shareholders are unable to buy or sell shares.

Senior secured floating rate loans for which an active secondary market exists to a reliable degree are valued at the mean of the last available bid/ask prices in the market for such loans, as provided by a Pricing Service. Senior secured floating rate loans for which an active secondary market does not exist to a reliable degree are valued at fair value, which is intended to approximate market value. In valuing a senior secured floating rate loan at fair value, the factors considered may include, but are not limited to, the following: (a) the creditworthiness of the borrower and any intermediate participants, (b) the terms of the loan, (c) recent prices in the market for similar loans, if any, and (d) recent prices in the market for instruments of similar quality, rate, period until next interest rate reset and maturity.

Investments valued in currencies other than the U.S. dollar are converted to the U.S. dollar using exchange rates obtained from Pricing Services. As a result, the value of such investments and, in turn, the NAV of a Fund's shares may be affected by changes in the value of currencies in relation to the U.S. dollar. The value of investments traded in markets outside the United States or denominated in currencies other than the U.S. dollar may be affected significantly on a day that the Trust is not open for business. As a result, to the extent that a Fund holds foreign (non-U.S.) investments, the value of those investments may change at times when shareholders are unable to buy or sell shares and the value of such investments will be reflected in the Fund's next calculated NAV.

Investments for which market quotes or market based valuations are not readily available are valued at fair value as determined in good faith by the Board or persons acting at their direction. The Board has adopted methods for valuing securities and other assets in circumstances where market quotes are not readily available, and has delegated to the Adviser the responsibility for applying the fair valuation methods. In the event that market quotes or market based valuations are not readily available, and the security or asset cannot be valued pursuant to a Board approved valuation method, the value of the security or asset will be determined in good faith by the Board. Market quotes are considered not readily available in circumstances where there is an absence of current or reliable market-based data (e.g., trade information, bid/ask information, indicative market quotations ("Broker Quotes"), Pricing Services' prices), including where events occur after the close of the relevant market, but prior to the NYSE Close, that materially affect the values of a Fund's securities or assets. In addition, market quotes are considered not readily available when, due to extraordinary circumstances, the exchanges or markets on which the securities trade do not open for trading for the entire day and no other market prices are available. The Board has delegated, to the Adviser, the responsibility for monitoring significant events that may materially affect the values of a Fund's securities or assets and for determining whether the value of the applicable securities or assets should be reevaluated in light of such significant events.

When a Fund uses fair valuation to determine the value of a portfolio security or other asset for purposes of calculating its NAV, such investments will not be priced on the basis of quotes from the primary market in which they are traded, but rather may be priced by another method that the Board or persons acting at their direction believe reflects fair value. Fair valuation may require subjective determinations about the value of a security. While the Trust's policy is intended to result in a calculation of a Fund's NAV that fairly reflects security values as of the time of pricing, the Trust cannot ensure that fair values determined by the Board or persons acting at their direction would accurately reflect the price that a Fund could obtain for a security if it were to dispose of that security as of the time of pricing (for instance,

in a forced or distressed sale). The prices used by a Fund may differ from the value that would be realized if the securities were sold. The Funds' use of fair valuation may also help to deter "stale price arbitrage" as discussed under the "Abusive Trading Practices" section in each Fund's prospectus.

(b) Fair Value Hierarchy   U.S. GAAP describes fair value as the price that a Fund would receive to sell an asset or pay to transfer a liability in an orderly transaction between market participants at the measurement date. It establishes a fair value hierarchy that prioritizes inputs to valuation methods and requires disclosure of the fair value hierarchy, separately for each major category of assets and liabilities, that segregates fair value measurements into levels (Level 1, 2, or 3). The inputs or methodology used for valuing securities are not necessarily an indication of the risks associated with investing in those securities. Levels 1, 2, and 3 of the fair value hierarchy are defined as follows:

- Level 1 — Quoted prices in active markets or exchanges for identical assets and liabilities.

- Level 2 — Significant other observable inputs, which may include, but are not limited to, quoted prices for similar assets or liabilities in markets that are active, quoted prices for identical or similar assets or liabilities in markets that are not active, inputs other than quoted prices that are observable for the assets or liabilities (such as interest rates, yield curves, volatilities, prepayment speeds, loss severities, credit risks and default rates) or other market corroborated inputs.

- Level 3 — Significant unobservable inputs based on the best information available in the circumstances, to the extent observable inputs are not available, which may include assumptions made by the Board or persons acting at their direction that are used in determining the fair value of investments.

Assets or liabilities categorized as Level 2 or 3 as of period end have been transferred between Levels 2 and 3 since the prior period due to changes in the method utilized in valuing the investments. Transfers from Level 2 to Level 3 are a result of a change, in the normal course of business, from the use of methods used by Pricing Services (Level 2) to the use of a Broker Quote or valuation technique which utilizes significant unobservable inputs due to an absence of current or reliable market-based data (Level 3). Transfers from Level 3 to Level 2 are a result of the availability of current and reliable market-based data provided by Pricing Services or other valuation techniques which utilize significant observable inputs. In accordance with the requirements of U.S. GAAP, the amounts of transfers into and out of Level 3, if material, are disclosed in the Notes to Schedule of Investments for each respective Fund.

For fair valuations using significant unobservable inputs, U.S. GAAP requires a reconciliation of the beginning to ending balances for reported fair values that presents changes attributable to realized gain (loss), unrealized appreciation (depreciation), purchases and sales, accrued discounts (premiums), and transfers into and out of the Level 3 category during the period. The end of period value is used for the transfers between Levels of a Fund's assets and liabilities. Additionally, U.S. GAAP requires quantitative information regarding the significant unobservable inputs used in the determination of fair value of assets or liabilities categorized as Level 3 in the fair value hierarchy. In accordance with the requirements of U.S. GAAP, a fair value hierarchy, and if material, a Level 3 reconciliation and details of significant unobservable inputs, have been included in the Notes to Schedule of Investments for each respective Fund.

(c) Valuation Techniques and the Fair Value Hierarchy
Level 1 and Level 2 trading assets and trading liabilities, at fair value   The valuation methods (or "techniques") and significant inputs used in determining the fair values of portfolio securities or other assets and liabilities categorized as Level 1 and Level 2 of the fair value hierarchy are as follows:

Fixed income securities including corporate, convertible and municipal bonds and notes, U.S. government agencies, U.S. treasury obligations, sovereign issues, bank loans, convertible preferred securities and non-U.S. bonds are normally valued on the basis of quotes obtained from brokers and dealers or Pricing Services that use broker-dealer quotations, reported trades or valuation estimates from their internal pricing models. The Pricing Services' internal models use inputs that are observable such as issuer details, interest rates, yield curves, prepayment speeds, credit risks/spreads, default rates and quoted prices for similar assets. Securities that use similar valuation techniques and inputs as described above are categorized as Level 2 of the fair value hierarchy.

Fixed income securities purchased on a delayed-delivery basis or as a repurchase commitment in a sale-buyback transaction are marked to market daily until settlement at the forward settlement date and are categorized as Level 2 of the fair value hierarchy.

Mortgage-related and asset-backed securities are usually issued as separate tranches, or classes, of securities within each deal. These securities are also normally valued by Pricing Services that use broker-dealer quotations, reported trades or valuation estimates from their internal pricing models. The pricing models for these securities usually consider tranche-level attributes, current market data, estimated cash flows and market-based yield spreads for each tranche, and incorporate deal collateral performance, as available. Mortgage-related and asset-backed securities that use similar valuation techniques and inputs as described above are categorized as Level 2 of the fair value hierarchy.

## Notes to Financial Statements <sub>(Cont.)</sub>

Common stocks, ETFs, exchange-traded notes and financial derivative instruments, such as futures contracts, rights and warrants, or options on futures that are traded on a national securities exchange, are stated at the last reported sale or settlement price on the day of valuation. To the extent these securities are actively traded and valuation adjustments are not applied, they are categorized as Level 1 of the fair value hierarchy.

Valuation adjustments may be applied to certain securities that are solely traded on a foreign exchange to account for the market movement between the close of the foreign market and the NYSE Close. These securities are valued using Pricing Services that consider the correlation of the trading patterns of the foreign security to the intraday trading in the U.S. markets for investments. Securities using these valuation adjustments are categorized as Level 2 of the fair value hierarchy. Preferred securities and other equities traded on inactive markets or valued by reference to similar instruments are also categorized as Level 2 of the fair value hierarchy.

Investments in registered open-end investment companies (other than ETFs) will be valued based upon the NAVs of such investments and are categorized as Level 1 of the fair value hierarchy. Investments in unregistered open-end investment companies will be calculated based upon the NAVs of such investments and are considered Level 1 provided that the NAVs are observable, calculated daily and are the value at which both purchases and sales will be conducted.

Equity exchange-traded options and over the counter financial derivative instruments, such as forward foreign currency contracts and options contracts derive their value from underlying asset prices, indices, reference rates, and other inputs or a combination of these factors. These contracts are normally valued on the basis of quotes obtained from a quotation reporting system, established market makers or Pricing Services (normally determined as of the NYSE Close). Depending on the product and the terms of the transaction, financial derivative instruments can be valued by Pricing Services using a series of techniques, including simulation pricing models. The pricing models use inputs that are observed from actively quoted markets such as quoted prices, issuer details, indices, bid/ask spreads, interest rates, implied volatilities, yield curves, dividends and exchange rates. Financial derivative instruments that use similar valuation techniques and inputs as described above are categorized as Level 2 of the fair value hierarchy.

Centrally cleared swaps and over the counter swaps derive their value from underlying asset prices, indices, reference rates, and other inputs or a combination of these factors. They are valued using a broker-dealer bid quotation or on market-based prices provided by Pricing Services (normally determined as of the NYSE Close). Centrally cleared swaps and over the counter swaps can be valued by Pricing Services

using a series of techniques, including simulation pricing models. The pricing models may use inputs that are observed from actively quoted markets such as the overnight index swap rate, London Interbank Offered Rate forward rate, interest rates, yield curves and credit spreads. These securities are categorized as Level 2 of the fair value hierarchy.

Level 3 trading assets and trading liabilities, at fair value   When a fair valuation method is applied by the Adviser that uses significant unobservable inputs, investments will be priced by a method that the Board or persons acting at their direction believe reflects fair value and are categorized as Level 3 of the fair value hierarchy. The valuation techniques and significant inputs used in determining the fair values of portfolio assets and liabilities categorized as Level 3 of the fair value hierarchy are as follows:

Proxy pricing procedures set the base price of a fixed income security and subsequently adjust the price proportionally to market value changes of a pre-determined security deemed to be comparable in duration, generally a U.S. Treasury or sovereign note based on country of issuance. The base price may be a broker-dealer quote, transaction price, or an internal value as derived by analysis of market data. The base price of the security may be reset on a periodic basis based on the availability of market data and procedures approved by the Valuation Oversight Committee. Significant changes in the unobservable inputs of the proxy pricing process (the base price) would result in direct and proportional changes in the fair value of the security. These securities are categorized as Level 3 of the fair value hierarchy.

If third-party evaluated vendor pricing is not available or not deemed to be indicative of fair value, the Adviser may elect to obtain indicative market quotations directly from the broker-dealer or passed-through Broker Quotes from a third-party vendor. In the event that fair value is based upon a single sourced Broker Quote, these securities are categorized as Level 3 of the fair value hierarchy. Broker Quotes are typically received from established market participants. Although independently received, the Adviser does not have the transparency to view the underlying inputs which support the market quotation. Significant changes in the Broker Quote would have direct and proportional changes in the fair value of the security.

Discounted cash flow valuation uses an internal analysis based on the Adviser's expectation of future income and expenses, capital structure, exit multiples of a security, and other unobservable inputs which may include contractual and factual loan factors, estimated future payments and credit rating. Significant changes in the unobservable inputs of the models would result in direct and proportional changes in the fair value of the security. These securities are categorized as Level 3 of the fair value hierarchy.

Market comparable valuation estimates fair value by applying a valuation multiple to a key performance metric of the company, which may include unobservable inputs such as earnings before interest, taxes, depreciation and amortization ("EBITDA"), the Adviser's assumptions regarding comparable companies and non-public statements from the underlying company. Significant changes in the unobservable inputs would result in direct and proportional changes in the fair value of the security. These securities are categorized as Level 3 of the fair value hierarchy.

Reference instrument valuation estimates fair value by utilizing the correlation of the security to one or more broad-based securities, market indices, and/or other financial instruments, whose pricing information is readily available. Unobservable inputs may include those used in algorithms based on percentage change in the reference instruments and/or weights of each reference instrument. Significant changes in the unobservable inputs would result in direct and proportional changes in the fair value of the security. These securities are categorized as Level 3 of the fair value hierarchy.

Expected recovery valuation estimates that the fair value of an existing asset can be recovered, net of any liability. Significant changes in the unobservable inputs would result in direct and proportional changes in the fair value of the security. These securities are categorized as Level 3 of the fair value hierarchy.

Securities may be valued based on purchase prices of privately negotiated transactions. Significant changes in the unobservable inputs would result in direct and proportional changes in the fair value of the security. These securities are categorized as Level 3 of the fair value hierarchy.

Short-term debt instruments (such as commercial paper) having a remaining maturity of 60 days or less may be valued at amortized cost, so long as the amortized cost value of such short-term debt instruments is approximately the same as the fair value of the instrument as determined without the use of amortized cost valuation. These securities are categorized as Level 2 or Level 3 of the fair value hierarchy depending on the source of the base price.

## 4. SECURITIES AND OTHER INVESTMENTS

### (a) Investments in Affiliates

Each Fund may invest in the PIMCO Short Asset Portfolio and the PIMCO Short-Term Floating NAV Portfolio III ("Central Funds") to the extent permitted by the Act and rules thereunder. The Central Funds are registered investment companies created for use solely by the series of the Trust and other series of registered investment companies advised by the Adviser, in connection with their cash management activities. The main investments of the Central Funds are money market and short maturity fixed income instruments. The Central Funds may incur expenses related to their investment activities, but do not pay Investment Advisory Fees or Supervisory and Administrative Fees to the Adviser. The Central Funds are considered to be affiliated with the Funds. A complete schedule of portfolio holdings for each affiliate fund is filed with the SEC for the first and third quarters of each fiscal year on Form N-PORT and is available at the SEC's website at www.sec.gov. A copy of each affiliate fund's shareholder report is also available at the SEC's website at www.sec.gov, on the Funds' website at www.pimco.com, or upon request, as applicable. The tables below show the Funds' transactions in and earnings from investments in the affiliated Funds for the period ended March 31, 2021 (amounts in thousands†):

#### Investment in PIMCO Short Asset Portfolio

| Fund Name | Market Value 03/31/2020 | Purchases at Cost | Proceeds from Sales | Net Realized Gain (Loss) | Change in Unrealized Appreciation (Depreciation) | Market Value 03/31/2021 | Dividend Income[1] | Realized Net Capital Gain Distributions[1] |
|---|---|---|---|---|---|---|---|---|
| PIMCO Diversified Income Fund | $ 30,618 | $ 402 | $ (1) | $ 0 | $ 1,027 | $ 32,046 | $ 402 | $ 0 |

#### Investments in PIMCO Short-Term Floating NAV Portfolio III

| Fund Name | Market Value 03/31/2020 | Purchases at Cost | Proceeds from Sales | Net Realized Gain (Loss) | Change in Unrealized Appreciation (Depreciation) | Market Value 03/31/2021 | Dividend Income[1] | Realized Net Capital Gain Distributions[1] |
|---|---|---|---|---|---|---|---|---|
| PIMCO Credit Opportunities Bond Fund | $ 42,171 | $ 297,186 | $ (252,100) | $ (77) | $ 347 | $ 87,527 | $ 286 | $ 0 |
| PIMCO Diversified Income Fund | 1,332 | 1,475,725 | (1,016,100) | 17 | (38) | 460,936 | 324 | 0 |
| PIMCO High Yield Spectrum Fund | 23,442 | 286,822 | (271,101) | 49 | 54 | 39,266 | 122 | 0 |
| PIMCO Long-Term Credit Bond Fund | 22,239 | 1,922,875 | (1,889,700) | 357 | (26) | 55,745 | 145 | 0 |
| PIMCO Low Duration Credit Fund | 41,898 | 689,540 | (706,800) | 301 | 34 | 24,973 | 141 | 0 |
| PIMCO Low Duration Income Fund | 27,158 | 1,312,017 | (1,304,700) | (8) | (1) | 34,466 | 37 | 0 |
| PIMCO Preferred and Capital Securities Fund | 52 | 1,266,122 | (1,188,000) | 94 | 9 | 78,277 | 322 | 0 |

† A zero balance may reflect actual amounts rounding to less than one thousand.

[1] The tax characterization of distributions is determined in accordance with Federal income tax regulations and may contain a return of capital. The actual tax characterization of distributions received is determined at the end of the fiscal year of the affiliated fund. See Note 2, Distributions to Shareholders, in the Notes to Financial Statements for more information.

## Notes to Financial Statements (Cont.)

### (b) Investments in Securities

The Funds may utilize the investments and strategies described below to the extent permitted by each Fund's respective investment policies.

Bank Obligations in which a Fund may invest include certificates of deposit, bankers' acceptances, and fixed time deposits. Certificates of deposit are negotiable certificates issued against Funds deposited in a commercial bank for a definite period of time and earning a specified return. Bankers' acceptances are negotiable drafts or bills of exchange, normally drawn by an importer or exporter to pay for specific merchandise, which are "accepted" by a bank, meaning, in effect, that the bank unconditionally agrees to pay the face value of the instrument on maturity. Fixed time deposits are bank obligations payable at a stated maturity date and bearing interest at a fixed rate. Fixed time deposits may be withdrawn on demand by the investor, but may be subject to early withdrawal penalties which vary depending upon market conditions and the remaining maturity of the obligation.

Delayed-Delivery Transactions involve a commitment by a Fund to purchase or sell securities for a predetermined price or yield, with payment and delivery taking place beyond the customary settlement period. When delayed-delivery transactions are outstanding, a Fund will designate or receive as collateral liquid assets in an amount sufficient to meet the purchase price or respective obligations. When purchasing a security on a delayed-delivery basis, a Fund assumes the rights and risks of ownership of the security, including the risk of price and yield fluctuations, and takes such fluctuations into account when determining its NAV. A Fund may dispose of or renegotiate a delayed-delivery transaction after it is entered into, which may result in a realized gain (loss). When a Fund has sold a security on a delayed-delivery basis, the Fund does not participate in future gains (losses) with respect to the security.

Inflation-Indexed Bonds are fixed income securities whose principal value is periodically adjusted by the rate of inflation. The interest rate on these bonds is generally fixed at issuance at a rate lower than typical bonds. Over the life of an inflation-indexed bond, however, interest will be paid based on a principal value which is adjusted for inflation. Any increase or decrease in the principal amount of an inflation-indexed bond will be included as interest income on the Statements of Operations, even though investors do not receive their principal until maturity. Repayment of the original bond principal upon maturity (as adjusted for inflation) is guaranteed in the case of U.S. Treasury Inflation-Protected Securities. For bonds that do not provide a similar guarantee, the adjusted principal value of the bond repaid at maturity may be less than the original principal.

Loans and Other Indebtedness, Loan Participations and Assignments are direct debt instruments which are interests in amounts owed to lenders or lending syndicates by corporate, governmental, or other borrowers. A Fund's investments in loans may be in the form of participations in loans or assignments of all or a portion of loans from third parties or investments in or originations of loans by the Fund or Funds. A loan is often administered by a bank or other financial institution (the "agent") that acts as agent for all holders. The agent administers the terms of the loan, as specified in the loan agreement. A Fund may invest in multiple series or tranches of a loan, which may have varying terms and carry different associated risks. When a Fund purchases assignments from agents it acquires direct rights against the borrowers of the loans. These loans may include participations in bridge loans, which are loans taken out by borrowers for a short period (typically less than one year) pending arrangement of more permanent financing through, for example, the issuance of bonds, frequently high yield bonds issued for the purpose of acquisitions.

The types of loans and related investments in which the Funds may invest include, among others, senior loans, subordinated loans (including second lien loans, B-Notes and mezzanine loans), whole loans, commercial real estate and other commercial loans and structured loans. The Funds may originate loans or acquire direct interests in loans through primary loan distributions and/or in private transactions. In the case of subordinated loans, there may be significant indebtedness ranking ahead of the borrower's obligation to the holder of such a loan, including in the event of the borrower's insolvency. Mezzanine loans are typically secured by a pledge of an equity interest in the mortgage borrower that owns the real estate rather than an interest in a mortgage.

Investments in loans may include unfunded loan commitments, which are contractual obligations for funding. Unfunded loan commitments may include revolving credit facilities, which may obligate a Fund to supply additional cash to the borrower on demand. Unfunded loan commitments represent a future obligation in full, even though a percentage of the committed amount may not be utilized by the borrower. When investing in a loan participation, a Fund has the right to receive payments of principal, interest and any fees to which it is entitled only from the agent selling the loan agreement and only upon receipt of payments by the agent from the borrower. A Fund may receive a commitment fee based on the undrawn portion of the underlying line of credit portion of a loan. In certain circumstances, a Fund may receive a penalty fee upon the prepayment of a loan by a borrower. Fees earned or paid are recorded as a component of interest income or interest expense, respectively, on the Statements of Operations. Unfunded loan commitments are reflected as a liability on the Statements of Assets and Liabilities.

**Mortgage-Related and Other Asset-Backed Securities** directly or indirectly represent a participation in, or are secured by and payable from, loans on real property. Mortgage-related securities are created from pools of residential or commercial mortgage loans, including mortgage loans made by savings and loan institutions, mortgage bankers, commercial banks and others. These securities provide a monthly payment which consists of both interest and principal. Interest may be determined by fixed or adjustable rates. The rate of prepayments on underlying mortgages will affect the price and volatility of a mortgage-related security, and may have the effect of shortening or extending the effective duration of the security relative to what was anticipated at the time of purchase. The timely payment of principal and interest of certain mortgage-related securities is guaranteed with the full faith and credit of the U.S. Government. Pools created and guaranteed by non-governmental issuers, including government-sponsored corporations, may be supported by various forms of insurance or guarantees, but there can be no assurance that private insurers or guarantors can meet their obligations under the insurance policies or guarantee arrangements. Many of the risks of investing in mortgage-related securities secured by commercial mortgage loans reflect the effects of local and other economic conditions on real estate markets, the ability of tenants to make lease payments, and the ability of a property to attract and retain tenants. These securities may be less liquid and may exhibit greater price volatility than other types of mortgage-related or other asset-backed securities. Other asset-backed securities are created from many types of assets, including, but not limited to, auto loans, accounts receivable, such as credit card receivables and hospital account receivables, home equity loans, student loans, boat loans, mobile home loans, recreational vehicle loans, manufactured housing loans, aircraft leases, computer leases and syndicated bank loans.

**Collateralized Debt Obligations** ("CDOs") include Collateralized Bond Obligations ("CBOs"), Collateralized Loan Obligations ("CLOs") and other similarly structured securities. CBOs and CLOs are types of asset-backed securities. A CBO is a trust which is backed by a diversified pool of high risk, below investment grade fixed income securities. A CLO is a trust typically collateralized by a pool of loans, which may include, among others, domestic and foreign senior secured loans, senior unsecured loans, and subordinate corporate loans, including loans that may be rated below investment grade or equivalent unrated loans. The risks of an investment in a CDO depend largely on the type of the collateral securities and the class of the CDO in which a Fund invests. In addition to the normal risks associated with fixed income securities discussed elsewhere in this report and each Fund's prospectus and statement of additional information (e.g., prepayment risk, credit risk, liquidity risk, market risk, structural risk, legal risk and interest rate risk (which may be exacerbated if the interest rate payable

on a structured financing changes based on multiples of changes in interest rates or inversely to changes in interest rates)), CBOs, CLOs and other CDOs carry additional risks including, but not limited to, (i) the possibility that distributions from collateral securities will not be adequate to make interest or other payments, (ii) the quality of the collateral may decline in value or default, (iii) the risk that a Fund may invest in CBOs, CLOs, or other CDOs that are subordinate to other classes, and (iv) the complex structure of the security may not be fully understood at the time of investment and may produce disputes with the issuer or unexpected investment results.

**Collateralized Mortgage Obligations** ("CMOs") are debt obligations of a legal entity that are collateralized by whole mortgage loans or private mortgage bonds and divided into classes. CMOs are structured into multiple classes, often referred to as "tranches", with each class bearing a different stated maturity and entitled to a different schedule for payments of principal and interest, including prepayments. CMOs may be less liquid and may exhibit greater price volatility than other types of mortgage-related or asset-backed securities.

**Stripped Mortgage-Backed Securities** ("SMBS") are derivative multi-class mortgage securities. SMBS are usually structured with two classes that receive different proportions of the interest and principal distributions on a pool of mortgage assets. An SMBS will have one class that will receive all of the interest (the interest-only or "IO" class), while the other class will receive the entire principal (the principal-only or "PO" class). Payments received for IOs are included in interest income on the Statements of Operations. Because no principal will be received at the maturity of an IO, adjustments are made to the cost of the security on a monthly basis until maturity. These adjustments are included in interest income on the Statements of Operations. Payments received for POs are treated as reductions to the cost and par value of the securities.

**Payment In-Kind Securities** may give the issuer the option at each interest payment date of making interest payments in either cash and/or additional debt securities. Those additional debt securities usually have the same terms, including maturity dates and interest rates, and associated risks as the original bonds. The daily market quotations of the original bonds may include the accrued interest (referred to as a dirty price) and require a pro rata adjustment from the unrealized appreciation (depreciation) on investments to interest receivable on the Statements of Assets and Liabilities.

**Perpetual Bonds** are fixed income securities with no maturity date but pay a coupon in perpetuity (with no specified ending or maturity date). Unlike typical fixed income securities, there is no obligation for perpetual bonds to repay principal. The coupon payments, however, are mandatory. While perpetual bonds have no maturity date, they may

## Notes to Financial Statements (Cont.)

have a callable date in which the perpetuity is eliminated and the issuer may return the principal received on the specified call date. Additionally, a perpetual bond may have additional features, such as interest rate increases at periodic dates or an increase as of a predetermined point in the future.

Real Estate Investment Trusts ("REITs") are pooled investment vehicles that own, and typically operate, income-producing real estate. If a REIT meets certain requirements, including distributing to shareholders substantially all of its taxable income (other than net capital gains), then it is not taxed on the income distributed to shareholders. Distributions received from REITs may be characterized as income, capital gain or a return of capital. A return of capital is recorded by a Fund as a reduction to the cost basis of its investment in the REIT. REITs are subject to management fees and other expenses, and so the Funds that invest in REITs will bear their proportionate share of the costs of the REITs' operations.

Restricted Investments are subject to legal or contractual restrictions on resale and may generally be sold privately, but may be required to be registered or exempted from such registration before being sold to the public. Private placement securities are generally considered to be restricted except for those securities traded between qualified institutional investors under the provisions of Rule 144A of the Securities Act of 1933. Disposal of restricted investments may involve time-consuming negotiations and expenses, and prompt sale at an acceptable price may be difficult to achieve. Restricted investments held by the Funds at March 31, 2021, as applicable, are disclosed in the Notes to Schedules of Investments.

Securities Issued by U.S. Government Agencies or Government-Sponsored Enterprises are obligations of and, in certain cases, guaranteed by, the U.S. Government, its agencies or instrumentalities. Some U.S. Government securities, such as Treasury bills, notes and bonds, and securities guaranteed by the Government National Mortgage Association, are supported by the full faith and credit of the U.S. Government; others, such as those of the Federal Home Loan Banks, are supported by the right of the issuer to borrow from the U.S. Department of the Treasury (the "U.S. Treasury"); and others, such as those of the Federal National Mortgage Association ("FNMA" or "Fannie Mae"), are supported by the discretionary authority of the U.S. Government to purchase the agency's obligations. U.S. Government securities may include zero coupon securities which do not distribute interest on a current basis and tend to be subject to a greater risk than interest-paying securities of similar maturities.

Government-related guarantors (i.e., not backed by the full faith and credit of the U.S. Government) include FNMA and the Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac"). FNMA is a government-sponsored corporation. FNMA purchases conventional (i.e., not insured or guaranteed by any government agency) residential mortgages from a list of approved seller/servicers which include state and federally chartered savings and loan associations, mutual savings banks, commercial banks and credit unions and mortgage bankers. Pass-through securities issued by FNMA are guaranteed as to timely payment of principal and interest by FNMA, but are not backed by the full faith and credit of the U.S. Government. FHLMC issues Participation Certificates ("PCs"), which are pass-through securities, each representing an undivided interest in a pool of residential mortgages. FHLMC guarantees the timely payment of interest and ultimate collection of principal, but PCs are not backed by the full faith and credit of the U.S. Government.

In June 2019, FNMA and FHLMC started issuing Uniform Mortgage Backed Securities in place of their current offerings of TBA-eligible securities (the "Single Security Initiative"). The Single Security Initiative seeks to support the overall liquidity of the TBA market and aligns the characteristics of FNMA and FHLMC certificates. The effects that the Single Security Initiative may have on the market for TBA and other mortgage-backed securities are uncertain.

Roll-timing strategies can be used where a Fund seeks to extend the expiration or maturity of a position, such as a TBA security on an underlying asset, by closing out the position before expiration and opening a new position with respect to substantially the same underlying asset with a later expiration date. TBA securities purchased or sold are reflected on the Statements of Assets and Liabilities as an asset or liability, respectively.

Warrants are securities that are usually issued together with a debt security or preferred security and that give the holder the right to buy a proportionate amount of common stock at a specified price. Warrants normally have a life that is measured in years and entitle the holder to buy common stock of a company at a price that is usually higher than the market price at the time the warrant is issued. Warrants may entail greater risks than certain other types of investments. Generally, warrants do not carry the right to receive dividends or exercise voting rights with respect to the underlying securities, and they do not represent any rights in the assets of the issuer. In addition, their value does not necessarily change with the value of the underlying securities, and they cease to have value if they are not exercised on or before their expiration date. If the market price of the underlying stock does not exceed the exercise price during the life of the warrant, the warrant will expire worthless. Warrants may increase the potential profit or loss to be realized from the investment as compared with investing the same amount in the underlying securities. Similarly, the percentage increase or decrease in the value of an equity security warrant may be greater than the percentage increase or decrease in the value of the underlying

common stock. Warrants may relate to the purchase of equity or debt securities. Debt obligations with warrants attached to purchase equity securities have many characteristics of convertible securities and their prices may, to some degree, reflect the performance of the underlying stock. Debt obligations also may be issued with warrants attached to purchase additional debt securities at the same coupon rate. A decline in interest rates would permit a Fund to sell such warrants at a profit. If interest rates rise, these warrants would generally expire with no value.

**When-Issued Transactions**  are purchases or sales made on a when-issued basis. These transactions are made conditionally because a security, although authorized, has not yet been issued in the market. Transactions to purchase or sell securities on a when-issued basis involve a commitment by a Fund to purchase or sell these securities for a predetermined price or yield, with payment and delivery taking place beyond the customary settlement period. A Fund may sell when-issued securities before they are delivered, which may result in a realized gain (loss).

## 5. BORROWINGS AND OTHER FINANCING TRANSACTIONS

The Funds may enter into the borrowings and other financing transactions described below to the extent permitted by each Fund's respective investment policies.

The following disclosures contain information on a Fund's ability to lend or borrow cash or securities to the extent permitted under the Act, which may be viewed as borrowing or financing transactions by a Fund. The location of these instruments in each Fund's financial statements is described below.

**(a) Line of Credit**  The PIMCO High Yield Spectrum Fund and PIMCO Low Duration Credit Fund entered into a 364-day senior unsecured revolving credit agreement with State Street Bank & Trust Company and other commercial banks to be utilized for temporary purposes to fund shareholder redemptions or for other short-term liquidity purposes. State Street Bank & Trust Company serves as both a bank and as an agent for the other banks that are parties to the agreement. The Funds pay financing charges based on a combination of a London Interbank Offered Rate-based variable rate plus a credit spread. The Funds also pay a fee of 0.15% per annum on the unused maximum available commitment amounts. As of March 31, 2021, if applicable any outstanding borrowings would be disclosed as a payable for line of credit on the Statements of Assets and Liabilities. Interest and commitment and upfront fees, if any, paid by the Funds are disclosed as part of the interest expense on the Statements of Operations.

During the period, there were no borrowings on this line of credit. The maximum available commitment and related fees for the revolving credit agreement are:

| Funds | Maximum Available Commitment* | Expiration Date | Commitment and Upfront Fees |
|---|---|---|---|
| PIMCO High Yield Spectrum Fund | $ 19,000,000 | 08/31/2021 | $  61,295 |
| PIMCO Low Duration Credit Fund | $ 47,000,000 | 08/31/2021 | $ 113,826 |

\*  Maximum available commitment prior to renewal on September 1, 2020, for PIMCO High Yield Spectrum Bond and PIMCO Low Duration Credit Fund was $35,000,000 and $45,000,000, respectively. The agreements expire on August 31, 2021 unless extended or renewed.

**(b) Repurchase Agreements**  Under the terms of a typical repurchase agreement, a Fund purchases an underlying debt obligation (collateral) subject to an obligation of the seller to repurchase, and a Fund to resell, the obligation at an agreed-upon price and time. In an open maturity repurchase agreement, there is no pre-determined repurchase date and the agreement can be terminated by the Fund or counterparty at any time. The underlying securities for all repurchase agreements are held by a Fund's custodian or designated subcustodians under tri-party repurchase agreements and in certain instances will remain in custody with the counterparty. The market value of the collateral must be equal to or exceed the total amount of the repurchase obligations, including interest. Repurchase agreements, if any, including accrued interest, are included on the Statements of Assets and Liabilities. Interest earned is recorded as a component of interest income on the Statements of Operations. In periods of increased demand for collateral, a Fund may pay a fee for the receipt of collateral, which may result in interest expense to the Fund.

**(c) Reverse Repurchase Agreements**  In a reverse repurchase agreement, a Fund delivers a security in exchange for cash to a financial institution, the counterparty, with a simultaneous agreement to repurchase the same or substantially the same security at an agreed upon price and date. In an open maturity reverse repurchase agreement, there is no pre-determined repurchase date and the agreement can be terminated by the Fund or counterparty at any time. A Fund is entitled to receive principal and interest payments, if any, made on the security delivered to the counterparty during the term of the agreement. Cash received in exchange for securities delivered plus accrued interest payments to be made by a Fund to counterparties are reflected as a liability on the Statements of Assets and Liabilities. Interest payments made by a Fund to counterparties are recorded as a component of interest expense on the Statements of Operations. In periods of increased demand for the security, a Fund may receive a fee for use of the security by the counterparty, which may result in interest income to the Fund. A Fund will segregate assets determined to be liquid by the Adviser or will otherwise cover its obligations under reverse repurchase agreements.

**Notes to Financial Statements** (Cont.)

(d) Sale-Buybacks  A sale-buyback financing transaction consists of a sale of a security by a Fund to a financial institution, the counterparty, with a simultaneous agreement to repurchase the same or substantially the same security at an agreed-upon price and date. A Fund is not entitled to receive principal and interest payments, if any, made on the security sold to the counterparty during the term of the agreement. The agreed-upon proceeds for securities to be repurchased by a Fund are reflected as a liability on the Statements of Assets and Liabilities. A Fund will recognize net income represented by the price differential between the price received for the transferred security and the agreed-upon repurchase price. This is commonly referred to as the 'price drop'. A price drop consists of (i) the foregone interest and inflationary income adjustments, if any, a Fund would have otherwise received had the security not been sold and (ii) the negotiated financing terms between a Fund and counterparty. Foregone interest and inflationary income adjustments, if any, are recorded as components of interest income on the Statements of Operations. Interest payments based upon negotiated financing terms made by a Fund to counterparties are recorded as a component of interest expense on the Statements of Operations. In periods of increased demand for the security, a Fund may receive a fee for use of the security by the counterparty, which may result in interest income to the Fund. A Fund will segregate assets determined to be liquid by the Adviser or will otherwise cover its obligations under sale-buyback transactions.

(e) Short Sales  Short sales are transactions in which a Fund sells a security that it may not own. A Fund may make short sales of securities to (i) offset potential declines in long positions in similar securities, (ii) to increase the flexibility of the Fund, (iii) for investment return, (iv) as part of a risk arbitrage strategy, and (v) as part of its overall portfolio management strategies involving the use of derivative instruments. When a Fund engages in a short sale, it may borrow the security sold short and deliver it to the counterparty. A Fund will ordinarily have to pay a fee or premium to borrow a security and be obligated to repay the lender of the security any dividend or interest that accrues on the security during the period of the loan. Securities sold in short sale transactions and the dividend or interest payable on such securities, if any, are reflected as payable for short sales on the Statements of Assets and Liabilities. Short sales expose a Fund to the risk that it will be required to cover its short position at a time when the security or other asset has appreciated in value, thus resulting in losses to a Fund. A short sale is "against the box" if a Fund holds in its portfolio or has the right to acquire the security sold short, or securities identical to the security sold short, at no additional cost. A Fund will be subject to additional risks to the extent that it engages in short sales that are not "against the box." A Fund's loss on a short sale could theoretically be unlimited in cases where a Fund is unable, for whatever reason, to close out its short position.

(f) Interfund Lending  In accordance with an exemptive order (the "Order") from the SEC, the Funds of the Trust may participate in a joint lending and borrowing facility for temporary purposes (the "Interfund Lending Program"), subject to compliance with the terms and conditions of the Order, and to the extent permitted by each Fund's investment policies and restrictions. The Funds are currently permitted to borrow under the Interfund Lending Program. A lending fund may lend in aggregate up to 15% of its current net assets at the time of the interfund loan, but may not lend more than 5% of its net assets to any one borrowing fund through the Interfund Lending Program. A borrowing fund may not borrow through the Interfund Lending Program or from any other source if its total outstanding borrowings immediately after the borrowing would be more than 33 1/3% of its total assets (or any lower threshold provided for by the fund's investment restrictions). If a borrowing fund's total outstanding borrowings exceed 10% of its total assets, each of its outstanding interfund loans will be subject to collateralization of at least 102% of the outstanding principal value of the loan. All interfund loans are for temporary or emergency purposes and the interfund loan rate to be charged will be the average of the highest current overnight repurchase agreement rate available to a lending fund and the bank loan rate, as calculated according to a formula established by the Board.

On March 23, 2020, the SEC issued an exemptive order (the "Temporary Order") to provide temporary relief to the Funds of the Trust in relation to the Interfund Lending Program, and the Board has authorized the Funds to rely on the Temporary Order. With respect to interfund lending, the Temporary Order permitted, under certain conditions, a lending fund to lend in aggregate up to 25% of its current net assets at the time of the interfund loan and to make interfund loans with term limits of up to the expiration of the Temporary Order, notwithstanding the current limit of seven business days under the Order. The SEC provided notice in April 2021 that the Temporary Order would be terminated on April 30, 2021.

During the period ended March 31, 2021, the Funds did not participate in the Interfund Lending Program.

## 6. FINANCIAL DERIVATIVE INSTRUMENTS

The Funds may enter into the financial derivative instruments described below to the extent permitted by each Fund's respective investment policies.

The following disclosures contain information on how and why the Funds use financial derivative instruments, and how financial derivative instruments affect the Funds' financial position, results of operations and cash flows. The location and fair value amounts of these instruments on the Statements of Assets and Liabilities and the net realized gain (loss) and net change in unrealized appreciation

(depreciation) on the Statements of Operations, each categorized by type of financial derivative contract and related risk exposure, are included in a table in the Notes to Schedules of Investments. The financial derivative instruments outstanding as of period end and the amounts of net realized gain (loss) and net change in unrealized appreciation (depreciation) on financial derivative instruments during the period, as disclosed in the Notes to Schedules of Investments, serve as indicators of the volume of financial derivative activity for the Funds.

(a) Forward Foreign Currency Contracts  may be engaged, in connection with settling planned purchases or sales of securities, to hedge the currency exposure associated with some or all of a Fund's securities or as part of an investment strategy. A forward foreign currency contract is an agreement between two parties to buy and sell a currency at a set price on a future date. The market value of a forward foreign currency contract fluctuates with changes in foreign currency exchange rates. Forward foreign currency contracts are marked to market daily, and the change in value is recorded by a Fund as an unrealized gain (loss). Realized gains (losses) are equal to the difference between the value of the contract at the time it was opened and the value at the time it was closed and are recorded upon delivery or receipt of the currency. These contracts may involve market risk in excess of the unrealized gain (loss) reflected on the Statements of Assets and Liabilities. In addition, a Fund could be exposed to risk if the counterparties are unable to meet the terms of the contracts or if the value of the currency changes unfavorably to the U.S. dollar. To mitigate such risk, cash or securities may be exchanged as collateral pursuant to the terms of the underlying contracts.

(b) Futures Contracts  are agreements to buy or sell a security or other asset for a set price on a future date and are traded on an exchange. A Fund may use futures contracts to manage its exposure to the securities markets or to movements in interest rates and currency values. The primary risks associated with the use of futures contracts are the imperfect correlation between the change in market value of the securities held by a Fund and the prices of futures contracts and the possibility of an illiquid market. Futures contracts are valued based upon their quoted daily settlement prices. Upon entering into a futures contract, a Fund is required to deposit with its futures broker an amount of cash, U.S. Government and Agency Obligations, or select sovereign debt, in accordance with the initial margin requirements of the broker or exchange. Futures contracts are marked to market daily and based on such movements in the price of the contracts, an appropriate payable or receivable for the change in value may be posted or collected by the Fund ("Futures Variation Margin"). Futures Variation Margins, if any, are disclosed within centrally cleared financial derivative instruments on the Statements of Assets and Liabilities. Gains (losses) are recognized but not considered realized until the contracts expire or close. Futures contracts involve, to varying degrees, risk of loss in excess of the Futures Variation Margin included within exchange traded or centrally cleared financial derivative instruments on the Statements of Assets and Liabilities.

(c) Options Contracts  may be written or purchased to enhance returns or to hedge an existing position or future investment. A Fund may write call and put options on securities and financial derivative instruments it owns or in which it may invest. Writing put options tends to increase a Fund's exposure to the underlying instrument. Writing call options tends to decrease a Fund's exposure to the underlying instrument. When a Fund writes a call or put, an amount equal to the premium received is recorded and subsequently marked to market to reflect the current value of the option written. These amounts are included on the Statements of Assets and Liabilities. Premiums received from writing options which expire are treated as realized gains. Premiums received from writing options which are exercised or closed are added to the proceeds or offset against amounts paid on the underlying futures, swap, security or currency transaction to determine the realized gain (loss). Certain options may be written with premiums to be determined on a future date. The premiums for these options are based upon implied volatility parameters at specified terms. A Fund as a writer of an option has no control over whether the underlying instrument may be sold ("call") or purchased ("put") and as a result bears the market risk of an unfavorable change in the price of the instrument underlying the written option. There is the risk a Fund may not be able to enter into a closing transaction because of an illiquid market.

Purchasing call options tends to increase a Fund's exposure to the underlying instrument. Purchasing put options tends to decrease a Fund's exposure to the underlying instrument. A Fund pays a premium which is included as an asset on the Statements of Assets and Liabilities and subsequently marked to market to reflect the current value of the option. Premiums paid for purchasing options which expire are treated as realized losses. Certain options may be purchased with premiums to be determined on a future date. The premiums for these options are based upon implied volatility parameters at specified terms. The risk associated with purchasing put and call options is limited to the premium paid. Premiums paid for purchasing options which are exercised or closed are added to the amounts paid or offset against the proceeds on the underlying investment transaction to determine the realized gain (loss) when the underlying transaction is executed.

Credit Default Swaptions  may be written or purchased to hedge exposure to the credit risk of an investment without making a commitment to the underlying instrument. A credit default swaption is an option to sell or buy credit protection on a specific reference by entering into a pre-defined swap agreement by some specified date in the future.

**Notes to Financial Statements** (Cont.)

**Foreign Currency Options**  may be written or purchased to be used as a short or long hedge against possible variations in foreign exchange rates or to gain exposure to foreign currencies.

**Inflation-Capped Options**  may be written or purchased to enhance returns or for hedging opportunities. The purpose of purchasing inflation-capped options is to protect a Fund from inflation erosion above a certain rate on a given notional exposure. A floor can be used to give downside protection to investments in inflation-linked products.

**Interest Rate Swaptions**  may be written or purchased to enter into a pre-defined swap agreement or to shorten, extend, cancel or otherwise modify an existing swap agreement, by some specified date in the future. The writer of the swaption becomes the counterparty to the swap if the buyer exercises. The interest rate swaption agreement will specify whether the buyer of the swaption will be a fixed-rate receiver or a fixed-rate payer upon exercise.

**Options on Exchange-Traded Futures Contracts**  ("Futures Option") may be written or purchased to hedge an existing position or future investment, for speculative purposes or to manage exposure to market movements. A Futures Option is an option contract in which the underlying instrument is a single futures contract.

**Options on Securities**  may be written or purchased to enhance returns or to hedge an existing position or future investment. An option on a security uses a specified security as the underlying instrument for the option contract.

**(d) Swap Agreements**  are bilaterally negotiated agreements between a Fund and a counterparty to exchange or swap investment cash flows, assets, foreign currencies or market-linked returns at specified, future intervals. Swap agreements may be privately negotiated in the over the counter market ("OTC swaps") or may be cleared through a third party, known as a central counterparty or derivatives clearing organization ("Centrally Cleared Swaps"). A Fund may enter into asset, credit default, cross-currency, interest rate, total return, variance and other forms of swap agreements to manage its exposure to credit, currency, interest rate, commodity, equity and inflation risk. In connection with these agreements, securities or cash may be identified as collateral or margin in accordance with the terms of the respective swap agreements to provide assets of value and recourse in the event of default or bankruptcy/insolvency.

Centrally Cleared Swaps are marked to market daily based upon valuations as determined from the underlying contract or in accordance with the requirements of the central counterparty or derivatives clearing organization. Changes in market value, if any, are reflected as a component of net change in unrealized appreciation (depreciation) on the Statements of Operations. Daily changes in valuation of centrally cleared swaps ("Swap Variation Margin"), if any, are disclosed within centrally cleared financial derivative instruments on the Statements of Assets and Liabilities. Centrally Cleared and OTC swap payments received or paid at the beginning of the measurement period are included on the Statements of Assets and Liabilities and represent premiums paid or received upon entering into the swap agreement to compensate for differences between the stated terms of the swap agreement and prevailing market conditions (credit spreads, currency exchange rates, interest rates, and other relevant factors). Upfront premiums received (paid) are initially recorded as liabilities (assets) and subsequently marked to market to reflect the current value of the swap. These upfront premiums are recorded as realized gain (loss) on the Statements of Operations upon termination or maturity of the swap. A liquidation payment received or made at the termination of the swap is recorded as realized gain (loss) on the Statements of Operations. Net periodic payments received or paid by a Fund are included as part of realized gain (loss) on the Statements of Operations.

For purposes of applying certain of a Fund's investment policies and restrictions, swap agreements, like other derivative instruments, may be valued by a Fund at market value, notional value or full exposure value. In the case of a credit default swap, in applying certain of a Fund's investment policies and restrictions, the Funds will value the credit default swap at its notional value or its full exposure value (*i.e.*, the sum of the notional amount for the contract plus the market value), but may value the credit default swap at market value for purposes of applying certain of a Fund's other investment policies and restrictions. For example, a Fund may value credit default swaps at full exposure value for purposes of a Fund's credit quality guidelines (if any) because such value in general better reflects a Fund's actual economic exposure during the term of the credit default swap agreement. As a result, a Fund may, at times, have notional exposure to an asset class (before netting) that is greater or lesser than the stated limit or restriction noted in a Fund's prospectus. In this context, both the notional amount and the market value may be positive or negative depending on whether a Fund is selling or buying protection through the credit default swap. The manner in which certain securities or other instruments are valued by a Fund for purposes of applying investment policies and restrictions may differ from the manner in which those investments are valued by other types of investors.

Entering into swap agreements involves, to varying degrees, elements of interest, credit, market and documentation risk in excess of the amounts recognized on the Statements of Assets and Liabilities. Such risks involve the possibility that there will be no liquid market for these agreements, that the counterparty to the agreements may default on its obligation to perform or disagree as to the meaning of contractual terms in the agreements and that there may be unfavorable changes in interest rates or the values of the asset upon which the swap is based.

A Fund's maximum risk of loss from counterparty credit risk is the discounted net value of the cash flows to be received from the counterparty over the contract's remaining life, to the extent that amount is positive. The risk may be mitigated by having a master netting arrangement between a Fund and the counterparty and by the posting of collateral to a Fund to cover a Fund's exposure to the counterparty.

To the extent a Fund has a policy to limit the net amount owed to or to be received from a single counterparty under existing swap agreements, such limitation only applies to counterparties to OTC swaps and does not apply to centrally cleared swaps where the counterparty is a central counterparty or derivatives clearing organization.

Credit Default Swap Agreements  on corporate, loan, sovereign, U.S. municipal or U.S. Treasury issues are entered into to provide a measure of protection against defaults of the issuers (*i.e.*, to reduce risk where a Fund owns or has exposure to the referenced obligation) or to take an active long or short position with respect to the likelihood of a particular issuer's default. Credit default swap agreements involve one party making a stream of payments (referred to as the buyer of protection) to another party (the seller of protection) in exchange for the right to receive a specified return in the event that the referenced entity, obligation or index, as specified in the swap agreement, undergoes a certain credit event. As a seller of protection on credit default swap agreements, a Fund will generally receive from the buyer of protection a fixed rate of income throughout the term of the swap provided that there is no credit event. As the seller, a Fund would effectively add leverage to its portfolio because, in addition to its total net assets, a Fund would be subject to investment exposure on the notional amount of the swap.

If a Fund is a seller of protection and a credit event occurs, as defined under the terms of that particular swap agreement, a Fund will either (i) pay to the buyer of protection an amount equal to the notional amount of the swap and take delivery of the referenced obligation, other deliverable obligations or underlying securities comprising the referenced index or (ii) pay a net settlement amount in the form of cash or securities equal to the notional amount of the swap less the recovery value of the referenced obligation or underlying securities comprising the referenced index. If a Fund is a buyer of protection and a credit event occurs, as defined under the terms of that particular swap agreement, a Fund will either (i) receive from the seller of protection an amount equal to the notional amount of the swap and deliver the referenced obligation, other deliverable obligations or underlying securities comprising the referenced index or (ii) receive a net settlement amount in the form of cash or securities equal to the notional amount of the swap less the recovery value of the referenced

obligation or underlying securities comprising the referenced index. Recovery values are estimated by market makers considering either industry standard recovery rates or entity specific factors and considerations until a credit event occurs. If a credit event has occurred, the recovery value is determined by a facilitated auction whereby a minimum number of allowable broker bids, together with a specified valuation method, are used to calculate the settlement value. The ability to deliver other obligations may result in a cheapest-to-deliver option (the buyer of protection's right to choose the deliverable obligation with the lowest value following a credit event).

Credit default swap agreements on credit indices involve one party making a stream of payments to another party in exchange for the right to receive a specified return in the event of a write-down, principal shortfall, interest shortfall or default of all or part of the referenced entities comprising the credit index. A credit index is a basket of credit instruments or exposures designed to be representative of some part of the credit market as a whole. These indices are made up of reference credits that are judged by a poll of dealers to be the most liquid entities in the credit default swap market based on the sector of the index. Components of the indices may include, but are not limited to, investment grade securities, high yield securities, asset-backed securities, emerging markets, and/or various credit ratings within each sector. Credit indices are traded using credit default swaps with standardized terms including a fixed spread and standard maturity dates. An index credit default swap references all the names in the index, and if there is a default, the credit event is settled based on that name's weight in the index. The composition of the indices changes periodically, usually every six months, and for most indices, each name has an equal weight in the index. A Fund may use credit default swaps on credit indices to hedge a portfolio of credit default swaps or bonds, which is less expensive than it would be to buy many credit default swaps to achieve a similar effect. Credit default swaps on indices are instruments for protecting investors owning bonds against default, and traders use them to speculate on changes in credit quality.

Implied credit spreads, represented in absolute terms, utilized in determining the market value of credit default swap agreements on corporate, loan, sovereign, U.S. municipal or U.S. Treasury issues as of period end, if any, are disclosed in the Notes to Schedules of Investments. They serve as an indicator of the current status of payment/performance risk and represent the likelihood or risk of default for the reference entity. The implied credit spread of a particular referenced entity reflects the cost of buying/selling protection and may include upfront payments required to be made to enter into the agreement. Wider credit spreads represent a deterioration of the referenced entity's credit soundness and a greater likelihood or risk of default or other credit event occurring as defined under the terms of

**Notes to Financial Statements** (Cont.)

the agreement. For credit default swap agreements on asset-backed securities and credit indices, the quoted market prices and resulting values serve as the indicator of the current status of the payment/performance risk. Increasing market values, in absolute terms when compared to the notional amount of the swap, represent a deterioration of the referenced entity's credit soundness and a greater likelihood or risk of default or other credit event occurring as defined under the terms of the agreement.

The maximum potential amount of future payments (undiscounted) that a Fund as a seller of protection could be required to make under a credit default swap agreement equals the notional amount of the agreement. Notional amounts of each individual credit default swap agreement outstanding as of period end for which a Fund is the seller of protection are disclosed in the Notes to Schedules of Investments. These potential amounts would be partially offset by any recovery values of the respective referenced obligations, upfront payments received upon entering into the agreement, or net amounts received from the settlement of buy protection credit default swap agreements entered into by a Fund for the same referenced entity or entities.

Interest Rate Swap Agreements  may be entered into to help hedge against interest rate risk exposure and to maintain a Fund's ability to generate income at prevailing market rates. The value of the fixed rate bonds that the Funds hold may decrease if interest rates rise. To help hedge against this risk and to maintain its ability to generate income at prevailing market rates, a Fund may enter into interest rate swap agreements. Interest rate swap agreements involve the exchange by a Fund with another party for their respective commitment to pay or receive interest on the notional amount of principal. Certain forms of interest rate swap agreements may include: (i) interest rate caps, under which, in return for a premium, one party agrees to make payments to

the other to the extent that interest rates exceed a specified rate, or "cap", (ii) interest rate floors, under which, in return for a premium, one party agrees to make payments to the other to the extent that interest rates fall below a specified rate, or "floor", (iii) interest rate collars, under which a party sells a cap and purchases a floor or vice versa in an attempt to protect itself against interest rate movements exceeding given minimum or maximum levels, (iv) callable interest rate swaps, under which the buyer pays an upfront fee in consideration for the right to early terminate the swap transaction in whole, at zero cost and at a predetermined date and time prior to the maturity date, (v) spreadlocks, which allow the interest rate swap users to lock in the forward differential (or spread) between the interest rate swap rate and a specified benchmark, or (vi) basis swaps, under which two parties can exchange variable interest rates based on different segments of money markets.

Total Return Swap Agreements  are entered into to gain or mitigate exposure to the underlying reference asset. Total return swap agreements involve commitments where single or multiple cash flows are exchanged based on the price of an underlying reference asset and on a fixed or variable interest rate. Total return swap agreements may involve commitments to pay interest in exchange for a market-linked return. One counterparty pays out the total return of a specific underlying reference asset, which may include a single security, a basket of securities, or an index, and in return receives a fixed or variable rate. At the maturity date, a net cash flow is exchanged where the total return is equivalent to the return of the underlying reference asset less a financing rate, if any. As a receiver, a Fund would receive payments based on any net positive total return and would owe payments in the event of a net negative total return. As the payer, a Fund would owe payments on any net positive total return, and would receive payments in the event of a net negative total return.

## 7. PRINCIPAL AND OTHER RISKS

(a) Principal Risks

The principal risks of investing in a Fund, which could adversely affect its net asset value, yield and total return, are listed below.

| Risks | PIMCO Credit Opportunities Bond Fund | PIMCO Diversified Income Fund | PIMCO ESG Income Fund | PIMCO High Yield Spectrum Fund | PIMCO Long-Term Credit Bond Fund | PIMCO Low Duration Credit Fund | PIMCO Low Duration Income Fund | PIMCO Preferred and Capital Securities Fund |
|---|---|---|---|---|---|---|---|---|
| New Fund | — | — | X | — | — | — | — | — |
| Small Fund | — | — | X | — | — | — | — | — |
| Interest Rate | X | X | X | X | X | X | X | X |
| Call | X | X | X | X | X | X | X | X |
| Credit | X | X | X | X | X | X | X | X |
| Capital Securities | — | — | — | — | — | — | — | X |
| Preferred Securities | — | — | — | — | — | — | — | X |
| Concentration in Banking Industries | — | — | — | — | — | — | — | X |
| Contingent Convertible Securities | — | — | X | — | — | — | X | X |
| High Yield | X | X | X | X | X | X | X | X |
| Market | X | X | X | X | X | X | X | X |

| Risks | PIMCO Credit Opportunities Bond Fund | PIMCO Diversified Income Fund | PIMCO ESG Income Fund | PIMCO High Yield Spectrum Fund | PIMCO Long-Term Credit Bond Fund | PIMCO Low Duration Credit Fund | PIMCO Low Duration Income Fund | PIMCO Preferred and Capital Securities Fund |
|---|---|---|---|---|---|---|---|---|
| Issuer | X | X | X | X | X | X | X | X |
| Liquidity | X | X | X | X | X | X | X | X |
| Derivatives | X | X | X | X | X | X | X | X |
| Equity | X | X | X | X | X | X | X | X |
| Mortgage-Related and Other Asset-Backed Securities | X | X | X | — | X | — | X | — |
| Foreign (Non-U.S.) Investment | X | X | X | X | X | X | X | X |
| Emerging Markets | X | X | X | X | X | X | X | X |
| Sovereign Debt | X | X | X | X | X | X | X | X |
| Currency | X | X | X | X | X | — | X | X |
| Leveraging | X | X | X | X | X | X | X | X |
| Management | X | X | X | X | X | X | X | X |
| Subsidiary | — | — | — | — | — | — | — | X |
| Regulation S Securities | — | — | — | — | — | — | — | X |
| Short Exposure | X | X | X | X | X | X | X | X |
| Convertible Securities | X | — | — | — | — | — | — | — |
| Senior Loan | X | — | — | — | — | X | — | — |
| Distribution Rate | — | — | X | — | — | — | X | — |
| Environmental, Social and Governance Investing | — | — | X | — | — | — | — | — |
| LIBOR Transition | X | X | X | — | X | X | X | X |

Please see "Description of Principal Risks" in a Fund's prospectus for a more detailed description of the risks of investing in a Fund.

**New Fund Risk** is the risk that a new fund's performance may not represent how the fund is expected to or may perform in the long term. In addition, new funds have limited operating histories for investors to evaluate and new funds may not attract sufficient assets to achieve investment and trading efficiencies.

**Small Fund Risk** is the risk that a smaller fund may not achieve investment or trading efficiencies. Additionally, a smaller fund may be more adversely affected by large purchases or redemptions of fund shares.

**Interest Rate Risk** is the risk that fixed income securities will decline in value because of an increase in interest rates; a fund with a longer average portfolio duration will be more sensitive to changes in interest rates than a fund with a shorter average portfolio duration.

**Call Risk** is the risk that an issuer may exercise its right to redeem a fixed income security earlier than expected (a call). Issuers may call outstanding securities prior to their maturity for a number of reasons (e.g., declining interest rates, changes in credit spreads and improvements in the issuer's credit quality). If an issuer calls a security that a Fund has invested in, the Fund may not recoup the full amount of its initial investment and may be forced to reinvest in lower-yielding securities, securities with greater credit risks or securities with other, less favorable features.

**Credit Risk** is the risk that a Fund could lose money if the issuer or guarantor of a fixed income security, or the counterparty to a derivative contract, is unable or unwilling, or is perceived (whether by market participants, rating agencies, pricing services or otherwise) as unable or unwilling, to meet its financial obligations.

**Capital Securities Risk** is the risk that the value of securities issued by U.S. and non-U.S. financial institutions that can be used to satisfy their regulatory capital requirements may decline in response to changes in legislation and regulations applicable to financial institutions and financial markets, increased competition, adverse changes in general or industry-specific economic conditions, or unfavorable interest rates. By investing under normal circumstances at least 80% of its assets in a combination of preferred securities and Capital Securities, the PIMCO Preferred and Capital Securities Fund will be more susceptible to these risks than a fund that does not invest in Capital Securities to the same extent as the Fund.

**Preferred Securities Risk** is the risk that preferred securities may be subject to greater credit or other risks than senior debt instruments. In addition, preferred securities are subject to other risks, such as risks related to deferred and omitted distributions, limited voting rights, liquidity, interest rate, regulatory changes and special redemption rights.

**Concentration in Banking Industries Risk** is the risk of concentrating in industries related to banking, including interest rate risk, market risk, the risk of heightened competition and the risk that legislation and other government actions could adversely affect such industries.

**Notes to Financial Statements** (Cont.)

**Contingent Convertible Securities Risk** is the risk of investing in contingent convertible securities, including the risk that interest payments will be cancelled by the issuer or a regulatory authority, the risk of ranking junior to other creditors in the event of a liquidation or other bankruptcy-related event as a result of holding subordinated debt, the risk of a Fund's investment becoming further subordinated as a result of conversion from debt to equity, the risk that principal amount due can be written down to a lesser amount, and the general risks applicable to fixed income investments, including interest rate risk, credit risk, market risk and liquidity risk, any of which could result in losses to a Fund.

**High Yield Risk** is the risk that high yield securities and unrated securities of similar credit quality (commonly known as "junk bonds") are subject to greater levels of credit, call and liquidity risks, including the risk that a court will subordinate high yield senior debt to other debt of the issuer or take other actions detrimental to holders of the senior debt. High yield securities are considered primarily speculative with respect to the issuer's continuing ability to make principal and interest payments, and may be more volatile than higher-rated securities of similar maturity.

**Market Risk** is the risk that the value of securities owned by a Fund may go up or down, sometimes rapidly or unpredictably, due to factors affecting securities markets generally or particular industries.

**Issuer Risk** is the risk that the value of a security may decline for a reason directly related to the issuer, such as management performance, financial leverage and reduced demand for the issuer's goods or services.

**Liquidity Risk** is the risk that a particular investment may be difficult to purchase or sell and that a Fund may be unable to sell illiquid investments at an advantageous time or price or achieve its desired level of exposure to a certain sector. Liquidity risk may result from the lack of an active market, reduced number and capacity of traditional market participants to make a market in fixed income securities, and may be magnified in a rising interest rate environment or other circumstances where investor redemptions from fixed income funds may be higher than normal, causing increased supply in the market due to selling activity.

**Derivatives Risk** is the risk of investing in derivative instruments (such as futures, swaps and structured securities), including leverage, liquidity, interest rate, market, credit and management risks, and valuation complexity. Changes in the value of a derivative may not correlate perfectly with, and may be more sensitive to market events than, the underlying asset, rate or index, and a Fund could lose more than the initial amount invested. A Fund's use of derivatives may result

in losses to the Fund, a reduction in the Fund's returns and/or increased volatility. Over-the-counter ("OTC") derivatives are also subject to the risk that a counterparty to the transaction will not fulfill its contractual obligations to the other party, as many of the protections afforded to centrally-cleared derivative transactions might not be available for OTC derivatives. The primary credit risk on derivatives that are exchange-traded or traded through a central clearing counterparty resides with a Fund's clearing broker, or the clearinghouse. Changes in regulation relating to a mutual fund's use of derivatives and related instruments could potentially limit or impact a Fund's ability to invest in derivatives, limit a Fund's ability to employ certain strategies that use derivatives and/or adversely affect the value of derivatives and a Fund's performance.

**Equity Risk** is the risk that the value of equity securities, such as common stocks and preferred securities, may decline due to general market conditions which are not specifically related to a particular company or to factors affecting a particular industry or industries. Equity securities generally have greater price volatility than fixed income securities.

**Mortgage-Related and Other Asset-Backed Securities Risk** is the risk of investing in mortgage-related and other asset-backed securities, including interest rate risk, extension risk, prepayment risk and credit risk.

**Foreign (Non-U.S.) Investment Risk** is the risk that investing in foreign (non-U.S.) securities may result in a Fund experiencing more rapid and extreme changes in value than a fund that invests exclusively in securities of U.S. companies, due to smaller markets, differing reporting, accounting and auditing standards, increased risk of delayed settlement of portfolio transactions or loss of certificates of portfolio securities, and the risk of unfavorable foreign government actions, including nationalization, expropriation or confiscatory taxation, currency blockage, or political changes or diplomatic developments. Foreign securities may also be less liquid and more difficult to value than securities of U.S. issuers.

**Emerging Markets Risk** is the risk of investing in emerging market securities, primarily increased foreign (non-U.S.) investment risk.

**Sovereign Debt Risk** is the risk that investments in fixed income instruments issued by sovereign entities may decline in value as a result of default or other adverse credit event resulting from an issuer's inability or unwillingness to make principal or interest payments in a timely fashion.

**Currency Risk** is the risk that foreign (non-U.S.) currencies will change in value relative to the U.S. dollar and affect a Fund's investments in foreign (non-U.S.) currencies or in securities that trade in, and receive revenues in, or in derivatives that provide exposure to, foreign (non-U.S.) currencies.

Leveraging Risk  is the risk that certain transactions of a Fund, such as reverse repurchase agreements, loans of portfolio securities, and the use of when-issued, delayed delivery or forward commitment transactions, or derivative instruments, may give rise to leverage, magnifying gains and losses and causing a Fund to be more volatile than if it had not been leveraged. This means that leverage entails a heightened risk of loss.

Management Risk  is the risk that the investment techniques and risk analyses applied by PIMCO will not produce the desired results and that actual or potential conflicts of interest, legislative, regulatory, or tax restrictions, policies or developments may affect the investment techniques available to PIMCO and the individual portfolio manager in connection with managing a Fund and may cause PIMCO to restrict or prohibit participation in certain investments. There is no guarantee that the investment objective of a Fund will be achieved.

Subsidiary Risk  is the risk that, by investing in a Fund's subsidiary, the Fund is indirectly exposed to the risks associated with the subsidiary's investments. Fund subsidiaries are not registered under the 1940 Act and may not be subject to all the investor protections of the 1940 Act. There is no guarantee that the investment objective of a subsidiary will be achieved.

Regulation S Securities Risk  is the risk that Regulation S securities may be less liquid than publicly traded securities and may not be subject to the disclosure and other investor protection requirements that would be applicable if they were publicly traded. Accordingly, Regulation S Securities may involve a high degree of business and financial risk and may result in substantial losses.

Short Exposure Risk  is the risk of entering into short sales, including the potential loss of more money than the actual cost of the investment, and the risk that the third party to the short sale will not fulfill its contractual obligations, causing a loss to a Fund.

Convertible Securities Risk  is the risk that arises when convertible securities share both fixed income and equity characteristics. Convertible securities are subject to risks to which fixed income and equity investments are subject. These risks include equity risk, interest rate risk and credit risk.

Senior Loan Risk  is the risk that investing in senior loans, including bank loans, exposes a Fund to heightened credit risk, call risk, settlement risk and liquidity risk. If an issuer of a senior loan prepays or redeems the loan prior to maturity, a Fund may have to reinvest the proceeds in instruments that pay lower interest rates.

Distribution Rate Risk  is the risk that a Fund's distribution rate may change unexpectedly as a result of numerous factors, including changes in realized and projected market returns, fluctuations in market interest rates, Fund performance and other factors.

Environmental, Social and Governance Investing Risk  is the risk that, because a Fund's ESG strategy may select or exclude securities of certain issuers for reasons other than performance, a Fund's performance will differ from funds that do not utilize an ESG investing strategy. ESG investing is qualitative and subjective by nature, and there is no guarantee that the factors utilized by PIMCO or any judgment exercised by PIMCO will reflect the opinions of any particular investor.

LIBOR Transition Risk  is the risk related to the anticipated discontinuation of the London Interbank Offered Rate ("LIBOR") by the end of 2021. Certain instruments held by a Fund rely in some fashion upon LIBOR. Although the transition process away from LIBOR has become increasingly well-defined in advance of the anticipated discontinuation date, there remains uncertainty regarding the nature of any replacement rate, and any potential effects of the transition away from LIBOR on a Fund or on certain instruments in which a Fund invests can be difficult to ascertain. The transition process may involve, among other things, increased volatility or illiquidity in markets for instruments that currently rely on LIBOR and may result in a reduction in value of certain instruments held by a Fund.

(b) Other Risks
In general, a Fund may be subject to additional risks, including, but not limited to, risks related to government regulation and intervention in financial markets, operational risks, risks associated with financial, economic and global market disruptions, and cybersecurity risks. Please see a Fund's prospectus and Statement of Additional Information for a more detailed description of the risks of investing in a Fund. Please see the Important Information section of this report for additional discussion of certain regulatory and market developments that may impact a Fund's performance.

Market Disruption Risk  A Fund is subject to investment and operational risks associated with financial, economic and other global market developments and disruptions, including those arising from war, terrorism, market manipulation, government interventions, defaults and shutdowns, political changes or diplomatic developments, public health emergencies (such as the spread of infectious diseases, pandemics and epidemics) and natural/environmental disasters, which can all negatively impact the securities markets and cause a Fund to lose value. These events can also impair the technology and other operational systems upon which a Fund's service providers, including PIMCO as a Fund's investment adviser, rely, and could otherwise disrupt a Fund's service providers' ability to fulfill their obligations to a Fund. For example, the recent spread of an infectious respiratory illness

**Notes to Financial Statements** (Cont.)

caused by a novel strain of coronavirus (known as COVID-19) has caused volatility, severe market dislocations and liquidity constraints in many markets, including markets for the securities a Fund holds, and may adversely affect a Fund's investments and operations. Please see the Important Information section for additional discussion of the COVID-19 pandemic.

Government Intervention in Financial Markets  Federal, state, and other governments, their regulatory agencies, or self-regulatory organizations may take actions that affect the regulation of the instruments in which a Fund invests, or the issuers of such instruments, in ways that are unforeseeable. Legislation or regulation may also change the way in which a Fund itself is regulated. Such legislation or regulation could limit or preclude a Fund's ability to achieve its investment objective. Furthermore, volatile financial markets can expose a Fund to greater market and liquidity risk and potential difficulty in valuing portfolio instruments held by the Fund. The value of a Fund's holdings is also generally subject to the risk of future local, national, or global economic disturbances based on unknown weaknesses in the markets in which a Fund invests. In addition, it is not certain that the U.S. Government will intervene in response to a future market disturbance and the effect of any such future intervention cannot be predicted. It is difficult for issuers to prepare for the impact of future financial downturns, although companies can seek to identify and manage future uncertainties through risk management programs.

Regulatory Risk  Financial entities, such as investment companies and investment advisers, are generally subject to extensive government regulation and intervention. Government regulation and/or intervention may change the way a Fund is regulated, affect the expenses incurred directly by a Fund and the value of its investments, and limit and/or preclude a Fund's ability to achieve its investment objective. Government regulation may change frequently and may have significant adverse consequences. Moreover, government regulation may have unpredictable and unintended effects.

Operational Risk  An investment in a Fund, like any fund, can involve operational risks arising from factors such as processing errors, human errors, inadequate or failed internal or external processes, failures in systems and technology, changes in personnel and errors caused by third-party service providers. The occurrence of any of these failures, errors or breaches could result in a loss of information, regulatory scrutiny, reputational damage or other events, any of which could have a material adverse effect on a Fund. While a Fund seeks to minimize such events through controls and oversight, there may still be failures that could cause losses to the Fund.

Cyber Security Risk  As the use of technology has become more prevalent in the course of business, the Funds have become potentially more susceptible to operational and information security risks resulting from breaches in cyber security. A breach in cyber security refers to both intentional and unintentional cyber events that may, among other things, cause a Fund to lose proprietary information, suffer data corruption and/or destruction or lose operational capacity, result in the unauthorized release or other misuse of confidential information, or otherwise disrupt normal business operations. Cyber security failures or breaches may result in financial losses to a Fund and its shareholders. These failures or breaches may also result in disruptions to business operations, potentially resulting in financial losses; interference with a Fund's ability to calculate its net asset value, process shareholder transactions or otherwise transact business with shareholders; impediments to trading; violations of applicable privacy and other laws; regulatory fines; penalties; reputational damage; reimbursement or other compensation costs; additional compliance and cyber security risk management costs and other adverse consequences. In addition, substantial costs may be incurred in order to prevent any cyber incidents in the future.

## 8. MASTER NETTING ARRANGEMENTS

A Fund may be subject to various netting arrangements ("Master Agreements") with select counterparties. Master Agreements govern the terms of certain transactions, and are intended to reduce the counterparty risk associated with relevant transactions by specifying credit protection mechanisms and providing standardization that is intended to improve legal certainty. Each type of Master Agreement governs certain types of transactions. Different types of transactions may be traded out of different legal entities or affiliates of a particular organization, resulting in the need for multiple agreements with a single counterparty. As the Master Agreements are specific to unique operations of different asset types, they allow a Fund to close out and net its total exposure to a counterparty in the event of a default with respect to all the transactions governed under a single Master Agreement with a counterparty. For financial reporting purposes the Statements of Assets and Liabilities generally present derivative assets and liabilities on a gross basis, which reflects the full risks and exposures prior to netting.

Master Agreements can also help limit counterparty risk by specifying collateral posting arrangements at pre-arranged exposure levels. Under most Master Agreements, collateral is routinely transferred if the total net exposure to certain transactions (net of existing collateral already in place) governed under the relevant Master Agreement with a counterparty in a given account exceeds a specified threshold, which typically ranges from zero to $250,000 depending on the counterparty and the type of Master Agreement. United States Treasury Bills and U.S. dollar cash are generally the preferred forms of collateral, although other securities may be used depending on the terms outlined in the applicable Master Agreement. Securities and cash pledged as collateral

are reflected as assets on the Statements of Assets and Liabilities as either a component of Investments at value (securities) or Deposits with counterparty. Cash collateral received is not typically held in a segregated account and as such is reflected as a liability on the Statements of Assets and Liabilities as Deposits from counterparty. The market value of any securities received as collateral is not reflected as a component of NAV. A Fund's overall exposure to counterparty risk can change substantially within a short period, as it is affected by each transaction subject to the relevant Master Agreement.

Master Repurchase Agreements and Global Master Repurchase Agreements (individually and collectively "Master Repo Agreements") govern repurchase, reverse repurchase, and certain sale-buyback transactions between a Fund and select counterparties. Master Repo Agreements maintain provisions for, among other things, initiation, income payments, events of default, and maintenance of collateral. The market value of transactions under the Master Repo Agreement, collateral pledged or received, and the net exposure by counterparty as of period end are disclosed in the Notes to Schedules of Investments.

Master Securities Forward Transaction Agreements ("Master Forward Agreements") govern certain forward settling transactions, such as TBA securities, delayed-delivery or certain sale-buyback transactions by and between a Fund and select counterparties. The Master Forward Agreements maintain provisions for, among other things, transaction initiation and confirmation, payment and transfer, events of default, termination, and maintenance of collateral. The market value of forward settling transactions, collateral pledged or received, and the net exposure by counterparty as of period end is disclosed in the Notes to Schedules of Investments.

Customer Account Agreements and related addenda govern cleared derivatives transactions such as futures, options on futures, and cleared OTC derivatives. Such transactions require posting of initial margin as determined by each relevant clearing agency which is segregated in an account at a futures commission merchant ("FCM") registered with the Commodity Futures Trading Commission. In the United States, counterparty risk may be reduced as creditors of an FCM cannot have a claim to Fund assets in the segregated account. Portability of exposure reduces risk to the Funds. Variation margin, or changes in market value, are generally exchanged daily, but may not be netted between futures and cleared OTC derivatives unless the parties have agreed to a separate arrangement in respect of portfolio margining. The market value or accumulated unrealized appreciation (depreciation), initial margin posted, and any unsettled variation margin as of period end are disclosed in the Notes to Schedules of Investments.

Prime Broker Arrangements may be entered into to facilitate execution and/or clearing of listed equity option transactions or short sales of equity securities between a Fund and selected counterparties. The arrangements provide guidelines surrounding the rights, obligations, and other events, including, but not limited to, margin, execution, and settlement. These agreements maintain provisions for, among other things, payments, maintenance of collateral, events of default, and termination. Margin and other assets delivered as collateral are typically in the possession of the prime broker and would offset any obligations due to the prime broker. The market values of listed options and securities sold short and related collateral are disclosed in the Notes to Schedules of Investments.

International Swaps and Derivatives Association, Inc. Master Agreements and Credit Support Annexes ("ISDA Master Agreements") govern bilateral OTC derivative transactions entered into by a Fund with select counterparties. ISDA Master Agreements maintain provisions for general obligations, representations, agreements, collateral posting and events of default or termination. Events of termination include conditions that may entitle counterparties to elect to terminate early and cause settlement of all outstanding transactions under the applicable ISDA Master Agreement. Any election to terminate early could be material to the financial statements. The ISDA Master Agreement may contain additional provisions that add counterparty protection beyond coverage of existing daily exposure if the counterparty has a decline in credit quality below a predefined level or as required by regulation. Similarly, if required by regulation, the Funds may be required to post additional collateral beyond coverage of daily exposure. These amounts, if any, may (or if required by law, will) be segregated with a third-party custodian. To the extent the Funds are required by regulation to post additional collateral beyond coverage of daily exposure, it could potentially incur costs, including in procuring eligible assets to meet collateral requirements, associated with such posting. The market value of OTC financial derivative instruments, collateral received or pledged, and net exposure by counterparty as of period end are disclosed in the Notes to Schedules of Investments.

## 9. FEES AND EXPENSES

(a) Investment Advisory Fee  PIMCO is a majority-owned subsidiary of Allianz Asset Management of America L.P. ("Allianz Asset Management") and serves as the Adviser to the Trust, pursuant to an investment advisory contract. The Adviser receives a monthly fee from each Fund at an annual rate based on average daily net assets (the "Investment Advisory Fee"). The Investment Advisory Fee for all classes is charged at an annual rate as noted in the table in note (b) below.

(b) Supervisory and Administrative Fee  PIMCO serves as administrator (the "Administrator") and provides supervisory and administrative services to the Trust for which it receives a monthly supervisory and administrative fee based on each share class's average daily net assets (the "Supervisory and Administrative Fee"). As the Administrator, PIMCO bears the costs of various third-party services, including audit, custodial, portfolio accounting, legal, transfer agency and printing costs.

**Notes to Financial Statements** (Cont.)

The Investment Advisory Fees and Supervisory and Administrative Fees for all classes, as applicable, are charged at the annual rate as noted in the following table (calculated as a percentage of each Fund's average daily net assets attributable to each class):

| Fund Name | Investment Advisory Fee All Classes | Supervisory and Administrative Fee Institutional Class | I-2 | I-3 | Administrative Class | Class A | Class C | Class C-2 |
|---|---|---|---|---|---|---|---|---|
| PIMCO Credit Opportunities Bond Fund | 0.60% | 0.30% | 0.40% | 0.50%[2]* | N/A | 0.45% | 0.45% | N/A |
| PIMCO Diversified Income Fund | 0.45% | 0.30% | 0.40% | 0.50%[2] | 0.30% | 0.45% | 0.45% | N/A |
| PIMCO ESG Income Fund | 0.25% | 0.25% | 0.35% | 0.45%[3] | N/A | 0.40% | 0.40% | N/A |
| PIMCO High Yield Spectrum Fund | 0.30% | 0.30% | 0.40% | 0.50%[2] | N/A | 0.40% | 0.40% | N/A |
| PIMCO Long-Term Credit Bond Fund | 0.30% | 0.25% | 0.35% | N/A | N/A | 0.40%* | N/A | N/A |
| PIMCO Low Duration Credit Fund | 0.40% | 0.30% | 0.40% | N/A | N/A | 0.35% | 0.35% | N/A |
| PIMCO Low Duration Income Fund | 0.30% | 0.20% | 0.30% | 0.40%[2] | N/A | 0.35% | 0.35% | 0.35% |
| PIMCO Preferred and Capital Securities Fund[1] | 0.44% | 0.35% | 0.45% | 0.55%[2] | N/A | 0.45% | 0.45% | N/A |

[1]  PIMCO has contractually agreed to waive the Fund's Investment Advisory Fee and the supervisory and administrative fee in an amount equal to the management fee and administrative services fee, respectively, paid by the PIMCO Capital Securities Fund (Cayman) Ltd. (the "Subsidiary") to PIMCO. The Subsidiary pays PIMCO a management fee and an administrative services fee at the annual rates of 0.49% and 0.20%, respectively, of its net assets. This waiver may not be terminated by PIMCO and will remain in effect for as long as PIMCO's contract with the Subsidiary is in place.

[2]  PIMCO has contractually agreed, through July 31, 2021, to waive its supervisory and administrative fee for I-3 shares by 0.05% of the average daily net assets attributable to I-3 shares of the Fund.

[3]  PIMCO has contractually agreed, through July 31, 2022, to waive its supervisory and administrative fee for I-3 shares by 0.05% of the average daily net assets attributable to I-3 shares of the Fund.

*  This particular share class has been registered with the SEC, but has not yet launched.

(c) Distribution and Servicing Fees  PIMCO Investments LLC, a wholly-owned subsidiary of PIMCO, serves as the distributor ("Distributor") of the Trust's shares.

The Trust has adopted separate Distribution and Servicing Plans with respect to the Class A, Class C and Class C-2 shares of the Trust pursuant to Rule 12b-1 under the Act. In connection with the distribution of Class C and Class C-2 shares of the Trust, the Distributor receives distribution fees from the Trust of up to 0.75% for Class C shares and 0.50% for Class C-2 shares, and in connection with personal services rendered to Class A, Class C and Class C-2 shareholders and the maintenance of such shareholder accounts, the Distributor receives servicing fees from the Trust of up to 0.25% for each of Class A, Class C and Class C-2 shares (percentages reflect annual rates of the average daily net assets attributable to the applicable class).

The Trust has adopted a Distribution and Servicing Plan with respect to the Administrative Class shares of each Fund pursuant to Rule 12b-1 under the Act (the "Administrative Class Plan"). Under the terms of the Administrative Class Plan, a Fund may compensate the Distributor for providing, or procuring through financial intermediaries, distribution, administrative, recordkeeping, shareholder and/or related services with respect to Administrative Class shares. The Administrative Class Plan permits a Fund to make total payments at an annual rate of up to 0.25% of the average daily net assets attributable to the Administrative Class shares.

The Trust paid distribution and servicing fees at effective rates as noted in the following table (calculated as a percentage of each Fund's average daily net assets attributable to each class):

| | Allowable Rate Distribution Fee | Servicing Fee |
|---|---|---|
| **Class A** | | |
| All Funds | — | 0.25% |
| **Class C** | | |
| PIMCO Low Duration Income Fund | 0.30% | 0.25% |
| All Other Funds | 0.75% | 0.25% |
| **Class C-2** | | |
| PIMCO Low Duration Income Fund | 0.50% | 0.25% |

| | Distribution and/or Servicing Fee |
|---|---|
| **Administrative Class** | |
| All Funds | 0.25% |

The Distributor also received the proceeds of the initial sales charges paid by the shareholders upon the purchase of Class A shares, except for the PIMCO Short Asset Investment Fund, and the contingent deferred sales charges paid by the shareholders upon certain redemptions of Class A, Class C and Class C-2 shares, except for the PIMCO Government Money Market Fund and the PIMCO Short Asset Investment Fund. For the period ended March 31, 2021, the Distributor retained $5,518,745 representing commissions (sales charges) and contingent deferred sales charges from the Trust.

(d) Redemption Fees  Shareholders of the PIMCO Low Duration Credit Fund are subject to a redemption fee on redemptions and exchanges of 1.00% of the NAV of the PIMCO Low Duration Credit Fund shares redeemed or exchanged. Redemption fees are charged on shares redeemed or exchanged within 30 days after their acquisition, including shares acquired through exchanges. Under certain circumstances, the redemption fee may be waived. Actual redemption fees charged are reported on the Statements of Changes in Net Assets.

(e) Fund Expenses  PIMCO provides or procures supervisory and administrative services for shareholders and also bears the costs of various third-party services required by the Funds, including audit, custodial, portfolio accounting, legal, transfer agency and printing costs. The Trust is responsible for the following expenses: (i) taxes and governmental fees; (ii) brokerage fees and commissions and other portfolio transaction expenses; (iii) the costs of borrowing money, including interest expenses; (iv) fees and expenses of the Trustees who are not "interested persons" of PIMCO or the Trust, and any counsel retained exclusively for their benefit (except the PIMCO All Asset and PIMCO All Asset All Authority Funds); (v) extraordinary expense, including costs of litigation and indemnification expenses; (vi) organizational expenses; and (vii) any expenses allocated or allocable to a specific class of shares, which include service fees payable with respect to the Administrative Class Shares, and may include certain other expenses as permitted by the Trust's Multi-Class Plan adopted pursuant to Rule 18f-3 under the Act and subject to review and approval by the Trustees. The ratio of expenses to average net assets per share class, as disclosed on the Financial Highlights, may differ from the annual fund operating expenses per share class.

The Trust pays no compensation directly to any Trustee or any other officer who is affiliated with the Administrator, all of whom receive remuneration for their services to the Trust from the Administrator or its affiliates.

(f) Expense Limitation  Pursuant to the Expense Limitation Agreement, PIMCO has agreed to waive a portion of the Funds' Supervisory and Administrative Fee, or reimburse each Fund, to the extent that each Fund's organizational expenses, pro rata share of expenses related to obtaining or maintaining a Legal Entity Identifier and pro rata share of Trustee Fees exceed 0.0049%, the "Expense Limit" (calculated as a percentage of each Fund's average daily net assets attributable to each class). The Expense Limitation Agreement will automatically renew for one-year terms unless PIMCO provides written notice to the Trust at least 30 days prior to the end of the then current term.

Prior to July 31, 2018, PIMCO had contractually agreed to reduce its Investment Advisory Fee for the PIMCO Low Duration Income Fund. In any month in which the supervision and administration agreement is in effect, PIMCO is entitled to reimbursement by each Fund of any portion of the supervisory and administrative fee waived or reimbursed as set forth above (the "Reimbursement Amount") during the previous thirty-six months from the date of the waiver, provided that such amount paid to PIMCO will not: i) together with any organizational expenses, pro rata share of expenses related to obtaining or maintaining a Legal Entity Identifier and pro rata Trustee fees, exceed, for such month, the Expense Limit (or the amount of the expense limit in place at the time the amount being recouped was originally waived if lower than the Expense Limit); ii) exceed the total Reimbursement Amount; or iii) include any amounts previously reimbursed to PIMCO. The total recoverable amounts to PIMCO (from the Fee Waiver Agreement and Expense Limitation Agreement combined) at March 31, 2021, were as follows (amounts in thousands[†]):

| Fund Name | Expiring Within | | | |
| | 12 months | 13-24 months | 25-36 months | Total |
| --- | --- | --- | --- | --- |
| PIMCO ESG Income Fund | $   0 | $   0 | $ 97 | $  97 |
| PIMCO Low Duration Income Fund | 182 | 30 | 35 | 247 |

† A zero balance may reflect actual amounts rounding to less than one thousand.

Pursuant to a Fee Waiver Agreement, PIMCO has contractually agreed, through July 31, 2021, to reduce its supervisory and administrative fee for I-3 shares by 0.05% of the average daily net assets attributable to I-3 shares of each of the PIMCO Credit Opportunities Bond Fund, PIMCO Diversified Income Fund, PIMCO High Yield Spectrum Fund, PIMCO Low Duration Income Fund and PIMCO Preferred and Capital Securities Fund. This Fee Waiver Agreement will automatically renew for one-year terms unless PIMCO provides written notice to the Trust at least 30 days prior to the end of the then current term.

Pursuant to a Fee Waiver Agreement, PIMCO has contractually agreed, through July 31, 2022, to reduce its supervisory and administrative fee for I-3 shares of the PIMCO ESG Income Fund. This Fee Waiver Agreement will automatically renew for one-year terms unless PIMCO provides written notice to the Trust at least 30 days prior to the end of the then current term.

The waivers are reflected on the Statements of Operations as a component of Waiver and/or Reimbursement by PIMCO. For the period ended March 31, 2021, the Funds below waived the following fees (amounts in thousands[†]):

| Fund Name | Waived Fees |
| --- | --- |
| PIMCO Diversified Income Fund | $ 12 |
| PIMCO ESG Income Fund | 0 |
| PIMCO High Yield Spectrum Fund | 0 |
| PIMCO Low Duration Income Fund | 23 |
| PIMCO Preferred and Capital Securities Fund | 19 |

† A zero balance may reflect actual amounts rounding to less than one thousand.

(g) Acquired Fund Fees and Expenses  PIMCO Capital Securities Fund (Cayman) Ltd. (the "Subsidiary"), has entered into a separate contract with PIMCO for the management of the Subsidiary's portfolio pursuant to which the Subsidiary pays PIMCO a management fee and administrative services fee

## Notes to Financial Statements (Cont.)

at the annual rates of 0.49% and 0.20%, respectively, of its net assets. PIMCO has contractually agreed to waive the Investment Advisory Fee and the Supervisory and Administrative Fees it receives from the Subsidiary in an amount equal to the management fee and administrative services fee, respectively, paid to PIMCO by the Subsidiary. This waiver may not be terminated by PIMCO and will remain in effect for as long as PIMCO's contract with the Subsidiary is in place. The waiver is reflected on the Statements of Operations as a component of Waiver and/ or Reimbursement by PIMCO. During the period ended March 31, 2021, the amount was $ 1,724,700. See Note 14, Basis for Consolidation in the Notes to Financial Statements for more information regarding the Subsidiary.

## 10. RELATED PARTY TRANSACTIONS

The Adviser, Administrator, and Distributor are related parties. Fees paid to these parties are disclosed in Note 9, Fees and Expenses, and the accrued related party fee amounts are disclosed on the Statements of Assets and Liabilities.

Certain Funds are permitted to purchase or sell securities from or to certain related affiliated funds under specified conditions outlined in procedures adopted by the Board. The procedures have been designed to ensure that any purchase or sale of securities by the Funds from or to another fund or portfolio that are, or could be, considered an affiliate, or an affiliate of an affiliate, by virtue of having a common investment adviser (or affiliated investment advisers), common Trustees and/or common officers complies with Rule 17a-7 under the Act. Further, as defined under the procedures, each transaction is effected at the current market price. Purchases and sales of securities pursuant to Rule 17a-7 under the Act for the period ended March 31, 2021, were as follows (amounts in thousands[†]):

| Fund Name | Purchases | Sales |
|---|---|---|
| PIMCO Credit Opportunities Bond Fund | $ 5,923 | $ 37,515 |
| PIMCO Diversified Income Fund | 66,739 | 3,433 |
| PIMCO High Yield Spectrum Fund | 14,707 | 27,363 |
| PIMCO Long-Term Credit Bond Fund | 92,205 | 788,808 |
| PIMCO Low Duration Credit Fund | 38,457 | 173,017 |
| PIMCO Low Duration Income Fund | 422,929 | 374,917 |
| PIMCO Preferred and Capital Securities Fund | 107,430 | 199,932 |

[†]   A zero balance may reflect actual amounts rounding to less than one thousand.

## 11. GUARANTEES AND INDEMNIFICATIONS

Under the Trust's organizational documents, each Trustee or officer of the Trust is indemnified and each employee or other agent of the Trust (including the Trust's investment manager) may be indemnified, to the extent permitted by the Act, against certain liabilities that may arise out of performance of their duties to the Funds. Additionally, in the normal course of business, the Funds enter into contracts that contain a variety of indemnification clauses. The Funds' maximum exposure under these arrangements is unknown as this would involve future claims that may

be made against the Funds that have not yet occurred. However, the Funds have not had prior claims or losses pursuant to these contracts.

## 12. PURCHASES AND SALES OF SECURITIES

The length of time a Fund has held a particular security is not generally a consideration in investment decisions. A change in the securities held by a Fund is known as "portfolio turnover." Each Fund may engage in frequent and active trading of portfolio securities to achieve its investment objective, particularly during periods of volatile market movements. High portfolio turnover may involve correspondingly greater transaction costs, including brokerage commissions or dealer mark-ups and other transaction costs on the sale of securities and reinvestments in other securities, which are borne by the Fund. Such sales may also result in realization of taxable capital gains, including short-term capital gains (which are generally taxed at ordinary income tax rates when distributed to shareholders). The transaction costs associated with portfolio turnover may adversely affect a Fund's performance. The portfolio turnover rates are reported in the Financial Highlights.

Purchases and sales of securities (excluding short-term investments) for the period ended March 31, 2021, were as follows (amounts in thousands[†]):

| Fund Name | U.S. Government/Agency | | All Other | |
| | Purchases | Sales | Purchases | Sales |
|---|---|---|---|---|
| PIMCO Credit Opportunities Bond Fund | $ 83,079 | $ 88,804 | $ 265,703 | $ 213,604 |
| PIMCO Diversified Income Fund | 4,464,894 | 4,959,012 | 1,644,837 | 462,831 |
| PIMCO ESG Income Fund | 21,101 | 15,745 | 26,165 | 441 |
| PIMCO High Yield Spectrum Fund | 0 | 10,863 | 248,531 | 128,685 |
| PIMCO Long-Term Credit Bond Fund | 3,086,406 | 3,046,413 | 1,466,097 | 1,711,353 |
| PIMCO Low Duration Credit Fund | 0 | 0 | 789,704 | 723,327 |
| PIMCO Low Duration Income Fund | 33,877,315 | 33,048,711 | 2,610,700 | 1,918,816 |
| PIMCO Preferred and Capital Securities Fund | 0 | 0 | 1,245,726 | 929,315 |

[†]   A zero balance may reflect actual amounts rounding to less than one thousand.

## 13. SHARES OF BENEFICIAL INTEREST

The Trust may issue an unlimited number of shares of beneficial interest with a $0.01 par value. Changes in shares of beneficial interest were as follows (shares and amounts in thousands[†]):

| | PIMCO Credit Opportunities Bond Fund | | | | PIMCO Diversified Income Fund | | | | PIMCO ESG Income Fund | |
| | Year Ended 03/31/2021 | | Year Ended 03/31/2020 | | Year Ended 03/31/2021 | | Year Ended 03/31/2020 | | Inception date through 03/31/2021[a] | |
| | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts for shares sold** | | | | | | | | | | |
| Institutional Class | 17,386 | $ 169,444 | 21,509 | $ 214,927 | 165,151 | $ 1,820,798 | 124,907 | $ 1,384,119 | 3,584 | $ 36,867 |
| I-2 | 8,470 | 81,135 | 4,544 | 44,714 | 56,864 | 624,877 | 45,146 | 497,874 | 137 | 1,420 |
| I-3 | N/A | N/A | N/A | N/A | 2,407 | 26,362 | 1,733 | 18,951 | 4 | 44 |
| Administrative Class | N/A | N/A | N/A | N/A | 1,861 | 20,366 | 3,442 | 38,110 | N/A | N/A |
| Class A | 1,071 | 10,453 | 1,377 | 13,815 | 11,844 | 130,736 | 23,272 | 256,516 | 2 | 23 |
| Class C | 68 | 647 | 121 | 1,206 | 2,292 | 25,151 | 3,356 | 37,209 | 14 | 140 |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Issued as reinvestment of distributions** | | | | | | | | | | |
| Institutional Class | 618 | 6,098 | 1,059 | 10,494 | 11,675 | 129,038 | 12,296 | 135,966 | 14 | 145 |
| I-2 | 348 | 3,420 | 230 | 2,263 | 1,337 | 14,794 | 998 | 11,038 | 0 | 0 |
| I-3 | N/A | N/A | N/A | N/A | 78 | 861 | 41 | 457 | 0 | 0 |
| Administrative Class | N/A | N/A | N/A | N/A | 366 | 4,010 | 694 | 7,675 | N/A | N/A |
| Class A | 69 | 676 | 79 | 777 | 943 | 10,408 | 1,301 | 14,396 | 0 | 0 |
| Class C | 12 | 120 | 17 | 163 | 170 | 1,871 | 218 | 2,413 | 0 | 0 |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Cost of shares redeemed** | | | | | | | | | | |
| Institutional Class | (16,809) | (164,030) | (26,196) | (261,302) | (81,977) | (905,243) | (99,637) | (1,090,394) | (10) | (103) |
| I-2 | (3,334) | (32,165) | (3,523) | (34,316) | (30,347) | (336,234) | (28,871) | (303,111) | 0 | 0 |
| I-3 | N/A | N/A | N/A | N/A | (1,330) | (14,769) | (771) | (8,418) | 0 | 0 |
| Administrative Class | N/A | N/A | N/A | N/A | (16,855) | (190,142) | (2,889) | (31,430) | N/A | N/A |
| Class A | (1,345) | (13,269) | (1,626) | (15,817) | (9,118) | (100,372) | (18,659) | (205,130) | 0 | 0 |
| Class C | (269) | (2,628) | (153) | (1,508) | (3,867) | (43,012) | (2,763) | (30,329) | (5) | (50) |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Net increase (decrease) resulting from Fund share transactions** | 6,285 | $ 59,901 | (2,562) | $ (24,584) | 111,494 | $ 1,219,500 | 63,814 | $ 735,912 | 3,740 | $ 38,486 |

**Notes to Financial Statements** (Cont.)

| | PIMCO High Yield Spectrum Fund | | | | PIMCO Long-Term Credit Bond Fund | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Year Ended 03/31/2021 | | Year Ended 03/31/2020 | | Year Ended 03/31/2021 | | Year Ended 03/31/2020 | |
| | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount |
| **Receipts for shares sold** | | | | | | | | |
| Institutional Class | 15,758 | $ 150,819 | 11,802 | $ 114,924 | 127,496 | $ 1,657,609 | 74,209 | $ 945,065 |
| I-2 | 10,940 | 103,496 | 9,172 | 88,789 | 6,512 | 84,387 | 76,109 | 913,081 |
| I-3 | 321 | 3,226 | 131 | 1,285 | N/A | N/A | N/A | N/A |
| Administrative Class | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Class A | 2,000 | 19,050 | 2,616 | 25,490 | N/A | N/A | N/A | N/A |
| Class C | 143 | 1,341 | 212 | 2,080 | N/A | N/A | N/A | N/A |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Issued as reinvestment of distributions** | | | | | | | | |
| Institutional Class | 556 | 5,350 | 2,128 | 20,777 | 20,005 | 265,843 | 13,375 | 169,882 |
| I-2 | 991 | 9,549 | 1,026 | 9,948 | 845 | 11,228 | 2,819 | 36,025 |
| I-3 | 4 | 44 | 5 | 44 | N/A | N/A | N/A | N/A |
| Administrative Class | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Class A | 254 | 2,431 | 334 | 3,235 | N/A | N/A | N/A | N/A |
| Class C | 28 | 269 | 37 | 358 | N/A | N/A | N/A | N/A |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Cost of shares redeemed** | | | | | | | | |
| Institutional Class | (11,086) | (105,205) | (64,310) | (631,552) | (138,210) | (1,837,578) | (119,006) | (1,478,867) |
| I-2 | (3,876) | (37,699) | (14,477) | (135,288) | (12,780) | (168,188) | (68,705) | (804,433) |
| I-3 | (16) | (150) | (305) | (2,969) | N/A | N/A | N/A | N/A |
| Administrative Class | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Class A | (2,658) | (25,406) | (3,653) | (35,009) | N/A | N/A | N/A | N/A |
| Class C | (445) | (4,325) | (286) | (2,716) | N/A | N/A | N/A | N/A |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Net increase (decrease) resulting from Fund share transactions** | 12,914 | $ 122,790 | (55,568) | $ (540,604) | 3,868 | $ 13,301 | (21,199) | $ (219,247) |

| PIMCO Low Duration Credit Fund | | | | PIMCO Low Duration Income Fund | | | | PIMCO Preferred and Capital Securities Fund | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Year Ended 03/31/2021 | | Year Ended 03/31/2020 | | Year Ended 03/31/2021 | | Year Ended 03/31/2020 | | Year Ended 03/31/2021 | | Year Ended 03/31/2020 | |
| Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount |
| 57,516 | $ 508,572 | 8,053 | $ 71,706 | 139,515 | $ 1,189,071 | 138,482 | $ 1,183,176 | 90,063 | $ 946,468 | 104,274 | $ 1,078,445 |
| 1,210 | 11,212 | 1,864 | 18,194 | 220,654 | 1,875,382 | 291,656 | 2,494,678 | 15,481 | 164,218 | 28,613 | 298,095 |
| N/A | N/A | N/A | N/A | 10,676 | 90,305 | 4,569 | 39,250 | 2,563 | 26,519 | 2,443 | 24,672 |
| N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 1,761 | 16,324 | 1,788 | 17,491 | 117,404 | 1,000,360 | 151,107 | 1,296,372 | 11,242 | 119,798 | 30,453 | 320,917 |
| 176 | 1,637 | 374 | 3,671 | 8,566 | 72,817 | 12,717 | 108,692 | 758 | 7,969 | 1,463[b] | 15,617[b] |
| N/A | N/A | N/A | N/A | 369[c] | 3,203[c] | N/A | N/A | N/A | N/A | N/A | N/A |
| 1,364 | 12,505 | 674 | 6,545 | 6,729 | 57,016 | 10,108 | 86,282 | 3,573 | 38,995 | 2,450 | 25,679 |
| 89 | 819 | 173 | 1,685 | 7,249 | 61,447 | 8,838 | 75,346 | 964 | 10,489 | 1,095 | 11,412 |
| N/A | N/A | N/A | N/A | 168 | 1,430 | 266 | 2,275 | 135 | 1,462 | 90 | 935 |
| N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 177 | 1,630 | 343 | 3,332 | 4,365 | 36,987 | 5,458 | 46,542 | 937 | 10,166 | 1,054 | 11,001 |
| 46 | 421 | 145 | 1,409 | 560 | 4,739 | 820 | 7,000 | 47 | 511 | 12[b] | 131[b] |
| N/A | N/A | N/A | N/A | 1[c] | 9[c] | N/A | N/A | N/A | N/A | N/A | N/A |
| (53,754) | (491,341) | (8,853) | (83,558) | (98,942) | (830,487) | (137,843) | (1,157,264) | (69,562) | (732,835) | (47,291) | (492,441) |
| (1,937) | (17,814) | (3,019) | (28,964) | (152,068) | (1,281,222) | (233,999) | (1,951,013) | (12,716) | (132,374) | (17,787) | (175,055) |
| N/A | N/A | N/A | N/A | (3,291) | (27,710) | (6,870) | (57,819) | (1,922) | (19,883) | (667) | (6,426) |
| N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| (2,168) | (19,747) | (5,260) | (50,376) | (82,399) | (696,005) | (113,424) | (958,767) | (13,550) | (142,914) | (14,737) | (148,658) |
| (1,774) | (16,309) | (2,666) | (25,529) | (9,832) | (83,279) | (10,518) | (88,968) | (340) | (3,608) | (114)[b] | (1,067)[b] |
| N/A | N/A | N/A | N/A | 0[c] | (1)[c] | N/A | N/A | N/A | N/A | N/A | N/A |
| 2,706 | $ 7,909 | (6,384) | $ (64,394) | 169,724 | $ 1,474,062 | 121,367 | $ 1,125,782 | 27,673 | $ 294,981 | 91,351 | $ 963,257 |

† A zero balance may reflect actual amounts rounding to less than one thousand.
(a) Inception date of the Fund was September 30, 2020.
(b) Inception date of Class C was August 23, 2019.
(c) Inception date of Class C-2 was October 21, 2020.

The following table discloses the number of shareholders that own 10% or more of the outstanding shares of a Fund along with their respective percent ownership, if any, as of March 31, 2021. Some of these shareholders may be considered related parties, which may include, but are not limited to, the investment adviser and its affiliates, affiliated broker dealers, fund of funds and directors or employees of the Trust or Adviser.

| | Shareholders that own 10% or more of outstanding shares | | Total percentage of portfolio held by shareholders that own 10% or more of outstanding shares | |
|---|---|---|---|---|
| | Non-Related Parties | Related Parties | Non-Related Parties | Related Parties |
| PIMCO ESG Income Fund | 0 | 1 | 0% | 14% |
| PIMCO Low Duration Credit Fund | 0 | 1 | 0% | 30% |

## 14. BASIS FOR CONSOLIDATION

The Subsidiary, a Cayman Islands exempted company, was incorporated on February 4, 2015, as a wholly owned subsidiary acting as an investment vehicle for the PIMCO Preferred and Capital Securities Fund (the "PCS Fund") in order to effect certain investments for the PCS Fund consistent with the PCS Fund's investment objectives and policies as specified in its prospectus and statement of additional information. The PCS Fund's investment portfolio has been consolidated and includes the portfolio holdings of the PCS Fund and the Subsidiary. The consolidated financial statements include the accounts of the PCS Fund and the Subsidiary, if any. All inter-company transactions and balances have been eliminated. A subscription agreement was entered into between the PCS Fund and the Subsidiary, comprising the entire issued share capital of the Subsidiary, with the intent that the PCS Fund will remain the sole shareholder and retain all rights. Under the Memorandum and Articles of Association, shares issued by the Subsidiary confer upon a shareholder the right to receive notice of, to attend and to vote at general meetings of the Subsidiary

## Notes to Financial Statements (Cont.)

and shall confer upon the shareholder rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Subsidiary. The net assets of the Subsidiary as of period end represented 16.7% of the Fund's consolidated net assets.

### 15. REGULATORY AND LITIGATION MATTERS

The Funds are not named as defendants in any material litigation or arbitration proceedings and are not aware of any material litigation or claim pending or threatened against them.

The foregoing speaks only as of the date of this report.

### 16. FEDERAL INCOME TAX MATTERS

Each Fund intends to qualify as a regulated investment company under Subchapter M of the Internal Revenue Code (the "Code") and distribute all of its taxable income and net realized gains, if applicable, to shareholders. Accordingly, no provision for Federal income taxes has been made.

A Fund may be subject to local withholding taxes, including those imposed on realized capital gains. Any applicable foreign capital gains tax is accrued daily based upon net unrealized gains, and may be payable following the sale of any applicable investments.

In accordance with U.S. GAAP, the Adviser has reviewed the Funds' tax positions for all open tax years. As of March 31, 2021, the Funds have recorded no liability for net unrecognized tax benefits relating to uncertain income tax positions they have taken or expect to take in future tax returns.

The Funds file U.S. federal, state, and local tax returns as required. The Funds' tax returns are subject to examination by relevant tax authorities until expiration of the applicable statute of limitations, which is generally three years after the filing of the tax return but which can be extended to six years in certain circumstances. Tax returns for open years have incorporated no uncertain tax positions that require a provision for income taxes.

As of March 31, 2021, the components of distributable taxable earnings are as follows (amounts in thousands[†]):

| | Undistributed Ordinary Income[1] | Undistributed Long-Term Capital Gains | Net Tax Basis Unrealized Appreciation/ (Depreciation)[2] | Other Book-to-Tax Accounting Differences[3] | Accumulated Capital Losses[4] | Qualified Late-Year Loss Deferral - Capital[5] | Qualified Late-Year Loss Deferral - Ordinary[6] | Total Distributable Earnings |
|---|---|---|---|---|---|---|---|---|
| PIMCO Credit Opportunities Bond Fund | $ 5,336 | $ 0 | $ 4,530 | $ (1) | $ (54,930) | $ 0 | $ 0 | $ (45,065) |
| PIMCO Diversified Income Fund | 6,995 | 0 | 49,454 | (940) | (40,463) | 0 | 0 | 15,046 |
| PIMCO ESG Income Fund | 115 | 0 | 131 | 0 | (28) | 0 | 0 | 218 |
| PIMCO High Yield Spectrum Fund | 7,673 | 0 | 2,845 | (121) | (49,699) | 0 | 0 | (39,302) |
| PIMCO Long-Term Credit Bond Fund | 51,319 | 63,791 | 116,501 | (472) | 0 | 0 | 0 | 231,139 |
| PIMCO Low Duration Credit Fund | 2,166 | 0 | 4,656 | (20) | (71,835) | 0 | 0 | (65,033) |
| PIMCO Low Duration Income Fund | 0 | 0 | 38,922 | (2,184) | (200,810) | 0 | 0 | (164,072) |
| PIMCO Preferred and Capital Securities Fund | 15,789 | 16,238 | 81,106 | 0 | 0 | 0 | 0 | 113,133 |

[†]  A zero balance may reflect actual amounts rounding to less than one thousand.
[1]  Includes undistributed short-term capital gains, if any.
[2]  Adjusted for open wash sale loss deferrals and the accelerated recognition of unrealized gain or loss on certain futures, options and forward contracts for federal income tax purposes. Also adjusted for differences between book and tax realized and unrealized gain (loss) on swap contracts, sale/buyback transactions, interest accrued on defaulted securities, straddle loss deferrals, hyperinflationary investments, Passive Foreign Investment Companies (PFICs), and partnership investments.
[3]  Represents differences in income tax regulations and financial accounting principles generally accepted in the United States of America, mainly for organizational costs and distributions payable at fiscal year-end.
[4]  Capital losses available to offset future net capital gains expire in varying amounts as shown below.
[5]  Capital losses realized during the period November 1, 2020 through March 31, 2021 which the Funds elected to defer to the following taxable year pursuant to income tax regulations.
[6]  Specified losses realized during the period November 1, 2020 through March 31, 2021 and Ordinary losses realized during the period January 1, 2021 through March 31, 2021, which the Funds elected to defer to the following taxable year pursuant to income tax regulations.

Under the Regulated Investment Company Modernization Act of 2010, a fund is permitted to carry forward any new capital losses for an unlimited period. Additionally, such capital losses that are carried forward will retain their character as either short-term or long-term capital losses rather than being considered all short-term under previous law.

As of March 31, 2021, the Funds had the following post-effective capital losses with no expiration (amounts in thousands[†]):

| | Short-Term | Long-Term |
|---|---|---|
| PIMCO Credit Opportunities Bond Fund* | $ 30,937 | $ 23,993 |
| PIMCO Diversified Income Fund | 30,282 | 10,181 |
| PIMCO ESG Income Fund | 28 | 0 |

| | Short-Term | Long-Term |
|---|---|---|
| PIMCO High Yield Spectrum Fund* | $    203 | $   49,496 |
| PIMCO Long-Term Credit Bond Fund | 0 | 0 |
| PIMCO Low Duration Credit Fund* | 1,959 | 69,876 |
| PIMCO Low Duration Income Fund | 61,817 | 138,993 |
| PIMCO Preferred and Capital Securities Fund | 0 | 0 |

† A zero balance may reflect actual amounts rounding to less than one thousand.

\* Portion of amount represents realized loss and recognized built-in loss under IRC 382-83, which is carried forward to future years to offset future realized gain subject to certain limitations.

As of March 31, 2021, the aggregate cost and the net unrealized appreciation/(depreciation) of investments for federal income tax purposes are as follows (amounts in thousands†):

| | Federal Tax Cost | Unrealized Appreciation | Unrealized (Depreciation) | Net Unrealized Appreciation/ (Depreciation)[7] |
|---|---|---|---|---|
| PIMCO Credit Opportunities Bond Fund | $   403,204 | $   14,310 | $    (9,782) | $     4,528 |
| PIMCO Diversified Income Fund | 5,502,197 | 185,472 | (135,002) | 50,470 |
| PIMCO ESG Income Fund | 37,186 | 421 | (286) | 135 |
| PIMCO High Yield Spectrum Fund | 468,578 | 16,897 | (13,889) | 3,008 |
| PIMCO Long-Term Credit Bond Fund | 4,227,442 | 256,380 | (138,847) | 117,533 |
| PIMCO Low Duration Credit Fund | 286,772 | 6,108 | (1,281) | 4,827 |
| PIMCO Low Duration Income Fund | 8,833,018 | 300,488 | (258,698) | 41,790 |
| PIMCO Preferred and Capital Securities Fund | 1,852,658 | 90,069 | (8,204) | 81,865 |

† A zero balance may reflect actual amounts rounding to less than one thousand.

[7] Primary differences, if any, between book and tax net unrealized appreciation/(depreciation) are attributable to open wash sale loss deferrals, unrealized gain or loss on certain futures, options and forward contracts, realized and unrealized gain (loss) swap contracts, sale/buyback transactions, interest accrued on defaulted securities, straddle loss deferrals, hyperinflationary investments, Passive Foreign Investment Companies (PFICs), and partnership investments.

For the fiscal years ended March 31, 2021 and March 31, 2020, respectively, the Funds made the following tax basis distributions (amounts in thousands†):

| | March 31, 2021 | | | March 31, 2020 | | |
|---|---|---|---|---|---|---|
| | Ordinary Income Distributions[8] | Long-Term Capital Gain Distributions | Return of Capital[9] | Ordinary Income Distributions[8] | Long-Term Capital Gain Distributions | Return of Capital[9] |
| PIMCO Credit Opportunities Bond Fund | $   13,801 | $     0 | $     0 | $   16,000 | $ 0 | $ 0 |
| PIMCO Diversified Income Fund | 171,361 | 0 | 0 | 185,589 | 0 | 0 |
| PIMCO ESG Income Fund | 145 | 0 | 0 | 0 | 0 | 0 |
| PIMCO High Yield Spectrum Fund | 18,960 | 0 | 0 | 35,915 | 0 | 0 |
| PIMCO Long-Term Credit Bond Fund | 191,241 | 98,003 | 0 | 213,296 | 0 | 0 |
| PIMCO Low Duration Credit Fund | 15,555 | 0 | 0 | 13,664 | 0 | 0 |
| PIMCO Low Duration Income Fund | 152,870 | 0 | 35,601 | 259,370 | 0 | 0 |
| PIMCO Preferred and Capital Securities Fund | 66,842 | 161 | 0 | 49,804 | 0 | 0 |

† A zero balance may reflect actual amounts rounding to less than one thousand.

[8] Includes short-term capital gains distributed, if any.

[9] A portion of the distributions made represents a tax return of capital. Return of capital distributions have been reclassified from undistributed net investment income to paid-in capital to more appropriately conform financial accounting to tax accounting.

## 17. SUBSEQUENT EVENTS

On February 10, 2021, the Board approved a proposal to change the name of the PIMCO Senior Floating Rate Fund to PIMCO Low Duration Credit Fund. The name change occurred on May 3, 2021.

Effective May 3, 2021, any redemptions of PIMCO Low Duration Credit Fund shares will no longer be subject to a redemption fee.

There were no other subsequent events identified that require recognition or disclosure.

# Report of Independent Registered Public Accounting Firm

To the Board of Trustees of PIMCO Funds and Shareholders of PIMCO Credit Opportunities Bond Fund, PIMCO Diversified Income Fund, PIMCO ESG Income Fund, PIMCO High Yield Spectrum Fund, PIMCO Long-Term Credit Bond Fund, PIMCO Low Duration Credit Fund, PIMCO Low Duration Income Fund and PIMCO Preferred and Capital Securities Fund

### Opinions on the Financial Statements

We have audited the accompanying statements of assets and liabilities, including the schedules of investments, of each of the funds indicated in the table below (eight of the funds constituting PIMCO Funds, hereafter collectively referred to as the "Funds") as of March 31, 2021, the related statements of operations, of cash flows for PIMCO Long-Term Credit Bond Fund and PIMCO Low Duration Credit Fund, and of changes in net assets for each of the periods indicated in the table below, including the related notes, and the financial highlights for each of the periods indicated in the table below (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of each of the Funds as of March 31, 2021, the results of each of their operations and each of the cash flows for PIMCO Long-Term Credit Bond Fund and PIMCO Low Duration Credit Fund, the changes in each of their net assets, and each of the financial highlights for each of the periods indicated in the table below, in conformity with accounting principles generally accepted in the United States of America.

PIMCO Credit Opportunities Bond Fund[1]
PIMCO Diversified Income Fund[2]
PIMCO ESG Income Fund[3]
PIMCO High Yield Spectrum Fund[2]
PIMCO Long-Term Credit Bond Fund[4]
PIMCO Low Duration Credit Fund[4]
PIMCO Low Duration Income Fund[2]
PIMCO Preferred and Capital Securities Fund[2]

[1]   Statement of operations for the year ended March 31, 2021, statement of changes in net assets for the years ended March 31, 2021 and 2020 and the financial highlights for the years ended March 31, 2021, 2020, 2019, 2018 and 2017
[2]   Statement of operations for the year ended March 31, 2021, statement of changes in net assets for the years ended March 31, 2021 and 2020 and the financial highlights for each of the periods indicated therein
[3]   Statement of operations, statement of changes in net assets and the financial highlights for the period September 30, 2020 (inception date) through March 31, 2021
[4]   Statement of operations and statement of cash flows for the year ended March 31, 2021, statement of changes in net assets for the years ended March 31, 2021 and 2020 and the financial highlights for the years ended March 31, 2021, 2020, 2019, 2018 and 2017

### Basis for Opinions

These financial statements are the responsibility of the Funds' management. Our responsibility is to express an opinion on the Funds' financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Funds in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits of these financial statements in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. Our procedures included confirmation of securities owned as of March 31, 2021 by correspondence with the custodian, transfer agent, brokers and agent banks; when replies were not received from brokers or agent banks, we performed other auditing procedures. We believe that our audits provide a reasonable basis for our opinions.

/s/ PricewaterhouseCoopers LLP
Kansas City, Missouri

May 27, 2021

We have served as the auditor of one or more investment companies in PIMCO Funds since 1987.

# Glossary: (abbreviations that may be used in the preceding statements)

(Unaudited)

**Counterparty Abbreviations:**

| | | | | | |
|---|---|---|---|---|---|
| AZD | Australia and New Zealand Banking Group | FBF | Credit Suisse International | NGF | Nomura Global Financial Products, Inc. |
| BCY | Barclays Capital, Inc. | FICC | Fixed Income Clearing Corporation | NOM | Nomura Securities International Inc. |
| BOA | Bank of America N.A. | FOB | Credit Suisse Securities (USA) LLC | NXN | Natixis New York |
| BOM | Bank of Montreal | GLM | Goldman Sachs Bank USA | RBC | Royal Bank of Canada |
| BPG | BNP Paribas Securities Corp. | GSC | Goldman Sachs & Co. LLC | RYL | NatWest Markets Plc |
| BPS | BNP Paribas S.A. | GST | Goldman Sachs International | SAL | Citigroup Global Markets, Inc. |
| BRC | Barclays Bank PLC | HUS | HSBC Bank USA N.A. | SBI | Citigroup Global Markets Ltd. |
| BSH | Banco Santander S.A. - New York Branch | IND | Crédit Agricole Corporate and Investment Bank S.A. | SCX | Standard Chartered Bank, London |
| BSN | The Bank of Nova Scotia - Toronto | JML | JP Morgan Securities Plc | SOG | Societe Generale Paris |
| CBK | Citibank N.A. | JPM | JP Morgan Chase Bank N.A. | SSB | State Street Bank and Trust Co. |
| DBL | Deutsche Bank AG London | JPS | J.P. Morgan Securities LLC | TDM | TD Securities (USA) LLC |
| DEU | Deutsche Bank Securities, Inc. | MEI | Merrill Lynch International | TOR | The Toronto-Dominion Bank |
| DUB | Deutsche Bank AG | MYC | Morgan Stanley Capital Services LLC | UAG | UBS AG Stamford |
| FAR | Wells Fargo Bank National Association | MYI | Morgan Stanley & Co. International PLC | UBS | UBS Securities LLC |

**Currency Abbreviations:**

| | | | | | |
|---|---|---|---|---|---|
| ARS | Argentine Peso | DOP | Dominican Peso | NOK | Norwegian Krone |
| AUD | Australian Dollar | EUR | Euro | PEN | Peruvian New Sol |
| BRL | Brazilian Real | GBP | British Pound | PLN | Polish Zloty |
| CAD | Canadian Dollar | HKD | Hong Kong Dollar | RUB | Russian Ruble |
| CLP | Chilean Peso | HUF | Hungarian Forint | SEK | Swedish Krona |
| CNH | Chinese Renminbi (Offshore) | IDR | Indonesian Rupiah | TRY | Turkish New Lira |
| CNY | Chinese Renminbi (Mainland) | INR | Indian Rupee | USD (or $) | United States Dollar |
| COP | Colombian Peso | JPY | Japanese Yen | ZAR | South African Rand |
| DKK | Danish Krone | MXN | Mexican Peso | | |

**Exchange Abbreviations:**

| | | | |
|---|---|---|---|
| CME | Chicago Mercantile Exchange | OTC | Over the Counter |

**Index/Spread Abbreviations:**

| | | | | | |
|---|---|---|---|---|---|
| BADLARPP | Argentina Badlar Floating Rate Notes | CMBX | Commercial Mortgage-Backed Index | RUONIA | Ruble Overnight Index Average |
| BBSW3M | 3 Month Bill Swap Rate | CNREPOFIX | China Fixing Repo Rates 7-Day | SONIO | Sterling Overnight Interbank Average Rate |
| CDX.EM | Credit Derivatives Index - Emerging Markets | EUR003M | 3 Month EUR Swap Rate | UKRPI | United Kingdom Retail Prices Index |
| CDX.HY | Credit Derivatives Index - High Yield | H15T1Y | 1 Year US Treasury Yield Curve Constant Maturity Rate | US0003M | ICE 3-Month USD LIBOR |
| CDX.IG | Credit Derivatives Index - Investment Grade | LIBOR03M | 3 Month USD-LIBOR | US0006M | ICE 6-Month USD LIBOR |
| CDX.MCDX | Credit Derivatives Index - Municipal Bond Credit Derivative Index | PRIME | Daily US Prime Rate | | |

**Other Abbreviations:**

| | | | | | |
|---|---|---|---|---|---|
| ABS | Asset-Backed Security | CDO | Collateralized Debt Obligation | OIS | Overnight Index Swap |
| ALT | Alternate Loan Trust | CLO | Collateralized Loan Obligation | PIK | Payment-in-Kind |
| BABs | Build America Bonds | CMBS | Collateralized Mortgage-Backed Security | REMIC | Real Estate Mortgage Investment Conduit |
| BBR | Bank Bill Rate | DAC | Designated Activity Company | RMBS | Residential Mortgage-Backed Security |
| BBSW | Bank Bill Swap Reference Rate | EURIBOR | Euro Interbank Offered Rate | TBA | To-Be-Announced |
| BTP | Buoni del Tesoro Poliennali "Long-term Treasury Bond" | JIBAR | Johannesburg Interbank Agreed Rate | TBD | To-Be-Determined |
| CBO | Collateralized Bond Obligation | LIBOR | London Interbank Offered Rate | TBD% | Interest rate to be determined when loan settles or at the time of funding |
| CDI | Brazil Interbank Deposit Rate | Lunar | Monthly payment based on 28-day periods. One year consists of 13 periods. | TIIE | Tasa de Interés Interbancaria de Equilibrio "Equilibrium Interbank Interest Rate" |

# Federal Income Tax Information <span style="float:right">(Unaudited)</span>

As required by the Internal Revenue Code ("Code") and Treasury Regulations, if applicable, shareholders must be notified within 60 days of the Funds' fiscal year end regarding the status of qualified dividend income and the dividend received deduction.

**Dividend Received Deduction.** Corporate shareholders are generally entitled to take the dividend received deduction on the portion of a Funds' dividend distribution that qualifies under tax law. The percentage of the following Funds' Fiscal 2021 ordinary income dividend that qualifies for the corporate dividend received deduction is set forth below:

**Qualified Dividend Income.** Under the Jobs and Growth Tax Relief Reconciliation Act of 2003, the following percentage of ordinary dividends paid during the fiscal year ended March 31, 2021 was designated as 'qualified dividend income' as defined in the Jobs and Growth Tax Relief Reconciliation Act of 2003 subject to reduced tax rates in 2021:

**Qualified Interest Income and Qualified Short-Term Capital Gain (for non-U.S. resident shareholders only).** Under the American Jobs Creation Act of 2004, the following amounts of ordinary dividends paid during the fiscal year ended March 31, 2021 are considered to be derived from "qualified interest income," as defined in Section 871(k)(1)(E) of the Code, and therefore are designated as interest-related dividends, as defined in Section 871(k)(1)(C) of the Code. Further, the following amounts of ordinary dividends paid during the fiscal year ended March 31, 2021 are considered to be derived from "qualified short-term capital gain," as defined in

Section 871(k)(2)(D) of the Code, and therefore are designated as qualified short-term gain dividends, as defined by Section 871(k)(2)(C) of the Code.

| | Dividend Received Deduction % | Qualified Dividend Income % | Qualified Interest Income (000's[†]) | Qualified Short-Term Capital Gain (000's[†]) |
|---|---|---|---|---|
| PIMCO Credit Opportunities Bond Fund | 0% | 0% | $ 11,536 | $ 0 |
| PIMCO Diversified Income Fund | 0% | 0% | 122,335 | 0 |
| PIMCO ESG Income Fund | 0% | 0% | 0 | 0 |
| PIMCO High Yield Spectrum Fund | 0% | 0% | 18,960 | 0 |
| PIMCO Long-Term Credit Bond Fund | 0% | 0% | 191,241 | 0 |
| PIMCO Low Duration Credit Fund | 0% | 0% | 15,555 | 0 |
| PIMCO Low Duration Income Fund | 0% | 0% | 152,870 | 0 |
| PIMCO Preferred and Capital Securities Fund | 40.53% | 92.94% | 66,842 | 0 |

[†]   A zero balance may reflect actual amounts rounding to less than one thousand.

Shareholders are advised to consult their own tax advisor with respect to the tax consequences of their investment in the Trust. In January 2022, you will be advised on IRS Form 1099-DIV as to the federal tax status of the dividends and distributions received by you in calendar year 2021.

**Section 163(j) Interest Dividends.** The funds intend to pass through the maximum amount allowable as Section 163(j) Interest Dividends as defined in Proposed Treasury Section 1.163(j)-1(b). The 163(j) percentage of ordinary income distributions are as follows:

| | 163 (j) Interest Dividends % |
|---|---|
| PIMCO Credit Opportunities Bond Fund | 0% |
| PIMCO Diversified Income Fund | 0% |
| PIMCO ESG Income Fund | 0% |
| PIMCO High Yield Spectrum Fund | 0% |
| PIMCO Long-Term Credit Bond Fund | 0% |
| PIMCO Low Duration Credit Fund | 0% |
| PIMCO Low Duration Income Fund | 0% |
| PIMCO Preferred and Capital Securities Fund | 0% |

# Distribution Information

For purposes of Section 19 of the Investment Company Act of 1940 (the "Act"), the Funds estimated the periodic sources of any dividends paid during the period covered by this report in accordance with good accounting practice. Pursuant to Rule 19a-1(e) under the Act, the table below sets forth the actual source information for dividends paid during the fiscal period ended March 31, 2021 calculated as of each distribution period pursuant to Section 19 of the Act. The information below is not provided for U.S. federal income tax reporting purposes. The tax character of all dividends and distributions is reported on Form 1099-DIV (for shareholders who receive U.S. federal tax reporting) at the end of each calendar year.

See the Financial Highlights section of this report for the tax characterization of distributions determined in accordance with federal income tax regulations for the fiscal year.

## PIMCO Low Duration Income Fund

| Institutional Class | Net Investment Income* | Net Realized Capital Gains* | Paid-in Surplus or Other Capital Sources** | Total (per common share) |
|---|---|---|---|---|
| October 2020 | $0.0245 | $0.0000 | $0.0000 | $0.0245 |
| November 2020 | $0.0245 | $0.0000 | $0.0000 | $0.0245 |
| December 2020 | $0.0245 | $0.0000 | $0.0000 | $0.0245 |
| January 2021 | $0.0200 | $0.0000 | $0.0000 | $0.0200 |
| February 2021 | $0.0200 | $0.0000 | $0.0000 | $0.0200 |
| March 2021 | $0.0200 | $0.0000 | $0.0000 | $0.0200 |

| I-2 Class | Net Investment Income* | Net Realized Capital Gains* | Paid-in Surplus or Other Capital Sources** | Total (per common share) |
|---|---|---|---|---|
| October 2020 | $0.0238 | $0.0000 | $0.0000 | $0.0238 |
| November 2020 | $0.0238 | $0.0000 | $0.0000 | $0.0238 |
| December 2020 | $0.0238 | $0.0000 | $0.0000 | $0.0238 |
| January 2021 | $0.0193 | $0.0000 | $0.0000 | $0.0193 |
| February 2021 | $0.0193 | $0.0000 | $0.0000 | $0.0193 |
| March 2021 | $0.0193 | $0.0000 | $0.0000 | $0.0193 |

| I-3 Class | Net Investment Income* | Net Realized Capital Gains* | Paid-in Surplus or Other Capital Sources** | Total (per common share) |
|---|---|---|---|---|
| October 2020 | $0.0235 | $0.0000 | $0.0000 | $0.0235 |
| November 2020 | $0.0234 | $0.0000 | $0.0000 | $0.0234 |
| December 2020 | $0.0234 | $0.0000 | $0.0000 | $0.0234 |
| January 2021 | $0.0189 | $0.0000 | $0.0000 | $0.0189 |
| February 2021 | $0.0189 | $0.0000 | $0.0000 | $0.0189 |
| March 2021 | $0.0189 | $0.0000 | $0.0000 | $0.0189 |

| Class A | Net Investment Income* | Net Realized Capital Gains* | Paid-in Surplus or Other Capital Sources** | Total (per common share) |
|---|---|---|---|---|
| October 2020 | $0.0217 | $0.0000 | $0.0000 | $0.0217 |
| November 2020 | $0.0217 | $0.0000 | $0.0000 | $0.0217 |
| December 2020 | $0.0216 | $0.0000 | $0.0000 | $0.0216 |
| January 2021 | $0.0171 | $0.0000 | $0.0000 | $0.0171 |
| February 2021 | $0.0171 | $0.0000 | $0.0000 | $0.0171 |
| March 2021 | $0.0171 | $0.0000 | $0.0000 | $0.0171 |

## Distribution Information (Cont.)

<span style="float:right">(Unaudited)</span>

| Class C | Net Investment Income* | Net Realized Capital Gains* | Paid-in Surplus or Other Capital Sources** | Total (per common share) |
|---|---|---|---|---|
| October 2020 | $0.0196 | $0.0000 | $0.0000 | $0.0196 |
| November 2020 | $0.0196 | $0.0000 | $0.0000 | $0.0196 |
| December 2020 | $0.0195 | $0.0000 | $0.0000 | $0.0195 |
| January 2021 | $0.0149 | $0.0000 | $0.0000 | $0.0149 |
| February 2021 | $0.0149 | $0.0000 | $0.0000 | $0.0149 |
| March 2021 | $0.0149 | $0.0000 | $0.0000 | $0.0149 |

| Class C-2 | Net Investment Income* | Net Realized Capital Gains* | Paid-in Surplus or Other Capital Sources** | Total (per common share) |
|---|---|---|---|---|
| October 2020 | $0.0062 | $0.0000 | $0.0000 | $0.0062 |
| November 2020 | $0.0182 | $0.0000 | $0.0000 | $0.0182 |
| December 2020 | $0.0181 | $0.0000 | $0.0000 | $0.0181 |
| January 2021 | $0.0135 | $0.0000 | $0.0000 | $0.0135 |
| February 2021 | $0.0135 | $0.0000 | $0.0000 | $0.0135 |
| March 2021 | $0.0135 | $0.0000 | $0.0000 | $0.0135 |

\* The source of dividends provided in the table differs, in some respects, from information presented in this report prepared in accordance with generally accepted accounting principles, or U.S. GAAP. For example, net earnings from certain interest rate swap contracts are included as a source of net investment income for purposes of Section 19(a). Accordingly, the information in the table may differ from information in the accompanying financial statements that are presented on the basis of U.S. GAAP and may differ from tax information presented in the footnotes. Amounts shown may include accumulated, as well as fiscal period net income and net profits.

\*\* Occurs when a fund distributes an amount greater than its accumulated net income and net profits. Amounts are not reflective of a fund's net income, yield, earnings or investment performance.

# Management of the Trust

(Unaudited)

The charts below identify the Trustees and executive officers of the Trust. Unless otherwise indicated, the address of all persons below is 650 Newport Center Drive, Newport Beach, CA 92660.

The Funds' Statement of Additional Information includes more information about the Trustees and Officers. To request a free copy, call PIMCO at (888) 87-PIMCO or visit the Funds' website at www.pimco.com.

| Name, Year of Birth and Position Held with Trust* | Term of Office and Length of Time Served† | Principal Occupation(s) During Past 5 Years | Number of Funds in Fund Complex Overseen by Trustee | Other Public Company and Investment Company Directorships Held by Trustee During the Past 5 Years |
|---|---|---|---|---|
| **Interested Trustees¹** | | | | |
| **Peter G. Strelow (1970)** *Chairman of the Board and Trustee* | 05/2017 to present<br><br>Chairman 02/2019 to present | Managing Director and Co-Chief Operating Officer, PIMCO. Senior Vice President of the Trust, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. Formerly, Chief Administrative Officer, PIMCO. | 149 | Chairman and Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT. |
| **Kimberley G. Stafford (1978)** *Trustee* | 02/2021 to present | Managing Director and Global Head of Product Strategy, and Member of Executive Committee. Formerly, Head of Asia-Pacific, Global Head of Consultant Relations and Head of US Institutional and Alternatives Sales, PIMCO. | 149 | Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT. |
| **Independent Trustees** | | | | |
| **George E. Borst (1948)** *Trustee* | 04/2015 to present | Executive Advisor, McKinsey & Company; Formerly, Executive Advisor, Toyota Financial Services; and CEO, Toyota Financial Services. | 149 | Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT; Director, MarineMax Inc. |
| **Jennifer Holden Dunbar (1963)** *Trustee* | 04/2015 to present | Managing Director, Dunbar Partners, LLC (business consulting and investments). Formerly, Partner, Leonard Green & Partners, L.P. | 149 | Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT; Director, PS Business Parks; Director, Big 5 Sporting Goods Corporation. |
| **Kym M. Hubbard (1957)** *Trustee* | 02/2017 to present | Formerly, Global Head of Investments, Chief Investment Officer and Treasurer, Ernst & Young. | 149 | Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT; Director, State Auto Financial Corporation. |
| **Gary F. Kennedy (1955)** *Trustee* | 04/2015 to present | Formerly, Senior Vice President, General Counsel and Chief Compliance Officer, American Airlines and AMR Corporation (now American Airlines Group). | 149 | Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. |
| **Peter B. McCarthy (1950)** *Trustee* | 04/2015 to present | Formerly, Assistant Secretary and Chief Financial Officer, United States Department of Treasury; Deputy Managing Director, Institute of International Finance. | 149 | Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. |
| **Ronald C. Parker (1951)** *Lead Independent Trustee* | 07/2009 to present<br><br>Lead Independent Trustee - 02/2017 to present | Director of Roseburg Forest Products Company. Formerly, Chairman of the Board, The Ford Family Foundation; and President, Chief Executive Officer, Hampton Affiliates (forestry products). | 149 | Lead Independent Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. |

\*  Unless otherwise noted, the information for the individuals listed is as of March 31, 2021.

¹  Ms. Stafford and Mr. Strelow are "interested persons" of the Trust (as that term is defined in the 1940 Act) because of their affiliations with PIMCO.

†  Trustees serve until their successors are duly elected and qualified.

# Management of the Trust (Cont.)

(Unaudited)

## Executive Officers

| Name, Year of Birth and Position Held with Trust* | Term of Office and Length of Time Served | Principal Occupation(s) During Past 5 Years† |
|---|---|---|
| **Eric D. Johnson (1970)** *President* | 06/2019 to present | Executive Vice President and Head of Funds Business Group Americas, PIMCO. President, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **David C. Flattum (1964)** *Chief Legal Officer* | 05/2019 to present | Managing Director and General Counsel, PIMCO. Chief Legal Officer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. Formerly, Managing Director, Chief Operating Officer and General Counsel, Allianz Asset Management of America L.P. |
| **Keisha Audain-Pressley (1975)** *Chief Compliance Officer* | 01/2020 to present | Executive Vice President and Deputy Chief Compliance Officer, PIMCO. Chief Compliance Officer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Joshua D. Ratner (1976)\*\*** *Senior Vice President* | 05/2019 to present | Executive Vice President and Head of Americas Operations, PIMCO. Senior Vice President, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Peter G. Strelow (1970)** *Senior Vice President* | 06/2019 to present | Managing Director and Co-Chief Operating Officer, PIMCO. Senior Vice President, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. Formerly, Chief Administrative Officer, PIMCO. |
| **Ryan G. Leshaw (1980)** *Vice President - Senior Counsel, Secretary* | 11/2018 to present | Executive Vice President and Senior Counsel, PIMCO. Vice President, Senior Counsel and Secretary, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. Chief Legal Officer, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. Formerly, Associate, Willkie Farr & Gallagher LLP. |
| **Wu-Kwan Kit (1981)** *Assistant Secretary* | 08/2017 to present | Senior Vice President and Senior Counsel, PIMCO. Assistant Secretary, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. Vice President, Senior Counsel and Secretary, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. Formerly, Assistant General Counsel, VanEck Associates Corp. |
| **Jeffrey A. Byer (1976)** *Vice President* | 02/2020 to present | Executive Vice President, PIMCO. Vice President, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Elizabeth A. Duggan (1964)** *Vice President* | 02/2021 to present | Executive Vice President, PIMCO. Vice President, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. |
| **Brian J. Pittluck (1977)** *Vice President* | 01/2020 to present | Senior Vice President, PIMCO. Vice President, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Bijal Y. Parikh (1978)** *Treasurer* | 01/2021 to present | Senior Vice President, PIMCO. Treasurer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Erik C. Brown (1967)\*\*\*** *Assistant Treasurer* | 02/2001 to present | Executive Vice President, PIMCO. Assistant Treasurer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Brandon T. Evans (1982)** *Assistant Treasurer* | 05/2019 to present | Vice President, PIMCO. Assistant Treasurer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Colleen D. Miller (1980)\*\*** *Assistant Treasurer* | 02/2017 to present | Senior Vice President, PIMCO. Assistant Treasurer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. Deputy Treasurer, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Jason J. Nagler (1982)\*\*\*** *Assistant Treasurer* | 05/2015 to present | Senior Vice President, PIMCO. Assistant Treasurer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **H. Jessica Zhang (1973)\*\*** *Assistant Treasurer* | 01/2020 to present | Senior Vice President, PIMCO. Assistant Treasurer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |

\* Unless otherwise noted, the information for the individuals listed is as of March 31, 2021.

† The term "PIMCO-Sponsored Closed-End Funds" as used herein includes: PIMCO California Municipal Income Fund, PIMCO California Municipal Income Fund II, PIMCO California Municipal Income Fund III, PIMCO Municipal Income Fund, PIMCO Municipal Income Fund II, PIMCO Municipal Income Fund III, PIMCO New York Municipal Income Fund, PIMCO New York Municipal Income Fund II, PIMCO New York Municipal Income Fund III, PCM Fund Inc., PIMCO Corporate & Income Opportunity Fund, PIMCO Corporate & Income Strategy Fund, PIMCO Dynamic Credit and Mortgage Income Fund, PIMCO Dynamic Income Fund, PIMCO Dynamic Income Opportunities Fund, PIMCO Energy and Tactical Credit Opportunities Fund, PIMCO Global StocksPLUS® & Income Fund, PIMCO High Income Fund, PIMCO Income Opportunity Fund, PIMCO Income Strategy Fund, PIMCO Income Strategy Fund II and PIMCO Strategic Income Fund, Inc.; the term "PIMCO-Sponsored Interval Funds" as used herein includes: PIMCO Flexible Credit Income Fund and PIMCO Flexible Municipal Income Fund.

\*\* The address of these officers is Pacific Investment Management Company LLC, 1633 Broadway, New York, New York 10019.

\*\*\* The address of these officers is Pacific Investment Management Company LLC, 401 Congress Ave., Austin, Texas 78701.

# Privacy Policy[1]

(Unaudited)

The Funds[2,3] consider customer privacy to be a fundamental aspect of their relationships with shareholders and are committed to maintaining the confidentiality, integrity and security of their current, prospective and former shareholders' non-public personal information. The Funds have developed policies that are designed to protect this confidentiality, while allowing shareholder needs to be served.

## OBTAINING NON-PUBLIC PERSONAL INFORMATION

In the course of providing shareholders with products and services, the Funds and certain service providers to the Funds, such as the Funds' investment advisers or sub-advisers ("Advisers"), may obtain non-public personal information about shareholders, which may come from sources such as account applications and other forms, from other written, electronic or verbal correspondence, from shareholder transactions, from a shareholder's brokerage or financial advisory firm, financial professional or consultant, and/or from information captured on applicable websites.

## RESPECTING YOUR PRIVACY

As a matter of policy, the Funds do not disclose any non-public personal information provided by shareholders or gathered by the Funds to non-affiliated third parties, except as required or permitted by law or as necessary for such third parties to perform their agreements with respect to the Funds. As is common in the industry, non-affiliated companies may from time to time be used to provide certain services, such as preparing and mailing prospectuses, reports, account statements and other information, conducting research on shareholder satisfaction and gathering shareholder proxies. The Funds or their affiliates may also retain non-affiliated companies to market Fund shares or products which use Fund shares and enter into joint marketing arrangements with them and other companies. These companies may have access to a shareholder's personal and account information, but are permitted to use this information solely to provide the specific service or as otherwise permitted by law. In most cases, the shareholders will be clients of a third party, but the Funds may also provide a shareholder's personal and account information to the shareholder's respective brokerage or financial advisory firm and/or financial professional or consultant.

## SHARING INFORMATION WITH THIRD PARTIES

The Funds reserve the right to disclose or report personal or account information to non-affiliated third parties in limited circumstances where the Funds believe in good faith that disclosure is required under law, to cooperate with regulators or law enforcement authorities, to protect their rights or property, or upon reasonable request by any Fund in which a shareholder has invested. In addition, the Funds may disclose information about a shareholder or a shareholder's accounts to a non-affiliated third party at the shareholder's request or with the consent of the shareholder.

## SHARING INFORMATION WITH AFFILIATES

The Funds may share shareholder information with their affiliates in connection with servicing shareholders' accounts, and subject to applicable law may provide shareholders with information about products and services that the Funds or their Advisers, distributors or their affiliates ("Service Affiliates") believe may be of interest to such shareholders. The information that the Funds may share may include, for example, a shareholder's participation in the Funds or in other investment programs sponsored by a Service Affiliate, a shareholder's ownership of certain types of accounts (such as IRAs), information about the Funds' experiences or transactions with a shareholder, information captured on applicable websites, or other data about a shareholder's accounts, subject to applicable law. The Funds' Service Affiliates, in turn, are not permitted to share shareholder information with non-affiliated entities, except as required or permitted by law.

## PROCEDURES TO SAFEGUARD PRIVATE INFORMATION

The Funds take seriously the obligation to safeguard shareholder non-public personal information. In addition to this policy, the Funds have implemented procedures that are designed to restrict access to a shareholder's non-public personal information to internal personnel who need to know that information to perform their jobs, such as servicing shareholder accounts or notifying shareholders of new products or services. Physical, electronic and procedural safeguards are in place to guard a shareholder's non-public personal information.

## INFORMATION COLLECTED FROM WEBSITES

The Funds or their service providers and partners may collect information from shareholders via websites they maintain. The information collected via websites maintained by the Funds or their service providers includes client non-public personal information.

## CHANGES TO THE PRIVACY POLICY

From time to time, the Funds may update or revise this privacy policy. If there are changes to the terms of this privacy policy, documents containing the revised policy on the relevant website will be updated.

[1] Amended as of June 25, 2020.
[2] PIMCO Investments LLC ("PI") serves as the Funds' distributor and does not provide brokerage services or any financial advice to investors in the Funds solely because it distributes the Funds. This Privacy Policy applies to the activities of PI to the extent that PI regularly effects or engages in transactions with or for a shareholder of a series of a Trust who is the record owner of such shares. For purposes of this Privacy Policy, references to "the Funds" shall include PI when acting in this capacity.
[3] When distributing this Policy, a Fund may combine the distribution with any similar distribution of its investment adviser's privacy policy. The distributed, combined, policy may be written in the first person (i.e. by using "we" instead of "the Funds").

# Liquidity Risk Management Program

In compliance with Rule 22e-4 (the "Liquidity Rule") under the Investment Company Act of 1940, as amended ("1940 Act"), PIMCO Funds (the "Trust") has adopted and implemented a liquidity risk management program (the "Program") for each series of the Trust (each a "Fund" and collectively, the "Funds") not regulated as a money market fund under 1940 Act Rule 2a-7, which is reasonably designed to assess and manage the Funds' liquidity risk. The Trust's Board of Trustees (the "Board") previously approved the designation of the PIMCO Liquidity Risk Committee (the "Administrator") as Program administrator. The PIMCO Liquidity Risk Committee consists of senior members from certain PIMCO business areas, such as Portfolio Risk Management, Americas Operations, Compliance, Account Management and Portfolio Management, and is advised by members of PIMCO Legal.

A Fund's "liquidity risk" is the risk that the Fund could not meet requests to redeem shares issued by the Fund without significant dilution of the remaining investors' interests in the Fund. In accordance with the Program, each Fund's liquidity risk is assessed no less frequently than annually taking into consideration a variety of factors, including, as applicable, the Fund's investment strategy and liquidity of portfolio investments, cash flow projections, and holdings of cash and cash equivalents, as well as borrowing arrangements and other funding sources. Certain factors are considered under both normal and reasonably foreseeable stressed conditions. Each Fund portfolio investment is classified into one of four liquidity categories (including "highly liquid investments" and "illiquid investments," discussed below) based on a determination of the number of days it is reasonably expected to take to convert the investment to cash, or sell or dispose of the investment, in current market conditions without significantly changing the investment's market value. Each Fund has adopted a "Highly Liquid Investment Minimum" (or "HLIM"), which is a minimum amount of Fund net assets to be invested in highly liquid investments that are assets. As required under the Liquidity Rule, each Fund's HLIM is periodically reviewed, no less frequently than annually, and the Funds have adopted policies and procedures for responding to a shortfall of a Fund's highly liquid investments below its HLIM. The Liquidity Rule also limits the Funds' investments in illiquid investments by prohibiting a Fund from acquiring any illiquid investment if, immediately after the acquisition, the Fund would have invested more than 15% of its net assets in illiquid investments that are assets. Certain non-public reporting is generally required if a Fund's holdings of illiquid investments that are assets were to exceed 15% of Fund net assets.

At a meeting of the Board held on February 9-10, 2021, the Board received a report (the "Report") from the Administrator addressing the Program's operation and assessing the adequacy and effectiveness of its implementation for the period from December 1, 2019 through December 31, 2020. The Report reviewed the operation of the Program's components during such period, noted the March-April 2020 market conditions and associated monitoring by the Administrator, and stated that the Program is operating effectively to assess and manage each Fund's liquidity risk and that the Program has been and continues to be adequately and effectively implemented to monitor and, as applicable, respond to the Funds' liquidity developments. This has remained true for the 12-month reporting period ended March 31, 2021.

## General Information

**Investment Adviser and Administrator**

Pacific Investment Management Company LLC

650 Newport Center Drive

Newport Beach, CA 92660

**Distributor**

PIMCO Investments LLC

1633 Broadway

New York, NY 10019

**Custodian**

State Street Bank and Trust Company

801 Pennsylvania Avenue

Kansas City, MO 64105

**Transfer Agent**

DST Asset Manager Solutions, Inc.

Institutional Class, I-2, I-3, Administrative Class

430 W 7th Street STE 219024

Kansas City, MO 64105-1407

DST Asset Manager Solutions, Inc.

Class A, Class C, Class C-2, Class R

430 W 7th Street STE 219294

Kansas City, MO 64105-1407

**Legal Counsel**

Dechert LLP

1900 K Street, N.W.

Washington, D.C. 20006

**Independent Registered Public Accounting Firm**

PricewaterhouseCoopers LLP

1100 Walnut Street, Suite 1300

Kansas City, MO 64106

This report is submitted for the general information of the shareholders of the Funds listed on the Report cover.

Sign-up for e-delivery
pimco.com/edelivery

**pimco.com**



PF3003AR_033121

PIMCO

# EXHIBIT 21



# EXHIBIT 22

**To:** Mori, Cheryl M.[ ]
**From:** Bart Hubbard
**Sent:** Fri 7/29/2022 4:33:24 PM
**Subject:** Re: Crew Funds website
**Received:** Fri 7/29/2022 4:35:00 PM
Crew-Funds-Summary.pdf

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi, Cher.

Sorry for sending multiple emails to you today. I just wrapped up some meetings and thought that the following summary of Crew Funds that I had put together for Jason Hunter (the estate attorney) on 7-20-2022 may be helpful for you. I sent information to Jason in response to his request for a summary of the work that we've done related to a number of outstanding invoices that I have submitted to him. I summarized a few of other projects that we have worked on in that email for Jason as well, but this is the information regarding the recent Crew Funds system work that we were working on prior to Steve's death. Let me know if you have any questions. I'll be happy to help however I can and can also ask Jason and Wendy if we are ok to provide access to the code and/or database behind the system if needed. You may be able to provide better guidance on that topic, but I'm not sure what we can and can't do in that case since the hosting account and system are not technically owned by us. We do have access to the production hosting account and servers, though, so that we can deploy updates and changes when requested by Steve.

---

Crew Funds Summary:

Crew Funds is a tracking tool/system for an investment fund that Steve managed and is something that we have worked on for him since roughly 2015. This system has gone through a number of iterations, but it is currently called Crew Funds/Crew Capital Group and is accessed by clients and admins at https://www.crewfunds.com. While I can take you through how the tracking tool that we have built for Steve works, I am not familiar with how Crew Funds worked into Steve's overall advisory practice and who else was involved with this business beyond the fact that I believe that it was a part of the strategy that he would employ for some of his clients overall investment portfolio. I do know that Jake Cazier had an admin account at one point, but Steve had also requested that we remove that access by updating some database records a few months back. Jake may be able to shed more light on this and provide a better picture of how the fund works. In the meantime I've attached a document called "Crew-Funds-Summary.pdf" which is the content that was publically displayed on the previous website at CrewFunds.com until recently when he (Steve) engaged us to start a new round of system updates and marketing site changes. See https://web.archive.org/web/20220102045947/https://www.crewfunds.com/ for an archive of that version of the site as well.

Over the years, we have helped Steve to develop, overhaul, enhance, and maintain the Crew Funds toolset/system. The system has always kept the same core tracking features, but we've continuously added a number of different views, reporting tools, and enhanced feature sets over the years. In the past few months, Steve had been working with Matt Gardner on a completely new user interface design, branding, as well as a new set of enhanced features for the system that he was really excited about and had asked us to move on as quickly as possible once he wrapped up some major design specifications with Matt in May of this year. We had started transitioning development team members over to that between May and June, but were unfortunately not able to complete those major updates before Steve's death.

---

I hope that helps in some way,
-Bart

--
Bart Hubbard
801-960-2030 | objective.dev

On Fri, Jul 29, 2022 at 12:36 PM Bart Hubbard <bart@ [ ] > wrote:

Hi, Cher.

You bet. It was nice to meet you. I'll let you know if I have any questions or if I'm contacted by anyone else. I'll be happy to help however I can.

-Bart

--
Bart Hubbard
[ ] objective.dev

The Wayback Machine - https://web.archive.org/web/20220102043947/https://www.crewfunds.com/

Client login

# Do you want to eliminate market turbulence?

Learn how

**FUND OVERVIEW**

Bank loans, which offer a floating rate of income, may provide a hedge against rising rates. This actively managed portfolio of senior secured floating rate loans is designed to provide attractive risk-adjusted return potential, with a higher quality orientation. The "spread" or difference between the senior secured floating loan rates and the declared minimum rate on the account is used to purchase options on the S&P; 500 Index. When returns of the S&P; 500 Index are higher than the declared minimum rate on the account, these options are exercised and gains (up to the declared maximum or "cap") are distributed.

**OUR EXPERTISE**

Crew Capital Group uses PIMCO has the active subadvisor on our Index Account. PIMCO has been a pioneer in fixed income investing for four decades. Their time-tested investment process combines our informed, top-down global economic outlook with rigorous bottom-up credit research and risk management, allowing the fund's investment professionals to focus on what they do best: seeking attractive risk-adjusted returns for investors.

**WHY INVEST IN THIS FUND**

**An attractive risk/return profile**

Floating rate bank loans, made to below- investment-grade companies, offer higher-return potential credit than investment grade bonds, and tend to have lower volatility than high yield bonds. The fund emphasizes higher-quality loans, which typically have a higher recovery rate and lower risk of default than lower-quality, unsecured debt.

**Minimal interest rate exposure**

Because rates on bank loans typically float, or shift to prevailing interest rates, they may provide a hedge in a rising rate environment, as well as an opportunity to enhance returns with increased credit exposure.

**Time-tested management expertise**

Crew Capital Group has managed floating rate bank loans portfolios since 1997. Our process, which combines bottom-up security selection, robust credit research and our long-term global outlook, provides an informed framework for positioning the portfolio across the credit cycle.

**YEAR-END RETURNS**



**FLOATING-RATE BANK LOANS**

When investing in floating-rate funds, it is important to understand the basics of floating-rate loans. Floating-rate loans are variable-rate loans made by financial institutions to companies. They are also known as syndicated loans or senior bank loans. Borrowers enter into these loans to raise capital for things like recapitalizations, debt refinancing or to make acquisitions. After banks originate the loans, they sell them to hedge funds, collateralized loan obligations (CLO) and mutual funds.

The loans are called "floating-rate" because the interest paid on the loans adjusts periodically, usually every 30 to 90 days, based on changes in widely accepted reference rates, like LIBOR, plus a predetermined credit spread over the reference rate. The size of the credit spread depends on things like the credit quality of

the borrower, the value of the collateral backing the loan and the covenants associated with the loan. Floating-rate loans are classified as senior debt and are usually collateralized by specific assets, like the borrower's inventory, receivables or property. The word "senior debt" is especially important here. It means that the loans are typically senior to bondholders, preferred stock holders and common stock holders in the borrower's capital structure.

**KEY QUALITIES OF FLOATING-RATE FUNDS**

**Limited Duration:** A floating-rate fund's net asset value (NAV) should be less sensitive to movements in short-term borrowing rates than other income-producing mutual funds, like long-term bond funds. The maturity of a floating-rate loan is around seven years, but the underlying interest rate on most loans will adjusts every 30-90 days, based on changes in the reference rate. For this reason, the market value of a floating-rate loan will be less sensitive to changes in short-term borrowing rates relative to most fixed-rate investments. This makes floating-rate funds attractive to income investors in periods when the economy is recovering and short-term borrowing rates are expected to rise.

**Diversification and a Niche Market:** Floating-rate funds can offer diversification benefits to income investors. Because floating-rate loans are uniquely structured, they traditionally have low correlations with most major asset classes like stocks, government bonds, high-grade corporate bonds and municipal bonds.

Year-End Balance

Overview



Investments are not FDIC-insured, nor are they deposits of or guaranteed by a bank or any other entity, so they may lose value. Investors should carefully consider investment objectives, risks, charges and expenses. This and other important information is contained in the fund prospectus which can be obtained from a financial professional and should be read carefully before investing.

# Contact

# Us

**BY MAIL**

Crew Capital Group
228 Park Avenue S
Suite 60530
New York, NY 10003

**BY EMAIL**

info@crewfunds.com

**BY TELEPHONE**

(844) 384-4354

**BY CONTACT FORM**

If you are a human, ignore this field

Name

Email

Phone

Comments

Send

# EXHIBIT 23

**Sent:** Fri 1/7/2011 3:54:09 PM
**Subject:** Re: Capital Coop Updates
**From:** Steve Swensen ███████████com>
**To:** Bart Hubbard <bart@a███████████

Thanks Bart!

On Fri, Jan 7, 2011 at 11:53 AM, Bart Hubbard <bart@agencyfusion.com> wrote:

Hi Steve!  Max put in some extra time last night and was able to finish up the updates to the capital coop system this morning.  Things have been pushed up to the live site, tested and are ready to go for you now.  It ended up taking us just under 3.5 hours.  We'll send over the invoice later accordingly.
Let me know if you have any other questions.  We're glad to help.

Thanks!
-Bart

Bart Hubbard

www.agencyfusion.com
twitter.com/AgencyFusion

--
Stephen R. Swensen
1785 East 1450 South, Suite 380, Clearfield, UT 84015
████████ mobile  |  801.775.8022 fax

# EXHIBIT 24

Main | Payee Info

Paid to PEF: `CREWCAPITAL`   Paid to PEF Name: `CREW CAPITAL GROUP`

Payee Name: `CREW CAPITAL GROUP`

Address: 
```
WELLS FARGO BANK
ABA - 321270742
CREW CAPITAL. ACCT ████2933
```

Paid for PEF: `CREWCAPITAL`   Paid for PEF Name: `CREW CAPITAL GROUP`

IRA Dist Code: ` `

Main | Payee Info

Paid to PEF: | CREWCAPITAL | Paid to PEF Name: | CREW CAPITAL GROUP

Payee Name: | CREW CAPITAL GROUP

Address: | WELLS FARGO BANK
ABA - 124002971
ACCT # █████ 2933

Paid for PEF: | CREWCAPITAL | Paid for PEF Name: | CREW CAPITAL GROUP

IRA Dist Code:

Main   Payee Info

Paid to PEF: [ ]   Paid to PEF Name: [ ]

Payee Name: CREW CAPITAL GROUP LLC

Address:
WIRE TO WELLS FARGO BANK
ROUTING # 121000248
CHECKING ACCOUNT # ███2933

Paid for PEF: [ ]   Paid for PEF Name: [ ]

IRA Dist Code: [ ]

# EXHIBIT 25



# EXHIBIT 26

**Real Property Search Criteria: Person Role-All, Address Type-All, 1473 monroe, kaysville, UT, Reference: , Date: 08/30/22 06:32 PM**

Case 1:22-cv-00135-DBP   Document 3-3   Filed 10/14/22   PageID.337   Page 264 of 733

| Situs Address | Owner | Mailing Address | Relevance | Records | Reported |
|---|---|---|---|---|---|
| ███████ KAYSVILLE, UT ███ | WS FAMILY IP LLC | ███████ KAYSVILLE, UT ███ | *** | 3 | 07/21/2022 |

**Real Property Records**

| Name | Situs Address | Parcel Number | Source | Reported |
|---|---|---|---|---|
| WS FAMILY IP LLC | ██████ KAYSVILLE, UT ███ | ███ | Deed | 07/21/2022 |
| TAYLOR, MADISON & ZACH | ██████ KAYSVILLE, UT ███ | ███ | Deed | 07/20/2022 |
| TAYLOR MADISON | ██████ KAYSVILLE, UT ███ | ███ | Tax Roll | 2021 |

Source: **Deed Detail**

**OWNER INFORMATION**

Situs Address:

████████

KAYSVILLE, UT ████
DAVIS

Mailing Address-1:

████████
KAYSVILLE, UT ████

Owner: WS FAMILY IP LLC
Owner Relationship: COMPANY / CORPORATION
Corporate Owner: CORPORATE OWNER

**PROPERTY INFORMATION**
FIPS Code: DAVIS
FIPS State Code: UTAH
APN: 001
Unformatted APN: ████████
Formatted APN: ████████
Original APN: ██████
Property Type: SINGLE FAMILY RESIDENCE - TOWNHOUSE
Land Use: PLANNED UNIT DEVELOPMENT

**TRANSACTION INFORMATION**
Transaction Date: 07/21/2022
Recording Date: 07/26/2022
Document Number: 3489229
Book: 8057
Page: 181

Deed Type: DEED OF TRUST

*The data provided to you by CLEAR may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.*

**Real Property Search Criteria: Person Role-All, Address Type-All, 1473 monroe, kaysville, UT, Reference: , Date: 08/30/22 06:32 PM**

Case 1:22-cv-00135-DBP   Document 3-3   Filed 10/14/22   PageID.338   Page 265 of 733

Type of Transaction: REFINANCE
Mortgage Amount: $400,000.00
Mortgage Type: PRIVATE PARTY LENDER
Mortgage Deed Type: DEED OF TRUST

Mortgage Date: 07/21/2022

Lender Name: MADISON & ZACH TAYLOR

Lender Address:
█████████████████
KAYSVILLE, UT

Title Company: ATTORNEY ONLY
Private Party Lender: YES

Source:  Deed Detail

**OWNER INFORMATION**

Situs Address:
█████████████
KAYSVILLE, UT ████████
DAVIS

Mailing Address-1:
█████████████
KAYSVILLE, UT ████████

Owner: TAYLOR, MADISON & ZACH
Owner Relationship: JOINT TENANTS

**PROPERTY INFORMATION**
FIPS Code: DAVIS
FIPS State Code: UTAH
APN: 001
Unformatted APN: ████████
Formatted APN: █████████
Original APN: ██████
Property Type: VACANT
Land Use: VACANT LAND (NEC)

**TRANSACTION INFORMATION**
Transaction Date: 07/20/2022
Recording Date: 07/22/2022

*The data provided to you by CLEAR may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.*

Real Property Search Criteria: Person Role-All, Address Type-All, 1473 monroe, kaysville, UT, Reference: , Date: 08/30/22 06:32 PM

Case 1:22-cv-00135-DBP   Document 3-3   Filed 10/14/22   PageID.339   Page 266 of 733

Document Number: 3488992
Book: 8056
Page: 184

Seller Name: 317 KAYSVILLE OPS LLC
Deed Type: WARRANTY DEED
Type of Transaction: RESALE

Title Company: REAL ADVANTAGE TITLE
Construction Type: SALE IS A RE-SALE
Purchase Payment: CASH

Source:  Tax Roll Detail

**OWNER INFORMATION**

Owner: TAYLOR MADISON
Co-Owner: TAYLOR ZACH
Additional Name: TAYLOR MADISON & ZACH
Owner Ownership Rights Code: JOINT TENANCY
Absentee Owner: SITUS FROM SALE (OCCUPIED)

Situs Address

KAYSVILLE, UT
DAVIS

Mailing Address/Phone

KAYSVILLE, UT

**PROPERTY INFORMATION**

FIPS Code: DAVIS
FIPS Sub Code: 000
FIPS State Code: UTAH
APN Sequence Number: 1
Unformatted APN:
Formatted APN:
Original APN:
Property Indicator: SINGLE FAMILY RESIDENCE - TOWNHOUSE
Land Use: PLANNED UNIT DEVELOPMENT
Land Square Footage: 3485
Acres: 0.0800
Municipality Name: KAYSVILLE ABHZ

*Page 3 of 5*
*The data provided to you by CLEAR may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.*

**Real Property Search Criteria: Person Role-All, Address Type-All, 1473 monroe, kaysville, UT, Reference: , Date: 08/30/22 06:32 PM**

Case 1:22-cv-00135-DBP   Document 3-3   Filed 10/14/22   PageID.340   Page 267 of 733

Subdivision Name: ██████████████

Legal Description: ████████████████████ SUBDIVISION, THE. CONT. 0.08000 ACRES.

Lot Number: ██

## TAX ASSESSOR INFORMATION

Tax Year: 2021

Calculated Land Value: $187,949.00

Calculated Improvement Value: $177,932.00

Calculated Total Value: $365,881.00

Assessed Land Value: $103,372.00

Assessed Improvement Value: $97,863.00

Assessed Total Value: $201,235.00

Market Land Value: $187,949.00

Market Improvement Value: $177,932.00

Market Total Value: $365,881.00

Total Value Calculated Indicator: MARKET

Tax Amount: $1,124.59

Tax Code Area: 034

## BUILDING/IMPROVEMENT CHARACTERISTICS

Lot Area: 3485

## LAST FULL MARKET SALE INFORMATION

Sale Date: 07/20/2022

Seller Name: 317 KAYSVILLE OPS LLC

Deed Type: GRANT DEED

Type of Sale: RESALE

Recording Date: 07/22/2022

Recording Book: 8056

Recording Page: 184

Document Number: ████████

Title Company: REAL ADVANTAGE TITLE

## PREVIOUS TRANSFER INFORMATION

Number of Parcels: Y Y

## HISTORICAL TAX ASSESSOR INFORMATION

Estimated Tax Year: 2020

Calculated Land Value: $97,115.00

Calculated Total Value: $97,115.00

Assessed Total Value: $97,115.00

Unformatted APN: ████████

Formatted APN: ████████

*The data provided to you by CLEAR may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.*

**Real Property Search Criteria: Person Role-All, Address Type-All, 1473 monroe, kaysville, UT, Reference: , Date: 08/30/22 06:32 PM**

Case 1:22-cv-00135-DBP   Document 3-3   Filed 10/14/22   PageID.341   Page 268 of 733

Original APN: 118680015
Absentee Owner: ABSENTEE (MAIL AND SITUS NOT=)
Owner: 317 KAYSVILLE OPS LLC

Situs Address

██████████████

KAYSVILLE, UT ███████ 


Mailing Address

1148 W LEGACY CROSSING BLVD 317
CENTERVILLE, UT 84014-5539

████████████████████████████████████

*The data provided to you by CLEAR may not be used as a factor in establishing a consumer's eligibility for credit, insurance, employment, or for any other purpose authorized under the FCRA.*

# EXHIBIT 27



RECEIVED
JAN 19 2014
Utah Div. Of Corp. & Comm. Code



*This form must be type written or computer generated.*

State of Utah
**Department of Commerce**
**Division of Corporations & Commercial Code**
**Certificate of Organization (Limited Liability Company)**

**Important:** Read instructions before completing form     Non-Refundable Processing Fee: $70.00

| 1. **Name of Limited Liability Company:** | Last Advisor, LLC | | | |
|---|---|---|---|---|

| 2. **Principal office address:** | 1725 E. 1450 S., Suite 345 | Clearfield | UT | 84015 |
|---|---|---|---|---|
| | Address | City | State | Zip |

**3. The name of the Registered Agent (Individual or Business Entity or Commercial Registered Agent):**

Sage Corporate Services, LLC

*The address must be listed if you have a non-commercial registered agent. See instructions for further details.*

**Address of the Registered Agent:**
Utah Street Address Required. PO Boxes can be listed after the Street Address

**City:**       **State UT**    **Zip:**

**4. Name and signature of Organizer** (attach additional pages if needed)

Name:                  Signature:

| 5. **Name and Address of Members and/or Managers (optional):** | 1. Stephen R. Swensen | | Manager | |
|---|---|---|---|---|
| | Name | | Position | |
| | 1725 E. 1450 S., Suite 345 | Clearfield | UT | 84015 |
| | Address | City | State | Zip |
| | 2. | | | |
| | Name | | Position | |
| | Address | City | State | Zip |

| 6. **Duration (optional):** | ✓ | The duration of the company shall be perpetual |
|---|---|---|
| | | The duration of the company shall be _____ |

**7. Purpose (optional):**

Under GRAMA [63-2-201], all registration information maintained by the Division is classified as public record. For confidentiality purposes, you may use the business entity physical address rather than the residential or private address of any individual affiliated with the entity.

**Optional Inclusion of Ownership Information: This information is not required.**

Is this a female owned business?   ○ Yes   ○ No

Is this a minority owned business?   ○ Yes   ○ No   If yes, please specify: Select/Type the race of the owner here

01-09-14 P04:22 RCVD

Date: 01/10/2014
Receipt Number: 5470340
Amount Paid: $70.00

State of Utah
Department of Commerce
Division of Corporations and Commercial Code
I hereby certified that the foregoing has been filed
and approved on this _9_ day of _Jan_ 2014
in this office of this Division and hereby issued
This Certificate thereof.

Examiner _MS_ Date _1-17-14_



Kathy Berg
Division Director

8909046

**State of Utah**
**Department of Commerce**
**Division of Corporations & Commercial Code**
**Amendment to Certificate of Organization**

Receipt Number: 8683033
Amount Paid:   $37.00

RECEIVED

DEC 31 2020

Utah Div. of Corp. & Comm. Code

**Non-Refundable Processing Fee: $37.00**

Pursuant to UCA § 48-3a-202, the individual named below causes this Amendment to the Certificate of Organization to be delivered to the Utah Division of Corporations for filing, and states as follows:

Entity Number: 8909046-0160

The name of the limited liability company is:   Last Advisor, LLC

The Certificate of Organization shall be amended as set forth herein (complete all that apply):

There is a change in the name of the limited liability company to:
Four Buckets, LLC

The Certificate of Organization is amended as follows:

Filing date of initial certificate January 9, 2014

Future effective date (if not to be effective upon filing) _____ *(MM-DD-YYYY & not to exceed 90 days)*

Under penalties of perjury, I declare that this Amendment of Certificate of Organization has been examined by me and is, to the best of my knowledge and belief, true, correct and complete.

Name:   Steven Swensen          Signed: _____ Steph_er Swensen

Title:   Manager          Dated:   12 - 31 - 2020

Under GRAMA [63G-2-201], all registration information maintained by the Division is classified as public record. For confidentiality purposes, you may use the business entity physical address rather than the residential or private address of any individual affiliated with the entity.

State of Utah
Department of Commerce
Division of Corporations and Commercial Code
I hereby certified that the foregoing has been filed
and approved on this 31 day of DEC 2020
Ir this office of this Division and hereby issued
This Certificate thereof.

Examiner SD    Date 01/04/21

Jason Stezer
Division Director

DEC 31 '20 PM 1:14

01/14



State of Utah
Department of Commerce
Division of Corporations & Commercial Code
Amendment to Certificate of Organization

Date: 05/31/2022
Receipt Number: 9481060
Amount Paid: $112.00

**RECEIVED**

MAY 3 1 2022

Utah Div. of Corp. & Comm. Code

Non-Refundable Processing Fee: $37.00

**EXPEDITE**

Pursuant to UCA § 48-3a-202, the individual named below causes this Amendment to the Certificate of Organization to be delivered to the Utah Division of Corporations for filing, and states as follows:

Entity Number: 8909046-0160

The name of the limited liability company is: Four Buckets, LLC

The Certificate of Organization shall be amended as set forth herein (complete all that apply):

There is a change in the name of the limited liability company to:
Swensen Capital, LLC

The Certificate of Organization is amended as follows:

Filing date of initial certificate 01-09-2014

Future effective date (if not to be effective upon filing) _____ (MM-DD-YYYY & not to exceed 90 days)

Under penalties of perjury, I declare that this Amendment of Certificate of Organization has been examined by me and is, to the best of my knowledge and belief, true, correct and complete.

Name: Jason C. Hunter

Signed: _____

Title: Authorized Agent

Dated: 5/31/2022

Under GRAMA {63G-2-201}, all registration information maintained by the Division is classified as public record. For confidentiality purposes, you may use the business entity physical address rather than the residential or private address of any individual affiliated with the entity.

State of Utah
Department of Commerce
Division of Corporations and Commercial Code
I hereby certified that the foregoing has been filed
and approved on this ___ day of _____ 20 __
in this office of this Division and hereby issued
This Certificate thereof.

Examiner _____ Date _____



Leigh Veillette
Division Director

01/14



# State of Utah
**DEPARTMENT OF COMMERCE**
**Division of Corporations & Commercial Code**

## *Summary of Online Changes*



Business Name: SWENSEN CAPITAL, LLC

Entity number: 8909046-0160

Date of Filing: 07/12/2022

### PREVIOUS Registered Principals:

**Name** ...... STEPHEN R SWENSEN
**Position** .. Manager
**Address** .. 1725 E 1450 S STE 345
           Clearfield, UT 84015

### UPDATED Registered Principals:

**Name** ...... Ronald S. Gibb
**Position** .. Manager
**Address** .. 1725 East 1450 South
           Suite 345
           Clearfield, UT 84015 United States

Shane A. Dominguez, Esq. 07/12/2022

Under GRAMA {63-2-201}, all registration information maintained by the Division is classified as public record. For confidentiality purposes, the business entity physical address may be provided rather than the residential or private address of any individual affiliated with the entity.



Utah.gov Secured   A SECURE ONLINE SERVICE FROM UTAH.GOV

Subscribers   FAQs   Support   Font Size: A A A

DIVISION OF CORPORATIONS AND COMMERCIAL CODE
**BUSINESS SEARCH**

RELATED
LINKS & RESOURCES

## Registered Principals

| Name | Type | City | Status |
| --- | --- | --- | --- |
| BUCKET BLISS | DBA | Clearfield | Active |
| | | | |

| Position | Name | Address | |
| --- | --- | --- | --- |
| Registered Agent | SAGE CORPORATE SERVICES, LLC | 140 N UNION AVE STE 220 | Farmington UT 84025 |
| Applicant | SWENSEN CAPITAL, LLC | 1725 EAST 1450 SOUTH | CLEARFIELD UT 84015 |
| | | | |

If you believe there may be more principals, click here to View Filed Documents View Filed Documents

<< Back to Search Results

Search by:   **Business Name**   Number   Executive Name   Search Hints

Business Name:            Search

### Get Business Info On Your Mobile

Visit this site with your mobile device

### Commerce Searches

- Business Search
- Data Request
- Professional License
- Real Estate License
- Registered Principal
- Trademark
- Uniform Commercial Code
- Verify Utah

### Department of Commerce

- Department of Commerce Home
- Division of Corporations
- Contact Us
- Disclaimer

Send Us Your Feedback
We want to know what you think. Click here to share your feedback with Utah.gov!

Utah.gov Home      Utah.gov Terms of Use      Utah.gov Privacy Policy      Translate Utah.gov
Copyright © 2022 State of Utah - All rights reserved.

# EXHIBIT 28

Receipt Number: 9550220
Amount Paid: $129.00

State of Utah
Department of Commerce
Division of Corporations & Commercial Code
Certificate of Organization (Limited Liability Company)

*This form cannot be hand written.*

**RECEIVED**

JUL 21 2022

Utah Div of Corp. & Comm. Code

# EXPEDITE

Important: Read instructions before completing form.     Non-Refundable Processing Fee: $54.00  **SP**

| 1. Name of Limited Liability Company: | WS Family IP, LLC | | | |
|---|---|---|---|---|
| 2. Principal office address: Street Address Required. PO Box can be listed after Street Address | 1142 Foxtrotter Court, Kaysville, Utah 84037 | | | |
| | Address | City | State | Zip |

3. The name of the Registered Agent (Individual or Business Entity or Commercial Registered Agent):

Sage Corporate Services, LLC

*This address must be listed if you have a non-commercial registered agent. See instructions for further details.*

Address of the Registered Agent:

Utah Street Address Required, PO Boxes can be listed after the Street Address

City:                                                                      State UT     Zip:

| 4. Signature of Organizer: | Signature: | | | |
|---|---|---|---|---|
| | 1. Wendy A. Swensen | | Manager | ▼ |
| | Name | | Position | |
| 5. Name and Address of Members and/or Managers (optional): | 1142 Foxtrotter Court, Kaysville, Utah 84037 | | | |
| | Address | City | State | Zip |
| | 2. Name | | Position | |
| | Address | City | State | Zip |

| 6. Duration (optional): | ✔ | The duration of the company shall be perpetual |
|---|---|---|
| | | The duration of the company shall be _____ |

7. Purpose (optional):

Under GRAMA (63G-2-301), all registration information maintained by the Division is classified as public record. For confidentiality purposes, you may use the business entity physical address rather than the residential or private address of any individual affiliated with the entity.

Optional Inclusion of Ownership Information: This information is not required.

| Is this a female owned business? | ◯ Yes | ◯ No | | |
|---|---|---|---|---|
| Is this a minority owned business? | ◯ Yes | ◯ No | If yes, please specify: | Select/Type the race of the owner here |

**State of Utah
Department of Commerce
Division of Corporations and Commercial Code**
I hereby certified that the foregoing has been filed
and approved on this __21__ day of __JUL__ 20__22__
in this office of this Division and hereby issued
This Certificate thereof.

Examiner ___mv___     Date ___7-22-2022___



*L. Veillette*
**Leigh Veillette
Division Director**

12952356 - 0160

# EXHIBIT 29

State of Utah
Department of Commerce
Division of Corporations & Commercial Code
Certificate of Organization (Limited Liability Company)

*This form cannot be hand written*

Date:
Receipt Number: 8462851
Amount Paid: $150.00

**RECEIVED**

**AUG 1 1 2020**

Utah Div. Corp. & Comm. Code

HCS

Print
Clear Form
Instructions

## EXPEDITE

Important: Read instructions before completing form      Non-Refundable Processing Fee: $70.00

| | |
|---|---|
| 1. Name of Limited Liability Company: | Hatchat, LLC |

**2. Principal office address:**
Street Address Required
PO Box can be listed after Street Address

1142 Foxtrotter Court, Kaysville, UT 84037
Address      City      State      Zip

**3. The name of the Registered Agent (Individual or Business Entity or Commercial Registered Agent):**

Sage Corporate Services, LLC

*The address must be listed if you have a non-commercial registered agent. See instructions for further details.*

Address of the Registered Agent: _____

     Utah Street Address Required, PO Boxes can be listed after the Street Address

City: _____      State UT    Zip: _____

**4. Signature of Organizer:**

Signature: _____

**5. Name and Address of Members and/or Managers (optional):**

1. Stephen R. Swensen         Manager
Name                      Position
1142 Foxtrotter Court, Kaysville, UT 84037
Address      City      State    Zip
2. _____
Name                      Position
Address      City      State    Zip

**6. Duration (optional):**   ✔   The duration of the company shall be perpetual
                 The duration of the company shall be _____

**7. Purpose (optional):**

Under GRAMA {63G-2-201}, all registration information maintained by the Division is classified as public record. For confidentiality purposes, you may use the business entity physical address rather than the residential or private address of any individual affiliated with the entity.

**Optional Inclusion of Ownership Information: This information is not required.**

Is this a female owned business?   ○ Yes   ○ No

Is this a minority owned business?   ○ Yes   ○ No    If yes, please specify: | Select/Type the race of the owner here |

Mailing/Faxing Information: www.corporations.utah.gov/contactus.html   Division's Website: www.corporations.utah.gov

AUG 11 '20 AM 11:57

State of Utah
Department of Commerce
Division of Corporations and Commercial Code
I hereby certified that the foregoing has been filed
and approved on this 11 day of AUG 20 20
in this office of this Division and hereby issued
This Certificate thereof.

Examiner _____ Date 8/12/20

Jason Sterzer
Division Director

03/16

11893095-0160

State of Utah
**Department of Commerce**
Division of Corporations & Commercial Code
Amendment to Certificate of Organization

Receipt Number: 8683032
Amount Paid:   $37.00

**RECEIVED**

DEC 3 1 2020

Utah Div. of Corp. & Comm. Code

**Non-Refundable Processing Fee: $37.00**

Pursuant to UCA § 48-3a-202, the individual named below causes this Amendment to the Certificate of Organization to be delivered to the Utah Division of Corporations for filing, and states as follows:

Entity Number: 11893095-0160

The name of the limited liability company is:  Hatchat, LLC

The Certificate of Organization shall be amended as set forth herein (complete all that apply):

There is a change in the name of the limited liability company to:
Wingman, LLC

The Certificate of Organization is amended as follows:

Filing date of initial certificate  August 11, 2020

Future effective date (if not to be effective upon filing) _____ *(MM-DD-YYYY & not to exceed 90 days)*

Under penalties of perjury, I declare that this Amendment of Certificate of Organization has been examined by me and is, to the best of my knowledge and belief, true, correct and complete.

Name:  Steven Swensen          Signed: _____

Title:  Manager          Dated:  12-31-2020

Under GRAMA {63G-2-201}, all registration information maintained by the Division is classified as public record. For confidentiality purposes, you may use the business entity physical address rather than the residential or private address of any individual affiliated with the entity.

State of Utah
Department of Commerce
Division of Corporations and Commercial Code
I hereby certified that the foregoing has been filed
and approved on this 31 day of DEC 2020
Ir this office of this Division and hereby issued
This Certificate thereof.

DEC 31 '20 PM 1:13

Examiner _____ Date 01/04/21

Jason Stoner
Division Director

01/14

# EXHIBIT 30

<u>DECLARATION OF BRET THURMAN</u>

       I, Bret Thurman, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am over the age of 21 and am a resident of Clinton, Utah.  I make this declaration based upon my personal knowledge.  If called to testify, I could and would competently testify to the following facts:

2.      I retired in 2020.  Before retiring, I worked at the Internal Revenue Service.  I am married to Debra Thurman.

3.      Debra and I met Stephen Swensen in 2012.  My wife told me that her boss at work referred her to Steve as an investment advisor.  Steve came to our home in August or September 2012 and met with Debra and me.  Steve recommended that we invest our money in Capital Cooperative, which he said was an investment company that paid a guaranteed return of 4% annually.  I asked Steve what his fees would be.  In response, Steve said that Capital Cooperative actually paid a return of 7% annually, and that Steve kept 3% of that for his fees such that Debra and I would not owe him any additional fees.  Steve said that Capital Cooperative was a safe investment.

4.      After Steve left, Debra and I discussed what he said and we decided that it would be a good investment.  We wanted to invest in something safe, and bank accounts paid far less interest than the guaranteed 4% that Steve said we could earn with Capital Cooperative.

5.      After we decided to invest, Steve came to our house again and brought paperwork for Debra to sign to move Debra's 401K money into Capital Cooperative.  We never got our own copy of that paperwork.  Our account with Capital Cooperative was opened on September 13, 2012, and we invested $75,000 at that time.  Debra signed paperwork with Steve to transfer this money from Debra's IRA account at Ameriprise.

6.     Because our investment in Capital Cooperative was doing well, we decided to invest more money.  On or around February 15, 2013, Debra and I invested an additional approximately $76,141 in Capital Cooperative, and on or around December 17, 2013 Debra and I invested another $131,510.76 in Capital Cooperative.  Debra and I gave checks to Steve to invest in Capital Cooperative.  I cannot remember who the checks were made out to.  One of the checks we gave to Steve was from our account at JPMorgan, which Steve was reinvesting in Capital Cooperative for us.

7.     We got periodic statements showing that our money was growing in Capital Cooperative.  An example of one of these statements is attached as **Exhibit 1**.  This statement is dated June 30, 2014.  It shows that our account with Capital Cooperative Group was earning 4.5%.  Even though it shows 4.5%, I remember Steve saying at our first meeting that this investment only paid 4%.  I do not remember noticing that difference at the time.

8.     Steve gave us access to a website, www.capitalcoop.com, where we could see our Capital Cooperative account balance and transactions.  Attached as **Exhibit 2** is a true and correct copy of an email from Steve to Debra and me on August 13, 2013 giving us access to this website.  I would periodically log in to check that our investment was growing as Steve said it would.

9.     We also received periodic account statement emails from Summit Brokerage Services Inc. and also from a company called BlueLeaf.  These emails gave links to websites where we could see our account balance.  An example of one of these emails from Summit Brokerage Services Inc. is attached as **Exhibit 3**, and one of these emails from BlueLeaf is attached as **Exhibit 4.**

10.     At some point, Capital Cooperative changed its name to Crew Capital Group.  Our periodic statements now said "Crew Capital Group" at the top.  A true and correct copy of one of

these is attached as **Exhibit 5.**  The website changed to www.crewfunds.com.  I got my login and password from Steve for www.crewfunds.com.  I would periodically log in to see my account balance and earnings.  A true and correct copy of a printout of what my account looked like on www.crewfunds.com on July 7, 2022 is attached as **Exhibit 6**, and attached as **Exhibit 7** is a printout of the "transactions" page of my account as shown on www.crewfunds.com on July 7, 2022.

11.     Debra and I did not withdraw any money from the Crew Capital account.  We just let it earn interest and grow.  At some point, Steve told us that we would have to set up an account at the Bank of Utah when we wanted to start getting distributions from Crew Capital.

12.     Debra and I would meet annually with Steve to talk about our investment plan.  Steve had partners.  At first Steve's partner was Steve's brother-in-law Jason Kimber.  Later, Steve split off from Jason Kimber and got a new partner named Jacob Cazier.  Either Jason or Jacob would always be present at our annual meetings with Steve.  Our annual report documents would show our investment in Capital Cooperative (later, Crew Capital).  An example of the relevant pages from our most recent annual report document, prepared by Jacob Cazier and dated March 31, 2022, is attached as **Exhibit 8.**

13.     Debra and I noticed small print disclosures on the website and on our statements saying that the Crew Capital investment was not FDIC insured and may lose value.  We asked Steve about it.  He told us not to worry about it and that it was taken care of through some other insurance.  He said that Crew Capital was one of the safest places to invest your money.  Once, I asked Steve, "What will happen if this starts to tank?"  Steve said that he had his own money invested in Crew Capital, and that if Crew Capital starts to lose a bunch of money, he would pull his money out and our money too.  He also said that our returns were guaranteed.

14.     Our Crew Capital statements had a phone number on them.  I sometimes called that number when I got locked out of my account on the website by typing my password incorrectly. The person who answered always took a message, and eventually either Jake or Steve would either call or email me to reset my password for the website.

15.     I recall at one of our annual meetings I told Steve that I thought Debra and I should be earning more than 4% on our Crew Capital investment since we had so much money invested there.  I believed that we were only getting 4%.  Steve responded that he could increase our rate of return to 4.5%.  I believed at the time that Steve was going to reduce the amount of fees he took in order to increase the return to Debra and me.

16.     In subsequent years after we invested in Crew Capital, Steve continued to urge us to invest more money in Crew Capital but we never did.  He was always after us to invest more. He wanted me to pull money out of my other investments to put it into Crew Capital.

17.     I received Forms 1099 from Crew Capital for 2019 and 2020.  These are attached as **Exhibit 9** and **Exhibit 10**.  When I got the Forms 1099, I called Steve and said that I should not have received Forms 1099 because Debra and I had not taken any distributions from Crew Capital and all of our earnings were re-invested.  Steve told me not to worry about it, that they were sent out in error, and that he would take care of it.

18.     Debra and I had our annual meeting with Steve and Jacob Cazier on March 31, 2022 at their office at Wealth Navigation in Centerville, Utah.  This is the meeting at which Jake gave us

the annual report document that is attached as **Exhibit 8**.  Jake reviewed our account balances for us, and then Steve told us about a new index fund that he had available for his investment clients.  He said it paid a guaranteed 5% with the possibility of up to 10% annually.  He said it was based on an index (either the S&P 500 or some other index – I cannot recall which).  If the index did better than 5% that year, we could get that additional amount up to 10% maximum, but we were guaranteed to get a minimum of 5%.  He said that if we invested in this new index fund, we would not be able to take any funds out for one year.  Steve said that we could put just a portion of our Crew Capital money into the new index fund (which would be locked up for one year), so that we would still have access to the rest of our money and avoid having it locked up for a year.  Jake Cazier was in the room while Steve was explaining this new investment to us.

19.     We were still asking questions about the new index fund when Steve and Jake had to end our meeting because their next meeting was going to start.  We still had questions, so we emailed Jake with our questions.  Jake's email answering our questions is attached as **Exhibit 11.**

20.     Debra and I were still considering whether to invest in the "new fund" that Steve talked about when we learned from Jake that Steve had died.  After Steve died, Jake told me that the new investment Steve had been explaining to us on March 31, 2022 was just the same thing as Crew Capital.

21.     I declare under penalty of perjury that the foregoing is true and correct.

Executed in Clinton, Utah on __September 07__, 2022.


_Bret Thurman_
Bret Thurman

# EXHIBIT 1

**EXHIBIT 1**



**CAPITAL** COOPERATIVE GROUP

**Physical Address**
101 Convention Center Dr, 7th Floor
Las Vegas, NV 89109
www.capitalcoop.com

**Mailing Address**
P.O. Box 27740
Las Vegas, NV 89126

## Account Information

**Bret Thurman**
**Debra Thurman**

**Account Number:** ▮▮▮▮0822 *(opened September 13, 2012)*
**Declared Earnings Rate:** 4.5%
**Statement Date:** June 30, 2014
**Advisor:** Stephen Swensen
**Advisor Phone:** (888) 775-8021

## Account Summary

| TRANSACTION TYPE | YEAR TO DATE | SINCE INCEPTION |
|---|---|---|
| Deposits | $0.00 | $282,651.76 |
| Withdrawals | $0.00 | $0.00 |
| Earnings | $6,550.94 | $14,218.80 |

**Total Value $296,870.56 *(as of June 30, 2014)***

## Transaction Summary

| TYPE | DATE | AMOUNT |
|---|---|---|
| Daily Earnings Credit | April 30, 2014 | $1,087.71 |
| Daily Earnings Credit | May 31, 2014 | $1,128.20 |
| Daily Earnings Credit | June 30, 2014 | $1,095.92 |

*Disclosure: Investors should carefully consider the objectives, risks, charges and expenses of their investments. This and other important information can be obtained from your financial professional and should be read carefully before investing. For information about your account or any other services, please contact your financial professional.*

# EXHIBIT 2

Capital Cooperative Fixed Account

| | |
|---|---|
| **From** | wen en@ ummitcig com, |
| **To:** | @aol.com, |
| **Subject** | Capital Cooperative Fixed Account |
| **Date:** | Tue, Aug 13, 2013 9:07 am |

<div style="border:1px solid black; display:inline-block; padding:10px">

**EXHIBIT 2**

</div>

Good morning Bret and Debbie,

I wanted to drop you a quick note to let you know that your fixed account no longer provides a direct feed into your online access accounts at Summit  As you recall, they used to update that value on a quarterly basis.

In order to see that account value, you'll need to log directly into that account as follows:

1. Go to www.capitalcoop.com
2  In the top right corner, enter your username and password   Your username is your email address and the password is Bret's SSN without any dashes.  You can change your password after your initial login.

If you wouldn't mind sending me a quick email to let me know that you received this email, I would really appreciate it.  I'm looking forward to meeting with you both in the next few months for our 4th quarter review   Let me know if you have any questions in the interim

Regards,
Steve

**Stephen R. Swensen**
Financial Advisor
888.775.8021 toll free   |   801.775.8022 fax   |   801.540.1440 mobile   |   sswensen@summitcig.com

**Summit Capital Investment Group, Inc.**
1725 East 1450 South, Suite 345, Clearfield, UT  84015   |   www.summitcig.com

Summit Capital Investment Group, Inc. is an independent firm with securities offered through Summit Brokerage Services, Inc. Member FINRA / SIPC. Summit Capital Investment Group, Inc. is not associated with Summit Brokerage Services, Inc  and Summit Financial Group, Inc  This e mail and any attachments are intended only for the addressee   If you are not the intended recipient, please permanently delete this message immediately and do not use, copy, distribute or forward any part of this message, as it may contain proprietary, confidential, or privileged information. Also, please let me know of the error by return e-mail. Summit Capital Investment Group, Inc. does not provide legal or tax advice.

# EXHIBIT 3

EXHIBIT
3

**From**  edelivery@myedocument uite com,
**To:**            @AOL.COM,
**Subject**  Brokerage Account Statement Notification
**Date:**  Mon, Jul 1, 2013 1:53 pm

---

# SUMMIT BROKERAGE SERVICES INC

07/01/2013

**Account ending in:**

Your  tatement i  now available  Vi  it www.myedocument uite com to view, download or print your communications. Please have your user ID and password ready.

If you would like to stop receiving e-mail notifications and resume receiving paper copies of your account communication  , you may log in to your account and change your paperle   delivery preference   at any time. Please contact SUMMIT BROKERAGE SERVICES INC if you have any questions.



Paperless account communications available through http://www.myedocumentsuite.com are provided on behalf of SUMMIT BROKERAGE SERVICES INC by Pershing LLC (member FINRA, NYSE, SIPC), a subsidiary of The Bank of New York Mellon Corporation

Please add edelivery@myedocumentsuite.com to your address book to help ensure that you continue to receive e-mails from SUMMIT BROKERAGE SERVICES INC.

This message is automatically generated. Please do not reply to this message.

# EXHIBIT 4

**From** monthlyupdate@blueleaf com,
**To:** @aol.com,
**Subject** Thurman, Bret & Debra' Monthly Inve tment Summary
**Date:** Sun, Apr 2, 2017 6:08 am



**EXHIBIT 4**

View Online. Not interested in this? Change your email settings here.

powered by  **blueleaf**

Monthly Financial Update for Mar 31, 2017.

 **Advisor Summit Capital.**

Stephen Swensen & Jason Kimber, Advisors

**TOTAL MONTHLY CHANGE**

 **↑$700.10**

| | |
|---|---|
| Investment Value **MAR 31, 2017** | **$** |
| Mar 1, 2017 | $ |

For more information, ign into your Blueleaf com account

 **Blueleaf Sign in**

**Accounts**

| ACCOUNT NAME | As of Mar 31, 2017 | Monthly Change |
|---|---|---|
| Joint - Crew Capital Group NON QUAL - 1048120822 Other Assets | $334,786 88 | $0 00 |

| Debra Thurman  Tran  am<br>Life TRAD IRA - 0000012...<br>DST Advisor | | $700.10 |
| TOTAL | $ | **$700 10** |

---

Sign in to My Money  •  Help  •  About Blueleaf  •  Blueleaf Blog  •  Blueleaf on Twitter

blueleaf

© Copyright 2017 Blueleaf Wealth, Inc  All right  re erved

Advisor Disclaimer:

The Values represented within this report reflects are only valid for the period in which this report wa  run  Thi  report i  for informational purpo e  only and i  not an official account  tatement  We urge you to compare this data with the account statements you receive from the custodian of your account assets. Source documents may contain notices, disclosures and other information important and may also serve as a reference should questions arise regarding the accuracy of the information in the con olidated report  For complete information on any of the fund  in your portfolio, including management fees and expenses, please consult the prospectus you received. You should always read the prospectus carefully to obtain the most current and complete redemption fee policy information. Always consider the funds´ investment objectives, ri k factor  and charge  and e pen e  before inve ting  Pa t performance i  not indicative of future results. Asset allocation/diversification does not guarantee a profit or protect against a loss. There may be a potential tax implication with a rebalancing strategy, so please consult your tax advisor before implementing such a strategy. Allegis and its affiliates do not offer legal, tax or accounting advice  Client  are urged to con ult their own legal, ta  and accounting advi or  with respect to their specific situations. Allegis is separately owned from any other named entity.

# EXHIBIT 5

 **CREW CAPITAL** GROUP

**EXHIBIT 5**

**Address**
177 Huntington Ave
Suite 1703
Boston, MA 02115
www.crewfunds.com

---

## Account Information

**Bret Thurman**
Debra Thurman

Clinton, UT 84015

**Account Number:** ******0822
**Declared Earnings Rate:** 4.50%
**Statement Date:** 10-31-2018
**Advisor:** Stephen Swensen
**Advisor Phone Number:** (888) 775-8021

---

## Account Summary

(Opened 09-12-2012)

| Transaction type | Year to date | Since inception |
|---|---|---|
| Deposits | $0.00 | $282,651.76 |
| Withdrawals | $0.00 | $0.00 |
| Earnings | $14,435.22 | $79,402.19 |

---

## Transaction Summary

| Type | Date | Amount |
|---|---|---|
| Daily Earnings Credits | 10-31-2018 | $1,332.25 |

---

## History

Current Value as of 10-31-2018  **$360,934.04**



---

Investments are not FDIC-insured, nor are they deposits of or guaranteed by a bank or any other entity, so they may lose value. Investors should carefully consider investment objectives, risks, charges and expenses. This and other important information is contained in the fund prospectus which can be obtained from a financial professional and should be read carefully before investing.

# EXHIBIT 6

Bret & Debra Thurman        Logout

Account Summary    Documents    Transaction History    Withdrawal        Menu

Current account: Thurman

# Account Summary

Account Number ████ **0822**

Balance: **$425,923.78**

Type: **Fixed**

Opening Date **11/12/2013**

Declared Earnings Rate:

4.50%

## Account Activity

| Transaction type | Year to date | Since inception |
|---|---|---|
| Deposits | $0.00 | $282,651.76 |
| Withdrawals | $0.00 | $0.00 |
| Earnings | $9,706.67 | $143,233.17 |

## History

Current Balance  $425,923 78



---

## Account Holder

**Bret Thurman**

Address:



Clinton, UT

---

## Advisor

Name: **Stephen Swensen**

Crew Capital

Phone: **(801) 410 1800**

Investments are not FDIC-insured, nor are they deposits of or guaranteed by a bank or any other entity, so they may lose value. Investors should carefully consider investment objectives, risks, charges and expenses. This and other important information is contained in the fund prospectus which can be obtained from a financial professional and should be read carefully before investing.

# EXHIBIT 7

**EXHIBIT 7**

Bret & Debra Thurman          Logout

Account Summary    Documents    Transaction History    Withdrawal          Menu

Current account: Thurman

# Transaction History

**Transaction Type**

| All | ⌄ |
|---|---|

**Start Date**

| MM-DD-YYYY |
|---|

**End Date**

| MM-DD-YYYY |
|---|

Search

## Transactions

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | July 6, 2022 | $52.50 | $425,923.78 |
| Daily Earnings Credit | July 5, 2022 | $52.50 | $425,871.27 |
| Daily Earnings Credit | July 4, 2022 | $52.49 | $425,818.77 |
| Daily Earnings Credit | July 3, 2022 | $52.49 | $425,766.28 |
| Daily Earnings Credit | July 2, 2022 | $52.48 | $425,713.80 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | July 1, 2022 | $52.47 | $425,661.32 |
| Daily Earnings Credit | June 30, 2022 | $52.47 | $425,608.85 |
| Daily Earnings Credit | June 29, 2022 | $52.46 | $425,556.38 |
| Daily Earnings Credit | June 28, 2022 | $52.45 | $425,503.92 |
| Daily Earnings Credit | June 27, 2022 | $52.45 | $425,451.47 |
| Daily Earnings Credit | June 26, 2022 | $52.44 | $425,399.02 |
| Daily Earnings Credit | June 25, 2022 | $52.43 | $425,346.58 |
| Daily Earnings Credit | June 24, 2022 | $52.43 | $425,294.15 |
| Daily Earnings Credit | June 23, 2022 | $52.42 | $425,241.72 |
| Daily Earnings Credit | June 22, 2022 | $52.41 | $425,189.30 |
| Daily Earnings Credit | June 21, 2022 | $52.41 | $425,136.89 |
| Daily Earnings Credit | June 20, 2022 | $52.40 | $425,084.48 |
| Daily Earnings Credit | June 19, 2022 | $52.39 | $425,032.08 |
| Daily Earnings Credit | June 18, 2022 | $52.39 | $424,979.68 |
| Daily Earnings Credit | June 17, 2022 | $52.38 | $424,927.29 |
| Daily Earnings Credit | June 16, 2022 | $52.38 | $424,874.91 |
| Daily Earnings Credit | June 15, 2022 | $52.37 | $424,822.54 |
| Daily Earnings Credit | June 14, 2022 | $52.36 | $424,770.17 |
| Daily Earnings Credit | June 13, 2022 | $52.36 | $424,717.81 |
| Daily Earnings Credit | June 12, 2022 | $52.35 | $424,665.45 |
| Daily Earnings Credit | June 11, 2022 | $52.34 | $424,613.10 |
| Daily Earnings Credit | June 10, 2022 | $52.34 | $424,560.76 |
| Daily Earnings Credit | June 9, 2022 | $52.33 | $424,508.42 |
| Daily Earnings Credit | June 8, 2022 | $52.32 | $424,456.09 |
| Daily Earnings Credit | June 7, 2022 | $52.32 | $424,403.77 |
| Daily Earnings Credit | June 6, 2022 | $52.31 | $424,351.45 |
| Daily Earnings Credit | June 5, 2022 | $52.30 | $424,299.14 |
| Daily Earnings Credit | June 4, 2022 | $52.30 | $424,246.83 |
| Daily Earnings Credit | June 3, 2022 | $52.29 | $424,194.54 |
| Daily Earnings Credit | June 2, 2022 | $52.29 | $424,142.24 |
| Daily Earnings Credit | June 1, 2022 | $52.28 | $424,089.96 |
| Daily Earnings Credit | May 31, 2022 | $52.27 | $424,037.68 |
| Daily Earnings Credit | May 30, 2022 | $52.27 | $423,985.41 |
| Daily Earnings Credit | May 29, 2022 | $52.26 | $423,933.14 |
| Daily Earnings Credit | May 28, 2022 | $52.25 | $423,880.88 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | May 27, 2022 | $52.25 | $423,828.63 |
| Daily Earnings Credit | May 26, 2022 | $52.24 | $423,776.38 |
| Daily Earnings Credit | May 25, 2022 | $52.23 | $423,724.14 |
| Daily Earnings Credit | May 24, 2022 | $52.23 | $423,671.91 |
| Daily Earnings Credit | May 23, 2022 | $52.22 | $423,619.68 |
| Daily Earnings Credit | May 22, 2022 | $52.21 | $423,567.46 |
| Daily Earnings Credit | May 21, 2022 | $52.21 | $423,515.25 |
| Daily Earnings Credit | May 20, 2022 | $52.20 | $423,463.04 |
| Daily Earnings Credit | May 19, 2022 | $52.19 | $423,410.84 |
| Daily Earnings Credit | May 18, 2022 | $52.19 | $423,358.64 |
| Daily Earnings Credit | May 17, 2022 | $52.18 | $423,306.46 |
| Daily Earnings Credit | May 16, 2022 | $52.18 | $423,254.27 |
| Daily Earnings Credit | May 15, 2022 | $52.17 | $423,202.10 |
| Daily Earnings Credit | May 14, 2022 | $52.16 | $423,149.93 |
| Daily Earnings Credit | May 13, 2022 | $52.16 | $423,097.77 |
| Daily Earnings Credit | May 12, 2022 | $52.15 | $423,045.61 |
| Daily Earnings Credit | May 11, 2022 | $52.14 | $422,993.46 |
| Daily Earnings Credit | May 10, 2022 | $52.14 | $422,941.32 |
| Daily Earnings Credit | May 9, 2022 | $52.13 | $422,889.18 |
| Daily Earnings Credit | May 8, 2022 | $52.12 | $422,837.05 |
| Daily Earnings Credit | May 7, 2022 | $52.12 | $422,784.92 |
| Daily Earnings Credit | May 6, 2022 | $52.11 | $422,732.81 |
| Daily Earnings Credit | May 5, 2022 | $52.10 | $422,680.70 |
| Daily Earnings Credit | May 4, 2022 | $52.10 | $422,628.59 |
| Daily Earnings Credit | May 3, 2022 | $52.09 | $422,576.49 |
| Daily Earnings Credit | May 2, 2022 | $52.09 | $422,524.40 |
| Daily Earnings Credit | May 1, 2022 | $52.08 | $422,472.31 |
| Daily Earnings Credit | April 30, 2022 | $52.07 | $422,420.24 |
| Daily Earnings Credit | April 29, 2022 | $52.07 | $422,368.16 |
| Daily Earnings Credit | April 28, 2022 | $52.06 | $422,316.10 |
| Daily Earnings Credit | April 27, 2022 | $52.05 | $422,264.04 |
| Daily Earnings Credit | April 26, 2022 | $52.05 | $422,211.98 |
| Daily Earnings Credit | April 25, 2022 | $52.04 | $422,159.94 |
| Daily Earnings Credit | April 24, 2022 | $52.03 | $422,107.89 |
| Daily Earnings Credit | April 23, 2022 | $52.03 | $422,055.86 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | April 22, 2022 | $52.02 | $422,003.83 |
| Daily Earnings Credit | April 21, 2022 | $52.02 | $421,951.81 |
| Daily Earnings Credit | April 20, 2022 | $52.01 | $421,899.80 |
| Daily Earnings Credit | April 19, 2022 | $52.00 | $421,847.79 |
| Daily Earnings Credit | April 18, 2022 | $52.00 | $421,795.79 |
| Daily Earnings Credit | April 17, 2022 | $51.99 | $421,743.79 |
| Daily Earnings Credit | April 16, 2022 | $51.98 | $421,691.80 |
| Daily Earnings Credit | April 15, 2022 | $51.98 | $421,639.82 |
| Daily Earnings Credit | April 14, 2022 | $51.97 | $421,587.84 |
| Daily Earnings Credit | April 13, 2022 | $51.96 | $421,535.87 |
| Daily Earnings Credit | April 12, 2022 | $51.96 | $421,483.91 |
| Daily Earnings Credit | April 11, 2022 | $51.95 | $421,431.95 |
| Daily Earnings Credit | April 10, 2022 | $51.94 | $421,380.00 |
| Daily Earnings Credit | April 9, 2022 | $51.94 | $421,328.05 |
| Daily Earnings Credit | April 8, 2022 | $51.93 | $421,276.12 |
| Daily Earnings Credit | April 7, 2022 | $51.93 | $421,224.18 |
| Daily Earnings Credit | April 6, 2022 | $51.92 | $421,172.26 |
| Daily Earnings Credit | April 5, 2022 | $51.91 | $421,120.34 |
| Daily Earnings Credit | April 4, 2022 | $51.91 | $421,068.43 |
| Daily Earnings Credit | April 3, 2022 | $51.90 | $421,016.52 |
| Daily Earnings Credit | April 2, 2022 | $51.89 | $420,964.62 |
| Daily Earnings Credit | April 1, 2022 | $51.89 | $420,912.73 |
| Daily Earnings Credit | March 31, 2022 | $51.88 | $420,860.84 |
| Daily Earnings Credit | March 30, 2022 | $51.87 | $420,808.96 |
| Daily Earnings Credit | March 29, 2022 | $51.87 | $420,757.09 |
| Daily Earnings Credit | March 28, 2022 | $51.86 | $420,705.22 |
| Daily Earnings Credit | March 27, 2022 | $51.85 | $420,653.36 |
| Daily Earnings Credit | March 26, 2022 | $51.85 | $420,601.50 |
| Daily Earnings Credit | March 25, 2022 | $51.84 | $420,549.65 |
| Daily Earnings Credit | March 24, 2022 | $51.84 | $420,497.81 |
| Daily Earnings Credit | March 23, 2022 | $51.83 | $420,445.97 |
| Daily Earnings Credit | March 22, 2022 | $51.82 | $420,394.15 |
| Daily Earnings Credit | March 21, 2022 | $51.82 | $420,342.32 |
| Daily Earnings Credit | March 20, 2022 | $51.81 | $420,290.51 |
| Daily Earnings Credit | March 19, 2022 | $51.80 | $420,238.70 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | March 18, 2022 | $51.80 | $420,186.89 |
| Daily Earnings Credit | March 17, 2022 | $51.79 | $420,135.09 |
| Daily Earnings Credit | March 16, 2022 | $51.78 | $420,083.30 |
| Daily Earnings Credit | March 15, 2022 | $51.78 | $420,031.52 |
| Daily Earnings Credit | March 14, 2022 | $51.77 | $419,979.74 |
| Daily Earnings Credit | March 13, 2022 | $51.77 | $419,927.97 |
| Daily Earnings Credit | March 12, 2022 | $51.76 | $419,876.20 |
| Daily Earnings Credit | March 11, 2022 | $51.75 | $419,824.44 |
| Daily Earnings Credit | March 10, 2022 | $51.75 | $419,772.69 |
| Daily Earnings Credit | March 9, 2022 | $51.74 | $419,720.94 |
| Daily Earnings Credit | March 8, 2022 | $51.73 | $419,669.20 |
| Daily Earnings Credit | March 7, 2022 | $51.73 | $419,617.47 |
| Daily Earnings Credit | March 6, 2022 | $51.72 | $419,565.74 |
| Daily Earnings Credit | March 5, 2022 | $51.71 | $419,514.02 |
| Daily Earnings Credit | March 4, 2022 | $51.71 | $419,462.31 |
| Daily Earnings Credit | March 3, 2022 | $51.70 | $419,410.60 |
| Daily Earnings Credit | March 2, 2022 | $51.70 | $419,358.90 |
| Daily Earnings Credit | March 1, 2022 | $51.69 | $419,307.20 |
| Daily Earnings Credit | February 28, 2022 | $51.68 | $419,255.51 |
| Daily Earnings Credit | February 27, 2022 | $51.68 | $419,203.83 |
| Daily Earnings Credit | February 26, 2022 | $51.67 | $419,152.15 |
| Daily Earnings Credit | February 25, 2022 | $51.66 | $419,100.48 |
| Daily Earnings Credit | February 24, 2022 | $51.66 | $419,048.82 |
| Daily Earnings Credit | February 23, 2022 | $51.65 | $418,997.16 |
| Daily Earnings Credit | February 22, 2022 | $51.64 | $418,945.51 |
| Daily Earnings Credit | February 21, 2022 | $51.64 | $418,893.87 |
| Daily Earnings Credit | February 20, 2022 | $51.63 | $418,842.23 |
| Daily Earnings Credit | February 19, 2022 | $51.63 | $418,790.60 |
| Daily Earnings Credit | February 18, 2022 | $51.62 | $418,738.97 |
| Daily Earnings Credit | February 17, 2022 | $51.61 | $418,687.35 |
| Daily Earnings Credit | February 16, 2022 | $51.61 | $418,635.74 |
| Daily Earnings Credit | February 15, 2022 | $51.60 | $418,584.14 |
| Daily Earnings Credit | February 14, 2022 | $51.59 | $418,532.54 |
| Daily Earnings Credit | February 13, 2022 | $51.59 | $418,480.94 |
| Daily Earnings Credit | February 12, 2022 | $51.58 | $418,429.35 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | February 11, 2022 | $51.57 | $418,377.77 |
| Daily Earnings Credit | February 10, 2022 | $51.57 | $418,326.20 |
| Daily Earnings Credit | February 9, 2022 | $51.56 | $418,274.63 |
| Daily Earnings Credit | February 8, 2022 | $51.56 | $418,223.07 |
| Daily Earnings Credit | February 7, 2022 | $51.55 | $418,171.51 |
| Daily Earnings Credit | February 6, 2022 | $51.54 | $418,119.96 |
| Daily Earnings Credit | February 5, 2022 | $51.54 | $418,068.42 |
| Daily Earnings Credit | February 4, 2022 | $51.53 | $418,016.89 |
| Daily Earnings Credit | February 3, 2022 | $51.52 | $417,965.36 |
| Daily Earnings Credit | February 2, 2022 | $51.52 | $417,913.83 |
| Daily Earnings Credit | February 1, 2022 | $51.51 | $417,862.31 |
| Daily Earnings Credit | January 31, 2022 | $51.50 | $417,810.80 |
| Daily Earnings Credit | January 30, 2022 | $51.50 | $417,759.30 |
| Daily Earnings Credit | January 29, 2022 | $51.49 | $417,707.80 |
| Daily Earnings Credit | January 28, 2022 | $51.49 | $417,656.31 |
| Daily Earnings Credit | January 27, 2022 | $51.48 | $417,604.82 |
| Daily Earnings Credit | January 26, 2022 | $51.47 | $417,553.34 |
| Daily Earnings Credit | January 25, 2022 | $51.47 | $417,501.87 |
| Daily Earnings Credit | January 24, 2022 | $51.46 | $417,450.41 |
| Daily Earnings Credit | January 23, 2022 | $51.45 | $417,398.94 |
| Daily Earnings Credit | January 22, 2022 | $51.45 | $417,347.49 |
| Daily Earnings Credit | January 21, 2022 | $51.44 | $417,296.04 |
| Daily Earnings Credit | January 20, 2022 | $51.43 | $417,244.60 |
| Daily Earnings Credit | January 19, 2022 | $51.43 | $417,193.17 |
| Daily Earnings Credit | January 18, 2022 | $51.42 | $417,141.74 |
| Daily Earnings Credit | January 17, 2022 | $51.42 | $417,090.32 |
| Daily Earnings Credit | January 16, 2022 | $51.41 | $417,038.90 |
| Daily Earnings Credit | January 15, 2022 | $51.40 | $416,987.49 |
| Daily Earnings Credit | January 14, 2022 | $51.40 | $416,936.09 |
| Daily Earnings Credit | January 13, 2022 | $51.39 | $416,884.69 |
| Daily Earnings Credit | January 12, 2022 | $51.38 | $416,833.30 |
| Daily Earnings Credit | January 11, 2022 | $51.38 | $416,781.92 |
| Daily Earnings Credit | January 10, 2022 | $51.37 | $416,730.54 |
| Daily Earnings Credit | January 9, 2022 | $51.37 | $416,679.17 |
| Daily Earnings Credit | January 8, 2022 | $51.36 | $416,627.80 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | January 7, 2022 | $51.35 | $416,576.44 |
| Daily Earnings Credit | January 6, 2022 | $51.35 | $416,525.09 |
| Daily Earnings Credit | January 5, 2022 | $51.34 | $416,473.75 |
| Daily Earnings Credit | January 4, 2022 | $51.33 | $416,422.41 |
| Daily Earnings Credit | January 3, 2022 | $51.33 | $416,371.07 |
| Daily Earnings Credit | January 2, 2022 | $51.32 | $416,319.75 |
| Daily Earnings Credit | January 1, 2022 | $51.31 | $416,268.43 |
| Daily Earnings Credit | December 31, 2021 | $51.31 | $416,217.11 |
| Daily Earnings Credit | December 30, 2021 | $51.30 | $416,165.80 |
| Daily Earnings Credit | December 29, 2021 | $51.30 | $416,114.50 |
| Daily Earnings Credit | December 28, 2021 | $51.29 | $416,063.21 |
| Daily Earnings Credit | December 27, 2021 | $51.28 | $416,011.92 |
| Daily Earnings Credit | December 26, 2021 | $51.28 | $415,960.63 |
| Daily Earnings Credit | December 25, 2021 | $51.27 | $415,909.36 |
| Daily Earnings Credit | December 24, 2021 | $51.26 | $415,858.09 |
| Daily Earnings Credit | December 23, 2021 | $51.26 | $415,806.82 |
| Daily Earnings Credit | December 22, 2021 | $51.25 | $415,755.57 |
| Daily Earnings Credit | December 21, 2021 | $51.24 | $415,704.31 |
| Daily Earnings Credit | December 20, 2021 | $51.24 | $415,653.07 |
| Daily Earnings Credit | December 19, 2021 | $51.23 | $415,601.83 |
| Daily Earnings Credit | December 18, 2021 | $51.23 | $415,550.60 |
| Daily Earnings Credit | December 17, 2021 | $51.22 | $415,499.37 |
| Daily Earnings Credit | December 16, 2021 | $51.21 | $415,448.15 |
| Daily Earnings Credit | December 15, 2021 | $51.21 | $415,396.94 |
| Daily Earnings Credit | December 14, 2021 | $51.20 | $415,345.73 |
| Daily Earnings Credit | December 13, 2021 | $51.19 | $415,294.53 |
| Daily Earnings Credit | December 12, 2021 | $51.19 | $415,243.34 |
| Daily Earnings Credit | December 11, 2021 | $51.18 | $415,192.15 |
| Daily Earnings Credit | December 10, 2021 | $51.18 | $415,140.97 |
| Daily Earnings Credit | December 9, 2021 | $51.17 | $415,089.79 |
| Daily Earnings Credit | December 8, 2021 | $51.16 | $415,038.62 |
| Daily Earnings Credit | December 7, 2021 | $51.16 | $414,987.46 |
| Daily Earnings Credit | December 6, 2021 | $51.15 | $414,936.30 |
| Daily Earnings Credit | December 5, 2021 | $51.14 | $414,885.15 |
| Daily Earnings Credit | December 4, 2021 | $51.14 | $414,834.01 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | December 3, 2021 | $51.13 | $414,782.87 |
| Daily Earnings Credit | December 2, 2021 | $51.13 | $414,731.74 |
| Daily Earnings Credit | December 1, 2021 | $51.12 | $414,680.61 |
| Daily Earnings Credit | November 30, 2021 | $51.11 | $414,629.50 |
| Daily Earnings Credit | November 29, 2021 | $51.11 | $414,578.38 |
| Daily Earnings Credit | November 28, 2021 | $51.10 | $414,527.28 |
| Daily Earnings Credit | November 27, 2021 | $51.09 | $414,476.18 |
| Daily Earnings Credit | November 26, 2021 | $51.09 | $414,425.08 |
| Daily Earnings Credit | November 25, 2021 | $51.08 | $414,374.00 |
| Daily Earnings Credit | November 24, 2021 | $51.07 | $414,322.92 |
| Daily Earnings Credit | November 23, 2021 | $51.07 | $414,271.84 |
| Daily Earnings Credit | November 22, 2021 | $51.06 | $414,220.77 |
| Daily Earnings Credit | November 21, 2021 | $51.06 | $414,169.71 |
| Daily Earnings Credit | November 20, 2021 | $51.05 | $414,118.66 |
| Daily Earnings Credit | November 19, 2021 | $51.04 | $414,067.61 |
| Daily Earnings Credit | November 18, 2021 | $51.04 | $414,016.56 |
| Daily Earnings Credit | November 17, 2021 | $51.03 | $413,965.53 |
| Daily Earnings Credit | November 16, 2021 | $51.02 | $413,914.50 |
| Daily Earnings Credit | November 15, 2021 | $51.02 | $413,863.47 |
| Daily Earnings Credit | November 14, 2021 | $51.01 | $413,812.45 |
| Daily Earnings Credit | November 13, 2021 | $51.01 | $413,761.44 |
| Daily Earnings Credit | November 12, 2021 | $51.00 | $413,710.44 |
| Daily Earnings Credit | November 11, 2021 | $50.99 | $413,659.44 |
| Daily Earnings Credit | November 10, 2021 | $50.99 | $413,608.44 |
| Daily Earnings Credit | November 9, 2021 | $50.98 | $413,557.46 |
| Daily Earnings Credit | November 8, 2021 | $50.97 | $413,506.48 |
| Daily Earnings Credit | November 7, 2021 | $50.97 | $413,455.50 |
| Daily Earnings Credit | November 6, 2021 | $50.96 | $413,404.54 |
| Daily Earnings Credit | November 5, 2021 | $50.96 | $413,353.57 |
| Daily Earnings Credit | November 4, 2021 | $50.95 | $413,302.62 |
| Daily Earnings Credit | November 3, 2021 | $50.94 | $413,251.67 |
| Daily Earnings Credit | November 2, 2021 | $50.94 | $413,200.73 |
| Daily Earnings Credit | November 1, 2021 | $50.93 | $413,149.79 |
| Daily Earnings Credit | October 31, 2021 | $50.92 | $413,098.86 |
| Daily Earnings Credit | October 30, 2021 | $50.92 | $413,047.94 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | October 29, 2021 | $50.91 | $412,997.02 |
| Daily Earnings Credit | October 28, 2021 | $50.90 | $412,946.11 |
| Daily Earnings Credit | October 27, 2021 | $50.90 | $412,895.20 |
| Daily Earnings Credit | October 26, 2021 | $50.89 | $412,844.31 |
| Daily Earnings Credit | October 25, 2021 | $50.89 | $412,793.41 |
| Daily Earnings Credit | October 24, 2021 | $50.88 | $412,742.53 |
| Daily Earnings Credit | October 23, 2021 | $50.87 | $412,691.65 |
| Daily Earnings Credit | October 22, 2021 | $50.87 | $412,640.77 |
| Daily Earnings Credit | October 21, 2021 | $50.86 | $412,589.91 |
| Daily Earnings Credit | October 20, 2021 | $50.85 | $412,539.05 |
| Daily Earnings Credit | October 19, 2021 | $50.85 | $412,488.19 |
| Daily Earnings Credit | October 18, 2021 | $50.84 | $412,437.34 |
| Daily Earnings Credit | October 17, 2021 | $50.84 | $412,386.50 |
| Daily Earnings Credit | October 16, 2021 | $50.83 | $412,335.66 |
| Daily Earnings Credit | October 15, 2021 | $50.82 | $412,284.83 |
| Daily Earnings Credit | October 14, 2021 | $50.82 | $412,234.01 |
| Daily Earnings Credit | October 13, 2021 | $50.81 | $412,183.19 |
| Daily Earnings Credit | October 12, 2021 | $50.80 | $412,132.38 |
| Daily Earnings Credit | October 11, 2021 | $50.80 | $412,081.58 |
| Daily Earnings Credit | October 10, 2021 | $50.79 | $412,030.78 |
| Daily Earnings Credit | October 9, 2021 | $50.79 | $411,979.99 |
| Daily Earnings Credit | October 8, 2021 | $50.78 | $411,929.20 |
| Daily Earnings Credit | October 7, 2021 | $50.77 | $411,878.42 |
| Daily Earnings Credit | October 6, 2021 | $50.77 | $411,827.65 |
| Daily Earnings Credit | October 5, 2021 | $50.76 | $411,776.88 |
| Daily Earnings Credit | October 4, 2021 | $50.75 | $411,726.12 |
| Daily Earnings Credit | October 3, 2021 | $50.75 | $411,675.37 |
| Daily Earnings Credit | October 2, 2021 | $50.74 | $411,624.62 |
| Daily Earnings Credit | October 1, 2021 | $50.74 | $411,573.88 |
| Daily Earnings Credit | September 30, 2021 | $50.73 | $411,523.14 |
| Daily Earnings Credit | September 29, 2021 | $50.72 | $411,472.41 |
| Daily Earnings Credit | September 28, 2021 | $50.72 | $411,421.69 |
| Daily Earnings Credit | September 27, 2021 | $50.71 | $411,370.97 |
| Daily Earnings Credit | September 26, 2021 | $50.70 | $411,320.26 |
| Daily Earnings Credit | September 25, 2021 | $50.70 | $411,269.56 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | September 24, 2021 | $50.69 | $411,218.86 |
| Daily Earnings Credit | September 23, 2021 | $50.69 | $411,168.17 |
| Daily Earnings Credit | September 22, 2021 | $50.68 | $411,117.48 |
| Daily Earnings Credit | September 21, 2021 | $50.67 | $411,066.80 |
| Daily Earnings Credit | September 20, 2021 | $50.67 | $411,016.13 |
| Daily Earnings Credit | September 19, 2021 | $50.66 | $410,965.46 |
| Daily Earnings Credit | September 18, 2021 | $50.65 | $410,914.80 |
| Daily Earnings Credit | September 17, 2021 | $50.65 | $410,864.15 |
| Daily Earnings Credit | September 16, 2021 | $50.64 | $410,813.50 |
| Daily Earnings Credit | September 15, 2021 | $50.64 | $410,762.86 |
| Daily Earnings Credit | September 14, 2021 | $50.63 | $410,712.22 |
| Daily Earnings Credit | September 13, 2021 | $50.62 | $410,661.59 |
| Daily Earnings Credit | September 12, 2021 | $50.62 | $410,610.97 |
| Daily Earnings Credit | September 11, 2021 | $50.61 | $410,560.35 |
| Daily Earnings Credit | September 10, 2021 | $50.60 | $410,509.74 |
| Daily Earnings Credit | September 9, 2021 | $50.60 | $410,459.13 |
| Daily Earnings Credit | September 8, 2021 | $50.59 | $410,408.54 |
| Daily Earnings Credit | September 7, 2021 | $50.59 | $410,357.94 |
| Daily Earnings Credit | September 6, 2021 | $50.58 | $410,307.36 |
| Daily Earnings Credit | September 5, 2021 | $50.57 | $410,256.78 |
| Daily Earnings Credit | September 4, 2021 | $50.57 | $410,206.21 |
| Daily Earnings Credit | September 3, 2021 | $50.56 | $410,155.64 |
| Daily Earnings Credit | September 2, 2021 | $50.55 | $410,105.08 |
| Daily Earnings Credit | September 1, 2021 | $50.55 | $410,054.52 |
| Daily Earnings Credit | August 31, 2021 | $50.54 | $410,003.97 |
| Daily Earnings Credit | August 30, 2021 | $50.54 | $409,953.43 |
| Daily Earnings Credit | August 29, 2021 | $50.53 | $409,902.90 |
| Daily Earnings Credit | August 28, 2021 | $50.52 | $409,852.37 |
| Daily Earnings Credit | August 27, 2021 | $50.52 | $409,801.84 |
| Daily Earnings Credit | August 26, 2021 | $50.51 | $409,751.33 |
| Daily Earnings Credit | August 25, 2021 | $50.50 | $409,700.81 |
| Daily Earnings Credit | August 24, 2021 | $50.50 | $409,650.31 |
| Daily Earnings Credit | August 23, 2021 | $50.49 | $409,599.81 |
| Daily Earnings Credit | August 22, 2021 | $50.49 | $409,549.32 |
| Daily Earnings Credit | August 21, 2021 | $50.48 | $409,498.83 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | August 20, 2021 | $50.47 | $409,448.35 |
| Daily Earnings Credit | August 19, 2021 | $50.47 | $409,397.88 |
| Daily Earnings Credit | August 18, 2021 | $50.46 | $409,347.41 |
| Daily Earnings Credit | August 17, 2021 | $50.46 | $409,296.95 |
| Daily Earnings Credit | August 16, 2021 | $50.45 | $409,246.49 |
| Daily Earnings Credit | August 15, 2021 | $50.44 | $409,196.05 |
| Daily Earnings Credit | August 14, 2021 | $50.44 | $409,145.60 |
| Daily Earnings Credit | August 13, 2021 | $50.43 | $409,095.17 |
| Daily Earnings Credit | August 12, 2021 | $50.42 | $409,044.74 |
| Daily Earnings Credit | August 11, 2021 | $50.42 | $408,994.31 |
| Daily Earnings Credit | August 10, 2021 | $50.41 | $408,943.89 |
| Daily Earnings Credit | August 9, 2021 | $50.41 | $408,893.48 |
| Daily Earnings Credit | August 8, 2021 | $50.40 | $408,843.08 |
| Daily Earnings Credit | August 7, 2021 | $50.39 | $408,792.68 |
| Daily Earnings Credit | August 6, 2021 | $50.39 | $408,742.29 |
| Daily Earnings Credit | August 5, 2021 | $50.38 | $408,691.90 |
| Daily Earnings Credit | August 4, 2021 | $50.37 | $408,641.52 |
| Daily Earnings Credit | August 3, 2021 | $50.37 | $408,591.14 |
| Daily Earnings Credit | August 2, 2021 | $50.36 | $408,540.78 |
| Daily Earnings Credit | August 1, 2021 | $50.36 | $408,490.41 |
| Daily Earnings Credit | July 31, 2021 | $50.35 | $408,440.06 |
| Daily Earnings Credit | July 30, 2021 | $50.34 | $408,389.71 |
| Daily Earnings Credit | July 29, 2021 | $50.34 | $408,339.37 |
| Daily Earnings Credit | July 28, 2021 | $50.33 | $408,289.03 |
| Daily Earnings Credit | July 27, 2021 | $50.32 | $408,238.70 |
| Daily Earnings Credit | July 26, 2021 | $50.32 | $408,188.37 |
| Daily Earnings Credit | July 25, 2021 | $50.31 | $408,138.06 |
| Daily Earnings Credit | July 24, 2021 | $50.31 | $408,087.74 |
| Daily Earnings Credit | July 23, 2021 | $50.30 | $408,037.44 |
| Daily Earnings Credit | July 22, 2021 | $50.29 | $407,987.14 |
| Daily Earnings Credit | July 21, 2021 | $50.29 | $407,936.84 |
| Daily Earnings Credit | July 20, 2021 | $50.28 | $407,886.56 |
| Daily Earnings Credit | July 19, 2021 | $50.27 | $407,836.28 |
| Daily Earnings Credit | July 18, 2021 | $50.27 | $407,786.00 |
| Daily Earnings Credit | July 17, 2021 | $50.26 | $407,735.73 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | July 16, 2021 | $50.26 | $407,685.47 |
| Daily Earnings Credit | July 15, 2021 | $50.25 | $407,635.21 |
| Daily Earnings Credit | July 14, 2021 | $50.24 | $407,584.96 |
| Daily Earnings Credit | July 13, 2021 | $50.24 | $407,534.72 |
| Daily Earnings Credit | July 12, 2021 | $50.23 | $407,484.48 |
| Daily Earnings Credit | July 11, 2021 | $50.23 | $407,434.25 |
| Daily Earnings Credit | July 10, 2021 | $50.22 | $407,384.02 |
| Daily Earnings Credit | July 9, 2021 | $50.21 | $407,333.80 |
| Daily Earnings Credit | July 8, 2021 | $50.21 | $407,283.59 |
| Daily Earnings Credit | July 7, 2021 | $50.20 | $407,233.38 |
| Daily Earnings Credit | July 6, 2021 | $50.19 | $407,183.18 |
| Daily Earnings Credit | July 5, 2021 | $50.19 | $407,132.99 |
| Daily Earnings Credit | July 4, 2021 | $50.18 | $407,082.80 |
| Daily Earnings Credit | July 3, 2021 | $50.18 | $407,032.62 |
| Daily Earnings Credit | July 2, 2021 | $50.17 | $406,982.44 |
| Daily Earnings Credit | July 1, 2021 | $50.16 | $406,932.27 |
| Daily Earnings Credit | June 30, 2021 | $50.16 | $406,882.11 |
| Daily Earnings Credit | June 29, 2021 | $50.15 | $406,831.95 |
| Daily Earnings Credit | June 28, 2021 | $50.15 | $406,781.80 |
| Daily Earnings Credit | June 27, 2021 | $50.14 | $406,731.66 |
| Daily Earnings Credit | June 26, 2021 | $50.13 | $406,681.52 |
| Daily Earnings Credit | June 25, 2021 | $50.13 | $406,631.38 |
| Daily Earnings Credit | June 24, 2021 | $50.12 | $406,581.26 |
| Daily Earnings Credit | June 23, 2021 | $50.11 | $406,531.14 |
| Daily Earnings Credit | June 22, 2021 | $50.11 | $406,481.02 |
| Daily Earnings Credit | June 21, 2021 | $50.10 | $406,430.92 |
| Daily Earnings Credit | June 20, 2021 | $50.10 | $406,380.81 |
| Daily Earnings Credit | June 19, 2021 | $50.09 | $406,330.72 |
| Daily Earnings Credit | June 18, 2021 | $50.08 | $406,280.63 |
| Daily Earnings Credit | June 17, 2021 | $50.08 | $406,230.55 |
| Daily Earnings Credit | June 16, 2021 | $50.07 | $406,180.47 |
| Daily Earnings Credit | June 15, 2021 | $50.06 | $406,130.40 |
| Daily Earnings Credit | June 14, 2021 | $50.06 | $406,080.33 |
| Daily Earnings Credit | June 13, 2021 | $50.05 | $406,030.27 |
| Daily Earnings Credit | June 12, 2021 | $50.05 | $405,980.22 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | June 11, 2021 | $50.04 | $405,930.18 |
| Daily Earnings Credit | June 10, 2021 | $50.03 | $405,880.14 |
| Daily Earnings Credit | June 9, 2021 | $50.03 | $405,830.10 |
| Daily Earnings Credit | June 8, 2021 | $50.02 | $405,780.07 |
| Daily Earnings Credit | June 7, 2021 | $50.02 | $405,730.05 |
| Daily Earnings Credit | June 6, 2021 | $50.01 | $405,680.04 |
| Daily Earnings Credit | June 5, 2021 | $50.00 | $405,630.03 |
| Daily Earnings Credit | June 4, 2021 | $50.00 | $405,580.03 |
| Daily Earnings Credit | June 3, 2021 | $49.99 | $405,530.03 |
| Daily Earnings Credit | June 2, 2021 | $49.98 | $405,480.04 |
| Daily Earnings Credit | June 1, 2021 | $49.98 | $405,430.05 |
| Daily Earnings Credit | May 31, 2021 | $49.97 | $405,380.07 |
| Daily Earnings Credit | May 30, 2021 | $49.97 | $405,330.10 |
| Daily Earnings Credit | May 29, 2021 | $49.96 | $405,280.14 |
| Daily Earnings Credit | May 28, 2021 | $49.95 | $405,230.18 |
| Daily Earnings Credit | May 27, 2021 | $49.95 | $405,180.22 |
| Daily Earnings Credit | May 26, 2021 | $49.94 | $405,130.28 |
| Daily Earnings Credit | May 25, 2021 | $49.94 | $405,080.33 |
| Daily Earnings Credit | May 24, 2021 | $49.93 | $405,030.40 |
| Daily Earnings Credit | May 23, 2021 | $49.92 | $404,980.47 |
| Daily Earnings Credit | May 22, 2021 | $49.92 | $404,930.55 |
| Daily Earnings Credit | May 21, 2021 | $49.91 | $404,880.63 |
| Daily Earnings Credit | May 20, 2021 | $49.90 | $404,830.72 |
| Daily Earnings Credit | May 19, 2021 | $49.90 | $404,780.81 |
| Daily Earnings Credit | May 18, 2021 | $49.89 | $404,730.92 |
| Daily Earnings Credit | May 17, 2021 | $49.89 | $404,681.02 |
| Daily Earnings Credit | May 16, 2021 | $49.88 | $404,631.14 |
| Daily Earnings Credit | May 15, 2021 | $49.87 | $404,581.26 |
| Daily Earnings Credit | May 14, 2021 | $49.87 | $404,531.38 |
| Daily Earnings Credit | May 13, 2021 | $49.86 | $404,481.52 |
| Daily Earnings Credit | May 12, 2021 | $49.86 | $404,431.66 |
| Daily Earnings Credit | May 11, 2021 | $49.85 | $404,381.80 |
| Daily Earnings Credit | May 10, 2021 | $49.84 | $404,331.95 |
| Daily Earnings Credit | May 9, 2021 | $49.84 | $404,282.11 |
| Daily Earnings Credit | May 8, 2021 | $49.83 | $404,232.27 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | May 7, 2021 | $49.82 | $404,182.44 |
| Daily Earnings Credit | May 6, 2021 | $49.82 | $404,132.62 |
| Daily Earnings Credit | May 5, 2021 | $49.81 | $404,082.80 |
| Daily Earnings Credit | May 4, 2021 | $49.81 | $404,032.98 |
| Daily Earnings Credit | May 3, 2021 | $49.80 | $403,983.18 |
| Daily Earnings Credit | May 2, 2021 | $49.79 | $403,933.38 |
| Daily Earnings Credit | May 1, 2021 | $49.79 | $403,883.58 |
| Daily Earnings Credit | April 30, 2021 | $49.78 | $403,833.80 |
| Daily Earnings Credit | April 29, 2021 | $49.78 | $403,784.02 |
| Daily Earnings Credit | April 28, 2021 | $49.77 | $403,734.24 |
| Daily Earnings Credit | April 27, 2021 | $49.76 | $403,684.47 |
| Daily Earnings Credit | April 26, 2021 | $49.76 | $403,634.71 |
| Daily Earnings Credit | April 25, 2021 | $49.75 | $403,584.95 |
| Daily Earnings Credit | April 24, 2021 | $49.74 | $403,535.20 |
| Daily Earnings Credit | April 23, 2021 | $49.74 | $403,485.45 |
| Daily Earnings Credit | April 22, 2021 | $49.73 | $403,435.72 |
| Daily Earnings Credit | April 21, 2021 | $49.73 | $403,385.98 |
| Daily Earnings Credit | April 20, 2021 | $49.72 | $403,336.26 |
| Daily Earnings Credit | April 19, 2021 | $49.71 | $403,286.54 |
| Daily Earnings Credit | April 18, 2021 | $49.71 | $403,236.82 |
| Daily Earnings Credit | April 17, 2021 | $49.70 | $403,187.11 |
| Daily Earnings Credit | April 16, 2021 | $49.70 | $403,137.41 |
| Daily Earnings Credit | April 15, 2021 | $49.69 | $403,087.72 |
| Daily Earnings Credit | April 14, 2021 | $49.68 | $403,038.03 |
| Daily Earnings Credit | April 13, 2021 | $49.68 | $402,988.34 |
| Daily Earnings Credit | April 12, 2021 | $49.67 | $402,938.67 |
| Daily Earnings Credit | April 11, 2021 | $49.67 | $402,889.00 |
| Daily Earnings Credit | April 10, 2021 | $49.66 | $402,839.33 |
| Daily Earnings Credit | April 9, 2021 | $49.65 | $402,789.67 |
| Daily Earnings Credit | April 8, 2021 | $49.65 | $402,740.02 |
| Daily Earnings Credit | April 7, 2021 | $49.64 | $402,690.37 |
| Daily Earnings Credit | April 6, 2021 | $49.63 | $402,640.73 |
| Daily Earnings Credit | April 5, 2021 | $49.63 | $402,591.10 |
| Daily Earnings Credit | April 4, 2021 | $49.62 | $402,541.47 |
| Daily Earnings Credit | April 3, 2021 | $49.62 | $402,491.85 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | April 2, 2021 | $49.61 | $402,442.23 |
| Daily Earnings Credit | April 1, 2021 | $49.60 | $402,392.62 |
| Daily Earnings Credit | March 31, 2021 | $49.60 | $402,343.02 |
| Daily Earnings Credit | March 30, 2021 | $49.59 | $402,293.42 |
| Daily Earnings Credit | March 29, 2021 | $49.59 | $402,243.83 |
| Daily Earnings Credit | March 28, 2021 | $49.58 | $402,194.24 |
| Daily Earnings Credit | March 27, 2021 | $49.57 | $402,144.66 |
| Daily Earnings Credit | March 26, 2021 | $49.57 | $402,095.09 |
| Daily Earnings Credit | March 25, 2021 | $49.56 | $402,045.52 |
| Daily Earnings Credit | March 24, 2021 | $49.56 | $401,995.96 |
| Daily Earnings Credit | March 23, 2021 | $49.55 | $401,946.40 |
| Daily Earnings Credit | March 22, 2021 | $49.54 | $401,896.85 |
| Daily Earnings Credit | March 21, 2021 | $49.54 | $401,847.31 |
| Daily Earnings Credit | March 20, 2021 | $49.53 | $401,797.78 |
| Daily Earnings Credit | March 19, 2021 | $49.52 | $401,748.24 |
| Daily Earnings Credit | March 18, 2021 | $49.52 | $401,698.72 |
| Daily Earnings Credit | March 17, 2021 | $49.51 | $401,649.20 |
| Daily Earnings Credit | March 16, 2021 | $49.51 | $401,599.69 |
| Daily Earnings Credit | March 15, 2021 | $49.50 | $401,550.18 |
| Daily Earnings Credit | March 14, 2021 | $49.49 | $401,500.68 |
| Daily Earnings Credit | March 13, 2021 | $49.49 | $401,451.19 |
| Daily Earnings Credit | March 12, 2021 | $49.48 | $401,401.70 |
| Daily Earnings Credit | March 11, 2021 | $49.48 | $401,352.22 |
| Daily Earnings Credit | March 10, 2021 | $49.47 | $401,302.74 |
| Daily Earnings Credit | March 9, 2021 | $49.46 | $401,253.27 |
| Daily Earnings Credit | March 8, 2021 | $49.46 | $401,203.81 |
| Daily Earnings Credit | March 7, 2021 | $49.45 | $401,154.35 |
| Daily Earnings Credit | March 6, 2021 | $49.45 | $401,104.90 |
| Daily Earnings Credit | March 5, 2021 | $49.44 | $401,055.46 |
| Daily Earnings Credit | March 4, 2021 | $49.43 | $401,006.02 |
| Daily Earnings Credit | March 3, 2021 | $49.43 | $400,956.58 |
| Daily Earnings Credit | March 2, 2021 | $49.42 | $400,907.16 |
| Daily Earnings Credit | March 1, 2021 | $49.41 | $400,857.74 |
| Daily Earnings Credit | February 28, 2021 | $49.41 | $400,808.32 |
| Daily Earnings Credit | February 27, 2021 | $49.40 | $400,758.91 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | February 26, 2021 | $49.40 | $400,709.51 |
| Daily Earnings Credit | February 25, 2021 | $49.39 | $400,660.11 |
| Daily Earnings Credit | February 24, 2021 | $49.38 | $400,610.72 |
| Daily Earnings Credit | February 23, 2021 | $49.38 | $400,561.34 |
| Daily Earnings Credit | February 22, 2021 | $49.37 | $400,511.96 |
| Daily Earnings Credit | February 21, 2021 | $49.37 | $400,462.59 |
| Daily Earnings Credit | February 20, 2021 | $49.36 | $400,413.22 |
| Daily Earnings Credit | February 19, 2021 | $49.35 | $400,363.86 |
| Daily Earnings Credit | February 18, 2021 | $49.35 | $400,314.51 |
| Daily Earnings Credit | February 17, 2021 | $49.34 | $400,265.16 |
| Daily Earnings Credit | February 16, 2021 | $49.34 | $400,215.82 |
| Daily Earnings Credit | February 15, 2021 | $49.33 | $400,166.48 |
| Daily Earnings Credit | February 14, 2021 | $49.32 | $400,117.16 |
| Daily Earnings Credit | February 13, 2021 | $49.32 | $400,067.83 |
| Daily Earnings Credit | February 12, 2021 | $49.31 | $400,018.51 |
| Daily Earnings Credit | February 11, 2021 | $49.31 | $399,969.20 |
| Daily Earnings Credit | February 10, 2021 | $49.30 | $399,919.90 |
| Daily Earnings Credit | February 9, 2021 | $49.29 | $399,870.60 |
| Daily Earnings Credit | February 8, 2021 | $49.29 | $399,821.31 |
| Daily Earnings Credit | February 7, 2021 | $49.28 | $399,772.02 |
| Daily Earnings Credit | February 6, 2021 | $49.27 | $399,722.74 |
| Daily Earnings Credit | February 5, 2021 | $49.27 | $399,673.46 |
| Daily Earnings Credit | February 4, 2021 | $49.26 | $399,624.19 |
| Daily Earnings Credit | February 3, 2021 | $49.26 | $399,574.93 |
| Daily Earnings Credit | February 2, 2021 | $49.25 | $399,525.68 |
| Daily Earnings Credit | February 1, 2021 | $49.24 | $399,476.42 |
| Daily Earnings Credit | January 31, 2021 | $49.24 | $399,427.18 |
| Daily Earnings Credit | January 30, 2021 | $49.23 | $399,377.94 |
| Daily Earnings Credit | January 29, 2021 | $49.23 | $399,328.71 |
| Daily Earnings Credit | January 28, 2021 | $49.22 | $399,279.48 |
| Daily Earnings Credit | January 27, 2021 | $49.21 | $399,230.26 |
| Daily Earnings Credit | January 26, 2021 | $49.21 | $399,181.05 |
| Daily Earnings Credit | January 25, 2021 | $49.20 | $399,131.84 |
| Daily Earnings Credit | January 24, 2021 | $49.20 | $399,082.64 |
| Daily Earnings Credit | January 23, 2021 | $49.19 | $399,033.44 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | January 22, 2021 | $49.18 | $398,984.25 |
| Daily Earnings Credit | January 21, 2021 | $49.18 | $398,935.07 |
| Daily Earnings Credit | January 20, 2021 | $49.17 | $398,885.89 |
| Daily Earnings Credit | January 19, 2021 | $49.17 | $398,836.72 |
| Daily Earnings Credit | January 18, 2021 | $49.16 | $398,787.55 |
| Daily Earnings Credit | January 17, 2021 | $49.15 | $398,738.39 |
| Daily Earnings Credit | January 16, 2021 | $49.15 | $398,689.24 |
| Daily Earnings Credit | January 15, 2021 | $49.14 | $398,640.09 |
| Daily Earnings Credit | January 14, 2021 | $49.14 | $398,590.95 |
| Daily Earnings Credit | January 13, 2021 | $49.13 | $398,541.82 |
| Daily Earnings Credit | January 12, 2021 | $49.12 | $398,492.69 |
| Daily Earnings Credit | January 11, 2021 | $49.12 | $398,443.56 |
| Daily Earnings Credit | January 10, 2021 | $49.11 | $398,394.45 |
| Daily Earnings Credit | January 9, 2021 | $49.11 | $398,345.34 |
| Daily Earnings Credit | January 8, 2021 | $49.10 | $398,296.23 |
| Daily Earnings Credit | January 7, 2021 | $49.09 | $398,247.13 |
| Daily Earnings Credit | January 6, 2021 | $49.09 | $398,198.04 |
| Daily Earnings Credit | January 5, 2021 | $49.08 | $398,148.95 |
| Daily Earnings Credit | January 4, 2021 | $49.07 | $398,099.87 |
| Daily Earnings Credit | January 3, 2021 | $49.07 | $398,050.80 |
| Daily Earnings Credit | January 2, 2021 | $49.06 | $398,001.73 |
| Daily Earnings Credit | January 1, 2021 | $49.06 | $397,952.67 |
| Daily Earnings Credit | December 31, 2020 | $48.92 | $397,903.61 |
| Daily Earnings Credit | December 30, 2020 | $48.91 | $397,854.69 |
| Daily Earnings Credit | December 29, 2020 | $48.90 | $397,805.78 |
| Daily Earnings Credit | December 28, 2020 | $48.90 | $397,756.88 |
| Daily Earnings Credit | December 27, 2020 | $48.89 | $397,707.98 |
| Daily Earnings Credit | December 26, 2020 | $48.89 | $397,659.09 |
| Daily Earnings Credit | December 25, 2020 | $48.88 | $397,610.20 |
| Daily Earnings Credit | December 24, 2020 | $48.87 | $397,561.32 |
| Daily Earnings Credit | December 23, 2020 | $48.87 | $397,512.45 |
| Daily Earnings Credit | December 22, 2020 | $48.86 | $397,463.58 |
| Daily Earnings Credit | December 21, 2020 | $48.86 | $397,414.71 |
| Daily Earnings Credit | December 20, 2020 | $48.85 | $397,365.86 |
| Daily Earnings Credit | December 19, 2020 | $48.84 | $397,317.01 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | December 18, 2020 | $48.84 | $397,268.16 |
| Daily Earnings Credit | December 17, 2020 | $48.83 | $397,219.32 |
| Daily Earnings Credit | December 16, 2020 | $48.83 | $397,170.49 |
| Daily Earnings Credit | December 15, 2020 | $48.82 | $397,121.67 |
| Daily Earnings Credit | December 14, 2020 | $48.81 | $397,072.85 |
| Daily Earnings Credit | December 13, 2020 | $48.81 | $397,024.03 |
| Daily Earnings Credit | December 12, 2020 | $48.80 | $396,975.22 |
| Daily Earnings Credit | December 11, 2020 | $48.80 | $396,926.42 |
| Daily Earnings Credit | December 10, 2020 | $48.79 | $396,877.62 |
| Daily Earnings Credit | December 9, 2020 | $48.78 | $396,828.83 |
| Daily Earnings Credit | December 8, 2020 | $48.78 | $396,780.05 |
| Daily Earnings Credit | December 7, 2020 | $48.77 | $396,731.27 |
| Daily Earnings Credit | December 6, 2020 | $48.77 | $396,682.50 |
| Daily Earnings Credit | December 5, 2020 | $48.76 | $396,633.73 |
| Daily Earnings Credit | December 4, 2020 | $48.75 | $396,584.97 |
| Daily Earnings Credit | December 3, 2020 | $48.75 | $396,536.22 |
| Daily Earnings Credit | December 2, 2020 | $48.74 | $396,487.47 |
| Daily Earnings Credit | December 1, 2020 | $48.74 | $396,438.73 |
| Daily Earnings Credit | November 30, 2020 | $48.73 | $396,389.99 |
| Daily Earnings Credit | November 29, 2020 | $48.72 | $396,341.26 |
| Daily Earnings Credit | November 28, 2020 | $48.72 | $396,292.53 |
| Daily Earnings Credit | November 27, 2020 | $48.71 | $396,243.82 |
| Daily Earnings Credit | November 26, 2020 | $48.71 | $396,195.10 |
| Daily Earnings Credit | November 25, 2020 | $48.70 | $396,146.40 |
| Daily Earnings Credit | November 24, 2020 | $48.69 | $396,097.70 |
| Daily Earnings Credit | November 23, 2020 | $48.69 | $396,049.00 |
| Daily Earnings Credit | November 22, 2020 | $48.68 | $396,000.31 |
| Daily Earnings Credit | November 21, 2020 | $48.68 | $395,951.63 |
| Daily Earnings Credit | November 20, 2020 | $48.67 | $395,902.95 |
| Daily Earnings Credit | November 19, 2020 | $48.66 | $395,854.28 |
| Daily Earnings Credit | November 18, 2020 | $48.66 | $395,805.62 |
| Daily Earnings Credit | November 17, 2020 | $48.65 | $395,756.96 |
| Daily Earnings Credit | November 16, 2020 | $48.65 | $395,708.31 |
| Daily Earnings Credit | November 15, 2020 | $48.64 | $395,659.66 |
| Daily Earnings Credit | November 14, 2020 | $48.63 | $395,611.02 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | November 13, 2020 | $48.63 | $395,562.39 |
| Daily Earnings Credit | November 12, 2020 | $48.62 | $395,513.76 |
| Daily Earnings Credit | November 11, 2020 | $48.62 | $395,465.13 |
| Daily Earnings Credit | November 10, 2020 | $48.61 | $395,416.52 |
| Daily Earnings Credit | November 9, 2020 | $48.60 | $395,367.91 |
| Daily Earnings Credit | November 8, 2020 | $48.60 | $395,319.30 |
| Daily Earnings Credit | November 7, 2020 | $48.59 | $395,270.70 |
| Daily Earnings Credit | November 6, 2020 | $48.59 | $395,222.11 |
| Daily Earnings Credit | November 5, 2020 | $48.58 | $395,173.52 |
| Daily Earnings Credit | November 4, 2020 | $48.57 | $395,124.94 |
| Daily Earnings Credit | November 3, 2020 | $48.57 | $395,076.37 |
| Daily Earnings Credit | November 2, 2020 | $48.56 | $395,027.80 |
| Daily Earnings Credit | November 1, 2020 | $48.56 | $394,979.23 |
| Daily Earnings Credit | October 31, 2020 | $48.55 | $394,930.68 |
| Daily Earnings Credit | October 30, 2020 | $48.55 | $394,882.13 |
| Daily Earnings Credit | October 29, 2020 | $48.54 | $394,833.58 |
| Daily Earnings Credit | October 28, 2020 | $48.53 | $394,785.04 |
| Daily Earnings Credit | October 27, 2020 | $48.53 | $394,736.51 |
| Daily Earnings Credit | October 26, 2020 | $48.52 | $394,687.98 |
| Daily Earnings Credit | October 25, 2020 | $48.52 | $394,639.46 |
| Daily Earnings Credit | October 24, 2020 | $48.51 | $394,590.95 |
| Daily Earnings Credit | October 23, 2020 | $48.50 | $394,542.44 |
| Daily Earnings Credit | October 22, 2020 | $48.50 | $394,493.93 |
| Daily Earnings Credit | October 21, 2020 | $48.49 | $394,445.44 |
| Daily Earnings Credit | October 20, 2020 | $48.49 | $394,396.94 |
| Daily Earnings Credit | October 19, 2020 | $48.48 | $394,348.46 |
| Daily Earnings Credit | October 18, 2020 | $48.47 | $394,299.98 |
| Daily Earnings Credit | October 17, 2020 | $48.47 | $394,251.51 |
| Daily Earnings Credit | October 16, 2020 | $48.46 | $394,203.04 |
| Daily Earnings Credit | October 15, 2020 | $48.46 | $394,154.58 |
| Daily Earnings Credit | October 14, 2020 | $48.45 | $394,106.12 |
| Daily Earnings Credit | October 13, 2020 | $48.44 | $394,057.67 |
| Daily Earnings Credit | October 12, 2020 | $48.44 | $394,009.23 |
| Daily Earnings Credit | October 11, 2020 | $48.43 | $393,960.79 |
| Daily Earnings Credit | October 10, 2020 | $48.43 | $393,912.36 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | October 9, 2020 | $48.42 | $393,863.93 |
| Daily Earnings Credit | October 8, 2020 | $48.41 | $393,815.51 |
| Daily Earnings Credit | October 7, 2020 | $48.41 | $393,767.10 |
| Daily Earnings Credit | October 6, 2020 | $48.40 | $393,718.69 |
| Daily Earnings Credit | October 5, 2020 | $48.40 | $393,670.29 |
| Daily Earnings Credit | October 4, 2020 | $48.39 | $393,621.89 |
| Daily Earnings Credit | October 3, 2020 | $48.38 | $393,573.50 |
| Daily Earnings Credit | October 2, 2020 | $48.38 | $393,525.12 |
| Daily Earnings Credit | October 1, 2020 | $48.37 | $393,476.74 |
| Daily Earnings Credit | September 30, 2020 | $48.37 | $393,428.37 |
| Daily Earnings Credit | September 29, 2020 | $48.36 | $393,380.00 |
| Daily Earnings Credit | September 28, 2020 | $48.35 | $393,331.64 |
| Daily Earnings Credit | September 27, 2020 | $48.35 | $393,283.29 |
| Daily Earnings Credit | September 26, 2020 | $48.34 | $393,234.94 |
| Daily Earnings Credit | September 25, 2020 | $48.34 | $393,186.59 |
| Daily Earnings Credit | September 24, 2020 | $48.33 | $393,138.26 |
| Daily Earnings Credit | September 23, 2020 | $48.32 | $393,089.93 |
| Daily Earnings Credit | September 22, 2020 | $48.32 | $393,041.60 |
| Daily Earnings Credit | September 21, 2020 | $48.31 | $392,993.28 |
| Daily Earnings Credit | September 20, 2020 | $48.31 | $392,944.97 |
| Daily Earnings Credit | September 19, 2020 | $48.30 | $392,896.66 |
| Daily Earnings Credit | September 18, 2020 | $48.30 | $392,848.36 |
| Daily Earnings Credit | September 17, 2020 | $48.29 | $392,800.07 |
| Daily Earnings Credit | September 16, 2020 | $48.28 | $392,751.78 |
| Daily Earnings Credit | September 15, 2020 | $48.28 | $392,703.49 |
| Daily Earnings Credit | September 14, 2020 | $48.27 | $392,655.22 |
| Daily Earnings Credit | September 13, 2020 | $48.27 | $392,606.95 |
| Daily Earnings Credit | September 12, 2020 | $48.26 | $392,558.68 |
| Daily Earnings Credit | September 11, 2020 | $48.25 | $392,510.42 |
| Daily Earnings Credit | September 10, 2020 | $48.25 | $392,462.17 |
| Daily Earnings Credit | September 9, 2020 | $48.24 | $392,413.92 |
| Daily Earnings Credit | September 8, 2020 | $48.24 | $392,365.68 |
| Daily Earnings Credit | September 7, 2020 | $48.23 | $392,317.44 |
| Daily Earnings Credit | September 6, 2020 | $48.22 | $392,269.21 |
| Daily Earnings Credit | September 5, 2020 | $48.22 | $392,220.99 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | September 4, 2020 | $48.21 | $392,172.77 |
| Daily Earnings Credit | September 3, 2020 | $48.21 | $392,124.56 |
| Daily Earnings Credit | September 2, 2020 | $48.20 | $392,076.35 |
| Daily Earnings Credit | September 1, 2020 | $48.19 | $392,028.15 |
| Daily Earnings Credit | August 31, 2020 | $48.19 | $391,979.96 |
| Daily Earnings Credit | August 30, 2020 | $48.18 | $391,931.77 |
| Daily Earnings Credit | August 29, 2020 | $48.18 | $391,883.59 |
| Daily Earnings Credit | August 28, 2020 | $48.17 | $391,835.41 |
| Daily Earnings Credit | August 27, 2020 | $48.16 | $391,787.24 |
| Daily Earnings Credit | August 26, 2020 | $48.16 | $391,739.08 |
| Daily Earnings Credit | August 25, 2020 | $48.15 | $391,690.92 |
| Daily Earnings Credit | August 24, 2020 | $48.15 | $391,642.76 |
| Daily Earnings Credit | August 23, 2020 | $48.14 | $391,594.62 |
| Daily Earnings Credit | August 22, 2020 | $48.14 | $391,546.48 |
| Daily Earnings Credit | August 21, 2020 | $48.13 | $391,498.34 |
| Daily Earnings Credit | August 20, 2020 | $48.12 | $391,450.21 |
| Daily Earnings Credit | August 19, 2020 | $48.12 | $391,402.09 |
| Daily Earnings Credit | August 18, 2020 | $48.11 | $391,353.97 |
| Daily Earnings Credit | August 17, 2020 | $48.11 | $391,305.86 |
| Daily Earnings Credit | August 16, 2020 | $48.10 | $391,257.76 |
| Daily Earnings Credit | August 15, 2020 | $48.09 | $391,209.66 |
| Daily Earnings Credit | August 14, 2020 | $48.09 | $391,161.56 |
| Daily Earnings Credit | August 13, 2020 | $48.08 | $391,113.47 |
| Daily Earnings Credit | August 12, 2020 | $48.08 | $391,065.39 |
| Daily Earnings Credit | August 11, 2020 | $48.07 | $391,017.32 |
| Daily Earnings Credit | August 10, 2020 | $48.06 | $390,969.25 |
| Daily Earnings Credit | August 9, 2020 | $48.06 | $390,921.18 |
| Daily Earnings Credit | August 8, 2020 | $48.05 | $390,873.12 |
| Daily Earnings Credit | August 7, 2020 | $48.05 | $390,825.07 |
| Daily Earnings Credit | August 6, 2020 | $48.04 | $390,777.03 |
| Daily Earnings Credit | August 5, 2020 | $48.03 | $390,728.99 |
| Daily Earnings Credit | August 4, 2020 | $48.03 | $390,680.95 |
| Daily Earnings Credit | August 3, 2020 | $48.02 | $390,632.92 |
| Daily Earnings Credit | August 2, 2020 | $48.02 | $390,584.90 |
| Daily Earnings Credit | August 1, 2020 | $48.01 | $390,536.88 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | July 31, 2020 | $48.01 | $390,488.87 |
| Daily Earnings Credit | July 30, 2020 | $48.00 | $390,440.87 |
| Daily Earnings Credit | July 29, 2020 | $47.99 | $390,392.87 |
| Daily Earnings Credit | July 28, 2020 | $47.99 | $390,344.87 |
| Daily Earnings Credit | July 27, 2020 | $47.98 | $390,296.89 |
| Daily Earnings Credit | July 26, 2020 | $47.98 | $390,248.91 |
| Daily Earnings Credit | July 25, 2020 | $47.97 | $390,200.93 |
| Daily Earnings Credit | July 24, 2020 | $47.96 | $390,152.96 |
| Daily Earnings Credit | July 23, 2020 | $47.96 | $390,105.00 |
| Daily Earnings Credit | July 22, 2020 | $47.95 | $390,057.04 |
| Daily Earnings Credit | July 21, 2020 | $47.95 | $390,009.09 |
| Daily Earnings Credit | July 20, 2020 | $47.94 | $389,961.14 |
| Daily Earnings Credit | July 19, 2020 | $47.93 | $389,913.20 |
| Daily Earnings Credit | July 18, 2020 | $47.93 | $389,865.27 |
| Daily Earnings Credit | July 17, 2020 | $47.92 | $389,817.34 |
| Daily Earnings Credit | July 16, 2020 | $47.92 | $389,769.42 |
| Daily Earnings Credit | July 15, 2020 | $47.91 | $389,721.50 |
| Daily Earnings Credit | July 14, 2020 | $47.90 | $389,673.59 |
| Daily Earnings Credit | July 13, 2020 | $47.90 | $389,625.68 |
| Daily Earnings Credit | July 12, 2020 | $47.89 | $389,577.79 |
| Daily Earnings Credit | July 11, 2020 | $47.89 | $389,529.89 |
| Daily Earnings Credit | July 10, 2020 | $47.88 | $389,482.00 |
| Daily Earnings Credit | July 9, 2020 | $47.88 | $389,434.12 |
| Daily Earnings Credit | July 8, 2020 | $47.87 | $389,386.25 |
| Daily Earnings Credit | July 7, 2020 | $47.86 | $389,338.38 |
| Daily Earnings Credit | July 6, 2020 | $47.86 | $389,290.52 |
| Daily Earnings Credit | July 5, 2020 | $47.85 | $389,242.66 |
| Daily Earnings Credit | July 4, 2020 | $47.85 | $389,194.81 |
| Daily Earnings Credit | July 3, 2020 | $47.84 | $389,146.96 |
| Daily Earnings Credit | July 2, 2020 | $47.83 | $389,099.12 |
| Daily Earnings Credit | July 1, 2020 | $47.83 | $389,051.29 |
| Daily Earnings Credit | June 30, 2020 | $47.82 | $389,003.46 |
| Daily Earnings Credit | June 29, 2020 | $47.82 | $388,955.63 |
| Daily Earnings Credit | June 28, 2020 | $47.81 | $388,907.82 |
| Daily Earnings Credit | June 27, 2020 | $47.80 | $388,860.01 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | June 26, 2020 | $47.80 | $388,812.20 |
| Daily Earnings Credit | June 25, 2020 | $47.79 | $388,764.40 |
| Daily Earnings Credit | June 24, 2020 | $47.79 | $388,716.61 |
| Daily Earnings Credit | June 23, 2020 | $47.78 | $388,668.82 |
| Daily Earnings Credit | June 22, 2020 | $47.78 | $388,621.04 |
| Daily Earnings Credit | June 21, 2020 | $47.77 | $388,573.27 |
| Daily Earnings Credit | June 20, 2020 | $47.76 | $388,525.50 |
| Daily Earnings Credit | June 19, 2020 | $47.76 | $388,477.73 |
| Daily Earnings Credit | June 18, 2020 | $47.75 | $388,429.98 |
| Daily Earnings Credit | June 17, 2020 | $47.75 | $388,382.22 |
| Daily Earnings Credit | June 16, 2020 | $47.74 | $388,334.48 |
| Daily Earnings Credit | June 15, 2020 | $47.73 | $388,286.74 |
| Daily Earnings Credit | June 14, 2020 | $47.73 | $388,239.00 |
| Daily Earnings Credit | June 13, 2020 | $47.72 | $388,191.28 |
| Daily Earnings Credit | June 12, 2020 | $47.72 | $388,143.55 |
| Daily Earnings Credit | June 11, 2020 | $47.71 | $388,095.84 |
| Daily Earnings Credit | June 10, 2020 | $47.70 | $388,048.13 |
| Daily Earnings Credit | June 9, 2020 | $47.70 | $388,000.42 |
| Daily Earnings Credit | June 8, 2020 | $47.69 | $387,952.72 |
| Daily Earnings Credit | June 7, 2020 | $47.69 | $387,905.03 |
| Daily Earnings Credit | June 6, 2020 | $47.68 | $387,857.34 |
| Daily Earnings Credit | June 5, 2020 | $47.68 | $387,809.66 |
| Daily Earnings Credit | June 4, 2020 | $47.67 | $387,761.98 |
| Daily Earnings Credit | June 3, 2020 | $47.66 | $387,714.31 |
| Daily Earnings Credit | June 2, 2020 | $47.66 | $387,666.65 |
| Daily Earnings Credit | June 1, 2020 | $47.65 | $387,618.99 |
| Daily Earnings Credit | May 31, 2020 | $47.65 | $387,571.34 |
| Daily Earnings Credit | May 30, 2020 | $47.64 | $387,523.69 |
| Daily Earnings Credit | May 29, 2020 | $47.63 | $387,476.05 |
| Daily Earnings Credit | May 28, 2020 | $47.63 | $387,428.42 |
| Daily Earnings Credit | May 27, 2020 | $47.62 | $387,380.79 |
| Daily Earnings Credit | May 26, 2020 | $47.62 | $387,333.17 |
| Daily Earnings Credit | May 25, 2020 | $47.61 | $387,285.55 |
| Daily Earnings Credit | May 24, 2020 | $47.61 | $387,237.94 |
| Daily Earnings Credit | May 23, 2020 | $47.60 | $387,190.33 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | May 22, 2020 | $47.59 | $387,142.73 |
| Daily Earnings Credit | May 21, 2020 | $47.59 | $387,095.14 |
| Daily Earnings Credit | May 20, 2020 | $47.58 | $387,047.55 |
| Daily Earnings Credit | May 19, 2020 | $47.58 | $386,999.97 |
| Daily Earnings Credit | May 18, 2020 | $47.57 | $386,952.39 |
| Daily Earnings Credit | May 17, 2020 | $47.56 | $386,904.82 |
| Daily Earnings Credit | May 16, 2020 | $47.56 | $386,857.26 |
| Daily Earnings Credit | May 15, 2020 | $47.55 | $386,809.70 |
| Daily Earnings Credit | May 14, 2020 | $47.55 | $386,762.15 |
| Daily Earnings Credit | May 13, 2020 | $47.54 | $386,714.60 |
| Daily Earnings Credit | May 12, 2020 | $47.54 | $386,667.06 |
| Daily Earnings Credit | May 11, 2020 | $47.53 | $386,619.52 |
| Daily Earnings Credit | May 10, 2020 | $47.52 | $386,572.00 |
| Daily Earnings Credit | May 9, 2020 | $47.52 | $386,524.47 |
| Daily Earnings Credit | May 8, 2020 | $47.51 | $386,476.95 |
| Daily Earnings Credit | May 7, 2020 | $47.51 | $386,429.44 |
| Daily Earnings Credit | May 6, 2020 | $47.50 | $386,381.94 |
| Daily Earnings Credit | May 5, 2020 | $47.49 | $386,334.44 |
| Daily Earnings Credit | May 4, 2020 | $47.49 | $386,286.94 |
| Daily Earnings Credit | May 3, 2020 | $47.48 | $386,239.45 |
| Daily Earnings Credit | May 2, 2020 | $47.48 | $386,191.97 |
| Daily Earnings Credit | May 1, 2020 | $47.47 | $386,144.49 |
| Daily Earnings Credit | April 30, 2020 | $47.47 | $386,097.02 |
| Daily Earnings Credit | April 29, 2020 | $47.46 | $386,049.56 |
| Daily Earnings Credit | April 28, 2020 | $47.45 | $386,002.10 |
| Daily Earnings Credit | April 27, 2020 | $47.45 | $385,954.65 |
| Daily Earnings Credit | April 26, 2020 | $47.44 | $385,907.20 |
| Daily Earnings Credit | April 25, 2020 | $47.44 | $385,859.76 |
| Daily Earnings Credit | April 24, 2020 | $47.43 | $385,812.32 |
| Daily Earnings Credit | April 23, 2020 | $47.42 | $385,764.89 |
| Daily Earnings Credit | April 22, 2020 | $47.42 | $385,717.47 |
| Daily Earnings Credit | April 21, 2020 | $47.41 | $385,670.05 |
| Daily Earnings Credit | April 20, 2020 | $47.41 | $385,622.63 |
| Daily Earnings Credit | April 19, 2020 | $47.40 | $385,575.23 |
| Daily Earnings Credit | April 18, 2020 | $47.40 | $385,527.83 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | April 17, 2020 | $47.39 | $385,480.43 |
| Daily Earnings Credit | April 16, 2020 | $47.38 | $385,433.04 |
| Daily Earnings Credit | April 15, 2020 | $47.38 | $385,385.66 |
| Daily Earnings Credit | April 14, 2020 | $47.37 | $385,338.28 |
| Daily Earnings Credit | April 13, 2020 | $47.37 | $385,290.91 |
| Daily Earnings Credit | April 12, 2020 | $47.36 | $385,243.54 |
| Daily Earnings Credit | April 11, 2020 | $47.35 | $385,196.18 |
| Daily Earnings Credit | April 10, 2020 | $47.35 | $385,148.83 |
| Daily Earnings Credit | April 9, 2020 | $47.34 | $385,101.48 |
| Daily Earnings Credit | April 8, 2020 | $47.34 | $385,054.14 |
| Daily Earnings Credit | April 7, 2020 | $47.33 | $385,006.80 |
| Daily Earnings Credit | April 6, 2020 | $47.33 | $384,959.47 |
| Daily Earnings Credit | April 5, 2020 | $47.32 | $384,912.14 |
| Daily Earnings Credit | April 4, 2020 | $47.31 | $384,864.83 |
| Daily Earnings Credit | April 3, 2020 | $47.31 | $384,817.51 |
| Daily Earnings Credit | April 2, 2020 | $47.30 | $384,770.20 |
| Daily Earnings Credit | April 1, 2020 | $47.30 | $384,722.90 |
| Daily Earnings Credit | March 31, 2020 | $47.29 | $384,675.61 |
| Daily Earnings Credit | March 30, 2020 | $47.28 | $384,628.32 |
| Daily Earnings Credit | March 29, 2020 | $47.28 | $384,581.03 |
| Daily Earnings Credit | March 28, 2020 | $47.27 | $384,533.75 |
| Daily Earnings Credit | March 27, 2020 | $47.27 | $384,486.48 |
| Daily Earnings Credit | March 26, 2020 | $47.26 | $384,439.21 |
| Daily Earnings Credit | March 25, 2020 | $47.26 | $384,391.95 |
| Daily Earnings Credit | March 24, 2020 | $47.25 | $384,344.70 |
| Daily Earnings Credit | March 23, 2020 | $47.24 | $384,297.45 |
| Daily Earnings Credit | March 22, 2020 | $47.24 | $384,250.20 |
| Daily Earnings Credit | March 21, 2020 | $47.23 | $384,202.96 |
| Daily Earnings Credit | March 20, 2020 | $47.23 | $384,155.73 |
| Daily Earnings Credit | March 19, 2020 | $47.22 | $384,108.50 |
| Daily Earnings Credit | March 18, 2020 | $47.21 | $384,061.28 |
| Daily Earnings Credit | March 17, 2020 | $47.21 | $384,014.07 |
| Daily Earnings Credit | March 16, 2020 | $47.20 | $383,966.86 |
| Daily Earnings Credit | March 15, 2020 | $47.20 | $383,919.66 |
| Daily Earnings Credit | March 14, 2020 | $47.19 | $383,872.46 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | March 13, 2020 | $47.19 | $383,825.27 |
| Daily Earnings Credit | March 12, 2020 | $47.18 | $383,778.08 |
| Daily Earnings Credit | March 11, 2020 | $47.17 | $383,730.90 |
| Daily Earnings Credit | March 10, 2020 | $47.17 | $383,683.73 |
| Daily Earnings Credit | March 9, 2020 | $47.16 | $383,636.56 |
| Daily Earnings Credit | March 8, 2020 | $47.16 | $383,589.40 |
| Daily Earnings Credit | March 7, 2020 | $47.15 | $383,542.24 |
| Daily Earnings Credit | March 6, 2020 | $47.15 | $383,495.09 |
| Daily Earnings Credit | March 5, 2020 | $47.14 | $383,447.94 |
| Daily Earnings Credit | March 4, 2020 | $47.13 | $383,400.80 |
| Daily Earnings Credit | March 3, 2020 | $47.13 | $383,353.67 |
| Daily Earnings Credit | March 2, 2020 | $47.12 | $383,306.54 |
| Daily Earnings Credit | March 1, 2020 | $47.12 | $383,259.42 |
| Daily Earnings Credit | February 29, 2020 | $47.11 | $383,212.30 |
| Daily Earnings Credit | February 28, 2020 | $47.10 | $383,165.19 |
| Daily Earnings Credit | February 27, 2020 | $47.10 | $383,118.09 |
| Daily Earnings Credit | February 26, 2020 | $47.09 | $383,070.99 |
| Daily Earnings Credit | February 25, 2020 | $47.09 | $383,023.90 |
| Daily Earnings Credit | February 24, 2020 | $47.08 | $382,976.81 |
| Daily Earnings Credit | February 23, 2020 | $47.08 | $382,929.73 |
| Daily Earnings Credit | February 22, 2020 | $47.07 | $382,882.65 |
| Daily Earnings Credit | February 21, 2020 | $47.06 | $382,835.58 |
| Daily Earnings Credit | February 20, 2020 | $47.06 | $382,788.52 |
| Daily Earnings Credit | February 19, 2020 | $47.05 | $382,741.46 |
| Daily Earnings Credit | February 18, 2020 | $47.05 | $382,694.41 |
| Daily Earnings Credit | February 17, 2020 | $47.04 | $382,647.36 |
| Daily Earnings Credit | February 16, 2020 | $47.04 | $382,600.32 |
| Daily Earnings Credit | February 15, 2020 | $47.03 | $382,553.28 |
| Daily Earnings Credit | February 14, 2020 | $47.02 | $382,506.26 |
| Daily Earnings Credit | February 13, 2020 | $47.02 | $382,459.23 |
| Daily Earnings Credit | February 12, 2020 | $47.01 | $382,412.21 |
| Daily Earnings Credit | February 11, 2020 | $47.01 | $382,365.20 |
| Daily Earnings Credit | February 10, 2020 | $47.00 | $382,318.20 |
| Daily Earnings Credit | February 9, 2020 | $46.99 | $382,271.19 |
| Daily Earnings Credit | February 8, 2020 | $46.99 | $382,224.20 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | February 7, 2020 | $46.98 | $382,177.21 |
| Daily Earnings Credit | February 6, 2020 | $46.98 | $382,130.23 |
| Daily Earnings Credit | February 5, 2020 | $46.97 | $382,083.25 |
| Daily Earnings Credit | February 4, 2020 | $46.97 | $382,036.28 |
| Daily Earnings Credit | February 3, 2020 | $46.96 | $381,989.31 |
| Daily Earnings Credit | February 2, 2020 | $46.95 | $381,942.35 |
| Daily Earnings Credit | February 1, 2020 | $46.95 | $381,895.40 |
| Daily Earnings Credit | January 31, 2020 | $46.94 | $381,848.45 |
| Daily Earnings Credit | January 30, 2020 | $46.94 | $381,801.51 |
| Daily Earnings Credit | January 29, 2020 | $46.93 | $381,754.57 |
| Daily Earnings Credit | January 28, 2020 | $46.93 | $381,707.64 |
| Daily Earnings Credit | January 27, 2020 | $46.92 | $381,660.71 |
| Daily Earnings Credit | January 26, 2020 | $46.91 | $381,613.79 |
| Daily Earnings Credit | January 25, 2020 | $46.91 | $381,566.88 |
| Daily Earnings Credit | January 24, 2020 | $46.90 | $381,519.97 |
| Daily Earnings Credit | January 23, 2020 | $46.90 | $381,473.07 |
| Daily Earnings Credit | January 22, 2020 | $46.89 | $381,426.17 |
| Daily Earnings Credit | January 21, 2020 | $46.89 | $381,379.28 |
| Daily Earnings Credit | January 20, 2020 | $46.88 | $381,332.40 |
| Daily Earnings Credit | January 19, 2020 | $46.87 | $381,285.52 |
| Daily Earnings Credit | January 18, 2020 | $46.87 | $381,238.64 |
| Daily Earnings Credit | January 17, 2020 | $46.86 | $381,191.78 |
| Daily Earnings Credit | January 16, 2020 | $46.86 | $381,144.91 |
| Daily Earnings Credit | January 15, 2020 | $46.85 | $381,098.06 |
| Daily Earnings Credit | January 14, 2020 | $46.84 | $381,051.21 |
| Daily Earnings Credit | January 13, 2020 | $46.84 | $381,004.36 |
| Daily Earnings Credit | January 12, 2020 | $46.83 | $380,957.52 |
| Daily Earnings Credit | January 11, 2020 | $46.83 | $380,910.69 |
| Daily Earnings Credit | January 10, 2020 | $46.82 | $380,863.86 |
| Daily Earnings Credit | January 9, 2020 | $46.82 | $380,817.04 |
| Daily Earnings Credit | January 8, 2020 | $46.81 | $380,770.22 |
| Daily Earnings Credit | January 7, 2020 | $46.80 | $380,723.41 |
| Daily Earnings Credit | January 6, 2020 | $46.80 | $380,676.61 |
| Daily Earnings Credit | January 5, 2020 | $46.79 | $380,629.81 |
| Daily Earnings Credit | January 4, 2020 | $46.79 | $380,583.02 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | January 3, 2020 | $46.78 | $380,536.23 |
| Daily Earnings Credit | January 2, 2020 | $46.78 | $380,489.45 |
| Daily Earnings Credit | January 1, 2020 | $46.77 | $380,442.67 |
| Daily Earnings Credit | December 31, 2019 | $46.89 | $380,395.90 |
| Daily Earnings Credit | December 30, 2019 | $46.89 | $380,349.01 |
| Daily Earnings Credit | December 29, 2019 | $46.88 | $380,302.12 |
| Daily Earnings Credit | December 28, 2019 | $46.88 | $380,255.24 |
| Daily Earnings Credit | December 27, 2019 | $46.87 | $380,208.37 |
| Daily Earnings Credit | December 26, 2019 | $46.86 | $380,161.50 |
| Daily Earnings Credit | December 25, 2019 | $46.86 | $380,114.64 |
| Daily Earnings Credit | December 24, 2019 | $46.85 | $380,067.78 |
| Daily Earnings Credit | December 23, 2019 | $46.85 | $380,020.93 |
| Daily Earnings Credit | December 22, 2019 | $46.84 | $379,974.08 |
| Daily Earnings Credit | December 21, 2019 | $46.83 | $379,927.24 |
| Daily Earnings Credit | December 20, 2019 | $46.83 | $379,880.41 |
| Daily Earnings Credit | December 19, 2019 | $46.82 | $379,833.58 |
| Daily Earnings Credit | December 18, 2019 | $46.82 | $379,786.75 |
| Daily Earnings Credit | December 17, 2019 | $46.81 | $379,739.94 |
| Daily Earnings Credit | December 16, 2019 | $46.81 | $379,693.12 |
| Daily Earnings Credit | December 15, 2019 | $46.80 | $379,646.32 |
| Daily Earnings Credit | December 14, 2019 | $46.79 | $379,599.52 |
| Daily Earnings Credit | December 13, 2019 | $46.79 | $379,552.72 |
| Daily Earnings Credit | December 12, 2019 | $46.78 | $379,505.94 |
| Daily Earnings Credit | December 11, 2019 | $46.78 | $379,459.15 |
| Daily Earnings Credit | December 10, 2019 | $46.77 | $379,412.38 |
| Daily Earnings Credit | December 9, 2019 | $46.77 | $379,365.61 |
| Daily Earnings Credit | December 8, 2019 | $46.76 | $379,318.84 |
| Daily Earnings Credit | December 7, 2019 | $46.75 | $379,272.08 |
| Daily Earnings Credit | December 6, 2019 | $46.75 | $379,225.33 |
| Daily Earnings Credit | December 5, 2019 | $46.74 | $379,178.58 |
| Daily Earnings Credit | December 4, 2019 | $46.74 | $379,131.84 |
| Daily Earnings Credit | December 3, 2019 | $46.73 | $379,085.10 |
| Daily Earnings Credit | December 2, 2019 | $46.73 | $379,038.37 |
| Daily Earnings Credit | December 1, 2019 | $46.72 | $378,991.64 |
| Daily Earnings Credit | November 30, 2019 | $46.71 | $378,944.93 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | November 29, 2019 | $46.71 | $378,898.21 |
| Daily Earnings Credit | November 28, 2019 | $46.70 | $378,851.50 |
| Daily Earnings Credit | November 27, 2019 | $46.70 | $378,804.80 |
| Daily Earnings Credit | November 26, 2019 | $46.69 | $378,758.11 |
| Daily Earnings Credit | November 25, 2019 | $46.68 | $378,711.42 |
| Daily Earnings Credit | November 24, 2019 | $46.68 | $378,664.73 |
| Daily Earnings Credit | November 23, 2019 | $46.67 | $378,618.05 |
| Daily Earnings Credit | November 22, 2019 | $46.67 | $378,571.38 |
| Daily Earnings Credit | November 21, 2019 | $46.66 | $378,524.71 |
| Daily Earnings Credit | November 20, 2019 | $46.66 | $378,478.05 |
| Daily Earnings Credit | November 19, 2019 | $46.65 | $378,431.39 |
| Daily Earnings Credit | November 18, 2019 | $46.64 | $378,384.74 |
| Daily Earnings Credit | November 17, 2019 | $46.64 | $378,338.10 |
| Daily Earnings Credit | November 16, 2019 | $46.63 | $378,291.46 |
| Daily Earnings Credit | November 15, 2019 | $46.63 | $378,244.83 |
| Daily Earnings Credit | November 14, 2019 | $46.62 | $378,198.20 |
| Daily Earnings Credit | November 13, 2019 | $46.62 | $378,151.58 |
| Daily Earnings Credit | November 12, 2019 | $46.61 | $378,104.96 |
| Daily Earnings Credit | November 11, 2019 | $46.60 | $378,058.35 |
| Daily Earnings Credit | November 10, 2019 | $46.60 | $378,011.75 |
| Daily Earnings Credit | November 9, 2019 | $46.59 | $377,965.15 |
| Daily Earnings Credit | November 8, 2019 | $46.59 | $377,918.56 |
| Daily Earnings Credit | November 7, 2019 | $46.58 | $377,871.97 |
| Daily Earnings Credit | November 6, 2019 | $46.58 | $377,825.39 |
| Daily Earnings Credit | November 5, 2019 | $46.57 | $377,778.81 |
| Daily Earnings Credit | November 4, 2019 | $46.56 | $377,732.24 |
| Daily Earnings Credit | November 3, 2019 | $46.56 | $377,685.68 |
| Daily Earnings Credit | November 2, 2019 | $46.55 | $377,639.12 |
| Daily Earnings Credit | November 1, 2019 | $46.55 | $377,592.57 |
| Daily Earnings Credit | October 31, 2019 | $46.54 | $377,546.02 |
| Daily Earnings Credit | October 30, 2019 | $46.54 | $377,499.48 |
| Daily Earnings Credit | October 29, 2019 | $46.53 | $377,452.95 |
| Daily Earnings Credit | October 28, 2019 | $46.52 | $377,406.42 |
| Daily Earnings Credit | October 27, 2019 | $46.52 | $377,359.89 |
| Daily Earnings Credit | October 26, 2019 | $46.51 | $377,313.37 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | October 25, 2019 | $46.51 | $377,266.86 |
| Daily Earnings Credit | October 24, 2019 | $46.50 | $377,220.36 |
| Daily Earnings Credit | October 23, 2019 | $46.50 | $377,173.85 |
| Daily Earnings Credit | October 22, 2019 | $46.49 | $377,127.36 |
| Daily Earnings Credit | October 21, 2019 | $46.48 | $377,080.87 |
| Daily Earnings Credit | October 20, 2019 | $46.48 | $377,034.39 |
| Daily Earnings Credit | October 19, 2019 | $46.47 | $376,987.91 |
| Daily Earnings Credit | October 18, 2019 | $46.47 | $376,941.44 |
| Daily Earnings Credit | October 17, 2019 | $46.46 | $376,894.97 |
| Daily Earnings Credit | October 16, 2019 | $46.46 | $376,848.51 |
| Daily Earnings Credit | October 15, 2019 | $46.45 | $376,802.05 |
| Daily Earnings Credit | October 14, 2019 | $46.44 | $376,755.60 |
| Daily Earnings Credit | October 13, 2019 | $46.44 | $376,709.16 |
| Daily Earnings Credit | October 12, 2019 | $46.43 | $376,662.72 |
| Daily Earnings Credit | October 11, 2019 | $46.43 | $376,616.29 |
| Daily Earnings Credit | October 10, 2019 | $46.42 | $376,569.86 |
| Daily Earnings Credit | October 9, 2019 | $46.41 | $376,523.44 |
| Daily Earnings Credit | October 8, 2019 | $46.41 | $376,477.03 |
| Daily Earnings Credit | October 7, 2019 | $46.40 | $376,430.62 |
| Daily Earnings Credit | October 6, 2019 | $46.40 | $376,384.22 |
| Daily Earnings Credit | October 5, 2019 | $46.39 | $376,337.82 |
| Daily Earnings Credit | October 4, 2019 | $46.39 | $376,291.43 |
| Daily Earnings Credit | October 3, 2019 | $46.38 | $376,245.04 |
| Daily Earnings Credit | October 2, 2019 | $46.37 | $376,198.66 |
| Daily Earnings Credit | October 1, 2019 | $46.37 | $376,152.28 |
| Daily Earnings Credit | September 30, 2019 | $46.36 | $376,105.91 |
| Daily Earnings Credit | September 29, 2019 | $46.36 | $376,059.55 |
| Daily Earnings Credit | September 28, 2019 | $46.35 | $376,013.19 |
| Daily Earnings Credit | September 27, 2019 | $46.35 | $375,966.84 |
| Daily Earnings Credit | September 26, 2019 | $46.34 | $375,920.49 |
| Daily Earnings Credit | September 25, 2019 | $46.33 | $375,874.15 |
| Daily Earnings Credit | September 24, 2019 | $46.33 | $375,827.82 |
| Daily Earnings Credit | September 23, 2019 | $46.32 | $375,781.49 |
| Daily Earnings Credit | September 22, 2019 | $46.32 | $375,735.17 |
| Daily Earnings Credit | September 21, 2019 | $46.31 | $375,688.85 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | September 20, 2019 | $46.31 | $375,642.54 |
| Daily Earnings Credit | September 19, 2019 | $46.30 | $375,596.23 |
| Daily Earnings Credit | September 18, 2019 | $46.29 | $375,549.93 |
| Daily Earnings Credit | September 17, 2019 | $46.29 | $375,503.63 |
| Daily Earnings Credit | September 16, 2019 | $46.28 | $375,457.35 |
| Daily Earnings Credit | September 15, 2019 | $46.28 | $375,411.06 |
| Daily Earnings Credit | September 14, 2019 | $46.27 | $375,364.78 |
| Daily Earnings Credit | September 13, 2019 | $46.27 | $375,318.51 |
| Daily Earnings Credit | September 12, 2019 | $46.26 | $375,272.25 |
| Daily Earnings Credit | September 11, 2019 | $46.26 | $375,225.98 |
| Daily Earnings Credit | September 10, 2019 | $46.25 | $375,179.73 |
| Daily Earnings Credit | September 9, 2019 | $46.24 | $375,133.48 |
| Daily Earnings Credit | September 8, 2019 | $46.24 | $375,087.24 |
| Daily Earnings Credit | September 7, 2019 | $46.23 | $375,041.00 |
| Daily Earnings Credit | September 6, 2019 | $46.23 | $374,994.77 |
| Daily Earnings Credit | September 5, 2019 | $46.22 | $374,948.54 |
| Daily Earnings Credit | September 4, 2019 | $46.22 | $374,902.32 |
| Daily Earnings Credit | September 3, 2019 | $46.21 | $374,856.10 |
| Daily Earnings Credit | September 2, 2019 | $46.20 | $374,809.89 |
| Daily Earnings Credit | September 1, 2019 | $46.20 | $374,763.69 |
| Daily Earnings Credit | August 31, 2019 | $46.19 | $374,717.49 |
| Daily Earnings Credit | August 30, 2019 | $46.19 | $374,671.30 |
| Daily Earnings Credit | August 29, 2019 | $46.18 | $374,625.11 |
| Daily Earnings Credit | August 28, 2019 | $46.18 | $374,578.93 |
| Daily Earnings Credit | August 27, 2019 | $46.17 | $374,532.76 |
| Daily Earnings Credit | August 26, 2019 | $46.16 | $374,486.59 |
| Daily Earnings Credit | August 25, 2019 | $46.16 | $374,440.42 |
| Daily Earnings Credit | August 24, 2019 | $46.15 | $374,394.27 |
| Daily Earnings Credit | August 23, 2019 | $46.15 | $374,348.11 |
| Daily Earnings Credit | August 22, 2019 | $46.14 | $374,301.97 |
| Daily Earnings Credit | August 21, 2019 | $46.14 | $374,255.83 |
| Daily Earnings Credit | August 20, 2019 | $46.13 | $374,209.69 |
| Daily Earnings Credit | August 19, 2019 | $46.12 | $374,163.56 |
| Daily Earnings Credit | August 18, 2019 | $46.12 | $374,117.44 |
| Daily Earnings Credit | August 17, 2019 | $46.11 | $374,071.32 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | August 16, 2019 | $46.11 | $374,025.20 |
| Daily Earnings Credit | August 15, 2019 | $46.10 | $373,979.10 |
| Daily Earnings Credit | August 14, 2019 | $46.10 | $373,933.00 |
| Daily Earnings Credit | August 13, 2019 | $46.09 | $373,886.90 |
| Daily Earnings Credit | August 12, 2019 | $46.08 | $373,840.81 |
| Daily Earnings Credit | August 11, 2019 | $46.08 | $373,794.73 |
| Daily Earnings Credit | August 10, 2019 | $46.07 | $373,748.65 |
| Daily Earnings Credit | August 9, 2019 | $46.07 | $373,702.57 |
| Daily Earnings Credit | August 8, 2019 | $46.06 | $373,656.51 |
| Daily Earnings Credit | August 7, 2019 | $46.06 | $373,610.45 |
| Daily Earnings Credit | August 6, 2019 | $46.05 | $373,564.39 |
| Daily Earnings Credit | August 5, 2019 | $46.04 | $373,518.34 |
| Daily Earnings Credit | August 4, 2019 | $46.04 | $373,472.30 |
| Daily Earnings Credit | August 3, 2019 | $46.03 | $373,426.26 |
| Daily Earnings Credit | August 2, 2019 | $46.03 | $373,380.22 |
| Daily Earnings Credit | August 1, 2019 | $46.02 | $373,334.20 |
| Daily Earnings Credit | July 31, 2019 | $46.02 | $373,288.17 |
| Daily Earnings Credit | July 30, 2019 | $46.01 | $373,242.16 |
| Daily Earnings Credit | July 29, 2019 | $46.00 | $373,196.15 |
| Daily Earnings Credit | July 28, 2019 | $46.00 | $373,150.14 |
| Daily Earnings Credit | July 27, 2019 | $45.99 | $373,104.14 |
| Daily Earnings Credit | July 26, 2019 | $45.99 | $373,058.15 |
| Daily Earnings Credit | July 25, 2019 | $45.98 | $373,012.16 |
| Daily Earnings Credit | July 24, 2019 | $45.98 | $372,966.18 |
| Daily Earnings Credit | July 23, 2019 | $45.97 | $372,920.20 |
| Daily Earnings Credit | July 22, 2019 | $45.97 | $372,874.23 |
| Daily Earnings Credit | July 21, 2019 | $45.96 | $372,828.27 |
| Daily Earnings Credit | July 20, 2019 | $45.95 | $372,782.31 |
| Daily Earnings Credit | July 19, 2019 | $45.95 | $372,736.35 |
| Daily Earnings Credit | July 18, 2019 | $45.94 | $372,690.41 |
| Daily Earnings Credit | July 17, 2019 | $45.94 | $372,644.46 |
| Daily Earnings Credit | July 16, 2019 | $45.93 | $372,598.53 |
| Daily Earnings Credit | July 15, 2019 | $45.93 | $372,552.60 |
| Daily Earnings Credit | July 14, 2019 | $45.92 | $372,506.67 |
| Daily Earnings Credit | July 13, 2019 | $45.91 | $372,460.75 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | July 12, 2019 | $45.91 | $372,414.84 |
| Daily Earnings Credit | July 11, 2019 | $45.90 | $372,368.93 |
| Daily Earnings Credit | July 10, 2019 | $45.90 | $372,323.02 |
| Daily Earnings Credit | July 9, 2019 | $45.89 | $372,277.13 |
| Daily Earnings Credit | July 8, 2019 | $45.89 | $372,231.24 |
| Daily Earnings Credit | July 7, 2019 | $45.88 | $372,185.35 |
| Daily Earnings Credit | July 6, 2019 | $45.87 | $372,139.47 |
| Daily Earnings Credit | July 5, 2019 | $45.87 | $372,093.60 |
| Daily Earnings Credit | July 4, 2019 | $45.86 | $372,047.73 |
| Daily Earnings Credit | July 3, 2019 | $45.86 | $372,001.86 |
| Daily Earnings Credit | July 2, 2019 | $45.85 | $371,956.01 |
| Daily Earnings Credit | July 1, 2019 | $45.85 | $371,910.15 |
| Daily Earnings Credit | June 30, 2019 | $45.84 | $371,864.31 |
| Daily Earnings Credit | June 29, 2019 | $45.83 | $371,818.47 |
| Daily Earnings Credit | June 28, 2019 | $45.83 | $371,772.63 |
| Daily Earnings Credit | June 27, 2019 | $45.82 | $371,726.80 |
| Daily Earnings Credit | June 26, 2019 | $45.82 | $371,680.98 |
| Daily Earnings Credit | June 25, 2019 | $45.81 | $371,635.16 |
| Daily Earnings Credit | June 24, 2019 | $45.81 | $371,589.35 |
| Daily Earnings Credit | June 23, 2019 | $45.80 | $371,543.54 |
| Daily Earnings Credit | June 22, 2019 | $45.80 | $371,497.74 |
| Daily Earnings Credit | June 21, 2019 | $45.79 | $371,451.94 |
| Daily Earnings Credit | June 20, 2019 | $45.78 | $371,406.16 |
| Daily Earnings Credit | June 19, 2019 | $45.78 | $371,360.37 |
| Daily Earnings Credit | June 18, 2019 | $45.77 | $371,314.59 |
| Daily Earnings Credit | June 17, 2019 | $45.77 | $371,268.82 |
| Daily Earnings Credit | June 16, 2019 | $45.76 | $371,223.05 |
| Daily Earnings Credit | June 15, 2019 | $45.76 | $371,177.29 |
| Daily Earnings Credit | June 14, 2019 | $45.75 | $371,131.53 |
| Daily Earnings Credit | June 13, 2019 | $45.74 | $371,085.78 |
| Daily Earnings Credit | June 12, 2019 | $45.74 | $371,040.04 |
| Daily Earnings Credit | June 11, 2019 | $45.73 | $370,994.30 |
| Daily Earnings Credit | June 10, 2019 | $45.73 | $370,948.57 |
| Daily Earnings Credit | June 9, 2019 | $45.72 | $370,902.84 |
| Daily Earnings Credit | June 8, 2019 | $45.72 | $370,857.12 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | June 7, 2019 | $45.71 | $370,811.40 |
| Daily Earnings Credit | June 6, 2019 | $45.71 | $370,765.69 |
| Daily Earnings Credit | June 5, 2019 | $45.70 | $370,719.98 |
| Daily Earnings Credit | June 4, 2019 | $45.69 | $370,674.29 |
| Daily Earnings Credit | June 3, 2019 | $45.69 | $370,628.59 |
| Daily Earnings Credit | June 2, 2019 | $45.68 | $370,582.90 |
| Daily Earnings Credit | June 1, 2019 | $45.68 | $370,537.22 |
| Daily Earnings Credit | May 31, 2019 | $45.67 | $370,491.54 |
| Daily Earnings Credit | May 30, 2019 | $45.67 | $370,445.87 |
| Daily Earnings Credit | May 29, 2019 | $45.66 | $370,400.21 |
| Daily Earnings Credit | May 28, 2019 | $45.65 | $370,354.55 |
| Daily Earnings Credit | May 27, 2019 | $45.65 | $370,308.89 |
| Daily Earnings Credit | May 26, 2019 | $45.64 | $370,263.24 |
| Daily Earnings Credit | May 25, 2019 | $45.64 | $370,217.60 |
| Daily Earnings Credit | May 24, 2019 | $45.63 | $370,171.96 |
| Daily Earnings Credit | May 23, 2019 | $45.63 | $370,126.33 |
| Daily Earnings Credit | May 22, 2019 | $45.62 | $370,080.70 |
| Daily Earnings Credit | May 21, 2019 | $45.62 | $370,035.08 |
| Daily Earnings Credit | May 20, 2019 | $45.61 | $369,989.47 |
| Daily Earnings Credit | May 19, 2019 | $45.60 | $369,943.86 |
| Daily Earnings Credit | May 18, 2019 | $45.60 | $369,898.25 |
| Daily Earnings Credit | May 17, 2019 | $45.59 | $369,852.66 |
| Daily Earnings Credit | May 16, 2019 | $45.59 | $369,807.06 |
| Daily Earnings Credit | May 15, 2019 | $45.58 | $369,761.48 |
| Daily Earnings Credit | May 14, 2019 | $45.58 | $369,715.89 |
| Daily Earnings Credit | May 13, 2019 | $45.57 | $369,670.32 |
| Daily Earnings Credit | May 12, 2019 | $45.56 | $369,624.75 |
| Daily Earnings Credit | May 11, 2019 | $45.56 | $369,579.18 |
| Daily Earnings Credit | May 10, 2019 | $45.55 | $369,533.62 |
| Daily Earnings Credit | May 9, 2019 | $45.55 | $369,488.07 |
| Daily Earnings Credit | May 8, 2019 | $45.54 | $369,442.52 |
| Daily Earnings Credit | May 7, 2019 | $45.54 | $369,396.98 |
| Daily Earnings Credit | May 6, 2019 | $45.53 | $369,351.45 |
| Daily Earnings Credit | May 5, 2019 | $45.53 | $369,305.91 |
| Daily Earnings Credit | May 4, 2019 | $45.52 | $369,260.39 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | May 3, 2019 | $45.51 | $369,214.87 |
| Daily Earnings Credit | May 2, 2019 | $45.51 | $369,169.36 |
| Daily Earnings Credit | May 1, 2019 | $45.50 | $369,123.85 |
| Daily Earnings Credit | April 30, 2019 | $45.50 | $369,078.34 |
| Daily Earnings Credit | April 29, 2019 | $45.49 | $369,032.85 |
| Daily Earnings Credit | April 28, 2019 | $45.49 | $368,987.36 |
| Daily Earnings Credit | April 27, 2019 | $45.48 | $368,941.87 |
| Daily Earnings Credit | April 26, 2019 | $45.47 | $368,896.39 |
| Daily Earnings Credit | April 25, 2019 | $45.47 | $368,850.91 |
| Daily Earnings Credit | April 24, 2019 | $45.46 | $368,805.45 |
| Daily Earnings Credit | April 23, 2019 | $45.46 | $368,759.98 |
| Daily Earnings Credit | April 22, 2019 | $45.45 | $368,714.52 |
| Daily Earnings Credit | April 21, 2019 | $45.45 | $368,669.07 |
| Daily Earnings Credit | April 20, 2019 | $45.44 | $368,623.62 |
| Daily Earnings Credit | April 19, 2019 | $45.44 | $368,578.18 |
| Daily Earnings Credit | April 18, 2019 | $45.43 | $368,532.75 |
| Daily Earnings Credit | April 17, 2019 | $45.42 | $368,487.32 |
| Daily Earnings Credit | April 16, 2019 | $45.42 | $368,441.89 |
| Daily Earnings Credit | April 15, 2019 | $45.41 | $368,396.47 |
| Daily Earnings Credit | April 14, 2019 | $45.41 | $368,351.06 |
| Daily Earnings Credit | April 13, 2019 | $45.40 | $368,305.65 |
| Daily Earnings Credit | April 12, 2019 | $45.40 | $368,260.25 |
| Daily Earnings Credit | April 11, 2019 | $45.39 | $368,214.86 |
| Daily Earnings Credit | April 10, 2019 | $45.39 | $368,169.46 |
| Daily Earnings Credit | April 9, 2019 | $45.38 | $368,124.08 |
| Daily Earnings Credit | April 8, 2019 | $45.37 | $368,078.70 |
| Daily Earnings Credit | April 7, 2019 | $45.37 | $368,033.33 |
| Daily Earnings Credit | April 6, 2019 | $45.36 | $367,987.96 |
| Daily Earnings Credit | April 5, 2019 | $45.36 | $367,942.59 |
| Daily Earnings Credit | April 4, 2019 | $45.35 | $367,897.24 |
| Daily Earnings Credit | April 3, 2019 | $45.35 | $367,851.89 |
| Daily Earnings Credit | April 2, 2019 | $45.34 | $367,806.54 |
| Daily Earnings Credit | April 1, 2019 | $45.33 | $367,761.20 |
| Daily Earnings Credit | March 31, 2019 | $45.33 | $367,715.86 |
| Daily Earnings Credit | March 30, 2019 | $45.32 | $367,670.54 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | March 29, 2019 | $45.32 | $367,625.21 |
| Daily Earnings Credit | March 28, 2019 | $45.31 | $367,579.89 |
| Daily Earnings Credit | March 27, 2019 | $45.31 | $367,534.58 |
| Daily Earnings Credit | March 26, 2019 | $45.30 | $367,489.27 |
| Daily Earnings Credit | March 25, 2019 | $45.30 | $367,443.97 |
| Daily Earnings Credit | March 24, 2019 | $45.29 | $367,398.68 |
| Daily Earnings Credit | March 23, 2019 | $45.28 | $367,353.39 |
| Daily Earnings Credit | March 22, 2019 | $45.28 | $367,308.10 |
| Daily Earnings Credit | March 21, 2019 | $45.27 | $367,262.82 |
| Daily Earnings Credit | March 20, 2019 | $45.27 | $367,217.55 |
| Daily Earnings Credit | March 19, 2019 | $45.26 | $367,172.28 |
| Daily Earnings Credit | March 18, 2019 | $45.26 | $367,127.02 |
| Daily Earnings Credit | March 17, 2019 | $45.25 | $367,081.76 |
| Daily Earnings Credit | March 16, 2019 | $45.25 | $367,036.51 |
| Daily Earnings Credit | March 15, 2019 | $45.24 | $366,991.27 |
| Daily Earnings Credit | March 14, 2019 | $45.23 | $366,946.03 |
| Daily Earnings Credit | March 13, 2019 | $45.23 | $366,900.79 |
| Daily Earnings Credit | March 12, 2019 | $45.22 | $366,855.56 |
| Daily Earnings Credit | March 11, 2019 | $45.22 | $366,810.34 |
| Daily Earnings Credit | March 10, 2019 | $45.21 | $366,765.12 |
| Daily Earnings Credit | March 9, 2019 | $45.21 | $366,719.91 |
| Daily Earnings Credit | March 8, 2019 | $45.20 | $366,674.70 |
| Daily Earnings Credit | March 7, 2019 | $45.20 | $366,629.50 |
| Daily Earnings Credit | March 6, 2019 | $45.19 | $366,584.31 |
| Daily Earnings Credit | March 5, 2019 | $45.18 | $366,539.12 |
| Daily Earnings Credit | March 4, 2019 | $45.18 | $366,493.93 |
| Daily Earnings Credit | March 3, 2019 | $45.17 | $366,448.76 |
| Daily Earnings Credit | March 2, 2019 | $45.17 | $366,403.58 |
| Daily Earnings Credit | March 1, 2019 | $45.16 | $366,358.42 |
| Daily Earnings Credit | February 28, 2019 | $45.16 | $366,313.25 |
| Daily Earnings Credit | February 27, 2019 | $45.15 | $366,268.10 |
| Daily Earnings Credit | February 26, 2019 | $45.15 | $366,222.95 |
| Daily Earnings Credit | February 25, 2019 | $45.14 | $366,177.80 |
| Daily Earnings Credit | February 24, 2019 | $45.13 | $366,132.66 |
| Daily Earnings Credit | February 23, 2019 | $45.13 | $366,087.53 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | February 22, 2019 | $45.12 | $366,042.40 |
| Daily Earnings Credit | February 21, 2019 | $45.12 | $365,997.28 |
| Daily Earnings Credit | February 20, 2019 | $45.11 | $365,952.16 |
| Daily Earnings Credit | February 19, 2019 | $45.11 | $365,907.05 |
| Daily Earnings Credit | February 18, 2019 | $45.10 | $365,861.94 |
| Daily Earnings Credit | February 17, 2019 | $45.10 | $365,816.84 |
| Daily Earnings Credit | February 16, 2019 | $45.09 | $365,771.74 |
| Daily Earnings Credit | February 15, 2019 | $45.08 | $365,726.65 |
| Daily Earnings Credit | February 14, 2019 | $45.08 | $365,681.57 |
| Daily Earnings Credit | February 13, 2019 | $45.07 | $365,636.49 |
| Daily Earnings Credit | February 12, 2019 | $45.07 | $365,591.42 |
| Daily Earnings Credit | February 11, 2019 | $45.06 | $365,546.35 |
| Daily Earnings Credit | February 10, 2019 | $45.06 | $365,501.29 |
| Daily Earnings Credit | February 9, 2019 | $45.05 | $365,456.23 |
| Daily Earnings Credit | February 8, 2019 | $45.05 | $365,411.18 |
| Daily Earnings Credit | February 7, 2019 | $45.04 | $365,366.14 |
| Daily Earnings Credit | February 6, 2019 | $45.03 | $365,321.10 |
| Daily Earnings Credit | February 5, 2019 | $45.03 | $365,276.06 |
| Daily Earnings Credit | February 4, 2019 | $45.02 | $365,231.04 |
| Daily Earnings Credit | February 3, 2019 | $45.02 | $365,186.01 |
| Daily Earnings Credit | February 2, 2019 | $45.01 | $365,141.00 |
| Daily Earnings Credit | February 1, 2019 | $45.01 | $365,095.98 |
| Daily Earnings Credit | January 31, 2019 | $45.00 | $365,050.98 |
| Daily Earnings Credit | January 30, 2019 | $45.00 | $365,005.98 |
| Daily Earnings Credit | January 29, 2019 | $44.99 | $364,960.98 |
| Daily Earnings Credit | January 28, 2019 | $44.98 | $364,915.99 |
| Daily Earnings Credit | January 27, 2019 | $44.98 | $364,871.01 |
| Daily Earnings Credit | January 26, 2019 | $44.97 | $364,826.03 |
| Daily Earnings Credit | January 25, 2019 | $44.97 | $364,781.06 |
| Daily Earnings Credit | January 24, 2019 | $44.96 | $364,736.09 |
| Daily Earnings Credit | January 23, 2019 | $44.96 | $364,691.13 |
| Daily Earnings Credit | January 22, 2019 | $44.95 | $364,646.17 |
| Daily Earnings Credit | January 21, 2019 | $44.95 | $364,601.22 |
| Daily Earnings Credit | January 20, 2019 | $44.94 | $364,556.27 |
| Daily Earnings Credit | January 19, 2019 | $44.93 | $364,511.33 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | January 18, 2019 | $44.93 | $364,466.40 |
| Daily Earnings Credit | January 17, 2019 | $44.92 | $364,421.47 |
| Daily Earnings Credit | January 16, 2019 | $44.92 | $364,376.55 |
| Daily Earnings Credit | January 15, 2019 | $44.91 | $364,331.63 |
| Daily Earnings Credit | January 14, 2019 | $44.91 | $364,286.72 |
| Daily Earnings Credit | January 13, 2019 | $44.90 | $364,241.81 |
| Daily Earnings Credit | January 12, 2019 | $44.90 | $364,196.91 |
| Daily Earnings Credit | January 11, 2019 | $44.89 | $364,152.02 |
| Daily Earnings Credit | January 10, 2019 | $44.88 | $364,107.13 |
| Daily Earnings Credit | January 9, 2019 | $44.88 | $364,062.24 |
| Daily Earnings Credit | January 8, 2019 | $44.87 | $364,017.36 |
| Daily Earnings Credit | January 7, 2019 | $44.87 | $363,972.49 |
| Daily Earnings Credit | January 6, 2019 | $44.86 | $363,927.62 |
| Daily Earnings Credit | January 5, 2019 | $44.86 | $363,882.76 |
| Daily Earnings Credit | January 4, 2019 | $44.85 | $363,837.90 |
| Daily Earnings Credit | January 3, 2019 | $44.85 | $363,793.05 |
| Daily Earnings Credit | January 2, 2019 | $44.84 | $363,748.21 |
| Daily Earnings Credit | January 1, 2019 | $44.83 | $363,703.37 |
| Daily Earnings Credit | December 31, 2018 | $44.83 | $363,658.53 |
| Daily Earnings Credit | December 30, 2018 | $44.82 | $363,613.70 |
| Daily Earnings Credit | December 29, 2018 | $44.82 | $363,568.88 |
| Daily Earnings Credit | December 28, 2018 | $44.81 | $363,524.06 |
| Daily Earnings Credit | December 27, 2018 | $44.81 | $363,479.25 |
| Daily Earnings Credit | December 26, 2018 | $44.80 | $363,434.44 |
| Daily Earnings Credit | December 25, 2018 | $44.80 | $363,389.64 |
| Daily Earnings Credit | December 24, 2018 | $44.79 | $363,344.84 |
| Daily Earnings Credit | December 23, 2018 | $44.78 | $363,300.05 |
| Daily Earnings Credit | December 22, 2018 | $44.78 | $363,255.27 |
| Daily Earnings Credit | December 21, 2018 | $44.77 | $363,210.49 |
| Daily Earnings Credit | December 20, 2018 | $44.77 | $363,165.71 |
| Daily Earnings Credit | December 19, 2018 | $44.76 | $363,120.95 |
| Daily Earnings Credit | December 18, 2018 | $44.76 | $363,076.18 |
| Daily Earnings Credit | December 17, 2018 | $44.75 | $363,031.43 |
| Daily Earnings Credit | December 16, 2018 | $44.75 | $362,986.67 |
| Daily Earnings Credit | December 15, 2018 | $44.74 | $362,941.93 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | December 14, 2018 | $44.74 | $362,897.19 |
| Daily Earnings Credit | December 13, 2018 | $44.73 | $362,852.45 |
| Daily Earnings Credit | December 12, 2018 | $44.72 | $362,807.72 |
| Daily Earnings Credit | December 11, 2018 | $44.72 | $362,763.00 |
| Daily Earnings Credit | December 10, 2018 | $44.71 | $362,718.28 |
| Daily Earnings Credit | December 9, 2018 | $44.71 | $362,673.57 |
| Daily Earnings Credit | December 8, 2018 | $44.70 | $362,628.86 |
| Daily Earnings Credit | December 7, 2018 | $44.70 | $362,584.16 |
| Daily Earnings Credit | December 6, 2018 | $44.69 | $362,539.46 |
| Daily Earnings Credit | December 5, 2018 | $44.69 | $362,494.77 |
| Daily Earnings Credit | December 4, 2018 | $44.68 | $362,450.08 |
| Daily Earnings Credit | December 3, 2018 | $44.67 | $362,405.40 |
| Daily Earnings Credit | December 2, 2018 | $44.67 | $362,360.73 |
| Daily Earnings Credit | December 1, 2018 | $44.66 | $362,316.06 |
| Daily Earnings Credit | November 30, 2018 | $44.66 | $362,271.40 |
| Daily Earnings Credit | November 29, 2018 | $44.65 | $362,226.74 |
| Daily Earnings Credit | November 28, 2018 | $44.65 | $362,182.08 |
| Daily Earnings Credit | November 27, 2018 | $44.64 | $362,137.44 |
| Daily Earnings Credit | November 26, 2018 | $44.64 | $362,092.80 |
| Daily Earnings Credit | November 25, 2018 | $44.63 | $362,048.16 |
| Daily Earnings Credit | November 24, 2018 | $44.63 | $362,003.53 |
| Daily Earnings Credit | November 23, 2018 | $44.62 | $361,958.90 |
| Daily Earnings Credit | November 22, 2018 | $44.61 | $361,914.28 |
| Daily Earnings Credit | November 21, 2018 | $44.61 | $361,869.67 |
| Daily Earnings Credit | November 20, 2018 | $44.60 | $361,825.06 |
| Daily Earnings Credit | November 19, 2018 | $44.60 | $361,780.46 |
| Daily Earnings Credit | November 18, 2018 | $44.59 | $361,735.86 |
| Daily Earnings Credit | November 17, 2018 | $44.59 | $361,691.27 |
| Daily Earnings Credit | November 16, 2018 | $44.58 | $361,646.68 |
| Daily Earnings Credit | November 15, 2018 | $44.58 | $361,602.10 |
| Daily Earnings Credit | November 14, 2018 | $44.57 | $361,557.53 |
| Daily Earnings Credit | November 13, 2018 | $44.56 | $361,512.96 |
| Daily Earnings Credit | November 12, 2018 | $44.56 | $361,468.39 |
| Daily Earnings Credit | November 11, 2018 | $44.55 | $361,423.83 |
| Daily Earnings Credit | November 10, 2018 | $44.55 | $361,379.28 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | November 9, 2018 | $44.54 | $361,334.73 |
| Daily Earnings Credit | November 8, 2018 | $44.54 | $361,290.19 |
| Daily Earnings Credit | November 7, 2018 | $44.53 | $361,245.65 |
| Daily Earnings Credit | November 6, 2018 | $44.53 | $361,201.12 |
| Daily Earnings Credit | November 5, 2018 | $44.52 | $361,156.59 |
| Daily Earnings Credit | November 4, 2018 | $44.52 | $361,112.07 |
| Daily Earnings Credit | November 3, 2018 | $44.51 | $361,067.56 |
| Daily Earnings Credit | November 2, 2018 | $44.50 | $361,023.05 |
| Daily Earnings Credit | November 1, 2018 | $44.50 | $360,978.54 |
| Daily Earnings Credit | October 31, 2018 | $44.49 | $360,934.04 |
| Daily Earnings Credit | October 30, 2018 | $44.49 | $360,889.55 |
| Daily Earnings Credit | October 29, 2018 | $44.48 | $360,845.06 |
| Daily Earnings Credit | October 28, 2018 | $44.48 | $360,800.58 |
| Daily Earnings Credit | October 27, 2018 | $44.47 | $360,756.10 |
| Daily Earnings Credit | October 26, 2018 | $44.47 | $360,711.63 |
| Daily Earnings Credit | October 25, 2018 | $44.46 | $360,667.17 |
| Daily Earnings Credit | October 24, 2018 | $44.45 | $360,622.71 |
| Daily Earnings Credit | October 23, 2018 | $44.45 | $360,578.25 |
| Daily Earnings Credit | October 22, 2018 | $44.44 | $360,533.80 |
| Daily Earnings Credit | October 21, 2018 | $44.44 | $360,489.36 |
| Daily Earnings Credit | October 20, 2018 | $44.43 | $360,444.92 |
| Daily Earnings Credit | October 19, 2018 | $44.43 | $360,400.49 |
| Daily Earnings Credit | October 18, 2018 | $44.42 | $360,356.06 |
| Daily Earnings Credit | October 17, 2018 | $44.42 | $360,311.64 |
| Daily Earnings Credit | October 16, 2018 | $44.41 | $360,267.22 |
| Daily Earnings Credit | October 15, 2018 | $44.41 | $360,222.81 |
| Daily Earnings Credit | October 14, 2018 | $44.40 | $360,178.40 |
| Daily Earnings Credit | October 13, 2018 | $44.39 | $360,134.00 |
| Daily Earnings Credit | October 12, 2018 | $44.39 | $360,089.61 |
| Daily Earnings Credit | October 11, 2018 | $44.38 | $360,045.22 |
| Daily Earnings Credit | October 10, 2018 | $44.38 | $360,000.84 |
| Daily Earnings Credit | October 9, 2018 | $44.37 | $359,956.46 |
| Daily Earnings Credit | October 8, 2018 | $44.37 | $359,912.09 |
| Daily Earnings Credit | October 7, 2018 | $44.36 | $359,867.72 |
| Daily Earnings Credit | October 6, 2018 | $44.36 | $359,823.36 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | October 5, 2018 | $44.35 | $359,779.00 |
| Daily Earnings Credit | October 4, 2018 | $44.35 | $359,734.65 |
| Daily Earnings Credit | October 3, 2018 | $44.34 | $359,690.30 |
| Daily Earnings Credit | October 2, 2018 | $44.33 | $359,645.96 |
| Daily Earnings Credit | October 1, 2018 | $44.33 | $359,601.63 |
| Daily Earnings Credit | September 30, 2018 | $44.32 | $359,557.30 |
| Daily Earnings Credit | September 29, 2018 | $44.32 | $359,512.98 |
| Daily Earnings Credit | September 28, 2018 | $44.31 | $359,468.66 |
| Daily Earnings Credit | September 27, 2018 | $44.31 | $359,424.35 |
| Daily Earnings Credit | September 26, 2018 | $44.30 | $359,380.04 |
| Daily Earnings Credit | September 25, 2018 | $44.30 | $359,335.74 |
| Daily Earnings Credit | September 24, 2018 | $44.29 | $359,291.44 |
| Daily Earnings Credit | September 23, 2018 | $44.29 | $359,247.15 |
| Daily Earnings Credit | September 22, 2018 | $44.28 | $359,202.86 |
| Daily Earnings Credit | September 21, 2018 | $44.27 | $359,158.58 |
| Daily Earnings Credit | September 20, 2018 | $44.27 | $359,114.31 |
| Daily Earnings Credit | September 19, 2018 | $44.26 | $359,070.04 |
| Daily Earnings Credit | September 18, 2018 | $44.26 | $359,025.78 |
| Daily Earnings Credit | September 17, 2018 | $44.25 | $358,981.52 |
| Daily Earnings Credit | September 16, 2018 | $44.25 | $358,937.27 |
| Daily Earnings Credit | September 15, 2018 | $44.24 | $358,893.02 |
| Daily Earnings Credit | September 14, 2018 | $44.24 | $358,848.78 |
| Daily Earnings Credit | September 13, 2018 | $44.23 | $358,804.54 |
| Daily Earnings Credit | September 12, 2018 | $44.23 | $358,760.31 |
| Daily Earnings Credit | September 11, 2018 | $44.22 | $358,716.08 |
| Daily Earnings Credit | September 10, 2018 | $44.21 | $358,671.86 |
| Daily Earnings Credit | September 9, 2018 | $44.21 | $358,627.65 |
| Daily Earnings Credit | September 8, 2018 | $44.20 | $358,583.44 |
| Daily Earnings Credit | September 7, 2018 | $44.20 | $358,539.24 |
| Daily Earnings Credit | September 6, 2018 | $44.19 | $358,495.04 |
| Daily Earnings Credit | September 5, 2018 | $44.19 | $358,450.85 |
| Daily Earnings Credit | September 4, 2018 | $44.18 | $358,406.66 |
| Daily Earnings Credit | September 3, 2018 | $44.18 | $358,362.48 |
| Daily Earnings Credit | September 2, 2018 | $44.17 | $358,318.30 |
| Daily Earnings Credit | September 1, 2018 | $44.17 | $358,274.13 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | August 31, 2018 | $44.16 | $358,229.96 |
| Daily Earnings Credit | August 30, 2018 | $44.15 | $358,185.80 |
| Daily Earnings Credit | August 29, 2018 | $44.15 | $358,141.65 |
| Daily Earnings Credit | August 28, 2018 | $44.14 | $358,097.50 |
| Daily Earnings Credit | August 27, 2018 | $44.14 | $358,053.36 |
| Daily Earnings Credit | August 26, 2018 | $44.13 | $358,009.22 |
| Daily Earnings Credit | August 25, 2018 | $44.13 | $357,965.09 |
| Daily Earnings Credit | August 24, 2018 | $44.12 | $357,920.96 |
| Daily Earnings Credit | August 23, 2018 | $44.12 | $357,876.84 |
| Daily Earnings Credit | August 22, 2018 | $44.11 | $357,832.72 |
| Daily Earnings Credit | August 21, 2018 | $44.11 | $357,788.61 |
| Daily Earnings Credit | August 20, 2018 | $44.10 | $357,744.50 |
| Daily Earnings Credit | August 19, 2018 | $44.09 | $357,700.40 |
| Daily Earnings Credit | August 18, 2018 | $44.09 | $357,656.31 |
| Daily Earnings Credit | August 17, 2018 | $44.08 | $357,612.22 |
| Daily Earnings Credit | August 16, 2018 | $44.08 | $357,568.14 |
| Daily Earnings Credit | August 15, 2018 | $44.07 | $357,524.06 |
| Daily Earnings Credit | August 14, 2018 | $44.07 | $357,479.99 |
| Daily Earnings Credit | August 13, 2018 | $44.06 | $357,435.92 |
| Daily Earnings Credit | August 12, 2018 | $44.06 | $357,391.86 |
| Daily Earnings Credit | August 11, 2018 | $44.05 | $357,347.80 |
| Daily Earnings Credit | August 10, 2018 | $44.05 | $357,303.75 |
| Daily Earnings Credit | August 9, 2018 | $44.04 | $357,259.70 |
| Daily Earnings Credit | August 8, 2018 | $44.03 | $357,215.66 |
| Daily Earnings Credit | August 7, 2018 | $44.03 | $357,171.63 |
| Daily Earnings Credit | August 6, 2018 | $44.02 | $357,127.60 |
| Daily Earnings Credit | August 5, 2018 | $44.02 | $357,083.58 |
| Daily Earnings Credit | August 4, 2018 | $44.01 | $357,039.56 |
| Daily Earnings Credit | August 3, 2018 | $44.01 | $356,995.55 |
| Daily Earnings Credit | August 2, 2018 | $44.00 | $356,951.54 |
| Daily Earnings Credit | August 1, 2018 | $44.00 | $356,907.54 |
| Daily Earnings Credit | July 31, 2018 | $43.99 | $356,863.54 |
| Daily Earnings Credit | July 30, 2018 | $43.99 | $356,819.55 |
| Daily Earnings Credit | July 29, 2018 | $43.98 | $356,775.56 |
| Daily Earnings Credit | July 28, 2018 | $43.98 | $356,731.58 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | July 27, 2018 | $43.97 | $356,687.60 |
| Daily Earnings Credit | July 26, 2018 | $43.96 | $356,643.63 |
| Daily Earnings Credit | July 25, 2018 | $43.96 | $356,599.67 |
| Daily Earnings Credit | July 24, 2018 | $43.95 | $356,555.71 |
| Daily Earnings Credit | July 23, 2018 | $43.95 | $356,511.76 |
| Daily Earnings Credit | July 22, 2018 | $43.94 | $356,467.81 |
| Daily Earnings Credit | July 21, 2018 | $43.94 | $356,423.87 |
| Daily Earnings Credit | July 20, 2018 | $43.93 | $356,379.93 |
| Daily Earnings Credit | July 19, 2018 | $43.93 | $356,336.00 |
| Daily Earnings Credit | July 18, 2018 | $43.92 | $356,292.07 |
| Daily Earnings Credit | July 17, 2018 | $43.92 | $356,248.15 |
| Daily Earnings Credit | July 16, 2018 | $43.91 | $356,204.23 |
| Daily Earnings Credit | July 15, 2018 | $43.90 | $356,160.32 |
| Daily Earnings Credit | July 14, 2018 | $43.90 | $356,116.42 |
| Daily Earnings Credit | July 13, 2018 | $43.89 | $356,072.52 |
| Daily Earnings Credit | July 12, 2018 | $43.89 | $356,028.63 |
| Daily Earnings Credit | July 11, 2018 | $43.88 | $355,984.74 |
| Daily Earnings Credit | July 10, 2018 | $43.88 | $355,940.86 |
| Daily Earnings Credit | July 9, 2018 | $43.87 | $355,896.98 |
| Daily Earnings Credit | July 8, 2018 | $43.87 | $355,853.11 |
| Daily Earnings Credit | July 7, 2018 | $43.86 | $355,809.24 |
| Daily Earnings Credit | July 6, 2018 | $43.86 | $355,765.38 |
| Daily Earnings Credit | July 5, 2018 | $43.85 | $355,721.52 |
| Daily Earnings Credit | July 4, 2018 | $43.85 | $355,677.67 |
| Daily Earnings Credit | July 3, 2018 | $43.84 | $355,633.82 |
| Daily Earnings Credit | July 2, 2018 | $43.83 | $355,589.98 |
| Daily Earnings Credit | July 1, 2018 | $43.83 | $355,546.15 |
| Daily Earnings Credit | June 30, 2018 | $43.82 | $355,502.32 |
| Daily Earnings Credit | June 29, 2018 | $43.82 | $355,458.50 |
| Daily Earnings Credit | June 28, 2018 | $43.81 | $355,414.68 |
| Daily Earnings Credit | June 27, 2018 | $43.81 | $355,370.87 |
| Daily Earnings Credit | June 26, 2018 | $43.80 | $355,327.06 |
| Daily Earnings Credit | June 25, 2018 | $43.80 | $355,283.26 |
| Daily Earnings Credit | June 24, 2018 | $43.79 | $355,239.46 |
| Daily Earnings Credit | June 23, 2018 | $43.79 | $355,195.67 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | June 22, 2018 | $43.78 | $355,151.88 |
| Daily Earnings Credit | June 21, 2018 | $43.78 | $355,108.10 |
| Daily Earnings Credit | June 20, 2018 | $43.77 | $355,064.32 |
| Daily Earnings Credit | June 19, 2018 | $43.76 | $355,020.55 |
| Daily Earnings Credit | June 18, 2018 | $43.76 | $354,976.79 |
| Daily Earnings Credit | June 17, 2018 | $43.75 | $354,933.03 |
| Daily Earnings Credit | June 16, 2018 | $43.75 | $354,889.28 |
| Daily Earnings Credit | June 15, 2018 | $43.74 | $354,845.53 |
| Daily Earnings Credit | June 14, 2018 | $43.74 | $354,801.79 |
| Daily Earnings Credit | June 13, 2018 | $43.73 | $354,758.05 |
| Daily Earnings Credit | June 12, 2018 | $43.73 | $354,714.32 |
| Daily Earnings Credit | June 11, 2018 | $43.72 | $354,670.59 |
| Daily Earnings Credit | June 10, 2018 | $43.72 | $354,626.87 |
| Daily Earnings Credit | June 9, 2018 | $43.71 | $354,583.15 |
| Daily Earnings Credit | June 8, 2018 | $43.71 | $354,539.44 |
| Daily Earnings Credit | June 7, 2018 | $43.70 | $354,495.73 |
| Daily Earnings Credit | June 6, 2018 | $43.69 | $354,452.03 |
| Daily Earnings Credit | June 5, 2018 | $43.69 | $354,408.34 |
| Daily Earnings Credit | June 4, 2018 | $43.68 | $354,364.65 |
| Daily Earnings Credit | June 3, 2018 | $43.68 | $354,320.97 |
| Daily Earnings Credit | June 2, 2018 | $43.67 | $354,277.29 |
| Daily Earnings Credit | June 1, 2018 | $43.67 | $354,233.62 |
| Daily Earnings Credit | May 31, 2018 | $43.66 | $354,189.95 |
| Daily Earnings Credit | May 30, 2018 | $43.66 | $354,146.29 |
| Daily Earnings Credit | May 29, 2018 | $43.65 | $354,102.63 |
| Daily Earnings Credit | May 28, 2018 | $43.65 | $354,058.98 |
| Daily Earnings Credit | May 27, 2018 | $43.64 | $354,015.33 |
| Daily Earnings Credit | May 26, 2018 | $43.64 | $353,971.69 |
| Daily Earnings Credit | May 25, 2018 | $43.63 | $353,928.05 |
| Daily Earnings Credit | May 24, 2018 | $43.62 | $353,884.42 |
| Daily Earnings Credit | May 23, 2018 | $43.62 | $353,840.80 |
| Daily Earnings Credit | May 22, 2018 | $43.61 | $353,797.18 |
| Daily Earnings Credit | May 21, 2018 | $43.61 | $353,753.57 |
| Daily Earnings Credit | May 20, 2018 | $43.60 | $353,709.96 |
| Daily Earnings Credit | May 19, 2018 | $43.60 | $353,666.36 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | May 18, 2018 | $43.59 | $353,622.76 |
| Daily Earnings Credit | May 17, 2018 | $43.59 | $353,579.17 |
| Daily Earnings Credit | May 16, 2018 | $43.58 | $353,535.58 |
| Daily Earnings Credit | May 15, 2018 | $43.58 | $353,492.00 |
| Daily Earnings Credit | May 14, 2018 | $43.57 | $353,448.42 |
| Daily Earnings Credit | May 13, 2018 | $43.57 | $353,404.85 |
| Daily Earnings Credit | May 12, 2018 | $43.56 | $353,361.28 |
| Daily Earnings Credit | May 11, 2018 | $43.55 | $353,317.72 |
| Daily Earnings Credit | May 10, 2018 | $43.55 | $353,274.17 |
| Daily Earnings Credit | May 9, 2018 | $43.54 | $353,230.62 |
| Daily Earnings Credit | May 8, 2018 | $43.54 | $353,187.08 |
| Daily Earnings Credit | May 7, 2018 | $43.53 | $353,143.54 |
| Daily Earnings Credit | May 6, 2018 | $43.53 | $353,100.01 |
| Daily Earnings Credit | May 5, 2018 | $43.52 | $353,056.48 |
| Daily Earnings Credit | May 4, 2018 | $43.52 | $353,012.96 |
| Daily Earnings Credit | May 3, 2018 | $43.51 | $352,969.44 |
| Daily Earnings Credit | May 2, 2018 | $43.51 | $352,925.93 |
| Daily Earnings Credit | May 1, 2018 | $43.50 | $352,882.42 |
| Daily Earnings Credit | April 30, 2018 | $43.50 | $352,838.92 |
| Daily Earnings Credit | April 29, 2018 | $43.49 | $352,795.42 |
| Daily Earnings Credit | April 28, 2018 | $43.48 | $352,751.93 |
| Daily Earnings Credit | April 27, 2018 | $43.48 | $352,708.45 |
| Daily Earnings Credit | April 26, 2018 | $43.47 | $352,664.97 |
| Daily Earnings Credit | April 25, 2018 | $43.47 | $352,621.50 |
| Daily Earnings Credit | April 24, 2018 | $43.46 | $352,578.03 |
| Daily Earnings Credit | April 23, 2018 | $43.46 | $352,534.57 |
| Daily Earnings Credit | April 22, 2018 | $43.45 | $352,491.11 |
| Daily Earnings Credit | April 21, 2018 | $43.45 | $352,447.66 |
| Daily Earnings Credit | April 20, 2018 | $43.44 | $352,404.21 |
| Daily Earnings Credit | April 19, 2018 | $43.44 | $352,360.77 |
| Daily Earnings Credit | April 18, 2018 | $43.43 | $352,317.33 |
| Daily Earnings Credit | April 17, 2018 | $43.43 | $352,273.90 |
| Daily Earnings Credit | April 16, 2018 | $43.42 | $352,230.47 |
| Daily Earnings Credit | April 15, 2018 | $43.42 | $352,187.05 |
| Daily Earnings Credit | April 14, 2018 | $43.41 | $352,143.63 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | April 13, 2018 | $43.40 | $352,100.22 |
| Daily Earnings Credit | April 12, 2018 | $43.40 | $352,056.82 |
| Daily Earnings Credit | April 11, 2018 | $43.39 | $352,013.42 |
| Daily Earnings Credit | April 10, 2018 | $43.39 | $351,970.03 |
| Daily Earnings Credit | April 9, 2018 | $43.38 | $351,926.64 |
| Daily Earnings Credit | April 8, 2018 | $43.38 | $351,883.26 |
| Daily Earnings Credit | April 7, 2018 | $43.37 | $351,839.88 |
| Daily Earnings Credit | April 6, 2018 | $43.37 | $351,796.51 |
| Daily Earnings Credit | April 5, 2018 | $43.36 | $351,753.14 |
| Daily Earnings Credit | April 4, 2018 | $43.36 | $351,709.78 |
| Daily Earnings Credit | April 3, 2018 | $43.35 | $351,666.42 |
| Daily Earnings Credit | April 2, 2018 | $43.35 | $351,623.07 |
| Daily Earnings Credit | April 1, 2018 | $43.34 | $351,579.72 |
| Daily Earnings Credit | March 31, 2018 | $43.33 | $351,536.38 |
| Daily Earnings Credit | March 30, 2018 | $43.33 | $351,493.05 |
| Daily Earnings Credit | March 29, 2018 | $43.32 | $351,449.72 |
| Daily Earnings Credit | March 28, 2018 | $43.32 | $351,406.40 |
| Daily Earnings Credit | March 27, 2018 | $43.31 | $351,363.08 |
| Daily Earnings Credit | March 26, 2018 | $43.31 | $351,319.77 |
| Daily Earnings Credit | March 25, 2018 | $43.30 | $351,276.46 |
| Daily Earnings Credit | March 24, 2018 | $43.30 | $351,233.16 |
| Daily Earnings Credit | March 23, 2018 | $43.29 | $351,189.86 |
| Daily Earnings Credit | March 22, 2018 | $43.29 | $351,146.57 |
| Daily Earnings Credit | March 21, 2018 | $43.28 | $351,103.28 |
| Daily Earnings Credit | March 20, 2018 | $43.28 | $351,060.00 |
| Daily Earnings Credit | March 19, 2018 | $43.27 | $351,016.72 |
| Daily Earnings Credit | March 18, 2018 | $43.27 | $350,973.45 |
| Daily Earnings Credit | March 17, 2018 | $43.26 | $350,930.18 |
| Daily Earnings Credit | March 16, 2018 | $43.25 | $350,886.92 |
| Daily Earnings Credit | March 15, 2018 | $43.25 | $350,843.67 |
| Daily Earnings Credit | March 14, 2018 | $43.24 | $350,800.42 |
| Daily Earnings Credit | March 13, 2018 | $43.24 | $350,757.18 |
| Daily Earnings Credit | March 12, 2018 | $43.23 | $350,713.94 |
| Daily Earnings Credit | March 11, 2018 | $43.23 | $350,670.71 |
| Daily Earnings Credit | March 10, 2018 | $43.22 | $350,627.48 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | March 9, 2018 | $43.22 | $350,584.26 |
| Daily Earnings Credit | March 8, 2018 | $43.21 | $350,541.04 |
| Daily Earnings Credit | March 7, 2018 | $43.21 | $350,497.83 |
| Daily Earnings Credit | March 6, 2018 | $43.20 | $350,454.62 |
| Daily Earnings Credit | March 5, 2018 | $43.20 | $350,411.42 |
| Daily Earnings Credit | March 4, 2018 | $43.19 | $350,368.22 |
| Daily Earnings Credit | March 3, 2018 | $43.19 | $350,325.03 |
| Daily Earnings Credit | March 2, 2018 | $43.18 | $350,281.84 |
| Daily Earnings Credit | March 1, 2018 | $43.17 | $350,238.66 |
| Daily Earnings Credit | February 28, 2018 | $43.17 | $350,195.49 |
| Daily Earnings Credit | February 27, 2018 | $43.16 | $350,152.32 |
| Daily Earnings Credit | February 26, 2018 | $43.16 | $350,109.16 |
| Daily Earnings Credit | February 25, 2018 | $43.15 | $350,066.00 |
| Daily Earnings Credit | February 24, 2018 | $43.15 | $350,022.85 |
| Daily Earnings Credit | February 23, 2018 | $43.14 | $349,979.70 |
| Daily Earnings Credit | February 22, 2018 | $43.14 | $349,936.56 |
| Daily Earnings Credit | February 21, 2018 | $43.13 | $349,893.42 |
| Daily Earnings Credit | February 20, 2018 | $43.13 | $349,850.29 |
| Daily Earnings Credit | February 19, 2018 | $43.12 | $349,807.16 |
| Daily Earnings Credit | February 18, 2018 | $43.12 | $349,764.04 |
| Daily Earnings Credit | February 17, 2018 | $43.11 | $349,720.92 |
| Daily Earnings Credit | February 16, 2018 | $43.11 | $349,677.81 |
| Daily Earnings Credit | February 15, 2018 | $43.10 | $349,634.70 |
| Daily Earnings Credit | February 14, 2018 | $43.10 | $349,591.60 |
| Daily Earnings Credit | February 13, 2018 | $43.09 | $349,548.50 |
| Daily Earnings Credit | February 12, 2018 | $43.08 | $349,505.41 |
| Daily Earnings Credit | February 11, 2018 | $43.08 | $349,462.33 |
| Daily Earnings Credit | February 10, 2018 | $43.07 | $349,419.25 |
| Daily Earnings Credit | February 9, 2018 | $43.07 | $349,376.18 |
| Daily Earnings Credit | February 8, 2018 | $43.06 | $349,333.11 |
| Daily Earnings Credit | February 7, 2018 | $43.06 | $349,290.05 |
| Daily Earnings Credit | February 6, 2018 | $43.05 | $349,246.99 |
| Daily Earnings Credit | February 5, 2018 | $43.05 | $349,203.94 |
| Daily Earnings Credit | February 4, 2018 | $43.04 | $349,160.89 |
| Daily Earnings Credit | February 3, 2018 | $43.04 | $349,117.85 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | February 2, 2018 | $43.03 | $349,074.81 |
| Daily Earnings Credit | February 1, 2018 | $43.03 | $349,031.78 |
| Daily Earnings Credit | January 31, 2018 | $43.02 | $348,988.75 |
| Daily Earnings Credit | January 30, 2018 | $43.02 | $348,945.73 |
| Daily Earnings Credit | January 29, 2018 | $43.01 | $348,902.71 |
| Daily Earnings Credit | January 28, 2018 | $43.00 | $348,859.70 |
| Daily Earnings Credit | January 27, 2018 | $43.00 | $348,816.70 |
| Daily Earnings Credit | January 26, 2018 | $42.99 | $348,773.70 |
| Daily Earnings Credit | January 25, 2018 | $42.99 | $348,730.71 |
| Daily Earnings Credit | January 24, 2018 | $42.98 | $348,687.72 |
| Daily Earnings Credit | January 23, 2018 | $42.98 | $348,644.74 |
| Daily Earnings Credit | January 22, 2018 | $42.97 | $348,601.76 |
| Daily Earnings Credit | January 21, 2018 | $42.97 | $348,558.79 |
| Daily Earnings Credit | January 20, 2018 | $42.96 | $348,515.82 |
| Daily Earnings Credit | January 19, 2018 | $42.96 | $348,472.86 |
| Daily Earnings Credit | January 18, 2018 | $42.95 | $348,429.90 |
| Daily Earnings Credit | January 17, 2018 | $42.95 | $348,386.95 |
| Daily Earnings Credit | January 16, 2018 | $42.94 | $348,344.00 |
| Daily Earnings Credit | January 15, 2018 | $42.94 | $348,301.06 |
| Daily Earnings Credit | January 14, 2018 | $42.93 | $348,258.12 |
| Daily Earnings Credit | January 13, 2018 | $42.93 | $348,215.19 |
| Daily Earnings Credit | January 12, 2018 | $42.92 | $348,172.26 |
| Daily Earnings Credit | January 11, 2018 | $42.91 | $348,129.34 |
| Daily Earnings Credit | January 10, 2018 | $42.91 | $348,086.43 |
| Daily Earnings Credit | January 9, 2018 | $42.90 | $348,043.52 |
| Daily Earnings Credit | January 8, 2018 | $42.90 | $348,000.62 |
| Daily Earnings Credit | January 7, 2018 | $42.89 | $347,957.72 |
| Daily Earnings Credit | January 6, 2018 | $42.89 | $347,914.83 |
| Daily Earnings Credit | January 5, 2018 | $42.88 | $347,871.94 |
| Daily Earnings Credit | January 4, 2018 | $42.88 | $347,829.06 |
| Daily Earnings Credit | January 3, 2018 | $42.87 | $347,786.18 |
| Daily Earnings Credit | January 2, 2018 | $42.87 | $347,743.31 |
| Daily Earnings Credit | January 1, 2018 | $42.86 | $347,700.44 |
| Daily Earnings Credit | December 31, 2017 | $42.86 | $347,657.58 |
| Daily Earnings Credit | December 30, 2017 | $42.85 | $347,614.72 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | December 29, 2017 | $42.85 | $347,571.87 |
| Daily Earnings Credit | December 28, 2017 | $42.84 | $347,529.02 |
| Daily Earnings Credit | December 27, 2017 | $42.84 | $347,486.18 |
| Daily Earnings Credit | December 26, 2017 | $42.83 | $347,443.34 |
| Daily Earnings Credit | December 25, 2017 | $42.83 | $347,400.51 |
| Daily Earnings Credit | December 24, 2017 | $42.82 | $347,357.68 |
| Daily Earnings Credit | December 23, 2017 | $42.81 | $347,314.86 |
| Daily Earnings Credit | December 22, 2017 | $42.81 | $347,272.05 |
| Daily Earnings Credit | December 21, 2017 | $42.80 | $347,229.24 |
| Daily Earnings Credit | December 20, 2017 | $42.80 | $347,186.44 |
| Daily Earnings Credit | December 19, 2017 | $42.79 | $347,143.64 |
| Daily Earnings Credit | December 18, 2017 | $42.79 | $347,100.85 |
| Daily Earnings Credit | December 17, 2017 | $42.78 | $347,058.06 |
| Daily Earnings Credit | December 16, 2017 | $42.78 | $347,015.28 |
| Daily Earnings Credit | December 15, 2017 | $42.77 | $346,972.50 |
| Daily Earnings Credit | December 14, 2017 | $42.77 | $346,929.73 |
| Daily Earnings Credit | December 13, 2017 | $42.76 | $346,886.96 |
| Daily Earnings Credit | December 12, 2017 | $42.76 | $346,844.20 |
| Daily Earnings Credit | December 11, 2017 | $42.75 | $346,801.44 |
| Daily Earnings Credit | December 10, 2017 | $42.75 | $346,758.69 |
| Daily Earnings Credit | December 9, 2017 | $42.74 | $346,715.94 |
| Daily Earnings Credit | December 8, 2017 | $42.74 | $346,673.20 |
| Daily Earnings Credit | December 7, 2017 | $42.73 | $346,630.46 |
| Daily Earnings Credit | December 6, 2017 | $42.72 | $346,587.73 |
| Daily Earnings Credit | December 5, 2017 | $42.72 | $346,545.01 |
| Daily Earnings Credit | December 4, 2017 | $42.71 | $346,502.29 |
| Daily Earnings Credit | December 3, 2017 | $42.71 | $346,459.58 |
| Daily Earnings Credit | December 2, 2017 | $42.70 | $346,416.87 |
| Daily Earnings Credit | December 1, 2017 | $42.70 | $346,374.17 |
| Daily Earnings Credit | November 30, 2017 | $42.69 | $346,331.47 |
| Daily Earnings Credit | November 29, 2017 | $42.69 | $346,288.78 |
| Daily Earnings Credit | November 28, 2017 | $42.68 | $346,246.09 |
| Daily Earnings Credit | November 27, 2017 | $42.68 | $346,203.41 |
| Daily Earnings Credit | November 26, 2017 | $42.67 | $346,160.73 |
| Daily Earnings Credit | November 25, 2017 | $42.67 | $346,118.06 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | November 24, 2017 | $42.66 | $346,075.39 |
| Daily Earnings Credit | November 23, 2017 | $42.66 | $346,032.73 |
| Daily Earnings Credit | November 22, 2017 | $42.65 | $345,990.07 |
| Daily Earnings Credit | November 21, 2017 | $42.65 | $345,947.42 |
| Daily Earnings Credit | November 20, 2017 | $42.64 | $345,904.77 |
| Daily Earnings Credit | November 19, 2017 | $42.64 | $345,862.13 |
| Daily Earnings Credit | November 18, 2017 | $42.63 | $345,819.49 |
| Daily Earnings Credit | November 17, 2017 | $42.62 | $345,776.86 |
| Daily Earnings Credit | November 16, 2017 | $42.62 | $345,734.24 |
| Daily Earnings Credit | November 15, 2017 | $42.61 | $345,691.62 |
| Daily Earnings Credit | November 14, 2017 | $42.61 | $345,649.01 |
| Daily Earnings Credit | November 13, 2017 | $42.60 | $345,606.40 |
| Daily Earnings Credit | November 12, 2017 | $42.60 | $345,563.80 |
| Daily Earnings Credit | November 11, 2017 | $42.59 | $345,521.20 |
| Daily Earnings Credit | November 10, 2017 | $42.59 | $345,478.61 |
| Daily Earnings Credit | November 9, 2017 | $42.58 | $345,436.02 |
| Daily Earnings Credit | November 8, 2017 | $42.58 | $345,393.44 |
| Daily Earnings Credit | November 7, 2017 | $42.57 | $345,350.86 |
| Daily Earnings Credit | November 6, 2017 | $42.57 | $345,308.29 |
| Daily Earnings Credit | November 5, 2017 | $42.56 | $345,265.72 |
| Daily Earnings Credit | November 4, 2017 | $42.56 | $345,223.16 |
| Daily Earnings Credit | November 3, 2017 | $42.55 | $345,180.60 |
| Daily Earnings Credit | November 2, 2017 | $42.55 | $345,138.05 |
| Daily Earnings Credit | November 1, 2017 | $42.54 | $345,095.50 |
| Daily Earnings Credit | October 31, 2017 | $42.54 | $345,052.96 |
| Daily Earnings Credit | October 30, 2017 | $42.53 | $345,010.42 |
| Daily Earnings Credit | October 29, 2017 | $42.53 | $344,967.89 |
| Daily Earnings Credit | October 28, 2017 | $42.52 | $344,925.36 |
| Daily Earnings Credit | October 27, 2017 | $42.51 | $344,882.84 |
| Daily Earnings Credit | October 26, 2017 | $42.51 | $344,840.33 |
| Daily Earnings Credit | October 25, 2017 | $42.50 | $344,797.82 |
| Daily Earnings Credit | October 24, 2017 | $42.50 | $344,755.32 |
| Daily Earnings Credit | October 23, 2017 | $42.49 | $344,712.82 |
| Daily Earnings Credit | October 22, 2017 | $42.49 | $344,670.33 |
| Daily Earnings Credit | October 21, 2017 | $42.48 | $344,627.84 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | October 20, 2017 | $42.48 | $344,585.36 |
| Daily Earnings Credit | October 19, 2017 | $42.47 | $344,542.88 |
| Daily Earnings Credit | October 18, 2017 | $42.47 | $344,500.41 |
| Daily Earnings Credit | October 17, 2017 | $42.46 | $344,457.94 |
| Daily Earnings Credit | October 16, 2017 | $42.46 | $344,415.48 |
| Daily Earnings Credit | October 15, 2017 | $42.45 | $344,373.02 |
| Daily Earnings Credit | October 14, 2017 | $42.45 | $344,330.57 |
| Daily Earnings Credit | October 13, 2017 | $42.44 | $344,288.12 |
| Daily Earnings Credit | October 12, 2017 | $42.44 | $344,245.68 |
| Daily Earnings Credit | October 11, 2017 | $42.43 | $344,203.24 |
| Daily Earnings Credit | October 10, 2017 | $42.43 | $344,160.81 |
| Daily Earnings Credit | October 9, 2017 | $42.42 | $344,118.38 |
| Daily Earnings Credit | October 8, 2017 | $42.42 | $344,075.96 |
| Daily Earnings Credit | October 7, 2017 | $42.41 | $344,033.54 |
| Daily Earnings Credit | October 6, 2017 | $42.40 | $343,991.13 |
| Daily Earnings Credit | October 5, 2017 | $42.40 | $343,948.73 |
| Daily Earnings Credit | October 4, 2017 | $42.39 | $343,906.33 |
| Daily Earnings Credit | October 3, 2017 | $42.39 | $343,863.94 |
| Daily Earnings Credit | October 2, 2017 | $42.38 | $343,821.55 |
| Daily Earnings Credit | October 1, 2017 | $42.38 | $343,779.17 |
| Daily Earnings Credit | September 30, 2017 | $42.37 | $343,736.79 |
| Daily Earnings Credit | September 29, 2017 | $42.37 | $343,694.42 |
| Daily Earnings Credit | September 28, 2017 | $42.36 | $343,652.05 |
| Daily Earnings Credit | September 27, 2017 | $42.36 | $343,609.69 |
| Daily Earnings Credit | September 26, 2017 | $42.35 | $343,567.33 |
| Daily Earnings Credit | September 25, 2017 | $42.35 | $343,524.98 |
| Daily Earnings Credit | September 24, 2017 | $42.34 | $343,482.63 |
| Daily Earnings Credit | September 23, 2017 | $42.34 | $343,440.29 |
| Daily Earnings Credit | September 22, 2017 | $42.33 | $343,397.95 |
| Daily Earnings Credit | September 21, 2017 | $42.33 | $343,355.62 |
| Daily Earnings Credit | September 20, 2017 | $42.32 | $343,313.29 |
| Daily Earnings Credit | September 19, 2017 | $42.32 | $343,270.97 |
| Daily Earnings Credit | September 18, 2017 | $42.31 | $343,228.65 |
| Daily Earnings Credit | September 17, 2017 | $42.31 | $343,186.34 |
| Daily Earnings Credit | September 16, 2017 | $42.30 | $343,144.03 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | September 15, 2017 | $42.30 | $343,101.73 |
| Daily Earnings Credit | September 14, 2017 | $42.29 | $343,059.43 |
| Daily Earnings Credit | September 13, 2017 | $42.28 | $343,017.14 |
| Daily Earnings Credit | September 12, 2017 | $42.28 | $342,974.86 |
| Daily Earnings Credit | September 11, 2017 | $42.27 | $342,932.58 |
| Daily Earnings Credit | September 10, 2017 | $42.27 | $342,890.31 |
| Daily Earnings Credit | September 9, 2017 | $42.26 | $342,848.04 |
| Daily Earnings Credit | September 8, 2017 | $42.26 | $342,805.78 |
| Daily Earnings Credit | September 7, 2017 | $42.25 | $342,763.52 |
| Daily Earnings Credit | September 6, 2017 | $42.25 | $342,721.27 |
| Daily Earnings Credit | September 5, 2017 | $42.24 | $342,679.02 |
| Daily Earnings Credit | September 4, 2017 | $42.24 | $342,636.78 |
| Daily Earnings Credit | September 3, 2017 | $42.23 | $342,594.54 |
| Daily Earnings Credit | September 2, 2017 | $42.23 | $342,552.31 |
| Daily Earnings Credit | September 1, 2017 | $42.22 | $342,510.08 |
| Daily Earnings Credit | August 31, 2017 | $42.22 | $342,467.86 |
| Daily Earnings Credit | August 30, 2017 | $42.21 | $342,425.64 |
| Daily Earnings Credit | August 29, 2017 | $42.21 | $342,383.43 |
| Daily Earnings Credit | August 28, 2017 | $42.20 | $342,341.22 |
| Daily Earnings Credit | August 27, 2017 | $42.20 | $342,299.02 |
| Daily Earnings Credit | August 26, 2017 | $42.19 | $342,256.82 |
| Daily Earnings Credit | August 25, 2017 | $42.19 | $342,214.63 |
| Daily Earnings Credit | August 24, 2017 | $42.18 | $342,172.44 |
| Daily Earnings Credit | August 23, 2017 | $42.18 | $342,130.26 |
| Daily Earnings Credit | August 22, 2017 | $42.17 | $342,088.08 |
| Daily Earnings Credit | August 21, 2017 | $42.16 | $342,045.91 |
| Daily Earnings Credit | August 20, 2017 | $42.16 | $342,003.75 |
| Daily Earnings Credit | August 19, 2017 | $42.15 | $341,961.59 |
| Daily Earnings Credit | August 18, 2017 | $42.15 | $341,919.44 |
| Daily Earnings Credit | August 17, 2017 | $42.14 | $341,877.29 |
| Daily Earnings Credit | August 16, 2017 | $42.14 | $341,835.15 |
| Daily Earnings Credit | August 15, 2017 | $42.13 | $341,793.01 |
| Daily Earnings Credit | August 14, 2017 | $42.13 | $341,750.88 |
| Daily Earnings Credit | August 13, 2017 | $42.12 | $341,708.75 |
| Daily Earnings Credit | August 12, 2017 | $42.12 | $341,666.63 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | August 11, 2017 | $42.11 | $341,624.51 |
| Daily Earnings Credit | August 10, 2017 | $42.11 | $341,582.40 |
| Daily Earnings Credit | August 9, 2017 | $42.10 | $341,540.29 |
| Daily Earnings Credit | August 8, 2017 | $42.10 | $341,498.19 |
| Daily Earnings Credit | August 7, 2017 | $42.09 | $341,456.09 |
| Daily Earnings Credit | August 6, 2017 | $42.09 | $341,414.00 |
| Daily Earnings Credit | August 5, 2017 | $42.08 | $341,371.91 |
| Daily Earnings Credit | August 4, 2017 | $42.08 | $341,329.83 |
| Daily Earnings Credit | August 3, 2017 | $42.07 | $341,287.75 |
| Daily Earnings Credit | August 2, 2017 | $42.07 | $341,245.68 |
| Daily Earnings Credit | August 1, 2017 | $42.06 | $341,203.61 |
| Daily Earnings Credit | July 31, 2017 | $42.06 | $341,161.55 |
| Daily Earnings Credit | July 30, 2017 | $42.05 | $341,119.49 |
| Daily Earnings Credit | July 29, 2017 | $42.05 | $341,077.44 |
| Daily Earnings Credit | July 28, 2017 | $42.04 | $341,035.39 |
| Daily Earnings Credit | July 27, 2017 | $42.04 | $340,993.35 |
| Daily Earnings Credit | July 26, 2017 | $42.03 | $340,951.31 |
| Daily Earnings Credit | July 25, 2017 | $42.02 | $340,909.28 |
| Daily Earnings Credit | July 24, 2017 | $42.02 | $340,867.26 |
| Daily Earnings Credit | July 23, 2017 | $42.01 | $340,825.24 |
| Daily Earnings Credit | July 22, 2017 | $42.01 | $340,783.23 |
| Daily Earnings Credit | July 21, 2017 | $42.00 | $340,741.22 |
| Daily Earnings Credit | July 20, 2017 | $42.00 | $340,699.22 |
| Daily Earnings Credit | July 19, 2017 | $41.99 | $340,657.22 |
| Daily Earnings Credit | July 18, 2017 | $41.99 | $340,615.23 |
| Daily Earnings Credit | July 17, 2017 | $41.98 | $340,573.24 |
| Daily Earnings Credit | July 16, 2017 | $41.98 | $340,531.26 |
| Daily Earnings Credit | July 15, 2017 | $41.97 | $340,489.28 |
| Daily Earnings Credit | July 14, 2017 | $41.97 | $340,447.31 |
| Daily Earnings Credit | July 13, 2017 | $41.96 | $340,405.34 |
| Daily Earnings Credit | July 12, 2017 | $41.96 | $340,363.38 |
| Daily Earnings Credit | July 11, 2017 | $41.95 | $340,321.42 |
| Daily Earnings Credit | July 10, 2017 | $41.95 | $340,279.47 |
| Daily Earnings Credit | July 9, 2017 | $41.94 | $340,237.52 |
| Daily Earnings Credit | July 8, 2017 | $41.94 | $340,195.58 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | July 7, 2017 | $41.93 | $340,153.64 |
| Daily Earnings Credit | July 6, 2017 | $41.93 | $340,111.71 |
| Daily Earnings Credit | July 5, 2017 | $41.92 | $340,069.78 |
| Daily Earnings Credit | July 4, 2017 | $41.92 | $340,027.86 |
| Daily Earnings Credit | July 3, 2017 | $41.91 | $339,985.94 |
| Daily Earnings Credit | July 2, 2017 | $41.91 | $339,944.03 |
| Daily Earnings Credit | July 1, 2017 | $41.90 | $339,902.12 |
| Daily Earnings Credit | June 30, 2017 | $41.90 | $339,860.22 |
| Daily Earnings Credit | June 29, 2017 | $41.89 | $339,818.32 |
| Daily Earnings Credit | June 28, 2017 | $41.89 | $339,776.43 |
| Daily Earnings Credit | June 27, 2017 | $41.88 | $339,734.54 |
| Daily Earnings Credit | June 26, 2017 | $41.87 | $339,692.66 |
| Daily Earnings Credit | June 25, 2017 | $41.87 | $339,650.79 |
| Daily Earnings Credit | June 24, 2017 | $41.86 | $339,608.92 |
| Daily Earnings Credit | June 23, 2017 | $41.86 | $339,567.06 |
| Daily Earnings Credit | June 22, 2017 | $41.85 | $339,525.20 |
| Daily Earnings Credit | June 21, 2017 | $41.85 | $339,483.35 |
| Daily Earnings Credit | June 20, 2017 | $41.84 | $339,441.50 |
| Daily Earnings Credit | June 19, 2017 | $41.84 | $339,399.66 |
| Daily Earnings Credit | June 18, 2017 | $41.83 | $339,357.82 |
| Daily Earnings Credit | June 17, 2017 | $41.83 | $339,315.99 |
| Daily Earnings Credit | June 16, 2017 | $41.82 | $339,274.16 |
| Daily Earnings Credit | June 15, 2017 | $41.82 | $339,232.34 |
| Daily Earnings Credit | June 14, 2017 | $41.81 | $339,190.52 |
| Daily Earnings Credit | June 13, 2017 | $41.81 | $339,148.71 |
| Daily Earnings Credit | June 12, 2017 | $41.80 | $339,106.90 |
| Daily Earnings Credit | June 11, 2017 | $41.80 | $339,065.10 |
| Daily Earnings Credit | June 10, 2017 | $41.79 | $339,023.30 |
| Daily Earnings Credit | June 9, 2017 | $41.79 | $338,981.51 |
| Daily Earnings Credit | June 8, 2017 | $41.78 | $338,939.72 |
| Daily Earnings Credit | June 7, 2017 | $41.78 | $338,897.94 |
| Daily Earnings Credit | June 6, 2017 | $41.77 | $338,856.16 |
| Daily Earnings Credit | June 5, 2017 | $41.77 | $338,814.39 |
| Daily Earnings Credit | June 4, 2017 | $41.76 | $338,772.62 |
| Daily Earnings Credit | June 3, 2017 | $41.76 | $338,730.86 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | June 2, 2017 | $41.75 | $338,689.10 |
| Daily Earnings Credit | June 1, 2017 | $41.75 | $338,647.35 |
| Daily Earnings Credit | May 31, 2017 | $41.74 | $338,605.60 |
| Daily Earnings Credit | May 30, 2017 | $41.74 | $338,563.86 |
| Daily Earnings Credit | May 29, 2017 | $41.73 | $338,522.12 |
| Daily Earnings Credit | May 28, 2017 | $41.73 | $338,480.39 |
| Daily Earnings Credit | May 27, 2017 | $41.72 | $338,438.66 |
| Daily Earnings Credit | May 26, 2017 | $41.72 | $338,396.94 |
| Daily Earnings Credit | May 25, 2017 | $41.71 | $338,355.22 |
| Daily Earnings Credit | May 24, 2017 | $41.70 | $338,313.51 |
| Daily Earnings Credit | May 23, 2017 | $41.70 | $338,271.81 |
| Daily Earnings Credit | May 22, 2017 | $41.69 | $338,230.11 |
| Daily Earnings Credit | May 21, 2017 | $41.69 | $338,188.42 |
| Daily Earnings Credit | May 20, 2017 | $41.68 | $338,146.73 |
| Daily Earnings Credit | May 19, 2017 | $41.68 | $338,105.05 |
| Daily Earnings Credit | May 18, 2017 | $41.67 | $338,063.37 |
| Daily Earnings Credit | May 17, 2017 | $41.67 | $338,021.70 |
| Daily Earnings Credit | May 16, 2017 | $41.66 | $337,980.03 |
| Daily Earnings Credit | May 15, 2017 | $41.66 | $337,938.37 |
| Daily Earnings Credit | May 14, 2017 | $41.65 | $337,896.71 |
| Daily Earnings Credit | May 13, 2017 | $41.65 | $337,855.06 |
| Daily Earnings Credit | May 12, 2017 | $41.64 | $337,813.41 |
| Daily Earnings Credit | May 11, 2017 | $41.64 | $337,771.77 |
| Daily Earnings Credit | May 10, 2017 | $41.63 | $337,730.13 |
| Daily Earnings Credit | May 9, 2017 | $41.63 | $337,688.50 |
| Daily Earnings Credit | May 8, 2017 | $41.62 | $337,646.87 |
| Daily Earnings Credit | May 7, 2017 | $41.62 | $337,605.25 |
| Daily Earnings Credit | May 6, 2017 | $41.61 | $337,563.63 |
| Daily Earnings Credit | May 5, 2017 | $41.61 | $337,522.02 |
| Daily Earnings Credit | May 4, 2017 | $41.60 | $337,480.41 |
| Daily Earnings Credit | May 3, 2017 | $41.60 | $337,438.81 |
| Daily Earnings Credit | May 2, 2017 | $41.59 | $337,397.21 |
| Daily Earnings Credit | May 1, 2017 | $41.59 | $337,355.62 |
| Daily Earnings Credit | April 30, 2017 | $41.58 | $337,314.03 |
| Daily Earnings Credit | April 29, 2017 | $41.58 | $337,272.45 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | April 28, 2017 | $41.57 | $337,230.87 |
| Daily Earnings Credit | April 27, 2017 | $41.57 | $337,189.30 |
| Daily Earnings Credit | April 26, 2017 | $41.56 | $337,147.73 |
| Daily Earnings Credit | April 25, 2017 | $41.56 | $337,106.17 |
| Daily Earnings Credit | April 24, 2017 | $41.55 | $337,064.61 |
| Daily Earnings Credit | April 23, 2017 | $41.55 | $337,023.06 |
| Daily Earnings Credit | April 22, 2017 | $41.54 | $336,981.51 |
| Daily Earnings Credit | April 21, 2017 | $41.54 | $336,939.97 |
| Daily Earnings Credit | April 20, 2017 | $41.53 | $336,898.43 |
| Daily Earnings Credit | April 19, 2017 | $41.53 | $336,856.90 |
| Daily Earnings Credit | April 18, 2017 | $41.52 | $336,815.37 |
| Daily Earnings Credit | April 17, 2017 | $41.52 | $336,773.85 |
| Daily Earnings Credit | April 16, 2017 | $41.51 | $336,732.33 |
| Daily Earnings Credit | April 15, 2017 | $41.50 | $336,690.82 |
| Daily Earnings Credit | April 14, 2017 | $41.50 | $336,649.32 |
| Daily Earnings Credit | April 13, 2017 | $41.49 | $336,607.82 |
| Daily Earnings Credit | April 12, 2017 | $41.49 | $336,566.33 |
| Daily Earnings Credit | April 11, 2017 | $41.48 | $336,524.84 |
| Daily Earnings Credit | April 10, 2017 | $41.48 | $336,483.36 |
| Daily Earnings Credit | April 9, 2017 | $41.47 | $336,441.88 |
| Daily Earnings Credit | April 8, 2017 | $41.47 | $336,400.41 |
| Daily Earnings Credit | April 7, 2017 | $41.46 | $336,358.94 |
| Daily Earnings Credit | April 6, 2017 | $41.46 | $336,317.48 |
| Daily Earnings Credit | April 5, 2017 | $41.45 | $336,276.02 |
| Daily Earnings Credit | April 4, 2017 | $41.45 | $336,234.57 |
| Daily Earnings Credit | April 3, 2017 | $41.44 | $336,193.12 |
| Daily Earnings Credit | April 2, 2017 | $41.44 | $336,151.68 |
| Daily Earnings Credit | April 1, 2017 | $41.43 | $336,110.24 |
| Daily Earnings Credit | March 31, 2017 | $41.43 | $336,068.81 |
| Daily Earnings Credit | March 30, 2017 | $41.42 | $336,027.38 |
| Daily Earnings Credit | March 29, 2017 | $41.42 | $335,985.96 |
| Daily Earnings Credit | March 28, 2017 | $41.41 | $335,944.54 |
| Daily Earnings Credit | March 27, 2017 | $41.41 | $335,903.13 |
| Daily Earnings Credit | March 26, 2017 | $41.40 | $335,861.72 |
| Daily Earnings Credit | March 25, 2017 | $41.40 | $335,820.32 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | March 24, 2017 | $41.39 | $335,778.92 |
| Daily Earnings Credit | March 23, 2017 | $41.39 | $335,737.53 |
| Daily Earnings Credit | March 22, 2017 | $41.38 | $335,696.14 |
| Daily Earnings Credit | March 21, 2017 | $41.38 | $335,654.76 |
| Daily Earnings Credit | March 20, 2017 | $41.37 | $335,613.38 |
| Daily Earnings Credit | March 19, 2017 | $41.37 | $335,572.01 |
| Daily Earnings Credit | March 18, 2017 | $41.36 | $335,530.64 |
| Daily Earnings Credit | March 17, 2017 | $41.36 | $335,489.28 |
| Daily Earnings Credit | March 16, 2017 | $41.35 | $335,447.92 |
| Daily Earnings Credit | March 15, 2017 | $41.35 | $335,406.57 |
| Daily Earnings Credit | March 14, 2017 | $41.34 | $335,365.22 |
| Daily Earnings Credit | March 13, 2017 | $41.34 | $335,323.88 |
| Daily Earnings Credit | March 12, 2017 | $41.33 | $335,282.54 |
| Daily Earnings Credit | March 11, 2017 | $41.33 | $335,241.21 |
| Daily Earnings Credit | March 10, 2017 | $41.32 | $335,199.88 |
| Daily Earnings Credit | March 9, 2017 | $41.32 | $335,158.56 |
| Daily Earnings Credit | March 8, 2017 | $41.31 | $335,117.24 |
| Daily Earnings Credit | March 7, 2017 | $41.31 | $335,075.93 |
| Daily Earnings Credit | March 6, 2017 | $41.30 | $335,034.62 |
| Daily Earnings Credit | March 5, 2017 | $41.30 | $334,993.32 |
| Daily Earnings Credit | March 4, 2017 | $41.29 | $334,952.02 |
| Daily Earnings Credit | March 3, 2017 | $41.29 | $334,910.73 |
| Daily Earnings Credit | March 2, 2017 | $41.28 | $334,869.44 |
| Daily Earnings Credit | March 1, 2017 | $41.28 | $334,828.16 |
| Daily Earnings Credit | February 28, 2017 | $41.27 | $334,786.88 |
| Daily Earnings Credit | February 27, 2017 | $41.27 | $334,745.61 |
| Daily Earnings Credit | February 26, 2017 | $41.26 | $334,704.34 |
| Daily Earnings Credit | February 25, 2017 | $41.25 | $334,663.08 |
| Daily Earnings Credit | February 24, 2017 | $41.25 | $334,621.83 |
| Daily Earnings Credit | February 23, 2017 | $41.24 | $334,580.58 |
| Daily Earnings Credit | February 22, 2017 | $41.24 | $334,539.34 |
| Daily Earnings Credit | February 21, 2017 | $41.23 | $334,498.10 |
| Daily Earnings Credit | February 20, 2017 | $41.23 | $334,456.87 |
| Daily Earnings Credit | February 19, 2017 | $41.22 | $334,415.64 |
| Daily Earnings Credit | February 18, 2017 | $41.22 | $334,374.42 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | February 17, 2017 | $41.21 | $334,333.20 |
| Daily Earnings Credit | February 16, 2017 | $41.21 | $334,291.99 |
| Daily Earnings Credit | February 15, 2017 | $41.20 | $334,250.78 |
| Daily Earnings Credit | February 14, 2017 | $41.20 | $334,209.58 |
| Daily Earnings Credit | February 13, 2017 | $41.19 | $334,168.38 |
| Daily Earnings Credit | February 12, 2017 | $41.19 | $334,127.19 |
| Daily Earnings Credit | February 11, 2017 | $41.18 | $334,086.00 |
| Daily Earnings Credit | February 10, 2017 | $41.18 | $334,044.82 |
| Daily Earnings Credit | February 9, 2017 | $41.17 | $334,003.64 |
| Daily Earnings Credit | February 8, 2017 | $41.17 | $333,962.47 |
| Daily Earnings Credit | February 7, 2017 | $41.16 | $333,921.30 |
| Daily Earnings Credit | February 6, 2017 | $41.16 | $333,880.14 |
| Daily Earnings Credit | February 5, 2017 | $41.15 | $333,838.98 |
| Daily Earnings Credit | February 4, 2017 | $41.15 | $333,797.83 |
| Daily Earnings Credit | February 3, 2017 | $41.14 | $333,756.68 |
| Daily Earnings Credit | February 2, 2017 | $41.14 | $333,715.54 |
| Daily Earnings Credit | February 1, 2017 | $41.13 | $333,674.40 |
| Daily Earnings Credit | January 31, 2017 | $41.13 | $333,633.27 |
| Daily Earnings Credit | January 30, 2017 | $41.12 | $333,592.14 |
| Daily Earnings Credit | January 29, 2017 | $41.12 | $333,551.02 |
| Daily Earnings Credit | January 28, 2017 | $41.11 | $333,509.90 |
| Daily Earnings Credit | January 27, 2017 | $41.11 | $333,468.79 |
| Daily Earnings Credit | January 26, 2017 | $41.10 | $333,427.68 |
| Daily Earnings Credit | January 25, 2017 | $41.10 | $333,386.58 |
| Daily Earnings Credit | January 24, 2017 | $41.09 | $333,345.48 |
| Daily Earnings Credit | January 23, 2017 | $41.09 | $333,304.39 |
| Daily Earnings Credit | January 22, 2017 | $41.08 | $333,263.30 |
| Daily Earnings Credit | January 21, 2017 | $41.08 | $333,222.22 |
| Daily Earnings Credit | January 20, 2017 | $41.07 | $333,181.14 |
| Daily Earnings Credit | January 19, 2017 | $41.07 | $333,140.07 |
| Daily Earnings Credit | January 18, 2017 | $41.06 | $333,099.00 |
| Daily Earnings Credit | January 17, 2017 | $41.06 | $333,057.94 |
| Daily Earnings Credit | January 16, 2017 | $41.05 | $333,016.88 |
| Daily Earnings Credit | January 15, 2017 | $41.05 | $332,975.83 |
| Daily Earnings Credit | January 14, 2017 | $41.04 | $332,934.78 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | January 13, 2017 | $41.04 | $332,893.74 |
| Daily Earnings Credit | January 12, 2017 | $41.03 | $332,852.70 |
| Daily Earnings Credit | January 11, 2017 | $41.03 | $332,811.67 |
| Daily Earnings Credit | January 10, 2017 | $41.02 | $332,770.64 |
| Daily Earnings Credit | January 9, 2017 | $41.02 | $332,729.62 |
| Daily Earnings Credit | January 8, 2017 | $41.01 | $332,688.60 |
| Daily Earnings Credit | January 7, 2017 | $41.01 | $332,647.59 |
| Daily Earnings Credit | January 6, 2017 | $41.00 | $332,606.58 |
| Daily Earnings Credit | January 5, 2017 | $41.00 | $332,565.58 |
| Daily Earnings Credit | January 4, 2017 | $40.99 | $332,524.58 |
| Daily Earnings Credit | January 3, 2017 | $40.99 | $332,483.59 |
| Daily Earnings Credit | January 2, 2017 | $40.98 | $332,442.60 |
| Daily Earnings Credit | January 1, 2017 | $40.98 | $332,401.62 |
| Daily Earnings Credit | December 31, 2016 | $40.97 | $332,360.64 |
| Daily Earnings Credit | December 30, 2016 | $40.97 | $332,319.67 |
| Daily Earnings Credit | December 29, 2016 | $40.96 | $332,278.70 |
| Daily Earnings Credit | December 28, 2016 | $40.96 | $332,237.74 |
| Daily Earnings Credit | December 27, 2016 | $40.95 | $332,196.78 |
| Daily Earnings Credit | December 26, 2016 | $40.95 | $332,155.83 |
| Daily Earnings Credit | December 25, 2016 | $40.94 | $332,114.88 |
| Daily Earnings Credit | December 24, 2016 | $40.94 | $332,073.94 |
| Daily Earnings Credit | December 23, 2016 | $40.93 | $332,033.00 |
| Daily Earnings Credit | December 22, 2016 | $40.93 | $331,992.07 |
| Daily Earnings Credit | December 21, 2016 | $40.92 | $331,951.14 |
| Daily Earnings Credit | December 20, 2016 | $40.92 | $331,910.22 |
| Daily Earnings Credit | December 19, 2016 | $40.91 | $331,869.30 |
| Daily Earnings Credit | December 18, 2016 | $40.91 | $331,828.39 |
| Daily Earnings Credit | December 17, 2016 | $40.90 | $331,787.48 |
| Daily Earnings Credit | December 16, 2016 | $40.90 | $331,746.58 |
| Daily Earnings Credit | December 15, 2016 | $40.89 | $331,705.68 |
| Daily Earnings Credit | December 14, 2016 | $40.89 | $331,664.79 |
| Daily Earnings Credit | December 13, 2016 | $40.88 | $331,623.90 |
| Daily Earnings Credit | December 12, 2016 | $40.88 | $331,583.02 |
| Daily Earnings Credit | December 11, 2016 | $40.87 | $331,542.14 |
| Daily Earnings Credit | December 10, 2016 | $40.87 | $331,501.27 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | December 9, 2016 | $40.86 | $331,460.40 |
| Daily Earnings Credit | December 8, 2016 | $40.86 | $331,419.54 |
| Daily Earnings Credit | December 7, 2016 | $40.85 | $331,378.68 |
| Daily Earnings Credit | December 6, 2016 | $40.84 | $331,337.83 |
| Daily Earnings Credit | December 5, 2016 | $40.84 | $331,296.99 |
| Daily Earnings Credit | December 4, 2016 | $40.83 | $331,256.15 |
| Daily Earnings Credit | December 3, 2016 | $40.83 | $331,215.32 |
| Daily Earnings Credit | December 2, 2016 | $40.82 | $331,174.49 |
| Daily Earnings Credit | December 1, 2016 | $40.82 | $331,133.67 |
| Daily Earnings Credit | November 30, 2016 | $40.81 | $331,092.85 |
| Daily Earnings Credit | November 29, 2016 | $40.81 | $331,052.04 |
| Daily Earnings Credit | November 28, 2016 | $40.80 | $331,011.23 |
| Daily Earnings Credit | November 27, 2016 | $40.80 | $330,970.43 |
| Daily Earnings Credit | November 26, 2016 | $40.79 | $330,929.63 |
| Daily Earnings Credit | November 25, 2016 | $40.79 | $330,888.84 |
| Daily Earnings Credit | November 24, 2016 | $40.78 | $330,848.05 |
| Daily Earnings Credit | November 23, 2016 | $40.78 | $330,807.27 |
| Daily Earnings Credit | November 22, 2016 | $40.77 | $330,766.49 |
| Daily Earnings Credit | November 21, 2016 | $40.77 | $330,725.72 |
| Daily Earnings Credit | November 20, 2016 | $40.76 | $330,684.95 |
| Daily Earnings Credit | November 19, 2016 | $40.76 | $330,644.19 |
| Daily Earnings Credit | November 18, 2016 | $40.75 | $330,603.43 |
| Daily Earnings Credit | November 17, 2016 | $40.75 | $330,562.68 |
| Daily Earnings Credit | November 16, 2016 | $40.74 | $330,521.93 |
| Daily Earnings Credit | November 15, 2016 | $40.74 | $330,481.19 |
| Daily Earnings Credit | November 14, 2016 | $40.73 | $330,440.45 |
| Daily Earnings Credit | November 13, 2016 | $40.73 | $330,399.72 |
| Daily Earnings Credit | November 12, 2016 | $40.72 | $330,358.99 |
| Daily Earnings Credit | November 11, 2016 | $40.72 | $330,318.27 |
| Daily Earnings Credit | November 10, 2016 | $40.71 | $330,277.55 |
| Daily Earnings Credit | November 9, 2016 | $40.71 | $330,236.84 |
| Daily Earnings Credit | November 8, 2016 | $40.70 | $330,196.13 |
| Daily Earnings Credit | November 7, 2016 | $40.70 | $330,155.43 |
| Daily Earnings Credit | November 6, 2016 | $40.69 | $330,114.73 |
| Daily Earnings Credit | November 5, 2016 | $40.69 | $330,074.04 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | November 4, 2016 | $40.68 | $330,033.35 |
| Daily Earnings Credit | November 3, 2016 | $40.68 | $329,992.67 |
| Daily Earnings Credit | November 2, 2016 | $40.67 | $329,951.99 |
| Daily Earnings Credit | November 1, 2016 | $40.67 | $329,911.32 |
| Daily Earnings Credit | October 31, 2016 | $40.66 | $329,870.65 |
| Daily Earnings Credit | October 30, 2016 | $40.66 | $329,829.99 |
| Daily Earnings Credit | October 29, 2016 | $40.65 | $329,789.33 |
| Daily Earnings Credit | October 28, 2016 | $40.65 | $329,748.68 |
| Daily Earnings Credit | October 27, 2016 | $40.64 | $329,708.03 |
| Daily Earnings Credit | October 26, 2016 | $40.64 | $329,667.39 |
| Daily Earnings Credit | October 25, 2016 | $40.63 | $329,626.75 |
| Daily Earnings Credit | October 24, 2016 | $40.63 | $329,586.12 |
| Daily Earnings Credit | October 23, 2016 | $40.62 | $329,545.49 |
| Daily Earnings Credit | October 22, 2016 | $40.62 | $329,504.87 |
| Daily Earnings Credit | October 21, 2016 | $40.61 | $329,464.25 |
| Daily Earnings Credit | October 20, 2016 | $40.61 | $329,423.64 |
| Daily Earnings Credit | October 19, 2016 | $40.60 | $329,383.03 |
| Daily Earnings Credit | October 18, 2016 | $40.60 | $329,342.43 |
| Daily Earnings Credit | October 17, 2016 | $40.59 | $329,301.83 |
| Daily Earnings Credit | October 16, 2016 | $40.59 | $329,261.24 |
| Daily Earnings Credit | October 15, 2016 | $40.58 | $329,220.65 |
| Daily Earnings Credit | October 14, 2016 | $40.58 | $329,180.07 |
| Daily Earnings Credit | October 13, 2016 | $40.57 | $329,139.49 |
| Daily Earnings Credit | October 12, 2016 | $40.57 | $329,098.92 |
| Daily Earnings Credit | October 11, 2016 | $40.56 | $329,058.35 |
| Daily Earnings Credit | October 10, 2016 | $40.56 | $329,017.79 |
| Daily Earnings Credit | October 9, 2016 | $40.55 | $328,977.23 |
| Daily Earnings Credit | October 8, 2016 | $40.55 | $328,936.68 |
| Daily Earnings Credit | October 7, 2016 | $40.54 | $328,896.13 |
| Daily Earnings Credit | October 6, 2016 | $40.54 | $328,855.59 |
| Daily Earnings Credit | October 5, 2016 | $40.53 | $328,815.05 |
| Daily Earnings Credit | October 4, 2016 | $40.53 | $328,774.52 |
| Daily Earnings Credit | October 3, 2016 | $40.52 | $328,733.99 |
| Daily Earnings Credit | October 2, 2016 | $40.52 | $328,693.47 |
| Daily Earnings Credit | October 1, 2016 | $40.51 | $328,652.95 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | September 30, 2016 | $40.51 | $328,612.44 |
| Daily Earnings Credit | September 29, 2016 | $40.50 | $328,571.93 |
| Daily Earnings Credit | September 28, 2016 | $40.50 | $328,531.43 |
| Daily Earnings Credit | September 27, 2016 | $40.49 | $328,490.93 |
| Daily Earnings Credit | September 26, 2016 | $40.49 | $328,450.44 |
| Daily Earnings Credit | September 25, 2016 | $40.48 | $328,409.95 |
| Daily Earnings Credit | September 24, 2016 | $40.48 | $328,369.47 |
| Daily Earnings Credit | September 23, 2016 | $40.47 | $328,328.99 |
| Daily Earnings Credit | September 22, 2016 | $40.47 | $328,288.52 |
| Daily Earnings Credit | September 21, 2016 | $40.46 | $328,248.05 |
| Daily Earnings Credit | September 20, 2016 | $40.46 | $328,207.59 |
| Daily Earnings Credit | September 19, 2016 | $40.45 | $328,167.13 |
| Daily Earnings Credit | September 18, 2016 | $40.45 | $328,126.68 |
| Daily Earnings Credit | September 17, 2016 | $40.44 | $328,086.23 |
| Daily Earnings Credit | September 16, 2016 | $40.44 | $328,045.79 |
| Daily Earnings Credit | September 15, 2016 | $40.43 | $328,005.35 |
| Daily Earnings Credit | September 14, 2016 | $40.43 | $327,964.92 |
| Daily Earnings Credit | September 13, 2016 | $40.42 | $327,924.49 |
| Daily Earnings Credit | September 12, 2016 | $40.42 | $327,884.07 |
| Daily Earnings Credit | September 11, 2016 | $40.41 | $327,843.65 |
| Daily Earnings Credit | September 10, 2016 | $40.41 | $327,803.24 |
| Daily Earnings Credit | September 9, 2016 | $40.40 | $327,762.83 |
| Daily Earnings Credit | September 8, 2016 | $40.40 | $327,722.43 |
| Daily Earnings Credit | September 7, 2016 | $40.39 | $327,682.03 |
| Daily Earnings Credit | September 6, 2016 | $40.39 | $327,641.64 |
| Daily Earnings Credit | September 5, 2016 | $40.38 | $327,601.25 |
| Daily Earnings Credit | September 4, 2016 | $40.38 | $327,560.87 |
| Daily Earnings Credit | September 3, 2016 | $40.37 | $327,520.49 |
| Daily Earnings Credit | September 2, 2016 | $40.37 | $327,480.12 |
| Daily Earnings Credit | September 1, 2016 | $40.36 | $327,439.75 |
| Daily Earnings Credit | August 31, 2016 | $40.36 | $327,399.39 |
| Daily Earnings Credit | August 30, 2016 | $40.35 | $327,359.03 |
| Daily Earnings Credit | August 29, 2016 | $40.35 | $327,318.68 |
| Daily Earnings Credit | August 28, 2016 | $40.34 | $327,278.33 |
| Daily Earnings Credit | August 27, 2016 | $40.34 | $327,237.99 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | August 26, 2016 | $40.33 | $327,197.65 |
| Daily Earnings Credit | August 25, 2016 | $40.33 | $327,157.33 |
| Daily Earnings Credit | August 24, 2016 | $40.32 | $327,117.00 |
| Daily Earnings Credit | August 23, 2016 | $40.32 | $327,076.68 |
| Daily Earnings Credit | August 22, 2016 | $40.31 | $327,036.36 |
| Daily Earnings Credit | August 21, 2016 | $40.31 | $326,996.04 |
| Daily Earnings Credit | August 20, 2016 | $40.30 | $326,955.73 |
| Daily Earnings Credit | August 19, 2016 | $40.30 | $326,915.43 |
| Daily Earnings Credit | August 18, 2016 | $40.29 | $326,875.13 |
| Daily Earnings Credit | August 17, 2016 | $40.29 | $326,834.83 |
| Daily Earnings Credit | August 16, 2016 | $40.28 | $326,794.54 |
| Daily Earnings Credit | August 15, 2016 | $40.28 | $326,754.26 |
| Daily Earnings Credit | August 14, 2016 | $40.27 | $326,713.98 |
| Daily Earnings Credit | August 13, 2016 | $40.27 | $326,673.70 |
| Daily Earnings Credit | August 12, 2016 | $40.27 | $326,633.43 |
| Daily Earnings Credit | August 11, 2016 | $40.26 | $326,593.17 |
| Daily Earnings Credit | August 10, 2016 | $40.26 | $326,552.91 |
| Daily Earnings Credit | August 9, 2016 | $40.25 | $326,512.65 |
| Daily Earnings Credit | August 8, 2016 | $40.25 | $326,472.40 |
| Daily Earnings Credit | August 7, 2016 | $40.24 | $326,432.16 |
| Daily Earnings Credit | August 6, 2016 | $40.24 | $326,391.92 |
| Daily Earnings Credit | August 5, 2016 | $40.23 | $326,351.68 |
| Daily Earnings Credit | August 4, 2016 | $40.23 | $326,311.45 |
| Daily Earnings Credit | August 3, 2016 | $40.22 | $326,271.23 |
| Daily Earnings Credit | August 2, 2016 | $40.22 | $326,231.01 |
| Daily Earnings Credit | August 1, 2016 | $40.21 | $326,190.79 |
| Daily Earnings Credit | July 31, 2016 | $40.21 | $326,150.58 |
| Daily Earnings Credit | July 30, 2016 | $40.20 | $326,110.37 |
| Daily Earnings Credit | July 29, 2016 | $40.20 | $326,070.17 |
| Daily Earnings Credit | July 28, 2016 | $40.19 | $326,029.98 |
| Daily Earnings Credit | July 27, 2016 | $40.19 | $325,989.79 |
| Daily Earnings Credit | July 26, 2016 | $40.18 | $325,949.60 |
| Daily Earnings Credit | July 25, 2016 | $40.18 | $325,909.42 |
| Daily Earnings Credit | July 24, 2016 | $40.17 | $325,869.25 |
| Daily Earnings Credit | July 23, 2016 | $40.17 | $325,829.07 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | July 22, 2016 | $40.16 | $325,788.91 |
| Daily Earnings Credit | July 21, 2016 | $40.16 | $325,748.75 |
| Daily Earnings Credit | July 20, 2016 | $40.15 | $325,708.59 |
| Daily Earnings Credit | July 19, 2016 | $40.15 | $325,668.44 |
| Daily Earnings Credit | July 18, 2016 | $40.14 | $325,628.29 |
| Daily Earnings Credit | July 17, 2016 | $40.14 | $325,588.15 |
| Daily Earnings Credit | July 16, 2016 | $40.13 | $325,548.02 |
| Daily Earnings Credit | July 15, 2016 | $40.13 | $325,507.89 |
| Daily Earnings Credit | July 14, 2016 | $40.12 | $325,467.76 |
| Daily Earnings Credit | July 13, 2016 | $40.12 | $325,427.64 |
| Daily Earnings Credit | July 12, 2016 | $40.11 | $325,387.52 |
| Daily Earnings Credit | July 11, 2016 | $40.11 | $325,347.41 |
| Daily Earnings Credit | July 10, 2016 | $40.10 | $325,307.30 |
| Daily Earnings Credit | July 9, 2016 | $40.10 | $325,267.20 |
| Daily Earnings Credit | July 8, 2016 | $40.09 | $325,227.11 |
| Daily Earnings Credit | July 7, 2016 | $40.09 | $325,187.01 |
| Daily Earnings Credit | July 6, 2016 | $40.08 | $325,146.93 |
| Daily Earnings Credit | July 5, 2016 | $40.08 | $325,106.85 |
| Daily Earnings Credit | July 4, 2016 | $40.07 | $325,066.77 |
| Daily Earnings Credit | July 3, 2016 | $40.07 | $325,026.70 |
| Daily Earnings Credit | July 2, 2016 | $40.06 | $324,986.63 |
| Daily Earnings Credit | July 1, 2016 | $40.06 | $324,946.57 |
| Daily Earnings Credit | June 30, 2016 | $40.05 | $324,906.51 |
| Daily Earnings Credit | June 29, 2016 | $40.05 | $324,866.46 |
| Daily Earnings Credit | June 28, 2016 | $40.04 | $324,826.41 |
| Daily Earnings Credit | June 27, 2016 | $40.04 | $324,786.37 |
| Daily Earnings Credit | June 26, 2016 | $40.03 | $324,746.33 |
| Daily Earnings Credit | June 25, 2016 | $40.03 | $324,706.30 |
| Daily Earnings Credit | June 24, 2016 | $40.02 | $324,666.27 |
| Daily Earnings Credit | June 23, 2016 | $40.02 | $324,626.25 |
| Daily Earnings Credit | June 22, 2016 | $40.01 | $324,586.23 |
| Daily Earnings Credit | June 21, 2016 | $40.01 | $324,546.22 |
| Daily Earnings Credit | June 20, 2016 | $40.00 | $324,506.21 |
| Daily Earnings Credit | June 19, 2016 | $40.00 | $324,466.21 |
| Daily Earnings Credit | June 18, 2016 | $39.99 | $324,426.21 |

CrewCapital

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | June 17, 2016 | $39.99 | $324,386.22 |
| Daily Earnings Credit | June 16, 2016 | $39.98 | $324,346.23 |
| Daily Earnings Credit | June 15, 2016 | $39.98 | $324,306.25 |
| Daily Earnings Credit | June 14, 2016 | $39.97 | $324,266.27 |
| Daily Earnings Credit | June 13, 2016 | $39.97 | $324,226.30 |
| Daily Earnings Credit | June 12, 2016 | $39.96 | $324,186.33 |
| Daily Earnings Credit | June 11, 2016 | $39.96 | $324,146.36 |
| Daily Earnings Credit | June 10, 2016 | $39.95 | $324,106.41 |
| Daily Earnings Credit | June 9, 2016 | $39.95 | $324,066.45 |
| Daily Earnings Credit | June 8, 2016 | $39.94 | $324,026.50 |
| Daily Earnings Credit | June 7, 2016 | $39.94 | $323,986.56 |
| Daily Earnings Credit | June 6, 2016 | $39.93 | $323,946.62 |
| Daily Earnings Credit | June 5, 2016 | $39.93 | $323,906.69 |
| Daily Earnings Credit | June 4, 2016 | $39.92 | $323,866.76 |
| Daily Earnings Credit | June 3, 2016 | $39.92 | $323,826.83 |
| Daily Earnings Credit | June 2, 2016 | $39.91 | $323,786.92 |
| Daily Earnings Credit | June 1, 2016 | $39.91 | $323,747.00 |
| Daily Earnings Credit | May 31, 2016 | $39.90 | $323,707.09 |
| Daily Earnings Credit | May 30, 2016 | $39.90 | $323,667.19 |
| Daily Earnings Credit | May 29, 2016 | $39.89 | $323,627.29 |
| Daily Earnings Credit | May 28, 2016 | $39.89 | $323,587.39 |
| Daily Earnings Credit | May 27, 2016 | $39.88 | $323,547.50 |
| Daily Earnings Credit | May 26, 2016 | $39.88 | $323,507.62 |
| Daily Earnings Credit | May 25, 2016 | $39.87 | $323,467.74 |
| Daily Earnings Credit | May 24, 2016 | $39.87 | $323,427.87 |
| Daily Earnings Credit | May 23, 2016 | $39.86 | $323,388.00 |
| Daily Earnings Credit | May 22, 2016 | $39.86 | $323,348.13 |
| Daily Earnings Credit | May 21, 2016 | $39.86 | $323,308.27 |
| Daily Earnings Credit | May 20, 2016 | $39.85 | $323,268.42 |
| Daily Earnings Credit | May 19, 2016 | $39.85 | $323,228.57 |
| Daily Earnings Credit | May 18, 2016 | $39.84 | $323,188.72 |
| Daily Earnings Credit | May 17, 2016 | $39.84 | $323,148.88 |
| Daily Earnings Credit | May 16, 2016 | $39.83 | $323,109.04 |
| Daily Earnings Credit | May 15, 2016 | $39.83 | $323,069.21 |
| Daily Earnings Credit | May 14, 2016 | $39.82 | $323,029.39 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | May 13, 2016 | $39.82 | $322,989.57 |
| Daily Earnings Credit | May 12, 2016 | $39.81 | $322,949.75 |
| Daily Earnings Credit | May 11, 2016 | $39.81 | $322,909.94 |
| Daily Earnings Credit | May 10, 2016 | $39.80 | $322,870.13 |
| Daily Earnings Credit | May 9, 2016 | $39.80 | $322,830.33 |
| Daily Earnings Credit | May 8, 2016 | $39.79 | $322,790.54 |
| Daily Earnings Credit | May 7, 2016 | $39.79 | $322,750.75 |
| Daily Earnings Credit | May 6, 2016 | $39.78 | $322,710.96 |
| Daily Earnings Credit | May 5, 2016 | $39.78 | $322,671.18 |
| Daily Earnings Credit | May 4, 2016 | $39.77 | $322,631.40 |
| Daily Earnings Credit | May 3, 2016 | $39.77 | $322,591.63 |
| Daily Earnings Credit | May 2, 2016 | $39.76 | $322,551.86 |
| Daily Earnings Credit | May 1, 2016 | $39.76 | $322,512.10 |
| Daily Earnings Credit | April 30, 2016 | $39.75 | $322,472.34 |
| Daily Earnings Credit | April 29, 2016 | $39.75 | $322,432.59 |
| Daily Earnings Credit | April 28, 2016 | $39.74 | $322,392.85 |
| Daily Earnings Credit | April 27, 2016 | $39.74 | $322,353.10 |
| Daily Earnings Credit | April 26, 2016 | $39.73 | $322,313.37 |
| Daily Earnings Credit | April 25, 2016 | $39.73 | $322,273.63 |
| Daily Earnings Credit | April 24, 2016 | $39.72 | $322,233.91 |
| Daily Earnings Credit | April 23, 2016 | $39.72 | $322,194.18 |
| Daily Earnings Credit | April 22, 2016 | $39.71 | $322,154.46 |
| Daily Earnings Credit | April 21, 2016 | $39.71 | $322,114.75 |
| Daily Earnings Credit | April 20, 2016 | $39.70 | $322,075.04 |
| Daily Earnings Credit | April 19, 2016 | $39.70 | $322,035.34 |
| Daily Earnings Credit | April 18, 2016 | $39.69 | $321,995.64 |
| Daily Earnings Credit | April 17, 2016 | $39.69 | $321,955.95 |
| Daily Earnings Credit | April 16, 2016 | $39.68 | $321,916.26 |
| Daily Earnings Credit | April 15, 2016 | $39.68 | $321,876.58 |
| Daily Earnings Credit | April 14, 2016 | $39.67 | $321,836.90 |
| Daily Earnings Credit | April 13, 2016 | $39.67 | $321,797.23 |
| Daily Earnings Credit | April 12, 2016 | $39.66 | $321,757.56 |
| Daily Earnings Credit | April 11, 2016 | $39.66 | $321,717.89 |
| Daily Earnings Credit | April 10, 2016 | $39.65 | $321,678.23 |
| Daily Earnings Credit | April 9, 2016 | $39.65 | $321,638.58 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | April 8, 2016 | $39.64 | $321,598.93 |
| Daily Earnings Credit | April 7, 2016 | $39.64 | $321,559.29 |
| Daily Earnings Credit | April 6, 2016 | $39.63 | $321,519.65 |
| Daily Earnings Credit | April 5, 2016 | $39.63 | $321,480.01 |
| Daily Earnings Credit | April 4, 2016 | $39.62 | $321,440.38 |
| Daily Earnings Credit | April 3, 2016 | $39.62 | $321,400.76 |
| Daily Earnings Credit | April 2, 2016 | $39.62 | $321,361.14 |
| Daily Earnings Credit | April 1, 2016 | $39.61 | $321,321.52 |
| Daily Earnings Credit | March 31, 2016 | $39.61 | $321,281.91 |
| Daily Earnings Credit | March 30, 2016 | $39.60 | $321,242.31 |
| Daily Earnings Credit | March 29, 2016 | $39.60 | $321,202.71 |
| Daily Earnings Credit | March 28, 2016 | $39.59 | $321,163.11 |
| Daily Earnings Credit | March 27, 2016 | $39.59 | $321,123.52 |
| Daily Earnings Credit | March 26, 2016 | $39.58 | $321,083.93 |
| Daily Earnings Credit | March 25, 2016 | $39.58 | $321,044.35 |
| Daily Earnings Credit | March 24, 2016 | $39.57 | $321,004.78 |
| Daily Earnings Credit | March 23, 2016 | $39.57 | $320,965.21 |
| Daily Earnings Credit | March 22, 2016 | $39.56 | $320,925.64 |
| Daily Earnings Credit | March 21, 2016 | $39.56 | $320,886.08 |
| Daily Earnings Credit | March 20, 2016 | $39.55 | $320,846.52 |
| Daily Earnings Credit | March 19, 2016 | $39.55 | $320,806.97 |
| Daily Earnings Credit | March 18, 2016 | $39.54 | $320,767.42 |
| Daily Earnings Credit | March 17, 2016 | $39.54 | $320,727.88 |
| Daily Earnings Credit | March 16, 2016 | $39.53 | $320,688.34 |
| Daily Earnings Credit | March 15, 2016 | $39.53 | $320,648.81 |
| Daily Earnings Credit | March 14, 2016 | $39.52 | $320,609.28 |
| Daily Earnings Credit | March 13, 2016 | $39.52 | $320,569.76 |
| Daily Earnings Credit | March 12, 2016 | $39.51 | $320,530.24 |
| Daily Earnings Credit | March 11, 2016 | $39.51 | $320,490.73 |
| Daily Earnings Credit | March 10, 2016 | $39.50 | $320,451.22 |
| Daily Earnings Credit | March 9, 2016 | $39.50 | $320,411.72 |
| Daily Earnings Credit | March 8, 2016 | $39.49 | $320,372.22 |
| Daily Earnings Credit | March 7, 2016 | $39.49 | $320,332.73 |
| Daily Earnings Credit | March 6, 2016 | $39.48 | $320,293.24 |
| Daily Earnings Credit | March 5, 2016 | $39.48 | $320,253.76 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | March 4, 2016 | $39.47 | $320,214.28 |
| Daily Earnings Credit | March 3, 2016 | $39.47 | $320,174.81 |
| Daily Earnings Credit | March 2, 2016 | $39.46 | $320,135.34 |
| Daily Earnings Credit | March 1, 2016 | $39.46 | $320,095.87 |
| Daily Earnings Credit | February 29, 2016 | $39.45 | $320,056.41 |
| Daily Earnings Credit | February 28, 2016 | $39.45 | $320,016.96 |
| Daily Earnings Credit | February 27, 2016 | $39.44 | $319,977.51 |
| Daily Earnings Credit | February 26, 2016 | $39.44 | $319,938.07 |
| Daily Earnings Credit | February 25, 2016 | $39.43 | $319,898.63 |
| Daily Earnings Credit | February 24, 2016 | $39.43 | $319,859.19 |
| Daily Earnings Credit | February 23, 2016 | $39.43 | $319,819.76 |
| Daily Earnings Credit | February 22, 2016 | $39.42 | $319,780.34 |
| Daily Earnings Credit | February 21, 2016 | $39.42 | $319,740.92 |
| Daily Earnings Credit | February 20, 2016 | $39.41 | $319,701.50 |
| Daily Earnings Credit | February 19, 2016 | $39.41 | $319,662.09 |
| Daily Earnings Credit | February 18, 2016 | $39.40 | $319,622.68 |
| Daily Earnings Credit | February 17, 2016 | $39.40 | $319,583.28 |
| Daily Earnings Credit | February 16, 2016 | $39.39 | $319,543.89 |
| Daily Earnings Credit | February 15, 2016 | $39.39 | $319,504.50 |
| Daily Earnings Credit | February 14, 2016 | $39.38 | $319,465.11 |
| Daily Earnings Credit | February 13, 2016 | $39.38 | $319,425.73 |
| Daily Earnings Credit | February 12, 2016 | $39.37 | $319,386.35 |
| Daily Earnings Credit | February 11, 2016 | $39.37 | $319,346.98 |
| Daily Earnings Credit | February 10, 2016 | $39.36 | $319,307.61 |
| Daily Earnings Credit | February 9, 2016 | $39.36 | $319,268.25 |
| Daily Earnings Credit | February 8, 2016 | $39.35 | $319,228.90 |
| Daily Earnings Credit | February 7, 2016 | $39.35 | $319,189.54 |
| Daily Earnings Credit | February 6, 2016 | $39.34 | $319,150.20 |
| Daily Earnings Credit | February 5, 2016 | $39.34 | $319,110.85 |
| Daily Earnings Credit | February 4, 2016 | $39.33 | $319,071.52 |
| Daily Earnings Credit | February 3, 2016 | $39.33 | $319,032.18 |
| Daily Earnings Credit | February 2, 2016 | $39.32 | $318,992.85 |
| Daily Earnings Credit | February 1, 2016 | $39.32 | $318,953.53 |
| Daily Earnings Credit | January 31, 2016 | $39.31 | $318,914.21 |
| Daily Earnings Credit | January 30, 2016 | $39.31 | $318,874.90 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | January 29, 2016 | $39.30 | $318,835.59 |
| Daily Earnings Credit | January 28, 2016 | $39.30 | $318,796.29 |
| Daily Earnings Credit | January 27, 2016 | $39.29 | $318,756.99 |
| Daily Earnings Credit | January 26, 2016 | $39.29 | $318,717.69 |
| Daily Earnings Credit | January 25, 2016 | $39.28 | $318,678.41 |
| Daily Earnings Credit | January 24, 2016 | $39.28 | $318,639.12 |
| Daily Earnings Credit | January 23, 2016 | $39.27 | $318,599.84 |
| Daily Earnings Credit | January 22, 2016 | $39.27 | $318,560.57 |
| Daily Earnings Credit | January 21, 2016 | $39.27 | $318,521.30 |
| Daily Earnings Credit | January 20, 2016 | $39.26 | $318,482.03 |
| Daily Earnings Credit | January 19, 2016 | $39.26 | $318,442.77 |
| Daily Earnings Credit | January 18, 2016 | $39.25 | $318,403.52 |
| Daily Earnings Credit | January 17, 2016 | $39.25 | $318,364.27 |
| Daily Earnings Credit | January 16, 2016 | $39.24 | $318,325.02 |
| Daily Earnings Credit | January 15, 2016 | $39.24 | $318,285.78 |
| Daily Earnings Credit | January 14, 2016 | $39.23 | $318,246.54 |
| Daily Earnings Credit | January 13, 2016 | $39.23 | $318,207.31 |
| Daily Earnings Credit | January 12, 2016 | $39.22 | $318,168.09 |
| Daily Earnings Credit | January 11, 2016 | $39.22 | $318,128.86 |
| Daily Earnings Credit | January 10, 2016 | $39.21 | $318,089.65 |
| Daily Earnings Credit | January 9, 2016 | $39.21 | $318,050.44 |
| Daily Earnings Credit | January 8, 2016 | $39.20 | $318,011.23 |
| Daily Earnings Credit | January 7, 2016 | $39.20 | $317,972.03 |
| Daily Earnings Credit | January 6, 2016 | $39.19 | $317,932.83 |
| Daily Earnings Credit | January 5, 2016 | $39.19 | $317,893.64 |
| Daily Earnings Credit | January 4, 2016 | $39.18 | $317,854.45 |
| Daily Earnings Credit | January 3, 2016 | $39.18 | $317,815.27 |
| Daily Earnings Credit | January 2, 2016 | $39.17 | $317,776.09 |
| Daily Earnings Credit | January 1, 2016 | $39.17 | $317,736.92 |
| Daily Earnings Credit | December 31, 2015 | $39.16 | $317,697.75 |
| Daily Earnings Credit | December 30, 2015 | $39.16 | $317,658.58 |
| Daily Earnings Credit | December 29, 2015 | $39.15 | $317,619.43 |
| Daily Earnings Credit | December 28, 2015 | $39.15 | $317,580.27 |
| Daily Earnings Credit | December 27, 2015 | $39.14 | $317,541.12 |
| Daily Earnings Credit | December 26, 2015 | $39.14 | $317,501.98 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | December 25, 2015 | $39.13 | $317,462.84 |
| Daily Earnings Credit | December 24, 2015 | $39.13 | $317,423.70 |
| Daily Earnings Credit | December 23, 2015 | $39.12 | $317,384.57 |
| Daily Earnings Credit | December 22, 2015 | $39.12 | $317,345.45 |
| Daily Earnings Credit | December 21, 2015 | $39.12 | $317,306.33 |
| Daily Earnings Credit | December 20, 2015 | $39.11 | $317,267.21 |
| Daily Earnings Credit | December 19, 2015 | $39.11 | $317,228.10 |
| Daily Earnings Credit | December 18, 2015 | $39.10 | $317,189.00 |
| Daily Earnings Credit | December 17, 2015 | $39.10 | $317,149.90 |
| Daily Earnings Credit | December 16, 2015 | $39.09 | $317,110.80 |
| Daily Earnings Credit | December 15, 2015 | $39.09 | $317,071.71 |
| Daily Earnings Credit | December 14, 2015 | $39.08 | $317,032.62 |
| Daily Earnings Credit | December 13, 2015 | $39.08 | $316,993.54 |
| Daily Earnings Credit | December 12, 2015 | $39.07 | $316,954.47 |
| Daily Earnings Credit | December 11, 2015 | $39.07 | $316,915.39 |
| Daily Earnings Credit | December 10, 2015 | $39.06 | $316,876.33 |
| Daily Earnings Credit | December 9, 2015 | $39.06 | $316,837.26 |
| Daily Earnings Credit | December 8, 2015 | $39.05 | $316,798.21 |
| Daily Earnings Credit | December 7, 2015 | $39.05 | $316,759.15 |
| Daily Earnings Credit | December 6, 2015 | $39.04 | $316,720.11 |
| Daily Earnings Credit | December 5, 2015 | $39.04 | $316,681.06 |
| Daily Earnings Credit | December 4, 2015 | $39.03 | $316,642.03 |
| Daily Earnings Credit | December 3, 2015 | $39.03 | $316,602.99 |
| Daily Earnings Credit | December 2, 2015 | $39.02 | $316,563.96 |
| Daily Earnings Credit | December 1, 2015 | $39.02 | $316,524.94 |
| Daily Earnings Credit | November 30, 2015 | $39.01 | $316,485.92 |
| Daily Earnings Credit | November 29, 2015 | $39.01 | $316,446.91 |
| Daily Earnings Credit | November 28, 2015 | $39.00 | $316,407.90 |
| Daily Earnings Credit | November 27, 2015 | $39.00 | $316,368.89 |
| Daily Earnings Credit | November 26, 2015 | $38.99 | $316,329.89 |
| Daily Earnings Credit | November 25, 2015 | $38.99 | $316,290.90 |
| Daily Earnings Credit | November 24, 2015 | $38.99 | $316,251.91 |
| Daily Earnings Credit | November 23, 2015 | $38.98 | $316,212.92 |
| Daily Earnings Credit | November 22, 2015 | $38.98 | $316,173.94 |
| Daily Earnings Credit | November 21, 2015 | $38.97 | $316,134.97 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
| --- | --- | --- | --- |
| Daily Earnings Credit | November 20, 2015 | $38.97 | $316,096.00 |
| Daily Earnings Credit | November 19, 2015 | $38.96 | $316,057.03 |
| Daily Earnings Credit | November 18, 2015 | $38.96 | $316,018.07 |
| Daily Earnings Credit | November 17, 2015 | $38.95 | $315,979.11 |
| Daily Earnings Credit | November 16, 2015 | $38.95 | $315,940.16 |
| Daily Earnings Credit | November 15, 2015 | $38.94 | $315,901.21 |
| Daily Earnings Credit | November 14, 2015 | $38.94 | $315,862.27 |
| Daily Earnings Credit | November 13, 2015 | $38.93 | $315,823.34 |
| Daily Earnings Credit | November 12, 2015 | $38.93 | $315,784.40 |
| Daily Earnings Credit | November 11, 2015 | $38.92 | $315,745.47 |
| Daily Earnings Credit | November 10, 2015 | $38.92 | $315,706.55 |
| Daily Earnings Credit | November 9, 2015 | $38.91 | $315,667.63 |
| Daily Earnings Credit | November 8, 2015 | $38.91 | $315,628.72 |
| Daily Earnings Credit | November 7, 2015 | $38.90 | $315,589.81 |
| Daily Earnings Credit | November 6, 2015 | $38.90 | $315,550.91 |
| Daily Earnings Credit | November 5, 2015 | $38.89 | $315,512.01 |
| Daily Earnings Credit | November 4, 2015 | $38.89 | $315,473.12 |
| Daily Earnings Credit | November 3, 2015 | $38.88 | $315,434.23 |
| Daily Earnings Credit | November 2, 2015 | $38.88 | $315,395.34 |
| Daily Earnings Credit | November 1, 2015 | $38.87 | $315,356.46 |
| Daily Earnings Credit | October 31, 2015 | $38.87 | $315,317.59 |
| Daily Earnings Credit | October 30, 2015 | $38.87 | $315,278.72 |
| Daily Earnings Credit | October 29, 2015 | $38.86 | $315,239.85 |
| Daily Earnings Credit | October 28, 2015 | $38.85 | $315,162.14 |
| Daily Earnings Credit | October 27, 2015 | $38.85 | $315,123.29 |
| Daily Earnings Credit | October 26, 2015 | $38.84 | $315,084.44 |
| Daily Earnings Credit | October 25, 2015 | $38.84 | $315,045.60 |
| Daily Earnings Credit | October 24, 2015 | $38.83 | $315,006.76 |
| Daily Earnings Credit | October 23, 2015 | $38.83 | $314,967.93 |
| Daily Earnings Credit | October 22, 2015 | $38.82 | $314,929.10 |
| Daily Earnings Credit | October 21, 2015 | $38.82 | $314,890.28 |
| Daily Earnings Credit | October 20, 2015 | $38.81 | $314,851.46 |
| Daily Earnings Credit | October 19, 2015 | $38.81 | $314,812.65 |
| Daily Earnings Credit | October 18, 2015 | $38.80 | $314,773.84 |
| Daily Earnings Credit | October 17, 2015 | $38.80 | $314,735.04 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | October 16, 2015 | $38.79 | $314,696.24 |
| Daily Earnings Credit | October 15, 2015 | $38.79 | $314,657.45 |
| Daily Earnings Credit | October 14, 2015 | $38.78 | $314,618.66 |
| Daily Earnings Credit | October 13, 2015 | $38.78 | $314,579.87 |
| Daily Earnings Credit | October 12, 2015 | $38.77 | $314,541.10 |
| Daily Earnings Credit | October 11, 2015 | $38.77 | $314,502.32 |
| Daily Earnings Credit | October 10, 2015 | $38.76 | $314,463.55 |
| Daily Earnings Credit | October 9, 2015 | $38.76 | $314,424.79 |
| Daily Earnings Credit | October 8, 2015 | $38.76 | $314,386.03 |
| Daily Earnings Credit | October 7, 2015 | $38.75 | $314,347.27 |
| Daily Earnings Credit | October 6, 2015 | $38.75 | $314,308.52 |
| Daily Earnings Credit | October 5, 2015 | $38.74 | $314,269.78 |
| Daily Earnings Credit | October 4, 2015 | $38.74 | $314,231.03 |
| Daily Earnings Credit | October 3, 2015 | $38.73 | $314,192.30 |
| Daily Earnings Credit | October 2, 2015 | $38.73 | $314,153.57 |
| Daily Earnings Credit | October 1, 2015 | $38.72 | $314,114.84 |
| Daily Earnings Credit | September 30, 2015 | $38.72 | $314,076.12 |
| Daily Earnings Credit | September 29, 2015 | $38.71 | $314,037.40 |
| Daily Earnings Credit | September 28, 2015 | $38.71 | $313,998.69 |
| Daily Earnings Credit | September 27, 2015 | $38.70 | $313,959.98 |
| Daily Earnings Credit | September 26, 2015 | $38.70 | $313,921.28 |
| Daily Earnings Credit | September 25, 2015 | $38.69 | $313,882.58 |
| Daily Earnings Credit | September 24, 2015 | $38.69 | $313,843.89 |
| Daily Earnings Credit | September 23, 2015 | $38.68 | $313,805.20 |
| Daily Earnings Credit | September 22, 2015 | $38.68 | $313,766.52 |
| Daily Earnings Credit | September 21, 2015 | $38.67 | $313,727.84 |
| Daily Earnings Credit | September 20, 2015 | $38.67 | $313,689.16 |
| Daily Earnings Credit | September 19, 2015 | $38.66 | $313,650.49 |
| Daily Earnings Credit | September 18, 2015 | $38.66 | $313,611.83 |
| Daily Earnings Credit | September 17, 2015 | $38.66 | $313,573.17 |
| Daily Earnings Credit | September 16, 2015 | $38.65 | $313,534.51 |
| Daily Earnings Credit | September 15, 2015 | $38.65 | $313,495.86 |
| Daily Earnings Credit | September 14, 2015 | $38.64 | $313,457.22 |
| Daily Earnings Credit | September 13, 2015 | $38.64 | $313,418.58 |
| Daily Earnings Credit | September 12, 2015 | $38.63 | $313,379.94 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | September 11, 2015 | $38.63 | $313,341.31 |
| Daily Earnings Credit | September 10, 2015 | $38.62 | $313,302.68 |
| Daily Earnings Credit | September 9, 2015 | $38.62 | $313,264.06 |
| Daily Earnings Credit | September 8, 2015 | $38.61 | $313,225.45 |
| Daily Earnings Credit | September 7, 2015 | $38.61 | $313,186.83 |
| Daily Earnings Credit | September 6, 2015 | $38.60 | $313,148.23 |
| Daily Earnings Credit | September 5, 2015 | $38.60 | $313,109.62 |
| Daily Earnings Credit | September 4, 2015 | $38.59 | $313,071.03 |
| Daily Earnings Credit | September 3, 2015 | $38.59 | $313,032.43 |
| Daily Earnings Credit | September 2, 2015 | $38.58 | $312,993.84 |
| Daily Earnings Credit | September 1, 2015 | $38.58 | $312,955.26 |
| Daily Earnings Credit | August 31, 2015 | $38.57 | $312,916.68 |
| Daily Earnings Credit | August 30, 2015 | $38.57 | $312,878.11 |
| Daily Earnings Credit | August 29, 2015 | $38.56 | $312,839.54 |
| Daily Earnings Credit | August 28, 2015 | $38.56 | $312,800.97 |
| Daily Earnings Credit | August 27, 2015 | $38.56 | $312,762.41 |
| Daily Earnings Credit | August 26, 2015 | $38.55 | $312,723.86 |
| Daily Earnings Credit | August 25, 2015 | $38.55 | $312,685.31 |
| Daily Earnings Credit | August 24, 2015 | $38.54 | $312,646.76 |
| Daily Earnings Credit | August 23, 2015 | $38.54 | $312,608.22 |
| Daily Earnings Credit | August 22, 2015 | $38.53 | $312,569.69 |
| Daily Earnings Credit | August 21, 2015 | $38.53 | $312,531.15 |
| Daily Earnings Credit | August 20, 2015 | $38.52 | $312,492.63 |
| Daily Earnings Credit | August 19, 2015 | $38.52 | $312,454.11 |
| Daily Earnings Credit | August 18, 2015 | $38.51 | $312,415.59 |
| Daily Earnings Credit | August 17, 2015 | $38.51 | $312,377.08 |
| Daily Earnings Credit | August 16, 2015 | $38.50 | $312,338.57 |
| Daily Earnings Credit | August 15, 2015 | $38.50 | $312,300.07 |
| Daily Earnings Credit | August 14, 2015 | $38.49 | $312,261.57 |
| Daily Earnings Credit | August 13, 2015 | $38.49 | $312,223.07 |
| Daily Earnings Credit | August 12, 2015 | $38.48 | $312,184.59 |
| Daily Earnings Credit | August 11, 2015 | $38.48 | $312,146.10 |
| Daily Earnings Credit | August 10, 2015 | $38.47 | $312,107.62 |
| Daily Earnings Credit | August 9, 2015 | $38.47 | $312,069.15 |
| Daily Earnings Credit | August 8, 2015 | $38.46 | $312,030.68 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | August 7, 2015 | $38.46 | $311,992.21 |
| Daily Earnings Credit | August 6, 2015 | $38.46 | $311,953.75 |
| Daily Earnings Credit | August 5, 2015 | $38.45 | $311,915.30 |
| Daily Earnings Credit | August 4, 2015 | $38.45 | $311,876.85 |
| Daily Earnings Credit | August 3, 2015 | $38.44 | $311,838.40 |
| Daily Earnings Credit | August 2, 2015 | $38.44 | $311,799.96 |
| Daily Earnings Credit | August 1, 2015 | $38.43 | $311,761.52 |
| Daily Earnings Credit | July 31, 2015 | $38.43 | $311,723.09 |
| Daily Earnings Credit | July 30, 2015 | $38.42 | $311,684.67 |
| Daily Earnings Credit | July 29, 2015 | $38.42 | $311,646.24 |
| Daily Earnings Credit | July 28, 2015 | $38.41 | $311,607.83 |
| Daily Earnings Credit | July 27, 2015 | $38.41 | $311,569.41 |
| Daily Earnings Credit | July 26, 2015 | $38.40 | $311,531.00 |
| Daily Earnings Credit | July 25, 2015 | $38.40 | $311,492.60 |
| Daily Earnings Credit | July 24, 2015 | $38.39 | $311,454.20 |
| Daily Earnings Credit | July 23, 2015 | $38.39 | $311,415.81 |
| Daily Earnings Credit | July 22, 2015 | $38.38 | $311,377.42 |
| Daily Earnings Credit | July 21, 2015 | $38.38 | $311,339.04 |
| Daily Earnings Credit | July 20, 2015 | $38.37 | $311,300.66 |
| Daily Earnings Credit | July 19, 2015 | $38.37 | $311,262.28 |
| Daily Earnings Credit | July 18, 2015 | $38.37 | $311,223.91 |
| Daily Earnings Credit | July 17, 2015 | $38.36 | $311,185.55 |
| Daily Earnings Credit | July 16, 2015 | $38.36 | $311,147.18 |
| Daily Earnings Credit | July 15, 2015 | $38.35 | $311,108.83 |
| Daily Earnings Credit | July 14, 2015 | $38.35 | $311,070.48 |
| Daily Earnings Credit | July 13, 2015 | $38.34 | $311,032.13 |
| Daily Earnings Credit | July 12, 2015 | $38.34 | $310,993.79 |
| Daily Earnings Credit | July 11, 2015 | $38.33 | $310,955.45 |
| Daily Earnings Credit | July 10, 2015 | $38.33 | $310,917.12 |
| Daily Earnings Credit | July 9, 2015 | $38.32 | $310,878.79 |
| Daily Earnings Credit | July 8, 2015 | $38.32 | $310,840.47 |
| Daily Earnings Credit | July 7, 2015 | $38.31 | $310,802.15 |
| Daily Earnings Credit | July 6, 2015 | $38.31 | $310,763.84 |
| Daily Earnings Credit | July 5, 2015 | $38.30 | $310,725.53 |
| Daily Earnings Credit | July 4, 2015 | $38.30 | $310,687.22 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | July 3, 2015 | $38.29 | $310,648.93 |
| Daily Earnings Credit | July 2, 2015 | $38.29 | $310,610.63 |
| Daily Earnings Credit | July 1, 2015 | $38.29 | $310,572.34 |
| Daily Earnings Credit | June 30, 2015 | $38.28 | $310,534.06 |
| Daily Earnings Credit | June 29, 2015 | $38.28 | $310,495.78 |
| Daily Earnings Credit | June 28, 2015 | $38.27 | $310,457.50 |
| Daily Earnings Credit | June 27, 2015 | $38.27 | $310,419.23 |
| Daily Earnings Credit | June 26, 2015 | $38.26 | $310,380.96 |
| Daily Earnings Credit | June 25, 2015 | $38.26 | $310,342.70 |
| Daily Earnings Credit | June 24, 2015 | $38.25 | $310,304.44 |
| Daily Earnings Credit | June 23, 2015 | $38.25 | $310,266.19 |
| Daily Earnings Credit | June 22, 2015 | $38.24 | $310,227.94 |
| Daily Earnings Credit | June 21, 2015 | $38.24 | $310,189.70 |
| Daily Earnings Credit | June 20, 2015 | $38.23 | $310,151.46 |
| Daily Earnings Credit | June 19, 2015 | $38.23 | $310,113.23 |
| Daily Earnings Credit | June 18, 2015 | $38.22 | $310,075.00 |
| Daily Earnings Credit | June 17, 2015 | $38.22 | $310,036.78 |
| Daily Earnings Credit | June 16, 2015 | $38.21 | $309,998.56 |
| Daily Earnings Credit | June 15, 2015 | $38.21 | $309,960.35 |
| Daily Earnings Credit | June 14, 2015 | $38.20 | $309,922.14 |
| Daily Earnings Credit | June 13, 2015 | $38.20 | $309,883.93 |
| Daily Earnings Credit | June 12, 2015 | $38.20 | $309,845.73 |
| Daily Earnings Credit | June 11, 2015 | $38.19 | $309,807.53 |
| Daily Earnings Credit | June 10, 2015 | $38.19 | $309,769.34 |
| Daily Earnings Credit | June 9, 2015 | $38.18 | $309,731.16 |
| Daily Earnings Credit | June 8, 2015 | $38.18 | $309,692.98 |
| Daily Earnings Credit | June 7, 2015 | $38.17 | $309,654.80 |
| Daily Earnings Credit | June 6, 2015 | $38.17 | $309,616.63 |
| Daily Earnings Credit | June 5, 2015 | $38.16 | $309,578.46 |
| Daily Earnings Credit | June 4, 2015 | $38.16 | $309,540.30 |
| Daily Earnings Credit | June 3, 2015 | $38.15 | $309,502.14 |
| Daily Earnings Credit | June 2, 2015 | $38.15 | $309,463.99 |
| Daily Earnings Credit | June 1, 2015 | $38.14 | $309,425.84 |
| Daily Earnings Credit | May 31, 2015 | $38.14 | $309,387.69 |
| Daily Earnings Credit | May 30, 2015 | $38.13 | $309,349.56 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | May 29, 2015 | $38.13 | $309,311.42 |
| Daily Earnings Credit | May 28, 2015 | $38.12 | $309,273.29 |
| Daily Earnings Credit | May 27, 2015 | $38.12 | $309,235.17 |
| Daily Earnings Credit | May 26, 2015 | $38.12 | $309,197.05 |
| Daily Earnings Credit | May 25, 2015 | $38.11 | $309,158.93 |
| Daily Earnings Credit | May 24, 2015 | $38.11 | $309,120.82 |
| Daily Earnings Credit | May 23, 2015 | $38.10 | $309,082.71 |
| Daily Earnings Credit | May 22, 2015 | $38.10 | $309,044.61 |
| Daily Earnings Credit | May 21, 2015 | $38.09 | $309,006.51 |
| Daily Earnings Credit | May 20, 2015 | $38.09 | $308,968.42 |
| Daily Earnings Credit | May 19, 2015 | $38.08 | $308,930.34 |
| Daily Earnings Credit | May 18, 2015 | $38.08 | $308,892.25 |
| Daily Earnings Credit | May 17, 2015 | $38.07 | $308,854.17 |
| Daily Earnings Credit | May 16, 2015 | $38.07 | $308,816.10 |
| Daily Earnings Credit | May 15, 2015 | $38.06 | $308,778.03 |
| Daily Earnings Credit | May 14, 2015 | $38.06 | $308,739.97 |
| Daily Earnings Credit | May 13, 2015 | $38.05 | $308,701.91 |
| Daily Earnings Credit | May 12, 2015 | $38.05 | $308,663.85 |
| Daily Earnings Credit | May 11, 2015 | $38.05 | $308,625.81 |
| Daily Earnings Credit | May 10, 2015 | $38.04 | $308,587.76 |
| Daily Earnings Credit | May 9, 2015 | $38.04 | $308,549.72 |
| Daily Earnings Credit | May 8, 2015 | $38.03 | $308,511.68 |
| Daily Earnings Credit | May 7, 2015 | $38.03 | $308,473.65 |
| Daily Earnings Credit | May 6, 2015 | $38.02 | $308,435.63 |
| Daily Earnings Credit | May 5, 2015 | $38.02 | $308,397.60 |
| Daily Earnings Credit | May 4, 2015 | $38.01 | $308,359.59 |
| Daily Earnings Credit | May 3, 2015 | $38.01 | $308,321.57 |
| Daily Earnings Credit | May 2, 2015 | $38.00 | $308,283.57 |
| Daily Earnings Credit | May 1, 2015 | $38.00 | $308,245.56 |
| Daily Earnings Credit | April 30, 2015 | $37.99 | $308,207.57 |
| Daily Earnings Credit | April 29, 2015 | $37.99 | $308,169.57 |
| Daily Earnings Credit | April 28, 2015 | $37.98 | $308,131.58 |
| Daily Earnings Credit | April 27, 2015 | $37.98 | $308,093.60 |
| Daily Earnings Credit | April 26, 2015 | $37.97 | $308,055.62 |
| Daily Earnings Credit | April 25, 2015 | $37.97 | $308,017.64 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | April 24, 2015 | $37.97 | $307,979.67 |
| Daily Earnings Credit | April 23, 2015 | $37.96 | $307,941.71 |
| Daily Earnings Credit | April 22, 2015 | $37.96 | $307,903.75 |
| Daily Earnings Credit | April 21, 2015 | $37.95 | $307,865.79 |
| Daily Earnings Credit | April 20, 2015 | $37.95 | $307,827.84 |
| Daily Earnings Credit | April 19, 2015 | $37.94 | $307,789.89 |
| Daily Earnings Credit | April 18, 2015 | $37.94 | $307,751.95 |
| Daily Earnings Credit | April 17, 2015 | $37.93 | $307,714.01 |
| Daily Earnings Credit | April 16, 2015 | $37.93 | $307,676.08 |
| Daily Earnings Credit | April 15, 2015 | $37.92 | $307,638.15 |
| Daily Earnings Credit | April 14, 2015 | $37.92 | $307,600.23 |
| Daily Earnings Credit | April 13, 2015 | $37.91 | $307,562.31 |
| Daily Earnings Credit | April 12, 2015 | $37.91 | $307,524.40 |
| Daily Earnings Credit | April 11, 2015 | $37.90 | $307,486.49 |
| Daily Earnings Credit | April 10, 2015 | $37.90 | $307,448.58 |
| Daily Earnings Credit | April 9, 2015 | $37.90 | $307,410.68 |
| Daily Earnings Credit | April 8, 2015 | $37.89 | $307,372.79 |
| Daily Earnings Credit | April 7, 2015 | $37.89 | $307,334.90 |
| Daily Earnings Credit | April 6, 2015 | $37.88 | $307,297.01 |
| Daily Earnings Credit | April 5, 2015 | $37.88 | $307,259.13 |
| Daily Earnings Credit | April 4, 2015 | $37.87 | $307,221.25 |
| Daily Earnings Credit | April 3, 2015 | $37.87 | $307,183.38 |
| Daily Earnings Credit | April 2, 2015 | $37.86 | $307,145.51 |
| Daily Earnings Credit | April 1, 2015 | $37.86 | $307,107.65 |
| Daily Earnings Credit | March 31, 2015 | $37.85 | $307,069.79 |
| Daily Earnings Credit | March 30, 2015 | $37.85 | $307,031.94 |
| Daily Earnings Credit | March 29, 2015 | $37.84 | $306,994.09 |
| Daily Earnings Credit | March 28, 2015 | $37.84 | $306,956.25 |
| Daily Earnings Credit | March 27, 2015 | $37.83 | $306,918.41 |
| Daily Earnings Credit | March 26, 2015 | $37.83 | $306,880.57 |
| Daily Earnings Credit | March 25, 2015 | $37.83 | $306,842.74 |
| Daily Earnings Credit | March 24, 2015 | $37.82 | $306,804.92 |
| Daily Earnings Credit | March 23, 2015 | $37.82 | $306,767.10 |
| Daily Earnings Credit | March 22, 2015 | $37.81 | $306,729.28 |
| Daily Earnings Credit | March 21, 2015 | $37.81 | $306,691.47 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | March 20, 2015 | $37.80 | $306,653.66 |
| Daily Earnings Credit | March 19, 2015 | $37.80 | $306,615.86 |
| Daily Earnings Credit | March 18, 2015 | $37.79 | $306,578.06 |
| Daily Earnings Credit | March 17, 2015 | $37.79 | $306,540.27 |
| Daily Earnings Credit | March 16, 2015 | $37.78 | $306,502.48 |
| Daily Earnings Credit | March 15, 2015 | $37.78 | $306,464.70 |
| Daily Earnings Credit | March 14, 2015 | $37.77 | $306,426.92 |
| Daily Earnings Credit | March 13, 2015 | $37.77 | $306,389.15 |
| Daily Earnings Credit | March 12, 2015 | $37.76 | $306,351.38 |
| Daily Earnings Credit | March 11, 2015 | $37.76 | $306,313.61 |
| Daily Earnings Credit | March 10, 2015 | $37.76 | $306,275.85 |
| Daily Earnings Credit | March 9, 2015 | $37.75 | $306,238.10 |
| Daily Earnings Credit | March 8, 2015 | $37.75 | $306,200.35 |
| Daily Earnings Credit | March 7, 2015 | $37.74 | $306,162.60 |
| Daily Earnings Credit | March 6, 2015 | $37.74 | $306,124.86 |
| Daily Earnings Credit | March 5, 2015 | $37.73 | $306,087.12 |
| Daily Earnings Credit | March 4, 2015 | $37.73 | $306,049.39 |
| Daily Earnings Credit | March 3, 2015 | $37.72 | $306,011.66 |
| Daily Earnings Credit | March 2, 2015 | $37.72 | $305,973.94 |
| Daily Earnings Credit | March 1, 2015 | $37.71 | $305,936.22 |
| Daily Earnings Credit | February 28, 2015 | $37.71 | $305,898.51 |
| Daily Earnings Credit | February 27, 2015 | $37.70 | $305,860.80 |
| Daily Earnings Credit | February 26, 2015 | $37.70 | $305,823.09 |
| Daily Earnings Credit | February 25, 2015 | $37.70 | $305,785.39 |
| Daily Earnings Credit | February 24, 2015 | $37.69 | $305,747.70 |
| Daily Earnings Credit | February 23, 2015 | $37.69 | $305,710.01 |
| Daily Earnings Credit | February 22, 2015 | $37.68 | $305,672.32 |
| Daily Earnings Credit | February 21, 2015 | $37.68 | $305,634.64 |
| Daily Earnings Credit | February 20, 2015 | $37.67 | $305,596.96 |
| Daily Earnings Credit | February 19, 2015 | $37.67 | $305,559.29 |
| Daily Earnings Credit | February 18, 2015 | $37.66 | $305,521.63 |
| Daily Earnings Credit | February 17, 2015 | $37.66 | $305,483.96 |
| Daily Earnings Credit | February 16, 2015 | $37.65 | $305,446.31 |
| Daily Earnings Credit | February 15, 2015 | $37.65 | $305,408.65 |
| Daily Earnings Credit | February 14, 2015 | $37.64 | $305,371.00 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | February 13, 2015 | $37.64 | $305,333.36 |
| Daily Earnings Credit | February 12, 2015 | $37.63 | $305,295.72 |
| Daily Earnings Credit | February 11, 2015 | $37.63 | $305,258.09 |
| Daily Earnings Credit | February 10, 2015 | $37.63 | $305,220.46 |
| Daily Earnings Credit | February 9, 2015 | $37.62 | $305,182.83 |
| Daily Earnings Credit | February 8, 2015 | $37.62 | $305,145.21 |
| Daily Earnings Credit | February 7, 2015 | $37.61 | $305,107.59 |
| Daily Earnings Credit | February 6, 2015 | $37.61 | $305,069.98 |
| Daily Earnings Credit | February 5, 2015 | $37.60 | $305,032.37 |
| Daily Earnings Credit | February 4, 2015 | $37.60 | $304,994.77 |
| Daily Earnings Credit | February 3, 2015 | $37.59 | $304,957.18 |
| Daily Earnings Credit | February 2, 2015 | $37.59 | $304,919.58 |
| Daily Earnings Credit | February 1, 2015 | $37.58 | $304,881.99 |
| Daily Earnings Credit | January 31, 2015 | $37.58 | $304,844.41 |
| Daily Earnings Credit | January 30, 2015 | $37.57 | $304,806.83 |
| Daily Earnings Credit | January 29, 2015 | $37.57 | $304,769.26 |
| Daily Earnings Credit | January 28, 2015 | $37.57 | $304,731.69 |
| Daily Earnings Credit | January 27, 2015 | $37.56 | $304,694.12 |
| Daily Earnings Credit | January 26, 2015 | $37.56 | $304,656.56 |
| Daily Earnings Credit | January 25, 2015 | $37.55 | $304,619.01 |
| Daily Earnings Credit | January 24, 2015 | $37.55 | $304,581.45 |
| Daily Earnings Credit | January 23, 2015 | $37.54 | $304,543.91 |
| Daily Earnings Credit | January 22, 2015 | $37.54 | $304,506.37 |
| Daily Earnings Credit | January 21, 2015 | $37.53 | $304,468.83 |
| Daily Earnings Credit | January 20, 2015 | $37.53 | $304,431.30 |
| Daily Earnings Credit | January 19, 2015 | $37.52 | $304,393.77 |
| Daily Earnings Credit | January 18, 2015 | $37.52 | $304,356.24 |
| Daily Earnings Credit | January 17, 2015 | $37.51 | $304,318.73 |
| Daily Earnings Credit | January 16, 2015 | $37.51 | $304,281.21 |
| Daily Earnings Credit | January 15, 2015 | $37.50 | $304,243.70 |
| Daily Earnings Credit | January 14, 2015 | $37.50 | $304,206.20 |
| Daily Earnings Credit | January 13, 2015 | $37.50 | $304,168.70 |
| Daily Earnings Credit | January 12, 2015 | $37.49 | $304,131.20 |
| Daily Earnings Credit | January 11, 2015 | $37.49 | $304,093.71 |
| Daily Earnings Credit | January 10, 2015 | $37.48 | $304,056.22 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | January 9, 2015 | $37.48 | $304,018.74 |
| Daily Earnings Credit | January 8, 2015 | $37.47 | $303,981.26 |
| Daily Earnings Credit | January 7, 2015 | $37.47 | $303,943.79 |
| Daily Earnings Credit | January 6, 2015 | $37.46 | $303,906.32 |
| Daily Earnings Credit | January 5, 2015 | $37.46 | $303,868.86 |
| Daily Earnings Credit | January 4, 2015 | $37.45 | $303,831.40 |
| Daily Earnings Credit | January 3, 2015 | $37.45 | $303,793.95 |
| Daily Earnings Credit | January 2, 2015 | $37.44 | $303,756.50 |
| Daily Earnings Credit | January 1, 2015 | $37.44 | $303,719.05 |
| Daily Earnings Credit | December 31, 2014 | $37.44 | $303,681.61 |
| Daily Earnings Credit | December 30, 2014 | $37.43 | $303,644.18 |
| Daily Earnings Credit | December 29, 2014 | $37.43 | $303,606.75 |
| Daily Earnings Credit | December 28, 2014 | $37.42 | $303,569.32 |
| Daily Earnings Credit | December 27, 2014 | $37.42 | $303,531.90 |
| Daily Earnings Credit | December 26, 2014 | $37.41 | $303,494.48 |
| Daily Earnings Credit | December 25, 2014 | $37.41 | $303,457.07 |
| Daily Earnings Credit | December 24, 2014 | $37.40 | $303,419.66 |
| Daily Earnings Credit | December 23, 2014 | $37.40 | $303,382.26 |
| Daily Earnings Credit | December 22, 2014 | $37.39 | $303,344.86 |
| Daily Earnings Credit | December 21, 2014 | $37.39 | $303,307.46 |
| Daily Earnings Credit | December 20, 2014 | $37.38 | $303,270.07 |
| Daily Earnings Credit | December 19, 2014 | $37.38 | $303,232.69 |
| Daily Earnings Credit | December 18, 2014 | $37.38 | $303,195.31 |
| Daily Earnings Credit | December 17, 2014 | $37.37 | $303,157.93 |
| Daily Earnings Credit | December 16, 2014 | $37.37 | $303,120.56 |
| Daily Earnings Credit | December 15, 2014 | $37.36 | $303,083.19 |
| Daily Earnings Credit | December 14, 2014 | $37.36 | $303,045.83 |
| Daily Earnings Credit | December 13, 2014 | $37.35 | $303,008.48 |
| Daily Earnings Credit | December 12, 2014 | $37.35 | $302,971.12 |
| Daily Earnings Credit | December 11, 2014 | $37.34 | $302,933.77 |
| Daily Earnings Credit | December 10, 2014 | $37.34 | $302,896.43 |
| Daily Earnings Credit | December 9, 2014 | $37.33 | $302,859.09 |
| Daily Earnings Credit | December 8, 2014 | $37.33 | $302,821.76 |
| Daily Earnings Credit | December 7, 2014 | $37.33 | $302,784.43 |
| Daily Earnings Credit | December 6, 2014 | $37.32 | $302,747.10 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | December 5, 2014 | $37.32 | $302,709.78 |
| Daily Earnings Credit | December 4, 2014 | $37.31 | $302,672.47 |
| Daily Earnings Credit | December 3, 2014 | $37.31 | $302,635.16 |
| Daily Earnings Credit | December 2, 2014 | $37.30 | $302,597.85 |
| Daily Earnings Credit | December 1, 2014 | $37.30 | $302,560.55 |
| Daily Earnings Credit | November 30, 2014 | $37.29 | $302,523.25 |
| Daily Earnings Credit | November 29, 2014 | $37.29 | $302,485.96 |
| Daily Earnings Credit | November 28, 2014 | $37.28 | $302,448.67 |
| Daily Earnings Credit | November 27, 2014 | $37.28 | $302,411.38 |
| Daily Earnings Credit | November 26, 2014 | $37.27 | $302,374.11 |
| Daily Earnings Credit | November 25, 2014 | $37.27 | $302,336.83 |
| Daily Earnings Credit | November 24, 2014 | $37.27 | $302,299.56 |
| Daily Earnings Credit | November 23, 2014 | $37.26 | $302,262.30 |
| Daily Earnings Credit | November 22, 2014 | $37.26 | $302,225.03 |
| Daily Earnings Credit | November 21, 2014 | $37.25 | $302,187.78 |
| Daily Earnings Credit | November 20, 2014 | $37.25 | $302,150.53 |
| Daily Earnings Credit | November 19, 2014 | $37.24 | $302,113.28 |
| Daily Earnings Credit | November 18, 2014 | $37.24 | $302,076.04 |
| Daily Earnings Credit | November 17, 2014 | $37.23 | $302,038.80 |
| Daily Earnings Credit | November 16, 2014 | $37.23 | $302,001.57 |
| Daily Earnings Credit | November 15, 2014 | $37.22 | $301,964.34 |
| Daily Earnings Credit | November 14, 2014 | $37.22 | $301,927.11 |
| Daily Earnings Credit | November 13, 2014 | $37.21 | $301,889.89 |
| Daily Earnings Credit | November 12, 2014 | $37.21 | $301,852.68 |
| Daily Earnings Credit | November 11, 2014 | $37.21 | $301,815.47 |
| Daily Earnings Credit | November 10, 2014 | $37.20 | $301,778.26 |
| Daily Earnings Credit | November 9, 2014 | $37.20 | $301,741.06 |
| Daily Earnings Credit | November 8, 2014 | $37.19 | $301,703.87 |
| Daily Earnings Credit | November 7, 2014 | $37.19 | $301,666.67 |
| Daily Earnings Credit | November 6, 2014 | $37.18 | $301,629.49 |
| Daily Earnings Credit | November 5, 2014 | $37.18 | $301,592.30 |
| Daily Earnings Credit | November 4, 2014 | $37.17 | $301,555.13 |
| Daily Earnings Credit | November 3, 2014 | $37.17 | $301,517.95 |
| Daily Earnings Credit | November 2, 2014 | $37.16 | $301,480.78 |
| Daily Earnings Credit | November 1, 2014 | $37.16 | $301,443.62 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | October 31, 2014 | $37.16 | $301,406.46 |
| Daily Earnings Credit | October 30, 2014 | $37.15 | $301,369.30 |
| Daily Earnings Credit | October 29, 2014 | $37.15 | $301,332.15 |
| Daily Earnings Credit | October 28, 2014 | $37.14 | $301,295.01 |
| Daily Earnings Credit | October 27, 2014 | $37.14 | $301,257.87 |
| Daily Earnings Credit | October 26, 2014 | $37.13 | $301,220.73 |
| Daily Earnings Credit | October 25, 2014 | $37.13 | $301,183.60 |
| Daily Earnings Credit | October 24, 2014 | $37.12 | $301,146.47 |
| Daily Earnings Credit | October 23, 2014 | $37.12 | $301,109.35 |
| Daily Earnings Credit | October 22, 2014 | $37.11 | $301,072.23 |
| Daily Earnings Credit | October 21, 2014 | $37.11 | $301,035.11 |
| Daily Earnings Credit | October 20, 2014 | $37.10 | $300,998.00 |
| Daily Earnings Credit | October 19, 2014 | $37.10 | $300,960.90 |
| Daily Earnings Credit | October 18, 2014 | $37.10 | $300,923.80 |
| Daily Earnings Credit | October 17, 2014 | $37.09 | $300,886.70 |
| Daily Earnings Credit | October 16, 2014 | $37.09 | $300,849.61 |
| Daily Earnings Credit | October 15, 2014 | $37.08 | $300,812.53 |
| Daily Earnings Credit | October 14, 2014 | $37.08 | $300,775.44 |
| Daily Earnings Credit | October 13, 2014 | $37.07 | $300,738.37 |
| Daily Earnings Credit | October 12, 2014 | $37.07 | $300,701.29 |
| Daily Earnings Credit | October 11, 2014 | $37.06 | $300,664.23 |
| Daily Earnings Credit | October 10, 2014 | $37.06 | $300,627.16 |
| Daily Earnings Credit | October 9, 2014 | $37.05 | $300,590.10 |
| Daily Earnings Credit | October 8, 2014 | $37.05 | $300,553.05 |
| Daily Earnings Credit | October 7, 2014 | $37.05 | $300,516.00 |
| Daily Earnings Credit | October 6, 2014 | $37.04 | $300,478.95 |
| Daily Earnings Credit | October 5, 2014 | $37.04 | $300,441.91 |
| Daily Earnings Credit | October 4, 2014 | $37.03 | $300,404.88 |
| Daily Earnings Credit | October 3, 2014 | $37.03 | $300,367.84 |
| Daily Earnings Credit | October 2, 2014 | $37.02 | $300,330.82 |
| Daily Earnings Credit | October 1, 2014 | $37.02 | $300,293.79 |
| Daily Earnings Credit | September 30, 2014 | $37.01 | $300,256.78 |
| Daily Earnings Credit | September 29, 2014 | $37.01 | $300,219.76 |
| Daily Earnings Credit | September 28, 2014 | $37.00 | $300,182.75 |
| Daily Earnings Credit | September 27, 2014 | $37.00 | $300,145.75 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | September 26, 2014 | $37.00 | $300,108.75 |
| Daily Earnings Credit | September 25, 2014 | $36.99 | $300,071.75 |
| Daily Earnings Credit | September 24, 2014 | $36.99 | $300,034.76 |
| Daily Earnings Credit | September 23, 2014 | $36.98 | $299,997.78 |
| Daily Earnings Credit | September 22, 2014 | $36.98 | $299,960.80 |
| Daily Earnings Credit | September 21, 2014 | $36.97 | $299,923.82 |
| Daily Earnings Credit | September 20, 2014 | $36.97 | $299,886.85 |
| Daily Earnings Credit | September 19, 2014 | $36.96 | $299,849.88 |
| Daily Earnings Credit | September 18, 2014 | $36.96 | $299,812.91 |
| Daily Earnings Credit | September 17, 2014 | $36.95 | $299,775.96 |
| Daily Earnings Credit | September 16, 2014 | $36.95 | $299,739.00 |
| Daily Earnings Credit | September 15, 2014 | $36.95 | $299,702.05 |
| Daily Earnings Credit | September 14, 2014 | $36.94 | $299,665.11 |
| Daily Earnings Credit | September 13, 2014 | $36.94 | $299,628.17 |
| Daily Earnings Credit | September 12, 2014 | $36.93 | $299,591.23 |
| Daily Earnings Credit | September 11, 2014 | $36.93 | $299,554.30 |
| Daily Earnings Credit | September 10, 2014 | $36.92 | $299,517.37 |
| Daily Earnings Credit | September 9, 2014 | $36.92 | $299,480.45 |
| Daily Earnings Credit | September 8, 2014 | $36.91 | $299,443.53 |
| Daily Earnings Credit | September 7, 2014 | $36.91 | $299,406.62 |
| Daily Earnings Credit | September 6, 2014 | $36.90 | $299,369.71 |
| Daily Earnings Credit | September 5, 2014 | $36.90 | $299,332.81 |
| Daily Earnings Credit | September 4, 2014 | $36.90 | $299,295.91 |
| Daily Earnings Credit | September 3, 2014 | $36.89 | $299,259.01 |
| Daily Earnings Credit | September 2, 2014 | $36.89 | $299,222.12 |
| Daily Earnings Credit | September 1, 2014 | $36.88 | $299,185.23 |
| Daily Earnings Credit | August 31, 2014 | $36.88 | $299,148.35 |
| Daily Earnings Credit | August 30, 2014 | $36.87 | $299,111.48 |
| Daily Earnings Credit | August 29, 2014 | $36.87 | $299,074.60 |
| Daily Earnings Credit | August 28, 2014 | $36.86 | $299,037.74 |
| Daily Earnings Credit | August 27, 2014 | $36.86 | $299,000.87 |
| Daily Earnings Credit | August 26, 2014 | $36.85 | $298,964.01 |
| Daily Earnings Credit | August 25, 2014 | $36.85 | $298,927.16 |
| Daily Earnings Credit | August 24, 2014 | $36.85 | $298,890.31 |
| Daily Earnings Credit | August 23, 2014 | $36.84 | $298,853.47 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | August 22, 2014 | $36.84 | $298,816.63 |
| Daily Earnings Credit | August 21, 2014 | $36.83 | $298,779.79 |
| Daily Earnings Credit | August 20, 2014 | $36.83 | $298,742.96 |
| Daily Earnings Credit | August 19, 2014 | $36.82 | $298,706.13 |
| Daily Earnings Credit | August 18, 2014 | $36.82 | $298,669.31 |
| Daily Earnings Credit | August 17, 2014 | $36.81 | $298,632.49 |
| Daily Earnings Credit | August 16, 2014 | $36.81 | $298,595.68 |
| Daily Earnings Credit | August 15, 2014 | $36.80 | $298,558.87 |
| Daily Earnings Credit | August 14, 2014 | $36.80 | $298,522.06 |
| Daily Earnings Credit | August 13, 2014 | $36.80 | $298,485.26 |
| Daily Earnings Credit | August 12, 2014 | $36.79 | $298,448.47 |
| Daily Earnings Credit | August 11, 2014 | $36.79 | $298,411.68 |
| Daily Earnings Credit | August 10, 2014 | $36.78 | $298,374.89 |
| Daily Earnings Credit | August 9, 2014 | $36.78 | $298,338.11 |
| Daily Earnings Credit | August 8, 2014 | $36.77 | $298,301.33 |
| Daily Earnings Credit | August 7, 2014 | $36.77 | $298,264.56 |
| Daily Earnings Credit | August 6, 2014 | $36.76 | $298,227.79 |
| Daily Earnings Credit | August 5, 2014 | $36.76 | $298,191.03 |
| Daily Earnings Credit | August 4, 2014 | $36.75 | $298,154.27 |
| Daily Earnings Credit | August 3, 2014 | $36.75 | $298,117.52 |
| Daily Earnings Credit | August 2, 2014 | $36.75 | $298,080.77 |
| Daily Earnings Credit | August 1, 2014 | $36.74 | $298,044.02 |
| Daily Earnings Credit | July 31, 2014 | $36.74 | $298,007.28 |
| Daily Earnings Credit | July 30, 2014 | $36.73 | $297,970.55 |
| Daily Earnings Credit | July 29, 2014 | $36.73 | $297,933.81 |
| Daily Earnings Credit | July 28, 2014 | $36.72 | $297,897.09 |
| Daily Earnings Credit | July 27, 2014 | $36.72 | $297,860.36 |
| Daily Earnings Credit | July 26, 2014 | $36.71 | $297,823.65 |
| Daily Earnings Credit | July 25, 2014 | $36.71 | $297,786.93 |
| Daily Earnings Credit | July 24, 2014 | $36.70 | $297,750.22 |
| Daily Earnings Credit | July 23, 2014 | $36.70 | $297,713.52 |
| Daily Earnings Credit | July 22, 2014 | $36.70 | $297,676.82 |
| Daily Earnings Credit | July 21, 2014 | $36.69 | $297,640.12 |
| Daily Earnings Credit | July 20, 2014 | $36.69 | $297,603.43 |
| Daily Earnings Credit | July 19, 2014 | $36.68 | $297,566.75 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | July 18, 2014 | $36.68 | $297,530.06 |
| Daily Earnings Credit | July 17, 2014 | $36.67 | $297,493.39 |
| Daily Earnings Credit | July 16, 2014 | $36.67 | $297,456.71 |
| Daily Earnings Credit | July 15, 2014 | $36.66 | $297,420.05 |
| Daily Earnings Credit | July 14, 2014 | $36.66 | $297,383.38 |
| Daily Earnings Credit | July 13, 2014 | $36.65 | $297,346.72 |
| Daily Earnings Credit | July 12, 2014 | $36.65 | $297,310.07 |
| Daily Earnings Credit | July 11, 2014 | $36.65 | $297,273.42 |
| Daily Earnings Credit | July 10, 2014 | $36.64 | $297,236.77 |
| Daily Earnings Credit | July 9, 2014 | $36.64 | $297,200.13 |
| Daily Earnings Credit | July 8, 2014 | $36.63 | $297,163.49 |
| Daily Earnings Credit | July 7, 2014 | $36.63 | $297,126.86 |
| Daily Earnings Credit | July 6, 2014 | $36.62 | $297,090.23 |
| Daily Earnings Credit | July 5, 2014 | $36.62 | $297,053.61 |
| Daily Earnings Credit | July 4, 2014 | $36.61 | $297,016.99 |
| Daily Earnings Credit | July 3, 2014 | $36.61 | $296,980.38 |
| Daily Earnings Credit | July 2, 2014 | $36.61 | $296,943.77 |
| Daily Earnings Credit | July 1, 2014 | $36.60 | $296,907.16 |
| Daily Earnings Credit | June 30, 2014 | $36.60 | $296,870.56 |
| Daily Earnings Credit | June 29, 2014 | $36.59 | $296,833.97 |
| Daily Earnings Credit | June 28, 2014 | $36.59 | $296,797.38 |
| Daily Earnings Credit | June 27, 2014 | $36.58 | $296,760.79 |
| Daily Earnings Credit | June 26, 2014 | $36.58 | $296,724.21 |
| Daily Earnings Credit | June 25, 2014 | $36.57 | $296,687.63 |
| Daily Earnings Credit | June 24, 2014 | $36.57 | $296,651.05 |
| Daily Earnings Credit | June 23, 2014 | $36.56 | $296,614.49 |
| Daily Earnings Credit | June 22, 2014 | $36.56 | $296,577.92 |
| Daily Earnings Credit | June 21, 2014 | $36.56 | $296,541.36 |
| Daily Earnings Credit | June 20, 2014 | $36.55 | $296,504.81 |
| Daily Earnings Credit | June 19, 2014 | $36.55 | $296,468.25 |
| Daily Earnings Credit | June 18, 2014 | $36.54 | $296,431.71 |
| Daily Earnings Credit | June 17, 2014 | $36.54 | $296,395.17 |
| Daily Earnings Credit | June 16, 2014 | $36.53 | $296,358.63 |
| Daily Earnings Credit | June 15, 2014 | $36.53 | $296,322.10 |
| Daily Earnings Credit | June 14, 2014 | $36.52 | $296,285.57 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | June 13, 2014 | $36.52 | $296,249.04 |
| Daily Earnings Credit | June 12, 2014 | $36.51 | $296,212.52 |
| Daily Earnings Credit | June 11, 2014 | $36.51 | $296,176.01 |
| Daily Earnings Credit | June 10, 2014 | $36.51 | $296,139.50 |
| Daily Earnings Credit | June 9, 2014 | $36.50 | $296,102.99 |
| Daily Earnings Credit | June 8, 2014 | $36.50 | $296,066.49 |
| Daily Earnings Credit | June 7, 2014 | $36.49 | $296,029.99 |
| Daily Earnings Credit | June 6, 2014 | $36.49 | $295,993.50 |
| Daily Earnings Credit | June 5, 2014 | $36.48 | $295,957.01 |
| Daily Earnings Credit | June 4, 2014 | $36.48 | $295,920.53 |
| Daily Earnings Credit | June 3, 2014 | $36.47 | $295,884.05 |
| Daily Earnings Credit | June 2, 2014 | $36.47 | $295,847.58 |
| Daily Earnings Credit | June 1, 2014 | $36.47 | $295,811.11 |
| Daily Earnings Credit | May 31, 2014 | $36.46 | $295,774.64 |
| Daily Earnings Credit | May 30, 2014 | $36.46 | $295,738.18 |
| Daily Earnings Credit | May 29, 2014 | $36.45 | $295,701.72 |
| Daily Earnings Credit | May 28, 2014 | $36.45 | $295,665.27 |
| Daily Earnings Credit | May 27, 2014 | $36.44 | $295,628.82 |
| Daily Earnings Credit | May 26, 2014 | $36.44 | $295,592.38 |
| Daily Earnings Credit | May 25, 2014 | $36.43 | $295,555.94 |
| Daily Earnings Credit | May 24, 2014 | $36.43 | $295,519.51 |
| Daily Earnings Credit | May 23, 2014 | $36.43 | $295,483.08 |
| Daily Earnings Credit | May 22, 2014 | $36.42 | $295,446.65 |
| Daily Earnings Credit | May 21, 2014 | $36.42 | $295,410.23 |
| Daily Earnings Credit | May 20, 2014 | $36.41 | $295,373.82 |
| Daily Earnings Credit | May 19, 2014 | $36.41 | $295,337.41 |
| Daily Earnings Credit | May 18, 2014 | $36.40 | $295,301.00 |
| Daily Earnings Credit | May 17, 2014 | $36.40 | $295,264.60 |
| Daily Earnings Credit | May 16, 2014 | $36.39 | $295,228.20 |
| Daily Earnings Credit | May 15, 2014 | $36.39 | $295,191.80 |
| Daily Earnings Credit | May 14, 2014 | $36.38 | $295,155.42 |
| Daily Earnings Credit | May 13, 2014 | $36.38 | $295,119.03 |
| Daily Earnings Credit | May 12, 2014 | $36.38 | $295,082.65 |
| Daily Earnings Credit | May 11, 2014 | $36.37 | $295,046.28 |
| Daily Earnings Credit | May 10, 2014 | $36.37 | $295,009.90 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | May 9, 2014 | $36.36 | $294,973.54 |
| Daily Earnings Credit | May 8, 2014 | $36.36 | $294,937.18 |
| Daily Earnings Credit | May 7, 2014 | $36.35 | $294,900.82 |
| Daily Earnings Credit | May 6, 2014 | $36.35 | $294,864.46 |
| Daily Earnings Credit | May 5, 2014 | $36.34 | $294,828.12 |
| Daily Earnings Credit | May 4, 2014 | $36.34 | $294,791.77 |
| Daily Earnings Credit | May 3, 2014 | $36.34 | $294,755.43 |
| Daily Earnings Credit | May 2, 2014 | $36.33 | $294,719.10 |
| Daily Earnings Credit | May 1, 2014 | $36.33 | $294,682.77 |
| Daily Earnings Credit | April 30, 2014 | $36.32 | $294,646.44 |
| Daily Earnings Credit | April 29, 2014 | $36.32 | $294,610.12 |
| Daily Earnings Credit | April 28, 2014 | $36.31 | $294,573.80 |
| Daily Earnings Credit | April 27, 2014 | $36.31 | $294,537.49 |
| Daily Earnings Credit | April 26, 2014 | $36.30 | $294,501.18 |
| Daily Earnings Credit | April 25, 2014 | $36.30 | $294,464.87 |
| Daily Earnings Credit | April 24, 2014 | $36.30 | $294,428.57 |
| Daily Earnings Credit | April 23, 2014 | $36.29 | $294,392.28 |
| Daily Earnings Credit | April 22, 2014 | $36.29 | $294,355.99 |
| Daily Earnings Credit | April 21, 2014 | $36.28 | $294,319.70 |
| Daily Earnings Credit | April 20, 2014 | $36.28 | $294,283.42 |
| Daily Earnings Credit | April 19, 2014 | $36.27 | $294,247.14 |
| Daily Earnings Credit | April 18, 2014 | $36.27 | $294,210.87 |
| Daily Earnings Credit | April 17, 2014 | $36.26 | $294,174.60 |
| Daily Earnings Credit | April 16, 2014 | $36.26 | $294,138.34 |
| Daily Earnings Credit | April 15, 2014 | $36.25 | $294,102.08 |
| Daily Earnings Credit | April 14, 2014 | $36.25 | $294,065.83 |
| Daily Earnings Credit | April 13, 2014 | $36.25 | $294,029.58 |
| Daily Earnings Credit | April 12, 2014 | $36.24 | $293,993.33 |
| Daily Earnings Credit | April 11, 2014 | $36.24 | $293,957.09 |
| Daily Earnings Credit | April 10, 2014 | $36.23 | $293,920.85 |
| Daily Earnings Credit | April 9, 2014 | $36.23 | $293,884.62 |
| Daily Earnings Credit | April 8, 2014 | $36.22 | $293,848.39 |
| Daily Earnings Credit | April 7, 2014 | $36.22 | $293,812.17 |
| Daily Earnings Credit | April 6, 2014 | $36.21 | $293,775.95 |
| Daily Earnings Credit | April 5, 2014 | $36.21 | $293,739.73 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | April 4, 2014 | $36.21 | $293,703.52 |
| Daily Earnings Credit | April 3, 2014 | $36.20 | $293,667.32 |
| Daily Earnings Credit | April 2, 2014 | $36.20 | $293,631.12 |
| Daily Earnings Credit | April 1, 2014 | $36.19 | $293,594.92 |
| Daily Earnings Credit | March 31, 2014 | $36.19 | $293,558.73 |
| Daily Earnings Credit | March 30, 2014 | $36.18 | $293,522.54 |
| Daily Earnings Credit | March 29, 2014 | $36.18 | $293,486.36 |
| Daily Earnings Credit | March 28, 2014 | $36.17 | $293,450.18 |
| Daily Earnings Credit | March 27, 2014 | $36.17 | $293,414.00 |
| Daily Earnings Credit | March 26, 2014 | $36.17 | $293,377.83 |
| Daily Earnings Credit | March 25, 2014 | $36.16 | $293,341.67 |
| Daily Earnings Credit | March 24, 2014 | $36.16 | $293,305.51 |
| Daily Earnings Credit | March 23, 2014 | $36.15 | $293,269.35 |
| Daily Earnings Credit | March 22, 2014 | $36.15 | $293,233.20 |
| Daily Earnings Credit | March 21, 2014 | $36.14 | $293,197.05 |
| Daily Earnings Credit | March 20, 2014 | $36.14 | $293,160.91 |
| Daily Earnings Credit | March 19, 2014 | $36.13 | $293,124.77 |
| Daily Earnings Credit | March 18, 2014 | $36.13 | $293,088.63 |
| Daily Earnings Credit | March 17, 2014 | $36.13 | $293,052.50 |
| Daily Earnings Credit | March 16, 2014 | $36.12 | $293,016.38 |
| Daily Earnings Credit | March 15, 2014 | $36.12 | $292,980.26 |
| Daily Earnings Credit | March 14, 2014 | $36.11 | $292,944.14 |
| Daily Earnings Credit | March 13, 2014 | $36.11 | $292,908.03 |
| Daily Earnings Credit | March 12, 2014 | $36.10 | $292,871.92 |
| Daily Earnings Credit | March 11, 2014 | $36.10 | $292,835.82 |
| Daily Earnings Credit | March 10, 2014 | $36.09 | $292,799.72 |
| Daily Earnings Credit | March 9, 2014 | $36.09 | $292,763.63 |
| Daily Earnings Credit | March 8, 2014 | $36.09 | $292,727.54 |
| Daily Earnings Credit | March 7, 2014 | $36.08 | $292,691.45 |
| Daily Earnings Credit | March 6, 2014 | $36.08 | $292,655.37 |
| Daily Earnings Credit | March 5, 2014 | $36.07 | $292,619.29 |
| Daily Earnings Credit | March 4, 2014 | $36.07 | $292,583.22 |
| Daily Earnings Credit | March 3, 2014 | $36.06 | $292,547.15 |
| Daily Earnings Credit | March 2, 2014 | $36.06 | $292,511.09 |
| Daily Earnings Credit | March 1, 2014 | $36.05 | $292,475.03 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | February 28, 2014 | $36.05 | $292,438.98 |
| Daily Earnings Credit | February 27, 2014 | $36.05 | $292,402.93 |
| Daily Earnings Credit | February 26, 2014 | $36.04 | $292,366.88 |
| Daily Earnings Credit | February 25, 2014 | $36.04 | $292,330.84 |
| Daily Earnings Credit | February 24, 2014 | $36.03 | $292,294.81 |
| Daily Earnings Credit | February 23, 2014 | $36.03 | $292,258.77 |
| Daily Earnings Credit | February 22, 2014 | $36.02 | $292,222.75 |
| Daily Earnings Credit | February 21, 2014 | $36.02 | $292,186.72 |
| Daily Earnings Credit | February 20, 2014 | $36.01 | $292,150.70 |
| Daily Earnings Credit | February 19, 2014 | $36.01 | $292,114.69 |
| Daily Earnings Credit | February 18, 2014 | $36.01 | $292,078.68 |
| Daily Earnings Credit | February 17, 2014 | $36.00 | $292,042.67 |
| Daily Earnings Credit | February 16, 2014 | $36.00 | $292,006.67 |
| Daily Earnings Credit | February 15, 2014 | $35.99 | $291,970.68 |
| Daily Earnings Credit | February 14, 2014 | $35.99 | $291,934.68 |
| Daily Earnings Credit | February 13, 2014 | $35.98 | $291,898.70 |
| Daily Earnings Credit | February 12, 2014 | $35.98 | $291,862.71 |
| Daily Earnings Credit | February 11, 2014 | $35.97 | $291,826.74 |
| Daily Earnings Credit | February 10, 2014 | $35.97 | $291,790.76 |
| Daily Earnings Credit | February 9, 2014 | $35.97 | $291,754.79 |
| Daily Earnings Credit | February 8, 2014 | $35.96 | $291,718.83 |
| Daily Earnings Credit | February 7, 2014 | $35.96 | $291,682.86 |
| Daily Earnings Credit | February 6, 2014 | $35.95 | $291,646.91 |
| Daily Earnings Credit | February 5, 2014 | $35.95 | $291,610.96 |
| Daily Earnings Credit | February 4, 2014 | $35.94 | $291,575.01 |
| Daily Earnings Credit | February 3, 2014 | $35.94 | $291,539.07 |
| Daily Earnings Credit | February 2, 2014 | $35.93 | $291,503.13 |
| Daily Earnings Credit | February 1, 2014 | $35.93 | $291,467.19 |
| Daily Earnings Credit | January 31, 2014 | $35.93 | $291,431.26 |
| Daily Earnings Credit | January 30, 2014 | $35.92 | $291,395.34 |
| Daily Earnings Credit | January 29, 2014 | $35.92 | $291,359.42 |
| Daily Earnings Credit | January 28, 2014 | $35.91 | $291,323.50 |
| Daily Earnings Credit | January 27, 2014 | $35.91 | $291,287.59 |
| Daily Earnings Credit | January 26, 2014 | $35.90 | $291,251.68 |
| Daily Earnings Credit | January 25, 2014 | $35.90 | $291,215.78 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | January 24, 2014 | $35.89 | $291,179.88 |
| Daily Earnings Credit | January 23, 2014 | $35.89 | $291,143.98 |
| Daily Earnings Credit | January 22, 2014 | $35.89 | $291,108.09 |
| Daily Earnings Credit | January 21, 2014 | $35.88 | $291,072.21 |
| Daily Earnings Credit | January 20, 2014 | $35.88 | $291,036.32 |
| Daily Earnings Credit | January 19, 2014 | $35.87 | $291,000.45 |
| Daily Earnings Credit | January 18, 2014 | $35.87 | $290,964.58 |
| Daily Earnings Credit | January 17, 2014 | $35.86 | $290,928.71 |
| Daily Earnings Credit | January 16, 2014 | $35.86 | $290,892.84 |
| Daily Earnings Credit | January 15, 2014 | $35.85 | $290,856.98 |
| Daily Earnings Credit | January 14, 2014 | $35.85 | $290,821.13 |
| Daily Earnings Credit | January 13, 2014 | $35.85 | $290,785.28 |
| Daily Earnings Credit | January 12, 2014 | $35.84 | $290,749.43 |
| Daily Earnings Credit | January 11, 2014 | $35.84 | $290,713.59 |
| Daily Earnings Credit | January 10, 2014 | $35.83 | $290,677.75 |
| Daily Earnings Credit | January 9, 2014 | $35.83 | $290,641.92 |
| Daily Earnings Credit | January 8, 2014 | $35.82 | $290,606.09 |
| Daily Earnings Credit | January 7, 2014 | $35.82 | $290,570.27 |
| Daily Earnings Credit | January 6, 2014 | $35.81 | $290,534.45 |
| Daily Earnings Credit | January 5, 2014 | $35.81 | $290,498.64 |
| Daily Earnings Credit | January 4, 2014 | $35.81 | $290,462.82 |
| Daily Earnings Credit | January 3, 2014 | $35.80 | $290,427.02 |
| Daily Earnings Credit | January 2, 2014 | $35.80 | $290,391.22 |
| Daily Earnings Credit | January 1, 2014 | $35.79 | $290,355.42 |
| Daily Earnings Credit | December 31, 2013 | $35.79 | $290,319.63 |
| Daily Earnings Credit | December 30, 2013 | $35.78 | $290,283.84 |
| Daily Earnings Credit | December 29, 2013 | $35.78 | $290,248.05 |
| Daily Earnings Credit | December 28, 2013 | $35.78 | $290,212.27 |
| Daily Earnings Credit | December 27, 2013 | $35.77 | $290,176.50 |
| Deposit | December 27, 2013 | $131,510.76 | $290,140.73 |
| Daily Earnings Credit | December 26, 2013 | $19.55 | $158,629.97 |
| Daily Earnings Credit | December 25, 2013 | $19.55 | $158,610.41 |
| Daily Earnings Credit | December 24, 2013 | $19.55 | $158,590.86 |
| Daily Earnings Credit | December 23, 2013 | $19.55 | $158,571.31 |
| Daily Earnings Credit | December 22, 2013 | $19.55 | $158,551.76 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | December 21, 2013 | $19.54 | $158,532.22 |
| Daily Earnings Credit | December 20, 2013 | $19.54 | $158,512.68 |
| Daily Earnings Credit | December 19, 2013 | $19.54 | $158,493.14 |
| Daily Earnings Credit | December 18, 2013 | $19.54 | $158,473.60 |
| Daily Earnings Credit | December 17, 2013 | $19.53 | $158,454.06 |
| Daily Earnings Credit | December 16, 2013 | $19.53 | $158,434.53 |
| Daily Earnings Credit | December 15, 2013 | $19.53 | $158,415.00 |
| Daily Earnings Credit | December 14, 2013 | $19.53 | $158,395.47 |
| Daily Earnings Credit | December 13, 2013 | $19.52 | $158,375.94 |
| Daily Earnings Credit | December 12, 2013 | $19.52 | $158,356.42 |
| Daily Earnings Credit | December 11, 2013 | $19.52 | $158,336.90 |
| Daily Earnings Credit | December 10, 2013 | $19.52 | $158,317.38 |
| Daily Earnings Credit | December 9, 2013 | $19.51 | $158,297.87 |
| Daily Earnings Credit | December 8, 2013 | $19.51 | $158,278.35 |
| Daily Earnings Credit | December 7, 2013 | $19.51 | $158,258.84 |
| Daily Earnings Credit | December 6, 2013 | $19.51 | $158,239.33 |
| Daily Earnings Credit | December 5, 2013 | $19.50 | $158,219.82 |
| Daily Earnings Credit | December 4, 2013 | $19.50 | $158,200.32 |
| Daily Earnings Credit | December 3, 2013 | $19.50 | $158,180.82 |
| Daily Earnings Credit | December 2, 2013 | $19.50 | $158,161.32 |
| Daily Earnings Credit | December 1, 2013 | $19.49 | $158,141.82 |
| Daily Earnings Credit | November 30, 2013 | $19.49 | $158,122.33 |
| Daily Earnings Credit | November 29, 2013 | $19.49 | $158,102.84 |
| Daily Earnings Credit | November 28, 2013 | $19.49 | $158,083.35 |
| Daily Earnings Credit | November 27, 2013 | $19.48 | $158,063.86 |
| Daily Earnings Credit | November 26, 2013 | $19.48 | $158,044.37 |
| Daily Earnings Credit | November 25, 2013 | $19.48 | $158,024.89 |
| Daily Earnings Credit | November 24, 2013 | $19.48 | $158,005.41 |
| Daily Earnings Credit | November 23, 2013 | $19.48 | $157,985.93 |
| Daily Earnings Credit | November 22, 2013 | $19.47 | $157,966.46 |
| Daily Earnings Credit | November 21, 2013 | $19.47 | $157,946.98 |
| Daily Earnings Credit | November 20, 2013 | $19.47 | $157,927.51 |
| Daily Earnings Credit | November 19, 2013 | $19.47 | $157,908.05 |
| Daily Earnings Credit | November 18, 2013 | $19.46 | $157,888.58 |
| Daily Earnings Credit | November 17, 2013 | $19.46 | $157,869.12 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | November 16, 2013 | $19.46 | $157,849.66 |
| Daily Earnings Credit | November 15, 2013 | $19.46 | $157,830.20 |
| Daily Earnings Credit | November 14, 2013 | $19.45 | $157,810.74 |
| Daily Earnings Credit | November 13, 2013 | $19.45 | $157,791.29 |
| Daily Earnings Credit | November 12, 2013 | $19.45 | $157,771.84 |
| Daily Earnings Credit | November 11, 2013 | $19.45 | $157,752.39 |
| Daily Earnings Credit | November 10, 2013 | $19.44 | $157,732.94 |
| Daily Earnings Credit | November 9, 2013 | $19.44 | $157,713.50 |
| Daily Earnings Credit | November 8, 2013 | $19.44 | $157,694.05 |
| Daily Earnings Credit | November 7, 2013 | $19.44 | $157,674.61 |
| Daily Earnings Credit | November 6, 2013 | $19.43 | $157,655.18 |
| Daily Earnings Credit | November 5, 2013 | $19.43 | $157,635.74 |
| Daily Earnings Credit | November 4, 2013 | $19.43 | $157,616.31 |
| Daily Earnings Credit | November 3, 2013 | $19.43 | $157,596.88 |
| Daily Earnings Credit | November 2, 2013 | $19.43 | $157,577.45 |
| Daily Earnings Credit | November 1, 2013 | $19.42 | $157,558.03 |
| Daily Earnings Credit | October 31, 2013 | $19.42 | $157,538.61 |
| Daily Earnings Credit | October 30, 2013 | $19.42 | $157,519.19 |
| Daily Earnings Credit | October 29, 2013 | $19.42 | $157,499.77 |
| Daily Earnings Credit | October 28, 2013 | $19.41 | $157,480.35 |
| Daily Earnings Credit | October 27, 2013 | $19.41 | $157,460.94 |
| Daily Earnings Credit | October 26, 2013 | $19.41 | $157,441.53 |
| Daily Earnings Credit | October 25, 2013 | $19.41 | $157,422.12 |
| Daily Earnings Credit | October 24, 2013 | $19.40 | $157,402.71 |
| Daily Earnings Credit | October 23, 2013 | $19.40 | $157,383.31 |
| Daily Earnings Credit | October 22, 2013 | $19.40 | $157,363.91 |
| Daily Earnings Credit | October 21, 2013 | $19.40 | $157,344.51 |
| Daily Earnings Credit | October 20, 2013 | $19.39 | $157,325.11 |
| Daily Earnings Credit | October 19, 2013 | $19.39 | $157,305.72 |
| Daily Earnings Credit | October 18, 2013 | $19.39 | $157,286.33 |
| Daily Earnings Credit | October 17, 2013 | $19.39 | $157,266.94 |
| Daily Earnings Credit | October 16, 2013 | $19.38 | $157,247.55 |
| Daily Earnings Credit | October 15, 2013 | $19.38 | $157,228.17 |
| Daily Earnings Credit | October 14, 2013 | $19.38 | $157,208.79 |
| Daily Earnings Credit | October 13, 2013 | $19.38 | $157,189.41 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | October 12, 2013 | $19.37 | $157,170.03 |
| Daily Earnings Credit | October 11, 2013 | $19.37 | $157,150.66 |
| Daily Earnings Credit | October 10, 2013 | $19.37 | $157,131.28 |
| Daily Earnings Credit | October 9, 2013 | $19.37 | $157,111.91 |
| Daily Earnings Credit | October 8, 2013 | $19.37 | $157,092.55 |
| Daily Earnings Credit | October 7, 2013 | $19.36 | $157,073.18 |
| Daily Earnings Credit | October 6, 2013 | $19.36 | $157,053.82 |
| Daily Earnings Credit | October 5, 2013 | $19.36 | $157,034.46 |
| Daily Earnings Credit | October 4, 2013 | $19.36 | $157,015.10 |
| Daily Earnings Credit | October 3, 2013 | $19.35 | $156,995.74 |
| Daily Earnings Credit | October 2, 2013 | $19.35 | $156,976.39 |
| Daily Earnings Credit | October 1, 2013 | $19.35 | $156,957.04 |
| Daily Earnings Credit | September 30, 2013 | $19.35 | $156,937.69 |
| Daily Earnings Credit | September 29, 2013 | $19.34 | $156,918.34 |
| Daily Earnings Credit | September 28, 2013 | $19.34 | $156,899.00 |
| Daily Earnings Credit | September 27, 2013 | $19.34 | $156,879.66 |
| Daily Earnings Credit | September 26, 2013 | $19.34 | $156,860.32 |
| Daily Earnings Credit | September 25, 2013 | $19.33 | $156,840.98 |
| Daily Earnings Credit | September 24, 2013 | $19.33 | $156,821.65 |
| Daily Earnings Credit | September 23, 2013 | $19.33 | $156,802.32 |
| Daily Earnings Credit | September 22, 2013 | $19.33 | $156,782.99 |
| Daily Earnings Credit | September 21, 2013 | $19.32 | $156,763.66 |
| Daily Earnings Credit | September 20, 2013 | $19.32 | $156,744.34 |
| Daily Earnings Credit | September 19, 2013 | $19.32 | $156,725.01 |
| Daily Earnings Credit | September 18, 2013 | $19.32 | $156,705.69 |
| Daily Earnings Credit | September 17, 2013 | $19.32 | $156,686.38 |
| Daily Earnings Credit | September 16, 2013 | $19.31 | $156,667.06 |
| Daily Earnings Credit | September 15, 2013 | $19.31 | $156,647.75 |
| Daily Earnings Credit | September 14, 2013 | $19.31 | $156,628.44 |
| Daily Earnings Credit | September 13, 2013 | $19.31 | $156,609.13 |
| Daily Earnings Credit | September 12, 2013 | $19.30 | $156,589.82 |
| Daily Earnings Credit | September 11, 2013 | $19.30 | $156,570.52 |
| Daily Earnings Credit | September 10, 2013 | $19.30 | $156,551.22 |
| Daily Earnings Credit | September 9, 2013 | $19.30 | $156,531.92 |
| Daily Earnings Credit | September 8, 2013 | $19.29 | $156,512.63 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | September 7, 2013 | $19.29 | $156,493.33 |
| Daily Earnings Credit | September 6, 2013 | $19.29 | $156,474.04 |
| Daily Earnings Credit | September 5, 2013 | $19.29 | $156,454.75 |
| Daily Earnings Credit | September 4, 2013 | $19.28 | $156,435.47 |
| Daily Earnings Credit | September 3, 2013 | $19.28 | $156,416.18 |
| Daily Earnings Credit | September 2, 2013 | $19.28 | $156,396.90 |
| Daily Earnings Credit | September 1, 2013 | $19.28 | $156,377.62 |
| Daily Earnings Credit | August 31, 2013 | $19.27 | $156,358.34 |
| Daily Earnings Credit | August 30, 2013 | $19.27 | $156,339.07 |
| Daily Earnings Credit | August 29, 2013 | $19.27 | $156,319.80 |
| Daily Earnings Credit | August 28, 2013 | $19.27 | $156,300.53 |
| Daily Earnings Credit | August 27, 2013 | $19.27 | $156,281.26 |
| Daily Earnings Credit | August 26, 2013 | $19.26 | $156,261.99 |
| Daily Earnings Credit | August 25, 2013 | $19.26 | $156,242.73 |
| Daily Earnings Credit | August 24, 2013 | $19.26 | $156,223.47 |
| Daily Earnings Credit | August 23, 2013 | $19.26 | $156,204.21 |
| Daily Earnings Credit | August 22, 2013 | $19.25 | $156,184.96 |
| Daily Earnings Credit | August 21, 2013 | $19.25 | $156,165.70 |
| Daily Earnings Credit | August 20, 2013 | $19.25 | $156,146.45 |
| Daily Earnings Credit | August 19, 2013 | $19.25 | $156,127.20 |
| Daily Earnings Credit | August 18, 2013 | $19.24 | $156,107.96 |
| Daily Earnings Credit | August 17, 2013 | $19.24 | $156,088.71 |
| Daily Earnings Credit | August 16, 2013 | $19.24 | $156,069.47 |
| Daily Earnings Credit | August 15, 2013 | $19.24 | $156,050.23 |
| Daily Earnings Credit | August 14, 2013 | $19.23 | $156,030.99 |
| Daily Earnings Credit | August 13, 2013 | $19.23 | $156,011.76 |
| Daily Earnings Credit | August 12, 2013 | $19.23 | $155,992.53 |
| Daily Earnings Credit | August 11, 2013 | $19.23 | $155,973.30 |
| Daily Earnings Credit | August 10, 2013 | $19.22 | $155,954.07 |
| Daily Earnings Credit | August 9, 2013 | $19.22 | $155,934.85 |
| Daily Earnings Credit | August 8, 2013 | $19.22 | $155,915.62 |
| Daily Earnings Credit | August 7, 2013 | $19.22 | $155,896.40 |
| Daily Earnings Credit | August 6, 2013 | $19.22 | $155,877.19 |
| Daily Earnings Credit | August 5, 2013 | $19.21 | $155,857.97 |
| Daily Earnings Credit | August 4, 2013 | $19.21 | $155,838.76 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | August 3, 2013 | $19.21 | $155,819.55 |
| Daily Earnings Credit | August 2, 2013 | $19.21 | $155,800.34 |
| Daily Earnings Credit | August 1, 2013 | $19.20 | $155,781.13 |
| Daily Earnings Credit | July 31, 2013 | $19.20 | $155,761.93 |
| Daily Earnings Credit | July 30, 2013 | $19.20 | $155,742.73 |
| Daily Earnings Credit | July 29, 2013 | $19.20 | $155,723.53 |
| Daily Earnings Credit | July 28, 2013 | $19.19 | $155,704.33 |
| Daily Earnings Credit | July 27, 2013 | $19.19 | $155,685.14 |
| Daily Earnings Credit | July 26, 2013 | $19.19 | $155,665.95 |
| Daily Earnings Credit | July 25, 2013 | $19.19 | $155,646.76 |
| Daily Earnings Credit | July 24, 2013 | $19.18 | $155,627.57 |
| Daily Earnings Credit | July 23, 2013 | $19.18 | $155,608.39 |
| Daily Earnings Credit | July 22, 2013 | $19.18 | $155,589.20 |
| Daily Earnings Credit | July 21, 2013 | $19.18 | $155,570.02 |
| Daily Earnings Credit | July 20, 2013 | $19.18 | $155,550.85 |
| Daily Earnings Credit | July 19, 2013 | $19.17 | $155,531.67 |
| Daily Earnings Credit | July 18, 2013 | $19.17 | $155,512.50 |
| Daily Earnings Credit | July 17, 2013 | $19.17 | $155,493.33 |
| Daily Earnings Credit | July 16, 2013 | $19.17 | $155,474.16 |
| Daily Earnings Credit | July 15, 2013 | $19.16 | $155,454.99 |
| Daily Earnings Credit | July 14, 2013 | $19.16 | $155,435.83 |
| Daily Earnings Credit | July 13, 2013 | $19.16 | $155,416.67 |
| Daily Earnings Credit | July 12, 2013 | $19.16 | $155,397.51 |
| Daily Earnings Credit | July 11, 2013 | $19.15 | $155,378.35 |
| Daily Earnings Credit | July 10, 2013 | $19.15 | $155,359.20 |
| Daily Earnings Credit | July 9, 2013 | $19.15 | $155,340.05 |
| Daily Earnings Credit | July 8, 2013 | $19.15 | $155,320.90 |
| Daily Earnings Credit | July 7, 2013 | $19.14 | $155,301.75 |
| Daily Earnings Credit | July 6, 2013 | $19.14 | $155,282.61 |
| Daily Earnings Credit | July 5, 2013 | $19.14 | $155,263.47 |
| Daily Earnings Credit | July 4, 2013 | $19.14 | $155,244.33 |
| Daily Earnings Credit | July 3, 2013 | $19.14 | $155,225.19 |
| Daily Earnings Credit | July 2, 2013 | $19.13 | $155,206.05 |
| Daily Earnings Credit | July 1, 2013 | $19.13 | $155,186.92 |
| Daily Earnings Credit | June 30, 2013 | $19.13 | $155,167.79 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | June 29, 2013 | $19.13 | $155,148.66 |
| Daily Earnings Credit | June 28, 2013 | $19.12 | $155,129.54 |
| Daily Earnings Credit | June 27, 2013 | $19.12 | $155,110.41 |
| Daily Earnings Credit | June 26, 2013 | $19.12 | $155,091.29 |
| Daily Earnings Credit | June 25, 2013 | $19.12 | $155,072.17 |
| Daily Earnings Credit | June 24, 2013 | $19.11 | $155,053.06 |
| Daily Earnings Credit | June 23, 2013 | $19.11 | $155,033.94 |
| Daily Earnings Credit | June 22, 2013 | $19.11 | $155,014.83 |
| Daily Earnings Credit | June 21, 2013 | $19.11 | $154,995.72 |
| Daily Earnings Credit | June 20, 2013 | $19.10 | $154,976.62 |
| Daily Earnings Credit | June 19, 2013 | $19.10 | $154,957.51 |
| Daily Earnings Credit | June 18, 2013 | $19.10 | $154,938.41 |
| Daily Earnings Credit | June 17, 2013 | $19.10 | $154,919.31 |
| Daily Earnings Credit | June 16, 2013 | $19.09 | $154,900.21 |
| Daily Earnings Credit | June 15, 2013 | $19.09 | $154,881.12 |
| Daily Earnings Credit | June 14, 2013 | $19.09 | $154,862.03 |
| Daily Earnings Credit | June 13, 2013 | $19.09 | $154,842.94 |
| Daily Earnings Credit | June 12, 2013 | $19.09 | $154,823.85 |
| Daily Earnings Credit | June 11, 2013 | $19.08 | $154,804.76 |
| Daily Earnings Credit | June 10, 2013 | $19.08 | $154,785.68 |
| Daily Earnings Credit | June 9, 2013 | $19.08 | $154,766.60 |
| Daily Earnings Credit | June 8, 2013 | $19.08 | $154,747.52 |
| Daily Earnings Credit | June 7, 2013 | $19.07 | $154,728.44 |
| Daily Earnings Credit | June 6, 2013 | $19.07 | $154,709.37 |
| Daily Earnings Credit | June 5, 2013 | $19.07 | $154,690.30 |
| Daily Earnings Credit | June 4, 2013 | $19.07 | $154,671.23 |
| Daily Earnings Credit | June 3, 2013 | $19.06 | $154,652.16 |
| Daily Earnings Credit | June 2, 2013 | $19.06 | $154,633.10 |
| Daily Earnings Credit | June 1, 2013 | $19.06 | $154,614.04 |
| Daily Earnings Credit | May 31, 2013 | $19.06 | $154,594.98 |
| Daily Earnings Credit | May 30, 2013 | $19.06 | $154,575.92 |
| Daily Earnings Credit | May 29, 2013 | $19.05 | $154,556.86 |
| Daily Earnings Credit | May 28, 2013 | $19.05 | $154,537.81 |
| Daily Earnings Credit | May 27, 2013 | $19.05 | $154,518.76 |
| Daily Earnings Credit | May 26, 2013 | $19.05 | $154,499.71 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | May 25, 2013 | $19.04 | $154,480.67 |
| Daily Earnings Credit | May 24, 2013 | $19.04 | $154,461.62 |
| Daily Earnings Credit | May 23, 2013 | $19.04 | $154,442.58 |
| Daily Earnings Credit | May 22, 2013 | $19.04 | $154,423.54 |
| Daily Earnings Credit | May 21, 2013 | $19.03 | $154,404.51 |
| Daily Earnings Credit | May 20, 2013 | $19.03 | $154,385.47 |
| Daily Earnings Credit | May 19, 2013 | $19.03 | $154,366.44 |
| Daily Earnings Credit | May 18, 2013 | $19.03 | $154,347.41 |
| Daily Earnings Credit | May 17, 2013 | $19.02 | $154,328.39 |
| Daily Earnings Credit | May 16, 2013 | $19.02 | $154,309.36 |
| Daily Earnings Credit | May 15, 2013 | $19.02 | $154,290.34 |
| Daily Earnings Credit | May 14, 2013 | $19.02 | $154,271.32 |
| Daily Earnings Credit | May 13, 2013 | $19.02 | $154,252.30 |
| Daily Earnings Credit | May 12, 2013 | $19.01 | $154,233.29 |
| Daily Earnings Credit | May 11, 2013 | $19.01 | $154,214.28 |
| Daily Earnings Credit | May 10, 2013 | $19.01 | $154,195.27 |
| Daily Earnings Credit | May 9, 2013 | $19.01 | $154,176.26 |
| Daily Earnings Credit | May 8, 2013 | $19.00 | $154,157.25 |
| Daily Earnings Credit | May 7, 2013 | $19.00 | $154,138.25 |
| Daily Earnings Credit | May 6, 2013 | $19.00 | $154,119.25 |
| Daily Earnings Credit | May 5, 2013 | $19.00 | $154,100.25 |
| Daily Earnings Credit | May 4, 2013 | $18.99 | $154,081.25 |
| Daily Earnings Credit | May 3, 2013 | $18.99 | $154,062.26 |
| Daily Earnings Credit | May 2, 2013 | $18.99 | $154,043.27 |
| Daily Earnings Credit | May 1, 2013 | $18.99 | $154,024.28 |
| Daily Earnings Credit | April 30, 2013 | $18.98 | $154,005.29 |
| Daily Earnings Credit | April 29, 2013 | $18.98 | $153,986.31 |
| Daily Earnings Credit | April 28, 2013 | $18.98 | $153,967.32 |
| Daily Earnings Credit | April 27, 2013 | $18.98 | $153,948.34 |
| Daily Earnings Credit | April 26, 2013 | $18.98 | $153,929.37 |
| Daily Earnings Credit | April 25, 2013 | $18.97 | $153,910.39 |
| Daily Earnings Credit | April 24, 2013 | $18.97 | $153,891.42 |
| Daily Earnings Credit | April 23, 2013 | $18.97 | $153,872.45 |
| Daily Earnings Credit | April 22, 2013 | $18.97 | $153,853.48 |
| Daily Earnings Credit | April 21, 2013 | $18.96 | $153,834.51 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | April 20, 2013 | $18.96 | $153,815.55 |
| Daily Earnings Credit | April 19, 2013 | $18.96 | $153,796.59 |
| Daily Earnings Credit | April 18, 2013 | $18.96 | $153,777.63 |
| Daily Earnings Credit | April 17, 2013 | $18.95 | $153,758.67 |
| Daily Earnings Credit | April 16, 2013 | $18.95 | $153,739.72 |
| Daily Earnings Credit | April 15, 2013 | $18.95 | $153,720.77 |
| Daily Earnings Credit | April 14, 2013 | $18.95 | $153,701.82 |
| Daily Earnings Credit | April 13, 2013 | $18.94 | $153,682.87 |
| Daily Earnings Credit | April 12, 2013 | $18.94 | $153,663.92 |
| Daily Earnings Credit | April 11, 2013 | $18.94 | $153,644.98 |
| Daily Earnings Credit | April 10, 2013 | $18.94 | $153,626.04 |
| Daily Earnings Credit | April 9, 2013 | $18.94 | $153,607.10 |
| Daily Earnings Credit | April 8, 2013 | $18.93 | $153,588.17 |
| Daily Earnings Credit | April 7, 2013 | $18.93 | $153,569.23 |
| Daily Earnings Credit | April 6, 2013 | $18.93 | $153,550.30 |
| Daily Earnings Credit | April 5, 2013 | $18.93 | $153,531.37 |
| Daily Earnings Credit | April 4, 2013 | $18.92 | $153,512.45 |
| Daily Earnings Credit | April 3, 2013 | $18.92 | $153,493.52 |
| Daily Earnings Credit | April 2, 2013 | $18.92 | $153,474.60 |
| Daily Earnings Credit | April 1, 2013 | $18.92 | $153,455.68 |
| Daily Earnings Credit | March 31, 2013 | $18.91 | $153,436.77 |
| Daily Earnings Credit | March 30, 2013 | $18.91 | $153,417.85 |
| Daily Earnings Credit | March 29, 2013 | $18.91 | $153,398.94 |
| Daily Earnings Credit | March 28, 2013 | $18.91 | $153,380.03 |
| Daily Earnings Credit | March 27, 2013 | $18.91 | $153,361.12 |
| Daily Earnings Credit | March 26, 2013 | $18.90 | $153,342.22 |
| Daily Earnings Credit | March 25, 2013 | $18.90 | $153,323.31 |
| Daily Earnings Credit | March 24, 2013 | $18.90 | $153,304.41 |
| Daily Earnings Credit | March 23, 2013 | $18.90 | $153,285.52 |
| Daily Earnings Credit | March 22, 2013 | $18.89 | $153,266.62 |
| Daily Earnings Credit | March 21, 2013 | $18.89 | $153,247.73 |
| Daily Earnings Credit | March 20, 2013 | $18.89 | $153,228.83 |
| Daily Earnings Credit | March 19, 2013 | $18.89 | $153,209.95 |
| Daily Earnings Credit | March 18, 2013 | $18.88 | $153,191.06 |
| Daily Earnings Credit | March 17, 2013 | $18.88 | $153,172.17 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | March 16, 2013 | $18.88 | $153,153.29 |
| Daily Earnings Credit | March 15, 2013 | $18.88 | $153,134.41 |
| Daily Earnings Credit | March 14, 2013 | $18.87 | $153,115.54 |
| Daily Earnings Credit | March 13, 2013 | $18.87 | $153,096.66 |
| Daily Earnings Credit | March 12, 2013 | $18.87 | $153,077.79 |
| Daily Earnings Credit | March 11, 2013 | $18.87 | $153,058.92 |
| Daily Earnings Credit | March 10, 2013 | $18.87 | $153,040.05 |
| Daily Earnings Credit | March 9, 2013 | $18.86 | $153,021.18 |
| Daily Earnings Credit | March 8, 2013 | $18.86 | $153,002.32 |
| Daily Earnings Credit | March 7, 2013 | $18.86 | $152,983.46 |
| Daily Earnings Credit | March 6, 2013 | $18.86 | $152,964.60 |
| Daily Earnings Credit | March 5, 2013 | $18.85 | $152,945.74 |
| Daily Earnings Credit | March 4, 2013 | $18.85 | $152,926.89 |
| Daily Earnings Credit | March 3, 2013 | $18.85 | $152,908.04 |
| Daily Earnings Credit | March 2, 2013 | $18.85 | $152,889.19 |
| Daily Earnings Credit | March 1, 2013 | $18.84 | $152,870.34 |
| Daily Earnings Credit | February 28, 2013 | $18.84 | $152,851.50 |
| Daily Earnings Credit | February 27, 2013 | $18.84 | $152,832.66 |
| Daily Earnings Credit | February 26, 2013 | $18.84 | $152,813.82 |
| Daily Earnings Credit | February 25, 2013 | $18.84 | $152,794.98 |
| Daily Earnings Credit | February 24, 2013 | $18.83 | $152,776.14 |
| Daily Earnings Credit | February 23, 2013 | $18.83 | $152,757.31 |
| Daily Earnings Credit | February 22, 2013 | $18.83 | $152,738.48 |
| Daily Earnings Credit | February 21, 2013 | $18.83 | $152,719.65 |
| Daily Earnings Credit | February 20, 2013 | $18.82 | $152,700.82 |
| Daily Earnings Credit | February 19, 2013 | $18.82 | $152,682.00 |
| Daily Earnings Credit | February 18, 2013 | $18.82 | $152,663.18 |
| Daily Earnings Credit | February 17, 2013 | $18.82 | $152,644.36 |
| Daily Earnings Credit | February 16, 2013 | $18.81 | $152,625.54 |
| Daily Earnings Credit | February 15, 2013 | $18.81 | $152,606.73 |
| Deposit | February 15, 2013 | $75,391.00 | $151,837.91 |
| Deposit | February 15, 2013 | $750.00 | $152,587.91 |
| Daily Earnings Credit | February 14, 2013 | $9.42 | $76,446.91 |
| Daily Earnings Credit | February 13, 2013 | $9.42 | $76,437.49 |
| Daily Earnings Credit | February 12, 2013 | $9.42 | $76,428.07 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | February 11, 2013 | $9.42 | $76,418.65 |
| Daily Earnings Credit | February 10, 2013 | $9.42 | $76,409.23 |
| Daily Earnings Credit | February 9, 2013 | $9.42 | $76,399.81 |
| Daily Earnings Credit | February 8, 2013 | $9.42 | $76,390.39 |
| Daily Earnings Credit | February 7, 2013 | $9.42 | $76,380.97 |
| Daily Earnings Credit | February 6, 2013 | $9.41 | $76,371.56 |
| Daily Earnings Credit | February 5, 2013 | $9.41 | $76,362.14 |
| Daily Earnings Credit | February 4, 2013 | $9.41 | $76,352.73 |
| Daily Earnings Credit | February 3, 2013 | $9.41 | $76,343.32 |
| Daily Earnings Credit | February 2, 2013 | $9.41 | $76,333.91 |
| Daily Earnings Credit | February 1, 2013 | $9.41 | $76,324.50 |
| Daily Earnings Credit | January 31, 2013 | $9.41 | $76,315.09 |
| Daily Earnings Credit | January 30, 2013 | $9.41 | $76,305.68 |
| Daily Earnings Credit | January 29, 2013 | $9.41 | $76,296.27 |
| Daily Earnings Credit | January 28, 2013 | $9.40 | $76,286.87 |
| Daily Earnings Credit | January 27, 2013 | $9.40 | $76,277.46 |
| Daily Earnings Credit | January 26, 2013 | $9.40 | $76,268.06 |
| Daily Earnings Credit | January 25, 2013 | $9.40 | $76,258.66 |
| Daily Earnings Credit | January 24, 2013 | $9.40 | $76,249.26 |
| Daily Earnings Credit | January 23, 2013 | $9.40 | $76,239.86 |
| Daily Earnings Credit | January 22, 2013 | $9.40 | $76,230.46 |
| Daily Earnings Credit | January 21, 2013 | $9.40 | $76,221.06 |
| Daily Earnings Credit | January 20, 2013 | $9.39 | $76,211.67 |
| Daily Earnings Credit | January 19, 2013 | $9.39 | $76,202.27 |
| Daily Earnings Credit | January 18, 2013 | $9.39 | $76,192.88 |
| Daily Earnings Credit | January 17, 2013 | $9.39 | $76,183.49 |
| Daily Earnings Credit | January 16, 2013 | $9.39 | $76,174.09 |
| Daily Earnings Credit | January 15, 2013 | $9.39 | $76,164.70 |
| Daily Earnings Credit | January 14, 2013 | $9.39 | $76,155.32 |
| Daily Earnings Credit | January 13, 2013 | $9.39 | $76,145.93 |
| Daily Earnings Credit | January 12, 2013 | $9.39 | $76,136.54 |
| Daily Earnings Credit | January 11, 2013 | $9.38 | $76,127.16 |
| Daily Earnings Credit | January 10, 2013 | $9.38 | $76,117.77 |
| Daily Earnings Credit | January 9, 2013 | $9.38 | $76,108.39 |
| Daily Earnings Credit | January 8, 2013 | $9.38 | $76,099.01 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | January 7, 2013 | $9.38 | $76,089.62 |
| Daily Earnings Credit | January 6, 2013 | $9.38 | $76,080.25 |
| Daily Earnings Credit | January 5, 2013 | $9.38 | $76,070.87 |
| Daily Earnings Credit | January 4, 2013 | $9.38 | $76,061.49 |
| Daily Earnings Credit | January 3, 2013 | $9.38 | $76,052.11 |
| Daily Earnings Credit | January 2, 2013 | $9.37 | $76,042.74 |
| Daily Earnings Credit | January 1, 2013 | $9.37 | $76,033.36 |
| Daily Earnings Credit | December 31, 2012 | $9.37 | $76,023.99 |
| Daily Earnings Credit | December 30, 2012 | $9.37 | $76,014.62 |
| Daily Earnings Credit | December 29, 2012 | $9.37 | $76,005.25 |
| Daily Earnings Credit | December 28, 2012 | $9.37 | $75,995.88 |
| Daily Earnings Credit | December 27, 2012 | $9.37 | $75,986.51 |
| Daily Earnings Credit | December 26, 2012 | $9.37 | $75,977.14 |
| Daily Earnings Credit | December 25, 2012 | $9.36 | $75,967.78 |
| Daily Earnings Credit | December 24, 2012 | $9.36 | $75,958.41 |
| Daily Earnings Credit | December 23, 2012 | $9.36 | $75,949.05 |
| Daily Earnings Credit | December 22, 2012 | $9.36 | $75,939.69 |
| Daily Earnings Credit | December 21, 2012 | $9.36 | $75,930.33 |
| Daily Earnings Credit | December 20, 2012 | $9.36 | $75,920.97 |
| Daily Earnings Credit | December 19, 2012 | $9.36 | $75,911.61 |
| Daily Earnings Credit | December 18, 2012 | $9.36 | $75,902.25 |
| Daily Earnings Credit | December 17, 2012 | $9.36 | $75,892.89 |
| Daily Earnings Credit | December 16, 2012 | $9.35 | $75,883.54 |
| Daily Earnings Credit | December 15, 2012 | $9.35 | $75,874.18 |
| Daily Earnings Credit | December 14, 2012 | $9.35 | $75,864.83 |
| Daily Earnings Credit | December 13, 2012 | $9.35 | $75,855.48 |
| Daily Earnings Credit | December 12, 2012 | $9.35 | $75,846.13 |
| Daily Earnings Credit | December 11, 2012 | $9.35 | $75,836.78 |
| Daily Earnings Credit | December 10, 2012 | $9.35 | $75,827.43 |
| Daily Earnings Credit | December 9, 2012 | $9.35 | $75,818.08 |
| Daily Earnings Credit | December 8, 2012 | $9.35 | $75,808.73 |
| Daily Earnings Credit | December 7, 2012 | $9.34 | $75,799.39 |
| Daily Earnings Credit | December 6, 2012 | $9.34 | $75,790.04 |
| Daily Earnings Credit | December 5, 2012 | $9.34 | $75,780.70 |
| Daily Earnings Credit | December 4, 2012 | $9.34 | $75,771.36 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | December 3, 2012 | $9.34 | $75,762.02 |
| Daily Earnings Credit | December 2, 2012 | $9.34 | $75,752.68 |
| Daily Earnings Credit | December 1, 2012 | $9.34 | $75,743.34 |
| Daily Earnings Credit | November 30, 2012 | $9.34 | $75,734.00 |
| Daily Earnings Credit | November 29, 2012 | $9.33 | $75,724.67 |
| Daily Earnings Credit | November 28, 2012 | $9.33 | $75,715.33 |
| Daily Earnings Credit | November 27, 2012 | $9.33 | $75,706.00 |
| Daily Earnings Credit | November 26, 2012 | $9.33 | $75,696.67 |
| Daily Earnings Credit | November 25, 2012 | $9.33 | $75,687.34 |
| Daily Earnings Credit | November 24, 2012 | $9.33 | $75,678.01 |
| Daily Earnings Credit | November 23, 2012 | $9.33 | $75,668.68 |
| Daily Earnings Credit | November 22, 2012 | $9.33 | $75,659.35 |
| Daily Earnings Credit | November 21, 2012 | $9.33 | $75,650.02 |
| Daily Earnings Credit | November 20, 2012 | $9.32 | $75,640.70 |
| Daily Earnings Credit | November 19, 2012 | $9.32 | $75,631.37 |
| Daily Earnings Credit | November 18, 2012 | $9.32 | $75,622.05 |
| Daily Earnings Credit | November 17, 2012 | $9.32 | $75,612.73 |
| Daily Earnings Credit | November 16, 2012 | $9.32 | $75,603.41 |
| Daily Earnings Credit | November 15, 2012 | $9.32 | $75,594.09 |
| Daily Earnings Credit | November 14, 2012 | $9.32 | $75,584.77 |
| Daily Earnings Credit | November 13, 2012 | $9.32 | $75,575.45 |
| Daily Earnings Credit | November 12, 2012 | $9.32 | $75,566.13 |
| Daily Earnings Credit | November 11, 2012 | $9.31 | $75,556.82 |
| Daily Earnings Credit | November 10, 2012 | $9.31 | $75,547.50 |
| Daily Earnings Credit | November 9, 2012 | $9.31 | $75,538.19 |
| Daily Earnings Credit | November 8, 2012 | $9.31 | $75,528.88 |
| Daily Earnings Credit | November 7, 2012 | $9.31 | $75,519.57 |
| Daily Earnings Credit | November 6, 2012 | $9.31 | $75,510.26 |
| Daily Earnings Credit | November 5, 2012 | $9.31 | $75,500.95 |
| Daily Earnings Credit | November 4, 2012 | $9.31 | $75,491.64 |
| Daily Earnings Credit | November 3, 2012 | $9.30 | $75,482.34 |
| Daily Earnings Credit | November 2, 2012 | $9.30 | $75,473.03 |
| Daily Earnings Credit | November 1, 2012 | $9.30 | $75,463.73 |
| Daily Earnings Credit | October 31, 2012 | $9.30 | $75,454.43 |
| Daily Earnings Credit | October 30, 2012 | $9.30 | $75,445.13 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | October 29, 2012 | $9.30 | $75,435.82 |
| Daily Earnings Credit | October 28, 2012 | $9.30 | $75,426.53 |
| Daily Earnings Credit | October 27, 2012 | $9.30 | $75,417.23 |
| Daily Earnings Credit | October 26, 2012 | $9.30 | $75,407.93 |
| Daily Earnings Credit | October 25, 2012 | $9.29 | $75,398.63 |
| Daily Earnings Credit | October 24, 2012 | $9.29 | $75,389.34 |
| Daily Earnings Credit | October 23, 2012 | $9.29 | $75,380.05 |
| Daily Earnings Credit | October 22, 2012 | $9.29 | $75,370.75 |
| Daily Earnings Credit | October 21, 2012 | $9.29 | $75,361.46 |
| Daily Earnings Credit | October 20, 2012 | $9.29 | $75,352.17 |
| Daily Earnings Credit | October 19, 2012 | $9.29 | $75,342.88 |
| Daily Earnings Credit | October 18, 2012 | $9.29 | $75,333.60 |
| Daily Earnings Credit | October 17, 2012 | $9.29 | $75,324.31 |
| Daily Earnings Credit | October 16, 2012 | $9.28 | $75,315.02 |
| Daily Earnings Credit | October 15, 2012 | $9.28 | $75,305.74 |
| Daily Earnings Credit | October 14, 2012 | $9.28 | $75,296.46 |
| Daily Earnings Credit | October 13, 2012 | $9.28 | $75,287.18 |
| Daily Earnings Credit | October 12, 2012 | $9.28 | $75,277.89 |
| Daily Earnings Credit | October 11, 2012 | $9.28 | $75,268.61 |
| Daily Earnings Credit | October 10, 2012 | $9.28 | $75,259.34 |
| Daily Earnings Credit | October 9, 2012 | $9.28 | $75,250.06 |
| Daily Earnings Credit | October 8, 2012 | $9.28 | $75,240.78 |
| Daily Earnings Credit | October 7, 2012 | $9.27 | $75,231.51 |
| Daily Earnings Credit | October 6, 2012 | $9.27 | $75,222.23 |
| Daily Earnings Credit | October 5, 2012 | $9.27 | $75,212.96 |
| Daily Earnings Credit | October 4, 2012 | $9.27 | $75,203.69 |
| Daily Earnings Credit | October 3, 2012 | $9.27 | $75,194.42 |
| Daily Earnings Credit | October 2, 2012 | $9.27 | $75,185.15 |
| Daily Earnings Credit | October 1, 2012 | $9.27 | $75,175.88 |
| Daily Earnings Credit | September 30, 2012 | $9.27 | $75,166.61 |
| Daily Earnings Credit | September 29, 2012 | $9.26 | $75,157.35 |
| Daily Earnings Credit | September 28, 2012 | $9.26 | $75,148.08 |
| Daily Earnings Credit | September 27, 2012 | $9.26 | $75,138.82 |
| Daily Earnings Credit | September 26, 2012 | $9.26 | $75,129.56 |
| Daily Earnings Credit | September 25, 2012 | $9.26 | $75,120.29 |

| Transaction Type | Transaction Date | Amount | Ending Balance |
|---|---|---|---|
| Daily Earnings Credit | September 24, 2012 | $9.26 | $75,111.03 |
| Daily Earnings Credit | September 23, 2012 | $9.26 | $75,101.78 |
| Daily Earnings Credit | September 22, 2012 | $9.26 | $75,092.52 |
| Daily Earnings Credit | September 21, 2012 | $9.26 | $75,083.26 |
| Daily Earnings Credit | September 20, 2012 | $9.25 | $75,074.00 |
| Daily Earnings Credit | September 19, 2012 | $9.25 | $75,064.75 |
| Daily Earnings Credit | September 18, 2012 | $9.25 | $75,055.50 |
| Daily Earnings Credit | September 17, 2012 | $9.25 | $75,046.24 |
| Daily Earnings Credit | September 16, 2012 | $9.25 | $75,036.99 |
| Daily Earnings Credit | September 15, 2012 | $9.25 | $75,027.74 |
| Daily Earnings Credit | September 14, 2012 | $9.25 | $75,018.49 |
| Daily Earnings Credit | September 13, 2012 | $9.25 | $75,009.25 |
| Deposit | September 13, 2012 | $75,000.00 | $75,000.00 |

Investments are not FDIC-insured, nor are they deposits of or guaranteed by a bank or any other entity, so they may lose value. Investors should carefully consider investment objectives, risks, charges and expenses. This and other important information is contained in the fund prospectus which can be obtained from a financial professional and should be read carefully before investing.

# EXHIBIT 8

EXHIBIT

**8**

MARCH 2022 INCOME PLAN

# Bret & Debra Thurman

MARCH 31, 2022



Prepared by: **Jake Cazier, Navigation Capital Group**

1148 W Legacy Crossing Blvd, Suite 300, Centerville, UT 84014

4352323267 | jake@nav.capital

Th s report  s  ntended so e y to fac  tate a d scuss on w th you (the c  ent) and your f nanc a  adv sor on a poss b e w thdrawa  schedu e based on current assets va ues, growth rates, and des red w thdrawa  amounts that were used to produce th s report. Th s report  s s mp y des gned to eva uate whether or not the current assets w   support a stated ret rement  ncome goa  based on hypothet ca  assumpt ons and  nformat on prov ded by you (the c  ent).

# Balance Sheet for Bret Thurman and Debra Thurman

## Cash Accounts

| | Description | Owner | 12/31/2019 | 06/18/2020 | 06/03/2021 | 03/31/2022 |
|---|---|---|---|---|---|---|
| ☐ | Savings | Joint | ███ | ███ | ███ | ███ |
| ☑ | Cash Savings - Bucket 1 | Joint | ■ | ███ | ███ | ███ |
| | Total cash accounts | | ███ | ███ | ███ | ███ |

## Investment Accounts

| | Description | Owner | 12/31/2019 | 06/18/2020 | 06/03/2021 | 03/31/2022 |
|---|---|---|---|---|---|---|
| ☑ | █████ | Debra Thurman | ███ | ███ | ███ | ███ |
| ☑ | ██████ | Bret Thurman | ███ | ███ | ███ | ███ |
| ☑ | ██████ | Debra Thurman | ███ | ███ | ███ | $█ |
| ☑ | ███████* | Debra Thurman | ███ | ███ | ███ | $█ |
| ☑ | Crew Capital | Joint | $378,387 | $388,382 | $405,480 | $420,809 |
| | Total investment accounts | | ███ | ███ | ███ | ███ |

## Total Available Assets

| | |
|---|---|
| **Total Available Assets** | ███ |

Balance Shee  da a is based on in orma ion provided by you  he clien ).    his in orma ion is incorrec ,  he illus ra ion will no  be valid. These values should no  be considered a projec ion o  u ure per ormance; and are provided  or illus ra ive purposes only. There is no guaran ee  ha  any inves men  s ra egy will mee  i s s a ed objec ives.

# EXHIBIT 9

Payer's Name:
Crew Capital Group, LLC
177 Huntington Ave Ste 1703
Boston, MA 02115

**EXHIBIT**

**9**

**2019 Form 1099-INT**
**Interest Income**

OMB No. 1545-0112

**Copy B** For Recipient

This is important tax information and is being
furnished to the Internal Revenue Service. If you
are required to file a return, a negligence penalty
or other sanction may be imposed on you if this
income is taxable and the IRS determines that it
has not been reported.

Recipient's Name:
BRET THURMAN

CLINTON, UT 84015

FOR QUESTIONS ABOUT THIS FORM, CONTACT
YOUR FINANCIAL ADVISOR AT (801) 540-1440

| Payer's federal identification number: | Recipient's identification number: |
|---|---|
| 27-2201239 | |

| Box 1: Interest Income | |
|---|---|
| | $16,690.48 |

# EXHIBIT 10

**EXHIBIT 10**

Payer's Name:
Crew Capital Group, LLC
228 Park Avenue S
New York, NY 10003-1502

**2020 Form 1099-INT**
**Interest Income**

OMB No. 1545-0112

**Copy B For Recipient**

This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported.

Recipient's Name:
BRET THURMAN

CLINTON, UT 84015

For questions about this form, contact your financial advisor at (801) 410-1800

| Payer's federal identification number: | Recipient's identification number: |
|---|---|
| 27-2201239 | |

**Box 1: Interest Income**

$17,458.79

**Instructions for Recipient**

The information provided may be different for covered and noncovered securities. For a description of covered securities, see the Instructions for Form 8949. For a taxable covered security acquired at a premium, unless you notified the payer in writing in accordance with Regulations section 1.6045-1(n)(5) that you did not want to amortize the premium under section 171, or for a tax-exempt covered security acquired at a premium, your payer generally must report either (1) a net amount of interest that reflects the offset of the amount of interest paid to you by the amount of premium amortization allocable to the payment(s), or (2) a gross amount for both the interest paid to you and the premium amortization allocable to the payment(s). If you did notify your payer that you did not want to amortize the premium on a taxable covered security, then your payer will only report the gross amount of interest paid to you. For a noncovered security acquired at a premium, your payer is only required to report the gross amount of interest paid to you.

**Recipient's taxpayer identification number (TIN).** For your protection, this form may show only the last four digits of your TIN (social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN)). However, the issuer has reported your complete TIN to the IRS.

**FATCA filing requirement.** If the FATCA filing requirement box is checked, the payer is reporting on this Form 1099 to satisfy its chapter 4 account reporting requirement. You also may have a filing requirement. See the Instructions for Form 8938.

**Account number.** May show an account or other unique number the payer assigned to distinguish your account.

**Box 1.** Shows taxable interest paid to you during the calendar year by the payer. This does not include interest shown in box 3. May also show the total amount of the credits from clean renewable energy bonds, new clean renewable energy bonds, qualified energy conservation bonds, qualified zone academy bonds, qualified school construction bonds, and build America bonds that must be included in your interest income. These amounts were treated as paid to you during 2020 on the credit allowance dates (March 15, June 15, September 15, and December 15). For more information, see Form 8912. See the instructions above for a taxable covered security acquired at a premium.

**Box 2.** Shows interest or principal forfeited because of early withdrawal of time savings. You may deduct this amount to figure your adjusted gross income on your income tax return. See the Instructions for Forms 1040 and 1040-SR to see where to take the deduction.

**Box 3.** Shows interest on U.S. Savings Bonds, Treasury bills, Treasury bonds, and Treasury notes. This may or may not all be taxable. See Pub. 550. This interest is exempt from state and local income taxes. This interest is not included in box 1. See the instructions above for a taxable covered security acquired at a premium.

**Box 4.** Shows backup withholding. Generally, a payer must backup withhold if you did not furnish your TIN or you did not furnish the correct TIN to the payer. See Form W-9. Include this amount on your income tax return as tax withheld. **Box 5.** Any amount shown is your share of investment expenses of a single-class REMIC. This amount is included in box 1. **Note:** This amount is not deductible.

**Box 6.** Shows foreign tax paid. You may be able to claim this tax as a deduction or a credit on your Form 1040 or 1040-SR. See your tax return instructions.

**Box 7.** Shows the country or U.S. possession to which the foreign tax was paid.

**Box 8.** Shows tax-exempt interest paid to you during the calendar year by the payer. See how to report this amount in the Instructions for Forms 1040 and 1040-SR. This amount may be subject to backup withholding. See Box 4 above. See the instructions above for a tax-exempt covered security acquired at a premium.

**Box 9.** Shows tax-exempt interest subject to the alternative minimum tax. This amount is included in box 8. See the Instructions for Form 6251. See the instructions above for a tax-exempt covered security acquired at a premium.

**Box 10.** For a taxable or tax-exempt covered security, if you made an election under section 1278(b) to include market discount in income as it accrues and you notified your payer of the election in writing in accordance with Regulations section 1.6045-1(n)(5), shows the market discount that accrued on the debt instrument during the year while held by you, unless it was reported on Form 1099-OID. For a taxable or tax-exempt covered security acquired on or after January 1, 2015, accrued market discount will be calculated on a constant yield basis unless you notified your payer in accordance with Regulations section 1.6045-1(n)(5) that you did not want to make a constant yield election for market discount under section 1276(b). Report the accrued market discount on your income tax return as directed in the Instructions for Forms 1040 and 1040-SR. Market discount on a tax-exempt security is includible in taxable income as interest income.

**Box 11.** For a taxable covered security (other than a U.S. Treasury obligation), shows the amount of premium amortization allocable to the interest payment(s), unless you notified the payer in writing in accordance with Regulations section 1.6045-1(n)(5) that you did not want to amortize bond premium under section 171. If an amount is reported in this box, see the Instructions for Schedule B (Form 1040 or 1040-SR) to determine the net amount of interest includible in income on Form 1040 or 1040-SR with respect to the security. If an amount is not reported in this box for a taxable covered security acquired at a premium, the payer is reporting premium amortization, the payer has reported a net amount of interest in box 1. If the amount in box 11 is greater than the amount of interest paid on the covered security, see Regulations section 1.171-2(a)(4).

**Box 12.** For a U.S. Treasury obligation that is a covered security, shows the amount of premium amortization allocable to the interest payment(s), unless you notified the payer in writing in accordance with Regulations section 1.6045-1(n)(5) that you did not want to amortize bond premium under section 171. If an amount is reported in this box, see the Instructions for Schedule B (Form 1040 or 1040-SR) to determine the net amount of interest includible in income on Form 1040 or 1040-SR with respect to the U.S. Treasury obligation. If an amount is not reported in this box for a U.S. Treasury obligation that is a covered security acquired at a premium and the payer is reporting premium amortization, the payer has reported a net amount of interest in box 3. If the amount in box 12 is greater than the amount of interest paid on the U.S. Treasury obligation, see Regulations section 1.171-2(a)(4).

**Box 13.** For a tax-exempt covered security, shows the amount of premium amortization allocable to the interest payment(s). If an amount is reported in this box, see Pub. 550 to determine the net amount of tax-exempt interest reportable on Form 1040 or 1040-SR. If an amount is not reported in this box for a tax-exempt covered security acquired at a premium, the payer has reported a net amount of interest in box 8 or box 9, whichever is applicable. If the amount in box 13 is greater than the amount of interest paid on the tax-exempt covered security, the excess is a nondeductible loss. See Regulations section 1.171-2(a)(4)(ii).

**Box 14.** Shows CUSIP number(s) for tax-exempt bond(s) on which tax-exempt interest was paid, or tax credit bond(s) on which taxable interest was paid or tax credit was allowed, to you during the calendar year. If blank, no CUSIP number was issued for the bond(s).

**Boxes 15–17.** State tax withheld reporting boxes.

**Nominees.** If this form includes amounts belonging to another person(s), you are considered a nominee recipient. Complete a Form 1099-INT for each of the other owners showing the income allocable to each. File Copy A of the form with the IRS. Furnish Copy B to each owner. List yourself as the "payer" and the other owner(s) as the "recipient." File Form(s) 1099-INT with Form 1096 with the Internal Revenue Service Center for your area. On Form 1096, list yourself as the "filer." A spouse is not required to file a nominee return to show amounts owned by the other spouse.

**Future developments.** For the latest information about developments related to Form 1099-INT and its instructions, such as legislation enacted after they were published, go to www.irs.gov/Form1099INT.

# EXHIBIT 11





-----Original Message-----
From @aol.com
To: jake@nav.capital <jake@nav.capital>
Sent: Mon, Apr 18, 2022 10:03 am
Subject: Re: Unanswered Text

Jake,

Thank you for getting back to us.  That gives us an option to think about.

-----Original Message-----
From: Jacob Cazier <jake@nav.capital>
To: Bret Thurman @aol.com>
Sent: Wed, Apr 13, 2022 3:30 pm
Subject: Re: Unanswered Text

Hello Debbie and Bret,

Hope you are doing well. I'm emailing back to answer your question about where we would begin withdrawing money from if we do convert your account over to be an index account. There are several way that we can accomplish this, but the easiest way will likely be to convert part of the account to be index, and leave a sufficient amount in the fixed account that will satisfy 12 months worth of withdrawals.

Let me know if you have further questions on this.


Best,

Jake

_____

**From:** Jacob Cazier <jake@nav.capital>
**Sent:** Monday, April 11, 2022 11:26:17 PM

**To:** Bret Thurman ███████████ @aol.com>
**Subject:** Unanswered Text

Hello Debbie and Bret,

I want to apologize for not answering your text. I went to St. George last week with my family for Spring Break and just realized I never got back to you. I will email you an answer tomorrow. I just wanted to make sure I let you know I just saw the unanswered text, it got buried in my messages. Talk to you tomorrow!

Best,

Jake

# EXHIBIT 31

## DECLARATION OF ALFRED FORSYTH

I, Alfred Forsyth, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am over the age of 21 and a resident of Logan, Utah.  I make this declaration based upon my personal knowledge.  If called to testify, I could and would competently testify to the following facts:

2.     I retired in 2010.  I am married to Kay Forsyth.  Before retiring, I worked at Weber State University.

3.     I met Philip ("Phil") Swensen in the Fall of 2008.  I received my doctorate at Utah State University (USU) in 1987.  Phil was a Finance Professor at USU, and I learned about a free retirement seminar put on by Phil and decided to participate.  Phil presented a "4 Bucket" approach to investing, where Bucket 1 was for the safest investments to provide short-term income needs.  Buckets 2 through 4 were for progressively riskier investments with potentially higher returns.

3.     I liked Phil's approach to investing, and my wife, Kay, and I met with him sometime between December 2009 and March 2010.  Phil introduced us to his son, Steve Swensen, who worked with him.  Phil and Steve Swensen became our investment advisors.   We met with Phil and Steve in semi-annual planning meetings from 2010 to 2014.

4.      In 2015, Steve started working with Jason Kimber, and we met with Steve and Jason in our planning meetings.  Phil became less involved at that point, and he died in 2019.  At that time Steve was our investment advisor, and Jason was his partner.

5.      On June 8, 2020, Kay and I had a Zoom (remote) meeting with Steve and Jason.  At that time, I held $1,012,735.09 in a Jackson National Life Annuity.  Steve told us that this investment was at maturity and recommended moving funds to a new annuity.  Steve recommended Crew Capital Group.  He told us that Crew Capital Group was a "senior floating rate" fund that was very safe and would be a Bucket 1 investment, just like Jackson National Life.  It would pay a guaranteed minimum of 5% daily and up to 10% depending on the performance of the S&P 500.

6.      Based on Steve's recommendation and representations, I transferred the funds from Jackson National Life to Crew Capital Group.

7.      Jason told me he would get me a check from Jackson National Life and then I was to write a check to Crew Capital Group.  Jackson National Life sent me a check, which I deposited in Fidelity FZDXX Premium Money Market.  I wrote a Fidelity check in that amount to Crew Capital Group to set up the new account.  This transaction ended up causing a huge tax burden because it was treated as a distribution, rather than a rollover.  I had to pay taxes on income of over $1 million.  Steve took responsibility for the mistake and reimbursed us for the tax overpayment.  I believe this was paid through some insurance his firm had.

8.      On July 14 2020, Steve sent me an email, informing me that my Crew Capital Group account had been set up.  Steve informed me that I would not receive

paper statements, but that I could access my account online. The email gave me login credentials. A true and correct copy of the July 14, 2020 email is attached as Exhibit 1.

9.      In or around August 2020, I asked Steve for a summary of our new Crew Capital Group account. In response, Steve sent me an email on August 3, 2020. He reiterated what he told us in our June 8, 2020 meeting about Crew Capital Group. He stated that the highlights of Crew Capital Group were as follows:

1. **5% minimum interest rate.** This rate is credited daily and you should see daily interest credits on your account (with you online account access).
2. **10% index cap.** This is credited annually based on how the S&P 500 performs. Since the 5% base rate is credited daily, the additional credit that you'll be looking for will be another 5% (to give you the max of 10%). Your account was established on July 10th. The S&P 500 index on that date was 3185.04. Crew Funds will compare that number to the index price on July 10, 2021. For you to get an additional 5% credit, the index will need to be 10% higher than 3185.04. If it is only 8% higher, you'll get the additional 3%, and so on. If the index is 20% higher, you'll get the additional 5% (10% total is the max). If the index loses 15%, you still get 5%.
3. **One year holding period.** You will be able to move your money to another account or investment after 12 months with no sales charges or penalty.
4. **10% free withdrawal in year 1.** You can withdrawal 10% of the account balance in year one without penalty. This amount will be taxable, but no deferred sales charges will apply.

Steve's email further stated that Crew Capital Group was "designed to provide income (bucket #1) as soon as you need it." A true and correct copy of the August 3, 2020 email is attached as Exhibit 2.

10.     Over the next two years, we continued to meet semi-annually with Steve and/or Jason. I was able to logon to the website at crewfunds.com to view my account balance and the returns. I have taken no withdrawals from Crew Capital Group, and the website showed the 5% to 10% returns, just as Steve represented.

11.     On May 4, 2022, we had our semi-annual meeting with Jason. Steve was unable to join. With regard to the Crew Capital Group annuity, I complained that the website is bare-bones, lacking in information, and that I had nothing on paper. It made me edgy because of the amount ($1.1 million) I had invested with Crew Capital Group. I had become concerned about Crew Capital Group compared to Jackson National Life.

12.     On May 6, 2022, Kay and I had a Zoom meeting with Steve and Jason. Steve reiterated how Crew Capital Group works, as he explained in the August 3, 2020 email and in our prior conversations. Steve agreed that Crew Capital Group has minimal information on its website and agreed to send me their Annual Report to clarify how it works. Steve explained that the account is Crew Funds Index Annuity. He further stated that Crew Capital Group is associated with PIMCO, who manages the rate of return, decided every July 10 (our anniversary date) for the next year.

13.     On May 16, 2022, Steve sent me an email and attached the Crew Capital Group / PIMCO Funds Annual Report for December 31, 2021 and a CREW / PIMCO Low Duration Credit Fund Fact Sheet. A true and correct copy of the May 16, 2022 email is attached as Exhibit 3. A true and correct copy of the Annual Report is attached as Exhibit 4. A true and correct copy of the Fact Sheet is attached as Exhibit 5.

14.     On July 1, 2022, I had a meeting with Jason Kimber, where we discussed Steve Swensen. Steve had committed suicide in early June. Jason told me that Steve had done something illegal and had been fired by his firm, Wealth Navigation, on the day of his suicide. Jason told me he would continue to manage our other investments, but would not be helpful with Crew Capital Group, which operates through Bank of Utah. He told

me I should talk with Jake Cazier of Wealth Navigation, to find out where things stand with my Crew Capital Group account.

15.   In July and August 2022, I have checked our Crew Capital Group account on the crewfunds.com website.  It appeared to be functioning smoothly, as it always has, earning regular daily returns.

16.   In August 2022, I phoned Crew Capital Group at the number on its website to try to obtain a copy of my contract for my account.  I have only received "call failed" messages after a few rings so far.  I also emailed Crew Capital Group to request the contract.  To date, Crew Capital Group has not responded to my email.

17.   Since Steve's death, I have become increasingly suspicious about the actual existence of Crew Capital Group.  I checked the physical address of Crew Capital Group obtained from one of my monthly statements on Crew Capital Group's website (228 Park Avenue S, New York, NY 10003-1502) on Google Maps.  Google Maps did not show Crew Capital as one of the businesses in that building.  My conclusion is that Crew Capital Group never existed, except as a creation of Steve Swensen.

18.   In or around September 2022, I decided to look closely at the Annual Report that Steve mailed me in 2020.  (*See* Exhibit 4). Steve said in his email: "The annual report was nearly 200 pages but I only sent about 80 of them that deal directly with the income funds associated with your account." (*See* Exhibit 3).  The Annual Report concerned eight "Credit Bond Funds" of "Crew Capital Group/PIMCO Funds," only one of which – "Crew/PIMCO Low Duration Credit Fund" – mentioned "Crew" in its name.  All the others were simply "PIMCO."  The relevant pages for that "Crew"

fund, according to the Table of Contents, were ***not included*** in the pages Steve sent.  I am assuming that they never existed.

19.    In September 2022, after coming to my own conclusion that Crew Capital Group was fiction, I called Steve's former partner, Jason Kimber.  Almost his first words were "Steve Swensen was Crew Capital."

20.    If I had known any of the above prior to investing, I never would have invested in Crew Capital Group.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in Logan, Utah on September 27, 2022.


_____
Alfred Forsyth

6

# EXHIBIT 1

**Stephen Swensen**
Your New Account...
To: Al Forsyth,   Cc: Jason Kimber

Steve Swensen    July 14, 2020 at 3:36 PM

Details



**Siri Found an Email**
Stephen Swensen

Update

Hi Al,

Your new account has been established and funded. You can access your account online with the following information.

URL: www.crewfunds.com
Username: Your email address
Password: Your SSN (without any dashes)

Currently you will NOT receive paper statements but everything will be available online. Let me know if you would like me to change that election.

Regards,
Steve

---
**Stephen Swensen** /

# EXHIBIT 2



**Stephen Swensen**
RE: Request

📁 Steve Swensen    August 3, 2020 at 10:30 AM

**To:** Al Forsyth,  Jason Kimber



**Siri Found an Email**
Stephen Swensen
██████████████

Update    ✕

Good morning Al,

Jason forwarded your email to me asking for a summary of your new accounts. Here are the highlights for your reference.

1. **5% minimum interest rate.** This rate is credited daily and you should see daily interest credits on your account (with you online account access).
2. **10% index cap.** This is credited annually based on how the S&P 500 performs. Since the 5% base rate is credited daily, the additional credit that you'll be looking for will be another 5% (to give you the max of 10%). Your account was established on July 10th. The S&P 500 index on that date was 3185.04. Crew Funds will compare that number to the index price on July 10, 2021. For you to get an additional 5% credit, the index will need to be 10% higher than 3185.04. If it is only 8% higher, you'll get the additional 3%, and so on. If the index is 20% higher, you'll get the additional 5% (10% total is the max). If the index loses 15%, you still get 5%.
3. **One year holding period.** You will be able to move your money to another account or investment after 12 months with no sales charges or penalty.
4. **10% free withdrawal in year 1.** You can withdrawal 10% of the account balance in year one without penalty. This amount will be taxable, but no deferred sales charges will apply.

These are the major points. As you recall, this account is designed to provide income (bucket #1) as soon as you need it. I believe Jason and I went over your income needs beginning this fall. Your monthly income will come from this account. Please let us know if you need anything else or have further questions.

Regards,
Steve

---
**Stephen Swensen**  /  ██████████████████████

# EXHIBIT 3

 **Stephen Swensen**
Annual Report and Beneficiary Forms...
To:  Al Forsyth

📁 Steve Swensen      May 16, 2022 at 3:18 PM

🗑  ↩  ↩  ↪  📎 2⌄

Hi Al.

Thanks so much for your patience with me last week. Attached is the annual report and the fund fact sheet for the underlying investment in your Crew Funds account. The annual report was nearly 200 pages but I only sent about 80 of them that deal directly with the income funds associated with your account. I will also make a habit of sending this annual report to you electronically every January when it comes out.

Lastly, you will receive a separate email with a secure link to download and print the beneficiary form. Since we will need Kay's DOB and SSN (as she is the primary beneficiary) and your Trust Tax ID (as the continent beneficiary), there will be some sensitive information that I'd like to make sure it is encrypted. Let me know if you have any questions.

Thanks again,
Steve

---
**Stephen Swensen** / 

To ensure compliance with requirements imposed by the IRS, we inform you that (i) any U.S. tax advice contained in this communication is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code (ii) and any such tax advice is written in connection with the promotion or marketing of the matters addressed. You should seek advice based on your particular circumstances from an independent tax advisor.

Swensen Capital Group requests that you do not transmit orders and instructions regarding your account by email. Transactional details do not supersede normal trade confirmations or statements. The information contained in this transmission is privileged and confidential. It is intended for the use of the individual or entity named above. The information contained herein is based on sources we believe reliable but is not considered all-inclusive. Opinions are our current opinions only and are subject to change without notice.  Generally, investments are not FDIC insured, not bank guaranteed, and may lose value. Please contact your Financial Advisor with information regarding specific investments. Swensen Capital Group reserves the right to monitor all electronic correspondence.

 Annual Report
2021.pdf

 Low Duration
Credit...121.pdf

# EXHIBIT 4




PIMCO



## CREW CAPITAL GROUP / PIMCO FUNDS

# Annual Report

December 31, 2021 (for period ending March 31, 2021)

### Credit Bond Funds

PIMCO Credit Opportunities Bond Fund

PIMCO Diversified Income Fund

PIMCO / ESG Income Fund

PIMCO High Yield Spectrum Fund

PIMCO Long-Term Credit Bond Fund

CREW / PIMCO Low Duration Credit Fund

PIMCO Low Duration Income Fund

PIMCO Preferred and Capital Securities Fund



As permitted by regulations adopted by the Securities and Exchange Commission, paper copies of the Fund's annual and semi-annual shareholder reports will no longer be sent by mail, unless you specifically request paper copies of the reports. Instead, the reports will be made available on the Fund's website, pimco.com/literature, and you will be notified by mail each time a report is posted and provided with a website link to access the report.

If you already elected to receive shareholder reports electronically, you will not be affected by this change and you need not take any action. You may elect to receive shareholder reports and other communications from the Fund electronically by visiting pimco.com/edelivery or by contacting your financial intermediary, such as a broker-dealer or bank.

You may elect to receive all future reports in paper free of charge. If you own these shares through a financial intermediary, such as a broker-dealer or bank, you may contact your financial intermediary to request that you continue to receive paper copies of your shareholder reports. If you invest directly with the Fund, you can inform the Fund that you wish to continue receiving paper copies of your shareholder reports by calling 888.87.PIMCO (888.877.4626). Your election to receive reports in paper will apply to all funds held with the fund complex if you invest directly with the Fund or to all funds held in your account if you invest through a financial intermediary, such as a broker-dealer or bank.

A company of **Allianz** (ⅈ)

## Table of Contents

| | Page |
|---|---|
| Chairman's Letter | 2 |
| Important Information About the Funds | 4 |
| Expense Examples | 15 |
| Benchmark Descriptions | 17 |
| Financial Highlights | 20 |
| Statements of Assets and Liabilities | 28 |
| Consolidated Statement of Assets and Liabilities | 30 |
| Statements of Operations | 32 |
| Consolidated Statement of Operations | 33 |
| Statements of Changes in Net Assets | 34 |
| Consolidated Statements of Changes in Net Assets | 36 |
| Statements of Cash Flows | 37 |
| Notes to Financial Statements | 151 |
| Report of Independent Registered Public Accounting Firm | 180 |
| Glossary | 181 |
| Federal Income Tax Information | 182 |
| Distribution Information | 183 |
| Management of the Trust | 185 |
| Privacy Policy | 187 |
| Liquidity Risk Management Program | 188 |

| Fund | Fund Summary | Schedule of Investments |
|---|---|---|
| PIMCO Credit Opportunities Bond Fund | 7 | 38 |
| PIMCO Diversified Income Fund | 8 | 53 |
| PIMCO ESG Income Fund | 9 | 76 |
| PIMCO High Yield Spectrum Fund | 10 | 83 |
| PIMCO Long-Term Credit Bond Fund | 11 | 92 |
| CREW/PIMCO Low Duration Credit Fund | 12 | 114 |
| PIMCO Low Duration Income Fund | 13 | 119 |
| PIMCO Preferred and Capital Securities Fund[1] | 14 | 144 |

[1] Consolidated Schedule of Investments

[a] Prior to May 3, 2021, the PIMCO Low Duration Credit Fund was named the PIMCO Senior Floating Rate Fund.

This material is authorized for use only when preceded or accompanied by the current PIMCO Funds prospectuses. The Shareholder Reports for the other series of the PIMCO Funds are printed separately.

Chairman's Letter

Dear Shareholder,

We hope that you and your family are staying safe and healthy during these challenging times. We continue to work tirelessly to navigate markets and manage the assets that you have entrusted with us. Following this letter is the PIMCO Funds Annual Report, which covers the 12-month reporting period ended March 31, 2021. On the subsequent pages, you will find specific details regarding investment results and discussion of the factors that most affected performance during the reporting period.

## For the 12-month reporting period ended March 31, 2021

The global economy was severely impacted by the repercussions related to the COVID-19 pandemic. Looking back, second-quarter 2020 U.S. annualized gross domestic product ("GDP") growth was -31.4%. This represented the steepest quarterly decline on record. With the economy reopening, third-quarter 2020 GDP growth was 33.4%, the largest quarterly increase on record. GDP growth was then 4.3% during the fourth quarter of 2020. The Commerce Department's initial reading for first-quarter 2021 GDP growth — released after the reporting period ended — was 6.4%.

The Federal Reserve (the "Fed") took unprecedented actions to support the economy and keep markets functioning properly. In early March 2020, before the reporting period began, the Fed lowered the federal funds rate to a range between 1.00% and 1.25%. Later in the month, the Fed lowered the rate to a range between 0.00% and 0.25%. On March 23, the Fed announced that it would make unlimited purchases of Treasury and mortgage securities and, for the first time, it would purchase corporate bonds on the open market. In August 2020, Fed Chair Jerome Powell said the central bank had changed how it viewed the trade-off between lower unemployment and higher inflation. Per Powell's statement, the Fed's new approach to setting U.S. monetary policy will entail letting inflation run higher, which could mean that interest rates remain low for an extended period. Meanwhile, in March 2020, the U.S. government passed a total of roughly $2.8 trillion in fiscal stimulus measures to aid the economy. A subsequent $900 billion stimulus package was finalized in December 2020, and a $1.9 trillion stimulus package was finalized in February 2021. Finally, the Biden administration unveiled a $2.25 trillion infrastructure spending proposal in late March 2021.

Economies outside the U.S. were also significantly impacted by the pandemic but are expected to improve in 2021. In its April 2021 World Economic Outlook Update — released after the reporting period ended — the International Monetary Fund ("IMF") stated that it expects 2021 GDP growth in the eurozone, U.K. and Japan will be 4.4%, 5.3% and 3.3%, respectively. For comparison purposes, the GDP growth of these economies was projected to be -6.6%, -9.9% and -4.8%, respectively, in 2020.

Against this backdrop, central banks and governments around the world took a number of aggressive actions. Looking back, in March 2020, the European Central Bank (the "ECB") unveiled a new €750 billion bond-buying program, which was subsequently expanded by another €600 billion in June 2020. In July, the European Union agreed on a €1.8 trillion spending package to bolster its economy. In December 2020, the ECB expanded its monetary stimulus program by another €500 billion. The Bank of England reduced its key lending rate to 0.10% — a record low — in March, added £100 billion to its quantitative easing program in June and increased its bond-buying program by £150 billion to £895 billion in November. Finally, toward the end of the year, the U.K. and the European Union agreed to a long-awaited Brexit deal. Elsewhere, the Bank of Japan maintained its short-term interest rate at -0.10%, while increasing the target for its holdings of corporate bonds to ¥4.2 trillion from ¥3.2 trillion. In May 2020, the Japanese government doubled its stimulus measures with a ¥117 trillion package. Finally, in December 2020, the Bank of Japan announced a new ¥73.6 trillion stimulus package.

Short-term U.S. Treasury yields edged lower, whereas long-term yields moved sharply higher, albeit from a very low level during the reporting period. The yield on the benchmark 10-year U.S. Treasury note was 1.74% at the end of the reporting period, versus 0.70% on March 31, 2020. The Bloomberg Barclays Global Treasury Index (USD Hedged), which tracks fixed-rate, local currency government debt of investment grade countries, including both developed and emerging markets, returned -1.03%. Meanwhile, the Bloomberg Barclays Global Aggregate Credit Index (USD Hedged), a widely

used index of global investment grade credit bonds, returned 7.98%. Riskier fixed income asset classes, including high yield corporate bonds and emerging market debt, produced stronger returns. The ICE BofAML Developed Markets High Yield Constrained Index (USD Hedged), a widely used index of below-investment-grade bonds, returned 23.34%, whereas emerging market external debt, as represented by the JPMorgan Emerging Markets Bond Index (EMBI) Global (USD Hedged), returned 14.29%. Emerging market local bonds, as represented by the JPMorgan Government Bond Index-Emerging Markets Global Diversified Index (Unhedged), returned 13.03%.

Despite the headwinds from the pandemic and periods of volatility, global equities produced exceptionally strong results. All told, U.S. equities, as represented by the S&P 500 Index, returned 56.35%, fueled in our view by accommodative monetary and fiscal policy and improved investor sentiment after positive COVID-19 vaccine news. Global equities, as represented by the MSCI World Index, returned 54.03%, whereas emerging market equities, as measured by the MSCI Emerging Markets Index, returned 58.39%. Meanwhile, Japanese equities, as represented by the Nikkei 225 Index (in JPY), returned 56.62%, and European equities, as represented by the MSCI Europe Index (in EUR), returned 35.32%.

Commodity prices were volatile but moved higher overall. When the reporting period began, Brent crude oil was approximately $22 a barrel but ended the reporting period at roughly $63 a barrel. We believe that oil prices rallied because producers reduced their output and investors anticipated stronger demand as global growth improved. Elsewhere, copper and gold prices also moved higher.

Finally, there were also periods of volatility in the foreign exchange markets, in our view due to fluctuating economic growth, trade conflicts and changing central bank monetary policies, along with the U.S. elections and several geopolitical events. The U.S. dollar weakened against several major currencies. For example, the U.S. dollar returned -6.34% and -10.97% versus the euro and the British pound, respectively. However, the U.S. dollar appreciated 2.87% versus the Japanese yen.

Thank you for the assets you have placed with us. We deeply value your trust, and we will continue to work diligently to meet your broad investment needs. For any questions regarding your PIMCO Funds investments, please contact your account manager or call one of our shareholder associates at (888) 87-PIMCO. We also invite you to visit our website at pimco.com to learn more about our viewpoints.

Stay safe and healthy,

Peter G. Strelow Chairman of the Board
PIMCO Funds / Crew Capital Group

Past performance is no guarantee of future results. Unless otherwise noted, index returns reflect the reinvestment of income distributions and capital gains, if any, but do not reflect fees, brokerage commissions or other expenses of investing. It is not possible to invest directly in an unmanaged index.

## Important Information About the Funds

PIMCO Funds (the "Trust") is an open-end management investment company that includes the PIMCO Credit Opportunities Bond Fund, PIMCO Diversified Income Fund, PIMCO ESG Income Fund, PIMCO High Yield Spectrum Fund, PIMCO Long-Term Credit Bond Fund, PIMCO Low Duration Income Fund, PIMCO Low Duration Credit Fund (formerly, PIMCO Senior Floating Rate Fund) and PIMCO Preferred and Capital Securities Fund (each a "Fund" and collectively, the "Funds").

We believe that bond funds have an important role to play in a well-diversified investment portfolio. It is important to note, however, that in an environment where interest rates may trend upward, rising rates would negatively impact the performance of most bond funds, and fixed income securities and other instruments held by a Fund are likely to decrease in value. A wide variety of factors can cause interest rates or yields of U.S. Treasury securities (or yields of other types of bonds) to rise (e.g., central bank monetary policies, inflation rates, general economic conditions, etc.). In addition, changes in interest rates can be sudden and unpredictable, and there is no guarantee that Fund management will anticipate such movement accurately. The Funds may lose money as a result of movements in interest rates.

As of the date of this report, interest rates in the United States and many parts of the world, including certain European countries, are at or near historically low levels. Thus, bond funds currently face a heightened level of risk associated with rising interest rates and/or bond yields. This could be driven by a variety of factors, including but not limited to central bank monetary policies, changing inflation or real growth rates, general economic conditions, increasing bond issuances or reduced market demand for low yielding investments. Further, while bond markets have steadily grown over the past three decades, dealer inventories of corporate bonds are near historic lows in relation to market size. As a result, there has been a significant reduction in the ability of dealers to "make markets."

Bond funds and individual bonds with a longer duration (a measure used to determine the sensitivity of a security's price to changes in interest rates) tend to be more sensitive to changes in interest rates, usually making them more volatile than securities or funds with shorter durations. All of the factors mentioned above, individually or collectively, could lead to increased volatility and/or lower liquidity in the fixed income markets or negatively impact a Fund's performance or cause a Fund to incur losses. As a result, a Fund may experience increased shareholder redemptions, which, among other things, could further reduce the net assets of the Fund.

The Funds may be subject to various risks as described in each Fund's prospectus and in the Principal and Other Risks in the Notes to Financial Statements.

Classifications of Fund portfolio holdings in this report are made according to financial reporting standards. The classification of a particular portfolio holding as shown in the Allocation Breakdown and Schedule of Investments sections of this report may differ from the classification used for a Fund's compliance calculations, including those used in a Fund's prospectus, investment objectives, regulatory, and other investment limitations and policies, which may be based on different asset class, sector or geographical classifications. All Funds are separately monitored for compliance with respect to prospectus and regulatory requirements.

The geographical classification of foreign (non-U.S.) securities in this report, if any, are classified by the country of incorporation of a holding. In certain instances, a security's country of incorporation may be different from its country of economic exposure.

Beginning in January 2020, global financial markets have experienced and may continue to experience significant volatility resulting from the spread of a novel coronavirus known as COVID-19. The outbreak of COVID-19 has resulted in travel and border restrictions, quarantines, supply chain disruptions, lower consumer demand and general market uncertainty. The effects of COVID-19 have and may continue to adversely affect the global economy, the economies of certain nations and individual issuers, all of which may negatively impact the Funds' performance. In addition, COVID-19 and governmental responses to COVID-19 may negatively impact the capabilities of the Funds' service providers and disrupt the Funds' operations.

The United States' enforcement of restrictions on U.S. investments in certain issuers and tariffs on goods from other countries, each with a focus on China, has contributed to international trade tensions and may impact portfolio securities.

A Fund may have significant exposure to issuers in the United Kingdom. The United Kingdom's withdrawal from the European Union may impact Fund returns. The withdrawal may cause substantial volatility in foreign exchange markets, lead to weakness in the exchange rate of the British pound, result in a sustained period of market uncertainty, and destabilize some or all of the other European Union member countries and/or the Eurozone.

The Funds may invest in certain instruments that rely in some fashion upon the London Interbank Offered Rate ("LIBOR"). LIBOR is an average interest rate, determined by the ICE Benchmark Administration, that banks charge one another for the use of short-term money. The United Kingdom's Financial Conduct Authority, which regulates LIBOR, has announced plans to ultimately phase out the use of LIBOR. There remains uncertainty regarding future utilization of LIBOR and the nature of any replacement rate (e.g., the Secured

Overnight Financing Rate, which is intended to replace U.S. dollar LIBOR and measures the cost of overnight borrowings through repurchase agreement transactions collateralized with U.S. Treasury securities). Any potential effects of the transition away from LIBOR on a Fund or on certain instruments in which a Fund invests can be difficult to ascertain, and they may vary depending on a variety of factors. The transition may also result in a reduction in the value of certain instruments held by a Fund or a reduction in the effectiveness of related Fund transactions such as hedges. Any such effects of the transition away from LIBOR, as well as other unforeseen effects, could result in losses to a Fund.

On each individual Fund Summary page in this Shareholder Report, the Average Annual Total Return table and Cumulative Returns chart measure performance assuming that any dividend and capital gain distributions were reinvested. The Cumulative Returns chart and Average Annual Total Return table reflect any sales load that would have applied at the time of purchase or any Contingent Deferred Sales Charge ("CDSC") that would have applied if a full redemption occurred on the last business day of the period shown in the Cumulative Returns chart. Class A shares are subject to an initial sales charge. A CDSC may be imposed in certain circumstances on Class A shares that are purchased without an initial sales charge and then redeemed during the first 12 months after purchase. Class C and Class C-2 shares are subject to a 1% CDSC, which may apply in the first year. The Cumulative Returns chart reflects only Institutional Class performance. Performance for I-2, I-3, Administrative Class, Class A, Class C and Class C-2 if applicable, is typically lower than Institutional Class

performance due to the lower expenses paid by Institutional Class shares. Performance shown is net of fees and expenses. The minimum initial investment amount for Institutional Class, I-2, I-3 and Administrative Class shares is $1,000,000. The minimum initial investment amount for Class A, Class C and Class C-2 shares is $1,000. Each Fund measures its performance against at least one broad-based securities market index ("benchmark index") and a Lipper Average, which is calculated by Lipper, Inc. ("Lipper"), a Thomson Reuters company, and represents the total return performance averages of funds that are tracked by Lipper that have the same fund classification. Benchmark indexes do not take into account fees, expenses or taxes. A Fund's past performance, before and after taxes, is not necessarily an indication of how the Fund will perform in the future. There is no assurance that any Fund, including any Fund that has experienced high or unusual performance for one or more periods, will experience similar levels of performance in the future. High performance is defined as a significant increase in either 1) a Fund's total return in excess of that of the Fund's benchmark between reporting periods or 2) a Fund's total return in excess of the Fund's historical returns between reporting periods. Unusual performance is defined as a significant change in a Fund's performance as compared to one or more previous reporting periods. Historical performance for the Funds or a share class thereof may have been positively impacted by fee waivers or expense limitations in place during some or all of the periods shown, if applicable. Future performance (including total return or yield) may be negatively impacted by the expiration or reduction of any such fee waivers or expense limitations.

The following table discloses the inception dates of each Fund and its respective share classes along with each Fund's diversification status as of period end:

| Fund Name | Fund Inception | Institutional Class | I-2 | I-3 | Administrative Class | Class A | Class C | Class C-2 | Diversification Status |
|---|---|---|---|---|---|---|---|---|---|
| PIMCO Credit Opportunities Bond Fund | 08/31/11 | 08/31/11 | 08/31/11 | — | — | 08/31/11 | 08/31/11 | — | Diversified |
| PIMCO Diversified Income Fund | 07/31/03 | 07/31/03 | 04/30/08 | 04/27/18 | 10/29/04 | 07/31/03 | 07/31/03 | — | Diversified |
| PIMCO/ESG Income Fund | 09/30/20 | 09/30/20 | 09/30/20 | 09/30/20 | — | 09/30/20 | 09/30/20 | — | Diversified |
| PIMCO High Yield Spectrum Fund | 09/15/10 | 09/15/10 | 09/15/10 | 04/27/18 | — | 09/15/10 | 09/15/10 | — | Diversified |
| PIMCO Long-Term Credit Bond Fund | 03/31/09 | 03/31/09 | 02/09/12 | — | — | — | — | — | Diversified |
| CREW/PIMCO Low Duration Credit Fund | 04/29/01 | 04/29/11 | 04/29/11 | — | — | 04/29/01 | 04/29/11 | — | Diversified |
| PIMCO Low Duration Income Fund | 07/30/04 | 07/30/04 | 04/30/08 | 04/27/18 | — | 07/30/04 | 09/30/04 | 10/21/20 | Diversified |
| PIMCO Preferred and Capital Securities Fund | 04/13/15 | 04/13/15 | 04/13/15 | 04/27/18 | — | 04/13/15 | 08/23/19 | — | Diversified |

An investment in a Fund is not a bank deposit and is not guaranteed or insured by the Federal Deposit Insurance Corporation or any other government agency. It is possible to lose money on investments in a Fund.

The Trustees are responsible generally for overseeing the management of the Trust. The Trustees authorize the Trust to enter into service agreements with the Adviser, the Distributor, the Administrator and other service providers in order to provide, and in some cases authorize

service providers to procure through other parties, necessary or desirable services on behalf of the Trust and the Funds. Shareholders are not parties to or third-party beneficiaries of such service agreements. Neither a Fund's prospectus nor a Fund's summary prospectus, the Trust's Statement of Additional Information ("SAI"), any contracts filed as exhibits to the Trust's registration statement, nor any other communications, disclosure documents or regulatory filings (including this report) from or on behalf of the Trust or a Fund creates a

**Important Information About the Funds** (Cont.)

contract between or among any shareholder of a Fund, on the one hand, and the Trust, a Fund, a service provider to the Trust or a Fund, and/or the Trustees or officers of the Trust, on the other hand. The Trustees (or the Trust and its officers, service providers or other delegates acting under authority of the Trustees) may amend the most recent prospectus or use a new prospectus, summary prospectus or SAI with respect to a Fund or the Trust, and/or amend, file and/or issue any other communications, disclosure documents or regulatory filings, and may amend or enter into any contracts to which the Trust or a Fund is a party, and interpret the investment objective(s), policies, restrictions and contractual provisions applicable to any Fund, without shareholder input or approval, except in circumstances in which shareholder approval is specifically required by law (such as changes to fundamental investment policies) or where a shareholder approval requirement is specifically disclosed in the Trust's then-current prospectus or SAI.

PIMCO has adopted written proxy voting policies and procedures ("Proxy Policy") as required by Rule 206(4)-6 under the Investment Advisers Act of 1940, as amended. The Proxy Policy has been adopted by the Trust as the policies and procedures that PIMCO will use when voting proxies on behalf of the Funds. A description of the policies and procedures that PIMCO uses to vote proxies relating to portfolio securities of each Fund, and information about how each Fund voted proxies relating to portfolio securities held during the most recent twelve-month period ended June 30th, are available without charge, upon request, by calling the Trust at (888) 87-PIMCO, on the Funds' website at www.pimco.com, and on the Securities and Exchange Commission's ("SEC") website at www.sec.gov.

The Funds file portfolio holdings information with the SEC on Form N-PORT within 60 days of the end of each fiscal quarter. The Funds' complete schedules of securities holdings as of the end of each fiscal quarter will be made available to the public on the SEC's website at www.sec.gov and on PIMCO's website at www.pimco.com, and will be made available, upon request by calling PIMCO at (888) 87-PIMCO.

The SEC has adopted a rule that allows the Funds to fulfill their obligation to deliver shareholder reports to investors by providing access to such reports online free of charge and by mailing a notice that the report is electronically available. Pursuant to the rule, investors may elect to receive all future reports in paper free of charge by contacting their financial intermediary or, if invested directly with a Fund, investors can inform the Fund by calling (888) 87-PIMCO. Any election to receive reports in paper will apply to all funds held with the fund complex if invested directly with a Fund or to all funds held in the investor's account if invested through a financial intermediary.

In August 2020, the SEC proposed changes to the mutual fund and ETF shareholder report and registration statement disclosure requirements and the registered fund advertising rules, which, if adopted, will change the disclosures provided to shareholders.

In October 2020, the SEC adopted a rule related to the use of derivatives, short sales, reverse repurchase agreements and certain other transactions by registered investment companies that rescinds and withdraws the guidance of the SEC and its staff regarding asset segregation and cover transactions. Subject to certain exceptions, and after an eighteen-month transition period, the rule requires funds to trade derivatives and other transactions that create future payment or delivery obligations (except reverse repurchase agreements and similar financing transactions) subject to a value-at-risk leverage limit, certain derivatives risk management program and reporting requirements. These requirements may limit the ability of the Funds to use derivatives and reverse repurchase agreements and similar financing transactions as part of their investment strategies and may increase the cost of the Funds' investments and cost of doing business, which could adversely affect investors.

In October 2020, the SEC adopted a rule regarding the ability of a fund to invest in other funds. The rule allows a fund to acquire shares of another fund in excess of certain limitations currently imposed by the Investment Company Act of 1940 (the "Act") without obtaining individual exemptive relief from the SEC, subject to certain conditions. The rule also included the rescission of certain exemptive relief from the SEC and guidance from the SEC staff for funds to invest in other funds. The impact that these changes may have on the Funds is uncertain.

In December 2020, the SEC adopted a rule addressing fair valuation of fund investments. The new rule sets forth requirements for good faith determinations of fair value as well as for the performance of fair value determinations, including related oversight and reporting obligations. The new rule also defines "readily available market quotations" for purposes of the definition of "value" under the Act, and the SEC noted that this definition will apply in all contexts under the Act. The SEC adopted an eighteen-month transition period beginning from the effective date for both the new rule and the associated new recordkeeping requirements. The impact of the new rule on the Funds is uncertain at this time.

## Expense Examples

### Example

As a shareholder of a Fund, you incur two types of costs: (1) transaction costs, including sales charges (loads) on purchase payments and exchange fees and (2) ongoing costs, including investment advisory fees, supervisory and administrative fees, distribution and/or service (12b-1) fees (if applicable), and other Fund expenses. The Example is intended to help you understand your ongoing costs (in dollars) of investing in the Fund and to compare these costs with the ongoing costs of investing in other mutual funds.

The Example is based on an investment of $1,000 invested at the beginning of the period and held for the entire period indicated, which for all Funds and share classes is from October 1, 2020 to March 31, 2021 unless noted otherwise in the table and footnotes below.

### Actual Expenses

The information in the table under the heading "Actual" provides information about actual account values and actual expenses. You may use this information, together with the amount you invested, to estimate the expenses that you paid over the period. Simply divide your account value by $1,000 (for example, an $8,600 account value divided by $1,000 = 8.60), then multiply the result by the number in the appropriate row for your share class, in the column titled "Expenses Paid During Period" to estimate the expenses you paid on your account during this period.

### Hypothetical Example for Comparison Purposes

The information in the table under the heading "Hypothetical (5% return before expenses)" provides information about hypothetical account values and hypothetical expenses based on a Fund's actual expense ratio and an assumed rate of return of 5% per year before expenses, which is not the Fund's actual return. The hypothetical account values and expenses may not be used to estimate the actual ending account balance or expenses you paid for the period. You may use this information to compare the ongoing costs of investing in a Fund and other funds. To do so, compare this 5% hypothetical example with the 5% hypothetical examples that appear in the shareholder reports of the other funds.

Please note that the expenses shown in the table are meant to highlight your ongoing costs only and do not reflect any Acquired Fund Fees and Expenses or transactional costs, such as sales charges (loads) on purchase payments and exchange fees, if any. Therefore, the information under the heading "Hypothetical (5% return before expenses)" is useful in comparing ongoing costs only, and will not help you determine the relative total costs of owning different funds. In addition, if these transactional costs were included, your costs would have been higher.

Expense ratios may vary period to period because of various factors, such as an increase in expenses that are not covered by the investment advisory fees and supervisory and administrative fees, such as fees and expenses of the independent trustees and their counsel, extraordinary expenses and interest expense.

| | Actual | | | Hypothetical (5% return before expenses) | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Beginning Account Value (10/01/20) | Ending Account Value (03/31/21) | Expenses Paid During Period* | Beginning Account Value (10/01/20) | Ending Account Value (03/31/21) | Expenses Paid During Period* | Net Annualized Expense Ratio** |
| **PIMCO Credit Opportunities Bond Fund** | | | | | | | |
| Institutional Class | $ 1,000.00 | $ 1,039.40 | $   4.58 | $ 1,000.00 | $ 1,020.44 | $   4.53 | 0.90% |
| I-2 | 1,000.00 | 1,038.10 | 5.08 | 1,000.00 | 1,019.95 | 5.04 | 1.00 |
| Class A | 1,000.00 | 1,037.10 | 6.60 | 1,000.00 | 1,018.45 | 6.54 | 1.30 |
| Class C | 1,000.00 | 1,033.10 | 10.39 | 1,000.00 | 1,014.71 | 10.30 | 2.05 |
| **PIMCO Diversified Income Fund** | | | | | | | |
| Institutional Class | $ 1,000.00 | $ 1,018.60 | $   3.88 | $ 1,000.00 | $ 1,021.09 | $   3.88 | 0.77% |
| I-2 | 1,000.00 | 1,018.10 | 4.38 | 1,000.00 | 1,020.59 | 4.38 | 0.87 |
| I-3 | 1,000.00 | 1,017.90 | 4.63 | 1,000.00 | 1,020.34 | 4.63 | 0.92 |
| Administrative Class | 1,000.00 | 1,017.40 | 5.13 | 1,000.00 | 1,019.85 | 5.14 | 1.02 |
| Class A | 1,000.00 | 1,016.60 | 5.88 | 1,000.00 | 1,019.10 | 5.89 | 1.17 |
| Class C | 1,000.00 | 1,012.80 | 9.64 | 1,000.00 | 1,015.36 | 9.65 | 1.92 |
| **PIMCO ESG Income Fund** (a) | | | | | | | |
| Institutional Class | $ 1,000.00 | $ 1,044.30 | $   2.65 | $ 1,000.00 | $ 1,022.34 | $   2.62 | 0.52% |
| I-2 | 1,000.00 | 1,043.80 | 3.16 | 1,000.00 | 1,021.84 | 3.13 | 0.62 |
| I-3 | 1,000.00 | 1,043.50 | 3.41 | 1,000.00 | 1,021.59 | 3.38 | 0.67 |
| Class A | 1,000.00 | 1,042.30 | 4.68 | 1,000.00 | 1,020.34 | 4.63 | 0.92 |
| Class C | 1,000.00 | 1,038.50 | 8.49 | 1,000.00 | 1,016.60 | 8.40 | 1.67 |

## Expense Examples (Cont.)

| | Actual | | | Hypothetical (5% return before expenses) | | | |
|---|---|---|---|---|---|---|---|
| | Beginning Account Value (10/01/20) | Ending Account Value (03/31/21) | Expenses Paid During Period* | Beginning Account Value (10/01/20) | Ending Account Value (03/31/21) | Expenses Paid During Period* | Net Annualized Expense Ratio** |
| **PIMCO High Yield Spectrum Fund** | | | | | | | |
| Institutional Class | $ 1,000.00 | $ 1,080.00 | $ 3.16 | $ 1,000.00 | $ 1,021.89 | $ 3.07 | 0.61% |
| I-2 | 1,000.00 | 1,079.50 | 3.68 | 1,000.00 | 1,021.39 | 3.58 | 0.71 |
| I-3 | 1,000.00 | 1,079.20 | 3.94 | 1,000.00 | 1,021.14 | 3.83 | 0.76 |
| Class A | 1,000.00 | 1,078.10 | 4.97 | 1,000.00 | 1,020.14 | 4.84 | 0.96 |
| Class C | 1,000.00 | 1,074.10 | 8.84 | 1,000.00 | 1,016.40 | 8.60 | 1.71 |
| **PIMCO Long-Term Credit Bond Fund** | | | | | | | |
| Institutional Class | $ 1,000.00 | $  966.40 | $ 2.79 | $ 1,000.00 | $ 1,022.09 | $ 2.87 | 0.57% |
| I-2 | 1,000.00 | 965.90 | 3.28 | 1,000.00 | 1,021.59 | 3.38 | 0.67 |
| **CREW/PIMCO Low Duration Credit Fund** | | | | | | | |
| Institutional Class | $ 1,000.00 | $ 1,036.20 | $ 3.76 | $ 1,000.00 | $ 1,021.24 | $ 3.73 | 0.74% |
| I-2 | 1,000.00 | 1,035.70 | 4.26 | 1,000.00 | 1,020.74 | 4.23 | 0.84 |
| Class A | 1,000.00 | 1,034.70 | 5.28 | 1,000.00 | 1,019.75 | 5.24 | 1.04 |
| Class C | 1,000.00 | 1,030.80 | 9.06 | 1,000.00 | 1,016.01 | 9.00 | 1.79 |
| **PIMCO Low Duration Income Fund** | | | | | | | |
| Institutional Class | $ 1,000.00 | $ 1,043.30 | $ 2.70 | $ 1,000.00 | $ 1,022.29 | $ 2.67 | 0.53% |
| I-2 | 1,000.00 | 1,042.70 | 3.21 | 1,000.00 | 1,021.79 | 3.18 | 0.63 |
| I-3 | 1,000.00 | 1,042.50 | 3.46 | 1,000.00 | 1,021.54 | 3.43 | 0.68 |
| Class A | 1,000.00 | 1,041.20 | 4.73 | 1,000.00 | 1,020.29 | 4.68 | 0.93 |
| Class C | 1,000.00 | 1,039.60 | 6.25 | 1,000.00 | 1,018.80 | 6.19 | 1.23 |
| Class C-2(b) | 1,000.00 | 1,038.60 | 6.43 | 1,000.00 | 1,015.75 | 6.36 | 1.43 |
| **PIMCO Preferred and Capital Securities Fund (Consolidated)** | | | | | | | |
| Institutional Class | $ 1,000.00 | $ 1,077.70 | $ 4.14 | $ 1,000.00 | $ 1,020.94 | $ 4.03 | 0.80% |
| I-2 | 1,000.00 | 1,077.20 | 4.66 | 1,000.00 | 1,020.44 | 4.53 | 0.90 |
| I-3 | 1,000.00 | 1,076.80 | 4.92 | 1,000.00 | 1,020.19 | 4.78 | 0.95 |
| Class A | 1,000.00 | 1,076.30 | 5.95 | 1,000.00 | 1,019.20 | 5.79 | 1.15 |
| Class C | 1,000.00 | 1,072.50 | 9.82 | 1,000.00 | 1,015.46 | 9.55 | 1.90 |

* Expenses Paid During Period are equal to the net annualized expense ratio for the class, multiplied by the average account value over the period, multiplied by 182/365 (to reflect the one-half year period).

** Net Annualized Expense Ratio is reflective of any applicable contractual fee waivers and/or expense reimbursements or voluntary fee waivers. Details regarding fee waivers, if any, can be found in Note 9, Fees and Expenses, in the Notes to Financial Statements.

(a) The Beginning Account Value is reflective as of 09/30/20 which is the Fund's inception date.

(b) The Beginning Account Value is reflective as of 10/21/20 for Actual expense. Expenses paid in the Actual expense section are equal to the net annualized expense ratio for the class, multiplied by the average account value over the period, multiplied by 161/365 for Class C-2 shares of the PIMCO Low Duration Income Fund (to reflect the period since the inception date of 10/21/20). Hypothetical expenses reflect an amount as if the class had been operational for the entire fiscal half year.

# Benchmark Descriptions

| Index* | Benchmark Description |
|---|---|
| 50% ICE BofAML 1-5 Year US High Yield Constrained Index and 50% J.P. Morgan Leveraged Loan Index | The benchmark is a blend of 50% ICE BofAML 1-5 Year US High Yield Constrained Index and 50% J.P. Morgan Leveraged Loan Index. The ICE BofAML 1-5 Year US High Yield Constrained Index is designed to track the performance of short-term U.S. dollar denominated below investment grade corporate debt publicly issued in the U.S. domestic market with at least one year and less than five years remaining term to final maturity, at least 18 months to final maturity at issuance, a fixed coupon schedule and a minimum amount outstanding of $250 million. The J.P. Morgan Leveraged Loan Index is designed to mirror the investable universe of USD institutional leveraged loans and is comprised of issuers domiciled across global markets (the international component is comprised of developed market-domiciled issuers only). |
| 1/3 each — Bloomberg Barclays Global Aggregate Credit ex Emerging Markets, USD Hedged; ICE BofAML BB-B Rated Developed Markets High Yield Constrained Index, USD Hedged; and JPMorgan EMBI Global, USD Hedged | The Bloomberg Barclays Global Aggregate Credit ex Emerging Markets (USD Hedged) provides a broad-based measure of the global developed markets investment-grade fixed income markets. The ICE BofAML BB-B Rated Developed Markets High Yield Constrained Index (USD Hedged) tracks the performance of below investment grade bonds of corporate issuers domiciled in developed market countries rated BB1 through B3, based on an average of Moody's, S&P and Fitch. Qualifying bonds are capitalization-weighted provided the total allocation to an individual issuer (defined by Bloomberg tickers) does not exceed 2%. Issuers that exceed the limit are reduced to 2% and the face value of each of their bonds is adjusted on a pro-rata basis. Similarly, the face value of bonds of all other issuers that fall below the 2% cap are increased on a pro-rata basis. The index is rebalanced on the last calendar day of the month. The JPMorgan EMBI Global (USD Hedged) tracks total returns for U.S. dollar-denominated debt instruments issued by emerging market sovereign and quasi-sovereign entities, Brady bonds, loans, Eurobonds and local market instruments. |
| 3 Month USD LIBOR | The 3 Month USD LIBOR (London Interbank Offered Rate) is an average interest rate, determined by the ICE Benchmark Administration, that banks charge one another for the use of short-term money (3 months) in England's Eurodollar market. |
| 70% ICE BofAML 8% Constrained Core West Preferred & Jr Subordinated Securities Index (P8JC) and 30% ICE BofAML Contingent Capital Index (COCO) | The benchmark is a blend of 70% ICE BofAML 8% Constrained Core West Preferred & Jr Subordinated Securities Index (P8JC) and 30% ICE BofAML Contingent Capital Index (COCO). The ICE BofAML 8% Constrained Core West Preferred & Jr Subordinated Securities Index tracks the performance of US dollar denominated high grade and high yield preferred securities and deeply subordinated corporate debt issued in the US domestic market. Qualifying securities must be rated at least B3, based on an average of Moody's, S&P and Fitch and have a country of risk of either the U.S. or a Western European country. Qualifying preferred securities must be issued as public securities or through a 144a filing, must have a fixed or floating dividend schedule and must have a minimum amount outstanding of $100 million. The ICE BofAML Contingent Capital Index tracks the performance of investment grade and below investment grade contingent capital debt publicly issued in the major domestic and eurobond markets. Qualifying securities must have a capital-dependent conversion feature and must be rated by either Moody's, S&P or Fitch. In addition, qualifying securities must have at least one month remaining term to final maturity and at least 18 months to maturity at point of issuance. For investment grade debt, qualifying currencies and their respective minimum size requirements (in local currency terms) are: AUD 100 million; CAD 100 million; EUR 250 million; JPY 20 billion; GBP 100 million; and USD 250 million. For below investment grade debt, minimum size requirements are CAD 100 million, EUR 100 million, GBP 50 million, or USD 100 million. |
| Bloomberg Barclays Global Credit Hedged USD Index | Bloomberg Barclays Global Credit Hedged USD contains investment grade and high yield credit securities from the Multiverse represented in US Dollars on a hedged basis, (Multiverse is the merger of two groups: the Global Aggregate and the Global High Yield). |
| Bloomberg Barclays U.S. Aggregate 1-3 Years Index | Bloomberg Barclays U.S. Aggregate 1-3 Years Index represents securities that are SEC-registered, taxable, and dollar denominated with a maturity between one and three years. The index covers the U.S. investment grade fixed rate bond market, with index components for government and corporate securities, mortgage pass-through securities, and asset-backed securities. |
| Bloomberg Barclays U.S. Aggregate Index | Bloomberg Barclays U.S. Aggregate Index represents securities that are SEC-registered, taxable, and dollar denominated. The index covers the U.S. investment grade fixed rate bond market, with index components for government and corporate securities, mortgage pass-through securities, and asset-backed securities. These major sectors are subdivided into more specific indices that are calculated and reported on a regular basis. |

## Benchmark Descriptions (Cont.)

| Index* | Benchmark Description |
| --- | --- |
| Bloomberg Barclays U.S. Long Credit Index | Bloomberg Barclays U.S. Long Credit Index includes both corporate and non-corporate sectors with maturities equal to or greater than 10 years. The corporate sectors are Industrial, Utility, and Finance, which include both U.S. and non-U.S. corporations. The non-corporate sectors are Sovereign, Supranational, Foreign Agency, and Foreign Local Government. |
| ICE BofAML Developed Markets High Yield Constrained (USD Hedged) Index | The ICE BofAML Developed Markets High Yield Constrained (USD Hedged) Index is a subcomponent of the ICE BofAML Global High Yield Constrained (USD Hedged) Index that excludes all non-developed countries. |
| J.P. Morgan BB/B Leveraged Loan Index | The J.P. Morgan BB/B Leveraged Loan Index is a subset of the broader Leveraged Loan Index, and as such follows all of the same inclusion rules, loan selection methodology and the rebalance process, with the sole exception being the tranche rating criteria. |

* It is not possible to invest directly in an unmanaged index.

(THIS PAGE INTENTIONALLY LEFT BLANK)

# Financial Highlights

| Selected Per Share Data for the Year or Period Ended^: | Net Asset Value Beginning of Year or Period(a) | Investment Operations | | | Less Distributions(c) | | | |
|---|---|---|---|---|---|---|---|---|
| | | Net Investment Income (Loss)(b) | Net Realized/ Unrealized Gain (Loss) | Total | From Net Investment Income | From Net Realized Capital Gains | Tax Basis Return of Capital | Total |
| **PIMCO Credit Opportunities Bond Fund** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 03/31/2021 | $ 9.07 | $ 0.30 | $ 0.97 | $ 1.27 | $ (0.35) | $ 0.00 | $ 0.00 | $ (0.35) |
| 03/31/2020 | 9.90 | 0.41 | (0.85) | (0.44) | (0.39) | 0.00 | 0.00 | (0.39) |
| 03/31/2019 | 10.08 | 0.46 | (0.19) | 0.27 | (0.45) | 0.00 | 0.00 | (0.45) |
| 03/31/2018 | 10.04 | 0.38 | 0.06 | 0.44 | (0.40) | 0.00 | 0.00 | (0.40) |
| 03/31/2017 | 9.32 | 0.44 | 0.59 | 1.03 | (0.31) | 0.00 | 0.00 | (0.31) |
| I-2 | | | | | | | | |
| 03/31/2021 | 9.03 | 0.29 | 0.96 | 1.25 | (0.34) | 0.00 | 0.00 | (0.34) |
| 03/31/2020 | 9.86 | 0.40 | (0.84) | (0.44) | (0.39) | 0.00 | 0.00 | (0.39) |
| 03/31/2019 | 10.05 | 0.45 | (0.20) | 0.25 | (0.44) | 0.00 | 0.00 | (0.44) |
| 03/31/2018 | 10.01 | 0.38 | 0.05 | 0.43 | (0.39) | 0.00 | 0.00 | (0.39) |
| 03/31/2017 | 9.30 | 0.42 | 0.60 | 1.02 | (0.31) | 0.00 | 0.00 | (0.31) |
| Class A | | | | | | | | |
| 03/31/2021 | 9.08 | 0.26 | 0.97 | 1.23 | (0.31) | 0.00 | 0.00 | (0.31) |
| 03/31/2020 | 9.91 | 0.37 | (0.84) | (0.47) | (0.36) | 0.00 | 0.00 | (0.36) |
| 03/31/2019 | 10.10 | 0.42 | (0.20) | 0.22 | (0.41) | 0.00 | 0.00 | (0.41) |
| 03/31/2018 | 10.06 | 0.35 | 0.05 | 0.40 | (0.36) | 0.00 | 0.00 | (0.36) |
| 03/31/2017 | 9.34 | 0.42 | 0.58 | 1.00 | (0.28) | 0.00 | 0.00 | (0.28) |
| Class C | | | | | | | | |
| 03/31/2021 | 8.95 | 0.18 | 0.95 | 1.13 | (0.23) | 0.00 | 0.00 | (0.23) |
| 03/31/2020 | 9.78 | 0.30 | (0.84) | (0.54) | (0.29) | 0.00 | 0.00 | (0.29) |
| 03/31/2019 | 9.96 | 0.34 | (0.19) | 0.15 | (0.33) | 0.00 | 0.00 | (0.33) |
| 03/31/2018 | 9.94 | 0.26 | 0.05 | 0.31 | (0.29) | 0.00 | 0.00 | (0.29) |
| 03/31/2017 | 9.26 | 0.33 | 0.58 | 0.91 | (0.23) | 0.00 | 0.00 | (0.23) |
| **PIMCO Diversified Income Fund** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 03/31/2021 | $ 10.21 | $ 0.34 | $ 0.89 | $ 1.23 | $ (0.40) | $ 0.00 | $ 0.00 | $ (0.40) |
| 03/31/2020 | 10.86 | 0.35 | (0.48) | (0.13) | (0.50) | (0.02) | 0.00 | (0.52) |
| 03/31/2019 | 10.77 | 0.37 | 0.20 | 0.57 | (0.48) | 0.00 | 0.00 | (0.48) |
| 03/31/2018 | 10.78 | 0.37 | 0.14 | 0.51 | (0.51) | 0.00 | (0.01) | (0.52) |
| 03/31/2017 | 10.15 | 0.47 | 0.68 | 1.15 | (0.52) | 0.00 | 0.00 | (0.52) |
| I-2 | | | | | | | | |
| 03/31/2021 | 10.21 | 0.33 | 0.89 | 1.22 | (0.39) | 0.00 | 0.00 | (0.39) |
| 03/31/2020 | 10.86 | 0.34 | (0.48) | (0.14) | (0.49) | (0.02) | 0.00 | (0.51) |
| 03/31/2019 | 10.77 | 0.35 | 0.20 | 0.55 | (0.46) | 0.00 | 0.00 | (0.46) |
| 03/31/2018 | 10.78 | 0.35 | 0.15 | 0.50 | (0.50) | 0.00 | (0.01) | (0.51) |
| 03/31/2017 | 10.15 | 0.46 | 0.68 | 1.14 | (0.51) | 0.00 | 0.00 | (0.51) |
| I-3 | | | | | | | | |
| 03/31/2021 | 10.21 | 0.32 | 0.90 | 1.22 | (0.39) | 0.00 | 0.00 | (0.39) |
| 03/31/2020 | 10.86 | 0.34 | (0.49) | (0.15) | (0.48) | (0.02) | 0.00 | (0.50) |
| 04/27/2018 - 03/31/2019 | 10.72 | 0.35 | 0.22 | 0.57 | (0.43) | 0.00 | 0.00 | (0.43) |
| Administrative Class | | | | | | | | |
| 03/31/2021 | 10.21 | 0.31 | 0.90 | 1.21 | (0.38) | 0.00 | 0.00 | (0.38) |
| 03/31/2020 | 10.86 | 0.33 | (0.49) | (0.16) | (0.47) | (0.02) | 0.00 | (0.49) |
| 03/31/2019 | 10.77 | 0.36 | 0.18 | 0.54 | (0.45) | 0.00 | 0.00 | (0.45) |
| 03/31/2018 | 10.78 | 0.34 | 0.14 | 0.48 | (0.48) | 0.00 | (0.01) | (0.49) |
| 03/31/2017 | 10.15 | 0.44 | 0.68 | 1.12 | (0.49) | 0.00 | 0.00 | (0.49) |
| Class A | | | | | | | | |
| 03/31/2021 | 10.21 | 0.29 | 0.90 | 1.19 | (0.36) | 0.00 | 0.00 | (0.36) |
| 03/31/2020 | 10.86 | 0.31 | (0.49) | (0.18) | (0.45) | (0.02) | 0.00 | (0.47) |
| 03/31/2019 | 10.77 | 0.32 | 0.20 | 0.52 | (0.43) | 0.00 | 0.00 | (0.43) |
| 03/31/2018 | 10.78 | 0.32 | 0.14 | 0.46 | (0.46) | 0.00 | (0.01) | (0.47) |
| 03/31/2017 | 10.15 | 0.43 | 0.68 | 1.11 | (0.48) | 0.00 | 0.00 | (0.48) |
| Class C | | | | | | | | |
| 03/31/2021 | 10.21 | 0.21 | 0.90 | 1.11 | (0.28) | 0.00 | 0.00 | (0.28) |
| 03/31/2020 | 10.86 | 0.23 | (0.49) | (0.26) | (0.37) | (0.02) | 0.00 | (0.39) |
| 03/31/2019 | 10.77 | 0.24 | 0.20 | 0.44 | (0.35) | 0.00 | 0.00 | (0.35) |
| 03/31/2018 | 10.78 | 0.24 | 0.14 | 0.38 | (0.38) | 0.00 | (0.01) | (0.39) |
| 03/31/2017 | 10.15 | 0.35 | 0.68 | 1.03 | (0.40) | 0.00 | 0.00 | (0.40) |

| Net Asset Value End of Year or Period[a] | Total Return[a] | Net Assets End of Year or Period (000s) | Ratios/Supplemental Data | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Ratios to Average Net Assets | | | | | |
| | | | Expenses | Expenses Excluding Waivers | Expenses Excluding Interest Expense | Expenses Excluding Interest Expense and Waivers | Net Investment Income (Loss) | Portfolio Turnover Rate |
| $  9.99 | 14.06% | $  268,038 | 0.90% | 0.90% | 0.90% | 0.90% | 3.10% | 99% |
| 9.07 | (4.69) | 232,487 | 0.92 | 0.92 | 0.90 | 0.90 | 4.13 | 138 |
| 9.90 | 2.77 | 289,576 | 0.93 | 0.93 | 0.90 | 0.90 | 4.60 | 110 |
| 10.08 | 4.38 | 353,288 | 0.91 | 0.91 | 0.90 | 0.90 | 3.72 | 100 |
| 10.04 | 11.23 | 342,617 | 0.91 | 0.91 | 0.90 | 0.90 | 4.50 | 146 |
| 9.94 | 13.92 | 115,116 | 1.00 | 1.00 | 1.00 | 1.00 | 3.01 | 99 |
| 9.03 | (4.78) | 55,030 | 1.02 | 1.02 | 1.00 | 1.00 | 4.03 | 138 |
| 9.86 | 2.58 | 47,743 | 1.03 | 1.03 | 1.00 | 1.00 | 4.51 | 110 |
| 10.05 | 4.33 | 58,119 | 1.01 | 1.01 | 1.00 | 1.00 | 3.71 | 100 |
| 10.01 | 11.10 | 28,172 | 1.01 | 1.01 | 1.00 | 1.00 | 4.25 | 146 |
| 10.00 | 13.61 | 19,542 | 1.30 | 1.30 | 1.30 | 1.30 | 2.68 | 99 |
| 9.08 | (5.01) | 19,607 | 1.32 | 1.32 | 1.30 | 1.30 | 3.73 | 138 |
| 9.91 | 2.24 | 23,099 | 1.33 | 1.33 | 1.30 | 1.30 | 4.20 | 110 |
| 10.10 | 4.03 | 30,228 | 1.31 | 1.31 | 1.30 | 1.30 | 3.41 | 100 |
| 10.06 | 10.79 | 10,740 | 1.31 | 1.31 | 1.30 | 1.30 | 4.30 | 146 |
| 9.85 | 12.73 | 3,866 | 2.05 | 2.05 | 2.05 | 2.05 | 1.91 | 99 |
| 8.95 | (5.75) | 5,206 | 2.07 | 2.07 | 2.05 | 2.05 | 3.00 | 138 |
| 9.78 | 1.63 | 5,834 | 2.08 | 2.08 | 2.05 | 2.05 | 3.45 | 110 |
| 9.96 | 3.13 | 7,532 | 2.06 | 2.06 | 2.05 | 2.05 | 2.58 | 100 |
| 9.94 | 9.91 | 6,835 | 2.06 | 2.06 | 2.05 | 2.05 | 3.43 | 146 |
| $  11.04 | 12.15% | $  4,132,019 | 0.77% | 0.77% | 0.75% | 0.75% | 3.04% | 110% |
| 10.21 | (1.45) | 2,852,619 | 0.79 | 0.79 | 0.75 | 0.75 | 3.19 | 127 |
| 10.86 | 5.45 | 2,627,609 | 0.79 | 0.79 | 0.75 | 0.75 | 3.45 | 105 |
| 10.77 | 4.75 | 2,558,977 | 0.77 | 0.77 | 0.75 | 0.75 | 3.36 | 146 |
| 10.78 | 11.53 | 2,383,388 | 0.77 | 0.77 | 0.76 | 0.76 | 4.42 | 156 |
| 11.04 | 12.04 | 670,322 | 0.87 | 0.87 | 0.85 | 0.85 | 2.94 | 110 |
| 10.21 | (1.55) | 335,490 | 0.89 | 0.89 | 0.85 | 0.85 | 3.07 | 127 |
| 10.86 | 5.34 | 169,410 | 0.89 | 0.89 | 0.85 | 0.85 | 3.35 | 105 |
| 10.77 | 4.64 | 129,856 | 0.87 | 0.87 | 0.85 | 0.85 | 3.25 | 146 |
| 10.78 | 11.42 | 84,476 | 0.87 | 0.87 | 0.86 | 0.86 | 4.27 | 156 |
| 11.04 | 11.98 | 27,498 | 0.92 | 0.97 | 0.90 | 0.95 | 2.88 | 110 |
| 10.21 | (1.60) | 13,637 | 0.94 | 0.99 | 0.90 | 0.95 | 3.03 | 127 |
| 10.86 | 5.47 | 3,619 | 0.94* | 0.99* | 0.90* | 0.95* | 3.55* | 105 |
| 11.04 | 11.87 | 10,752 | 1.02 | 1.02 | 1.00 | 1.00 | 2.83 | 110 |
| 10.21 | (1.70) | 159,259 | 1.04 | 1.04 | 1.00 | 1.00 | 2.94 | 127 |
| 10.86 | 5.19 | 155,936 | 1.04 | 1.04 | 1.00 | 1.00 | 3.36 | 105 |
| 10.77 | 4.49 | 10,049 | 1.02 | 1.02 | 1.00 | 1.00 | 3.12 | 146 |
| 10.78 | 11.25 | 12,535 | 1.02 | 1.02 | 1.01 | 1.01 | 4.09 | 156 |
| 11.04 | 11.71 | 361,780 | 1.17 | 1.17 | 1.15 | 1.15 | 2.64 | 110 |
| 10.21 | (1.84) | 297,090 | 1.19 | 1.19 | 1.15 | 1.15 | 2.78 | 127 |
| 10.86 | 5.03 | 251,911 | 1.19 | 1.19 | 1.15 | 1.15 | 3.04 | 105 |
| 10.77 | 4.33 | 260,394 | 1.17 | 1.17 | 1.15 | 1.15 | 2.97 | 146 |
| 10.78 | 11.09 | 167,491 | 1.17 | 1.17 | 1.16 | 1.16 | 4.02 | 156 |
| 11.04 | 10.87 | 67,889 | 1.92 | 1.92 | 1.90 | 1.90 | 1.89 | 110 |
| 10.21 | (2.58) | 77,114 | 1.94 | 1.94 | 1.90 | 1.90 | 2.04 | 127 |
| 10.86 | 4.25 | 73,261 | 1.94 | 1.94 | 1.90 | 1.90 | 2.29 | 105 |
| 10.77 | 3.56 | 82,085 | 1.92 | 1.92 | 1.90 | 1.90 | 2.22 | 146 |
| 10.78 | 10.26 | 104,368 | 1.92 | 1.92 | 1.91 | 1.91 | 3.29 | 156 |

## Financial Highlights (Cont.)

| | | Investment Operations | | | | Less Distributions[c] | | |
|---|---|---|---|---|---|---|---|---|
| Selected Per Share Data for the Year or Period Ended^: | Net Asset Value Beginning of Year or Period[a] | Net Investment Income (Loss)[b] | Net Realized/ Unrealized Gain (Loss) | Total | From Net Investment Income | From Net Realized Capital Gains | Tax Basis Return of Capital | Total |
| **PIMCO ESG Income Fund** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 09/30/2020 - 03/31/2021 | $ 10.00 | $ 0.10 | $ 0.34 | $ 0.44 | $ (0.09) | $ 0.00 | $ 0.00 | $ (0.09) |
| I-2 | | | | | | | | |
| 09/30/2020 - 03/31/2021 | 10.00 | 0.09 | 0.35 | 0.44 | (0.09) | 0.00 | 0.00 | (0.09) |
| I-3 | | | | | | | | |
| 09/30/2020 - 03/31/2021 | 10.00 | 0.09 | 0.34 | 0.43 | (0.08) | 0.00 | 0.00 | (0.08) |
| Class A | | | | | | | | |
| 09/30/2020 - 03/31/2021 | 10.00 | 0.07 | 0.35 | 0.42 | (0.07) | 0.00 | 0.00 | (0.07) |
| Class C | | | | | | | | |
| 09/30/2020 - 03/31/2021 | 10.00 | 0.03 | 0.35 | 0.38 | (0.03) | 0.00 | 0.00 | (0.03) |
| **PIMCO High Yield Spectrum Fund** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 03/31/2021 | $ 8.58 | $ 0.45 | $ 1.47 | $ 1.92 | $ (0.47) | $ 0.00 | $ 0.00 | $ (0.47) |
| 03/31/2020 | 9.71 | 0.54 | (1.12) | (0.58) | (0.55) | 0.00 | 0.00 | (0.55) |
| 03/31/2019 | 9.78 | 0.57 | (0.07) | 0.50 | (0.57) | 0.00 | 0.00 | (0.57) |
| 03/31/2018 | 9.93 | 0.55 | (0.14) | 0.41 | (0.30) | 0.00 | (0.26) | (0.56) |
| 03/31/2017 | 9.22 | 0.58 | 0.77 | 1.35 | (0.64) | 0.00 | 0.00 | (0.64) |
| I-2 | | | | | | | | |
| 03/31/2021 | 8.58 | 0.44 | 1.47 | 1.91 | (0.46) | 0.00 | 0.00 | (0.46) |
| 03/31/2020 | 9.71 | 0.52 | (1.11) | (0.59) | (0.54) | 0.00 | 0.00 | (0.54) |
| 03/31/2019 | 9.78 | 0.56 | (0.06) | 0.50 | (0.57) | 0.00 | 0.00 | (0.57) |
| 03/31/2018 | 9.93 | 0.54 | (0.14) | 0.40 | (0.29) | 0.00 | (0.26) | (0.55) |
| 03/31/2017 | 9.22 | 0.57 | 0.77 | 1.34 | (0.63) | 0.00 | 0.00 | (0.63) |
| I-3 | | | | | | | | |
| 03/31/2021 | 8.58 | 0.43 | 1.48 | 1.91 | (0.46) | 0.00 | 0.00 | (0.46) |
| 03/31/2020 | 9.71 | 0.52 | (1.12) | (0.60) | (0.53) | 0.00 | 0.00 | (0.53) |
| 04/27/2018 - 03/31/2019 | 9.81 | 0.52 | (0.10) | 0.42 | (0.52) | 0.00 | 0.00 | (0.52) |
| Class A | | | | | | | | |
| 03/31/2021 | 8.58 | 0.42 | 1.47 | 1.89 | (0.44) | 0.00 | 0.00 | (0.44) |
| 03/31/2020 | 9.71 | 0.50 | (1.12) | (0.62) | (0.51) | 0.00 | 0.00 | (0.51) |
| 03/31/2019 | 9.78 | 0.54 | (0.07) | 0.47 | (0.54) | 0.00 | 0.00 | (0.54) |
| 03/31/2018 | 9.93 | 0.52 | (0.14) | 0.38 | (0.27) | 0.00 | (0.26) | (0.53) |
| 03/31/2017 | 9.22 | 0.54 | 0.77 | 1.31 | (0.60) | 0.00 | 0.00 | (0.60) |
| Class C | | | | | | | | |
| 03/31/2021 | 8.58 | 0.36 | 1.46 | 1.82 | (0.37) | 0.00 | 0.00 | (0.37) |
| 03/31/2020 | 9.71 | 0.42 | (1.11) | (0.69) | (0.44) | 0.00 | 0.00 | (0.44) |
| 03/31/2019 | 9.78 | 0.47 | (0.07) | 0.40 | (0.47) | 0.00 | 0.00 | (0.47) |
| 03/31/2018 | 9.93 | 0.44 | (0.14) | 0.30 | (0.19) | 0.00 | (0.26) | (0.45) |
| 03/31/2017 | 9.22 | 0.47 | 0.77 | 1.24 | (0.53) | 0.00 | 0.00 | (0.53) |
| **PIMCO Long-Term Credit Bond Fund** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 03/31/2021 | $ 12.08 | $ 0.50 | $ 0.74 | $ 1.24 | $ (0.58) | $ (0.46) | $ 0.00 | $ (1.04) |
| 03/31/2020 | 11.69 | 0.48 | 0.54 | 1.02 | (0.59) | (0.04) | 0.00 | (0.63) |
| 03/31/2019 | 11.83 | 0.49 | 0.08 | 0.57 | (0.49) | (0.15) | (0.07) | (0.71) |
| 03/31/2018 | 11.63 | 0.53 | 0.25 | 0.78 | (0.58) | 0.00 | 0.00 | (0.58) |
| 03/31/2017 | 11.40 | 0.56 | 0.32 | 0.88 | (0.60) | 0.00 | (0.05) | (0.65) |
| I-2 | | | | | | | | |
| 03/31/2021 | 12.08 | 0.49 | 0.73 | 1.22 | (0.56) | (0.46) | 0.00 | (1.02) |
| 03/31/2020 | 11.69 | 0.47 | 0.54 | 1.01 | (0.58) | (0.04) | 0.00 | (0.62) |
| 03/31/2019 | 11.83 | 0.48 | 0.08 | 0.56 | (0.48) | (0.15) | (0.07) | (0.70) |
| 03/31/2018 | 11.63 | 0.52 | 0.25 | 0.77 | (0.57) | 0.00 | 0.00 | (0.57) |
| 03/31/2017 | 11.40 | 0.54 | 0.33 | 0.87 | (0.59) | 0.00 | (0.05) | (0.64) |
| **CREW/PIMCO Low Duration Credit Fund** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 03/31/2021 | $ 8.63 | $ 0.31 | $ 0.70 | $ 1.01 | $ (0.33) | $ 0.00 | $ 0.00 | $ (0.33) |
| 03/31/2020 | 9.73 | 0.43 | (1.06) | (0.63) | (0.47) | 0.00 | 0.00 | (0.47) |
| 03/31/2019 | 9.90 | 0.41 | (0.14) | 0.27 | (0.44) | 0.00 | 0.00 | (0.44) |
| 03/31/2018 | 9.94 | 0.35 | 0.01 | 0.36 | (0.38) | 0.00 | (0.02) | (0.40) |
| 03/31/2017 | 9.65 | 0.35 | 0.31 | 0.66 | (0.37) | 0.00 | 0.00 | (0.37) |

| Net Asset Value End of Year or Period(a) | Total Return(a) | Net Assets End of Year or Period (000s) | Ratios/Supplemental Data | | | | | |
| | | | Ratios to Average Net Assets | | | | | |
| | | | Expenses | Expenses Excluding Waivers | Expenses Excluding Interest Expense | Expenses Excluding Interest Expense and Waivers | Net Investment Income (Loss) | Portfolio Turnover Rate |
|---|---|---|---|---|---|---|---|---|
| $ 10.35 | 4.43% | $ 37,125 | 0.52%* | 1.14%* | 0.50%* | 1.12%* | 1.87%* | 135% |
| 10.35 | 4.38 | 1,421 | 0.62* | 1.24* | 0.60* | 1.22* | 1.81* | 135 |
| 10.35 | 4.35 | 45 | 0.72* | 1.34* | 0.70* | 1.32* | 1.69* | 135 |
| 10.35 | 4.23 | 23 | 0.92* | 1.54* | 0.90* | 1.52* | 1.46* | 135 |
| 10.35 | 3.85 | 90 | 1.67* | 2.29* | 1.65* | 2.27* | 0.67* | 135 |
| $ 10.03 | 22.77% | $ 170,488 | 0.62% | 0.62% | 0.60% | 0.60% | 4.67% | 39% |
| 8.58 | (6.52) | 101,092 | 0.62 | 0.62 | 0.60 | 0.60 | 5.47 | 27 |
| 9.71 | 5.36 | 603,647 | 0.63 | 0.63 | 0.60 | 0.60 | 5.93 | 26 |
| 9.78 | 4.15 | 655,038 | 0.62 | 0.62 | 0.60 | 0.60 | 5.53 | 24 |
| 9.93 | 14.98 | 1,505,442 | 0.61 | 0.61 | 0.60 | 0.60 | 5.92 | 35 |
| 10.03 | 22.65 | 238,069 | 0.72 | 0.72 | 0.70 | 0.70 | 4.60 | 39 |
| 8.58 | (6.61) | 134,676 | 0.72 | 0.72 | 0.70 | 0.70 | 5.34 | 27 |
| 9.71 | 5.26 | 193,934 | 0.73 | 0.73 | 0.70 | 0.70 | 5.85 | 26 |
| 9.78 | 4.05 | 150,910 | 0.72 | 0.72 | 0.70 | 0.70 | 5.45 | 24 |
| 9.93 | 14.87 | 142,214 | 0.71 | 0.71 | 0.70 | 0.70 | 5.82 | 35 |
| 10.03 | 22.59 | 3,621 | 0.77 | 0.82 | 0.75 | 0.80 | 4.41 | 39 |
| 8.58 | (6.66) | 445 | 0.77 | 0.82 | 0.75 | 0.80 | 5.28 | 27 |
| 9.71 | 4.45 | 2,142 | 0.78* | 0.83* | 0.75* | 0.80* | 5.91* | 26 |
| 10.03 | 22.35 | 54,395 | 0.97 | 0.97 | 0.95 | 0.95 | 4.43 | 39 |
| 8.58 | (6.85) | 50,039 | 0.97 | 0.97 | 0.95 | 0.95 | 5.08 | 27 |
| 9.71 | 5.00 | 63,446 | 0.98 | 0.98 | 0.95 | 0.95 | 5.58 | 26 |
| 9.78 | 3.79 | 83,841 | 0.97 | 0.97 | 0.95 | 0.95 | 5.21 | 24 |
| 9.93 | 14.58 | 43,592 | 0.96 | 0.96 | 0.95 | 0.95 | 5.55 | 35 |
| 10.03 | 21.44 | 5,265 | 1.72 | 1.72 | 1.70 | 1.70 | 3.72 | 39 |
| 8.58 | (7.54) | 6,862 | 1.72 | 1.72 | 1.70 | 1.70 | 4.33 | 27 |
| 9.71 | 4.22 | 8,118 | 1.73 | 1.73 | 1.70 | 1.70 | 4.83 | 26 |
| 9.78 | 3.02 | 10,506 | 1.72 | 1.72 | 1.70 | 1.70 | 4.44 | 24 |
| 9.93 | 13.73 | 9,777 | 1.71 | 1.71 | 1.70 | 1.70 | 4.81 | 35 |
| $ 12.28 | 9.84% | $ 3,483,341 | 0.59% | 0.59% | 0.55% | 0.55% | 3.79% | 103% |
| 12.08 | 8.59 | 3,313,697 | 0.84 | 0.84 | 0.55 | 0.55 | 3.84 | 180 |
| 11.69 | 5.20 | 3,576,056 | 0.79 | 0.79 | 0.55 | 0.55 | 4.33 | 133 |
| 11.83 | 6.76 | 3,309,210 | 0.85 | 0.85 | 0.55 | 0.55 | 4.43 | 96 |
| 11.63 | 7.79 | 2,805,317 | 0.72 | 0.72 | 0.55 | 0.55 | 4.70 | 114 |
| 12.28 | 9.73 | 133,698 | 0.69 | 0.69 | 0.65 | 0.65 | 3.69 | 103 |
| 12.08 | 8.49 | 197,002 | 0.94 | 0.94 | 0.65 | 0.65 | 3.71 | 180 |
| 11.69 | 5.10 | 71,189 | 0.89 | 0.89 | 0.65 | 0.65 | 4.23 | 133 |
| 11.83 | 6.66 | 54,410 | 0.95 | 0.95 | 0.65 | 0.65 | 4.34 | 96 |
| 11.63 | 7.68 | 41,527 | 0.82 | 0.82 | 0.65 | 0.65 | 4.56 | 114 |
| $ 9.31 | 11.85% | $ 210,739 | 0.73% | 0.73% | 0.70% | 0.70% | 3.42% | 184% |
| 8.63 | (6.94) | 151,077 | 0.75 | 0.75 | 0.70 | 0.70 | 4.42 | 49 |
| 9.73 | 2.74 | 171,645 | 0.75 | 0.75 | 0.70 | 0.70 | 4.15 | 42 |
| 9.90 | 3.66 | 1,269,665 | 0.72 | 0.72 | 0.70 | 0.70 | 3.55 | 34 |
| 9.94 | 6.96 | 1,148,303 | 0.74 | 0.74 | 0.70 | 0.70 | 3.53 | 19 |

# Financial Highlights (Cont.)

| Selected Per Share Data for the Year or Period Ended^: | Net Asset Value Beginning of Year or Period(a) | Net Investment Income (Loss)(b) | Net Realized/ Unrealized Gain (Loss) | Total | From Net Investment Income | From Net Realized Capital Gains | Tax Basis Return of Capital | Total |
|---|---|---|---|---|---|---|---|---|
| | | **Investment Operations** | | | **Less Distributions(c)** | | | |
| **CREW/PIMCO Low Duration Credit Fund (Cont.)** | | | | | | | | |
| I-2 | | | | | | | | |
| 03/31/2021 | $ 8.63 | $ 0.31 | $ 0.69 | $ 1.00 | $ (0.32) | $ 0.00 | $ 0.00 | $ (0.32) |
| 03/31/2020 | 9.73 | 0.42 | (1.06) | (0.64) | (0.46) | 0.00 | 0.00 | (0.46) |
| 03/31/2019 | 9.90 | 0.42 | (0.16) | 0.26 | (0.43) | 0.00 | 0.00 | (0.43) |
| 03/31/2018 | 9.94 | 0.34 | 0.01 | 0.35 | (0.37) | 0.00 | (0.02) | (0.39) |
| 03/31/2017 | 9.65 | 0.34 | 0.31 | 0.65 | (0.36) | 0.00 | 0.00 | (0.36) |
| Class A | | | | | | | | |
| 03/31/2021 | 8.63 | 0.29 | 0.70 | 0.99 | (0.31) | 0.00 | 0.00 | (0.31) |
| 03/31/2020 | 9.73 | 0.40 | (1.06) | (0.66) | (0.44) | 0.00 | 0.00 | (0.44) |
| 03/31/2019 | 9.90 | 0.39 | (0.15) | 0.24 | (0.41) | 0.00 | 0.00 | (0.41) |
| 03/31/2018 | 9.94 | 0.32 | 0.01 | 0.33 | (0.35) | 0.00 | (0.02) | (0.37) |
| 03/31/2017 | 9.65 | 0.32 | 0.31 | 0.63 | (0.34) | 0.00 | 0.00 | (0.34) |
| Class C | | | | | | | | |
| 03/31/2021 | 8.63 | 0.21 | 0.71 | 0.92 | (0.24) | 0.00 | 0.00 | (0.24) |
| 03/31/2020 | 9.73 | 0.33 | (1.06) | (0.73) | (0.37) | 0.00 | 0.00 | (0.37) |
| 03/31/2019 | 9.90 | 0.32 | (0.16) | 0.16 | (0.33) | 0.00 | 0.00 | (0.33) |
| 03/31/2018 | 9.94 | 0.25 | 0.00 | 0.25 | (0.27) | 0.00 | (0.02) | (0.29) |
| 03/31/2017 | 9.65 | 0.25 | 0.31 | 0.56 | (0.27) | 0.00 | 0.00 | (0.27) |
| **PIMCO Low Duration Income Fund** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 03/31/2021 | $ 7.95 | $ 0.25 | $ 0.75 | $ 1.00 | $ (0.23) | $ 0.00 | $ (0.05) | $ (0.28) |
| 03/31/2020 | 8.58 | 0.32 | (0.55) | (0.23) | (0.40) | 0.00 | 0.00 | (0.40) |
| 03/31/2019 | 8.56 | 0.30 | 0.01 | 0.31 | (0.29) | 0.00 | 0.00 | (0.29) |
| 03/31/2018 | 8.46 | 0.27 | 0.09 | 0.36 | (0.26) | 0.00 | 0.00 | (0.26) |
| 03/31/2017 | 7.67 | 0.35 | 0.74 | 1.09 | (0.30) | 0.00 | 0.00 | (0.30) |
| I-2 | | | | | | | | |
| 03/31/2021 | 7.95 | 0.24 | 0.75 | 0.99 | (0.22) | 0.00 | (0.05) | (0.27) |
| 03/31/2020 | 8.58 | 0.31 | (0.55) | (0.24) | (0.39) | 0.00 | 0.00 | (0.39) |
| 03/31/2019 | 8.56 | 0.30 | 0.00 | 0.30 | (0.28) | 0.00 | 0.00 | (0.28) |
| 03/31/2018 | 8.46 | 0.26 | 0.09 | 0.35 | (0.25) | 0.00 | 0.00 | (0.25) |
| 03/31/2017 | 7.67 | 0.32 | 0.76 | 1.08 | (0.29) | 0.00 | 0.00 | (0.29) |
| I-3 | | | | | | | | |
| 03/31/2021 | 7.95 | 0.24 | 0.75 | 0.99 | (0.22) | 0.00 | (0.05) | (0.27) |
| 03/31/2020 | 8.58 | 0.31 | (0.56) | (0.25) | (0.38) | 0.00 | 0.00 | (0.38) |
| 04/27/2018 - 03/31/2019 | 8.54 | 0.29 | 0.01 | 0.30 | (0.26) | 0.00 | 0.00 | (0.26) |
| Class A | | | | | | | | |
| 03/31/2021 | 7.95 | 0.22 | 0.75 | 0.97 | (0.20) | 0.00 | (0.05) | (0.25) |
| 03/31/2020 | 8.58 | 0.28 | (0.55) | (0.27) | (0.36) | 0.00 | 0.00 | (0.36) |
| 03/31/2019 | 8.56 | 0.27 | 0.01 | 0.28 | (0.26) | 0.00 | 0.00 | (0.26) |
| 03/31/2018 | 8.46 | 0.23 | 0.09 | 0.32 | (0.22) | 0.00 | 0.00 | (0.22) |
| 03/31/2017 | 7.67 | 0.31 | 0.75 | 1.06 | (0.27) | 0.00 | 0.00 | (0.27) |
| Class C | | | | | | | | |
| 03/31/2021 | 7.95 | 0.19 | 0.75 | 0.94 | (0.17) | 0.00 | (0.05) | (0.22) |
| 03/31/2020 | 8.58 | 0.26 | (0.55) | (0.29) | (0.34) | 0.00 | 0.00 | (0.34) |
| 03/31/2019 | 8.56 | 0.24 | 0.01 | 0.25 | (0.23) | 0.00 | 0.00 | (0.23) |
| 03/31/2018 | 8.46 | 0.20 | 0.10 | 0.30 | (0.20) | 0.00 | 0.00 | (0.20) |
| 03/31/2017 | 7.67 | 0.29 | 0.75 | 1.04 | (0.25) | 0.00 | 0.00 | (0.25) |
| Class C-2 | | | | | | | | |
| 10/21/2020 - 03/31/2021 | 8.47 | 0.08 | 0.20 | 0.28 | (0.03) | 0.00 | (0.05) | (0.08) |
| **PIMCO Preferred and Capital Securities Fund (Consolidated)** | | | | | | | | |
| Institutional Class | | | | | | | | |
| 03/31/2021 | $ 9.23 | $ 0.40 | $ 1.88 | $ 2.28 | $ (0.41) | $ 0.00 | $ 0.00 | $ (0.41) |
| 03/31/2020 | 9.98 | 0.41 | (0.63) | (0.22) | (0.50) | (0.03) | 0.00 | (0.53) |
| 03/31/2019 | 10.31 | 0.46 | (0.18) | 0.28 | (0.59) | (0.01) | (0.01) | (0.61) |
| 03/31/2018 | 10.22 | 0.41 | 0.43 | 0.84 | (0.72) | (0.03) | 0.00 | (0.75) |
| 03/31/2017 | 9.44 | 0.46 | 0.94 | 1.40 | (0.62) | 0.00 | 0.00 | (0.62) |

| Net Asset Value End of Year or Period[a] | Total Return[a] | Net Assets End of Year or Period (000s) | Ratios/Supplemental Data | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Ratios to Average Net Assets | | | | | |
| | | | Expenses | Expenses Excluding Waivers | Expenses Excluding Interest Expense | Expenses Excluding Interest Expense and Waivers | Net Investment Income (Loss) | Portfolio Turnover Rate |
| $ 9.31 | 11.74% | $  22,046 | 0.83% | 0.83% | 0.80% | 0.80% | 3.34% | 184% |
| 8.63 | (7.03) | 25,932 | 0.85 | 0.85 | 0.80 | 0.80 | 4.30 | 49 |
| 9.73 | 2.64 | 38,809 | 0.85 | 0.85 | 0.80 | 0.80 | 4.25 | 42 |
| 9.90 | 3.56 | 22,172 | 0.82 | 0.82 | 0.80 | 0.80 | 3.47 | 34 |
| 9.94 | 6.85 | 13,970 | 0.84 | 0.84 | 0.80 | 0.80 | 3.44 | 19 |
| 9.31 | 11.52 | 54,219 | 1.03 | 1.03 | 1.00 | 1.00 | 3.16 | 184 |
| 8.63 | (7.22) | 52,228 | 1.05 | 1.05 | 1.00 | 1.00 | 4.13 | 49 |
| 9.73 | 2.44 | 89,364 | 1.05 | 1.05 | 1.00 | 1.00 | 4.02 | 42 |
| 9.90 | 3.35 | 94,579 | 1.02 | 1.02 | 1.00 | 1.00 | 3.24 | 34 |
| 9.94 | 6.63 | 87,065 | 1.04 | 1.04 | 1.00 | 1.00 | 3.24 | 19 |
| 9.31 | 10.68 | 9,975 | 1.78 | 1.78 | 1.75 | 1.75 | 2.34 | 184 |
| 8.63 | (7.91) | 22,627 | 1.80 | 1.80 | 1.75 | 1.75 | 3.39 | 49 |
| 9.73 | 1.68 | 46,421 | 1.80 | 1.80 | 1.75 | 1.75 | 3.27 | 42 |
| 9.90 | 2.58 | 44,916 | 1.77 | 1.77 | 1.75 | 1.75 | 2.48 | 34 |
| 9.94 | 5.84 | 55,559 | 1.79 | 1.79 | 1.75 | 1.75 | 2.49 | 19 |
| $ 8.67 | 12.72% | $ 2,204,463 | 0.54% | 0.54% | 0.51% | 0.51% | 2.96% | 410% |
| 7.95 | (2.94) | 1,644,585 | 0.55 | 0.55 | 0.51 | 0.51 | 3.77 | 432 |
| 8.58 | 3.70 | 1,682,347 | 0.58 | 0.59 | 0.50 | 0.51 | 3.55 | 207 |
| 8.56 | 4.29 | 705,766 | 0.50 | 0.55 | 0.46 | 0.51 | 3.21 | 128 |
| 8.46 | 14.45 | 95,776 | 0.61[d] | 0.62[d] | 0.55[d] | 0.56[d] | 4.23 | 243 |
| 8.67 | 12.61 | 3,109,079 | 0.64 | 0.64 | 0.61 | 0.61 | 2.85 | 410 |
| 7.95 | (3.04) | 2,246,989 | 0.65 | 0.65 | 0.61 | 0.61 | 3.64 | 432 |
| 8.58 | 3.60 | 1,854,130 | 0.68 | 0.69 | 0.60 | 0.61 | 3.49 | 207 |
| 8.56 | 4.19 | 509,577 | 0.60 | 0.65 | 0.56 | 0.61 | 3.10 | 128 |
| 8.46 | 14.34 | 55,138 | 0.71[e] | 0.72[e] | 0.65[e] | 0.66[e] | 3.85 | 243 |
| 8.67 | 12.57 | 87,455 | 0.69 | 0.74 | 0.66 | 0.71 | 2.82 | 410 |
| 7.95 | (3.09) | 20,116 | 0.70 | 0.75 | 0.66 | 0.71 | 3.63 | 432 |
| 8.58 | 3.56 | 39,161 | 0.73* | 0.79* | 0.65* | 0.71* | 3.69* | 207 |
| 8.67 | 12.28 | 1,784,043 | 0.94 | 0.94 | 0.91 | 0.91 | 2.55 | 410 |
| 7.95 | (3.33) | 1,322,295 | 0.95 | 0.95 | 0.91 | 0.91 | 3.33 | 432 |
| 8.58 | 3.29 | 1,056,714 | 0.98 | 0.99 | 0.90 | 0.91 | 3.16 | 207 |
| 8.56 | 3.87 | 533,327 | 0.90 | 0.95 | 0.86 | 0.91 | 2.70 | 128 |
| 8.46 | 14.00 | 169,743 | 1.01[f] | 1.02[f] | 0.95[f] | 0.96[f] | 3.77 | 243 |
| 8.67 | 11.95 | 212,807 | 1.24 | 1.24 | 1.21 | 1.21 | 2.25 | 410 |
| 7.95 | (3.62) | 200,678 | 1.25 | 1.25 | 1.21 | 1.21 | 3.07 | 432 |
| 8.58 | 2.98 | 190,628 | 1.28 | 1.29 | 1.20 | 1.21 | 2.85 | 207 |
| 8.56 | 3.56 | 101,717 | 1.20 | 1.25 | 1.16 | 1.21 | 2.34 | 128 |
| 8.46 | 13.65 | 85,943 | 1.31[f] | 1.32[f] | 1.25[f] | 1.26[f] | 3.53 | 243 |
| 8.67 | 3.35 | 3,209 | 1.44* | 1.44* | 1.41* | 1.41* | 2.04* | 410 |
| $ 11.10 | 24.86% | $ 1,216,087 | 0.81% | 0.91% | 0.79% | 0.89% | 3.74% | 59% |
| 9.23 | (2.68) | 788,615 | 0.79 | 0.87 | 0.78 | 0.86 | 3.92 | 67 |
| 9.98 | 2.83 | 259,798 | 0.82 | 0.91 | 0.81 | 0.90 | 4.58 | 57 |
| 10.31 | 8.28 | 119,949 | 0.80 | 0.87 | 0.80 | 0.87 | 3.94 | 151 |
| 10.22 | 15.22 | 60,707 | 0.80 | 0.87 | 0.80 | 0.87 | 4.62 | 123 |

## Financial Highlights (Cont.)

| Selected Per Share Data for the Year or Period Ended^: | Net Asset Value Beginning of Year or Period[a] | Investment Operations | | | Less Distributions[c] | | | |
|---|---|---|---|---|---|---|---|---|
| | | Net Investment Income (Loss)[b] | Net Realized/ Unrealized Gain (Loss) | Total | From Net Investment Income | From Net Realized Capital Gains | Tax Basis Return of Capital | Total |
| **PIMCO Preferred and Capital Securities Fund (Continued)** | | | | | | | | |
| I-2 | | | | | | | | |
| 03/31/2021 | $ 9.21 | $ 0.39 | $ 1.88 | $ 2.27 | $ (0.40) | $ 0.00 | $ 0.00 | $ (0.40) |
| 03/31/2020 | 9.97 | 0.40 | (0.64) | (0.24) | (0.49) | (0.03) | 0.00 | (0.52) |
| 03/31/2019 | 10.30 | 0.45 | (0.18) | 0.27 | (0.58) | (0.01) | (0.01) | (0.60) |
| 03/31/2018 | 10.21 | 0.40 | 0.43 | 0.83 | (0.71) | (0.03) | 0.00 | (0.74) |
| 03/31/2017 | 9.45 | 0.42 | 0.96 | 1.38 | (0.62) | 0.00 | 0.00 | (0.62) |
| I-3 | | | | | | | | |
| 03/31/2021 | 9.20 | 0.38 | 1.88 | 2.26 | (0.40) | 0.00 | 0.00 | (0.40) |
| 03/31/2020 | 9.95 | 0.40 | (0.63) | (0.23) | (0.49) | (0.03) | 0.00 | (0.52) |
| 04/27/2018 - 03/31/2019 | 10.32 | 0.43 | (0.19) | 0.24 | (0.59) | (0.01) | (0.01) | (0.61) |
| Class A | | | | | | | | |
| 03/31/2021 | 9.19 | 0.36 | 1.88 | 2.24 | (0.38) | 0.00 | 0.00 | (0.38) |
| 03/31/2020 | 9.95 | 0.37 | (0.63) | (0.26) | (0.47) | (0.03) | 0.00 | (0.50) |
| 03/31/2019 | 10.29 | 0.43 | (0.19) | 0.24 | (0.56) | (0.01) | (0.01) | (0.58) |
| 03/31/2018 | 10.22 | 0.38 | 0.42 | 0.80 | (0.70) | (0.03) | 0.00 | (0.73) |
| 03/31/2017 | 9.43 | 0.42 | 0.95 | 1.37 | (0.58) | 0.00 | 0.00 | (0.58) |
| Class C | | | | | | | | |
| 03/31/2021 | 9.19 | 0.28 | 1.87 | 2.15 | (0.31) | 0.00 | 0.00 | (0.31) |
| 08/23/2019 - 03/31/2020 | 10.48 | 0.16 | (1.08) | (0.92) | (0.34) | (0.03) | 0.00 | (0.37) |

^  A zero balance may reflect actual amounts rounding to less than $0.01 or 0.01%.

*  Annualized

(a) Includes adjustments required by U.S. GAAP and may differ from net asset values and performance reported elsewhere by the Funds.

(b) Per share amounts based on average number of shares outstanding during the year or period.

(c) The tax characterization of distributions is determined in accordance with Federal income tax regulations. See Note 2, Distributions to Shareholders, in the Notes to Financial Statements for more information.

(d) Effective January 23, 2017, the Class's supervisory and administrative fee was decreased by 0.05% to an annual rate of 0.20%.

(e) Effective January 23, 2017, the Class's supervisory and administrative fee was decreased by 0.05% to an annual rate of 0.30%.

(f) Effective January 23, 2017, the Class's supervisory and administrative fee was decreased by 0.05% to an annual rate of 0.35%.

| | | | Ratios/Supplemental Data | | | | | |
| | | | Ratios to Average Net Assets | | | | | |
| Net Asset Value End of Year or Period[a] | Total Return[a] | Net Assets End of Year or Period (000s) | Expenses | Expenses Excluding Waivers | Expenses Excluding Interest Expense | Expenses Excluding Interest Expense and Waivers | Net Investment Income (Loss) | Portfolio Turnover Rate |
|---|---|---|---|---|---|---|---|---|
| $ 11.08 | 24.81% | $ 318,242 | 0.91% | 1.01% | 0.89% | 0.99% | 3.65% | 59% |
| 9.21 | (2.87) | 230,245 | 0.89 | 0.97 | 0.88 | 0.96 | 3.85 | 67 |
| 9.97 | 2.76 | 130,385 | 0.92 | 1.01 | 0.91 | 1.00 | 4.51 | 57 |
| 10.30 | 8.27 | 36,539 | 0.90 | 0.97 | 0.90 | 0.97 | 3.82 | 151 |
| 10.21 | 14.92 | 6,002 | 0.90 | 0.97 | 0.90 | 0.97 | 4.19 | 123 |
| 11.06 | 24.68 | 42,310 | 0.96 | 1.11 | 0.94 | 1.09 | 3.60 | 59 |
| 9.20 | (2.80) | 28,048 | 0.94 | 1.07 | 0.93 | 1.06 | 3.80 | 67 |
| 9.95 | 2.49 | 11,782 | 0.97* | 1.11* | 0.96* | 1.10* | 4.79* | 57 |
| 11.05 | 24.46 | 302,567 | 1.16 | 1.26 | 1.14 | 1.24 | 3.40 | 59 |
| 9.19 | (3.06) | 264,206 | 1.17 | 1.22 | 1.13 | 1.21 | 3.57 | 67 |
| 9.95 | 2.50 | 119,215 | 1.17 | 1.26 | 1.16 | 1.25 | 4.29 | 57 |
| 10.29 | 7.88 | 35,464 | 1.15 | 1.22 | 1.15 | 1.22 | 3.63 | 151 |
| 10.22 | 14.79 | 1,954 | 1.15 | 1.22 | 1.15 | 1.22 | 4.22 | 123 |
| 11.03 | 23.53 | 20,136 | 1.91 | 2.01 | 1.89 | 1.99 | 2.65 | 59 |
| 9.19 | (9.21) | 12,500 | 1.89* | 1.97* | 1.88* | 1.96* | 2.64* | 67 |

## Statements of Assets and Liabilities

| (Amounts in thousands[†], except per share amounts) | PIMCO Credit Opportunities Bond Fund | PIMCO Diversified Income Fund | PIMCO ESG Income Fund | PIMCO High Yield Spectrum Fund | PIMCO Long-Term Credit Bond Fund | CREW/PIMCO Low Duration Credit Fund | PIMCO Low Duration Income Fund |
|---|---|---|---|---|---|---|---|
| **Assets:** | | | | | | | |
| *Investments, at value* | | | | | | | |
| Investments in securities* | $ 317,460 | $ 5,000,202 | $ 36,955 | $ 427,660 | $ 4,243,108 | $ 266,096 | $ 9,408,017 |
| Investments in Affiliates | 87,527 | 492,982 | 0 | 39,266 | 55,745 | 24,973 | 34,466 |
| *Financial Derivative Instruments* | | | | | | | |
| Exchange-traded or centrally cleared | 350 | 2,938 | 12 | 85 | 3,163 | 0 | 7,463 |
| Over the counter | 1,773 | 17,247 | 116 | 2,590 | 14,027 | 532 | 61,149 |
| Cash | 648 | 1,857 | 3,173 | 106 | 0 | 4,029 | 20 |
| Deposits with counterparty | 9,997 | 2,538 | 188 | 2,571 | 23,574 | 0 | 41,866 |
| Foreign currency, at value | 619 | 5,346 | 26 | 3 | 5,850 | 24 | 30,385 |
| Receivable for investments sold | 3,279 | 109 | 2 | 757 | 9,064 | 22,047 | 6,493 |
| Receivable for TBA investments sold | 13,493 | 279,613 | 2,665 | 0 | 194,657 | 0 | 2,718,507 |
| Receivable for Fund shares sold | 997 | 4,582 | 1,634 | 173 | 6,105 | 136 | 29,516 |
| Interest and/or dividends receivable | 2,822 | 45,259 | 193 | 5,714 | 37,143 | 1,033 | 40,364 |
| Dividends receivable from Affiliates | 13 | 109 | 0 | 9 | 3 | 4 | 3 |
| Reimbursement receivable from PIMCO | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Prepaid expenses | 0 | 0 | 0 | 10 | 0 | 23 | 0 |
| Other assets | 0 | 0 | 0 | 0 | 2 | 0 | 0 |
| **Total Assets** | 438,978 | 5,852,783 | 44,964 | 478,944 | 4,592,441 | 318,897 | 12,378,249 |
| **Liabilities:** | | | | | | | |
| *Borrowings & Other Financing Transactions* | | | | | | | |
| Payable for reverse repurchase agreements | $ 2,168 | $ 13,497 | $ 852 | $ 0 | $ 567,377 | $ 0 | $ 442,931 |
| Payable for sale-buyback transactions | 0 | 0 | 0 | 0 | 2,226 | 0 | 4,390 |
| Payable for short sales | 1,501 | 0 | 0 | 0 | 0 | 0 | 733,804 |
| *Financial Derivative Instruments* | | | | | | | |
| Exchange-traded or centrally cleared | 78 | 831 | 0 | 0 | 861 | 0 | 1,583 |
| Over the counter | 870 | 1,472 | 47 | 3 | 6,868 | 2 | 47,945 |
| Payable for investments purchased | 2,900 | 15,630 | 995 | 3,174 | 44,624 | 19,614 | 156,348 |
| Payable for investments in Affiliates purchased | 13 | 109 | 0 | 9 | 3 | 4 | 3 |
| Payable for TBA investments purchased | 18,472 | 519,410 | 4,335 | 0 | 334,299 | 0 | 3,513,713 |
| Payable for unfunded loan commitments | 1,294 | 2,997 | 0 | 136 | 5,473 | 1,347 | 299 |
| Deposits from counterparty | 842 | 17,197 | 0 | 2,330 | 9,152 | 280 | 53,541 |
| Payable for Fund shares redeemed | 3,945 | 6,848 | 17 | 1,043 | 2,346 | 426 | 16,321 |
| Distributions payable | 0 | 940 | 0 | 120 | 460 | 15 | 2,184 |
| Overdraft due to custodian | 0 | 0 | 0 | 0 | 69 | 0 | 0 |
| Accrued investment advisory fees | 209 | 2,003 | 7 | 120 | 888 | 107 | 1,816 |
| Accrued supervisory and administrative fees | 117 | 1,451 | 7 | 146 | 750 | 84 | 1,726 |
| Accrued distribution fees | 2 | 46 | 0 | 4 | 0 | 6 | 55 |
| Accrued servicing fees | 5 | 92 | 0 | 13 | 0 | 14 | 420 |
| Accrued taxes payable | 0 | 0 | 0 | 0 | 0 | 0 | 98 |
| Accrued reimbursement to PIMCO | 0 | 0 | 0 | 0 | 0 | 0 | 16 |
| Other liabilities | 0 | 0 | 0 | 8 | 6 | 19 | 0 |
| **Total Liabilities** | 32,416 | 582,523 | 6,260 | 7,106 | 975,402 | 21,918 | 4,977,193 |
| **Net Assets** | $ 406,562 | $ 5,270,260 | $ 38,704 | $ 471,838 | $ 3,617,039 | $ 296,979 | $ 7,401,056 |
| **Net Assets Consist of:** | | | | | | | |
| Paid in capital | $ 451,627 | $ 5,255,214 | $ 38,486 | $ 511,140 | $ 3,385,900 | $ 362,012 | $ 7,565,128 |
| Distributable earnings (accumulated loss) | (45,065) | 15,046 | 218 | (39,302) | 231,139 | (65,033) | (164,072) |
| **Net Assets** | $ 406,562 | $ 5,270,260 | $ 38,704 | $ 471,838 | $ 3,617,039 | $ 296,979 | $ 7,401,056 |
| Cost of investments in securities | $ 311,652 | $ 4,912,841 | $ 36,974 | $ 415,855 | $ 4,123,967 | $ 260,398 | $ 9,413,827 |
| Cost of investments in Affiliates | $ 87,421 | $ 492,959 | $ 0 | $ 39,225 | $ 55,750 | $ 24,974 | $ 34,466 |
| Cost of foreign currency held | $ 671 | $ 5,088 | $ 28 | $ 2 | $ 6,609 | $ 24 | $ 30,628 |
| Proceeds received on short sales | $ 1,433 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 733,686 |
| Cost or premiums of financial derivative instruments, net | $ 2,388 | $ 39,194 | $ 82 | $ 1,787 | $ 35,407 | $ 0 | $ 25,856 |
| * Includes repurchase agreements of: | $ 1,597 | $ 0 | $ 0 | $ 0 | $ 5,943 | $ 0 | $ 33,560 |

† A zero balance may reflect actual amounts rounding to less than one thousand.

March 31, 2021

| | PIMCO Credit Opportunities Bond Fund | PIMCO Diversified Income Fund | PIMCO ESG Income Fund | PIMCO High Yield Spectrum Fund | PIMCO Long-Term Credit Bond Fund | CREW/PIMCO Low Duration Credit Fund | PIMCO Low Duration Income Fund |
|---|---|---|---|---|---|---|---|
| **Net Assets:** | | | | | | | |
| Institutional Class | $ 268,038 | $ 4,132,019 | $ 37,125 | $ 170,488 | $ 3,483,341 | $ 210,739 | $ 2,204,463 |
| I-2 | 115,116 | 670,322 | 1,421 | 238,069 | 133,698 | 22,046 | 3,109,079 |
| I-3 | N/A | 27,498 | 45 | 3,621 | N/A | N/A | 87,455 |
| Administrative Class | N/A | 10,752 | N/A | N/A | N/A | N/A | N/A |
| Class A | 19,542 | 361,780 | 23 | 54,395 | N/A | 54,219 | 1,784,043 |
| Class C | 3,866 | 67,889 | 90 | 5,265 | N/A | 9,975 | 212,807 |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | 3,209 |
| | | | | | | | |
| **Shares Issued and Outstanding:** | | | | | | | |
| Institutional Class | 26,834 | 374,313 | 3,588 | 17,005 | 283,666 | 22,637 | 254,185 |
| I-2 | 11,578 | 60,723 | 137 | 23,746 | 10,888 | 2,368 | 358,496 |
| I-3 | N/A | 2,491 | 4 | 361 | N/A | N/A | 10,084 |
| Administrative Class | N/A | 974 | N/A | N/A | N/A | N/A | N/A |
| Class A | 1,955 | 32,774 | 2 | 5,426 | N/A | 5,824 | 205,709 |
| Class C | 393 | 6,150 | 9 | 525 | N/A | 1,071 | 24,538 |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | 370 |
| | | | | | | | |
| **Net Asset Value Per Share Outstanding[a]:** | | | | | | | |
| Institutional Class | $ 9.99 | $ 11.04 | $ 10.35 | $ 10.03 | $ 12.28 | $ 9.31 | $ 8.67 |
| I-2 | 9.94 | 11.04 | 10.35 | 10.03 | 12.28 | 9.31 | 8.67 |
| I-3 | N/A | 11.04 | 10.35 | 10.03 | N/A | N/A | 8.67 |
| Administrative Class | N/A | 11.04 | N/A | N/A | N/A | N/A | N/A |
| Class A | 10.00 | 11.04 | 10.35 | 10.03 | N/A | 9.31 | 8.67 |
| Class C | 9.85 | 11.04 | 10.35 | 10.03 | N/A | 9.31 | 8.67 |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | 8.67 |

[a] Includes adjustments required by U.S. GAAP and may differ from net asset values and performance reported elsewhere by the Funds.

## Consolidated Statement of Assets and Liabilities

|  | PIMCO Preferred and Capital Securities Fund |
|---|---|
| (Amounts in thousands†, except per share amounts) | |
| **Assets:** | |
| *Investments, at value* | |
| Investments in securities* | $ 1,832,564 |
| Investments in Affiliates | 78,277 |
| *Financial Derivative Instruments* | |
| Exchange-traded or centrally cleared | 923 |
| Over the counter | 18,746 |
| Cash | 2,747 |
| Deposits with counterparty | 11,232 |
| Foreign currency, at value | 2,790 |
| Receivable for investments sold | 1,009 |
| Receivable for Fund shares sold | 1,530 |
| Interest and/or dividends receivable | 18,568 |
| Dividends receivable from Affiliates | 12 |
| Reimbursement receivable from PIMCO | 187 |
| **Total Assets** | 1,968,585 |
| | |
| **Liabilities:** | |
| *Borrowings & Other Financing Transactions* | |
| Payable for reverse repurchase agreements | $ 39,487 |
| *Financial Derivative Instruments* | |
| Exchange-traded or centrally cleared | 657 |
| Over the counter | 1,625 |
| Payable for investments purchased | 6,598 |
| Payable for investments in Affiliates purchased | 12 |
| Deposits from counterparty | 17,582 |
| Payable for Fund shares redeemed | 1,545 |
| Accrued investment advisory fees | 835 |
| Accrued supervisory and administrative fees | 673 |
| Accrued distribution fees | 12 |
| Accrued servicing fees | 68 |
| Other liabilities | 149 |
| **Total Liabilities** | 69,243 |
| | |
| **Net Assets** | $ 1,899,342 |
| | |
| **Net Assets Consist of:** | |
| Paid in capital | $ 1,786,209 |
| Distributable earnings (accumulated loss) | 113,133 |
| | |
| **Net Assets** | $ 1,899,342 |
| | |
| Cost of investments in securities | $ 1,735,592 |
| Cost of investments in Affiliates | $ 78,268 |
| Cost of foreign currency held | $ 2,858 |
| Cost or premiums of financial derivative instruments, net | $ 1,296 |
| | |
| * Includes repurchase agreements of: | $ 78,225 |

† A zero balance may reflect actual amounts rounding to less than one thousand.

| | PIMCO Preferred and Capital Securities Fund |
|---|---|
| **Net Assets:** | |
| Institutional Class | $ 1,216,087 |
| I-2 | 318,242 |
| I-3 | 42,310 |
| Class A | 302,567 |
| Class C | 20,136 |
| | |
| **Shares Issued and Outstanding:** | |
| Institutional Class | 109,541 |
| I-2 | 28,734 |
| I-3 | 3,826 |
| Class A | 27,381 |
| Class C | 1,826 |
| | |
| **Net Asset Value Per Share Outstanding**(a)**:** | |
| Institutional Class | $   11.10 |
| I-2 | 11.08 |
| I-3 | 11.06 |
| Class A | 11.05 |
| Class C | 11.03 |

(a) Includes adjustments required by U.S. GAAP and may differ from net asset values and performance reported elsewhere by the Fund.

## Statements of Operations

Year Ended March 31, 2021

| (Amounts in thousands[1]) | PIMCO Credit Opportunities Bond Fund | PIMCO Diversified Income Fund | PIMCO ESG Income Fund[a] | PIMCO High Yield Spectrum Fund | PIMCO Long-Term Credit Bond Fund | CREW/PIMCO Low Duration Credit Fund | PIMCO Low Duration Income Fund |
|---|---|---|---|---|---|---|---|
| **Investment Income:** | | | | | | | |
| Interest, net of foreign taxes* | $ 15,406 | $ 180,569 | $ 187 | $ 21,177 | $ 162,625 | $ 18,345 | $ 208,561 |
| Dividends | 0 | 1,274 | 0 | 0 | 1,531 | 0 | 1,254 |
| Dividends from Investments in Affiliates | 286 | 726 | 0 | 122 | 145 | 141 | 37 |
| Total Income | 15,692 | 182,569 | 187 | 21,299 | 164,301 | 18,486 | 209,852 |
| **Expenses:** | | | | | | | |
| Investment advisory fees | 2,351 | 21,522 | 19 | 1,198 | 11,242 | 1,776 | 18,021 |
| Supervisory and administrative fees | 1,311 | 15,599 | 19 | 1,465 | 9,529 | 1,389 | 17,144 |
| Distribution and/or servicing fees - Administrative Class | N/A | 299 | N/A | N/A | N/A | N/A | N/A |
| Distribution fees - Class C | 38 | 612 | 0 | 53 | N/A | 128 | 621 |
| Distribution fees - C-2 | N/A | N/A | N/A | N/A | N/A | N/A | 2[b] |
| Servicing fees - Class A | 55 | 860 | 0 | 137 | N/A | 125 | 3,699 |
| Servicing fees - Class C | 13 | 204 | 0 | 18 | N/A | 43 | 517 |
| Servicing fees - C-2 | N/A | N/A | N/A | N/A | N/A | N/A | 1[b] |
| Trustee fees | 2 | 26 | 0 | 2 | 23 | 2 | 35 |
| Interest expense | 18 | 1,070 | 2 | 69 | 1,428 | 135 | 1,883 |
| Organizational expense | 0 | 0 | 98 | 0 | 0 | 0 | 0 |
| Miscellaneous expense | 5 | 47 | 0 | 6 | 47 | 6 | 365 |
| Total Expenses | 3,793 | 40,239 | 138 | 2,948 | 22,269 | 3,604 | 42,288 |
| Waiver and/or Reimbursement by PIMCO | 0 | (12) | (97) | (0) | 0 | 0 | (57) |
| Net Expenses | 3,793 | 40,227 | 41 | 2,948 | 22,269 | 3,604 | 42,231 |
| **Net Investment Income (Loss)** | 11,899 | 142,342 | 146 | 18,351 | 142,032 | 14,882 | 167,621 |
| **Net Realized Gain (Loss):** | | | | | | | |
| Investments in securities | 77 | (18,964) | (14) | (8,687) | 228,001 | 12,824 | 28,633 |
| Investments in Affiliates | (77) | 17 | 0 | 49 | 357 | 301 | (8) |
| Exchange-traded or centrally cleared financial derivative instruments | 310 | (6,009) | 3 | (139) | (32,437) | (2,049) | (144,334) |
| Over the counter financial derivative instruments | (344) | (24,090) | (55) | (2,140) | 9,899 | (742) | (35,848) |
| Short sales | (776) | 30 | 0 | 0 | 0 | 0 | (26) |
| Foreign currency | (315) | (4,281) | 22 | (934) | (1,050) | (1,664) | (5,443) |
| **Net Realized Gain (Loss)** | (1,125) | (53,297) | (44) | (11,851) | 204,770 | 8,670 | (157,026) |
| **Net Change in Unrealized Appreciation (Depreciation):** | | | | | | | |
| Investments in securities | 32,867 | 295,819 | (19) | 63,813 | (41,137) | 27,777 | 326,397 |
| Investments in Affiliates | 347 | 989 | 0 | 54 | (26) | 34 | (1) |
| Exchange-traded or centrally cleared financial derivative instruments | 2,332 | 80,242 | 197 | 1,601 | 62,758 | 580 | 300,557 |
| Over the counter financial derivative instruments | 1,248 | 23,617 | 85 | 3,313 | 14,614 | 998 | 47,849 |
| Short sales | 618 | 0 | 0 | 0 | 0 | 0 | 0 |
| Foreign currency assets and liabilities | (54) | (2,800) | (2) | (387) | (728) | (182) | (4,595) |
| **Net Change in Unrealized Appreciation (Depreciation)** | 37,358 | 397,867 | 261 | 68,394 | 35,481 | 29,207 | 670,207 |
| **Net Increase (Decrease) in Net Assets Resulting from Operations** | $ 48,132 | $ 486,912 | $ 363 | $ 74,894 | $ 382,283 | $ 52,759 | $ 680,802 |
| * Foreign tax withholdings | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 99 |

[1] A zero balance may reflect actual amounts rounding to less than one thousand.
[a] Inception date of the Fund was September 30, 2020.
[b] Inception date of Class C-2 was October 21, 2020.

# Consolidated Statement of Operations

Year Ended March 31, 2021

|  | PIMCO Preferred and Capital Securities Fund |
|---|---|
| (Amounts in thousands†) | |
| **Investment Income:** | |
| Interest, net of foreign taxes* | $  74,597 |
| Dividends | 3,671 |
| Dividends from Investments in Affiliates | 322 |
| Total Income | 78,590 |
| | |
| **Expenses:** | |
| Investment advisory fees | 8,814 |
| Supervisory and administrative fees | 7,191 |
| Distribution fees - Class C | 127 |
| Servicing fees - Class A | 722 |
| Servicing fees - Class C | 42 |
| Trustee fees | 9 |
| Interest expense | 264 |
| Miscellaneous expense | 6 |
| Total Expenses | 17,175 |
| Waiver and/or Reimbursement by PIMCO | (1,744) |
| Net Expenses | 15,431 |
| | |
| **Net Investment Income (Loss)** | 63,159 |
| | |
| **Net Realized Gain (Loss):** | |
| Investments in securities | 48,868 |
| Investments in Affiliates | 94 |
| Exchange-traded or centrally cleared financial derivative instruments | (6,343) |
| Over the counter financial derivative instruments | (41,241) |
| Foreign currency | (3,013) |
| | |
| **Net Realized Gain (Loss)** | (1,635) |
| | |
| **Net Change in Unrealized Appreciation (Depreciation):** | |
| Investments in securities | 267,586 |
| Investments in Affiliates | 9 |
| Exchange-traded or centrally cleared financial derivative instruments | 4,889 |
| Over the counter financial derivative instruments | 14,689 |
| Foreign currency assets and liabilities | (947) |
| | |
| **Net Change in Unrealized Appreciation (Depreciation)** | 286,226 |
| | |
| **Net Increase (Decrease) in Net Assets Resulting from Operations** | $ 347,750 |
| | |
| * Foreign tax withholdings | $      150 |

†  A zero balance may reflect actual amounts rounding to less than one thousand.

# Statements of Changes in Net Assets

| | PIMCO Credit Opportunities Bond Fund | | PIMCO Diversified Income Fund | | PIMCO ESG Income Fund |
|---|---|---|---|---|---|
| | Year Ended March 31, 2021 | Year Ended March 31, 2020 | Year Ended March 31, 2021 | Year Ended March 31, 2020 | Inception date through March 31, 2021[a] |
| (Amounts in thousands[†]) | | | | | |
| **Increase (Decrease) in Net Assets from:** | | | | | |
| **Operations:** | | | | | |
| Net investment income (loss) | $  11,899 | $  16,704 | $  142,342 | $  123,630 | $  146 |
| Net realized gain (loss) | (1,125) | 7,747 | (53,297) | 101,111 | (44) |
| Net change in unrealized appreciation (depreciation) | 37,358 | (37,789) | 397,867 | (321,601) | 261 |
| **Net Increase (Decrease) in Net Assets Resulting from Operations** | 48,132 | (13,338) | 486,912 | (96,860) | 363 |
| **Distributions to Shareholders:** | | | | | |
| From net investment income and/or net realized capital gains | | | | | |
| Institutional Class | (9,582) | (12,786) | (133,148) | (139,643) | (145) |
| I-2 | (3,420) | (2,265) | (19,957) | (19,963) | (0) |
| I-3 | N/A | N/A | (861) | (457) | (0) |
| Administrative Class | N/A | N/A | (4,152) | (7,677) | N/A |
| Class A | (678) | (785) | (11,193) | (15,078) | (0) |
| Class C | (121) | (164) | (2,050) | (2,771) | (0) |
| Class C-2 | N/A | N/A | N/A | N/A | N/A |
| Tax basis return of capital | | | | | |
| Institutional Class | 0 | 0 | 0 | 0 | 0 |
| I-2 | 0 | 0 | 0 | 0 | 0 |
| I-3 | N/A | N/A | 0 | 0 | 0 |
| Administrative Class | N/A | N/A | 0 | 0 | N/A |
| Class A | 0 | 0 | 0 | 0 | 0 |
| Class C | 0 | 0 | 0 | 0 | 0 |
| Class C-2 | N/A | N/A | N/A | N/A | N/A |
| **Total Distributions[c]** | (13,801) | (16,000) | (171,361) | (185,589) | (145) |
| **Fund Share Transactions:** | | | | | |
| Net increase (decrease) resulting from Fund share transactions* | 59,901 | (24,584) | 1,219,500 | 735,912 | 38,486 |
| Fund Redemption Fee | 0 | 0 | 0 | 0 | 0 |
| **Total Increase (Decrease) in Net Assets** | 94,232 | (53,922) | 1,535,051 | 453,463 | 38,704 |
| **Net Assets:** | | | | | |
| Beginning of year | 312,330 | 366,252 | 3,735,209 | 3,281,746 | 0 |
| End of year | $ 406,562 | $ 312,330 | $ 5,270,260 | $ 3,735,209 | $ 38,704 |

† A zero balance may reflect actual amounts rounding to less than one thousand.
* See Note 13, Shares of Beneficial Interest, in the Notes to Financial Statements.
(a) Inception date of the Fund was September 30, 2020.
(b) Inception date of Class C-2 was October 21, 2020.
(c) The tax characterization of distributions is determined in accordance with Federal income tax regulations. See Note 2, Distributions to Shareholders, in the Notes to Financial Statements for more information.

| | PIMCO High Yield Spectrum Fund | | PIMCO Long-Term Credit Bond Fund | | CREW/PIMCO Low Duration Credit Fund | | PIMCO Low Duration Income Fund | |
|---|---|---|---|---|---|---|---|---|
| | Year Ended March 31, 2021 | Year Ended March 31, 2020 | Year Ended March 31, 2021 | Year Ended March 31, 2020 | Year Ended March 31, 2021 | Year Ended March 31, 2020 | Year Ended March 31, 2021 | Year Ended March 31, 2020 |
| | $ 18,351 | $ 34,913 | $ 142,032 | $ 163,332 | $ 14,882 | $ 12,449 | $ 167,621 | $ 205,782 |
| | (11,851) | (199) | 204,770 | 150,366 | 8,670 | (9,909) | (157,026) | 48,896 |
| | 68,394 | (36,368) | 35,481 | (17,701) | 29,207 | (18,860) | 670,207 | (509,407) |
| | 74,894 | (1,654) | 382,283 | 295,997 | 52,759 | (16,320) | 680,802 | (254,729) |
| | (6,511) | (22,219) | (277,514) | (177,079) | (12,655) | (7,188) | (47,908) | (88,052) |
| | (9,623) | (9,969) | (11,730) | (36,217) | (819) | (1,685) | (65,476) | (107,707) |
| | (44) | (44) | N/A | N/A | N/A | N/A | (1,159) | (2,275) |
| | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | (2,510) | (3,318) | N/A | N/A | (1,656) | (3,368) | (34,131) | (53,304) |
| | (272) | (365) | N/A | N/A | (425) | (1,423) | (4,193) | (8,032) |
| | N/A | N/A | N/A | N/A | N/A | N/A | (3)(b) | N/A |
| | 0 | 0 | 0 | 0 | 0 | 0 | (10,469) | 0 |
| | 0 | 0 | 0 | 0 | 0 | 0 | (14,862) | 0 |
| | 0 | 0 | N/A | N/A | N/A | N/A | (271) | 0 |
| | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | 0 | 0 | N/A | N/A | 0 | 0 | (8,768) | 0 |
| | 0 | 0 | N/A | N/A | 0 | 0 | (1,225) | 0 |
| | N/A | N/A | N/A | N/A | N/A | N/A | (6)(b) | N/A |
| | (18,960) | (35,915) | (289,244) | (213,296) | (15,555) | (13,664) | (188,471) | (259,370) |
| | 122,790 | (540,604) | 13,301 | (219,247) | 7,909 | (64,394) | 1,474,062 | 1,125,782 |
| | 0 | 0 | 0 | 0 | 2 | 3 | 0 | 0 |
| | 178,724 | (578,173) | 106,340 | (136,546) | 45,115 | (94,375) | 1,966,393 | 611,683 |
| | 293,114 | 871,287 | 3,510,699 | 3,647,245 | 251,864 | 346,239 | 5,434,663 | 4,822,980 |
| | $ 471,838 | $ 293,114 | $ 3,617,039 | $ 3,510,699 | $ 296,979 | $ 251,864 | $ 7,401,056 | $ 5,434,663 |

# Schedule of Investments   CREW/PIMCO Low Duration Credit Fund

(Amounts in thousands*, except number of shares, contracts, units and ounces, if any)

| | PRINCIPAL AMOUNT (000S) | MARKET VALUE (000S) |
|---|---|---|
| **INVESTMENTS IN SECURITIES 89.6%** | | |
| **LOAN PARTICIPATIONS AND ASSIGNMENTS 85.9%** | | |
| **AAdvantage Loyalty IP Ltd.** | | |
| TBD% due 04/20/2028 | $ 1,800 | $ 1,844 |
| **Advantage Sales & Marketing, Inc.** | | |
| 6.000% (LIBOR03M + 5.250%) due 10/28/2027 ~ | 3,500 | 3,500 |
| **Ahlstrom-Munksjo Oyj** | | |
| TBD% due 03/11/2028 | 1,550 | 1,555 |
| **AlixPartners, LLP** | | |
| 3.250% (LIBOR03M + 2.750%) due 02/04/2028 ~ | 1,725 | 1,720 |
| **Alliant Holdings Intermediate LLC** | | |
| 3.359% (LIBOR03M + 3.250%) due 05/09/2025 ~ | 1,646 | 1,627 |
| **Allied Universal Holdco LLC** | | |
| 4.359% (LIBOR03M + 4.250%) due 07/10/2026 ~ | 1,135 | 1,133 |
| **Alphabet Holding Co., Inc.** | | |
| 3.609% (LIBOR03M + 3.500%) due 09/26/2024 ~ | 848 | 843 |
| **Altice Financing S.A.** | | |
| 2.856% (LIBOR03M + 2.750%) due 07/15/2025 ~ | 990 | 972 |
| 2.953% (LIBOR03M + 2.750%) due 01/31/2026 ~ | 2,431 | 2,386 |
| **Altice France S.A.** | | |
| 4.198% (LIBOR03M + 4.000%) due 08/14/2026 ~ | 3,381 | 3,374 |
| **American Trailer World Corp.** | | |
| 4.500% (LIBOR03M + 3.750%) due 02/17/2028 ~ | 3,200 | 3,182 |
| **Arches Buyer, Inc.** | | |
| 3.750% (LIBOR03M + 3.250%) due 12/06/2027 ~ | 3,865 | 3,847 |
| **Array Technologies, Inc.** | | |
| 3.750% (LIBOR03M + 3.250%) due 10/14/2027 ~ | 2,561 | 2,563 |
| **Astoria Energy LLC** | | |
| 4.500% (LIBOR03M + 3.500%) due 12/10/2027 ~ | 2,575 | 2,580 |
| **Asurion LLC** | | |
| 3.359% (LIBOR03M + 3.250%) due 12/23/2026 ~ | 4,542 | 4,519 |
| **Athenahealth, Inc.** | | |
| 4.453% (LIBOR03M + 4.250%) due 02/11/2026 ~ | 2,000 | 2,008 |
| **Banijay Entertainment S.A.S** | | |
| 3.854% (LIBOR03M + 3.750%) due 03/01/2025 ~ | 1,045 | 1,037 |
| **Barracuda Networks, Inc.** | | |
| 4.500% (LIBOR03M + 3.750%) due 02/12/2025 ~ | 1,194 | 1,194 |
| **Blackhawk Network Holdings, Inc.** | | |
| 3.109% (LIBOR03M + 3.000%) due 06/15/2025 ~ | 552 | 545 |
| **Boels Topholding BV** | | |
| 4.000% (EUR003M + 4.000%) due 02/06/2027 ~ | EUR 2,800 | 3,294 |
| **BWAY Holding Co.** | | |
| 3.443% (LIBOR03M + 3.250%) due 04/03/2024 ~ | $ 3,631 | 3,556 |
| **Caesars Resort Collection LLC** | | |
| 2.859% (LIBOR03M + 2.750%) due 12/23/2024 ~ | 3,904 | 3,848 |
| 4.609% (LIBOR03M + 4.500%) due 07/21/2025 ~ | 3,234 | 3,244 |
| **Camelot U.S. Acquisition Co.** | | |
| 3.109% (LIBOR03M + 3.000%) due 10/30/2026 ~ | 2,597 | 2,580 |
| **Canada Goose, Inc.** | | |
| 5.000% (LIBOR03M + 4.250%) due 10/07/2027 ~ | 1,397 | 1,400 |

| | PRINCIPAL AMOUNT (000S) | MARKET VALUE (000S) |
|---|---|---|
| **Carnival Corp.** | | |
| 8.500% (LIBOR03M + 7.500%) due 06/30/2025 ~ | $ 2,233 | $ 2,311 |
| **CBI Buyer, INC.** | | |
| 3.750% (LIBOR03M + 3.250%) due 01/06/2028 ~ | 475 | 473 |
| **Chobani LLC** | | |
| 4.500% (LIBOR03M + 3.500%) due 10/20/2027 ~ | 1,418 | 1,419 |
| **CityCenter Holdings LLC** | | |
| 3.000% (LIBOR03M + 2.250%) due 04/18/2024 ~ | 3,142 | 3,106 |
| **Clarios Global LP** | | |
| 3.359% (LIBOR03M + 3.250%) due 04/30/2026 ~ | 1,995 | 1,987 |
| **Clear Channel Outdoor Holdings, Inc.** | | |
| 3.712% (LIBOR03M + 3.500%) due 08/21/2026 ~ | 4,950 | 4,768 |
| **CNT Holdings Corp.** | | |
| 4.500% (LIBOR03M + 3.750%) due 11/08/2027 ~ | 2,000 | 1,998 |
| **CommScope, Inc.** | | |
| 3.359% (LIBOR03M + 3.250%) due 04/06/2026 ~ | 1,414 | 1,408 |
| **Consumer Cellular, Inc.** | | |
| 4.750% (LIBOR03M + 4.000%) due 12/17/2027 ~ | 1,200 | 1,203 |
| **Core & Main LP** | | |
| 3.750% (LIBOR03M + 2.750%) due 08/01/2024 ~ | 895 | 893 |
| **Coty, Inc.** | | |
| 2.354% (LIBOR03M + 2.250%) due 04/07/2025 ~ | 3,892 | 3,749 |
| **COWEN INC TL B 1L** | | |
| TBD% due 03/12/2028 « | 1,600 | 1,596 |
| **Da Vinci Purchaser Corp.** | | |
| 5.000% (LIBOR03M + 4.000%) due 01/08/2027 ~ | 1,375 | 1,377 |
| **Delta 2 (LUX) SARL** | | |
| 3.500% (LIBOR03M + 2.500%) due 02/01/2024 ~ | 2,362 | 2,342 |
| **Diamond (BC) BV** | | |
| 3.109% (LIBOR03M + 3.000%) due 09/06/2024 ~ | 98 | 98 |
| 3.250% (EUR003M + 3.250%) due 09/06/2024 ~ | EUR 1,443 | 1,692 |
| **Diamond Sports Group LLC** | | |
| 3.360% (LIBOR03M + 3.250%) due 08/24/2026 ~ | $ 5,058 | 3,585 |
| **Dun & Bradstreet Corp.** | | |
| 3.359% (LIBOR03M + 3.250%) due 02/06/2026 ~ | 1,372 | 1,366 |
| **E2open LLC** | | |
| 4.000% (LIBOR03M + 3.500%) due 10/29/2027 ~ | 1,625 | 1,625 |
| **Endure Digital, Inc.** | | |
| 4.250% (LIBOR03M + 3.500%) due 02/10/2028 ~ | 2,200 | 2,194 |
| **Entercom Media Corp.** | | |
| 2.609% (LIBOR03M + 2.500%) due 11/18/2024 ~ | 315 | 309 |
| **Envision Healthcare Corp.** | | |
| 3.859% (LIBOR03M + 3.750%) due 10/10/2025 ~ | 1,521 | 1,315 |
| **EyeCare Partners LLC** | | |
| 3.859% (LIBOR03M + 3.750%) due 02/18/2027 ~ | 882 | 874 |
| **Flex Acquisition Co., Inc.** | | |
| 3.238% - 3.488% (LIBOR03M + 3.250%) due 06/29/2025 ~ | 1,457 | 1,435 |
| **Foundation Building Materials Holding Co LLC** | | |
| 3.750% (LIBOR03M + 3.250%) due 02/03/2028 ~ | 1,700 | 1,687 |

| | PRINCIPAL AMOUNT (000S) | MARKET VALUE (000S) |
|---|---|---|
| **Frontier Communications Corp.** | | |
| 5.750% (LIBOR03M + 4.750%) due 10/08/2021 ~ | $ 4,175 | $ 4,188 |
| **Gainwell Acquisition Corp.** | | |
| 4.750% (LIBOR03M + 4.000%) due 10/01/2027 ~ | 4,220 | 4,212 |
| **Getty Images, Inc.** | | |
| 4.609% (LIBOR03M + 4.500%) due 02/19/2026 ~ | 1,985 | 1,970 |
| **Global Medical Response, Inc.** | | |
| 5.750% (LIBOR03M + 4.750%) due 10/02/2025 ~ | 4,242 | 4,235 |
| **GlobalLogic Holdings, Inc.** | | |
| 2.859% (LIBOR03M + 2.750%) due 08/01/2025 «~ | 988 | 986 |
| **Golden Entertainment, Inc.** | | |
| 3.750% (LIBOR03M + 3.000%) due 10/21/2024 ~ | 300 | 297 |
| **Graham Packaging Co., Inc.** | | |
| 3.750% (LIBOR03M + 3.000%) due 08/04/2027 ~ | 3,388 | 3,373 |
| **Hearthside Food Solutions LLC** | | |
| 3.796% (LIBOR03M + 3.688%) due 05/23/2025 ~ | 1,073 | 1,065 |
| 6.000% (LIBOR03M + 5.000%) due 05/23/2025 ~ | 398 | 399 |
| **Hub International Ltd.** | | |
| 2.965% - 3.215% (LIBOR03M + 3.000%) due 04/25/2025 ~ | 2,144 | 2,117 |
| **iHeartCommunications, Inc.** | | |
| 3.109% (LIBOR03M + 3.000%) due 05/01/2026 ~ | 672 | 665 |
| **Illuminate Buyer LLC** | | |
| 3.609% (LIBOR03M + 3.500%) due 06/30/2027 ~ | 2,095 | 2,088 |
| **INEOS Enterprises Holdings U.S. Finco LLC** | | |
| 4.500% (LIBOR03M + 3.500%) due 08/28/2026 ~ | 1,516 | 1,520 |
| **INEOS Styrolution US Holding LLC** | | |
| 3.250% (LIBOR03M + 2.750%) due 01/29/2026 ~ | 900 | 898 |
| **Informatica LLC** | | |
| 3.359% (LIBOR03M + 3.250%) due 02/25/2027 ~ | 1,020 | 1,014 |
| **IRB Holding Corp.** | | |
| 3.750% (LIBOR03M + 2.750%) due 02/05/2025 ~ | 2,240 | 2,225 |
| 4.250% (LIBOR03M + 3.250%) due 12/15/2027 ~ | 2,675 | 2,672 |
| **Ivanti Software, Inc.** | | |
| 5.750% (LIBOR03M + 4.750%) due 12/01/2027 ~ | 3,800 | 3,823 |
| **Kronos Acquisition Holdings, Inc.** | | |
| 4.250% (LIBOR03M + 3.750%) due 12/22/2026 ~ | 2,350 | 2,320 |
| **LBM Acquisition LLC** | | |
| TBD% due 12/17/2027 µ | 287 | 286 |
| 4.500% (LIBOR03M + 3.750%) due 12/17/2027 ~ | 1,291 | 1,287 |
| **Les Schwab Tire Centers** | | |
| 4.250% (LIBOR03M + 3.500%) due 11/02/2027 ~ | 2,625 | 2,634 |
| **Marriott Ownership Resorts, Inc.** | | |
| 1.859% (LIBOR03M + 1.750%) due 08/29/2025 ~ | 479 | 468 |
| **MH Sub LLC** | | |
| 3.609% (LIBOR03M + 3.500%) due 09/13/2024 ~ | 4,516 | 4,468 |
| **MPH Acquisition Holdings LLC** | | |
| 3.750% (LIBOR03M + 2.750%) due 06/07/2023 ~ | 432 | 430 |
| **MTN Infrastructure TopCo., Inc.** | | |
| 4.000% (LIBOR03M + 3.000%) due 11/15/2024 ~ | 1,221 | 1,220 |

March 31, 2021

| | PRINCIPAL AMOUNT (000S) | MARKET VALUE (000S) |
|---|---|---|
| **NEP Group, Inc.** | | |
| 3.359% (LIBOR03M + 3.250%) due 10/20/2025 ~ | $ 3,308 | $ 3,219 |
| **Nielsen Consumer, Inc.** | | |
| 4.103% (LIBOR03M + 4.000%) due 03/06/2028 ~ | 2,275 | 2,270 |
| **NorthRiver Midstream Finance LP** | | |
| 3.488% (LIBOR03M + 3.250%) due 10/01/2025 ~ | 733 | 724 |
| **Nouryon Finance BV** | | |
| 2.860% (LIBOR03M + 2.750%) due 10/01/2025 ~ | 3,548 | 3,499 |
| **Novelis, Inc.** | | |
| TBD% due 04/15/2025 « | 3,840 | 3,782 |
| **OneDigital Borrower LLC** | | |
| TBD% due 11/16/2027 µ | 175 | 175 |
| 5.250% (LIBOR03M + 4.500%) due 11/16/2027 ~ | 1,775 | 1,778 |
| **Ortho-Clinical Diagnostics S.A.** | | |
| 3.359% - 5.500% (LIBOR03M + 3.250%) due 06/30/2025 ~ | 2,900 | 2,899 |
| **Parexel International Corp.** | | |
| 2.859% (LIBOR03M + 2.750%) due 09/27/2024 ~ | 855 | 846 |
| **Park River Holdings, Inc.** | | |
| 4.000% (LIBOR03M + 3.250%) due 12/28/2027 ~ | 875 | 872 |
| **Peraton Holding Corp.** | | |
| TBD% due 02/01/2028 µ | 893 | 893 |
| 4.500% (LIBOR03M + 3.750%) due 02/01/2028 ~ | 507 | 507 |
| **Petco Health & Wellness Co.** | | |
| 4.000% (LIBOR03M + 3.250%) due 03/03/2028 ~ | 1,150 | 1,147 |
| **Phoenix Guarantor, Inc.** | | |
| 3.361% (LIBOR03M + 3.250%) due 03/05/2026 ~ | 1,372 | 1,363 |
| **PQ Corp.** | | |
| 4.000% (LIBOR03M + 3.000%) due 02/07/2027 ~ | 685 | 686 |
| **Presidio, Inc.** | | |
| 3.720% (LIBOR03M + 3.500%) due 01/22/2027 ~ | 2,214 | 2,212 |
| **Prime Security Services Borrower LLC** | | |
| 3.500% (LIBOR03M + 2.750%) due 09/23/2026 ~ | 1,285 | 1,280 |
| **Project Ruby Ultimate Parent Corp.** | | |
| 4.000% (LIBOR03M + 3.250%) due 03/03/2028 ~ | 900 | 897 |
| **PUG LLC** | | |
| 3.609% (LIBOR03M + 3.500%) due 02/12/2027 ~ | 1,310 | 1,269 |
| **Radiate Holdco LLC** | | |
| 4.250% (LIBOR03M + 3.500%) due 09/25/2026 ~ | 2,479 | 2,480 |
| **RegionalCare Hospital Partners Holdings, Inc.** | | |
| 3.859% (LIBOR03M + 3.750%) due 11/16/2025 ~ | 2,952 | 2,949 |
| **Reynolds Group Holdings, Inc.** | | |
| 3.359% (LIBOR03M + 3.250%) due 02/05/2026 ~ | 1,621 | 1,605 |
| **Sabre GLBL, Inc.** | | |
| 2.109% (LIBOR03M + 2.000%) due 02/22/2024 ~ | 2,969 | 2,935 |
| **Scientific Games International, Inc.** | | |
| 2.859% (LIBOR03M + 2.750%) due 08/14/2024 ~ | 2,243 | 2,203 |
| **Sequa Mezzanine Holdings LLC** | | |
| 7.750% (LIBOR03M + 6.750%) due 11/28/2023 ~ | 1,251 | 1,258 |
| **Sigma Bidco BV** | | |
| 3.260% (LIBOR03M + 3.000%) due 07/02/2025 ~ | 2,481 | 2,460 |
| **SolarWinds Holdings, Inc.** | | |
| 2.859% (LIBOR03M + 2.750%) due 02/05/2024 ~ | 1,250 | 1,229 |

| | PRINCIPAL AMOUNT (000S) | MARKET VALUE (000S) |
|---|---|---|
| **Sophia LP** | | |
| 4.500% (LIBOR03M + 3.750%) due 10/07/2027 ~ | $ 1,546 | $ 1,547 |
| **Sotera Health Holdings LLC** | | |
| 3.250% (LIBOR03M + 2.750%) due 12/11/2026 ~ | 1,100 | 1,099 |
| **Spirit AeroSystems Holdings, Inc.** | | |
| 6.000% (LIBOR03M + 5.250%) due 01/15/2025 ~ | 1,945 | 1,962 |
| **Staples, Inc.** | | |
| 4.705% (LIBOR03M + 4.500%) due 09/12/2024 ~ | 246 | 243 |
| 5.205% (LIBOR03M + 5.000%) due 04/16/2026 ~ | 1,627 | 1,592 |
| **Station Casinos LLC** | | |
| 2.500% (LIBOR03M + 2.250%) due 02/08/2027 ~ | 2,557 | 2,521 |
| **Sunshine Luxembourg SARL** | | |
| 4.500% (LIBOR03M + 3.500%) due 06/30/2021 ~ | 308 | 308 |
| **Symplr Software, Inc.** | | |
| 5.250% (LIBOR03M + 4.500%) due 12/22/2027 ~ | 575 | 578 |
| **Team Health Holdings, Inc.** | | |
| 3.750% (LIBOR03M + 2.750%) due 02/06/2024 ~ | 823 | 768 |
| **Telesat LLC** | | |
| 2.860% (LIBOR03M + 2.750%) due 12/07/2026 ~ | 814 | 785 |
| **Tempo Acquisition LLC** | | |
| 3.750% (LIBOR03M + 3.250%) due 11/02/2026 ~ | 1,985 | 1,987 |
| **Terrier Media Buyer, Inc.** | | |
| 3.609% (LIBOR03M + 3.500%) due 12/17/2026 ~ | 494 | 490 |
| **Tibco Software, Inc.** | | |
| 3.860% (LIBOR03M + 3.750%) due 06/30/2026 ~ | 596 | 590 |
| **Triton Water Holdings, Inc.** | | |
| TBD% due 03/18/2028 | 850 | 848 |
| **Truck Hero, Inc.** | | |
| 4.500% (LIBOR03M + 3.750%) due 01/31/2028 ~ | 350 | 350 |
| **U.S. Renal Care, Inc.** | | |
| 5.125% (LIBOR03M + 5.000%) due 06/26/2026 ~ | 1,662 | 1,655 |
| **Uber Technologies, Inc.** | | |
| 3.609% (LIBOR03M + 3.500%) due 04/04/2025 ~ | 3,179 | 3,169 |
| **Ultimate Software Group, Inc.** | | |
| 4.000% (LIBOR03M + 3.250%) due 05/04/2026 ~ | 1,990 | 1,991 |
| **Univision Communications, Inc.** | | |
| 2.857% (LIBOR03M + 2.750%) due 03/15/2024 ~ | 4,102 | 4,079 |
| **USS Ultimate Holdings, Inc.** | | |
| 4.750% (LIBOR03M + 3.750%) due 08/25/2024 ~ | 3,487 | 3,491 |
| **Verifone Systems, Inc.** | | |
| 4.182% (LIBOR03M + 4.000%) due 08/20/2025 ~ | 3,501 | 3,431 |
| **Verscend Holding Corp.** | | |
| 4.607% (LIBOR03M + 4.500%) due 08/27/2025 ~ | 1,587 | 1,593 |
| **Vertical U.S. Newco, Inc.** | | |
| 4.478% (LIBOR03M + 4.250%) due 07/30/2027 ~ | 1,147 | 1,151 |
| **Wand NewCo 3, Inc.** | | |
| 3.109% (LIBOR03M + 3.000%) due 02/05/2026 ~ | 3,015 | 2,982 |
| **Weber-Stephen Products LLC** | | |
| 4.000% (LIBOR03M + 3.250%) due 10/30/2027 ~ | 2,294 | 2,296 |

| | PRINCIPAL AMOUNT (000S) | MARKET VALUE (000S) |
|---|---|---|
| **Welbilt, Inc.** | | |
| 2.607% (LIBOR03M + 2.500%) due 10/23/2025 ~ | $ 1,615 | $ 1,555 |
| **White Cap Buyer LLC** | | |
| 4.500% (LIBOR03M + 4.000%) due 10/19/2027 ~ | 3,591 | 3,589 |
| **WOOF Holdings, Inc.** | | |
| 4.500% (LIBOR03M + 3.750%) due 12/21/2027 ~ | 1,100 | 1,097 |
| **Zaxby's Operating Company LLC** | | |
| 4.500% (LIBOR03M + 3.750%) due 12/28/2027 ~ | 1,225 | 1,226 |
| **Zayo Group Holdings, Inc.** | | |
| 3.109% (LIBOR03M + 3.000%) due 03/09/2027 ~ | 4,739 | 4,707 |
| **Total Loan Participations and Assignments (Cost $249,454)** | | 255,138 |

| CORPORATE BONDS & NOTES 3.6% | | |
|---|---|---|
| **BANKING & FINANCE 0.4%** | | |
| **Freedom Mortgage Corp.** | | |
| 7.625% due 05/01/2026 | 350 | 367 |
| **PennyMac Financial Services, Inc.** | | |
| 4.250% due 02/15/2029 | 800 | 767 |
| | | 1,134 |

| INDUSTRIALS 3.2% | | |
|---|---|---|
| **Bausch Health Americas, Inc.** | | |
| 9.250% due 04/01/2026 | 600 | 665 |
| **Cinemark USA, Inc.** | | |
| 5.875% due 03/15/2026 | 250 | 257 |
| **Mohegan Gaming & Entertainment** | | |
| 8.000% due 02/01/2026 | 1,200 | 1,210 |
| **NCR Corp.** | | |
| 5.125% due 04/15/2029 (a) | 1,600 | 1,615 |
| **Prime Healthcare Services, Inc.** | | |
| 7.250% due 11/01/2025 | 1,700 | 1,817 |
| **Six Flags Entertainment Corp.** | | |
| 4.875% due 07/31/2024 | 250 | 253 |
| **Staples, Inc.** | | |
| 7.500% due 04/15/2026 | 475 | 502 |
| **Vine Energy Holdings LLC** | | |
| 6.750% due 04/15/2029 (a) | 2,650 | 2,650 |
| **Wynn Macau Ltd.** | | |
| 5.500% due 01/15/2026 | 500 | 522 |
| | | 9,491 |

| UTILITIES 0.0% | | |
|---|---|---|
| **Crestwood Midstream Partners LP** | | |
| 6.000% due 02/01/2029 | 100 | 99 |
| **Total Corporate Bonds & Notes (Cost $10,696)** | | 10,724 |

| | SHARES | |
|---|---|---|
| COMMON STOCKS 0.1% | | |
| **FINANCIALS 0.1%** | | |
| **Stearns Holdings LLC 'B' «(b)** | 52,605 | 234 |
| **Total Common Stocks (Cost $248)** | | 234 |
| **Total Investments in Securities (Cost $260,398)** | | 266,096 |

# Schedule of Investments CREW/PIMCO Low Duration Credit Fund (Cont.)

| | SHARES | | MARKET VALUE (000S) |
|---|---|---|---|
| **INVESTMENTS IN AFFILIATES 8.4%** | | | |
| **SHORT-TERM INSTRUMENTS 8.4%** | | | |
| **CENTRAL FUNDS USED FOR CASH MANAGEMENT PURPOSES 8.4%** | | | |
| PIMCO Short-Term Floating NAV Portfolio III | 2,532,753 | $ | 24,973 |
| Total Short-Term Instruments (Cost $24,974) | | | 24,973 |
| Total Investments in Affiliates (Cost $24,974) | | | 24,973 |
| Total Investments 98.0% (Cost $285,372) | | $ | 291,069 |
| Financial Derivative Instruments (c) 0.2% (Cost or Premiums, net $0) | | | 530 |
| Other Assets and Liabilities, net 1.8% | | | 5,380 |
| Net Assets 100.0% | | $ | 296,979 |

## NOTES TO SCHEDULE OF INVESTMENTS:

\* A zero balance may reflect actual amounts rounding to less than one thousand.

« Security valued using significant unobservable inputs (Level 3).

µ All or a portion of this amount represents unfunded loan commitments. The interest rate for the unfunded portion will be determined at the time of funding. See Note 4, Securities and Other Investments, in the Notes to Financial Statements for more information regarding unfunded loan commitments.

~ Variable or Floating rate security. Rate shown is the rate in effect as of period end. Certain variable rate securities are not based on a published reference rate and spread, rather are determined by the issuer or agent and are based on current market conditions. Reference rate is as of reset date, which may vary by security. These securities may not indicate a reference rate and/or spread in their description.

(a) When-issued security.

### (b) RESTRICTED SECURITIES:

| Issuer Description | Acquisition Date | Cost | Market Value | Market Value as Percentage of Net Assets |
|---|---|---|---|---|
| Stearns Holdings LLC 'B' | 3/15/2021 | $ 248 | $ 234 | 0.08% |

### BORROWINGS AND OTHER FINANCING TRANSACTIONS

The average amount of borrowings outstanding during the period ended March 31, 2021 was $(2,497) at a weighted average interest rate of 0.721%. Average borrowings may include reverse repurchase agreements and sale-buyback transactions, if held during the period.

### (c) FINANCIAL DERIVATIVE INSTRUMENTS: OVER THE COUNTER

#### FORWARD FOREIGN CURRENCY CONTRACTS:

| Counterparty | Settlement Month | Currency to be Delivered | | Currency to be Received | | Unrealized Appreciation/ (Depreciation) Asset | Liability |
|---|---|---|---|---|---|---|---|
| JPM | 04/2021 | $ | 1,488 | EUR | 1,267 | $ 0 | $ (2) |
| SCX | 04/2021 | EUR | 11,912 | $ | 14,471 | 501 | 0 |
| | 05/2021 | | 11,912 | | 14,008 | 31 | 0 |
| **Total Forward Foreign Currency Contracts** | | | | | | **$ 532** | **$ (2)** |

**FINANCIAL DERIVATIVE INSTRUMENTS: OVER THE COUNTER SUMMARY**

The following is a summary by counterparty of the market value of OTC financial derivative instruments and collateral (received) as of March 31, 2021:

| Counterparty | Financial Derivative Assets | | | | Financial Derivative Liabilities | | | | Net Market Value of OTC Derivatives | Collateral (Received) | Net Exposure[1] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Forward Foreign Currency Contracts | Purchased Options | Swap Agreements | Total Over the Counter | Forward Foreign Currency Contracts | Written Options | Swap Agreements | Total Over the Counter | | | |
| JPM | $ 0 | $ 0 | $ 0 | $ 0 | $ (2) | $ 0 | $ 0 | $ (2) | $ (2) | $ 0 | $ (2) |
| SCX | 532 | 0 | 0 | 532 | 0 | 0 | 0 | 0 | 532 | (280) | 252 |
| **Total Over the Counter** | **$ 532** | **$ 0** | **$ 0** | **$ 532** | **$ (2)** | **$ 0** | **$ 0** | **$ (2)** | | | |

[1] Net Exposure represents the net receivable/(payable) that would be due from/to the counterparty in the event of default. Exposure from OTC financial derivative instruments can only be netted across transactions governed under the same master agreement with the same legal entity. See Note 8, Master Netting Arrangements, in the Notes to Financial Statements for more information.

**FAIR VALUE OF FINANCIAL DERIVATIVE INSTRUMENTS**

The following is a summary of the fair valuation of the Fund's derivative instruments categorized by risk exposure. See Note 7, Principal and Other Risks, in the Notes to Financial Statements on risks of the Fund.

Fair Values of Financial Derivative Instruments on the Statements of Assets and Liabilities as of March 31, 2021:

| | Derivatives not accounted for as hedging instruments | | | | | |
|---|---|---|---|---|---|---|
| | Commodity Contracts | Credit Contracts | Equity Contracts | Foreign Exchange Contracts | Interest Rate Contracts | Total |
| **Financial Derivative Instruments - Assets** | | | | | | |
| Over the counter | | | | | | |
| Forward Foreign Currency Contracts | $ 0 | $ 0 | $ 0 | $ 532 | $ 0 | $ 532 |
| **Financial Derivative Instruments - Liabilities** | | | | | | |
| Over the counter | | | | | | |
| Forward Foreign Currency Contracts | $ 0 | $ 0 | $ 0 | $ 2 | $ 0 | $ 2 |

The effect of Financial Derivative Instruments on the Statements of Operations for the year ended March 31, 2021:

| | Derivatives not accounted for as hedging instruments | | | | | |
|---|---|---|---|---|---|---|
| | Commodity Contracts | Credit Contracts | Equity Contracts | Foreign Exchange Contracts | Interest Rate Contracts | Total |
| **Net Realized Gain (Loss) on Financial Derivative Instruments** | | | | | | |
| Exchange-traded or centrally cleared | | | | | | |
| Swap Agreements | $ 0 | $ (2,048) | $ 0 | $ 0 | $ (1) | $ (2,049) |
| Over the counter | | | | | | |
| Forward Foreign Currency Contracts | $ 0 | $ 0 | $ 0 | $ (809) | $ 0 | $ (809) |
| Swap Agreements | 0 | 0 | 0 | 0 | 67 | 67 |
| | $ 0 | $ 0 | $ 0 | $ (809) | $ 67 | $ (742) |
| | $ 0 | $ (2,048) | $ 0 | $ (809) | $ 66 | $ (2,791) |
| **Net Change in Unrealized Appreciation on Financial Derivative Instruments** | | | | | | |
| Exchange-traded or centrally cleared | | | | | | |
| Swap Agreements | $ 0 | $ 580 | $ 0 | $ 0 | $ 0 | $ 580 |
| Over the counter | | | | | | |
| Forward Foreign Currency Contracts | $ 0 | $ 0 | $ 0 | $ 554 | $ 0 | $ 554 |
| Swap Agreements | 0 | 0 | 0 | 0 | 444 | 444 |
| | $ 0 | $ 0 | $ 0 | $ 554 | $ 444 | $ 998 |
| | $ 0 | $ 580 | $ 0 | $ 554 | $ 444 | $ 1,578 |

## Schedule of Investments CREW/PIMCO Low Duration Credit Fund (Cont.)

March 31, 2021

**FAIR VALUE MEASUREMENTS**

The following is a summary of the fair valuations according to the inputs used as of March 31, 2021 in valuing the Fund's assets and liabilities:

| Category and Subcategory | Level 1 | Level 2 | Level 3 | Fair Value at 03/31/2021 |
|---|---|---|---|---|
| **Investments in Securities, at Value** | | | | |
| Loan Participations and Assignments | $ 0 | $ 248,774 | $ 6,364 | $ 255,138 |
| Corporate Bonds & Notes | | | | |
| Banking & Finance | 0 | 1,134 | 0 | 1,134 |
| Industrials | 2,650 | 6,841 | 0 | 9,491 |
| Utilities | 0 | 99 | 0 | 99 |
| Common Stocks | | | | |
| Financials | 0 | 0 | 234 | 234 |
| | $ 2,650 | $ 256,848 | $ 6,598 | $ 266,096 |
| | | | | |
| **Investments in Affiliates, at Value** | | | | |
| Short-Term Instruments | | | | |
| Central Funds Used for Cash Management Purposes | $ 24,973 | $ 0 | $ 0 | $ 24,973 |
| | | | | |
| Total Investments | $ 27,623 | $ 256,848 | $ 6,598 | $ 291,069 |

| Category and Subcategory | Level 1 | Level 2 | Level 3 | Fair Value at 03/31/2021 |
|---|---|---|---|---|
| **Financial Derivative Instruments - Assets** | | | | |
| Over the counter | $ 0 | $ 532 | $ 0 | $ 532 |
| | | | | |
| **Financial Derivative Instruments - Liabilities** | | | | |
| Over the counter | $ 0 | $ (2) | $ 0 | $ (2) |
| | | | | |
| Total Financial Derivative Instruments | $ 0 | $ 530 | $ 0 | $ 530 |
| | | | | |
| Totals | $ 27,623 | $ 257,378 | $ 6,598 | $ 291,599 |

The following is a reconciliation of the fair valuations using significant unobservable inputs (Level 3) for the Fund during the period ended March 31, 2021:

| Category and Subcategory | Beginning Balance at 03/31/2020 | Net Purchases | Net Sales/ Settlements | Accrued Discounts/ (Premiums) | Realized Gain/(Loss) | Net Change in Unrealized Appreciation/ (Depreciation)[1] | Transfers into Level 3 | Transfers out of Level 3 | Ending Balance at 03/31/2021 | Net Change in Unrealized Appreciation/ (Depreciation) on Investments Held at 03/31/2021[1] |
|---|---|---|---|---|---|---|---|---|---|---|
| **Investments in Securities, at Value** | | | | | | | | | | |
| Loan Participations and Assignments | $ 62,620 | $ 48,107 | $ (81,029) | $ 573 | $ 764 | $ 5,486 | $ 907 | $ (31,064) | $ 6,364 | $ 169 |
| Common Stocks | | | | | | | | | | |
| Financials | 0 | 248 | 0 | 0 | 0 | (14) | 0 | 0 | 234 | (14) |
| | | | | | | | | | | |
| Totals | $ 62,620 | $ 48,355 | $ (81,029) | $ 573 | $ 764 | $ 5,472 | $ 907 | $ (31,064) | $ 6,598 | $ 155 |

The following is a summary of significant unobservable inputs used in the fair valuations of assets and liabilities categorized within Level 3 of the fair value hierarchy:

| Category and Subcategory | Ending Balance at 03/31/2021 | Valuation Technique | Unobservable Inputs | Input Value(s) | Weighted Average |
|---|---|---|---|---|---|
| | | | | (% Unless Noted Otherwise) | |
| **Investments in Securities, at Value** | | | | | |
| Loan Participations and Assignments | $ 6,364 | Third Party Vendor | Broker Quote | 98.500-99.875 | 99.027 |
| Common Stocks | | | | | |
| Financials | 234 | Expected Recovery | Book Value | 1.000x | — |
| Total | $ 6,598 | | | | |

[1] Any difference between Net Change in Unrealized Appreciation/(Depreciation) and Net Change in Unrealized Appreciation/(Depreciation) on Investments Held at March 31, 2021 may be due to an investment no longer held or categorized as Level 3 at period end.

**Notes to Financial Statements**

## 1. ORGANIZATION

PIMCO Funds (the "Trust") is a Massachusetts business trust established under a Declaration of Trust dated February 19, 1987, as amended and restated November 4, 2014. The Trust is registered under the Investment Company Act of 1940, as amended (the "Act"), as an open-end management investment company. Information presented in these financial statements pertains to the Institutional Class, I-2, I-3, Administrative Class, Class A, Class C and Class C-2 shares of the funds (each a "Fund" and collectively, the "Funds") indicated on the cover of this report. Pacific Investment Management Company LLC ("PIMCO") serves as the investment adviser (the "Adviser") for the Funds.

On November 18, 2020, the Board of Trustees approved a reduction in the holding period of an automatic conversion of the Funds' Class C and Class C-2 shares into Class A shares of the same Fund from ten years to eight years. The reduction in the holding period became effective on January 18, 2021, with the first conversion taking place on or about February 10, 2021 and subsequent conversions occurring monthly thereafter. Certain financial intermediaries may have different policies and procedures regarding the conversion of Class C and Class C-2 shares to Class A shares, as described in Appendix B to the applicable Fund's prospectus (Financial Firm-Specific Sales Charge Waivers and Discounts).

## 2. SIGNIFICANT ACCOUNTING POLICIES

The following is a summary of significant accounting policies consistently followed by the Trust in the preparation of its financial statements in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP"). Each Fund is treated as an investment company under the reporting requirements of U.S. GAAP. The functional and reporting currency for the Funds is the U.S. dollar. The preparation of financial statements in accordance with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of increases and decreases in net assets from operations during the reporting period. Actual results could differ from those estimates.

(a) Securities Transactions and Investment Income  Securities transactions are recorded as of the trade date for financial reporting purposes. Securities purchased or sold on a when-issued or delayed-delivery basis may be settled beyond a standard settlement period for the security after the trade date. Realized gains (losses) from securities sold are recorded on the identified cost basis. Dividend income is recorded on the ex-dividend date, except certain dividends from foreign securities where the ex-dividend date may have passed, which are

recorded as soon as a Fund is informed of the ex-dividend date. Interest income, adjusted for the accretion of discounts and amortization of premiums, is recorded on the accrual basis from settlement date, with the exception of securities with a forward starting effective date, where interest income is recorded on the accrual basis from effective date. For convertible securities, premiums attributable to the conversion feature are not amortized. Estimated tax liabilities on certain foreign securities are recorded on an accrual basis and are reflected as components of interest income or net change in unrealized appreciation (depreciation) on investments on the Statements of Operations, as appropriate. Tax liabilities realized as a result of such security sales are reflected as a component of net realized gain (loss) on investments on the Statements of Operations. Paydown gains (losses) on mortgage-related and other asset-backed securities, if any, are recorded as components of interest income on the Statements of Operations. Income or short-term capital gain distributions received from registered investment companies, if any, are recorded as dividend income. Long-term capital gain distributions received from registered investment companies, if any, are recorded as realized gains.

Debt obligations may be placed on non-accrual status and related interest income may be reduced by ceasing current accruals and writing off interest receivable when the collection of all or a portion of interest has become doubtful based on consistently applied procedures. A debt obligation is removed from non-accrual status when the issuer resumes interest payments or when collectability of interest is probable.

(b) Foreign Currency Translation  The market values of foreign securities, currency holdings and other assets and liabilities denominated in foreign currencies are translated into U.S. dollars based on the current exchange rates each business day. Purchases and sales of securities and income and expense items denominated in foreign currencies, if any, are translated into U.S. dollars at the exchange rate in effect on the transaction date. The Funds do not separately report the effects of changes in foreign exchange rates from changes in market prices on securities held. Such changes are included in net realized gain (loss) and net change in unrealized appreciation (depreciation) from investments on the Statements of Operations. The Funds may invest in foreign currency-denominated securities and may engage in foreign currency transactions either on a spot (cash) basis at the rate prevailing in the currency exchange market at the time or through a forward foreign currency contract. Realized foreign exchange gains (losses) arising from sales of spot foreign currencies, currency gains (losses) realized between the trade and settlement dates on securities transactions and the difference between the recorded amounts of dividends, interest, and foreign withholding taxes and the U.S. dollar equivalent of the amounts actually received or paid are included in net realized gain (loss) on foreign currency transactions on

**Notes to Financial Statements** (Cont.)

the Statements of Operations. Net unrealized foreign exchange gains (losses) arising from changes in foreign exchange rates on foreign denominated assets and liabilities other than investments in securities held at the end of the reporting period are included in net change in unrealized appreciation (depreciation) on foreign currency assets and liabilities on the Statements of Operations.

(c) Multi-Class Operations  Each class offered by the Trust has equal rights as to assets and voting privileges (except that shareholders of a class have exclusive voting rights regarding any matter relating solely to that class of shares). Income and non-class specific expenses are allocated daily to each class on the basis of the relative net assets. Realized and unrealized capital gains (losses) are allocated daily based on the relative net assets of each class of the respective Fund. Class specific expenses, where applicable, currently include supervisory and administrative and distribution and servicing fees. Under certain circumstances, the per share net asset value ("NAV") of a class of the respective Fund's shares may be different from the per share NAV of another class of shares as a result of the different daily expense accruals applicable to each class of shares.

(d) Distributions to Shareholders  The following table shows the anticipated frequency of distributions from net investment income, if any, for each Fund.

| Fund Name | Distribution Frequency | |
|---|---|---|
| | Declared | Distributed |
| PIMCO Diversified Income Fund | Daily | Monthly |
| PIMCO ESG Income Fund | Daily | Monthly |
| PIMCO High Yield Spectrum Fund | Daily | Monthly |
| PIMCO Long-Term Credit Bond Fund | Daily | Monthly |
| PIMCO Low Duration Credit Fund | Daily | Monthly |
| PIMCO Low Duration Income Fund | Daily | Monthly |
| PIMCO Credit Opportunities Bond Fund | Quarterly | Quarterly |
| PIMCO Preferred and Capital Securities Fund | Quarterly | Quarterly |

Net realized capital gains earned by each Fund, if any, will be distributed no less frequently than once each year.

Income distributions and capital gain distributions are determined in accordance with income tax regulations which may differ from U.S. GAAP. Differences between tax regulations and U.S. GAAP may cause timing differences between income and capital gain recognition. Further, the character of investment income and capital gains may be different for certain transactions under the two methods of accounting. As a result, income distributions and capital gain distributions declared during a fiscal period may differ significantly from the net investment income (loss) and realized gains (losses) reported on each Fund's annual financial statements presented under U.S. GAAP.

Separately, if a Fund determines or estimates, as applicable, that a portion of a distribution may be comprised of amounts from sources other than net investment income in accordance with its policies, accounting records (if applicable), and accounting practices, the Fund will notify shareholders of the estimated composition of such distribution through a Section 19 Notice. For these purposes, a Fund determines or estimates, as applicable, the source or sources from which a distribution is paid, to the close of the period as of which it is paid, in reference to its internal accounting records and related accounting practices. If, based on such accounting records and practices, it is determined or estimated, as applicable, that a particular distribution does not include capital gains or paid-in surplus or other capital sources, a Section 19 Notice generally would not be issued. It is important to note that differences exist between a Fund's daily internal accounting records and practices, a Fund's financial statements presented in accordance with U.S. GAAP, and recordkeeping practices under income tax regulations. For instance, a Fund's internal accounting records and practices may take into account, among other factors, tax-related characteristics of certain sources of distributions that differ from treatment under U.S. GAAP. Examples of such differences may include but are not limited to, for certain Funds, the treatment of periodic payments under interest rate swap contracts. Accordingly, among other consequences, it is possible that a Fund may not issue a Section 19 Notice in situations where the Fund's financial statements prepared later and in accordance with U.S. GAAP and/or the final tax character of those distributions might later report that the sources of those distributions included capital gains and/or a return of capital. Please visit www.pimco.com for the most recent Section 19 Notice, if applicable, for additional information regarding the estimated composition of distributions. Final determination of a distribution's tax character will be provided to shareholders when such information is available.

Distributions classified as a tax basis return of capital at a Fund's fiscal year end, if any, are reflected on the Statements of Changes in Net Assets and have been recorded to paid in capital on the Statements of Assets and Liabilities. In addition, other amounts have been reclassified between distributable earnings (accumulated loss) and paid in capital on the Statements of Assets and Liabilities to more appropriately conform U.S. GAAP to tax characterizations of distributions.

(e) New Accounting Pronouncements and Regulatory Updates  In March 2020, the Financial Accounting Standards Board issued an Accounting Standards Update ("ASU"), ASU 2020-04, which provides optional guidance to ease the potential accounting burden associated with transitioning away from the London Interbank Offered Rate and other reference rates that are expected to be discontinued. The ASU is effective immediately upon release of the update on March 12, 2020

through December 31, 2022. At this time, management is evaluating implications of these changes on the financial statements.

In October 2020, the U.S. Securities and Exchange Commission ("SEC") adopted a rule related to the use of derivatives, short sales, reverse repurchase agreements and certain other transactions by registered investment companies that rescinds and withdraws the guidance of the SEC and its staff regarding asset segregation and cover transactions. Subject to certain exceptions, the rule requires funds to trade derivatives and other transactions that create future payment or delivery obligations (except reverse repurchase agreements and similar financing transactions) subject to a value-at-risk leverage limit, certain derivatives risk management program and reporting requirements. The rule went into effect on February 19, 2021 and funds will have an eighteen-month transition period to comply with the rule and related reporting requirements. At this time, management is evaluating the implications of these changes on the financial statements.

In October 2020, the SEC adopted a rule regarding the ability of a fund to invest in other funds. The rule allows a fund to acquire shares of another fund in excess of certain limitations currently imposed by the Act without obtaining individual exemptive relief from the SEC, subject to certain conditions. The rule also included the rescission of certain exemptive relief from the SEC and guidance from the SEC staff for funds to invest in other funds. The rule went into effect on January 19, 2021 and funds will have a one-year transition period to comply with the rule and related reporting requirements. At this time, management is evaluating the implications of these changes on the financial statements.

In December 2020, the SEC adopted a rule addressing fair valuation of fund investments. The new rule sets forth requirements for good faith determinations of fair value as well as for the performance of fair value determinations, including related oversight and reporting obligations. The new rule also defines "readily available market quotations" for purposes of the definition of "value" under the Act, and the SEC noted that this definition would apply in all contexts under the Act. The effective date for the rule was March 8, 2021. The SEC adopted an eighteen-month transition period beginning from the effective date for both the new rule and the associated new recordkeeping requirements. At this time, management is evaluating the implications of these changes on the financial statements.

## 3. INVESTMENT VALUATION AND FAIR VALUE MEASUREMENTS

(a) Investment Valuation Policies   The price of a Fund's shares is based on the Fund's NAV. The NAV of a Fund, or each of its share classes, as applicable, is determined by dividing the total value of

portfolio investments and other assets, less any liabilities attributable to that Fund or class, by the total number of shares outstanding of that Fund or class.

On each day that the New York Stock Exchange ("NYSE") is open, Fund shares are ordinarily valued as of the close of regular trading (normally 4:00 p.m., Eastern time) ("NYSE Close"). Information that becomes known to the Funds or their agents after the time as of which NAV has been calculated on a particular day will not generally be used to retroactively adjust the price of a security or the NAV determined earlier that day. If regular trading on the NYSE closes earlier than scheduled, each Fund reserves the right to either (i) calculate its NAV as of the earlier closing time or (ii) calculate its NAV as of the normally scheduled close of regular trading on the NYSE for that day. Each Fund generally does not calculate their NAV on days during which the NYSE is closed. However, if the NYSE is closed on a day it would normally be open for business, each Fund reserves the right to calculate their NAV as of the normally scheduled close of regular trading on the NYSE for that day or such other time that the Fund may determine.

For purposes of calculating NAV, portfolio securities and other assets for which market quotes are readily available are valued at market value. Market value is generally determined on the basis of official closing prices or the last reported sales prices, or if no sales are reported, based on quotes obtained from established market makers or prices (including evaluated prices) supplied by the Funds' approved pricing services, quotation reporting systems and other third-party sources (together, "Pricing Services"). The Funds will normally use pricing data for domestic equity securities received shortly after the NYSE Close and do not normally take into account trading, clearances or settlements that take place after the NYSE Close. If market value pricing is used, a foreign (non-U.S.) equity security traded on a foreign exchange or on more than one exchange is typically valued using pricing information from the exchange considered by the Adviser to be the primary exchange. A foreign (non-U.S.) equity security will be valued as of the close of trading on the foreign exchange, or the NYSE Close, if the NYSE Close occurs before the end of trading on the foreign exchange. Domestic and foreign (non-U.S.) fixed income securities, non-exchange traded derivatives, and equity options are normally valued on the basis of quotes obtained from brokers and dealers or Pricing Services using data reflecting the earlier closing of the principal markets for those securities. Prices obtained from Pricing Services may be based on, among other things, information provided by market makers or estimates of market values obtained from yield data relating to investments or securities with similar characteristics. Certain fixed income securities purchased on a delayed-delivery basis are marked to market daily until settlement at the forward settlement date. Exchange-traded options, except equity options, futures and options on futures

**Notes to Financial Statements** (Cont.)

are valued at the settlement price determined by the relevant exchange. Swap agreements are valued on the basis of bid quotes obtained from brokers and dealers or market-based prices supplied by Pricing Services. A Fund's investments in open-end management investment companies, other than exchange-traded funds ("ETFs"), are valued at the NAVs of such investments. Open-end management investment companies may include affiliated funds.

If a foreign (non-U.S.) equity security's value has materially changed after the close of the security's primary exchange or principal market but before the NYSE Close, the security may be valued at fair value based on procedures established and approved by the Board of Trustees of the Trust (the "Board"). Foreign (non-U.S.) equity securities that do not trade when the NYSE is open are also valued at fair value. With respect to foreign (non-U.S.) equity securities, a Fund may determine the fair value of investments based on information provided by Pricing Services and other third-party vendors, which may recommend fair value or adjustments with reference to other securities, indices or assets. In considering whether fair value is required and in determining fair values, a Fund may, among other things, consider significant events (which may be considered to include changes in the value of U.S. securities or securities indices) that occur after the close of the relevant market and before the NYSE Close. A Fund may utilize modeling tools provided by third-party vendors to determine fair values of foreign (non-U.S.) securities. For these purposes, any movement in the applicable reference index or instrument ("zero trigger") between the earlier close of the applicable foreign market and the NYSE Close may be deemed to be a significant event, prompting the application of the pricing model (effectively resulting in daily fair valuations). Foreign exchanges may permit trading in foreign (non-U.S.) equity securities on days when the Trust is not open for business, which may result in a Fund's portfolio investments being affected when shareholders are unable to buy or sell shares.

Senior secured floating rate loans for which an active secondary market exists to a reliable degree are valued at the mean of the last available bid/ask prices in the market for such loans, as provided by a Pricing Service. Senior secured floating rate loans for which an active secondary market does not exist to a reliable degree are valued at fair value, which is intended to approximate market value. In valuing a senior secured floating rate loan at fair value, the factors considered may include, but are not limited to, the following: (a) the creditworthiness of the borrower and any intermediate participants, (b) the terms of the loan, (c) recent prices in the market for similar loans, if any, and (d) recent prices in the market for instruments of similar quality, rate, period until next interest rate reset and maturity.

Investments valued in currencies other than the U.S. dollar are converted to the U.S. dollar using exchange rates obtained from Pricing

Services. As a result, the value of such investments and, in turn, the NAV of a Fund's shares may be affected by changes in the value of currencies in relation to the U.S. dollar. The value of investments traded in markets outside the United States or denominated in currencies other than the U.S. dollar may be affected significantly on a day that the Trust is not open for business. As a result, to the extent that a Fund holds foreign (non-U.S.) investments, the value of those investments may change at times when shareholders are unable to buy or sell shares and the value of such investments will be reflected in the Fund's next calculated NAV.

Investments for which market quotes or market based valuations are not readily available are valued at fair value as determined in good faith by the Board or persons acting at their direction. The Board has adopted methods for valuing securities and other assets in circumstances where market quotes are not readily available, and has delegated to the Adviser the responsibility for applying the fair valuation methods. In the event that market quotes or market based valuations are not readily available, and the security or asset cannot be valued pursuant to a Board approved valuation method, the value of the security or asset will be determined in good faith by the Board. Market quotes are considered not readily available in circumstances where there is an absence of current or reliable market-based data (e.g., trade information, bid/ask information, indicative market quotations ("Broker Quotes"), Pricing Services' prices), including where events occur after the close of the relevant market, but prior to the NYSE Close, that materially affect the values of a Fund's securities or assets. In addition, market quotes are considered not readily available when, due to extraordinary circumstances, the exchanges or markets on which the securities trade do not open for trading for the entire day and no other market prices are available. The Board has delegated, to the Adviser, the responsibility for monitoring significant events that may materially affect the values of a Fund's securities or assets and for determining whether the value of the applicable securities or assets should be reevaluated in light of such significant events.

When a Fund uses fair valuation to determine the value of a portfolio security or other asset for purposes of calculating its NAV, such investments will not be priced on the basis of quotes from the primary market in which they are traded, but rather may be priced by another method that the Board or persons acting at their direction believe reflects fair value. Fair valuation may require subjective determinations about the value of a security. While the Trust's policy is intended to result in a calculation of a Fund's NAV that fairly reflects security values as of the time of pricing, the Trust cannot ensure that fair values determined by the Board or persons acting at their direction would accurately reflect the price that a Fund could obtain for a security if it were to dispose of that security as of the time of pricing (for instance,

in a forced or distressed sale). The prices used by a Fund may differ from the value that would be realized if the securities were sold. The Funds' use of fair valuation may also help to deter "stale price arbitrage" as discussed under the "Abusive Trading Practices" section in each Fund's prospectus.

(b) Fair Value Hierarchy   U.S. GAAP describes fair value as the price that a Fund would receive to sell an asset or pay to transfer a liability in an orderly transaction between market participants at the measurement date. It establishes a fair value hierarchy that prioritizes inputs to valuation methods and requires disclosure of the fair value hierarchy, separately for each major category of assets and liabilities, that segregates fair value measurements into levels (Level 1, 2, or 3). The inputs or methodology used for valuing securities are not necessarily an indication of the risks associated with investing in those securities. Levels 1, 2, and 3 of the fair value hierarchy are defined as follows:

- Level 1 — Quoted prices in active markets or exchanges for identical assets and liabilities.

- Level 2 — Significant other observable inputs, which may include, but are not limited to, quoted prices for similar assets or liabilities in markets that are active, quoted prices for identical or similar assets or liabilities in markets that are not active, inputs other than quoted prices that are observable for the assets or liabilities (such as interest rates, yield curves, volatilities, prepayment speeds, loss severities, credit risks and default rates) or other market corroborated inputs.

- Level 3 — Significant unobservable inputs based on the best information available in the circumstances, to the extent observable inputs are not available, which may include assumptions made by the Board or persons acting at their direction that are used in determining the fair value of investments.

Assets or liabilities categorized as Level 2 or 3 as of period end have been transferred between Levels 2 and 3 since the prior period due to changes in the method utilized in valuing the investments. Transfers from Level 2 to Level 3 are a result of a change, in the normal course of business, from the use of methods used by Pricing Services (Level 2) to the use of a Broker Quote or valuation technique which utilizes significant unobservable inputs due to an absence of current or reliable market-based data (Level 3). Transfers from Level 3 to Level 2 are a result of the availability of current and reliable market-based data provided by Pricing Services or other valuation techniques which utilize significant observable inputs. In accordance with the requirements of U.S. GAAP, the amounts of transfers into and out of Level 3, if material, are disclosed in the Notes to Schedule of Investments for each respective Fund.

For fair valuations using significant unobservable inputs, U.S. GAAP requires a reconciliation of the beginning to ending balances for reported fair values that presents changes attributable to realized gain (loss), unrealized appreciation (depreciation), purchases and sales, accrued discounts (premiums), and transfers into and out of the Level 3 category during the period. The end of period value is used for the transfers between Levels of a Fund's assets and liabilities. Additionally, U.S. GAAP requires quantitative information regarding the significant unobservable inputs used in the determination of fair value of assets or liabilities categorized as Level 3 in the fair value hierarchy. In accordance with the requirements of U.S. GAAP, a fair value hierarchy, and if material, a Level 3 reconciliation and details of significant unobservable inputs, have been included in the Notes to Schedule of Investments for each respective Fund.

(c) Valuation Techniques and the Fair Value Hierarchy
Level 1 and Level 2 trading assets and trading liabilities, at fair value   The valuation methods (or "techniques") and significant inputs used in determining the fair values of portfolio securities or other assets and liabilities categorized as Level 1 and Level 2 of the fair value hierarchy are as follows:

Fixed income securities including corporate, convertible and municipal bonds and notes, U.S. government agencies, U.S. treasury obligations, sovereign issues, bank loans, convertible preferred securities and non-U.S. bonds are normally valued on the basis of quotes obtained from brokers and dealers or Pricing Services that use broker-dealer quotations, reported trades or valuation estimates from their internal pricing models. The Pricing Services' internal models use inputs that are observable such as issuer details, interest rates, yield curves, prepayment speeds, credit risks/spreads, default rates and quoted prices for similar assets. Securities that use similar valuation techniques and inputs as described above are categorized as Level 2 of the fair value hierarchy.

Fixed income securities purchased on a delayed-delivery basis or as a repurchase commitment in a sale-buyback transaction are marked to market daily until settlement at the forward settlement date and are categorized as Level 2 of the fair value hierarchy.

Mortgage-related and asset-backed securities are usually issued as separate tranches, or classes, of securities within each deal. These securities are also normally valued by Pricing Services that use broker-dealer quotations, reported trades or valuation estimates from their internal pricing models. The pricing models for these securities usually consider tranche-level attributes, current market data, estimated cash flows and market-based yield spreads for each tranche, and incorporate deal collateral performance, as available. Mortgage-related and asset-backed securities that use similar valuation techniques and inputs as described above are categorized as Level 2 of the fair value hierarchy.

**Notes to Financial Statements** (Cont.)

Common stocks, ETFs, exchange-traded notes and financial derivative instruments, such as futures contracts, rights and warrants, or options on futures that are traded on a national securities exchange, are stated at the last reported sale or settlement price on the day of valuation. To the extent these securities are actively traded and valuation adjustments are not applied, they are categorized as Level 1 of the fair value hierarchy.

Valuation adjustments may be applied to certain securities that are solely traded on a foreign exchange to account for the market movement between the close of the foreign market and the NYSE Close. These securities are valued using Pricing Services that consider the correlation of the trading patterns of the foreign security to the intraday trading in the U.S. markets for investments. Securities using these valuation adjustments are categorized as Level 2 of the fair value hierarchy. Preferred securities and other equities traded on inactive markets or valued by reference to similar instruments are also categorized as Level 2 of the fair value hierarchy.

Investments in registered open-end investment companies (other than ETFs) will be valued based upon the NAVs of such investments and are categorized as Level 1 of the fair value hierarchy. Investments in unregistered open-end investment companies will be calculated based upon the NAVs of such investments and are considered Level 1 provided that the NAVs are observable, calculated daily and are the value at which both purchases and sales will be conducted.

Equity exchange-traded options and over the counter financial derivative instruments, such as forward foreign currency contracts and options contracts derive their value from underlying asset prices, indices, reference rates, and other inputs or a combination of these factors. These contracts are normally valued on the basis of quotes obtained from a quotation reporting system, established market makers or Pricing Services (normally determined as of the NYSE Close). Depending on the product and the terms of the transaction, financial derivative instruments can be valued by Pricing Services using a series of techniques, including simulation pricing models. The pricing models use inputs that are observed from actively quoted markets such as quoted prices, issuer details, indices, bid/ask spreads, interest rates, implied volatilities, yield curves, dividends and exchange rates. Financial derivative instruments that use similar valuation techniques and inputs as described above are categorized as Level 2 of the fair value hierarchy.

Centrally cleared swaps and over the counter swaps derive their value from underlying asset prices, indices, reference rates, and other inputs or a combination of these factors. They are valued using a broker-dealer bid quotation or on market-based prices provided by Pricing Services (normally determined as of the NYSE Close). Centrally cleared swaps and over the counter swaps can be valued by Pricing Services

using a series of techniques, including simulation pricing models. The pricing models may use inputs that are observed from actively quoted markets such as the overnight index swap rate, London Interbank Offered Rate forward rate, interest rates, yield curves and credit spreads. These securities are categorized as Level 2 of the fair value hierarchy.

Level 3 trading assets and trading liabilities, at fair value   When a fair valuation method is applied by the Adviser that uses significant unobservable inputs, investments will be priced by a method that the Board or persons acting at their direction believe reflects fair value and are categorized as Level 3 of the fair value hierarchy. The valuation techniques and significant inputs used in determining the fair values of portfolio assets and liabilities categorized as Level 3 of the fair value hierarchy are as follows:

Proxy pricing procedures set the base price of a fixed income security and subsequently adjust the price proportionally to market value changes of a pre-determined security deemed to be comparable in duration, generally a U.S. Treasury or sovereign note based on country of issuance. The base price may be a broker-dealer quote, transaction price, or an internal value as derived by analysis of market data. The base price of the security may be reset on a periodic basis based on the availability of market data and procedures approved by the Valuation Oversight Committee. Significant changes in the unobservable inputs of the proxy pricing process (the base price) would result in direct and proportional changes in the fair value of the security. These securities are categorized as Level 3 of the fair value hierarchy.

If third-party evaluated vendor pricing is not available or not deemed to be indicative of fair value, the Adviser may elect to obtain indicative market quotations directly from the broker-dealer or passed-through Broker Quotes from a third-party vendor. In the event that fair value is based upon a single sourced Broker Quote, these securities are categorized as Level 3 of the fair value hierarchy. Broker Quotes are typically received from established market participants. Although independently received, the Adviser does not have the transparency to view the underlying inputs which support the market quotation. Significant changes in the Broker Quote would have direct and proportional changes in the fair value of the security.

Discounted cash flow valuation uses an internal analysis based on the Adviser's expectation of future income and expenses, capital structure, exit multiples of a security, and other unobservable inputs which may include contractual and factual loan factors, estimated future payments and credit rating. Significant changes in the unobservable inputs of the models would result in direct and proportional changes in the fair value of the security. These securities are categorized as Level 3 of the fair value hierarchy.

Market comparable valuation estimates fair value by applying a valuation multiple to a key performance metric of the company, which may include unobservable inputs such as earnings before interest, taxes, depreciation and amortization ("EBITDA"), the Adviser's assumptions regarding comparable companies and non-public statements from the underlying company. Significant changes in the unobservable inputs would result in direct and proportional changes in the fair value of the security. These securities are categorized as Level 3 of the fair value hierarchy.

Reference instrument valuation estimates fair value by utilizing the correlation of the security to one or more broad-based securities, market indices, and/or other financial instruments, whose pricing information is readily available. Unobservable inputs may include those used in algorithms based on percentage change in the reference instruments and/or weights of each reference instrument. Significant changes in the unobservable inputs would result in direct and proportional changes in the fair value of the security. These securities are categorized as Level 3 of the fair value hierarchy.

Expected recovery valuation estimates that the fair value of an existing asset can be recovered, net of any liability. Significant changes in the unobservable inputs would result in direct and proportional changes in the fair value of the security. These securities are categorized as Level 3 of the fair value hierarchy.

Securities may be valued based on purchase prices of privately negotiated transactions. Significant changes in the unobservable inputs would result in direct and proportional changes in the fair value of the security. These securities are categorized as Level 3 of the fair value hierarchy.

Short-term debt instruments (such as commercial paper) having a remaining maturity of 60 days or less may be valued at amortized cost, so long as the amortized cost value of such short-term debt instruments is approximately the same as the fair value of the instrument as determined without the use of amortized cost valuation. These securities are categorized as Level 2 or Level 3 of the fair value hierarchy depending on the source of the base price.

## 4. SECURITIES AND OTHER INVESTMENTS

### (a) Investments in Affiliates

Each Fund may invest in the PIMCO Short Asset Portfolio and the PIMCO Short-Term Floating NAV Portfolio III ("Central Funds") to the extent permitted by the Act and rules thereunder. The Central Funds are registered investment companies created for use solely by the series of the Trust and other series of registered investment companies advised by the Adviser, in connection with their cash management activities. The main investments of the Central Funds are money market and short maturity fixed income instruments. The Central Funds may incur expenses related to their investment activities, but do not pay Investment Advisory Fees or Supervisory and Administrative Fees to the Adviser. The Central Funds are considered to be affiliated with the Funds. A complete schedule of portfolio holdings for each affiliate fund is filed with the SEC for the first and third quarters of each fiscal year on Form N-PORT and is available at the SEC's website at www.sec.gov. A copy of each affiliate fund's shareholder report is also available at the SEC's website at www.sec.gov, on the Funds' website at www.pimco.com, or upon request, as applicable. The tables below show the Funds' transactions in and earnings from investments in the affiliated Funds for the period ended March 31, 2021 (amounts in thousands[†]):

### Investment in PIMCO Short Asset Portfolio

| Fund Name | Market Value 03/31/2020 | Purchases at Cost | Proceeds from Sales | Net Realized Gain (Loss) | Change in Unrealized Appreciation (Depreciation) | Market Value 03/31/2021 | Dividend Income[(1)] | Realized Net Capital Gain Distributions[(1)] |
|---|---|---|---|---|---|---|---|---|
| PIMCO Diversified Income Fund | $ 30,618 | $ 402 | $ (1) | $ 0 | $ 1,027 | $ 32,046 | $ 402 | $ 0 |

### Investments in PIMCO Short-Term Floating NAV Portfolio III

| Fund Name | Market Value 03/31/2020 | Purchases at Cost | Proceeds from Sales | Net Realized Gain (Loss) | Change in Unrealized Appreciation (Depreciation) | Market Value 03/31/2021 | Dividend Income[(1)] | Realized Net Capital Gain Distributions[(1)] |
|---|---|---|---|---|---|---|---|---|
| PIMCO Credit Opportunities Bond Fund | $ 42,171 | $ 297,186 | $ (252,100) | $ (77) | $ 347 | $ 87,527 | $ 286 | $ 0 |
| PIMCO Diversified Income Fund | 1,332 | 1,475,725 | (1,016,100) | 17 | (38) | 460,936 | 324 | 0 |
| PIMCO High Yield Spectrum Fund | 23,442 | 286,822 | (271,101) | 49 | 54 | 39,266 | 122 | 0 |
| PIMCO Long-Term Credit Bond Fund | 22,239 | 1,922,875 | (1,889,700) | 357 | (26) | 55,745 | 145 | 0 |
| PIMCO Low Duration Credit Fund | 41,898 | 689,540 | (706,800) | 301 | 34 | 24,973 | 141 | 0 |
| PIMCO Low Duration Income Fund | 27,158 | 1,312,017 | (1,304,700) | (8) | (1) | 34,466 | 37 | 0 |
| PIMCO Preferred and Capital Securities Fund | 52 | 1,266,122 | (1,188,000) | 94 | 9 | 78,277 | 322 | 0 |

[†]   A zero balance may reflect actual amounts rounding to less than one thousand.

[(1)]   The tax characterization of distributions is determined in accordance with Federal income tax regulations and may contain a return of capital. The actual tax characterization of distributions received is determined at the end of the fiscal year of the affiliated fund. See Note 2, Distributions to Shareholders, in the Notes to Financial Statements for more information.

(b) Investments in Securities

The Funds may utilize the investments and strategies described below to the extent permitted by each Fund's respective investment policies.

Bank Obligations  in which a Fund may invest include certificates of deposit, bankers' acceptances, and fixed time deposits. Certificates of deposit are negotiable certificates issued against Funds deposited in a commercial bank for a definite period of time and earning a specified return. Bankers' acceptances are negotiable drafts or bills of exchange, normally drawn by an importer or exporter to pay for specific merchandise, which are "accepted" by a bank, meaning, in effect, that the bank unconditionally agrees to pay the face value of the instrument on maturity. Fixed time deposits are bank obligations payable at a stated maturity date and bearing interest at a fixed rate. Fixed time deposits may be withdrawn on demand by the investor, but may be subject to early withdrawal penalties which vary depending upon market conditions and the remaining maturity of the obligation.

Delayed-Delivery Transactions  involve a commitment by a Fund to purchase or sell securities for a predetermined price or yield, with payment and delivery taking place beyond the customary settlement period. When delayed-delivery transactions are outstanding, a Fund will designate or receive as collateral liquid assets in an amount sufficient to meet the purchase price or respective obligations. When purchasing a security on a delayed-delivery basis, a Fund assumes the rights and risks of ownership of the security, including the risk of price and yield fluctuations, and takes such fluctuations into account when determining its NAV. A Fund may dispose of or renegotiate a delayed-delivery transaction after it is entered into, which may result in a realized gain (loss). When a Fund has sold a security on a delayed-delivery basis, the Fund does not participate in future gains (losses) with respect to the security.

Inflation-Indexed Bonds  are fixed income securities whose principal value is periodically adjusted by the rate of inflation. The interest rate on these bonds is generally fixed at issuance at a rate lower than typical bonds. Over the life of an inflation-indexed bond, however, interest will be paid based on a principal value which is adjusted for inflation. Any increase or decrease in the principal amount of an inflation-indexed bond will be included as interest income on the Statements of Operations, even though investors do not receive their principal until maturity. Repayment of the original bond principal upon maturity (as adjusted for inflation) is guaranteed in the case of U.S. Treasury Inflation-Protected Securities. For bonds that do not provide a similar guarantee, the adjusted principal value of the bond repaid at maturity may be less than the original principal.

Loans and Other Indebtedness, Loan Participations and Assignments  are direct debt instruments which are interests in amounts owed to lenders or lending syndicates by corporate, governmental, or other borrowers. A Fund's investments in loans may be in the form of participations in loans or assignments of all or a portion of loans from third parties or investments in or originations of loans by the Fund or Funds. A loan is often administered by a bank or other financial institution (the "agent") that acts as agent for all holders. The agent administers the terms of the loan, as specified in the loan agreement. A Fund may invest in multiple series or tranches of a loan, which may have varying terms and carry different associated risks. When a Fund purchases assignments from agents it acquires direct rights against the borrowers of the loans. These loans may include participations in bridge loans, which are loans taken out by borrowers for a short period (typically less than one year) pending arrangement of more permanent financing through, for example, the issuance of bonds, frequently high yield bonds issued for the purpose of acquisitions.

The types of loans and related investments in which the Funds may invest include, among others, senior loans, subordinated loans (including second lien loans, B-Notes and mezzanine loans), whole loans, commercial real estate and other commercial loans and structured loans. The Funds may originate loans or acquire direct interests in loans through primary loan distributions and/or in private transactions. In the case of subordinated loans, there may be significant indebtedness ranking ahead of the borrower's obligation to the holder of such a loan, including in the event of the borrower's insolvency. Mezzanine loans are typically secured by a pledge of an equity interest in the mortgage borrower that owns the real estate rather than an interest in a mortgage.

Investments in loans may include unfunded loan commitments, which are contractual obligations for funding. Unfunded loan commitments may include revolving credit facilities, which may obligate a Fund to supply additional cash to the borrower on demand. Unfunded loan commitments represent a future obligation in full, even though a percentage of the committed amount may not be utilized by the borrower. When investing in a loan participation, a Fund has the right to receive payments of principal, interest and any fees to which it is entitled only from the agent selling the loan agreement and only upon receipt of payments by the agent from the borrower. A Fund may receive a commitment fee based on the undrawn portion of the underlying line of credit portion of a loan. In certain circumstances, a Fund may receive a penalty fee upon the prepayment of a loan by a borrower. Fees earned or paid are recorded as a component of interest income or interest expense, respectively, on the Statements of Operations. Unfunded loan commitments are reflected as a liability on the Statements of Assets and Liabilities.

**Mortgage-Related and Other Asset-Backed Securities** directly or indirectly represent a participation in, or are secured by and payable from, loans on real property. Mortgage-related securities are created from pools of residential or commercial mortgage loans, including mortgage loans made by savings and loan institutions, mortgage bankers, commercial banks and others. These securities provide a monthly payment which consists of both interest and principal. Interest may be determined by fixed or adjustable rates. The rate of prepayments on underlying mortgages will affect the price and volatility of a mortgage-related security, and may have the effect of shortening or extending the effective duration of the security relative to what was anticipated at the time of purchase. The timely payment of principal and interest of certain mortgage-related securities is guaranteed with the full faith and credit of the U.S. Government. Pools created and guaranteed by non-governmental issuers, including government-sponsored corporations, may be supported by various forms of insurance or guarantees, but there can be no assurance that private insurers or guarantors can meet their obligations under the insurance policies or guarantee arrangements. Many of the risks of investing in mortgage-related securities secured by commercial mortgage loans reflect the effects of local and other economic conditions on real estate markets, the ability of tenants to make lease payments, and the ability of a property to attract and retain tenants. These securities may be less liquid and may exhibit greater price volatility than other types of mortgage-related or other asset-backed securities. Other asset-backed securities are created from many types of assets, including, but not limited to, auto loans, accounts receivable, such as credit card receivables and hospital account receivables, home equity loans, student loans, boat loans, mobile home loans, recreational vehicle loans, manufactured housing loans, aircraft leases, computer leases and syndicated bank loans.

**Collateralized Debt Obligations** ("CDOs") include Collateralized Bond Obligations ("CBOs"), Collateralized Loan Obligations ("CLOs") and other similarly structured securities. CBOs and CLOs are types of asset-backed securities. A CBO is a trust which is backed by a diversified pool of high risk, below investment grade fixed income securities. A CLO is a trust typically collateralized by a pool of loans, which may include, among others, domestic and foreign senior secured loans, senior unsecured loans, and subordinate corporate loans, including loans that may be rated below investment grade or equivalent unrated loans. The risks of an investment in a CDO depend largely on the type of the collateral securities and the class of the CDO in which a Fund invests. In addition to the normal risks associated with fixed income securities discussed elsewhere in this report and each Fund's prospectus and statement of additional information (e.g., prepayment risk, credit risk, liquidity risk, market risk, structural risk, legal risk and interest rate risk (which may be exacerbated if the interest rate payable

on a structured financing changes based on multiples of changes in interest rates or inversely to changes in interest rates)), CBOs, CLOs and other CDOs carry additional risks including, but not limited to, (i) the possibility that distributions from collateral securities will not be adequate to make interest or other payments, (ii) the quality of the collateral may decline in value or default, (iii) the risk that a Fund may invest in CBOs, CLOs, or other CDOs that are subordinate to other classes, and (iv) the complex structure of the security may not be fully understood at the time of investment and may produce disputes with the issuer or unexpected investment results.

**Collateralized Mortgage Obligations** ("CMOs") are debt obligations of a legal entity that are collateralized by whole mortgage loans or private mortgage bonds and divided into classes. CMOs are structured into multiple classes, often referred to as "tranches", with each class bearing a different stated maturity and entitled to a different schedule for payments of principal and interest, including prepayments. CMOs may be less liquid and may exhibit greater price volatility than other types of mortgage-related or asset-backed securities.

**Stripped Mortgage-Backed Securities** ("SMBS") are derivative multi-class mortgage securities. SMBS are usually structured with two classes that receive different proportions of the interest and principal distributions on a pool of mortgage assets. An SMBS will have one class that will receive all of the interest (the interest-only or "IO" class), while the other class will receive the entire principal (the principal-only or "PO" class). Payments received for IOs are included in interest income on the Statements of Operations. Because no principal will be received at the maturity of an IO, adjustments are made to the cost of the security on a monthly basis until maturity. These adjustments are included in interest income on the Statements of Operations. Payments received for POs are treated as reductions to the cost and par value of the securities.

**Payment In-Kind Securities** may give the issuer the option at each interest payment date of making interest payments in either cash and/or additional debt securities. Those additional debt securities usually have the same terms, including maturity dates and interest rates, and associated risks as the original bonds. The daily market quotations of the original bonds may include the accrued interest (referred to as a dirty price) and require a pro rata adjustment from the unrealized appreciation (depreciation) on investments to interest receivable on the Statements of Assets and Liabilities.

**Perpetual Bonds** are fixed income securities with no maturity date but pay a coupon in perpetuity (with no specified ending or maturity date). Unlike typical fixed income securities, there is no obligation for perpetual bonds to repay principal. The coupon payments, however, are mandatory. While perpetual bonds have no maturity date, they may

**Notes to Financial Statements** (Cont.)

have a callable date in which the perpetuity is eliminated and the issuer may return the principal received on the specified call date. Additionally, a perpetual bond may have additional features, such as interest rate increases at periodic dates or an increase as of a predetermined point in the future.

Real Estate Investment Trusts ("REITs") are pooled investment vehicles that own, and typically operate, income-producing real estate. If a REIT meets certain requirements, including distributing to shareholders substantially all of its taxable income (other than net capital gains), then it is not taxed on the income distributed to shareholders. Distributions received from REITs may be characterized as income, capital gain or a return of capital. A return of capital is recorded by a Fund as a reduction to the cost basis of its investment in the REIT. REITs are subject to management fees and other expenses, and so the Funds that invest in REITs will bear their proportionate share of the costs of the REITs' operations.

Restricted Investments are subject to legal or contractual restrictions on resale and may generally be sold privately, but may be required to be registered or exempted from such registration before being sold to the public. Private placement securities are generally considered to be restricted except for those securities traded between qualified institutional investors under the provisions of Rule 144A of the Securities Act of 1933. Disposal of restricted investments may involve time-consuming negotiations and expenses, and prompt sale at an acceptable price may be difficult to achieve. Restricted investments held by the Funds at March 31, 2021, as applicable, are disclosed in the Notes to Schedules of Investments.

Securities Issued by U.S. Government Agencies or Government-Sponsored Enterprises are obligations of and, in certain cases, guaranteed by, the U.S. Government, its agencies or instrumentalities. Some U.S. Government securities, such as Treasury bills, notes and bonds, and securities guaranteed by the Government National Mortgage Association, are supported by the full faith and credit of the U.S. Government; others, such as those of the Federal Home Loan Banks, are supported by the right of the issuer to borrow from the U.S. Department of the Treasury (the "U.S. Treasury"); and others, such as those of the Federal National Mortgage Association ("FNMA" or "Fannie Mae"), are supported by the discretionary authority of the U.S. Government to purchase the agency's obligations. U.S. Government securities may include zero coupon securities which do not distribute interest on a current basis and tend to be subject to a greater risk than interest-paying securities of similar maturities.

Government-related guarantors (i.e., not backed by the full faith and credit of the U.S. Government) include FNMA and the Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac"). FNMA is a government-sponsored corporation. FNMA purchases conventional (i.e., not insured or guaranteed by any government agency) residential mortgages from a list of approved seller/servicers which include state and federally chartered savings and loan associations, mutual savings banks, commercial banks and credit unions and mortgage bankers. Pass-through securities issued by FNMA are guaranteed as to timely payment of principal and interest by FNMA, but are not backed by the full faith and credit of the U.S. Government. FHLMC issues Participation Certificates ("PCs"), which are pass-through securities, each representing an undivided interest in a pool of residential mortgages. FHLMC guarantees the timely payment of interest and ultimate collection of principal, but PCs are not backed by the full faith and credit of the U.S. Government.

In June 2019, FNMA and FHLMC started issuing Uniform Mortgage Backed Securities in place of their current offerings of TBA-eligible securities (the "Single Security Initiative"). The Single Security Initiative seeks to support the overall liquidity of the TBA market and aligns the characteristics of FNMA and FHLMC certificates. The effects that the Single Security Initiative may have on the market for TBA and other mortgage-backed securities are uncertain.

Roll-timing strategies can be used where a Fund seeks to extend the expiration or maturity of a position, such as a TBA security on an underlying asset, by closing out the position before expiration and opening a new position with respect to substantially the same underlying asset with a later expiration date. TBA securities purchased or sold are reflected on the Statements of Assets and Liabilities as an asset or liability, respectively.

Warrants are securities that are usually issued together with a debt security or preferred security and that give the holder the right to buy a proportionate amount of common stock at a specified price. Warrants normally have a life that is measured in years and entitle the holder to buy common stock of a company at a price that is usually higher than the market price at the time the warrant is issued. Warrants may entail greater risks than certain other types of investments. Generally, warrants do not carry the right to receive dividends or exercise voting rights with respect to the underlying securities, and they do not represent any rights in the assets of the issuer. In addition, their value does not necessarily change with the value of the underlying securities, and they cease to have value if they are not exercised on or before their expiration date. If the market price of the underlying stock does not exceed the exercise price during the life of the warrant, the warrant will expire worthless. Warrants may increase the potential profit or loss to be realized from the investment as compared with investing the same amount in the underlying securities. Similarly, the percentage increase or decrease in the value of an equity security warrant may be greater than the percentage increase or decrease in the value of the underlying

common stock. Warrants may relate to the purchase of equity or debt securities. Debt obligations with warrants attached to purchase equity securities have many characteristics of convertible securities and their prices may, to some degree, reflect the performance of the underlying stock. Debt obligations also may be issued with warrants attached to purchase additional debt securities at the same coupon rate. A decline in interest rates would permit a Fund to sell such warrants at a profit. If interest rates rise, these warrants would generally expire with no value.

When-Issued Transactions  are purchases or sales made on a when-issued basis. These transactions are made conditionally because a security, although authorized, has not yet been issued in the market. Transactions to purchase or sell securities on a when-issued basis involve a commitment by a Fund to purchase or sell these securities for a predetermined price or yield, with payment and delivery taking place beyond the customary settlement period. A Fund may sell when-issued securities before they are delivered, which may result in a realized gain (loss).

## 5. BORROWINGS AND OTHER FINANCING TRANSACTIONS

The Funds may enter into the borrowings and other financing transactions described below to the extent permitted by each Fund's respective investment policies.

The following disclosures contain information on a Fund's ability to lend or borrow cash or securities to the extent permitted under the Act, which may be viewed as borrowing or financing transactions by a Fund. The location of these instruments in each Fund's financial statements is described below.

(a) Line of Credit  The PIMCO High Yield Spectrum Fund and PIMCO Low Duration Credit Fund entered into a 364-day senior unsecured revolving credit agreement with State Street Bank & Trust Company and other commercial banks to be utilized for temporary purposes to fund shareholder redemptions or for other short-term liquidity purposes. State Street Bank & Trust Company serves as both a bank and as an agent for the other banks that are parties to the agreement. The Funds pay financing charges based on a combination of a London Interbank Offered Rate-based variable rate plus a credit spread. The Funds also pay a fee of 0.15% per annum on the unused maximum available commitment amounts. As of March 31, 2021, if applicable any outstanding borrowings would be disclosed as a payable for line of credit on the Statements of Assets and Liabilities. Interest and commitment and upfront fees, if any, paid by the Funds are disclosed as part of the interest expense on the Statements of Operations.

During the period, there were no borrowings on this line of credit. The maximum available commitment and related fees for the revolving credit agreement are:

| Funds | Maximum Available Commitment* | Expiration Date | Commitment and Upfront Fees |
|---|---|---|---|
| PIMCO High Yield Spectrum Fund | $ 19,000,000 | 08/31/2021 | $ 61,295 |
| PIMCO Low Duration Credit Fund | $ 47,000,000 | 08/31/2021 | $ 113,826 |

\*   Maximum available commitment prior to renewal on September 1, 2020, for PIMCO High Yield Spectrum Bond and PIMCO Low Duration Credit Fund was $35,000,000 and $45,000,000, respectively. The agreements expire on August 31, 2021 unless extended or renewed.

(b) Repurchase Agreements  Under the terms of a typical repurchase agreement, a Fund purchases an underlying debt obligation (collateral) subject to an obligation of the seller to repurchase, and a Fund to resell, the obligation at an agreed-upon price and time. In an open maturity repurchase agreement, there is no pre-determined repurchase date and the agreement can be terminated by the Fund or counterparty at any time. The underlying securities for all repurchase agreements are held by a Fund's custodian or designated subcustodians under tri-party repurchase agreements and in certain instances will remain in custody with the counterparty. The market value of the collateral must be equal to or exceed the total amount of the repurchase obligations, including interest. Repurchase agreements, if any, including accrued interest, are included on the Statements of Assets and Liabilities. Interest earned is recorded as a component of interest income on the Statements of Operations. In periods of increased demand for collateral, a Fund may pay a fee for the receipt of collateral, which may result in interest expense to the Fund.

(c) Reverse Repurchase Agreements  In a reverse repurchase agreement, a Fund delivers a security in exchange for cash to a financial institution, the counterparty, with a simultaneous agreement to repurchase the same or substantially the same security at an agreed upon price and date. In an open maturity reverse repurchase agreement, there is no pre-determined repurchase date and the agreement can be terminated by the Fund or counterparty at any time. A Fund is entitled to receive principal and interest payments, if any, made on the security delivered to the counterparty during the term of the agreement. Cash received in exchange for securities delivered plus accrued interest payments to be made by a Fund to counterparties are reflected as a liability on the Statements of Assets and Liabilities. Interest payments made by a Fund to counterparties are recorded as a component of interest expense on the Statements of Operations. In periods of increased demand for the security, a Fund may receive a fee for use of the security by the counterparty, which may result in interest income to the Fund. A Fund will segregate assets determined to be liquid by the Adviser or will otherwise cover its obligations under reverse repurchase agreements.

(d) Sale-Buybacks  A sale-buyback financing transaction consists of a sale of a security by a Fund to a financial institution, the counterparty, with a simultaneous agreement to repurchase the same or substantially the same security at an agreed-upon price and date. A Fund is not entitled to receive principal and interest payments, if any, made on the security sold to the counterparty during the term of the agreement. The agreed-upon proceeds for securities to be repurchased by a Fund are reflected as a liability on the Statements of Assets and Liabilities. A Fund will recognize net income represented by the price differential between the price received for the transferred security and the agreed-upon repurchase price. This is commonly referred to as the 'price drop'. A price drop consists of (i) the foregone interest and inflationary income adjustments, if any, a Fund would have otherwise received had the security not been sold and (ii) the negotiated financing terms between a Fund and counterparty. Foregone interest and inflationary income adjustments, if any, are recorded as components of interest income on the Statements of Operations. Interest payments based upon negotiated financing terms made by a Fund to counterparties are recorded as a component of interest expense on the Statements of Operations. In periods of increased demand for the security, a Fund may receive a fee for use of the security by the counterparty, which may result in interest income to the Fund. A Fund will segregate assets determined to be liquid by the Adviser or will otherwise cover its obligations under sale-buyback transactions.

(e) Short Sales  Short sales are transactions in which a Fund sells a security that it may not own. A Fund may make short sales of securities to (i) offset potential declines in long positions in similar securities, (ii) to increase the flexibility of the Fund, (iii) for investment return, (iv) as part of a risk arbitrage strategy, and (v) as part of its overall portfolio management strategies involving the use of derivative instruments. When a Fund engages in a short sale, it may borrow the security sold short and deliver it to the counterparty. A Fund will ordinarily have to pay a fee or premium to borrow a security and be obligated to repay the lender of the security any dividend or interest that accrues on the security during the period of the loan. Securities sold in short sale transactions and the dividend or interest payable on such securities, if any, are reflected as payable for short sales on the Statements of Assets and Liabilities. Short sales expose a Fund to the risk that it will be required to cover its short position at a time when the security or other asset has appreciated in value, thus resulting in losses to a Fund. A short sale is "against the box" if a Fund holds in its portfolio or has the right to acquire the security sold short, or securities identical to the security sold short, at no additional cost. A Fund will be subject to additional risks to the extent that it engages in short sales that are not "against the box." A Fund's loss on a short sale could theoretically be unlimited in cases where a Fund is unable, for whatever reason, to close out its short position.

(f) Interfund Lending  In accordance with an exemptive order (the "Order") from the SEC, the Funds of the Trust may participate in a joint lending and borrowing facility for temporary purposes (the "Interfund Lending Program"), subject to compliance with the terms and conditions of the Order, and to the extent permitted by each Fund's investment policies and restrictions. The Funds are currently permitted to borrow under the Interfund Lending Program. A lending fund may lend in aggregate up to 15% of its current net assets at the time of the interfund loan, but may not lend more than 5% of its net assets to any one borrowing fund through the Interfund Lending Program. A borrowing fund may not borrow through the Interfund Lending Program or from any other source if its total outstanding borrowings immediately after the borrowing would be more than 33 1/3% of its total assets (or any lower threshold provided for by the fund's investment restrictions). If a borrowing fund's total outstanding borrowings exceed 10% of its total assets, each of its outstanding interfund loans will be subject to collateralization of at least 102% of the outstanding principal value of the loan. All interfund loans are for temporary or emergency purposes and the interfund loan rate to be charged will be the average of the highest current overnight repurchase agreement rate available to a lending fund and the bank loan rate, as calculated according to a formula established by the Board.

On March 23, 2020, the SEC issued an exemptive order (the "Temporary Order") to provide temporary relief to the Funds of the Trust in relation to the Interfund Lending Program, and the Board has authorized the Funds to rely on the Temporary Order. With respect to interfund lending, the Temporary Order permitted, under certain conditions, a lending fund to lend in aggregate up to 25% of its current net assets at the time of the interfund loan and to make interfund loans with term limits of up to the expiration of the Temporary Order, notwithstanding the current limit of seven business days under the Order. The SEC provided notice in April 2021 that the Temporary Order would be terminated on April 30, 2021.

During the period ended March 31, 2021, the Funds did not participate in the Interfund Lending Program.

## 6. FINANCIAL DERIVATIVE INSTRUMENTS

The Funds may enter into the financial derivative instruments described below to the extent permitted by each Fund's respective investment policies.

The following disclosures contain information on how and why the Funds use financial derivative instruments, and how financial derivative instruments affect the Funds' financial position, results of operations and cash flows. The location and fair value amounts of these instruments on the Statements of Assets and Liabilities and the net realized gain (loss) and net change in unrealized appreciation

(depreciation) on the Statements of Operations, each categorized by type of financial derivative contract and related risk exposure, are included in a table in the Notes to Schedules of Investments. The financial derivative instruments outstanding as of period end and the amounts of net realized gain (loss) and net change in unrealized appreciation (depreciation) on financial derivative instruments during the period, as disclosed in the Notes to Schedules of Investments, serve as indicators of the volume of financial derivative activity for the Funds.

(a) Forward Foreign Currency Contracts may be engaged, in connection with settling planned purchases or sales of securities, to hedge the currency exposure associated with some or all of a Fund's securities or as part of an investment strategy. A forward foreign currency contract is an agreement between two parties to buy and sell a currency at a set price on a future date. The market value of a forward foreign currency contract fluctuates with changes in foreign currency exchange rates. Forward foreign currency contracts are marked to market daily, and the change in value is recorded by a Fund as an unrealized gain (loss). Realized gains (losses) are equal to the difference between the value of the contract at the time it was opened and the value at the time it was closed and are recorded upon delivery or receipt of the currency. These contracts may involve market risk in excess of the unrealized gain (loss) reflected on the Statements of Assets and Liabilities. In addition, a Fund could be exposed to risk if the counterparties are unable to meet the terms of the contracts or if the value of the currency changes unfavorably to the U.S. dollar. To mitigate such risk, cash or securities may be exchanged as collateral pursuant to the terms of the underlying contracts.

(b) Futures Contracts are agreements to buy or sell a security or other asset for a set price on a future date and are traded on an exchange. A Fund may use futures contracts to manage its exposure to the securities markets or to movements in interest rates and currency values. The primary risks associated with the use of futures contracts are the imperfect correlation between the change in market value of the securities held by a Fund and the prices of futures contracts and the possibility of an illiquid market. Futures contracts are valued based upon their quoted daily settlement prices. Upon entering into a futures contract, a Fund is required to deposit with its futures broker an amount of cash, U.S. Government and Agency Obligations, or select sovereign debt, in accordance with the initial margin requirements of the broker or exchange. Futures contracts are marked to market daily and based on such movements in the price of the contracts, an appropriate payable or receivable for the change in value may be posted or collected by the Fund ("Futures Variation Margin"). Futures Variation Margins, if any, are disclosed within centrally cleared financial derivative instruments on the Statements of Assets and Liabilities. Gains (losses) are recognized but not considered realized until the

contracts expire or close. Futures contracts involve, to varying degrees, risk of loss in excess of the Futures Variation Margin included within exchange traded or centrally cleared financial derivative instruments on the Statements of Assets and Liabilities.

(c) Options Contracts may be written or purchased to enhance returns or to hedge an existing position or future investment. A Fund may write call and put options on securities and financial derivative instruments it owns or in which it may invest. Writing put options tends to increase a Fund's exposure to the underlying instrument. Writing call options tends to decrease a Fund's exposure to the underlying instrument. When a Fund writes a call or put, an amount equal to the premium received is recorded and subsequently marked to market to reflect the current value of the option written. These amounts are included on the Statements of Assets and Liabilities. Premiums received from writing options which expire are treated as realized gains. Premiums received from writing options which are exercised or closed are added to the proceeds or offset against amounts paid on the underlying futures, swap, security or currency transaction to determine the realized gain (loss). Certain options may be written with premiums to be determined on a future date. The premiums for these options are based upon implied volatility parameters at specified terms. A Fund as a writer of an option has no control over whether the underlying instrument may be sold ("call") or purchased ("put") and as a result bears the market risk of an unfavorable change in the price of the instrument underlying the written option. There is the risk a Fund may not be able to enter into a closing transaction because of an illiquid market.

Purchasing call options tends to increase a Fund's exposure to the underlying instrument. Purchasing put options tends to decrease a Fund's exposure to the underlying instrument. A Fund pays a premium which is included as an asset on the Statements of Assets and Liabilities and subsequently marked to market to reflect the current value of the option. Premiums paid for purchasing options which expire are treated as realized losses. Certain options may be purchased with premiums to be determined on a future date. The premiums for these options are based upon implied volatility parameters at specified terms. The risk associated with purchasing put and call options is limited to the premium paid. Premiums paid for purchasing options which are exercised or closed are added to the amounts paid or offset against the proceeds on the underlying investment transaction to determine the realized gain (loss) when the underlying transaction is executed.

Credit Default Swaptions may be written or purchased to hedge exposure to the credit risk of an investment without making a commitment to the underlying instrument. A credit default swaption is an option to sell or buy credit protection on a specific reference by entering into a pre-defined swap agreement by some specified date in the future.

**Notes to Financial Statements** (Cont.)

**Foreign Currency Options** may be written or purchased to be used as a short or long hedge against possible variations in foreign exchange rates or to gain exposure to foreign currencies.

**Inflation-Capped Options** may be written or purchased to enhance returns or for hedging opportunities. The purpose of purchasing inflation-capped options is to protect a Fund from inflation erosion above a certain rate on a given notional exposure. A floor can be used to give downside protection to investments in inflation-linked products.

**Interest Rate Swaptions** may be written or purchased to enter into a pre-defined swap agreement or to shorten, extend, cancel or otherwise modify an existing swap agreement, by some specified date in the future. The writer of the swaption becomes the counterparty to the swap if the buyer exercises. The interest rate swaption agreement will specify whether the buyer of the swaption will be a fixed-rate receiver or a fixed-rate payer upon exercise.

**Options on Exchange-Traded Futures Contracts** ("Futures Option") may be written or purchased to hedge an existing position or future investment, for speculative purposes or to manage exposure to market movements. A Futures Option is an option contract in which the underlying instrument is a single futures contract.

**Options on Securities** may be written or purchased to enhance returns or to hedge an existing position or future investment. An option on a security uses a specified security as the underlying instrument for the option contract.

**(d) Swap Agreements** are bilaterally negotiated agreements between a Fund and a counterparty to exchange or swap investment cash flows, assets, foreign currencies or market-linked returns at specified, future intervals. Swap agreements may be privately negotiated in the over the counter market ("OTC swaps") or may be cleared through a third party, known as a central counterparty or derivatives clearing organization ("Centrally Cleared Swaps"). A Fund may enter into asset, credit default, cross-currency, interest rate, total return, variance and other forms of swap agreements to manage its exposure to credit, currency, interest rate, commodity, equity and inflation risk. In connection with these agreements, securities or cash may be identified as collateral or margin in accordance with the terms of the respective swap agreements to provide assets of value and recourse in the event of default or bankruptcy/insolvency.

Centrally Cleared Swaps are marked to market daily based upon valuations as determined from the underlying contract or in accordance with the requirements of the central counterparty or derivatives clearing organization. Changes in market value, if any, are reflected as a component of net change in unrealized appreciation (depreciation) on the Statements of Operations. Daily changes in valuation of centrally

cleared swaps ("Swap Variation Margin"), if any, are disclosed within centrally cleared financial derivative instruments on the Statements of Assets and Liabilities. Centrally Cleared and OTC swap payments received or paid at the beginning of the measurement period are included on the Statements of Assets and Liabilities and represent premiums paid or received upon entering into the swap agreement to compensate for differences between the stated terms of the swap agreement and prevailing market conditions (credit spreads, currency exchange rates, interest rates, and other relevant factors). Upfront premiums received (paid) are initially recorded as liabilities (assets) and subsequently marked to market to reflect the current value of the swap. These upfront premiums are recorded as realized gain (loss) on the Statements of Operations upon termination or maturity of the swap. A liquidation payment received or made at the termination of the swap is recorded as realized gain (loss) on the Statements of Operations. Net periodic payments received or paid by a Fund are included as part of realized gain (loss) on the Statements of Operations.

For purposes of applying certain of a Fund's investment policies and restrictions, swap agreements, like other derivative instruments, may be valued by a Fund at market value, notional value or full exposure value. In the case of a credit default swap, in applying certain of a Fund's investment policies and restrictions, the Funds will value the credit default swap at its notional value or its full exposure value (*i.e.*, the sum of the notional amount for the contract plus the market value), but may value the credit default swap at market value for purposes of applying certain of a Fund's other investment policies and restrictions. For example, a Fund may value credit default swaps at full exposure value for purposes of a Fund's credit quality guidelines (if any) because such value in general better reflects a Fund's actual economic exposure during the term of the credit default swap agreement. As a result, a Fund may, at times, have notional exposure to an asset class (before netting) that is greater or lesser than the stated limit or restriction noted in a Fund's prospectus. In this context, both the notional amount and the market value may be positive or negative depending on whether a Fund is selling or buying protection through the credit default swap. The manner in which certain securities or other instruments are valued by a Fund for purposes of applying investment policies and restrictions may differ from the manner in which those investments are valued by other types of investors.

Entering into swap agreements involves, to varying degrees, elements of interest, credit, market and documentation risk in excess of the amounts recognized on the Statements of Assets and Liabilities. Such risks involve the possibility that there will be no liquid market for these agreements, that the counterparty to the agreements may default on its obligation to perform or disagree as to the meaning of contractual terms in the agreements and that there may be unfavorable changes in interest rates or the values of the asset upon which the swap is based.

A Fund's maximum risk of loss from counterparty credit risk is the discounted net value of the cash flows to be received from the counterparty over the contract's remaining life, to the extent that amount is positive. The risk may be mitigated by having a master netting arrangement between a Fund and the counterparty and by the posting of collateral to a Fund to cover a Fund's exposure to the counterparty.

To the extent a Fund has a policy to limit the net amount owed to or to be received from a single counterparty under existing swap agreements, such limitation only applies to counterparties to OTC swaps and does not apply to centrally cleared swaps where the counterparty is a central counterparty or derivatives clearing organization.

Credit Default Swap Agreements  on corporate, loan, sovereign, U.S. municipal or U.S. Treasury issues are entered into to provide a measure of protection against defaults of the issuers (*i.e.*, to reduce risk where a Fund owns or has exposure to the referenced obligation) or to take an active long or short position with respect to the likelihood of a particular issuer's default. Credit default swap agreements involve one party making a stream of payments (referred to as the buyer of protection) to another party (the seller of protection) in exchange for the right to receive a specified return in the event that the referenced entity, obligation or index, as specified in the swap agreement, undergoes a certain credit event. As a seller of protection on credit default swap agreements, a Fund will generally receive from the buyer of protection a fixed rate of income throughout the term of the swap provided that there is no credit event. As the seller, a Fund would effectively add leverage to its portfolio because, in addition to its total net assets, a Fund would be subject to investment exposure on the notional amount of the swap.

If a Fund is a seller of protection and a credit event occurs, as defined under the terms of that particular swap agreement, a Fund will either (i) pay to the buyer of protection an amount equal to the notional amount of the swap and take delivery of the referenced obligation, other deliverable obligations or underlying securities comprising the referenced index or (ii) pay a net settlement amount in the form of cash or securities equal to the notional amount of the swap less the recovery value of the referenced obligation or underlying securities comprising the referenced index. If a Fund is a buyer of protection and a credit event occurs, as defined under the terms of that particular swap agreement, a Fund will either (i) receive from the seller of protection an amount equal to the notional amount of the swap and deliver the referenced obligation, other deliverable obligations or underlying securities comprising the referenced index or (ii) receive a net settlement amount in the form of cash or securities equal to the notional amount of the swap less the recovery value of the referenced

obligation or underlying securities comprising the referenced index. Recovery values are estimated by market makers considering either industry standard recovery rates or entity specific factors and considerations until a credit event occurs. If a credit event has occurred, the recovery value is determined by a facilitated auction whereby a minimum number of allowable broker bids, together with a specified valuation method, are used to calculate the settlement value. The ability to deliver other obligations may result in a cheapest-to-deliver option (the buyer of protection's right to choose the deliverable obligation with the lowest value following a credit event).

Credit default swap agreements on credit indices involve one party making a stream of payments to another party in exchange for the right to receive a specified return in the event of a write-down, principal shortfall, interest shortfall or default of all or part of the referenced entities comprising the credit index. A credit index is a basket of credit instruments or exposures designed to be representative of some part of the credit market as a whole. These indices are made up of reference credits that are judged by a poll of dealers to be the most liquid entities in the credit default swap market based on the sector of the index. Components of the indices may include, but are not limited to, investment grade securities, high yield securities, asset-backed securities, emerging markets, and/or various credit ratings within each sector. Credit indices are traded using credit default swaps with standardized terms including a fixed spread and standard maturity dates. An index credit default swap references all the names in the index, and if there is a default, the credit event is settled based on that name's weight in the index. The composition of the indices changes periodically, usually every six months, and for most indices, each name has an equal weight in the index. A Fund may use credit default swaps on credit indices to hedge a portfolio of credit default swaps or bonds, which is less expensive than it would be to buy many credit default swaps to achieve a similar effect. Credit default swaps on indices are instruments for protecting investors owning bonds against default, and traders use them to speculate on changes in credit quality.

Implied credit spreads, represented in absolute terms, utilized in determining the market value of credit default swap agreements on corporate, loan, sovereign, U.S. municipal or U.S. Treasury issues as of period end, if any, are disclosed in the Notes to Schedules of Investments. They serve as an indicator of the current status of payment/performance risk and represent the likelihood or risk of default for the reference entity. The implied credit spread of a particular referenced entity reflects the cost of buying/selling protection and may include upfront payments required to be made to enter into the agreement. Wider credit spreads represent a deterioration of the referenced entity's credit soundness and a greater likelihood or risk of default or other credit event occurring as defined under the terms of

## Notes to Financial Statements (Cont.)

the agreement. For credit default swap agreements on asset-backed securities and credit indices, the quoted market prices and resulting values serve as the indicator of the current status of the payment/performance risk. Increasing market values, in absolute terms when compared to the notional amount of the swap, represent a deterioration of the referenced entity's credit soundness and a greater likelihood or risk of default or other credit event occurring as defined under the terms of the agreement.

The maximum potential amount of future payments (undiscounted) that a Fund as a seller of protection could be required to make under a credit default swap agreement equals the notional amount of the agreement. Notional amounts of each individual credit default swap agreement outstanding as of period end for which a Fund is the seller of protection are disclosed in the Notes to Schedules of Investments. These potential amounts would be partially offset by any recovery values of the respective referenced obligations, upfront payments received upon entering into the agreement, or net amounts received from the settlement of buy protection credit default swap agreements entered into by a Fund for the same referenced entity or entities.

Interest Rate Swap Agreements may be entered into to help hedge against interest rate risk exposure and to maintain a Fund's ability to generate income at prevailing market rates. The value of the fixed rate bonds that the Funds hold may decrease if interest rates rise. To help hedge against this risk and to maintain its ability to generate income at prevailing market rates, a Fund may enter into interest rate swap agreements. Interest rate swap agreements involve the exchange by a Fund with another party for their respective commitment to pay or receive interest on the notional amount of principal. Certain forms of interest rate swap agreements may include: (i) interest rate caps, under which, in return for a premium, one party agrees to make payments to

the other to the extent that interest rates exceed a specified rate, or "cap", (ii) interest rate floors, under which, in return for a premium, one party agrees to make payments to the other to the extent that interest rates fall below a specified rate, or "floor", (iii) interest rate collars, under which a party sells a cap and purchases a floor or vice versa in an attempt to protect itself against interest rate movements exceeding given minimum or maximum levels, (iv) callable interest rate swaps, under which the buyer pays an upfront fee in consideration for the right to early terminate the swap transaction in whole, at zero cost and at a predetermined date and time prior to the maturity date, (v) spreadlocks, which allow the interest rate swap users to lock in the forward differential (or spread) between the interest rate swap rate and a specified benchmark, or (vi) basis swaps, under which two parties can exchange variable interest rates based on different segments of money markets.

Total Return Swap Agreements are entered into to gain or mitigate exposure to the underlying reference asset. Total return swap agreements involve commitments where single or multiple cash flows are exchanged based on the price of an underlying reference asset and on a fixed or variable interest rate. Total return swap agreements may involve commitments to pay interest in exchange for a market-linked return. One counterparty pays out the total return of a specific underlying reference asset, which may include a single security, a basket of securities, or an index, and in return receives a fixed or variable rate. At the maturity date, a net cash flow is exchanged where the total return is equivalent to the return of the underlying reference asset less a financing rate, if any. As a receiver, a Fund would receive payments based on any net positive total return and would owe payments in the event of a net negative total return. As the payer, a Fund would owe payments on any net positive total return, and would receive payments in the event of a net negative total return.

## 7. PRINCIPAL AND OTHER RISKS

(a) Principal Risks

The principal risks of investing in a Fund, which could adversely affect its net asset value, yield and total return, are listed below.

| Risks | PIMCO Credit Opportunities Bond Fund | PIMCO Diversified Income Fund | PIMCO ESG Income Fund | PIMCO High Yield Spectrum Fund | PIMCO Long-Term Credit Bond Fund | CREW/PIMCO Low Duration Credit Fund | PIMCO Low Duration Income Fund | PIMCO Preferred and Capital Securities Fund |
|---|---|---|---|---|---|---|---|---|
| New Fund | — | — | X | — | — | — | — | — |
| Small Fund | — | — | X | — | — | — | — | — |
| Interest Rate | X | X | X | X | X | X | X | X |
| Call | X | X | X | X | X | X | X | X |
| Credit | X | X | X | X | X | X | X | X |
| Capital Securities | — | — | — | — | — | — | — | X |
| Preferred Securities | — | — | — | — | — | — | — | X |
| Concentration in Banking Industries | — | — | — | — | — | — | — | X |
| Contingent Convertible Securities | — | — | X | — | — | — | X | X |
| High Yield | X | X | X | X | X | X | X | X |
| Market | X | X | X | X | X | X | X | X |

| Risks | PIMCO Credit Opportunities Bond Fund | PIMCO Diversified Income Fund | PIMCO ESG Income Fund | PIMCO High Yield Spectrum Fund | PIMCO Long-Term Credit Bond Fund | CREW/PIMCO Low Duration Credit Fund | PIMCO Low Duration Income Fund | PIMCO Preferred and Capital Securities Fund |
|---|---|---|---|---|---|---|---|---|
| Issuer | X | X | X | X | X | X | X | X |
| Liquidity | X | X | X | X | X | X | X | X |
| Derivatives | X | X | X | X | X | X | X | X |
| Equity | X | X | X | X | X | X | X | X |
| Mortgage-Related and Other Asset-Backed Securities | X | X | X | — | X | — | X | — |
| Foreign (Non-U.S.) Investment | X | X | X | X | X | X | X | X |
| Emerging Markets | X | X | X | X | X | X | X | X |
| Sovereign Debt | X | X | X | X | X | X | X | X |
| Currency | X | X | X | X | X | — | X | X |
| Leveraging | X | X | X | X | X | X | X | X |
| Management | X | X | X | X | X | X | X | X |
| Subsidiary | — | — | — | — | — | — | — | X |
| Regulation S Securities | — | — | — | — | — | — | — | X |
| Short Exposure | X | X | X | X | X | X | X | X |
| Convertible Securities | X | — | — | — | — | — | — | — |
| Senior Loan | X | — | — | — | — | X | — | — |
| Distribution Rate | — | — | X | — | — | — | X | — |
| Environmental, Social and Governance Investing | — | — | X | — | — | — | — | — |
| LIBOR Transition | X | X | X | — | X | X | X | X |

Please see "Description of Principal Risks" in a Fund's prospectus for a more detailed description of the risks of investing in a Fund.

New Fund Risk  is the risk that a new fund's performance may not represent how the fund is expected to or may perform in the long term. In addition, new funds have limited operating histories for investors to evaluate and new funds may not attract sufficient assets to achieve investment and trading efficiencies.

Small Fund Risk  is the risk that a smaller fund may not achieve investment or trading efficiencies. Additionally, a smaller fund may be more adversely affected by large purchases or redemptions of fund shares.

Interest Rate Risk  is the risk that fixed income securities will decline in value because of an increase in interest rates; a fund with a longer average portfolio duration will be more sensitive to changes in interest rates than a fund with a shorter average portfolio duration.

Call Risk  is the risk that an issuer may exercise its right to redeem a fixed income security earlier than expected (a call). Issuers may call outstanding securities prior to their maturity for a number of reasons (e.g., declining interest rates, changes in credit spreads and improvements in the issuer's credit quality). If an issuer calls a security that a Fund has invested in, the Fund may not recoup the full amount of its initial investment and may be forced to reinvest in lower-yielding securities, securities with greater credit risks or securities with other, less favorable features.

Credit Risk  is the risk that a Fund could lose money if the issuer or guarantor of a fixed income security, or the counterparty to a derivative contract, is unable or unwilling, or is perceived (whether by market participants, rating agencies, pricing services or otherwise) as unable or unwilling, to meet its financial obligations.

Capital Securities Risk  is the risk that the value of securities issued by U.S. and non-U.S. financial institutions that can be used to satisfy their regulatory capital requirements may decline in response to changes in legislation and regulations applicable to financial institutions and financial markets, increased competition, adverse changes in general or industry-specific economic conditions, or unfavorable interest rates. By investing under normal circumstances at least 80% of its assets in a combination of preferred securities and Capital Securities, the PIMCO Preferred and Capital Securities Fund will be more susceptible to these risks than a fund that does not invest in Capital Securities to the same extent as the Fund.

Preferred Securities Risk  is the risk that preferred securities may be subject to greater credit or other risks than senior debt instruments. In addition, preferred securities are subject to other risks, such as risks related to deferred and omitted distributions, limited voting rights, liquidity, interest rate, regulatory changes and special redemption rights.

Concentration in Banking Industries Risk  is the risk of concentrating in industries related to banking, including interest rate risk, market risk, the risk of heightened competition and the risk that legislation and other government actions could adversely affect such industries.

## Notes to Financial Statements (Cont.)

**Contingent Convertible Securities Risk** is the risk of investing in contingent convertible securities, including the risk that interest payments will be cancelled by the issuer or a regulatory authority, the risk of ranking junior to other creditors in the event of a liquidation or other bankruptcy-related event as a result of holding subordinated debt, the risk of a Fund's investment becoming further subordinated as a result of conversion from debt to equity, the risk that principal amount due can be written down to a lesser amount, and the general risks applicable to fixed income investments, including interest rate risk, credit risk, market risk and liquidity risk, any of which could result in losses to a Fund.

**High Yield Risk** is the risk that high yield securities and unrated securities of similar credit quality (commonly known as "junk bonds") are subject to greater levels of credit, call and liquidity risks, including the risk that a court will subordinate high yield senior debt to other debt of the issuer or take other actions detrimental to holders of the senior debt. High yield securities are considered primarily speculative with respect to the issuer's continuing ability to make principal and interest payments, and may be more volatile than higher-rated securities of similar maturity.

**Market Risk** is the risk that the value of securities owned by a Fund may go up or down, sometimes rapidly or unpredictably, due to factors affecting securities markets generally or particular industries.

**Issuer Risk** is the risk that the value of a security may decline for a reason directly related to the issuer, such as management performance, financial leverage and reduced demand for the issuer's goods or services.

**Liquidity Risk** is the risk that a particular investment may be difficult to purchase or sell and that a Fund may be unable to sell illiquid investments at an advantageous time or price or achieve its desired level of exposure to a certain sector. Liquidity risk may result from the lack of an active market, reduced number and capacity of traditional market participants to make a market in fixed income securities, and may be magnified in a rising interest rate environment or other circumstances where investor redemptions from fixed income funds may be higher than normal, causing increased supply in the market due to selling activity.

**Derivatives Risk** is the risk of investing in derivative instruments (such as futures, swaps and structured securities), including leverage, liquidity, interest rate, market, credit and management risks, and valuation complexity. Changes in the value of a derivative may not correlate perfectly with, and may be more sensitive to market events than, the underlying asset, rate or index, and a Fund could lose more than the initial amount invested. A Fund's use of derivatives may result

in losses to the Fund, a reduction in the Fund's returns and/or increased volatility. Over-the-counter ("OTC") derivatives are also subject to the risk that a counterparty to the transaction will not fulfill its contractual obligations to the other party, as many of the protections afforded to centrally-cleared derivative transactions might not be available for OTC derivatives. The primary credit risk on derivatives that are exchange-traded or traded through a central clearing counterparty resides with a Fund's clearing broker, or the clearinghouse. Changes in regulation relating to a mutual fund's use of derivatives and related instruments could potentially limit or impact a Fund's ability to invest in derivatives, limit a Fund's ability to employ certain strategies that use derivatives and/or adversely affect the value of derivatives and a Fund's performance.

**Equity Risk** is the risk that the value of equity securities, such as common stocks and preferred securities, may decline due to general market conditions which are not specifically related to a particular company or to factors affecting a particular industry or industries. Equity securities generally have greater price volatility than fixed income securities.

**Mortgage-Related and Other Asset-Backed Securities Risk** is the risk of investing in mortgage-related and other asset-backed securities, including interest rate risk, extension risk, prepayment risk and credit risk.

**Foreign (Non-U.S.) Investment Risk** is the risk that investing in foreign (non-U.S.) securities may result in a Fund experiencing more rapid and extreme changes in value than a fund that invests exclusively in securities of U.S. companies, due to smaller markets, differing reporting, accounting and auditing standards, increased risk of delayed settlement of portfolio transactions or loss of certificates of portfolio securities, and the risk of unfavorable foreign government actions, including nationalization, expropriation or confiscatory taxation, currency blockage, or political changes or diplomatic developments. Foreign securities may also be less liquid and more difficult to value than securities of U.S. issuers.

**Emerging Markets Risk** is the risk of investing in emerging market securities, primarily increased foreign (non-U.S.) investment risk.

**Sovereign Debt Risk** is the risk that investments in fixed income instruments issued by sovereign entities may decline in value as a result of default or other adverse credit event resulting from an issuer's inability or unwillingness to make principal or interest payments in a timely fashion.

**Currency Risk** is the risk that foreign (non-U.S.) currencies will change in value relative to the U.S. dollar and affect a Fund's investments in foreign (non-U.S.) currencies or in securities that trade in, and receive revenues in, or in derivatives that provide exposure to, foreign (non-U.S.) currencies.

**Leveraging Risk**  is the risk that certain transactions of a Fund, such as reverse repurchase agreements, loans of portfolio securities, and the use of when-issued, delayed delivery or forward commitment transactions, or derivative instruments, may give rise to leverage, magnifying gains and losses and causing a Fund to be more volatile than if it had not been leveraged. This means that leverage entails a heightened risk of loss.

**Management Risk**  is the risk that the investment techniques and risk analyses applied by PIMCO will not produce the desired results and that actual or potential conflicts of interest, legislative, regulatory, or tax restrictions, policies or developments may affect the investment techniques available to PIMCO and the individual portfolio manager in connection with managing a Fund and may cause PIMCO to restrict or prohibit participation in certain investments. There is no guarantee that the investment objective of a Fund will be achieved.

**Subsidiary Risk**  is the risk that, by investing in a Fund's subsidiary, the Fund is indirectly exposed to the risks associated with the subsidiary's investments. Fund subsidiaries are not registered under the 1940 Act and may not be subject to all the investor protections of the 1940 Act. There is no guarantee that the investment objective of a subsidiary will be achieved.

**Regulation S Securities Risk**  is the risk that Regulation S securities may be less liquid than publicly traded securities and may not be subject to the disclosure and other investor protection requirements that would be applicable if they were publicly traded. Accordingly, Regulation S Securities may involve a high degree of business and financial risk and may result in substantial losses.

**Short Exposure Risk**  is the risk of entering into short sales, including the potential loss of more money than the actual cost of the investment, and the risk that the third party to the short sale will not fulfill its contractual obligations, causing a loss to a Fund.

**Convertible Securities Risk**  is the risk that arises when convertible securities share both fixed income and equity characteristics. Convertible securities are subject to risks to which fixed income and equity investments are subject. These risks include equity risk, interest rate risk and credit risk.

**Senior Loan Risk**  is the risk that investing in senior loans, including bank loans, exposes a Fund to heightened credit risk, call risk, settlement risk and liquidity risk. If an issuer of a senior loan prepays or redeems the loan prior to maturity, a Fund may have to reinvest the proceeds in instruments that pay lower interest rates.

**Distribution Rate Risk**  is the risk that a Fund's distribution rate may change unexpectedly as a result of numerous factors, including changes in realized and projected market returns, fluctuations in market interest rates, Fund performance and other factors.

**Environmental, Social and Governance Investing Risk**  is the risk that, because a Fund's ESG strategy may select or exclude securities of certain issuers for reasons other than performance, a Fund's performance will differ from funds that do not utilize an ESG investing strategy. ESG investing is qualitative and subjective by nature, and there is no guarantee that the factors utilized by PIMCO or any judgment exercised by PIMCO will reflect the opinions of any particular investor.

**LIBOR Transition Risk**  is the risk related to the anticipated discontinuation of the London Interbank Offered Rate ("LIBOR") by the end of 2021. Certain instruments held by a Fund rely in some fashion upon LIBOR. Although the transition process away from LIBOR has become increasingly well-defined in advance of the anticipated discontinuation date, there remains uncertainty regarding the nature of any replacement rate, and any potential effects of the transition away from LIBOR on a Fund or on certain instruments in which a Fund invests can be difficult to ascertain. The transition process may involve, among other things, increased volatility or illiquidity in markets for instruments that currently rely on LIBOR and may result in a reduction in value of certain instruments held by a Fund.

**(b) Other Risks**

In general, a Fund may be subject to additional risks, including, but not limited to, risks related to government regulation and intervention in financial markets, operational risks, risks associated with financial, economic and global market disruptions, and cybersecurity risks. Please see a Fund's prospectus and Statement of Additional Information for a more detailed description of the risks of investing in a Fund. Please see the Important Information section of this report for additional discussion of certain regulatory and market developments that may impact a Fund's performance.

**Market Disruption Risk**  A Fund is subject to investment and operational risks associated with financial, economic and other global market developments and disruptions, including those arising from war, terrorism, market manipulation, government interventions, defaults and shutdowns, political changes or diplomatic developments, public health emergencies (such as the spread of infectious diseases, pandemics and epidemics) and natural/environmental disasters, which can all negatively impact the securities markets and cause a Fund to lose value. These events can also impair the technology and other operational systems upon which a Fund's service providers, including PIMCO as a Fund's investment adviser, rely, and could otherwise disrupt a Fund's service providers' ability to fulfill their obligations to a Fund. For example, the recent spread of an infectious respiratory illness

**Notes to Financial Statements** (Cont.)

caused by a novel strain of coronavirus (known as COVID-19) has caused volatility, severe market dislocations and liquidity constraints in many markets, including markets for the securities a Fund holds, and may adversely affect a Fund's investments and operations. Please see the Important Information section for additional discussion of the COVID-19 pandemic.

Government Intervention in Financial Markets   Federal, state, and other governments, their regulatory agencies, or self-regulatory organizations may take actions that affect the regulation of the instruments in which a Fund invests, or the issuers of such instruments, in ways that are unforeseeable. Legislation or regulation may also change the way in which a Fund itself is regulated. Such legislation or regulation could limit or preclude a Fund's ability to achieve its investment objective. Furthermore, volatile financial markets can expose a Fund to greater market and liquidity risk and potential difficulty in valuing portfolio instruments held by the Fund. The value of a Fund's holdings is also generally subject to the risk of future local, national, or global economic disturbances based on unknown weaknesses in the markets in which a Fund invests. In addition, it is not certain that the U.S. Government will intervene in response to a future market disturbance and the effect of any such future intervention cannot be predicted. It is difficult for issuers to prepare for the impact of future financial downturns, although companies can seek to identify and manage future uncertainties through risk management programs.

Regulatory Risk   Financial entities, such as investment companies and investment advisers, are generally subject to extensive government regulation and intervention. Government regulation and/or intervention may change the way a Fund is regulated, affect the expenses incurred directly by a Fund and the value of its investments, and limit and/or preclude a Fund's ability to achieve its investment objective. Government regulation may change frequently and may have significant adverse consequences. Moreover, government regulation may have unpredictable and unintended effects.

Operational Risk   An investment in a Fund, like any fund, can involve operational risks arising from factors such as processing errors, human errors, inadequate or failed internal or external processes, failures in systems and technology, changes in personnel and errors caused by third-party service providers. The occurrence of any of these failures, errors or breaches could result in a loss of information, regulatory scrutiny, reputational damage or other events, any of which could have a material adverse effect on a Fund. While a Fund seeks to minimize such events through controls and oversight, there may still be failures that could cause losses to the Fund.

Cyber Security Risk   As the use of technology has become more prevalent in the course of business, the Funds have become potentially more susceptible to operational and information security risks resulting from breaches in cyber security. A breach in cyber security refers to both intentional and unintentional cyber events that may, among other things, cause a Fund to lose proprietary information, suffer data corruption and/or destruction or lose operational capacity, result in the unauthorized release or other misuse of confidential information, or otherwise disrupt normal business operations. Cyber security failures or breaches may result in financial losses to a Fund and its shareholders. These failures or breaches may also result in disruptions to business operations, potentially resulting in financial losses; interference with a Fund's ability to calculate its net asset value, process shareholder transactions or otherwise transact business with shareholders; impediments to trading; violations of applicable privacy and other laws; regulatory fines; penalties; reputational damage; reimbursement or other compensation costs; additional compliance and cyber security risk management costs and other adverse consequences. In addition, substantial costs may be incurred in order to prevent any cyber incidents in the future.

## 8. MASTER NETTING ARRANGEMENTS

A Fund may be subject to various netting arrangements ("Master Agreements") with select counterparties. Master Agreements govern the terms of certain transactions, and are intended to reduce the counterparty risk associated with relevant transactions by specifying credit protection mechanisms and providing standardization that is intended to improve legal certainty. Each type of Master Agreement governs certain types of transactions. Different types of transactions may be traded out of different legal entities or affiliates of a particular organization, resulting in the need for multiple agreements with a single counterparty. As the Master Agreements are specific to unique operations of different asset types, they allow a Fund to close out and net its total exposure to a counterparty in the event of a default with respect to all the transactions governed under a single Master Agreement with a counterparty. For financial reporting purposes the Statements of Assets and Liabilities generally present derivative assets and liabilities on a gross basis, which reflects the full risks and exposures prior to netting.

Master Agreements can also help limit counterparty risk by specifying collateral posting arrangements at pre-arranged exposure levels. Under most Master Agreements, collateral is routinely transferred if the total net exposure to certain transactions (net of existing collateral already in place) governed under the relevant Master Agreement with a counterparty in a given account exceeds a specified threshold, which typically ranges from zero to $250,000 depending on the counterparty and the type of Master Agreement. United States Treasury Bills and U.S. dollar cash are generally the preferred forms of collateral, although other securities may be used depending on the terms outlined in the applicable Master Agreement. Securities and cash pledged as collateral

are reflected as assets on the Statements of Assets and Liabilities as either a component of Investments at value (securities) or Deposits with counterparty. Cash collateral received is not typically held in a segregated account and as such is reflected as a liability on the Statements of Assets and Liabilities as Deposits from counterparty. The market value of any securities received as collateral is not reflected as a component of NAV. A Fund's overall exposure to counterparty risk can change substantially within a short period, as it is affected by each transaction subject to the relevant Master Agreement.

Master Repurchase Agreements and Global Master Repurchase Agreements (individually and collectively "Master Repo Agreements") govern repurchase, reverse repurchase, and certain sale-buyback transactions between a Fund and select counterparties. Master Repo Agreements maintain provisions for, among other things, initiation, income payments, events of default, and maintenance of collateral. The market value of transactions under the Master Repo Agreement, collateral pledged or received, and the net exposure by counterparty as of period end are disclosed in the Notes to Schedules of Investments.

Master Securities Forward Transaction Agreements ("Master Forward Agreements") govern certain forward settling transactions, such as TBA securities, delayed-delivery or certain sale-buyback transactions by and between a Fund and select counterparties. The Master Forward Agreements maintain provisions for, among other things, transaction initiation and confirmation, payment and transfer, events of default, termination, and maintenance of collateral. The market value of forward settling transactions, collateral pledged or received, and the net exposure by counterparty as of period end is disclosed in the Notes to Schedules of Investments.

Customer Account Agreements and related addenda govern cleared derivatives transactions such as futures, options on futures, and cleared OTC derivatives. Such transactions require posting of initial margin as determined by each relevant clearing agency which is segregated in an account at a futures commission merchant ("FCM") registered with the Commodity Futures Trading Commission. In the United States, counterparty risk may be reduced as creditors of an FCM cannot have a claim to Fund assets in the segregated account. Portability of exposure reduces risk to the Funds. Variation margin, or changes in market value, are generally exchanged daily, but may not be netted between futures and cleared OTC derivatives unless the parties have agreed to a separate arrangement in respect of portfolio margining. The market value or accumulated unrealized appreciation (depreciation), initial margin posted, and any unsettled variation margin as of period end are disclosed in the Notes to Schedules of Investments.

Prime Broker Arrangements may be entered into to facilitate execution and/or clearing of listed equity option transactions or short sales of

equity securities between a Fund and selected counterparties. The arrangements provide guidelines surrounding the rights, obligations, and other events, including, but not limited to, margin, execution, and settlement. These agreements maintain provisions for, among other things, payments, maintenance of collateral, events of default, and termination. Margin and other assets delivered as collateral are typically in the possession of the prime broker and would offset any obligations due to the prime broker. The market values of listed options and securities sold short and related collateral are disclosed in the Notes to Schedules of Investments.

International Swaps and Derivatives Association, Inc. Master Agreements and Credit Support Annexes ("ISDA Master Agreements") govern bilateral OTC derivative transactions entered into by a Fund with select counterparties. ISDA Master Agreements maintain provisions for general obligations, representations, agreements, collateral posting and events of default or termination. Events of termination include conditions that may entitle counterparties to elect to terminate early and cause settlement of all outstanding transactions under the applicable ISDA Master Agreement. Any election to terminate early could be material to the financial statements. The ISDA Master Agreement may contain additional provisions that add counterparty protection beyond coverage of existing daily exposure if the counterparty has a decline in credit quality below a predefined level or as required by regulation. Similarly, if required by regulation, the Funds may be required to post additional collateral beyond coverage of daily exposure. These amounts, if any, may (or if required by law, will) be segregated with a third-party custodian. To the extent the Funds are required by regulation to post additional collateral beyond coverage of daily exposure, it could potentially incur costs, including in procuring eligible assets to meet collateral requirements, associated with such posting. The market value of OTC financial derivative instruments, collateral received or pledged, and net exposure by counterparty as of period end are disclosed in the Notes to Schedules of Investments.

## 9. FEES AND EXPENSES

(a) Investment Advisory Fee  PIMCO is a majority-owned subsidiary of Allianz Asset Management of America L.P. ("Allianz Asset Management") and serves as the Adviser to the Trust, pursuant to an investment advisory contract. The Adviser receives a monthly fee from each Fund at an annual rate based on average daily net assets (the "Investment Advisory Fee"). The Investment Advisory Fee for all classes is charged at an annual rate as noted in the table in note (b) below.

(b) Supervisory and Administrative Fee  PIMCO serves as administrator (the "Administrator") and provides supervisory and administrative services to the Trust for which it receives a monthly supervisory and administrative fee based on each share class's average daily net assets (the "Supervisory and Administrative Fee"). As the Administrator, PIMCO bears the costs of various third-party services, including audit, custodial, portfolio accounting, legal, transfer agency and printing costs.

**Notes to Financial Statements** (Cont.)

The Investment Advisory Fees and Supervisory and Administrative Fees for all classes, as applicable, are charged at the annual rate as noted in the following table (calculated as a percentage of each Fund's average daily net assets attributable to each class):

| | Investment Advisory Fee | Supervisory and Administrative Fee | | | | | | |
| | | Institutional | | | Administrative | | | |
| Fund Name | All Classes | Class | I-2 | I-3 | Class | Class A | Class C | Class C-2 |
|---|---|---|---|---|---|---|---|---|
| PIMCO Credit Opportunities Bond Fund | 0.60% | 0.30% | 0.40% | 0.50%(2)* | N/A | 0.45% | 0.45% | N/A |
| PIMCO Diversified Income Fund | 0.45% | 0.30% | 0.40% | 0.50%(2) | 0.30% | 0.45% | 0.45% | N/A |
| PIMCO ESG Income Fund | 0.25% | 0.25% | 0.35% | 0.45%(3) | N/A | 0.40% | 0.40% | N/A |
| PIMCO High Yield Spectrum Fund | 0.30% | 0.30% | 0.40% | 0.50%(2) | N/A | 0.40% | 0.40% | N/A |
| PIMCO Long-Term Credit Bond Fund | 0.30% | 0.25% | 0.35% | N/A | N/A | 0.40%* | N/A | N/A |
| PIMCO Low Duration Credit Fund | 0.40% | 0.30% | 0.40% | N/A | N/A | 0.35% | 0.35% | N/A |
| PIMCO Low Duration Income Fund | 0.30% | 0.20% | 0.30% | 0.40%(2) | N/A | 0.35% | 0.35% | 0.35% |
| PIMCO Preferred and Capital Securities Fund(1) | 0.44% | 0.35% | 0.45% | 0.55%(2) | N/A | 0.45% | 0.45% | N/A |

(1)  PIMCO has contractually agreed to waive the Fund's Investment Advisory Fee and the supervisory and administrative fee in an amount equal to the management fee and administrative services fee, respectively, paid by the PIMCO Capital Securities Fund (Cayman) Ltd. (the "Subsidiary") to PIMCO. The Subsidiary pays PIMCO a management fee and an administrative services fee at the annual rates of 0.49% and 0.20%, respectively, of its net assets. This waiver may not be terminated by PIMCO and will remain in effect for as long as PIMCO's contract with the Subsidiary is in place.

(2)  PIMCO has contractually agreed, through July 31, 2021, to waive its supervisory and administrative fee for I-3 shares by 0.05% of the average daily net assets attributable to I-3 shares of the Fund.

(3)  PIMCO has contractually agreed, through July 31, 2022, to waive its supervisory and administrative fee for I-3 shares by 0.05% of the average daily net assets attributable to I-3 shares of the Fund.

*  This particular share class has been registered with the SEC, but has not yet launched.

(c) Distribution and Servicing Fees  PIMCO Investments LLC, a wholly-owned subsidiary of PIMCO, serves as the distributor ("Distributor") of the Trust's shares.

The Trust has adopted separate Distribution and Servicing Plans with respect to the Class A, Class C and Class C-2 shares of the Trust pursuant to Rule 12b-1 under the Act. In connection with the distribution of Class C and Class C-2 shares of the Trust, the Distributor receives distribution fees from the Trust of up to 0.75% for Class C shares and 0.50% for Class C-2 shares, and in connection with personal services rendered to Class A, Class C and Class C-2 shareholders and the maintenance of such shareholder accounts, the Distributor receives servicing fees from the Trust of up to 0.25% for each of Class A, Class C and Class C-2 shares (percentages reflect annual rates of the average daily net assets attributable to the applicable class).

The Trust has adopted a Distribution and Servicing Plan with respect to the Administrative Class shares of each Fund pursuant to Rule 12b-1 under the Act (the "Administrative Class Plan"). Under the terms of the Administrative Class Plan, a Fund may compensate the Distributor for providing, or procuring through financial intermediaries, distribution, administrative, recordkeeping, shareholder and/or related services with respect to Administrative Class shares. The Administrative Class Plan permits a Fund to make total payments at an annual rate of up to 0.25% of the average daily net assets attributable to the Administrative Class shares.

The Trust paid distribution and servicing fees at effective rates as noted in the following table (calculated as a percentage of each Fund's average daily net assets attributable to each class):

| | Allowable Rate | |
| | Distribution Fee | Servicing Fee |
|---|---|---|
| **Class A** | | |
| All Funds | — | 0.25% |
| **Class C** | | |
| PIMCO Low Duration Income Fund | 0.30% | 0.25% |
| All Other Funds | 0.75% | 0.25% |
| **Class C-2** | | |
| PIMCO Low Duration Income Fund | 0.50% | 0.25% |

| | Distribution and/or Servicing Fee |
|---|---|
| **Administrative Class** | |
| All Funds | 0.25% |

The Distributor also received the proceeds of the initial sales charges paid by the shareholders upon the purchase of Class A shares, except for the PIMCO Short Asset Investment Fund, and the contingent deferred sales charges paid by the shareholders upon certain redemptions of Class A, Class C and Class C-2 shares, except for the PIMCO Government Money Market Fund and the PIMCO Short Asset Investment Fund. For the period ended March 31, 2021, the Distributor retained $5,518,745 representing commissions (sales charges) and contingent deferred sales charges from the Trust.

(d) Redemption Fees  Shareholders of the PIMCO Low Duration Credit Fund are subject to a redemption fee on redemptions and exchanges of 1.00% of the NAV of the PIMCO Low Duration Credit Fund shares redeemed or exchanged. Redemption fees are charged on shares redeemed or exchanged within 30 days after their acquisition, including shares acquired through exchanges. Under certain circumstances, the redemption fee may be waived. Actual redemption fees charged are reported on the Statements of Changes in Net Assets.

(e) Fund Expenses   PIMCO provides or procures supervisory and administrative services for shareholders and also bears the costs of various third-party services required by the Funds, including audit, custodial, portfolio accounting, legal, transfer agency and printing costs. The Trust is responsible for the following expenses: (i) taxes and governmental fees; (ii) brokerage fees and commissions and other portfolio transaction expenses; (iii) the costs of borrowing money, including interest expenses; (iv) fees and expenses of the Trustees who are not "interested persons" of PIMCO or the Trust, and any counsel retained exclusively for their benefit (except the PIMCO All Asset and PIMCO All Asset All Authority Funds); (v) extraordinary expense, including costs of litigation and indemnification expenses; (vi) organizational expenses; and (vii) any expenses allocated or allocable to a specific class of shares, which include service fees payable with respect to the Administrative Class Shares, and may include certain other expenses as permitted by the Trust's Multi-Class Plan adopted pursuant to Rule 18f-3 under the Act and subject to review and approval by the Trustees. The ratio of expenses to average

net assets per share class, as disclosed on the Financial Highlights, may differ from the annual fund operating expenses per share class.

The Trust pays no compensation directly to any Trustee or any other officer who is affiliated with the Administrator, all of whom receive remuneration for their services to the Trust from the Administrator or its affiliates.

(f) Expense Limitation   Pursuant to the Expense Limitation Agreement, PIMCO has agreed to waive a portion of the Funds' Supervisory and Administrative Fee, or reimburse each Fund, to the extent that each Fund's organizational expenses, pro rata share of expenses related to obtaining or maintaining a Legal Entity Identifier and pro rata share of Trustee Fees exceed 0.0049%, the "Expense Limit" (calculated as a percentage of each Fund's average daily net assets attributable to each class). The Expense Limitation Agreement will automatically renew for one-year terms unless PIMCO provides written notice to the Trust at least 30 days prior to the end of the then current term.

Prior to July 31, 2018, PIMCO had contractually agreed to reduce its Investment Advisory Fee for the PIMCO Low Duration Income Fund. In any month in which the supervision and administration agreement is in effect, PIMCO is entitled to reimbursement by each Fund of any portion of the supervisory and administrative fee waived or reimbursed as set forth above (the "Reimbursement Amount") during the previous thirty-six months from the date of the waiver, provided that such amount paid to PIMCO will not: i) together with any organizational expenses, pro rata share of expenses related to obtaining or maintaining a Legal Entity Identifier and pro rata Trustee fees, exceed, for such month, the Expense Limit (or the amount of the expense limit in place at the time the amount being recouped was originally waived if lower than the Expense Limit); ii) exceed the total Reimbursement Amount; or iii) include any amounts previously reimbursed to PIMCO. The total recoverable amounts to PIMCO (from the Fee Waiver Agreement and Expense Limitation Agreement combined) at March 31, 2021, were as follows (amounts in thousands[†]):

| Fund Name | Expiring Within | | | |
| | 12 months | 13-24 months | 25-36 months | Total |
|---|---|---|---|---|
| PIMCO ESG Income Fund | $ 0 | $ 0 | $ 97 | $ 97 |
| PIMCO Low Duration Income Fund | 182 | 30 | 35 | 247 |

[†]   A zero balance may reflect actual amounts rounding to less than one thousand.

Pursuant to a Fee Waiver Agreement, PIMCO has contractually agreed, through July 31, 2021, to reduce its supervisory and administrative fee for I-3 shares by 0.05% of the average daily net assets attributable to I-3 shares of each of the PIMCO Credit Opportunities Bond Fund, PIMCO Diversified Income Fund, PIMCO High Yield Spectrum Fund, PIMCO Low Duration Income Fund and PIMCO Preferred and Capital Securities Fund. This Fee Waiver Agreement will automatically renew for one-year terms unless PIMCO provides written notice to the Trust at least 30 days prior to the end of the then current term.

Pursuant to a Fee Waiver Agreement, PIMCO has contractually agreed, through July 31, 2022, to reduce its supervisory and administrative fee for I-3 shares of the PIMCO ESG Income Fund. This Fee Waiver Agreement will automatically renew for one-year terms unless PIMCO provides written notice to the Trust at least 30 days prior to the end of the then current term.

The waivers are reflected on the Statements of Operations as a component of Waiver and/or Reimbursement by PIMCO. For the period ended March 31, 2021, the Funds below waived the following fees (amounts in thousands[†]):

| Fund Name | Waived Fees |
|---|---|
| PIMCO Diversified Income Fund | $ 12 |
| PIMCO ESG Income Fund | 0 |
| PIMCO High Yield Spectrum Fund | 0 |
| PIMCO Low Duration Income Fund | 23 |
| PIMCO Preferred and Capital Securities Fund | 19 |

[†]   A zero balance may reflect actual amounts rounding to less than one thousand.

(g) Acquired Fund Fees and Expenses   PIMCO Capital Securities Fund (Cayman) Ltd. (the "Subsidiary"), has entered into a separate contract with PIMCO for the management of the Subsidiary's portfolio pursuant to which the Subsidiary pays PIMCO a management fee and administrative services fee

## Notes to Financial Statements (Cont.)

at the annual rates of 0.49% and 0.20%, respectively, of its net assets. PIMCO has contractually agreed to waive the Investment Advisory Fee and the Supervisory and Administrative Fees it receives from the Subsidiary in an amount equal to the management fee and administrative services fee, respectively, paid to PIMCO by the Subsidiary. This waiver may not be terminated by PIMCO and will remain in effect for as long as PIMCO's contract with the Subsidiary is in place. The waiver is reflected on the Statements of Operations as a component of Waiver and/ or Reimbursement by PIMCO. During the period ended March 31, 2021, the amount was $ 1,724,700. See Note 14, Basis for Consolidation in the Notes to Financial Statements for more information regarding the Subsidiary.

## 10. RELATED PARTY TRANSACTIONS

The Adviser, Administrator, and Distributor are related parties. Fees paid to these parties are disclosed in Note 9, Fees and Expenses, and the accrued related party fee amounts are disclosed on the Statements of Assets and Liabilities.

Certain Funds are permitted to purchase or sell securities from or to certain related affiliated funds under specified conditions outlined in procedures adopted by the Board. The procedures have been designed to ensure that any purchase or sale of securities by the Funds from or to another fund or portfolio that are, or could be, considered an affiliate, or an affiliate of an affiliate, by virtue of having a common investment adviser (or affiliated investment advisers), common Trustees and/or common officers complies with Rule 17a-7 under the Act. Further, as defined under the procedures, each transaction is effected at the current market price. Purchases and sales of securities pursuant to Rule 17a-7 under the Act for the period ended March 31, 2021, were as follows (amounts in thousands[†]):

| Fund Name | Purchases | Sales |
|---|---|---|
| PIMCO Credit Opportunities Bond Fund | $ 5,923 | $ 37,515 |
| PIMCO Diversified Income Fund | 66,739 | 3,433 |
| PIMCO High Yield Spectrum Fund | 14,707 | 27,363 |
| PIMCO Long-Term Credit Bond Fund | 92,205 | 788,808 |
| PIMCO Low Duration Credit Fund | 38,457 | 173,017 |
| PIMCO Low Duration Income Fund | 422,929 | 374,917 |
| PIMCO Preferred and Capital Securities Fund | 107,430 | 199,932 |

[†]   A zero balance may reflect actual amounts rounding to less than one thousand.

## 11. GUARANTEES AND INDEMNIFICATIONS

Under the Trust's organizational documents, each Trustee or officer of the Trust is indemnified and each employee or other agent of the Trust (including the Trust's investment manager) may be indemnified, to the extent permitted by the Act, against certain liabilities that may arise out of performance of their duties to the Funds. Additionally, in the normal course of business, the Funds enter into contracts that contain a variety of indemnification clauses. The Funds' maximum exposure under these arrangements is unknown as this would involve future claims that may be made against the Funds that have not yet occurred. However, the Funds have not had prior claims or losses pursuant to these contracts.

## 12. PURCHASES AND SALES OF SECURITIES

The length of time a Fund has held a particular security is not generally a consideration in investment decisions. A change in the securities held by a Fund is known as "portfolio turnover." Each Fund may engage in frequent and active trading of portfolio securities to achieve its investment objective, particularly during periods of volatile market movements. High portfolio turnover may involve correspondingly greater transaction costs, including brokerage commissions or dealer mark-ups and other transaction costs on the sale of securities and reinvestments in other securities, which are borne by the Fund. Such sales may also result in realization of taxable capital gains, including short-term capital gains (which are generally taxed at ordinary income tax rates when distributed to shareholders). The transaction costs associated with portfolio turnover may adversely affect a Fund's performance. The portfolio turnover rates are reported in the Financial Highlights.

Purchases and sales of securities (excluding short-term investments) for the period ended March 31, 2021, were as follows (amounts in thousands[†]):

| Fund Name | U.S. Government/Agency | | All Other | |
| | Purchases | Sales | Purchases | Sales |
|---|---|---|---|---|
| PIMCO Credit Opportunities Bond Fund | $ 83,079 | $ 88,804 | $ 265,703 | $ 213,604 |
| PIMCO Diversified Income Fund | 4,464,894 | 4,959,012 | 1,644,837 | 462,831 |
| PIMCO ESG Income Fund | 21,101 | 15,745 | 26,165 | 441 |
| PIMCO High Yield Spectrum Fund | 0 | 10,863 | 248,531 | 128,685 |
| PIMCO Long-Term Credit Bond Fund | 3,086,406 | 3,046,413 | 1,466,097 | 1,711,353 |
| PIMCO Low Duration Credit Fund | 0 | 0 | 789,704 | 723,327 |
| PIMCO Low Duration Income Fund | 33,877,315 | 33,048,711 | 2,610,700 | 1,918,816 |
| PIMCO Preferred and Capital Securities Fund | 0 | 0 | 1,245,726 | 929,315 |

[†]   A zero balance may reflect actual amounts rounding to less than one thousand.

## 13. SHARES OF BENEFICIAL INTEREST

The Trust may issue an unlimited number of shares of beneficial interest with a $0.01 par value. Changes in shares of beneficial interest were as follows (shares and amounts in thousands[†]):

| | PIMCO Credit Opportunities Bond Fund | | | | PIMCO Diversified Income Fund | | | | PIMCO ESG Income Fund | |
| | Year Ended 03/31/2021 | | Year Ended 03/31/2020 | | Year Ended 03/31/2021 | | Year Ended 03/31/2020 | | Inception date through 03/31/2021[a] | |
| | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts for shares sold** | | | | | | | | | | |
| Institutional Class | 17,386 | $ 169,444 | 21,509 | $ 214,927 | 165,151 | $ 1,820,798 | 124,907 | $ 1,384,119 | 3,584 | $ 36,867 |
| I-2 | 8,470 | 81,135 | 4,544 | 44,714 | 56,864 | 624,877 | 45,146 | 497,874 | 137 | 1,420 |
| I-3 | N/A | N/A | N/A | N/A | 2,407 | 26,362 | 1,733 | 18,951 | 4 | 44 |
| Administrative Class | N/A | N/A | N/A | N/A | 1,861 | 20,366 | 3,442 | 38,110 | N/A | N/A |
| Class A | 1,071 | 10,453 | 1,377 | 13,815 | 11,844 | 130,736 | 23,272 | 256,516 | 2 | 23 |
| Class C | 68 | 647 | 121 | 1,206 | 2,292 | 25,151 | 3,356 | 37,209 | 14 | 140 |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Issued as reinvestment of distributions** | | | | | | | | | | |
| Institutional Class | 618 | 6,098 | 1,059 | 10,494 | 11,675 | 129,038 | 12,296 | 135,966 | 14 | 145 |
| I-2 | 348 | 3,420 | 230 | 2,263 | 1,337 | 14,794 | 998 | 11,038 | 0 | 0 |
| I-3 | N/A | N/A | N/A | N/A | 78 | 861 | 41 | 457 | 0 | 0 |
| Administrative Class | N/A | N/A | N/A | N/A | 366 | 4,010 | 694 | 7,675 | N/A | N/A |
| Class A | 69 | 676 | 79 | 777 | 943 | 10,408 | 1,301 | 14,396 | 0 | 0 |
| Class C | 12 | 120 | 17 | 163 | 170 | 1,871 | 218 | 2,413 | 0 | 0 |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Cost of shares redeemed** | | | | | | | | | | |
| Institutional Class | (16,809) | (164,030) | (26,196) | (261,302) | (81,977) | (905,243) | (99,637) | (1,090,394) | (10) | (103) |
| I-2 | (3,334) | (32,165) | (3,523) | (34,316) | (30,347) | (336,234) | (28,871) | (303,111) | 0 | 0 |
| I-3 | N/A | N/A | N/A | N/A | (1,330) | (14,769) | (771) | (8,418) | 0 | 0 |
| Administrative Class | N/A | N/A | N/A | N/A | (16,855) | (190,142) | (2,889) | (31,430) | N/A | N/A |
| Class A | (1,345) | (13,269) | (1,626) | (15,817) | (9,118) | (100,372) | (18,659) | (205,130) | 0 | 0 |
| Class C | (269) | (2,628) | (153) | (1,508) | (3,867) | (43,012) | (2,763) | (30,329) | (5) | (50) |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Net increase (decrease) resulting from Fund share transactions** | 6,285 | $ 59,901 | (2,562) | $ (24,584) | 111,494 | $ 1,219,500 | 63,814 | $ 735,912 | 3,740 | $ 38,486 |

**Notes to Financial Statements** (Cont.)

| | PIMCO High Yield Spectrum Fund | | | | PIMCO Long-Term Credit Bond Fund | | | |
|---|---|---|---|---|---|---|---|---|
| | Year Ended 03/31/2021 | | Year Ended 03/31/2020 | | Year Ended 03/31/2021 | | Year Ended 03/31/2020 | |
| | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount |
| **Receipts for shares sold** | | | | | | | | |
| Institutional Class | 15,758 | $ 150,819 | 11,802 | $ 114,924 | 127,496 | $ 1,657,609 | 74,209 | $ 945,065 |
| I-2 | 10,940 | 103,496 | 9,172 | 88,789 | 6,512 | 84,387 | 76,109 | 913,081 |
| I-3 | 321 | 3,226 | 131 | 1,285 | N/A | N/A | N/A | N/A |
| Administrative Class | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Class A | 2,000 | 19,050 | 2,616 | 25,490 | N/A | N/A | N/A | N/A |
| Class C | 143 | 1,341 | 212 | 2,080 | N/A | N/A | N/A | N/A |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Issued as reinvestment of distributions** | | | | | | | | |
| Institutional Class | 556 | 5,350 | 2,128 | 20,777 | 20,005 | 265,843 | 13,375 | 169,882 |
| I-2 | 991 | 9,549 | 1,026 | 9,948 | 845 | 11,228 | 2,819 | 36,025 |
| I-3 | 4 | 44 | 5 | 44 | N/A | N/A | N/A | N/A |
| Administrative Class | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Class A | 254 | 2,431 | 334 | 3,235 | N/A | N/A | N/A | N/A |
| Class C | 28 | 269 | 37 | 358 | N/A | N/A | N/A | N/A |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Cost of shares redeemed** | | | | | | | | |
| Institutional Class | (11,086) | (105,205) | (64,310) | (631,552) | (138,210) | (1,837,578) | (119,006) | (1,478,867) |
| I-2 | (3,876) | (37,699) | (14,477) | (135,288) | (12,780) | (168,188) | (68,705) | (804,433) |
| I-3 | (16) | (150) | (305) | (2,969) | N/A | N/A | N/A | N/A |
| Administrative Class | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Class A | (2,658) | (25,406) | (3,653) | (35,009) | N/A | N/A | N/A | N/A |
| Class C | (445) | (4,325) | (286) | (2,716) | N/A | N/A | N/A | N/A |
| Class C-2 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Net increase (decrease) resulting from Fund share transactions** | 12,914 | $ 122,790 | (55,568) | $ (540,604) | 3,868 | $ 13,301 | (21,199) | $ (219,247) |

| CREW/PIMCO Low Duration Credit Fund | | | | PIMCO Low Duration Income Fund | | | | PIMCO Preferred and Capital Securities Fund | | | |
| Year Ended 03/31/2021 | | Year Ended 03/31/2020 | | Year Ended 03/31/2021 | | Year Ended 03/31/2020 | | Year Ended 03/31/2021 | | Year Ended 03/31/2020 | |
| Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount | Shares | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 57,516 | $ 508,572 | 8,053 | $ 71,706 | 139,515 | $ 1,189,071 | 138,482 | $ 1,183,176 | 90,063 | $ 946,468 | 104,274 | $ 1,078,445 |
| 1,210 | 11,212 | 1,864 | 18,194 | 220,654 | 1,875,382 | 291,656 | 2,494,678 | 15,481 | 164,218 | 28,613 | 298,095 |
| N/A | N/A | N/A | N/A | 10,676 | 90,305 | 4,569 | 39,250 | 2,563 | 26,519 | 2,443 | 24,672 |
| N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 1,761 | 16,324 | 1,788 | 17,491 | 117,404 | 1,000,360 | 151,107 | 1,296,372 | 11,242 | 119,798 | 30,453 | 320,917 |
| 176 | 1,637 | 374 | 3,671 | 8,566 | 72,817 | 12,717 | 108,692 | 758 | 7,969 | 1,463[b] | 15,617[b] |
| N/A | N/A | N/A | N/A | 369[c] | 3,203[c] | N/A | N/A | N/A | N/A | N/A | N/A |
| 1,364 | 12,505 | 674 | 6,545 | 6,729 | 57,016 | 10,108 | 86,282 | 3,573 | 38,995 | 2,450 | 25,679 |
| 89 | 819 | 173 | 1,685 | 7,249 | 61,447 | 8,838 | 75,346 | 964 | 10,489 | 1,095 | 11,412 |
| N/A | N/A | N/A | N/A | 168 | 1,430 | 266 | 2,275 | 135 | 1,462 | 90 | 935 |
| N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 177 | 1,630 | 343 | 3,332 | 4,365 | 36,987 | 5,458 | 46,542 | 937 | 10,166 | 1,054 | 11,001 |
| 46 | 421 | 145 | 1,409 | 560 | 4,739 | 820 | 7,000 | 47 | 511 | 12[b] | 131[b] |
| N/A | N/A | N/A | N/A | 1[c] | 9[c] | N/A | N/A | N/A | N/A | N/A | N/A |
| (53,754) | (491,341) | (8,853) | (83,558) | (98,942) | (830,487) | (137,843) | (1,157,264) | (69,562) | (732,835) | (47,291) | (492,441) |
| (1,937) | (17,814) | (3,019) | (28,964) | (152,068) | (1,281,222) | (233,999) | (1,951,013) | (12,716) | (132,374) | (17,787) | (175,055) |
| N/A | N/A | N/A | N/A | (3,291) | (27,710) | (6,870) | (57,819) | (1,922) | (19,883) | (667) | (6,426) |
| N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| (2,168) | (19,747) | (5,260) | (50,376) | (82,399) | (696,005) | (113,424) | (958,767) | (13,550) | (142,914) | (14,737) | (148,658) |
| (1,774) | (16,309) | (2,666) | (25,529) | (9,832) | (83,279) | (10,518) | (88,968) | (340) | (3,608) | (114)[b] | (1,067)[b] |
| N/A | N/A | N/A | N/A | 0[c] | (1)[c] | N/A | N/A | N/A | N/A | N/A | N/A |
| 2,706 | $ 7,909 | (6,384) | $ (64,394) | 169,724 | $ 1,474,062 | 121,367 | $ 1,125,782 | 27,673 | $ 294,981 | 91,351 | $ 963,257 |

† A zero balance may reflect actual amounts rounding to less than one thousand.
(a) Inception date of the Fund was September 30, 2020.
(b) Inception date of Class C was August 23, 2019.
(c) Inception date of Class C-2 was October 21, 2020.

The following table discloses the number of shareholders that own 10% or more of the outstanding shares of a Fund along with their respective percent ownership, if any, as of March 31, 2021. Some of these shareholders may be considered related parties, which may include, but are not limited to, the investment adviser and its affiliates, affiliated broker dealers, fund of funds and directors or employees of the Trust or Adviser.

| | Shareholders that own 10% or more of outstanding shares | | Total percentage of portfolio held by shareholders that own 10% or more of outstanding shares | |
| | Non-Related Parties | Related Parties | Non-Related Parties | Related Parties |
|---|---|---|---|---|
| PIMCO ESG Income Fund | 0 | 1 | 0% | 14% |
| PIMCO Low Duration Credit Fund | 0 | 1 | 0% | 30% |

## 14. BASIS FOR CONSOLIDATION

The Subsidiary, a Cayman Islands exempted company, was incorporated on February 4, 2015, as a wholly owned subsidiary acting as an investment vehicle for the PIMCO Preferred and Capital Securities Fund (the "PCS Fund") in order to effect certain investments for the PCS Fund consistent with the PCS Fund's investment objectives and policies as specified in its prospectus and statement of additional information. The PCS Fund's investment portfolio has been consolidated and includes the portfolio holdings of the PCS Fund and

the Subsidiary. The consolidated financial statements include the accounts of the PCS Fund and the Subsidiary, if any. All inter-company transactions and balances have been eliminated. A subscription agreement was entered into between the PCS Fund and the Subsidiary, comprising the entire issued share capital of the Subsidiary, with the intent that the PCS Fund will remain the sole shareholder and retain all rights. Under the Memorandum and Articles of Association, shares issued by the Subsidiary confer upon a shareholder the right to receive notice of, to attend and to vote at general meetings of the Subsidiary

## Notes to Financial Statements (Cont.)

and shall confer upon the shareholder rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Subsidiary. The net assets of the Subsidiary as of period end represented 16.7% of the Fund's consolidated net assets.

## 15. REGULATORY AND LITIGATION MATTERS

The Funds are not named as defendants in any material litigation or arbitration proceedings and are not aware of any material litigation or claim pending or threatened against them.

The foregoing speaks only as of the date of this report.

## 16. FEDERAL INCOME TAX MATTERS

Each Fund intends to qualify as a regulated investment company under Subchapter M of the Internal Revenue Code (the "Code") and distribute all of its taxable income and net realized gains, if applicable, to shareholders. Accordingly, no provision for Federal income taxes has been made.

A Fund may be subject to local withholding taxes, including those imposed on realized capital gains. Any applicable foreign capital gains tax is accrued daily based upon net unrealized gains, and may be payable following the sale of any applicable investments.

In accordance with U.S. GAAP, the Adviser has reviewed the Funds' tax positions for all open tax years. As of March 31, 2021, the Funds have recorded no liability for net unrecognized tax benefits relating to uncertain income tax positions they have taken or expect to take in future tax returns.

The Funds file U.S. federal, state, and local tax returns as required. The Funds' tax returns are subject to examination by relevant tax authorities until expiration of the applicable statute of limitations, which is generally three years after the filing of the tax return but which can be extended to six years in certain circumstances. Tax returns for open years have incorporated no uncertain tax positions that require a provision for income taxes.

As of March 31, 2021, the components of distributable taxable earnings are as follows (amounts in thousands[†]):

| | Undistributed Ordinary Income[(1)] | Undistributed Long-Term Capital Gains | Net Tax Basis Unrealized Appreciation/ (Depreciation)[(2)] | Other Book-to-Tax Accounting Differences[(3)] | Accumulated Capital Losses[(4)] | Qualified Late-Year Loss Deferral - Capital[(5)] | Qualified Late-Year Loss Deferral - Ordinary[(6)] | Total Distributable Earnings |
|---|---|---|---|---|---|---|---|---|
| PIMCO Credit Opportunities Bond Fund | $ 5,336 | $ 0 | $ 4,530 | $ (1) | $ (54,930) | $ 0 | $ 0 | $ (45,065) |
| PIMCO Diversified Income Fund | 6,995 | 0 | 49,454 | (940) | (40,463) | 0 | 0 | 15,046 |
| PIMCO ESG Income Fund | 115 | 0 | 131 | 0 | (28) | 0 | 0 | 218 |
| PIMCO High Yield Spectrum Fund | 7,673 | 0 | 2,845 | (121) | (49,699) | 0 | 0 | (39,302) |
| PIMCO Long-Term Credit Bond Fund | 51,319 | 63,791 | 116,501 | (472) | 0 | 0 | 0 | 231,139 |
| PIMCO Low Duration Credit Fund | 2,166 | 0 | 4,656 | (20) | (71,835) | 0 | 0 | (65,033) |
| PIMCO Low Duration Income Fund | 0 | 0 | 38,922 | (2,184) | (200,810) | 0 | 0 | (164,072) |
| PIMCO Preferred and Capital Securities Fund | 15,789 | 16,238 | 81,106 | 0 | 0 | 0 | 0 | 113,133 |

[†]   A zero balance may reflect actual amounts rounding to less than one thousand.
[(1)]   Includes undistributed short-term capital gains, if any.
[(2)]   Adjusted for open wash sale loss deferrals and the accelerated recognition of unrealized gain or loss on certain futures, options and forward contracts for federal income tax purposes. Also adjusted for differences between book and tax realized and unrealized gain (loss) on swap contracts, sale/buyback transactions, interest accrued on defaulted securities, straddle loss deferrals, hyperinflationary investments, Passive Foreign Investment Companies (PFICs), and partnership investments.
[(3)]   Represents differences in income tax regulations and financial accounting principles generally accepted in the United States of America, mainly for organizational costs and distributions payable at fiscal year-end.
[(4)]   Capital losses available to offset future net capital gains expire in varying amounts as shown below.
[(5)]   Capital losses realized during the period November 1, 2020 through March 31, 2021 which the Funds elected to defer to the following taxable year pursuant to income tax regulations.
[(6)]   Specified losses realized during the period November 1, 2020 through March 31, 2021 and Ordinary losses realized during the period January 1, 2021 through March 31, 2021, which the Funds elected to defer to the following taxable year pursuant to income tax regulations.

Under the Regulated Investment Company Modernization Act of 2010, a fund is permitted to carry forward any new capital losses for an unlimited period. Additionally, such capital losses that are carried forward will retain their character as either short-term or long-term capital losses rather than being considered all short-term under previous law.

As of March 31, 2021, the Funds had the following post-effective capital losses with no expiration (amounts in thousands[†]):

| | Short-Term | Long-Term |
|---|---|---|
| PIMCO Credit Opportunities Bond Fund* | $ 30,937 | $ 23,993 |
| PIMCO Diversified Income Fund | 30,282 | 10,181 |
| PIMCO ESG Income Fund | 28 | 0 |

| | Short-Term | Long-Term |
|---|---|---|
| PIMCO High Yield Spectrum Fund* | $ 203 | $ 49,496 |
| PIMCO Long-Term Credit Bond Fund | 0 | 0 |
| PIMCO Low Duration Credit Fund* | 1,959 | 69,876 |
| PIMCO Low Duration Income Fund | 61,817 | 138,993 |
| PIMCO Preferred and Capital Securities Fund | 0 | 0 |

† A zero balance may reflect actual amounts rounding to less than one thousand.

* Portion of amount represents realized loss and recognized built-in loss under IRC 382-83, which is carried forward to future years to offset future realized gain subject to certain limitations.

As of March 31, 2021, the aggregate cost and the net unrealized appreciation/(depreciation) of investments for federal income tax purposes are as follows (amounts in thousands†):

| | Federal Tax Cost | Unrealized Appreciation | Unrealized (Depreciation) | Net Unrealized Appreciation/ (Depreciation)[7] |
|---|---|---|---|---|
| PIMCO Credit Opportunities Bond Fund | $ 403,204 | $ 14,310 | $ (9,782) | $ 4,528 |
| PIMCO Diversified Income Fund | 5,502,197 | 185,472 | (135,002) | 50,470 |
| PIMCO ESG Income Fund | 37,186 | 421 | (286) | 135 |
| PIMCO High Yield Spectrum Fund | 468,578 | 16,897 | (13,889) | 3,008 |
| PIMCO Long-Term Credit Bond Fund | 4,227,442 | 256,380 | (138,847) | 117,533 |
| PIMCO Low Duration Credit Fund | 286,772 | 6,108 | (1,281) | 4,827 |
| PIMCO Low Duration Income Fund | 8,833,018 | 300,488 | (258,698) | 41,790 |
| PIMCO Preferred and Capital Securities Fund | 1,852,658 | 90,069 | (8,204) | 81,865 |

† A zero balance may reflect actual amounts rounding to less than one thousand.

[7] Primary differences, if any, between book and tax net unrealized appreciation/(depreciation) are attributable to open wash sale loss deferrals, unrealized gain or loss on certain futures, options and forward contracts, realized and unrealized gain (loss) swap contracts, sale/buyback transactions, interest accrued on defaulted securities, straddle loss deferrals, hyperinflationary investments, Passive Foreign Investment Companies (PFICs), and partnership investments.

For the fiscal years ended March 31, 2021 and March 31, 2020, respectively, the Funds made the following tax basis distributions (amounts in thousands†):

| | March 31, 2021 | | | March 31, 2020 | | |
|---|---|---|---|---|---|---|
| | Ordinary Income Distributions[8] | Long-Term Capital Gain Distributions | Return of Capital[9] | Ordinary Income Distributions[8] | Long-Term Capital Gain Distributions | Return of Capital[9] |
| PIMCO Credit Opportunities Bond Fund | $ 13,801 | $ 0 | $ 0 | $ 16,000 | $ 0 | $ 0 |
| PIMCO Diversified Income Fund | 171,361 | 0 | 0 | 185,589 | 0 | 0 |
| PIMCO ESG Income Fund | 145 | 0 | 0 | 0 | 0 | 0 |
| PIMCO High Yield Spectrum Fund | 18,960 | 0 | 0 | 35,915 | 0 | 0 |
| PIMCO Long-Term Credit Bond Fund | 191,241 | 98,003 | 0 | 213,296 | 0 | 0 |
| PIMCO Low Duration Credit Fund | 15,555 | 0 | 0 | 13,664 | 0 | 0 |
| PIMCO Low Duration Income Fund | 152,870 | 0 | 35,601 | 259,370 | 0 | 0 |
| PIMCO Preferred and Capital Securities Fund | 66,842 | 161 | 0 | 49,804 | 0 | 0 |

† A zero balance may reflect actual amounts rounding to less than one thousand.

[8] Includes short-term capital gains distributed, if any.

[9] A portion of the distributions made represents a tax return of capital. Return of capital distributions have been reclassified from undistributed net investment income to paid-in capital to more appropriately conform financial accounting to tax accounting.

# 17. SUBSEQUENT EVENTS

On February 10, 2021, the Board approved a proposal to change the name of the PIMCO Senior Floating Rate Fund to PIMCO Low Duration Credit Fund. The name change occurred on May 3, 2021.

Effective May 3, 2021, any redemptions of PIMCO Low Duration Credit Fund shares will no longer be subject to a redemption fee.

There were no other subsequent events identified that require recognition or disclosure.

# Report of Independent Registered Public Accounting Firm

To the Board of Trustees of PIMCO Funds and Shareholders of PIMCO Credit Opportunities Bond Fund, PIMCO Diversified Income Fund, PIMCO ESG Income Fund, PIMCO High Yield Spectrum Fund, PIMCO Long-Term Credit Bond Fund, PIMCO Low Duration Credit Fund, PIMCO Low Duration Income Fund and PIMCO Preferred and Capital Securities Fund

## Opinions on the Financial Statements

We have audited the accompanying statements of assets and liabilities, including the schedules of investments, of each of the funds indicated in the table below (eight of the funds constituting PIMCO Funds, hereafter collectively referred to as the "Funds") as of March 31, 2021, the related statements of operations, of cash flows for PIMCO Long-Term Credit Bond Fund and PIMCO Low Duration Credit Fund, and of changes in net assets for each of the periods indicated in the table below, including the related notes, and the financial highlights for each of the periods indicated in the table below (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of each of the Funds as of March 31, 2021, the results of each of their operations and each of the cash flows for PIMCO Long-Term Credit Bond Fund and PIMCO Low Duration Credit Fund, the changes in each of their net assets, and each of the financial highlights for each of the periods indicated in the table below, in conformity with accounting principles generally accepted in the United States of America.

PIMCO Credit Opportunities Bond Fund[1]

PIMCO Diversified Income Fund[2]

PIMCO ESG Income Fund[3]

PIMCO High Yield Spectrum Fund[2]

PIMCO Long-Term Credit Bond Fund[4]

PIMCO Low Duration Credit Fund[4]

PIMCO Low Duration Income Fund[2]

PIMCO Preferred and Capital Securities Fund[2]

[1]   Statement of operations for the year ended March 31, 2021, statement of changes in net assets for the years ended March 31, 2021 and 2020 and the financial highlights for the years ended March 31, 2021, 2020, 2019, 2018 and 2017

[2]   Statement of operations for the year ended March 31, 2021, statement of changes in net assets for the years ended March 31, 2021 and 2020 and the financial highlights for each of the periods indicated therein

[3]   Statement of operations, statement of changes in net assets and the financial highlights for the period September 30, 2020 (inception date) through March 31, 2021

[4]   Statement of operations and statement of cash flows for the year ended March 31, 2021, statement of changes in net assets for the years ended March 31, 2021 and 2020 and the financial highlights for the years ended March 31, 2021, 2020, 2019, 2018 and 2017

## Basis for Opinions

These financial statements are the responsibility of the Funds' management. Our responsibility is to express an opinion on the Funds' financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Funds in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits of these financial statements in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. Our procedures included confirmation of securities owned as of March 31, 2021 by correspondence with the custodian, transfer agent, brokers and agent banks; when replies were not received from brokers or agent banks, we performed other auditing procedures. We believe that our audits provide a reasonable basis for our opinions.

/s/ PricewaterhouseCoopers LLP

Kansas City, Missouri

May 27, 2021

We have served as the auditor of one or more investment companies in PIMCO Funds since 1987.

# Glossary: (abbreviations that may be used in the preceding statements)

(Unaudited)

## Counterparty Abbreviations:

| | | | | | |
|---|---|---|---|---|---|
| AZD | Australia and New Zealand Banking Group | FBF | Credit Suisse International | NGF | Nomura Global Financial Products, Inc. |
| BCY | Barclays Capital, Inc. | FICC | Fixed Income Clearing Corporation | NOM | Nomura Securities International Inc. |
| BOA | Bank of America N.A. | FOB | Credit Suisse Securities (USA) LLC | NXN | Natixis New York |
| BOM | Bank of Montreal | GLM | Goldman Sachs Bank USA | RBC | Royal Bank of Canada |
| BPG | BNP Paribas Securities Corp. | GSC | Goldman Sachs & Co. LLC | RYL | NatWest Markets Plc |
| BPS | BNP Paribas S.A. | GST | Goldman Sachs International | SAL | Citigroup Global Markets, Inc. |
| BRC | Barclays Bank PLC | HUS | HSBC Bank USA N.A. | SBI | Citigroup Global Markets Ltd. |
| BSH | Banco Santander S.A. - New York Branch | IND | Crédit Agricole Corporate and Investment Bank S.A. | SCX | Standard Chartered Bank, London |
| BSN | The Bank of Nova Scotia - Toronto | JML | JP Morgan Securities Plc | SOG | Societe Generale Paris |
| CBK | Citibank N.A. | JPM | JP Morgan Chase Bank N.A. | SSB | State Street Bank and Trust Co. |
| DBL | Deutsche Bank AG London | JPS | J.P. Morgan Securities LLC | TDM | TD Securities (USA) LLC |
| DEU | Deutsche Bank Securities, Inc. | MEI | Merrill Lynch International | TOR | The Toronto-Dominion Bank |
| DUB | Deutsche Bank AG | MYC | Morgan Stanley Capital Services LLC | UAG | UBS AG Stamford |
| FAR | Wells Fargo Bank National Association | MYI | Morgan Stanley & Co. International PLC | UBS | UBS Securities LLC |

## Currency Abbreviations:

| | | | | | |
|---|---|---|---|---|---|
| ARS | Argentine Peso | DOP | Dominican Peso | NOK | Norwegian Krone |
| AUD | Australian Dollar | EUR | Euro | PEN | Peruvian New Sol |
| BRL | Brazilian Real | GBP | British Pound | PLN | Polish Zloty |
| CAD | Canadian Dollar | HKD | Hong Kong Dollar | RUB | Russian Ruble |
| CLP | Chilean Peso | HUF | Hungarian Forint | SEK | Swedish Krona |
| CNH | Chinese Renminbi (Offshore) | IDR | Indonesian Rupiah | TRY | Turkish New Lira |
| CNY | Chinese Renminbi (Mainland) | INR | Indian Rupee | USD (or $) | United States Dollar |
| COP | Colombian Peso | JPY | Japanese Yen | ZAR | South African Rand |
| DKK | Danish Krone | MXN | Mexican Peso | | |

## Exchange Abbreviations:

| | | | |
|---|---|---|---|
| CME | Chicago Mercantile Exchange | OTC | Over the Counter |

## Index/Spread Abbreviations:

| | | | | | |
|---|---|---|---|---|---|
| BADLARPP | Argentina Badlar Floating Rate Notes | CMBX | Commercial Mortgage-Backed Index | RUONIA | Ruble Overnight Index Average |
| BBSW3M | 3 Month Bank Bill Swap Rate | CNREPOFIX | China Fixing Repo Rates 7-Day | SONIO | Sterling Overnight Interbank Average Rate |
| CDX.EM | Credit Derivatives Index - Emerging Markets | EUR003M | 3 Month EUR Swap Rate | UKRPI | United Kingdom Retail Prices Index |
| CDX.HY | Credit Derivatives Index - High Yield | H15T1Y | 1 Year US Treasury Yield Curve Constant Maturity Rate | US0003M | ICE 3-Month USD LIBOR |
| CDX.IG | Credit Derivatives Index - Investment Grade | LIBOR03M | 3 Month USD-LIBOR | US0006M | ICE 6-Month USD LIBOR |
| CDX.MCDX | Credit Derivatives Index - Municipal Bond Credit Derivative Index | PRIME | Daily US Prime Rate | | |

## Other Abbreviations:

| | | | | | |
|---|---|---|---|---|---|
| ABS | Asset-Backed Security | CDO | Collateralized Debt Obligation | OIS | Overnight Index Swap |
| ALT | Alternate Loan Trust | CLO | Collateralized Loan Obligation | PIK | Payment-in-Kind |
| BABs | Build America Bonds | CMBS | Collateralized Mortgage-Backed Security | REMIC | Real Estate Mortgage Investment Conduit |
| BBR | Bank Bill Rate | DAC | Designated Activity Company | RMBS | Residential Mortgage-Backed Security |
| BBSW | Bank Bill Swap Reference Rate | EURIBOR | Euro Interbank Offered Rate | TBA | To-Be-Announced |
| BTP | Buoni del Tesoro Poliennali "Long-term Treasury Bond" | JIBAR | Johannesburg Interbank Agreed Rate | TBD | To-Be-Determined |
| CBO | Collateralized Bond Obligation | LIBOR | London Interbank Offered Rate | TBD% | Interest rate to be determined when loan settles or at the time of funding |
| CDI | Brazil Interbank Deposit Rate | Lunar | Monthly payment based on 28-day periods. One year consists of 13 periods. | TIIE | Tasa de Interés Interbancaria de Equilibrio "Equilibrium Interbank Interest Rate" |

## Federal Income Tax Information <span style="float:right">(Unaudited)</span>

As required by the Internal Revenue Code ("Code") and Treasury Regulations, if applicable, shareholders must be notified within 60 days of the Funds' fiscal year end regarding the status of qualified dividend income and the dividend received deduction.

Dividend Received Deduction. Corporate shareholders are generally entitled to take the dividend received deduction on the portion of a Funds' dividend distribution that qualifies under tax law. The percentage of the following Funds' Fiscal 2021 ordinary income dividend that qualifies for the corporate dividend received deduction is set forth below:

Qualified Dividend Income. Under the Jobs and Growth Tax Relief Reconciliation Act of 2003, the following percentage of ordinary dividends paid during the fiscal year ended March 31, 2021 was designated as 'qualified dividend income' as defined in the Jobs and Growth Tax Relief Reconciliation Act of 2003 subject to reduced tax rates in 2021:

Qualified Interest Income and Qualified Short-Term Capital Gain (for non-U.S. resident shareholders only). Under the American Jobs Creation Act of 2004, the following amounts of ordinary dividends paid during the fiscal year ended March 31, 2021 are considered to be derived from "qualified interest income," as defined in Section 871(k)(1)(E) of the Code, and therefore are designated as interest-related dividends, as defined in Section 871(k)(1)(C) of the Code. Further, the following amounts of ordinary dividends paid during the fiscal year ended March 31, 2021 are considered to be derived from "qualified short-term capital gain," as defined in

Section 871(k)(2)(D) of the Code, and therefore are designated as qualified short-term gain dividends, as defined by Section 871(k)(2)(C) of the Code.

| | Dividend Received Deduction % | Qualified Dividend Income % | Qualified Interest Income (000s†) | Qualified Short-Term Capital Gain (000s†) |
|---|---|---|---|---|
| PIMCO Credit Opportunities Bond Fund | 0% | 0% | $ 11,536 | $ 0 |
| PIMCO Diversified Income Fund | 0% | 0% | 122,335 | 0 |
| PIMCO ESG Income Fund | 0% | 0% | 0 | 0 |
| PIMCO High Yield Spectrum Fund | 0% | 0% | 18,960 | 0 |
| PIMCO Long-Term Credit Bond Fund | 0% | 0% | 191,241 | 0 |
| PIMCO Low Duration Credit Fund | 0% | 0% | 15,555 | 0 |
| PIMCO Low Duration Income Fund | 0% | 0% | 152,870 | 0 |
| PIMCO Preferred and Capital Securities Fund | 40.53% | 92.94% | 66,842 | 0 |

† A zero balance may reflect actual amounts rounding to less than one thousand.

Shareholders are advised to consult their own tax advisor with respect to the tax consequences of their investment in the Trust. In January 2022, you will be advised on IRS Form 1099-DIV as to the federal tax status of the dividends and distributions received by you in calendar year 2021.

Section 163(j) Interest Dividends. The funds intend to pass through the maximum amount allowable as Section 163(j) Interest Dividends as defined in Proposed Treasury Section 1.163(j)-1(b). The 163(j) percentage of ordinary income distributions are as follows:

| | 163 (j) Interest Dividends % |
|---|---|
| PIMCO Credit Opportunities Bond Fund | 0% |
| PIMCO Diversified Income Fund | 0% |
| PIMCO ESG Income Fund | 0% |
| PIMCO High Yield Spectrum Fund | 0% |
| PIMCO Long-Term Credit Bond Fund | 0% |
| PIMCO Low Duration Credit Fund | 0% |
| PIMCO Low Duration Income Fund | 0% |
| PIMCO Preferred and Capital Securities Fund | 0% |

# Distribution Information

For purposes of Section 19 of the Investment Company Act of 1940 (the "Act"), the Funds estimated the periodic sources of any dividends paid during the period covered by this report in accordance with good accounting practice. Pursuant to Rule 19a-1(e) under the Act, the table below sets forth the actual source information for dividends paid during the fiscal period ended March 31, 2021 calculated as of each distribution period pursuant to Section 19 of the Act. The information below is not provided for U.S. federal income tax reporting purposes. The tax character of all dividends and distributions is reported on Form 1099-DIV (for shareholders who receive U.S. federal tax reporting) at the end of each calendar year.

See the Financial Highlights section of this report for the tax characterization of distributions determined in accordance with federal income tax regulations for the fiscal year.

## PIMCO Low Duration Income Fund

| Institutional Class | Net Investment Income* | Net Realized Capital Gains* | Paid-in Surplus or Other Capital Sources** | Total (per common share) |
|---|---|---|---|---|
| October 2020 | $0.0245 | $0.0000 | $0.0000 | $0.0245 |
| November 2020 | $0.0245 | $0.0000 | $0.0000 | $0.0245 |
| December 2020 | $0.0245 | $0.0000 | $0.0000 | $0.0245 |
| January 2021 | $0.0200 | $0.0000 | $0.0000 | $0.0200 |
| February 2021 | $0.0200 | $0.0000 | $0.0000 | $0.0200 |
| March 2021 | $0.0200 | $0.0000 | $0.0000 | $0.0200 |

| I-2 Class | Net Investment Income* | Net Realized Capital Gains* | Paid-in Surplus or Other Capital Sources** | Total (per common share) |
|---|---|---|---|---|
| October 2020 | $0.0238 | $0.0000 | $0.0000 | $0.0238 |
| November 2020 | $0.0238 | $0.0000 | $0.0000 | $0.0238 |
| December 2020 | $0.0238 | $0.0000 | $0.0000 | $0.0238 |
| January 2021 | $0.0193 | $0.0000 | $0.0000 | $0.0193 |
| February 2021 | $0.0193 | $0.0000 | $0.0000 | $0.0193 |
| March 2021 | $0.0193 | $0.0000 | $0.0000 | $0.0193 |

| I-3 Class | Net Investment Income* | Net Realized Capital Gains* | Paid-in Surplus or Other Capital Sources** | Total (per common share) |
|---|---|---|---|---|
| October 2020 | $0.0235 | $0.0000 | $0.0000 | $0.0235 |
| November 2020 | $0.0234 | $0.0000 | $0.0000 | $0.0234 |
| December 2020 | $0.0234 | $0.0000 | $0.0000 | $0.0234 |
| January 2021 | $0.0189 | $0.0000 | $0.0000 | $0.0189 |
| February 2021 | $0.0189 | $0.0000 | $0.0000 | $0.0189 |
| March 2021 | $0.0189 | $0.0000 | $0.0000 | $0.0189 |

| Class A | Net Investment Income* | Net Realized Capital Gains* | Paid-in Surplus or Other Capital Sources** | Total (per common share) |
|---|---|---|---|---|
| October 2020 | $0.0217 | $0.0000 | $0.0000 | $0.0217 |
| November 2020 | $0.0217 | $0.0000 | $0.0000 | $0.0217 |
| December 2020 | $0.0216 | $0.0000 | $0.0000 | $0.0216 |
| January 2021 | $0.0171 | $0.0000 | $0.0000 | $0.0171 |
| February 2021 | $0.0171 | $0.0000 | $0.0000 | $0.0171 |
| March 2021 | $0.0171 | $0.0000 | $0.0000 | $0.0171 |

## Distribution Information (Cont.)

<span style="float:right">(Unaudited)</span>

| Class C | Net Investment Income* | Net Realized Capital Gains* | Paid-in Surplus or Other Capital Sources** | Total (per common share) |
|---|---|---|---|---|
| October 2020 | $0.0196 | $0.0000 | $0.0000 | $0.0196 |
| November 2020 | $0.0196 | $0.0000 | $0.0000 | $0.0196 |
| December 2020 | $0.0195 | $0.0000 | $0.0000 | $0.0195 |
| January 2021 | $0.0149 | $0.0000 | $0.0000 | $0.0149 |
| February 2021 | $0.0149 | $0.0000 | $0.0000 | $0.0149 |
| March 2021 | $0.0149 | $0.0000 | $0.0000 | $0.0149 |

| Class C-2 | Net Investment Income* | Net Realized Capital Gains* | Paid-in Surplus or Other Capital Sources** | Total (per common share) |
|---|---|---|---|---|
| October 2020 | $0.0062 | $0.0000 | $0.0000 | $0.0062 |
| November 2020 | $0.0182 | $0.0000 | $0.0000 | $0.0182 |
| December 2020 | $0.0181 | $0.0000 | $0.0000 | $0.0181 |
| January 2021 | $0.0135 | $0.0000 | $0.0000 | $0.0135 |
| February 2021 | $0.0135 | $0.0000 | $0.0000 | $0.0135 |
| March 2021 | $0.0135 | $0.0000 | $0.0000 | $0.0135 |

\* The source of dividends provided in the table differs, in some respects, from information presented in this report prepared in accordance with generally accepted accounting principles, or U.S. GAAP. For example, net earnings from certain interest rate swap contracts are included as a source of net investment income for purposes of Section 19(a). Accordingly, the information in the table may differ from information in the accompanying financial statements that are presented on the basis of U.S. GAAP and may differ from tax information presented in the footnotes. Amounts shown may include accumulated, as well as fiscal period net income and net profits.

\*\* Occurs when a fund distributes an amount greater than its accumulated net income and net profits. Amounts are not reflective of a fund's net income, yield, earnings or investment performance.

## Management of the Trust

(Unaudited)

The charts below identify the Trustees and executive officers of the Trust. Unless otherwise indicated, the address of all persons below is 650 Newport Center Drive, Newport Beach, CA 92660.

The Funds' Statement of Additional Information includes more information about the Trustees and Officers. To request a free copy, call PIMCO at (888) 87-PIMCO or visit the Funds' website at www.pimco.com.

| Name, Year of Birth and Position Held with Trust* | Term of Office and Length of Time Served† | Principal Occupation(s) During Past 5 Years | Number of Funds in Fund Complex Overseen by Trustee | Other Public Company and Investment Company Directorships Held by Trustee During the Past 5 Years |
|---|---|---|---|---|
| **Interested Trustees¹** | | | | |
| **Peter G. Strelow (1970)** *Chairman of the Board and Trustee* | 05/2017 to present<br><br>Chairman 02/2019 to present | Managing Director and Co-Chief Operating Officer, PIMCO. Senior Vice President of the Trust, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. Formerly, Chief Administrative Officer, PIMCO. | 149 | Chairman and Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT. |
| **Kimberley G. Stafford (1978)** *Trustee* | 02/2021 to present | Managing Director and Global Head of Product Strategy, PIMCO; and Member of Executive Committee. Formerly, Head of Asia-Pacific, Global Head of Consultant Relations and Head of US Institutional and Alternatives Sales, PIMCO. | 149 | Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT. |
| **Independent Trustees** | | | | |
| **George E. Borst (1948)** *Trustee* | 04/2015 to present | Executive Advisor, McKinsey & Company; Formerly, Executive Advisor, Toyota Financial Services; and CEO, Toyota Financial Services. | 149 | Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT; Director, MarineMax Inc. |
| **Jennifer Holden Dunbar (1963)** *Trustee* | 04/2015 to present | Managing Director, Dunbar Partners, LLC (business consulting and investments). Formerly, Partner, Leonard Green & Partners, L.P. | 149 | Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT; Director, PS Business Parks; Director, Big 5 Sporting Goods Corporation. |
| **Kym M. Hubbard (1957)** *Trustee* | 02/2017 to present | Formerly, Global Head of Investments, Chief Investment Officer and Treasurer, Ernst & Young. | 149 | Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT; Director, State Auto Financial Corporation. |
| **Gary F. Kennedy (1955)** *Trustee* | 04/2015 to present | Formerly, Senior Vice President, General Counsel and Chief Compliance Officer, American Airlines and AMR Corporation (now American Airlines Group). | 149 | Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. |
| **Peter B. McCarthy (1950)** *Trustee* | 04/2015 to present | Formerly, Assistant Secretary and Chief Financial Officer, United States Department of Treasury; Deputy Managing Director, Institute of International Finance. | 149 | Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. |
| **Ronald C. Parker (1951)** *Lead Independent Trustee* | 07/2009 to present<br><br>Lead Independent Trustee - 02/2017 to present | Director of Roseburg Forest Products Company. Formerly, Chairman of the Board, The Ford Family Foundation; and President, Chief Executive Officer, Hampton Affiliates (forestry products). | 149 | Lead Independent Trustee, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. |

\* Unless otherwise noted, the information for the individuals listed is as of March 31, 2021.

¹ Ms. Stafford and Mr. Strelow are "interested persons" of the Trust (as that term is defined in the 1940 Act) because of their affiliations with PIMCO.

† Trustees serve until their successors are duly elected and qualified.

# Management of the Trust (Cont.)

(Unaudited)

### Executive Officers

| Name, Year of Birth and Position Held with Trust* | Term of Office and Length of Time Served | Principal Occupation(s) During Past 5 Years† |
| --- | --- | --- |
| **Eric D. Johnson (1970)** *President* | 06/2019 to present | Executive Vice President and Head of Funds Business Group Americas, PIMCO. President, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **David C. Flattum (1964)** *Chief Legal Officer* | 05/2019 to present | Managing Director and General Counsel, PIMCO. Chief Legal Officer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. Formerly, Managing Director, Chief Operating Officer and General Counsel, Allianz Asset Management of America L.P. |
| **Keisha Audain-Pressley (1975)** *Chief Compliance Officer* | 01/2020 to present | Executive Vice President and Deputy Chief Compliance Officer, PIMCO. Chief Compliance Officer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Joshua D. Ratner (1976)\*\*** *Senior Vice President* | 05/2019 to present | Executive Vice President and Head of Americas Operations, PIMCO. Senior Vice President, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Peter G. Strelow (1970)** *Senior Vice President* | 06/2019 to present | Managing Director and Co-Chief Operating Officer, PIMCO. Senior Vice President, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. Formerly, Chief Administrative Officer, PIMCO. |
| **Ryan G. Leshaw (1980)** *Vice President - Senior Counsel, Secretary* | 11/2018 to present | Executive Vice President and Senior Counsel, PIMCO. Vice President, Senior Counsel and Secretary, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. Chief Legal Officer, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. Formerly, Associate, Willkie Farr & Gallagher LLP. |
| **Wu-Kwan Kit (1981)** *Assistant Secretary* | 08/2017 to present | Senior Vice President and Senior Counsel, PIMCO. Assistant Secretary, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. Vice President, Senior Counsel and Secretary, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. Formerly, Assistant General Counsel, VanEck Associates Corp. |
| **Jeffrey A. Byer (1976)** *Vice President* | 02/2020 to present | Executive Vice President, PIMCO. Vice President, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Elizabeth A. Duggan (1964)** *Vice President* | 02/2021 to present | Executive Vice President, PIMCO. Vice President, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. |
| **Brian J. Pittluck (1977)** *Vice President* | 01/2020 to present | Senior Vice President, PIMCO. Vice President, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Bijal Y. Parikh (1978)** *Treasurer* | 01/2021 to present | Senior Vice President, PIMCO. Treasurer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Erik C. Brown (1967)\*\*\*** *Assistant Treasurer* | 02/2001 to present | Executive Vice President, PIMCO. Assistant Treasurer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Brandon T. Evans (1982)** *Assistant Treasurer* | 05/2019 to present | Vice President, PIMCO. Assistant Treasurer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Colleen D. Miller (1980)\*\*** *Assistant Treasurer* | 02/2017 to present | Senior Vice President, PIMCO. Assistant Treasurer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series and PIMCO Equity Series VIT. Deputy Treasurer, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **Jason J. Nagler (1982)\*\*\*** *Assistant Treasurer* | 05/2015 to present | Senior Vice President, PIMCO. Assistant Treasurer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Interval Funds and PIMCO-Sponsored Closed-End Funds. |
| **H. Jessica Zhang (1973)\*\*** *Assistant Treasurer* | 01/2020 to present | Senior Vice President, PIMCO. Assistant Treasurer, PIMCO Variable Insurance Trust, PIMCO ETF Trust, PIMCO Equity Series, PIMCO Equity Series VIT, PIMCO Managed Accounts Trust, PIMCO-Sponsored Closed-End Funds. |

\*    Unless otherwise noted, the information for the individuals listed is as of March 31, 2021.

†    The term "PIMCO-Sponsored Closed-End Funds" as used herein includes: PIMCO California Municipal Income Fund, PIMCO California Municipal Income Fund II, PIMCO California Municipal Income Fund III, PIMCO Municipal Income Fund, PIMCO Municipal Income Fund II, PIMCO Municipal Income Fund III, PIMCO New York Municipal Income Fund, PIMCO New York Municipal Income Fund II, PIMCO New York Municipal Income Fund III, PCM Fund Inc., PIMCO Corporate & Income Opportunity Fund, PIMCO Corporate & Income Strategy Fund, PIMCO Dynamic Credit and Mortgage Income Fund, PIMCO Dynamic Income Fund, PIMCO Dynamic Income Opportunities Fund, PIMCO Energy and Tactical Credit Opportunities Fund, PIMCO Global StocksPLUS® & Income Fund, PIMCO High Income Fund, PIMCO Income Opportunity Fund, PIMCO Income Strategy Fund, PIMCO Income Strategy Fund II and PIMCO Strategic Income Fund, Inc.; the term "PIMCO-Sponsored Interval Funds" as used herein includes: PIMCO Flexible Credit Income Fund and PIMCO Flexible Municipal Income Fund.

\*\*   The address of these officers is Pacific Investment Management Company LLC, 1633 Broadway, New York, New York 10019.

\*\*\*  The address of these officers is Pacific Investment Management Company LLC, 401 Congress Ave., Austin, Texas 78701.

# Privacy Policy[1]

The Funds[2,3] consider customer privacy to be a fundamental aspect of their relationships with shareholders and are committed to maintaining the confidentiality, integrity and security of their current, prospective and former shareholders' non-public personal information. The Funds have developed policies that are designed to protect this confidentiality, while allowing shareholder needs to be served.

### OBTAINING NON-PUBLIC PERSONAL INFORMATION

In the course of providing shareholders with products and services, the Funds and certain service providers to the Funds, such as the Funds' investment advisers or sub-advisers ("Advisers"), may obtain non-public personal information about shareholders, which may come from sources such as account applications and other forms, from other written, electronic or verbal correspondence, from shareholder transactions, from a shareholder's brokerage or financial advisory firm, financial professional or consultant, and/or from information captured on applicable websites.

### RESPECTING YOUR PRIVACY

As a matter of policy, the Funds do not disclose any non-public personal information provided by shareholders or gathered by the Funds to non-affiliated third parties, except as required or permitted by law or as necessary for such third parties to perform their agreements with respect to the Funds. As is common in the industry, non-affiliated companies may from time to time be used to provide certain services, such as preparing and mailing prospectuses, reports, account statements and other information, conducting research on shareholder satisfaction and gathering shareholder proxies. The Funds or their affiliates may also retain non-affiliated companies to market Fund shares or products which use Fund shares and enter into joint marketing arrangements with them and other companies. These companies may have access to a shareholder's personal and account information, but are permitted to use this information solely to provide the specific service or as otherwise permitted by law. In most cases, the shareholders will be clients of a third party, but the Funds may also provide a shareholder's personal and account information to the shareholder's respective brokerage or financial advisory firm and/or financial professional or consultant.

### SHARING INFORMATION WITH THIRD PARTIES

The Funds reserve the right to disclose or report personal or account information to non-affiliated third parties in limited circumstances where the Funds believe in good faith that disclosure is required under law, to cooperate with regulators or law enforcement authorities, to protect their rights or property, or upon reasonable request by any Fund in which a shareholder has invested. In addition, the Funds may disclose information about a shareholder or a shareholder's accounts to a non-affiliated third party at the shareholder's request or with the consent of the shareholder.

### SHARING INFORMATION WITH AFFILIATES

The Funds may share shareholder information with their affiliates in connection with servicing shareholders' accounts, and subject to applicable law may provide shareholders with information about products and services that the Funds or their Advisers, distributors or their affiliates ("Service Affiliates") believe may be of interest to such shareholders. The information that the Funds may share may include, for example, a shareholder's participation in the Funds or in other investment programs sponsored by a Service Affiliate, a shareholder's ownership of certain types of accounts (such as IRAs), information about the Funds' experiences or transactions with a shareholder, information captured on applicable websites, or other data about a shareholder's accounts, subject to applicable law. The Funds' Service Affiliates, in turn, are not permitted to share shareholder information with non-affiliated entities, except as required or permitted by law.

### PROCEDURES TO SAFEGUARD PRIVATE INFORMATION

The Funds take seriously the obligation to safeguard shareholder non-public personal information. In addition to this policy, the Funds have implemented procedures that are designed to restrict access to a shareholder's non-public personal information to internal personnel who need to know that information to perform their jobs, such as servicing shareholder accounts or notifying shareholders of new products or services. Physical, electronic and procedural safeguards are in place to guard a shareholder's non-public personal information.

### INFORMATION COLLECTED FROM WEBSITES

The Funds or their service providers and partners may collect information from shareholders via websites they maintain. The information collected via websites maintained by the Funds or their service providers includes client non-public personal information.

### CHANGES TO THE PRIVACY POLICY

From time to time, the Funds may update or revise this privacy policy. If there are changes to the terms of this privacy policy, documents containing the revised policy on the relevant website will be updated.

[1] Amended as of June 25, 2020.
[2] PIMCO Investments LLC ("PI") serves as the Funds' distributor and does not provide brokerage services or any financial advice to investors in the Funds solely because it distributes the Funds. This Privacy Policy applies to the activities of PI to the extent that PI regularly effects or engages in transactions with or for a shareholder of a series of a Trust who is the record owner of such shares. For purposes of this Privacy Policy, references to "the Funds" shall include PI when acting in this capacity.
[3] When distributing this Policy, a Fund may combine the distribution with any similar distribution of its investment adviser's privacy policy. The distributed, combined, policy may be written in the first person (i.e. by using "we" instead of "the Funds").

# Liquidity Risk Management Program

In compliance with Rule 22e-4 (the "Liquidity Rule") under the Investment Company Act of 1940, as amended ("1940 Act"), PIMCO Funds (the "Trust") has adopted and implemented a liquidity risk management program (the "Program") for each series of the Trust (each a "Fund" and collectively, the "Funds") not regulated as a money market fund under 1940 Act Rule 2a-7, which is reasonably designed to assess and manage the Funds' liquidity risk. The Trust's Board of Trustees (the "Board") previously approved the designation of the PIMCO Liquidity Risk Committee (the "Administrator") as Program administrator. The PIMCO Liquidity Risk Committee consists of senior members from certain PIMCO business areas, such as Portfolio Risk Management, Americas Operations, Compliance, Account Management and Portfolio Management, and is advised by members of PIMCO Legal.

A Fund's "liquidity risk" is the risk that the Fund could not meet requests to redeem shares issued by the Fund without significant dilution of the remaining investors' interests in the Fund. In accordance with the Program, each Fund's liquidity risk is assessed no less frequently than annually taking into consideration a variety of factors, including, as applicable, the Fund's investment strategy and liquidity of portfolio investments, cash flow projections, and holdings of cash and cash equivalents, as well as borrowing arrangements and other funding sources. Certain factors are considered under both normal and reasonably foreseeable stressed conditions. Each Fund portfolio investment is classified into one of four liquidity categories (including "highly liquid investments" and "illiquid investments," discussed below) based on a determination of the number of days it is reasonably expected to take to convert the investment to cash, or sell or dispose of the investment, in current market conditions without significantly changing the investment's market value. Each Fund has adopted a "Highly Liquid Investment Minimum" (or "HLIM"), which is a minimum amount of Fund net assets to be invested in highly liquid investments that are assets. As required under the Liquidity Rule, each Fund's HLIM is periodically reviewed, no less frequently than annually, and the Funds have adopted policies and procedures for responding to a shortfall of a Fund's highly liquid investments below its HLIM. The Liquidity Rule also limits the Funds' investments in illiquid investments by prohibiting a Fund from acquiring any illiquid investment if, immediately after the acquisition, the Fund would have invested more than 15% of its net assets in illiquid investments that are assets. Certain non-public reporting is generally required if a Fund's holdings of illiquid investments that are assets were to exceed 15% of Fund net assets.

At a meeting of the Board held on February 9-10, 2021, the Board received a report (the "Report") from the Administrator addressing the Program's operation and assessing the adequacy and effectiveness of its implementation for the period from December 1, 2019 through December 31, 2020. The Report reviewed the operation of the Program's components during such period, noted the March-April 2020 market conditions and associated monitoring by the Administrator, and stated that the Program is operating effectively to assess and manage each Fund's liquidity risk and that the Program has been and continues to be adequately and effectively implemented to monitor and, as applicable, respond to the Funds' liquidity developments. This has remained true for the 12-month reporting period ended March 31, 2021.

## General Information

**Investment Adviser and Administrator**

Pacific Investment Management Company LLC

650 Newport Center Drive

Newport Beach, CA 92660

**Distributor**

PIMCO Investments LLC

1633 Broadway

New York, NY 10019

**Custodian**

State Street Bank and Trust Company

801 Pennsylvania Avenue

Kansas City, MO 64105

**Transfer Agent**

DST Asset Manager Solutions, Inc.

Institutional Class, I-2, I-3, Administrative Class

430 W 7th Street STE 219024

Kansas City, MO 64105-1407

DST Asset Manager Solutions, Inc.

Class A, Class C, Class C-2, Class R

430 W 7th Street STE 219294

Kansas City, MO 64105-1407

**Legal Counsel**

Dechert LLP

1900 K Street, N.W.

Washington, D.C. 20006

**Independent Registered Public Accounting Firm**

PricewaterhouseCoopers LLP

1100 Walnut Street, Suite 1300

Kansas City, MO 64106

This report is submitted for the general information of the shareholders of the Funds listed on the Report cover.

Sign-up for e-delivery
pimco.com/edelivery

**pimco.com**



PF3003AR_033121

P I M C O

# EXHIBIT 5

**PIMCO**

# CREW / PIMCO Low Duration Credit Fund

| | |
|---|---|
| CLASS: | **INSTITUTIONAL** |
| FUND INCEPTION DATE: | **29 APRIL 2001** |
| TICKER: | **PSRIX** |
| CUSIP: | **72201W790** |
| TOTAL NET ASSETS (IN MILLIONS): | **$495.1** |

**PORTFOLIO MANAGERS**

David Forgash, Michael Levinson

**FUND STATISTICS**

| | |
|---|---|
| Effective duration (yrs) | 1.51 |
| Effective maturity (yrs) | 5.18 |

**SECTOR DIVERSIFICATION (%)**

| | Market value weighted |
|---|---|
| Bank Loans | 62.3 |
| Bonds | 25.4 |
| Other [1] | 9.9 |
| Net Other Short Duration Instruments [2] | 2.3 |

**TOP 5 INDUSTRY DIVERSIFICATION (%)**

| | Market value weighted |
|---|---|
| Technology | 16.1 |
| Healthcare | 7.5 |
| Consumer Products | 4.8 |
| Consumer Cyclical Services | 4.6 |
| Independent E&P | 4.1 |

## Fund description

CREW/PIMCO Low Duration Credit Fund is a diversified, actively managed portfolio of floating or variable senior secured loans and short dated high yield bonds. The fund seeks to provide a high level of current income and is the underlying investment at Crew Capital Group for it's Index Account.

**INVESTOR BENEFITS**

This fund is designed to offer investors attractive exposure to bank loans and short-dated high yield bonds. The fund adopts a flexible approach across these sectors to reflect the evolving opportunity set in credit markets.

Potential benefits of this fund and the underlying asset class include:

- Low correlation to most traditional asset classes, especially Treasuries
- May provide a hedge against rising interest rates and offer higher-return potential returns versus other fixed income securities in a rising rate environment
- Higher credit-risk premium than investment grade corporate bonds with full liquidity (No CDSC or fees.)
- Access to PIMCO's fundamental credit research, global platform and comprehensive macroeconomic views

**THE FUND ADVANTAGE**

The fund's flexible approach in allocating between bank loans and short dated high yield is an efficient way to gain exposure to the low duration leveraged finance market while aiming to maintain attractive risk adjusted returns. The fund benefits from PIMCO's time-tested investment process, and emphasized disciplined, proprietary, bottom-up analysis of credit quality and market factors including supply, demand and liquidity, while also incorporating proprietary global macroeconomic forecasting. PIMCO's investment team has the experience, depth and diversity to actively manage a broad and diversified opportunity set.

**VALUE OF CREDIT STRATEGIES**

An allocation to PIMCO's credit strategies may be beneficial as part of a diversified portfolio. Corporate bonds and other credit assets tend to appreciate during periods of improving economic conditions, when government bonds may experience below average gains. Credit products should provide for the repayment of principal at maturity, and with a probable steady income stream contributing to the return, can be used as a more defensive corporate investment than equities. PIMCO credit strategies offer many options for diversification within the sector, from investment grade to high yield, in domestic, global developed and emerging markets.

SEC-FORSYTHA-E-0000086

# PIMCO

CREW / PIMCO Low Duration Credit Fund

| Performance (net of fees) | 10 yrs. | 5 yrs. | 3 yrs. | 1 yr. | 6 mos. | 3 mos. |
|---|---|---|---|---|---|---|
| PIMCO Fund (%) | 6.70 | 7.33 | 7.07 | 7.96 | 6.22 | 2.23 |
| Benchmark (%) | 5.19 | 5.80 | 5.07 | 6.64 | 4.08 | 1.93 |

*Performance quoted represents past performance. Past performance is not a guarantee or a reliable indicator of future results. Investment return and the principal value of an investment will fluctuate. Shares may be worth more or less than original cost when redeemed. Current performance may be lower or higher than performance shown. For performance current to the most recent month-end, visit PIMCO.com or by calling 888.87.PIMCO.*

For the periods prior to the inception date of a share class, performance information is based on the performance of the Fund's oldest class shares, adjusted to reflect the fees and expenses paid by that class of shares.

Differences in the Fund's performance versus the index and related attribution information with respect to particular categories of securities or individual positions may be attributable, in part, to differences in the pricing methodologies used by the Fund and the index. There is no assurance that any fund, including any fund that has experienced **high or unusual performance** for one or more periods, will experience similar levels of performance in the future. High performance is defined as a significant increase in either 1) a fund's total return in excess of that of the fund's benchmark between reporting periods or 2) a fund's total return in excess of the fund's historical returns between reporting periods. Unusual performance is defined as a significant change in a fund's performance as compared to one or more previous reporting periods.

| Lipper rankings* (Loan Participation Funds) | 10 yrs. | 5 yrs. | 3 yrs. | 1 yr. |
|---|---|---|---|---|
| Fund rank | 5 | 8 | 12 | 45 |
| Number of funds | 56 | 94 | 98 | 101 |
| Quartile | 1 | 1 | 1 | 2 |

\* Based on total return performance, with distributions reinvested, and operating expenses deducted.

*Investors should consider the investment objectives, risks, charges and expenses of the funds carefully before investing.  This and other information are contained in the fund's prospectus and summary prospectus, if available, which may be obtained by contacting your PIMCO representative.  Please read them carefully before you invest or send money.*

¹ "Other" may include municipals, convertibles, preferreds, and yankee bonds. ² Net Other Short Duration Instruments includes securities and other instruments (except those instruments tied to emerging markets by country of risk) with an effective duration less than one year and rated investment grade or higher or, if unrated, determined by PIMCO to be of comparable quality, commingled liquidity funds, uninvested cash, interest receivables, net unsettled trades, broker money, short duration derivatives and derivatives offsets. With respect to certain categories of short duration securities, the Adviser reserves the discretion to require a minimum credit rating higher than investment grade for inclusion in this category. Derivatives Offsets includes offsets associated with investments in futures, swaps and other derivatives. Such offsets may be taken at the notional value of the derivative position.

**Prior to May 3rd, 2021 the Fund was named PIMCO Senior Floating Rate Fund and was benchmarked against the JPM Leveraged Loan Index.**

MV% may not equal 100 due to rounding.

Performance reflects changes in share price, reinvestment of dividends and capital gains distributions. All periods longer than one year are annualized. Periods less than one year are cumulative.

Effective duration is the duration for a bond with an embedded option when the value is calculated to include the expected change in cash flow caused by the option as interest rates change.

Investments made by a Fund and the results achieved by a Fund are not expected to be the same as those made by any other PIMCO-advised Fund, including those with a similar name, investment objective or policies. A new or smaller Fund's performance may not represent how the Fund is expected to or may perform in the long-term. New Funds have limited operating histories for investors to evaluate and new and smaller Funds may not attract sufficient assets to achieve investment and trading efficiencies. A Fund may be forced to sell a comparatively large portion of its portfolio to meet significant shareholder redemptions for cash, or hold a comparatively large portion of its portfolio in cash due to significant share purchases for cash, in each case when the Fund otherwise would not seek to do so, which may adversely affect performance.

**A word about risk:** Investing in the **bond market** is subject to risks, including market, interest rate, issuer, credit, inflation risk, and liquidity risk. The value of most bonds and bond strategies are impacted by **changes in interest rates.** Bonds and bond strategies with longer durations tend to be more sensitive and volatile than those with shorter durations; bond prices generally fall as interest rates rise, and low interest rate environments increase this risk. Reductions in bond counterparty capacity may contribute to decreased market liquidity and increased price volatility. Bond investments may be worth more or less than the original cost when redeemed. **Bank loans** are often less liquid than other types of debt instruments. There is no assurance that the liquidation of any collateral from a secured bank loan would satisfy the borrower's obligation, or that such collateral could be liquidated. Investing in **foreign denominated and/or domiciled securities** may involve heightened risk due to currency fluctuations, and economic and political risks, which may be enhanced in emerging markets. **Mortgage and asset-backed securities** may be sensitive to **changes in interest rates,** subject to early repayment risk, and their value may fluctuate in response to the market's perception of issuer creditworthiness; while generally supported by some form of government or private guarantee there is no assurance that private guarantors will meet their obligations. **High-yield, lower-rated, securities** involve greater risk than higher-rated securities; portfolios that invest in them may be subject to greater levels of credit and liquidity risk than portfolios that do not. **Derivatives** may involve certain costs and risks such as liquidity, interest rate, market, credit, management and the risk that a position could not be closed when most advantageous. Investing in derivatives could lose more than the amount invested. **Diversification** does not ensure against loss.

The minimum initial investment for institutional class shares is $1 million; however, it may be modified for certain financial intermediaries who submit trades on behalf of eligible investors.

Past rankings are no guarantee of future rankings. Rankings begin with the inception of the actual share class. Lipper does not take into account sales charges.

No part of this material may be reproduced in any form, or referred to in any other publication, without express written permission. PIMCO is a trademark of Allianz Asset Management of America L.P. in the United States and throughout the world. ©2021, PIMCO. **PIMCO Investments LLC,** distributor, 1633 Broadway, New York, NY, 10019 is a company of PIMCO.

PFS6026I_2Q21

## BASIC FACTS

| | |
|---|---|
| Dividend frequency | **Daily accrual** |

## FUND EXPENSES

| | |
|---|---|
| Gross Expense Ratio | **0.75%** |
| Adjusted Expense Ratio | **0.70%** |

The Adjusted Expense Ratio excludes certain investment expenses, such as interest expense from borrowings and repurchase agreements and dividend expense from investments on short sales, incurred directly by the Fund or indirectly through the Fund's investments in underlying PIMCO Funds (if applicable), none of which are paid to PIMCO.

## PERFORMANCE CHARACTERISTICS

| | |
|---|---|
| SEC 30-day yield (%) | **2.76%** |

## ABOUT THE BENCHMARK

The benchmark is a blend of 50% ICE BofAML 1-5 Year US High Yield Constrained Index and 50% J.P. Morgan Leveraged Loan Index. The ICE BofAML 1-5 Year US High Yield Constrained Index is designed to track the performance of short-term U.S. dollar denominated below investment grade corporate debt publicly issued in the U.S. domestic market with at least one year and less than five years remaining term to final maturity, at least 18 months to final maturity at issuance, a fixed coupon schedule and a minimum amount outstanding of $250 million. The J.P. Morgan Leveraged Loan Index is designed to mirror the investable universe of USD institutional leveraged loans and is comprised of issuers domiciled across global markets (the international component is comprised of developed market-domiciled issuers only).

## ABOUT PIMCO

PIMCO is one of the world's premier fixed income investment managers. Since our founding in 1971 in Newport Beach, California, we have continued to bring innovation and expertise to our partnership with clients seeking the best investment solutions. Today our professionals work in 17 offices across the globe, united by a single purpose: creating opportunities for investors in every environment.

## FOR MORE INFORMATION, CALL YOUR PIMCO REPRESENTATIVE.

## VISIT OUR WEBSITE FOR A FULL MENU OF PRODUCTS AND SERVICES AT PIMCO.COM.

SEC-FORSYTHA-E-0000087

# EXHIBIT 32

I, David Luthy, pursuant to 28 U.S.C. § 1746, declare as follows:

1.  I am over the age of 21 and a resident of Logan, Utah. I make this declaration based upon my personal knowledge. If called to testify, I could and would competently testify to the following facts:

2.  I retired in 2007. Before retiring, I worked at Utah State University. I am married to Karen Luthy.

3.  One of my colleagues at Utah State University was Philip Swensen, who was a Professor of Finance. Phil became my investment advisor.

3.  We met Steve Swensen through Phil. Steve is Phil's son and became his investment advisor partner. After Phil retired, we remained with Steve as our investment advisor. We were happy with Steve and trusted him completely with our investments.

4.  In 2017, we held $882,069 in Jackson Insurance annuities and Pacific Life. These were our most important investments. Steve recommended that we move the funds to Crew Capital Group. He told us that Crew Capital Group would provide a better vehicle for investment for us. It would be a self-directed IRA with guaranteed returns with a ceiling of 10% and a loss floor of 5%. Steve explained that the level of risk would be the same as that in Jackson Insurance and Pacific Life. The amount of return would be based on market movement with 5% as the guaranteed loss floor.

5.     Based on Steve's recommendation and representations, we transferred our funds to Crew Capital Group in September 2017. A statement from Crew Capital Group showing these deposits is attached as Exhibit 1. We continued to receive periodic statements from the Bank of Utah showing our Crew Funds and cash balance amounts. We also received cash returns in the years 2018, 2019 and 2021 that we needed to meet the IRS Required Minimum Distribution (RMD) for our investments. Because of COVID, no RMD was required in 2020, so we received no cash flow from this investment that year. The total cash we received was $88,900. We were very satisfied with the returns as indicated by these cash flows and reports from the Bank of Utah that indicated growth in our investment.

6.     In June 2022, we learned that Steve committed suicide. We reached out to the Bank of Utah to find out the balance in our Crew Capital Group account. The Bank of Utah sent an email stating that our cash balance was $4.36. A copy of the email, dated Jun 27, 2022, is attached as Exhibit 2.

7.     The Bank of Utah also provided a current statement showing our Crew Capital Group account. The statement shows a balance of $1,154,692.78. A copy of the statement is attached as Exhibit 3.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Logan, Utah on September 19, 2022.

_David Luthy_
David Luthy

2

# EXHIBIT 1

 **CREW CAPITAL** GROUP

**Address**
548 Market Street
San Francisco, CA 94104-5401
www.crewfunds.com

## Account Information

**David Luthy IRA**
**Bank of Utah - Custodian**

North Logan, UT ▮

**Account Number:** ▮2773 *(opened September 18, 2017)*
**Declared Earnings Rate:** 5%
**Statement Date:** September 30, 2017
**Advisor:** Stephen Swensen
**Advisor Phone:** (888) 775-8021

## Account Summary

| TRANSACTION TYPE | YEAR TO DATE | SINCE INCEPTION |
|---|---|---|
| Deposits | $882,069.41 | $882,069.41 |
| Withdrawals | $0.00 | $0.00 |
| Earnings | $1,501.30 | $1,501.30 |

**Total Value $883,570.71** *(as of September 30, 2017)*

## Transaction Summary

| TYPE | DATE | AMOUNT |
|---|---|---|
| Deposit | September 18, 2017 | $104,987.05 |
| Deposit | September 18, 2017 | $263,558.90 |
| Deposit | September 19, 2017 | $513,523.46 |
| Daily Earnings Credit | September 30, 2017 | $1,501.30 |

*Disclosure: Investors should carefully consider the objectives, risks, charges and expenses of their investments. This and other important information can be obtained from your financial professional and should be read carefully before investing. For information about your account or any other services, please contact your financial professional.*

# EXHIBIT 2

---------- Forwarded message ---------
From: **Janna Coley** <jcoley@bankofutah.com>
Date: Mon, Jun 27, 2022 at 11:39 AM
Subject: RE: Request for information by David H. Luthy
To: David Luthy <█████████████>

Hello


Here is a current statement

Your cash balance is 4.36 – the rest of the funds are with crew funds index with crew capital.

Thanks



 **Janna Coley** | TRUST ADMINISTRATOR II
Direct: 801-409-5401 | Fax 801-746-3519
2605 Washington Blvd, Ogden, UT 84401
jcoley@bankofutah.com

**In Wealth Management We Market, Solve and Administer**

To facilitate your email requests, please include Annette Rhoades, Trust Assistant, at srhoades@bankofutah.com.  Annette can also be reached at 801-409-5417.

**Please Note:**  **No trade instructions can be accepted without verbal confirmation. "Price and limit orders are not accepted".**
·
**\*\*\*Deadline for submitting trade requests: Stock/ETF - 1pm MT / Mutual Funds - 12pm MT**


Bank of Utah does not provide investment, tax or legal advice for Self-Directed IRAs & Custodial Accounts. We do not endorse or recommend any company or entity. Any communication with Bank of Utah is solely for educational purposes and should not be considered advice. We recommend that you consult a tax, legal or investment professional prior to making any decisions regarding your account.

*Disclaimer: This email message is for the sole use of the intended recipient(s) and may contain privileged or confidential information. Unauthorized use, distribution, review or decisions is prohibited. If you are not the intended recipient, please reply by email then destroy all copies of this original message.*

# EXHIBIT 3

Bank of Utah
2605 Washington Blvd
Ogden, UT 84401

# Account Statement

From 1/1/2022 To 6/24/2022

Account #: ____2773
BANK OF UTAH CUSTODIAN FOR DAVID H
LUTHY SELF DIRECTED IRA
Administrator:                              Janna Coley

Client Relationship Advisor:

DAVID H LUTHY

LOGAN, UT

Financial Advisor:
                                                   Directed

## Asset Allocation



|  | Market Value | % Portfolio |
|---|---|---|
| Cash & Equivalents | $4.36 | 0.00 % |
| Other | $1,154,688.42 | 100.00 % |
| Total Assets | $1,154,692.78 | 100.00 % |

Cash & Equivalents

Other

## Account Summary

|  | Value as of This Period | % of Acct |  | Previous Tax Year (2021) | Current Tax Year To Date (2022) |
|---|---|---|---|---|---|
|  |  |  | Distributions | $54,000.00 | $0.00 |
| Cash | $0.00 | 0.00 % | Contributions | $0.00 | $0.00 |
| Not Categorized | $1,154,688.42 | 100.00 % |  |  |  |
| Money Markets | $4.36 | 0.00 % |  |  |  |
| Value as of 6/24/2022 | $1,154,692.78 | 100.00 % |  |  |  |

 **BANK OF UTAH.**

## Asset Summary

| Symbol | Asset Description | Units/Shares or Face Value | Unit Price | Total Cost | Market Value |
|---|---|---|---|---|---|
| **Cash** | | | | $0.00 | $0.00 |
| 000 Not Categorized | | | | | |
| ▮1214 | CREW FUNDS INDEX ACCOUNT CREW CAPITAL GROUP - ADVISOR: STEPHEN SWENSEN | 1.0000 | $1,154,688.42 | $882,069.41 | $1,154,688.42 |
| | | | **Total:** | **$882,069.41** | **$1,154,688.42** |
| **MKT Money Markets** | | | | | |
| ▮DIXX | FEDERATED TREASURY OBLIGATIONS (CASH) | 4.3600 | $1.00 | $4.36 | $4.36 |
| | | | **Total:** | **$4.36** | **$4.36** |
| **Grand Total** | | | | **$882,073.77** | **$1,154,692.78** |

## Transaction Summary

| Date | Transaction Description / Payee | Units | Cash Change | Investment Change |
|---|---|---|---|---|
| | **Beginning Cash Balance** | | **$0.00** | |
| **Cash** | | | | |
| 3/29/22 | CASH DEPOSIT  ACH 03/28/2022 FEES | 0.0000 | $1,500.00 | $0.00 |
| 3/30/22 | ADMINISTRATION FEE  COLLECTED FOR PERIOD ENDING 1/31/22 | 0.0000 | ($1,500.00) | $0.00 |
| | **Totals for 2 Transactions for:  Cash** | **0.0000** | **$0.00** | **$0.00** |
| FEDERATED TREASURY OBLIGATIONS (CASH) | | | | |
| | **Totals for 2 Transactions for:  FEDERATED TREASURY OBLIGATIONS (CASH)** | **0.0000** | **$0.00** | **$0.00** |
| | **Ending Cash Balance** | | **$0.00** | |

# EXHIBIT 33

## DECLARATION OF JOHN KEITH

I, John E. Keith, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am over the age of 21 and am a resident of North Logan, Utah.  I make this declaration based upon my personal knowledge.  If called to testify, I could and would competently testify to the following facts:

2.      I was a professor of Economics at Utah State University (USU) in Logan, Utah.  My employment at USU began in 1973.  I retired as a Full Professor in 2009.

3.      I am married to Linda E. Keith.  Linda retired from the Information Services office at USU in 2002.

4.      Before retiring, I knew Phil Swensen, a well-respected Professor of Finance at Utah State University.  Phil developed a retirement investment approach that involved four "buckets."  The safest investments were put into "Bucket 1" for near-term income, with other buckets having more risk but expecting higher returns.  We liked the approach, and Phil became our investment advisor.

5.      Shortly after my retirement, we were introduced to Steve Swensen, Phil's son.  Steve became partners with Phil and also acted as our investment advisor.  We were very satisfied with their approach and our investments and continued to work with Steve upon Phil's retirement.  We maintained a good relationship with Steve.

6.      Initially, Steve worked under a company called Summit Capital.  While there, Steve worked with a partner named Jason Kimber.  We had regular meetings with Steve and Jason to discuss our investments.

7.      Later, Steve left Summit Capital and went to work under a company called Wealth Navigation. Steve got a new partner named Jacob Cazier, and we continued to have regular meetings with Jason, in which Steve participated.

8.      In or around June 2019, Steve proposed that we move Linda's IRA account to Bank of Utah. Steve told us that the Bank of Utah account paid guaranteed returns of 5% and up to 10%, depending on the market. If gains of over 10% were made, that money would go to the broker. Steve assured us that the Bank of Utah was a safe, secure, risk-free investment. The Bank of Utah investment was part of our Bucket 1, the safest investments for our short-term uses.

9.      We signed paperwork and received an account at Bank of Utah dated June 25, 2019. A true and correct copy of the paperwork is attached as Exhibit 1. After opening our Bank of Utah account, we occasionally received statements from Bank of Utah. Based on the paperwork we signed and Steve's representations, we believed our money was being held and invested by the Bank of Utah.

10.     After opening our account, we received a monthly stipend of $1,800, after Federal tax withholding, from our Bank of Utah account. In or around June 2022, we received a letter from the Bank of Utah, dated June 16, 2022, indicating that Steve had passed away, that income and receipts from Crew Capital had been discontinued, and that there would be no more payments made from the account until a replacement for Steve was authorized.

11.     In or around this same time period, we learned that Steve had committed suicide. About a couple weeks after Steve's death, we met with Jason Kimber, who told us that our Bank of Utah account was actually invested in a company called Crew

Capital, and that there may be a problem with Crew Capital. Prior to receipt of the letter from the Bank of Utah and Jason's information, Linda and I had never heard of Crew Capital. We were never given any paperwork related to Crew Capital.

12.     After receiving the letter from Bank of Utah, we received one more stipend payment on July 1, 2022, but they have since ceased.

I declare under penalty of perjury that the foregoing is true and correct. Executed in North Logan, Utah, on September 19, 2022.

John E. Keith

# EXHIBIT 1



**BANK OF UTAH**

LINDA E KEITH


LOGAN, UT

---

## Required Minimum Distribution for 2022^

Account: ███ 2973  BANK OF UTAH, CUSTODIAN FOR LINDA E KEITH SELF DIRECTED IRA

| | |
|---|---|
| Required Minimum Distribution: | $ 6,426.23 |
| Distributions Received: | $ 2,100.00 |
| Remaining Distribution to be disbursed by 12/31/2022*; ** | $ 4,326.23 |
| Life Expectancy Table Value: | 22.90 |
| Market Value: | $ 147,160.74 |

^ - Based on the information provided for this Account, you are required to take a distribution from your IRA per Internal Revenue Service (IRS) regulations regarding Required Minimum Distributions (RMD). Your RMD Status for the calendar year will be reported to the IRS on Form 5498.

* - The Required Beginning Date [RBD] for minimum distributions in the calendar year in which the account owner attains age 72 is April 1 of the following year.  The Required Minimum Distribution in each subsequent year must be made by December 31.

** - The SECURE Act of 2019 increased the age for which Minimum Distributions are required. For account owners that had already attained age 70.5 prior to the effective date of January 1, 2020, the age increase does not apply. For these account owners, Minimum Distributions are required for the year in which the account owner attained age 70.5 and subsequent years.

**BANK OF UTAH.**

July 10, 2019

Linda E Keith

Logan, UT ▮▮▮▮▮

Dear Mrs. Keith;

Thank you for choosing Bank of Utah, Trust Department for your Self Directed IRA needs. We are confident that you will be very satisfied with the services that we offer.

I am your IRA account manager, Jodie Nutt, I can be reached at 801-409-5118 or by email jnutt@bankofutah.com. I also have an assistance, Kim Taylor who can be reached at: 801-409-5047 or by email ktaylor@bankofutah.com.

Your IRA account number is ▮▮▮2973. If you call, please have it handy so that we can expedite your requests.

Your account has been set up for Quarterly & Annual December Statements that will be mailed to the address on file. You also have the ability to view your account electronically. By visiting www.bankofutah.com Clicking on the Green [TRUST] box, and selecting the green [NEW USER] tab. Please fill out the information needed and submit. If you have any problems viewing your account electronically, please contact Kim Taylor at 801-409-5047. If you do not want to receive paper statements, please call us and we can turn that off.

Enclosed are copies of your new account documents and IRA disclosures.

Thank you for choosing Bank of Utah, Trust Department.

If you have questions, please contact us.

Sincerely,

Jodie K Nutt
VP, Trust Officer

# Traditional IRA Application

## Bank of Utah Trust & Investments Department



**BANK of UTAH**
Experience. Service.

Account Number: 2973

## Customer Identification Notice

In accordance with Section 326 of the USA Patriot Act signed October 26, 2001, and in accordance with other federally mandated laws and regulations, Bank of Utah is required to obtain sufficient information to verify the identity of our customers. Bank of Utah maintains a record of the documentation used during this verification process. In keeping with these laws, we verify your identification and may take additional steps in order to verify your identity. In all cases, protection of our customer's identity and confidentially is the Bank's pledge to you.

## Account Owner Information

Full Name: Linda E. Keith
Social Security Number: ████8802          Employer: Retired
Date of Birth: ████1945                   Occupation:
State of Residency: Utah

Home Street Address (Required):
Physical Street Address:
City, State, Zip: Logan, UT ██████

Mailing Address, if different:
Mailing Address (1):
Mailing Address (2):
City, State, Zip:

Email:
Phone (Home): ████████          Phone (Office):
Phone (Cell): ████████          Fax:

## Government Identification (Attach a Copy)

Identification Type:                      Issue Date:
Document Number:                          Expiration Date:

## Account Funding Information

Amount: $200,000                          Contribution Date:
                                          Tax Year:

Deposit/Contribution Type (select one):
☐ Regular (including Catch-Up)
☐ Rollover
☐ Rollover/Direct Rollover from an Eligible Retirement Plan
☑ Transfer
☐ Recharacterization

☐ Simplified Employee Pension (SEP) Plan
☐ Qualified Reservist/Designated Disaster Distribution Repayment*
☐ Disaster/Combat Zone Postponed Contribution*

*Reason Code, if applicable: _____

## Acknowledgement of Fee Schedule

*IRA Owner Initials* — I acknowledge having received and read a copy of the Bank of Utah Trust & Investment Department's fee schedule. I understand that the stated fee will be paid from this account. I acknowledge that Bank of Utah may, from time to time, revise said fee schedule providing me written notice at least thirty days prior to the change.

## Authorization to Invest Idle Cash

*IRA Owner Initials* — I hereby authorize Bank of Utah to invest the cash deposited into this IRA into Federated Treasury Obligations Funds until I direct the funds to be invested otherwise. I authorize Bank of Utah to use any replacement fund, providing me written notice at least thirty days prior to the change.

## Designation of Beneficiary

At the time of my death, the primary beneficiary(beneficiaries) named below will receive my IRA assets. If all of my primary beneficiaries die before me, the contingent beneficiary(beneficiaries) named below will receive my IRA assets. In the event a beneficiary dies before me, such beneficiary's share will be reallocated on a pro-rata basis to the other beneficiaries which share the deceased beneficiary's classification as a primary or contingent beneficiary. If all of the beneficiaries die before me, my IRA assets will be paid to my estate. If no percentages are assigned to beneficiaries, or if the percentage total for any beneficiary classification exceeds 100 percent, the beneficiaries in that beneficiary classification will share equally. If the percentage total for each beneficiary classification type is less than 100 percent, any remaining percentage will be divided equally among the beneficiaries within such class. This designation revokes and supercedes all earlier beneficiary designations which may apply to this IRA.

### Primary Beneficiary

| Percentage | Full Name of Beneficiary | Relationship to Owner | SSN or TIN | Date of Birth |
|---|---|---|---|---|
| 100% | John E. Keith | Spouse | 1170 | 1940 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Ttl 100%

### Contingent Beneficiary

| Percentage | Full Name of Beneficiary | Relationship to Owner | SSN or TIN | Date of Birth |
|---|---|---|---|---|
| 100% | All Children Equally | | | |
| | | | | |
| | | | | |
| | | | | |

Ttl 100%

### Spousal Consent

Spousal consent is required if you are married and you have **not** designated your spouse as the sole primary beneficiary, AND you live in a community or marital property state including: AZ, CA, ID, LA, NV, NM, TX, WA, and WI. In addition, if required by your state, the form must be signed in the presence of a witness and/or Notary Public.

### IRA Owner Declaration Regarding Community or Marital Property (select one):

☐ I **DO NOT** live in a community or marital property state and I am NOT required to obtain spousal consent.

☐ I **DO** live in a community or marital property state AND I am **Not Married.** I understand that if I marry in the future, I must complete a new Designation of Beneficiary form, which will require spousal consent.

*IRA Owner Initials*

☐ I **DO** live in a community or marital property state AND I am **Married\*.** I understand that if I designate a primary beneficiary other than my spouse, my spouse must consent by signing below.

**\*Spousal Consent:** I am the spouse of the IRA owner. I acknowledge the significant consequences associated with giving up my interest in the IRA. I further acknowledge that Bank of Utah has not provided me with legal or tax advice, but has advised me to seek legal or tax advice. I acknowledge that I have received a fair and reasonable disclosure of the IRA owner's assets or property and any financial obligations for a community property state. In the event I have a legal interest in the IRA assets, I hereby give the IRA owner such interest in the assets held in this IRA and consent to the beneficiary designation set forth in this Application.

X
_____
*Spouse Signature*          Date          *Print Name*

X
_____
*Witness Signature (if required)*          Date          *Print Name*
*(Witness cannot be IRA owner or a beneficiary of this IRA)*

## Application, Taxpayer Identification Number, and Backup Withholding Certification

**Application and Account Agreement:** I certify that the information provided by me on this application is accurate, and that I have received a copy of IRS Form 5305, *Traditional Individual Retirement Trust Account* or IRS Form 5305-A, *Traditional Individual Retirement Custodial Account,* Disclosure Statement, and Financial Disclosure. I agree to be bound by the terms and conditions found in the Agreement, Disclosure Agreement, Financial Disclosure, and amendments thereto. I assume sole responsibility for all consequences relating to my actions concerning this IRA. I understand that I may revoke this IRA on or before seven (7) days after the date of establishment. My designation of the tax year for my contribution, and any election to treat a contribution as a rollover or recharacterization, is irrevocable. I indemnify and agree to hold Bank of Utah harmless against any liabilities. I understand that Bank of Utah cannot provide, and has not provided, me with tax or legal advice. I have been advised to seek the guidance of a tax or legal professional.

**Taxpayer Identification Number and Backup Withholding Certification:** Under penalties of perjury, I certify that the Taxpayer Identification Number (TIN) shown below is my correct taxpayer identification number; that I am not subject to backup withholding either because I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, the IRS has notified me that I am no longer subject to backup withholding, or I am an exempt recipient according to IRS Regulations; and that I am a U.S. citizen or other U.S. person.

X _____      6 | 25 | 19      _____ 8802
*IRA Owner Signature*                *Date*                *Taxpayer Identification Number (TIN)*

## Custodian Acceptance of Application

X _____      6 | 25 | 19
*Bank of Utah, Custodian Signature*     *Date*

## Additional Information

**Purpose:** This Traditional IRA Application form is designed to assist you in opening a traditional individual retirement account. This Application will accompany an Internal Revenue Service (IRS) Form 5305, *Traditional Individual Retirement Trust Account,* IRS Form 5305-A, *Traditional Individual Retirement Custodial Account,* or IRS-approved prototype, Disclosure Statement, and Financial Disclosure.

**Additional Documents:** For a recharacterization, the IRS requires you to provide a written notice of recharacterization.

**Financial Disclosure:** Self-Directed IRA assets often are placed in investments where the growth in value of the IRA investment is neither guaranteed nor projected (e.g., Real-Estate, Partnerships, LLCs, Promissory Notes). Thus the Financial disclosure cannot project the growth in value of the IRA. However, we are required to provide the following information as part of this financial disclosure:

   **Earnings:** The method for computing and allocating the earnings on your IRA investments may be found in the prospectus or similar materials applicable to your IRA investment that you have chosen. The method will vary depending on the type of investment.

   **Investments:** The investments contained in your IRA will be directed by you. No investment or legal advice will be given.

   **IRA Fees:** IRA fees were previously disclosed, the specified fees are computed on a monthly basis.

**For Additional Guidance:** It is in your best interest to seek the guidance of a tax or legal professional before completing this document. For more information, refer to IRS Publication 590, *Individual Retirement Arrangements (IRAs),* IRS Form 5498, *IRA Contribution Information,* instructions to your federal income tax return, your local IRS office, or the IRS's web site at www.irs.gov.

# Custodial Agreement

## Bank of Utah Trust & Investments Department



**BANK of UTAH**
Experience. Service.

Account Number:  2973

Linda E. Keith , hereinafter referred to as the "Depositor", herewith delivers to **Bank of Utah,** hereinafter referred to as **"Custodian",** the securities listed in the Schedule "A" attached hereto. With respect to the securities held in this account and any additions thereto, it is agreed as follows:

1. **Instructions from Depositor**
   The Custodian shall keep the deposited property, collect and receive the income and principal and buy, sell, invest, disburse or otherwise dispose of the property or its proceeds only upon the written instructions of the Depositor *or the Depositor's duly authorized agent. Any designation of an authorized agent by depositor must be forwarded to Custodian in writing.*

   <u>THE CUSTODIAN DOES NOT ASSUME INVESTMENT MANAGEMENT OF THIS ACCOUNT.</u>

2. **Responsibility of Depositor**
   The Depositor and not the Custodian shall be responsible for money or other property paid or delivered to any broker or other person upon direction of the Depositor to the Custodian.

3. **Registration of Property**
   Corporate stocks, bonds, and other securities shall be held in bearer form, in the name of the Custodian or its nominee. The Custodian or its nominee may use the Depository Trust Company or other depository to hold the securities.

4. **Indemnification of Custodian**
   The Custodian shall not be required to comply with any instruction of the Depositor which in the judgement of the Custodian may subject it to liability or expense or to prosecute or defend any action unless the Custodian is indemnified in a manner and amount satisfactory to the Custodian.

5. **Binding Effect**
   The Custodian's actions taken in accordance with the instructions of the Depositor shall be valid and binding upon all persons claiming by, through or under the Depositor.

6. **Written Instructions**
   All instructions to the Custodian and the designation of any agent of the Depositor shall be in writing including, but not limited to, instructions given to the Custodian regarding investments. The Custodian may, in its sole discretion, accept verbal instructions which the Depositor will confirm in writing.

*Depositor Initials* ⎯⎯⎯ *Bank Officer Initials* ⎯⎯⎯

7. **Notices**

All notices to the Depositor shall be given in person, by certified or regular mail, by facsimile transmission or by overnight delivery service at the address last on file with the Custodian and shall be effective upon delivery or mailing.

8. **Compensation**

The Custodian shall be compensated for its service in accordance with its fee schedule or as otherwise negotiated in writing.

9. **Incapacity**

The powers herein granted shall not be affected by the incapacity of the Depositor *except:*

- *Custodian shall be under no obligation to ascertain the incapacity of the Depositor. Upon notice from a court of competent jurisdiction, custodian shall accept directions from the duly qualified guardian, or conservator for the named Depositor.*
- *Custodian shall accept directions from a designated agent holding a power of attorney when it in good faith believes said power of attorney is valid and genuine.*

10. **Accounting**

The Custodian will give Depositor a statement showing all cash receipts and disbursements, the assets comprising the account at the end of the period covered by the statement and the principal transactions occurring during the period covered by the statement.

11. **Money Market Sweep**

The Custodian has discretion to select any money market fund in which to invest and reinvest excess cash balances in the Account using its automatic cash management sweep system.

12. **Notification**

Depositor waives any requirements regarding written notification of individual security transactions and will rely instead on periodic statements of the Account. These statements will be prepared monthly, quarterly or annually as requested by Depositor. The Depositor acknowledges the right to request such written notification at no additional cost to the Depositor.

13. **Disclosure**

Securities held in the account:

- *Are not* deposits or obligations of or guaranteed by Bank of Utah or any of its non-bank subsidiaries; and
- *Are not* insured by the FDIC, or any other government agency; and
- *Are* subject to investment risk, including the possible loss of principal.

*Depositor Initials* _____ *Bank Officer Initials* _____

**14. Hold Harmless**

The Custodian is hereby released form any and all liability, loss or damage resulting from an investment or other action taken pursuant to the Depositor's instructions to the Custodian. *Custodian is relieved of any liability for the lack of directions from the Depositor or its duly qualified agent to make investment decisions.* The Depositor hereby agrees to defend and hold Custodian harmless from any claims arising from actions taken by the Custodian pursuant to the instructions of the Depositor or the Depositor's agent.

**15. Termination**

This Agreement may be terminated at any time by either party upon notice in writing to the other party.  Upon termination, the Custodian shall deliver to the Depositor or the Depositor's estate the property then held in the account, but only when all sums due from the Depositor are paid and the Custodian is indemnified against liabilities lawfully incurred in the administration of this custodianship in a manner and an amount satisfactory to the Custodian.

Executed this 21    day of June        20 19 .

Depositor

_____
(Signature)

Bank of Utah, Custodian

by

_____
(Signature)

## SCHEDULE "A"

Custodial Agreement by and between  Linda E. Keith      and **Bank of Utah**, executed the 21     day
of June                , 20 19  .

Assets subject to Custodial Agreement:

Bank of Utah Money Market Account

Crew Capital Group Index Account


Depositor

_____
(Signature)

Bank of Utah, Custodian
by

_____
(Signature)





# Trust Department Account Fee Schedule

## Managed Trusts and Investment Management Accounts:

| Tier | | Rate |
|------|------|------|
| First | $1,000,000 | .0120 |
| Next | 1,000,000 | .0070 |
| Next | 1,000,000 | .0050 |
| Over | 3,000,000 | .0040 |

*• Rates are based on the absolute market value of assets and liabilities*
*• Minimum annual fee of $1,500 applies*
*• Separate outside advisor fees are not included in this schedule*

## Custodial and Self-Directed IRA Accounts:

| Tier | | Rate |
|------|------|------|
| First | $1,000,000 | .0060 |
| Over | 1,000,000 | .0030 |

*• Rates are based on the absolute market value of assets and liabilities*
*• Minimum annual fee of $1,000 applies*

## Life Insurance Trusts:

Flat annual fee of $800, plus $225 per life insurance policy.

## Probates:

Personal Representative's fees are billed for time and labor at $125 per hour, plus the annual custodial fee.
*• Minimum fee of $3,500 applies*

## Conservatorships:

The greater of: the Managed Trust fee schedule or 5% of receipts.
*• Minimum fee of $1,500 applies*

## Additional Fees (if applicable):

**Fiduciary Tax Preparation**        $350
Fiduciary tax return preparation or as billed by accountant if greater.

**Owner Occupied Real Estate**        $300
Annual fee per parcel to hold title, pay insurance, and taxes. The value of owner-occupied real estate is not included in the market value calculation.

**Real Estate Inspection Fee**        $100
Fee assessed per inspection of property.

**Special Assets**        Negotiated
Non-publicly traded securities or unusual assets held in account.

**Individual Investment Products**
There may be a higher fee charged for an individual investment product. This will be disclosed at the purchase of that investment.

## Termination Fees:

A termination fee will be charged to the account at an hourly rate of $125 with a minimum of $500. If the account has been open less than 1 year, the minimum termination fee will be one year's fee with credit for prior fees collected.

## Other Extraordinary Fees:

From time to time, we may provide other extra-ordinary services at negotiated rates, normally $125 per hour.

*Effective 1/1/2011*
*Bank of Utah reserves the right to change fees with 30 days advance notice.*

 **BANK OF UTAH**

# Personal Trust Department Fee Schedule

## Managed Discretionary Accounts

· **Irrevocable Trusts**
· **Conservatorships**
· **Probates and Estate Administration**

| Tier | | Rate |
|------|------|------|
| First | $1,000,000 | 0.0140 |
| Next | 1,000,000 | 0.0100 |
| Next | 1,000,000 | 0.0080 |
| Over | 3,000,000 | 0.0070 |

• Minimum annual fee of $3,000 applies for Trust Accounts and Conservatorships

• Minimum annual fee of $5,000 applies for Probates and Estate Administration

• Separate outside advisor fees are not included in this schedule

• A 25% discount may apply where Trust Agreement states that Trustee has no investment responsibility.

• Additional 10 basis points per tier for Co-Trustee/joint authority.

· **Life Insurance Trusts**
• Initial policy review fee of $250 per policy

• Flat $3,000 annual fee, plus $250 per life insurance policy.

• Other assets charged per Managed Trust Fee Schedule

## Managed Agency Accounts

· **Revocable Trusts**
· **Investment Management Accounts**
· **Managed IRAs**

| Tier | | Rate |
|------|------|------|
| First | $1,000,000 | 0.0130 |
| Next | 1,000,000 | 0.0090 |
| Next | 1,000,000 | 0.0070 |
| Over | 3,000,000 | 0.0060 |

• Minimum annual fee of $2,000 applies

## Directed Accounts

· **Custodial Accounts**
· **Self-Directed IRAs**

| Tier | | Rate |
|------|------|------|
| First | $1,000,000 | 0.0060 |
| Next | 1,000,000 | 0.0045 |
| Over | 2,000,000 | 0.0030 |

• Minimum annual fee of $1,000 applies

---

## Additional Fees (if applicable):

**Fiduciary Tax Preparation**                                           $500

Fiduciary tax return preparation or as billed by accountant, if greater.

**Non-managed Real Estate**                                             $300

Annual fee per parcel to hold title, pay insurance, and taxes. The value of non-managed real estate is not included in the market value calculation.

**Managed Real Estate**                                    Market Value Fee

Additional third-party property manager fees may be charged to the account.

**Real Estate Inspection Fee**                                          $100

Fee assessed per inspection of property.

**Real Estate Purchases & Sales**

Without a broker:  Up to 7% - $500 minimum

With a broker:  Up to 3% - $500 minimum

**Special Assets**                                                Negotiated

Non-publicly traded securities or unusual assets held in account.

**Oil Gas & Mineral Interests**

$200 set-up fee per asset / $100 annual fee per asset. Advisory fees will be charged to the account.

**Outside Investment Advisor**

Additional 10 basis points per tier

Review of outside advisor - $250/yr

**Individual Investment Products**

There may be a higher fee charged for an individual investment product. This will be disclosed at the purchase of that investment.

**Termination Fees**

Minimum of $500 for self-directed IRAs and $750 for all other accounts. If the account has been open less than 1 year, the minimum termination fee will be one year's fee with credit for prior fees collected.

**Other Extraordinary Fees**

Extraordinary services may be charged at negotiated rates, normally $175/hour for officers & $100/hour for office staff. Additional expenses may be charged to the account.

**Past Due Fees**                                               2% Monthly

## Some Investments Offered:

• Are not FDIC insured
• Contain no bank guarantee
• May lose value

---

Market value rates are based on the absolute market value of assets & liabilities

Bank of Utah reserves the right to change fees with 30 days advance notice.

Effective 11/1/2018

Rev 4/10

 **WHAT DOES BANK OF UTAH DO WITH YOUR PERSONAL INFORMATION?**



| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
|---|---|
| What? | The types of personal information we collect and share depend on the product or service you have with us. This information can include: <ul><li>Social Security number and income</li><li>Account balances and payment history</li><li>Credit history and credit scores</li></ul> When you are *no longer* our customer, we continue to share your information as described in this notice. |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Bank of Utah chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Bank of Utah share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes** such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes** to offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | Yes | No |
| **For our affiliates' everyday business purposes** information about your transactions and experiences | No | No |
| **For our affiliates' everyday business purposes** information about your creditworthiness | No | No |
| **For our affiliates to market to you** | No | No |
| **For nonaffiliates to market to you** | No | No |

Questions?   Call 1-800-516-5559 or go to www.bankofutah.com

**Page 2**

**What we do**

| | |
|---|---|
| **How does Bank of Utah protect my personal information?** | To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. |
| **How does Bank of Utah collect my personal information?** | We collect your personal information, for example, from<br>■ Information we receive from you on applications or other forms<br>■ Information about your transactions with us<br>■ Information about your transactions with nonaffiliated third parties<br>■ Information from a consumer reporting agency |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only<br>■ sharing for affiliates' everyday business purposes--information about your creditworthiness<br>■ affiliates from using your information to market to you<br>■ sharing for nonaffiliates to market to you<br><br>State laws and individual companies may give you additional rights to limit sharing. |

**Definitions**

| | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br><br>■ *Bank of Utah has no affiliates* |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>■ *Bank of Utah does not share with nonaffiliates so they can market to you* |
| **Joint marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>■ *Bank of Utah's joint marketing partners include credit card companies, check printing companies, identity theft prevention and recovery companies, checking account benefit companies, and merchant services companies* |

# Traditional
# IRA

## Individual Retirement Account

**Self-Directed**

# TRADITIONAL INDIVIDUAL RETIREMENT CUSTODIAL ACCOUNT

(Under section 408(a) of the Internal Revenue Code)

Form **5305-A** (Rev. March 2002) Department of the Treasury Internal Revenue Service
The depositor and the custodian make the following agreement:

Do Not File with
Internal Revenue Service          ☐ Amendment

**Article I.** Except in the case of a rollover contribution described in section 402(c), 403(a)(4), 403(b)(8), 408(d)(3), or 457(e)(16), an employer contribution to a simplified employee pension plan as described in section 408(k), or a recharacterized contribution described in section 408A(d)(6), the custodian will accept only cash contributions up to $3,000 per year for tax years 2002 through 2004. That contribution limit is increased to $4,000 for tax years 2005 through 2007 and $5,000 for 2008 and thereafter. For individuals who have reached the age of 50 before the close of the tax year, the contribution limit is increased to $3,500 for tax years 2002 through 2004, $4,500 for 2005, $5,000 for 2006 and 2007, and $6,000 for 2008 and thereafter. For tax years after 2008, the above limits will be increased to reflect a cost-of-living adjustment, if any.

**Article II.** The depositor's interest in the balance in the custodial account is nonforfeitable.

**Article III.**

**1.** No part of the custodial account funds may be invested in life insurance contracts, nor may the assets of the custodial account be commingled with other property except in a common trust fund or common investment fund (within the meaning of section 408(a)(5)).

**2.** No part of the custodial account funds may be invested in collectibles (within the meaning of section 408(m)) except as otherwise permitted by section 408(m)(3), which provides an exception for certain gold, silver, and platinum coins, coins issued under the laws of any state, and certain bullion.

**Article IV.**

**1.** Notwithstanding any provision of this agreement to the contrary, the distribution of the depositor's interest in the custodial account shall be made in accordance with the following requirements and shall otherwise comply with section 408(a)(6) and the regulations thereunder, the provisions of which are herein incorporated by reference.

**2.** The depositor's entire interest in the custodial account must be, or begin to be, distributed not later than the depositor's required beginning date, April 1 following the calendar year in which the depositor reaches age 70 1/2. By that date, the depositor may elect, in a manner acceptable to the custodian, to have the balance in the custodial account distributed in:

(a) A single sum; or

(b) Payments over a period not longer than the life of the depositor or the joint lives of the depositor and his or her designated beneficiary.

**3.** If the depositor dies before his or her entire interest is distributed to him or her, the remaining interest will be distributed as follows:

(a) If the depositor dies on or after the required beginning date and:

   (i) the designated beneficiary is the depositor's surviving spouse, the remaining interest will be distributed over the surviving spouse's life expectancy as determined each year until such spouse's death, or over the period in paragraph (a)(iii) below if longer. Any interest remaining after the spouse's death will be distributed over such spouse's remaining life expectancy as determined in the year of the spouse's death and reduced by 1 for each subsequent year, or, if distributions are being made over the period in paragraph (a)(iii) below, over such period.

   (ii) the designated beneficiary is not the depositor's surviving spouse, the remaining interest will be distributed over the beneficiary's remaining life expectancy as determined in the year following the death of the depositor and reduced by 1 for each subsequent year, or over the period in paragraph (a)(iii) below if longer.

   (iii) there is no designated beneficiary, the remaining interest will be distributed over the remaining life expectancy of the depositor as determined in the year of the depositor's death and reduced by 1 for each subsequent year.

(b) If the depositor dies before the required beginning date, the remaining interest will be distributed in accordance with (i) below or, if elected or there is no designated beneficiary, in accordance with (ii) below:

   (i) The remaining interest will be distributed in accordance with paragraphs (a)(i) and (a)(ii) above (but not over the period in paragraph (a)(iii), even if longer), starting by the end of the calendar year following the year of the depositor's death. If, however, the designated beneficiary is the depositor's surviving spouse, then this distribution is not required to begin before the end of the calendar year in which the depositor would have reached age 70 1/2. But, in such case, if the depositor's surviving spouse dies before distributions are required to begin, then the remaining interest will be distributed in accordance with (a)(ii) above (but not over the period in paragraph (a)(iii), even if longer), over such spouse's designated beneficiary's life expectancy, or in accordance with (ii) below if there is no such designated beneficiary.

   (ii) The remaining interest will be distributed by the end of the calendar year containing the fifth anniversary of the depositor's death.

**4.** If the depositor dies before his or her entire interest has been distributed and if the designated beneficiary is not the depositor's surviving spouse, no additional contributions may be accepted in the account.

**5.** The minimum amount that must be distributed each year, beginning with the year containing the depositor's required beginning date, is known as the "required minimum distribution" and is determined as follows:

(a) The required minimum distribution under paragraph 2(b) for any year, beginning with the year the depositor reaches age 70 1/2, is the depositor's account value at the close of business on December 31 of the preceding year divided by the distribution period in the uniform lifetime table in Regulations section 1.401(a)(9)-9. However, if the depositor's designated beneficiary is his or her surviving spouse, the required minimum distribution for a year shall not be more than the depositor's account value at the close of business on December 31 of the preceding year divided by the number in the joint and last survivor table in Regulations section 1.401(a)(9)-9. The required minimum distribution for a year under this paragraph (a) is determined using the depositor's (or, if applicable, the depositor and spouse's) attained age (or ages) in the year.

(b) The required minimum distribution under paragraphs 3(a) and 3(b)(i) for a year, beginning with the year following the year of the depositor's death (or the year the depositor would have reached age 70 1/2, if applicable under paragraph 3(b)(i)) is the account value at the close of business on December 31 of the preceding year divided by the life expectancy (in the single life table in Regulations section 1.401(a)(9)-9) of the individual specified in such paragraphs 3(a) and 3(b)(i).

(c) The required minimum distribution for the year the depositor reaches age 70 1/2 can be made as late as April 1 of the following year. The required minimum distribution for any other year must be made by the end of such year.

**6.** The owner of two or more traditional IRAs may satisfy the minimum distribution requirements described above by taking from one traditional IRA the amount required to satisfy the requirement for another in accordance with the regulations under section 408(a)(6).

**Article V.**

**1.** The depositor agrees to provide the custodian with all information necessary to prepare any reports required by section 408(i) and Regulations sections 1.408-5 and 1.408-6.

**2.** The custodian agrees to submit to the Internal Revenue Service (IRS) and depositor the reports prescribed by the IRS.

**Article VI.** Notwithstanding any other articles which may be added or incorporated, the provisions of Articles I through III and this sentence will be controlling. Any additional articles inconsistent with section 408(a) and the related regulations will be invalid.

**Article VII.** This agreement will be amended as necessary to comply with the provisions of the Code and the related regulations. Other amendments may be made with the consent of the persons whose signatures appear on the Application that accompanies this agreement.

**Article VIII.**

**8.01 Your IRA Documents.** This Internal Revenue Service (IRS) Forms 5305 series agreement for traditional IRAs, amendments, application, beneficiary designation, disclosure statement, and other documentation, if any, set forth the terms and conditions governing your individual retirement account (IRA) and your or, after your death, your beneficiary's relationship with us. The disclosure statement sets forth various IRA rules in simpler language. Unless it would be inconsistent to do so, words and phrases used in this document should be construed so the singular includes the plural and the plural includes the singular.

**8.02 Definitions.** This agreement refers to you as the depositor, and us as the custodian. References to "you," "your," and "IRA owner" will mean the depositor, and "we," "us," and "our" will mean the custodian. The terms "you" and "your" will apply to you. In the event you appoint a third party, or have a third party appointed on your behalf, to handle certain transactions affecting your IRA, such agent will be considered "you" for purposes of this agreement. Additionally, references to "IRA" will mean the custodial account.

**8.03 Additional Provisions.** Additional provisions may be attached to, and made a part of, this agreement by either party. The provisions must be in writing, agreed to by us, and in a format acceptable to us.

**8.04 Our Fees and Expenses.** We may charge reasonable fees and are entitled to reimbursement for any expenses we incur in establishing and maintaining your IRA. We may change the fees at any time by providing you with notice of such changes. We will provide you with fee disclosures and policies. We may deduct fees directly from your IRA assets or bill you separately. Fees billed separately to you and paid by you may be claimed on your federal income tax return as miscellaneous itemized deductions. The payment of fees has no effect on your contributions. Additionally, we have the right to liquidate your IRA assets to pay such fees and expenses. If you do not direct us on the liquidation, we will liquidate the assets of our choice and will not be responsible for any losses or claims that may arise out of the liquidation.

**8.05 Amendments.** We may amend your IRA in any respect and at any time, including retroactively, to comply with applicable laws governing retirement plans and the corresponding regulations. Any other amendments shall require your consent, by action or no action, and will be preceded by written notice to you. Unless otherwise required, you are deemed to automatically consent to an amendment, which means that your written approval is not required for the amendment to apply to the IRA. In certain instances the governing law or our policies may require us to secure your written consent before an amendment can be applied to the IRA. If you want to withhold your consent to an amendment, you must provide us with a written objection within 30 days of the receipt date of the amendment.

**8.06 Notice and Delivery.** Any notice mailed to you will be deemed delivered and received by you, five days after the postmark date. This fifth day following the postmark is the receipt date. Notices will be mailed to the last address we have in our records. You are responsible for ensuring that we have your proper mailing address. Upon your consent, we may provide you with notice in a delivery format other than by mail. Such formats may include various electronic deliveries. Any notice, including terminations, change in personal information, or contributions mailed to us will be deemed delivered when actually received by us based on our ordinary business practices. All notices must be in writing unless our policies and procedures provide for oral notices.

**8.07 Applicable Laws.** This agreement will be construed and interpreted in accordance with the laws of, and venued in, our state of domicile.

**8.08 Disqualifying Provisions.** Any provision of this agreement that would disqualify the IRA will be disregarded to the extent necessary to maintain the account as an IRA.

**8.09 Interpretation.** If any question arises as to the meaning of any provision of this agreement, then we shall be authorized to interpret any such provision, and our interpretation will be binding upon all parties.

**8.10 Representations and Indemnity.** You represent that any information you or your agents provide to us is accurate and complete, and that your actions comply with this agreement and applicable laws governing retirement plans. You understand that we will rely on the information provided by you, and that we have no duty to inquire about or investigate such information. We are not responsible for any losses or expenses that may result from your information, direction, or actions, including your failure to act. You agree to hold us harmless, to indemnify, and to defend us against any and all actions or claims arising from, and liabilities and losses incurred by reason of your information, direction, or actions. Additionally, you represent that it is your responsibility to seek the guidance of a tax or legal professional for your IRA issues.

We are not responsible for determining whether any contributions or distributions comply with this agreement or the federal laws governing retirement plans. We are not responsible for any taxes, judgments, penalties or expenses incurred in connection with your IRA, or any losses that are a result of events beyond our control. We have no responsibility to process transactions until after we have received appropriate direction and documentation, and we have had a reasonable opportunity to process the transactions. We are not responsible for interpreting or directing beneficiary designations or divisions, including separate accounting, court orders, penalty exception determinations, or other similar situations.

**8.11 Investment of IRA Assets.**

(a) **Investment of Contributions.** You may invest IRA contributions in any IRA investments we offer. If you fail to provide us with investment direction for a contribution, we will return or hold all or part of such contribution based on our policies and procedures. We will not be responsible for any loss of IRA income associated with your failure to provide appropriate investment direction.

(b) **Directing Investments.** All investment directions must be in a format or manner acceptable to us. You may invest in any IRA investments that you are qualified to purchase, and that we are authorized to offer and do offer at the time of the investment selection, and that are acceptable under the applicable laws governing retirement plans. Your IRA investments will generally be registered in our name or our nominee's name (if applicable) for the benefit of your IRA. Specific investment information may be provided at the time of the investment.

Based on our policies, we may allow you to delegate the investment responsibility of your IRA to an agent by providing us with written notice of delegation in a format acceptable to us. We will not review or guide your agent's decisions, and you are responsible for the agent's actions or failure to act. We are not responsible for directing your investments, or providing investment advice, including guidance on the suitability or potential market value of various investments. For investments in securities, we will exercise voting rights and other similar rights only at your direction, and according to our then current policies and procedures.

(c) **Investment Fees and Asset Liquidation.** Certain investment-related fees, which apply to your IRA, must be charged to your IRA and cannot be paid by you. We have the right to liquidate your IRA assets to pay fees and expenses, federal tax levies, or other assessments on your IRA. If you do not direct us on the liquidation, we will liquidate the assets of our choice and will not be responsible for any losses or claims that may arise out of the liquidation.

(d) **Deposit Investments.** The deposit investments provided by us may include savings, share, or money market accounts, and certificates of deposit (CDs), and will earn a reasonable rate .

(e) **Nondeposit Investments.** Nondeposit investments include investments in property, annuities, mutual funds, stocks, bonds, and government, municipal and U.S. Treasury securities, and other similar investments. Most, if not all, of the investments we offer are subject to investment risks, including possible loss of the principal amount invested. Special disclosures concerning your investments will be provided to you.

(f) **Qualifying Longevity Annuity Contract (QLAC).** A QLAC is an investment vehicle and payout option we may choose to allow or purchase on your behalf. In summary, a QLAC is an annuity contract purchased from an insurance company that provides a delayed annuity payment starting date which will be after your required beginning date but must begin no later than the first day of the month following your 85th birthday. Premiums paid from your IRA to purchase a QLAC are limited to the lesser of: $125,000 (subject to annual cost-of-living adjustments) or 25% of your aggregated traditional (including SEP) and SIMPLE IRA balances. The $125,000 limit is also reduced by the amount of premium you paid from an employer-sponsored retirement plan (i.e., 401(k) plan) to purchase a QLAC. We may rely on your representations that premiums paid for your QLAC(s) in other IRAs or employer plans do not exceed the $125,000 limit nor exceed 25% of aggregated IRA balances. Please refer to the Disclosure Statement for additional QLAC information.

**8.12 Distributions.** Withdrawal requests must be in a format acceptable to us, or on forms provided by us. We may require you, or your beneficiary after your death, to elect a distribution reason, provide documentation, and provide a proper tax identification number before we process a distribution. These withdrawals may be subject to taxes, withholding, and penalties. Distributions will generally be in cash or in kind based on our policies. In-kind distributions will be valued according to our policies at the time of the distribution.

Required minimum distributions will be based on Treasury Regulations 1.401(a)(9) and 1.408-8 in addition to our then current policies and procedures. The required minimum distribution regulations are described within the Disclosure Statement. In the event you, or your beneficiary after your death, fail to take a required minimum distribution we may do nothing, distribute your entire IRA balance, or distribute the amount of your required minimum distribution based on our own calculation.

**Cash or In-Kind Contributions.** We may accept transfers,

**8.13** rollovers, recharacterizations, and other similar contributions in cash or in kind from other IRAs, eligible retirement plans, and as allowed by law. Prior to completing such transactions we may require that you provide certain information in a format acceptable to us. In-kind contributions will be valued according to our policies and procedures at the time of the contribution.

**8.14 Reports and Records.** We will maintain the records necessary for IRS reporting on this IRA. Required reports will be provided to you, or your beneficiary after your death, and the IRS. If you believe that your report is inaccurate or incomplete you must notify us in writing within 30 days following the receipt date. Your investments may require additional state and federal reporting.

**8.15 Termination.** You may terminate this agreement without our consent by providing us with a written notice of termination. A termination and the resulting distribution or transfer will be processed and completed as soon as administratively feasible following the receipt of proper notice. At the time of termination we may retain the sum necessary to cover any fees and expenses, taxes, or investment penalties.

**8.16 Our Resignation.** We can resign at any time by providing you with 30 days written notice prior to the resignation date, or within five days of our receipt of your written objection to an amendment. In the event you materially breach this agreement, we can terminate this agreement by providing you with five days prior written notice. Upon our resignation, you must appoint a qualified successor custodian or trustee. Your IRA assets will be transferred to the successor custodian or trustee once we have received appropriate direction. Transfers will be completed within a reasonable time following our resignation notice and the payment of your remaining IRA fees or expenses. At the time of resignation we may retain the sum necessary to cover any fees and expenses, taxes, or investment penalties. If you fail to provide us with acceptable transfer direction within 30 days from the date of the notice, we can transfer the assets to a successor custodian or trustee of our choice, distribute the assets to you in kind, or liquidate the assets and distribute them to you in cash.

**8.17 Successor Organization.** If we merge with, purchase, or are acquired by, another organization, such organization, if qualified, may automatically become the successor custodian or trustee of your IRA.

# IRS FORM 5305-A INSTRUCTIONS (Rev. 3-2002)

## General Instructions

*Section references are to the Internal Revenue Code unless otherwise noted.*

### Purpose of Form

Form 5305-A is a model custodial account agreement that meets the requirements of section 408(a) and has been pre-approved by the IRS. A traditional individual retirement account (traditional IRA) is established after the form is fully executed by both the individual (depositor) and the custodian and must be completed no later than the due date of the individual's income tax return for the tax year (excluding extensions). This account must be created in the United States for the exclusive benefit of the depositor and his or her beneficiaries.

**Do not** file Form 5305-A with the IRS. Instead, keep it with your records.

For more information on IRAs, including the required disclosures the custodian must give the depositor, see **Pub. 590**, Individual Retirement Arrangements (IRAs).

## Definitions

**Custodian.** The custodian must be a bank or savings and loan association, as defined in section 408(n), or any person who has the approval of the IRS to act as custodian. **Depositor.** The depositor is the person who establishes the custodial account.

### Identifying Number

The depositor's social security number will serve as the identification number of his or her IRA. An employer identification number (EIN) is required only for an IRA for which a return is filed to report unrelated business taxable income. An EIN is required for a common fund created for IRAs.

### Traditional IRA for Nonworking Spouse

Form 5305-A may be used to establish the IRA custodial account for a nonworking spouse.

Contributions to an IRA custodial account for a nonworking spouse must be made to a separate IRA custodial account established by the nonworking spouse.

## Specific Instructions

**Article IV.** Distributions made under this article may be made in a single sum, periodic payment, or a combination of both. The distribution option should be reviewed in the year the depositor reaches age 70 1/2 to ensure that the requirements of section 408(a)(6) have been met.

**Article VIII.** Article VIII and any that follow it may incorporate additional provisions that are agreed to by the depositor and custodian to complete the agreement. They may include, for example, definitions, investment powers, voting rights, exculpatory provisions, amendment and termination, removal of the custodian, custodian's fees, state law requirements, beginning date of distributions, accepting only cash, treatment of excess contributions, prohibited transactions with the depositor, etc. Attach additional pages if necessary.

# TRADITIONAL IRA DISCLOSURE STATEMENT

**Right to Revoke Your IRA.** With some exceptions, you have the right to revoke this individual retirement account (IRA) within seven days of receiving this Disclosure Statement. If you revoke your IRA, we will return your entire IRA contribution without any adjustment for items such as sales commissions, administrative expenses, or fluctuation in market value. Exceptions to your right of revocation include that you may not revoke an IRA established with a recharacterized contribution, nor do you have the right to revoke upon amendment of this agreement.

You may revoke your IRA by providing us with written notice. The revocation notice may be mailed by first-class mail, or hand delivered to us. If your notice is mailed by first-class, postage pre-paid mail, the revocation will be deemed mailed on the date of the postmark.

If you have any questions or concerns regarding the revocation of your IRA, please call or write to us. Our telephone number, address, and contact name, to be used for communications, can be found on the application that accompanies this Disclosure Statement and Internal Revenue Service (IRS) Forms 5305 series agreement.

**This Disclosure Statement.** This Disclosure Statement provides you, and your beneficiaries after your death, with a summary of the rules and regulations governing this IRA.

**Definitions.** The IRS Forms 5305 series agreement for traditional IRAs contains a definitions section. The definitions found in such section apply to this agreement. The IRS refers to you as the depositor, and us as the custodian. References to "you," "your," and "IRA owner" will mean the depositor, and "we," "us," and "our" will mean the custodian. The terms "you" and "your" will apply to you. In the event you appoint a third party, or have a third party appointed on your behalf to handle certain transactions affecting your IRA, such third party will be considered your agent and, therefore, "you" for purposes of this agreement. Additionally, references to "IRA" and "traditional IRA" will mean the custodial account and include an IRA indicated to be a SEP IRA.

**For Additional Guidance.** It is in your best interest to seek the guidance of a tax or legal professional before completing any IRA establishment documents. For more information, you can also refer to IRS Publication 590-A, *Contributions to Individual Retirement Arrangements (IRAs)*, IRS Publication 590-B, *Distributions from Individual Retirement Arrangements (IRAs)*, instructions to your federal income tax return, your local IRS office, or the IRS's web site at www.irs.gov.

**IRA Restrictions and Approval.**

1. **IRS Form 5305 or 5305-A Agreement.** This Disclosure Statement and the IRS Forms 5305 series agreement, amendments, application, and additional provisions set forth the terms and conditions governing your traditional IRA. Such documents are the agreement.
2. **Individual/Beneficiary Benefit.** This IRA must be for the exclusive benefit of you, and upon your death, your beneficiaries. The IRA must be established in your name and not in the name of your beneficiary, living trust, or another party or entity.
3. **Beneficiary Designation.** By completing the appropriate section on the corresponding IRA application you may designate any person(s) as your beneficiary to receive your IRA assets upon your death. You may also change or revoke an existing designation in such manner and in accordance with such rules as we prescribe for this purpose. If there is no beneficiary designation on file at the time of your death, or if none of the beneficiaries on file are alive at the time of your death, your IRA assets will be paid to your estate. We may rely on the latest beneficiary designation on file at the time of your death, will be fully protected in doing so, and will have no liability whatsoever to any person making a claim to the IRA assets under a subsequently filed designation or for any other reason.
4. **Cash Contributions.** Regular or annual IRA contributions must be in cash, which may include a check, money order, or wire transfer. It is within our discretion to accept in-kind contributions for rollovers, transfers, or recharacterizations.
5. **IRA Custodian.** An IRA custodian must be a bank, federally insured credit union, savings and loan association, trust company, or other entity, which is approved by the Secretary of the Treasury to act as an IRA custodian.
6. **Prohibition Against Life Insurance and Commingling.** None of your IRA assets may be invested in life insurance contracts, or commingled with other property, except in a common trust fund or common investment fund.
7. **Nonforfeitability.** The assets in your IRA are not forfeitable.
8. **Collectibles.** Generally, none of your IRA assets may be invested in collectibles, including any work of art, rug, or antique, metal or gem, stamp or coin, alcoholic beverage, or any other tangible personal property. If we allow, you may invest your IRA assets in the following coins and bullion: certain gold, silver, and platinum coins minted by the United States; a coin issued under the laws of any state; and any gold, silver, platinum, and palladium bullion of a certain fineness, and only if such coins and bullion are held by us. For additional guidance on collectibles, see Section 408(m) of the Internal Revenue Code (IRC).
9. **Cash or In-Kind Rollovers.** You may be eligible to make a rollover contribution, in cash or in kind, to an IRA or certain employer-sponsored eligible retirement plans. Rollovers to and from IRAs and eligible retirement plans are described in greater detail elsewhere in this Disclosure Statement.
10. **Required Minimum Distribution (RMD) Rules.** Your IRA is subject to the RMD rules summarized in this agreement.
11. **No Prohibited Transactions.** If your account stops being an IRA because you or your beneficiary engaged in a prohibited transaction, the account is treated as distributing all its assets to you at their fair market values on the first day of the year. If the total of those values is more than your basis in the IRA, you will have a taxable gain that is includible in your income.
12. **No Pledging.** If you use a part of your IRA as security for a loan, that part is treated as a distribution and is included in your gross income. You may have to pay the 10% additional tax on early distributions.
13. **IRS Approval of Form.** This agreement includes an IRS Forms 5305 series agreement. This IRS document has been approved by the IRS. This approval is not a determination of its merits, and not an endorsement of the investments provided by us, or the operation of the IRA.
14. **State Laws.** State laws may affect your IRA in certain situations, including deductions, beneficiary designations, agency relationships, consent, taxes, tax withholding, and reporting.

**IRA Eligibility and Contributions.**

1. **Regular or Annual IRA Contribution.** An annual contribution, commonly referred to as a regular contribution, is your contribution for the tax year, and is based on your and your spouse's compensation if filing jointly. Your designation of the tax year for your contribution is irrevocable. You may direct all or a portion of any tax refund directly to an IRA.

    If you are married, file a joint federal income tax return, and are younger than age 70 1/2 during the entire tax year, you or your spouse may make a contribution on your behalf for that tax year if you or your spouse have compensation. This contribution must be made into your IRA, and it cannot exceed the contribution limits applicable to regular IRA contributions.
2. **Compensation for Eligibility.** You are eligible to contribute to your IRA if you are younger than age 70 1/2 during the entire tax year for which your contribution applies, and you have compensation (also referred to as earned income).

    Common examples of compensation include wages, salary, tips, bonuses, and other amounts received for providing personal services, and earned income from self-employment. Compensation does not include earnings and profits from property such as dividends, interest, or capital gains, or pension, annuity, or deferred compensation plan amounts. Your compensation includes any taxable alimony or separate maintenance payments you may receive under a divorce decree or separate maintenance agreement.
3. **Catch-Up Contributions.** Catch-up contributions are regular IRA contributions made in addition to any other regular IRA contributions. You are eligible to make catch-up contributions if you meet the eligibility requirements for regular contributions and you attain age 50 by the end of the taxable year for which a catch-up contribution is being made.

4. **SEP or SIMPLE IRA Contributions.** Your employer may make simplified employee pension (SEP) plan contributions to this IRA in addition to your own regular IRA contributions. Your employer is responsible for verifying the SEP eligibility requirements and determining the SEP contribution amount. This IRA cannot accept Savings Incentive Match Plan for Employees of Small Employers (SIMPLE) IRA contributions from your employer.

5. **Maximum Contribution Limits.** Your regular (including catch-up) IRA contributions are limited to the lesser of 100 percent of your and your spouse's compensation if filing jointly or the dollar amounts set forth on the following chart:

| Contribution Tax Year | Regular Contribution Limit | Catch-Up Contribution Limit | Total Contribution Limit |
|---|---|---|---|
| 2016 | $5,500 | $1,000 | $6,500 |
| 2017 | $5,500 | $1,000 | $6,500 |
| 2018 and later years | $5,500+ COLA* | $1,000 | $6,500+ COLA* |

\* The regular IRA contribution limits are subject to annual cost-of-living adjustments (COLAs), if any.

6. **Contribution Deadline.** You may make regular (including catch-up) IRA contributions any time for a taxable year up to and including your federal income tax return due date, excluding extensions, for that taxable year. The due date for most taxpayers is April 15. The deadline may be extended in some situations. Examples include a federally declared disaster, a terroristic or military action, or service in a combat zone.

7. **Roth IRA and Traditional IRA Contribution Limit.** Your combined regular (including catch-up) traditional IRA and Roth IRA contributions may not exceed the maximum contribution limit set forth in the previous chart.

**Tax Deductions.** Tax deductions apply only to your regular (including catch-up) IRA contribution amount, and the deduction may never exceed your maximum regular (including catch-up) contribution amount for the contribution year. Your deduction depends on whether you and your spouse (if applicable) are active participants, and your modified adjusted gross income (MAGI). Your MAGI is your adjusted gross income from your federal income tax return for the contribution year with certain subtractions and additions. For more information on MAGI, see the instructions to your federal income tax return or IRS Publication 590-A, *Contributions to Individual Retirement Arrangements (IRAs)*.

1. **Active Participant.** You could be an active participant in one of the following employer-sponsored retirement plans:
   a. a qualified pension, profit sharing, 401(k), money purchase pension, employee stock ownership plan, or stock bonus plan;
   b. a SEP plan;
   c. a SIMPLE IRA or SIMPLE 401(k) plan;
   d. a qualified annuity plan of an employer;
   e. a tax-sheltered annuity plan for employees of certain tax-exempt organizations or public schools;
   f. a Section 501(c)(18) trust;
   g. an H.R. 10 or Keogh plan (for self-employed individuals); or
   h. a plan for federal, state, or local government employees or by an agency or instrumentality thereof (other than a section 457(b) plan).

   For assistance in determining whether you (or your spouse) are an active participant, see your employer or a tax or legal professional. IRS Form W-2, *Wage and Tax Statement*, as provided by your employer, should indicate whether you are an active participant.

2. **Deduction Limits.** If you are not an active participant, your entire regular contribution to your IRA is generally deductible. Your marital status may affect your deduction amount. If you are an active participant, the amount you can deduct depends on your MAGI for the tax year for which the contribution applies. The following chart shows how your active participant status and tax-filing status and MAGI affect your deduction. If you are an active participant, the greater your MAGI, the lesser the amount you may deduct.

| | **MAGI THRESHOLDS** | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | **Filing Status** | | | | | |
| Tax Year | Single, Active Participant | | Married, Filing Jointly, Active Participant | | Married, Filing Separately, Active Participant | | Married, Filing Jointly, Not an Active Participant, but Spouse is | |
| | Low End | High End | Low End | High End | Low End | High End | Low End | High End |
| 2016 | $61,000 | $71,000 | $98,000 | $118,000 | $0 | $10,000 | $184,000 | $194,000 |
| 2017 | $62,000* | $72,000 | $99,000 | $119,000 | $0 | $10,000 | $186,000 | $196,000 |
| 2018 and later years | $62,000* | $72,000* | $99,000* | $119,000* | $0 | $10,000 | $186,000* | $196,000* |

\* The MAGI thresholds are subject to annual cost-of-living adjustments, if any.

3. **Deduction Calculation.** If your MAGI is equal to or is less than the applicable Low End number in the chart based on your tax-filing status, then you may deduct your entire regular (including catch-up) IRA contribution. If your MAGI meets or exceeds the High End number, you may not deduct any portion of your contribution. If your MAGI is between the Low End and High End numbers, which is the phaseout range, see your tax or legal professional for assistance in determining your deduction amount. IRS Publication 590-A, *Contributions to Individual Retirement Arrangements (IRAs)*, and the instructions to your federal income tax return also contain helpful calculation information.

4. **Nondeductible Contributions.** You may make nondeductible contributions to your IRA if you are not able to, or choose not to, deduct your contributions. You report nondeductible contributions to the IRS on IRS Form 8606, *Nondeductible IRAs*, which is attached to your federal income tax return for the year of the contribution. Failure to report nondeductible contributions, or the overstatement of nondeductible contributions, may result in IRS penalties.

**Nonrefundable Tax Credit.** You may be eligible to take a tax credit for regular IRA contributions. The credit is equal to a percentage of your qualified contributions up to $2,000. The credit cannot exceed $1,000 for any tax year, and is in addition to any deduction that may apply. To be eligible for the tax credit, you must be age 18 or older by the end of the applicable tax year, not a dependent of another taxpayer, not a full-time student, and satisfy certain restrictions on distributions.

**Moving Assets To and From IRAs.** There are a variety of transactions that allow you to move your retirement assets to and from your IRAs and certain other eligible retirement plans in cash or in kind based on our policies. We have sole discretion on whether we will accept, and how we will process, movements of assets to and from IRAs. We or any other financial organizations involved in the transaction may require documentation for such activities.

1. **IRA-to-IRA Transfers.** You may transfer all or a portion of your traditional IRA assets from one traditional IRA to another traditional IRA. An IRA transfer means that the IRA assets move from one IRA to another IRA in a manner that prevents you from cashing or liquidating the IRA assets, or even depositing the assets anywhere except in the receiving IRA. Transfers are not taxable or reportable, and the IRS does not impose timing or frequency restrictions on transfers. You may be required to complete a transfer authorization form prior to transferring your IRA assets.

2. **IRA-to-IRA Rollovers.** An IRA rollover is another way to move assets tax-free between IRAs. You may roll over all or a portion of your IRA assets by taking a distribution from an IRA and recontributing it as a rollover contribution into the same or another IRA. A rollover contribution is irrevocable. You must report your IRA rollover to the IRS on your federal income tax return. Your contribution may only be designated as a rollover if the IRA distribution is deposited within 60 calendar days following the date you receive the distributed assets. The 60-day period may be extended to 120 days for a first-time homebuyer distribution where there is a delay or cancellation in the purchase or construction of the home. You are limited to one rollover per 1-year (12-month) period. You may only roll over one IRA distribution per 1-year period aggregated between all of your IRAs. For this purpose IRA includes

rollovers among traditional (including SEP), SIMPLE, and Roth IRAs. For example, if you have IRA 1, IRA 2, and IRA 3, and take a distribution from IRA 1 and roll it over into a new IRA 4, you will have to wait 1 year from the date of that distribution to take another distribution from any of your IRAs and subsequently roll it over into an IRA. The 1-year limitation does not apply to rollovers related to first-time homebuyer distributions, distributions converted to a Roth IRA, and rollovers to or from an employer-sponsored eligible retirement plan.

3. **Rollovers and Transfers from SIMPLE IRAs.** You may not roll over or transfer assets from a SIMPLE IRA to a traditional IRA or other eligible retirement plan until two years have passed since the date on which you first participated in an employer's SIMPLE, which is the initial contribution date. If you participated in SIMPLEs of different employers, the initial contribution date and two-year period are determined separately for SIMPLE IRA assets from each employer.

4. **Rollovers to SIMPLE IRAs.** You may not roll over assets to a SIMPLE IRA from a traditional IRA or other eligible retirement plan until two years have passed since you first participated in an employer's SIMPLE, which is the initial contribution date. If you participated in SIMPLEs of different employers, the initial contribution date and two-year period are determined separately for SIMPLE IRA assets from each employer.

5. **Rollovers from Employer-Sponsored Eligible Retirement Plans.** You may directly or indirectly roll over assets from an eligible retirement plan, sponsored by your employer, into your IRA. Your plan administrator or employer is responsible for determining the amount of your assets in its eligible retirement plan that are eligible for rollover to an IRA or other eligible retirement plan.
   a. **Eligible Retirement Plan.** Eligible retirement plans include qualified trusts under IRC Section 401(a), annuity plans under IRC Section 403(a), annuity contracts under IRC Section 403(b), and certain governmental IRC Section 457(b) plans. Common names for these plans include 401(k), profit sharing, pension, money purchase, federal thrift savings, and tax-sheltered annuity plans.
   b. **Eligible Distribution.** Not all distributions from an employer-sponsored eligible retirement plan are eligible for rollover to an IRA. The most common distributions, which are not eligible for rollover, include RMDs, defaulted loans, substantially equal periodic payments as defined in IRC Section 402(c)(4)(A), distributions paid to nonspouse beneficiaries, and hardship distributions. Your employer determines which assets may not be rolled over, and must provide you with an IRC Section 402(f) notice of taxation, which explains the tax issues concerning distributions.
   c. **Direct Rollover.** A direct rollover moves eligible retirement plan assets from your employer-sponsored eligible retirement plan to your IRA in a manner that prevents you from cashing or liquidating the plan assets, or even depositing the assets anywhere except in the receiving IRA. A direct rollover is reported to the IRS but, if properly completed, the transaction is not subject to tax or penalty. There are no IRS limitations, such as the 60-day period or one per 1-year limitation, on direct rollovers. This agreement should not be used for a direct rollover from an eligible retirement plan to an inherited traditional IRA.
   d. **Indirect Rollover and Withholding.** An indirect rollover begins with a plan distribution made payable to you. If you receive distributions during the tax year totaling more than $200, your employer is required to withhold 20 percent on the taxable portion of your eligible rollover distribution as a prepayment of federal income taxes on distributions. You may make up the 20 percent withholding from your own funds at the time you deposit your distribution into an IRA, but that portion is generally treated as taxable income. If you are younger than age 59 1/2, you are subject to a 10 percent early-distribution penalty tax on the taxable amount of the distribution that is not rolled over, unless a penalty tax exception applies. Your distribution is only eligible to be contributed to an IRA during the 60 days following your receipt of a plan distribution. Your decision to contribute the assets to the IRA as a rollover contribution is irrevocable. The one per 1-year limitation does not apply to rollovers from

employer-sponsored eligible retirement plans. State withholding may apply to eligible rollover distributions.
   e. **Separate or Conduit IRA.** In certain cases, it may be to your benefit to make the rollover contribution into a separate or conduit IRA. Conduit IRAs can provide individuals with a means of tracking IRA assets from different sources, which may be subject to certain restrictions or favorable tax treatment.

6. **Waiver of the 60-Day Period.** The Secretary of the Treasury may waive the 60-day period for completing rollovers in certain situations such as casualty, disaster, or other events beyond the reasonable control of the individual who is subject to the 60-day period.

7. **Traditional IRA to Employer-Sponsored Eligible Retirement Plans.** You may directly or indirectly roll over a taxable distribution from your IRA to an employer-sponsored eligible retirement plan which accepts rollover contributions. Nontaxable or nondeductible IRA assets may not be rolled over into employer-sponsored eligible retirement plans. You can generally roll over, to employer-sponsored eligible retirement plans, only the aggregate taxable balance in all of your traditional IRAs and SIMPLE IRAs. The one per 1-year limitation does not apply to these rollovers.

8. **Transfers Due to Divorce.** Your former spouse, pursuant to a divorce decree or legal separation order, may transfer assets from your traditional IRA to his/her traditional IRA.

9. **Qualified Reservist Contributions.** If you are a qualified reservist ordered or called to active duty after September 11, 2001 more than 179 days (or for an indefinite period), and take an IRA distribution or take certain elective deferrals from an eligible retirement plan after September 11, 2001, and before the end of your active duty, you may make one or more contributions of these assets to your IRA within two years of the end of your active duty.

10. **Qualified Settlement Income.** You may roll over certain qualified settlement income (e.g, an amount received in connection with the Exxon Valdez litigation) to your IRA under limits provided by law. Generally, the one per 1-year limitation does not apply to such rollovers. It is in your best interest to seek the guidance of a tax or legal professional before taking advantage of such rollover or taking such assets from the IRA.

11. **Rollovers Due to Airline Carrier Bankruptcy.** If you are a qualified airline employee and receive an airline payment amount as defined by law, up to 90 percent of the amount may be rolled over to a traditional IRA. You must roll over the airline payment amount within 180 days of its receipt.

## Movement of Assets Between Traditional and Roth IRAs.

1. **Traditional IRA to Roth IRA Conversions.** You may convert all or a portion of your traditional IRA assets to a Roth IRA. Your conversion assets (excluding prorated nondeductible contributions) are subject to federal income tax. Your conversion must be reported to the IRS. The 10 percent early-distribution penalty tax does not apply to conversions. The one per 1-year limitation does not apply to conversions. If you elect to convert your assets using a rollover transaction, the 60-day rule applies.

2. **Traditional IRA and Roth IRA Recharacterizations.** You may recharacterize, or choose to treat all or a portion of your regular (including catch-up) traditional IRA contribution as a regular Roth IRA contribution. Similarly, you may recharacterize your regular and catch-up Roth IRA contribution as a regular traditional IRA contribution. You may cancel a conversion through a recharacterization of all or a portion of the amount converted from a traditional IRA to a Roth IRA. You may also recharacterize the amount rolled or directly rolled over to a Roth IRA from an eligible retirement plan, or other recharacterization, as provided by law. A recharacterization election is irrevocable. You must complete a recharacterization no later than your federal income tax-filing due date, including extensions, for the year you make the initial contribution. If you timely file your federal income tax return, you may still recharacterize as late as October 15 for calendar year filers. Recharacterizations must occur by transfer, which means that the assets, adjusted for gains and losses on the recharacterized

amount, must be transferred into another IRA. The recharacterized contribution is treated as though you deposited it into the second IRA on the same day you actually deposited it in the first IRA. Recharacterization transactions are reported to the IRS. The election to recharacterize may be completed on your behalf after your death. A written notice of recharacterization is required for recharacterization transactions.

3. **Traditional IRA to Roth IRA Reconversions.** A reconversion occurs when all or a portion of traditional IRA assets previously converted to a Roth IRA are recharacterized back to a traditional IRA and then converted again. After recharacterizing a conversion, you cannot reconvert until the later of: (1) the beginning of the year following the year the amount was converted, or (2) the end of the 30-day period following the day of the recharacterization. In other words, you cannot reconvert in the same year as the first conversion. Reconversion transactions are reported to the IRS.

**IRA Distributions.** You, or after your death your beneficiary, may take an IRA distribution, in cash or in kind based on our policies, at any time. However, depending on the timing and amount of your distribution you may be subject to income taxes or penalty taxes.

1. **Removal of Excess Contributions.** You may withdraw all or a portion of your excess contribution and attributable earnings by your federal income tax return due date, including extensions, for the taxable year for which you made the contribution. The excess contribution amount distributed will not be taxable, but the attributable earnings on the contribution will be taxable in the year in which you made the contribution and may be subject to the 10 percent early-distribution penalty tax. In certain situations, you may treat your excess as a regular (including catch-up) IRA contribution for the next year. If you timely file your federal income tax return, you may still remove your excess contribution, plus attributable earnings, as late as October 15 for calendar year filers.

2. **Distributions of Unwanted IRA Contributions by Tax-Filing Date.** You may withdraw all or a portion of your regular (including catch-up) IRA contribution and attributable earnings in the same manner as an excess contribution. However, you cannot apply your unwanted contribution as a regular IRA contribution for a future year. The unwanted contribution amount distributed will not be taxable, but the attributable earnings on the contribution will be taxable in the year in which you made the contribution, and may be subject to the 10 percent early-distribution penalty tax. If you timely file your federal income tax return, you may still remove your unwanted contribution, plus attributable earnings, as late as October 15 for calendar year filers.

3. **Distribution of Nondeductible and Nontaxable Contributions.** If any of your traditional IRAs or SIMPLE IRAs contain nondeductible contributions, rollovers of nontaxable distributions from employer-sponsored eligible retirement plans, or other nontaxable basis amounts, any distributions you take from any of your traditional IRAs or SIMPLE IRAs, that are not rolled over, will return to you a proportionate share of the taxable and nontaxable balances in all of your traditional IRAs and SIMPLE IRAs at the end of the tax year of your distributions. IRS Form 8606, *Nondeductible IRAs*, has been specifically designed to calculate this proportionate return. You must complete IRS Form 8606 each year you take distributions under these circumstances, and attach it to your tax return for that year to validate the nontaxable portion of your IRA distributions reported for that year.

4. **Qualified Health Savings Account (HSA) Funding Distribution.** If you are an HSA eligible individual, you may elect to take a qualified HSA funding distribution from your IRA (not including ongoing SEP and SIMPLE IRAs) to the extent such distribution is contributed to your HSA in a trustee-to-trustee transfer. This amount is aggregated with all other annual HSA contributions and is subject to your annual HSA contribution limit. A qualified HSA funding distribution election is irrevocable and is generally available once in your lifetime. A testing period applies. The testing period for this provision begins with the month of the contribution to your HSA and ends on the last day of the 12th month following such month. If you are not an eligible individual for the entire testing period, unless you die or become disabled, the amount of the distribution made under this provision will be includable in gross income for the tax year of the month you are not an eligible individual, and is subject to a 10 percent penalty tax.

5. **Qualified Charitable Distributions.** If you have attained age 70 1/2, you may be able to make tax-free distributions directly from your IRA to a qualified charitable organization. Tax-free distributions are limited to $100,000. Qualified charitable distributions are not permitted from an on-going SEP or SIMPLE IRA. Consult with your tax or legal professional regarding tax-free charitable distributions.

**RMDs For You.**

1. **After Age 70 1/2.** Your first RMD must be taken by April 1 following the year you attain age 70 1/2, which is your required beginning date (RBD). Second year and subsequent distributions must be taken by December 31 of each such year. An RMD is taxable in the calendar year you receive it.

2. **Distribution Calculations.** Your RMD will generally be calculated by dividing your previous year-end adjusted balance in your IRA by a divisor from the uniform lifetime table provided by the IRS. This table is indexed to your age attained during a distribution year. This table is used whether you have named a beneficiary and regardless of the age or type of beneficiary you may have named. However, if for any distribution year, you have as your only named beneficiary for the entire year, your spouse, who is more than ten years younger than you, the uniform lifetime table will not be used. To calculate your RMD for that year you will use the ages of you and your spouse at the end of that year to determine a joint life expectancy divisor from the IRS's joint and last survivor table. This will be the case even if your spouse dies, or you become divorced and do not change your beneficiary during that year. The fair market value of a qualifying longevity annuity contract (QLAC) is not included in the adjusted balance for RMD calculations.

3. **Failure to Withdraw an RMD.** If you do not withdraw your RMD by its required distribution date, you will owe a 50 percent excess accumulation penalty tax on the amount not withdrawn. You can always take more than your RMD in any year but no additional amounts taken can be credited to a subsequent year's RMD.

4. **Multiple IRAs.** If you have more than one traditional IRA or SIMPLE IRA you must calculate a separate RMD for each one. You may, however, take the aggregate total of your RMDs from any one or more of your personal traditional IRAs (including SEP IRAs) or SIMPLE IRAs.

5. **No Rollovers of RMDS.** An RMD must be satisfied before you can roll over any portion of your IRA account balance. The first distributions made during a year will be considered RMDs and can be satisfied by earlier distributions from your other traditional IRAs or SIMPLE IRAs that are aggregated. Any RMD that is rolled over will be subject to taxation and considered an excess contribution until corrected.

6. **Transfers of RMDs.** Transfers are not considered distributions. You can transfer any portion of your traditional IRA or SIMPLE IRA at any time during the year provided you satisfy your aggregate RMDs before the end of the distribution year.

7. **Qualifying Longevity Annuity Contract (QLAC).** The fair market value of any QLAC you hold in this IRA is not included in determining your adjusted account balance when calculating your RMD. If however, you make an excess premium payment (premium payment that causes you to exceed the $125,000 (as adjusted) or 25% of balance limitations) and the excess premium is returned to the non-QLAC portion of your IRA after the valuation date to determine the next year's RMD, such amount is added to the adjusted account balance used for the year of the return to calculate your RMD.

**RMDs For Your Beneficiaries.** Your beneficiaries will generally have until December 31 of the year following your death year to begin RMDs. Exceptions exist for your surviving spouse and for any beneficiary who must distribute or chooses to distribute his/her share of your traditional IRA within a five-year period. If your death occurs on or after your RBD, your beneficiaries must withdraw any of your RMD that you had not received during the year of your death.

1. **Distribution Calculations In General.** Most beneficiaries will use a single life expectancy method to satisfy these RMDs unless they elect the five-year rule. The five-year rule requires your beneficiary to completely withdraw your IRA assets by the end of the fifth year

following your death year. The single life expectancy method requires a calculation each year which takes the prior year-end balance and divides it by that current year's single life expectancy divisor. The single life expectancy divisor, using the IRS's single life table, will be determined by using the age on December 31 in the year following death of the oldest designated beneficiary unless multiple beneficiaries exist and separate accounting applies. This initially determined divisor is reduced by one for each subsequent year's calculation.

This general rule for determining life expectancy applies if your IRA has at least one designated beneficiary, whether your death occurs before or on or after your RBD. However, if you die on or after your RBD, your remaining life expectancy, determined in your death year and reduced by one in each subsequent year, may be used to determine the distribution each year. This is true if your remaining life expectancy is longer than the beneficiary's life expectancy that same year, determined in the year after your death and reduced by one in each subsequent year, or if your IRA is treated as having no designated beneficiary.

2. **Designated Beneficiary.** A designated beneficiary is any named beneficiary who has an interest in your IRA on the determination date, which is September 30 of the year following your death year. Named beneficiaries who completely distribute their interests in your IRA, or completely disclaim their interests in your IRA under IRC Section 2518, will not be considered when designated beneficiaries are determined. Named beneficiaries who die after your death but before the determination date will still be considered for the sake of determining the distribution period. If any named beneficiary that is not an individual, such as an estate or charity, has an interest in your IRA on the determination date, and separate accounting does not apply, your IRA will be treated as having no designated beneficiary.

If you name a qualified trust, which is defined in Treasury Regulation 1.401(a)(9)-4, Q&A 5, as your IRA beneficiary, the beneficiaries of the qualified trust are treated as the beneficiaries of your IRA for purposes of determining designated beneficiaries and the appropriate life expectancy period after your death. A qualified trust provides documentation of its beneficiaries to the custodian.

3. **Death Before Your RBD With No Designated Beneficiary.** If you die before your RBD and your IRA is treated as having no designated beneficiary, your named beneficiaries will be required to completely withdraw your IRA assets by the end of the fifth year following your death year.

4. **Death On or After Your RBD With No Designated Beneficiary.** If you die on or after your RBD and your IRA is treated as having no designated beneficiary, RMDs will continue to your named beneficiaries over your remaining single expectancy as determined in your death year. Once determined, this life expectancy divisor will be reduced by one for each subsequent year of the distribution period.

5. **Spouse Beneficiary.** If your spouse is your only designated beneficiary on the determination date, or if there are multiple designated beneficiaries and separate accounting applies, he/she will use his/her age each year to determine the life expectancy divisor for calculating that year's RMD. If your spouse is the only designated beneficiary, or if there are multiple designated beneficiaries and separate accounting applies, and you die before your RBD, your surviving spouse can postpone commencement of his/her RMDs until the end of the year in which you would have attained age 70 1/2. If you die on or after your RBD, your surviving spouse will use the longer of his/her single life expectancy, determined each year after the death year using his/her attained age, or your remaining single life expectancy determined in your death year and reduced by one each subsequent year.

If your spouse is the only designated beneficiary, or if there are multiple designated beneficiaries and separate accounting applies, he/she can treat your IRA as his/her own IRA after your death. This generally happens after any of your remaining RMD amount for the year of your death has been distributed.

Your spouse beneficiary could take a distribution of his/her share of your IRA and roll it over to an IRA of his/her own.

6. **Beneficiaries Naming Successor Beneficiaries.** Our policy may allow your beneficiaries to name their own successor beneficiaries to your IRA. A successor beneficiary would receive any of your IRA assets that remain after your death and the subsequent death of your beneficiaries. This distribution would be in accordance with Article IV.3 of the agreement, and generally would not allow a successor beneficiary to calculate RMDs based on his/her own life expectancy.

7. **Separate Accounting.** Our policies may permit separate accounting to be applied to your IRA for the benefit of your beneficiaries. If permitted, separate accounting must be applied in accordance with Treasury Regulation 1.401(a)(9)-8, Q&A 2 and 3. A beneficiary is considered the only designated beneficiary of his/her share of the IRA assets if separate accounting applies.

8. **Qualifying Longevity Annuity Contract (QLAC).** The terms of a QLAC you hold in this IRA may or may not provide a death benefit. If your QLAC has a return of premium feature as a death benefit, the premium returned to your beneficiary(ies) is the RMD amount if your death occurs after the RBD. The return of premium amount is the difference between the premiums paid for the QLAC and the amounts paid to the IRA owner or spouse beneficiary (annuitant) if less. The return of premium amount must be distributed to the beneficiary by the end of the calendar year following the year of death. If your death occurs before the RBD, a return of premium death benefit will be added to your IRA and must be taken in accordance with the beneficiary rules described earlier. If the death benefit under the terms of the QLAC is a life annuity, your beneficiary will receive annuity payments for life.

**Federal Income Tax Status of Distributions.**

1. **Taxation.** IRA distributions which are not rolled over will be taxed as income in the year distributed except for the portion of your aggregate SIMPLE IRA and traditional IRA distributions that represents your nondeductible contributions, nontaxable rollover amounts, or other nontaxable basis amounts. You may also be subject to state or local taxes and withholding on your IRA distributions.

2. **Earnings.** Earnings, including gains and losses, on your IRA will not be subject to federal income taxes until they are considered distributed.

3. **Ordinary Income Taxation.** Your taxable IRA distribution is usually included in gross income in the distribution year. IRA distributions are not eligible for special tax treatments, such as ten year averaging, that may apply to other employer-sponsored retirement plan distributions.

**Estate and Gift Tax.** The designation of a beneficiary to receive IRA distributions upon your death will not be considered a transfer of property for federal gift tax purposes. Upon your death, the value of all assets remaining in your IRA will usually be included in your gross estate for estate tax purposes, regardless of the named beneficiary or manner of distribution. There is no specific estate tax exclusion for assets held within an IRA. After your death, beneficiaries should pay careful attention to the rules for the disclaiming any portion of your IRA under IRC Section 2518.

**Federal Income Tax Withholding.** IRA distributions are subject to federal income tax withholding unless you or, upon your death, your beneficiary affirmatively elect not to have withholding apply. The required federal income tax withholding rate is 10 percent of the distribution. Upon your request for a distribution, by providing IRS Form W-4P or an appropriate substitute, we will notify you of your right to waive withholding or elect to have greater than 10 percent withheld.

**Annual Statements.** Each year we will furnish you and the IRS with statements reflecting the activity in your IRA. You and the IRS will receive IRS Forms 5498, *IRA Contribution Information*, and 1099-R, *Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.* IRS Form 5498 or an appropriate substitute indicates the fair market value of the account, including IRA contributions, for the year. IRS Form 1099-R reflects your IRA distributions for the year.

By January 31 of each year, you will receive a report of your fair market value as of the previous calendar year end. If applicable, you will also receive a report concerning your annual RMD.

**Federal Tax Penalties and IRS Form 5329.** Several tax penalties may apply to your various IRA transactions, and are in addition to any federal, state, or local taxes. Federal penalties and excise taxes are generally reported and remitted to the IRS by completing IRS Form 5329, *Additional Taxes on Qualified Plans (Including IRAs) and Other Tax-Favored Accounts,* and attaching the form to your federal income tax return. The penalties may include any of the following taxes:

1.  **Early-Distribution Penalty Tax.** If you take a distribution from your IRA before reaching age 59 1/2, you are subject to a 10 percent early-distribution penalty tax on the taxable portion of the distribution. However, certain exceptions apply. Exceptions to the 10 percent penalty tax are distributions due to death, disability, first-time home purchase, eligible higher education expenses, medical expenses exceeding a certain percentage of adjusted gross income, health insurance premiums due to your extended unemployment, a series of substantially equal periodic payments, IRS levy, traditional IRA conversions, qualified reservist distributions, and qualified HSA funding distributions. Properly completed rollovers, transfers, recharacterizations, and conversions are not subject to the 10 percent penalty tax.

2.  **Excess Contribution Penalty Tax.** If you contribute more to your IRA than you are eligible to contribute, you have created an excess contribution, which is subject to a 6 percent excise tax. The excise tax applies each year that the excess contribution remains in your IRA. If you timely file your federal income tax return, you may still remove your excess contribution, plus attributable earnings, as late as October 15 for calendar year filers.

3.  **Excess Accumulation Penalty Tax.** Any portion of a RMD that is not distributed by its deadline is subject to a 50 percent excess accumulation penalty tax. The IRS may waive this penalty upon your proof of reasonable error and that reasonable steps were taken to correct the error, including remedying the shortfall. See IRS Form 5329 instructions when requesting a waiver.

**Disaster Tax Relief.** Subject to IRC Section 1400Q, individuals in certain federally declared disaster areas may be given the opportunity to take qualified distributions (subject to applicable time periods defined by law) in aggregation from IRAs and other eligible retirement plans up to the prescribed limit (e.g., $100,000 for Midwestern Disaster). Typically, these rules permit an individual to prorate any amounts required to be included in gross income over a three tax year period or include it all in the year of distribution. In addition, an individual may be allowed three years after the date of receipt to roll over or repay all or part of the qualified distribution without being subject to the one rollover per 1-year limitation or the 60-day requirement. Certain first-time homebuyer or hardship distributions may be eligible for rollover within a prescribed time period. For additional disaster area information and IRS guidance on associated tax relief, refer to IRS notices and publications, or visit the IRS's web site at www.irs.gov.

# FINANCIAL DISCLOSURE

The purpose of this Financial Disclosure is to provide you with an IRS required growth projection of the value of your IRA available for withdrawal at the end of each of the first five years of its existence and at the end of the years in which you attain the ages of 60, 65, and 70. Certain assumptions are applied that may vary from your actual investment provisions.

Three projection methods are provided for the situations where the nature of your initial investment allows for a reasonable projection. The fourth projection method is for initial investments whose growth cannot be reasonably projected.

The growth projection must be made assuming either a $1,000 contribution made on January 1 of each year or a $1,000 one-time contribution made on January 1 of the first year. The annual contribution represents an initial contribution that is a regular, SEP, or recharacterized regular Roth IRA contribution. One-time contributions include a rollover, transfer, recharacterized conversion, or recharacterized Roth IRA rollover contribution. These projected amounts are not guaranteed.

## IRA FEES AND EARLY WITHDRAWAL PENALTIES

### This Section Applies To The Projection Method Selected.

The fees and penalties listed below may affect the projected value of your IRA. The disclosed fees and penalties will be included in that projection method applicable to your Financial Disclosure. With the exception of distribution transaction or termination fees, Projection Method One cannot be used if any other IRA Fee or certain Other boxes are checked below, including the Other box under Early Withdrawal Penalty.

**Fees:**

☐ None

☐ IRA Establishment Fee $ _____

☐ Annual Service/Administration Fee of $ _____

or _____ % of assets will be charged at ☐ end ☐ beginning of each year for purposes of this projection.

☐ Transfer/Direct Rollover Fee $ _____

☐ IRA Termination Fee $ _____

☒ Other: See Attached Fee Schedule $ _____ or _____% of Assets

☐ Other: _____ $ _____ or _____% of Assets

**Early Withdrawal Penalty** *(Check one):*

☒ None    ☐ 3-Month    ☐ 6-Month    ☐ 12-Month

☐ Other: _____

## PROJECTION METHODS *(Check one):*

☐ **Projection Method One—Use Preprinted Tables.**
The preprinted financial disclosure tables on the following page provide you with the IRA's projected values. The assumptions used to calculate each table's projected IRA values are:
   ◆ **Earnings rate** - One-tenth (.1) percent compounded annually on a 365-day year.
   ◆ **Projected values** - Calculated using numbers rounded down to the nearest whole dollar ($1.00).
   ◆ **Early withdrawal penalties** - The 3-, 6-, and 12-month penalties are calculated on a 30-day month and a 360-day year.
   ◆ **Calculated early withdrawal penalty** - The 3-, 6-, and 12-month penalties are not rounded prior to subtraction from the No Penalty column's projected value.

If a fee is disclosed for a distribution (e.g., transfer or direct rollover) transaction or an IRA termination, we will complete the *After Fees Values* section below the tables taking the fee(s) into account for each applicable projected value.

**How to use the tables.** These financial disclosure tables do not accommodate certain fees that may be charged to this IRA such as annual administration or establishment fees. Your projection will come from the Annual Contributions Table if your initial IRA contribution is a regular, SEP, or recharacterized regular Roth IRA contribution. The *Other Contributions Table* will be used if your initial contribution is a rollover, transfer, recharacterized conversion, or recharacterized Roth IRA rollover contribution. The top section of each table provides the projected values at the end of the first five years of the IRA. Find your age as of January 1 of this year of establishment on the appropriate table. If your birthday is January 1 of this year, find your age as of December 31 of the previous year. The amounts to the right of your age are the projected values of your IRA at the end of the year you attain age 60, 65, and 70. See IRA FEES AND EARLY WITHDRAWAL PENALTIES to determine the applicable early withdrawal penalty column to use for your projection.

☐ **Projection Method Two—Custom Projection.**
Your IRA's values projected below are based on the following assumptions *(Check one):*

☐ Annual Contributions.

☐ Rollover/Transfer (one-time) Contribution.

Your age on January 1 of this initial contribution year: _____

Earnings Rate: _____ %

Compounding Method: _____

_____.

Early Withdrawal Penalty Calculation Method: _____

_____.

| End of Year | Projected Value | Age | Projected Value |
|---|---|---|---|
| 1 | $ _____ | 60 | $ _____ |
| 2 | $ _____ | 65 | $ _____ |
| 3 | $ _____ | 70 | $ _____ |
| 4 | $ _____ | | |
| 5 | $ _____ | | |

☐ **Projection Method Three—See Separate Financial Disclosure and Assumptions Provided by Your IRA's Custodian.**

☒ **Projection Method Four—The Value of Your IRA Cannot be Reasonably Projected.**
The value of your IRA is solely dependent on the performance of your IRA's investments such as mutual funds, stocks, bonds, and other securities and cannot be reasonably projected. However, we are required to provide the following information as part of this financial disclosure:
1. **Earnings.** The method for computing and allocating the earnings on your IRA investments may be found in the prospectus or similar materials applicable to your IRA investments. The method may vary depending on the provider and type of the investments.
2. **Investments.** The investments contained in your IRA will be provided directly by us, through us, or by an entity registered as a broker-dealer.
3. **Investment Fees.** Various fees may be applied to your IRA investments. The investment fees may include termination or surrender fees, early withdrawal penalties, sales commissions, management fees, trustee fees, and other assessments.
4. **IRA Fees.** IRA Fees were previously disclosed. If necessary, the specified fees are computed as follows: See Attached Fee Schedule _____

_____

_____

# FINANCIAL DISCLOSURE - PROJECTION METHOD ONE

## ANNUAL CONTRIBUTIONS TABLE

| End of Year | No Penalty | 3-Month Penalty | 6-Month Penalty | 12-Month Penalty |
|---|---|---|---|---|
| 1 | 1,001 | 1,000 | 1,000 | 1,000 |
| 2 | 2,003 | 2,002 | 2,002 | 2,001 |
| 3 | 3,006 | 3,005 | 3,004 | 3,003 |
| 4 | 4,010 | 4,009 | 4,008 | 4,005 |
| 5 | 5,015 | 5,013 | 5,012 | 5,010 |

## OTHER CONTRIBUTIONS TABLE

| End of Year | No Penalty | 3-Month Penalty | 6-Month Penalty | 12-Month Penalty |
|---|---|---|---|---|
| 1 | 1,001 | 1,000 | 1,000 | 1,000 |
| 2 | 1,002 | 1,001 | 1,001 | 1,001 |
| 3 | 1,003 | 1,002 | 1,002 | 1,002 |
| 4 | 1,004 | 1,003 | 1,003 | 1,003 |
| 5 | 1,005 | 1,004 | 1,004 | 1,004 |

## How to determine the After Fees Values.

If we disclosed a distribution transaction or termination fee in IRA FEES AND EARLY WITHDRAWAL PENALTIES, we have completed the *After Fees Values* section to reflect your IRA's projected values for the first five years and for ages 60, 65 and 70, if applicable. You may calculate the projected value for additional years. Follow the steps under *How to use the tables.* Reduce the values by the amount of any distribution transaction or termination fees and fill in the amounts.

### AFTER FEES VALUES (if applicable)

| End of Year | | Age | |
|---|---|---|---|
| 1 | $ _____ | 60 | $ _____ |
| 2 | $ _____ | 65 | $ _____ |
| 3 | $ _____ | 70 | $ _____ |
| 4 | $ _____ | | |
| 5 | $ _____ | | |

first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of this title.

## § 4974. Excise tax on certain accumulations in qualified retirement plans

### (a) General rule

If the amount distributed during the taxable year of the payee under any qualified retirement plan or any eligible deferred compensation plan (as defined in section 457(b)) is less than the minimum required distribution for such taxable year, there is hereby imposed a tax equal to 50 percent of the amount by which such minimum required distribution exceeds the actual amount distributed during the taxable year. The tax imposed by this section shall be paid by the payee.

### (b) Minimum required distribution

For purposes of this section, the term "minimum required distribution" means the minimum amount required to be distributed during a taxable year under section 401(a)(9), 403(b)(10), 408(a)(6), 408(b)(3), or 457(d)(2), as the case may be, as determined under regulations prescribed by the Secretary.

### (c) Qualified retirement plan

For purposes of this section, the term "qualified retirement plan" means—

(1) a plan described in section 401(a) which includes a trust exempt from tax under section 501(a),

(2) an annuity plan described in section 403(a),

(3) an annuity contract described in section 403(b),

(4) an individual retirement account described in section 408(a), or

(5) an individual retirement annuity described in section 408(b).

Such term includes any plan, contract, account, or annuity which, at any time, has been determined by the Secretary to be such a plan, contract, account, or annuity.

### (d) Waiver of tax in certain cases

If the taxpayer establishes to the satisfaction of the Secretary that—

(1) the shortfall described in subsection (a) in the amount distributed during any taxable year was due to reasonable error, and

(2) reasonable steps are being taken to remedy the shortfall,

the Secretary may waive the tax imposed by subsection (a) for the taxable year.

(Added Pub. L. 93–406, title II, § 2002(e), Sept. 2, 1974, 88 Stat. 967; amended Pub. L. 94–455, title XIX, § 1906(b)(13)(A), Oct. 4, 1976, 90 Stat. 1834; Pub. L. 95–600, title I, § 157(i)(1), Nov. 6, 1978, 92 Stat. 2808; Pub. L. 99–514, title XI, § 1121(a)(1), title XVIII, § 1852(a)(7)(B), (C), Oct. 22, 1986, 100 Stat. 2464, 2866.)

### AMENDMENTS

1986—Pub. L. 99–514, § 1121(a)(1), amended section generally, substituting provisions imposing an excise tax on certain accumulations in qualified retirement plans for provisions imposing an excise tax on certain accumulations in individual retirement accounts and annuities.

Subsec. (a). Pub. L. 99–514, § 1852(a)(7)(B), substituted "section 408(a)(6) or 408(b)(3)'' for "section 408(a)(6) or (7), or 408(b)(3) or (4)''.

Subsec. (b). Pub. L. 99–514, § 1852(a)(7)(C), substituted "section 408(a)(6) or 408(b)(3)'' for "section 408(a)(6) or (7) or 408(b)(3) or (4)''.

1978—Subsec. (c). Pub. L. 95–600 added subsec. (c).

1976—Subsec. (b). Pub. L. 94–455 struck out "or his delegate'' after "Secretary''.

### EFFECTIVE DATE OF 1986 AMENDMENT

Amendment by section 1121(a)(1) of Pub. L. 99–514 applicable to years beginning after Dec. 31, 1988, with special provisions for plans maintained pursuant to collective bargaining agreements ratified before Mar. 1, 1986, and transition rules, see section 1121(d) of Pub. L. 99–514, set out as a note under section 401 of this title.

Amendment by section 1852(a)(7)(B), (C) of Pub. L. 99–514 effective, except as otherwise provided, as if included in the provisions of the Tax Reform Act of 1984, Pub. L. 98–369, div. A, to which such amendment relates, see section 1881 of Pub. L. 99–514, set out as a note under section 48 of this title.

### EFFECTIVE DATE OF 1978 AMENDMENT

Section 157(i)(2) of Pub. L. 95–600 provided that: "The amendment made by paragraph (1) [amending this section] shall apply to taxable years beginning after December 31, 1975.''

### EFFECTIVE DATE

Section effective Jan. 1, 1975, see section 2002(i)(2) of Pub. L. 93–406, set out as an Effective Date note under section 4973 of this title.

### PLAN AMENDMENTS NOT REQUIRED UNTIL JANUARY 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§ 1101–1147 and 1171–1177] or title XVIII [§§ 1800–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of this title.

## § 4975. Tax on prohibited transactions

### (a) Initial taxes on disqualified person

There is hereby imposed a tax on each prohibited transaction. The rate of tax shall be equal to 15 percent of the amount involved with respect to the prohibited transaction for each year (or part thereof) in the taxable period. The tax imposed by this subsection shall be paid by any disqualified person who participates in the prohibited transaction (other than a fiduciary acting only as such).

### (b) Additional taxes on disqualified person

In any case in which an initial tax is imposed by subsection (a) on a prohibited transaction and the transaction is not corrected within the taxable period, there is hereby imposed a tax equal to 100 percent of the amount involved. The tax imposed by this subsection shall be paid by any disqualified person who participated in the prohibited transaction (other than a fiduciary acting only as such).

### (c) Prohibited transaction

#### (1) General rule

For purposes of this section, the term "prohibited transaction" means any direct or indirect—

(A) sale or exchange, or leasing, of any property between a plan and a disqualified person;

(B) lending of money or other extension of credit between a plan and a disqualified person;

(C) furnishing of goods, services, or facilities between a plan and a disqualified person;

(D) transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan;

(E) act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interests or for his own account; or

(F) receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan.

**(2) Special exemption**

The Secretary shall establish an exemption procedure for purposes of this subsection. Pursuant to such procedure, he may grant a conditional or unconditional exemption of any disqualified person or transaction, orders of disqualified persons or transactions, from all or part of the restrictions imposed by paragraph (1) of this subsection. Action under this subparagraph may be taken only after consultation and coordination with the Secretary of Labor. The Secretary may not grant an exemption under this paragraph unless he finds that such exemption is—

(A) administratively feasible,

(B) in the interests of the plan and of its participants and beneficiaries, and

(C) protective of the rights of participants and beneficiaries of the plan.

Before granting an exemption under this paragraph, the Secretary shall require adequate notice to be given to interested persons and shall publish notice in the Federal Register of the pendency of such exemption and shall afford interested persons an opportunity to present views. No exemption may be granted under this paragraph with respect to a transaction described in subparagraph (E) or (F) of paragraph (1) unless the Secretary affords an opportunity for a hearing and makes a determination on the record with respect to the findings required under subparagraphs (A), (B), and (C) of this paragraph, except that in lieu of such hearing the Secretary may accept any record made by the Secretary of Labor with respect to an application for exemption under section 408(a) of title I of the Employee Retirement Income Security Act of 1974.

**(3) Special rule for individual retirement accounts**

An individual for whose benefit an individual retirement account is established and his beneficiaries shall be exempt from the tax imposed by this section with respect to any transaction concerning such account (which would otherwise be taxable under this section) if, with respect to such transaction, the account ceases to be an individual retirement account by reason of the application of section 408(e)(2)(A) or if section 408(e)(4) applies to such account.

**(4) Special rule for Archer MSAs**

An individual for whose benefit an Archer MSA (within the meaning of section 220(d)) is established shall be exempt from the tax imposed by this section with respect to any transaction concerning such account (which would otherwise be taxable under this section) if section 220(e)(2) applies to such transaction.

**(5) Special rule for Coverdell education savings accounts**

An individual for whose benefit a Coverdell education savings account is established and any contributor to such account shall be exempt from the tax imposed by this section with respect to any transaction concerning such account (which would otherwise be taxable under this section) if section 530(d) applies with respect to such transaction.

**(6) Special rule for health savings accounts**

An individual for whose benefit a health savings account (within the meaning of section 223(d)) is established shall be exempt from the tax imposed by this section with respect to any transaction concerning such account (which would otherwise be taxable under this section) if, with respect to such transaction, the account ceases to be a health savings account by reason of the application of section 223(e)(2) to such account.

**(d) Exemptions**

Except as provided in subsection (f)(6), the prohibitions provided in subsection (c) shall not apply to—

(1) any loan made by the plan to a disqualified person who is a participant or beneficiary of the plan if such loan—

(A) is available to all such participants or beneficiaries on a reasonably equivalent basis,

(B) is not made available to highly compensated employees (within the meaning of section 414(q)) in an amount greater than the amount made available to other employees,

(C) is made in accordance with specific provisions regarding such loans set forth in the plan,

(D) bears a reasonable rate of interest, and

(E) is adequately secured;

(2) any contract, or reasonable arrangement, made with a disqualified person for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor;

(3) any loan to an [1] leveraged employee stock ownership plan (as defined in subsection (e)(7)), if—

(A) such loan is primarily for the benefit of participants and beneficiaries of the plan, and

(B) such loan is at a reasonable rate of interest, and any collateral which is given to a disqualified person by the plan consists only of qualifying employer securities (as defined in subsection (e)(8));

(4) the investment of all or part of a plan's assets in deposits which bear a reasonable in-

---

[1] So in original. Probably should be "a".

terest rate in a bank or similar financial institution supervised by the United States or a State, if such bank or other institution is a fiduciary of such plan and if—

(A) the plan covers only employees of such bank or other institution and employees of affiliates of such bank or other institution, or

(B) such investment is expressly authorized by a provision of the plan or by a fiduciary (other than such bank or institution or affiliates thereof) who is expressly empowered by the plan to so instruct the trustee with respect to such investment;

(5) any contract for life insurance, health insurance, or annuities with one or more insurers which are qualified to do business in a State if the plan pays no more than adequate consideration, and if each such insurer or insurers is—

(A) the employer maintaining the plan, or

(B) a disqualified person which is wholly owned (directly or indirectly) by the employer establishing the plan, or by any person which is a disqualified person with respect to the plan, but only if the total premiums and annuity considerations written by such insurers for life insurance, health insurance, or annuities for all plans (and their employers) with respect to which such insurers are disqualified persons (not including premiums or annuity considerations written by the employer maintaining the plan) do not exceed 5 percent of the total premiums and annuity considerations written for all lines of insurance in that year by such insurers (not including premiums or annuity considerations written by the employer maintaining the plan);

(6) the provision of any ancillary service by a bank or similar financial institution supervised by the United States or a State, if such service is provided at not more than reasonable compensation, if such bank or other institution is a fiduciary of such plan, and if—

(A) such bank or similar financial institution has adopted adequate internal safeguards which assure that the provision of such ancillary service is consistent with sound banking and financial practice, as determined by Federal or State supervisory authority, and

(B) the extent to which such ancillary service is provided is subject to specific guidelines issued by such bank or similar financial institution (as determined by the Secretary after consultation with Federal and State supervisory authority), and under such guidelines the bank or similar financial institution does not provide such ancillary service—

(i) in an excessive or unreasonable manner, and

(ii) in a manner that would be inconsistent with the best interests of participants and beneficiaries of employee benefit plans;

(7) the exercise of a privilege to convert securities, to the extent provided in regulations of the Secretary but only if the plan receives

no less than adequate consideration pursuant to such conversion;

(8) any transaction between a plan and a common or collective trust fund or pooled investment fund maintained by a disqualified person which is a bank or trust company supervised by a State or Federal agency or between a plan and a pooled investment fund of an insurance company qualified to do business in a State if—

(A) the transaction is a sale or purchase of an interest in the fund,

(B) the bank, trust company, or insurance company receives not more than a reasonable compensation, and

(C) such transaction is expressly permitted by the instrument under which the plan is maintained, or by a fiduciary (other than the bank, trust company, or insurance company, or an affiliate thereof) who has authority to manage and control the assets of the plan;

(9) receipt by a disqualified person of any benefit to which he may be entitled as a participant or beneficiary in the plan, so long as the benefit is computed and paid on a basis which is consistent with the terms of the plan as applied to all other participants and beneficiaries;

(10) receipt by a disqualified person of any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan, but no person so serving who already receives full-time pay from an employer or an association of employers, whose employees are participants in the plan or from an employee organization whose members are participants in such plan shall receive compensation from such fund, except for reimbursement of expenses properly and actually incurred;

(11) service by a disqualified person as a fiduciary in addition to being an officer, employee, agent, or other representative of a disqualified person;

(12) the making by a fiduciary of a distribution of the assets of the trust in accordance with the terms of the plan if such assets are distributed in the same manner as provided under section 4044 of title IV of the Employee Retirement Income Security Act of 1974 (relating to allocation of assets);

(13) any transaction which is exempt from section 406 of such Act by reason of section 408(e) of such Act (or which would be so exempt if such section 406 applied to such transaction) or which is exempt from section 406 of such Act by reason of section 408(b)(12) of such Act;

(14) any transaction required or permitted under part 1 of subtitle E of title IV or section 4223 of the Employee Retirement Income Security Act of 1974, but this paragraph shall not apply with respect to the application of subsection (c)(1) (E) or (F);

(15) a merger of multiemployer plans, or the transfer of assets or liabilities between multiemployer plans, determined by the Pension Benefit Guaranty Corporation to meet the requirements of section 4231 of such Act, but

this paragraph shall not apply with respect to the application of subsection (c)(1)(E) or (F);

(16) a sale of stock held by a trust which constitutes an individual retirement account under section 408(a) to the individual for whose benefit such account is established if—

(A) such stock is in a bank (as defined in section 581) or a depository institution holding company (as defined in section 3(w)(1) of the Federal Deposit Insurance Act (12 U.S.C. 1813(w)(1)),[2]

(B) such stock is held by such trust as of the date of the enactment of this paragraph,

(C) such sale is pursuant to an election under section 1362(a) by such bank or company,

(D) such sale is for fair market value at the time of sale (as established by an independent appraiser) and the terms of the sale are otherwise at least as favorable to such trust as the terms that would apply on a sale to an unrelated party,

(E) such trust does not pay any commissions, costs, or other expenses in connection with the sale, and

(F) the stock is sold in a single transaction for cash not later than 120 days after the S corporation election is made;

(17) Any[3] transaction in connection with the provision of investment advice described in subsection (e)(3)(B) to a participant or beneficiary in a plan that permits such participant or beneficiary to direct the investment of plan assets in an individual account, if—

(A) the transaction is—

(i) the provision of the investment advice to the participant or beneficiary of the plan with respect to a security or other property available as an investment under the plan,

(ii) the acquisition, holding, or sale of a security or other property available as an investment under the plan pursuant to the investment advice, or

(iii) the direct or indirect receipt of fees or other compensation by the fiduciary adviser or an affiliate thereof (or any employee, agent, or registered representative of the fiduciary adviser or affiliate) in connection with the provision of the advice or in connection with an acquisition, holding, or sale of a security or other property available as an investment under the plan pursuant to the investment advice; and

(B) the requirements of subsection (f)(8) are met,[4]

(18) any transaction involving the purchase or sale of securities, or other property (as determined by the Secretary of Labor), between a plan and a disqualified person (other than a fiduciary described in subsection (e)(3)) with respect to a plan if—

(A) the transaction involves a block trade,

(B) at the time of the transaction, the interest of the plan (together with the inter-

ests of any other plans maintained by the same plan sponsor), does not exceed 10 percent of the aggregate size of the block trade,

(C) the terms of the transaction, including the price, are at least as favorable to the plan as an arm's length[5] transaction, and

(D) the compensation associated with the purchase and sale is not greater than the compensation associated with an arm's length[5] transaction with an unrelated party,[4]

(19) any transaction involving the purchase or sale of securities, or other property (as determined by the Secretary of Labor), between a plan and a disqualified person if—

(A) the transaction is executed through an electronic communication network, alternative trading system, or similar execution system or trading venue subject to regulation and oversight by—

(i) the applicable Federal regulating entity, or

(ii) such foreign regulatory entity as the Secretary of Labor may determine by regulation,

(B) either—

(i) the transaction is effected pursuant to rules designed to match purchases and sales at the best price available through the execution system in accordance with applicable rules of the Securities and Exchange Commission or other relevant governmental authority, or

(ii) neither the execution system nor the parties to the transaction take into account the identity of the parties in the execution of trades,

(C) the price and compensation associated with the purchase and sale are not greater than the price and compensation associated with an arm's length[5] transaction with an unrelated party,

(D) if[6] the disqualified person has an ownership interest in the system or venue described in subparagraph (A), the system or venue has been authorized by the plan sponsor or other independent fiduciary for transactions described in this paragraph, and

(E) not less than 30 days prior to the initial transaction described in this paragraph executed through any system or venue described in subparagraph (A), a plan fiduciary is provided written or electronic notice of the execution of such transaction through such system or venue,[4]

(20) transactions described in subparagraphs (A), (B), and (D) of subsection (c)(1) between a plan and a person that is a disqualified person other than a fiduciary (or an affiliate) who has or exercises any discretionary authority or control with respect to the investment of the plan assets involved in the transaction or renders investment advice (within the meaning of subsection (e)(3)(B)) with respect to those assets, solely by reason of providing services to the plan or solely by reason of a relationship

---

[2] So in original. Another closing parenthesis probably should precede the comma.

[3] So in original. Probably should not be capitalized.

[4] So in original. The comma probably should be a semicolon.

[5] So in original. Probably should be "arm's-length".

[6] So in original. The word "if" probably should not appear.

to such a service provider described in subparagraph (F), (G), (H), or (I) of subsection (e)(2), or both, but only if in connection with such transaction the plan receives no less, nor pays no more, than adequate consideration,[4]

(21) any foreign exchange transactions, between a bank or broker-dealer (or any affiliate of either) and a plan (as defined in this section) with respect to which such bank or broker-dealer (or affiliate) is a trustee, custodian, fiduciary, or other disqualified person person,[7] if—

(A) the transaction is in connection with the purchase, holding, or sale of securities or other investment assets (other than a foreign exchange transaction unrelated to any other investment in securities or other investment assets),

(B) at the time the foreign exchange transaction is entered into, the terms of the transaction are not less favorable to the plan than the terms generally available in comparable arm's length[5] foreign exchange transactions between unrelated parties, or the terms afforded by the bank or broker-dealer (or any affiliate of either) in comparable arm's-length foreign exchange transactions involving unrelated parties,

(C) the exchange rate used by such bank or broker-dealer (or affiliate) for a particular foreign exchange transaction does not deviate by more than 3 percent from the interbank bid and asked rates for transactions of comparable size and maturity at the time of the transaction as displayed on an independent service that reports rates of exchange in the foreign currency market for such currency, and

(D) the bank or broker-dealer (or any affiliate of either) does not have investment discretion, or provide investment advice, with respect to the transaction,[4]

(22) any transaction described in subsection (c)(1)(A) involving the purchase and sale of a security between a plan and any other account managed by the same investment manager, if—

(A) the transaction is a purchase or sale, for no consideration other than cash payment against prompt delivery of a security for which market quotations are readily available,

(B) the transaction is effected at the independent current market price of the security (within the meaning of section 270.17a–7(b) of title 17, Code of Federal Regulations),

(C) no brokerage commission, fee (except for customary transfer fees, the fact of which is disclosed pursuant to subparagraph (D)), or other remuneration is paid in connection with the transaction,

(D) a fiduciary (other than the investment manager engaging in the cross-trades or any affiliate) for each plan participating in the transaction authorizes in advance of any cross-trades (in a document that is separate from any other written agreement of the parties) the investment manager to engage

in cross trades at the investment manager's discretion, after such fiduciary has received disclosure regarding the conditions under which cross trades may take place (but only if such disclosure is separate from any other agreement or disclosure involving the asset management relationship), including the written policies and procedures of the investment manager described in subparagraph (H),

(E) each plan participating in the transaction has assets of at least $100,000,000, except that if the assets of a plan are invested in a master trust containing the assets of plans maintained by employers in the same controlled group (as defined in section 407(d)(7) of the Employee Retirement Income Security Act of 1974), the master trust has assets of at least $100,000,000,

(F) the investment manager provides to the plan fiduciary who authorized cross trading under subparagraph (D) a quarterly report detailing all cross trades executed by the investment manager in which the plan participated during such quarter, including the following information, as applicable: (i) the identity of each security bought or sold; (ii) the number of shares or units traded; (iii) the parties involved in the cross-trade; and (iv) trade price and the method used to establish the trade price,

(G) the investment manager does not base its fee schedule on the plan's consent to cross trading, and no other service (other than the investment opportunities and cost savings available through a cross trade) is conditioned on the plan's consent to cross trading,

(H) the investment manager has adopted, and cross-trades are effected in accordance with, written cross-trading policies and procedures that are fair and equitable to all accounts participating in the cross-trading program, and that include a description of the manager's pricing policies and procedures, and the manager's policies and procedures for allocating cross trades in an objective manner among accounts participating in the cross-trading program, and

(I) the investment manager has designated an individual responsible for periodically reviewing such purchases and sales to ensure compliance with the written policies and procedures described in subparagraph (H), and following such review, the individual shall issue an annual written report no later than 90 days following the period to which it relates signed under penalty of perjury to the plan fiduciary who authorized cross trading under subparagraph (D) describing the steps performed during the course of the review, the level of compliance, and any specific instances of non-compliance.

The written report shall also notify the plan fiduciary of the plan's right to terminate participation in the investment manager's cross-trading program at any time,[4] or

(23) except as provided in subsection (f)(11), a transaction described in subparagraph (A), (B), (C), or (D) of subsection (c)(1) in connection with the acquisition, holding, or disposition of

any security or commodity, if the transaction is corrected before the end of the correction period.

### (e) Definitions

#### (1) Plan

For purposes of this section, the term "plan" means—

(A) a trust described in section 401(a) which forms a part of a plan, or a plan described in section 403(a), which trust or plan is exempt from tax under section 501(a),

(B) an individual retirement account described in section 408(a),

(C) an individual retirement annuity described in section 408(b),

(D) an Archer MSA described in section 220(d),

(E) a health savings account described in section 223(d),

(F) a Coverdell education savings account described in section 530, or

(G) a trust, plan, account, or annuity which, at any time, has been determined by the Secretary to be described in any preceding subparagraph of this paragraph.

#### (2) Disqualified person

For purposes of this section, the term "disqualified person" means a person who is—

(A) a fiduciary;

(B) a person providing services to the plan;

(C) an employer any of whose employees are covered by the plan;

(D) an employee organization any of whose members are covered by the plan;

(E) an owner, direct or indirect, of 50 percent or more of—

(i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation,

(ii) the capital interest or the profits interest of a partnership, or

(iii) the beneficial interest of a trust or unincorporated enterprise,

which is an employer or an employee organization described in subparagraph (C) or (D);

(F) a member of the family (as defined in paragraph (6)) of any individual described in subparagraph (A), (B), (C), or (E);

(G) a corporation, partnership, or trust or estate of which (or in which) 50 percent or more of—

(i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of such corporation,

(ii) the capital interest or profits interest of such partnership, or

(iii) the beneficial interest of such trust or estate,

is owned directly or indirectly, or held by persons described in subparagraph (A), (B), (C), (D), or (E);

(H) an officer, director (or an individual having powers or responsibilities similar to those of officers or directors), a 10 percent or more shareholder, or a highly compensated employee (earning 10 percent or more of the yearly wages of an employer) of a person described in subparagraph (C), (D), (E), or (G); or

(I) a 10 percent or more (in capital or profits) partner or joint venturer of a person described in subparagraph (C), (D), (E), or (G).

The Secretary, after consultation and coordination with the Secretary of Labor or his delegate, may by regulation prescribe a percentage lower than 50 percent for subparagraphs (E) and (G) and lower than 10 percent for subparagraphs (H) and (I).

#### (3) Fiduciary

For purposes of this section, the term "fiduciary" means any person who—

(A) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

(B) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

(C) has any discretionary authority or discretionary responsibility in the administration of such plan.

Such term includes any person designated under section 405(c)(1)(B) of the Employee Retirement Income Security Act of 1974.

#### (4) Stockholdings

For purposes of paragraphs (2)(E)(i) and (G)(i) there shall be taken into account indirect stockholdings which would be taken into account under section 267(c), except that, for purposes of this paragraph, section 267(c)(4) shall be treated as providing that the members of the family of an individual are the members within the meaning of paragraph (6).

#### (5) Partnerships; trusts

For purposes of paragraphs (2)(E)(ii) and (iii), (G)(ii) and (iii), and (I) the ownership of profits or beneficial interests shall be determined in accordance with the rules for constructive ownership of stock provided in section 267(c) (other than paragraph (3) thereof), except that section 267(c)(4) shall be treated as providing that the members of the family of an individual are the members within the meaning of paragraph (6).

#### (6) Member of family

For purposes of paragraph (2)(F), the family of any individual shall include his spouse, ancestor, lineal descendant, and any spouse of a lineal descendant.

#### (7) Employee stock ownership plan

The term "employee stock ownership plan" means a defined contribution plan—

(A) which is a stock bonus plan which is qualified, or a stock bonus and a money purchase plan both of which are qualified under section 401(a), and which are designed to invest primarily in qualifying employer securities; and

(B) which is otherwise defined in regulations prescribed by the Secretary.

A plan shall not be treated as an employee stock ownership plan unless it meets the requirements of section 409(h), section 409(o), and, if applicable, section 409(n), section 409(p), and section 664(g) and, if the employer has a registration-type class of securities (as defined in section 409(e)(4)), it meets the requirements of section 409(e).

### (8) Qualifying employer security

The term "qualifying employer security" means any employer security within the meaning of section 409(l). If any moneys or other property of a plan are invested in shares of an investment company registered under the Investment Company Act of 1940, the investment shall not cause that investment company or that investment company's investment adviser or principal underwriter to be treated as a fiduciary or a disqualified person for purposes of this section, except when an investment company or its investment adviser or principal underwriter acts in connection with a plan covering employees of the investment company, its investment adviser, or its principal underwriter.

### (9) Section made applicable to withdrawal liability payment funds

For purposes of this section—

#### (A) In general

The term "plan" includes a trust described in section 501(c)(22).

#### (B) Disqualified person

In the case of any trust to which this section applies by reason of subparagraph (A), the term "disqualified person" includes any person who is a disqualified person with respect to any plan to which such trust is permitted to make payments under section 4223 of the Employee Retirement Income Security Act of 1974.

### (f) Other definitions and special rules

For purposes of this section—

#### (1) Joint and several liability

If more than one person is liable under subsection (a) or (b) with respect to any one prohibited transaction, all such persons shall be jointly and severally liable under such subsection with respect to such transaction.

#### (2) Taxable period

The term "taxable period" means, with respect to any prohibited transaction, the period beginning with the date on which the prohibited transaction occurs and ending on the earliest of—

  (A) the date of mailing a notice of deficiency with respect to the tax imposed by subsection (a) under section 6212,

  (B) the date on which the tax imposed by subsection (a) is assessed, or

  (C) the date on which correction of the prohibited transaction is completed.

#### (3) Sale or exchange; encumbered property

A transfer of real or personal property by a disqualified person to a plan shall be treated as a sale or exchange if the property is subject to a mortgage or similar lien which the plan assumes or if it is subject to a mortgage or similar lien which a disqualified person placed on the property within the 10-year period ending on the date of the transfer.

#### (4) Amount involved

The term "amount involved" means, with respect to a prohibited transaction, the greater of the amount of money and the fair market value of the other property given or the amount of money and the fair market value of the other property received; except that, in the case of services described in paragraphs (2) and (10) of subsection (d) the amount involved shall be only the excess compensation. For purposes of the preceding sentence, the fair market value—

  (A) in the case of the tax imposed by subsection (a), shall be determined as of the date on which the prohibited transaction occurs; and

  (B) in the case of the tax imposed by subsection (b), shall be the highest fair market value during the taxable period.

#### (5) Correction

The terms "correction" and "correct" mean, with respect to a prohibited transaction, undoing the transaction to the extent possible, but in any case placing the plan in a financial position not worse than that in which it would be if the disqualified person were acting under the highest fiduciary standards.

#### (6) Exemptions not to apply to certain transactions

##### (A) In general

In the case of a trust described in section 401(a) which is part of a plan providing contributions or benefits for employees some or all of whom are owner-employees (as defined in section 401(c)(3)), the exemptions provided by subsection (d) (other than paragraphs (9) and (12)) shall not apply to a transaction in which the plan directly or indirectly—

  (i) lends any part of the corpus or income of the plan to,

  (ii) pays any compensation for personal services rendered to the plan to, or

  (iii) acquires for the plan any property from, or sells any property to,

any such owner-employee, a member of the family (as defined in section 267(c)(4)) of any such owner-employee, or any corporation in which any such owner-employee owns, directly or indirectly, 50 percent or more of the total combined voting power of all classes of stock entitled to vote or 50 percent or more of the total value of shares of all classes of stock of the corporation.

##### (B) Special rules for shareholder-employees, etc.

###### (i) In general

For purposes of subparagraph (A), the following shall be treated as owner-employees:

  (I) A shareholder-employee.

  (II) A participant or beneficiary of an individual retirement plan (as defined in section 7701(a)(37)).

(III) An employer or association of employees which establishes such an individual retirement plan under section 408(c).

#### (ii) Exception for certain transactions involving shareholder-employees

Subparagraph (A)(iii) shall not apply to a transaction which consists of a sale of employer securities to an employee stock ownership plan (as defined in subsection (e)(7)) by a shareholder-employee, a member of the family (as defined in section 267(c)(4)) of such shareholder-employee, or a corporation in which such a shareholder-employee owns stock representing a 50 percent or greater interest described in subparagraph (A).

#### (iii) Loan exception

For purposes of subparagraph (A)(i), the term "owner-employee" shall only include a person described in subclause (II) or (III) of clause (i).

#### (C) Shareholder-employee

For purposes of subparagraph (B), the term "shareholder-employee" means an employee or officer of an S corporation who owns (or is considered as owning within the meaning of section 318(a)(1)) more than 5 percent of the outstanding stock of the corporation on any day during the taxable year of such corporation.

#### (7) S corporation repayment of loans for qualifying employer securities

A plan shall not be treated as violating the requirements of section 401 or 409 or subsection (e)(7), or as engaging in a prohibited transaction for purposes of subsection (d)(3), merely by reason of any distribution (as described in section 1368(a)) with respect to S corporation stock that constitutes qualifying employer securities, which in accordance with the plan provisions is used to make payments on a loan described in subsection (d)(3) the proceeds of which were used to acquire such qualifying employer securities (whether or not allocated to participants). The preceding sentence shall not apply in the case of a distribution which is paid with respect to any employer security which is allocated to a participant unless the plan provides that employer securities with a fair market value of not less than the amount of such distribution are allocated to such participant for the year which (but for the preceding sentence) such distribution would have been allocated to such participant.

#### (8) Provision of investment advice to participant and beneficiaries

##### (A) In general

The prohibitions provided in subsection (c) shall not apply to transactions described in subsection (d)(17) if the investment advice provided by a fiduciary adviser is provided under an eligible investment advice arrangement.

##### (B) Eligible investment advice arrangement

For purposes of this paragraph, the term "eligible investment advice arrangement" means an arrangement—

(i) which either—

(I) provides that any fees (including any commission or other compensation) received by the fiduciary adviser for investment advice or with respect to the sale, holding, or acquisition of any security or other property for purposes of investment of plan assets do not vary depending on the basis of any investment option selected, or

(II) uses a computer model under an investment advice program meeting the requirements of subparagraph (C) in connection with the provision of investment advice by a fiduciary adviser to a participant or beneficiary, and

(ii) with respect to which the requirements of subparagraphs (D), (E), (F), (G), (H), and (I) are met.

##### (C) Investment advice program using computer model

###### (i) In general

An investment advice program meets the requirements of this subparagraph if the requirements of clauses (ii), (iii), and (iv) are met.

###### (ii) Computer model

The requirements of this clause are met if the investment advice provided under the investment advice program is provided pursuant to a computer model that—

(I) applies generally accepted investment theories that take into account the historic returns of different asset classes over defined periods of time,

(II) utilizes relevant information about the participant, which may include age, life expectancy, retirement age, risk tolerance, other assets or sources of income, and preferences as to certain types of investments,

(III) utilizes prescribed objective criteria to provide asset allocation portfolios comprised of investment options available under the plan,

(IV) operates in a manner that is not biased in favor of investments offered by the fiduciary adviser or a person with a material affiliation or contractual relationship with the fiduciary adviser, and

(V) takes into account all investment options under the plan in specifying how a participant's account balance should be invested and is not inappropriately weighted with respect to any investment option.

###### (iii) Certification

(I) In general

The requirements of this clause are met with respect to any investment advice program if an eligible investment expert certifies, prior to the utilization of the computer model and in accordance with rules prescribed by the Secretary of Labor, that the computer model meets the requirements of clause (ii).

(II) Renewal of certifications

If, as determined under regulations prescribed by the Secretary of Labor,

there are material modifications to a computer model, the requirements of this clause are met only if a certification described in subclause (I) is obtained with respect to the computer model as so modified.

### (III) Eligible investment expert

The term "eligible investment expert" means any person which meets such requirements as the Secretary of Labor may provide and which does not bear any material affiliation or contractual relationship with any investment adviser or a related person thereof (or any employee, agent, or registered representative of the investment adviser or related person).

### (iv) Exclusivity of recommendation

The requirements of this clause are met with respect to any investment advice program if—

(I) the only investment advice provided under the program is the advice generated by the computer model described in clause (ii), and

(II) any transaction described in (d)(17)(A)(ii)[8] occurs solely at the direction of the participant or beneficiary.

Nothing in the preceding sentence shall preclude the participant or beneficiary from requesting investment advice other than that described in clause (i), but only if such request has not been solicited by any person connected with carrying out the arrangement.

### (D) Express authorization by separate fiduciary

The requirements of this subparagraph are met with respect to an arrangement if the arrangement is expressly authorized by a plan fiduciary other than the person offering the investment advice program, any person providing investment options under the plan, or any affiliate of either.

### (E) Audits

#### (i) In general

The requirements of this subparagraph are met if an independent auditor, who has appropriate technical training or experience and proficiency and so represents in writing—

(I) conducts an annual audit of the arrangement for compliance with the requirements of this paragraph, and

(II) following completion of the annual audit, issues a written report to the fiduciary who authorized use of the arrangement which presents its specific findings regarding compliance of the arrangement with the requirements of this paragraph.

#### (ii) Special rule for individual retirement and similar plans

In the case of a plan described in subparagraphs (B) through (F) (and so much of

subparagraph (G) as relates to such subparagraphs) of subsection (e)(1), in lieu of the requirements of clause (i), audits of the arrangement shall be conducted at such times and in such manner as the Secretary of Labor may prescribe.

### (iii) Independent auditor

For purposes of this subparagraph, an auditor is considered independent if it is not related to the person offering the arrangement to the plan and is not related to any person providing investment options under the plan.

### (F) Disclosure

The requirements of this subparagraph are met if—

(i) the fiduciary adviser provides to a participant or a beneficiary before the initial provision of the investment advice with regard to any security or other property offered as an investment option, a written notification (which may consist of notification by means of electronic communication)—

(I) of the role of any party that has a material affiliation or contractual relationship with the fiduciary adviser,[9] in the development of the investment advice program and in the selection of investment options available under the plan,

(II) of the past performance and historical rates of return of the investment options available under the plan,

(III) of all fees or other compensation relating to the advice that the fiduciary adviser or any affiliate thereof is to receive (including compensation provided by any third party) in connection with the provision of the advice or in connection with the sale, acquisition, or holding of the security or other property,

(IV) of any material affiliation or contractual relationship of the fiduciary adviser or affiliates thereof in the security or other property,

(V) the[10] manner, and under what circumstances, any participant or beneficiary information provided under the arrangement will be used or disclosed,

(VI) of the types of services provided by the fiduciary adviser in connection with the provision of investment advice by the fiduciary adviser,

(VII) that the adviser is acting as a fiduciary of the plan in connection with the provision of the advice, and

(VIII) that a recipient of the advice may separately arrange for the provision of advice by another adviser, that could have no material affiliation with and receive no fees or other compensation in connection with the security or other property, and

(ii) at all times during the provision of advisory services to the participant or beneficiary, the fiduciary adviser—

---

[8] So in original. Probably should be "subsection (d)(17)(A)(ii)".

[9] So in original. The comma probably should not appear.

[10] So in original. Probably should be "of the".

(I) maintains the information described in clause (i) in accurate form and in the manner described in subparagraph (H),

(II) provides, without charge, accurate information to the recipient of the advice no less frequently than annually,

(III) provides, without charge, accurate information to the recipient of the advice upon request of the recipient, and

(IV) provides, without charge, accurate information to the recipient of the advice concerning any material change to the information required to be provided to the recipient of the advice at a time reasonably contemporaneous to the change in information.

### (G) Other conditions

The requirements of this subparagraph are met if—

(i) the fiduciary adviser provides appropriate disclosure, in connection with the sale, acquisition, or holding of the security or other property, in accordance with all applicable securities laws,

(ii) the sale, acquisition, or holding occurs solely at the direction of the recipient of the advice,

(iii) the compensation received by the fiduciary adviser and affiliates thereof in connection with the sale, acquisition, or holding of the security or other property is reasonable, and

(iv) the terms of the sale, acquisition, or holding of the security or other property are at least as favorable to the plan as an arm's length[5] transaction would be.

### (H) Standards for presentation of information

#### (i) In general

The requirements of this subparagraph are met if the notification required to be provided to participants and beneficiaries under subparagraph (F)(i) is written in a clear and conspicuous manner and in a manner calculated to be understood by the average plan participant and is sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of the information required to be provided in the notification.

#### (ii) Model form for disclosure of fees and other compensation

The Secretary of Labor shall issue a model form for the disclosure of fees and other compensation required in subparagraph (F)(i)(III) which meets the requirements of clause (i).

### (I) Maintenance for 6 years of evidence of compliance

The requirements of this subparagraph are met if a fiduciary adviser who has provided advice referred to in subparagraph (A) maintains, for a period of not less than 6 years after the provision of the advice, any records necessary for determining whether the requirements of the preceding provisions of this paragraph and of subsection (d)(17) have

been met. A transaction prohibited under subsection (c) shall not be considered to have occurred solely because the records are lost or destroyed prior to the end of the 6-year period due to circumstances beyond the control of the fiduciary adviser.

### (J) Definitions

For purposes of this paragraph and subsection (d)(17)—

#### (i) Fiduciary adviser

The term "fiduciary adviser" means, with respect to a plan, a person who is a fiduciary of the plan by reason of the provision of investment advice referred to in subsection (e)(3)(B) by the person to a participant or beneficiary of the plan and who is—

(I) registered as an investment adviser under the Investment Advisers Act of 1940 (15 U.S.C. 80b–1 et seq.) or under the laws of the State in which the fiduciary maintains its principal office and place of business,

(II) a bank or similar financial institution referred to in subsection (d)(4) or a savings association (as defined in section 3(b)(1) of the Federal Deposit Insurance Act (12 U.S.C. 1813(b)(1)), but only if the advice is provided through a trust department of the bank or similar financial institution or savings association which is subject to periodic examination and review by Federal or State banking authorities,

(III) an insurance company qualified to do business under the laws of a State,

(IV) a person registered as a broker or dealer under the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.),

(V) an affiliate of a person described in any of subclauses (I) through (IV), or

(VI) an employee, agent, or registered representative of a person described in subclauses (I) through (V) who satisfies the requirements of applicable insurance, banking, and securities laws relating to the provision of the advice.

For purposes of this title, a person who develops the computer model described in subparagraph (C)(ii) or markets the investment advice program or computer model shall be treated as a person who is a fiduciary of the plan by reason of the provision of investment advice referred to in subsection (e)(3)(B) to a participant or beneficiary and shall be treated as a fiduciary adviser for purposes of this paragraph and subsection (d)(17), except that the Secretary of Labor may prescribe rules under which only 1 fiduciary adviser may elect to be treated as a fiduciary with respect to the plan.

#### (ii) Affiliate

The term "affiliate" of another entity means an affiliated person of the entity (as defined in section 2(a)(3) of the Investment Company Act of 1940 (15 U.S.C. 80a–2(a)(3))).

### (iii) Registered representative

The term "registered representative" of another entity means a person described in section 3(a)(18) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(18)) (substituting the entity for the broker or dealer referred to in such section) or a person described in section 202(a)(17) of the Investment Advisers Act of 1940 (15 U.S.C. 80b–2(a)(17)) (substituting the entity for the investment adviser referred to in such section).

### (9) Block trade

The term "block trade" means any trade of at least 10,000 shares or with a market value of at least $200,000 which will be allocated across two or more unrelated client accounts of a fiduciary.

### (10) Adequate consideration

The term "adequate consideration" means—

(A) in the case of a security for which there is a generally recognized market—

(i) the price of the security prevailing on a national securities exchange which is registered under section 6 of the Securities Exchange Act of 1934, taking into account factors such as the size of the transaction and marketability of the security, or

(ii) if the security is not traded on such a national securities exchange, a price not less favorable to the plan than the offering price for the security as established by the current bid and asked prices quoted by persons independent of the issuer and of the party in interest, taking into account factors such as the size of the transaction and marketability of the security, and

(B) in the case of an asset other than a security for which there is a generally recognized market, the fair market value of the asset as determined in good faith by a fiduciary or fiduciaries in accordance with regulations prescribed by the Secretary of Labor.

### (11) Correction period

#### (A) In general

For purposes of subsection (d)(23), the term "correction period" means the 14-day period beginning on the date on which the disqualified person discovers, or reasonably should have discovered, that the transaction would (without regard to this paragraph and subsection (d)(23)) constitute a prohibited transaction.

#### (B) Exceptions

##### (i) Employer securities

Subsection (d)(23) does not apply to any transaction between a plan and a plan sponsor or its affiliates that involves the acquisition or sale of an employer security (as defined in section 407(d)(1) of the Employee Retirement Income Security Act of 1974) or the acquisition, sale, or lease of employer real property (as defined in section 407(d)(2) of such Act).

##### (ii) Knowing prohibited transaction

In the case of any disqualified person, subsection (d)(23) does not apply to a transaction if, at the time the transaction is entered into, the disqualified person knew (or reasonably should have known) that the transaction would (without regard to this paragraph) constitute a prohibited transaction.

#### (C) Abatement of tax where there is a correction

If a transaction is not treated as a prohibited transaction by reason of subsection (d)(23), then no tax under subsections (a) and (b) shall be assessed with respect to such transaction, and if assessed the assessment shall be abated, and if collected shall be credited or refunded as an overpayment.

#### (D) Definitions

For purposes of this paragraph and subsection (d)(23)—

##### (i) Security

The term "security" has the meaning given such term by section 475(c)(2) (without regard to subparagraph (F)(iii) and the last sentence thereof).

##### (ii) Commodity

The term "commodity" has the meaning given such term by section 475(e)(2) (without regard to subparagraph (D)(iii) thereof).

##### (iii) Correct

The term "correct" means, with respect to a transaction—

(I) to undo the transaction to the extent possible and in any case to make good to the plan or affected account any losses resulting from the transaction, and

(II) to restore to the plan or affected account any profits made through the use of assets of the plan.

### (g) Application of section

This section shall not apply—

(1) in the case of a plan to which a guaranteed benefit policy (as defined in section 401(b)(2)(B) of the Employee Retirement Income Security Act of 1974) is issued, to any assets of the insurance company, insurance service, or insurance organization merely because of its issuance of such policy;

(2) to a governmental plan (within the meaning of section 414(d)); or

(3) to a church plan (within the meaning of section 414(e)) with respect to which the election provided by section 410(d) has not been made.

In the case of a plan which invests in any security issued by an investment company registered under the Investment Company Act of 1940, the assets of such plan shall be deemed to include such security but shall not, by reason of such investment, be deemed to include any assets of such company.

### (h) Notification of Secretary of Labor

Before sending a notice of deficiency with respect to the tax imposed by subsection (a) or (b), the Secretary shall notify the Secretary of Labor and provide him a reasonable opportunity

to obtain a correction of the prohibited transaction or to comment on the imposition of such tax.

**(i) Cross reference**

For provisions concerning coordination procedures between Secretary of Labor and Secretary of the Treasury with respect to application of tax imposed by this section and for authority to waive imposition of the tax imposed by subsection (b), see section 3003 of the Employee Retirement Income Security Act of 1974.

(Added Pub. L. 93–406, title II, §2003(a), Sept. 2, 1974, 88 Stat. 971; amended Pub. L. 94–455, title XIX, §1906(b)(13)(A), Oct. 4, 1976, 90 Stat. 1834; Pub. L. 95–600, title I, §141(f)(5), (6), Nov. 6, 1978, 92 Stat. 2795; Pub. L. 96–222, title I, §101(a)(7)(C), (K), (L)(iv)(III), (v)(XI), Apr. 1, 1980, 94 Stat. 198–201; Pub. L. 96–364, title II, §§208(b), 209(b), Sept. 26, 1980, 94 Stat. 1289, 1290; Pub. L. 96–596, §2(a)(1)(K),(L), (2)(I), (3)(F), Dec. 24, 1980, 94 Stat. 3468, 3471; Pub. L. 97–448, title III, §305(d)(5), Jan. 12, 1983, 96 Stat. 2400; Pub. L. 98–369, div. A, title IV, §491(d)(45), (46), (e)(7), (8), July 18, 1984, 98 Stat. 851–853; Pub. L. 99–514, title XI, §1114(b)(15)(A), title XVIII, §§1854(f)(3)(A), 1899A(51), Oct. 22, 1986, 100 Stat. 2452, 2882, 2961; Pub. L. 101–508, title XI, §11701(m), Nov. 5, 1990, 104 Stat. 1388–513; Pub. L. 104–188, title I, §§1453(a), 1702(g)(3), Aug. 20, 1996, 110 Stat. 1817, 1873; Pub. L. 104–191, title III, §301(f), Aug. 21, 1996, 110 Stat. 2051; Pub. L. 105–34, title II, §213(b), title X, §1074(a), title XV, §§1505(b)(1), 1530(c)(10), title XVI, §1602(a)(5), Aug. 5, 1997, 111 Stat. 816, 949, 1065, 1079, 1094; Pub. L. 105–206, title VI, §6023(19), July 22, 1998, 112 Stat. 825; Pub. L. 106–554, §1(a)(7) [title II, §202(a)(7), (b)(7), (10)], Dec. 21, 2000, 114 Stat. 2763, 2763A–628, 2763A–629; Pub. L. 107–16, title VI, §§612(a), 656(b), June 7, 2001, 115 Stat. 100, 134; Pub. L. 107–22, §1(b)(1)(D), (3)(D), July 26, 2001, 115 Stat. 197; Pub. L. 108–173, title XII, §1201(f), Dec. 8, 2003, 117 Stat. 2479; Pub. L. 108–357, title II, §§233(c), 240(a), Oct. 22, 2004, 118 Stat. 1434, 1437; Pub. L. 109–135, title IV, §413(a)(2), Dec. 21, 2005, 119 Stat. 2641; Pub. L. 109–280, title VI, §§601(b)(1), (2), 611(a)(2), (c)(2), (d)(2), (e)(2), (g)(2), 612(b), Aug. 17, 2006, 120 Stat. 958, 959, 967, 969–971, 974, 976; Pub. L. 110–458, title I, §106(a)(2), (b)(2), (c), Dec. 23, 2008, 122 Stat. 5105.)

REFERENCES IN TEXT

The Employee Retirement Income Security Act of 1974, referred to in text, is Pub. L. 93–406, Sept. 2, 1974, 88 Stat. 829. Part 1 of subtitle E of title IV of such Act is classified generally to part 1 (29 U.S.C. 1381 et seq.) of subtitle E of subchapter III of chapter 18 of Title 29, Labor. Sections 401, 405 to 408, 3003, 4044, 4223, and 4231 of such Act are classified to sections 1101, 1105 to 1108, 1203, 1344, 1403, and 1411, respectively, of Title 29. For complete classification of this Act to the Code, see Short Title note set out under section 1001 of Title 29 and Tables.

The date of the enactment of this paragraph, referred to in subsec. (d)(16)(B), is the date of enactment of Pub. L. 108–357, which was approved Oct. 22, 2004.

The Investment Company Act of 1940, referred to in subsecs. (e)(8) and (g), is title I of act Aug. 22, 1940, ch. 686, 54 Stat. 789, as amended, which is classified generally to subchapter I (§80a–1 et seq.) of chapter 2D of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see section 80a–51 of Title 15 and Tables.

The Investment Advisers Act of 1940, referred to in subsec. (f)(8)(J)(i)(I), is title II of act Aug. 22, 1940, ch.

686, 54 Stat. 847, as amended, which is classified generally to subchapter II (§80b–1 et seq.) of chapter 2D of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see section 80b–20 of Title 15 and Tables.

The Securities Exchange Act of 1934, referred to in subsec. (f)(8)(J)(i)(IV), (10)(A)(i), is act June 6, 1934, ch. 404, 48 Stat. 881, as amended, which is classified principally to chapter 2B (§78a et seq.) of Title 15, Commerce and Trade. Section 6 of the Act is classified to section 78f of Title 15. For complete classification of this Act to the Code, see section 78a of Title 15 and Tables.

AMENDMENTS

2008—Subsec. (d)(17). Pub. L. 110–458, §106(a)(2)(A), substituted "that permits" for "and that permits" in introductory provisions.

Subsec. (d)(18). Pub. L. 110–458, §106(b)(2)(A), in introductory provisions, substituted "disqualified person" for "party in interest" and "subsection (e)(3)" for "subsection (e)(3)(B)".

Subsec. (d)(19) to (21). Pub. L. 110–458, §106(b)(2)(B), substituted "disqualified person" for "party in interest" wherever appearing.

Subsec. (d)(21)(C). Pub. L. 110–458, §106(b)(2)(C), struck out "or less" before "than 3 percent".

Subsec. (f)(6)(A). Pub. L. 110–458, §106(a)(2)(B)(i), substituted "subsection (d)(17)" for "subsection (b)(14)".

Subsec. (f)(8)(C)(iv)(II). Pub. L. 110–458, §106(a)(2)(B)(ii), substituted "(d)(17)(A)(ii)" for "subsection (b)(14)(B)(ii)".

Subsec. (f)(8)(F)(i)(I). Pub. L. 110–458, §106(a)(2)(B)(iii), substituted "fiduciary adviser," for "financial adviser".

Subsec. (f)(8)(I). Pub. L. 110–458, §106(a)(2)(B)(iv), substituted "subsection (c)" for "section 406".

Subsec. (f)(8)(J)(i). Pub. L. 110–458, §106(a)(2)(B)(v), substituted "a participant" for "the participant" in introductory provisions and concluding provisions, inserted "referred to in subsection (e)(3)(B)" after "investment advice" in introductory provisions, and substituted "subsection (d)(4)" for "section 408(b)(4)" in subcl. (II).

Subsec. (f)(11)(B)(i). Pub. L. 110–458, §106(c), inserted "of the Employee Retirement Income Security Act of 1974" after "section 407(d)(1)" and "of such Act" after "section 407(d)(2)".

2006—Subsec. (d)(17). Pub. L. 109–280, §601(b)(1), added par. (17).

Subsec. (d)(18). Pub. L. 109–280, §611(a)(2)(A), added par. (18).

Subsec. (d)(19). Pub. L. 109–280, §611(c)(2), added par. (19).

Subsec. (d)(20). Pub. L. 109–280, §611(d)(2)(A), added par. (20).

Subsec. (d)(21). Pub. L. 109–280, §611(e)(2), added par. (21).

Subsec. (d)(22). Pub. L. 109–280, §611(g)(2), added par. (22).

Subsec. (d)(23). Pub. L. 109–280, §612(b)(1), added par. (23).

Subsec. (f)(8). Pub. L. 109–280, §601(b)(2), added par. (8).

Subsec. (f)(9). Pub. L. 109–280, §611(a)(2)(B), added par. (9).

Subsec. (f)(10). Pub. L. 109–280, §611(d)(2)(B), added par. (10).

Subsec. (f)(11). Pub. L. 109–280, §612(b)(2), added par. (11).

2005—Subsec. (d)(16)(A). Pub. L. 109–135, §413(a)(2)(A), inserted "or a depository institution holding company (as defined in section 3(w)(1) of the Federal Deposit Insurance Act (12 U.S.C. 1813(w)(1))" after "a bank (as defined in section 581)".

Subsec. (d)(16)(C). Pub. L. 109–135, §413(a)(2)(B), inserted "or company" after "such bank".

2004—Subsec. (d)(16). Pub. L. 108–357, §233(c), added par. (16).

Subsec. (f)(7). Pub. L. 108–357, §240(a), added par. (7).

2009—Subsec. (e)(6). Pub. L. 108–173, § 1201(f)(1), added par. (6).

Subsec. (e)(1)(B) to (G). Pub. L. 108–173, § 1201(f)(2), added subpar. (E) and redesignated former subpars. (E) and (F) as (F) and (G), respectively.

2001—Subsec. (c)(5). Pub. L. 107–22, § 1(b)(1)(D), (3)(D), in heading, substituted "Coverdell education savings" for "education individual retirement" and in text, substituted "a Coverdell education savings" for "an education individual retirement".

Subsec. (e)(1)(B). Pub. L. 107–22, § 1(b)(1)(D), substituted "a Coverdell education savings" for "an education individual retirement".

Subsec. (e)(7). Pub. L. 107–16, § 658(b), inserted ", section 409(p)," after "409(n)" in concluding provisions.

Subsec. (f)(6)(B)(iii). Pub. L. 107–16, § 612(a), added cl. (iii).

2000—Subsec. (c)(4). Pub. L. 106–554, § 1(a)(7) [title II, § 202(b)(10)], substituted "an Archer" for "a Archer".

Pub. L. 106–554, § 1(a)(7) [title II, § 202(a)(7)], substituted "Archer MSAs" for "medical savings accounts" in heading and "Archer MSA" for "medical savings account" in text.

Subsec. (e)(1)(D). Pub. L. 106–554, § 1(a)(7) [title II, § 202(b)(10)], substituted "an Archer" for "a Archer".

Pub. L. 106–554, § 1(a)(7) [title II, § 202(a)(7)], substituted "Archer MSA" for "medical savings account".

1998—Subsec. (c)(3). Pub. L. 105–206, § 6023(19)(A), substituted "exempt from the tax" for "exempt for the tax".

Subsec. (i). Pub. L. 105–206, § 6023(19)(B), substituted "Secretary of the Treasury" for "Secretary of Treasury".

1997—Subsec. (a). Pub. L. 105–34, § 1074(a), substituted "15 percent" for "10 percent".

Subsec. (c)(4). Pub. L. 105–34, § 1602(a)(5), substituted "if section 220(e)(2) applies to such transaction." for "if, with respect to such transaction, the account ceases to be a medical savings account by reason of the application of section 220(e)(2) to such account."

Subsec. (c)(5). Pub. L. 105–34, § 213(b)(2), added par. (5).

Subsec. (d). Pub. L. 105–34, § 1506(b)(1)(B)(ii), struck out concluding provisions which read as follows: "The exemptions provided by this subsection (other than paragraphs (9) and (12)) shall not apply to any transaction with respect to a trust described in section 401(a) which is part of a plan providing contributions or benefits for employees some or all of whom are owner-employees (as defined in section 401(c)(3)) in which a plan directly or indirectly lends any part of the corpus or income of the plan to, pays any compensation for personal services rendered to the plan to, or acquires for the plan any property from or sells any property to, any such owner-employee, a member of the family (as defined in section 267(c)(4)) of any such owner-employee, or a corporation controlled by any such owner-employee through the ownership, directly or indirectly, of 50 percent or more of the total combined voting power of all classes of stock entitled to vote or 50 percent or more of the total value of shares of all classes of stock of the corporation. For purposes of the preceding sentence, a shareholder-employee (as defined in section 1379, as in effect on the day before the date of the enactment of the Subchapter S Revision Act of 1982), a participant or beneficiary of an individual retirement account or an individual retirement annuity (as defined in section 408), and an employer or association of employees which establishes such an account or annuity under section 408(c) shall be deemed to be an owner-employee."

Pub. L. 105–34, § 1506(b)(1)(B)(i), substituted "Except as provided in subsection (f)(6), the prohibitions" for "The prohibitions" in introductory provisions.

Subsec. (e)(1)(D) to (F). Pub. L. 105–34, § 213(b)(1), struck out "or" at end of subpar. (D), added subpar. (E), and redesignated former subpar. (E) as (F).

Subsec. (e)(7). Pub. L. 105–34, § 1530(c)(10), inserted "and section 664(g)" after "section 409(n)" in concluding provisions.

Subsec. (f)(6). Pub. L. 105–34, § 1506(b)(1)(A), added par. (6).

1996—Subsec. (a). Pub. L. 104–188, § 1453(a), substituted "10 percent" for "5 percent".

Subsec. (c)(4). Pub. L. 104–191, § 301(f)(1), added par. (4).

Subsec. (d)(13). Pub. L. 104–188, § 1702(g)(3), substituted "408(b)(12))" for "408(b)".

Subsec. (e)(1). Pub. L. 104–191, § 301(f)(2), reenacted heading without change and amended text generally. Prior to amendment, text read as follows: "For purposes of this section, the term 'plan' means a trust described in section 401(a) which forms a part of a plan, or a plan described in section 403(a), which trust or plan is exempt from tax under section 501(a), an individual retirement account described in section 408(a) or an individual retirement annuity described in section 408(b) (or a trust, plan, account, or annuity which, at any time, has been determined by the Secretary to be such a trust, plan, or account)."

1990—Subsec. (d)(13). Pub. L. 101–508 inserted before semicolon at end "or which is exempt from section 406 of such Act by reason of section 408(b) of such Act".

1986—Subsec. (d). Pub. L. 99–514, § 1899A(51), inserted a closing parenthesis after "and (12)" in second sentence.

Subsec. (d)(1)(B). Pub. L. 99–514, § 1114(b)(15)(A), substituted "highly compensated employees (within the meaning of section 414(q))" for "highly compensated employees, officers, or shareholders".

Subsec. (e)(7). Pub. L. 99–514, § 1854(f)(3)(A), inserted ", section 409(o), and, if applicable, section 409(n)" in last sentence.

1984—Subsec. (d). Pub. L. 98–369, § 491(d)(45), substituted in provision following par. (15) "or an individual retirement annuity (as defined in section 408)" for ", individual retirement annuity, or an individual retirement bond (as defined in section 408 or 409)".

Subsec. (e)(1). Pub. L. 98–369, § 491(d)(46), struck out "or 405(a)" after "section 403(a)" and "or a retirement bond described in section 409" after "section 408(b)", and substituted "or annuity" for "annuity, or bond" and "or account" for "account, or bond".

Subsec. (e)(7). Pub. L. 98–369, § 491(e)(7), substituted "section 409(h)" for "section 409A(h)", "section 409(e)(4)" for "section 409A(e)(4)", and "section 409(e)" for "section 409A(e)".

Subsec. (e)(8). Pub. L. 98–369, § 491(e)(8), substituted "section 409(l)" for "section 409A(l)".

1983—Subsec. (d). Pub. L. 97–448 inserted ", as in effect on the day before the date of the enactment of the Subchapter S Revision Act of 1982" after "section 1379" in last sentence.

1980—Subsec. (b). Pub. L. 96–596, § 2(a)(1)(K), substituted "taxable period" for "correction period".

Subsec. (d)(14), (15). Pub. L. 96–364, § 208(b), added pars. (14) and (15).

Subsec. (e)(7). Pub. L. 96–222, § 101(a)(7)(K), (L)(iv)(III), (v)(XI), substituted references to an employee stock ownership plan, for references to a leveraged employee stock ownership plan wherever appearing therein, and substituted provisions relating to treatment of a plan as an employee stock ownership plan, for provisions relating to treatment of a plan as a leveraged employee stock ownership plan.

Subsec. (e)(8). Pub. L. 96–222, § 101(a)(7)(C), substituted provisions defining "qualifying employer security" within the meaning of section 409A(l), for provisions defining such term as stock, or otherwise an equity security, or within the meaning of section 503(e)(1) to (3).

Subsec. (e)(9). Pub. L. 96–364, § 209(b), added par. (9).

Subsec. (f)(2)(B), (C). Pub. L. 96–596, § 2(a)(2)(I), added subpar. (B) and redesignated former subpar. (B) as (C).

Subsec. (f)(4)(B). Pub. L. 96–596, § 2(a)(1)(L), substituted "taxable period" for "correction period".

Subsec. (f)(6). Pub. L. 96–596, § 2(a)(3)(F), struck out par. (6), which defined correction period, as the period beginning on the date on which the prohibited transaction occurs and ending 90 days after the date of mailing of a notice of deficiency with respect to the tax imposed by subsec. (b) of this section under section 6212 of this title, ex-

tended by any period in which a deficiency cannot be assessed under section 6213(a) of this title and any other period which the Secretary determines is reasonable and necessary to bring about the correction of the prohibited transaction.

1978—Subsec. (d)(3). Pub. L. 95-600, §141(f)(6), substituted "leveraged employee" for "employee".

Subsec. (e)(7). Pub. L. 95-600, §141(f)(5), substituted in heading "Leveraged employee" for "Employee", and in text, "leveraged employee" for "employee" and inserted provision that a plan not be treated as a leveraged employee stock ownership plan unless it meet the requirements of section 409A(e) and (h).

1976—Subsecs. (c) to (f). Pub. L. 94-455 struck out "or his delegate" after "Secretary" wherever appearing.

EFFECTIVE DATE OF 2008 AMENDMENT

Amendment by Pub. L. 110-458 effective as if included in the provisions of Pub. L. 109-280 to which the amendment relates, except as otherwise provided, see section 112 of Pub. L. 110-458, set out as a note under section 72 of this title.

EFFECTIVE DATE OF 2006 AMENDMENT

Pub. L. 109-280, title VI, §601(b)(4), Aug. 17, 2006, 120 Stat. 966, as amended by Pub. L. 110-458, title I, §106(a)(3), Dec. 23, 2008, 122 Stat. 5106, provided that: "Except as provided in this subsection [amending this section and enacting provisions set out as notes under this section], the amendments made by this subsection shall apply with respect to advice referred to in section 4975(e)(3)(B) of the Internal Revenue Code of 1986 provided after December 31, 2006."

Pub. L. 109-280, title VI, §611(h), Aug. 17, 2006, 120 Stat. 975, provided that:

"(1) IN GENERAL.—Except as provided in paragraph (2), the amendments made by this section [amending this section and sections 1002, 1106, and 1112 of Title 29, Labor] shall apply to transactions occurring after the date of the enactment of this Act [Aug. 17, 2006].

"(2) BONDING RULE.—The amendments made by subsection (b) [amending section 1112 of Title 29] shall apply to plan years beginning after such date."

Pub. L. 109-280, title VI, §612(c), Aug. 17, 2006, 120 Stat. 977, provided that: "The amendments made by this section [amending this section and section 1108 of Title 29, Labor] shall apply to any transaction which the fiduciary or disqualified person discovers, or reasonably should have discovered, after the date of the enactment of this Act [Aug. 17, 2006] constitutes a prohibited transaction."

EFFECTIVE DATE OF 2005 AMENDMENT

Amendment by Pub. L. 109-135 effective as if included in the provision of the American Jobs Creation Act of 2004, Pub. L. 108-357, to which such amendment relates, see section 413(d) of Pub. L. 109-135, set out as a note under section 1361 of this title.

EFFECTIVE DATE OF 2004 AMENDMENT

Amendment by section 233(c) of Pub. L. 108-357 effective Oct. 22, 2004, see section 233(e) of Pub. L. 108-357, set out as a note under section 512 of this title.

Pub. L. 108-357, title II, §240(b), Oct. 22, 2004, 118 Stat. 1437, provided that: "The amendment made by this section [amending this section] shall apply to distributions with respect to S corporation stock made after December 31, 1997."

EFFECTIVE DATE OF 2003 AMENDMENT

Amendment by Pub. L. 108-173 applicable to taxable years beginning after Dec. 31, 2003, see section 1201(k) of Pub. L. 108-173, set out as a note under section 62 of this title.

EFFECTIVE DATE OF 2001 AMENDMENTS

Amendment by Pub. L. 107-22 effective July 26, 2001, see section 1(c) of Pub. L. 107-22, set out as an Effective and Termination Dates of 2001 Amendment note under section 26 of this title.

Pub. L. 107-16, title VI, §612(c), June 7, 2001, 115 Stat. 100, provided that: "The amendment made by this section [amending this section and section 1108 of Title 29, Labor] shall apply to years beginning after December 31, 2001."

Amendment by section 656(b) of Pub. L. 107-16 applicable to plan years beginning after Dec. 31, 2004, except that in the case of any employee stock ownership plan established after Mar. 14, 2001, or established on or before such date if employer securities held by the plan consist of stock in a corporation with respect to which an election under section 1362(a) of this title is not in effect on such date, amendment applicable to plan years ending after Mar. 14, 2001, see section 656(d) of Pub. L. 107-16, set out as a note under section 409 of this title.

EFFECTIVE DATE OF 1997 AMENDMENT

Amendment by section 213(b) of Pub. L. 105-34 applicable to taxable years beginning after Dec. 31, 1997, see section 213(f) of Pub. L. 105-34, set out as a note under section 26 of this title.

Section 1074(b) of Pub. L. 105-34 provided that: "The amendment made by this section [amending this section] shall apply to prohibited transactions occurring after the date of the enactment of this Act [Aug. 5, 1997]."

Amendment by section 1506(b)(1) of Pub. L. 105-34 applicable to taxable years beginning after Dec. 31, 1997, see section 1506(c) of Pub. L. 105-34, set out as a note under section 409 of this title.

Amendment by section 1530(c)(10) of Pub. L. 105-34 applicable to transfers made by trusts to, or for the use of, an employee stock ownership plan after Aug. 5, 1997, see section 1530(d) of Pub. L. 105-34, set out as a note under section 401 of this title.

Amendment by section 1602(a)(5) of Pub. L. 105-34 effective as if included in the provisions of the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191, to which such amendment relates, see section 1602(i) of Pub. L. 105-34, set out as a note under section 26 of this title.

EFFECTIVE DATE OF 1996 AMENDMENTS

Amendment by Pub. L. 104-191 applicable to taxable years beginning after Dec. 31, 1996, see section 301(j) of Pub. L. 104-191, set out as a note under section 62 of this title.

Section 1453(b) of Pub. L. 104-188 provided that: "The amendment made by this section [amending this section] shall apply to prohibited transactions occurring after the date of the enactment of this Act [Aug. 20, 1996]."

Amendment by section 1702(g)(3) of Pub. L. 104-188 effective, except as otherwise expressly provided, as if included in the provision of the Revenue Reconciliation Act of 1990, Pub. L. 101-508, title XI, to which such amendment relates, see section 1702(i) of Pub. L. 104-188, set out as a note under section 38 of this title.

EFFECTIVE DATE OF 1990 AMENDMENT

Amendment by Pub. L. 101-508 effective, except as otherwise provided, as if included in the provision of the Revenue Reconciliation Act of 1989, Pub. L. 101-239, title VII, to which such amendment relates, see section 11701(n) of Pub. L. 101-508, set out as a note under section 42 of this title.

EFFECTIVE DATE OF 1986 AMENDMENT

Amendment by section 1114(b)(15)(A) of Pub. L. 99-514 applicable to years beginning after Dec. 31, 1988, see section 1114(c)(3) of Pub. L. 99-514, set out as a note under section 414 of this title.

Amendment by section 1854(f)(3)(A) of Pub. L. 99-514 effective Oct. 22, 1986, see section 1854(f)(4)(A) of Pub. L. 99-514, set out as a note under section 409 of this title.

## EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by section 491(d)(45), (46) of Pub. L. 98–369 applicable to obligations issued after Dec. 31, 1983, see section 491(f)(1) of Pub. L. 98–369, set out as a note under section 62 of this title.

Amendment by section 491(e)(7), (8) of Pub. L. 98–369 effective Jan. 1, 1984, see section 491(f)(3) of Pub. L. 98–369, set out as a note under section 401 of this title.

## EFFECTIVE DATE OF 1983 AMENDMENT

Amendment by Pub. L. 97–448 effective on date of enactment of Subchapter S Revision Act of 1982 [Oct. 19, 1982], see section 311(c)(4) of Pub. L. 97–448, set out as a note under section 1368 of this title.

## EFFECTIVE DATE OF 1980 AMENDMENTS

For effective date of amendment by Pub. L. 96–596 with respect to any first tier tax and to any second tier tax, see section 2(d) of Pub. L. 96–596, set out as an Effective Date note under section 4961 of this title.

Amendment by section 209(b) of Pub. L. 96–364 effective Sept. 26, 1980, see section 210(a) of Pub. L. 96–364, set out as an Effective Date note under section 418 of this title.

Amendment by section 209(b) of Pub. L. 96–364 applicable to taxable years ending after Sept. 26, 1980, see section 210(c) of Pub. L. 96–364, set out as an Effective Date note under section 418 of this title.

Section 101(b)(1)(C) of Pub. L. 96–222 provided that: "The amendment made by subparagraph (C) of subsection (a)(6) [probably should be '(a)(7)', which amended this section] shall apply to stock acquired after December 31, 1979."

Amendment by section 101(a)(7)(K), (L)(iv)(III), (v)(XI) of Pub. L. 96–222 effective, except as otherwise provided, as if it had been included in the provision of the Revenue Act of 1978, Pub. L. 95–600, to which such amendment relates, see section 201 of Pub. L. 96–222, set out as a note under section 32 of this title.

## EFFECTIVE DATE OF 1978 AMENDMENT

Section 141(h) of Pub. L. 95–600, as added by Pub. L. 96–222, title I, §101(a)(7)(B), Apr. 1, 1980, 94 Stat. 197; Pub. L. 99–514, §2, Oct. 22, 1986, 100 Stat. 2095, provided that: "Paragraphs (5) and (6) of subsection (f) [section 141(f)(5), (6) of Pub. L. 95–600] shall apply—

"(1) insofar as they make the requirements of subsections (e) and (h)(1)(B) of section 409A [now section 409] of the Internal Revenue Code of 1986 [formerly I.R.C. 1954] applicable to section 4975 of such Code, to stock acquired after December 31, 1979, and

"(2) insofar as they make paragraphs (1)(A) and (2) of section 409A(h) [now section 409(h)] of such Code applicable to such section 4975, to distributions after December 31, 1978."

## EFFECTIVE DATE; SAVINGS PROVISION

Section 2003(c) of Pub. L. 93–406, as amended by Pub. L. 99–514, §2, Oct. 22, 1986, 100 Stat. 2095, provided that:

"(1)(A) The amendments made by this section [enacting this section and amending section 503 of this title] shall take effect on January 1, 1975.

"(B) If, before the amendments made by this section [enacting this section and amending section 503 of this title] take effect, an organization described in section 401(a) of the Internal Revenue Code of 1986 [formerly I.R.C. 1954] is denied exemption under section 501(a) of such Code by reason of section 503 of such Code, the denial of such exemption shall not apply if the disqualified person elects (in such manner and at such time as the Secretary or his delegate shall by regulations prescribe) to pay, with respect to the prohibited transaction (within the meaning of section 503(b) or (g)) which resulted in such denial of exemption, a tax in the amount and in the manner provided with respect to the tax imposed under section 4975 of such Code. An election made under this subparagraph, once made, shall be irrevocable. The Secretary of the Treasury or his dele-gate shall prescribe such regulations as may be necessary to carry out the purposes of this subparagraph.

"(2) Section 4975 of the Internal Revenue Code of 1986 (relating to tax on prohibited transactions) shall not apply to—

"(A) a loan of money or other extension of credit between a plan and a disqualified person under a binding contract in effect on July 1, 1974 (or pursuant to renewals of such a contract), until June 30, 1984, if such loan or other extension of credit remains at least as favorable to the plan as in arm's-length transaction with an unrelated party would be, and if the execution of the contract, the making of the loan, or the extension of credit was not, at the time of such execution, making, or extension, a prohibited transaction (within the meaning of section 503(b) of such Code) or the corresponding provisions of prior law);

"(B) a lease of joint use of property involving the plan and a disqualified person pursuant to a binding contract in effect on July 1, 1974 (or pursuant to renewals of such a contract), until June 30, 1984, if such lease or joint use remains at least as favorable to the plan as an arm's-length transaction with an unrelated party would be and if the execution of the contract was not, at the time of such execution, a prohibited transaction (within the meaning of section 503(b) of such Code) or the corresponding provisions of prior law;

"(C) the sale, exchange, or other disposition of property described in subparagraph (B) between a plan and a disqualified person before June 30, 1984, if—

"(i) in the case of a sale, exchange, or other disposition of the property by the plan to the disqualified person, the plan receives an amount which is not less than the fair market value of the property at the time of such disposition; and

"(ii) in the case of the acquisition of the property by the plan, the plan pays an amount which is not in excess of the fair market value of the property at the time of such acquisition;

"(D) Until June 30, 1977, the provision of services to which subparagraphs (A), (B), and (C) do not apply between a plan and a disqualified person (i) under a binding contract in effect on July 1, 1974 (or pursuant to renewals of such contract), or (ii) if the disqualified person ordinarily and customarily furnished such services on June 30, 1974, if such provision of services remains at least as favorable to the plan as an arm's-length transaction with an unrelated party would be and if the provision of services was not, at the time of such provision, a prohibited transaction (within the meaning of section 503(b) of such Code) or the corresponding provisions of prior law; or

"(E) the sale, exchange, or other disposition of property which is owned by a plan on June 30, 1974, and all times thereafter, to a disqualified person, if such plan is required to dispose of such property in order to comply with the provisions of section 407(a)(2)(A) (relating to the prohibition against holding excess employer securities and employer real property) of the Employee Retirement Income Security Act of 1974 [29 U.S.C. 1107(a)(2)] and if the plan receives not less than adequate consideration.

For the purposes of this paragraph, the term 'disqualified person' has the meaning provided by section 4975(e)(2) of the Internal Revenue Code of 1986."

## REGULATIONS

Secretary of the Treasury or his delegate to issue before Feb. 1, 1988, final regulations to carry out amendments made by section 1114 of Pub. L. 99–514, see section 1141 of Pub. L. 99–514, set out as a note under section 401 of this title.

## DETERMINATION OF FEASIBILITY OF APPLICATION OF COMPUTER MODEL INVESTMENT ADVICE PROGRAMS FOR INDIVIDUAL RETIREMENT AND SIMILAR PLANS

Pub. L. 109–280, title VI, §601(b)(3), Aug. 17, 2006, 120 Stat. 964, provided that:

"(A) SOLICITATION OF INFORMATION.—As soon as practicable after the date of the enactment of this Act [Aug. 17, 2006], the Secretary of Labor, in consultation with the Secretary of the Treasury, shall—

"(i) solicit information as to the feasibility of the application of computer model investment advice programs for plans described in subparagraphs (B) through (F) (and so much of subparagraph (G) as relates to such subparagraphs) of section 4975(e)(1) of the Internal Revenue Code of 1986, including soliciting information from—

"(I) at least the top 50 trustees of such plans, determined on the basis of assets held by such trustees, and

"(II) other persons offering computer model investment advice programs based on nonproprietary products, and

"(ii) shall on the basis of such information make the determination under subparagraph (B).

The information solicited by the Secretary of Labor under clause (i) from persons described in subclauses (I) and (II) of clause (i) shall include information on computer modeling capabilities of such persons with respect to the current year and preceding year, including such capabilities for investment accounts maintained by such persons.

"(B) DETERMINATION OF FEASIBILITY.—The Secretary of Labor, in consultation with the Secretary of the Treasury, shall, on the basis of information received under subparagraph (A), determine whether there is any computer model investment advice program which may be utilized by a plan described in subparagraph (A)(i) to provide investment advice to the account beneficiary of the plan which—

"(i) utilizes relevant information about the account beneficiary, which may include age, life expectancy, retirement age, risk tolerance, other assets or sources of income, and preferences as to certain types of investments,

"(ii) takes into account the full range of investments, including equities and bonds, in determining the options for the investment portfolio of the account beneficiary, and

"(iii) allows the account beneficiary, in directing the investment of assets, sufficient flexibility in obtaining advice to evaluate and select investment options.

The Secretary of Labor shall report the results of such determination to the committees of Congress referred to in subparagraph (D)(ii) not later than December 31, 2007.

"(C) APPLICATION OF COMPUTER MODEL INVESTMENT ADVICE PROGRAM.—

"(i) CERTIFICATION REQUIRED FOR USE OF COMPUTER MODEL.—

"(I) RESTRICTION ON USE.—Subclause (I) of section 4975(f)(8)(B)(i) of the Internal Revenue Code of 1986 shall not apply to a plan described in subparagraph (A)(i).

"(II) RESTRICTION LIFTED IF MODEL CERTIFIED.—If the Secretary of Labor determines under subparagraph (B) or (D) that there is a computer model investment advice program described in subparagraph (B), subclause (I) shall cease to apply as of the date of such determination.

"(ii) CLASS EXEMPTION IF NO INITIAL CERTIFICATION BY SECRETARY.—If the Secretary of Labor determines under subparagraph (B) that there is no computer model investment advice program described in subparagraph (B), the Secretary of Labor shall grant a class exemption from treatment as a prohibited transaction under section 4975(c) of the Internal Revenue Code of 1986 to any transaction described in section 4975(d)(17)(A) of such Code with respect to plans described in subparagraph (A)(i), subject to such conditions as set forth in such exemption as are in the interests of the plan and its account beneficiary and protective of the rights of the account beneficiary and as are necessary to—

"(I) ensure the requirements of sections 4975(d)(17) and 4975(f)(8) (other than subparagraph

(C) thereof) of the Internal Revenue Code of 1986 are met, and

"(II) ensure the investment advice provided under the investment advice program utilizes prescribed objective criteria to provide asset allocation portfolios comprised of securities or other property available as investments under the plan.

If the Secretary of Labor solicits any information under subparagraph (A) from a person and such person does not provide such information within 60 days after the solicitation, then, unless such failure was due to reasonable cause and not wilful neglect, such person shall not be entitled to utilize the class exemption under this clause.

"(D) SUBSEQUENT DETERMINATION.—

"(i) IN GENERAL.—If the Secretary of Labor initially makes a determination described in subparagraph (C)(ii), the Secretary may subsequently determine that there is a computer model investment advice program described in subparagraph (B). If the Secretary makes such subsequent determination, then the class exemption described in subparagraph (C)(ii) shall cease to apply after the later of—

"(I) the date which is 2 years after such subsequent determination, or

"(II) the date which is 3 years after the first date on which such exemption took effect.

"(ii) REQUESTS FOR DETERMINATION.—Any person may request the Secretary of Labor to make a determination under this subparagraph with respect to any computer model investment advice program, and the Secretary of Labor shall make a determination with respect to such request within 90 days. If the Secretary of Labor makes a determination that such program is not described in subparagraph (B), the Secretary shall, within 10 days of such determination, notify the Committee on Ways and Means and the Committee on Education and the Workforce of the House of Representatives and the Committee on Finance and the Committee on Health, Education, Labor, and Pensions of the Senate of such determination and the reasons for such determination.

"(E) EFFECTIVE DATE.—The provisions of this paragraph shall take effect on the date of the enactment of this Act [Aug. 17, 2006]."

### COORDINATION OF 2006 AMENDMENT WITH EXISTING EXEMPTIONS

Pub. L. 109-280, title VI, § 601(c), Aug. 17, 2006, 120 Stat. 966, provided that: "Any exemption under section 408(b) of the Employee Retirement Income Security Act of 1974 [29 U.S.C. 1108(b)] and section 4975(d) of the Internal Revenue Code of 1986 provided by the amendments made by this section [amending this section and section 1108 of Title 29, Labor] shall not in any manner alter existing individual or class exemptions, provided by statute or administrative action."

### PLAN AMENDMENTS NOT REQUIRED UNTIL JANUARY 1, 1998

For provisions directing that if any amendments made by subtitle D [§§ 1401-1465] of title I of Pub. L. 104-188 require an amendment to any plan or annuity contract, such amendment shall not be required to be made before the first day of the first plan year beginning on or after Jan. 1, 1998, see section 1465 of Pub. L. 104-188, set out as a note under section 401 of this title.

### PLAN AMENDMENTS NOT REQUIRED UNTIL JANUARY 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§ 1101-1147 and 1171-1177] or title XVIII [§§ 1800-1899A] of Pub. L. 99-514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99-514, as amended, set out as a note under section 401 of this title.

INTENT OF CONGRESS CONCERNING EMPLOYEE STOCK
OWNERSHIP PLANS

Section 803(h) of Pub. L. 94–455 provided that: "The
Congress, in a series of laws (the Regional Rail Reorganization Act of 1973, the Employee Retirement Income
Security Act of 1974, the Trade Act of 1974, and the Tax
Reduction Act of 1975) and this Act has made clear its
interest in encouraging employee stock ownership
plans as a bold and innovative method of strengthening
the free private enterprise system which will solve the
dual problems of securing capital funds for necessary
capital growth and of bringing about stock ownership
by all corporate employees. The Congress is deeply concerned that the objectives sought by this series of laws
will be made unattainable by regulations and rulings
which treat employee stock ownership plans as conventional retirement plans, which reduce the freedom of
the employee trusts and employers to take the necessary steps to implement the plans, and which otherwise block the establishment and success of these
plans. Because of the special purposes for which employee stock ownership plans are established, it is consistent with the intent of Congress to permit these
plans (whether structured as pension, stock bonus, or
profit-sharing plans) to distribute income on employer
securities currently."

## § 4976. Taxes with respect to funded welfare benefit plans

### (a) General rule

If—

(1) an employer maintains a welfare benefit
fund, and

(2) there is a disqualified benefit provided
during any taxable year,

there is hereby imposed on such employer a tax
equal to 100 percent of such disqualified benefit.

### (b) Disqualified benefit

For purposes of subsection (a)—

#### (1) In general

The term "disqualified benefit" means—

(A) any post-retirement medical benefit or
life insurance benefit provided with respect
to a key employee if a separate account is
required to be established for such employee
under section 419A(d) and such payment is
not from such account,

(B) any post-retirement medical benefit or
life insurance benefit provided with respect
to an individual in whose favor discrimination is prohibited unless the plan meets the
requirements of section 505(b) with respect
to such benefit (whether or not such requirements apply to such plan), and

(C) any portion of a welfare benefit fund
reverting to the benefit of the employer.

#### (2) Exception for collective bargaining plans

Paragraph (1)(B) shall not apply to any plan
maintained pursuant to an agreement between
employee representatives and 1 or more employers if the Secretary finds that such agreement is a collective bargaining agreement and
that the benefits referred to in paragraph
(1)(B) were the subject of good faith bargaining between such employee representatives
and such employer or employers.

#### (3) Exception for nondeductible contributions

Paragraph (1)(C) shall not apply to any
amount attributable to a contribution to the
fund which is not allowable as a deduction

under section 419 for the taxable year or any
prior taxable year (and such contribution shall
not be included in any carryover under section
419(d)).

#### (4) Exception for certain amounts charged against existing reserve

Subparagraphs (A) and (B) of paragraph (1)
shall not apply to post-retirement benefits
charged against an existing reserve for post-retirement medical or life insurance benefits
(as defined in section 512(a)(3)(E)) or charged
against the income on such reserve.

### (c) Definitions

For purposes of this section, the terms used in
this section shall have the same respective
meanings as when used in subpart D of part I of
subchapter D of chapter 1.

(Added Pub. L. 98–369, div. A, title V, § 511(c)(1),
July 18, 1984, 98 Stat. 861; amended Pub. L.
99–514, title XVIII, § 1851(a)(11), Oct. 22, 1986, 100
Stat. 2861; Pub. L. 100–647, title I,
§ 1011B(a)(27)(A), (B), title III, § 3021(a)(1)(C), Nov.
10, 1988, 102 Stat. 3487, 3626; Pub. L. 101–140, title
II, § 203(a)(2), Nov. 8, 1989, 103 Stat. 830.)

CODIFICATION

Pub. L. 101–140 amended this section to read as if the
amendments made by section 1011B(a)(27) of Pub. L.
100–647 (enacting subsec. (c)) had not been enacted. Subsequent to enactment by Pub. L. 100–647, subsec. (c) was
amended by Pub. L. 100–647, § 3021(a)(1)(C). See 1988
Amendment note below.

AMENDMENTS

1989—Subsec. (b)(5). Pub. L. 101–140 amended subsec.
(b) to read as if amendments by Pub. L. 100–647,
§ 1011B(a)(27)(B), had not been enacted, see 1988 Amendment note below.

Subsecs. (c), (d). Pub. L. 101–140 amended this section
to read as if amendments by Pub. L. 100–647,
§ 1011B(a)(27)(A), had not been enacted, see 1988 Amendment note below.

1988—Subsec. (b)(5). Pub. L. 100–647, § 1011B(a)(27)(B),
added par. (5) relating to limitation in case of benefits
to which section 89 applies.

Subsec. (c). Pub. L. 100–647, § 1011B(a)(27)(A), added
subsec. (c) relating to tax on funded welfare benefit
funds which include discriminatory employee benefit
plan. Former subsec. (c) redesignated (d).

Subsec. (c)(1)(B). Pub. L. 100–647, § 3021(a)(1)(C)(i), substituted "any testing year (as defined in section
89(j)(13))" for "any plan year", see Codification note
above.

Subsec. (c)(2)(A). Pub. L. 100–647, § 3021(a)(1)(C)(ii),
substituted "testing" for "plan" in cls. (i) and (ii), see
Codification note above.

Subsec. (d). Pub. L. 100–647, § 1011B(a)(27)(A), redesignated former subsec. (c) as (d).

1986—Subsec. (b). Pub. L. 99–514 amended subsec. (b)
generally. Prior to amendment, subsec. (b) read as follows: "For purposes of subsection (a), the term 'disqualified benefit' means—

"(1) any medical benefit or life insurance benefit
provided with respect to a key employee other than
from a separate account established for such owner
under section 419A(d), and

"(2) any post-retirement medical or life insurance
benefit unless the plan meets the requirements of
section 505(b)(1) with respect to such benefit, and

"(3) any portion of such fund reverting to the benefit of the employer."

EFFECTIVE DATE OF 1989 AMENDMENT

Amendment by Pub. L. 101–140 effective as if included
in section 1151 of Pub. L. 99–514, see section 203(c) of

# EXHIBIT 34

# SL-02881

## *Hartman, Cathy - Vol. I.20220907.406640-SL*

### *9/7/2022 11:33 AM*

**Full-size Transcript**

**Prepared by:**

SL-02881

Thursday, October 6, 2022

1

1    THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    In the Matter of:                )

4                                      )  File No. SL-02881-A

5    STEPHEN ROMNEY SWENSEN            )

6

7    WITNESS:  Cathy L. Hartman

8    PAGES:    1 through 55

9    PLACE:    Securities and Exchange Commission

10             Salt Lake Regional Office

11             351 South West Temple, Suite 6.100

12             Salt Lake City, Utah 84101-1950

13   DATE:     Wednesday, September 7, 2022

14

15        The above-entitled matter came on for hearing, via

16   Webex, pursuant to notice, at 11:33 a.m., Mountain

17   Daylight Time.

18

19

20

21

22

23

24        Diversified Reporting Services, Inc.

25                 (202)467-9200

2

```
1    APPEARANCES:

2

3    On behalf of the Securities and Exchange Commission:

4         JONI OSTLER, ESQ.

5         CHERYL M. MORI, ESQ.

6         U.S. Securities and Exchange Commission

7         Division of Enforcement

8         Salt Lake Regional Office

9         351 South West Temple, Suite 6.100

10        Salt Lake City, Utah 84101-1950

11        (801) 524-6748

12        ostlerj@sec.gov

13

14   On behalf of the Witness:

15        CATHY L. HARTMAN, PRO SE

16        ██████████████████████████

17        Eagle Point, OR ██████

18

19

20   Also Present:

21        Trever Burke, SEC Law Clerk

22

23

24

25
```

3

```
 1                    C O N T E N T S

 2    WITNESS                              EXAMINATION

 3    Cathy L. Hartman                              5

 4

 5    EXHIBITS:     DESCRIPTION               IDENTIFIED

 6      6          Traditional IRA Application       18

 7                 Bates No. SEC-HartmanC-E-0000066

 8      7          Custodial Agreement               19

 9                 Bates No. SEC-HartmanC-E-0000070

10      8          Letter of Authorization           20

11                 Bates No. SEC-HartmanC-E-0000065

12      9          Email Correspondence w/Attachments  22

13                 Bates No. SEC-HartmanC-E-0000046

14     10          Crew Capital Group Account Statement  32

15                 Bates No. SEC-HartmanC-E-0000004

16     11          Crew Capital Group Account Summary  30

17                 Bates No. SEC-HartmanC-E-0000006

18     12          Email Correspondence blueleaf.com  33

19                 Bates No. SEC-HartmanC-E-0000007

20     13          Email Correspondence w/Attachments  38

21                 Bates No. SEC-HartmanC-E-0000079

22     14          Email Correspondence w/Attachments  39

23                 (No Bates Stamp Number Referenced)

24

25
```

4

1                    P R O C E E D I N G S

2          MS. OSTLER:  On the record, September 7, 2022,

3     at 11:33 a.m., Mountain Daylight Time.

4          My name is Joni Ostler, and with me is co-

5     counsel, Cheryl Mori.  It looks like our law clerk,

6     Trever Burke, has also joined.

7          MS. HARTMAN:  Yes.

8          MS. OSTLER:  He's another attorney that works

9     here at the SEC.  We are members of the staff of the

10    Enforcement Division of the Salt Lake Regional Office of

11    the United States Securities and Exchange Commission.

12    Cher and I are also officers of the Commission for the

13    purposes of this proceeding.

14          This is an investigation by the Commission

15    titled, "In the Matter of Stephen Romney Swensen," to

16    determine whether there have been any violations of the

17    federal securities laws or rules for which the

18    Commission has enforcement authority; however, facts

19    developed in this investigation might constitute

20    violations of other federal or state, criminal or civil

21    laws.

22          Mrs. Hartman, your testimony today is not

23    pursuant to subpoena, so you should understand that your

24    appearance here today is voluntary.

25          MS. HARTMAN:  Okay.

5

```
 1              MS. OSTLER:  Do you understand that you do not

 2     need to answer any question and that you can leave at

 3     any time you wish?

 4              MS. HARTMAN:  Yes.  Yes.

 5              MS. OSTLER:  Do you consent to being placed

 6     under oath?

 7              MS. HARTMAN:  Yes.

 8              MS. OSTLER:  Do you consent to taking the oath

 9     remotely, by Webex, rather than in person?

10              MS. HARTMAN:  Yes.

11              MS. OSTLER:  Great.  Also, do you -- is it

12     okay with you if Trever Burke, our law clerk, is present

13     for your testimony today as an observer?

14              MS. HARTMAN:  Yes.

15              MS. OSTLER:  Thank you.  Please raise your

16     right hand.

17              Do you consent -- or I'm sorry -- do you swear

18     to tell the truth, the whole truth, and nothing but the

19     truth?

20              MS. HARTMAN:  I do.

21     Whereupon,

22                       CATHY L. HARTMAN

23     was called as a witness and, having been first duly

24     sworn, was examined and testified as follows:

25                       EXAMINATION
```

6

1              BY MS. OSTLER:

2         Q    Great.  You can lower your hand.  Please state

3    and spell your full name for the record.

4         A    Cathy Hartman.  C-a-t-h-y H-a-r-t-m-a-n.

5         Q    Do you have a middle initial?

6         A    Yes, it's L, for Louise.

7         Q    So this session today is being conducted

8    remotely.  So just for the record, could you please tell

9    us the address of your location where you are?

10        A    Yes.  ████████████████████████████, Eagle

11   Point, Oregon.

12        Q    So prior to opening the record, I showed you

13   on the screen, the document that is called the formal

14   order, directing private investigation and designating

15   officers to take testimony in this matter.  That

16   document will be available to you throughout your

17   testimony today.  So if you ever want to look at it

18   again, just let me know and I can pull it back up on the

19   screen for you.

20        A    Okay.

21        Q    Have you had an opportunity to review the

22   formal order?

23        A    Yes.

24        Q    Do you have any questions about the formal

25   order?

7

1        A     No.

2        Q     Also prior to opening the record today, I gave

3    you a copy of the Commission's Form 1662 titled,

4    "Supplemental Information for Persons Requested to

5    Supply Information Voluntarily or Directed to Supply

6    Information Pursuant to a Commission Subpoena."  That

7    was that like, longer document, it was like five pages

8    long.  Have you had an opportunity to read the Form

9    1662?

10       A     Yes.

11       Q     Do you have any questions about it?

12       A     No.

13       Q     So I notice you are not represented by

14   counsel; is that correct?

15       A     That's correct.  We're talking to counsel, but

16   I have -- we have not signed an agreement yet.

17       Q     Okay.  Since you don't have counsel here

18   today, I'm going to give you some additional --

19   highlight some things for you.

20             You do have the right to be accompanied,

21   represented, and advised by counsel.  This means that

22   you have the right to have an attorney present, and an

23   attorney can advise you before, during and after your

24   testimony here today.  Do you understand that?

25       A     Yes, I do.

8

1        Q     So I also want to let you know these

2    proceedings can be adjourned at any time if you want

3    them to be adjourned so that you can obtain counsel.  Do

4    you understand that?

5        A     Yes, I do.

6        Q     Do you understand that the statutes that are

7    talked about in the Form 1662 provide criminal penalties

8    for knowingly providing false testimony or knowingly

9    using false documents in connection with this

10   investigation?

11       A     Yes, I do.

12       Q     Do you understand that you have the right to

13   assert your rights under the Fifth Amendment of the

14   Constitution and refuse to answer any question that may

15   tend to incriminate you?

16       A     Yes, I do.

17       Q     Okay, great.  So now just a few instructions

18   before I start in on the -- the actual questions.

19             Your testimony today is under oath, and it

20   will just be me asking you questions and you answering

21   to the best of your ability.  You are to answer

22   truthfully and as best as you can.  Do you understand

23   that?

24       A     Yes, I do.

25       Q     If you don't know the answer to a question or

9

```
 1    if you're speculating or guessing, please say so.

 2         A    Okay.

 3         Q    If you answer a question and don't tell us

 4    that you are guessing or speculating, we will assume

 5    that your answer is based on your own knowledge and that

 6    you're not guessing.  Do you understand that?

 7         A    Yes.

 8         Q    It is important for you to hear and understand

 9    my questions.  So if you don't hear me, let -- please

10    let me know.  If you don't understand a question, please

11    let me know and I will try to clarify it or rephrase it

12    to help you understand.  Do you understand that?

13         A    Yes.  Yes.

14         Q    So Lee Ann, our court reporter today, will be

15    taking down everything we say.  And just to help her so

16    that we have a good transcript, try to answer verbally

17    rather than shaking your head or nodding your head.

18         A    Okay.

19         Q    Try to say -- yeah.  Try to say "yes" or "no"

20    instead of "uh-huh" or "uh-uh."

21         A    Okay.  Yes.

22         Q    I will try not to interrupt your answer,

23    because it kind of gets muddy if we talk over each

24    other.  So I will try to make sure you finish your

25    answer before I start a new question.  And please try to
```

1   make sure that I finish my question before you say your

2   answer.

3       A    Yes.

4       Q    So I'm going to show you stuff on the screen

5   the way that I already did.  And I think everything but

6   one document that I'm going to show you today is stuff

7   you provided me.  But for the one I'm going to show you

8   that you did not provide me, I just have to let you know

9   that you're not allowed to take any screenshots of it or

10  keep any photos or copies of it.

11      A    Okay.  Yes.

12      Q    If you ever need a break, like to go into the

13  bathroom or grab a drink, just let me know, and I will

14  tell the court reporter to go off the record.

15          Are you ill at all today?

16      A    No.

17      Q    Have you taken any medication that might

18  affect your memory or impair your ability to testify

19  today?

20      A    No.

21      Q    Have you had anything alcoholic to drink in

22  the last eight hours?

23      A    No.

24      Q    Okay, great.  So let's start in with the

25  substantive questions.

1          Are you currently retired?

2     A    Yes.

3     Q    Where did you work before you retired?

4     A    Utah State University from 1992 to 2012.

5     Q    What was your position there?

6     A    I was a professor of marketing.  Wait a

7   minute.  I retired -- I'm sorry -- I retired in 2014.

8   2014.  I was a professor of marketing in the Business

9   Administration Department.

10    Q    Did you meet a man named Philip Swensen when

11  you were working there?

12    A    Yes, I did.  He was my department head.

13    Q    Was he also your investment advisor at any

14  point?

15    A    Yes.  He became our investment advisor, and

16  that's a date that I have to recall.  I think it was

17  around 1998.

18    Q    At that point was Philip Swensen's son,

19  Stephen Swensen, also your investment advisor?

20    A    And that's another thing that I'm going to

21  have to recall.  To the best of my knowledge, I think

22  that Steve was on board by at least 2000.  I will say

23  2000.  And I can't remember before then.

24    Q    Okay.  So you did start out being Philip

25  Swensen's client first?

12

1        A     Yes.

2        Q     And then at some point his son, Steve, also

3   became your advisor.

4        A     Yes.

5        Q     How often did you meet with them when they

6   were your investment advisors?

7        A     At least once a year.  I think -- to the best

8   of my knowledge, we had annual meetings.  And I don't

9   recall.  We, we may have had questions in the interim,

10  but we did not have formal meetings.  We just had an

11  annual review meeting every year.

12       Q     Do you recall there came a point where Phil

13  retired, and Steve got a new partner?

14       A     Yes.  And I'm not -- the first partner, and I

15  can't remember the date of this, would have been Jason.

16  Jason Kimber.  And then Jason left, I think 2019, then

17  Jacob Cazier came on, and I'm not sure if it was 2019 or

18  2020 when Jake came aboard.

19       Q     When was the first time that Steve Swensen

20  mentioned Crew Capital Funds to you?

21       A     It was 2018.  And we complained about an

22  investment of ours with Transamerica that was not

23  performing as we thought it should.  And Steve

24  recommended that we put our money into Crew Capital

25  Group.

13

1        Q     What did he tell you about Crew Capital?

2        A     He said that it had a minimum -- it was based

3    on the S&P 500, it had a minimum return guaranteed of 5

4    percent, a maximum of 10 percent, and it reset on our

5    anniversary date every year, which was April the 30th.

6        Q     What do you mean by "it reset"?

7        A     That would be the day that the reading of the

8    S&P 500 was taken.  And if in the time from April 30 to

9    one year to April 30 the next year, it had -- whatever

10   it had returned was our return.

11       Q     But you would always get 5 percent, even if

12   the S&P was lower than 5?

13       A     Yes.  We would always get 5 percent.  So the 5

14   percent was -- it accrued daily, okay?  It -- so every

15   day that went into our Crew Capital account.  And then

16   on the anniversary date, if the market had returned more

17   than 5 percent, there was a bump on May 1 of whatever

18   that was over 5 percent.

19       Q     Would that bump be like a one-time bonus

20   deposit?

21       A     Yes.  It was a periodic -- I can't remember

22   exactly.  Something like a periodic -- and I'd have to

23   look it up.  Periodic something payment.

24       Q     So then you would continue to just get a 5

25   percent for the following year.

1      A    Yes.

2      Q    Then you might get a bump.  But the bump could

3    never be more than 10 percent?

4      A    Yes.

5      Q    Did Steve say that it was -- that Crew Capital

6    was sub-managed by another sub-advisor?

7      A    The only other entity involved -- no.  The

8    only other entity involved was the Bank of Utah was the

9    custodian.

10     Q    Did Steve ever say where Crew Capital would

11   invest your money in order to create these returns?

12     A    He did not.

13     Q    Was anyone else in the room when Steve told

14   you about Crew Capital?

15     A    Yes.  I don't know if Jason Kimber was at the

16   beginning, but Jake -- Jake would have -- Jake would

17   have been later on when we would have our annual

18   meetings and we would review what the return had been,

19   and what we were going to do with respect to that fund.

20     Q    So the very first time that Steve told you

21   about Crew Capital when you were complaining that this

22   other investment wasn't doing well, and then he told you

23   about it.  Do you recall if Jason Kimber was in the room

24   at point?

25     A    No, I do not.

15

1     Q     So how did you go about investing the money?

2     Did Steve have you write a personal check?  A cashier's

3     check?  Wire transfer?  How did it go?

4     A     He did -- we had two accounts.  And so we had

5     the Transamerica account, and then we had an American

6     Funds Lincoln -- Lincoln Life something.  Lincoln --

7     Lincoln Funds.  It was American Funds Lincoln something

8     and Transamerica.  And Steve did -- Steve did the

9     transfers.  We just signed the transfer papers, so it

10    went directly -- those were -- it was either 401 -- what

11    is this, 401b?  401b?  So they went -- they went

12    directly from that type of -- you know, annuity to the

13    other type.

14    Q     So you took money from all of those different

15    investments to put into Crew?

16    A     We took all of the money from both of those

17    investments.  It was around $700,000.

18    Q     Did you have any other retirement funds that

19    remained invested in anything else?

20    A     Yes.  We have a -- some Roth IRAs.  We still

21    currently have them because we didn't move them,

22    although Steve had asked about moving them, and Jackson

23    National Life.

24    Q     Did Steve ever tell you that he was affiliated

25    with Crew Capital?

```
1        A    Yes.  Yes, he said he was an advisor at Crew

2   Capital.  Yes.

3        Q    He said he was an advisor there.

4        A    Mm-hmm.

5        Q    He never said that he was an owner.

6        A    No.

7        Q    Did he say how he was going to be compensated

8   for --

9        A    No.

10       Q    -- your investment?

11       A    No.

12       Q    How was he normally compensated by you for

13  being your investment advisor?

14       A    We never directly discussed that.  So I, I

15  cannot answer that.

16       Q    So you mentioned Bank of Utah.  What did Steve

17  tell you about the Bank of Utah?

18       A    He told me that the Bank of Utah was the

19  custodian on that account.  So I had all of our

20  "government documents" that we had to have for the IRS

21  came from the Bank of Utah.  So the Bank of Utah would

22  send us a form that told us how much we had to take out

23  of the IRA every year.  Then they would send us the 1099

24  Form that we would turn in to the IRS.

25            They also sent us another -- I looked through
```

17

1    my tax records, that's how come I know this -- they also

2    sent us a Form 5498 every year that showed us the market

3    value of that Crew Capital account.  And until -- well

4    until recently, I could go online and see my trust

5    account at the Bank of Utah, but for some reason it's no

6    longer accessible.

7        Q    Okay.  So going back to when you first were

8    going to invest in Crew, did you have a Bank of Utah

9    account before you invested in Crew?

10       A    I did not.

11       Q    Did Steve -- well let me back up.  How did you

12   get your account open at the Bank of Utah?

13       A    I received some documents, and I think I

14   forwarded them to you.  So, so Steve would have made the

15   initial contact and then we got this letter from the

16   Bank of Utah that told me to set up the account.

17       Q    Did you personally go into the Bank of Utah to

18   set it up?

19       A    No.  We haven't been in -- we haven't been in

20   Utah since 2014.

21       Q    Did Steve prepare the paperwork for you and

22   send it to you to sign for the Bank of Utah?

23       A    Yes, he did.

24            MS. OSTLER:  Okay.  I'm going to put a

25   document on the screen.

1                    (SEC Exhibit No. 6 was marked

2                         for identification.)

3            BY MS. OSTLER:

4       Q    Are you able to see on your screen a document

5    that has a yellow sticker saying 6?

6       A    Yes.

7       Q    Government Exhibit 6?

8       A    Mm-hmm.

9       Q    Okay.  So for the record, this is SEC HartmanC

10   E 66.

11      A    Mm-hmm.

12      Q    It says, "Traditional IRA Application."  Do

13   you recognize this document?

14      A    Yes, that's mine, and I sent it to you.

15      Q    I'm just going to scroll through it so you can

16   sort of familiarize yourself, because it's -- it's a

17   three-page document.

18      A    Yes.  (Examining) Those are my initials, yes.

19      Q    And this is your signature on page 3?

20      A    Yes, it is.

21      Q    Dated April 17, 2018.

22      A    Yes.

23      Q    This document, you have a recollection of

24   Steve having sent it to you?

25      A    Yes.  Steve sent that to us.

1     Q    Okay.  When it says, "Account funding

2   information amount 700,000," does that correspond to the

3   amount that you were going to invest into Crew Capital?

4     A   Yes, it does.

5     MS. OSTLER:  I'm going to take that down and

6   show another document.  It takes a second for my

7   computer.

8               (SEC Exhibit No. 7 was marked

9                 for identification.)

10     BY MS. OSTLER:

11     Q   Are you seeing on your screen a document

12   marked Government Exhibit 7?

13     A   Yes.

14     Q   Do you recognize this document?

15     (The witness examines the document.)

16     A   Yes.

17     Q   So just for the record, it's SEC HartmanC E

18   70.  And it says, "Custodial Agreement."  Mrs. Hartman,

19   did Steve prepare this for you or send this to you to

20   sign?

21     A   Yes.

22     Q   So after you -- are these your initials at the

23   bottom of these pages?

24     A   Yes.

25     Q   And this is your signature on the last page.

1      A    Yes.

2      Q    So when you signed this, do you remember if it

3   had already been signed by Jodie Nutt at the Bank of

4   Utah?

5      A    I do not.

6      Q    Did Steve send these documents to you by mail?

7      A    I, I -- I can't recall that.  We, we got -- we

8   either got, you know, messages online or he would send

9   us things FedEx.  And I do not remember how that came.

10     Q    Okay.  I'm going to do one more document.  Did

11  Steve -- can you remember what Steve explained to you

12  about the role of the Bank of Utah in the Crew Capital

13  investment?

14     A    I thought -- well I'm not -- I, I can't recall

15  what Steve explained to me.  I assumed they were

16  handling the money and I had an account there.  But I, I

17  can't recall if Steve told me that.

18          MS. OSTLER:  Okay.

19                    (SEC Exhibit No. 8 was marked

20                    for identification.)

21          BY MS. OSTLER:

22     Q    I'm now displaying on the screen a document

23  marked Government Exhibit 8.  Are you able to see that?

24     A    Yes.

25     Q    For the record, it's SEC HartmanC E 65, and

```
 1    it's titled, "Letter of Authorization."  Mrs. Hartman,

 2    do you recognize this document?

 3            (The witness examines the document.)

 4       A    I do.

 5       Q    Where did you get this document?

 6       A    From Steve.

 7       Q    Do you recall signing it?

 8       A    Yes.

 9       Q    Did you understand that this document was

10    going to allow Steve access to all of the funds you had

11    in the Bank of Utah account?

12       A    Yes, I did.

13       Q    Did you understand that Steve would be able to

14    withdraw all the money in that bank account?

15       A    No.  No, I didn't think he would be -- I

16    didn't think he would be doing that.  I don't -- I -- I

17    didn't really think Steve would be interacting with that

18    account.  I thought that it was Crew Capital Group who

19    were interacting with that account and, and the Bank of

20    Utah.  And the only thing I thought Steve was doing, we,

21    we would be talking to him about how -- we, we got a

22    monthly payment out of that account for four years from

23    2018 to 2022.  And all I understood was that -- we would

24    talk to Steve about what we were doing and then the Bank

25    of Utah would be doing everything else.
```

1          And as I recall there was one year when we

2     were getting a -- we were going to get the 10 percent.

3     We were getting that 5 percent bump.  And so I was very

4     excited to see it come into that account.  And it didn't

5     come in, and it didn't come in.  And I called the Bank

6     of Utah and they said, "Well, you know, it takes a while

7     for these records to be done."

8          And, and I talked to Steve and he said, "Don't

9     worry, it'll go in."  And like if it was supposed to be

10    there on May 1st, because you'd be accruing interest on

11    it, it was supposed to be there on May 1st and it would

12    be backdated to that date, and I would have all my

13    interest going forward.  But I understood this was all

14    being done through Crew Capital.

15         Q     You understood Crew Capital to be an

16    investment company.

17         A     An investment company which Steve represented.

18                        (SEC Exhibit No. 9 was marked

19                          for identification.)

20         BY MS. OSTLER:

21         Q     So I'm going to show you another document.

22    This is Government Exhibit 9.

23         A     Okay.

24         Q     This is a 5-page document, it's an email you

25    sent to me with documents attached.  So it's actually a

1    couple of documents together.  It's SEC HartmanC E 46.

2    And I'm just going to scroll down to show you the first

3    attachment says, "Bank of Utah."

4        A    Mm-hmm.

5        Q    So Mrs. Hartman, this is one of the documents

6    you gave to me.  Can you explain what you understand

7    this document to be?

8                (The witness examines the document.)

9        A    I understand that that was tell -- told me

10   what my minimum -- the amount of money that I had to

11   take out of that account for the year.

12       Q    Did Bank of Utah send this document to you?

13       A    Yes.

14       Q    And it says, "Required minimum distribution

15   for 2022."  Did you get one of these each year?

16       A    Yes, I did.

17       Q    Okay.  I'm going to scroll down.  There's a

18   blank page and then after that there's a document that

19   says, "Crew Capital Group Index Account."  And this is

20   another document you sent to me.  Where did you get this

21   document?

22       A    From Steve.  That would have been in -- he

23   would -- he would have -- he gave us that document at

24   several points.  He gave us that document when we

25   invested, and then when we would have our annual

24

1    meetings.  There would always be a copy of that in with

2    the documents that were in there.

3        Q    In the documents that Steve would provide to

4    you at the annual meeting?

5        A    Yes.

6             MS. MORI:  Hi Cindy.

7             THE WITNESS:  Yes?

8             MS. OSTLER:  Did --

9             MS. MORI:  How'd it go?

10            MS. OSTLER:  Oh, Cher, you're not on mute.

11            MS. MORI:  Oh, sorry.

12            BY MS. OSTLER:

13       Q    So Mrs. Hartman, do you recall Jake Cazier

14   ever giving you a copy of this document?

15       A    Not directly.  It would have been in the --

16   well, yes.  And that -- that's an annual -- it would

17   have been the annual report from this year that Jake

18   sent -- Jake sent it to us.  And I can't remember the

19   exact date, but Jake sent the document -- the file and

20   said, "These are the documents that we're going to be

21   reviewing."

22            And we set up the meeting on Zoom.  We went to

23   the meeting on Zoom and Steve never showed up.  This

24   would have been, oh, it -- I'm -- to the best of my

25   knowledge it would have been April of this year.  Steve

25

```
 1    -- Steve never showed up.

 2              And so we, we cancelled the meeting and we had

 3    to reschedule.  And the meeting came about in May, and

 4    we got a new set of documents.  Now, I tried to go back

 5    to Jake's email and get that first document that would

 6    have come from him and had this document in it and it's

 7    no longer available.  So I can't -- I can't get that.

 8         Q    Okay.

 9         A    But I know that would have been in there then.

10         Q    It would have been one of the documents that

11    Jake had emailed to you for your annual meeting?

12         A    Yes.

13         Q    Okay.  So I'm just going to --

14         A    And then -- oh, I'm sorry -- but, but then,

15    after that, peculiar things started to happen.  Because

16    then, after that, Jake was not at the next meeting, it

17    was only Steve.  And they had always been together.

18         Q    That was in -- about May 2022?

19         A    Yes.

20         Q    At this meeting where Steve was only there,

21    what did Steve talk to you about?

22         A    He talked to us about moving those Jackson

23    accounts.  He told us that the Jackson accounts -- they

24    had almost doubled from our original investment.  And he

25    said when they doubled, we wouldn't be getting anymore
```

1   accruals on those, and so we should move those into Crew

2   Capital.  And the reason that we were also motivated to

3   do that is we were trying to keep our monthly draw so

4   that it was not more than the 5 percent so our principal

5   would not decrease.  And we were pretty much there.  I

6   think we were just a couple thousand dollars off that.

7   And so we wanted to go ahead and move those in there so

8   that we could lower the amount we would be taking from

9   Crew.

10         Now the, the Crew account that we had was a

11  traditional IRA.  The Jackson's a Roth IRAs and so we

12  would have to set up a totally new Crew Capital account

13  and put those in there, separate from the one we already

14  had.  And we were in the process of doing that.  We had

15  gotten documents from Steve the Friday before he took

16  his life.  And those were mailed to us, I think, but --

17  no.  Steve sent it -- Steve sent us those online.  Steve

18  sent us those online, and we printed them, signed them,

19  did PDFs and sent them back to him.

20      Q    You were, when he died, in the process of

21  putting additional money into Crew Capital.

22      A    Yes, we were.  Thank goodness we did not.

23      Q    Did Steve, at that last meeting in May, talk

24  to you about an airplane?

25      A     Yes.  He told us that he had an airplane -- I

```
 1    can't remember what it was -- but it was an airplane

 2    that he had purchased for a million dollars.  And he had

 3    done some upgrades to it, he actually sent us the video

 4    where he was interacting with people that had done the

 5    new interior and all this kind of -- all these kinds of

 6    things.  And then Steve told us that he had sold that

 7    for $1.3 million.  So he had made -- he was very proud

 8    that he had made $300,000 off of that.  And he said the

 9    reason that he sold it was that he was no longer -- he,

10    he had been flying it to visit his clients in other

11    states, although he never visited us.  And he just

12    wasn't using it as often as he thought he would.  And so

13    he sold it.

14         Q    Do you recall at that last meeting in May, him

15    saying anything different about Crew Capital; that it

16    had changed?

17         A    No.

18         Q    Okay.  Did you get periodic statements from

19    Crew Capital showing you how your account was growing?

20         A    I had an online account for Crew Capital.  And

21    so I would periodically go onto that and just look at

22    what the monthly money was that was going in to get some

23    idea of how we were doing at maintaining the principal.

24         Q    Do you remember what the website was?

25         A    Oh, it's just like Crew Funds -- I'd have to
```

28

 1    look it up.  But it was like crewfunds.com, something

 2    like that.  I'd have to -- I'd have to look it up.

 3         Q    How did you get your login information for

 4    that account?

 5         A    I would have gotten that from -- I would have

 6    gotten that from Steve at some point.

 7         Q    Did you ever have trouble, like, did you ever

 8    get locked out when you typed in the wrong password?

 9         A    No.

10         Q    Did you ever call Crew Capital?

11         A    Only at -- after Steve took his life.  And we

12    received the letter from the Bank of Utah saying that we

13    may not get our next month withdrawal.  And for the

14    record, we have not gotten anything, even though it's

15    come out of my Crew account, we have not received any

16    money for August or September.  And -- what was I --

17    what was your question?  I'm sorry, because I --

18         Q    Oh, I was just asking if you'd ever telephoned

19    them.

20         A    Okay.  So we were, we were trying to find them

21    when we received this from the Bank of Utah because we

22    thought, "Wow, don't you know anybody at Crew Capital

23    that you can talk to find out what's going to happen

24    with this money?"

25              And it was Janna.  Janna Copley or Copely

 1   (sic) told me, "The only number we have is the number

 2   that you have.  This number in, in New York."

 3           And so we called that number, we got an

 4   answering service.  Very nice answering service.  Told

 5   us no problem, somebody would get right back to us.  But

 6   nobody ever returned our call.

 7           And so then we went online to try and find

 8   something else about Crew Capital.  And there are

 9   different firms, legitimate firms, that have Crew in

10   their name.  I think there's one called Crew Management.

11   I think it's called Crew Management, it's in Cincinnati.

12   And we called them, because we though that was Steve's

13   group and it turned out not to be.  And we could -- we

14   left several messages on that New York number.  But we

15   never got any response.

16       Q    So you said something about the money was

17   coming out of your Crew, but you didn't get it in August

18   and September.

19       A    Right.

20       Q    When you say, "the money was coming out," what

21   do you mean?

22       A    We -- right now we were drawing out thirty-

23   five hundred dollars a month.  The Bank of Utah was

24   sending $500 into the IRS for our taxes, and then they

25   were doing an electronic transfer to our bank account

1    here in Eagle Point at Rogue Credit Union.

2        Q    But in August and September this year, no

3    money came.

4        A    No money.

5        Q    Did you go onto the crewfunds.com website to

6    see if it showed a withdraw?

7        A    Yes.

8        Q    And did it show a withdrawal being made those

9    two months?

10       A    Yes.

11       Q    Even though no money came.

12       A    Yes.

13           MS. OSTLER:  Okay.  I'll show you another

14   document.

15                         (SEC Exhibit No. 11 was marked

16                             for identification.)

17           BY MS. OSTLER:

18       Q    So are you able to see Government Exhibit 11?

19       A    Yes.

20       Q    This is SEC HartmanC E 6.  Do you recognize

21   this as a -- one of the documents that you sent to me?

22           (The witness examines the document.)

23       A    Yes, and it would be -- it, it came out of a

24   -- my annual review report.

25       Q    Oh, okay.  So this was one of the pages --

1         A      Mm-hmm.

2         Q      -- that was handed to you by either Jake or

3    Steve at your meeting.

4         A      Yes.

5         Q      What do you understand this to be showing?

6         A      A summary of -- a summary of my accounts and,

7    and how much it's grown -- grown over the, the time that

8    we have had it.  It also -- I'm trying to look -- shows

9    the amount of our withdrawals and the amount of our

10   earnings.  And the market value.

11        Q      So this graph at the bottom where it says,

12   "History."

13        A      Yes.

14        Q      It sort of goes down over time and then it has

15   these bumps, like a bump in April.  And then it goes

16   down, and then there's a bump in April 2021.  Do you

17   know what those bumps were from?

18        A      Yes.  That's -- okay.  So it -- when it goes

19   down, that shows that our monthly amounts are coming

20   out.  Then that bump -- those bumps, when they occurred,

21   would have been when we got over 5 percent.

22               So that's why it's our anniversary date was

23   April 30th.  So that's basically May 1st when that

24   should have gone up.  And then you can see -- what's

25   that one?  I don't know what that bump is in -- can't

32

1    see -- Joni, I can't see those -- oh, okay.

2          So let me -- I can look up -- because I think

3    one -- a couple years we got 10 percent.  One year --

4    that little bump would have been 6 percent.

5      Q    So like in 2020 it hardly bumped at all.

6      A    Right.  I think it was --

7      Q    Just a little blip.

8      A    -- at 6 percent then.

9      Q    Okay.  So you never made additional capital

10   deposits.  These are just your, like annual --

11     A    Over 10 -- so anytime it was over -- when it

12   -- whenever it was over 5 percent.

13         MS. OSTLER:  Okay.  So I skipped Exhibit 10,

14   so I'm going to go back to it now if it will open.

15                         (SEC Exhibit No. 10 was marked

16                          for identification.)

17         BY MS. OSTLER:

18     Q    I'm now showing Government Exhibit 10, which

19   is SEC Hartman C E 4.

20     A    Mm-hmm.

21     Q    This appears to be an account statement from

22   Crew Capital Group to you.  Do you remember where you

23   got this?

24         (The witness examines the document.)

25     A    That would have been from Steve.  That was our

```
 1    original investment, I think.

 2        Q    So you didn't get things like this

 3    periodically mailed to you.

 4        A    No.

 5        Q    Okay.  So it's showing that your account was

 6    open on April 30, 2018; is that right?

 7        A    That's correct.  And there were, you know,

 8    there were two deposits:  one was the Transamerica, and

 9    the other was the American Funds/Lincoln.

10        Q    But they both went in in April 2018.

11        A    I think they both got there -- I'd have to,

12    I'd have to look.  The second one may have not gotten

13    there until May 9th.

14        Q    Okay.

15        A    For some reason.  I'd have to look.  I'd have

16    to look.  But that date sticks in my mind.  I can look

17    at my records if you want me to.

18        Q    That's okay.

19        A    Okay.

20                         (SEC Exhibit No. 12 was marked

21                          for identification.)

22             BY MS. OSTLER:

23        Q    So I'm now showing you Government Exhibit 12,

24    which is SEC HartmanC E 7.  And this is an email that

25    you sent to me, and it looks you're forwarding me an
```

34

1    email that you got from the address

2    weeklyupdate@blueleaf.com on May 20, 2018.

3         A    Mm-hmm.

4         Q    Do you remember getting weekly updates; emails

5    like this from blueleaf.com?

6         A    No.  I did not.

7         Q    So do you think was just like a one-off?

8         A    Yes.  And it looks like Jason was involved at

9    that point -- I'm sorry.

10        Q    Summit Capital; was that Steve's investment

11   advisor company at that time?

12        A    Yes.

13        Q    I'm just going to scroll down a little.  And

14   this -- the second page has a list of your various

15   investments and the top one is Bank of Utah IRA.

16        A    Right.

17        Q    Was that the same thing as your Crew Capital?

18        A    Yes.

19        Q    And then you've got zero balances on Lincoln,

20   Transamerica Life, Transamerica Funds Roth.

21        A    Right.

22        Q    And Jackson National Trust.

23        A    Right.

24        Q    Were those the accounts that you took your

25   money from to put into Crew?

1       A    All except that 403b from Transamerica.  So

2   there is a -- okay.  So there's a Transamerica

3   Traditional; that, that went in.  Then there's that

4   Lincoln Financial, which also had American Funds in the

5   name.  Those are the two that went in.  And then there's

6   that Roth from Transamerica.  And I took that myself and

7   put it into Vanguard.

8       Q    Okay.

9       A    Because the whole Transamerica investment was

10  not performing.  And so we put the traditional IRA money

11  into Crew and the Roth account.  I told Steve, I would

12  just take it and put it where I wanted to because it all

13  couldn't go in the same account because they're

14  different types of investments.

15      Q    So you were taking distributions from Crew

16  Capital.  Would you tell Steve how much you wanted to

17  take?

18      A    I can tell you -- I, I can tell you how much

19  we took if I have a minute to look it up.  Over the four

20  years, we took a little -- around $200,000.  The first

21  year we took -- and I, and I have the IRS -- I, I have

22  the IRS document from the Bank of Utah that I -- I've

23  never given to you because I just went through our tax

24  records and found all of that.  So I can send you the

25  1099 forms that show what we took.  And also that other

1    form that shows what the market value of my trust

2    account was.

3            So from June of 2018 to May of 2020, we took

4    forty-seven fifty.  And so that was a total of $109,000

5    -- 109,250.  Then from -- then we decided we wanted to

6    lower the amounts, because we were eating into the

7    principal a little bit.  So we went from, from 6/1 of

8    2020 to 4/1 of 2021, we took forty-two fifty.

9            And then again, we decided that, that we

10    wanted to back off so that the principal would stop

11    coming down.  And so from 5/1 to 2021 we were taking

12    thirty-five hundred.  And those are the gross amounts.

13    So part of the money would go from -- that forty-seven

14    fifty, the reason it's a little bit more is the Bank of

15    Utah was supposed to be paying our taxes to the IRS and

16    to the State of Oregon.  And in 2019 we, we found that

17    they -- they had sent all the money to the IRS and

18    nothing to the State of Oregon.  And so we were

19    penalized by the State of Oregon for that.

20            And then Steve told us that the Bank of Utah

21    couldn't send money to the State.  And so we said, "Well

22    okay then, we'll just start sending our money to the

23    State."  So I don't know why --

24    Q    So --

25    A    I don't know why -- I don't know if that was

 1   true, why the Bank of Utah couldn't send money to the

 2   State of Oregon for our taxes.

 3        Q    So each time that you wanted to change your

 4   monthly draw, did you have to tell Steve?

 5             MALE VOICE:  (Coming from Witness's room) Yes.

 6             THE WITNESS:  Yes.

 7             BY MS. OSTLER:

 8        Q    Did you ever tell Jake Cazier and not Steve?

 9        A    No.  I do not recall doing that.

10        Q    Your Forms 1099 came from the Bank of Utah,

11   and they said "Bank of Utah" on them?

12        A    Yes.  I can send all of those to you that I

13   just found.

14        Q    Okay.  So I want you to try to remember, did

15   Jake Cazier ever tell you anything about Crew Capital

16   like, what the returns were?

17        A    Yes.

18        Q    Do you remember a specific instance of him

19   telling you that?

20        A    Yes.  He sent -- he, he sent an email earlier

21   this year.  And I don't know -- because I was asking a

22   question about the -- the account.  And, and Jake sent

23   an email to me and said, "Just" -- you know, "Just so

24   you know, there" -- "there's a 5 percent minimum and a

25   10 percent maximum."

```
 1              And I -- when I got, when I got the email I

 2    was a little irritated because that was something I

 3    obviously knew.  And so I didn't keep it.  I deleted it.

 4         Q    Okay.

 5         A    But he did send it to me.

 6         Q    Was that this year?

 7         A    Yes.

 8         Q    2022?

 9         A    Yes.

10              MS. OSTLER:  I'm going to show you another

11    document.

12                        (SEC Exhibit No. 13 was marked

13                         for identification.)

14         BY MS. OSTLER:

15         Q    I'm showing Government Exhibit 13, which is

16    SEC HartmanC E 79.

17         A    Yes.

18         Q    Do you recognize this document as an email

19    from Jake Cazier to you?

20              (The witness examines the document.)

21         A    Yes.

22         Q    And it says -- I know it's small, but it says,

23    "Monday, October 26, 2020."

24         A    Yes.

25         Q    And you sent this email to me, right?
```

39

1        A    Right.

2        Q    It looks like there are four attachments on

3   it.

4        A    Right, and one's Crew Capital.

5        Q    Okay.  But you -- I think that you were

6   talking about this earlier.  You said you could no

7   longer get those attachments?

8        A    I -- I'm not sure.  I am not sure if I can get

9   those attachments or not.  The, the one that I was

10  referring to was the, the document that came in this

11  year, about April, when Steve didn't show up at the

12  meeting.  I think I can download those if need be.

13       Q    Okay.  So it was the -- so Jake would have

14  sent a email similar to this in April of this year.

15       A    Yes.

16       Q    And that's the one that you couldn't get the

17  attachments off of.

18       A    Yes.

19       Q    Okay.

20       A    Yes.

21                      (SEC Exhibit No. 14 was marked

22                       for identification.)

23            BY MS. OSTLER:

24       Q    So I'm going to switch over to Exhibit 14.

25  Can you see Exhibit 14 now?

40

1        A    That's the one.  Yes.  That's the one.

2        Q    So this is actually the same email --

3             (The witness examines the document.)

4        A    Oh, no.  Then it's not the one.

5        Q    October 26, 2020.  But I pulled this out of a

6   different source.

7        A    Okay.

8        Q    And this has the attachments.  And so --

9        A    Oh, okay.

10       Q    -- this second page here is the Crew Capital

11  attachment.

12       A    Okay.

13       Q    So when Jake sent you the documents for the

14  meeting, did you ever talk to him about what the

15  documents showed or what they were?

16       A    No.

17       Q    When you went to the meeting, did you look at

18  this Crew Capital statement that he sent you to talk

19  about it at all?

20       A    Yes.  We would have -- at those meetings,

21  that's when we would have discussed whether or not we

22  wanted to keep the withdrawal where it was or change it.

23       Q    And where it says, "Index Date," that's what

24  you were talking about earlier when that's the date it

25  would look at the S&P 500 and see if you got your bonus.

41

1      A    Right.  Because the index date and then the

2   index price is the value of the S&P 500.  2912.

3      Q    Okay.  So did it work like, then one year from

4   this, if the index was higher than 2912, then you got

5   your bonus?

6      A    Yes, which was always an interesting situation

7   for us because the stock market could have really been

8   increasing a lot.  But for some reason, on April the

9   30th -- and this has nothing to do with Steve -- but on

10  April the 30th, there would seem to be downturn.  And so

11  when the market had been returning over 15 percent, we

12  would still only get the 10 or less.  But then there was

13  one year where either the market was below the 5

14  percent, and we got the 5 percent.

15          So it was always a lottery draw, whether or

16  not on the date that our anniversary was, would be the

17  date that we were going to get over 10 percent.

18          Do you understand what I'm --

19     Q    Yeah.

20     A    Yes.

21     Q    So I'm just going to scroll a little bit more

22  to the next attachment that was on this email.

23     A    Okay.

24     Q    And this says, "October 2020 Income Plan."

25     A    Mm-hmm.

42

1     Q    It says on the bottom "Prepared by Cathy

2  Hartman," but it -- that's inaccurate, isn't it?

3     A    Yes, it is.  It should say, "Prepared for"

4  maybe, but yeah, uh-huh, that's inaccurate.

5     Q    You -- yeah -- you got this from Jake, right?

6     A    Yes.

7     Q    Would he prepare one of these for you every

8  year?

9     A    Yes.

10    Q    On the list of your investment accounts it

11  shows Crew Funds Index IRA, and that was there every

12  year?

13    A    Yes.

14    Q    Okay.  That's all I have for these documents.

15  I'm just going to shut that.

16    A    And that's all that remain, because those

17  Jackson accounts stayed with Jason Kimber.  They did not

18  -- Steve and Jason parted -- which was something that

19  was confusing to us -- parted ways.  Was it -- it was

20  maybe 2019 to the best of my recollection.  And Jason

21  kept the Jackson accounts.  And we said to Steve, "Why

22  is Jason keeping the Jackson accounts and you're taking

23  the Crew accounts?"

24         And he said something like, "I'm taking the

25  big accounts and Jason's keeping these little smaller

43

```
 1    investments."
 2         Q    Did you ever talk to Jason about that?
 3         A    No.
 4         Q    Did you ever talk to Jason about Crew Capital?
 5         A    No.
 6         Q    How did you learn that Steve Swensen had died?
 7         A    Jason Kimber called us.
 8         Q    What did he say?
 9         A    Uh, "Bad news.  Steve took his life."
10              And we said, "Oh, no.  What happened?"
11              And Jason said, "Steve was having problems."
12              And we said, "Financial?"
13              And he said, "No, but he and I had a
14    discussion and I thought we had settled everything.  But
15    I guess we hadn't."
16         Q    Are you sure it was Jason that called you or
17    was it Jake?
18         A    So -- no, it was Jason.
19         Q    Okay.  Did Jake ever call you after Steve
20    Swensen had passed away?
21         A    Yes.  Jason called us or sent us texts on a
22    weekly basis.
23         Q    Oh, now you mean Jake, right?
24         A    Jake.  Jake, Jake.
25         Q    Jake Cazier?
```

44

1          A     Yes.

2          Q     And what has he said to you in those phone

3     calls and texts?

4          A     Oh, my gosh.  A lot of stuff.  On -- and I've

5     got -- I, I kept the record.  So on June 8th, Jake

6     called us and told us -- he didn't -- he went to the

7     Bank of Utah on the Monday after Steve took his life to

8     take over the account, found out there was nothing

9     there.  And -- and then he also told us that we may not

10    receive, you know, our monthly payout for the next two

11    months.  Well, it's been longer than that.

12              And then on July 15th he called me.  He called

13    me, we had a longer conversation.  And he, he told me

14    about a meeting that he had had with Jodie Buckner at

15    the Bank of Utah.  And she relayed to him that a while

16    back -- and I'm not sure how long a while back is -- a

17    while back she'd become suspicious of what was going on

18    with the Crew Capital account, and so she had decided to

19    make an unannounced visit to Steve's office.  And she

20    went there and there were a number of people working at

21    desks and so she assumed that, that was the Crew Capital

22    business that was taking place, and she didn't ask any

23    particular questions and left it at that.

24              And then on July 27th, Jake gave us the SEC

25    contacts.  Gave me you.

1        And then on July 30th he called and told me

2   the Jodie Nutt story again.  And then also told me that

3   he was the one that became suspicious enough that he

4   contacted -- what -- it's called Wealth Navigation or

5   Oak, whatever it's -- else it's called.  Seems to be two

6   names tied together.

7        Anyway, he called the company, said that he

8   thought Steve was doing something that wasn't

9   legitimate.  And the company contacted Steve and I --

10  and told them they wanted an accounting of the records.

11  And I'm not sure what happened after that because on

12  June 6th, they took his license away.  And I was not

13  sure that he had ever done anything.

14       And then -- let's see -- after that Jake

15  started sending -- he sends a text either weekly or

16  every-other week from this point on that just says, "I

17  don't have any new information."  Basically it says, "I

18  don't have any new information."

19  Q    Have you spoken --

20  A    Oh, but Jake -- oh, Jake did say on one of

21  those meetings that he was in a world of hurt because of

22  Steve and his own license was in jeopardy.  And he also

23  said that Steve was probably facing prison time for what

24  he did.

25  Q    Even though he's dead?

```
 1        A    No.  That was one of the earlier conversations
 2   -- yeah.  Well yeah, this was in retrospect.
 3        Q    Okay.
 4        A    He said Steve was probably going to go for --
 5   going to go to prison for this.
 6        Q    So he said that even before Steve died?
 7        A    No, no, after.
 8        Q    Oh, okay.  Like he was saying that Steve would
 9   have gone to prison --
10        A    Mm-hmm.
11        Q    Okay.  Had he not died.
12        A    Mm-hmm.
13        Q    Have you spoken to anyone at the Bank of Utah
14   since Steve died?
15        A    Just Janna Copley.  Just to ask her -- I
16   originally had a question about that letter that they
17   sent out.  Oh, and then -- oh, that was on another phone
18   call.
19             So, so we got -- okay, so we did get the July
20   payment.  And then when our August payment didn't come,
21   Jake told us that some people had gotten their August
22   payment.  So I called the Bank of Utah to ask why we
23   didn't get ours.  And Janna said there was no money
24   there.
25        Q    And when you are referencing the letter you
```

47

```
 1    got from Bank of Utah, you're referencing the letter you

 2    got after Steve died?

 3         A    Yes.

 4         Q    Okay.  Is there anything else that you think

 5    is important to tell us?

 6         A    Well I would like to send you those other tax

 7    forms that I, I got from the Bank of Utah to go to the

 8    IRS.  And my -- may I ask you?  If they sent government

 9    documents that shows the value of my account, doesn't

10    that suggest that that money should be there, and they

11    should know that money is there?

12         Q    I can't -- I don't really have an answer.  I'm

13    sorry.  From --

14         A    Well, the -- it seems to me they're forging

15    government documents.

16         Q    You should talk to your lawyer about -- if you

17    hire a lawyer --

18         A    Yes.

19         Q    -- you have to talk to your lawyer about that.

20         A    I'm going to.  Yes.  May I ask you?  What is a

21    custodian?  I've looked up custodian online as a

22    financial definition.  And a custodian has a

23    responsibility to look out for the money, to know where

24    the money is.

25         Q    So I can't really answer that either.  I'm not
```

48

1    allowed to give you legal advice.  I'm sorry.

2        A    Okay.

3        Q    I'm so sorry, Mrs. Hartman.  But your lawyer

4    would be able to help you with that, too.

5        A    Yes, okay.

6        Q    Yeah.  I did want to ask you something about

7    something you mentioned earlier.  You said that you were

8    able to see your account on the Bank of Utah website

9    until recently.

10       A    Yes.

11       Q    Can you explain that more?

12       A    Yes.  When I was going through my documents,

13   I, you know, I find -- found the original letter from

14   the Bank of Utah that suggested that I could send --

15   that I could set up an account by going to the trust

16   section of the bank.  And I thought, "I've never done

17   that."  Because I always just looked at crewcapital.com.

18   And so I thought, "Well I think I'll do that," and just

19   see what it says.  So I went in, and I set up an account

20   and it said that I had something like, $744,000 in that

21   trust account.

22           The following week, I tried to sign into that

23   account, and it said my password was not valid.  So I

24   went back to my original sequence to set up another

25   account.  I thought, "I'll see what happens here."

49

1          And the way the sequence works is you put in

2    the request, and they send something to your email, and

3    you track -- go from that email to set up the account.

4    Well when I put in that second request, I never got

5    anything back on my email to set up an account.  But I

6    did take screenshots of what was there on August 23rd.

7          Q    That was just this August 2022.

8          A    Yes, 2022.  And I have not contacted the Bank

9    of Utah to ask them why I can't see that account.  The

10   only question I had for them is I sent an email to Janna

11   to say, "Do you have our tax payments on account there

12   or have you been forwarding them to the IRS?"

13          And she says they forward them to the IRS on a

14   monthly basis.

15          Q    Okay.  Is there anything else that you can

16   think of that you want to supplement about what you said

17   today or --

18          A    Only, only that we had no idea that there was

19   anything going on.  We were perfectly happy with this

20   Crew Funds account.  We even recommended it to our

21   family and friends, and we are so thankful that none of

22   them signed on.  But it was -- it was just performing

23   exactly the way Steve had said.  We were able to take

24   our money out and actually maintain the principal.

25          So we just thought this was a perfect

1   situation.  We didn't think that the amounts that we

2   were getting were that extraordinary because I said, in

3   some years, the S&P 500 was -- had performed far beyond

4   what we got as our 10 percent because of when the

5   anniversary date was.  And so in my mind I always

6   thought, "Well this is, this is good because the company

7   has obviously made more money than they're giving us."

8   They've made over that 10 percent.  And so totally

9   solvent and everything's fine.

10          So we never in our wildest imagination thought

11  anything like this was happening.  That's all I would

12  say.  Steve was our friend.

13      Q    So you believe -- you believed your money was

14  invested somewhere.

15      A    Yes.

16      Q    Either in the S&P 500 or some other --

17      A    Yes, yes.

18      Q    Okay.

19      A    Yeah.

20      Q    And that you had a -- an account at a company

21  called Crew Capital.

22      A    I thought my money was at the bank.  Well, I

23  guess I thought Steve was somehow managing the money at

24  the, at the Bank of Utah.  What I assumed was that there

25  was a Crew Capital company that was making the money and

```
 1    they were sending my 5 percent daily to the Bank of Utah
 2    and that money was mine, and then they had whatever
 3    funds they had, and they were investing them.  But that
 4    was my money there.  That's what I thought.  And nobody
 5    was doing anything with that money except me.  That's
 6    what I thought.
 7              MS. OSTLER:  Cher, do you have any questions?
 8              MS. MORI:  No.
 9              I -- just to follow up on your last comment,
10    it sounds like you thought that because of what Steve
11    Swensen was telling you.  Is that right?
12              THE WITNESS:  Yes.  Yes.
13              MS. MORI:  Yeah.
14              THE WITNESS:  And Steve Swensen was a -- a
15    student -- he was a student in my class in 1992.
16              MS. MORI:  Wow.
17              THE WITNESS:  And so he graduated from Utah
18    State about 1996.  And my husband's a pilot.  Steve was
19    a pilot.  Phil Swensen was a pilot.  And so they shared
20    that aviation interest.  We used to talk about airplanes
21    all the time.  And the last email we got from Steve,
22    after that May meeting says, "Just love you guys," you
23    know -- it's like, "Okay."  Anyway.  Anyway.
24              MS. MORI:  Well, I just want to, again, thank
25    you for taking the time and know this is a difficult
```

1  situation and a lot of, you know, stress and anxiety is

2  involved.  So we really appreciate you providing this

3  testimony.  It's very helpful.

4          THE WITNESS:  I've adopted a new attitude of

5  late.  I was really upset about this and sometimes I'd

6  wake up in the middle of the night and I was really

7  upset about this.  But the way I look at it, the fraud

8  has happened.  It's over with.  It's done.  There is no

9  reason to be upset about it.  Only going forward, I have

10  to be a good witness for the prosecution.  That's the

11  way I look at this.  So I'll do whatever I --

12          MS. MORI:  Well we appreciate it.

13          MS. OSTLER:  Yeah.  Thank you very much.

14  You've been immensely helpful.

15          THE WITNESS:  Okay.

16          MS. MORI:  Very much so.

17          THE WITNESS:  Would you like to see my

18  government documents from the Bank of Utah?  I'll, I'll

19  send them to you.

20          MS. OSTLER:  Yes.  Yeah, please do.

21          THE WITNESS:  Okay.

22          MS. OSTLER:  Yeah.

23          THE WITNESS:  Well thank you.  We appreciate

24  everything you're doing.  I'm hopeful, since I did my

25  reporting, so you can freeze the assets, that there's

53

1     something there.

2              We'll probably sign on with a lawyer.  But we

3     took the documents that they sent us, and they advised

4     us let somebody else look at this.  And -- because

5     they're doing it on a contingency basis.  And so we're

6     having somebody else look at that before we sign it.

7     This lawyer said that they have probably over 12

8     investors signed on right now: that they're going to be

9     going after the estate and everybody else for the

10    damages and more.

11             MS. OSTLER:  So let's --

12             THE WITNESS:  Thank you again.  I'm glad

13    you're there.

14             MS. OSTLER:  Yeah.

15             THE WITNESS:  I suppose I would always like to

16    know how much longer this is going to take.  I know you

17    can't tell me that, so I'll just say --

18             MS. OSTLER:  Well let's go ahead and go off

19    the record.

20             (Whereupon, at 12:39 p.m., Mountain Daylight

21    Time, the examination was concluded.)

22                           * * * * *

23

24

25

54

1                    PROOFREADER'S CERTIFICATE

2

3    In the Matter of:    STEPHEN ROMNEY SWENSON

4    Witness:             Cathy Hartman

5    File No.             SL-02881-A

6    Date:                Wednesday, September 7, 2022

7    Location:            Salt Lake City, Utah

8

9          This is to certify that I, Christine Boyce,

10   (the undersigned), do hereby certify that the foregoing

11   transcript is a complete, true and accurate

12   transcription of all matters contained on the recorded

13   proceedings of the investigative testimony.

14

15

16   _____     _____

17   (Proofreader's Name)             9-16-2022

18

19

20

21

22

23

24

25

55

1                    REPORTER'S CERTIFICATE

2

3    I, Lee Ann Tardieu, reporter, hereby certify that the

4    foregoing transcript is a complete, true and accurate

5    transcript of the testimony indicated, held on 9/7/22,

6    at Salt Lake City, Utah, in the matter of:

7    STEPHEN ROMNEY SWENSON.

8

9    I further certify that this proceeding was recorded by

10   me, and that the foregoing transcript has been prepared

11   under my direction.

12                        9-19-2022

13

14

15

16

17

18

19

20

21

22

23

24

25

# Transcript Word Index

**[0000004 - accompanied]**

## 0

**0000004**
3:15
**0000006**
3:17
**0000007**
3:19
**0000046**
3:13
**0000065**
3:11
**0000066**
3:7
**0000070**
3:9
**0000079**
3:21
**02881**
1:4 54:5

## 1

**1**
1:8 13:17
**1.3**
27:7
**10**
3:14 13:4 14:3 22:2 32:3,11
32:13,15,18 37:25 41:12,17
50:4,8
**109,000**
36:4
**109,250**
36:5
**1099**
16:23 35:25 37:10
**11**
3:16 30:15,18
**11:33**
1:16 4:3
**12**
3:18 33:20,23 53:7
**12:39**
53:20
**13**
3:20 38:12,15
**14**
3:22 39:21,24,25
**15**
41:11
**15th**
44:12
**1662**
7:3,9 8:7
**17**
18:21

**18**
3:6
**19**
3:8
**1992**
11:4 51:15
**1996**
51:18
**1998**
11:17
**1st**
22:10,11 31:23

## 2

**20**
3:10 34:2
**200,000**
35:20
**2000**
11:22,23
**2012**
11:4
**2014**
11:7,8 17:20
**2018**
12:21 18:21 21:23 33:6,10
34:2 36:3
**2019**
12:16,17 36:16 42:20
**202**
1:25
**2020**
12:18 32:5 36:3,8 38:23
40:5 41:24
**2021**
31:16 36:8,11
**2022**
1:13 4:2 21:23 23:15 25:18
38:8 49:7,8 54:6
**22**
3:12
**23rd**
49:6
**26**
38:23 40:5
**27th**
44:24
**2912**
41:2,4

## 3

**3**
18:19
**30**
3:16 13:8,9 33:6
**300,000**
27:8

**30th**
13:5 31:23 41:9,10 45:1
**32**
3:14
**33**
3:18
**351**
1:11 2:9
**38**
3:20
**39**
3:22

## 4

**4**
32:19
**4/1**
36:8
**401**
15:10
**401b**
15:11,11
**403b**
35:1
**422**
2:16 6:10
**46**
23:1
**467-9200**
1:25

## 5

**5**
3:3 13:3,11,12,13,13,17,18
13:24 22:3,24 26:4 31:21
32:12 37:24 41:13,14 51:1
**5/1**
36:11
**500**
13:3,8 29:24 40:25 41:2
50:3,16
**524-6748**
2:11
**5498**
17:2
**55**
1:8

## 6

**6**
3:6 18:1,5,7 30:20 32:4,8
**6.100**
1:11 2:9
**6/1**
36:7
**65**
20:25

**66**
18:10
**6th**
45:12

## 7

**7**
1:13 3:8 4:2 19:8,12 33:24
54:6
**70**
19:18
**700,000**
15:17 19:2
**744,000**
48:20
**79**
38:16

## 8

**8**
3:10 20:19,23
**801**
2:11
**84101-1950**
1:12 2:10
**8th**
44:5

## 9

**9**
3:12 22:18,22
**9/7/22**
55:5
**9-16-2022**
54:17
**9-19-2022**
55:12
**97524**
2:17
**9th**
33:13

## a

**a.m.**
1:16 4:3
**ability**
8:21 10:18
**able**
18:4 20:23 21:13 30:18
48:4,8 49:23
**aboard**
12:18
**access**
21:10
**accessible**
17:6
**accompanied**
7:20

**[account - business]**

**account**
3:14,16 13:15 15:5 16:19
17:3,5,9,12,16 19:1 20:16
21:11,14,18,19,22 22:4
23:11,19 26:10,12 27:19,20
28:4,15 29:25 32:21 33:5
35:11,13 36:2 37:22 44:8
44:18 47:9 48:8,15,19,21
48:23,25 49:3,5,9,11,20
50:20

**accounting**
45:10

**accounts**
15:4 25:23,23 31:6 34:24
42:10,17,21,22,23,25

**accruals**
26:1

**accrued**
13:14

**accruing**
22:10

**accurate**
54:11 55:4

**actual**
8:18

**additional**
7:18 26:21 32:9

**address**
6:9 34:1

**adjourned**
8:2,3

**administration**
11:9

**adopted**
52:4

**advice**
48:1

**advise**
7:23

**advised**
7:21 53:3

**advisor**
11:13,15,19 12:3 14:6 16:1
16:3,13 34:11

**advisors**
12:6

**affect**
10:18

**affiliated**
15:24

**agreement**
3:8 7:16 19:18

**ahead**
26:7 53:18

**airplane**
26:24,25 27:1

**airplanes**
51:20

**alcoholic**
10:21

**allow**
21:10

**allowed**
10:9 48:1

**amendment**
8:13

**american**
15:5,7 33:9 35:4

**amount**
19:2,3 23:10 26:8 31:9,9

**amounts**
31:19 36:6,12 50:1

**ann**
9:14 55:3

**anniversary**
13:5,16 31:22 41:16 50:5

**annual**
12:8,11 14:17 23:25 24:4
24:16,17 25:11 30:24 32:10

**annuity**
15:12

**answer**
5:2 8:14,21,25 9:3,5,16,22
9:25 10:2 16:15 47:12,25

**answering**
8:20 29:4,4

**anxiety**
52:1

**anybody**
28:22

**anymore**
25:25

**anytime**
32:11

**anyway**
45:7 51:23,23

**appearance**
4:24

**appearances**
2:1

**appears**
32:21

**application**
3:6 18:12

**appreciate**
52:2,12,23

**april**
13:5,8,9 18:21 24:25 31:15
31:16,23 33:6,10 39:11,14
41:8,10

**asked**
15:22

**asking**
8:20 28:18 37:21

**assert**
8:13

**assets**
52:25

**assume**
9:4

**assumed**
20:15 44:21 50:24

**attached**
22:25

**attachment**
23:3 40:11 41:22

**attachments**
3:12,20,22 39:2,7,9,17 40:8

**attitude**
52:4

**attorney**
4:8 7:22,23

**august**
28:16 29:17 30:2 46:20,21
49:6,7

**authority**
4:18

**authorization**
3:10 21:1

**available**
6:16 25:7

**aviation**
51:20

**b**

**back**
6:18 17:7,11 25:4 26:19
29:5 32:14 36:10 44:16,16
44:17 48:24 49:5

**backdated**
22:12

**bad**
43:9

**balances**
34:19

**bank**
14:8 16:16,17,18,21,21
17:5,8,12,16,17,22 20:3,12
21:11,14,19,24 22:5 23:3
23:12 28:12,21 29:23,25
34:15 35:22 36:14,20 37:1
37:10,11 44:7,15 46:13,22
47:1,7 48:8,14,16 49:8
50:22,24 51:1 52:18

**based**
9:5 13:2

**basically**
31:23 45:17

**basis**
43:22 49:14 53:5

**bates**
3:7,9,11,13,15,17,19,21,23

**bathroom**
10:13

**beginning**
14:16

**behalf**
2:3,14

**believe**
50:13

**believed**
50:13

**best**
8:21,22 11:21 12:7 24:24
42:20

**beyond**
50:3

**big**
42:25

**bit**
36:7,14 41:21

**blank**
23:18

**blip**
32:7

**blueleaf.com**
3:18 34:2,5

**board**
11:22

**bonus**
13:19 40:25 41:5

**bottom**
19:23 31:11 42:1

2:16 6:10

**boyce**
54:9

**break**
10:12

**buckner**
44:14

**bump**
13:17,19 14:2,2 22:3 31:15
31:16,20,25 32:4

**bumped**
32:5

**bumps**
31:15,17,20

**burke**
2:21 4:6 5:12

**business**
11:8 44:22

[call - discussion]

**c**

**call**
28:10 29:6 43:19 46:18

**called**
5:23 6:13 22:5 29:3,10,11
29:12 43:7,16,21 44:6,12
44:12 45:1,4,5,7 46:22
50:21

**calls**
44:3

**cancelled**
25:2

**capital**
3:14,16 12:20,24 13:1,15
14:5,10,14,21 15:25 16:2
17:3 19:3 20:12 21:18
22:14,15 23:19 26:2,12,21
27:15,19,20 28:10,22 29:8
32:9,22 34:10,17 35:16
37:15 39:4 40:10,18 43:4
44:18,21 50:21,25

**cashier's**
15:2

**cathy**
1:7 2:15 3:3 5:22 6:4 42:1
54:4

**cazier**
12:17 24:13 37:8,15 38:19
43:25

**certificate**
54:1 55:1

**certify**
54:9,10 55:3,9

**change**
37:3 40:22

**changed**
27:16

**check**
15:2,3

**cher**
4:12 24:10 51:7

**cheryl**
2:5 4:5

**christine**
54:9

**cincinnati**
29:11

**cindy**
24:6

**city**
1:12 2:10 54:7 55:6

**civil**
4:20

**clarify**
9:11

**class**
51:15

**clerk**
2:21 4:5 5:12

**client**
11:25

**clients**
27:10

**coming**
29:17,20 31:19 36:11 37:5

**comment**
51:9

**commission**
1:1,9 2:3,6 4:11,12,14,18
7:6

**commission's**
7:3

**company**
22:16,17 34:11 45:7,9 50:6
50:20,25

**compensated**
16:7,12

**complained**
12:21

**complaining**
14:21

**complete**
54:11 55:4

**computer**
19:7

**concluded**
53:21

**conducted**
6:7

**confusing**
42:19

**connection**
8:9

**consent**
5:5,8,17

**constitute**
4:19

**constitution**
8:14

**contact**
17:15

**contacted**
45:4,9 49:8

**contacts**
44:25

**contained**
54:12

**contingency**
53:5

**continue**
13:24

**conversation**
44:13

**conversations**
46:1

**copely**
28:25

**copies**
10:10

**copley**
28:25 46:15

**copy**
7:3 24:1,14

**correct**
7:14,15 33:7

**correspond**
19:2

**correspondence**
3:12,18,20,22

**counsel**
4:5 7:14,15,17,21 8:3

**couple**
23:1 26:6 32:3

**court**
9:14 10:14

**create**
14:11

**credit**
30:1

**crew**
3:14,16 12:20,24 13:1,15
14:5,10,14,21 15:15,25
16:1 17:3,8,9 19:3 20:12
21:18 22:14,15 23:19 26:1
26:9,10,12,21 27:15,19,20
27:25 28:10,15,22 29:8,9
29:10,11,17 32:22 34:17,25
35:11,15 37:15 39:4 40:10
40:18 42:11,23 43:4 44:18
44:21 49:20 50:21,25

**crewcapital.com.**
48:17

**crewfunds.com**
28:1 30:5

**criminal**
4:20 8:7

**currently**
11:1 15:21

**custodial**
3:8 19:18

**custodian**
14:9 16:19 47:21,21,22

**d**

**daily**
13:14 51:1

**damages**
53:10

**conversation**
44:13

**date**
1:13 11:16 12:15 13:5,16
22:12 24:19 31:22 33:16
40:23,24 41:1,16,17 50:5
54:6

**dated**
18:21

**day**
13:7,15

**daylight**
1:17 4:3 53:20

**dead**
45:25

**decided**
36:5,9 44:18

**decrease**
26:5

**definition**
47:22

**deleted**
38:3

**department**
11:9,12

**deposit**
13:20

**deposits**
32:10 33:8

**description**
3:5

**designating**
6:14

**desks**
44:21

**determine**
4:16

**developed**
4:19

**died**
26:20 43:6 46:6,11,14 47:2

**different**
15:14 27:15 29:9 35:14
40:6

**difficult**
51:25

**directed**
7:5

**directing**
6:14

**direction**
55:11

**directly**
15:10,12 16:14 24:15

**discussed**
16:14 40:21

**discussion**
43:14

**[displaying - go]**

**displaying**
20:22
**distribution**
23:14
**distributions**
35:15
**diversified**
1:24
**division**
2:7 4:10
**document**
6:13,16 7:7 10:6 17:25 18:4
18:13,17,23 19:6,11,14,15
20:10,22 21:2,3,5,9 22:21
22:24 23:7,8,12,18,20,21
23:23,24 24:14,19 25:5,6
30:14,22 32:24 35:22 38:11
38:18,20 39:10 40:3
**documents**
8:9 16:20 17:13 20:6 22:25
23:1,5 24:2,3,20 25:4,10
26:15 30:21 40:13,15 42:14
47:9,15 48:12 52:18 53:3
**doing**
14:22 21:16,20,24,25 26:14
27:23 29:25 37:9 45:8 51:5
52:24 53:5
**dollars**
26:6 27:2 29:23
**doubled**
25:24,25
**download**
39:12
**downturn**
41:10
**draw**
26:3 37:4 41:15
**drawing**
29:22
**drink**
10:13,21
**duly**
5:23

**e**

**eagle**
2:17 6:10 30:1
**earlier**
37:20 39:6 40:24 46:1 48:7
**earnings**
31:10
**eating**
36:6
**eight**
10:22
**either**
15:10 20:8 31:2 41:13

**either (cont.)**
45:15 47:25 50:16
**electronic**
29:25
**email**
3:12,18,20,22 22:24 25:5
33:24 34:1 37:20,23 38:1
38:18,25 39:14 40:2 41:22
49:2,3,5,10 51:21
**emailed**
25:11
**emails**
34:4
**enforcement**
2:7 4:10,18
**entitled**
1:15
**entity**
14:7,8
**esq**
2:4,5
**estate**
53:9
**everybody**
53:9
**everything's**
50:9
**exact**
24:19
**exactly**
13:22 49:23
**examination**
3:2 5:25 53:21
**examined**
5:24
**examines**
19:15 21:3 23:8 30:22
32:24 38:20 40:3
**examining**
18:18
**exchange**
1:1,9 2:3,6 4:11
**excited**
22:4
**exhibit**
18:1,7 19:8,12 20:19,23
22:18,22 30:15,18 32:13,15
32:18 33:20,23 38:12,15
39:21,24,25
**exhibits**
3:5
**explain**
23:6 48:11
**explained**
20:11,15

**extraordinary**
50:2

**f**

**facing**
45:23
**facts**
4:18
**false**
8:8,9
**familiarize**
18:16
**family**
49:21
**far**
50:3
**federal**
4:17,20
**fedex**
20:9
**fifth**
8:13
**fifty**
36:4,8,14
**file**
1:4 24:19 54:5
**financial**
35:4 43:12 47:22
**find**
28:20,23 29:7 48:13
**fine**
50:9
**finish**
9:24 10:1
**firms**
29:9,9
**first**
5:23 11:25 12:14,19 14:20
17:7 23:2 25:5 35:20
**five**
7:7 29:23 36:12
**flying**
27:10
**follow**
51:9
**following**
13:25 48:22
**follows**
5:24
**foregoing**
54:10 55:4,10
**forging**
47:14
**form**
7:3,8 8:7 16:22,24 17:2
36:1

**formal**
6:13,22,24 12:10
**forms**
35:25 37:10 47:7
**forty**
36:4,8,13
**forward**
22:13 49:13 52:9
**forwarded**
17:14
**forwarding**
33:25 49:12
**found**
35:24 36:16 37:13 44:8
48:13
**four**
21:22 35:19 39:2
**fraud**
52:7
**freeze**
52:25
**friday**
26:15
**friend**
50:12
**friends**
49:21
**full**
6:3
**fund**
14:19
**funding**
19:1
**funds**
12:20 15:6,7,7,18 21:10
27:25 33:9 34:20 35:4
42:11 49:20 51:3
**further**
55:9

**g**

**getting**
22:2,3 25:25 34:4 50:2
**give**
7:18 48:1
**given**
35:23
**giving**
24:14 50:7
**glad**
53:12
**go**
10:12,14 15:1,3 17:4,17
22:9 24:9 25:4 26:7 27:21
30:5 32:14 35:13 36:13
46:4,5 47:7 49:3 53:18,18

**[goes - jason's]**

goes
31:14,15,18

going
7:18 10:4,6,7 11:20 14:19
16:7 17:7,8,24 18:15 19:3,5
20:10 21:10 22:2,13,21
23:2,17 24:20 25:13 27:22
28:23 32:14 34:13 38:10
39:24 41:17,21 42:15 44:17
46:4,5 47:20 48:12,15
49:19 52:9 53:8,9,16

good
9:16 50:6 52:10

goodness
26:22

gosh
44:4

gotten
26:15 28:5,6,14 33:12
46:21

government
16:20 18:7 19:12 20:23
22:22 30:18 32:18 33:23
38:15 47:8,15 52:18

grab
10:13

graduated
51:17

graph
31:11

great
5:11 6:2 8:17 10:24

gross
36:12

group
3:14,16 12:25 21:18 23:19
29:13 32:22

growing
27:19

grown
31:7,7

guaranteed
13:3

guess
43:15 50:23

guessing
9:1,4,6

guys
51:22

**h**

hand
5:16 6:2

handed
31:2

handling
20:16

happen
25:15 28:23

happened
43:10 45:11 52:8

happening
50:11

happens
48:25

happy
49:19

hartman
1:7 2:15 3:3 4:7,22,25 5:4,7
5:10,14,20,22 6:4 19:18
21:1 23:5 24:13 32:19 42:2
48:3 54:4

hartmanc
3:7,9,11,13,15,17,19,21
18:9 19:17 20:25 23:1
30:20 33:24 38:16

head
9:17,17 11:12

hear
9:8,9

hearing
1:15

held
55:5

help
9:12,15 48:4

helpful
52:3,14

hi
24:6

higher
41:4

highlight
7:19

hire
47:17

history
31:12

hmm
16:4 18:8,11 23:4 31:1
32:20 34:3 41:25 46:10,12

hopeful
52:24

hours
10:22

how'd
24:9

huh
9:20 42:4

hundred
29:23 36:12

hurt
45:21

husband's
51:18

**i**

idea
27:23 49:18

identification
18:2 19:9 20:20 22:19
30:16 32:16 33:21 38:13
39:22

identified
3:5

imagination
50:10

immensely
52:14

impair
10:18

important
9:8 47:5

inaccurate
42:2,4

income
41:24

increasing
41:8

incriminate
8:15

index
23:19 40:23 41:1,2,4 42:11

indicated
55:5

information
7:4,5,6 19:2 28:3 45:17,18

initial
6:5 17:15

initials
18:18 19:22

instance
37:18

instructions
8:17

interacting
21:17,19 27:4

interest
22:10,13 51:20

interesting
41:6

interim
12:9

interior
27:5

interrupt
9:22

invest
14:11 17:8 19:3

invested
15:19 17:9 23:25 50:14

investigation
4:14,19 6:14 8:10

investigative
54:13

investing
15:1 51:3

investment
11:13,15,19 12:6,22 14:22
16:10,13 20:13 22:16,17
25:24 33:1 34:10 35:9
42:10

investments
15:15,17 34:15 35:14 43:1

investors
53:8

involved
14:7,8 34:8 52:2

ira
3:6 16:23 18:12 26:11
34:15 35:10 42:11

iras
15:20 26:11

irritated
38:2

irs
16:20,24 29:24 35:21,22
36:15,17 47:8 49:12,13

it'll
22:9

**j**

jackson
15:22 25:22,23 34:22 42:17
42:21,22

jackson's
26:11

jacob
12:17

jake
12:18 14:16,16,16 24:13,17
24:18,19 25:11,16 31:2
37:8,15,22 38:19 39:13
40:13 42:5 43:17,19,23,24
43:24,24,25 44:5,24 45:14
45:20,20 46:21

jake's
25:5

janna
28:25,25 46:15,23 49:10

jason
12:15,16,16 14:15,23 34:8
42:17,18,20,22 43:2,4,7,11
43:16,18,21

jason's
42:25

[jeopardy - mute]

**jeopardy**
45:22
**jodie**
20:3 44:14 45:2
**joined**
4:6
▓▓▓▓ 6:10
**joni**
2:4 4:4 32:1
▓ 2:16
**july**
44:12,24 45:1 46:19
**june**
36:3 44:5 45:12

### k

**keep**
10:10 26:3 38:3 40:22
**keeping**
42:22,25
**kept**
42:21 44:5
**kimber**
12:16 14:15,23 42:17 43:7
**kind**
9:23 27:5
**kinds**
27:5
**knew**
38:3
**know**
6:18 8:1,25 9:10,11 10:8,13
14:15 15:12 17:1 20:8 22:6
25:9 28:22 31:17,25 33:7
36:23,25,25 37:21,23,24
38:22 44:10 47:11,23 48:13
51:23,25 52:1 53:16,16
**knowingly**
8:8,8
**knowledge**
9:5 11:21 12:8 24:25

### l

**lake**
1:10,12 2:8,10 4:10 54:7
55:6
**late**
52:5
**law**
2:21 4:5 5:12
**laws**
4:17,21
**lawyer**
47:16,17,19 48:3 53:2,7

**learn**
43:6
**leave**
5:2
**lee**
9:14 55:3
**left**
12:16 29:14 44:23
**legal**
48:1
**legitimate**
29:9 45:9
**letter**
3:10 17:15 21:1 28:12
46:16,25 47:1 48:13
**license**
45:12,22
**life**
15:6,23 26:16 28:11 34:20
43:9 44:7
**lincoln**
15:6,6,6,7,7 33:9 34:19
35:4
**list**
34:14 42:10
**little**
32:4,7 34:13 35:20 36:7,14
38:2 41:21 42:25
**location**
6:9 54:7
**locked**
28:8
**login**
28:3
**long**
7:8 44:16
**longer**
7:7 17:6 25:7 27:9 39:7
44:11,13 53:16
**look**
6:17 13:23 27:21 28:1,2
31:8 32:2 33:12,15,16,16
35:19 40:17,25 47:23 52:7
52:11 53:4,6
**looked**
16:25 47:21 48:17
**looks**
4:5 33:25 34:8 39:2
**lot**
41:8 44:4 52:1
**lottery**
41:15
**louise**
6:6
**love**
51:22

**lower**
6:2 13:12 26:8 36:6

### m

**mail**
20:6
**mailed**
26:16 33:3
**maintain**
49:24
**maintaining**
27:23
**making**
50:25
**male**
37:5
**man**
11:10
**managed**
14:6
**management**
29:10,11
**managing**
50:23
**marked**
18:1 19:8,12 20:19,23
22:18 30:15 32:15 33:20
38:12 39:21
**market**
13:16 17:2 31:10 36:1 41:7
41:11,13
**marketing**
11:6,8
**matter**
1:3,15 4:15 6:15 54:3 55:6
**matters**
54:12
**maximum**
13:4 37:25
**mean**
13:6 29:21 43:23
**means**
7:21
**medication**
10:17
**meet**
11:10 12:5
**meeting**
12:11 24:4,22,23 25:2,3,11
25:16,20 26:23 27:14 31:3
39:12 40:14,17 44:14 51:22
**meetings**
12:8,10 14:18 24:1 40:20
45:21
**members**
4:9

**memory**
10:18
**mentioned**
12:20 16:16 48:7
**messages**
20:8 29:14
**middle**
6:5 52:6
**million**
27:2,7
**mind**
33:16 50:5
**mine**
18:14 51:2
**minimum**
13:2,3 23:10,14 37:24
**minute**
11:7 35:19
**mm**
16:4 18:8,11 23:4 31:1
32:20 34:3 41:25 46:10,12
**monday**
38:23 44:7
**money**
12:24 14:11 15:1,14,16
20:16 21:14 23:10 26:21
27:22 28:16,24 29:16,20
30:3,4,11 34:25 35:10
36:13,17,21,22 37:1 46:23
47:10,11,23,24 49:24 50:7
50:13,22,23,25 51:2,4,5
**month**
28:13 29:23
**monthly**
21:22 26:3 27:22 31:19
37:4 44:10 49:14
**months**
30:9 44:11
**mori**
2:5 4:5 24:6,9,11 51:8,13
51:16,24 52:12,16
**motivated**
26:2
**mountain**
1:16 4:3 53:20
**move**
15:21 26:1,7
**moving**
15:22 25:22
**muddy**
9:23
**mute**
24:10

**[name - problems]**

| n |
|---|

**name**
4:4 6:3 29:10 35:5 54:17
**named**
11:10
**names**
45:6
**national**
15:23 34:22
**navigation**
45:4
**need**
5:2 10:12 39:12
**new**
9:25 12:13 25:4 26:12 27:5
29:2,14 45:17,18 52:4
**news**
43:9
**nice**
29:4
**night**
52:6
**nodding**
9:17
**normally**
16:12
**notice**
1:16 7:13
**number**
3:23 29:1,1,2,3,14 44:20
**nutt**
20:3 45:2

| o |
|---|

**oak**
45:5
**oath**
5:6,8 8:19
**observer**
5:13
**obtain**
8:3
**obviously**
38:3 50:7
**occurred**
31:20
**october**
38:23 40:5 41:24
**office**
1:10 2:8 4:10 44:19
**officers**
4:12 6:15
**oh**
24:10,11,24 25:14 27:25
28:18 30:25 32:1 40:4,9
43:10,23 44:4 45:20,20

**oh (cont.)**
46:8,17,17
**okay**
4:25 5:12 6:20 7:17 8:17
9:2,18,21 10:11,24 11:24
13:14 17:7,24 18:9 19:1
20:10,18 22:23 23:17 25:8
25:13 27:18 28:20 30:13,25
31:18 32:1,9,13 33:5,14,18
33:19 35:2,8 36:22 37:14
38:4 39:5,13,19 40:7,9,12
41:3,23 42:14 43:19 46:3,8
46:11,19 47:4 48:2,5 49:15
50:18 51:23 52:15,21
**once**
12:7
**one's**
39:4
**online**
17:4 20:8 26:17,18 27:20
29:7 47:21
**open**
17:12 32:14 33:6
**opening**
6:12 7:2
**opportunity**
6:21 7:8
**order**
6:14,22,25 14:11
**oregon**
6:11 36:16,18,19 37:2
**original**
25:24 33:1 48:13,24
**originally**
46:16
**ostler**
2:4 4:2,4,8 5:1,5,8,11,15
6:1 17:24 18:3 19:5,10
20:18,21 22:20 24:8,10,12
30:13,17 32:13,17 33:22
37:7 38:10,14 39:23 51:7
52:13,20,22 53:11,14,18
**ostlerj**
2:12
**owner**
16:5

| p |
|---|

**p.m.**
53:20
**page**
18:17,19 19:25 22:24 23:18
34:14 40:10
**pages**
1:8 7:7 19:23 30:25
**papers**
15:9

**paperwork**
17:21
**part**
36:13
**parted**
42:18,19
**particular**
44:23
**partner**
12:13,14
**passed**
43:20
**password**
28:8 48:23
**paying**
36:15
**payment**
13:23 21:22 46:20,20,22
**payments**
49:11
**payout**
44:10
**pdfs**
26:19
**peculiar**
25:15
**penalized**
36:19
**penalties**
8:7
**people**
27:4 44:20 46:21
**percent**
13:4,4,11,13,14,17,18,25
14:3 22:2,3 26:4 31:21 32:3
32:4,8,12 37:24,25 41:11
41:14,14,17 50:4,8 51:1
**perfect**
49:25
**perfectly**
49:19
**performed**
50:3
**performing**
12:23 35:10 49:22
**periodic**
13:21,22,23 27:18
**periodically**
27:21 33:3
**person**
5:9
**personal**
15:2
**personally**
17:17

**persons**
7:4
**phil**
12:12 51:19
**philip**
11:10,18,24
**phone**
44:2 46:17
**photos**
10:10
**pilot**
51:18,19,19
**place**
1:9 44:22
**placed**
5:5
**plan**
41:24
**please**
5:15 6:2,8 9:1,9,10,25
52:20
**point**
2:17 6:11 11:14,18 12:2,12
14:24 28:6 30:1 34:9 45:16
**points**
23:24
**position**
11:5
**prepare**
17:21 19:19 42:7
**prepared**
42:1,3 55:10
**present**
2:20 5:12 7:22
**pretty**
26:5
**price**
41:2
**principal**
26:4 27:23 36:7,10 49:24
**printed**
26:18
**prior**
6:12 7:2
**prison**
45:23 46:5,9
**private**
6:14
**pro**
2:15
**probably**
45:23 46:4 53:2,7
**problem**
29:5
**problems**
43:11

[proceeding - sent]

**proceeding**
4:13 55:9
**proceedings**
8:2 54:13
**process**
26:14,20
**professor**
11:6,8
**proofreader's**
54:1,17
**prosecution**
52:10
**proud**
27:7
**provide**
8:7 10:8 24:3
**provided**
10:7
**providing**
8:8 52:2
**pull**
6:18
**pulled**
40:5
**purchased**
27:2
**purposes**
4:13
**pursuant**
1:16 4:23 7:6
**put**
12:24 15:15 17:24 26:13
34:25 35:7,10,12 49:1,4
**putting**
26:21

**q**

**question**
5:2 8:14,25 9:3,10,25 10:1
28:17 37:22 46:16 49:10
**questions**
6:24 7:11 8:18,20 9:9 10:25
12:9 44:23 51:7

**r**

**raise**
5:15
**read**
7:8
**reading**
13:7
**really**
21:17 41:7 47:12,25 52:2,5
52:6
**reason**
17:5 26:2 27:9 33:15 36:14
41:8 52:9

**recall**
11:16,21 12:9,12 14:23
20:7,14,17 21:7 22:1 24:13
27:14 37:9
**receive**
44:10
**received**
17:13 28:12,15,21
**recognize**
18:13 19:14 21:2 30:20
38:18
**recollection**
18:23 42:20
**recommended**
12:24 49:20
**record**
4:2 6:3,8,12 7:2 10:14 18:9
19:17 20:25 28:14 44:5
53:19
**recorded**
54:12 55:9
**records**
17:1 22:7 33:17 35:24
45:10
**referenced**
3:23
**referencing**
46:25 47:1
**referring**
39:10
**refuse**
8:14
**regional**
1:10 2:8 4:10
**relayed**
44:15
**remain**
42:16
**remained**
15:19
**remember**
11:23 12:15 13:21 20:2,9
20:11 24:18 27:1,24 32:22
34:4 37:14,18
**remotely**
5:9 6:8
**rephrase**
9:11
**report**
24:17 30:24
**reporter**
9:14 10:14 55:3
**reporter's**
55:1
**reporting**
1:24 52:25

**represented**
7:13,21 22:17
**request**
49:2,4
**requested**
7:4
**required**
23:14
**reschedule**
25:3
**reset**
13:4,6
**respect**
14:19
**response**
29:15
**responsibility**
47:23
**retired**
11:1,3,7,7 12:13
**retirement**
15:18
**retrospect**
46:2
**return**
13:3,10 14:18
**returned**
13:10,16 29:6
**returning**
41:11
**returns**
14:11 37:16
**review**
6:21 12:11 14:18 30:24
**reviewing**
24:21
**right**
5:16 7:20,22 8:12 29:5,19
29:22 32:6 33:6 34:16,21
34:23 38:25 39:1,4 41:1
42:5 43:23 51:11 53:8
**rights**
8:13

2:16 6:10
**rogue**
30:1
**role**
20:12
**romney**
1:5 4:15 54:3 55:7
**room**
14:13,23 37:5
**roth**
15:20 26:11 34:20 35:6,11

**rules**
4:17

**s**

**s&p**
13:3,8,12 40:25 41:2 50:3
50:16
**salt**
1:10,12 2:8,10 4:10 54:7
55:6
**saying**
18:5 27:15 28:12 46:8
**says**
18:12 19:1,18 23:3,14,19
31:11 38:22,22 40:23 41:24
42:1 45:16,17 48:19 49:13
51:22
**screen**
6:13,19 10:4 17:25 18:4
19:11 20:22
**screenshots**
10:9 49:6
**scroll**
18:15 23:2,17 34:13 41:21
**se**
2:15
**sec**
2:21 3:7,9,11,13,15,17,19
3:21 4:9 18:1,9 19:8,17
20:19,25 22:18 23:1 30:15
30:20 32:15,19 33:20,24
38:12,16 39:21 44:24
**sec.gov**
2:12
**second**
19:6 33:12 34:14 40:10
49:4
**section**
48:16
**securities**
1:1,9 2:3,6 4:11,17
**seeing**
19:11
**send**
16:22,23 17:22 19:19 20:6
20:8 23:12 35:24 36:21
37:1,12 38:5 47:6 48:14
49:2 52:19
**sending**
29:24 36:22 45:15 51:1
**sends**
45:15
**sent**
16:25 17:2 18:14,24,25
22:25 23:20 24:18,18,19
26:17,17,18,19 27:3 30:21
33:25 36:17 37:20,20,22

**[sent - temple]**

**sent (cont.)**
38:25 39:14 40:13,18 43:21
46:17 47:8 49:10 53:3
**separate**
26:13
**september**
1:13 4:2 28:16 29:18 30:2
54:6
**sequence**
48:24 49:1
**service**
29:4,4
**services**
1:24
**session**
6:7
**set**
17:16,18 24:22 25:4 26:12
48:15,19,24 49:3,5
**settled**
43:14
**seven**
36:4,13
**shaking**
9:17
**shared**
51:19
**she'd**
44:17
**show**
10:4,6,7 19:6 22:21 23:2
30:8,13 35:25 38:10 39:11
**showed**
6:12 17:2 24:23 25:1 30:6
40:15
**showing**
27:19 31:5 32:18 33:5,23
38:15
**shows**
31:8,19 36:1 42:11 47:9
**shut**
42:15
**sic**
29:1
**sign**
17:22 19:20 48:22 53:2,6
**signature**
18:19 19:25
**signed**
7:16 15:9 20:2,3 26:18
49:22 53:8
**signing**
21:7
**similar**
39:14

**situation**
41:6 50:1 52:1
**skipped**
32:13
**sl**
1:4 54:5
**small**
38:22
**smaller**
42:25
**sold**
27:6,9,13
**solvent**
50:9
**somebody**
29:5 53:4,6
**son**
11:18 12:2
**sorry**
5:17 11:7 24:11 25:14
28:17 34:9 47:13 48:1,3
**sort**
18:16 31:14
**sounds**
51:10
**source**
40:6
**south**
1:11 2:9
**specific**
37:18
**speculating**
9:1,4
**spell**
6:3
**spoken**
45:19 46:13
**staff**
4:9
**stamp**
3:23
**start**
8:18 9:25 10:24 11:24
36:22
**started**
25:15 45:15
**state**
4:20 6:2 11:4 36:16,18,19
36:21,23 37:2 51:18
**statement**
3:14 32:21 40:18
**statements**
27:18
**states**
1:1 4:11 27:11

**statutes**
8:6
**stayed**
42:17
**stephen**
1:5 4:15 11:19 54:3 55:7
**steve**
11:22 12:2,13,19,23 14:5
14:10,13,20 15:2,8,8,22,24
16:16 17:11,14,21 18:24,25
19:19 20:6,11,11,15,17
21:6,10,13,17,20,24 22:8
22:17 23:22 24:3,23,25
25:1,17,20,21 26:15,17,17
26:17,23 27:6 28:6,11 31:3
32:25 35:11,16 36:20 37:4
37:8 39:11 41:9 42:18,21
43:6,9,11,19 44:7 45:8,9,22
45:23 46:4,6,8,14 47:2
49:23 50:12,23 51:10,14,18
51:21
**steve's**
29:12 34:10 44:19
**sticker**
18:5
**sticks**
33:16
**stock**
41:7
**stop**
36:10
**story**
45:2
**stress**
52:1
**student**
51:15,15
**stuff**
10:4,6 44:4
**sub**
14:6,6
**subpoena**
4:23 7:6
**substantive**
10:25
**suggest**
47:10
**suggested**
48:14
**suite**
1:11 2:9
**summary**
3:16 31:6,6
**summit**
34:10

**supplement**
49:16
**supplemental**
7:4
**supply**
7:5,5
**suppose**
53:15
**supposed**
22:9,11 36:15
**sure**
9:24 10:1 12:17 39:8,8
43:16 44:16 45:11,13
**suspicious**
44:17 45:3
**swear**
5:17
**swensen**
1:5 4:15 11:10,19 12:19
43:6,20 51:11,14,19
**swensen's**
11:18,25
**swenson**
54:3 55:7
**switch**
39:24
**sworn**
5:24

**t**

**taken**
10:17 13:8
**talk**
9:23 21:24 25:21 26:23
28:23 40:14,18 43:2,4
47:16,19 51:20
**talked**
8:7 22:8 25:22
**talking**
7:15 21:21 39:6 40:24
**tardieu**
55:3
**tax**
17:1 35:23 47:6 49:11
**taxes**
29:24 36:15 37:2
**telephoned**
28:18
**tell**
5:18 6:8 9:3 10:14 13:1
15:24 16:17 23:9 35:16,18
35:18 37:4,8,15 47:5 53:17
**telling**
37:19 51:11
**temple**
1:11 2:9

[tend - witness]

**tend**
8:15
**testified**
5:24
**testify**
10:18
**testimony**
4:22 5:13 6:15,17 7:24 8:8
8:19 52:3 54:13 55:5
**text**
45:15
**texts**
43:21 44:3
**thank**
5:15 26:22 51:24 52:13,23
53:12
**thankful**
49:21
**thing**
11:20 21:20 34:17
**things**
7:19 20:9 25:15 27:6 33:2
**think**
10:5 11:16,21 12:7,16
17:13 21:15,16,17 26:6,16
29:10,11 32:2,6 33:1,11
34:7 39:5,12 47:4 48:18
49:16 50:1
**thirty**
29:22 36:12
**thought**
12:23 20:14 21:18,20 27:12
28:22 43:14 45:8 48:16,18
48:25 49:25 50:6,10,22,23
51:4,6,10
**thousand**
26:6
**three**
18:17
**tied**
45:6
**time**
1:17 4:3 5:3 8:2 12:19 13:8
13:19 14:20 31:7,14 34:11
37:3 45:23 51:21,25 53:21
**titled**
4:15 7:3 21:1
**today**
4:22,24 5:13 6:7,17 7:2,18
7:24 8:19 9:14 10:6,15,19
49:17
**told**
14:13,20,22 16:18,22 17:16
20:17 23:9 25:23 26:25
27:6 29:1,4 35:11 36:20
44:6,9,13 45:1,2,10 46:21

**top**
34:15
**total**
36:4
**totally**
26:12 50:8
**track**
49:3
**traditional**
3:6 18:12 26:11 35:3,10
**transamerica**
12:22 15:5,8 33:8 34:20,20
35:1,2,6,9
**transcript**
9:16 54:11 55:4,5,10
**transcription**
54:12
**transfer**
15:3,9 29:25
**transfers**
15:9
▮
2:16 6:10
**trever**
2:21 4:6 5:12
**tried**
25:4 48:22
**trouble**
28:7
**true**
37:1 54:11 55:4
**trust**
17:4 34:22 36:1 48:15,21
**truth**
5:18,18,19
**truthfully**
8:22
**try**
9:11,16,19,19,22,24,25
29:7 37:14
**trying**
26:3 28:20 31:8
**turn**
16:24
**turned**
29:13
**type**
15:12,13
**typed**
28:8
**types**
35:14

---
**u**
---
**u.s.**
2:6

**uh**
9:20,20,20 42:4 43:9
**unannounced**
44:19
**undersigned**
54:10
**understand**
4:23 5:1 7:24 8:4,6,12,22
9:6,8,10,12,12 21:9,13 23:6
23:9 31:5 41:18
**understood**
21:23 22:13,15
**union**
30:1
**united**
1:1 4:11
**university**
11:4
**updates**
34:4
**upgrades**
27:3
**upset**
52:5,7,9
**utah**
1:12 2:10 11:4 14:8 16:16
16:17,18,21,21 17:5,8,12
17:16,17,20,22 20:4,12
21:11,20,25 22:6 23:3,12
28:12,21 29:23 34:15 35:22
36:15,20 37:1,10,11 44:7
44:15 46:13,22 47:1,7 48:8
48:14 49:9 50:24 51:1,17
52:18 54:7 55:6

---
**v**
---
**valid**
48:23
**value**
17:3 31:10 36:1 41:2 47:9
**vanguard**
35:7
**various**
34:14
**verbally**
9:16
**video**
27:3
**violations**
4:16,20
**visit**
27:10 44:19
**visited**
27:11
**voice**
37:5

**voluntarily**
7:5
**voluntary**
4:24

---
**w**
---
**wait**
11:6
**wake**
52:6
**want**
6:17 8:1,2 33:17 37:14 48:6
49:16 51:24
**wanted**
26:7 35:12,16 36:5,10 37:3
40:22 45:10
**ways**
42:19
**wealth**
45:4
**webex**
1:16 5:9
**website**
27:24 30:5 48:8
**wednesday**
1:13 54:6
**week**
45:16 48:22
**weekly**
34:4 43:22 45:15
**weeklyupdate**
34:2
**went**
13:15 15:10,11,11 24:22
29:7 33:10 35:3,5,23 36:7
40:17 44:6,20 48:19,24
**west**
1:11 2:9
**wildest**
50:10
**wire**
15:3
**wish**
5:3
**withdraw**
21:14 30:6
**withdrawal**
28:13 30:8 40:22
**withdrawals**
31:9
**witness**
1:7 2:14 3:2 5:23 19:15
21:3 23:8 24:7 30:22 32:24
37:6 38:20 40:3 51:12,14
51:17 52:4,10,15,17,21,23
53:12,15 54:4

[witness's - zoom]

**witness's**
  37:5
**work**
  11:3 41:3
**working**
  11:11 44:20
**works**
  4:8 49:1
**world**
  45:21
**worry**
  22:9
**wow**
  28:22 51:16
**write**
  15:2
**wrong**
  28:8

| y |
|---|

**yeah**
  9:19 41:19 42:4,5 46:2,2
  48:6 50:19 51:13 52:13,20
  52:22 53:14
**year**
  12:7,11 13:5,9,9,25 16:23
  17:2 22:1 23:11,15 24:17
  24:25 30:2 32:3 35:21
  37:21 38:6 39:11,14 41:3
  41:13 42:8,12
**years**
  21:22 32:3 35:20 50:3
**yellow**
  18:5
**york**
  29:2,14

| z |
|---|

**zero**
  34:19
**zoom**
  24:22,23



**GOVERNMENT EXHIBIT 8**

# Letter of Authorization

To:    Bank of Utah
       2605 Washington Blvd.
       Ogden, UT 84401

From:  Cathy L. Hartman

Date:  April 13, 2018

RE:    Self-Directed IRA

---

Please accept this letter as my authorization to allow Stephen R. Swensen to give instructions on the distribution of funds in my self-directed IRA at Bank of Utah. Should you have any questions about this request, please feel free to contact my advisor, Stephen R. Swensen or me.

Regards,

Cathy L. Hartman

SEC-HartmanC-E-0000065

GOVERNMENT
EXHIBIT

**9**

**To:**        Ostler, Joni[                    ]
**From:**      Cathy
**Sent:**      Tue 8/9/2022 3:23:29 PM
**Subject:**   Here are the docs
**Received:**          Tue 8/9/2022 3:23:38 PM

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.



CATHY L HARTMAN

## Required Minimum Distribution for 2022^

Account: 1602831  BANK OF UTAH CUSTODIAN FOR CATHY L HARTMAN SELF DIRECTED IRA

| | |
|---|---|
| Required Minimum Distribution: | $ ▮▮▮▮ |
| Distributions Received: | $ ▮▮▮▮ |
| Remaining Distribution to be disbursed by 12/31/2022*: ** | $ ▮▮▮▮▮▮ |
| Life Expectancy Table Value: | ▮▮▮▮  |
| Market Value: | $ ▮▮▮▮ |

* - Based on the information provided for this Account, you are required to take a distribution from your IRA per Internal Revenue Service (IRS) regulations regarding Required Minimum Distributions (RMD). Your RMD Status for the calendar year will be reported to the IRS on Form 5498.

* - The Required Beginning Date (RBD) for minimum distributions in the calendar year in which the account owner attains age 72 is April 1 of the following year.  The Required Minimum Distribution in each subsequent year must be made by December 31.

** - The SECURE Act of 2019 increased the age for which Minimum Distributions are required. For account owners that had already attained age 70.5 prior to the effective date of January 1, 2020, the age increase does not apply. For these account owners, Minimum Distributions are required for the year in which the account owner attained age 70.5 and subsequent years.

Page  1  of  1

SEC-HartmanC-E-0000046

SEC-HartmanC-E-0000048

 **CREW CAPITAL** GROUP

# INDEX ACCOUNT

## Fund Overview

### Income and diversification potential

Bank loans, which offer a floating rate of income, may provide a hedge against rising rates. This actively managed portfolio of senior secured floating rate loans is designed to provide attractive risk-adjusted return potential, with a higher quality orientation. The "spread" or difference between the senior secured floating loan rates and the declared minimum rate on the account is used to purchase options on the S&P 500 Index. When returns of the S&P 500 Index are higher than the declared minimum rate on the account, these options are exercised and gains (up to the declared maximum or "cap") are distributed.

## Why Invest In This Fund

### An attractive risk/return profile

Floating rate bank loans, made to below- investment-grade companies, offer higher-return potential credit than investment grade bonds, and tend to have lower volatility than high yield bonds. The fund emphasizes higher-quality loans, which typically have a higher recovery rate and lower risk of default than lower-quality, unsecured debt.

### Minimal interest rate exposure

Because rates on bank loans typically float, or shift to prevailing interest rates, they may provide a hedge in a rising rate environment, as well as an opportunity
nhance returns with increased credit exposure.

### Time-tested management expertise

Crew Capital Group has managed floating rate bank loans portfolios since 1997. Our process, which combines bottom-up security selection, robust credit research and our long-term global outlook, provides an informed framework for positioning the portfolio across the credit cycle.

## Our Expertise

Crew Capital Group uses PIMCO has the active subadvisor on our Index Account. PIMCO has been a pioneer in fixed income investing for four decades. Their time-tested investment process combines our informed, top-down global economic outlook with rigorous bottom-up credit research and risk management, allowing the fund's investment professionals to focus on what they do best: seeking attractive risk-adjusted returns for investors.

YEAR-END RETURNS (%)



US CREDIT RATES



S&P 500 INDEX PRICE



Source: Bernara Statistics / Tullet Prebon

PRIMARY BENCHMARK
J.P. Morgan DBP Leveraged Loan Index

SHARE CLASS INCEPTION
04/30/2011

DIVIDEND FREQUENCY
Monthly with Daily Accrual

CUSIP
22098570.0

PRIMARY BENCHMARK DESCRIPTION
The J.P. Morgan DBP Leveraged Loan Index is a subset of the broader Leveraged Loan Index, and as such follows all of the same indication rules, loan selection methodology and the rebalance process, with the sole exception being the tranche rating criteria.

SEC-HartmanC-E-0000046

Sent from my iPhone

SEC-HartmanC-E-0000050

**GOVERNMENT EXHIBIT**

**10**

 **CREW CAPITAL** GROUP

**Address**
548 Market Street
San Francisco, CA 94104-5401
www.crewfunds.com

## Account Information

Cathy L. Hartman IRA
Bank of Utah - Custodian

**Account Number:** ▮▮▮ (opened April 30, 2018)
**Declared Earnings Rate:** 5%
**Statement Date:** April 30, 2018
**Advisor:** Stephen Swensen
**Advisor Phone:** (888) 775-8021

## Account Summary

| TRANSACTION TYPE | YEAR TO DATE | SINCE INCEPTION |
|---|---|---|
| Deposits | $▮▮ | $▮▮ |
| Withdrawals | $0.00 | $0.00 |
| Earnings | $▮▮ | $▮▮ |

**Total Value $550,559.02** *(as of April 30, 2018)*

## Transaction Summary

| TYPE | DATE | AMOUNT |
|---|---|---|
| Deposit | April 30, 2018 | $▮▮ |
| Periodic Earnings Credit | April 30, 2018 | $▮▮ |
| Daily Earnings Credit | April 30, 2018 | $▮▮ |

*Disclosure: Investors should carefully consider the objectives, risks, charges and expenses of their investments. This and other important information can be obtained from your financial professional and should be read carefully before investing. For information about your account or any other services, please contact your financial professional.*

# EXHIBIT 35

# SL-02881

# *Fox, Mark - Vol. I.20220908.407850-SL*

## *9/8/2022 10:05 AM*

**Full-size Transcript**

**Prepared by:**

SL-02881

Thursday, October 6, 2022

1

1    UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    In the Matter of:            )

4                                 )  File No. SL-02881-A

5    STEPHEN ROMNEY SWENSEN       )

6

7    WITNESS:  Mark Lee Fox

8    PAGES:    1 through 72

9    PLACE:    Securities and Exchange Commission

10            351 SW Temple, #6-100

11            Salt Lake City, UT  84101

12    DATE:    Thursday, September 8, 2022

13

14        The above-entitled matter came on for hearing, via

15    WebEx, pursuant to notice, at 10:05 a.m.

16

17

18

19

20

21

22

23

24        Diversified Reporting Services, Inc.

25               (202)467-9200

2

1   APPEARANCES:

2

3   On behalf of the Securities and Exchange Commission:

4        CHERYL MORI, ESQ.

5        JONI OSTLER, ESQ.

6        TREVOR BURKE, ESQ.

7        Division of Enforcement

8        Securities and Exchange Commission

9        351 SW Temple, #6-100

10       Salt Lake City, UT  84101

11       (801)524-3141

12       MoriC@sec.gov

13

14   On behalf of the Witness:

15       MARK LEE FOX, PRO SE

16

17

18

19

20

21

22

23

24

25

3

1                        C O N T E N T S

2

3      WITNESS:                                   EXAMINATION

4      Mark Lee Fox                                       5

5

6      EXHIBITS        DESCRIPTION                 IDENTIFIED

7      15           Letter to SEC                        22

8      16           Email, Cazier to Fox & Swenson, 2/4/20   26

9      17           Mark & Barbara Fox Income Plan, Feb 2020   28

10     18           Crew Capital Group Account Summary   31

11     19           2021 Form 109-INT                    33

12     20           May 2022 Income Plan, 5/13/22        34

13     21           Crew Capital Group Index Account     35

14     22           Past Confidence Building             40

15

16

17

18

19

20

21

22

23

24

25

4

P R O C E E D I N G S

1

2          MS. MORI:  We are on the record on September 8th,

3     2022 at 10:05 a.m., Mountain Standard Time -- no wait --

4     yeah Daylight Time.  My name is Cheryl Mori and with me is

5     co-counsel Joni Ostler.  We are members of the Staff of the

6     Enforcement Division of the Salt Lake Regional Office of the

7     United States Securities and Exchange Commission.  We are

8     also officers of the Commission for the purpose of this

9     proceeding.  This is an investigation by the Commission

10    titled, "In the Matter of Stephen Romney Swenson, SL-02881,"

11    to determine whether there have been any violations of the

12    federal securities laws or rules for which the Commission

13    has enforcement authority.  However, facts developed in this

14    investigation might constitute violations of other

15    federal or state, criminal or civil laws.  Also with us is

16    Trevor Burke, who is also an attorney at the SEC.

17          Your testimony is not pursuant to a subpoena.

18    Accordingly, you should understand that your appearance here

19    is voluntary.  Do you understand that you need not answer

20    any question and that you may leave at any time you wish?

21          THE WITNESS:  Yes, I do.

22          MS. MORI:  Do you consent to being placed under

23    oath?

24          THE WITNESS:  Yes.

25          MS. MORI:  And do you consent to taking an oath to

1   tell the truth remotely via Web-Ex rather than in person?

2           THE WITNESS:  Yes.

3           MS. MORI:  Please raise your right hand.

4   Do you swear to tell the truth, the whole truth, and

5   nothing but the truth?

6           THE WITNESS:  I do.

7           MS. MORI:  Thank you.

8   Whereupon,

9                           MARK LEE FOX

10  was called as a witness and, having been first duly sworn,

11  was examined and testified as follows:

12                          EXAMINATION

13          BY MS. MORI:

14      Q   Would you please state and spell your full

15  name for the record?

16      A   It's Mark Lee Fox -- L-e-e F-o-x.

17      Q   Great, thank you.  This testimony session is

18  being conducted remotely so would you please provide the

19  address where you are right now?

20      A   ██████████████████████████ in Cocoa Beach,

21  Florida, ████.

22      Q   And is that your home address?

23      A   Yes.

24      Q   Prior to the opening of the record, I showed you

25  on screen the Formal Order directing private investigations

6

1    and designating officers to take testimony in this matter.

2    It will be available for your examination during the course

3    of this proceeding.  Have you had an opportunity to review

4    the Formal Order?

5        A    Yes.

6        Q    And do you have any questions about the Formal

7    Order?

8        A    Not at this time, no.

9        Q    Also prior to the opening of the record, you were

10   provided with a copy of the Commission's Form 1662 titled,

11   "Supplemental Information for Persons Requested to Supply

12   Information Voluntarily or Directed to Supply Information

13   Pursuant to a Commission Subpoena."  A copy of this form

14   will be available throughout the testimony today.  Have you

15   had an opportunity to read the Form 1662?

16       A    Yes.

17       Q    And do you have any questions concerning this

18   notice?

19       A    No, not at this time.

20       Q    Are you represented by counsel today?

21       A    No.

22       Q    Since you do have not counsel, I am going to go

23   over certain matters discussed in the Form 1662.  You do

24   have the right to be accompanied, represented, and advised

25   by counsel.  This means that you may have an attorney

7

1   present and that your attorney can advise you before,

2   during, and after your examination here today.  Do you

3   understand this?

4        A    Yes.

5        Q    Do you understand that upon your request, these

6   proceedings will be adjourned so that you may obtain

7   counsel?

8        A    Yes.

9        Q    Do you understand that the statute set forth in

10  Form 1662 provide criminal penalties for knowingly providing

11  false testimony or knowingly using false documents in

12  connection with this investigation?

13       A    Yes, I understand that.

14       Q    Do you understand that you may assert your rights

15  under the Fifth Amendment to the Constitution and refuse to

16  answer any question which may tend to incriminate you?

17       A    Yes.

18       Q    Okay, great.  Before we begin with the substantive

19  portion, let's just go over a few guidelines for testimony.

20  Your testimony is under oath and will consist of a series of

21  questions and answers.  I'll ask the questions and you are

22  to answer the questions truthfully and to the best of your

23  ability.  Do you understand that?

24       A    Yes.

25       Q    To the extent that you don't know the answer or

8

1    are merely speculating, please let us know on the record.

2    It's also important that you both hear and understand my

3    questions so if you don't hear or don't understand, please

4    ask me to repeat or rephrase it.

5         A    Okay.

6         Q    I will assume -- if you answer a question, I will

7    assume that you heard and understood the question.  Do you

8    understand that?

9         A    Yes.

10        Q    The court reporter is going to create a written

11   transcript of your testimony.  In order to make a clean

12   record, it's important that we -- that you answer all my

13   questions verbally.  Nodding of the head and uh-huhs and

14   huh-uhs are a little bit hard to understand on the record.

15   Also, try to let me finish my question before you answer and

16   I'll try to let you finish my answer.  Sometimes it's hard

17   to remember that so we'll try to remind each other and the

18   court reporter will remind us if we're having -- if she's

19   having a little difficulty understanding.

20             So I'm going to be showing you some documents on

21   screen.  Because of this non-public nature of the

22   investigation you cannot photograph or screenshot, make any

23   copies of the exhibits.  Most of them are ones that you

24   produced to me -- to us but there are a couple that were

25   produced by other parties.

9

1            If you need to take a break for any reason just

2    let me know and we will find a time to go off the record.

3    Let's see, is there any reason why you cannot provide

4    complete and truthful testimony today?

5        A    No.

6        Q    Are you ill or have you taken any medication or

7    any alcoholic drinks today?

8        A    No.

9        Q    Okay.  Now we'll get to the real part of the

10   testimony.

11       A    Okay.

12       Q    So Mr. Fox, are you currently employed?

13       A    No, I'm self-employed.

14       Q    Self-employed, okay.  And so you're not retired at

15   this point?

16       A    Well, it depends how you define "retired," because

17   I'm not making any money.

18       Q    Oh.

19       A    I'm inventing devices.  So I'm inventing a semi-

20   medical device I've been working on for three years but I'm

21   not -- I work for myself.  I have my own LLC.  I don't have

22   any income right now because I've been in research mode.

23       Q    I see.  Okay.  And are you married?

24       A    Yes.

25       Q    And what's your wife's name?

1        A      Barbara.

2        Q      Barbara.  And does Barbara work outside the home?

3        A      Yes. She works for Oracle Software.

4        Q      Okay, great.  And how did you first meet Steve

5   Swensen?

6        A      I first met him -- we were hangar mates, so

7   airplane hangars in Ogden, Utah.  We are -- I was looking

8   for a hangar to share with somebody and one of the

9   facilitators said, "Hey, there's a guy that's got this

10  hangar that has room for an airplane."  We both had small

11  airplanes at the time and so that -- we meet that way, as

12  hangar mates.

13       Q      Okay, great.  And was there some point that you

14  became -- that Mr. Swensen became your investment advisor?

15       A      Yes.  So when I met him there as, you know, hangar

16  mates and I asked him what he did of course.  He asked what

17  I did -- I worked for Morgan Fical at the time -- and he

18  said he was a financial advisor and I asked about that, that

19  I didn't have one or would like to have one.  And I told him

20  I said -- so I had several E*TRADE accounts that were

21  scattered in my name because I had started them -- different

22  accounts.  I'm like, "I can't get them all consolidated so

23  like if you can figure out how to get these pulled together

24  into one account then we'll talk about you being my

25  financial advisor," and he said, "Okay."  So then he worked

11

1    on that for several months and got them all into one

2    account.

3        Q    Okay.  So about how long was that -- ago was that,

4    do you remember?

5        A    Yeah.  I mean, about 20 years ago, roughly.

6        Q    Okay.  And so when he became your investment

7    advisor did you -- was it over the E*TRADE accounts or was

8    there other money that you put with him?

9        A    It was started with the E*TRADE accounts and then

10   we opened multiple accounts after that, different accounts

11   based on, you know, over time and our savings and our money

12   of what else do you recommend that we put our money in?  And

13   he has this strategy called the "Bucket Strategy," that he

14   put, you know, money into four different buckets for

15   investment.  Bucket one was money you're going to need near

16   term for retirement and bucket four is riskier stuff that

17   you wouldn't need for a longer term.

18       Q    Okay.  So Bucket one was the safest investment?

19       A    Yes.  So it's --

20       Q    Is that right?

21       A    It's whatever you were going to need the first --

22   you're going to draw from bucket one when you first retire

23   so it's stuff like bonds and things and actually Crew Funds

24   was my bucket one for the last 30 years.  So --

25       Q    Okay.  So when did you first hear about Crew

12

1    Funds?

2        A    I'm guessing but it roughly about the time I

3    signed up for it so it would have been about 2019.

4        Q    And what were you told about Crew Funds?  Was it

5    Mr. Swensen that talked to you about it?

6        A    Yeah, it was Steve Swensen that talked to me about

7    it so each -- well to answer your question a little bit

8    broader is I'd say that each time that we would go into a

9    fund or annuity or, you know, open up a new thing, I'd spend

10   a lot of time drilling into how does this thing work?"  "How

11   is it safe?," blah, blah, blah.  So I'd -- you know, the

12   first fund was called, "Jackson," and I probably spent a

13   year beating him up with questions and answers because we

14   were putting quite a bit of money into it.  So -- and then

15   that was an annuity.  And then we got a Genworth annuity.

16   Then we had money in Schwab and some other places.

17          And actually, the Crew Funds was the last fund

18   that we opened, which I said was like three years ago.  So

19   at that point I wasn't beating him up so much as far as,

20   "What does this thing do," right?  As he just basically

21   explained Crew Funds to me at that time was, he said it's

22   low risk in that -- for short term money because it pays a

23   minimum of 5 percent and a maximum of 10 percent and so it's

24   way better than a bank account, right, that's paying 0

25   percent or 0.3 or whatever.  So I'm like -- I asked him -- I

1   go, "So how does that work?"  I go, "I assume the fund

2   managers are banking on the rationale that the market's

3   going to have 12 to 13 percent long term and so when there's

4   a bad market and it's down 5 percent that they have to have

5   a lot of cash to be able to, you know, float this and be

6   able to make it work?"  And he said, "That's exactly

7   correct.  There's a bunch of cash that's backed behind it --

8   5 percent's the minimum, 10 percent is the max."  And so

9   that's what we -- initially, I don't remember, I might have

10  put 250,000 or something in it and then another 500,000 and

11  anyway, it was up to a million dollars.  So we -- we -- my

12  wife gets -- she's a vice-president at Oracle so in the

13  summertime she usually has what's called 'stock options,'

14  but they're RSUs that get invested so then we have some cash

15  that we need to put somewhere.  And so that's what we've

16  been doing for the last three years, is putting it into the

17  Crew Fund.

18       Q    I see.  So it sounds like you -- you really asked

19  him about -- and you did your due diligence asking him about

20  the safety of the investment.  And is that something you

21  talked about?

22       A    I did but to be honest, I -- doing my due

23  diligence, I did that for 20 years on 7 other accounts,

24  right?  So -- and I even said this to him years ago.  I

25  said, "So this is your business model is you let somebody

1   be" -- he's a very nice guy, gentle guy, right?  So I'm

2   like, "You get beat up for a year, year-and-a-half until

3   people trust you and then they stop beating you up.  Because

4   we did probably financial reviews every month for several

5   years.

6       Q    Oh really.

7       A    And then we went to once a quarter then twice a

8   year.  And so I -- you know, he goes, "Right, that is the

9   model that" -- so and then, I mean -- and we were kind of

10  not personal friends but you know, I presented to his

11  clients before in keynote presentations and stuff so we knew

12  each other.  I didn't know his family or anything.  But

13  anyway, so when it got to the Crew Fund, after 20 years of 7

14  or 8 other funds of beating him up, he presented what it

15  was.  It didn't sound like risk, a lot of it.  One of his

16  partners -- so that was it.  So I didn't -- what I think I

17  said in some of the documents I gave you before, what most

18  of my reviews are is I -- once the account is set up, I'm

19  not asking him about the account structure and due

20  diligence.  We're just looking at, what is your net worth,

21  when can I retire, and how much money can I draw?  So you're

22  only looking at --

23      Q    Right.

24      A    -- the passive income plan.  It's only once every

25  5-6 years that you have a new investment.  And actually, we

15

 1   weren't planning on any new investments.  We were planning

 2   on whatever money -- when you started to draw money,

 3   whatever money was coming out of bucket one -- which would

 4   be the Crew Fund -- was you'd just move more money into the

 5   Crew Fund, into safer investment money.  So the system that

 6   he had set up, theoretically, was you could withdraw money

 7   out of the any time.  On his website he had a little

 8   withdraw button and you could withdraw whatever you wanted

 9   to.  I have not started any of it because we haven't started

10   drawing retirement yet.

11        Q    I see.  So you didn't get any distributions or

12   anything?

13        A    No, I've never gotten any distributions, no.

14        Q    Okay.  Was anyone else with Mr. Swensen when he

15   told you about Crew Fund?

16        A    Yeah, and that's hard -- I think I mentioned this

17   before -- that's hard to remember.  It's hard to not

18   remember but to know exactly.  So he -- it was always just

19   me and Steve, right?  He would also give the presentations

20   himself for years and years and years.  And then he brought

21   some help on, right?  So his -- I think his first help was

22   Jacob -- what's Jake's last name?

23        Q    Jason?  Was it Jason Kimber?

24        A    Kimber.  Jason Kimber.

25        Q    Okay.

1       A    So he kind of brought on -- like he didn't go into

2    a lot of detail of who he -- it was just it was implied

3    like, "This is my assistant or an employee that I hired."

4    And you could tell -- like they would try to present the

5    presentation and then Steve would help him, guide them

6    through the presentation.  So he was training them and

7    teaching them, right?  And then so yeah, I never got into

8    any structure of his -- I just assumed he was an employee.

9    And then more and more they would present more than Steve.

10   And then to be honest, when Jake Cazier came on I thought it

11   was the same guy because their name sounded --

12      Q    Right.

13      A    Sounds kind of close and I hadn't seen him in a

14   year, right, or you know, close to a year.

15      Q    Yeah.

16      A    And he's kind of in the background on the Zoom

17   call, whatever.  So it wasn't until, you know, not too long

18   ago -- actually before all this happened -- that I thought

19   it was kind of the same guy, right?  I didn't even know it

20   was a different person.

21      Q    Okay, right.

22      A    So yeah, they're always -- they were kind of there

23   in the background, yes.  So Jake Cazier, the last -- I don't

24   know -- 4 to 6 reviews, he did most of them and Steve was

25   just there to answer questions.  But that was -- that --

1   now, when I had questions about -- we had a real issue with

2   this Jackson fund that Steve made a big mistake so, you

3   know, in that presentation Steve did most of the talking

4   because Jake had no idea what -- because he didn't know the

5   details.  So --

6       Q    Okay.  So do you recall Jake or Jason ever talking

7   to you about Crew Fund or making representations about Crew

8   Fund?

9       A    Yeah, I mean, again not in any -- he -- the

10   correct answer is "Yes."  Crew Funds is on my income plan,

11   right?  It's 1 of the 8 line items so of course Jake's going

12   to present, here's what the number is today.  You know,

13   "You've got a million in there.  Last review you had a

14   million, it's grown to this much."  And then he shows the

15   line item.  There's never a discussion about setting up the

16   fund or how the fund worked or anything because at that

17   point, like I said, is once you have the money in the fund,

18   you're not discussing that.  You're only discussing, "How

19   much did it grow?  Where's it at today?  How much did it not

20   grow," right?  It went backwards because of the -- that type

21   of thing.

22           So he's there from that standpoint of showing it

23   as part of the income plan and I think I told you this in

24   emails, I don't know that I ever got a detailed prospectus

25   or anything from Steve.  And like a couple of my friends of

1    course like, "What are you?  An idiot?"  I'm like, "Well, 20

2    years of knowing --

3        Q    You trusted him, right?

4        A    Well, when they hand you a prospectus it's 700

5    pages of that legalese stuff that you just gave me.  It's

6    like, I don't know what it's telling me.  I gotta go -- he's

7    my financial advisor.  It was supposed to be for a reason

8    because I don't have 24/7 to go understand that.  Just like

9    him and Jacob.  It's what they're being paid for.  So --

10       Q    Right.  So you trusted him to put you in the safe

11   investment as he told you?

12       A    Yeah. Absolutely, yes.

13       Q    So you said you don't recall any documents but did

14   he -- did you read the website to see how the fund worked or

15   anything like that?

16       A    Well, I've -- yeah, I've been to the website many

17   times and it's -- I mean, you're basically logging into your

18   account so you're seeing what -- so it pay -- on pay -- you

19   know, it was paying you every day, right?  So it -- the way

20   the fund works is it assumes you're going to get a 5 percent

21   annual so it's paying you a daily deposit based on that.  So

22   you can see the daily deposits.  And then when you're

23   anniversary date came up, it would look at what did the S&P

24   500 do?  So that's what it was indexed against.  And if the

25   S&P 500 did 9 percent, then you got an extra 4 percent lump

1    sum.  If the S&P did 12 percent, you got your max 10.  And

2    if the S&P did minus 10, you got nothing in addition to the

3    5 percent that you were getting for the year -- you know,

4    daily for the year.  So that -- of course I used it for --

5    you know, there's 1099s on there, Interest Income.  I had to

6    use that for tax purposes, right?  And then there's

7    quarterly statements and stuff on the website.

8                So to my knowledge, right, it was like same as

9    logging into Fidelity or America Funds or Charles Schwab.

10   It looks like a real account.  And that's the discussions

11   I'm having with Jake right now is, "How do I know the rest

12   of my money's okay, right, and in real funds?"  And that's

13   been obviously the point of discussion with Jake for the

14   last 2 months.

15        Q    Okay.  So we'll talk about -- about those

16   discussions in a -- a little bit later.  So you also

17   mentioned on the website there was a withdrawal button but

18   you never used it?

19        A    Correct.

20        Q    Is that right?

21        A    That's correct.

22        Q    But that it -- it appeared that you could just

23   push the button and withdraw money?

24        A    And I just -- that's why I asked Steve, I go, "If

25   I want to start withdrawing $10,000 a month what do I do?"

20

1    "You just gotta just click the 'withdraw,' and you just say,

2    '$10,000 a month,' and it'll set up -- put in your bank

3    account information and it'll send you the information."

4    I'm like, "Okay."  But I wasn't ready to do that because --

5    you know, Steve was like -- he told me 15 -- 10 years ago,

6    "You can retire now if you want."  And I'm like, "No, I'm

7    not comfortable with that."  So we've never drawn money out

8    of it -- out of anything.

9         Q    And when -- when you invested in Crew Fund, how

10   did you invest?  Was -- did you just pay cash or a check or

11   --

12        A    I just wrote a check to Crew Funds.

13        Q    Okay.  So you just wrote a personal check?

14        A    Yes.

15        Q    And do you know where it was deposited or --

16        A    No, I don't.

17        Q    Okay.  Did you have any dealings with the Bank of

18   Utah, regarding Crew Fund?

19        A    No.

20        Q    No?  Okay.

21        A    I actually didn't know -- I didn't know about any

22   banks -- I didn't know any of those connections.  Again, it

23   was just like if I was sending money to Schwab.  I would

24   write a check to Schwab.  Steve would send me a Fed-Ex

25   envelope, right, or just -- I'd Fed-Ex the check to Schwab,

21

1    to him, or America Funds.  So from my point of view, Crew

2    Fund was the exact same as Fidelity.  It just -- he told me

3    it was, right?

4        Q    Right.

5        A    It wasn't -- yeah.

6        Q    Do you remember if you sent the check to Steve?

7        A    Yes, I did.

8        Q    Okay.

9        A    So any investment that I've given him money I've

10    always sent him a check -- to my knowledge, if I remember --

11    Fed-Ex'd to him.  But it was always made out to whatever

12    fund and then he did whatever submission of paperwork

13    theoretically, right, with the money to do that.

14        Q    So this wasn't an IRA?  You just put cash in,

15    right?  Correct?

16        A    Well, some of the accounts I have are IRAs but I'm

17    still writing a check to Schwab.

18        Q    Okay.  But it's -- but it -- but the Crew Funds is

19    not IRA money?

20        A    The Crew Fund is not IRA money, yes, that's true.

21        Q    Did you say you've received periodic statements

22    regarding your Crew Fund investment, other than the website?

23        A    No, I don't think I did.  I think they were all

24    online.  I don't think I got any real statements but --

25        Q    Oh, on the web --

1      A    I'm not positive on that but I'm not recalling

2   any.  And when I looked to see if I -- so the reason that's

3   a little confusing is because I'm paperless everything.   In

4   fact, I had to ask Fidelity 45 times to put -- send me

5   statements because I -- I hate them, right?  So trying to

6   get the paper -- so all of my investments are online.   Go

7   download the PDF if I can get them to do that because I want

8   the mail.

9      Q    That makes sense.  So you said you made additional

10  deposits into Crew Fund after your initial deposit.  Did --

11  was that based on anything that Steve Swensen said to you?

12  I mean, did he suggest that or how did that come about?

13     A    Same as how it got -- Crew Fund got set up in the

14  first place is that I have cash right now sitting in a bank

15  account.  I've got enough money, hopefully, in the other

16  buckets.  The long -- the more I could build up bucket one,

17  the longer I could let the rest of the investments mature,

18  right?  So that was the solution, the initial solution.  And

19  once you get stock options, that's what we were doing is

20  just putting it in -- in the Crew Funds.

21     Q    Okay.  I'm going to now show you an exhibit.  This

22  will be Exhibit 15.  Okay, can you see that now?

23     A    Yes, uh-huh.

24     Q    Okay.  We've marked this as Government Exhibit 15.

25  This is a document that you provided to us.  Do you

23

1   recognize it?

2        A    Yes, I think so.  Yes.

3        Q    Is this something that you wrote yourself?

4        A    Yes.

5        Q    And what was the purpose?

6        A    You were asking me questions about what happened

7   and I was trying to summarize stuff to pull it all together

8   into one document, I think, to try and make it easier.

9        Q    So this is kind of your story of what happened?

10       A    Yes.

11       Q    That you wrote for -- for the SEC?

12       A    Yes.

13       Q    Okay.  And this -- this second half of the first

14   page where, "The way the fund was supposed to work paid a

15   minimum of 5 percent annually and a maximum of 10 percent

16   based on the S&P 500."  That's what you were explaining

17   before in testimony, correct?

18       A    Let me -- I'm scrolling down so I can see what you

19   were just saying.  But yes, that's what I was describing.

20       Q    Oh, can you see?  Okay.  And then let's go to the

21   next page.  And this looks like a -- is this a screenshot of

22   the Crew Capital Crew Funds website?

23       A    Yes, it is.

24       Q    So this is the -- the website -- crewfunds.com is

25   where you went to see your balances?

24

1        A     That's correct.  Yes, that's correct.

2        Q     Okay.  And then we scroll down to the next

3   screenshot and it says, "This was your initial $500,000

4   deposit."  And today's balance -- or at the time you wrote

5   that the balance was $1,045,935, correct?

6        A     No.  So --

7        Q     Oh.

8        A     The balance was at 1 million when I put 500,000

9   into it.  So --

10       Q     I think at the time you wrote this document --

11       A     Oh, at the time I wrote -- I can't remember if I

12   put 500,000 in first and then 200,000.  Maybe that's what it

13   was. I can look real fast if you want me to?

14       Q     That's okay.

15       A     Yeah.  So the initial investment -- well, what's

16   the date on here, '19?  Yeah, so that would have been the

17   initial -- so the first deposit was 500,000 and then I think

18   200,000 and then another 200,000 -- 7, 9, so yeah.  That's

19   what we put in -- 5, 2, and 2.

20       Q     Okay.  And then you also earned interest on -- on

21   --

22       A     Right.

23       Q     On those funds.

24       A     Yes.

25       Q     On page 3 this just has information about Steve.

1      A     Okay.

2      Q     And the same with page 4.  There's a Summit

3  Capital, which is where Steve worked.  And then there's a

4  screenshot of a May 20, 2022, income plan.  And was that

5  give to you by Steve Swensen?

6      A     Yes.  It says, "Prepared by Jake," on there but

7  this is -- yeah, the income plan was the main thing that

8  Steve gave me every, you know -- or initially, every month

9  pretty much, and then every quarter, and then twice a year.

10      Q     Okay, got it.

11      A     Alright.  So this is the main thing that we would

12  always review so it has Jake's name on there.  It has Oak

13  Lane Advisors on it.  And just a comment is -- is actually

14  just like -- not just like Jake and Jacob.  But it's Summit

15  Capital versus Oak Lane Advisors.  Steve changed the parent

16  group, or whatever used it, multiple times.  And I'd always

17  ask, "Who did you change to again?"  And why was he -- his

18  answer was, you know, he was changing his business model and

19  these guys have some offering that somebody else doesn't

20  have.

21           And then he changed --- my understanding is he

22  changed the type of advisor that Steve was over his career.

23  So like initially whatever it's called, he could not charge

24  1 percent or anything.  He could only get paid by the mutual

25  fund from their marketing.  Like so it didn't actually cost

1    anything.  But then he changed licenses or advanced his

2    license and stuff and then he could not charge the 1

3    percent.  But so -- but probably once every year or two it

4    seemed like, you know, he would have a new parent group that

5    he was with.

6           Q    Okay.  Interesting.

7           A    Do you know how he got paid?  Did you pay fees to

8    Mr. Swensen?

9           A    No.  I mean, I never paid him any fees directly so

10   he's getting his 1 percent or whatever -- like I said, when

11   we first met it was all mutual funds.  And my understanding,

12   the way he described it to me was, the mutual fund has --

13   just pick a number -- has a 3 percent marketing budget and

14   if I don't have a financial advisor and I own that fund,

15   then that money doesn't go anywhere.  But if I have a

16   financial advisor, then Steve would get paid 1 percent from

17   those managers.  So it never came out of my pocket, it was

18   money just sitting there.

19          Q    Okay.

20          A    But when he changed licenses, then he's getting

21   paid 1 percent directly from Oak Lane or however their

22   system works.  But I never -- I've never written a check

23   ever for 1 percent to buy --

24          Q    I see.

25          A    To Steve.

27

1      Q    I see, okay.  Okay, I'm going to -- I'm going to

2  now show you Exhibit 16.  All right, it takes a minute to

3  load.

4      A    That's okay.

5      Q    This is Government Exhibit 16.  It's an email.  It

6  is February 4th, 2020, from Jake Cazier to Mark Fox and

7  Steve Swensen.  Do you recognize this email?

8      A    No.

9      Q    Okay.  So is it -- did you receive emails from

10  Jake with the income plan?

11      A    Yes.

12      Q    Okay.  So this -- probably just you don't remember

13  it but this would have been something that you would have

14  received?

15      A    Yeah, it would have been something I received for

16  sure from Jake or Steve about income plans.  But that says

17  2020 and that's 2 ½ years ago.  And like I said, I'm -- I

18  get emails from Jake and Steve all the time.

19      Q    Yeah.

20      A    I can't -- I only see, "Best."  I'm not sure what

21  the rest of it just says.  So anyway -- but that's -- so

22  this -- hold on, I'll tell you in a bit.  So this is -- what

23  they normally would do is they would, you know, we have

24  something scheduled for a call on a Zoom call or whatever

25  this one was, right, this Google Hangouts or something.  So

28

```
 1    they would send me the income plan usually sometimes the day

 2    before, sometimes a minute before the meeting because they

 3    had just put it together I'm guessing.  And then that's what

 4    we would go over is that income plan.

 5         Q    Okay.  Did you usually meet in person or by phone

 6    or --

 7         A    Almost always on a Zoom -- I actually haven't seen

 8    Steve in person in 15 years.  I moved from Utah to Florida

 9    back in 2008 so I've not -- I don't remember seeing him

10    since then.  So.

11         Q    Okay.

12         A    I haven't been back in Utah, so.

13         Q    Now, can you see Government Exhibit 17 on your

14    screen?

15         A    Yes.

16         Q    Okay.  This says it's a February 22 -- 2020 income

17    plan for Mark and Barbara Fox.  Is this an -- on the first

18    page it says, "Prepared by Mark Fox."  That's probably not

19    correct.  Did you prepare this?

20         A    No, did not.  It should say --

21         Q    "Prepared for Mark Fox"?

22         A    Yes, that's a typo.

23         Q    Okay.  So this is -- this is the income plan that

24    you'd get either -- it started out monthly and then now it's

25    --   A    Right.
```

1      Q    Okay.

2      A    Yeah, that is the standard.  That's the typical

3  plan.  And of course it -- you know, the look -- it changed

4  over time because I was actually trying to help Steve with

5  his business and, you know, I was one of his first clients.

6  So I'd tell him, "You're presenting this wrong.  Here's what

7  -- how it should look.  Here's the right format."  So like

8  several things that you see in there are -- over time, are

9  things I told him to do so that --

10     Q    Okay.

11     A    -- he would present stuff better.

12     Q    So if you look on page 2, it looks like there's a

13  list of investment accounts and Crew Fund is one of them?

14     A    Yes.

15     Q    Do you see that?  So that -- that would show your

16  balance?

17     A    Yes.

18     Q    And your increases it looks like.

19     A    So what that is real fast is, this is the main

20  thing that we review, right, is the balance on these income

21  meetings that we have, income plan meetings.  Our basic --

22  our reviews would center around this document.  And what

23  that would show, it's just showing February 4th, second to

24  last column, and here's the market value for everything.

25  And then the GET was guaranteed values for annuities.  So

30

```
 1    there was two different numbers.  There was a market value

 2    and how much is that guaranteed to pay you over time when

 3    you pull the trigger and start drawing money from it.

 4        Q    Oh, okay.

 5        A    So Jackson and Genworth, so like I said, the first

 6    big mistake Steve made was on that Jackson, it really

 7    doesn't pay me that 1.1 million, which is another nightmare

 8    that happened about 8 months ago.  What had happened there

 9    real quick was I got a letter that -- or a statement from

10    Jackson which I never looked at that close but it surprised

11    me.  It said you've maxed out on your -- your investment.  I

12    mean, what does that mean?  So I asked Steve and he goes,

13    "Uh, I don't know."  He looked into it and he was like,

14    "Yeah, you maxed out so you can't draw -- you can't earn any

15    more money

16             So he's like -- so that was a debate, never been

17    told that.  So then what he told me was, "You need to start

18    drawing $50,000 a year out of Jackson so that the ceiling

19    can come down and it can grow 5 percent."  So we were all

20    excited about getting an extra 50k a year.  My wife wanted

21    this fun fund.  And then when we pulled the trigger on that,

22    that's when he found out this annuity didn't do what he

23    thought it did and so there is a huge mistake there of over

24    a million dollars in future revenue that we should have got.

25    So we ended up selling the Jackson for that market value
```

1    which sucked because it was only half the price.

2         Q    Oh, right.

3         A    So then Jackson I don't have anymore.  We sold it

4    for 644 and then we bought what you now see as the 2 other

5    Charles Schwab accounts.  I showed you the most recent one.

6         Q    Okay, got it.  Thank you.  Okay.  I'm going to

7    show you next Government Exhibit 18.  Okay, can you see

8    Exhibit 18 now?

9         A    Yes.

10        Q    Okay.  And this is something that you provided to

11   us.  Could you tell us what this is?

12        A    It -- well, so this is just -- yeah, the account

13   summary for Crew Fund that shows, you know, our name of

14   course.  It's got the index date, so it's -- again, it's

15   index against the S&P 500.  So the 5 to 10 percent rate that

16   I get is based on whatever last year's S&P was, right?  So

17   that's what that 43.73 thing is, right?  So it's showing --

18   so for example, earning $68,000 so that is -- so it's

19   deposits, $850,000.  So I put in -- I sent 5, 2, -- it must

20   have been 5, 2, and 150, because it's 850.  There's the 5 at

21   --

22        Q    Right.

23        A    And then -- it's earned 119,000.  Year-to-date was

24   68,000.  And then the graph is just showing the growth again

25   that it's paying you daily at a 5 percent rate until the

1    anniversary date, which would give it a bump or the bump --

2    where the big bump is where I put in, you know, more money;

3    500k --

4         Q    Got it.

5         A    Then 200, right?  So -- and that's one thing in

6    the end that what I'm talking about which is -- I'm not sure

7    how much you'll tell me if anything.  But like for example

8     -- which makes it a mess -- I lost a million dollars it

9    looks like.  That's 68,000 in all those 1099s.  I've paid

10   taxes on it.  So I had to pay interest.

11        Q    I was going to ask you about that, yeah.

12        A    So all those 1099s I've paid, you know, income

13   tax, earnings on that 68k.  So I had to pay extra 15-20,000

14   that -- until you guys --

15        Q    Right.

16        A    Make some judgement or criminals, I -- I've

17   already researched this.  I could take the million dollars

18   as a loss.  I could go to the IRS.  But for example, for me

19   to file an amendment I can only go back 3 years so I'm going

20   to lose all this if I don't do it by October.  So if I don't

21   do it in -- in the next 3 weeks, file a tax change, I can't

22   go back and do anything about money I paid interest on that

23   I don't have.

24        Q    I see.  That's not a good situation.

25        A    What I've been told is -- no.  What I've been told

33

```
 1    is the SEC, you guys, somebody has to say there's been some

 2    wrongdoing and there's been some kind of theft to -- so I

 3    can claim there's a theft and take some action on it.  So in

 4    the end, I want to talk about where are you guys at.  But

 5    anyway, keep going with your questions.  But --

 6         Q    Okay.

 7         A    -- to answer your question, that's what this is.

 8         Q    Yeah, I just -- one more thing about this Exhibit

 9    18.  Is it -- was this -- where did you get this?  Was this

10    from the website?

11         A    Yes.  It's off my account on the website.

12         Q    Okay.  So you just printed it out?

13         A    Yes.  I can log in -- as of yesterday, this is the

14    account.  The website's still running and I can go -- I can

15    go see that at zero -- 1,045,000 says it's 1,-51,000 today.

16         Q    Okay, I see.  Okay.  I'm going to now show you

17    what we've marked as Exhibit 19.  This is also a document

18    that you provided to us.

19         A    Okay.

20         Q    So this is again a document you provided to us,

21    which it says it's the 2021 Form 1099 showing interest

22    income.  Can you tell us what this is?

23         A    Yes.

24         Q    So you were talking about the 1099?

25         A    Yeah, this is a 1099 off the Crew Fund website in
```

1    my account that I have to go print out to -- for our tax

2    return to get to our accountant that shows my interest

3    income was 68,00 so I've got to pay capital gains on that.

4         Q    Okay.  So you always just got it off the website?

5         A    That's correct.

6         Q    Okay.

7         A    Well --

8         Q    And every year you paid taxes on interest you

9    earned on Crew Fund?

10        A    Let me take that back.  I'm not sure if I ever got

11   one in the mail.  I'm guessing I just got it offline.  But

12   yes, I have to pay taxes every year on that interest income.

13        Q    Okay.  And for 2021, that was 60 -- over $68,000

14   in interest that you had to pay taxes on?

15        A    Right.

16        Q    Is that right?

17        A    If you want to give me one second I can log in.

18   Yes.  But in the year before it was going to be something

19   less than that.  But if you want me to look real fast I can

20   or do you not want me to?

21        Q    Oh, that's okay.  That's okay.  Let me show you

22   now what we've marked as Exhibit 20.  Oh, let's -- I think I

23   did that wrong.  And again, this is a document you provided

24   to us.  It's Mark and Barbara Fox, May 2022 --

25        A    It hasn't come up, so --

35

1        Q     -- income plan.  Yeah.

2        A     Cheryl, it didn't come up yet.  I'm still --

3        Q     Okay, sorry.  It's still loading.  Do you see it

4    now?

5        A     It says, "Exhibit 20," -- yes, okay.

6        Q     Okay.  So this is something you provided us.  Is

7    this just what we've talked about before; your regular

8    income plan for May 2022?

9        A     Yeah, I'm trying to -- it's not moving very fast

10   but yeah, that's what it looks like.  It's the same format.

11       Q     Okay.  So this is probably the last time that you

12   met with Steve?

13       A     Yeah.  If it was May of 2022, yeah, I would say,

14   you know -- yeah.  He passed in June or something, right?

15   So --

16       Q     Okay.

17       A     But yes.  That would be my guess, right?  It's

18   scrolling really slow so the date you say was May?

19       Q     Yeah, May 2022.

20       A     So that would have been the last one, yes.

21       Q     Okay.  Let me show you what we've marked as

22   Exhibit 21.  It's being slow.

23             MS. MORI:  Trevor?  This document's not loading

24   for some reason.

25             MR. BURKE:  Yeah, is it -- so it's Exhibit 21?

```
 1              MS. MORI:  Yeah.

 2              MR. BURKE:  It could be -- it could be the size of

 3    that file.  Let's see.  Did you already select it?

 4              MS. MORI:  Yeah.  It looks like -- let me see if I

 5    can -- let me see if I can share my -- okay.  Can you see

 6    that now?

 7              THE WITNESS:  It's small but I can see it and I

 8    know what it is so --

 9              BY MS. MORI:

10       Q    Okay.  So this is something you provided to us,

11    which has the title, "Crew Capital Group Index Account."

12    Can you tell us what this is?

13       A    So yes.  You had asked me on email if I had a

14    prospectus -- I think you or somebody did -- and I was like,

15    "I don't know."  I went and looked for it.  I couldn't find

16    a prospectus.  Like I said, this being Crew Funds this was

17    one of the later.  I wouldn't have looked at it real close.

18    I would have just gone with Steve's recommendation.  I don't

19    recall ever getting this ahead of time but I might have.  I

20    just don't know.  It didn't look familiar so I -- that's --

21    the email that you asked me is -- I asked Jake, I go, "Is

22    there a prospectus for Crew Capital?"  And his answer was,

23    "There's a summary sheet that he would show potential

24    investors."  I go, "Can I have that?"  And Jake said, "Yes,"

25    so that's the document that Jake gave me a month or 2 ago
```

1    when you were asking me about it.  So --

2        Q    Okay.

3        A    Now, to my case in point, I read that document 4

4    times.  I still have no idea what kind of investment it

5    really is.  So it was like -- I would have just gone,

6    "That's confusing."  If it's 5 to 10 percent and it's

7    guaranteed to do that and it's safe -- and there's no reason

8    for me not to believe it wasn't -- I would have done it

9    anyway had I reviewed that, because it would have been just

10   like Jackson or the other ones where I read it.  For example

11   like on Jackson, I read it 5 times and then Steve and I

12   would spend weeks going through back and forth.  And he

13   would document in MOUs for me that I would make him do that

14   what it really means in layman's terms because you couldn't

15   understand this legalese or financial-ese language.

16       Q    Right.

17       A    "Read that on your own.  "Tell me what that" --

18   invested in.

19       Q    Right.

20       A    So that's --

21       Q    So you did not -- sorry.  Go ahead.

22       A    No, I'm done.  I was done.

23       Q    Okay.  So you didn't receive this until after

24   Steve's death?

25       A    I'm not positive of that but I think that' true.

38

1       Q    Okay.  But -- but this particular document you

2    received from Jake -- Jacob Cazier?

3       A    Yeah, sorry.  That one I got from Jake after

4    Steve's death when I asked for, "Is there a prospectus?"

5       Q    Got it.

6       A    He said, "This is what I know of that Steve would

7    give to clients."  So -- and Steve may have -- very well

8    have given that to me in 2019.  And honestly if he did, I

9    would have looked at it -- I would have read it once and

10   said I've got to -- "I don't want to read this again" and I

11   would have gone, "Okay, fine," right?  Same as any other

12   investment.  So --

13      Q    So you relied completely on Steve's

14   representations to you about Crew Fund?

15      A    Yes.

16      Q    To make the decision to invest?

17      A    Yes.  And for the most part as I -- annuities and

18   even in the early days and stuff was like, "Why Jackson?"

19   "Why is this the right thing to do?"  "Well, it's guaranteed

20   income.  It does this.  Here's how much it cost you.  So it

21   costs, you know, quite a bit on the front end but it's

22   guaranteed income."  And so I mean his explanations made

23   sense.  When they didn't, like I said is I have a lot of

24   MOUs and stuff over the years explained to me in laymen's'

25   terms what this is in income.  "Sign it," blah, blah, blah.

39

1    But for this one I did not because I've known him for 20

2    years and to be honest, I mean, it's a lot of money -- it

3    was 500k -- but it was like I had 4 million, 5 million other

4    investments.  It's like -- it's not like where, you know, an

5    attorney tells me, "You're an idiot for giving him money."

6    I was like, "Okay, you read that and tell me what that

7    says."

8         Q    Right.

9         A    -- loans, blah, blah, blah.  Okay.  And so like I

10   said, Steve was -- I trust him.  He was supposed to be the

11   expert, right?

12        Q    Yeah.

13        A    When I first met him he was just starting his

14   business.  I guess a side note is the first time I met him

15   was with his dad in his office, right?  His dad was a

16   professor teaching him all this stuff at a university so it

17   was all -- I got a lot of confidence from his father too

18   that they knew what they were doing as a team -- when I

19   first started.  So after beating him up for several years --

20   and again, I beat that to death but that -- it's not like

21   I'm an idiot but it is -- you know, I'm a rocket scientist

22   and designer and inventor.  I'm not a financial advisor.

23        Q    Right, well --

24        A    If I was a financial advisor I wouldn't need one

25   right?  So --

40

1      Q    Yeah, I understand.  Did you ever telephone Crew

2  Capital?

3      A    Did I ever telephone them?  No.

4      Q    Okay.

5      A    Now to be honest, I don't know that I've called

6  any of them, the other investments, until now.  So I've got

7  Jake calling them.  I'm calling them.  Getting letters from

8  people, "Do I really have money left in these other

9  accounts"?

10     Q    Yeah.

11     A    Or trying to.

12     Q    Can you see that exhibit?  I'm trying to see if I

13 can --

14     A    Okay, it was sideways.  Now I can, okay.

15     Q    Yeah, okay.  This -- I'm showing you what's been

16 marked as Government Exhibit 22, which is a document you

17 provided to us.  Can you tell me what this is?

18     A    This was a presentation I put together for --

19 after Steve's death, for Jake and Jacob to let them know

20 where my head was at, right?  "So do I fire you guys?"  Uh,

21 "Do I move on?"  "What do I do?"  That whole thing is, you

22 know, "Is my money okay?"  The answer was, "Yes."  Then I

23 found out the Crew Fund's not.

24          So I just went through a lot of what I just told

25 you was past confidence building, right?  How I met Steve.

1    We were hangar mates.  I met his dad.  I just mentioned

2    that.  He moved to consolidate the accounts together, which

3    is what I asked him to do before he became my financial

4    advisor.  We did monthly reviews, how the assets worked.  So

5    I asked a lot of questions about death, fraud, guarantees,

6    FDIC, SBIC, what are all the acronyms and stuff that are

7    protecting these assets.  Then we moved to one, two reviews

8    a year.  I don't know if you want hit each bullet but

9    anyway, that's what this document is.

10          The nest egg software was his bucket strategy, was

11   really good and the software was good but he was using it

12   for financial advisors only.  I said, "There's a market, I

13   think, for consumers."  So I re-built all that software

14   under a platform called Nest Egg Software, and I tried to

15   sell it to consumers but I didn't -- my wife is like if you

16   spend 100 bucks on a marketing and it doesn't work, quit.

17   So we didn't get very far with it so that ended up dying.

18   But I did workshops with him.

19          I teach creative thinking for business.  In Salt

20   Lake, I had several keynote presentations and workshops I

21   did for his clients for free.  He never paid me for any of

22   that stuff.  But -- and to be honest, I'm surprised I

23   haven't got that knock on the door yet.  But as far as lead

24   generation of friends and stuff, I recommended lots of my

25   friends to him.  I don't know who ended up being clients

42

1    because I stayed out of it once I introduced them because I

2    didn't want to be in the middle of anything.   So I 'm

3    certain I have some friends in Utah and elsewhere that were

4    his clients as well that maybe they weren't in the Crew

5    Fund, which is why I haven't gotten that phone call, right?

6         Q    Uh-huh.

7         A    But that's what this document was.   It was just

8    walking through past confidence.   But the intent was I was

9    trying to explain to Jacob and Jake -- it's not scrolling

10   down in the next slide but I know what it looks like.   It's

11   --

12        Q    Okay.   Yeah, I can -- okay.

13        A    Okay.

14        Q    Do you see the next one?

15        A    Yeah, it's sideways but I'll load it again.

16        Q    Yeah, let me rotate it.   Oh, wrong way.

17        A    Right.

18        Q    Sorry.

19        A    So I was just trying to explain --

20        Q    So -- go ahead.

21        A    Okay.   Yeah, the first slide was kind of the past

22   confidence building prior to Steve's death and then, I

23   guess, this all happened kind of prior to Steve's death as

24   well, the erosion?

25        A    This is all prior his Steve's death but it was

1    just some flags that popped up, right?  We had this -- I

2    asked him -- I had some cash.  I don't remember how long ago

3    it was -- like same thing.  She had some options.  "What

4    else can we put it in?"  He had some life insurance thing

5    about -- with some lady that he could buy her life insurance

6    and when she died we got 3x or something and I'm like, "I

7    don't the sound of that one."  He's kind of like, "Well,

8    we're doing her a favor because she needs cash."  So I know

9    -- and I almost -- I don't remember how much -- got ready to

10   write him a check for that and then at the last minute he

11   said, "No, this doesn't" -- "it doesn't do what I think it

12   does."  So he was going to invest in it as well and so

13   neither one of us did.

14        I already mentioned to you this multiple advisor

15   changes.  I jokingly, or not, said, "What do you got,

16   somebody in the crosshairs on you that you" -- "Why do you

17   keep changing advisory all the time?"  And he'd give me a

18   logical answer but -- and this rebalancing stuff that they

19   do in the background, I don't know what they really do.

20   They keep telling me, you know, they buy high, sell low and

21   it's stuff that they constantly do -- that financial

22   advisors constantly do.

23        But he did sell like -- he sold some stock and

24   bought a couple hundred grand of Oracle and we never had

25   that conversation.  So I was like, "Steve, when did you" --

44

1    "I didn't know you could even sell and buy stuff like that."

2    And he was like, he goes, "Uh, you told me to do it."  I'm

3    like, "No, I didn't."  So fortunately it was Oracle which we

4    have quite a bit of stock in.  But so that was all stuff

5    that again, over 20 years of once in a while something would

6    happen but it wasn't that big a deal.  And I did -- I've

7    never put this chart together, Cheryl, until after the fact,

8    right?  It's, "Okay, do I keep: --

9        Q    Right, right.

10       A    It's like, "Okay, do I keep Jake and -- right?

11   And then the Jackson was in the last 8 months.  That was by

12   far the biggest mistake.  It was at about 1.3 million in

13   income over 20 years that I was promised by that asset and

14   then didn't get it.

15            So then -- and this still irks me.  I just talked

16   to Jake again today, right?  Is -- here's what's very

17   frustrating for me personally is, no one at Oak Lane

18   Advisors has ever apologized, sent a letter, nothing.

19   Nobody has told me anything about the money missing, except

20   Jake.  You haven't, right?  Nobody's come and said, "There's

21   a crime," but my money's not there, and so something bad has

22   happened.

23            So it's like why was there not any internal cross-

24   checking, external audience?  Oak Lane Advisors' name is on

25   every one of those or Summit Capital.  I go, "Does anyone

1    there read the damn thing or look at it?"  And the answer

2    is, "I can handle it."  No.  And then I ask that question, I

3    go, "Is it illegal what he did and was a crime committed?"

4    And Jake's answer was, "What he did isn't illegal."  "If you

5    fire" -- "He can start his own fund, but he has to file all

6    the SEC paperwork," blah, blah, blah.  And he didn't appear

7    to do all that is what it looks like.

8            So that's as far as I -- which is exactly where

9    I'm at today, to be honest.  It's  why we're meeting today.

10   Do I fire these two guys?  Do I move on?  What do I do?  And

11   I'm in this limbo where that's where I'm at right now.  I

12   don't honestly believe Jake knew this.  Maybe it's a crappy

13   business set-up that they had that they weren't checking

14   each other's stuff.  But from my point of view he was an

15   employee or something, right?  He was a resident guy in

16   learning is all I knew.  He showed up at the meeting in the

17   background and helped present, right?

18           So this is like -- this whole document, to answer

19   your question, is really geared towards, you know, trying to

20   answer me and my wife's question is why -- "Do we get rid of

21   these guys?"  "Do we go with somebody else?"  Then I just

22   described some of my personal pain, which is real.  I just

23   came back -- as you know, I was in Utah for two months.  I

24   was on a ballooning vacation.  It was the most expensive of

25   my life.  And I couldn't really enjoy it as much as I wanted

1    to because of this, right?  And I couldn't -- I was in

2    Airbnbs for two months.  And I may have to go -- I haven't

3    had a corporate job in 18 years.  I may have to go back to

4    Kennedy Space Center next week, right?  I'm talking to

5    people right now about a job.

6            So real quick, this device that I've been working

7    on for three years, it costs a lot of money to pull the

8    trigger on mold tooling, which I just did two weeks ago,

9    which I can't -- I'm afraid to even do.  You get it, right,

10   because -- so again, the whole presentation was one, to make

11   them two feel bad, right?  And understand if I say you're

12   fired, why are you fired?  That was my heart-to-heart with

13   them six weeks ago.  So that's a long answer to your

14   question of what was the intent of this document.

15       Q    Okay.  No, that makes sense.  That is a lot of

16   pain.

17       A    Yeah, I mean 87 Dreams -- I'm a hot air

18   balloonist.  We were going to -- my wife, who's a -- just

19   real quick how painful this is.  She's going to retire --

20   was going to retire next year.  She's already hired her

21   replacement, like on contract to take her job, and we were

22   going to go fly balloons called 87 Dreams.  We were going to

23   go fly disadvantaged families around the country for free,

24   because I've never charged --

25       Q    Oh, wow.

47

1       A    So I had banners made up and everything to go do

2   this, then run around for a year or two and just give free

3   balloon rides.  I can't afford --

4       Q    Oh, wow.

5       A    I can't afford to do that now, right?  So the next

6   steps we're (audio cuts out) right?  Do we recover the

7   funds?  What do you guys do?  What happens?  What if 3

8   million of the 30 million -- all the questions I asked you

9   -- what part of it shows up?  What if his family has the

10  funds?  What about his personal assets and his airplanes and

11  updates from you guys?  And do I hire an attorney, which is

12  -- to be honest, I contacted Morgan & Morgan, which is the

13  most frustrating thing ever.  The guy's like oh, he won't

14  even give you an update on anything -- whether they're doing

15  anything.  The only answer I get is, "Ah, things take time,"

16  right?

17            And then the good news/bad news is I have -- my --

18  we have 200k to invest in short term money right now.  I was

19  that far away from putting it in Crew Funds, right, because

20  that's where it should have gone.  So now I'm like, "What do

21  I do with it?"  And so that's the good part, is I still have

22  some money there.

23            But anyway, so these -- again, this whole

24  presentation was directly towards Jake and Jason going, "Now

25  what?  If I fire you you'll understand it," and they both

1    get it.  They're both pretty sincere like, "We understand.

2    Guilty by association.  What kind of mark -- "We understand

3    where you could be coming from.  I've got the same

4    conversation with all the other clients, right, of Steve's."

5            And I get it.  I don't know Jake that well, you

6    know, personally of course, but it sure feels like in his --

7    but I was tricked by Steve too -- but it sure looks like in

8    his attitude that, you know, his career got ruined --

9    getting ruined too, right?  It is potentially.  And it's

10   like, "Are you thinking about just getting out of the

11   financial advice?"  And he said, "Maybe, because this is

12   horrible," you know?  So --

13       Q    Yeah.

14       A    Simple long answer to your question of what was

15   for.

16       Q    No, I appreciate that.  I did want to go through

17   those because I think those were all important points that

18   you made in that document.  Now, so how did you learn that

19   Steve Swensen died?

20       A    I was sitting here in my office.  Jake called me

21   the day after he died and he goes, "I have some really bad"

22   -- as soon as he said that -- he goes, "really bad."  I go

23   -- I knew he was going to say Steve died.  He goes, "Steve

24   died yesterday," and I'm like, "Okay.  What did he die of?"

25   And he goes, "The family's not talking about it."  So I

1    went, "Hmmm."  So I didn't say it because of emotional

2    stuff.  It's like, "It's horrible to hear.  He was a friend

3    of mine.  "Okay, is my money okay?"  He's goes, "Yeah, all

4    you money's fine.  Don't worry about that," blah, blah,

5    blah.  So left it at that.

6           I had promised to take Jake for a balloon ride 8

7    months earlier so I said, "I'm still going to Utah in a

8    couple weeks.  Do you want to go for -- I'll still take you

9    for a balloon rider or whatever. So after I hung up I told

10   my wife and of course immediately I was like okay, if the

11   family's not talking about it it's suicide or drug overdose

12   or both.  That's the only 2 things there are, okay, if the

13   family's not going to talk about it.  So I didn't know what

14   it was.

15          So I took Jake ballooning after July 5th, so July

16   10th, 12th, whatever.  After we got done ballooning we're

17   sitting around and I just said, "So any more information on

18   Steve's death?"  And he's like, "Yeah, he committed suicide.

19   He hung himself."  So they gave me some back detail and --

20   that he knew or that he would share and I'm like -- and then

21   he just kind of casually goes, "So Crew Fund looks like a

22   fund that wasn't set up correctly."  And I'm like, "What?"

23   And I go, "So what happens if I try to withdraw money out of

24   it?"  He goes, "You can't."  "So where's the money?"  "I

25   don't know."  "What do we do?"  "I'm talking to the SEC."

50

```
1    You know, he's like, "Everyone's on the same side here,

2    Mark, trying to figure out where the money is and what

3    bank."

4            So I'm just sitting there kind of shocked

5    obviously going, "Now what?"  "I don't know," right?  I go,

6    "Can I talk to the SEC?"  "Yeah."  So I asked Jake, "Give me

7    their contact info," so he gave me your contact information

8    and I got a hold of you.  So --

9        Q    Okay.  So it sounds like you've been talking with

10   Jake and Jason -- are they working together now?

11       A    It's always been confusing.

12       Q    Oh.

13       A    So my understanding -- so -- I've been talking to

14   Jake for these questions like, "What am I doing?"  I talked

15   to Jason because -- I never talked to Jason but maybe once a

16   long time ago.  My understanding is when Steve and Jason

17   broke up -- which I didn't know that happened -- is Jason

18   took the annuities and Jake -- we just had this conversation

19   the other day -- Jake doesn't have a license to manage the

20   annuity, right?  So I asked Jason, I go, "So Jason, I never

21   talked to you but maybe once in my life in 20 years -- 15.

22   Do you get paid every year from this annuity?"  He goes,

23   "Yes."  I'm like, "Okay, well I've never gotten it."

24           So I didn't know that business arrangement, of

25   course.  I was getting all my stuff from Steve and from my
```

51

1    perspective, they all worked for Steve.  I didn't know

2    they're in different brokerages or whatever.  So the way it

3    is right now, that Genworth account is under Jacob because

4    he is under a brokerage that can have annuities.  Jake

5    cannot.

6         Q    Oh, I see.

7         A    So Jake's telling me I can -- "Me and Jason talk

8    every day.  I can report the numbers but I can't really give

9    you advice on that annuity."  You know, that parts a mess.

10   And then Jacob's like, "I don't even like annuities.  You

11   should just get rid of it."  I'm like, "Well why the hell do

12   I have it?"  Because -- and he goes, "Well, they serve a

13   purpose.  If you need guaranteed income then they're there.

14   And you know, it's what Steve was -- I believe -- was trying

15   to recommend back then was, "This is what's best for you at

16   the time.  Was, "You want a guaranteed income and retiring

17   at a certain age.  And so that's why we got Jackson and

18   Genworth."  But anyway -- so I don't even remember what you

19   question was now.

20        Q    Yeah.  Oh, I was -- we were talking about Jason

21   and Jacob working together.

22        A    Yeah, so they -- they -- Jake tells me they talk

23   to each other every day or whatever but --

24        Q    Okay.

25        A    But -- and now Jake's like, "If you want me to be

52

1    your account -- or your financial advisor going forward, if

2    you keep that Genworth you've got, you're still going to

3    have Jacob on it.  If you want to sell it and put it in a

4    stock, then I can manage it.  But I can't manage that

5    because I don't have a license under a brokerage to handle

6    an annuity."

7         Q    Oh, right.

8         A    Now everything I just described to you, Cheryl --

9    I didn't understand that until the last 2 months.  I just

10   thought they were Steve's employees.

11        Q    Right.

12        A    It was always -- not presented that way.  It was

13   always assumed that way.  It was like having a meeting with

14   you and Trevor shows up to the meeting.  You assume you have

15   something do to with you in the same office, right?

16        Q    Right.

17        A    But -- and that wasn't -- so --

18        Q    Okay.  So do you recall anything else -- either

19   Jake or Jason said to you about Crew Funds?

20        A    No, no.  Besides what I --

21        Q    Okay.  So currently it sounds like they're still

22   your advisors, Jake and --

23        A    They -- well, they both are.

24        Q    Okay.

25        A    So I have to take action to pull them off of it

53

1   and I've not done that yet because when I do that, then

2   certain things can't happen, right?  If I need to trade or

3   do --

4        Q    Right.

5        A    I've got to go get somebody else to do it and

6   quite frankly, I still need advice like this new investment

7   thing.  I don't have Crew Fund anymore.  Where do I put

8   bucket one money?  And Jake and I -- right first call were

9   talking about, you know, corporate bonds and what are bond

10  ladders and where do you think the smartest place to go is?

11  And of course, he's scrambling trying to keep his clients,

12  right?  To figure out how he's -- not going to go -- we both

13  joked a little about we might both be working at Chik-Fil-A

14  next week.  Who knows, right?

15       Q    Oh, gosh.

16       A    The only other thing that you asked me about Crew

17  Fund -- and I've said this before but I'm not sure I said it

18  in this call -- is just what Jake has told me since Steve's

19  death is like how do you -- you know, when I'm asking in

20  that chart, "Where's the cross reference?  Where was it?

21  And he's like, "Steve just always said he was handling that

22  piece of it, you know?  And he would give me the number to

23  put in the income plan."  Jake's comment to me -- I've had

24  4-5 conversations with him since Steve's death, somewhere in

25  there was like, "I think maybe, Mark, I caught him and I

54

```
1    didn't know I caught him, reported him," because I kept --

2    he was buying -- my understanding was he was buying the

3    business from Steve, or a big chunk of it.  So he would buy

4    it from him so he kept asking for more information on Crew

5    Fund to pull stuff together.

6              And my understanding, Jake told me that he

7    contacted somebody at Oak Lane and said he couldn't get the

8    stuff from Steve or whatever and Steve was furious with him.

9    And then he told me that whoever at Oak Lane fired Steve.

10   And I was like, "Oh, okay.  Didn't know he actually reported

11   to somebody that he could get fired."  I thought they were

12   just -- so all of those little details -- I said, "Okay,

13   well if he got fired something bad happened here," right?

14   So that -- and Jacob told me -- I only learned this on

15   Steve's obituary when I saw the last name was the same as

16   Jacob's and I'm like -- so I just flat out asked Jacob on

17   the call, "Are you related to Steve?"  And he was like,

18   "Yeah, I'm married to his" sister, cousin or something.  I'm

19   like, "Never heard" -- again, "I'm not really mad about not

20   disclosing that but it might have been something, had I ever

21   talked to you, to know that.  But --

22        Q    Okay.

23        A    So then he goes -- I go, "So what do you think

24   happened?"  I go, "Where is this money?"  He goes, "He

25   didn't spend it.  He just" -- Jakes comment was, "He's this
```

1    really smart guy but I think he's an idiot.  He just set

2    something up and did it wrong and realized he's probably

3    going to jail or things were -- or maybe he did spend all

4    the money."  So I was like, "When I knew him he had SES

5    airplanes but not $30 million worth of airplanes.  I mean,

6    he had a Kit Fox.  For starters, it's the same value of

7    plane that I have.  It's $30,000, right?  But I know he has

8    airplanes now that are more expensive.

9           But anyway, that's the only thing I got around

10   Crew Funds was both of them were like his lifestyle wasn't

11   like he spent that money.  So like did he give it to his

12   kids?  Did he give it to his mistress?  What did he do?  And

13   they're like -- and, you know, Jacob's comment was, "Man he

14   had some of his best friends in this fund.  I mean, absolute

15   personal best friends.  And he made a comment something to

16   the effect of, "I don't think he'd do this to so and so."

17   And when he said that I'm like -- he said his first name.

18   He was talking about his father, who I knew had passed.  So

19   I guess his father or his mother were in this fund too --

20   all that.

21          So I know the information's going this way.  Is

22   there any information that can come this way about what are

23   you guys doing with the timeline?  Because like I just said,

24   I need to go talk to my tax guy now and I -- you told me you

25   can't do anything until it's public.  Is there any timeline?

56

1   There's a crime involved in that.  I gave him money and it's

2   not there and it was promised to me.

3        Q    Yeah.  Unfortunately --

4        A    I mean, I know that's -- sorry.

5        Q    I'm sorry.  We can't really share any information

6   but -- so we are a civil agency so we don't prosecute crime

7   -- criminal activity.  So we would -- so if we do find, you

8   know, wrongdoing, violations, then what we would do is file

9   an action in the federal district court here in Utah and

10  that's when things would become public.  But unfortunately,

11  we can't really, you know, give you any information about

12  that.

13       A    Is there any timeline at all if that happens or it

14  doesn't?

15       Q    It can take -- you know, investigations kind of

16  run the gambit as far as timeframes so it's hard to

17  estimate.  But we are working as fast as we can on this.  We

18  know that there are a lot of anxious people and we're trying

19  to resolve things as quickly as possible.  And we appreciate

20  you providing testimony because that also helps us as we

21  move forward.  Mr. Fox --

22       A    That's almost --

23       Q    I just have a few more -- oh, go ahead.

24       A    I was just going to say, that's almost word for

25  word what I knew you were going to tell me.

57

```
 1        Q    Yes.

 2        A    Go ahead.

 3        Q    So were you aware or did Steve ever tell you that

 4   he was involved with Crew Fund personally, that he had

 5   involvement?

 6        A    Involvement what?  Crew Funds what?

 7        Q    In Crew Funds, like personal involvement?

 8        A    No, he did not.

 9        Q    Okay.  You just assumed Crew Funds was -- we

10   talked about this -- like a Schwab or a Fidelity?

11        A    That's exactly how he presented it.  And when I --

12   when I asked him there must be a lot of money in here to be

13   able to float the logic stuff, you know, and the -- he goes,

14   "Yes, there is."  And at that point he would have -- he

15   would have said, "Yeah, it's my fund," or something and then

16   I obviously would have remembered that.  He didn't say

17   anything like that, no.

18        Q    Right.  And would you have invested in Crew Funds

19   if not for Steve's representations to you?

20        A    Well, I don't know how to answer that.  He's been

21   my financial advisor for 20 years.  So I mean -- yeah, if I

22   had a new financial advisor and somebody came along and they

23   said, hey -- and they presented it in the same way, there's

24   a 5 percent, 10 percent return and it's presented as a

25   legitimate thing, then yeah, I would invest in it I assume.
```

58

1        Q    Right.  But if you -- what about if you had known

2    what you know today?  Would you have invested in the fund?

3        A    Are you serious?  Of course not, okay?  No.  If I

4    would have known it's not a real fund then of course, I

5    wouldn't invest in it.

6             MS. MORI:  Joni, do you have any questions before

7    we finish up?

8             MS. OSTLER:  Actually, yeah, if you'll humor me.

9             BY MS. OSTLER:

10       Q    I mean, I just -- I'm not sure I fully understood

11   that Exhibit 22.  And I just want to make sure that I --

12       A    Okay.

13       Q    -- understood it and that it's clear on the

14   record.  So Mr. Fox, you wrote this past confidence building

15   side and the confidence erosion side here?

16       A    Yes.

17       Q    -- this specific side, before Steve died?

18       A    No, after.

19       Q    Oh, okay.  So you wrote all of this after Steve

20   died?

21       A    Yeah.  This was a presentation I gave to Jacob and

22   Jake to tell them what me and my wife are feeling thinking

23   about moving forward after Steve's death and do we fire you

24   guys and move to a new financial advisor or what do we do?

25       Q    So you gave them that presentation and they were

1    together when you gave the presentation?

2         A    No.  We were all on a Zoom call.

3         Q    When was that?

4         A    I can look at the exact date on it but roughly,

5    you know, 5 weeks ago, 6, something like that.

6         Q    So like this summer, like July?

7         A    Well, yeah.  I mean, I got to Utah on July 5th,

8    which means I ballooned with Jake on the 10th.  So it would

9    have been, you know, 4 or 5 days after that.  So the 15th or

10   something of July, somewhere in there.

11        Q    Okay.  And the bullet point that says, "Nest Egg

12   Software," what was that?

13        A    So again, as I said is I took the logic of the

14   bucket strategy because Steve was always sell -- he was only

15   selling his bucket strategy to other financial advisors, his

16   software.  And I said, "Are you going to a consumer base,

17   right, to try and sell it to average people as an investment

18   tool?"  And he's like, "No, that's a good idea."  I said,

19   "Well, the way you have it built it's built for financial

20   advisors.  Let me go build one that looks like a consumer

21   version."

22             So Nest Egg Software was what I called what I

23   built as a business and that's why I mentioned it.  It never

24   -- I built the whole thing like I do a lot of stuff -- I've

25   started 14 companies in 10 years.  I built that one.  It

1   took me a year and then I spent very little money on

2   marketing it and I didn't' sell much so I just dropped it.

3   So it was a platform that I built so a consumer could do the

4   same thing I'm doing without a financial advisor as far as

5   bucket strategy for income.

6        Q    Okay.  And the bullet point that says, "Death,

7   theft, fraud, guarantees, government backing, MOUs, et

8   cetera," what was that referring to?

9        A    So 20 years of conversations, "Steve, what happens

10  when you die?"  "What happens if you steal the money from

11  me?"  "What if it's fraud?"  "What's the guarantees?"

12  "What's the government backing?"  "Tell me what SPIC means."

13  "What does FDIC mean?"  "How much does it cover?"  "I need a

14  Memo of Understanding of how Jackson actually works."  So he

15  wrote MOUs and stuff that said, "Jackson will pay you," for

16  example.  Or Jackson was -- "It's gaining 5 percent per

17  year.  When you pull the trigger on it to draw money out of

18  it you're going to get 5 percent of the balance until the

19  market balance is zero.  Then you have a million dollar

20  guarantee at the end that pays out for the next 10 years."

21        So all of that stuff was, "Put that in writing.

22  So get it out of the legalese," right?  "I don't understand

23  that part.  Put it in letters and memos," which he did. And

24  we went back and forth on a lot of that and that was the

25  first big mistake is, that wasn't true about that on

1    Jackson.  So that's -- where I put past confidence building

2    was the conversations that we constantly had.  "What happens

3    when you die, Steve?"  "Well, I'm with this parent company.

4    They're backed by this." " What happens if you steal from

5    me?"  "SPIC will cover 500k per account per person.  Or

6    FDIC's 250 grand."  Okay?  So that's the government backing.

7           So I just had this exact same conversation with

8    Jake again today.  "Go back through the assets that I

9    actually own still," right?  "Which ones are SPIC?"  "Which

10   ones are FDIC?"  "What is really protected if Jake steals my

11   money?"  And so that was just the confidence building I said

12   earlier on that I beat Steve up a lot on the early years of,

13   "How do I protect my money?"

14          So as you guys can imagine -- if you can imagine

15   me personally, I spent 20 years trying to make sure this

16   didn't happen and it did, right?  I did everything I could

17   with all these investments, beating him up, beating him up.

18   "Prove to me."  "Prove to me."  "Show me this."  And he was

19   very polite and cordial and did what I asked, right?  And so

20   I have piles of MOUs.  I've got more documentation but I

21   don't have all that with Crew Funds because as I've already

22   said an hour-and-a-half ago was, by the time I got to Crew

23   Funds 3 years ago, that was a short-term -- I don't want to

24   put it in Bank of America when I put it type thing.  There

25   wasn't a lot of discussion about it so --

1        Q    Can you tell me again what Steve said to you about

2   SPIC?

3        A    So he -- well, I'm going on memory and stuff, but

4   it's fresh in my mind today because I just had the

5   conversation with Jake.  So FDIC or SPIC, anywhere you have

6   cash or stocks is, what is protected if there's fraud or

7   something happens.  What if Schwab disappears, right?  And

8   so let's pick Schwab.  So what I was told is on your

9   account, it's guaranteed by SPIC for $500,000 per name per

10  account.  So -- we just went through that today.  So one

11  where I have $300,000; if that got -- disappeared because

12  Schwab went out of business, the FDIC would come in and pay

13  that back.  If you have 700,000, you'd get 500,000 of it

14  back and you'd lose 200,000.

15           So it's those details that I'm now asking Jake, "I

16  already covered this 15 years ago.  Let's go back over that

17  again about the money I do have left," because that's -- so

18  my number 1 concern -- what I told Jake was, whether I keep

19  you or not is, "I don't want any" -- "no more negative

20  surprises," okay?  That's what we say in aerospace, right?

21  Rockets.  "No more negative surprises."  That's the number 1

22  goal.  Number 2 is, "What money do I have left, assuming

23  Crew's gone?"  And, "Do I have to go get a job or not?"

24           So, "Is this stuff protected?"  "How well is it

25  protected?"  How -- and Jake even told me today, he goes --

63

1    uh, you know -- he goes, "I'll be honest with you about

2    SPIC.  They don't have enough money in that kitty to cover

3    everybody if everyone went south, but they do if Schwab went

4    out.  But not if all," right?  So it's those conversations

5    of risk management of my money and how do I stop this from

6    happening again?

7          I understand the market fluctuations.  I'm never

8    talking about that.  You can't protect that.  It's just --

9    and what I've been asking -- and nobody can answer this, any

10   of them -- is this errors and omissions insurance that all

11   of these advisors must carry, what does it cover?  Does it

12   cover what Steve did?  Nobody can answer that.  Can I buy my

13   own insurance to cover what you guys don't cover?  Who

14   knows, right?

15         So I'm trying to learn all of that stuff with

16   these conversations is, what's errors and omissions cover?

17   Not one person has answered that.  And they don't know.  I

18   honestly think Jake -- "I don't know.  We have the insurance

19   because it requires us to have it."  It's kind of like my

20   hangar insurance, my airplane, I'm required to have

21   insurance.  It didn't cover anything.  It's some weird

22   liability thing that the hangar people want.  It doesn't do

23   anything for me.  But if I want to live there, I've got to

24   pay it, right?  So --

25         Q    So did Steve tell you that if he committed fraud

64

1    and took your money, that SPIC would cover that?

2         A    No, he did not.

3         Q    Okay.

4         A    I just asked him, what if -- it was more jokingly.

5    I said, "If you stole my money, what happens?"  And it's

6    kind of like -- that was more of a joke.  It was more of,

7    "What happens when you die?  What happens next?  Who do I go

8    to?"  And most of it, honestly -- I'm sorry.  What is your

9    name again?

10        Q    I'm Joni.

11        A    Joni.  Most of it, honestly, was around the trust.

12   That me and my wife at the same time in a car wreck or my

13   airplane, where the money goes after -- I go, "Who do they

14   call," right?  I've got a nephew who's -- can't remember the

15   name so, "Steve, I can't call you."  "Who else could they

16   call?"  "Where do they go?"  "What do they do?"  So it was

17   more around us dying and how do we -- we don't have any

18   kids.  How do we give money to not go back to the bank or

19   something.

20             So that was most of it.  The fraud part was more

21   of like a joke, right?  There was never a lot of discussion.

22   It's like -- and you wouldn't have that, right?  You

23   wouldn't have a detailed discussion, "Steve, what's going to

24   happen when I steal from you," right?  So we never had that

25   conversation besides, like I said, kind of jokingly.  There

```
 1    was never -- no, he never guaranteed, If I stole, this is

 2    what would happen."

 3        Q    Okay.  And has Jake -- can you tell me what Jake

 4    specifically has told you about SPIC?

 5        A    Just what he told me today again was, if Schwab

 6    went out of business or there was -- he did say, "If I stole

 7    money from you, then SPIC would come in and cover 250k or

 8    500k, depending on whether it's cash or a stock account."

 9        Q    So Jake said the SPIC covers you if he steals your money?

10        A    I think that's what he said.

11        Q    Okay.

12        A    I said, "theft," right?  I said if there's theft

13    or -- well, in that chart, in that way I just read it, theft

14    -- if something happens, Charles Schwab went -- yeah, I'm

15    pretty sure he said that.  But most of it was around if the

16    accounts -- and Jake's leaning towards -- like America Funds

17    is trillions of dollars.  Schwab is trillions of dollars.  I

18    can't -- his whole argument was, "I can't steal it from you.

19    I can't take it and do anything with it.  It's in these" --

20    so getting all these statements for this assurance -- I've

21    asked him, "I want a written letter from each one of these

22    people telling me that, "Yes, my money's still in the

23    account," and blah, blah, blah.

24            And he's got a couple letters he's said, right?

25    He was starting to show them to me today but I had to get
```

1    off the call for you guys.  And he goes, people like America

2    Funds -- I have it.  When I call Fidelity they're like, "Go

3    to hell.  I mean, it's a 401(k) and we're not writing a

4    separate letter for you," right?  It's -- "Here's your

5    statement," is what they're saying.  "Your statement says

6    you've got this much money and it's under Fidelity."  You're

7    like, "Okay."

8           So I asked, "Put a little matrix together who's

9    giving you additional assurance that our money is there."

10   But all of it's kind of like, you get it.  He's a -- I

11   honestly because he was trying for the last 2 weeks to do

12   what I asked him to do; calling people trying to get

13   additional insurance that something bad can't happen.  But

14   they're trillion dollar organizations, right, with tens of

15   thousands of advisors calling, right?

16       Q    Okay.  So let's go back to the web address that

17   you were able to check you Crew Funds balance on.

18       A    Go back to what?  I'm sorry.

19       Q    The web -- you were talking earlier about the

20   website that you were able to check your Crew Funds balance

21   on?  Do you remember the web address of that?

22       A    Yeah, I was just showing it.  It was

23   crewfunds.com, I think.

24       Q    How did you get access to that website?

25       A    Steve set me up.

```
 1        Q    So Steve sent you your user name and password?

 2        A    That or he sent -- I don't remember.  That or he

 3   sent me a link to set up an email or password.  So I'm not

 4   sure how it was set up.

 5        Q    Okay.  Did you ever have trouble getting into that

 6   website, like you forgot your password or got locked out?

 7        A    No.  And to be honest, I didn't go into it that

 8   often because I'm just looking at the income statements,

 9   right?  And I'd go in -- honestly, I'd look at it once in a

10   while but if there's no reason for me to go in -- the main

11   reason I go in is to get the 1099s for my taxes.

12        Q    Okay.

13        A    Or you know I'd go in -- I'd check once in a while

14   and say, "All right, is it still getting paid daily?"  The

15   main time I'd check is, of course, was on the anniversary

16   date.  I would go, "Did I get a lump sum of 50 grand or

17   something because the market did 10 percent?"  So I'd check

18   that every time and 1099s and stuff for taxes.  But yeah, I

19   don't want to -- I don't want to sit there and look at money

20   all day long.  It was like, you know, I've got other stuff

21   to do.  So I -- like I said, I backed all the way off into

22   sometimes once a year doing an income review because it was

23   like, we're on track.  I don't want to worry about -- I

24   don't want to look at it every day and worry about it so we

25   just -- so yeah.
```

68

1      Q    Okay.  Did you ever have occasion to talk to Jacob

2  Cazier about the website?

3      A    Well, I've talked to him quite a bit since Steve's

4  death, right?  Same thing as I said --

5      Q    I mean before -- before Steve's death.  Did you

6  ever talk --

7      A    No.

8      Q    Okay.

9      A    Not that I know of.  There was no reason to,

10  right?  It is -- again, I wasn't talking to Jake a whole

11  lot.  I talked to Steve.  Jake would be the guy that, well,

12  he was training to present the income reviews with me and

13  he'd be on the calls.  But if I'm calling someone with a

14  question -- only in the maybe last year would I text Jake

15  because Steve didn't answer or Jake was the one who was

16  responding.  So I would like just go to him because it was

17  obvious that Jake was doing most of the work and putting it

18  together and probably knew the answer quicker than Steve

19  did.  So --

20      Q    So -- okay, switching gears. You said you had a

21  hangar with Steve, of an airplane -- you were hangar mates?

22      A    Yes.

23      Q    Were you hangar mates up to this year when he died?

24      A    No.  I moved from Utah to Florida in 2008.

25      Q    Okay.  Did you happen to know what airplanes Steve

69

```
 1    owned at the time of his death?

 2         A    I don't know which -- well, no.  I mean, he had a

 3    Kit Fox that he sold.  I know he had his dad's airplane.  So

 4    when his dad died he had an airplane.  He had a Cirrus SR22

 5    that I don't know if he sold or not and I -- it wasn't a

 6    Pilatus but it's -- I have a picture of it somewhere.  What

 7    was it?  It's not a Pilatus.  It's not a Keenair.  It's a

 8    single turbo prop.  I can't remember right now but it's a

 9    more expensive airplane, yes.

10         Q    And Steve would talk to you about the planes he owned?

11         A    Yeah, of course.  I've flown with him.

12         Q    Okay.

13         A    I've flown in -- well, you know, his smaller

14    planes.  His Cirrus 22, I've flown in.  The Pilatus, or what

15    -- I think it was a Pilatus that we got that -- I didn't fly

16    in that one because he got that since I moved.  And I never

17    flew in his dad's plane.  It was his sport plane.

18         Q    Okay.  So in the last year before his death, did

19    he talk to you about buying additional airplanes?

20         A    No.

21         Q    Okay.  That's all the questions I have.  Thank you.

22              MS. MORI:  Thanks, Joni.

23              BY MS. MORI:

24         Q    Mr. Fox, before we go off the record, is there

25    anything else that you would like to add or clarify that we
```

1    haven't talked about?

2        A    Yeah, go find my money.

3        Q    Okay.  Thank you so much.  We're going to go --

4        A    I'll send you -- I'll send you guys a postcard

5    every day if I have to get a job.

6        Q    Okay.

7        A    Here's a picture of me at work and I don't need to

8    -- I can't be here.

9        Q    All right.

10            BY MS. OSTLER:

11       Q    But Mr. Fox, you know that we may not find it

12   right?

13       A    Yes, I do.

14       Q    Okay.  Just wanted to make sure.

15       A    But -- he can't spend $30 million.  It's got to be

16   somewhere.  It's either -- his wife's got it.  His kid's got

17   it.  His mistress got it.  Because it's not in his

18   airplanes.  It's not.  Even if he bought a Pilatus, they're

19   not $30 million and I know he didn't buy it.  So that money

20   is somewhere.

21            MS. MORI:  Okay.  Thank you so much.  We're going

22   to go off the record at 11:37 a.m.

23            (Whereupon, at 11:37 a.m., the examination was

24   concluded.)

25                          * * * * *

71

```
1                      PROOFREADER'S CERTIFICATE

2

3    In the Matter of:    STEPHEN ROMNEY SWENSON

4    Witness:             Mark Fox

5    File No.             SL-02881-A

6    Date:                Thursday, September 8, 2022

7    Location:            Salt Lake City, Utah

8

9            This is to certify that I, Christine Boyce,

10   (the undersigned), do hereby certify that the foregoing

11   transcript is a complete, true and accurate transcription of

12   all matters contained on the recorded proceedings of the

13   investigative testimony.

14

15

16   _____        _____

17   (Proofreader's Name)             9-19-2022

18

19

20

21

22

23

24

25
```

72

1                    REPORTER'S CERTIFICATE

2

3    I, Jemima Nobleza Euell, reporter, hereby certify that the

4    foregoing transcript is a complete, true and accurate

5    transcript of the testimony indicated, held on 9/8/22, at

6    Salt Lake City, Utah, in the matter of:

7    STEPHEN ROMNEY SWENSON.

8

9    I further certify that this proceeding was recorded by me,

10   and that the foregoing transcript has been prepared under my

11   direction.

12                   9-19-2022

13

14

15

16

17

18

19

20

21

22

23

24

25

# Transcript Word Index

**[& - 72]**

| & |
|---|
| **&** |
| 3:8,9 47:12 |

| 0 |
|---|
| **0** |
| 12:24 |
| **0.3** |
| 12:25 |
| **02881** |
| 1:4 4:10 71:5 |

| 1 |
|---|
| **1** |
| 1:8 17:11 24:8 25:24 26:2 |
| 26:10,16,21,23 33:15 62:18 |
| 62:21 |
| **1,045,000** |
| 33:15 |
| **1,045,935** |
| 24:5 |
| **1.1** |
| 30:7 |
| **1.3** |
| 44:12 |
| **10** |
| 12:23 13:8 19:1,2 20:5 |
| 23:15 31:15 37:6 57:24 |
| 59:25 60:20 67:17 |
| **10,000** |
| 19:25 20:2 |
| **10:05** |
| 1:15 4:3 |
| **100** |
| 41:16 |
| **109** |
| 3:11 |
| **1099** |
| 33:21,24,25 |
| **1099s** |
| 19:5 32:9,12 67:11,18 |
| **10th** |
| 49:16 59:8 |
| **11:37** |
| 70:22,23 |
| **119,000** |
| 31:23 |
| **12** |
| 13:3 19:1 |
| **12th** |
| 49:16 |
| **13** |
| 13:3 |
| **14** |
| 59:25 |
| **15** |
| 3:7 20:5 22:22,24 28:8 |

| 15 (cont.) |
|---|
| 50:21 62:16 |
| **150** |
| 31:20 |
| **15-20,000** |
| 32:13 |
| **15th** |
| 59:9 |
| **16** |
| 3:8 27:2,5 |
| **1662** |
| 6:10,15,23 7:10 |
| **17** |
| 3:9 28:13 |
| **18** |
| 3:10 31:7,8 33:9 46:3 |
| **19** |
| 3:11 24:16 33:17 |

| 2 |
|---|
| **2** |
| 19:14 24:19,19 27:17 29:12 |
| 31:4,19,20 36:25 49:12 |
| 52:9 62:22 66:11 |
| **2/4/20** |
| 3:8 |
| **20** |
| 3:12 11:5 13:23 14:13 18:1 |
| 25:4 34:22 35:5 39:1 44:5 |
| 44:13 50:21 57:21 60:9 |
| 61:15 |
| **200** |
| 32:5 |
| **200,000** |
| 24:12,18,18 62:14 |
| **2008** |
| 28:9 68:24 |
| **200k** |
| 47:18 |
| **2019** |
| 12:3 38:8 |
| **202** |
| 1:25 |
| **2020** |
| 3:9 27:6,17 28:16 |
| **2021** |
| 3:11 33:21 34:13 |
| **2022** |
| 1:12 3:12 4:3 25:4 34:24 |
| 35:8,13,19 71:6 |
| **■■20** |
| **21** |
| 3:13 35:22,25 |
| **22** |
| 3:7,14 28:16 40:16 58:11 |
| 69:14 |

| 24/7 |
|---|
| 18:8 |
| **250** |
| 61:6 |
| **250,000** |
| 13:10 |
| **250k** |
| 65:7 |
| **26** |
| 3:8 |
| **28** |
| 3:9 |

| 3 |
|---|
| **3** |
| 24:25 26:13 32:19,21 47:7 |
| 61:23 |
| **30** |
| 11:24 47:8 55:5 70:15,19 |
| **30,000** |
| 55:7 |
| **300,000** |
| 62:11 |
| **31** |
| 3:10 |
| **32931** |
| 5:21 |
| **33** |
| 3:11 |
| **34** |
| 3:12 |
| **35** |
| 3:13 |
| **351** |
| 1:10 2:9 |
| **3x** |
| 43:6 |

| 4 |
|---|
| **4** |
| 16:24 18:25 25:2 37:3 39:3 |
| 59:9 |
| **40** |
| 3:14 |
| **401** |
| 66:3 |
| **43.73** |
| 31:17 |
| **45** |
| 22:4 |
| **4-5** |
| 53:24 |
| **467-9200** |
| 1:25 |
| **4th** |
| 27:6 29:23 |

| 5 |
|---|
| **5** |
| 3:4 12:23 13:4,8 18:20 19:3 |
| 23:15 24:19 30:19 31:15,19 |
| 31:20,20,25 37:6,11 39:3 |
| 57:24 59:5,9 60:16,18 |
| **5/13/22** |
| 3:12 |
| **50** |
| 67:16 |
| **50,000** |
| 30:18 |
| **500** |
| 18:24,25 23:16 31:15 |
| **500,000** |
| 13:10 24:3,8,12,17 62:9,13 |
| **500k** |
| 32:3 39:3 61:5 65:8 |
| **50k** |
| 30:20 |
| **51,000** |
| 33:15 |
| **524-3141** |
| 2:11 |
| **5-6** |
| 14:25 |
| **5th** |
| 49:15 59:7 |

| 6 |
|---|
| **6** |
| 16:24 59:5 |
| **60** |
| 34:13 |
| **6-100** |
| 1:10 2:9 |
| **644** |
| 31:4 |
| **68,00** |
| 34:3 |
| **68,000** |
| 31:18,24 32:9 34:13 |
| **68k** |
| 32:13 |

| 7 |
|---|
| **7** |
| 13:23 14:13 24:18 |
| **700** |
| 18:4 |
| **700,000** |
| 62:13 |
| **72** |
| 1:8 |

[8 - back]

**8**

**8**
  1:12 14:14 17:11 30:8
  44:11 49:6 71:6
**801**
  2:11
**84101**
  1:11 2:10
**850**
  31:20
**850,000**
  31:19
**87**
  46:17,22
**8th**
  4:2

**9**

**9**
  18:25 24:18
**9/8/22**
  72:5
**9-19-2022**
  71:17 72:12

**a**

**a.m.**
  1:15 4:3 70:22,23
**ability**
  7:23
**able**
  13:5,6 57:13 66:17,20
**absolute**
  55:14
**absolutely**
  18:12
**access**
  66:24
**accompanied**
  6:24
**account**
  3:10,13 10:24 11:2 12:24
  14:18,19 18:18 19:10 20:3
  22:15 31:12 33:11,14 34:1
  36:11 51:3 52:1 61:5 62:9
  62:10 65:8,23
**accountant**
  34:2
**accounts**
  10:20,22 11:7,9,10,10
  13:23 21:16 29:13 31:5
  40:9 41:2 65:16
**accurate**
  71:11 72:4
**acronyms**
  41:6

**action**
  33:3 52:25 56:9
**activity**
  56:7
**add**
  69:25
**addition**
  19:2
**additional**
  22:9 66:9,13 69:19
**address**
  5:19,22 66:16,21
**adjourned**
  7:6
**advanced**
  26:1
**advice**
  48:11 51:9 53:6
**advise**
  7:1
**advised**
  6:24
**advisor**
  10:14,18,25 11:7 18:7
  25:22 26:14,16 39:22,24
  41:4 43:14 52:1 57:21,22
  58:24 60:4
**advisors**
  25:13,15 41:12 43:22 44:18
  44:24 52:22 59:15,20 63:11
  66:15
**advisory**
  43:17
**aerospace**
  62:20
**afford**
  47:3,5
**afraid**
  46:9
**age**
  51:17
**agency**
  56:6
**ago**
  11:3,5 12:18 13:24 16:18
  20:5 27:17 30:8 36:25 43:2
  46:8,13 50:16 59:5 61:22
  61:23 62:16
**ah**
  47:15
**ahead**
  36:19 37:21 42:20 56:23
  57:2
**air**
  46:17

**airbnbs**
  46:2
**airplane**
  10:7,10 63:20 64:13 68:21
  69:3,4,9
**airplanes**
  10:11 47:10 55:5,5,8 68:25
  69:19 70:18
**alcoholic**
  9:7
**alright**
  25:11
**amendment**
  7:15 32:19
**america**
  19:9 21:1 61:24 65:16 66:1
**anniversary**
  18:23 32:1 67:15
**annual**
  18:21
**annually**
  23:15
**annuities**
  29:25 38:17 50:18 51:4,10
**annuity**
  12:9,15,15 30:22 50:20,22
  51:9 52:6
**answer**
  4:19 7:16,22,25 8:6,12,15
  8:16 12:7 16:25 17:10
  25:18 33:7 36:22 40:22
  43:18 45:1,4,18,20 46:13
  47:15 48:14 57:20 63:9,12
  68:15,18
**answered**
  63:17
**answers**
  7:21 12:13
**anxious**
  56:18
**anymore**
  31:3 53:7
**anyway**
  13:11 14:13 27:21 33:5
  37:9 41:9 47:23 51:18 55:9
**apologized**
  44:18
**appear**
  45:6
**appearance**
  4:18
**appearances**
  2:1
**appeared**
  19:22

**airbnbs**

**appreciate**
  48:16 56:19
**argument**
  65:18
**arrangement**
  50:24
**asked**
  10:16,16,18 12:25 13:18
  19:24 30:12 36:13,21,21
  38:4 41:3,5 43:2 47:8 50:6
  50:20 53:16 54:16 57:12
  61:19 64:4 65:21 66:8,12
**asking**
  13:19 14:19 23:6 37:1
  53:19 54:4 62:15 63:9
**assert**
  7:14
**asset**
  44:13
**assets**
  41:4,7 47:10 61:8
**assistant**
  16:3
**association**
  48:2
**assume**
  8:6,7 13:1 52:14 57:25
**assumed**
  16:8 52:13 57:9
**assumes**
  18:20
**assuming**
  62:22
**assurance**
  65:20 66:9
**attitude**
  48:8
**attorney**
  4:16 6:25 7:1 39:5 47:11
**audience**
  44:24
**audio**
  47:6
**authority**
  4:13
**available**
  6:2,14
**average**
  59:17
**aware**
  57:3

**b**

**back**
  28:9,12 32:19,22 34:10
  37:12 45:23 46:3 49:19
  51:15 60:24 61:8 62:13,14

[back - clear]

**back** (cont.)
62:16 64:18 66:16,18
**backed**
13:7 61:4 67:21
**background**
16:16,23 43:19 45:17
**backing**
60:7,12 61:6
**backwards**
17:20
**bad**
13:4 44:21 46:11 47:17
48:21,22 54:13 66:13
**balance**
24:4,5,8 29:16,20 60:18,19
66:17,20
**balances**
23:25
**balloon**
47:3 49:6,9
**ballooned**
59:8
**ballooning**
45:24 49:15,16
**balloonist**
46:18
**balloons**
46:22
**bank**
12:24 20:2,17 22:14 50:3
61:24 64:18
**banking**
13:2
**banks**
20:22
**banners**
47:1
**barbara**
3:9 10:1,2,2 28:17 34:24
**base**
59:16
**based**
11:11 18:21 22:11 23:16
31:16
**basic**
29:21
**basically**
12:20 18:17
**beach**
5:20
**beat**
14:2 39:20 61:12
**beating**
12:13,19 14:3,14 39:19
61:17,17

**behalf**
2:3,14
**believe**
37:8 45:12 51:14
**best**
7:22 27:20 51:15 55:14,15
**better**
12:24 29:11
**big**
17:2 30:6 32:2 44:6 54:3
60:25
**biggest**
44:12
**bit**
8:14 12:7,14 19:16 27:22
38:21 44:4 68:3
**blah**
12:11,11,11 38:25,25,25
39:9,9,9 45:6,6,6 49:4,4,5
65:23,23,23
**bond**
53:9
**bonds**
11:23 53:9
**bought**
31:4 43:24 70:18
**boyce**
71:9
**break**
9:1
**broader**
12:8
**broke**
50:17
**brokerage**
51:4 52:5
**brokerages**
51:2
**brought**
15:20 16:1
**bucket**
11:13,15,16,18,22,24 15:3
22:16 41:10 53:8 59:14,15
60:5
**buckets**
11:14 22:16
**bucks**
41:16
**budget**
26:13
**build**
22:16 59:20
**building**
3:14 40:25 42:22 58:14
61:1,11

**built**
41:13 59:19,19,23,24,25
60:3
**bullet**
41:8 59:11 60:6
**bump**
32:1,1,2
**bunch**
13:7
**burke**
2:6 4:16 35:25 36:2
**business**
13:25 25:18 29:5 39:14
41:19 45:13 50:24 54:3
59:23 62:12 65:6
**button**
15:8 19:17,23
**buy**
26:23 43:5,20 44:1 54:3
63:12 70:19
**buying**
54:2,2 69:19

**c**

**call**
16:17 27:24,24 42:5 53:8
53:18 54:17 59:2 64:14,15
64:16 66:1,2
**called**
5:10 11:13 12:12 13:13
25:23 40:5 41:14 46:22
48:20 59:22
**calling**
40:7,7 66:12,15 68:13
**calls**
68:13
**capital**
3:10,13 23:22 25:3,15 34:3
36:11,22 40:2 44:25
**car**
64:12
**career**
25:22 48:8
**carry**
63:11
**case**
37:3
**cash**
13:5,7,14 20:10 21:14
22:14 43:2,8 62:6 65:8
**casually**
49:21
**caught**
53:25 54:1
**cazier**
3:8 16:10,23 27:6 38:2 68:2

**ceiling**
30:18
**center**
29:22 46:4
**certain**
6:23 42:3 51:17 53:2
**certificate**
71:1 72:1
**certify**
71:9,10 72:3,9
**cetera**
60:8
**change**
25:17 32:21
**changed**
25:15,21,22 26:1,20 29:3
**changes**
43:15
**changing**
25:18 43:17
**charge**
25:23 26:2
**charged**
46:24
**charles**
19:9 31:5 65:14
**chart**
44:7 53:20 65:13
**check**
20:10,12,13,24,25 21:6,10
21:17 26:22 43:10 66:17,20
67:13,15,17
**checking**
44:24 45:13
**cheryl**
2:4 4:4 35:2 44:7 52:8
**chik**
53:13
**christine**
71:9
**chunk**
54:3
**cirrus**
69:4,14
**city**
1:11 2:10 71:7 72:6
**civil**
4:15 56:6
**claim**
33:3
**clarify**
69:25
**clean**
8:11
**clear**
58:13

[click - devices]

**click**
20:1
**clients**
14:11 29:5 38:7 41:21,25
42:4 48:4 53:11
**close**
16:13,14 30:10 36:17
**cocoa**
5:20
**column**
29:24
**comfortable**
20:7
**coming**
15:3 48:3
**comment**
25:13 53:23 54:25 55:13,15
**commission**
1:1,9 2:3,8 4:7,8,9,12 6:13
**commission's**
6:10
**committed**
45:3 49:18 63:25
**companies**
59:25
**company**
61:3
**complete**
9:4 71:11 72:4
**completely**
38:13
**concern**
62:18
**concerning**
6:17
**concluded**
70:24
**conducted**
5:18
**confidence**
3:14 39:17 40:25 42:8,22
58:14,15 61:1,11
**confusing**
22:3 37:6 50:11
**connection**
7:12
**connections**
20:22
**consent**
4:22,25
**consist**
7:20
**consolidate**
41:2
**consolidated**
10:22

**constantly**
43:21,22 61:2
**constitute**
4:14
**constitution**
7:15
**consumer**
59:16,20 60:3
**consumers**
41:13,15
**contact**
50:7,7
**contacted**
47:12 54:7
**contained**
71:12
**contract**
46:21
**conversation**
43:25 48:4 50:18 61:7 62:5
64:25
**conversations**
53:24 60:9 61:2 63:4,16
**copies**
8:23
**copy**
6:10,13
**cordial**
61:19
**corporate**
46:3 53:9
**correct**
13:7 17:10 19:19,21 21:15
23:17 24:1,1,5 28:19 34:5
**correctly**
49:22
**cost**
25:25 38:20
**costs**
38:21 46:7
**counsel**
4:5 6:20,22,25 7:7
**country**
46:23
**couple**
8:24 17:25 43:24 49:8
65:24
**course**
6:2 10:16 17:11 18:1 19:4
29:3 31:14 48:6 49:10
50:25 53:11 58:3,4 67:15
69:11
**court**
8:10,18 56:9
**cousin**
54:18

**cover**
60:13 61:5 63:2,11,12,13
63:13,16,21 64:1 65:7
**covered**
62:16
**covers**
65:9
**crappy**
45:12
**create**
8:10
**creative**
41:19
**crew**
3:10,13 11:23,25 12:4,17
12:21 13:17 14:13 15:4,5
15:15 17:7,7,10 20:9,12,18
21:1,18,20,22 22:10,13,20
23:22,22 29:13 31:13 33:25
34:9 36:11,16,22 38:14
40:1,23 42:4 47:19 49:21
52:19 53:7,16 54:4 55:10
57:4,6,7,9,18 61:21,22
66:17,20
**crewfunds.com**
23:24 66:23
**crew's**
62:23
**crime**
44:21 45:3 56:1,6
**criminal**
4:15 7:10 56:7
**criminals**
32:16
**cross**
44:23 53:20
**crosshairs**
43:16
**currently**
9:12 52:21
**cuts**
47:6

**d**

**dad**
39:15,15 41:1 69:4
**dad's**
69:3,17
**daily**
18:21,22 19:4 31:25 67:14
**damn**
45:1
**date**
1:12 18:23 24:16 31:14,23
32:1 35:18 59:4 67:16 71:6
**day**
18:19 28:1 48:21 50:19

**day (cont.)**
51:8,23 67:20,24 70:5
**daylight**
4:4
**days**
38:18 59:9
**deal**
44:6
**dealings**
20:17
**death**
37:24 38:4 39:20 40:19
41:5 42:22,23,25 49:18
53:19,24 58:23 60:6 68:4,5
69:1,18
**debate**
30:16
**decision**
38:16
**define**
9:16
**depending**
65:8
**depends**
9:16
**deposit**
18:21 22:10 24:4,17
**deposited**
20:15
**deposits**
18:22 22:10 31:19
**described**
26:12 45:22 52:8
**describing**
23:19
**description**
3:6
**designating**
6:1
**designer**
39:22
**detail**
16:2 49:19
**detailed**
17:24 64:23
**details**
17:5 54:12 62:15
**determine**
4:11
**developed**
4:13
**device**
9:20 46:6
**devices**
9:19

**[die - fast]**

die
48:24 60:10 61:3 64:7
died
43:6 48:19,21,23,24 58:17
58:20 68:23 69:4
different
10:21 11:10,14 16:20 30:1
51:2
difficulty
8:19
diligence
13:19,23 14:20
directed
6:12
directing
5:25
direction
72:11
directly
26:9,21 47:24
disadvantaged
46:23
disappeared
62:11
disappears
62:7
disclosing
54:20
discussed
6:23
discussing
17:18,18
discussion
17:15 19:13 61:25 64:21,23
discussions
19:10,16
distributions
15:11,13
district
56:9
diversified
1:24
division
2:7 4:6
document
22:25 23:8 24:10 29:22
33:17,20 34:23 36:25 37:3
37:13 38:1 40:16 41:9 42:7
45:18 46:14 48:18
documentation
61:20
documents
7:11 8:20 14:17 18:13
document's
35:23

doing
13:16,22 22:19 39:18 43:8
47:14 50:14 55:23 60:4
67:22 68:17
dollar
60:19 66:14
dollars
13:11 30:24 32:8,17 65:17
65:17
don't
49:4
door
41:23
download
22:7
draw
11:22 14:21 15:2 30:14
60:17
drawing
15:10 30:3,18
drawn
20:7
dreams
46:17,22
drilling
12:10
drinks
9:7
drive
5:20
dropped
60:2
drug
49:11
due
13:19,22 14:19
duly
5:10
dying
41:17 64:17

**e**

earlier
49:7 61:12 66:19
early
38:18 61:12
earn
30:14
earned
24:20 31:23 34:9
earning
31:18
earnings
32:13
easier
23:8

effect
55:16
egg
41:10,14 59:11,22
either
28:24 52:18 70:16
email
3:8 27:5,7 36:13,21 67:3
emails
17:24 27:9,18
emotional
49:1
employed
9:12,13,14
employee
16:3,8 45:15
employees
52:10
ended
30:25 41:17,25
enforcement
2:7 4:6,13
enjoy
45:25
entitled
1:14
envelope
20:25
erosion
42:24 58:15
errors
63:10,16
ese
37:15
esq
2:4,5,6
estimate
56:17
et
60:7
euell
72:3
everybody
63:3
everyone's
50:1
ex
5:1 20:24,25
exact
21:2 59:4 61:7
exactly
13:6 15:18 45:8 57:11
examination
3:3 5:12 6:2 7:2 70:23
examined
5:11

example
31:18 32:7,18 37:10 60:16
exchange
1:1,9 2:3,8 4:7
excited
30:20
ex'd
21:11
exhibit
22:21,22,24 27:2,5 28:13
31:7,8 33:8,17 34:22 35:5
35:22,25 40:12,16 58:11
exhibits
3:6 8:23
expensive
45:24 55:8 69:9
expert
39:11
explain
42:9,19
explained
12:21 38:24
explaining
23:16
explanations
38:22
extent
7:25
external
44:24
extra
18:25 30:20 32:13

**f**

facilitators
10:9
fact
22:4 44:7
facts
4:13
false
7:11,11
familiar
36:20
families
46:23
family
14:12 47:9
family's
48:25 49:11,13
far
12:19 41:17,23 44:12 45:8
47:19 56:16 60:4
fast
24:13 29:19 34:19 35:9
56:17

**[father - gosh]**

**father**
39:17 55:18,19
**favor**
43:8
**fdic**
41:6 60:13 61:10 62:5,12
**fdic's**
61:6
**feb**
3:9
**february**
27:6 28:16 29:23
**fed**
20:24,25 21:11
**federal**
4:12,15 56:9
**feel**
46:11
**feeling**
58:22
**feels**
48:6
**fees**
26:7,9
**fical**
10:17
**fidelity**
19:9 21:2 22:4 57:10 66:2,6
**fifth**
7:15
**figure**
10:23 50:2 53:12
**fil**
53:13
**file**
1:4 32:19,21 36:3 45:5 56:8
71:5
**financial**
10:18,25 14:4 18:7 26:14
26:16 37:15 39:22,24 41:3
41:12 43:21 48:11 52:1
57:21,22 58:24 59:15,19
60:4
**find**
9:2 36:15 56:7 70:2,11
**fine**
38:11 49:4
**finish**
8:15,16 58:7
**fire**
40:20 45:5,10 47:25 58:23
**fired**
46:12,12 54:9,11,13
**first**
5:10 10:4,6 11:21,22,25
12:12 15:21 22:14 23:13

**first (cont.)**
24:12,17 26:11 28:17 29:5
30:5 39:13,14,19 42:21
53:8 55:17 60:25
**flags**
43:1
**flat**
54:16
**flew**
69:17
**float**
13:5 57:13
**florida**
5:21 28:8 68:24
**flower**
5:20
**flown**
69:11,13,14
**fluctuations**
63:7
**fly**
46:22,23 69:15
**follows**
5:11
**foregoing**
71:10 72:4,10
**forgot**
67:6
**form**
3:11 6:10,13,15,23 7:10
33:21
**formal**
5:25 6:4,6
**format**
29:7 35:10
**forth**
7:9 37:12 60:24
**fortunately**
44:3
**forward**
52:1 56:21 58:23
**found**
30:22 40:23
**four**
11:14,16
**fox**
1:7 2:15 3:4,8,9 5:9,16 9:12
27:6 28:17,18,21 34:24
55:6 56:21 58:14 69:3,24
70:11 71:4
**frankly**
53:6
**fraud**
41:5 60:7,11 62:6 63:25
64:20

**free**
41:21 46:23 47:2
**fresh**
62:4
**friend**
49:2
**friends**
14:10 17:25 41:24,25 42:3
55:14,15
**front**
38:21
**frustrating**
44:17 47:13
**full**
5:14
**fully**
58:10
**fun**
30:21
**fund**
12:9,12,17 13:1,17 14:13
15:4,5,15 17:2,7,8,16,16,17
18:14,20 20:9,18 21:2,12
21:20,22 22:10,13 23:14
25:25 26:12,14 29:13 30:21
31:13 33:25 34:9 38:14
42:5 45:5 49:21,22 53:7,17
54:5 55:14,19 57:4,15 58:2
58:4
**funds**
11:23 12:1,4,17,21 14:14
17:10 19:9,12,20 21:1
21:18 22:20 23:22 24:23
26:11 36:16 47:7,10,19
52:19 55:10 57:6,7,9,18
61:21,23 65:16 66:2,17,20
**fund's**
40:23
**furious**
54:8
**further**
72:9
**future**
30:24

**g**

**gaining**
60:16
**gains**
34:3
**gambit**
56:16
**geared**
45:19
**gears**
68:20

**generation**
41:24
**gentle**
14:1
**genworth**
12:15 30:5 51:3,18 52:2
**getting**
19:3 26:10,20 30:20 36:19
40:7 48:9,10 50:25 65:20
67:5,14
**give**
15:19 25:5 32:1 34:17 38:7
43:17 47:2,14 50:6 51:8
53:22 55:11,12 56:11 64:18
**given**
21:9 38:8
**giving**
39:5 66:9
**go**
6:22 7:19 9:2 12:8 13:1,1
16:1 18:6,8 19:24 22:6
23:20 26:15 28:4 32:18,19
32:22 33:14,15 34:1 36:21
36:24 37:21 42:20 44:25
45:3,21 46:2,3,22,23 47:1
48:16,22 49:8,23 50:5,20
53:5,10,12 54:23,24 55:24
56:23 57:2 59:20 61:8
62:16,23 64:7,13,16,18
66:2,16,18 67:7,9,10,11,13
67:16 68:16 69:24 70:2,3
70:22
**goal**
62:22
**goes**
14:8 30:12 44:2 48:21,22
48:23,25 49:3,21,24 50:22
51:12 54:23,24 57:13 62:25
63:1 64:13 66:1
**going**
6:22 8:10,20 11:15,21,22
13:3 17:11 18:20 22:21
27:1,1 31:6 32:11,19 33:5
33:16 34:18 37:12 43:12
46:18,19,20,22,22 47:24
48:23 49:7,13 50:5 52:1,2
53:12 55:3,21 56:24,25
59:16 60:18 62:3 64:23
70:3,21
**good**
32:24 41:11,11 47:17,21
59:18
**google**
27:25
**gosh**
53:15

**[gotta - investment]**

**gotta**
18:6 20:1
**gotten**
15:13 42:5 50:23
**government**
22:24 27:5 28:13 31:7
40:16 60:7,12 61:6
**grand**
43:24 61:6 67:16
**graph**
31:24
**great**
5:17 7:18 10:4,13
**group**
3:10,13 25:16 26:4 36:11
**grow**
17:19,20 30:19
**grown**
17:14
**growth**
31:24
**guarantee**
60:20
**guaranteed**
29:25 30:2 37:7 38:19,22
51:13,16 62:9 65:1
**guarantees**
41:5 60:7,11
**guess**
35:17 39:14 42:23 55:19
**guessing**
12:2 28:3 34:11
**guide**
16:5
**guidelines**
7:19
**guilty**
48:2
**guy**
10:9 14:1,1 16:11,19 45:15
55:1,24 68:11
**guys**
25:19 32:14 33:1,4 40:20
45:10,21 47:7,11 55:23
58:24 61:14 63:13 66:1
70:4
**guy's**
47:13

**h**

**half**
14:2 23:13 31:1 61:22
**hand**
5:3 18:4
**handle**
45:2 52:5

**handling**
53:21
**hangar**
10:6,8,10,12,15 41:1 63:20
63:22 68:21,21,23
**hangars**
10:7
**hangouts**
27:25
**happen**
44:6 53:2 61:16 64:24 65:2
66:13 68:25
**happened**
16:18 23:6,9 30:8,8 42:23
44:22 50:17 54:13,24
**happening**
63:6
**happens**
47:7 49:23 56:13 60:9,10
61:2,4 62:7 64:5,7,7 65:14
**hard**
8:14,16 15:16,17,17 56:16
**hate**
22:5
**head**
8:13 40:20
**hear**
8:2,3 11:25 49:2
**heard**
8:7 54:19
**hearing**
1:14
**heart**
46:12,12
**held**
72:5
**hell**
51:11 66:3
**help**
15:21,21 16:5 29:4
**helped**
45:17
**helps**
56:20
**hey**
10:9 57:23
**high**
43:20
**hire**
47:11
**hired**
16:3 46:20
**hit**
41:8
**hmmm**
49:1

**hold**
27:22 50:8
**home**
5:22 10:2
**honest**
13:22 16:10 39:2 40:5
41:22 45:9 47:12 63:1 67:7
**honestly**
38:8 45:12 63:18 64:8,11
66:11 67:9
**hopefully**
22:15
**horrible**
48:12 49:2
**hot**
46:17
**hour**
61:22
**huge**
30:23
**huh**
8:14 22:23 42:6
**huhs**
8:13
**humor**
58:8
**hundred**
43:24
**hung**
49:9,19

**i**

**idea**
17:4 37:4 59:18
**identified**
3:6
**idiot**
18:1 39:5,21 55:1
**illegal**
45:3,4
**imagine**
61:14,14
**immediately**
49:10
**implied**
16:2
**important**
8:2,12 48:17
**income**
3:9,12 9:22 14:24 17:10,23
19:5 25:4,7 27:10,16 28:1,4
28:16,23 29:20,21 32:12
33:22 34:3,12 35:1,8 38:20
38:22,25 44:13 51:13,16
53:23 60:5 67:8,22 68:12
**increases**
29:18

**incriminate**
7:16
**index**
3:13 31:14,15 36:11
**indexed**
18:24
**indicated**
72:5
**info**
50:7
**information**
6:11,12,12 20:3,3 24:25
49:17 50:7 54:4 55:22 56:5
56:11
**information's**
55:21
**initial**
22:10,18 24:3,15,17
**initially**
13:9 25:8,23
**insurance**
43:4,5 63:10,13,18,20,21
66:13
**int**
3:11
**intent**
42:8 46:14
**interest**
19:5 24:20 32:10,22 33:21
34:2,8,12,14
**interesting**
26:6
**internal**
44:23
**introduced**
42:1
**inventing**
9:19,19
**inventor**
39:22
**invest**
20:10 38:16 43:12 47:18
57:25 58:5
**invested**
13:14 20:9 37:18 57:18
58:2
**investigation**
4:9,14 7:12 8:22
**investigations**
5:25 56:15
**investigative**
71:13
**investment**
10:14 11:6,15,18 13:20
14:25 15:5 18:11 21:9,22
24:15 29:13 30:11 37:4

[investment - logic]

**investment (cont.)**
38:12 53:6 59:17
**investments**
15:1 22:6,17 39:4 40:6
61:17
**investors**
36:24
**involved**
56:1 57:4
**involvement**
57:5,6,7
**ira**
21:14,19,20
**iras**
21:16
**irks**
44:15
**irs**
32:18
**issue**
17:1
**item**
17:15
**items**
17:11
**it'll**
20:2,3

**j**

**jackson**
12:12 17:2 30:5,6,10,18,25
31:3 37:10,11 38:18 44:11
51:17 60:14,15,16 61:1
**jacob**
15:22 18:9 25:14 38:2
40:19 42:9 51:3,21 52:3
54:14,16 58:21 68:1
**jacob's**
51:10 54:16 55:13
**jail**
55:3
**jake**
16:10,23 17:4,6 19:11,13
25:6,14 27:6,10,16,18
36:21,24,25 38:2,3 40:7,19
42:9 44:10,16,20 45:12
47:24 48:5,20 49:6,15 50:6
50:10,14,18,19 51:4,22
52:19,22 53:8,18 54:6
58:22 59:8 61:8,10 62:5,15
62:18,25 63:18 65:3,3,9
68:10,11,14,15,17
**jakes**
54:25
**jake's**
15:22 17:11 25:12 45:4
51:7,25 53:23 65:16

**jason**
15:23,23,24 17:6 47:24
50:10,15,15,16,17,20,20
51:7,20 52:19
**jemima**
72:3
**job**
46:3,5,21 62:23 70:5
**joke**
64:6,21
**joked**
53:13
**jokingly**
43:15 64:4,25
**joni**
2:5 4:5 58:6 64:10,11 69:22
**judgement**
32:16
**july**
49:15,15 59:6,7,10
**june**
35:14

**k**

**keenair**
69:7
**keep**
33:5 43:17,20 44:8,10 52:2
53:11 62:18
**kennedy**
46:4
**kept**
54:1,4
**keynote**
14:11 41:20
**kids**
55:12 64:18
**kid's**
70:16
**kimber**
15:23,24,24
**kind**
14:9 16:1,13,16,19,22 23:9
33:2 37:4 42:21,23 43:7
48:2 49:21 50:4 56:15
63:19 64:6,25 66:10
**kit**
55:6 69:3
**kitty**
63:2
**knew**
14:11 39:18 45:12,16 48:23
49:20 55:4,18 56:25 68:18
**knock**
41:23
**know**
7:25 8:1 9:2 10:15 11:11,14

**know (cont.)**
12:9,11 13:5 14:8,10,12
15:18 16:14,17,19,24 17:3
17:4,12,24 18:6,19 19:3,5
19:11 20:5,15,21,21,22
25:8,18 26:4,7 27:23 29:3,5
30:13 31:13 32:2,12 35:14
36:8,15,20 38:6,21 39:4,21
40:5,19,22 41:8,25 42:10
43:8,19,20 44:1 45:19,23
48:5,6,8,12 49:13,25 50:1,5
50:17,24 51:1,9,14 53:9,19
53:22 54:1,10,21 55:7,13
55:21 56:4,8,11,15,18
57:13,20 58:2 59:5,9 63:1
63:17,18 67:13,20 68:9,25
69:2,3,5,13 70:11,19
**knowing**
18:2
**knowingly**
7:10,11
**knowledge**
19:8 21:10
**known**
39:1 58:1,4
**knows**
53:14 63:14

**l**

**ladders**
53:10
**lady**
43:5
**lake**
1:11 2:10 4:6 41:20 71:7
72:6
**lane**
25:13,15 26:21 44:17,24
54:7,9
**language**
37:15
**laws**
4:12,15
**layman's**
37:14
**laymen's**
38:24
**lead**
41:23
**leaning**
65:16
**learn**
48:18 63:15
**learned**
54:14
**learning**
45:16

**leave**
4:20
**lee**
1:7 2:15 3:4 5:9,16
**left**
40:8 49:5 62:17,22
**legalese**
18:5 37:15 60:22
**legitimate**
57:25
**letter**
3:7 30:9 44:18 65:21 66:4
**letters**
40:7 60:23 65:24
**liability**
63:22
**license**
26:2 50:19 52:5
**licenses**
26:1,20
**life**
43:4,5 45:25 50:21
**lifestyle**
55:10
**limbo**
45:11
**line**
17:11,15
**link**
67:3
**list**
29:13
**little**
8:14,19 12:7 15:7 19:16
22:3 53:13 54:12 60:1 66:8
**live**
63:23
**llc**
9:21
**load**
27:3 42:15
**loading**
35:3,23
**loans**
39:9
**location**
71:7
**locked**
67:6
**log**
33:13 34:17
**logging**
18:17 19:9
**logic**
57:13 59:13

[logical - nest]

**logical**
43:18
**long**
11:3 13:3 16:17 22:16 43:2
46:13 48:14 50:16 67:20
**longer**
11:17 22:17
**look**
18:23 24:13 29:3,7,12
34:19 36:20 45:1 59:4 67:9
67:19,24
**looked**
22:2 30:10,13 36:15,17
38:9
**looking**
10:7 14:20,22 67:8
**looks**
19:10 23:21 29:12,18 32:9
35:10 36:4 42:10 45:7 48:7
49:21 59:20
**lose**
32:20 62:14
**loss**
32:18
**lost**
32:8
**lot**
12:10 13:5 14:15 16:2
38:23 39:2,17 40:24 41:5
46:7,15 56:18 57:12 59:24
60:24 61:12,25 64:21 68:11
**lots**
41:24
**low**
12:22 43:20
**lump**
18:25 67:16

**m**

**mad**
54:19
**mail**
22:8 34:11
**main**
25:7,11 29:19 67:10,15
**making**
9:17 17:7
**man**
55:13
**manage**
50:19 52:4,4
**management**
63:5
**managers**
13:2 26:17
**mark**
1:7 2:15 3:4,9 5:9,16 27:6

**mark (cont.)**
28:17,18,21 34:24 48:2
50:2 53:25 71:4
**marked**
22:24 33:17 34:22 35:21
40:16
**market**
13:4 29:24 30:1,25 41:12
60:19 63:7 67:17
**marketing**
25:25 26:13 41:16 60:2
**market's**
13:2
**married**
9:23 54:18
**mates**
10:6,12,16 41:1 68:21,23
**matrix**
66:8
**matter**
1:3,14 4:10 6:1 71:3 72:6
**matters**
6:23 71:12
**mature**
22:17
**max**
13:8 19:1
**maxed**
30:11,14
**maximum**
12:23 23:15
**mean**
11:5 14:9 17:9 18:17 22:12
26:9 30:12,12 38:22 39:2
46:17 55:5,14 56:4 57:21
58:10 59:7 60:13 66:3 68:5
69:2
**means**
6:25 37:14 59:8 60:12
**medical**
9:20
**medication**
9:6
**meet**
10:4,11 28:5
**meeting**
28:2 45:9,16 52:13,14
**meetings**
29:21,21
**members**
4:5
**memo**
60:14
**memory**
62:3

**memos**
60:23
**mentioned**
15:16 19:17 41:1 43:14
59:23
**merely**
8:1
**mess**
32:8 51:9
**met**
10:6,15 26:11 35:12 39:13
39:14 40:25 41:1
**middle**
42:2
**million**
13:11 17:13,14 24:8 30:7
30:24 32:8,17 39:3,3 44:12
47:8,8 55:5 60:19 70:15,19
**mind**
62:4
**mine**
49:3
**minimum**
12:23 13:8 23:15
**minus**
19:2
**minute**
27:2 28:2 43:10
**missing**
44:19
**mistake**
17:2 30:6,23 44:12 60:25
**mistress**
55:12 70:17
**mode**
9:22
**model**
13:25 14:9 25:18
**mold**
46:8
**money**
9:17 11:8,11,12,14,15
12:14,16,22 14:21 15:2,2,3
15:4,5,6 17:17 19:23 20:7
20:23 21:9,13,19,20 22:15
26:15,18 30:3,15 32:2,22
39:2,5 40:8,22 44:19 46:7
47:18,22 49:3,23,24 50:2
53:8 54:24 55:4,11 56:1
57:12 60:1,10,17 61:11,13
62:17,22 63:2,5 64:1,5,13
64:18 65:7,9 66:6,9 67:19
70:2,19
**money's**
19:12 44:21 49:4 65:22

**month**
14:4 19:25 20:2 25:8 36:25
**monthly**
28:24 41:4
**months**
11:1 19:14 30:8 44:11
45:23 46:2 49:7 52:9
**morgan**
10:17 47:12,12
**mori**
2:4 4:2,4,22,25 5:3,7,13
35:23 36:1,4,9 58:6 69:22
69:23 70:21
**moric**
2:12
**mother**
55:19
**mountain**
4:3
**mous**
37:13 38:24 60:7,15 61:20
**move**
15:4 40:21 45:10 56:21
58:24
**moved**
28:8 41:2,7 68:24 69:16
**moving**
35:9 58:23
**multiple**
11:10 25:16 43:14
**mutual**
25:24 26:11,12

**n**

**name**
4:4 5:15 9:25 10:21 15:22
16:11 25:12 31:13 44:24
54:15 55:17 62:9 64:9,15
67:1 71:17
**nature**
8:21
**near**
11:15
**need**
4:19 9:1 11:15,17,21 13:15
30:17 39:24 51:13 53:2,6
55:24 60:13 70:7
**needs**
43:8
**negative**
62:19,21
**neither**
43:13
**nephew**
64:14
**nest**
41:10,14 59:11,22

**[net - planes]**

**net**
14:20
**new**
12:9 14:25 15:1 26:4 53:6
57:22 58:24
**news**
47:17,17
**nice**
14:1
**nightmare**
30:7
**nobleza**
72:3
**nobody's**
44:20
**nodding**
8:13
**non**
8:21
**normally**
27:23
**note**
39:14
**notice**
1:15 6:18
**number**
17:12 26:13 53:22 62:18,21
62:22
**numbers**
30:1 51:8

**o**

**oak**
25:12,15 26:21 44:17,24
54:7,9
**oath**
4:23,25 7:20
**obituary**
54:15
**obtain**
7:6
**obvious**
68:17
**obviously**
19:13 50:5 57:16
**occasion**
68:1
**october**
32:20
**offering**
25:19
**office**
4:6 39:15 48:20 52:15
**officers**
4:8 6:1
**offline**
34:11

**ogden**
10:7
**oh**
9:18 14:6 21:25 23:20 24:7
24:11 30:4 31:2 34:21,22
42:16 46:25 47:4,13 50:12
51:6,20 52:7 53:15 54:10
56:23 58:19
**okay**
7:18 8:5 9:9,11,14,23 10:4
10:13,25 11:3,6,18,25
15:14,25 16:21 17:6 19:12
19:15 20:4,13,17,20 21:8
21:18 22:21,22,24 23:13,20
24:2,14,20 25:1,10 26:6,19
27:1,1,4,9,12 28:5,11,16,23
29:1,10 30:4 31:6,6,7,10
33:6,12,16,16,19 34:4,6,13
34:21,21 35:3,5,6,11,16,21
36:5,10 37:2,23 38:1,11
39:6,9 40:4,14,14,15,22
42:12,12,13,21 44:8,10
46:15 48:24 49:3,3,10,12
50:9,23 51:24 52:18,21,24
54:10,12,22 57:9 58:3,12
58:19 59:11 60:6 61:6
62:20 64:3 65:3,11 66:7,16
67:5,12 68:1,8,20,25 69:12
69:18,21 70:3,6,14,21
**omissions**
63:10,16
**once**
14:7,18,24 17:17 22:19
26:3 38:9 42:1 44:5 50:15
50:21 67:9,13,22
**ones**
8:23 37:10 61:9,10
**online**
21:24 22:6
**open**
12:9
**opened**
11:10 12:18
**opening**
5:24 6:9
**opportunity**
6:3,15
**options**
13:13 22:19 43:3
**oracle**
10:3 13:12 43:24 44:3
**order**
5:25 6:4,7 8:11
**organizations**
66:14

**ostler**
2:5 4:5 58:8,9 70:10
**outside**
10:2
**overdose**
49:11
**owned**
69:1,10

**p**

**page**
23:14,21 24:25 25:2 28:18
29:12
**pages**
1:8 18:5
**paid**
18:9 23:14 25:24 26:7,9,16
26:21 32:9,12,22 34:8
41:21 50:22 67:14
**pain**
45:22 46:16
**painful**
46:19
**paper**
22:6
**paperless**
22:3
**paperwork**
21:12 45:6
**parent**
25:15 26:4 61:3
**part**
9:9 17:23 38:17 47:9,21
60:23 64:20
**particular**
38:1
**parties**
8:25
**partners**
14:16
**parts**
51:9
**passed**
35:14 55:18
**passive**
14:24
**password**
67:1,3,6
**pay**
18:18,18 20:10 26:7 30:2,7
32:10,13 34:3,12,14 60:15
62:12 63:24
**paying**
12:24 18:19,21 31:25
**pays**
12:22 60:20

**pdf**
22:7
**penalties**
7:10
**people**
14:3 40:8 46:5 56:18 59:17
63:22 65:22 66:1,12
**percent**
12:23,23,25 13:3,4,8 18:20
18:25,25 19:1,3 23:15,15
25:24 26:3,10,13,16,21,23
30:19 31:15,25 37:6 57:24
57:24 60:16,18 67:17
**percent's**
13:8
**periodic**
21:21
**person**
5:1 16:20 28:5,8 61:5 63:17
**personal**
14:10 20:13 45:22 47:10
55:15 57:7
**personally**
44:17 48:6 57:4 61:15
**persons**
6:11
**perspective**
51:1
**phone**
28:5 42:5
**photograph**
8:22
**pick**
26:13 62:8
**picture**
69:6 70:7
**piece**
53:22
**pilatus**
69:6,7,14,15 70:18
**piles**
61:20
**place**
1:9 22:14 53:10
**placed**
4:22
**places**
12:16
**plan**
3:9,12 14:24 17:10,23 25:4
25:7 27:10 28:1,4,17,23
29:3,21 35:1,8 53:23
**plane**
55:7 69:17,17
**planes**
69:10,14

**[planning - remembered]**

**planning**
15:1,1
**plans**
27:16
**platform**
41:14 60:3
**please**
5:3,14,18 8:1,3
**pocket**
26:17
**point**
9:15 10:13 12:19 17:17
19:13 21:1 37:3 45:14
57:14 59:11 60:6
**points**
48:17
**polite**
61:19
**popped**
43:1
**portion**
7:19
**positive**
22:1 37:25
**possible**
56:19
**postcard**
70:4
**potential**
36:23
**potentially**
48:9
**prepare**
28:19
**prepared**
25:6 28:18,21 72:10
**present**
7:1 16:4,9 17:12 29:11
45:17 68:12
**presentation**
16:5,6 17:3 40:18 46:10
47:24 58:21,25 59:1
**presentations**
14:11 15:19 41:20
**presented**
14:10,14 52:12 57:11,23,24
**presenting**
29:6
**president**
13:12
**pretty**
25:9 48:1 65:15
**price**
31:1
**print**
34:1

**printed**
33:12
**prior**
5:24 6:9 42:22,23,25
**private**
5:25
**pro**
2:15
**probably**
12:12 14:4 26:3 27:12
28:18 35:11 55:2 68:18
**proceeding**
4:9 6:3 72:9
**proceedings**
7:6 71:12
**produced**
8:24,25
**professor**
39:16
**promised**
44:13 49:6 56:2
**proofreader's**
71:1,17
**prop**
69:8
**prosecute**
56:6
**prospectus**
17:24 18:4 36:14,16,22
38:4
**protect**
61:13 63:8
**protected**
61:10 62:6,24,25
**protecting**
41:7
**prove**
61:18,18
**provide**
5:18 7:10 9:3
**provided**
6:10 22:25 31:10 33:18,20
34:23 35:6 36:10 40:17
**providing**
7:10 56:20
**public**
8:21 55:25 56:10
**pull**
23:7 30:3 46:7 52:25 54:5
60:17
**pulled**
10:23 30:21
**purpose**
4:8 23:5 51:13
**purposes**
19:6

**pursuant**
1:15 4:17 6:13
**push**
19:23
**put**
11:8,12,14 13:10,15 18:10
20:2 21:14 22:4 24:8,12,19
28:3 31:19 32:2 40:18 43:4
44:7 52:3 53:7,23 60:21,23
61:1,24,24 66:8
**putting**
12:14 13:16 22:20 47:19
68:17

---

**q**

**quarter**
14:7 25:9
**quarterly**
19:7
**question**
4:20 7:16 8:6,7,15 12:7
33:7 45:2,19,20 46:14
48:14 51:19 68:14
**questions**
6:6,17 7:21,21,22 8:3,13
12:13 16:25 17:1 23:6 33:5
41:5 47:8 50:14 58:6 69:21
**quick**
30:9 46:6,19
**quicker**
68:18
**quickly**
56:19
**quit**
41:16
**quite**
12:14 38:21 44:4 53:6 68:3

---

**r**

**raise**
5:3
**rate**
31:15,25
**rationale**
13:2
**read**
6:15 18:14 37:3,10,11,17
38:9,10 39:6 45:1 65:13
**ready**
20:4 43:9
**real**
9:9 17:1 19:10,12 21:24
24:13 29:19 30:9 34:19
36:17 45:22 46:6,19 58:4
**realized**
55:2

**really**
13:18 14:6 30:6 35:18 37:5
37:14 40:8 41:11 43:19
45:19,25 48:21,22 51:8
54:19 55:1 56:5,11 61:10
**reason**
9:1,3 18:7 22:2 35:24 37:7
67:10,11 68:9
**rebalancing**
43:18
**recall**
17:6 18:13 36:19 52:18
**recalling**
22:1
**receive**
27:9 37:23
**received**
21:21 27:14,15 38:2
**recognize**
23:1 27:7
**recommend**
11:12 51:15
**recommendation**
36:18
**recommended**
41:24
**record**
4:2 5:15,24 6:9 8:1,12,14
9:2 58:14 69:24 70:22
**recorded**
71:12 72:9
**recover**
47:6
**reference**
53:20
**referring**
60:8
**refuse**
7:15
**regarding**
20:18 21:22
**regional**
4:6
**regular**
35:7
**related**
54:17
**relied**
38:13
**remember**
8:17 11:4 13:9 15:17,18
21:6,10 24:11 27:12 28:9
43:2,9 51:18 64:14 66:21
67:2 69:8
**remembered**
57:16

[remind - session]

remind
8:17,18
remotely
5:1,18
repeat
8:4
rephrase
8:4
replacement
46:21
report
51:8
reported
54:1,10
reporter
8:10,18 72:3
reporter's
72:1
reporting
1:24
representations
17:7 38:14 57:19
represented
6:20,24
request
7:5
requested
6:11
required
63:20
requires
63:19
research
9:22
researched
32:17
resident
45:15
resolve
56:19
responding
68:16
rest
19:11 22:17 27:21
retire
11:22 14:21 20:6 46:19,20
retired
9:14,16
retirement
11:16 15:10
retiring
51:16
return
34:2 57:24
revenue
30:24

review
6:3 17:13 25:12 29:20
67:22
reviewed
37:9
reviews
14:4,18 16:24 29:22 41:4,7
68:12
rid
45:20 51:11
ride
49:6
rider
49:9
rides
47:3
right
5:3,19 6:24 9:22 11:20
12:20,24 13:24 14:1,8,23
15:19,21 16:7,12,14,19,21
17:11,20 18:3,10,19 19:6,8
19:11,12,20 20:25 21:3,4
21:13,15 22:5,14,18 24:22
27:2,25 28:25 29:7,20 31:2
31:16,17,22 32:5,15 34:15
34:16 35:14,17 37:16,19
38:11,19 39:8,11,15,23,25
40:20,25 42:5,17 43:1 44:8
44:9,9,10,16,20 45:11,15
45:17 46:1,4,5,9,11 47:5,6
47:16,18,19 48:4,9 50:5,20
51:3 52:7,11,15,16 53:2,4,8
53:12,14 54:13 55:7 57:18
58:1 59:17 60:22 61:9,16
61:19 62:7,20 63:4,14,24
64:14,21,22,24 65:12,24
66:4,14,15 67:9,14 68:4,10
69:8 70:9,12
rights
7:14
risk
12:22 14:15 63:5
riskier
11:16
rocket
39:21
rockets
62:21
romney
1:5 4:10 71:3 72:7
room
10:10
▮▮▮▮
5:20
rotate
42:16

roughly
11:5 12:2 59:4
rsus
13:14
ruined
48:8,9
rules
4:12
run
47:2 56:16
running
33:14

**s**

s&p
18:23,25 19:1,2 23:16
31:15,16
safe
12:11 18:10 37:7
safer
15:5
safest
11:18
safety
13:20
salt
1:11 2:10 4:6 41:19 71:7
72:6
savings
11:11
saw
54:15
saying
23:19 66:5
says
24:3 25:6 27:16,21 28:16
28:18 33:15,21 35:5 39:7
59:11 60:6 66:5
sbic
41:6
scattered
10:21
scheduled
27:24
schwab
12:16 19:9 20:23,24,25
21:17 31:5 57:10 62:7,8,12
63:3 65:5,14,17
scientist
39:21
scrambling
53:11
screen
5:25 8:21 28:14
screenshot
8:22 23:21 24:3 25:4

scroll
24:2
scrolling
23:18 35:18 42:9
se
2:15
sec
3:7 4:16 23:11 33:1 45:6
49:25 50:6
sec.gov
2:12
second
23:13 29:23 34:17
securities
1:1,9 2:3,8 4:7,12
seeing
18:18 28:9
seen
16:13 28:7
select
36:3
self
9:13,14
sell
41:15 43:20,23 44:1 52:3
59:14,17 60:2
selling
30:25 59:15
semi
9:19
send
20:3,24 22:4 28:1 70:4,4
sending
20:23
sense
22:9 38:23 46:15
sent
21:6,10 31:19 44:18 67:1,2
67:3
separate
66:4
september
1:12 4:2 71:6
series
7:20
serious
58:3
serve
51:12
services
1:24
ses
55:4
session
5:17

**[set - supposed]**

**set**
7:9 14:18 15:6 20:2 22:13
45:13 49:22 55:1 66:25
67:3,4

**setting**
17:15

**share**
10:8 36:5 49:20 56:5

**sheet**
36:23

**shocked**
50:4

**short**
12:22 47:18 61:23

**show**
22:21 27:2 29:15,23 31:7
33:16 34:21 35:21 36:23
61:18 65:25

**showed**
5:24 31:5 45:16

**showing**
8:20 17:22 29:23 31:17,24
33:21 40:15 66:22

**shows**
17:14 31:13 34:2 47:9
52:14

**side**
39:14 50:1 58:15,15,17

**sideways**
40:14 42:15

**sign**
38:25

**signed**
12:3

**simple**
48:14

**sincere**
48:1

**single**
69:8

**sister**
54:18

**sit**
67:19

**sitting**
22:14 26:18 48:20 49:17
50:4

**situation**
32:24

**six**
46:13

**size**
36:2

**sl**
1:4 4:10 71:5

**slide**
42:10,21

**slow**
35:18,22

**small**
10:10 36:7

**smaller**
69:13

**smart**
55:1

**smartest**
53:10

**software**
10:3 41:10,11,13,14 59:12
59:16,22

**sold**
31:3 43:23 69:3,5

**solution**
22:18,18

**somebody**
10:8 13:25 25:19 33:1
36:14 43:16 45:21 53:5
54:7,11 57:22

**soon**
48:22

**sorry**
35:3 37:21 38:3 42:18 56:4
56:5 64:8 66:18

**sound**
14:15 43:7

**sounded**
16:11

**sounds**
13:18 16:13 50:9 52:21

**south**
63:3

**space**
46:4

**specific**
58:17

**specifically**
65:4

**speculating**
8:1

**spell**
5:14

**spend**
12:9 37:12 41:16 54:25
55:3 70:15

**spent**
12:12 55:11 60:1 61:15

**spic**
60:12 61:5,9 62:2,5,9 63:2
64:1 65:4,7,9

**sport**
69:17

**sr22**
69:4

**staff**
4:5

**standard**
4:3 29:2

**standpoint**
17:22

**start**
19:25 30:3,17 45:5

**started**
10:21 11:9 15:2,9,9 28:24
39:19 59:25

**starters**
55:6

**starting**
39:13 65:25

**state**
4:15 5:14

**statement**
30:9 66:5,5

**statements**
19:7 21:21,24 22:5 65:20
67:8

**states**
1:1 4:7

**statute**
7:9

**stayed**
42:1

**steal**
60:10 61:4 64:24 65:18

**steals**
61:10 65:9

**stephen**
1:5 4:10 71:3 72:7

**steps**
47:6

**steve**
10:4 12:6 15:19 16:5,9,24
17:2,3,25 19:24 20:5,24
21:6 22:11 24:25 25:3,5,8
25:15,22 26:16,25 27:7,16
27:18 28:8 29:4 30:6,12
35:12 37:11 38:6,7 39:10
40:25 43:25 48:7,19,23,23
50:16,25 51:1,14 53:21
54:3,8,8,9,17 57:3 58:17,19
59:14 60:9 61:3,12 62:1
63:12,25 64:15,23 66:25
67:1 68:11,15,18,21,25
69:10

**steve's**
36:18 37:24 38:4,13 40:19
42:22,23,25 48:4 49:18
52:10 53:18,24 54:15 57:19

**steve's (cont.)**
58:23 68:3,5

**stock**
13:13 22:19 43:23 44:4
52:4 65:8

**stocks**
62:6

**stole**
64:5 65:1,6

**stop**
14:3 63:5

**story**
23:9

**strategy**
11:13,13 41:10 59:14,15
60:5

**structure**
14:19 16:8

**stuff**
11:16,23 14:11 18:5 19:7
23:7 26:2 29:11 38:18,24
39:16 41:6,22,24 43:18,21
44:1,4 45:14 49:2 50:25
54:5,8 57:13 59:24 60:15
60:21 62:3,24 63:15 67:18
67:20

**submission**
21:12

**subpoena**
4:17 6:13

**substantive**
7:18

**sucked**
31:1

**suggest**
22:12

**suicide**
49:11,18

**sum**
19:1 67:16

**summarize**
23:7

**summary**
3:10 31:13 36:23

**summer**
59:6

**summertime**
13:13

**summit**
25:2,14 44:25

**supplemental**
6:11

**supply**
6:11,12

**supposed**
18:7 23:14 39:10

**[sure - understood]**

**sure**
27:16,20 32:6 34:10 48:6,7
53:17 58:10,11 61:15 65:15
67:4 70:14
**surprised**
30:10 41:22
**surprises**
62:20,21
**sw**
1:10 2:9
**swear**
5:4
**swensen**
1:5 10:5,14 12:5,6 15:14
22:11 25:5 26:8 27:7 48:19
**swenson**
3:8 4:10 71:3 72:7
**switching**
68:20
**sworn**
5:10
**system**
15:5 26:22

**t**

**taken**
9:6
**talk**
10:24 19:15 33:4 49:13
50:6 51:7,22 55:24 68:1,6
69:10,19
**talked**
12:5,6 13:21 35:7 44:15
50:14,15,21 54:21 57:10
68:3,11 70:1
**talking**
17:3,6 32:6 33:24 46:4
48:25 49:11,25 50:9,13
51:20 53:9 55:18 63:8
66:19 68:10
**tax**
19:6 32:13,21 34:1 55:24
**taxes**
32:10 34:8,12,14 67:11,18
**teach**
41:19
**teaching**
16:7 39:16
**team**
39:18
**telephone**
40:1,3
**tell**
5:1,4 16:4 27:22 29:6 31:11
32:7 33:22 36:12 37:17
39:6 40:17 56:25 57:3
58:22 60:12 62:1 63:25

**tell (cont.)**
65:3
**telling**
18:6 43:20 51:7 65:22
**tells**
39:5 51:22
**temple**
1:10 2:9
**tend**
7:16
**tens**
66:14
**term**
11:16,17 12:22 13:3 47:18
61:23
**terms**
37:14 38:25
**testified**
5:11
**testimony**
4:17 5:17 6:1,14 7:11,19,20
8:11 9:4,10 23:17 56:20
71:13 72:5
**text**
68:14
**thank**
5:7,17 31:6 69:21 70:3,21
**thanks**
69:22
**theft**
33:2,3 60:7 65:12,12,13
**theoretically**
15:6 21:13
**thing**
12:9,10,20 17:21 25:7,11
29:20 31:17 32:5 33:8
38:19 40:21 43:3,4 45:1
47:13 53:7,16 55:9 57:25
59:24 60:4 61:24 63:22
68:4
**things**
11:23 29:8,9 47:15 49:12
53:2 55:3 56:10,19
**think**
14:16 15:16,21 17:23 21:23
21:23,24 23:2,8 24:10,17
34:22 36:14 37:25 41:13
43:11 48:17 53:10,25 54:23
55:1,16 63:18 65:10 66:23
69:15
**thinking**
41:19 48:10 58:22
**thought**
16:10,18 30:23 52:10 54:11
**thousands**
66:15

**three**
9:20 12:18 13:16 46:7
**thursday**
1:12 71:6
**time**
4:3,4,20 6:8,19 9:2 10:11
10:17 11:11 12:2,8,10,21
15:7 24:4,10,11 27:18 29:4
29:8 30:2 35:11 36:19
39:14 43:17 47:15 50:16
51:16 61:22 64:12 67:15,18
69:1
**timeframes**
56:16
**timeline**
55:23,25 56:13
**times**
18:17 22:4 25:16 37:4,11
**title**
36:11
**titled**
4:10 6:10
**today**
6:14,20 7:2 9:4,7 17:12,19
33:15 44:16 45:9,9 58:2
61:8 62:4,10,25 65:5,25
**today's**
24:4
**told**
10:19 12:4 15:15 17:23
18:11 20:5 21:2 29:9 30:17
30:17 32:25,25 40:24 44:2
44:19 49:9 53:18 54:6,9,14
55:24 62:8,18,25 65:4,5
**tool**
59:18
**tooling**
46:8
**track**
67:23
**trade**
10:20 11:7,9 53:2
**training**
16:6 68:12
**transcript**
8:11 71:11 72:4,5,10
**transcription**
71:11
**trevor**
2:6 4:16 35:23 52:14
**tricked**
48:7
**tried**
41:14
**trigger**
30:3,21 46:8 60:17

**trillion**
66:14
**trillions**
65:17,17
**trouble**
67:5
**true**
21:20 37:25 60:25 71:11
72:4
**trust**
14:3 39:10 64:11
**trusted**
18:3,10
**truth**
5:1,4,4,5
**truthful**
9:4
**truthfully**
7:22
**try**
8:15,16,17 16:4 23:8 49:23
59:17
**trying**
22:5 23:7 29:4 35:9 40:11
40:12 42:9,19 45:19 50:2
51:14 53:11 56:18 61:15
63:15 66:11,12
**turbo**
69:8
**twice**
14:7 25:9
**type**
17:20 25:22 61:24
**typical**
29:2
**typo**
28:22

**u**

**uh**
8:13 22:23 30:13 40:20
42:6 44:2 63:1
**uhs**
8:14
**undersigned**
71:10
**understand**
4:18,19 7:3,5,9,13,14,23
8:2,3,8,14 18:8 37:15 40:1
46:11 47:25 48:1,2 52:9
60:22 63:7
**understanding**
8:19 25:21 26:11 50:13,16
54:2,6 60:14
**understood**
8:7 58:10,13

[unfortunately - zoom]

**unfortunately**
56:3,10
**united**
1:1 4:7
**university**
39:16
**update**
47:14
**updates**
47:11
**use**
19:6
**user**
67:1
**usually**
13:13 28:1,5
**ut**
1:11 2:10
**utah**
10:7 20:18 28:8,12 42:3
45:23 49:7 56:9 59:7 68:24
71:7 72:6

**v**

**vacation**
45:24
**value**
29:24 30:1,25 55:6
**values**
29:25
**verbally**
8:13
**version**
59:21
**versus**
25:15
**vice**
13:12
**view**
21:1 45:14
**violations**
4:11,14 56:8
**voluntarily**
6:12
**voluntary**
4:19

**w**

**wait**
4:3
**walking**
42:8
**want**
19:25 20:6 22:7 24:13 33:4
34:17,19,20 38:10 41:8
42:2 48:16 49:8 51:16,25
52:3 58:11 61:23 62:19

**want (cont.)**
63:22,23 65:21 67:19,19,23
67:24
**wanted**
15:8 30:20 45:25 70:14
**web**
5:1 21:25 66:16,19,21
**webex**
1:15
**website**
15:7 18:14,16 19:7,17
21:22 23:22,24 33:10,11,25
34:4 66:20,24 67:6 68:2
**website's**
33:14
**week**
46:4 53:14
**weeks**
32:21 37:12 46:8,13 49:8
59:5 66:11
**weird**
63:21
**went**
14:7 17:20 23:25 36:15
40:24 49:1 60:24 62:10,12
63:3,3 65:6,14
**weren't**
15:1
**we've**
13:15 20:7 22:24 33:17
34:22 35:7,21
**wife**
13:12 30:20 41:15 46:18
49:10 58:22 64:12
**wife's**
9:25 45:20 70:16
**wish**
4:20
**withdraw**
15:6,8,8 19:23 20:1 49:23
**withdrawal**
19:17
**withdrawing**
19:25
**witness**
1:7 2:14 3:3 4:21,24 5:2,6
5:10 36:7 71:4
**word**
56:24,25
**work**
9:21 10:2 12:10 13:1,6
23:14 41:16 68:17 70:7
**worked**
10:17,25 17:16 18:14 25:3
41:4 51:1

**working**
9:20 46:6 50:10 51:21
53:13 56:17
**works**
10:3 18:20 26:22 60:14
**workshops**
41:18,20
**worry**
49:4 67:23,24
**worth**
14:20 55:5
**wow**
46:25 47:4
**wreck**
64:12
**write**
20:24 43:10
**writing**
21:17 60:21 66:3
**written**
8:10 26:22 65:21
**wrong**
29:6 34:23 42:16 55:2
**wrongdoing**
33:2 56:8
**wrote**
20:12,13 23:3,11 24:4,10
24:11 58:14,19 60:15

**y**

**yeah**
4:4 11:5 12:6 15:16 16:7,15
16:22 17:9 18:12,16 21:5
24:15,16,18 25:7 27:15,19
29:2 30:14 31:12 32:11
33:8,25 35:1,9,10,13,13,14
35:19,25 36:1,4 38:3 39:12
40:1,10,15 42:12,15,16,21
46:17 48:13 49:3,18 50:6
51:20,22 54:18 56:3 57:15
57:21,25 58:8,21 59:7
65:14 66:22 67:18,25 69:11
70:2
**year**
12:13 14:2,2,8 16:14,14
19:3,4 25:9 26:3 30:18,20
31:23 34:8,12,18 41:8
46:20 47:2 50:22 60:1,17
67:22 68:14,23 69:18
**years**
9:20 11:5,24 12:18 13:16
13:23,24 14:5,13,25 15:20
15:20,20 18:2 20:5 27:17
28:8 32:19 38:24 39:2,19
44:5,13 46:3,7 50:21 57:21
59:25 60:9,20 61:12,15,23
62:16

**year's**
31:16
**yesterday**
33:13 48:24

**z**

**zero**
33:15 60:19
**zoom**
16:16 27:24 28:7 59:2



SEC,

Our financial advisor, that we've known for about 20 years, has been managing our investment accounts in anticipation for our upcoming retirement. I have spent 20 years trying to make sure this was done with FDIC and other government agency backing to reduce risk. But unfortunately, this still happened.

Our financial advisor committed suicide about five or six weeks ago. We were told that all our investments were safe, but we recently found out from his partner that at least one fund was created by our financial advisor outside of the normal filings and SEC type paperwork. So, it's something he created on his own, so there's a lot of unknowns, whether the money is in investments, whether it's gone, etc. We just don't know. The financial advisor's name was Steve Swensen, I believe he lived in Layton UT.

I actually knew him fairly well. We shared an airplane hangar for years and we started a couple businesses together. So, this is a huge shock.

His business partner has informed us at this fund has a lot of unknowns - not even sure what bank it's connected to etc. I am told by him that the SEC is investigating, but I have no personal contact with the SEC yet.

The fund is called Crew Capital Group. The web address is crewfunds.com. Here are some screenshots of what our account looks like when you log in.

https://www.crewfunds.com/

The way the fund was supposed to work is it paid a minimum of 5% annually and a maximum of 10% based on the S&P 500. It's supposedly paid you a daily rate assuming 5% annual and then on the anniversary date, if the market did say 8% for the year, you would get an additional lump sum of 3%. The logic being the fund manager owner is banking on long term stock market results being something like 13% so that since it's never paying more than 10% in the long term the fund would still make money for the money manager.

The attraction for the investor is short term management of money without any risk because of the 5%-10% guarantee. So, the fund was to be used for money to be spent in early retirement, where 5% is way better than your checking account interest rate of nearly 0%.

As you can see, we have/had slightly over $1 million in the account.  Of course, there are many other clients that he had that also have money in this fund. I was told by his partner roughly $30 million was in the fund. I don't not know how many clients he had, probably a few hundred.



This was the initial $500K deposit into the account. We have made several deposits since then. Today's balance says $1,045,935.



https://www.crewfunds.com/



Steve Swensen was under several advisor firms and changed several times over the years

Wealth Navigation Advisors

https://wealthnavigation.com/



That is him on the far left in the back row.

Summit Capital



The current group he was with is Oak Lane Advisors



Let me know what questions you have and I will try to provide what I know, which unfortunately is not much more than I laid out here ☹

I believe this is the guy who built the web site.



Jake Cazier is the one who told me who built the website. His name is Bart Hubbard from Objective in SLC.

I just googled him so I think this is the website

https://www.objective.dev/

Thanks

**Government Exhibit**

**21**

**CREW CAPITAL** GROUP

INDEX ACCOUNT

## Fund Overview

### Income and diversification potential

Bank loans, which offer a floating rate of income, may provide a hedge against rising rates. This actively managed portfolio of senior secured floating rate loans is designed to provide attractive risk-adjusted return potential, with a higher quality orientation. The "spread" or difference between the senior secured floating loan rates and the declared minimum rate on the account is used to purchase options on the S&P 500 Index. When returns of the S&P 500 Index are higher than the declared minimum rate on the account, these options are exercised and gains (up to the declared maximum or "cap") are distributed.

## Why Invest In This Fund

### An attractive risk/return profile

Floating rate bank loans, made to below- investment-grade companies, offer higher-return potential credit than investment grade bonds, and tend to have lower volatility than high yield bonds. The fund emphasizes higher-quality loans, which typically have a higher recovery rate and lower risk of default than lower-quality, unsecured debt.

### Minimal interest rate exposure

Because rates on bank loans typically float, or shift to prevailing interest rates, they may provide a hedge in a rising rate environment, as well as an opportunity to enhance returns with increased credit exposure.

### Time-tested management expertise

Crew Capital Group has managed floating rate bank loans portfolios since 1997. Our process, which combines bottom-up security selection, robust credit research and our long-term global outlook, provides an informed framework for positioning the portfolio across the credit cycle.

## Our Expertise

Crew Capital Group uses PIMCO has the active subadvisor on our Index Account. PIMCO has been a pioneer in fixed income investing for four decades. Their time-tested investment process combines our informed, top-down global economic outlook with rigorous bottom-up credit research and risk management, allowing the fund's investment professionals to focus on what they do best: seeking attractive risk-adjusted returns for investors.



YEAR-END RETURNS (%)



US CREDIT RATES



S&P 500 INDEX PRICE

Source: Barrons Statistics / Tullet Prebon

**PRIMARY BENCHMARK**
J.P. Morgan BB/B Leveraged Loan Index

**SHARE CLASS INCEPTION**
04/29/2011

**DIVIDEND FREQUENCY**
Monthly with Daily Accrual

**CUSIP**
W790

**PRIMARY BENCHMARK DESCRIPTION**
The J.P. Morgan BB/B Leveraged Loan Index is a subset of the broader Leveraged Loan Index, and as such follows all of the same inclusion rules, loan selection methodology and the rebalance process, with the sole exception being the tranche rating criteria.

SEC-FoxM-E-0000040

## Floating-Rate Bank Loans

When investing in floating-rate funds, it is important to understand the basics of floating-rate loans. Floating-rate loans are variable-rate loans made by financial institutions to companies. They are also known as syndicated loans or senior bank loans. Borrowers enter into these loans to raise capital for things like recapitalizations, debt refinancing or to make acquisitions. After banks originate the loans, they sell them to hedge funds, collateralized loan obligations (CLO) and mutual funds.

The loans are called "floating-rate" because the interest paid on the loans adjusts periodically, usually every 30 to 90 days, based on changes in widely accepted reference rates, like LIBOR, plus a predetermined credit spread over the reference rate. The size of the credit spread depends on things like the credit quality of the borrower, the value of the collateral backing the loan and the covenants associated with the loan. Floating-rate loans are classified as senior debt and are usually collateralized by specific assets, like the borrower's inventory, receivables or property. The word "senior debt" is especially important here. It means that the loans are typically senior to bondholders, preferred stock holders and common stock holders in the borrower's capital structure.

## Key Qualities of Floating-Rate Funds

**Limited Duration:** A floating-rate fund's net asset value (NAV) should be less sensitive to movements in short-term borrowing rates than other income-producing mutual funds, like long-term bond funds. The maturity of a floating-rate loan is around seven years, but the underlying interest rate on most loans will adjusts every 30-90 days, based on changes in the reference rate. For this reason, the market value of a floating-rate loan will be less sensitive to changes in short-term borrowing rates relative to most fixed-rate investments. This makes floating-rate funds attractive to income investors in periods when the economy is recovering and short-term borrowing rates are expected to rise.

**Diversification and a Niche Market:** Floating-rate funds can offer diversification benefits to income investors. Because floating-rate loans are uniquely structured, they traditionally have low correlations with most major asset classes like stocks, government bonds, high-grade corporate bonds and municipal bonds.



**Year-End Balance** ($100,000 beginning balance)

S&P 500     CCG

Overview

| Year | S&P 500 Index | Balance | CCG Index Account | Balance |
|------|---------------|---------|-------------------|---------|
| 2000 | -9.10% | $90,900 | 5.00% | $105,000 |
| 2001 | -11.89% | $80,092 | 5.00% | $110,250 |
| 2002 | -22.10% | $62,392 | 5.00% | $115,763 |
| 2003 | 28.68% | $80,286 | 10.00% | $127,339 |
| 2004 | 10.88% | $89,021 | 10.00% | $140,073 |
| 2005 | 4.91% | $93,392 | 5.00% | $147,076 |
| 2006 | 15.79% | $108,138 | 10.00% | $161,645 |
| 2007 | 5.49% | $114,075 | 5.49% | $170,520 |
| 2008 | -37.00% | $71,867 | 5.00% | $179,046 |
| 2009 | 26.46% | $90,883 | 10.00% | $196,950 |
| 2010 | 15.06% | $104,570 | 10.00% | $216,645 |
| 2011 | 2.11% | $106,777 | 5.00% | $227,477 |
| 2012 | 16.00% | $123,861 | 10.00% | $250,225 |
| 2013 | 32.39% | $163,980 | 10.00% | $275,248 |
| 2014 | 13.69% | $186,428 | 10.00% | $302,772 |
| 2015 | 1.38% | $189,001 | 5.00% | $317,911 |
| 2016 | 11.96% | $211,606 | 10.00% | $349,702 |
| 2017 | 21.83% | $257,799 | 10.00% | $384,672 |

**PRIMARY BENCHMARK**
J.P. Morgan BB/B Leveraged Loan Index

**SHARE CLASS INCEPTION**
04/29/2011

**DIVIDEND FREQUENCY**
Monthly with Daily Accrual

**CUSIP**
▮▮▮▮W790

**PRIMARY BENCHMARK DESCRIPTION**
The J.P. Morgan BB/B Leveraged Loan Index is a subset of the broader Leveraged Loan Index, and as such follows all of the same inclusion rules, loan selection methodology and the rebalance process, with the sole exception being the tranche rating criteria.

**SEC-FoxM-E-0000041**