# **EXHIBIT B**

R. Jeremy Adamson (12818)
Tucker F. Levis (17793)
**BUCHALTER**
**A Professional Corporation**
60 E. South Temple, Suite 1200
Salt Lake City, UT  84111
(801) 401-8625
jadamson@buchalter.com
tlevis@buchalter.com

*Attorneys for Court-Appointed Receiver Chad Pehrson*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, NORTHERN DIVISION**

| | |
|---|---|
| CHAD PEHRSON, as Receiver,<br><br>Plaintiff,<br><br>vs.<br><br>BANK OF UTAH, a Utah corporation,<br><br>Defendant. | **COMPLAINT**<br><br>**(Ancillary to Case No. 1:22-cv-00135-RJS-DBP – General Order 23-009)**<br><br>Civil No.: _____<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Dustin D. Pead |

Receiver Chad S. Pehrson hereby alleges, avers, and complains of Defendant Bank of Utah ("Bank of Utah") as follows:

**SHORT SUMMARY OF ACTION**

1. Plaintiff Chad Pehrson (the "Receiver") is acting in his capacity as Court-appointed Receiver in Case No. 1:22-cv-00135 pending in this District, over the assets of the Estate of Stephen Romney Swensen, which include the assets of WS Family, IP, LLC, Crew Capital Group, LLC, and Swensen Capital, LLC (collectively, the "Receivership Defendants"). The Receiver brings this case to recover funds transferred from Crew Capital and Swensen to Bank of Utah.

1

2. Bank of Utah received proceeds derived from an illegal Ponzi scheme implemented by Stephen Romney Swensen. The Bank did not provide reasonably equivalent value for what it received, and must return these funds to the Receiver for the benefit of the defrauded investors.

3. The wrongfully received proceeds include administrative fees paid to Bank of Utah, from Swensen, for investors' self-directed IRAs at the Bank of Utah. The Receiver files this action to recover all such proceeds, including any assets or benefits obtained using those funds.

4. In furtherance of the Ponzi scheme, Swensen instructed investors to open and fund self-directed individual retirement accounts ("IRAs") with Bank of Utah. After investors executed a Letter of Authorization, Swensen directed Bank of Utah to transfer the funds to Crew Capital's account with Wells Fargo ("Crew Capital Account"). Bank of Utah would then charge a quarterly administration fee for each Crew Capital investor with an account at Bank of Utah. Instead of charging these fees to the account or investors, Bank of Utah would submit quarterly invoices for all Crew Capital investors directly to Swensen, who would remit payment to Bank of Utah.

5. Bank of Utah received payments from Swensen, which came from investor funds, which amount to at least $811,806.37, from an account controlled by Swensen and Crew Capital.

**PARTIES, JURISDICTION, AND VENUE**

6. On August 8, 2023, the Receiver was appointed by this Court to identify, collect, and preserve the estates of the Receivership Defendants for the benefit of the estate's creditors, including over fifty defrauded investors.

7. The Receiver brings the instant action to recover the amounts and assets transferred to Bank of Utah, which were fraudulently obtained and belong to the Receivership Defendants.

8. Plaintiff has explicitly been granted authority to pursue fraudulent transfer actions.

9. Bank of Utah is a Utah corporation that does business, including providing Personal Trust Services, throughout the State of Utah.

10. This Court has jurisdiction over the subject matter of this action because it is ancillary to the SEC Action and the appointment of the Receiver by this Court.

11. Bank of Utah has sufficient minimum contacts with Utah that personal jurisdiction is appropriate in this Court. Personal jurisdiction is also proper pursuant to 28 U.S.C. §§ 754, 1692.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 754 and 28 U.S.C. § 1391(b).

## THE RECEIVER, STANDING, AND STATUS OF SEC ACTION

13. On October 14, 2022, the Securities and Exchange Commission ("SEC") filed a complaint against the Receivership Defendants in the United States District Court for the District of Utah, Case No. 1:22-cv-00135-RJS-DBP (the "SEC Action"). [1]

14. The SEC Action alleged that the Receivership Defendants fraudulently solicited over $29 million from investors, whom they tricked into investing in Crew Capital OPS, LLC ("Crew Capital"), which was allegedly co-managed by a reputable firm and purported to guarantee investors a minimum annual return.

15. The SEC alleged that the Receivership Defendants did not invest in any securities. Instead, they misappropriated essentially all investor funds to make Ponzi scheme payments to other investors and to pay for Swensen's personal expenses, such as real estate, vehicles and multiple private aircrafts, and living expenses for him and his family.

16. Due to the Ponzi scheme, Bank of Utah received, either directly or indirectly, approximately $811,806.37 from the Receivership Defendants. The transfers to Bank of Utah

---

[1] *See* Exhibit A.

furthered the fraudulent investment scheme without any legally recognized value for the transferred money.

17. On August 8, 2023, the Court entered an Order Appointing Receiver and Staying Litigation (the "Appointing Order"), appointing Mr. Pehrson as permanent Receiver.[2]

18. Pursuant to the Appointing Order, the Receiver is authorized to take immediate possession of all personal property of the Receivership Defendants, wherever located.[3]

19. The Receiver is further authorized to take immediate possession of all real property of the Receivership Defendants, wherever located.

20. The Receiver is further authorized to initiate suit to recover all property of the Receivership Defendants in the possession of third parties.

21. Since the entry of the Appointing Order, preliminary injunctions have been entered as to all the Receivership Defendants.

## THE FRAUDULENT PONZI SCHEME

22. Stephen Romney Swensen ("Swensen") was a registered representative of broker-dealers Summit Brokerage Services, Inc. (March 2010 to June 2014), Allegis Investment Services, LLC (July 2014 to May 2018), and J.W. Cole Advisors, Inc. (May 2018 to June 2018), and Wealth Navigation Advisors (June 2018 to June 2022).

23. In the course of the Ponzi Scheme, the Receivership Defendants made material misrepresentations and omissions, misappropriated investments and other funds, and committed fraud as a commodity pool operator.

---

[2] *See* Exhibit B.
[3] *See* Exhibit B.

4

24. The Receivership Defendants' purpose was to enable funding for Swensen and his family, from which Bank of Utah benefitted.

25. From at least July 2011, Swensen began offering and selling investments in Crew Capital Group, LLC. Swensen approached his customers and clients during meetings, during which he provided advice on their investment portfolios and retirement plans. He suggested that they include Crew Capital in their investment and retirement strategies.

26. Swensen informed investors that Crew Capital was a safe investment fund offering guaranteed minimum annual returns of 5%. He claimed that Crew Capital could provide their retirement income and described it as a safe option for their portfolios.

27. Swensen also told some investors that they would invest in a fund at the Bank of Utah, promising the same guaranteed minimum returns of 5% to 10%. He assured them that this Bank of Utah fund was also a safe option for their portfolios. However, there was no such fund at the Bank of Utah. After investors deposited their money at the Bank of Utah, Swensen promptly transferred these funds to Crew Capital's account at Wells Fargo Bank.

28. Swensen also provided some investors with written documentation about the fictitious Crew Capital investment, falsely portraying Crew Capital as an "actively managed portfolio" investing in senior secured floating rate loans and options on the S&P index. Some documents falsely claimed that Pacific Investment Management Company, LLC ("PIMCO") was the subadvisor to Crew Capital and that Crew Capital had been established in 1997. Other documents incorrectly stated that Crew Capital's "share class inception" date was April 29, 2011.

29. Swensen gave certain investors falsified PIMCO documents to create the impression that PIMCO and Crew Capital jointly managed a "Senior Floating Rate Fund." One

document claimed to be an annual report of the "Crew Capital Group / PIMCO Funds," stating that a collaborative fund existed with total assets of $318,897,000. However, PIMCO had no association whatsoever with Swensen or Crew Capital.

30. Swensen created a website for Crew Capital with the help of a web developer and a graphic designer. Initially named Capital Cooperative, the website was found at www.capitalcoop.com. Later, when it became Crew Capital in 2015, the website changed to www.crewfunds.com. These sites claimed that Crew Capital could remove market risk, stating: "Do you want to eliminate market turbulence? Talk to your financial advisor about how." Swensen gave investors login details for these sites, where they could see their account balances, including fake returns. The accounts supposedly showed daily growth of the guaranteed 5% yearly returns, with an extra lump sum payment of up to another 5% annual return on the anniversary of their investment. However, these statements and claims were fabricated.

31. Swensen managed a bank account at Wells Fargo Bank under the name of Crew Capital. He had exclusive control over the account and used it to pool investor funds from Crew Capital.

32. Swensen acquired investor funds by instructing investors at different times to write personal checks to Crew Capital, obtaining cashier's checks payable to Crew Capital, wiring funds directly to Crew Capital's accounts at Wells Fargo Bank, and/or signing documents authorizing the transfer of funds into Crew Capital's account from their other investment or retirement accounts.

33. Swensen also directed several investors to open self-directed IRA accounts at the Bank of Utah. He then had these investors sign a "Letter of Authorization," granting him the

authority to manage the funds in their self-directed Bank of Utah IRA accounts. After the investors deposited money into their new Bank of Utah accounts or transferred money from other investment or retirement accounts, Swensen instructed the Bank of Utah to wire the funds to Crew Capital's account at Wells Fargo Bank.

## AMOUNTS RECEIVED BY BANK OF UTAH

34. As a financial advisor, Swensen had a longstanding relationship with Bank of Utah, including with the employees and representatives of the Personal Trust Department, since at least 2011.

35. Through its Personal Trust Department, Bank of Utah offers self-directed individual retirement accounts ("IRAs") that allow customers to invest in "an almost unlimited array of possibilities."

36. An IRA account, including self-directed IRAs, must be held by a regulated financial institution (*e.g.*, bank, qualified brokerage firm, insurance company) in a custodial capacity for the benefit of the account holder.

37. A self-directed IRA permits the account holder to invest in assets other than savings accounts, brokerage accounts, or annuities that are offered by the custodial financial institution.

38. In furtherance of the Ponzi scheme, Swensen would meet with his clients to open IRA accounts at Bank of Utah.

39. At Swensen's direction, several investors in the Ponzi scheme opened self-directed IRAs with Bank of Utah. After the investor executed a Letter of Authorization, Swensen would direct Bank of Utah to transfer the funds to Crew Capital's account at Wells Fargo ("Crew Capital Account").

40. Bank of Utah charges a quarterly custodial account fee for administering self-directed IRAs. The fees are ordinarily charged directly to the individual customers through their bank accounts.

41. Leveraging his longstanding relationship, Swensen agreed to pay the Bank's custodial account fees that were charged to investors in the Ponzi scheme with self-directed IRAs with Bank of Utah.

42. Under the arrangement with Swensen, Bank of Utah issued quarterly statements to Swensen that identified each Crew Capital investor's custodial account fee. Swensen would then make a single, lump sum payment from his Crew Capital Account to Bank of Utah for all of the custodial account fees.[4] This arrangement was highly irregular, as custodial IRA fees are typically charged directly to each account holder.

43. Swensen, acting through Crew Capital and with control over the Receivership Defendants' accounts, directed payments to Bank of Utah totaling at least $811,806.37. Based on available records, the specific payments to Bank of Utah are identified as follows:

    a. On November 16, 2011 $500,000.00.

    b. On May 1, 2018 $13,662.50.

    c. On August 6, 2018 $16,412.50.

    d. On November 8, 2018 $16,412.50.

    e. On February 8, 2019 $16,412.50.

    f. On May 8, 2019 $16,162.50.

---

[4] Examples of the invoices remitted by Bank of Utah to Swensen for the IRA Administration Quarterly Fees are attached as Exhibit C.

8

BN 89435252v1

    g. On August 6, 2019 $16,162.50.

    h. On November 6, 2019 $17,045.82.

    i. On February 19, 2020 $10,000.00.

    j. On March 25, 2020 $7,233.00.

    k. On June 1, 2020 $25,609.19.

    l. On August 24, 2020 $22,240.80.

    m. On September 11, 2020 $123.54.

    n. On November 9, 2020 $22,091.75.

    o. On February 10, 2020 $22,725.27.

    p. On February 11, 2021 $180.00.

    q. On May 20, 2021 $22,682.300.

    r. On August 20, 2021 $22,683.00.

    s. On March 25, 2022 $22,683.00.

44. Upon information and belief, the Receivership Defendants transferred funds to Bank of Utah with improper intent, including intent to hinder, delay, or defraud the rightful owners of the funds. At the time of each transfer, or as a result thereof, the Receivership Defendants were insolvent or became insolvent, or were engaged in business for which their remaining assets were unreasonably small in relation to their obligations.

45. Bank of Utah ultimately received the benefit of no less than the $811,806.37 payments received from the Receivership Defendant's Crew Capital Wells Fargo account.

9

## FIRST CLAIM FOR RELIEF
### (Avoidance of Fraudulent Transfers)

46. The Receiver hereby incorporates the foregoing paragraphs of this Complaint herein by this reference.

47. The Receivership Defendants operated Crew Capital as a Ponzi scheme.

48. The Receivership Defendants paid Bank of Utah at least $811,806.37 from an account controlled by Swensen and Crew Capital. At the time of these transfers, the Receivership Defendants were insolvent or became insolvent as a result of the transfers, or were engaged in business for which their remaining assets were unreasonably small in relation to their obligations. Bank of Utah did not provide reasonably equivalent value in exchange for the funds received.

49. Because the Receivership Defendants operated a Ponzi scheme, as a matter of law, the transfers to Bank of Utah were made with the intent to hinder, delay, or defraud creditors.

50. Bank of Utah knew or should have known, based on its longstanding relationship with Swensen and the highly irregular payment arrangement, that the transfers were not made in the ordinary course and were likely made in furtherance of fraudulent conduct.

51. Pursuant to Utah's Uniform Voidable Transactions Act, specifically Utah Code Ann. § 25-6-5 (actual fraud) and § 25-6-6 (constructive fraud), the Receiver may avoid and recover the transfers made to Bank of Utah.

52. Bank of Utah did not provide reasonably equivalent value to any Receivership Defendants for the amounts the Receiver seeks to avoid.

53. Pursuant to Utah's Uniform Voidable Transactions Act, including Utah Code Ann. § 25-6-5 (actual fraud) and § 25-6-6 (constructive fraud), the Receiver may avoid and recover the transfers made to Defendant.

## SECOND CLAIM FOR RELIEF
### (Unjust Enrichment)

54. The Receiver hereby incorporates the foregoing paragraphs of this Complaint herein by this reference.

55. The transfers to Bank of Utah were comprised of property of the Receivership Defendants and were made by the Receivership Defendants in furtherance of the fraud scheme.

56. The transfers to Bank of Utah conferred a benefit on Defendant.

57. Bank of Utah knowingly accepted the benefits conferred by the Receivership Defendants.

58. Allowing Bank of Utah to retain the transfers at issue in this lawsuit would unjustly enrich them and be inequitable.

59. Bank of Utah did not provide reasonably equivalent value to the Receivership Defendants in exchange for the transfers, which were made using funds obtained from defrauded investors. Allowing Bank of Utah to retain these funds would unjustly enrich it at the expense of the victims of the Ponzi scheme, who are the rightful owners of the funds.

60. Absent the return of the transfers, the Receivership Estate would be damaged by Defendant's unjust enrichment and may have no adequate remedy at law.

61. Bank of Utah must disgorge the amount of the transfer.

## PRAYER FOR RELIEF

WHEREFORE, the Receiver requests judgment against Defendant as follows:1. recovering the amount of $811,806.37 in transfers; 2. Awarding prejudgment interest, costs, and reasonable attorney's fees as allowed by law; 3. Granting such other and further relief as the Court deems just and proper.

BN 89435252v1

.

DATED: May __, 2025

        **BUCHALTER, A Professional Corporation**

        _____

        R. Jeremy Adamson
        *Attorney for Receiver*