R. Jeremy Adamson (Utah SBN 12818)
Tucker F. Levis (Utah SBN 17793)
**BUCHALTER LLP**
60 E. South Temple Street, Suite 1200
Salt Lake City, UT 84111
Telephone: (801) 401-8625
jadamson@buchalter.com
tlevis@buchalter.com

*Attorneys for Receiver,*
*Chad S. Pehrson*

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> THE ESTATE OF STEPHEN ROMNEY SWENSEN, and CREW CAPITAL GROUP, LLC, a Nevada limited liability company, <br><br> Defendants. <br><br> WENDY SWENSEN, an individual, SARIA C. RODRIGUEZ, an individual, WS FAMILY IP, LLC, a Utah limited liability company, WINGMAN, LLC, a Utah limited liability company, and SWENSEN CAPITAL, LLC, a Utah limited liability company, <br><br> Relief Defendants. | **MOTION TO APPROVE PROPOSED DISTRIBUTION METHOD AND FIRST INTERIM DISTRIBUTION** <br><br> Case No.: 1:22-cv-00135-RJS-DBP <br><br> Judge: Robert J. Shelby <br><br> Magistrate Judge: Dustin B. Pead |

Receiver Chad S. Pehrson, the appointed receiver in this matter ("Receiver"), respectfully

requests that the Court authorize an initial distribution of recovered funds to investors harmed by

the underlying Ponzi scheme in this case. The Receiver anticipates some further recovery of funds,

but much of the Receivership Estate appears to have been collected and is of sufficient size for a

distribution to be made. As described below, the Receiver proposes that the Court authorize a first interim distribution to be made under the "net investment" method.

## I.    FACTUAL BACKGROUND

This case concerns a multi-year fraudulent securities offering perpetrated by the late Stephen Romney Swensen ("Swensen"), who defrauded dozens of investors of at least $29.3 million. Since at least July 2011 until his death in June 2022, Swensen made false statements to investors to induce them to invest in Crew Capital Group, LLC ("Crew Capital"), a limited liability company that Swensen created and operated. Among other things, Swensen represented to investors that Crew Capital was a safe investment fund paying a guaranteed minimum of 5% annually. But his representations were false. In fact, Crew Capital invested no money in securities. Rather, Swensen pooled investor funds in a Wells Fargo Bank Account that he controlled. In Ponzi-like fashion, Swensen used a portion of the funds to issue payments for fictitious earnings to certain investors. But he used the bulk of the funds for personal expenses. He also diverted funds to other businesses that Swensen owned or controlled.

As a result of this fraudulent scheme, the Securities and Exchange Commission ("Commission") filed this action against the Estate of Stephen Romney Swensen ("Estate of Swensen"). (Dkt. 2: Complaint.) On August 8, 2023, the Court entered an order appointing Chad Pehrson as Receiver and authorizing him to identify, collect, and preserve the assets of the Receivership Estate for the benefit of the Estate's creditors, including the defrauded investors.

Since the Receiver's appointment, the Receiver and his team have been diligently working to complete the various tasks assigned by the Court. The Receiver has identified assets and potential assets of the Receivership Estate, contacted dozens of investors to obtain additional records and information relating to the assets of the Receivership Estate, evaluated litigation

potentially affecting the Receivership Estate, entered a settlement agreement to recover transfers made to a third-party, and filed ancillary lawsuits to recover fraudulent transfers and return those funds to the Receivership Estate. Through these processes, the Receiver is working to recover additional funds through either formal litigation or settlement negotiations with third parties and their counsel.

The Receiver has reviewed the records from the Receivership Defendants to identify the known and potential investors, who were victims of the Receivership Defendants' scheme. The Receiver also established a website (https://www.swensencrewcapitalreceivership.com/), which contained an online questionnaire for investors with the Receivership Defendants to provide name, contact information, amounts invested and returned, and additional information bearing on their potential claims. As part of a detailed analysis, the Receiver then compiled those responses and compared them with the Receivership Defendants' records. The Receiver contacted known and potential investors to further refine the net winner and net loser determinations, for the purpose of identifying potential additional sources of receivership funds and identifying potential claimants. Many did not respond. For those that did, the Receiver identified discrepancies in the amounts contributed and distributed after receiving additional records and extensive communications with investors.

The work above has been challenging because some investor records and claims were not reconcilable.  Further, some investors lacked supporting documentation due to aged or inherited accounts, or an absence of records showing the original investment. Earlier this summer, the Receiver sent final letters to investors stating his calculation of contributions, withdrawals, and the net investment gain or loss. The letter made a final request for documentation and a response, if the investor disagreed with the Receiver's assessment. Some responses were received, and the

Receiver's analysis was updated. To date, the Receiver's accountant has attempted to verify the value of claims submitted by investors. To do so, the accountant has considered a number of available sources of information, including but not limited to:

- Bank records from accounts belonging to the Receivership Defendants;

- Questionnaires submitted by investors on the Receiver's website;

- Bank records provided to the Receiver by investors, including by submission pursuant to the online questionnaire on the Receiver's website; and

- Documents provided to the Receiver from third-parties, including external forensic accounting analyses and investor records received from banks with third-party consent forms.

Based on extensive efforts and investigation, the Receiver has a firm understanding of the potential claims to be asserted against the Receivership Estate, and now proposes the following Distribution Plan and Claim Procedures, to begin the equitable return of assets to harmed investors. A copy of the proposed Distribution Plan ("Plan") is attached as Exhibit A.

## II.    FUNDS AVAILABLE FOR DISTRIBUTION

As of this Motion, the Receivership Estate contains approximately $6,686,325 for potential distribution to investors. The Receiver proposes that the Court authorize an initial distribution of $4,750,000. Such distribution will provide injured claimants with the bulk of the funds already recovered. It should also leave sufficient funds to cover any further expenses that the Receiver will incur in resolving this matter, including the pursuit of claims against third-parties believed to have received fraudulent transfers from the Receivership Estate. Further, retaining some funds in the Receiver's account will not prejudice the Receivership Estate because a subsequent distribution will be required in any event to distribute the outstanding funds that the Receiver continues to

4

pursue.

The Receiver's investigation currently indicates a gross investment loss under the Ponzi scheme of approximately $24,708,264.25.[1] The current proposed distribution of $4,750,000.00 represents a 19.22% return on lost funds. That percentage will likely improve after a second distribution in which the Receiver can distribute any remaining funds in the Receivership Estate and any additionally collected funds.

### III.   PROPOSED DISTRIBUTION METHOD – NET INVESTMENT METHOD

The focus of a receivership is to safeguard assets and "assist the district court in achieving a final, equitable distribution of the assets." *S.E.C. v. Vescor Capital Corp.*, 599 F.3d 1189, 1194 (10th Cir. 2010). The Court has "broad powers and wide discretion to determine relief" in a receivership. *Id.*; *see also Commodity Futures Trading Comm'n v. Rust Rare Coin, Inc.*, No. 2:18-cv-00892, 2020 WL 4904165, at *1 (D. Utah Aug. 20, 2020) (unpublished). Any plan may be approved provided it is "fair and reasonable." *Rust Rare Coin, Inc.*, No. 2:18-cv-00892, 2020 WL 4904165, at *1 (D. Utah Aug. 20, 2020) (quoting *S.E.C. v. Byers*, 637 F.Supp.2d 166, 174 (S.D.N.Y. 2009)); *S.E.C. v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991). In general, courts favor the pro rata distribution of assets "where funds of defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders." *S.E.C. v. Merrill Scott & Assocs., Ltd.*, No. 2:02-cv-39, 2007 WL 26981, at *2 (D. Utah Jan. 3, 2007) (unpublished) (quoting *S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88–89 (2d Cir. 2002)). Pro rata distribution is especially appropriate for fraud victims of a Ponzi scheme. *Credit Bancorp*, 290 F.3d at 89 (collecting cases).

---

[1] The Receiver suspects that the actual gross investment loss may be larger, but he has only been able to verify this amount given the failure of a number of investors to respond to his multiple attempts to obtain information about their potential losses.

There are two primary methods to distribute receivership funds: the "net investment" method and the "rising tide" method. Under the "net investment" or "net loss" method, the receiver calculates each investor's net investment in the scheme by subtracting the investor's distributions or withdrawals from their total investment. Investors who received more than what they invested will not receive distributions from the Receiver. The remaining investors, *i.e.*, net losers, will share pro rata in available funds in proportion to their net loss relative to the total net losses of all claimants. To do so, the investor's net investment is then compared against the total amount of all net investments to determine the investors' percentage of all net investment. That percentage is then multiplied against the amount recovered by the Receiver to determine what portion of the Receiver's funds should be paid to the investor.

The following illustration assumes there are only five investors:

| Investor | Total Investment | Total Withdrawals | Net Investment | Percentage Return | Distribution (Dollars) |
|---|---|---|---|---|---|
| A | $200,000 | $50,000 | $150,000 | 15% | $52,500 |
| B | $500,000 | $100,000 | $400,000 | 40% | $140,000 |
| C | $300,000 | $250,000 | $50,000 | 5% | $17,500 |
| D | $700,000 | $300,000 | $400,000 | 40% | $140,000 |
| E | $250,000 | $275,000 | ($25,000) | N/A | |
| Totals | $1,950,000 | $975,000 | $1,000,000 | 100% | $350,000 |

Under this scenario, Investor E is a net winner because they withdrew more than they invested, and therefore they are not entitled to a distributions. The total net losses of all net losers equal $1,000,000. Each net loser's pro rata share is calculated by comparing their individual net investment loss against the total losses of all net losers. Each net loser then receives a pro rata share of the Receiver's assets available for distribution. In this example, the receiver has $350,000. Thus, Investor A would receive $52,500, Investor B would receive $140,000, Investor C would receive $17,500, and Investor D would receive $140,000.

In contrast, the rising tide method attempts to equalize the total recovery across all investors by considering investors' withdrawals as distributions from the receivership estate. *S.E.C. v. Huber*, 702 F.3d 903, 905 (7th Cir. 2012). Receivership assets are first distributed to bring all net loser investors up to the same level. *Id.* Then, after all net losers are brought to the same level, *i.e.*, suffered the same percentage loss, the receiver issues pro rata distributions. *Id.* The rising tide method is used most frequently in apportioning receivership assets. *Id.* at 906 (collecting cases). However, the rising tide method has been rejected where a large number of net loser investors would receive little or nothing from the receiver. *Id.* at 907 (citing *S.E.C. v. Byers*, 637 F.Supp.2d 166, 185 (S.D.N.Y 2009); *CFTC v. Barki, LLC*, No. 3:09-cv-106-mu, 2009 WL 3839389, at *2 (W.D.N.C. Nov. 12, 2009) (unpublished)).

The net investment method is commonly used in apportioning receivership assets for Ponzi scheme cases, particularly where funds were commingled and all investors had a similar relationship to the wrongdoer. *Commodity Futures Trading Commission v. Walsh,* 712 F.3d 735, 749 (2d Cir. 2013), (citing *S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88–89 (2d Cir. 2002)); *see also S.E.C. v. Infinity Group Co.*, 226 F. App'x. 217, 2018 (3d Cir. 2007); *CFTC v. Topworth, Intern., Ltd.*, 205 F.3d 1107, 1116 (9th Cir. 1999); *S.E.C. v. Illarramendi*, No. 2:11-cv-078, 2013 WL 6385036, at *3 (D. Conn. Dec. 6, 2013) (unpublished).  The method is simple, clear, and based on objective criteria, which minimizes legal disputes and administrative complexity. This is particularly important, here, where assets were commingled, and tracing contributions to the scheme is challenging due to the lack of reconcilable records. For example, in the Receiver's investigation, several individuals identified as substantial "net winners" with potential recoverable assets, were later determined to be net losers after receiving additional records. The net investment method provides equal, proportionate returns for all defrauded victims, and ensures that lost

7

principal is returned to all defrauded investors. In this way, the net investment method aligns directly with investors' actual losses and ensures that recovery is based on how much each investor remains out-of-pocket. Finally, the net investment method also reduces administrative costs and expedites the process of evaluating claims and issuing distributions, which will also conserve receivership assets for distribution to victims. The Receiver believes that this Plan is in the best interest of the Receivership Estate, provides the most equitable distribution to Claimants, and complies with applicable law.

Based on his investigation, the Receiver does not believe the rising tide method would be appropriate here. Because of the longstanding and relatively personal nature of this fraud, it is unknown why some investors received more returns than others, including whether personal relationships may have impacted how much certain investors received. The rising tide method would unfairly penalize investors who withdrew in the ordinary course and would not reflect the economic reality of the fraud. Moreover, the Receiver has identified approximately 79 investors with claims. Of those, slightly more than half are identified as net losers. If the Receiver were to follow the rising tide method, the distribution funds would largely go to a select few net losers while bringing everyone up to the same level of recovery. Most investors would receive very little in funds, and there would be little remaining for pro rata distributions. Preliminary calculations show that under the rising tide method, only 28 of the investors would receive a portion of the $4,750,000 distribution, ten of which would receive over 80% of the expected distribution.

The Receiver believes the net investment method is the more appropriate method to follow in this case as it ensures lost principal is returned quickly and efficiently to a wider net of victims.

IV.    **NOTICE AND DISTRIBUTION PROCEDURES**

Following submission, the Receiver will provide a copy of this Motion to all investors via

8

first class mail, email, and by posting this to the Receiver's website. The Receiver proposes allowing potential investors and claimants thirty days to respond or comment on the proposed distribution method. After claimants have had an opportunity to comment, and the Court has ruled on the proposed distribution method, the Receiver will begin making distributions to any claimants who qualify under the distribution method.

## V.     CONCLUSION

For the foregoing reasons, the Receiver respectfully requests that the Court authorize him to distribute $4,750,000.00 from the Receivership Estate to qualifying investors under the net investment distribution method.

DATED January 21, 2026.

**BUCHALTER LLP**

*/s/R. Jeremy Adamson*
R. JEREMY ADAMSON
TUCKER F. LEVIS

*Attorneys for Receiver, Chad S. Pehrson*

9